# EXHIBIT A

## Part 1 of 2

United States v. Kuhl, No. 25-2065 (6th Cir.)

LexisNexis printouts of the authorities cited in the Opening Brief, in order of first appearance, with substituted authorities following the citations they replace. Highlighting identifies the language supporting each cited proposition.

*Part 1 contains Indiana v. Edwards through United States v. Ganias. Part 2 begins with Franks v. Delaware.*

# Indiana v. Edwards

554 U.S. 164 (2008)

Cited in Opening Brief at: vi, 25, 30, 31

The standard of review citation is addressed in Response, Part III.B. Highlighted language appears at 554 U.S. at 174 and 177–78.

Caution
As of: September 14, 2026 12:10 PM Z

# Indiana v. Edwards

Supreme Court of the United States

March 26, 2008, Argued; June 19, 2008, Decided

No. 07-208

**Reporter**

554 U.S. 164 *; 128 S. Ct. 2379 **; 171 L. Ed. 2d 345 ***; 2008 U.S. LEXIS 5031 ****; 76 U.S.L.W. 4512; 21 Fla. L. Weekly Fed. S 380

INDIANA, Petitioner v. AHMAD EDWARDS

**Notice:** The LEXIS pagination of this document is subject to change pending release of the final published version.

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE SUPREME COURT OF INDIANA.

Edwards v. State, 866 N.E.2d 252, 2007 Ind. LEXIS 349 (Ind., 2007)

**Disposition:** Vacated and remanded.

## Syllabus

After Indiana charged respondent Edwards with attempted murder and other crimes for a shooting during his attempt to steal a pair of shoes, his [***349] mental condition became the subject of three competency proceedings and two self-representation requests, mostly before the same trial judge. Referring to the lengthy record of psychiatric reports, the trial court noted that Edwards suffered from schizophrenia and concluded that, although it appeared he was competent to stand trial, he was not competent to defend himself at trial. The court therefore denied Edwards' self-representation request. He was represented by appointed counsel at trial and convicted on two counts. Indiana's intermediate appellate court ordered a new trial, agreeing with Edwards that the trial court's refusal to permit him to represent himself deprived him of his constitutional right of self-representation under the Sixth Amendment and *Faretta* v. *California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562. Although finding that the record provided substantial support for the trial court's ruling, the Indiana Supreme Court nonetheless affirmed the intermediate appellate [****2] court on the ground that *Faretta* and *Godinez* v. *Moran*, 509 U.S. 389, 113 S. Ct. 2680, 125 L. Ed. 2d 321, required the State to allow Edwards to represent himself.

*Held:* The Constitution does not prohibit States from insisting upon representation by counsel for those competent enough to stand trial but who suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves. Pp. 169-179.

(a) This Court's precedents frame the question presented, but they do not answer it. *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824, and *Drope* v. *Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103, set forth the Constitution's "mental competence" standard forbidding the trial of an individual lacking a rational and factual understanding of the proceedings and sufficient ability to consult with his lawyer with a reasonable degree of rational understanding. But those cases did not consider the issue presented here, namely, the relation of that "mental competence" standard to the self-representation right. Similarly the Court's foundational "self-representation" case, *Faretta*, *supra*-- which held that the Sixth and Fourteenth Amendments include a "constitutional right to proceed *without* counsel when" a criminal defendant "voluntarily [****3] and intelligently elects to do so," 422 U.S., at 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562--does not answer the question as to the scope of the self-representation right. Finally, although *Godinez, supra,* presents a question closer to the one at issue in that it focused upon a borderline-competent defendant who had asked a state trial court to permit him to represent himself and to change his pleas from not guilty to guilty, *Godinez* provides no answer here because that defendant's ability to conduct a defense at trial was expressly not at issue in that case, see 509 U.S., at 399-400, 113 S. Ct. 2680, 125 L. Ed. 2d 321, and because the case's constitutional holding that a State may *permit* a gray-area defendant to represent himself does not tell a State whether it may *deny* such a

defendant the right to represent himself at his trial. Pp. 169-174.

(b) Several considerations taken together lead the Court to conclude that the Constitution permits a State to limit a defendant's self-representation right by insisting upon trial counsel when the defendant lacks the mental competency to conduct his [***350] trial defense unless represented. First, the Court's precedent, while not answering the question, points slightly in that direction. By setting forth a standard that focuses [****4] directly upon a defendant's ability to consult with his lawyer, *Dusky* and *Drope* assume representation by counsel and emphasize counsel's importance, thus suggesting (though not holding) that choosing to forgo trial counsel presents a very different set of circumstances than the mental competency determination for a defendant to stand trial. Also, *Faretta* rested its self-representation conclusion in part on pre-existing state cases that are consistent with, and at least two of which expressly adopt, a competency limitation on the self-representation right. See 422 U.S., at 813, 95 S. Ct. 2525, 45 L. Ed. 2d 562, and n 9. Second, the nature of mental illness--which is not a unitary concept, but varies in degree, can vary over time, and interferes with an individual's functioning at different times in different ways--cautions against using a single competency standard to decide both whether a defendant who is represented can proceed to trial and whether a defendant who goes to trial must be permitted to represent himself. Third, a self-representation right at trial will not "affirm the dignity" of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel, see *McKaskle* v. *Wiggins*, 465 U.S. 168, 176-177, 104 S. Ct. 944, 79 L. Ed. 2d 122, [****5] and may undercut the most basic of the Constitution's criminal law objectives, providing a fair trial. The trial judge--particularly one such as the judge in this case, who presided over one of Edwards' competency hearings and his two trials--will often prove best able to make more fine-tuned mental capacity decisions, tailored to the particular defendant's individualized circumstances. Pp. 174-178.

(c) Indiana's proposed standard, which would deny a criminal defendant the right to represent himself at trial if he cannot communicate coherently with the court or a jury, is rejected because this Court is uncertain as to how that standard would work in practice. The Court also declines Indiana's request to overrule *Faretta* because today's opinion may well remedy the unfair trial concerns previously leveled against the case. Pp. 178-179.

866 N.E. 2d 252, vacated and remanded.

**Counsel: Thomas M. Fisher** argued the cause for petitioner.

**Michael R. Dreeban** argued the cause for the United States, as amicus curiae, by special leave of court.

**Mark T. Stancil** argued the cause for respondent.

**Judges:** Breyer, J., delivered the opinion of the Court, in which Roberts, C. J., and Stevens, Kennedy, Souter, Ginsburg, and Alito, JJ., joined. Scalia, J., filed a dissenting opinion, in which Thomas, J., joined, post, p. 179.

**Opinion by:** Breyer

# Opinion

[*167] [**2381] Justice **Breyer** delivered the opinion of the Court.

This case focuses upon a criminal defendant whom a state court [****6] found mentally competent to stand trial if represented by counsel but not mentally competent to conduct that trial himself. We must decide whether in these circumstances the Constitution prohibits a State from insisting that the defendant proceed to trial with counsel, the State thereby denying the defendant the right to represent himself. See U.S. Const., Amdt. 6; *Faretta* v. *California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). We conclude that the Constitution does not forbid a State so to insist.

[***351] [**2382] I

In July 1999 Ahmad Edwards, the respondent, tried to steal a pair of shoes from an Indiana department store. After he was discovered, he drew a gun, fired at a store security officer, and wounded a bystander. He was caught and then charged with attempted murder, battery with a deadly weapon, criminal recklessness, and theft. His mental condition subsequently became the subject of three competency proceedings and two self-representation requests, mostly before the same trial judge:

1. *First Competency Hearing: August 2000.* Five months after Edwards' arrest, his court-appointed

counsel asked for a psychiatric evaluation. After hearing psychiatrist and neuropsychologist witnesses (in February 2000 and again in August [****7] 2000), the court found Edwards incompetent to stand trial, App. 365a, and committed him to Logansport State Hospital for evaluation and treatment, see *id.*, at 48a-53a.

[*168] 2. *Second Competency Hearing: March 2002.* Seven months after his commitment, doctors found that Edwards' condition had improved to the point where he could stand trial. *Id.*, at 63a-64a. Several months later, however, but still before trial, Edwards' counsel asked for another psychiatric evaluation. In March 2002, the judge held a competency hearing, considered additional psychiatric evidence, and (in April) found that Edwards, while "suffer[ing] from mental illness," was "competent to assist his attorneys in his defense and stand trial for the charged crimes." *Id.*, at 114a.

3. *Third Competency Hearing: April 2003.* Seven months later but still before trial, Edwards' counsel sought yet another psychiatric evaluation of his client. And, in April 2003, the court held yet another competency hearing. Edwards' counsel presented further psychiatric and neuropsychological evidence showing that Edwards was suffering from serious thinking difficulties and delusions. A testifying psychiatrist reported that Edwards could understand the [****8] charges against him, but he was "unable to cooperate with his attorney in his defense because of his schizophrenic illness"; "[h]is delusions and his marked difficulties in thinking make it impossible for him to cooperate with his attorney." *Id.*, at 164a. In November 2003, the court concluded that Edwards was not then competent to stand trial and ordered his recommitment to the state hospital. *Id.*, at 206a-211a.

4. *First Self-Representation Request and First Trial: June 2005.* About eight months after his commitment, the hospital reported that Edwards' condition had again improved to the point that he had again become competent to stand trial. *Id.*, at 228a-236a. And almost one year after that, Edwards' trial began. Just before trial, Edwards asked to represent himself. *Id.*, at 509a, 520a. He also asked for a continuance, which, he said, he needed in order to proceed *pro se. Id.*, at 519a-520a. The court refused the continuance. *Id.*, at 520a. Edwards then proceeded to trial [*169] represented by counsel. The jury convicted him of criminal recklessness and theft but failed to reach a verdict on the charges of attempted murder and battery.

5. *Second Self-Representation Request and Second Trial: December [****9] 2005.* The State decided to retry Edwards on the attempted murder and battery charges. Just before the retrial, [***352] Edwards again asked the court to permit him to represent himself. *Id.*, at 279a-282a. Referring to the lengthy record of psychiatric reports, the trial court noted that Edwards still suffered from schizophrenia and concluded that "[w]ith these findings, he's competent [**2383] to stand trial but I'm not going to find he's competent to defend himself." *Id.*, at 527a. The court denied Edwards' self-representation request. Edwards was represented by appointed counsel at his retrial. The jury convicted Edwards on both of the remaining counts.

Edwards subsequently appealed to Indiana's intermediate appellate court. He argued that the trial court's refusal to permit him to represent himself at his retrial deprived him of his constitutional right of self-representation. U.S. Const., Amdt. 6; *Faretta*, *supra*. The court agreed and ordered a new trial. The matter then went to the Indiana Supreme Court. That court found that "[t]he record in this case presents a substantial basis to agree with the trial court," 866 N.E.2d 252, 260 (2007), but it nonetheless affirmed the intermediate appellate court [****10] on the belief that this Court's precedents, namely, *Faretta*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562, and *Godinez* v. *Moran*, 509 U.S. 389, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993), required the State to allow Edwards to represent himself. At Indiana's request, we agreed to consider whether the Constitution required the trial court to allow Edwards to represent himself at trial.

II

Our examination of this Court's precedents convinces us that those precedents frame the question presented, but they do not answer it. The two cases that set forth the Constitution's [*170] "mental competence" standard, *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) *(per curiam)*, and *Drope* v. *Missouri*, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975), specify that [1] the Constitution does not permit trial of an individual who lacks "mental competency." *Dusky* defines the competency standard as including both (1) "whether" the defendant has "a rational as well as factual understanding of the proceedings against him" and (2) whether the defendant "has sufficient present ability *to consult with his lawyer* with a reasonable degree of rational understanding." 362 U.S., at 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (emphasis added; internal quotation marks omitted). *Drope* repeats that standard, stating that it "has long been accepted that a

person whose mental [****11] condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, *to consult with counsel, and to assist in preparing his defense* may not be subjected to a trial." 420 U.S., at 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (emphasis added). Neither case considered the mental competency issue presented here, namely, the relation of the mental competence standard to the right of self-representation.

The Court's foundational "self-representation" case, *Faretta*, held that [2] the Sixth and Fourteenth Amendments include a "constitutional right to proceed *without* counsel when" a criminal defendant "voluntarily and intelligently elects to do so." 422 U.S., at 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (emphasis in original). The Court implied that right from: (1) a "nearly universal conviction," made manifest in state law, that "forcing a lawyer upon an unwilling [***353] defendant is contrary to his basic right to defend himself if he truly wants to do so," *id*., at 817-818, 95 S. Ct. 2525, 45 L. Ed. 2d 562; (2) Sixth Amendment language granting rights to the "accused"; (3) Sixth Amendment structure indicating that the rights it sets forth, related to the "fair administration of American justice," are "persona[l]" to the accused, *id*., at 818-821, 95 S. Ct. 2525, 45 L. Ed. 2d 562; (4) the absence of historical [****12] examples of *forced* representation, *id*., at 821-832, 95 S. Ct. 2525, 45 L. Ed. 2d 562; and (5) "'respect for the individual,'" *id*., at 834, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (quoting [**2384] *Illinois* v. *Allen*, 397 U.S. 337, 350-351, 90 S. Ct. 1057, 25 L. Ed. 2d 353 [*171] (1970) (Brennan, J., concurring) (a knowing and intelligent waiver of counsel "must be honored out of 'that respect for the individual which is the lifeblood of the law'")).

*Faretta* does not answer the question before us both because it did not consider the problem of mental competency (cf. 422 U.S., at 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (Faretta was "literate, competent, and understanding")), and because *Faretta* itself and later cases have made clear that [3] the right of self-representation is not absolute. See *Martinez* v. *Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 163, 120 S. Ct. 684, 145 L. Ed. 2d 597 (2000) (no right of self-representation on direct appeal in a criminal case); *McKaskle* v. *Wiggins*, 465 U.S. 168, 178-179, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) (appointment of standby counsel over self-represented defendant's objection is permissible); *Faretta*, 422 U.S., at 835, n. 46, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (no right "to abuse the dignity of the courtroom"); *ibid.* (no right to avoid compliance with "relevant rules of procedural and substantive law"); *id.,* at 834, n. 46, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (no right to "engag[e] in serious and obstructionist misconduct," [****13] referring to *Illinois* v. *Allen*, *supra*). The question here concerns a mental-illness-related limitation on the scope of the self-representation right.

The sole case in which this Court considered mental competence and self-representation together, *Godinez, supra,* presents a question closer to that at issue here. The case focused upon a borderline-competent criminal defendant who had asked a state trial court to permit him to represent himself and to change his pleas from not guilty to guilty. The state trial court had found that the defendant met *Dusky*'s mental competence standard, that he "knowingly and intelligently" waived his right to assistance of counsel, and that he "freely and voluntarily" chose to plead guilty. 509 U.S., at 393, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (internal quotation marks omitted). And the state trial court had consequently granted the defendant's self-representation and change-of-plea requests. See *id*., at 392-393, 113 S. Ct. 2680, 125 L. Ed. 2d 321. A federal appeals court, however, had vacated the defendant's guilty pleas on the ground that the Constitution [*172] required the trial court to ask a further question, namely, whether the defendant was competent to waive his constitutional right to counsel. See *id*., at 393-394, 113 S. Ct. 2680, 125 L. Ed. 2d 321. Competence [****14] to make that latter decision, the appeals court said, required the defendant to satisfy a higher mental competency standard than the standard set forth in *Dusky.* See 509 U.S., at 393-394, 113 S. Ct. 2680, 125 L. Ed. 2d 321. *Dusky*'s more general standard sought only to determine [***354] whether a defendant represented by counsel was competent to stand trial, not whether he was competent to waive his right to counsel. 509 U.S., at 394-395, 113 S. Ct. 2680, 125 L. Ed. 2d 321.

This Court, reversing the Court of Appeals, "reject[ed] the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard." *Id*., at 398, 113 S. Ct. 2680, 125 L. Ed. 2d 321. The decision to plead guilty, we said, "is no more complicated than the sum total of decisions that a [represented] defendant may be called upon to make during the course of a trial." *Ibid.* Hence "there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights." *Id*., at 399, 113 S. Ct. 2680, 125

L. Ed. 2d 321. And even assuming that self-representation might pose special trial-related difficulties, "the competence that is required of a defendant seeking to waive his right to counsel [****15] is the competence to *waive the right,* not the competence to represent himself." *Ibid.* (emphasis in [**2385] original). For this reason, we concluded, "the defendant's 'technical legal knowledge' is 'not relevant' to the determination." *Id.*, at 400, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (quoting *Faretta*, *supra*, at 836, 95 S. Ct. 2525, 45 L. Ed. 2d 562).

We concede that *Godinez* bears certain similarities with the present case. Both involve mental competence and self-representation. Both involve a defendant who wants to represent himself. Both involve a mental condition that falls in a gray area between *Dusky*'s minimal constitutional requirement that measures a defendant's ability to stand trial and a somewhat higher standard that measures mental fitness for another legal purpose.

[*173] We nonetheless conclude that *Godinez* does not answer the question before us now. In part that is because the Court of Appeals' higher standard at issue in *Godinez* differs in a critical way from the higher standard at issue here. In *Godinez,* the higher standard sought to measure the defendant's ability to proceed on his own to enter a guilty plea; here the higher standard seeks to measure the defendant's ability to conduct trial proceedings. To put the matter more specifically, the *Godinez* defendant [****16] sought only to change his pleas to guilty, he did not seek to conduct trial proceedings, and his ability to conduct a defense at trial was expressly not at issue. Thus we emphasized in *Godinez* that we needed to consider only the defendant's "competence to *waive the right.*" 509 U.S., at 399,113 S. Ct. 2680, 125 L. Ed. 2d 321 (emphasis in original). And we further emphasized that we need *not* consider the defendant's "technical legal knowledge" about how to proceed at trial. *Id.*, at 400, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (internal quotation marks omitted). We found our holding consistent with this Court's earlier statement in *Massey* v. *Moore*, 348 U.S. 105, 108, 75 S. Ct. 145, 99 L. Ed. 135 (1954), that [4] "[o]ne might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel." See *Godinez*, *supra*, at 399-400, n. 10, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (quoting *Massey* and noting that it dealt with "a question that is quite different from the question presented" in *Godinez*). In this case, the very matters that we did not consider [***355] in *Godinez* are directly before us.

For another thing, *Godinez* involved a State that sought to *permit* a gray-area defendant to represent himself. *Godinez*'s constitutional holding is that a State may do so. But that holding simply [****17] does not tell a State whether it may *deny* a gray-area defendant the right to represent himself--the matter at issue here. One might argue that *Godinez*'s grant (to a State) of permission to allow a gray-area defendant self-representation must implicitly include permission to deny self-representation. Cf. 509 U.S., at 402, 113 S. Ct. 2680, 125 L. Ed. 2d 321 ("States are free to adopt competency standards that are more elaborate [*174] than the *Dusky* formulation"). Yet one could more forcefully argue that *Godinez* simply did not consider whether the Constitution *requires* self-representation by gray-area defendants even in circumstances where the State seeks to disallow it (the question here). The upshot is that, in our view, the question before us is an open one.

III

We now turn to the question presented. We assume that [5] a criminal defendant has sufficient mental competence to stand trial (*i.e.*, the defendant meets *Dusky*'s standard) and that the defendant insists on representing himself during that trial. We ask whether the Constitution permits a State to limit that defendant's self-representation right by insisting upon representation by counsel at trial--on the ground that the defendant lacks the mental capacity [**2386] to conduct his trial [****18] defense unless represented.

Several considerations taken together lead us to conclude that the answer to this question is yes. First, the Court's precedent, while not answering the question, points slightly in the direction of our affirmative answer. *Godinez,* as we have just said, simply leaves the question open. But [6] the Court's "mental competency" cases set forth a standard that focuses directly upon a defendant's "present ability to consult with his lawyer," *Dusky*, 362 U.S., at 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (internal quotation marks omitted); a "capacity . . . to consult with counsel," and an ability "to assist [counsel] in preparing his defense," *Drope*, 420 U.S., at 171, 95 S. Ct. 896, 43 L. Ed. 2d 103. See *ibid.* ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, *to consult with counsel,* and to assist in preparing his defense may not be subjected to a trial" (emphasis added)). These standards assume representation by counsel and

emphasize the importance of counsel. They thus suggest (though do not hold) that an instance in which a defendant who would choose to forgo counsel at trial presents [*175] a very different set of circumstances, [****19] which in our view, calls for a different standard.

At the same time *Faretta*, the foundational self-representation case, rested its conclusion in part upon pre-existing state law set forth in cases all of which are consistent with, and at least two of which expressly adopt, a competency limitation on the self-representation right. See 422 U.S., at 813, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (citing 16 state-court decisions and two secondary sources). See, *e.g.*, *Cappetta* v. *State*, 204 So. 2d 913, 917-918 (Fla. App. 1967), rev'd on other grounds, 216 So. 2d 749 (Fla. [***356] 1968), cited in *Faretta*, *supra*, at 813, n. 9, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (assuring a "mentally competent" defendant the right "to conduct his own defense" *provided that* "no unusual circumstances exist" such as, *e.g.*, "mental derangement" that "would . . . depriv[e]" the defendant "of a fair trial if allowed to conduct his own defense," 204 So. 2d, at 917-918); *id.*, at 918 (noting that "whether unusual circumstances are evident is a matter resting in the sound discretion granted to the trial judge"); *Allen* v. *Commonwealth*, 324 Mass. 558, 562-563, 87 N.E.2d 192, 195 (1949) (noting "the assignment of counsel" was "necessary" where there was some "special circumstance" such as when the [****20] criminal defendant was "mentally defective").

Second, the nature of the problem before us cautions against the use of a single mental competency standard for deciding both (1) whether a defendant who is represented by counsel can proceed to trial and (2) whether a defendant who goes to trial must be permitted to represent himself. Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways. The history of this case (set forth in Part I, *supra)* illustrates the complexity of the problem. In certain instances an individual may well be able to satisfy *Dusky*'s mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic [*176] tasks needed to present his own defense without the help of counsel. See, *e.g.*, N. Poythress, R. Bonnie, J. Monahan, R. Otto, & S. Hoge, Adjudicative Competence: The MacArthur Studies 103 (2002) ("Within each domain of adjudicative competence (competence to assist counsel; decisional competence) the data indicate that understanding, reasoning, and appreciation [of the charges against [****21] a defendant] are separable and somewhat independent aspects of functional [**2387] legal ability"). See also *McKaskle*, 465 U.S., at 174, 104 S. Ct. 944, 79 L. Ed. 2d 122 (describing trial tasks as including organization of defense, making motions, arguing points of law, participating in *voir dire*, questioning witnesses, and addressing the court and jury).

The American Psychiatric Association (APA) tells us (without dispute) in its *amicus* brief filed in support of neither party that "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant." Brief for APA et al. as *Amici Curiae* 26. Motions and other documents that the defendant prepared in this case (one of which we include in the Appendix, *infra*) suggest to a layperson the common sense of this general conclusion.

Third, in our view, [7] a right of self-representation at trial will not "affirm the dignity" of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel. [****22] *McKaskle*, *supra*, at 176-177, 104 S. Ct. 944, 79 L. Ed. 2d 122 ("Dignity" and "autonomy" of individual underlie self-representation right). To the contrary, given that defendant's uncertain mental state, the spectacle that could well result from his self-representation at trial is [***357] at least as likely to prove humiliating as ennobling. Moreover, [8] insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, [*177] providing a fair trial. As Justice Brennan put it, "[t]he Constitution would protect none of us if it prevented the courts from acting to preserve the very processes that the Constitution itself prescribes." *Allen*, 397 U.S., at 350, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (concurring opinion). See *Martinez*, 528 U.S., at 162, 120 S. Ct. 684, 145 L. Ed. 2d 597 ("Even at the trial level . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer"). See also *Sell* v. *United States*, 539 U.S. 166, 180, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003) ("[T]he Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one").

Further, [9] proceedings must [****23] not only be fair, they must "appear fair to all who observe them." *Wheat*

v. *United States*, 486 U.S. 153, 160, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988). An *amicus* brief reports one psychiatrist's reaction to having observed a patient (a patient who had satisfied *Dusky*) try to conduct his own defense: "[H]ow in the world can our legal system allow an insane man to defend himself?" Brief for State of Ohio et al. as *Amici Curiae* 24 (internal quotation marks omitted). See *Massey*, 348 U.S., at 108, 75 S. Ct. 145, 99 L. Ed. 135 ([10] "No trial can be fair that leaves the defense to a man who is insane, unaided by counsel, and who by reason of his mental condition stands helpless and alone before the court"). The application of *Dusky*'s basic mental competence standard can help in part to avoid this result. But given the different capacities needed to proceed to trial without counsel, there is little reason to believe that *Dusky* alone is sufficient. At the same time, the trial judge, particularly one such as the trial judge in this case, who presided over one of Edwards' competency hearings and his two trials, will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant.

We consequently [****24] conclude that [11] the Constitution permits judges to take realistic account of the particular defendant's [**2388] mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to [*178] do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

IV

Indiana has also asked us to adopt, as a measure of a defendant's ability to conduct a trial, a more specific standard that would "deny a criminal defendant the right to represent himself at trial where the defendant cannot communicate coherently with the court or a jury." Brief for Petitioner 20 (emphasis deleted). We are sufficiently uncertain, however, as to how that particular standard would work in practice to refrain from endorsing it as a federal constitutional standard here. We need not now, and we do not, adopt it. [***358]

Indiana has also asked us to overrule *Faretta.* We decline to do so. We recognize that judges have sometimes expressed concern that *Faretta,* contrary to its intent, [****25] has led to trials that are unfair. See *Martinez*, *supra*, at 164, 120 S. Ct. 684, 145 L. Ed. 2d 597 (Breyer, J., concurring) (noting practical concerns of trial judges). But recent empirical research suggests that such instances are not common. See, *e.g.*, Hashimoto, Defending the Right of Self-Representation: An Empirical Look at the Pro Se Felony Defendant, 85 N. C. L. Rev. 423, 427, 447, 428 (2007) (noting that of the small number of defendants who chose to proceed *pro se*--"roughly 0.3% to 0.5%" of the total, state felony defendants in particular "appear to have achieved higher felony acquittal rates than their represented counterparts in that they were less likely to have been convicted of felonies"). At the same time, instances in which the trial's fairness is in doubt may well be concentrated in the 20 percent or so of self-representation cases where the mental competence of the defendant is also at issue. See *id*., at 428 (about 20 percent of federal *pro se* felony defendants ordered to undergo competency evaluations). If so, today's [*179] opinion, assuring trial judges the authority to deal appropriately with cases in the latter category, may well alleviate those fair trial concerns.

For these reasons, the judgment of the [****26] Supreme Court of Indiana is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

APPENDIX

Excerpt from respondent's filing entitled "'Defendant's Version of the Instant Offense,'" which he had attached to his presentence investigation report:

> "'The appointed motion of permissive intervention filed therein the court superior on, 6-26-01 caused a stay of action and apon it's expiration or thereafter three years the plan to establish a youth program to and for the coordination of aspects of law enforcement to prevent and reduce crime amoung young people in Indiana became a diplomatic act as under the Safe Streets Act of 1967, "A omnibuc considerate agent: I membered clients within the public and others that at/production of the courts actions showcased causes. The costs of the stay (Trial Rule 60) has a derivative property that is: my knowledged events as not unnexpended to contract the membered clients is the commission of finding a facilitie for this plan or project to become organization of administrative recommendations conditioned by governors.'" [**2389] 866 N. E. 2d, at 258, n. 4 (alterations omitted).

**Dissent by:** Scalia

## Dissent

Justice **Scalia** with whom Justice [****27] **Thomas** joins, dissenting.

The Constitution guarantees a defendant who knowingly and voluntarily waives the right to counsel the right to proceed *pro se* at his trial. *Faretta* v. *California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). A mentally ill defendant who knowingly and voluntarily elects to proceed *pro se* instead of through counsel [*180] receives a fair trial that comports with the [***359] Fourteenth Amendment. *Godinez* v. *Moran*, 509 U.S. 389, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993). The Court today concludes that a State may nonetheless strip a mentally ill defendant of the right to represent himself when that would be fairer. In my view the Constitution does not permit a State to substitute its own perception of fairness for the defendant's right to make his own case before the jury--a specific right long understood as essential to a fair trial.

I

Ahmad Edwards suffers from schizophrenia, an illness that has manifested itself in different ways over time, depending on how and whether Edwards was treated as well as on other factors that appear harder to identify. In the years between 2000 and 2003--years in which Edwards was apparently not treated with the antipsychotic medications and other drugs that are commonly prescribed for his illness--Edwards [****28] was repeatedly declared incompetent to stand trial. Even during this period, however, his mental state seems to have fluctuated. For instance, one psychiatrist in March 2001 described Edwards in a competency report as "free of psychosis, depression, mania, and confusion," "alert, oriented, [and] appropriate," apparently "able to think clearly" and apparently "psychiatrically normal." App. 61a.

Edwards seems to have been treated with antipsychotic medication for the first time in 2004. He was found competent to stand trial the same year. The psychiatrist making the recommendation described Edwards' thought processes as "coherent" and wrote that he "communicate[d] very well," that his speech was "easy to understand," that he displayed "good communications skills, cooperative attitude, average intelligence, and good cognitive functioning," that he could "appraise the roles of the participants in the courtroom proceedings," and that he had the capacity to challenge prosecution witnesses realistically and to testify relevantly. *Id.*, at 232a-235a (report of Dr. Robert Sena).

[*181] Over the course of what became two separate criminal trials, Edwards sought to act as his own lawyer. He filed a number [****29] of incoherent written pleadings with the judge on which the Court places emphasis, but he also filed several intelligible pleadings, such as a motion to dismiss counsel, a motion to dismiss charges under the Indiana speedy trial provision, and a motion seeking a trial transcript.

Edwards made arguments in the courtroom that were more coherent than his written pleadings. In seeking to represent himself at his first trial, Edwards complained in detail that the attorney representing him had not spent adequate time preparing and was not sharing legal materials for use in his defense. The trial judge concluded that Edwards had knowingly and voluntarily waived his right to counsel and proceeded to quiz Edwards about matters of state law. Edwards correctly answered questions about the meaning of *voir dire* and how it operated, and described the basic framework for admitting videotape evidence to trial, though he [**2390] was unable to answer other questions, including questions about the topics covered by state evidentiary rules that the judge identified only by number. He persisted in his request to represent himself, but the judge denied the request because Edwards acknowledged he would need a continuance. [****30] Represented by counsel, he [***360] was convicted of criminal recklessness and theft, but the jury deadlocked on charges of attempted murder and battery.

At his second trial, Edwards again asked the judge to be allowed to proceed *pro se.* He explained that he and his attorney disagreed about which defense to present to the attempted murder charge. Edwards' counsel favored lack of intent to kill; Edwards, self-defense. As the defendant put it: "My objection is me and my attorney actually had discussed a defense, I think prosecution had mentioned that, and we are in disagreement with it. He has a defense and I have a defense that I would like to represent or present to the Judge." *Id.,* at 523a.

[*182] The court again rejected Edwards' request to proceed *pro se*, and this time it did not have the justification that Edwards had sought a continuance. The court did not dispute that Edwards knowingly and

intelligently waived his right to counsel, but stated it was "going to carve out a third exception" to the right of self-representation, and--without explaining precisely what abilities Edwards lacked--stated Edwards was "competent to stand trial but I'm not going to find he's competent to defend himself." *Id.,* at 527a. [****31] Edwards sought--by a request through counsel and by raising an objection in open court--to address the judge on the matter, but the judge refused, stating that the issue had already been decided. Edwards' court-appointed attorney pursued the defense the attorney judged best--lack of intent, not self-defense--and Edwards was convicted of both attempted murder and battery. The Supreme Court of Indiana held that he was entitled to a new trial because he had been denied the right to represent himself. The State of Indiana sought certiorari, which we granted. 552 U.S. 1074, 128 S. Ct. 741, 169 L. Ed. 2d 579 (2007).

II

A

The Constitution guarantees to every criminal defendant the "right to proceed *without* counsel when he voluntarily and intelligently elects to do so." *Faretta*, 422 U.S., at 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562. The right reflects "a nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Id.*, at 817, 95 S. Ct. 2525, 45 L. Ed. 2d 562. *Faretta*'s discussion of the history of the right, *id.*, at 821-833, 95 S. Ct. 2525, 45 L. Ed. 2d 562, includes the observation that "[i]n the long history of British criminal jurisprudence, there was only one tribunal that ever adopted [****32] a practice of forcing counsel upon an unwilling defendant in a criminal proceeding. The tribunal was the Star Chamber," *id.*, at 821, 95 S. Ct. 2525, 45 L. Ed. 2d 562. *Faretta* described the right to proceed *pro se* as a premise of the Sixth Amendment, [*183] which confers the tools for a defense on the "accused," and describes the role of the attorney as one of "assistance." The right of self-representation could also be seen as a part of the traditional meaning of the Due Process Clause. See *Martinez* v. *Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 165, 120 S. Ct. 684, 145 L. Ed. 2d 597 (2000) (Scalia, J., concurring in judgment). Whichever provision provides its source, it means that a State simply may not force a lawyer upon a criminal defendant who wishes to conduct [***361] his own defense. [**2391] *Faretta*, 422 U.S., at 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562.

Exercising the right of self-representation requires waiving the right to counsel. A defendant may represent himself only when he "'knowingly and intelligently'" waives the lawyer's assistance that is guaranteed by the Sixth Amendment. *Id.,* at 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562. He must "be made aware of the dangers and disadvantages of self-representation," and the record must "establish that 'he knows what he is doing and his choice is made with eyes open.'" *Ibid.* [****33] (quoting *Adams* v. *United States ex rel. McCann*, 317 U.S. 269, 279, 63 S. Ct. 236, 87 L. Ed. 268 (1942)). This limitation may be relevant to many mentally ill defendants, but there is no dispute that Edwards was not one of them. Edwards was warned extensively of the risks of proceeding *pro se.* The trial judge found that Edwards had "knowingly and voluntarily" waived his right to counsel at his first trial, App. 512a, and at his second trial the judge denied him the right to represent himself only by "carv[ing] out" a new "exception" to the right beyond the standard of knowing and voluntary waiver, *id.,* at 527a.

When a defendant appreciates the risks of forgoing counsel and chooses to do so voluntarily, the Constitution protects his ability to present his own defense even when that harms his case. In fact waiving counsel "usually" does so. *McKaskle* v. *Wiggins*, 465 U.S. 168, 177, n. 8, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984); see also *Faretta*, 422 U.S., at 834, 95 S. Ct. 2525, 45 L. Ed. 2d 562. We have nonetheless said that the defendant's "choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Ibid.* [*184] What the Constitution requires is not that a State's case be subject to the most rigorous adversarial testing possible--after all, it permits [****34] a defendant to eliminate *all* adversarial testing by pleading guilty. What the Constitution requires is that a defendant be given the right to challenge the State's case against him using the arguments *he* sees fit.

In *Godinez,* 509 U.S. 389, 113 S. Ct. 2680, 125 L. Ed. 2d 321, we held that the Due Process Clause posed no barrier to permitting a defendant who suffered from mental illness both to waive his right to counsel and to plead guilty, so long as he was competent to stand trial and knowingly and voluntarily waived trial and the counsel right. *Id.*, at 391, 400, 113 S. Ct. 2680, 125 L. Ed. 2d 321. It was "never the rule at common law" that a defendant could be competent to stand trial and yet incompetent to either exercise or give up some of the rights provided for his defense. *Id.*, at 404, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (Kennedy, J., concurring in part and concurring in judgment). We rejected the invitation

to craft a higher competency standard for waiving counsel than for standing trial. That proposal, we said, was built on the "flawed premise" that a defendant's "competence to represent himself" was the relevant measure: "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, [****35] not the competence to represent himself." *Id.*, at 399, 113 S. Ct. 2680, 125 L. Ed. 2d 321. We grounded this on *Faretta*'s candid acknowledgment that the Sixth Amendment protected the defendant's right to conduct a defense to his disadvantage. 509 U.S. at 399-400, 113 S. Ct. 2680, 125 L. Ed. 2d 321. [***362]

B

The Court is correct that this case presents a variation on *Godinez:* It presents the question not whether another constitutional requirement (in *Godinez*, the proposed higher degree of competence required for a waiver) limits a defendant's constitutional right to elect self-representation, but whether a State's view of fairness [**2392] (or of other values) permits it to strip the defendant of this right. But that makes the question before us an easier one. While one constitutional [*185] requirement must yield to another in case of conflict, nothing permits a State, because of *its* view of what is fair, to deny a constitutional protection. Although "the purpose of the rights set forth in [the Sixth] Amendment is to ensure a fair trial," it "does not follow that the rights can be disregarded so long as the trial is, on the whole, fair." *United States* v. *Gonzalez-Lopez,* 548 U.S. 140, 145, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006). Thus, although the Confrontation Clause aims to produce fairness by ensuring the reliability [****36] of testimony, States may not provide for unconfronted testimony to be used at trial so long as it is reliable. *Crawford* v. *Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). We have rejected an approach to individual liberties that "'abstracts from the right to its purposes, and then eliminates the right.'" *Gonzalez-Lopez*, *supra*, at 145, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (quoting *Maryland* v. *Craig*, 497 U.S. 836, 862, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990) (Scalia, J., dissenting)).

Until today, the right of self-representation has been accorded the same respect as other constitutional guarantees. The only circumstance in which we have permitted the State to deprive a defendant of this trial right is the one under which we have allowed the State to deny *other* such rights: when it is necessary to enable the trial to proceed in an orderly fashion. That overriding necessity, we have said, justifies forfeiture of even the Sixth Amendment right to be present at trial--if, after being threatened with removal, a defendant "insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Illinois* v. *Allen,* 397 U.S. 337, 343, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). A *pro se* defendant may not "abuse the dignity [****37] of the courtroom," nor may he fail to "comply with relevant rules of procedural and substantive law," and a court may "terminate" the self-representation of a defendant who "deliberately engages in serious and obstructionist misconduct." *Faretta, supra,* at 834-835, n. 46, 95 S. Ct. 2525, 45 L. Ed. 2d 562. This ground for terminating self-representation is unavailable here, however, because Edwards [*186] was not even allowed to begin to represent himself, and because he was respectful and compliant and did not provide a basis to conclude a trial could not have gone forward had he been allowed to press his own claims.

Beyond this circumstance, we have never constrained the ability of a defendant to retain "actual control over the case he chooses to present to the jury"--what we have termed "the core of the *Faretta* right." *Wiggins, supra*, at 178, 104 S. Ct. 944, 79 L. Ed. 2d 122. Thus, while *Faretta* recognized that the right of self-representation does not bar the court from appointing standby counsel, we explained in *Wiggins* that "[t]he *pro se* defendant must be allowed to control the organization [***363] and content of his own defense, to make motions, to argue points of law, to participate in *voir dire,* to question witnesses, and to address the court and the jury [****38] at appropriate points in the trial." 465 U.S., at 174, 104 S. Ct. 944, 79 L. Ed. 2d 122. Furthermore, because "multiple voices 'for the defense'" could "confuse the message the defendant wishes to convey," *id.*, at 177, 104 S. Ct. 944, 79 L. Ed. 2d 122, a standby attorney's participation would be barred when it would "destroy the jury's perception that the defendant is representing himself," *id.*, at 178, 104 S. Ct. 944, 79 L. Ed. 2d 122.

As I have explained, I would not adopt an approach to the right of self-representation that we have squarely rejected for other rights--allowing courts to disregard [**2393] the right when doing so serves the purposes for which the right was intended. But if I were to adopt such an approach, I would remain in dissent, because I believe the Court's assessment of the purposes of the right of self-representation is inaccurate to boot. While there is little doubt that preserving

individual "'dignity'" (to which the Court refers), *ante,* at 176, 171 L. Ed. 2d, at 356, is paramount among those purposes, there is equally little doubt that the loss of "dignity" the right is designed to prevent is *not* the defendant's making a fool of himself by presenting an amateurish or even incoherent defense. Rather, the dignity at issue is the supreme human dignity of being master of one's fate rather than [****39] a ward of the State--the [*187] dignity of individual choice. *Faretta* explained that the Sixth Amendment's counsel clause should not be invoked to impair "'the exercise of [the defendant's] free choice'" to dispense with the right, 422 U.S., at 815, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (quoting *Adams*, 317 U.S., at 280, 63 S. Ct. 236, 87 L. Ed. 268); for "whatever else may be said of those who wrote the Bill of Rights, surely there can be no doubt that they understood the inestimable worth of free choice," 422 U.S., at 833-834, 95 S. Ct. 2525, 45 L. Ed. 2d 562. Nine years later, when we wrote in *Wiggins* that the self-representation right served the "dignity and autonomy of the accused," 465 U.S., at 177, 104 S. Ct. 944, 79 L. Ed. 2d 122, we explained in no uncertain terms that this meant according every defendant the right to his say in court. In particular, we said that individual dignity and autonomy barred standby counsel from participating in a manner that would to "destroy the jury's perception that the defendant is representing himself," and meant that "the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury." *Id.*, at 178, 104 S. Ct. 944, 79 L. Ed. 2d 122. In sum, if the Court is to honor the particular conception of "dignity" that underlies the self-representation right, it should respect the autonomy [****40] of the individual by honoring his choices knowingly and voluntarily made.

A further purpose that the Court finds is advanced by denial of the right of self-representation is the purpose of assuring that trials "appear fair to all who observe them." *Ante*, at 177, 171 L. Ed. 2d, at 357 (internal quotation marks omitted). To my knowledge we have never denied a defendant a right simply on the ground that it would make his trial appear less "fair" to outside observers, and I would not inaugurate that principle here. But were I to do so, I would not apply it to deny a defendant the right to represent himself when [***364] he knowingly and voluntarily waives counsel. When Edwards stood to say that "I have a defense that I would like to represent or present to the Judge," App. 523a, it seems to me the epitome of both actual and apparent unfairness for the judge to say, I have heard "your desire to proceed by yourself and [*188] I've denied your request, so your attorney will speak for you from now on," *id.*, at 530a.

III

It may be that the Court permits a State to deprive mentally ill defendants of a historic component of a fair trial because it is suspicious of the constitutional footing of the right of self-representation itself. The right is not explicitly set forth [****41] in the text of the Sixth Amendment, and some Members of this Court have expressed skepticism about *Faretta*'s holding. See *Martinez*, 528 U.S., at 156-158, 120 S. Ct. 684, 145 L. Ed. 2d 597 (questioning relevance of historical evidence underlying *Faretta*'s holding); 528 U.S., at 164, 120 S. Ct. 684, 145 L. Ed. 2d 597 (Breyer, J., concurring) (noting "judges closer to the firing line have sometimes expressed dismay about the practical consequences" of the right of self-representation).

While the Sixth Amendment makes no mention of the right to forgo counsel, it [**2394] provides the defendant, and not his lawyer, the right to call witnesses in his defense and to confront witnesses against him, and counsel is permitted to assist in "*his* defence" (emphasis added). Our trial system, however, allows the attorney representing a defendant "full authority to manage the conduct of the trial"--an authority without which "[t]he adversary process could not function effectively." *Taylor* v. *Illinois*, 484 U.S. 400, 418, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988); see also *Florida* v. *Nixon,* 543 U.S. 175, 187, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004). We have held that "the client must accept the consequences of the lawyer's decision to forgo cross-examination, to decide not to put certain witnesses on the stand, or to decide not to disclose the identity [****42] of certain witnesses in advance of trial." *Taylor*, *supra*, at 418, 108 S. Ct. 646, 98 L. Ed. 2d 798. Thus, in order for the defendant's right to call his own witnesses, to cross-examine witnesses, and to put on a defense to be anything more than "a tenuous and unacceptable legal fiction," a defendant must have consented to the representation of counsel. *Faretta,* 422 U.S., at 821, 95 S. Ct. 2525, 45 L. Ed. 2d 562. Otherwise, "the defense presented is not the defense [*189] guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense." *Ibid.*

The facts of this case illustrate this point with the utmost clarity. Edwards wished to take a self-defense case to the jury. His counsel preferred a defense that focused on lack of intent. Having been denied the right to conduct his own defense, Edwards was convicted without having had the opportunity to present to the jury the grounds he believed supported his innocence. I do not doubt that he likely would have been convicted

anyway. But to hold that a defendant may be deprived of the right to make legal arguments for acquittal simply because a state-selected agent has made different arguments on his behalf is, as Justice Frankfurter wrote in *Adams, supra*, at 280, 63 S. Ct. 236, 87 L. Ed. 268, to "imprison a man in his privileges [****43] and call it the Constitution." In singling out mentally ill defendants for this treatment, the Court's opinion does not even have [***365] the questionable virtue of being politically correct. At a time when all society is trying to mainstream the mentally impaired, the Court permits them to be deprived of a basic constitutional right--for their own good.

Today's holding is extraordinarily vague. The Court does not accept Indiana's position that self-representation can be denied "'where the defendant cannot communicate coherently with the court or a jury,'" *ante*, at 178, 171 L. Ed. 2d, at 357. It does not even hold that Edwards was properly denied his right to represent himself. It holds only that lack of mental competence can under some circumstances form a basis for denying the right to proceed *pro se, ante,* at 167, 171 L. Ed. 2d, at 350-351. We will presumably give some meaning to this holding in the future, but the indeterminacy makes a bad holding worse. Once the right of self-representation for the mentally ill is a sometime thing, trial judges will have every incentive to make their lives easier--to avoid the painful necessity of deciphering occasional pleadings of the sort contained in the Appendix to today's opinion--by appointing knowledgeable [****44] and literate counsel.

[*190] Because I think a defendant who is competent to stand trial, and who is capable of knowing and voluntary waiver of assistance of counsel, has a constitutional right to conduct his own defense, I respectfully dissent.

## References

U.S.C.S., Constitution, Amendments 6, 14

3 Criminal Constitutional Law § 13.05 (Matthew Bender)

1A Criminal Defense Techniques §§ 14.04, 17.02 (Matthew Bender)

27 Moore's Federal Practice § 644.37 (Matthew Bender 3d ed.)

L Ed Digest, Criminal Law § 46

L Ed Index, Incompetent or Insane Persons; Pro Se

Right, under Federal Constitution, of accused to represent himself or herself in criminal proceedings--Supreme Court cases. 145 L. Ed. 2d 1177.

Supreme Court's views as to validity, under due process clause of Federal Constitution's Fourteenth Amendment, of state provisions concerning accused's competence to stand trial. 120 L. Ed. 2d 1037.

Supreme Court's views as to what constitutes valid waiver of accused's federal constitutional right to counsel. 101 L. Ed. 2d 1017.

Accused's right to counsel under the Federal Constitution--Supreme Court cases. 93 L. Ed. 137, 2 L. Ed. 2d 1644, 9 L. Ed. 2d 1260, 18 L. Ed. 2d 1420.

---

End of Document

# United States v. Carpenter

360 F.3d 591 (6th Cir. 2004) (en banc)

Cited in Opening Brief at: vii, xi, 52

See Response, Part III.G. Highlighted language appears at 360 F.3d at 594–95.

Caution
As of: September 14, 2026 8:08 PM Z

# United States v. Carpenter

United States Court of Appeals for the Sixth Circuit

June 11, 2003, Argued and Submitted ; March 9, 2004, Decided ; March 9, 2004, Filed

Nos. 01-5368/01-5370/01-5446

**Reporter**

360 F.3d 591 *; 2004 U.S. App. LEXIS 4435 **; 2004 FED App. 0072P (6th Cir.) ***

UNITED STATES OF AMERICA, Plaintiff-Appellee/Cross-Appellant, v. LONNIE D. CARPENTER (01-5368) and SHEILA J. CARPENTER (01-5370), Defendants-Appellants/Cross-Appellees.

**Subsequent History:** US Supreme Court certiorari denied by Carpenter v. United States, 2004 U.S. LEXIS 6305 (U.S., Oct. 4, 2004)

US Supreme Court certiorari denied by Carpenter v. United States, 2004 U.S. LEXIS 6306 (U.S., Oct. 4, 2004)

**Prior History:** [**1] Appeal from the United States District Court for the Eastern District of Tennessee at Greeneville. No. 99-00045. Thomas G. Hull, District Judge. Argued and.

United States v. Carpenter, 317 F.3d 618, 2003 U.S. App. LEXIS 588 (6th Cir.) (6th Cir. Tenn., 2003)

**Disposition:** Prior panel decision reinstated and adopted in part, district court judgment remanded for further proceedings.

**Counsel:** ARGUED: Nikki C. Pierce, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, Greeneville, Tennessee, for Appellants.

Michael E. Winck, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

ON BRIEF: Nikki C. Pierce, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, Greeneville, Tennessee, for Appellants.

Michael E. Winck, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

Lonnie D. Carpenter, Rogersville, Tennessee, Pro se.

**Judges:** Before: BOGGS, Chief Judge; MARTIN, SILER, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, and COOK, Circuit Judges. SILER, J., delivered the opinion of the court, in which BOGGS, C. J., BATCHELDER, GIBBONS, ROGERS, SUTTON, and COOK, JJ., joined. GILMAN, J., delivered a separate concurring opinion. MOORE, J., delivered a separate dissenting opinion, in which MARTIN, DAUGHTREY, COLE, and CLAY, JJ., joined, with MARTIN, J., also delivering a separate dissenting opinion.

**Opinion by:** SILER

## Opinion

[*593] [***2] SILER, Circuit Judge. Defendants [**2] Lonnie D. and Sheila J. Carpenter were convicted of manufacturing marijuana. One of the issues that they raised on appeal was a claim that the district court erred in failing to suppress the evidence of their illegal activity. The government cross-appealed the district court's ruling that limited the amount of the Carpenters' land subject to forfeiture. A divided panel of this court affirmed in part, vacated in part, and remanded the case for further [***3] proceedings. *United States v. Carpenter*, 317 F.3d 618 (6th Cir. 2003).

Rehearing en banc was subsequently granted in order to consider a question regarding the application of *United States v. Leon*, 468 U.S. 897, 922, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984), that is, whether a search conducted pursuant to an invalid warrant may be saved under the "good-faith exception" on the basis that the officers had other information that was not presented to the issuing magistrate, but that would have established probable cause. We need not reach that question because we conclude that the police officers' reliance on the deficient warrant was reasonable because the information that *was* presented to the issuing judge [**3] was sufficient to support a good-faith belief in the warrant's validity. We therefore REINSTATE the judgment of the panel in this case, and adopt the panel opinion except for its discussion of the *Leon* good-faith

exception, and REMAND the case to the district court for further proceedings.

I. BACKGROUND

A. Factual background

In June 1999, Police Lieutenant Robert Crumley was conducting helicopter surveillance over Hawkins County, Tennessee. He spotted patches of marijuana growing in fields approximately 900 feet away from a residence belonging to the Carpenters. In addition, he observed beaten paths leading from the back door of the residence to the marijuana patches and saw two men, who turned out to be Lonnie Carpenter and his son, walking from the patches toward the residence. Crumley relayed this information to a team of police officers on the ground.

Captain Ronnie Lawson, a member of the ground team, sought a warrant to search the residence. A state judge, satisfied that Lawson's affidavit established probable cause, [***4] issued the requested search warrant. The affidavit, which the warrant incorporated, described the location of the Carpenter residence and then [**4] set forth the following reasons (in exactly the syntax shown) why Lawson believed that evidence of criminal conduct would be found in the residence:

> On June 23, 1999 at approx 12:30 pm, Helicopter Pilot Lt Bob Crumley was conducting an aerial search of Hawkins Co when he was flying over the above described property he saw numerous Marijuana Plants growing. Near the residence.
>
> Upon information I received from Lt Crumley, there is a road connecting the above described residence to the Marijuana Plants. Having personal knowledge that Lt. Crumley is certified in the identification of Marijuana I feel there is probable cause to search the said residence and property and seize any illegal contraband found.

Armed with this warrant, police officers searched the Carpenters' residence. They seized marijuana, marijuana seeds, and other items associated with marijuana manufacturing.

[*594] B. Procedural background

In July 1999, the Carpenters were indicted for manufacturing marijuana and with employing a minor to assist them, in violation of 21 U.S.C. §§ 841 and 861, respectively. The indictment also sought the forfeiture of the Carpenters' real property, [**5] a 100-acre farm, on the basis that it had been "used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of" marijuana manufacturing. 21 U.S.C. § 853(a)(2).

The district court subsequently denied the Carpenters' motions to suppress the evidence seized during the search of their residence. The Carpenters were eventually acquitted on the charge that they employed a minor to manufacture [***5] marijuana, but were found guilty of manufacturing marijuana. The jury also concluded that the Carpenters' property had been used to commit the crime, thereby triggering a forfeiture of the property.

II. ANALYSIS

A. The motions to suppress

*1. Standard of review*

In reviewing the denial of a motion to suppress, we defer to the district court's factual findings unless they are clearly erroneous. Legal conclusions, however, are reviewed *de novo*. *United States v. Bartholomew*, 310 F.3d 912, 919 (6th Cir. 2002), *cert. denied*, 537 U.S. 1177, 154 L. Ed. 2d 923, 123 S. Ct. 1005 (2003).

*2. Whether the affidavit provided a substantial basis for the determination of probable cause*

The Fourth Amendment provides that "no Warrants [**6] shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. In determining whether an affidavit establishes probable cause,

> the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983) (internal quotation marks and alterations omitted).

[***6] To justify a search, the circumstances must indicate why evidence of illegal activity will be found "in a particular place." There must, in other words, be a "nexus between the place to be searched and the evidence sought." *United States v. Van Shutters*, 163

F.3d 331, 336-37 (6th Cir. 1998). Lawson's affidavit did not provide a substantial basis for the issuing judge's conclusion that probable cause existed to search the Carpenters' [**7] residence, because it failed to set forth sufficient facts that incriminating evidence would be found *there*, rather than in some other place.

The facts that marijuana was growing "near" the residence and that a road ran nearby fall short of establishing the required nexus between the Carpenters' residence and evidence of marijuana manufacturing. If Lawson's affidavit had stated that beaten paths led from the marijuana patches to the door of the residence, and that two men had been spotted walking from the marijuana patches to the residence, the affidavit would likely have been sufficient to establish probable cause. *See* *United States v. Robins*, 978 F.2d 881, 892 (5th Cir. 1992) (holding that where a police detective has ascertained that a particular person, Robins, was a marijuana dealer, "there was undoubtedly an adequate nexus, [*595] between Robins' residence and Detective Soule's allegations to the Magistrate Judge about Robins' marijuana operation, to support the search warrant for the marijuana and related records [that] Detective Soule's experience and common sense told him would likely be at Robins' residence"); *United States v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990) [**8] (holding that a police officer's "observation of marijuana growing in Malin's [fenced] yard reasonably yielded the conclusion that marijuana or other evidence of marijuana possession would be found in Malin's house").

These additional facts, however, were not included in the affidavit. The facts in the affidavit that did connect the marijuana patches and the residence were too vague, generalized, and insubstantial to establish probable cause. [***7] We therefore conclude that the state judge lacked a substantial basis to determine that probable cause existed to search the Carpenters' residence. The government, indeed, concedes this point. Because the search of the Carpenters' residence violated the Fourth Amendment, we are left with the question of whether the evidence seized should be suppressed.

*3. The good-faith exception to the exclusionary rule*

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347, 94 L. Ed. 2d 364, 107 S. Ct. 1160 (1987). Courts should not, however, suppress [**9] "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984). But this good-faith exception to the exclusionary rule does not apply in circumstances where "the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 923. Thus, an officer would not "manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (quotation omitted).

*a. Whether the officers had a reasonable basis to believe that the information actually submitted supported the issuance of the search warrant*

Pursuant to *Leon*, we must now decide whether the officers in the instant case had a reasonable basis to believe that the information that *was submitted* supported the issuance of the search warrant. In considering this question, we agree with the following analysis by the Fourth Circuit:

> If a lack of a substantial basis also prevented application of the *Leon* objective good faith [**10] exception, the exception [***8] would be devoid of substance. In fact, *Leon* states that . . . a finding of objective good faith [is inappropriate] when an officer's affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." This is a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause in the first place.

*United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002) (citation omitted).

The affidavit in the case before us failed to provide a substantial basis for probable cause because it did not provide the required nexus between the residence and the illegal activity. However, the affidavit was not completely devoid of any nexus between the residence and the marijuana [*596] that the police observed. Rather, it noted both that the marijuana was growing "near" the residence and that "there is a road connecting" the residence and the marijuana plants.

We previously found *Leon* applicable in cases where we determined that the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched [**11] to support an officer's good-faith belief in the warrant's validity, even if the information provided was not enough to establish probable cause. *See United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998) (upholding a search where the affidavit underlying the warrant described the residence, the items sought, and the defendant's counterfeiting scheme, but connected the place to the illegal activity only by stating that the residence "was available" to the defendant); *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994) (upholding a search of safe deposit boxes at a bank where the affidavit underlying the warrant connected the boxes and the defendant's trafficking in illegal drugs only by stating that the officer's training and experience led him to believe that evidence would be located there). [***9]

A useful contrast is provided by *United States v. Hove*, 848 F.2d 137 (9th Cir. 1988). In *Hove,* the police officer had obtained a warrant to search a particular residence after submitting to the issuing magistrate an affidavit that failed to provide *any* nexus between the residence and illegal activity. *Id.* at 139-40 [**12] ("The final warrant application, while it set forth facts suggesting that Kimberly Hove had sent threatening letters, never linked Kimberly Hove or any suspected criminal activity in any way with the 2727 DeAnza residence."). The Ninth Circuit held that no reasonable officer could have believed that the warrant was valid, given the failure of the affidavit to articulate any nexus between the illegal activity and the place to be searched.

In the present case, however, the affidavit was not totally lacking in facts connecting the residence to the marijuana patches. These facts, as we explained above, were too vague to provide a substantial basis for the determination of probable cause. But these facts (unlike *Hove*) were not so vague as to be conclusory or meaningless. *See United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993) ("This is not a case in which the affidavit contained mere conclusory assertions or a single piece of evidence which the law of the stationhouse shop would recognize as clearly insufficient."). We therefore conclude that reasonable officers could have believed that the affidavit as submitted, even without the additional relevant information [**13] known to the officers, was sufficient to support the issuance of the warrant.

At oral argument, the Carpenters contended that Lawson's omission from his affidavit of the additional information known to the police (concerning the beaten paths and the two men walking from the marijuana patches to the residence) militated against the conclusion that they executed the warrant in good-faith reliance on its reasonableness. We disagree. Extrapolating from *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), this court has recognized that "material omissions [from an affidavit] are not immune from inquiry under [***10] *Franks*." *United States v. Atkin*, 107 F.3d 1213, 1216-17 (6th Cir. 1997) (discussing *Franks*'s holding that a defendant is entitled to an evidentiary hearing on the veracity of the affidavit if (1) he or she can make a preliminary showing that portions of the affidavit are deliberately or recklessly false, and (2) after setting aside the false information, the remaining parts of the affidavit would not support a finding of probable cause). But to be constitutionally problematic, the material must have [*597] been deliberately or recklessly [**14] omitted and must have *undermined* the showing of probable cause. *See id.* ("If the defendant does succeed in making a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists."). The Carpenters have made no showing that Lawson omitted facts from his affidavit deliberately or recklessly. Moreover, the omitted facts would have *bolstered* the affidavit's showing of probable cause, not undermined it.

The fact that a police officer had such additional knowledge certainly raises the inference that the officer should have recognized that a stronger showing of probable cause could have been made to the issuing magistrate. But such recognition says nothing about the reasonableness of the belief that the information that was presented was sufficient.

To the extent that the Carpenters are continuing to argue that the factual assertions that were in the affidavit were both false and recklessly included (a traditional *Franks* challenge), the district court [**15] found after a hearing that the affidavit was reasonably accurate and that no evidence supported the proposition that any inaccuracy was deliberately or recklessly included. These findings were not clearly erroneous.

[***11] *b.Whether the fact that the officers had other information that was not presented to the issuing magistrate, but that would have established probable cause, is relevant to the good-faith analysis*

Since we have concluded that the police officers' reliance on the deficient warrant was reasonable based on the information that actually was submitted to the issuing judge, we leave for another day the question of whether the search could have been saved under the "good-faith exception" on the basis that the officers had other information that was not presented to the issuing magistrate, but that would have established probable cause. *See, e.g.,* *United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001).

B. Other issues

Rule 35 of the Rules of the Sixth Circuit provides that "the effect of the granting of a rehearing en banc shall be to vacate the previous opinion and judgment of this Court." All of the issues raised by the Carpenters [**16] on appeal are thus before us. In our opinion, however, the reasoning of the prior panel was correct on all issues other than its analysis of the motions to suppress. We therefore reinstate and reaffirm the judgment in *United States v. Carpenter*, 317 F.3d 618 (6th Cir. 2003), and adopt its opinion except for its discussion of the *Leon* good-faith exception. *See Donahey v. Bogle*, 129 F.3d 838, 844 (6th Cir. 1997) (en banc) (reinstating the prior panel opinion on all issues not otherwise discussed by the en banc court), *vacated on other grounds*, 524 U.S. 924, 141 L. Ed. 2d 692, 118 S. Ct. 2317 (1998).

III. CONCLUSION

For all of the reasons set forth above, we REINSTATE the judgment of the panel in this case, albeit with different reasoning, and REMAND the case to the district court for further proceedings.

**Concur by:** RONALD LEE GILMAN

## Concur

[***12] RONALD LEE GILMAN, Circuit Judge, concurring. I concur in the conclusion reached by the majority opinion and in most of its [*598] reasoning. But I respectfully disagree with its decision to defer to another day the issue of whether a court should consider the additional information known to the officers but not communicated to [**17] the magistrate in deciding if the *Leon* good-faith exception has been satisfied. The government persuaded the district court that the consideration of such additional information was appropriate. In addition, the issue has been fully briefed and argued on appeal and is discussed in the dissenting opinion. Deciding the issue is therefore appropriate in order to provide guidance to the district courts within our circuit and to future panels of this court. *See Webster v. Reproductive Health Servs.*, 492 U.S. 490, 532-35, 106 L. Ed. 2d 410, 109 S. Ct. 3040 (1989) (Scalia, J., concurring in part and concurring in the judgment) (discussing numerous cases where the Supreme Court has departed from the general principle of deciding cases on the narrowest possible constitutional grounds).

As part of its argument, the government contends that the good-faith exception to the exclusionary rule should apply in this case because the police officers knew additional facts that were not included in Captain Lawson's affidavit, but that, when added to the information contained in the affidavit, would have established probable cause. Specifically, the police (1) knew that beaten paths led from the back [**18] door of the residence to the marijuana patches, and (2) had seen two men walking from the patches to the residence. I am of the opinion that any consideration of this additional information would be contrary to controlling Supreme Court precedent.

[***13] The Fourth Amendment prohibits police officers, absent certain exceptions not applicable here, from conducting searches of a residence without a properly issued warrant. *Agnello v. United States*, 269 U.S. 20, 33, 70 L. Ed. 145, 46 S. Ct. 4 (1925) ("Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant."). An officer's correct belief in the existence of probable cause does not obviate the warrant requirement. *Id.* ("And such searches are held unlawful notwithstanding facts unquestionably showing probable cause.").

According to the Supreme Court in *Leon*, evidence obtained through a search pursuant to a deficient warrant must be suppressed, unless the police officer acted "in objectively reasonable reliance on a subsequently invalidated search warrant." 468 U.S. at 922. Information tending to show the [**19] existence of probable cause that was not disclosed to the issuing magistrate cannot logically have any bearing on the reasonableness of the presenting officer's belief *that the warrant was properly issued*, as opposed to the officer's reasonable belief that probable cause existed for the search. The straightforward reason for this conclusion is that no magistrate can base his or her determination of the existence of probable cause upon information never received.

*Leon* and *Agnello* make clear that the relevant question is whether the officer reasonably believed that the warrant was properly issued, *not* whether probable cause existed in fact. *See* *United States v. Hove*, 848 F.2d 137, 140 (9th Cir. 1988) ("The *Leon* test for good faith reliance is clearly an objective one and it is based solely on facts presented to the magistrate. An obviously deficient affidavit cannot be cured by an officer's later testimony on his subjective intentions or knowledge.") (citation omitted); *United States v. Bynum*, 293 F.3d 192, 212 (4th Cir. 2002) (Michael, J., dissenting) ("*Leon* requires that the officer be able to entertain a reasonable belief [**20] that the magistrate had a substantial [*599] basis for finding probable [***14] cause. . . . What the officer knew but did not tell the magistrate is irrelevant.").

The government argues that *Leon* itself described situations in which a reviewing court would need to look to facts beyond the affidavit in order to ascertain whether the officers could have reasonably relied on a deficient warrant. I do not quarrel with this argument. But nothing in *Leon* suggests the illogical position that information supporting probable cause that is known to the officers but not to the issuing magistrate could make the officers' reliance on the deficient warrant reasonable. Instead, *Leon* describes several specific situations where the relevant extra-affidavit facts are ones other than pertinent, truthful information known to the officers but not communicated to the magistrate. 468 U.S. at 923. Suppression is appropriate, for example, "in cases where the issuing magistrate wholly abandoned his judicial role," because the Fourth Amendment requires a magistrate to be neutral and detached and to make his or her own determination of probable cause. *Id.* "No reasonably well trained [**21] officer should rely on the warrant" where the officer knows that it was not validly issued. *Id.* Similarly, the *Leon* Court instructed:

> Our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances--including whether the warrant application had previously been rejected by a different magistrate--may be considered.

*Id.* at 922 n.23.

This passage from *Leon* points out the need to consider the circumstances where extra-affidavit information might be relevant to an officer's good-faith reliance on the warrant's validity. For example, if an officer takes an affidavit to nine [***15] magistrates, all of whom decide that it does not establish probable cause, and the officer subsequently relies on a later-invalidated warrant issued by a tenth magistrate presented with the same affidavit, the fact that nine magistrates had decided against issuing a warrant raises an inference that the officer's reliance on the warrant was not objectively reasonable. [**22] A contrasting situation is found in the case before us, where the officer knew of facts that would have established probable cause, but omitted those facts from his affidavit and then relied on the warrant issued by a judge who did not know those additional facts. Knowing additional facts that would establish probable cause, but that were not presented to the issuing magistrate, does not establish that the officer reasonably believed that the warrant was properly issued. In the first situation, extra-affidavit facts are relevant to the pertinent question of whether the officer reasonably believed that the warrant was valid. But the extra-affidavit facts in the second situation have no bearing on the question.

The government also cites the Eleventh Circuit's decision in *United States v. Martin*, 297 F.3d 1308 (11th Cir.), *cert. denied*, 537 U.S. 1076, 123 S. Ct. 667, 154 L. Ed. 2d 574 (2002), in support of its proposed rule. In *Martin*, the Eleventh Circuit concluded that although the affidavit did not establish probable cause, it "contained sufficient indicia of probable cause to enable a reasonable officer to execute the warrant thinking it valid. [**23] " *Id.* at 1315. Because no other exception to *Leon* applied (e.g., the magistrate had not abandoned his judicial role), this conclusion should have ended the Eleventh Circuit's inquiry.

The *Martin* court then proceeded, however, to redundantly "make an inquiry as [*600] to whether [the police officer] reasonably relied upon the search warrant." *Id.* at 1318. In answering this question, the Eleventh Circuit decided that it was permitted to consider additional facts supporting probable cause that the police officer had known but had not disclosed to the issuing magistrate. The court concluded: "Under the totality of the circumstances, taking into account the facts [***16] known to [the police officer] at the time he applied for the search warrant, we find that [the police officer] reasonably believed that probable cause existed to execute a search warrant." *Id.* at 1320. I find this portion of the opinion in *Martin* perplexing, because the relevant question under *Leon* is whether the officer reasonably believed that the warrant was valid, not

whether probable cause existed. Perhaps this part of *Martin* can be chalked up [**24] to dicta. But even if this characterization is incorrect, this court is of course not bound by the holdings of our sister circuits. *Nixon v. Kent County*, 76 F.3d 1381, 1388 (6th Cir. 1996) (en banc).

The government also recites the comment in *Martin* that "the exclusionary rule is meant to guard against police officers who purposely leave critical facts out of search warrant affidavits because these facts would not support a finding of probable cause." 297 F.3d at 1320. I agree with this statement, but find it underinclusive. The Supreme Court stated in *Leon* that "the exclusionary rule . . . operates as a judicially created remedy *designed to safeguard Fourth Amendment rights generally* through its deterrent effect." 468 U.S. at 906 (internal quotation marks omitted) (emphasis added). Although an officer's intentional omission of unsupportive facts from a search warrant application may well violate the Fourth Amendment, it is by no means the only way to violate the Amendment. *See, e.g., id.* at 922-24 (listing multiple examples of Fourth Amendment violations). The *Martin* court's statement of the exclusionary [**25] rule's purpose is therefore underinclusive and does not justify the government's position.

One other conceivable source of authority for the consideration of the undisclosed information, which this court relied upon in the unpublished decision of *United States v. Leaster*, 35 Fed. Appx. 402, 2002 WL 1147343, at *8 (6th Cir. 2002), is *Anderson v. Creighton*, 483 U.S. 635, 641, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987). Although the Supreme Court did indeed state in *Anderson* that "whether it was objectively legally reasonable [***17] to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials," *id.* at 641, this statement was made in the context of deciding whether qualified immunity protected an officer conducting a warrantless search that was undertaken because of exigent circumstances. Given that no warrant is required for a search undertaken with both probable cause and exigent circumstances, I believe that *Anderson* provides no support for the rule proposed by the government. *Leaster* failed to make this key distinction [**26] and is thus unpersuasive.

The Eighth Circuit also relied on *Anderson* to justify its adoption of the rule proposed by the government. *See United States v. Martin*, 833 F.2d 752, 756 (8th Cir. 1987). It did so without acknowledging the significance of the "exigent circumstances" exception to the warrant requirement, an exception not present in the case before us. Subsequent Eighth Circuit cases have simply followed *Martin* without any further analysis. *See, e.g., United States v. Johnson*, 78 F.3d 1258, 1263 (8th Cir. 1996); *United States v. Simpkins*, 914 F.2d 1054, 1057 (8th Cir. [*601] 1990). I therefore find the Eighth Circuit cases equally unpersuasive.

No compelling authority, in sum, stands for the proposition that a search conducted pursuant to an invalid warrant can be saved under *Leon*'s good-faith exception on the basis that the officers had other information that was not presented to the issuing magistrate, but that would have established probable cause. This proposition is contrary to *Leon* and, in my opinion, the court should so declare in the case before us.

**Dissent by:** KAREN NELSON MOOREBoyce F. Martin

## Dissent

[***18] [**27] KAREN NELSON MOORE, Circuit Judge, dissenting. I respectfully dissent because the officers' reliance upon the warrant was not reasonable given the exiguous information presented to the issuing judge, and thus the *Leon* good-faith exception does not apply to this case. *See United States v. Leon*, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984).

Consequently, I believe that we must reach the issue, buried in the sand by the majority, of whether an officer can reasonably rely on a warrant when the officer possesses information that could establish probable cause but does not communicate that information to the magistrate. I wholeheartedly agree with Judge Gilman's opinion on the proper role (or lack thereof) of withheld information in the calculus of *Leon*, and I do not elaborate on its reasoning at great length. Judge Gilman is certainly correct that Captain Lawson's affidavit was insufficient to permit the issuing magistrate to determine that probable cause existed. Judge Gilman also properly concludes that information known to the officers, but not relayed to the issuing magistrate, cannot preserve the fruits of an invalid warrant under the *Leon* good-faith exception. [**28] The original panel should be reversed on this point, and I endorse Judge Gilman's rejection of the decisions of the Eighth and Eleventh Circuits. *See United States v. Johnson*, 78 F.3d 1258 (8th Cir. 1996); *United States v. Martin*, 297 F.3d 1308 (11th Cir.), *cert.*

*denied*, 537 U.S. 1076, 123 S. Ct. 667, 154 L. Ed. 2d 574 (2002). Knowledge withheld, either by accident or through purposeful omission or misrepresentation, cannot resuscitate otherwise suppressible evidence, because an officer who neglects to inform fully the issuing magistrate and who then executes the defective warrant does not manifest an "objectively reasonable" good-faith belief that the warrant was valid. *Leon*, 468 U.S. at 922. Far from [***19] demonstrating reasonable belief, the omitted information serves chiefly to highlight an officer's understanding of the warrant's deficiency because that officer is in a unique position to understand that the issuing magistrate lacked all the necessary data. Permitting information not presented to the issuing magistrate to serve as the lynchpin for invoking *Leon* perverts the meaning of the warrant requirement [**29] because it allows law enforcement officials to bypass the judiciary; evidence produced by inadequate search warrants, which are starved of information and seemingly doomed by insufficient probable cause, should not receive a reprieve solely because of information obscured from the issuing magistrate's consideration.

I part ways with Judge Gilman, as well as the majority, because of their conclusion that the officers here had an objectively reasonable good-faith belief in the warrant's legitimacy based upon the scant information actually given to the issuing magistrate. I would rule that these officers were "relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923 (quotation omitted). [*602] The majority holds that even though the affidavit did not provide enough of a nexus between the Carpenters' residence and the illegal activity to sustain probable cause, "the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched to support an officer's good-faith belief in the warrant's validity . . . ." Maj. Op. at 8. In the majority's [**30] view, the affidavit attesting to (1) the presence of marijuana "near" the residence and (2) "a road connecting" the residence to the area where the plants were growing did not suffice to give the officers probable cause to search, but supported the officers' objectively reasonable belief that the warrant was valid. *Id*. Because I believe that the two facts presented in the affidavit at best draw a tenuous and shadowy connection between the Carpenter residence and the marijuana plants that is not sufficient to meet the *Leon* standards, I cannot agree that a [***20] reasonable officer could have believed that the warrant was valid.

The threshold issue is how to determine whether an officer has an objectively reasonable good-faith belief in the defective warrant's validity. The *Leon* Court wrote that "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." 468 U.S. at 922 n.23. "The objective standard . . . requires officers to have a reasonable knowledge of what the law prohibits." *Id.* at 919 n.20. [**31] Some minimal connection between the property or person to be searched and the alleged wrongdoing is a necessary, but not sufficient, precondition for the satisfaction of this objective standard. The mere existence of some nexus will not preserve evidence from the exclusionary rule when a reasonable officer, well trained in the practice of searches and presumed to understand the basic principles of the law in this area, submits an affidavit describing a connection that so plainly fails to establish probable cause that the reasonable officer should not have applied for the warrant initially.

The presence of marijuana "near" the Carpenter residence and the sighting of a road "connecting" the marijuana and the residence implied some relationship between the two, but this link was so minimal and so plainly failed to show probable cause to search that the officers could not have believed that the warrant authorizing the search was valid. Several courts have held that *Leon* does not apply when an affidavit offers an extremely limited factual basis for probable cause or an extremely minimal nexus, because such an affidavit is "so lacking in indicia of probable cause as to render official [**32] belief in its existence entirely unreasonable." *Id.* at 923 (quotation omitted). For example, the Eighth Circuit ruled that no reasonable officer could have believed that probable cause existed when the only evidence connecting the defendant's home to the cultivation of drugs was the presence of [***21] marijuana on a farm close to the defendant, which was owned by his relatives. *United States v. Herron*, 215 F.3d 812, 815 (8th Cir. 2000). The court held that *Leon* did not apply, because there was neither evidence of marijuana growing at the defendant's residence nor proof of any participation by the defendant in the cultivation of the marijuana discovered at the other farm. *Id.* at 814. The "officers involved should have been fully aware of the deficiencies of their affidavits" because the affidavits, which make only a few passing references to the defendant, "simply do not say very much about [the defendant] or his residence." *Id.* & n.2; *see also* *United States v. Hove*, 848 F.2d 137, 140 (9th Cir. 1988) (rejecting argument that [*603] *Leon*

applied when affidavit did not link the searched residence to the defendant [**33] or explain why incriminating evidence may have been found there).

The cases upon which the majority relies are distinguishable from the facts here, because in each, the underlying affidavit contained considerably more detail or precision than Lawson's affidavit, and therefore made it possible for officers executing the warrant to form a reasonable belief that probable cause existed. In *United States v. Van Shutters*, 163 F.3d 331 (6th Cir. 1998), we upheld a search under *Leon* because the affidavit stated that the affiant had personal knowledge of the defendant's illegal activities, and because the affidavit described the location of the residence to be searched "with such particularity that a common sense inference is that the affiant visited the premises himself and presumably . . . observed [the defendant] in the premises." *Id.* at 337. In contrast to the majority's reading of *Van Shutters*, I do not believe that we applied the *Leon* exception based only upon an extremely minimal connection to the illegal activity, namely the defendant's access to the residence; we explained in *Van Shutters* that the affidavit presented a detailed connection [**34] such that "only a police officer with extraordinary legal training would have detected any deficiencies in [the] document." *Id.* Generally, when an affidavit provides [***22] detailed facts and eschews vague descriptions of the location or person to be searched, it is much more likely that a law enforcement official could form an objectively reasonable belief that a warrant was valid. *See United States v. Watkins*, 179 F.3d 489, 493, 499 (6th Cir. 1999) (applying *Leon* when a six-page affidavit detailed several instances of the defendant's drug-related activity both at and away from a different residence that the police did not search, even though the affidavit did not mention a second house that was the object of the search); *United States v. Williams*, 3 F.3d 69, 70-71, 74 (3d Cir. 1993) (applying *Leon* because affidavit of housekeeper detailed specifics of illegal drug activity in motel room, such as "coded" knocks, overheard conversations, and observations of paraphernalia made while cleaning); *cf. United States v. Helton*, 314 F.3d 812, 816, 824 (6th Cir. 2003) (rejecting application of *Leon* exception even though [**35] a twenty-seven-page affidavit supported the warrant, because the affidavit relied too heavily on an anonymous tipster's recollections).

Additionally, the proximity of illegal marijuana cultivation to the property that is searched is a significant factor in assessing the objective reasonableness of an officer's belief that probable cause existed. In *United States v. Malin*, 908 F.2d 163 (7th Cir. 1990), the Seventh Circuit found that probable cause existed to search a residence, but questioned in the alternative whether *Leon* would apply. The court answered affirmatively because the officer's affidavit described his observation of marijuana growing directly next to a house in a fenced-in yard, even though the officer did not observe any individual near the marijuana. *Id.* at 165-67. *See also United States v. Huggins*, 299 F.3d 1039, 1041, 1045 (9th Cir. 2002) (concluding that an objectively reasonable officer could rely on an affidavit when it presented information that the defendant's home consumed electricity in a manner consistent with marijuana cultivation).

[***23] The facts here are much closer to *Herron* than they are [**36] to *Van Shutters* or *Malin*. Lawson's affidavit provided only the barest modicum of information to the issuing magistrate. Its brevity and vacuousness sharply distinguishes it from the detailed affidavit presented in *Van Shutters*. It did not connect the Carpenter residence to the marijuana observed; that [*604] the marijuana was seen "near" to the residence does not necessarily imply a connection between the two, particularly when Lawson knew that the plants were in fact approximately 900 feet from the Carpenter residence. Unlike *Malin*, when the marijuana grew in a fenced-in yard directly adjacent to the house, the marijuana "near" the Carpenters' trailer was far enough away that no officer could draw a firm connection between the two, or between the marijuana and any other residence in the neighborhood for that matter. If the marijuana had been growing next to the trailer or in the patch of corn behind the trailer, the officers' belief in the warrant's validity might have been more reasonable. Furthermore, the road "connecting" the residence to the marijuana plants was in reality a dirt path leading from the Carpenters' trailer to a separate tractor path that may have served [**37] as the connection between the city road and a homestead behind the Carpenters' trailer that had burned down several years before. The good-faith exception cannot apply here because Lawson's affidavit was based on two extremely inconclusive connections between the marijuana and the house, and therefore Lawson could not have reasonably believed that probable cause existed.

Because there was no probable cause to justify the search and because I do not believe that a law enforcement officer could form the objectively reasonable belief that the warrant was valid when so little linked the Carpenter residence to the marijuana plants growing "near" the residence, I would reverse the

district court and exclude the evidence gathered from the illegal search.

[***24] BOYCE F. MARTIN, JR., Circuit Judge, dissenting. I join Judge Moore's very persuasive dissent and add only the following. Given the sophisticated technologies that the police now have at their disposal, as well as the wide discretion that they currently enjoy, it is especially important that we are careful not to expand their powers beyond what is authorized by the Constitution. In this case, the Constitution has been set aside [**38] in the name of expediency. Regrettably, we have descended further down that slippery slope of post-hoc rationalization, where everything that the police do becomes acceptable when viewed in retrospect.

For the reasons set forth by Judge Moore and for these reasons, I respectfully dissent.

---

End of Document

# McKaskle v. Wiggins

465 U.S. 168 (1984)

Cited in Opening Brief at: vii, 17, 38

The standard of review citation is addressed in Response, Part III.B. Highlighted language appears at 465 U.S. at 176, 177 n.8, and 178.

Q Questioned
As of: September 14, 2026 6:48 PM Z

# McKaskle v. Wiggins

Supreme Court of the United States

November 9, 1983, Argued ; January 23, 1984, Decided

No. 82-1135

**Reporter**
465 U.S. 168 *; 104 S. Ct. 944 **; 79 L. Ed. 2d 122 ***; 1984 U.S. LEXIS 24 ****; 52 U.S.L.W. 4176

McKASKLE, ACTING DIRECTOR, TEXAS DEPARTMENT OF CORRECTIONS v. WIGGINS

**Prior History:** [****1] CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.

**Disposition:** 681 F.2d 266, reversed.

## Syllabus

At his state robbery trial, respondent was permitted to proceed *pro se*, but the trial court appointed standby counsel to assist him. Before and during the trial, respondent frequently changed his mind regarding the standby counsel's role, objecting to counsel's participation on some occasions but agreeing to it on other occasions. Following his conviction, respondent unsuccessfully moved for a new trial on the ground that his standby counsel had unfairly interfered with his presentation of his defense. After exhausting direct appellate and state habeas corpus review, respondent filed a habeas petition in Federal District Court, claiming that standby counsel's conduct deprived him of his right to present his own defense, as guaranteed by *Faretta* v. *California*, 422 U.S. 806. The District Court denied the petition, but the Court of Appeals reversed, holding that respondent's Sixth Amendment right of self-representation was violated by the unsolicited participation of overzealous standby counsel.

*Held*: Respondent's Sixth Amendment right [****2] to conduct his own defense was not violated, since it appears that he was allowed to make his own appearances as he saw fit and that his standby counsel's unsolicited involvement was held within reasonable limits. Pp. 173-187.

(a) The Counsel Clause of the Sixth Amendment implies a right in the defendant to conduct his own defense, with assistance at what is his, not counsel's, trial. Here, the record reveals that respondent was accorded the rights of a *pro se* defendant to control the organization and conduct of his own defense, to make motions, to argue points of law, to participate in *voir dire*, to question witnesses, and to address the court and the jury at appropriate points in the trial. Pp. 173-175.

(b) The objectives of affirming a *pro se* defendant's dignity and autonomy and of allowing the presentation of what may be his best possible defense can both be achieved without categorically silencing standby counsel. In determining whether a defendant's *Faretta* rights have been respected, the primary focus must be on whether he had a fair chance to present his case in his own way. Such rights, however, do impose limits on the extent of standby counsel's unsolicited [****3] participation. First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury, and, second, standby counsel's participation without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself. Pp. 176-179.

(c) The appearance of a *pro se* defendant's self-representation will not be undermined by standby counsel's participation outside the jury's presence. In this case, most of the incidents of which respondent complains occurred when the jury was not in the courtroom, and, while some of those incidents were regrettable, counsel's participation fully satisfied the first limitation noted above. Respondent was given ample opportunity to present his own position to the court on every matter discussed, and all conflicts between respondent and counsel were resolved in respondent's favor. Pp. 179-181.

(d) It is when standby counsel participate in the jury's presence that a defendant may legitimately claim that excessive involvement by counsel will destroy the appearance that the defendant is acting *pro se*. Nevertheless, a categorical bar on counsel's

participation [****4] is unnecessary. Here, where respondent's *pro se* efforts were undermined primarily by his own changes of mind regarding counsel's role, it is very difficult to determine how much of counsel's participation was in fact contrary to respondent's desires. If a defendant is given the opportunity and elects to have counsel appear before the court or a jury, his complaints concerning counsel's subsequent unsolicited participation lose much of their force. Once a *pro se* defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced. Pp. 181-183.

(e) A defendant's Sixth Amendment rights are not violated when a trial judge appoints standby counsel -- even over the defendant's objection -- to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of his achievement of his own clearly indicated goals. At respondent's trial a significant part of standby counsel's [****5] participation involved such basic procedures, and none interfered with respondent's control over his defense or undermined his appearance before the jury in the status of a *pro se* defendant. Pp. 183-185.

(f) Aside from standby counsel's participation that was either approved by respondent or attendant to routine clerical or procedural matters, counsel's unsolicited comments in front of the jury were not substantial or frequent enough to have seriously undermined respondent's appearance before the jury in the status of representing himself. Pp. 185-187.

**Counsel:** *Leslie A. Benitez*, Assistant Attorney General of Texas, argued the cause for petitioner. With her on the brief were *Jim Mattox*, Attorney General, *David R. Richards*, Executive Assistant Attorney General, and *Nancy M. Simonson*, Assistant Attorney General.

*Craig Smyser*, by appointment of the Court, 460 U.S. 1035, argued the cause *pro hac vice* and filed a brief for respondent. Respondent filed a brief *pro se*.

**Judges:** O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and STEVENS, JJ., joined. BLACKMUN, J., concurred in the result. WHITE, J., [****6] filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 188.

**Opinion by:** O'CONNOR

# Opinion

[*170] [***128] [**947] JUSTICE O'CONNOR delivered the opinion of the Court.

[1A]In *Faretta* v. *California*, 422 U.S. 806 (1975), this Court recognized a defendant's Sixth Amendment right to conduct his own defense. The Court also held that a trial court may appoint "standby counsel" to assist the *pro se* defendant in his defense. Today we must decide what role standby counsel who is present at trial over the defendant's objection may play consistent with the protection of the defendant's *Faretta* rights.

I

Carl Edwin Wiggins was convicted of robbery and sentenced to life imprisonment as a recidivist. His conviction was set aside because of a defective indictment. When Wiggins was retried he was again convicted and sentenced to life imprisonment. Standby counsel were appointed to assist Wiggins at both trials. Wiggins [***129] now challenges counsel's participation in his second trial.

Prior to the first trial, a hearing was held on Wiggins' motion to proceed *pro se*. The court granted the motion, Record 4a, but simultaneously appointed two attorneys [****7] to act [*171] as standby counsel. Wiggins initially objected to their presence. *Id.*, at 11a. Shortly thereafter, however, counsel asked Wiggins how they should conduct themselves at trial, and Wiggins expressly requested that they bring appropriate objections directly to the attention of the court, without first consulting him. *Id.*, at 37a. After the trial, newly appointed counsel discovered that the original indictment was defective, and a new trial was granted.

On April 16, 1973, about two months before the second trial began, Wiggins filed a request for appointed counsel, stating that he wished to rescind his earlier waiver of counsel. App. A-54 -- A-55. [1] [****8] The next

---

[1] Wiggins' letter to the trial judge stated:

"I wish to *rescind my* earlier *request to waive* court appointed *assistance counsel* -- and request *that this honorable* court

day Wiggins filled out and signed a form captioned "Petition for Appointment of Counsel and Order Thereon." [2] The trial court appointed Benjamin Samples. About a month later Wiggins filed an additional request for counsel. [3] Five days later Wiggins [*172] filled out another appointment of counsel form, and the trial court appointed R. Norvell Graham.

[**948] Wiggins' wishes respecting appointed counsel remained volatile as his second trial approached. When pretrial proceedings began on June 4, 1973, Wiggins announced that he would be defending himself *pro se*; he then firmly requested that counsel not be allowed to interfere with Wiggins' presentations [****9] to the court. Record 8, 12, 39-40. Wiggins reaffirmed his desire to proceed *pro se* on the following morning, June 5, and objected even to the court's insistence that counsel remain available for consultation. *Id*., at 66-67. The trial began later that day, and shortly thereafter Wiggins interrupted his cross-examination of a witness to consult with Graham off the record. *Id*., at 201. Still later, Wiggins expressly agreed to allow Graham to conduct *voir dire* of another witness. *Id*., at 210.

Wiggins started the next day of trial, June 6, with a request that the trial not proceed in Samples' absence from the courtroom. *Id*., at 255. Later that morning Wiggins requested that counsel not be allowed to assist or interrupt, *id*., at 308, but a short while after Wiggins interrupted his own cross-examination [***130] of a witness to confer with Samples off the record. *Id*., at 310. When the trial reconvened in the afternoon, Wiggins agreed to proceed in Samples' absence. *Id*., at 328. After Samples returned, however, Wiggins again interrupted his own cross-examination of a witness to confer with him. *Id*., at 333. Later Wiggins insisted that [****10] counsel should not initiate private consultations with him. *Id*., at 345-346. Before the end of the day Wiggins once again found occasion to interrupt his own examination of a witness to confer with Samples. *Id*., at 384.

On the following day, June 7, Wiggins agreed that Graham would make Wiggins' opening statement to the jury. *Id*., at 486. On June 8, Wiggins was once again willing to have the trial proceed in the absence of one of his standby counsel. [*173] *Id*., at 546. Following his conviction, Wiggins moved for a new trial. At the July 31 hearing on Wiggins' motion, he denounced the services standby counsel had provided. He insisted that they had unfairly interfered with his presentation of his defense. *Id*., at 572b.

After exhausting direct appellate and state habeas review Wiggins filed a petition for federal habeas corpus relief. He argued that standby counsel's conduct deprived him of his right to present his own defense, as guaranteed by *Faretta*. The District Court denied the habeas petition, but the Court of Appeals for the Fifth Circuit reversed. *Wiggins* v. *Estelle*, 681 F.2d 266, rehearing denied, 691 F.2d 213 (1982). [****11] The Court of Appeals held that Wiggins' Sixth Amendment right of self-representation was violated by the unsolicited participation of overzealous standby counsel:

"[The] rule that we establish today is that court-appointed standby counsel is 'to be seen, but not heard.' By this we mean that he is not to compete with the defendant or supersede his defense. Rather, his presence is there for advisory purposes only, to be used or not used as the defendant sees fit." 681 F.2d, at 273 (footnote omitted).

We do not accept the Court of Appeals' rule, and reverse its judgment.

II

A

---

appoint *counsel* to assist me.

"I would appreciate very much if the court would appoint the Honorable Stewart J. Alexander who was previously appointed to assist on appeal, before sentence was set aside.

"And I apologize if I have caused an inconvenience to the court." Record 584 (original emphasis).

[2] The petition read:

"Now comes Carl Edwin Wiggins, defendant in the above styled and numbered cause, and respectfully petitions the Court to appoint counsel to represent him in said felony cause and would show to the Court that he is too poor to employ counsel." *Id*., at 586.

[3] This request read in pertinent part:

"I have been indicted four (4) times of the same offense. . . .

"According to Higgins v. State and Snow v. State, where prosecutions were dismissed -- and according to VACCP Art. 28.13, I should'nt *[sic]* be tried again.

*"Will you please appoint counsel* to cite authorities on this issue, also, in favor of the state. I find only authorities indicating that further prosecution is barred. None indicating other-wise *[sic]." Id*., at 623 (original emphasis).

In *Faretta* the Court considered the case of a criminal defendant who was required to present his defense exclusively through counsel. The Court held that an accused has a Sixth Amendment right to conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol. *Faretta* concluded that "[unless] the accused has acquiesced in [representation through [*174] counsel], the defense presented is not the defense guaranteed him by the Constitution, for, in a very [****12] real sense, it is not *his* defense." 422 U.S., at 821.

[2]Faretta's holding was based on the longstanding recognition of a right of self-representation in federal and most state [**949] courts, and on the language, structure, and spirit of the Sixth Amendment. Under that Amendment, it is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who has the right to confront witnesses, and who must be accorded "compulsory process for obtaining [***131] witnesses in his favor." The Counsel Clause itself, which permits the accused "to have the Assistance of Counsel for his defence," implies a right in the defendant to conduct his own defense, with *assistance* at what, after all, is his, not counsel's trial.

B

[3]A defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The *pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in *voir dire*, to question witnesses, and to address the court and the jury at appropriate points in the trial. The record reveals that Wiggins was [****13] in fact accorded all of these rights.

Before trial Wiggins moved the trial court to order preparation of a transcript of the first trial. He, not standby counsel, then waived receipt of the transcript and announced ready for trial. Record 7-11, 65-66. He filed and argued at least 12 *pro se* motions in pretrial proceedings. [4] [****14] Wiggins [*175] alone conducted the defense's *voir dire* of prospective jurors [5] and made the opening statement for the defense to the jury. *Id.*, at 347-348.

Wiggins filed numerous *pro se* motions in the course of the trial. [6] He cross-examined the prosecution's witnesses freely, *id.*, at 26-30, 199-206, 224-226, 228-237, 269-286, 290-292, 296-301, 310, 319-326, 332-336, 434-447, 455-468, 532-534, and registered his own objections, *id.*, at 237, 238, 317, 318, 352, 353-359, 418-420, 450, 484, 485, 497, 502-503, 536. Throughout the trial Wiggins selected the witnesses for the defense, *id.*, at 47, 56, 60-61, 348, 368, 381, 383, 384, 393, 396, 398-399, 403, 408, 412, 413, 424, examined them, *id.*, at 47-55, 349-351, 363-367, 368-373, 374-376, 380-381, 381-382, 383-384, 384-387, 399-401, 404-407, 408-412, 424-426, decided that certain questions would *not* be asked by the defense, *id.*, at 414, 449-450, and decided which witnesses would not be called, *id.*, at 390, 415, 422. Against counsel's advice, Wiggins announced that the defense rested. *Id.*, at 413. Wiggins filed his own requested [****15] charges to the jury, *id.*, at 471-473, and made his own objections to the court's suggested charge, *id.*, at 473-478. He obtained the removal of one of the court's proposed charges over counsel's express objection, *id.*, at 478, approved the verdict form supplied to the jury, *id.*, at 479, and gave a closing argument to the jury, *id.*, at 490-497. Wiggins elected to go to the jury at the punishment phase of his trial, *id.*, at 69, and he argued his case to the [***132] jury at that stage as well, *id.*, at 540-541.

[*176] C

[1B]Wiggins' complaint is directed not at limits placed on *his* participation in the trial, for there clearly were none. It is directed instead at the allegedly inadequate limits placed on standby counsel's participation.

---

[4] These included a motion for discovery, *id.*, at 14, a motion to set aside the indictment, *id.*, at 16, a double jeopardy claim, *id.*, at 17-22, a motion *in limine*, a motion for special relief, *id.*, at 23-24, a motion to correct an offense report, *id.*, at 31, a motion for discovery of any exculpatory material in the prosecutor's file, *id.*, at 33, a motion to keep a marked document out of the sight of the jury, *id.*, at 42, a motion to sequester the jury, *id.*, at 44-45, another motion *in limine, id.*, at 57-58, a motion for a change of venue (withdrawn by the defendant), *id.*, at 59, a motion for a speedy trial, *id.*, at 60, a motion for a jury shuffle, *id.*, at 67-68, and a motion for witness fees, *id.*, at 69-70.

[5] Wiggins made an opening statement to the venire, *id.*, at 101-103, and examined 33 individual venirepersons. *Id.*, at 106-185.

[6] These included a motion for acquittal, a motion to question a witness out of the presence of the jury, and a motion for the appointment of an investigator. *Id.*, at 342-344, 392-393, 394-395.

[**950] At trial Wiggins objected to the very fact [****16] that counsel would remain available to assist him. *Id*., at 66-67. Wiggins has abandoned that objection; he now contends only that his *Faretta* right to present his defense *pro se* was impaired by the distracting, intrusive, and unsolicited participation of counsel throughout the trial.

III

Wiggins claims, and the Court of Appeals agreed, that the *pro se* defendant may insist on presenting his own case wholly free from interruption or other uninvited involvement by standby counsel. Wiggins relies primarily on *Faretta*'s sole reference to standby counsel:

"Of course, a State may -- even over objection by the accused -- appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. See *United States* v. *Dougherty*, 154 U. S. App. D. C. 76, 87-89, 473 F.2d 1113, 1124-1126." 422 U.S., at 835, n. 46.

Wiggins contends that the "if and when" language defines the limits on standby counsel's role. He argues that the *Faretta* right will be eviscerated if counsel is [****17] allowed to argue with the defendant, make motions to the court contrary to the defendant's wishes, and take other steps not specifically approved by the defendant.

[4]In our view, both *Faretta*'s logic and its citation of the *Dougherty* case indicate that no absolute bar on standby counsel's unsolicited participation is appropriate or was intended. The right to appear *pro se* exists to affirm the [*177] dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense. Both of these objectives can be achieved without categorically silencing standby counsel.

[5]In determining whether a defendant's *Faretta* rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way. *Faretta* itself dealt with the defendant's affirmative right to participate, not with the limits on standby counsel's additional involvement. The specific rights to make his voice heard that Wiggins was plainly accorded, see *supra*, at 174-175, form the core of a defendant's right of self-representation.

[6A] [7A] [8A] [9]We recognize, nonetheless, that the right to speak [****18] for oneself entails more than the opportunity to add one's voice to a cacophony of others. As Wiggins contends, the objectives underlying the right to proceed *pro se* may be undermined by unsolicited and excessively intrusive participation by standby counsel. In proceedings before a jury the defendant may legitimately be concerned that multiple voices "for the defense" will confuse the message [***133] the defendant wishes to convey, thus defeating *Faretta*'s objectives. [7] [****19] Accordingly, the *Faretta* right must impose some limits on the extent of standby counsel's unsolicited participation. [8]

[*178] [****20] [**951] First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the *Faretta* right. If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical

---

[7] [6B]A *pro se* defendant must generally accept any unsolicited help or hindrance that may come from the judge who chooses to call and question witnesses, from the prosecutor who faithfully exercises his duty to present evidence favorable to the defense, from the plural voices speaking "for the defense" in a trial of more than one defendant, or from an *amicus* counsel appointed to assist the court, see *Brown* v. *United States*, 105 U. S. App. D. C. 77, 83, 264 F.2d 363, 369 (1959) (Burger, J., concurring in part).

[8]

[7B]Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to "harmless error" analysis. The right is either respected or denied; its deprivation cannot be harmless.

[8B]As a corollary, however, a defendant who exercises his right to appear *pro se* "cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Faretta*, 422 U.S., at 835, n. 46. Moreover, the defendant's right to proceed *pro se* exists in the larger context of the criminal trial designed to determine whether or not a defendant is guilty of the offense with which he is charged. The trial judge may be required to make numerous rulings reconciling the participation of standby counsel with a *pro se* defendant's objection to that participation; nothing in the nature of the *Faretta* right suggests that the usual deference to "judgment calls" on these issues by the trial judge should not obtain here as elsewhere.

decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded.

Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself. [9] The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy. In related contexts the courts have recognized that a defendant has a right to be present at all important stages of trial, *Snyder* v. *Massachusetts*, 291 U.S. 97 (1934), that he may not normally be forced to appear in court in shackles or prison garb, *Estelle* v. *Williams*, 425 U.S. 501, 504-505 (1976), [****21] and that he has a right to present testimony [*179] in his own behalf, see *Harris* v. *New York*, 401 U.S. 222, 225 (1971); *Brooks* v. *Tennessee*, 406 U.S. 605, 612 (1972). Appearing before the jury in the status of one who is defending himself may be equally important to the *pro se* defendant. [***134] From the jury's perspective, the message conveyed by the defense may depend as much on the messenger as on the message itself. From the defendant's own point of view, the right to appear *pro se* can lose much of its importance if only the lawyers in the courtroom know that the right is being exercised.

[****22] IV

[10]Participation by standby counsel outside the presence of the jury engages only the first of these two limitations. A trial judge, who in any event receives a defendant's original *Faretta* request and supervises the protection of the right throughout the trial, must be considered capable of differentiating the claims presented by a *pro se* defendant from those presented by standby counsel. Cf. *United States* v. *Martinez*, 597 F.2d 509, 510-511 (CA5), cert. denied, 444 U.S. 979 (1979); *United States* v. *Penick*, 496 F.2d 1105, 1108 (CA7), cert. denied, 419 U.S. 897 (1974); *United States* v. *Reeves*, 348 F.2d 469 (CA2 1965), cert. denied, 383 U.S. 929 (1966). Accordingly, the appearance of a *pro se* defendant's self-representation will not be unacceptably undermined by counsel's participation outside the presence of the jury.

[11]Thus, *Faretta* rights are adequately vindicated in proceedings outside the presence of the jury if the *pro se* defendant is allowed to address the court freely on his own behalf and if disagreements between counsel and the *pro* [****23] *se* defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel. [10]

[*180] [**952] Most of the incidents of which Wiggins complains occurred when the jury was not in the courtroom. In the jury's absence Wiggins' two standby counsel frequently explained to the trial judge their views and points of disagreement with Wiggins. Counsel made motions, dictated proposed strategies into the record, [11] registered objections to the prosecution's testimony, urged the summoning of additional witnesses, and suggested questions that the defendant should have asked of witnesses. [****24]

On several occasions Wiggins expressly adopted standby counsel's initiatives. When counsel moved to quash a jury panel, for example, Wiggins joined the motion. Record 81-82. Wiggins seconded counsel's requests for a police report and photographs. *Id.*, at 51-52, 54. At least twice, counsel made a motion, the motion was denied, and Wiggins then registered his exception to the denial. [12]

On several other occasions Wiggins strongly opposed the initiatives of counsel. He resisted counsel's

[9] *Faretta* anticipated this second requirement. In its footnote on standby counsel *Faretta* cited three pages of *United States* v. *Dougherty*, 154 U. S. App. D. C. 76, 473 F.2d 1113 (1972), in which we find this statement:

"The utility of an amicus appointment is dependent on explanation to and cooperation by [the] defendant, and on understanding, too, that he may claim with some merit that his *pro se* rights include his right to appear before the jury in the status of one defending himself, and that this is defeated if a too conspicuous role is played by an attorney, unless it clearly appears to the jury that he does not have the status of defense counsel." *Id.*, at 88, 473 F.2d, at 1125 (footnote omitted).

[10] Cf. ABA Standards For Criminal Justice 6-3.7 (2d ed. 1980) (standby counsel may "call the judge's attention to matters favorable to the accused upon which the judge should rule on his or her motion . . ."); Uniform Rule of Criminal Procedure 711 (1974) (same); *Mayberry* v. *Pennsylvania*, 400 U.S. 455, 467-468 (1971) (BURGER, C. J., concurring) (same).

[11] Record 344-345, 414-415, 427-428, 449-450, 478.

[12] See *id.*, at 243, 246; 447, 449. On other occasions Wiggins simply did not react to standby counsel's participation. See, *e. g., id.*, at 32.

suggestion that the trial be postponed so [***135] that the transcript of his prior trial could be prepared, [13] and he waived counsel's right to a 10-day [****25] preparation period, which counsel wished to invoke. *Id.*, at 64-66. In the course of a pretrial discussion concerning a discovery request Wiggins indignantly demanded that counsel not participate further without invitation. *Id.*, at 39-40. Later, Wiggins successfully opposed the inclusion in the jury instructions of a charge that counsel felt should be included. *Id.*, at 476-478.

The most acrimonious exchange between Graham and Wiggins occurred in the course of questioning a witness on *voir dire*. Wiggins suggests this exchange was typical of counsel's [*181] overbearing conduct, but he fails to place the incident in context. Wiggins had expressly agreed to have Graham conduct the *voir dire, id.*, at 210, but Wiggins attempted to take over the questioning in midstream. Plainly exasperated, Graham used profanity and curtly [****26] directed Wiggins to "[sit] down." [14]

Though several of these incidents are regrettable, we are satisfied that counsel's participation outside the presence of the jury fully satisfied the first standard we have outlined. Wiggins was given ample opportunity to present his own position to the court on every matter discussed. He was given time to think matters over, to explain his problems and concerns informally, and to speak to the judge off the record. Standby counsel participated actively, but for the most part in an orderly manner. The one instance of overbearing conduct by counsel was a direct result of Wiggins' own indecision as to who would question the witness on *voir dire*. Wiggins was given abundant opportunity to argue his contentions to the court.

Equally important, all conflicts between Wiggins and counsel were resolved in Wiggins' favor. The trial [****27] judge repeatedly explained to all concerned that Wiggins' strategic choices, not counsel's, would prevail. *Id.*, at 12-13, 65, 210, 223-224, 306-308, 341-342, 345-346, 414-415, 427, 430, 450, 477-478. Not every motion made by Wiggins was granted, but in no instance was counsel's position adopted over Wiggins' on [**953] a matter that would normally be left to the defense's discretion.

V

[12]Participation by standby counsel in the presence of the jury is more problematic. It is here that the defendant may legitimately claim that excessive involvement by counsel will destroy the appearance that the defendant is acting *pro se*. [*182] This, in turn, may erode the dignitary values that the right to self-representation is intended to promote and may undercut the defendant's presentation to the jury of his own most effective defense. Nonetheless, we believe that a categorical bar on participation by standby counsel in the presence of the jury is unnecessary.

A

[13]In measuring standby counsel's involvement against the standards we have described, it is important [***136] not to lose sight of the defendant's own conduct. A defendant can waive his *Faretta* rights. Participation [****28] by counsel with a *pro se* defendant's express approval is, of course, constitutionally unobjectionable. A defendant's invitation to counsel to participate in the trial obliterates any claim that the participation in question deprived the defendant of control over his own defense. Such participation also diminishes any general claim that counsel unreasonably interfered with the defendant's right to appear in the status of one defending himself.

Although this is self-evident, it is also easily overlooked. A defendant like Wiggins, who vehemently objects at the beginning of trial to standby counsel's very presence in the courtroom, may express quite different views as the trial progresses. Even when he insists that he is not waiving his *Faretta* rights, a *pro se* defendant's solicitation of or acquiescence in certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably.

The record in this case reveals that Wiggins' *pro se* efforts were undermined primarily by his own, frequent changes of mind regarding counsel's role. Early in the trial Wiggins insisted he wished to proceed entirely without assistance, [****29] but shortly thereafter he expressly agreed that counsel should question a witness on *voir dire*. Wiggins objected vehemently to some of counsel's motions, but warmly embraced others. Initially Wiggins objected to standby counsel's presence; later he refused to allow the trial to proceed in [*183] their absence; in the end he agreed that counsel

[13] *Id.*, at 7-9. Wiggins later came to regret the unavailability of the transcript, and claimed that he had never waived his right to receive it. *Id.*, at 252-254.

[14] *Id.*, at 215, 218, 223. Wiggins was given a full opportunity to question the witness when Graham had finished. *Id.*, at 224-226, 228-237.

would make a closing statement for the defense. The only two long appearances by counsel at Wiggins' trial, one before the jury and one outside its presence, were both initiated with Wiggins' express approval. Record 210-223, 241-243; 486-489. In these circumstances it is very difficult to determine how much of counsel's participation was in fact contrary to Wiggins' desires of the moment.

[14]*Faretta* does not require a trial judge to permit "hybrid" representation of the type Wiggins was actually allowed. But if a defendant is given the opportunity and elects to have counsel appear before the court or jury, his complaints concerning counsel's subsequent unsolicited participation lose much of their force. A defendant does not have a constitutional right to choreograph special appearances by counsel. Once a *pro se* defendant [****30] invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced.

B

[15] [16] [17]Faretta rights are also not infringed when standby counsel assists the *pro se* defendant in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to complete. Nor are they infringed when counsel merely helps [**954] to ensure the defendant's compliance with basic rules of courtroom protocol and procedure. In neither case is there any significant [***137] interference with the defendant's actual control over the presentation of his defense. The likelihood that the defendant's appearance in the status of one defending himself will be eroded is also slight, and in any event it is tolerable. A defendant does not have a constitutional right to receive personal instruction from the trial judge on courtroom procedure. [*184] Nor does the Constitution require judges [****31] to take over chores for a *pro se* defendant that would normally be attended to by trained counsel as a matter of course. *Faretta* recognized as much. "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." 422 U.S., at 835, n. 46.

[18]Accordingly, we make explicit today what is already implicit in *Faretta*: A defendant's Sixth Amendment rights are not violated when a trial judge appoints standby counsel -- even over the defendant's objection -- to relieve the judge of the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals. Participation by counsel to steer a defendant through the basic procedures of trial is permissible even in the unlikely event that it somewhat undermines the *pro se* defendant's appearance of control over his own defense.

At Wiggins' trial a significant part of standby counsel's participation both in and out of the jury's presence involved basic mechanics [****32] of the type we have described -- informing the court of the whereabouts of witnesses, supplying Wiggins with a form needed to elect to go to the jury at the punishment phase of trial, explaining to Wiggins that he should not argue his case while questioning a witness, and so on. See Record 9, 11-12, 45, 50, 69, 191, 206, 232, 251, 254, 255, 391, 393, 396, 404, 406, 471. When Wiggins attempted to introduce a document into evidence, but failed to mark it for identification or to lay a predicate for its introduction, counsel, at the trial court's suggestion, questioned the witness to lay an appropriate predicate, and Wiggins then resumed his examination. *Id.*, at 293-296. Similarly, the trial judge repeatedly instructed Wiggins to consult with counsel, not with the court, regarding the appropriate procedure for summoning witnesses. *Id.*, at 204-205, 207-208, 248, 272, 395, 396, 402.

[*185] [1C]Notwithstanding Wiggins' several general objections to the presence and participation of counsel, we find these aspects of counsel's involvement irreproachable. None interfered with Wiggins' actual control over his defense; none can reasonably be thought to have undermined Wiggins' [****33] appearance before the jury in the status of a *pro se* defendant.

C

Putting aside participation that was either approved by Wiggins or attendant to routine clerical or procedural matters, counsel's unsolicited comments in front of the jury were infrequent and for the most part innocuous. On two occasions Graham interrupted a witness' answer to a question put by Wiggins. *Id.*, at 204, 287. The first interruption was trivial. When the second [***138] was made the jury was briefly excused and subsequently given a cautionary instruction as requested by Graham.

Wiggins made no objection. Standby counsel also moved for a mistrial three times in the presence of the jury. *Id.*, at 262, 421-422, 498-499. Each motion was in response to allegedly prejudicial questions or comments by the prosecutor. Wiggins did not comment on the first motion, but he opposed the following two. All three motions were immediately denied by the trial court. Regrettably, counsel used profanity to express his exasperation on the second occasion. [15] [**955] Finally, counsel played an active [*186] role at the punishment phase of the trial. The record supplies no explanation for the sudden [****34] change in this regard. Wiggins made no objection to counsel's participation in this phase of the trial. We can only surmise that by then Wiggins had concluded that appearing *pro se* was not in his best interests.

[1D]The statements made by counsel during the guilt phase of the trial, in the presence of the jury and without Wiggins' express consent, occupy only a small portion of the transcript. Most were [****35] of an unobjectionable, mechanical sort. While standby counsel's participation at Wiggins' trial should not serve as a model for future trials, we believe that counsel's involvement fell short of infringing on Wiggins' *Faretta* rights. Wiggins unquestionably maintained actual control over the presentation of his own defense at all times.

We are also persuaded that Wiggins was allowed to appear before the jury in the status of one defending himself. At the outset the trial judge carefully explained to the jury that Wiggins would be appearing *pro se*. Record 84. Wiggins, not counsel, examined prospective jurors on *voir dire*, cross-examined the prosecution's witnesses, examined his own witnesses, and made an opening statement for the defense. Wiggins objected to the prosecutor's case at least as often as did counsel. If Wiggins' closing statement to the jury had to compete with one made by counsel, it was only because Wiggins agreed in advance to that arrangement.

By contrast, counsel's interruptions of Wiggins or witnesses being questioned by Wiggins in the presence of the jury were few and perfunctory. Most of counsel's uninvited comments were directed at the prosecutor. [****36] [16] [****37] Such interruptions [*187] present [***139] little threat to a defendant's *Faretta* rights, at least when the defendant's view regarding those objections has not been clearly articulated. On the rare occasions that disagreements between counsel and Wiggins were aired in the presence of the jury the trial judge consistently ruled in Wiggins' favor. This was a pattern more likely to reinforce than to detract from the appearance that Wiggins was controlling his own defense. [17] The intrusions by counsel [**956] at

[15] "MR. GRAHAM: Objection, Your Honor. The district attorney is testifying.

"THE COURT: Don't lead.

"MR. GRAHAM: I ask the Court to instruct the jury to disregard the remarks of counsel as not being testimony in the case.

"THE COURT: The Court will instruct the jury to disregard the last statement made by Mr. Rodriguez.

"MR. GRAHAM: Notwithstanding the Court's instruction, I am sure it is so prejudicial as to require a mistrial.

"DEFENDANT: No, Your Honor. I object to a mistrial. I object to counsel --

"THE COURT: I denied the motion for mistrial. Overruled.

"MR. GRAHAM: Jesus Christ." *Id.*, at 421-422.

[16] Graham registered about 15 objections during the course of the prosecutor's questioning of witnesses and closing argument. *Id.*, at 196, 261-262, 301, 302, 304, 339-340, 420-421, 498, 501. These involved pedestrian matters such as hearsay, leading the witness, calling for a conclusion, evidence not in the record, and so on. All but one, *id.*, at 339-340, were made without comment from Wiggins, and most were sustained by the trial judge without argument from the prosecutor. We note that at his first trial Wiggins, when asked, agreed that standby counsel should make objections without first consulting Wiggins. *Id.*, at 37a. On several occasions at the second trial Wiggins expressly joined counsel's objections or motions.

[17] It might be suggested that the very fact that the trial was interrupted several times by standby counsel prevented Wiggins from presenting his own defense effectively to the jury. This line of argument does not withstand scrutiny here. By our count the jury left the courtroom 15 times between the time when the indictment was read and the time when the jury retired to deliberate on the question of guilt. As best we can tell, four of these interruptions were caused by standby counsel, *id.*, at 287, 307, 341, 413, four by Wiggins himself, *id.*, at 356, 389, 393, 403, and seven by the court. *Id.*, at 207, 244, 327, 373, 392, 424. Likewise, we count 15 conferences, off-the-record but in the presence of the jury, between Wiggins and his counsel. Eight appear to have been initiated by Wiggins, *id.*, at 191, 201, 333, 340, 384, 406 (two), 450, and four by standby counsel, *id.*, at 340, 407, 415, 469; we cannot determine who initiated the remaining three, *id.*, at 280, 337, 412. Certainly the trial judge expressed his view that Wiggins himself was responsible for most of the delays and interruptions. *Id.*, at 397. In these circumstances, the interruptions caused by standby counsel did not significantly

Wiggins' trial were simply not substantial or frequent enough to have seriously undermined Wiggins' appearance before the jury in the status of one representing himself.

[****38] VI

[1E]Faretta affirmed the defendant's constitutional right to appear on stage at his trial. We recognize that a *pro se* [*188] defendant may wish to dance a solo, not a *pas de deux*. Standby counsel must generally respect that preference. But counsel need not be excluded altogether, especially when the participation is outside the presence of the jury or is with the defendant's express or tacit consent. The defendant in this case was allowed to make his own appearances as he saw fit. In our judgment counsel's unsolicited involvement was held within reasonable limits.

The judgment of the Court of Appeals is therefore

*Reversed*.

JUSTICE BLACKMUN concurs in the result.

**Dissent by:** WHITE

## Dissent

JUSTICE WHITE, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

Just as the Sixth Amendment accords an accused a fundamental right to the assistance of counsel, so also, this Court has recognized, it embodies "the correlative right to dispense with a lawyer's help," *Adams* v. *United States ex rel. McCann*, 317 U.S. 269, 279 (1942), and to manage one's own defense. *Faretta* v. *California*, 422 U.S. 806 (1975). It is, I believe, "undeniable [****39] that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." *Id*., at 834. Nevertheless, " [***140] *Faretta* establishes that the right to counsel is more than a right to have one's case presented competently and effectively." *Jones* v. *Barnes*, 463 U.S. 745, 759 (1983) (BRENNAN, J., dissenting). "The right to defend is personal," *Faretta*, 422 U.S., at 834, and the text and structure of the Sixth Amendment, as well as the common-law jurisprudence from which the Amendment emerged, comport with "a nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Id*., at 817. Thus, an accused who knowingly, intelligently, and voluntarily elects to do so is constitutionally entitled to refuse the services of a [*189] government-appointed attorney and to develop and present his own defense. *Id*., at 835-836.

I

After granting Wiggins' request that he be allowed to represent [****40] himself, the trial court designated his two appointed attorneys as standby counsel and made it clear that they served in a purely advisory capacity. One of the attorneys soon began to assume a more active role in the proceedings, and Wiggins protested that counsel's unsolicited participation was frustrating the conduct of his defense. The trial court informed Wiggins that he would receive counsel's aid whether he wanted it or not, [1] [****41] [**957] and it refused to instruct standby counsel not to volunteer their assistance without a request from Wiggins. [2]

---

detract from Wiggins' control, or appearance of control, over his *pro se* defense.

[1] "DEFENDANT: Your Honor, I would like to defend myself. I would appreciate it, sir if you would ask this man to let me defend myself.

"MR. GRAHAM: Certainly. Help yourself.

"DEFENDANT: I would be grateful. I have not solicited his assistance, Your Honor, and I don't want it.

"THE COURT: You are going to get help and/or assistance from him because you are obviously not a lawyer.

"DEFENDANT: Yes sir. I am not a lawyer.

"THE COURT: And this trial, if we do go into it, is going to be conducted according to the rules of law.

"DEFENDANT: Yes sir.

"THE COURT: And there might be an occasion when this Court is going to require that you consult with them as to what the proper procedure may be.

"DEFENDANT: Yes sir.

"THE COURT: You will have every right made available to you under the law, as this Court is able to determine.

"DEFENDANT: I appreciate that, Your Honor, but for assistant counsel to initiate something that the defendant does not want, I would like to consult the attorneys for advice. I will appreciate that, but for counsels *[sic]* to initiate something that is contrary to the defendant's defense, well, then, I couldn't appreciate that." App. A-8 -- A-9.

[2] "THE COURT: You are waiving the ten days as far as Mr.

Graham is concerned?

"THE DEFENDANT: Yes, Your Honor.

"THE COURT: The basis of that is that you expect to be an attorney for yourself pro se?

"DEFENDANT: Yes, Your Honor. In fact, not only that, I would like to waive his assistance, if I may.

"THE COURT: The Court is not going to relieve you of that. Now, you can use it or not use it. It's available to you in this case.

"DEFENDANT: Yes sir, but I would ask the court to ask Mr. Graham not to take the initiative to interfere with the defendant here, if I may do that?

"THE COURT: Well --

"DEFENDANT: I mean, if I want Mr. Graham's help I will ask for it and appreciate it if he wouldn't volunteer without me asking for it.

"THE COURT: Well, Mr. Graham is a competent attorney and he has much experience in this type of thing and I am sure what he is trying to do is what he thinks is best for you. I am not going to order him to do or not to do anything. If some problem or situation arises, I will act on it at that time. I am not going to order him not to.

"DEFENDANT: Your Honor, do I understand that the Court is forcing the services of Mr. Graham on the defendant?

"THE COURT: His availability, yes.

"DEFENDANT: May I except to that, Your Honor?" *Id.*, at A-13 -- A-14.

After numerous disagreements between Wiggins and counsel, Wiggins was again moved to request the assistance of the trial court:

"DEFENDANT: May I say it is peculiar to me, Your Honor and I would really appreciate it if I could . . . conduct my defense without the assistance and interruptions of counsel, with all respect, Mr. Graham.

"THE COURT: All right.

"MR. GRAHAM: I will sit third chair from now on. I will move back one notch.

"THE COURT: I am not going to order you Mr. Graham, because I know you are competent counsel, but let me suggest to you that unless he consults with you -- you do your own thing anyway, but don't object or don't ask questions unless and until the Court requests that you consult with him because he doesn't know the proper way to do something." *Id.*, at A-30 -- A-31. See also Record 345-346.

Notwithstanding this admonition, counsel continued to act of his own accord and to disrupt the presentation of Wiggins' defense throughout the trial.

[****42] [*190] Wiggins, [***141] on his own, made numerous pretrial motions, directly examined his own witnesses, cross-examined the State's witnesses, and attempted to argue his case to the jury [*191] at both stages of the bifurcated trial. But the trial did not go smoothly, for standby counsel "continuously participated in the proceedings, both in and outside the presence of the jury." *Wiggins* v. *Estelle*, 681 F.2d 266, 269-270, rehearing denied, 691 F.2d 213 (CA5 1982). In addition to making objections and motions too numerous to cite, counsel argued with Wiggins, moved for a mistrial against his wishes at several points during the trial, and twice cursed, once in the presence of the jury.

Although petitioner characterizes counsel's participation as "limited" and "intermittent," nothing could be further from the truth. Standby counsel intervened in a substantial manner without Wiggins' permission well over 50 times during the course of the 3-day trial; many of these interruptions precipitated direct conflicts between Wiggins and counsel, often in the presence of the jury. See App. A-3 -- A-54. Although the trial court appears to have [****43] resolved the conflicts calling for a ruling in Wiggins' favor, their mere existence disrupted the proceedings and turned the trial into an ordeal through which the jury was required to suffer. See, *e. g., id.*, at A-29; Record 423. At several points during the trial, moreover, counsel blatantly interfered with Wiggins' attempt to present his defense in a manner not calling for a ruling [**958] from the bench, see, *e. g.*, App. A-20, and we of course have no way of knowing the extent to which Wiggins' defense was subtly undermined or adversely affected by counsel's extensive unsolicited participation.

The Court of Appeals had little trouble concluding that counsel's conduct, expressly and tacitly approved by the trial court, prevented Wiggins from conducting his own defense. Although the Court of Appeals recognized that trial courts are empowered to appoint standby counsel for *pro se* defendants, it declared that "court-appointed standby counsel is 'to be seen, but not heard.'" 681 F.2d, at 273. Standby counsel, the Fifth Circuit made clear, "is not to compete with the defendant or supersede his defense. Rather, his presence [*192] is . . . for [****44] advisory purposes [***142] only, to be used or not used as the defendant sees fit." *Ibid.* (footnotes omitted).

The court recognized that in some cases counsel's interjections will be "few and innocuous"; reversal is not necessary "every time overzealous counsel, acting in the best interests of his client, [volunteers] his aid

without prior permission." *Id.*, at 274. But the continuous and substantial intervention of standby counsel, despite Wiggins' repeated demands that he play a passive role, could not have had "anything but a negative impact on the jury. It also destroyed Wiggins' own perception that he was conducting *his* defense." *Id.*, at 275 (emphasis in original). The Court of Appeals thus held that the State had failed to demonstrate that Wiggins had not been prejudiced by counsel's participation and that he was entitled to relief.

Disagreeing with the Court in several respects, I would affirm the judgment of the Court of Appeals.

II

The Court holds that the seen-but-not-heard standard used by the Court of Appeals in determining whether standby counsel improperly encroached on Wiggins' right of self-representation is too rigid [****45] and too restrictive on the conduct of standby counsel. As indicated above, however, the Court of Appeals would not hold that every instance of volunteered assistance or even every series of such instances would violate a defendant's rights. Nor, as I understand it, would the Court of Appeals' holding prevent a trial judge from directing a defendant to consult with standby counsel where necessary for the proper conduct of the trial or from insisting that a defendant agree to some ground rules with respect to when standby counsel could inject himself into the trial. I agree that the trial judge himself should not be burdened with educating the defendant in trial procedure and that he should be able to insist that the defendant learn what he needs to know [*193] from standby counsel. The judgment below is not to the contrary. In my view, the Court of Appeals announced a proper standard, one that is wholly consistent with *Faretta*'s ruling that "a State may -- even over objection by the accused -- appoint a 'standby counsel' to aid the accused if and when the accused requests help," *Faretta* v. *California*, 422 U.S., at 835, n. 46, and applied it in [****46] an acceptable way. In any event, it seems to me that the Court proffers a poor substitute for the approach of the Court of Appeals.

III

As the Court observes, *ante*, at 173, *Faretta* presented a situation in which the trial court wholly denied a defendant's request to proceed *pro se* and required him to address the State's charges only through his appointed attorney. Wiggins, unlike Faretta, was allowed to proceed *pro se* and took an active role in his trial. The Court concludes, on the basis of its examination of the record, that Wiggins was afforded "a fair chance to present his case in his own way," *ante*, at 177, and that "counsel's unsolicited involvement was held within reasonable limits," *ante*, at 188. It arrives at this conclusion by applying a two-part test that, in my judgment, provides little or no guidance [***143] for counsel and trial judges, imposes difficult, if not impossible, burdens [**959] on appellate courts, and undoubtedly will lead to the swift erosion of defendants' constitutional right to proceed *pro se*.

Under the Court's new test, it is necessary to determine whether the *pro se* defendant retained "actual control over the [****47] case he [chose] to present to the jury," *ante*, at 178, and whether standby counsel's participation "[destroyed] the jury's perception that the defendant [was] representing himself," *ibid*. Although this test purports to protect all of the values underlying our holding in *Faretta*, it is unclear whether it can achieve this result.

As long as the *pro se* defendant is allowed his say, the first prong of the Court's test accords standby counsel at a bench [*194] trial or any proceeding outside the presence of a jury virtually untrammeled discretion to present any factual or legal argument to which the defendant does not object. The limits placed on counsel's participation in this context by the "actual control" test are more apparent than real. First, counsel may not "make or substantially interfere with any significant tactical decisions." *Ibid*. Unless counsel directly overrides a defendant's strategy in the presence of the judge, however, it is apparent that courts will be almost wholly incapable of assessing the subtle and not-so-subtle effects of counsel's participation on the defense. Second, the Court suggests that conflicts between the *pro se* defendant [****48] and standby counsel on "[matters] that would normally be left to the defense's discretion," *ante*, at 181, will be resolved in the defendant's favor. But many disagreements will not produce direct conflicts requiring a trial court to choose one position over another. Under the Court's opinion, the burden apparently will fall on the *pro se* defendant to comprehend counsel's submissions and to create conflicts for the trial court to resolve. If applied this way, the Court's test surely will prove incapable of safeguarding the interest in individual autonomy from which the *Faretta* right derives.

Although the Court is more solicitous of a *pro se* defendant's interests when standby counsel intervenes before a jury, the test's second prong suffers from similar shortcomings. To the extent that trial and

appellate courts can discern the point at which counsel's unsolicited participation substantially undermines a *pro se* defendant's appearance before the jury, a matter about which I harbor substantial doubts, their decisions will, to a certain extent, "affirm the accused's individual dignity and autonomy." *Ante*, at 178. But they will do so incompletely, for in focusing [****49] on how the jury views the defendant, the majority opinion ignores *Faretta*'s emphasis on the defendant's own perception of the criminal justice system, *Faretta* v. *California, supra*, at 834, and implies that the Court actually adheres to the result-oriented harmless-error standard it purports to reject. *Ante*, at 177-178, n. 8.

[*195] As a guide for standby counsel and lower courts, moreover, the Court's two-part test is clearly deficient. Instead of encouraging counsel to accept a limited role, the Court plainly invites them to participate despite their clients' contrary [***144] instructions until the clients renew their objections and trial courts draw the line. Trial courts required to rule on *pro se* defendants' objections to counsel's intervention also are left at sea. They clearly must prevent standby counsel from overtly muzzling their *pro se* clients and resolve certain conflicts in defendants' favor. But the Court's opinion places few, if any, other clear limits on counsel's uninvited participation; instead it requires trial courts to make numerous subjective judgments concerning the effect of counsel's actions on defendants' [****50] *Faretta* rights. Because trial courts generally will consider only isolated actions of standby counsel expressly challenged by *pro se* defendants, only appellate courts may be in a position to form impressions on the basis of the entire trial. These courts, however, also will suffer from the lack of clear standards and from their inability or unwillingness to make the factual inquiries necessitated by the Court's two-part test.

[**960] In short, I believe that the Court's test is unworkable and insufficiently protective of the fundamental interests we recognized in *Faretta*.

IV

The inappropriateness of the Court's standard is made manifest by the Court's conclusion that the conduct of standby counsel in this case passes muster under that standard. In frequently and grievously exceeding the proper role of standby counsel, the more active of Wiggins' appointed attorneys distracted Wiggins and usurped his prerogatives, [3] [****52] [*196] altered the tenor of the defense, disrupted the trial, [4] undermined Wiggins' perception that he controlled his own fate, *Faretta* v. *California*, 422 U.S., at 834, induced a belief -- most assuredly unfounded, but sincerely [****51] held nevertheless -- that "the law [contrived] against him," *ibid*.; see App. A-78 -- A-81; Record 679, 700-701, 716-717, and undoubtedly reduced Wiggins' credibility and prejudiced him in the eyes of the jury. In allowing such intervention to continue despite Wiggins' repeated requests that it cease, the trial court clearly denied Wiggins' right of self-representation. The right to present and control one's own defense means little indeed if one's "standby" attorneys remain free to take any action they choose, whether consistent with the desired defense or inimical to it, at any point during the trial. In short, whatever advantage or satisfaction Wiggins might have hoped to derive from self-representation, see, *e. g*., ABA Standards for Criminal Justice 6-3.6(a) (2d ed. 1980), was [***145] surely nullified by the trial court's tolerance of counsel's conduct.

The Court reaches a different conclusion by pinning the blame for the interference with the right to proceed *pro se* on Wiggins himself and by dissecting counsel's activities into discrete categories and failing to consider their overall impact. These tactics, of course, both required the Court to do its own factfinding, a function normally left for district courts. Neither approach can withstand scrutiny. Particularly [*197] when the trial court has expressly refused to order standby counsel to serve in a purely advisory capacity, a *pro se* defendant cannot reasonably be expected to object to counsel's

---

[3] As has been cogently observed in a related context:

"[Numerous] strategic and tactical decisions must be made in the course of a criminal trial, many of which are made in circumstances that do not allow extended, if any, consultation. Every experienced advocate can recall the disconcerting experience of trying to conduct the examination of a witness or follow opposing arguments or the judge's charge while the client 'plucks at the attorney's sleeve' offering gratuitous suggestions." ABA Standards for Criminal Justice 4-5.2 (2d ed. 1980).

[4] Among other things, standby counsel's actions created a need for numerous conferences out of the hearing of the jury. The disruptive, vexatious, and possibly prejudicial effects of repeated bench conferences have long been recognized, *id*., 15-3.9, and indeed were expressly acknowledged by the trial court. See, *e. g*., Record 423. The Court's attempt to attribute many of these interruptions solely to Wiggins' conduct is unpersuasive.

every action. Not only would the trial [****53] court's initial decision tend to impress upon the defendant the futility of continuing objections, but also repeated objections could destroy the impression the defendant seeks to convey to the jury. Accordingly, a defendant's acquiescence in a violation of his *Faretta* right should not immunize that violation from judicial review. Similarly, the fact that a *pro se* defendant, with the trial court's approval, has authorized standby counsel to perform a discrete representational function should not give rise to a presumption that the defendant also has sanctioned subsequent interference in the conduct of the trial. In any event, the most glaring intrusions by counsel occurred without Wiggins' blessing. [5]

[****54] Considered in isolation, many types of interference by standby counsel in a *pro se* defense will likely appear inconsequential. [**961] The Court's desire to compartmentalize counsel's actions, while understandable, has, in my view, led it to ignore the cumulative effect of counsel's frequent participation on Wiggins' right to defend himself. To the extent that the Court rests on the proposition that not every transgression of standby counsel constitutes reversible error, I have no quarrel with its reasoning. A trial court's tolerance of isolated and innocuous participation by standby counsel could perhaps be characterized -- in line with the Court of Appeals' holding -- as harmless constitutional error; one also could conclude that such participation simply does not rise to the level of a constitutional violation. The second formulation is [*198] clearly preferable, [6] but it is unnecessary [***146] to choose between them to resolve this case since Wiggins should prevail under either view.

[****55] V

It also seems to me that if a standard different from that applied by the Court of Appeals is to govern this case, the [*199] Court should be content with announcing it and remanding to the Court of Appeals for reconsideration in light of that standard, rather than itself undertaking to apply the new standard in the first instance. That course would more comport with the proper roles and functions of both this Court and the courts of appeals.

With all due respect, I dissent and would affirm the judgment of the Court of Appeals.

## References

21A Am Jur 2d, Criminal Law 764, 766, 993-995

9 Federal Procedure, L Ed, 22:349-22:353, 22:358

---

*Chapman* v. *United States*, 553 F.2d 886, 891 (CA5 1977) (footnote omitted).

See *Moreno* v. *Estelle*, 717 F.2d 171, 173, n. 1 (CA5 1983); *Bittaker* v. *Enomoto*, 587 F.2d 400, 402-403 (CA9 1978), cert. denied, 441 U.S. 913 (1979); *United States* v. *Dougherty*, 154 U. S. App. D. C. 76, 90-93, 473 F.2d 1113, 1127-1130 (1972); *United States* v. *Plattner*, 330 F.2d 271, 273 (CA2 1964); *People* v. *Tyner*, 76 Cal. App. 3d 352, 356, 143 Cal. Rptr. 52, 54 (1977). But see *People* v. *Sharp*, 7 Cal. 3d 448, 462-463, 499 P. 2d 489, 498 (1972), cert. denied, 410 U.S. 944 (1973); *Burney* v. *State*, 244 Ga. 33, 37, 257 S.E. 2d 543, 547, cert. denied, 444 U.S. 970 (1979); *State* v. *Kirby*, 198 Neb. 646, 648-649, 254 N. W. 2d 424, 426 (1977). See also *Walker* v. *Loggins*, 608 F.2d 731, 736 (CA9 1979) (Carter, J., dissenting).

As is the case when the trial court completely denies a defendant's right of self-representation, application of the result-oriented harmless-error standard to cases like this one, where the defendant was allowed to proceed *pro se* but the conduct of his appointed standby counsel inhibited his ability to do so, would result in the denigration of the right. If counsel's interference can be characterized as *de minimis*, it is more consistent with the nature of the right of self-representation to conclude that no violation occurred than to say that the violation was harmless constitutional error. If, as is the case here, counsel acted with substantial autonomy and significantly interfered with the *pro se* defendant's presentation of his defense, reversal should follow automatically without any inquiry into the question whether the constitutional violation likely affected the outcome of the trial.

---

[5] Although the Court attributes counsel's extensive participation in the penalty phase of the trial to a conclusion by Wiggins that appearing *pro se* was not in his best interests, an equally plausible assumption is that Wiggins simply gave up his attempted self-representation as a result of the trial court's approval of counsel's repeated interruptions in the guilt phase.

[6] "The nature of the right to defend pro se renders the traditional harmless error doctrine peculiarly inapposite. Unlike other constitutional rights, the right to represent oneself is not 'result-oriented.' The normal operation of the harmless error doctrine is in cases where the challenged error concerns a right accorded the defendant to facilitate his defense or to insulate him from suspect evidence. . . . By contrast, we recognize the defendant's right to defend pro se not primarily out of the belief that he thereby stands a better chance of winning his case, but rather out of deference to the axiomatic notion that each person is ultimately responsible for choosing his own fate, including his position before the law. A defendant has the moral right to stand alone in his hour of trial and to embrace the consequences of that course of action."

7 Federal Procedural Forms, L Ed, Criminal Procedure 20:23-20:25

USCS Constitution, Sixth and Fourteenth Amendments 28 USCS 1654

US L Ed Digest, Appeal and Error 1354, 1513; Criminal Law 46

L Ed Index to Annos, Criminal Law

ALR Quick Index, Assistance of Counsel; Criminal Law; Pro Se

Federal Quick Index, Assistance of Counsel; Criminal Law; Self-Representation

Annotation References:

Accused's right, under Federal Constitution, [****56] to be present at his trial. 25 L Ed 2d 91.

Federal constitutional right to confront witnesses. 23 L Ed 2d 853.

Accused's right to counsel under the Federal Constitution. 93 L Ed 2d 137; 2 L Ed 2d 1644; 9 L Ed 2d 1260; 18 L Ed 2d 1420.

Accused's right, under 28 USCS 1654 and similar predecessor statutes, to represent himself in federal criminal proceeding. 27 ALR Fed 485.

Accused's right to represent himself in state criminal proceeding--modern state cases. 98 ALR3d 13.

---

End of Document

# Jackson v. Virginia

443 U.S. 307 (1979)

Cited in Opening Brief at: viii, 38

The standard of review citation is addressed in Response, Part III.B. Highlighted language appears at 443 U.S. at 319.

Warning
As of: September 14, 2026 1:01 PM Z

# Jackson v. Virginia

Supreme Court of the United States

March 21, 1979, Argued ; June 28, 1979, Decided

No. 78-5283

**Reporter**

443 U.S. 307 *; 99 S. Ct. 2781 **; 61 L. Ed. 2d 560 ***; 1979 U.S. LEXIS 10 ****; 1979 LX 95796

JACKSON v. VIRGINIA ET AL.

**Subsequent History:** [****1] Petition for Rehearing Denied October 1, 1979.

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT.

**Disposition:** 580 F.2d 1048, affirmed.

## Syllabus

Petitioner was convicted of first-degree murder after a bench trial in a Virginia court, and his motion and petition in the state courts to set aside the conviction on the ground that there was insufficient evidence of premeditation, a necessary element of first-degree murder, were denied. He then brought a habeas corpus proceeding in Federal District Court, which, applying the "no evidence" criterion of *Thompson* v. *Louisville*, 362 U.S. 199, found the record devoid of evidence of premeditation and granted the writ. Applying the same criterion, the Court of Appeals reversed, holding that there was some evidence that petitioner had intended to kill the victim.

*Held*:

1. A federal habeas corpus court must consider not whether there was *any* evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of fact to find guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358. Pp. 313-324.

(a) *In re Winship* presupposes [****2] as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense. Pp. 313-316.

(b) After *In re Winship*, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed on reasonable doubt, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. The relevant question is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The *Thompson* "no evidence" rule is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt. Pp. 316-320.

(c) In a challenge to a state conviction brought under 28 U. S. C. § 2254, which requires a federal court to entertain a state prisoner's claim that he is [****3] being held in "custody in violation of the Constitution or laws or treaties of the United States," the applicant is entitled to habeas corpus relief if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Pp. 320-324.

2. A review of the record in this case in the light most favorable to the prosecution shows that a rational factfinder could have found petitioner guilty beyond a reasonable doubt of first-degree murder under Virginia law. Pp. 324-326.

**Counsel:** Carolyn J. Colville, by appointment of the Court, 439 U.S. 1064, argued the cause pro hac vice and filed briefs for petitioner.

Marshall Coleman, Attorney General of Virginia, argued the cause for respondents. With him on the brief was

Linwood T. Wells, Assistant Attorney General. *

[****4]

**Judges:** STEWART, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, in which BURGER, C. J., and REHNQUIST, J., joined, post, p. 326. POWELL, J., took no part in the consideration or decision of the case.

**Opinion by:** STEWART

## Opinion

[*309] [***567] [**2783] MR. JUSTICE **STEWART** delivered the opinion of the Court.

[1] [2A]The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358. The question in this case is what standard is to be applied in a federal habeas corpus proceeding when the claim is made that a person has been convicted in a state court upon insufficient evidence.

I

[3]The petitioner was convicted after a bench trial in the Circuit Court of Chesterfield [**2784] County, Va., of the first-degree murder of a woman named Mary Houston Cole. [1]Under Virginia law, murder is defined as "the unlawful killing of another with malice aforethought." *Stapleton* v. *Commonwealth*, 123 Va. 825, 96 S. E. 801. Premeditation, or specific intent to kill, distinguishes murder [****5] in the first from murder in the second degree; proof of this element is essential to conviction of the former offense, and the burden of proving it clearly rests with the prosecution. *Shiflett* v. *Commonwealth*, 143 Va. 609, 130 S. E. 777;*Jefferson* v. *Commonwealth*, 214 Va. 432, 201 S. E. 2d 749.

[****6] That the petitioner had shot and killed Mrs. Cole was not in dispute at the trial. The State's evidence established that [*310] she had been a member of the staff at the local county jail, that she had befriended him while he was imprisoned there on a disorderly conduct charge, and that when he was released she had arranged for him to live in the home of her son and daughter-in-law. Testimony by her relatives indicated that on the day of the killing the petitioner had been drinking and had spent a great deal of time shooting at targets with his revolver. Late in the afternoon, according to their testimony, he had unsuccessfully attempted to talk the victim into driving him to North Carolina. She did drive the petitioner to a local diner. There the two were observed by several police officers, who testified that both the petitioner and the victim had been drinking. The two were observed by a deputy sheriff as they were preparing to leave the diner in her car. The petitioner was then in possession of his revolver, and the sheriff also observed a kitchen knife in the automobile. The sheriff testified that he had offered to keep the revolver until the petitioner sobered [***568] [****7] up, but that the latter had indicated that this would be unnecessary since he and the victim were about to engage in sexual activity.

* Briefs of amici curiae urging affirmance were filed by George Deukmejian, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, and Eddie T. Keller, Willard F. Jones, and Jane K. Fischer, Deputy Attorneys General, for the State of California; by Arthur K. Bolton, Attorney General, Robert S. Stubbs II, Executive Assistant Attorney General, Don A. Langham, First Assistant Attorney General, John C. Walden, Senior Assistant Attorney General, and Susan V. Boleyn, Assistant Attorney General, for the State of Georgia; by Frank J. Kelley, Attorney General, Robert A. Derengoski, Solicitor General, and Thomas L. Casey, Assistant Attorney General, for the State of Michigan; and for their respective States by Theodore L. Sendak, Attorney General, David A. Arthur, Deputy Attorney General, and Donald P. Bogard, of Indiana, Robert B. Hansen, Attorney General of Utah, Edward G. Biester, Jr., Attorney General of Pennsylvania, Paul L. Douglas, Attorney General of Nebraska, and Chauncey H. Browning, Attorney General of West Virginia.

[1] The degrees of murder in Virginia are specified in Va. Code § 18.2-32 (1975) as follows:

"Murder, other than capital murder, by poison, lying in wait, imprisonment, starving, or by any willful, deliberate, and premeditated killing, or in the commission of, or attempt to commit, arson, rape, robbery, burglary or abduction . . . is murder of the first degree, punishable as a Class 2 felony.

"All murder other than capital murder and murder in the first degree is murder of the second degree and is punishable as a Class 3 felony."

Class 2 felonies carry a term of 20 years to life. § 18.2-10 (b) (1975). The sentence for Class 3 felonies can range from 5 to 20 years, § 18.2-10 (c). Murder itself takes its definition in Virginia from the common law. *Stapleton* v. *Commonwealth*, 123 Va. 825, 96 S. E. 801.

Her body was found in a secluded church parking lot a day and a half later, naked from the waist down, her slacks beneath her body. Uncontradicted medical and expert evidence established that she had been shot twice at close range with the petitioner's gun. She appeared not to have been sexually molested. Six cartridge cases identified as having been fired from the petitioner's gun were found near the body.

[4A]After shooting Mrs. Cole, the petitioner drove her car to North Carolina, where, after a short trip to Florida, he was arrested several days later. In a postarrest statement, introduced in evidence by the prosecution, the petitioner admitted that he had shot the victim. He contended, however, that the shooting had been accidental. When asked to describe his condition at the time of the shooting, he indicated that he had not been drunk, but had been "pretty high." His [*311] story was that the victim had attacked him with a knife when he resisted her sexual advances. He said that he had defended himself by firing a number of warning shots [****8] into the ground, and had then reloaded his revolver. The victim, he said, then attempted to take the gun from him, and the gun "went off" in the ensuing struggle. He said that he fled without seeking help for the victim because he was afraid. At the trial, his position was that he had acted in self-defense. Alternatively, he claimed that in any event the State's own evidence showed that he had been too intoxicated to form the specific intent necessary [**2785] under Virginia law to sustain a conviction of murder in the first degree. [2]

The trial judge, declaring himself convinced beyond a reasonable doubt that the petitioner had committed first-degree murder, found him guilty of that offense. [3] The petitioner's motion to set aside [****9] the judgment as contrary to the evidence was denied, and he was sentenced to serve a term of 30 years in the Virginia state penitentiary. A petition for writ of error to the Virginia Supreme Court on the ground that the evidence was insufficient to support the conviction was denied. [4]

[****10]

[*312] [5B]The [***569] petitioner then commenced this habeas corpus proceeding in the United States District Court for the Eastern District of Virginia, raising the same basic claim. [5] Applying the "no evidence" criterion of *Thompson* v. *Louisville*, 362 U.S. 199, the District Court found the record devoid of evidence of premeditation and granted the writ. The Court of Appeals for the Fourth Circuit reversed the judgment. [6] The court noted that a dissent from the denial of certiorari in a case in this Court had exposed the question whether the constitutional rule of *In re Winship*, 397 U.S. 358, might compel a new criterion by which the validity of a state criminal conviction must be tested in a federal habeas corpus proceeding. See *Freeman* v. *Zahradnick*, 429 U.S. 1111 (dissent from denial of certiorari). But the appellate court held that in the absence of further guidance from this Court it would apply the same "no evidence" criterion of *Thompson* v. *Louisville* that the District Court had adopted. The court was of the view that some evidence that the petitioner had intended to kill the victim could be [****11] found in

---

[2] [4B]Under Virginia law, voluntary intoxication -- although not an affirmative defense to second-degree murder -- is material to the element of premeditation and may be found to have negated it. *Hatcher* v. *Commonwealth*, 218 Va. 811, 241 S. E. 2d 756.

[3] When trial without a jury is had on a not guilty plea in Virginia, the court is to "have and exercise all the powers, privileges and duties given to juries . . . ." Va. Code § 19.2-257 (1975).

[4]

[5A]There is no appeal as of right from a criminal conviction in Virginia. *Saunders* v. *Reynolds*, 214 Va. 697, 204 S. E. 2d 421. Each petition for writ of error under Va. Code § 19.2-317 (1975) is reviewed on the merits, however, and the effect of a denial is to affirm the judgment of conviction on the merits. *Saunders* v. *Reynolds, supra*.

The petition for writ of error alleged that "the trial Court erred in finding the Petitioner guilty of first-degree murder in light of the evidence introduced on behalf of the Commonwealth, and on unwarranted inferences drawn from this evidence." The petitioner contended that an affirmance would violate the Due Process Clause of the Fourteenth Amendment. In its order denying Jackson's petition, the Virginia Supreme Court stated it was "of [the] opinion that there is no reversible error in the judgment complained of . . . ." Virginia law requires sufficiency claims to be raised on direct appeal; such a claim may not be raised in a state habeas corpus proceeding. *Pettus* v. *Peyton*, 207 Va. 906, 153 S. E. 2d 278.

[5] The District Court correctly found that the petitioner had exhausted his state remedies on this issue. See n. 4, *supra*.

[6] The opinions of the District Court and the Court of Appeals are not reported. The Court of Appeals' judgment order is reported at 580 F.2d 1048.

the facts that the petitioner had reloaded his gun after firing warning shots, that he had had time to do so, and that the victim was then shot not once but twice. The court also concluded that the state trial judge could have found that the petitioner was not so intoxicated as to be incapable of premeditation.

[2B]We granted certiorari to consider the petitioner's claim that under *In re Winship, supra*, a federal habeas corpus court must [*313] consider not whether there was *any* evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt. 439 U.S. 1001.

II

Our inquiry [****12] in this case is narrow. The petitioner has not seriously questioned any [**2786] aspect of Virginia law governing the allocation of the burden of production or persuasion in a murder trial. See *Mullaney* v. *Wilbur*, 421 U.S. 684; *Patterson* v. *New York*, 432 U.S. 197. As the record demonstrates, the judge sitting as factfinder in the petitioner's trial was aware that the State bore the burden of establishing the element of premeditation, and stated that he was applying the reasonable-doubt standard in his appraisal of the State's evidence. The petitioner, moreover, does not contest the conclusion of the Court of Appeals that under the "no evidence" rule of *Thompson* v. *Louisville, supra*, his conviction of first-degree murder is sustainable. [***570] And he has not attacked the sufficiency of the evidence to support a conviction of second-degree murder. His sole constitutional claim, based squarely upon *Winship*, is that the District Court and the Court of Appeals were in error in not recognizing that the question to be decided in this case is whether any rational factfinder could have concluded beyond [****13] a reasonable doubt that the killing for which the petitioner was convicted was premeditated. The question thus raised goes to the basic nature of the constitutional right recognized in the *Winship* opinion.

III

A

This is the first of our cases to expressly consider the question whether the due process standard recognized in *Winship* constitutionally protects an accused against conviction except upon evidence that is sufficient fairly to support a conclusion [*314] that every element of the crime has been established beyond a reasonable doubt. Upon examination of the fundamental differences between the constitutional underpinnings of *Thompson* v. *Louisville, supra*, and of *In re Winship, supra*, the answer to that question, we think, is clear.

[6][7]It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process. *Cole* v. *Arkansas*, 333 U.S. 196, 201; *Presnell* v. *Georgia*, 439 U.S. 14. These standards no more than reflect a broader premise that has never been doubted in our constitutional system: that a person cannot incur the loss of [****14] liberty for an offense without notice and a meaningful opportunity to defend. *E. g., Hovey* v. *Elliott*, 167 U.S. 409, 416-420. Cf. *Boddie* v. *Connecticut*, 401 U.S. 371, 377-379. A meaningful opportunity to defend, if not the right to a trial itself, presumes as well that a total want of evidence to support a charge will conclude the case in favor of the accused. Accordingly, we held in the *Thompson* case that a conviction based upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm. See also *Vachon* v. *New Hampshire*, 414 U.S. 478; *Adderley* v. *Florida*, 385 U.S. 39; *Gregory* v. *Chicago*, 394 U.S. 111; *Douglas* v. *Buder*, 412 U.S. 430. The "no evidence" doctrine of *Thompson* v. *Louisville* thus secures to an accused the most elemental of due process rights: freedom from a wholly arbitrary deprivation of liberty.

The Court in *Thompson* explicitly stated that the due process right at issue did not concern a question of evidentiary "sufficiency." 362 U.S., at 199. [****15] The right established in *In re Winship*, however, clearly stands on a different footing. *Winship* involved an adjudication of juvenile delinquency made by a judge under a state statute providing that the prosecution must prove the conduct charged as delinquent -- which in *Winship* would have been a criminal offense if engaged in by an adult -- by a preponderance of the evidence. [*315] Applying [***571] that standard, the judge was satisfied that the juvenile was "guilty," but he noted that the result might well have been different under a standard of proof beyond [**2787] a reasonable doubt. In short, the record in *Winship* was not totally devoid of evidence of guilt.

The constitutional problem addressed in *Winship* was thus distinct from the stark problem of arbitrariness presented in *Thompson* v. *Louisville*. In *Winship*, the Court held for the first time that the Due Process Clause

of the Fourteenth Amendment protects a defendant in a criminal case against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S., at 364. In so holding, the Court [****16] emphasized that proof beyond a reasonable doubt has traditionally been regarded as the decisive difference between criminal culpability and civil liability. *Id*., at 358-362. See *Davis* v. *United States*, 160 U.S. 469; *Brinegar* v. *United States*, 338 U.S. 160, 174; *Leland* v. *Oregon*, 343 U.S. 790; 9 J. Wigmore, Evidence § 2495, pp. 307-308 (3d ed. 1940). Cf. *Woodby* v. *INS*, 385 U.S. 276, 285. The standard of proof beyond a reasonable doubt, said the Court, "plays a vital role in the American scheme of criminal procedure," because it operates to give "concrete substance" to the presumption of innocence, to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding. 397 U.S., at 363. At the same time, by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. *Id*., at 372 (Harlan, J., concurring).

[8A]The constitutional [****17] standard recognized in the *Winship* case was expressly phrased as one that protects an accused against a conviction except on *"proof* beyond a reasonable doubt . . . ." In subsequent cases discussing the reasonable-doubt standard, we have never departed from this definition of the rule or from [*316] the *Winship* understanding of the central purposes it serves. See, *e. g., Ivan V*. v. *City of New York*, 407 U.S. 203, 204; *Lego* v. *Twomey*, 404 U.S. 477, 486-487; *Mullaney* v. *Wilbur*, 421 U.S. 684; *Patterson* v. *New York*, 432 U.S. 197; *Cool* v. *United States*, 409 U.S. 100, 104. In short, *Winship* presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.

B

Although several of our cases have intimated that the fact-finder's application of the reasonable-doubt standard to the evidence may present [****18] a [***572] federal question when a state conviction is challenged, *Lego* v. *Twomey, supra*, at 487; *Johnson* v. *Louisiana*, 406 U.S. 356, 360, the Federal Courts of Appeals have generally assumed that so long as the reasonable-doubt instruction has been given at trial, the no-evidence doctrine of *Thompson* v. *Louisville* remains the appropriate guide for a federal habeas corpus court to apply in assessing a state prisoner's challenge to his conviction as founded upon insufficient evidence. See, *e. g., Cunha* v. *Brewer*, 511 F.2d 894 (CA8). [7] We cannot agree.

[****19] [9] [10] [11A] [12A]The [**2788] *Winship* doctrine requires more than simply a trial [*317] ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence. [8] [****20] A "reasonable doubt," at a minimum, is one based upon "reason." [9] Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and the same may be said of a trial judge sitting as a jury. In a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction. *Glasser* v. *United States*, 315 U.S. 60, 80; *Bronston* v. *United States*, 409 U.S. 352. See also, *e. g., Curley* v. *United States*, 81 U. S. App. D. C. 389, 392-393, 160 F.2d 229, 232-233. [10] Under

[7] The Court of Appeals in the present case, of course, recognized that *Winship* may have changed the constitutional standard in federal habeas corpus. And the Court of Appeals for the Sixth Circuit recently recognized the possible impact of *Winship* on federal habeas corpus in a case in which it held that "a rational trier of fact could have found the defendant . . . guilty beyond a reasonable doubt." *Spruytte* v. *Koehler*, affirmance order, 590 F.2d 335. An even more recent case in that court provoked a lively debate among three of its members regarding the effect of *Winship* upon federal habeas corpus. The writ was granted in that case, even though the trial record concededly contained "some evidence" of the applicant's guilt. See *Speigner* v. *Jago*, 603 F.2d 1208.

[8] The trier of fact in this case was a judge and not a jury. But this is of no constitutional significance. The record makes clear that the judge deemed himself "properly instructed."

[9] A "reasonable doubt" has often been described as one "based on reason which arises from the evidence or lack of evidence." *Johnson* v. *Louisiana*, 406 U.S. 356, 360 (citing cases). For a discussion of variations in the definition used in jury instructions, see *Holland* v. *United States*, 348 U.S. 121, 140 (rejecting contention that circumstantial evidence must exclude every hypothesis but that of guilt).

[10] [11B] [12B]This, of course, does not mean that convictions are frequently reversed upon this ground. The practice in the

[***573] *Winship*, which established [*318] proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction occurs in a state trial, it cannot constitutionally stand.

[****21] [13][14]A federal court has a duty to assess the historic facts when it is called upon to apply a constitutional standard to a conviction obtained in a state court. For example, on direct review of a state-court conviction, where the claim is made that an involuntary confession was used against the defendant, this Court reviews the facts to determine whether the confession was wrongly admitted in evidence. *Blackburn* v. *Alabama*, 361 U.S. 199, 205-210. Cf. *Drope* v. *Missouri*, 420 U.S. 162, 174-175, and n. 10. The same duty obtains in federal habeas corpus proceedings. See *Townsend* v. *Sain*, 372 U.S. 293, 318; *Brown* v. *Allen*, 344 U.S. 443, 506-507 (opinion of Frankfurter, J.).

[15][16A][17][18A]After *Winship*the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a [**2789] reasonable doubt. [11] [****23] But this inquiry does not require a court to "ask [*319] itself whether *it* believes that the evidence [****22] at the trial established guilt beyond a reasonable doubt." *Woodby* v. *INS*, 385 U.S., at 282 (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson* v. *Louisiana*, 406 U.S., at 362. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. [12] The criterion [***574] thus impinges

---

federal courts of entertaining properly preserved challenges to evidentiary sufficiency, see Fed. Rule Crim. Proc. 29, serves only to highlight the traditional understanding in our system that the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion. To be sure, the factfinder in a criminal case has traditionally been permitted to enter an unassailable but unreasonable verdict of "not guilty." This is the logical corollary of the rule that there can be no appeal from a judgment of acquittal, even if the evidence of guilt is overwhelming. The power of the factfinder to err upon the side of mercy, however, has never been thought to include a power to enter an unreasonable verdict of guilty. *Carpenters & Joiners* v. *United States*, 330 U.S. 395, 408. Cf. *Capital Traction Co*. v. *Hof*, 174 U.S. 1, 13-14. Any such premise is wholly belied by the settled practice of testing evidentiary sufficiency through a motion for judgment of acquittal and a postverdict appeal from the denial of such a motion. See generally 4 L. Orfield, Criminal Procedure Under the Federal Rules §§ 29:1-29:29 (1967 and Supp. 1978).

11

[16B]Until 1972, the Court of Appeals for the Second Circuit took the position advanced today by the opinion concurring in the judgment that the beyond-a-reasonable-doubt standard is merely descriptive of the state of mind required of the factfinder in a criminal case and not of the actual quantum and quality of proof necessary to support a criminal conviction. Thus, that court held that in a jury trial the judge need not distinguish between criminal and civil cases for the purpose of ruling on a motion for judgment of acquittal. *United States* v. *Feinberg*, 140 F.2d 592, 594. In *United States* v. *Taylor*, 464 F.2d 240 (CA2), *Feinberg* was overruled, partly on the strength of *Winship*. The *Taylor* court adopted the directed-verdict criterion articulated in *Curley* v. *United States*, 81 U. S. App. D. C. 389, 392-393, 160 F.2d 229, 232-233 (If "reasonable" jurors "must necessarily have . . . a reasonable doubt" as to guilt, the judge "must require acquittal, because no other result is permissible within the fixed bounds of jury consideration"). This is now the prevailing criterion for judging motions for acquittal in federal criminal trials. See generally 2 C. Wright, Federal Practice and Procedure § 467 (1969 and Supp. 1978).

[12] Contrary to the suggestion in the opinion concurring in the judgment, the criterion announced today as the constitutional minimum required to enforce the due process right established in *Winship* is not novel. See, *e. g., United States* v. *Amato*, 495 F.2d 545, 549 (CA5) ("whether, taking the view [of the evidence] most favorable to the Government, a *reasonably-minded jury* could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt") (emphasis added); *United States* v. *Jorgenson*, 451 F.2d 516, 521 (CA10) (whether, "considering the evidence in the light most favorable to the government, there is substantial evidence from which a jury might *reasonably find* that an accused is guilty beyond a reasonable doubt") (emphasis added). *Glasser* v. *United*

upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law. [13]

[****24]

[*320] [19][20A]That the *Thompson* "no evidence" rule is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt is readily apparent. "[A] mere modicum of evidence may satisfy a 'no evidence' standard . . . ." *Jacobellis* v. *Ohio*, 378 U.S. 184, 202 (Warren, C. J., dissenting). Any evidence that is relevant -- that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence, cf. Fed. Rule Evid. 401 -- could be deemed a "mere modicum." But it could not seriously be argued that such a "modicum" of evidence could by itself rationally support a conviction beyond a reasonable doubt. The [**2790] *Thompson* doctrine simply fails to supply a workable or even a predictable standard for determining whether the due process command of *Winship* has been honored. [14]

[****25] C

[8B]Under 28 U. S. C. § 2254, a federal court must entertain a claim by a state prisoner that he or she is being held in "custody in violation of the Constitution or laws or treaties of the [*321] United States." Under the *Winship* decision, it is clear that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim. Thus, assuming that state remedies have been exhausted, see 28 U. S. C. § 2254 (b), and that no independent and adequate state ground stands as a bar, see [***575] *Estelle* v. *Williams*, 425 U.S. 501;*Francis* v. *Henderson*, 425 U.S. 536;*Wainwright* v. *Sykes*, 433 U.S. 72;*Fay* v. *Noia*, 372 U.S. 391, 438, it follows that such a claim is cognizable in a federal habeas corpus proceeding. The respondents have argued, nonetheless, that a challenge to the constitutional sufficiency of the evidence should not be entertained by a federal district court under 28 U. S. C. § 2254.

In addition to the [****26] argument that a *Winship* standard invites replication of state criminal trials in the guise of § 2254 proceedings -- an argument that simply fails to recognize that courts can and regularly do gauge the sufficiency of the evidence without intruding into any legitimate domain of the trier of fact -- the respondents have urged that any departure from the *Thompson* test in federal habeas corpus proceedings will expand the number of meritless claims brought to the federal courts, will duplicate the work of the state appellate courts, will disserve the societal interest in the finality of state criminal proceedings, and will increase friction between the federal and state judiciaries. In sum, counsel for the State urges that this type of constitutional claim should be deemed to fall within the limit on federal habeas corpus jurisdiction identified in *Stone* v. *Powell*, 428 U.S. 465, with respect to Fourth Amendment claims. We disagree.

[21A]First, the burden that is likely to follow from acceptance of the *Winship* standard has, we think, been exaggerated. Federal-court challenges to the evidentiary support for state convictions have since *Thompson* been [****27] dealt with under § 2254. *E. g., Freeman* v. *Stone*, 444 F.2d 113 (CA9); *Grieco* v. [*322] *Meachum*, 533 F.2d 713 (CA1); *Williams* v. *Peyton*, 414 F.2d 776 (CA4). A more stringent standard

---

*States*, 315 U.S. 60, 80, has universally been understood as a case applying this criterion. See, *e. g., Harding* v. *United States*, 337 F.2d 254, 256 (CA8). See generally 4 Orfield, *supra* n. 10, § 29.28.

[13] [18B]The question whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached. Just as the standard announced today does not permit a court to make its own subjective determination of guilt or innocence, it does not require scrutiny of the reasoning process actually used by the factfinder -- if known. See generally 3 F. Wharton, Criminal Procedure § 520 (12th ed. 1975 and Supp. 1978).

[14]

[20B]Application of the *Thompson* standard to assess the validity of a criminal conviction after *Winship* could lead to absurdly unjust results. Our cases have indicated that failure to instruct a jury on the necessity of proof of guilt beyond a reasonable doubt can never be harmless error. See *Cool* v. *United States*, 409 U.S. 100. Cf. *Taylor* v. *Kentucky*, 436 U.S. 478. Thus, a defendant whose guilt was actually proved by overwhelming evidence would be denied due process if the jury was instructed that he could be found guilty on a mere preponderance of the evidence. Yet a defendant against whom there was but one slender bit of evidence would not be denied due process so long as the jury has been properly instructed on the prosecution's burden of proof beyond a reasonable doubt. Such results would be wholly faithless to the constitutional rationale of *Winship*.

will expand the contours of this type of claim, but will not create an entirely new class of cases cognizable on federal habeas corpus. Furthermore, most meritorious challenges to constitutional sufficiency of the evidence undoubtedly will be recognized in the state courts, and, if the state courts have fully considered the issue of sufficiency, the task of a federal habeas court should not be difficult. Cf. *Brown* v. *Allen*, 344 U.S., at 463. [15] [**2791] And this type of claim can almost always be judged on the written record without need for an evidentiary hearing in the federal court.

[****28] [22]Second, the problems of finality and federal-state comity arise whenever a state prisoner invokes the jurisdiction of a federal court to redress an alleged constitutional violation. A challenge to a state conviction brought on the ground that the evidence cannot fairly be deemed [***576] sufficient to have established guilt beyond a reasonable doubt states a federal constitutional claim. Although state appellate review undoubtedly will serve in the vast majority of cases to vindicate the due process protection that follows from *Winship*, the same could also be said of the vast majority of other federal constitutional rights that may be implicated in a state criminal trial. It is the occasional abuse that the federal writ of habeas corpus stands ready to correct. *Brown* v. *Allen, supra*, at 498-501 (opinion of Frankfurter, J.).

[*323] [23]The respondents have argued nonetheless that whenever a person convicted in a state court has been given a "full and fair hearing" in the state system -- meaning in this instance state appellate review of the sufficiency of the evidence -- further federal inquiry -- apart from the possibility of discretionary review [****29] by this Court -- should be foreclosed. This argument would prove far too much. A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. See 28 U. S. C. §§ 2254 (b), (d). What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur -- reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right -- is not one that can be so lightly abjured.

[24]The constitutional issue presented in this case is far [****30] different from the kind of issue that was the subject of the Court's decision in *Stone* v. *Powell, supra*.The question whether a defendant has been convicted upon inadequate evidence is central to the basic question of guilt or innocence. The constitutional necessity of proof beyond a reasonable doubt is not confined to those defendants who are morally blameless. *E. g., Mullaney* v. *Wilbur*, 421 U.S., at 697-698 (requirement of proof beyond a reasonable doubt is not "[limited] to those facts which, if not proved, would wholly exonerate" the accused). Under our system of criminal justice even a thief [*324] is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar.

[2C]We hold that in a challenge to a state criminal conviction brought under 28 U. S. C. § 2254 -- if the settled procedural prerequisites for such a claim have otherwise been satisfied -- the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no [**2792] rational trier of fact could have found proof of guilt beyond a reasonable [***577] doubt. [16]

---

[15] [21B]The Virginia Supreme Court's order denying Jackson's petition for writ of error does not make clear what criterion was applied to the petitioner's claim that the evidence in support of his first-degree murder conviction was insufficient. See n. 4, *supra*. At oral argument, counsel for the petitioner contended that the Virginia sufficiency standard is not keyed to *Winship*. Counsel for the State disagreed. Under these circumstances, we decline to speculate as to the criterion that the state court applied. The fact that a state appellate court invoked the proper standard, however, although entitled to great weight, does not totally bar a properly presented claim of this type under § 2254.

[16]

[2D]The respondents have suggested that this constitutional standard will invite intrusions upon the power of the States to define criminal offenses. Quite to the contrary, the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. Whether the State could constitutionally make the conduct at issue criminal at all is, of course, a distinct question. See *Papachristou* v. *Jacksonville*, 405 U.S. 156; *Robinson* v.

[****31] IV

[25]Turning finally to the specific facts of this case, we reject the petitioner's claim that under the constitutional standard dictated by *Winship* his conviction of first-degree murder cannot stand. A review of the record in the light most favorable to the prosecution convinces us that a rational factfinder could readily have found the petitioner guilty beyond a reasonable doubt of first-degree murder under Virginia law.

[26]There was no question at the trial that the petitioner had fatally shot Mary Cole. The crucial factual dispute went to the sufficiency of the evidence to support a finding that he had specifically intended to kill her. This question, as the Court of Appeals recognized, must be gauged in the light of applicable Virginia law defining the element of premeditation. Under that law it is well settled that premeditation need not exist for any particular length of time, and that an intent to kill may be formed at the moment of the commission of the unlawful act. *Commonwealth* v. *Brown*, 90 Va. 671, 19 S. E. 447.From the circumstantial evidence in the record, it is [*325] clear that the trial judge could reasonably have found [****32] beyond a reasonable doubt that the petitioner did possess the necessary intent at or before the time of the killing.

The prosecution's uncontradicted evidence established that the petitioner shot the victim not once but twice. The petitioner himself admitted that the fatal shooting had occurred only after he had first fired several shots into the ground and then reloaded his gun. The evidence was clear that the two shots that killed the victim were fired at close, and thus predictably fatal, range by a person who was experienced in the use of the murder weapon. Immediately after the shooting, the petitioner drove without mishap from Virginia to North Carolina, a fact quite at odds with his story of extreme intoxication. Shortly before the fatal episode, he had publicly expressed an intention to have sexual relations with the victim. Her body was found partially unclothed. From these uncontradicted circumstances, a rational factfinder readily could have inferred beyond a reasonable doubt that the petitioner, notwithstanding evidence that he had been drinking on the day of the killing, did have the capacity to form and had in fact formed an intent to kill the victim.

The petitioner's [****33] calculated behavior both before and after the killing demonstrated that he was fully capable of committing premeditated murder. His claim of self-defense would have required the trial judge to draw a series of improbable inferences from the basic facts, prime among them the inference that he was wholly uninterested in sexual [***578] activity with the victim but that she was so interested as to have willingly removed part of her clothing and then attacked him with a knife when he resisted her advances, even though he was armed with a loaded revolver that he had just demonstrated he knew how to use. It is evident from the record that the trial judge found this story, including the petitioner's belated contention that he had been so intoxicated as to be incapable of premeditation, incredible.

[*326] [27][28]Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's [**2793] challenge be sustained. That theory the Court has rejected in the past. *Holland* v. *United States*, 348 U.S. 121, 140. We decline to adopt it today. Under the standard established [****34] in this opinion as necessary to preserve the due process protection recognized in *Winship*, a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. Applying these criteria, we hold that a rational trier of fact could reasonably have found that the petitioner committed murder in the first degree under Virginia law.

For these reasons, the judgment of the Court of Appeals is affirmed.

*It is so ordered*.

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

**Concur by:** STEVENS

## Concur

MR. JUSTICE **STEVENS**, with whom THE CHIEF

*California*, 370 U.S. 660.

JUSTICE and MR. JUSTICE REHNQUIST join, concurring in the judgment. The Constitution prohibits the criminal conviction of any person except upon proof *sufficient to convince the trier of fact* of guilt beyond a reasonable doubt. Cf. *ante*, at 309. This rule has prevailed in our courts "at least from our early years as a Nation." *In re Winship*, 397 U.S. 358, 361.

Today the Court creates a [****35] new rule of law -- one that has never prevailed in our jurisprudence. According to the Court, the Constitution now prohibits the criminal conviction of any person -- including, apparently, a person against whom the facts have already been found beyond a reasonable doubt by a jury, a trial judge, and one or more levels of state appellate judges -- except upon proof sufficient to convince a *federal [*327] judge* that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ante*, at 319.

The adoption of this novel constitutional rule is not necessary to the decision of this case. Moreover, I believe it is an unwise act of lawmaking. Despite its chimerical appeal as a new counterpart to the venerable principle recognized in *Winship*, I am persuaded that its [***579] precipitous adoption will adversely affect the quality of justice administered by federal judges. For that reason I shall analyze this new brainchild with some care.

I shall begin by explaining why neither the record in this case, nor general experience with challenges to the sufficiency of the evidence supporting criminal convictions, supports, much less [****36] compels, the conclusion that there is *any* need for this new constitutional precept. I shall next show that it is not logically compelled by either the holding or the analysis in *In re Winship, supra*. Finally, I shall try to demonstrate why the Court's new rule -- if it is not just a meaningless shibboleth -- threatens serious harm to the quality of our judicial system.

I

It is, of course, part of this Court's tradition that new rules of law emerge from the process of case-by-case adjudication of constitutional issues. Widespread concern that existing constitutional doctrine is unjust often provides the occasion, and is sometimes even relied upon as a justification, for the exercise of such lawmaking authority by the Court. Without entering the debate over the legitimacy of this justification for judicial action, it is at least certain that it should not be the basis for dramatic -- indeed, for *any* -- constitutional lawmaking efforts unless (1) those efforts are necessary to the decision of the case at hand and (2) powerful reasons favor a change in the law. See *Ashwander* v. *TVA*, 297 U.S. 288, 345-348 (Brandeis, J., concurring).

[****37] [*328] In this case, the Court's analysis fails on both counts. It has accordingly formulated a new constitutional principle under the [**2794] most dangerous possible circumstances -- *i. e.*, where the exercise of judicial authority is neither necessitated nor capable of being limited by "the precise facts to which [the rule is originally] to be applied," *Liverpool, N. Y. & P. S. S. Co*. v. *Emigration Comm'rs*, 113 U.S. 33, 39, nor even by some broader set of identifiable experiences with the evil supposedly involved.

Most significantly, the Court has announced its new constitutional edict in a case in which it has absolutely no bearing on the outcome. The only factual issue at stake is whether petitioner intended to kill his victim. If the evidence is viewed "in the light most favorable to the prosecution," *ante*, at 319 -- and, indeed, we may view it through the eyes of the actual factfinder, whose observations about the evidence are recorded in the trial transcript -- there can be only one answer to that question no matter *what* standard of appellate review is applied. In Part IV of its opinion, the Court accepts this conclusion. There [****38] is, therefore, no need to fashion a broad new rule of constitutional law to dispose of this squalid but rather routine murder case. Under any view, the evidence is sufficient.

The Court's new rule is adopted simply to forestall some hypothetical evil that has not been demonstrated, and in my view is not fairly demonstrable. Although the Judiciary has received its share of criticism -- principally because of the delays and costs associated with litigation -- I [***580] am aware of no general dissatisfaction with the accuracy of the factfinding process or the adequacy of the rules applied by state appellate courts when reviewing claims of insufficiency.

What little evidence the Court marshals in favor of a contrary conclusion is unconvincing. See *ante*, at 317-318, n. 10. The Court is simply incorrect in implying that there are a significant number of occasions when federal convictions are [*329] overturned on appeal because no rational trier of fact could have found guilt beyond a reasonable doubt. The two opinions of this Court cited *ante*, at 317, stand for no such proposition. In neither was a conviction reversed for insufficiency. See *Glasser* v. *United States*, 315 U.S. 60; [****39] *Bronston* v. *United States*, 409 U.S. 352.

Moreover, a study of the 127 federal criminal convictions that were reviewed by the various Courts of Appeals and reported in the most recent hardbound volume of the Federal Reporter, Second Series, Volume 589, reveals that only 3 were overturned on sufficiency grounds. And of those, one was overturned under a "no evidence" standard, while the other two, in which a total of only 3 out of 36 counts were actually reversed, arguably involved legal issues masquerading as sufficiency questions. [1] It is difficult to believe that the federal courts will turn up more sufficiency problems than this on habeas review when, instead of acting as the first level of [*330] review, as in the cases [**2795] studied, they will be acting as the second, third, or even fourth level of appellate review. In short, there is simply no reason to tinker with an elaborate mechanism that is now functioning well.

[****40] II

There is nothing in the facts of this case or, so far as the Court has demonstrated, in those of cases like it to warrant today's excursion into constitutional rulemaking. The Court instead portrays its rule as the logical corollary of the principle recognized in *Winship* regarding the subjective state of mind that persons charged with the responsibility of evaluating the credibility of evidence must possess before they find the [***581] defendant guilty in a criminal case. But an examination of *Winship* reveals that it has nothing to do with appellate, much less habeas corpus, review standards; that the reasoning used in that case to reach its conclusion with respect to the trier of fact does not support, and indeed counsels against, the Court's conclusion with respect to federal habeas judges; and that there is no necessary connection between the rule recognized in *Winship* and the rule invented by the Court today.

In distinct contrast to the circumstances of this case, the facts of *Winship* presented "a case where the choice of the standard of proof has made a difference: the [trial] judge below forthrightly acknowledged that he believed by a preponderance of [****41] the evidence [in], but was not convinced beyond a reasonable doubt" of, the juvenile's guilt. 397 U.S., at 369 (Harlan, J., concurring). Because the trier of fact entertained such a doubt, this Court held that the juvenile was constitutionally entitled to the same verdict that an adult defendant in a criminal case would receive. In so holding, the Court merely extended to juveniles a protection that had traditionally been available to defendants in criminal *trials* in this Nation. *Id*., at 361.

But nothing in the *Winship* opinion suggests that it also [*331] bore on appellate or habeas corpus procedures. Although it repeatedly emphasized the function of the reasonable-doubt standard as describing the requisite "subjective state of certitude" of the *"factfinder*," [2] it

---

[1] In *United States* v. *Tarr*, 589 F.2d 55 (CA1 1978), the court overturned one of two counts of which appellant was convicted because there was insufficient evidence to prove that he had the intent to aid and abet the unauthorized transfer of a machinegun in violation of 26 U. S. C. § 5861 (e) and 18 U. S. C. § 2. The court found "no evidence" that appellant had the requisite knowledge. 589 F.2d, at 60.

In *United States* v. *Whetzel*, 191 U. S. App. D. C. 184, 589 F.2d 707 (1978), the court overturned 2 of the 35 counts of appellant's conviction because "the Government failed to offer proof that would permit a jury to reasonably infer that the merchandise [appellant] transported had a value of $ 5,000." *Id*., at 188, 589 F.2d, at 711. However, the basis for this determination was that the Government's valuation method, which the trial court allowed the jury to consider, was legally erroneous. Similarly, in *United States* v. *Fearn*, 589 F.2d 1316 (CA7 1978), the court overturned the conviction based on a federal nonconstitutional rule, which surely would not apply in habeas review of state convictions, "that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." *Id*., at 1321. The court did not independently analyze whether the uncorroborated confession involved in that case could itself have allowed a rational trier of fact to find guilt beyond a reasonable doubt.

[2] In *In re Winship*, 397 U. S., at 364, the Court stated: "As we said in *Speiser* v. *Randall*, [357 U.S. 513,] 525-526: 'There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value -- as a criminal defendant his liberty -- this margin of error is reduced as to him by the process of placing on the other party the burden of . . . *persuading the factfinder* at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . *convincing the factfinder of his guilt.'* To this end, the reasonable-doubt standard is indispensable, for it *'impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.'* Dorsen & Rezneck, In Re Gault and the Future of Juvenile Law, 1 Family Law Quarterly, No. 4, pp. 1, 26 (1967)." (Emphasis added.)

Later on the same page, the Court added:

"It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense

never mentioned the question of how appellate judges are to know whether the trier of fact really was convinced beyond a reasonable doubt, or, indeed, whether the factfinder was a "rational" person or group of persons.

[****42] Moreover, the mode of analysis employed in *Winship* finds no counterpart in the Court's opinion in this case. For example, in *Winship*, the Court pointed out the [**2796] breadth of both the historical and the current acceptance of the reasonable-doubt [***582] *trial* standard. [3] [****43] In this case, by contrast, the Court [*332] candidly recognizes that the Federal Courts of Appeals have "generally" *rejected* the habeas standard that it adopts today. *Ante*, at 316. [4]

The *Winship* court relied on nine prior opinions of this Court that bore directly on the issue presented. 397 U.S., at 362. Here, the Court purportedly relies on two prior decisions, but as is pointed out, *supra*, at 329, neither of these cases itself applied a "reasonable doubt" appellate standard to overturn a conviction, neither purported to be interpreting the Constitution, and neither expressed any view whatsoever on the appropriate standard in collateral [****44] proceedings such as are involved in this case. [5] As the Court itself notes, we have instead repeatedly endorsed the "no evidence" test, and have continued to do so after *Winship* was decided. *Vachon* v. [*333] *New Hampshire*, 414 U.S. 478; *Douglas* v. *Buder*, 412 U.S. 430; *Gregory* v. *Chicago*, 394 U.S. 111; *Adderley* v. *Florida*, 385 U.S. 39; *Thompson* v. *Louisville*, 362 U.S. 199. See also *Clyatt* v. *United States*, 197 U.S. 207, 222.

The primary reasoning of the Court in *Winship* is also inapplicable here. The Court noted in that [****45] case that the reasonable-doubt standard has the desirable effect of significantly reducing the risk of an inaccurate factfinding and thus of erroneous convictions, as well as of instilling confidence in the criminal justice system. 397 U.S., at 363-364. See also *id*., at 370-372 (Harlan, J., concurring). In this case, however, it would be impossible (and the Court does not even try) to demonstrate that there is an appreciable risk that a factfinding made by a jury beyond a reasonable doubt, and twice reviewed [***583] by a trial judge in ruling on directed verdict and post-trial acquittal motions and by one or more levels of appellate courts on direct appeal, as well as by two federal habeas courts under the *Thompson* "no evidence" rule, is likely to be erroneous. [6] Indeed, the very premise of *Winship* is that properly selected [**2797] judges and properly instructed juries act rationally, that the former will tell the truth when they declare that they are convinced beyond a reasonable doubt and the latter will conscientiously obey and understand the reasonable-doubt instructions they receive before retiring to reach a verdict, and [****46] therefore that either factfinder will itself provide the

---

*without convincing a proper factfinder of his guilt with utmost certainty." Ibid*. (emphasis added).

See also *id*., at 370 (Harlan, J., concurring) ("[A] standard of proof represents an attempt to instruct *the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions* for a particular type of adjudication") (emphasis added).

[3] The Court, relying on treatises that analyzed the law in all 50 States as well as in the federal system, determined both that the reasonable-doubt standard has prevailed at the *trial* level "at least from our early years as a Nation" and that it "is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the *trier* of all the essential elements of guilt." *Id*., at 361 (emphasis added). See also *id*., at 372 (Harlan, J., concurring) ("It is only because of the nearly complete and long-standing acceptance of the reasonable-doubt standard by the States in criminal *trials* that the Court has not before today had to hold explicitly that due process, as an expression of fundamental procedural fairness, requires a more stringent standard for criminal trials than for ordinary civil litigation") (emphasis added).

[4] The Court has undertaken no systematic analysis of the standards for reviewing the sufficiency of the evidence that prevail either in state habeas corpus and other collateral proceedings or in state appellate courts. What sources I have discovered suggest that "varied standards" are in use and that each is "subject to shifting and elastic definitions." Winningham, The Dilemma of the Directed Acquittal, 15 Vand. L. Rev. 699, 705-706 (1962). See ALI Code of Criminal Procedure, Commentary on § 321, pp. 961-962 (1930); Rules of Criminal Procedure 481 (c), 522 (a) and commentary, 10 U. L. A. (1974).

[5] It hardly bears repeating that habeas corpus is not intended as a substitute for appeal, nor as a device for reviewing the merits of guilt determinations at criminal trials. See generally *Stone* v. *Powell*, 428 U.S. 465. Instead, it is designed to guard against extreme malfunctions in the state criminal justice systems.

[6] As I discuss earlier, see *supra*, at 329, the incidence of factual error at the trial level in federal courts appears to be exceedingly low, even when measured by the relatively strict appellate standard used by the Federal Courts of Appeals. Presumably the incidence of errors that survive that first level of review is even smaller.

necessary bulwark against erroneous factual determinations. To presume otherwise is to make light of *Winship*. [7]

[*334] Having failed to identify the evil against which the rule is [****47] directed, and having failed to demonstrate how it follows from the analysis typically used in due process cases of this character, the Court places all of its reliance on a dry, and in my view incorrect, syllogism: If *Winship* requires the factfinder to apply a reasonable-doubt standard, then logic requires a reviewing judge to apply a like standard.

But, taken to its ultimate conclusion, this "logic" would require the reviewing court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby* v. *INS*, 385 U.S. 276, 282 (emphasis added). The Court, however, rejects this standard, as well as others that might be considered consistent with *Winship*. For example, it does not require the reviewing court to view just the evidence most favorable to the prosecution and then to decide whether that evidence convinced it beyond a reasonable doubt, nor whether, based on the entire record, rational triers of fact could be convinced of guilt beyond a reasonable doubt. Instead, and without explanation, it chooses a still narrower standard that merely asks whether, "after viewing the evidence in the [****48] light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ante*, at 319. [8] It seems to me that if "logic" allows [*335] [***584] this choice after *Winship* it should also allow the presumption that the Court has rejected -- that trial judges and juries will act rationally and honestly in applying the reasonable-doubt standard, at least so long as the trial is free of procedural error and the record contains evidence tending to prove each of the elements of the offense.

[****49] Time may prove that the rule the Court has adopted today is the wisest compromise between one extreme that maximizes the protection against the risk that innocent persons will be erroneously convicted and the other extreme that places the greatest faith in the ability of fair procedures to produce just verdicts. But the Court's opinion should not obscure the fact that its new rule is not logically compelled by the analysis or the holding in *Winship* or in any other precedent, or the fact that the rule reflects a new policy choice rather than the application of a pre-existing rule of law.

III

The Court cautions against exaggerating the significance of its new rule. *Ante*, at 321. It is true that in practice there may [**2798] be little or no difference between a record that does not contain at least some evidence tending to prove every element of an offense and a record containing so little evidence that no rational factfinder could be persuaded of guilt beyond a reasonable doubt. Moreover, I think the Court is quite correct when it acknowledges that "most meritorious challenges to constitutional sufficiency of the evidence undoubtedly will be recognized in the state [****50] courts." *Ante*, at 322. But this only means that the new rule will seldom, if ever, provide a convicted state prisoner with any tangible benefits. It does not mean that the rule will have no impact on the administration of justice. On the contrary, I am persuaded that it will be seriously harmful both to the state and federal judiciaries.

[*336] The Court indicates that the new standard to be applied by federal judges in habeas corpus proceedings may be substantially the same as the standard most state reviewing courts are already applying. *Ante*, at 322. The federal district courts are therefore being directed simply to duplicate the reviewing function that is now being performed adequately by state appellate courts. In my view, this task may well be inconsistent with the prohibition -- added by Congress to the federal habeas statute in order to forestall undue federal interference with state proceedings, see *Wainwright* v.

[7] Indeed, the Court makes light of *Winship* by suggesting that, in the absence of its new habeas procedure, the result of that case is simply "a trial ritual." *Ante*, at 316-317. Far more likely in my view is that the Court's difficult-to-apply but largely unnecessary rule will itself result in a "collateral-attack ritual" that will undermine the integrity of both the state and federal judiciaries. See *infra*, at 336-339.

[8] So far as I can determine, this standard first appeared in our jurisprudence in MR. JUSTICE STEWART's opinion dissenting from the Court's denial of certiorari in *Freeman* v. *Zahradnick*, 429 U.S. 1111, 1112, 1113, 1114, 1116. At that time, it gave the impression of being somewhat narrower than -- if only because it was stated quite differently from -- the test used by the Courts of Appeals in reviewing federal convictions on direct appeal. See *Curley* v. *United States*, 81 U. S. App. D. C. 389, 392-393, 160 F.2d 229, 232-233 (1947). Although the Court twice repeats the *Freeman* test, see *ante*, at 313, 319, it now appears either to equate that standard with the -- in my view -- broader federal direct-review standard, or to endorse both standards despite their differences. See *ante*, at 318, and nn. 11, 12.

*Sykes*, 433 U.S. 72, 80 -- against overturning "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction." 28 U. S. C. § 2254 (d). See *LaVallee* v. *Delle Rose*, 410 U.S. 690. [****51] In any case, to assign a single federal district judge the responsibility of directly reviewing, and inevitably supervising, the most routine work of the highest courts of a State can only undermine the morale and the esteem of the state judiciary -- particularly when the stated purpose of the additional layer of review is to determine whether the State's factfinder [***585] is "rational." [9] Such consequences are intangible but nonetheless significant.

[****52] [*337] The potential effect on federal judges is even more serious. Their burdens are already so heavy that they are delegating to staff assistants more and more work that we once expected judges to perform. [10] The new standard will invite an unknown number of state prisoners to make sufficiency challenges that they would not have made under the old rule. Moreover, because the "rational trier of fact" must certainly base its decisions on *all* of the evidence, the Court's broader standard may well require that the entire transcript of the state trial be read whenever the factfinders' rationality is challenged under the Court's rule. [11] [****54] [**2799] Because this task will confront the courts of appeals as well as district courts, it will surely impose countless additional hours of unproductive labor on federal judges and their assistants. [12] [****55] The

[9] In the past, collateral review of state proceedings has been justified largely on the grounds (1) that federal judges have special expertise in the federal issues that regularly arise in habeas corpus proceeding, and (2) that they are less susceptible than state judges to political pressures against applying constitutional rules to overturn convictions. See, *e. g.*, Bartels, Avoiding a Comity of Errors, 29 Stan. L. Rev. 27, 30 n. 9 (1976). Cf. *Steffel* v. *Thompson*, 415 U.S. 452, 464; *Mitchum* v. *Foster*, 407 U.S. 225, 242. But neither of these justifications has any force in the present context. State judges are more familiar with the elements of state offenses than are federal judges and should be better able to evaluate sufficiency claims. Moreover, of all decisions overturning convictions, the least likely to be unpopular and thus to distort state decisionmaking processes are ones based on the inadequacy of the evidence. Indeed, once federal courts were divested of authority to second-guess state courts on Fourth Amendment issues, which are far more likely to generate politically motivated state-court decisions, see *Stone* v. *Powell*, 428 U.S. 465, a like result in this case would seem to be *a fortiori*.

[10] For example, the heavy federal workload has required the 13 regular and 7 senior judges on the Ninth Circuit to hire 30 staff attorneys and 33 law clerks to assist them in their labors.

[11] Additional burdens will also be imposed if the Court's rule is extended to federal habeas proceedings reviewing federal criminal trials, as well as to ones reviewing state civil commitment proceedings in which we have recently required at least the "clear and convincing" test to be applied as a matter of federal constitutional law. *Addington* v. *Texas*, 441 U.S. 418.

This Court's work load will also increase, of course, when its certiorari docket expands to accommodate the challenges generated by the Court's new rule. The effect will be even greater if the Court's opinion is read to require state appellate courts to apply the reasonable-doubt test on direct review and to require this Court to apply it when reviewing the decisions of those courts on certiorari.

[12] Professor Bator has persuasively explained how the law of diminishing returns inevitably makes it unwise to have duplicative review processes on the "merits" in criminal cases:

"[If] a criminal judgment is ever to be final, the notion of legality must at some point include the assignment of final competencies to determine legality. But, it may be asked, why should we seek a point at which such a judgment becomes final? Conceding that no process can assure ultimate truth, will not repetition of inquiry stand a better chance of approximating it? In view of the awesomeness of the consequences of conviction, shouldn't we allow redetermination of the merits in an *attempt* to make sure that no error has occurred?

"Surely the answer runs, in the first place, in terms of conservation of resources -- and I mean not only simple economic resources, but all of the intellectual, moral, and political resources involved in the legal system. The presumption must be, it seems to me, that if a job can be well done once, it should not be done twice. If one set of institutions is as capable of performing the task at hand as another, we should not ask both to do it. The challenge really runs the other way: if a proceeding is held to determine the facts and law in a case, and the processes used in that proceeding are fitted to the task in a manner not inferior to those which would be used in a second proceeding, so that one cannot demonstrate that relitigation would not merely consist of repetition and second-guessing, why should not the first proceeding 'count'? Why should we duplicate effort? After all, it is the very purpose of the first go-around to decide the case. Neither it nor any subsequent go-around can assure ultimate truth. If, then, the previous determination is to be ignored, we must have some reasoned institutional justification why this should be so.

"Mere iteration of process can do other kinds of damage. I could imagine nothing more subversive of a judge's sense of

increasing volume [*338] of work of this character has [***586] already led some of our most distinguished lawyers to discontinue or reject service on the federal bench. [13] The addition of a significant volume [*339] of pointless labor can only impair the quality of justice administered by federal judges and thereby undermine [****53] "the respect and confidence of the community in applications of the . . . law." *In re Winship*, 397 U.S., at 364.

For these reasons, I am unable to join the Court's gratuitous directive to our colleagues on the federal bench.

## References

39 Am Jur 2d, Habeas Corpus 62

10 Federal Procedural Forms L Ed, Habeas Corpus 36:11 et seq.

11 Am Jur Pl & Pr [****56] Forms (Rev), Federal Practice and Procedure, Forms 41 et seq.; 13 Am Jur Pl & Pr Forms (Rev), Forms 2181 et seq.

20 Am Jur Trials 1, Federal Habeas Corpus Practice

28 USCS 2254

US L Ed Digest, Habeas Corpus 17

L Ed Index to Annos, Habeas Corpus

ALR Quick Index, Habeas Corpus

Federal Quick Index, Habeas Corpus

Annotation References:

Lack of evidence supporting state conviction of criminal offense as violation of federal due process. 15 L Ed 2d 889; 80 ALR2d 1362.

End of Document

---

responsibility, of the inner subjective conscientiousness which is so essential a part of the difficult and subtle art of judging well, than an indiscriminate acceptance of the notion that all the shots will always be called by someone else. Of course this does not mean that we should not have appeals. As we shall see, important functional and ethical purposes are served by allowing recourse to an appellate court in a unitary system, and to a federal supreme court in a federal system. The acute question is the effect it will have on a trial judge if we then allow still further recourse where these purposes may no longer be relevant. What seems so objectionable is second-guessing merely for the sake of second-guessing, in the service of the illusory notion that if we only try hard enough we will find the 'truth.'" Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 450-451 (1963).

See also F. James, Civil Procedure 518 (1965).

[13] The testimony of Griffin Bell at his confirmation hearings for Attorney General is particularly relevant. When asked by Senator Scott of Virginia why he had earlier resigned from his seat on the Court of Appeals for the Fifth Circuit, Judge Bell responded:

"I found it not to be a rewarding experience any longer. Whether it was because there was no more excitement after the 1960's, or whether it was because the case load changed, but the work load was oppressive. I would not have minded the work load, but the character of the cases changed. It was almost like serving on a criminal court. I did not want to do that any longer." Hearings on the Prospective Nomination of Griffin B. Bell, of Georgia, to be Attorney General, before the Senate Committee on the Judiciary, 95th Cong., 1st Sess., 27 (1977).

# Liteky v. United States

510 U.S. 540 (1994)

Cited in Opening Brief at: viii, 40

See Response, Parts III.B and III.G. Highlighted language appears at 510 U.S. at 555.

Caution
As of: September 14, 2026 1:02 PM Z

# Liteky v. United States

Supreme Court of the United States

November 3, 1993, Argued ; March 7, 1994, Decided

No. 92-6921

**Reporter**
510 U.S. 540 *; 114 S. Ct. 1147 **; 127 L. Ed. 2d 474 ***; 1994 U.S. LEXIS 2045 ****; 62 U.S.L.W. 4161; 94 Cal. Daily Op. Service 1668; 94 Daily Journal DAR 2985; 7 Fla. L. Weekly Fed. S 793

JOHN PATRICK LITEKY, CHARLES JOSEPH LITEKY AND ROY LAWRENCE BOURGEOIS, PETITIONERS v. UNITED STATES

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT.

**Disposition:** 973 F.2d 910, affirmed.

## Syllabus

Before and during petitioners' 1991 trial on federal criminal charges, the District Judge denied defense motions that he recuse himself pursuant to 28 U.S.C. § 455(a), which requires a federal judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The first motion was based on rulings and statements this same judge made, which allegedly displayed impatience, disregard, and animosity toward the defense, during and after petitioner Bourgeois' 1983 bench trial on similar charges. The second motion was founded on the judge's admonishment of Bourgeois' counsel and codefendants in front of the jury at the 1991 trial. [****2] In affirming petitioners' convictions, the Court of Appeals agreed with the District Judge that matters arising from judicial proceedings are not a proper basis for recusal.

*Held:* Required recusal under § 455(a) is subject to the limitation that has come to be known as the "extrajudicial source" doctrine. Pp. 543-556.

(a) The doctrine -- see *United States* v. *Grinnell Corp.*, 384 U.S. 563, 583, 16 L. Ed. 2d 778, 86 S. Ct. 1698 -- applies to § 455(a). It was developed under § 144, which requires disqualification for "personal bias or prejudice." That phrase is repeated as a recusal ground in § 455(b)(1), and § 455(a), addressing disqualification for appearance of partiality, also covers "bias or prejudice." The absence of the word "personal" in § 455(a) does not preclude the doctrine's application, since the textual basis for the doctrine is the pejorative connotation of the words "bias or prejudice," which indicate a judicial predisposition that is *wrongful* or *inappropriate*. Similarly, because the term "partiality" refers only to such favoritism as is, for some reason, wrongful or inappropriate, § 455(a)'s requirement of recusal [****3] *whenever* there exists a genuine question concerning a judge's impartiality does not preclude the doctrine's application. A contrary finding would cause the statute, in a significant sense, to contradict itself, since (petitioners acknowledge) § 455(b)(1) embodies the doctrines, and § 455(a) duplicates § 455(b)'s protection with regard to "bias and prejudice." Pp. 543-553.

(b) However, it is better to speak of the existence of an "extrajudicial source" *factor*, than of a *doctrine*, because the presence of such a source does not necessarily establish bias, and its absence does not necessarily preclude bias. The consequences of that factor are twofold for purposes of this case. First, judicial rulings alone almost never constitute valid basis for a bias or partiality recusal motion. See *Grinnell, supra*, at 583. Apart from surrounding comments or accompanying opinion, they cannot possibly show reliance on an extrajudicial source; and, absent such reliance, they require recusal only when they evidence such deepseated favoritism or antagonism as would make fair judgment impossible. Second, opinions formed by the judge on the basis of facts introduced [****4] or events occurring during current or prior proceedings are not grounds for a recusal motion unless they display a similar degree of favoritism or antagonism. Pp. 554-556.

(c) Application of the foregoing principles to the facts of this case demonstrates that none of the grounds petitioners assert required disqualification. They all consist of judicial rulings, routine trial administration

efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses. All occurred in the course of judicial proceedings, *and* neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible. P. 556.

**Counsel:** Peter Thompson, by appointment of the Court, 509 U.S. 920, argued the cause and filed briefs for petitioners.

Thomas G. Hungar argued the cause for the United States. With him on the brief were Solicitor General Days, Acting Assistant Attorney General Keeney, Deputy Solicitor General Bryson, and Joel M. Gershowitz.

**Judges:** SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, [****5] THOMAS, and GINSBURG, JJ., joined. KENNEDY, J., filed an opinion concurring in the judgment, in which BLACKMUN, STEVENS, and SOUTER, JJ., joined, post, p. 557.

**Opinion by:** SCALIA

## Opinion

[*541] [***482] [**1150] JUSTICE SCALIA delivered the opinion of the Court.

[1A] [2A] [3A]Section 455(a) of Title 28 of the United States Code requires a federal judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." This case presents the question whether required recusal under this provision is subject to the limitation that has come to be known as the "extrajudicial source" doctrine.

[*542] I

In the 1991 trial at issue here, petitioners were charged with willful destruction of property of the United States in violation of 18 U.S.C. § 1361. The indictment alleged that they had committed acts of vandalism, including the spilling of human blood on walls and various objects, at the Fort Benning [****6] Military Reservation. Before trial petitioners moved to disqualify the District Judge pursuant to 28 U.S.C. § 455(a). The motion relied on events that had occurred during and immediately after an earlier trial, involving [**1151] petitioner Bourgeois, before the same District Judge.

In the 1983 bench trial, Bourgeois, a Catholic priest of the Maryknoll order, had been tried and convicted of various misdemeanors committed during a protest action, also on the federal enclave of Fort Benning. Petitioners claimed that recusal was required in the present case because the judge had displayed "impatience, disregard for the defense and animosity" toward Bourgeois, Bourgeois' codefendants, and their beliefs. The alleged evidence of that included the following words and acts by the judge: stating at the outset of the [***483] trial that its purpose was to try a criminal case and not to provide a political forum; observing after Bourgeois' opening statement (which described the purpose of his protest) that the statement ought to have been directed toward the anticipated evidentiary showing; limiting defense counsel's cross-examination; questioning witnesses; periodically [****7] cautioning defense counsel to confine his questions to issues material to trial; similarly admonishing witnesses to keep answers responsive to actual questions directed to material issues; admonishing Bourgeois that closing argument was not a time for "making a speech" in a "political forum"; and giving Bourgeois what petitioners considered to be an excessive sentence. The final asserted ground for disqualification -- and the one that counsel for petitioners described at oral argument as the most serious -- was the judge's interruption of the closing argument of one of Bourgeois' codefendants, [*543] instructing him to cease the introduction of new facts, and to restrict himself to discussion of evidence already presented.

The District Judge denied petitioners' disqualification motion, stating that matters arising from judicial proceedings were not a proper basis for recusal. At the outset of the trial, Bourgeois' counsel informed the judge that he intended to focus his defense on the political motivation for petitioners' actions, which was to protest United States Government involvement in El Salvador. The judge said that he would allow petitioners to state their political [****8] purposes in opening argument and to testify about them as well, but that he would not allow long speeches or discussions concerning Government policy. When, in the course of opening argument, Bourgeois' counsel began to explain the circumstances surrounding certain events in El Salvador, the prosecutor objected, and the judge stated that he would not allow discussion about events in El Salvador. He then instructed defense counsel to limit his remarks to what he expected the evidence to show. At the close of the prosecution's case, Bourgeois renewed his disqualification motion, adding as grounds for it the District Judge's "admonishing [him] in front of the jury"

regarding the opening statement, and the District Judge's unspecified "admonishing [of] others," in particular Bourgeois' two *pro se* codefendants. The motion was again denied. Petitioners were convicted of the offense charged.

Petitioners appealed, claiming that the District Judge violated 28 U.S.C. § 455(a) in refusing to recuse himself. The Eleventh Circuit affirmed the convictions, agreeing with the District Court that "matters arising out of the course of judicial proceedings are not a [****9] proper basis for recusal." 973 F.2d 910 (1992). We granted certiorari. 508 U.S. 939 (1993).

II

[2B]Required judicial recusal for bias did not exist in England at the time of Blackstone. 3 W. Blackstone, Commentaries [*544] *361. Since 1792, federal statutes have compelled district judges to recuse themselves when they have an interest in the suit, or have been counsel to a party. See Act of May 8, 1792, ch. 36, § 11, 1 Stat. 278. In 1821, the basis of recusal was expanded to include all judicial relationship or connection with a [***484] party that would in the judge's opinion make it improper to sit. Act of Mar. 3, 1821, ch. 51, 3 Stat. 643. Not until 1911, however, was a provision enacted requiring district-judge recusal for bias *in general*. In its current form, codified at 28 U.S.C. § 144, that provision reads as follows:

> [**1152] "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against [****10] him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
>
> "The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

Under § 144 and its predecessor, there came to be generally applied in the courts of appeals a doctrine, more standard in its formulation than clear in its application, requiring -- to take its classic formulation found in an oft-cited opinion by Justice Douglas for this Court -- that "the alleged bias and prejudice to be disqualifying [under § 144] must stem from an extrajudicial source." *United States* v. *Grinnell Corp.*, 384 U.S. 563, 583, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966). We say that the doctrine was less than entirely clear in its application for [*545] several reasons. [****11] First, *Grinnell* (the only opinion of ours to recite the doctrine) clearly meant by "extrajudicial source" a source outside the judicial proceeding at hand -- which would include as extrajudicial sources earlier judicial proceedings conducted by the same judge (as are at issue here). [1] Yet many, perhaps most, Courts of Appeals considered knowledge (and the resulting attitudes) that a judge properly acquired in an earlier proceeding *not* to be "extrajudicial." See, *e.g., Lyons* v. *United States*, 325 F.2d 370, 376 (CA9), cert. denied, 377 U.S. 969, 12 L. Ed. 2d 738, 84 S. Ct. 1650 (1964); *Craven* v. *United States*, 22 F.2d 605, 607-608 (CA1 1927). Secondly, the doctrine was often quoted as justifying the refusal to consider trial *rulings* as the basis for § 144 recusal. See, *e.g., Toth* v. *Trans World Airlines, Inc.*, 862 F.2d 1381, 1387-1388 (CA9 1988); *Liberty Lobby, Inc.* v. *Dow Jones & Co.*, 267 U.S. App. D.C. 337, 838 F.2d 1287, 1301 (CADC), cert. denied, 488 U.S. 825, 102 L. Ed. 2d 51, 109 S. Ct. 75 (1988). But trial *rulings* have a judicial *expression* [****12] rather than a judicial *source*. They may well be based upon [***485] extrajudicial knowledge or motives. Cf. *In re International Business Machines Corp.*, 618 F.2d 923, 928, n.6 (CA2 1980). And finally, even in cases in which the "source" of the bias or prejudice was clearly the proceedings themselves (for example, testimony introduced or an event occurring at trial which produced unsuppressible judicial animosity), the supposed doctrine would not necessarily be applied. See, *e.g., Davis* v. *Board of School Comm'rs of Mobile County*, 517 F.2d 1044, 1051 (CA5 1975) (doctrine has "pervasive bias" exception), cert. denied, 425 U.S. 944, 48 L. Ed. 2d 188, 96 S. Ct. 1685 (1976); [*546] *Rice* v.

[1] That is clear when the language from *Grinnell* excerpted above is expanded to include its entire context: "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. *Berger* v. *United States*, 255 U.S. 22, 31, 65 L. Ed. 481, 41 S. Ct. 230. Any adverse attitudes that [the district judge in the present case] evinced toward the defendants were based on his study of the depositions and briefs which the parties had requested him to make." 384 U.S. at 583. The cited case, *Berger*, had found recusal required on the basis of judicial remarks made in an earlier proceeding.

*McKenzie*, 581 F.2d 1114, 1118 (CA4 1978) (doctrine "has always had limitations").

[****13]

[2C][4]Whatever the precise contours of the "extrajudicial source" doctrine (a subject to which we will revert shortly), it is the contention of petitioners that the doctrine has no application to § 455(a). Most Courts of Appeals to consider the matter have rejected this contention, see *United States* v. *Barry*, 295 U.S. App. D.C. 173, 961 F.2d 260, 263 (CADC 1992);*United States* v. *Sammons*, 918 F.2d 592, 599 (CA6 1990);*McWhorter* v. *Birmingham*, 906 F.2d 674, 678 (CA11 1990);*United States* v. *Mitchell*, 886 F.2d 667, 671 (CA4 1989); [**1153] *United States* v. *Merkt*, 794 F.2d 950, 960 (CA5 1986), cert. denied, 480 U.S. 946, 94 L. Ed. 2d 789, 107 S. Ct. 1603 (1987);*Johnson* v. *Trueblood*, 629 F.2d 287, 290-291 (CA3 1980), cert. denied, 450 U.S. 999, 68 L. Ed. 2d 200, 101 S. Ct. 1704 (1981);*United States* v. *Sibla*, 624 F.2d 864, 869 (CA9 1980). Some, however, [****14] have agreed with it, see *United States* v. *Chantal*, 902 F.2d 1018, 1023-1024 (CA1 1990); cf. *United States* v. *Coven*, 662 F.2d 162, 168-169 (CA2 1981) (semble), cert. denied, 456 U.S. 916, 72 L. Ed. 2d 176, 102 S. Ct. 1771 (1982).To understand the arguments pro and con it is necessary to appreciate the major changes in prior law effected by the revision of § 455 in 1974.

Before 1974, § 455 was nothing more than the then-current version of the 1821 prohibition against a judge's presiding who has an interest in the case or a relationship to a party. It read, quite simply:

> "Any justice or judge of the United States shall disqualify himself in any case in which he has a substantial interest, has been of counsel, is or has been a material witness, or is so related to or connected with any party or his attorney as to render it improper, in his opinion, for him to sit on the trial, appeal, or other proceeding therein." 28 U.S.C. § 455 (1970 ed.).

The 1974 revision made massive changes, so that § 455 now reads as follows:

> [*547] "(a) Any justice, judge, or magistrate of the United States [****15] shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> "(b) He shall also disqualify himself in the following circumstances:
>
> "(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>
> "(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or [***486] the judge or such lawyer has been a material witness concerning it;
>
> "(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;
>
> "(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;
>
> "(5) He or his spouse, or a person within the third degree of [****16] relationship to either of them, or the spouse of such a person:
>
> "(i) Is a party to the proceeding, or an officer, director, or trustee of a party;
>
> "(ii) Is acting as a lawyer in the proceeding;
>
> "(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
>
> "(iv) Is to the judge's knowledge likely to be a material witness in the proceeding."

[*548] Almost all of the revision (paragraphs (b)(2) through (b)(5)) merely rendered objective and spelled out in detail the "interest" and "relationship" grounds of recusal that had previously been covered by § 455. But the other two paragraphs of the revision brought into § 455 elements of general "bias and prejudice" recusal that had previously been addressed only by § 144. Specifically, paragraph (b)(1) entirely duplicated the grounds of recusal set forth in § 144 ("bias or prejudice"), but (1) made them applicable to *all* justices, judges, and magistrates (and not just district judges), and (2) placed the obligation to identify the existence of those grounds upon the judge himself, rather than

requiring recusal only in response to a party affidavit.

Subsection [****17] (a), the provision at issue here, was an entirely new "catchall" recusal provision, covering both "interest or relationship" and "bias or prejudice" grounds, see *Liljeberg* v. *Health Services Acquisition* [**1154] *Corp.*, 486 U.S. 847, 100 L. Ed. 2d 855, 108 S. Ct. 2194 (1988) -- but requiring them *all* to be evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance. Quite simply and quite universally, recusal was required whenever "impartiality might reasonably be questioned."

[2D]What effect these changes had upon the "extrajudicial source" doctrine -- whether they in effect render it obsolete, of continuing relevance only to § 144, which seems to be properly invocable only when § 455(a) can be invoked anyway -- depends upon what the basis for that doctrine was. Petitioners suggest that it consisted of the limitation of § 144 to "*personal* bias or prejudice," bias or prejudice officially acquired being different from "personal" bias or prejudice. And, petitioners point out, while § 455(b)(1) retains the phrase [****18] "personal bias or prejudice, " § 455(a) proscribes all partiality, not merely the "personal" sort.

It is true that a number of Courts of Appeals have relied upon the word " [***487] personal" in restricting § 144 to extrajudicial sources, see, *e.g., Craven* v. *United States*, 22 F.2d 605, 607-608 [*549] (CA1 1927); *Ferrari* v. *United States*, 169 F.2d 353, 355 (CA9 1948). And several cases have cited the absence of that word as a reason for excluding that restriction from § 455(a), see *United States* v. *Coven, supra*, at 168, cert. denied, 456 U.S. 916 (1982); *Panzardi-Alvarez* v. *United States*, 879 F.2d 975, 983-984, and n.6 (CA1), cert. denied, 493 U.S. 1082 (1989). It seems to us, however, that that mistakes the basis for the "extrajudicial source" doctrine. Petitioners' suggestion that we relied upon the word "personal" in our *Grinnell* opinion is simply in error. The only reason *Grinnell* gave for its "extrajudicial source" holding was citation of our opinion almost half a century earlier in *Berger* v. *United States*, 255 U.S. 22, 65 L. Ed. 481, 41 S. Ct. 230 (1921). [****19] But that case, and the case which it in turn cited, *Ex parte American Steel Barrel Co.*, 230 U.S. 35, 57 L. Ed. 1379, 33 S. Ct. 1007 (1913), relied not upon the word "personal" in § 144, but upon its provision requiring the recusal affidavit to be filed 10 days before the beginning of the court term. That requirement was the reason we found it obvious in *Berger* that the affidavit "must be based upon facts antedating the trial, not those occurring during the trial," 255 U.S. at 34; and the reason we said in *American Steel Barrel* that the recusal statute "was never intended to enable a discontented litigant to oust a judge because of adverse rulings made, . . . but to prevent his future action in the pending cause," 230 U.S. at 44.

In our view, the proper (though unexpressed) rationale for *Grinnell*, and the basis of the modern "extrajudicial source" doctrine, is not the statutory term "personal" -- for several reasons. First and foremost, that explanation is simply not the semantic success it pretends to be. Bias and prejudice seem to us not divided into the "personal" kind, which is offensive, and the official kind, which is [****20] perfectly all right. As generally used, these are pejorative terms, describing dispositions that are *never* appropriate. It is common to speak of "personal bias" or "personal prejudice" without meaning the adjective to do anything except emphasize the [*550] idiosyncratic nature of bias and prejudice, and certainly without implying that there is some other "nonpersonal," benign category of those mental states. In a similar vein, one speaks of an individual's "personal preference," without implying that he could also have a "nonpersonal preference." Secondly, interpreting the term "personal" to create a complete dichotomy between court-acquired and extrinsically acquired bias produces results so intolerable as to be absurd. Imagine, for example, a lengthy trial in which the presiding judge for the first time learns of an obscure religious sect, and acquires a passionate hatred for all its adherents. This would be "official" rather than "personal" bias, and would provide no basis for the judge's recusing himself.

[**1155] [2E] [5A] [****21] It seems to us that the origin of the "extrajudicial source" doctrine, and the key to understanding its flexible scope (or the so-called "exceptions" to it), is simply the pejorative connotation of the words " [***488] bias or prejudice." Not *all* unfavorable disposition towards an individual (or his case) is properly described by those terms. One would not say, for example, that world opinion is biased or prejudiced against Adolf Hitler. The words connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess (for example, a criminal juror who has been biased or prejudiced by receipt of inadmissible evidence concerning the defendant's prior criminal activities), or because it is excessive in degree (for example, a criminal juror who is so inflamed by properly admitted evidence of a defendant's prior criminal activities that he will vote

guilty regardless of the facts). The "extrajudicial source" doctrine is one application of this pejorativeness requirement to the terms "bias" and "prejudice" as they are used in §§ 144 and 455(b)(1) [****22] with specific reference to the work of judges.

[5B]The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, [*551] who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. As Judge Jerome Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *In re J. P. Linahan, Inc.*, 138 F.2d 650, 654 (CA2 1943). Also not subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in [****23] successive trials involving the same defendant.

It is wrong in theory, though it may not be too far off the mark as a practical matter, to suggest, as many opinions have, that "extrajudicial source" is the *only* basis for establishing disqualifying bias or prejudice. It is the only *common* basis, but not the exclusive one, since it is not the *exclusive* reason a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as "bias" or "prejudice" because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment. (That explains what some courts have called the "pervasive bias" exception to the "extrajudicial source" doctrine. See, *e.g., Davis* v. *Board of School Comm'rs of Mobile County*, 517 F.2d 1044, 1051 (CA5 1975), cert. denied, 425 U.S. 944, 48 L. Ed. 2d 188, 96 S. Ct. 1685 (1976).)

[2F][6]With this understanding of the "extrajudicial [****24] source" limitation in §§ 144 and 455(b)(1), we turn to the question whether it appears in § 455(a) as well. Petitioners' argument for the negative based upon the mere absence of the [*552] word "personal" is, for the reasons described above, not persuasive. Petitioners also rely upon the categorical nature of § 455's language: Recusal is required [***489] *whenever* there exists a genuine question concerning a judge's impartiality, and not merely when the question arises from an extrajudicial source. A similar "plain-language" argument could be made, however, with regard to §§ 144 and 455(b)(1): They apply *whenever* bias or prejudice exists, and not merely when it derives from an extrajudicial source. As we have described, the latter argument is invalid because the pejorative connotation of the terms "bias" and "prejudice" demands that they be applied only to judicial predispositions that go beyond what is normal and acceptable. We [**1156] think there is an equivalent pejorative connotation, with equivalent consequences, to the term "partiality." See American Heritage Dictionary 1319 (3d ed. 1992) ("partiality" defined as "favorable prejudice or bias"). A prospective [****25] juror in an insurance-claim case may be stricken as partial if he always votes for insurance companies; but not if he always votes for the party whom the terms of the contract support. "Partiality" does not refer to all favoritism, but only to such as is, for some reason, wrongful or inappropriate. Impartiality is not gullibility. Moreover, even if the pejorative connotation of "partiality" were not enough to import the "extrajudicial source" doctrine into § 455(a), the "reasonableness" limitation (recusal is required only if the judge's impartiality "might *reasonably* be questioned") would have the same effect. To demand the sort of "child-like innocence" that elimination of the "extrajudicial source" limitation would require is not reasonable.

[2G] [7A] [8A]Declining to find in the language of § 455(a) a limitation which (petitioners acknowledge) *is* contained in the language of § 455(b)(1) would cause the statute, in a significant sense, to contradict [****26] itself. As we have described, § 455(a) expands the protection of § 455(b), but duplicates some of its protection as well -- not only with regard to bias and prejudice but also with regard to interest and relationship. Within the [*553] area of overlap, it is unreasonable to interpret § 455(a) (unless the language *requires* it) as implicitly eliminating a limitation explicitly set forth in § 455(b). It would obviously be wrong, for example, to hold that "impartiality could reasonably be questioned" simply because one of the parties is in the fourth degree of relationship to the judge. Section 455(b)(5), which addresses the matter of relationship specifically, ends the disability at the *third* degree of relationship, and that should obviously govern for purposes of § 455(a) as well. Similarly, § 455(b)(1), which addresses the matter of personal bias and

prejudice specifically, contains the "extra-judicial source" limitation -- and *that* limitation (since nothing in the text contradicts it) should govern for purposes of § 455(a) as well. [2]

[7B]

[****27]

[*554] [9]Petitioners suggest that applying the "extrajudicial source" limitation [***490] to § 455(a) will cause disqualification of a trial judge to be more easily obtainable upon remand of a case by an appellate court than upon direct motion. We do not see why that necessarily follows; and if it does, why it is necessarily bad. Federal appellate courts' ability to assign a case to a different judge on remand rests not on the recusal statutes [**1157] alone, but on the appellate courts' statutory power to "require such further proceedings to be had as may be just under the circumstances," 28 U.S.C. § 2106. That may permit a different standard, and there may be pragmatic reasons for a different standard. We do not say so -- but merely say that the standards applied on remand are irrelevant to the question before us here.

[2I] [3B]For all these reasons, we think that the "extrajudicial source" doctrine, as we have described [****28] it, applies to § 455(a). As we have described it, however, there is not much doctrine to the doctrine. The fact that an opinion held by a judge derives from a source outside judicial proceedings is not a *necessary* condition for "bias or prejudice" recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice. Nor is it a *sufficient* condition for "bias or prejudice" recusal, since *some* opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will *not* suffice. Since neither the presence of an extrajudicial source necessarily establishes bias, nor the absence of an extrajudicial source necessarily precludes bias, it would be [*555] better to speak of the existence of a significant (and often determinative) "extrajudicial source" *factor*, than of an "extrajudicial source" *doctrine*, in recusal jurisprudence. .

[3C]The facts of the present case do not require us to describe the consequences of that factor in complete detail. It is enough for present purposes [****29] to say the following: First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. See *United States* v. *Grinnell Corp.*, 384 U.S. at 583.In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly [***491] show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a

---

[2] JUSTICE KENNEDY asserts that what we have said in this paragraph contradicts the proposition, established in *Liljeberg* v. *Health Services Acquisition Corp.,* 486 U.S. 847, 100 L. Ed. 2d 855, 108 S. Ct. 2194 (1988), that "subsections (a) and (b), while addressing many of the same underlying circumstances, are autonomous in operation." *Post*, at 566. *Liljeberg* established no such thing. It established that subsection (a) requires recusal in some circumstances where subsection (b) does not -- but that is something quite different from "autonomy," which in the context in which JUSTICE KENNEDY uses it means that the one subsection is to be interpreted and applied without reference to the other.

[7C] [8B]It is correct that subsection (a) has a "broader reach" than subsection (b), *post*, at 567, but the provisions obviously have some ground in common as well, and should not be applied inconsistently there. *Liljeberg* concerned a respect in which subsection (a) *did* go beyond (b). Since subsection (a) deals with the *objective appearance* of partiality, any limitations contained in (b) that consist of a subjective-knowledge requirement are obviously inapplicable. Subsection (a) also goes beyond (b) in another important respect: It covers *all* aspects of partiality, and not merely those specifically addressed in subsection (b). However, when one of those aspects addressed in (b) *is* at issue, it is poor statutory construction to interpret (a) as nullifying the limitations (b) provides, except to the extent the text requires. Thus, as we have said, under subsection (a) as under (b)(5), fourth degree of kinship will not do.

[2H]What is at issue in the present case *is* an aspect of "partiality" already addressed in (b), personal bias or prejudice. The "objective appearance" principle of subsection (a) makes irrelevant the subjective limitation of (b)(1): The judge does not have to be *subjectively* biased or prejudiced, so long as he *appears* to be so. But nothing in subsection (a) eliminates the longstanding limitation of (b)(1), that "personal bias or prejudice" does not consist of a disposition that fails to satisfy the "extrajudicial source" doctrine. The objective appearance of an adverse disposition attributable to information acquired in a prior trial is not an objective appearance of personal bias or prejudice, and hence not an objective appearance of improper partiality.

basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial [****30] source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger* v. *United States*, 255 U.S. 22, 65 L. Ed. 481, 41 S. Ct. 230 (1921), a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted). *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, [*556] and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration -- even a stern and short-tempered judge's ordinary efforts at courtroom administration -- remain immune.

III

[1B]Applying the principles we have discussed [****31] to the facts of the present case is not difficult. None of the grounds petitioners assert required disqualification. As we have described, petitioners' first recusal motion was based on rulings made, and statements uttered, by the District Judge during and after the 1983 trial; and petitioner Bourgeois' second recusal motion was founded on the judge's admonishment of Bourgeois' [**1158] counsel and codefendants. In their briefs here, petitioners have referred to additional manifestations of alleged bias in the District Judge's conduct of the trial below, including the questions he put to certain witnesses, his alleged "anti-defendant tone," his cutting off of testimony said to be relevant to defendants' state of mind, and his post-trial refusal to allow petitioners to appeal *in forma pauperis*. [3]

[1C]

[****32] All of these grounds are inadequate under the principles we have described above: They consist of judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses. All occurred in the course of [***492] judicial proceedings, *and* neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible.

The judgment of the Court of Appeals is

*Affirmed*.

**Concur by:** KENNEDY

## Concur

[*557] JUSTICE KENNEDY, with whom JUSTICE **BLACKMUN**, JUSTICE **STEVENS**, and JUSTICE **SOUTER** join, concurring in the judgment.

The Court's ultimate holding that petitioners did not assert sufficient grounds to disqualify the District Judge is unexceptionable. Nevertheless, I confine my concurrence to the judgment, for the Court's opinion announces a mistaken, unfortunate precedent in two respects. First, it accords nearly dispositive weight to the source of a judge's alleged partiality, to the point of stating that disqualification for intrajudicial partiality is not required unless it would make a fair hearing impossible. Second, [****33] the Court weakens the principal disqualification statute in the federal system, 28 U.S.C. § 455, by holding -- contrary to our most recent inter-pretation of the statute in *Liljeberg* v. *Health Services Acquisition Corp.*, 486 U.S. 847, 100 L. Ed. 2d 855, 108 S. Ct. 2194 (1988) -- that the broad protections afforded by subsection (a) are qualified by limitations explicit in the specific prohibitions of subsection (b).

I

We took this case to decide whether the reach of § 455(a) is limited by the so-called extrajudicial source rule. I agree with the Court insofar as it recognizes that there is no *per se* rule requiring that the alleged partiality arise from an extrajudicial source. In my view, however, the Court places undue emphasis upon the source of the challenged mindset in determining whether disqualification is mandated by § 455(a).

[3] Petitioners' brief also complains of the District Judge's refusal in the 1983 trial to call petitioner Bourgeois "Father," asserting that this "subtly manifested animosity toward Father Bourgeois." Brief for Petitioners 30. As we have discussed, when intrajudicial behavior is at issue, manifestations of animosity must be much more than subtle to establish bias.

A

Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." For present purposes, it should suffice to say that § 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as [****34] to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a [*558] judge's rulings or findings. I think all would agree that a high threshold is required to satisfy this standard. Thus, under § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.

The statute does not refer to the source of the disqualifying partiality. And placing too much emphasis upon whether the source is extrajudicial or intrajudicial distracts from the central inquiry. One of the very objects of law is the impartiality of its judges in fact and appearance. So in one sense it could be said that any disqualifying state of mind must originate from a source outside law [***493] itself. That meta-physical inquiry, however, is beside the point. The relevant consideration [**1159] under § 455(a) is the appearance of partiality, see *Liljeberg, supra*, at 860, not where it originated or how it was disclosed. If, for instance, a judge presiding over a retrial should state, [****35] based upon facts adduced and opinions formed during the original cause, an intent to ensure that one side or the other shall prevail, there can be little doubt that he or she must recuse. Cf. *Rugenstein* v. *Ottenheimer*, 78 Ore. 371, 372, 152 P. 215, 216 (1915) (reversing for judge's failure to disqualify himself on retrial, where judge had stated: "'This case may be tried again, and it will be tried before me. I will see to that. And I will see that the woman gets another verdict and judgment that will stand'").

I agree, then, with the Court's rejection of the *per se* rule applied by the Court of Appeals, which provides that "matters arising out of the course of judicial proceedings are not a proper basis for recusal" under § 455(a). 973 F.2d 910 (CA11 1992). But the Court proceeds to discern in the statute an extrajudicial source interpretive doctrine, under which the source of an alleged deep-seated predisposition is a primary factor in the analysis. The Court's candid struggle to find a persuasive rationale for this approach demonstrates that prior attempts along those lines have fallen [*559] somewhat short of the mark. This, I submit, [****36] is due to the fact that the doctrine crept into the jurisprudence more by accident than design.

The term "extrajudicial source," though not the interpretive doctrine bearing its name, has appeared in only one of our previous cases: *United States* v. *Grinnell Corp.,* 384 U.S. 563, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966). Respondents in *Grinnell* alleged that the trial judge had a personal bias against them, and sought his disqualification and a new trial under 28 U.S.C. § 144. That statute, like § 455(b)(1), requires disqualification for "bias or prejudice." In denying respondents' claim, the Court stated that "the alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." 384 U.S. at 583.

Although *Grinnell*'s articulation of the extrajudicial source rule has a categorical aspect about it, the decision, on closer examination, proves not to erect a *per se* barrier. After reciting what appeared to be an absolute rule, the Court proceeded to make a few additional points: [****37] that certain in-court statements by the judge "reflected no more than his view that, if the facts were as the Government alleged, stringent relief was called for"; that during the trial the judge "repeatedly stated that he had not made up his mind on the merits"; and that another of the judge's challenged statements did not "manifest a closed mind on the merits of the case," but rather was "a terse way" of reiterating a prior ruling. *Ibid.* Had we meant the extrajudicial source doctrine to be dispositive under § 144, those further remarks would have been unnecessary.

More to the point, *Grinnell* provides little justification for its announcement of the extrajudicial source rule, relying only upon a citation to *Berger* v. *United States*, 255 U.S. 22, 31, 65 L. Ed. 481, 41 S. Ct. [***494] 230 (1921). The cited passage from *Berger*, it turns out, does not bear the weight *Grinnell* places on it, but stands for the more limited proposition that the alleged bias "must be [*560] based upon something other than rulings in the case." 255 U.S. at 31. *Berger*, in turn, relies upon an earlier case advancing the same narrow proposition, [****38] *Ex parte American Steel Barrel Co.*, 230 U.S. 35, 44, 57 L. Ed. 1379, 33 S. Ct. 1007 (1913) (predecessor of § 144 "was never intended to enable a discontented litigant to oust a judge because of adverse rulings made, for such rulings are reviewable otherwise"). There is a real difference, of course, between a rule providing that bias must arise from an

extrajudicial source and one providing that judicial rulings alone cannot sustain a challenge for bias. *Grinnell*, therefore, provides a less than satisfactory rationale for reading the extrajudicial source doctrine into § 144 or the disqualification statutes at issue here. It should come as little surprise, then, [**1160] that the Court does not enlist *Grinnell* to support its adoption of the doctrine.

The Court adverts to, but does not ratify, *ante*, at 549, an alternative rationale: the requirement in § 144 that a litigant's recusal affidavit "be filed not less than 10 days before the beginning of the term at which the proceeding is to be heard," unless "good cause [is] shown for failure to file it within such time." If a litigant seeking disqualification must file an affidavit 10 days before the [****39] beginning of the term, the argument goes, the alleged bias cannot arise from events occurring or facts adduced during the litigation. See *Berger, supra*, at 34-35. That rationale fails as well. The 10-day rule has been an anachronism since 1963, when Congress abolished formal terms of court for United States district courts. See 28 U.S.C. § 138. In any event, the rule always had an exception for good cause. And even if the 10-day requirement could justify reading the extrajudicial source rule into § 144, it would not suffice as to § 455(a) or § 455(b)(1), which have no analogous requirement.

The Court is correct to reject yet another view, which has gained currency in several Courts of Appeals, that the term "personal" in §§ 144 and 455(b)(1) provides a textual home for the extrajudicial source doctrine. *Ante*, at 548-550.

[*561] Given the flaws with prior attempts to justify the doctrine, the Court advances a new rationale: The doctrine arises from the pejorative connotation of the term "bias or prejudice" in §§ 144 and 455(b)(1) and the converse of the term "impartiality" in § 455(a). *Ante*, at 550, 552-553. This rationale, [****40] as the Court acknowledges, does not amount to much. It is beyond dispute that challenged opinions or predispositions arising from outside the courtroom need not be disqualifying. See, *e.g., United States* v. *Conforte*, 624 F.2d 869, 878-881 (CA9), cert. denied, 449 U.S. 1012, 66 L. Ed. 2d 470, 101 S. Ct. 568 (1980). Likewise, prejudiced opinions based upon matters disclosed at trial may rise to the level where recusal is required. See, *e.g., United States* v. *Holland*, 655 F.2d 44 (CA5 1981); *Nicodemus* v. *Chrysler Corp.*, 596 F.2d 152, 155-157, and n.10 (CA6 1979). From this, the Court is correct to conclude that an allegation concerning some extrajudicial matter is [***495] neither a necessary nor a sufficient condition for disqualification under any of the recusal statutes. *Ante*, at 554-555. The Court nonetheless proceeds, without much explanation, to find "a significant (and often determinative) 'extrajudicial source' *factor*" in those statutes. *Ante*, at 555 (emphasis in original).

This last step warrants further attention. I recognize along with the Court that, as an empirical matter, doubts [****41] about a judge's impartiality seldom have merit when the challenged mindset arises as a result of some judicial proceeding. The dichotomy between extrajudicial and intrajudicial sources, then, has some slight utility; it provides a convenient shorthand to explain how courts have confronted the disqualification issue in circumstances that recur with some frequency.

To take a common example, litigants (like petitioners here) often seek disqualification based upon a judge's prior participation, in a judicial capacity, in some related litigation. Those allegations are meritless in most instances, and their prompt rejection is important so the case can proceed. Judges, if faithful to their oath, approach every aspect of [*562] each case with a neutral and objective disposition. They understand their duty to render decisions upon a proper record and to disregard earlier judicial contacts with a case or party.

Some may argue that a judge will feel the "motivation to vindicate a prior conclusion" when confronted with a question for the second or third time, for instance, upon trial after a remand. Ratner, Disqualification of Judges for Prior Judicial Actions, 3 How. L. J. 228, 229-230 (1957). [****42] Still, we accept the notion that the "conscientious judge will, as far as possible, make himself aware of his biases of this character, and, by that very self-knowledge, nullify their effect. " *In re J. P. Linahan, Inc.*, 138 F.2d 650, 652 (CA2 [**1161] 1943). The acquired skill and capacity to disregard extraneous matters is one of the requisites of judicial office. As a matter of sound administration, moreover, it may be necessary and prudent to permit judges to preside over successive causes involving the same parties or issues. See Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 4(a) ("The original motion shall be presented promptly to the judge of the district court who presided at the movant's trial and sentenced him, or, if the judge who imposed sentence was not the trial judge, then it shall go to the judge who was in charge of that part of the proceedings being attacked by the movant"). The public character of the prior and present proceedings tends to reinforce the

resolve of the judge to weigh with care the propriety of his or her decision to hear the case.

Out of this reconciliation of principle and practice comes [****43] the recognition that a judge's prior judicial experience and contacts need not, and often do not, give rise to reasonable questions concerning impartiality.

B

There is no justification, however, for a strict rule dismissing allegations of intrajudicial partiality, or the appearance [*563] thereof, in every case. A judge may find it difficult to put aside views formed during some earlier proceeding. In that instance we would expect the judge to heed the judicial oath and step down, but that does not always occur. If [***496] through obduracy, honest mistake, or simple inability to attain self-knowledge the judge fails to acknowledge a disqualifying predisposition or circumstance, an appellate court must order recusal no matter what the source. As I noted above, the central inquiry under § 455(a) is the appearance of partiality, not its place of origin.

I must part, then, from the Court's adoption of a standard that places all but dispositive weight upon the source of the alleged disqualification. The Court holds that opinions arising during the course of judicial proceedings require disqualification under § 455(a) only if they "display a deep-seated favoritism or antagonism [****44] that would make fair judgment impossible." *Ante*, at 555. That standard is not a fair interpretation of the statute, and is quite insufficient to serve and protect the integrity of the courts. In practical effect, the Court's standard will be difficult to distinguish from a *per se* extrajudicial source rule, the very result the Court professes to reject.

The Court's "impossibility of fair judgment" test bears little resemblance to the objective standard Congress adopted in § 455(a): whether a judge's "impartiality might reasonably be questioned." The statutory standard, which the Court preserves for allegations of an extrajudicial nature, asks whether there is an appearance of partiality. See *Liljeberg*, 486 U.S. at 860 ("the goal of section 455(a) is to avoid even the appearance of partiality") (internal quotation marks omitted); *United States* v. *Chantal*, 902 F.2d 1018, 1023 (CA1 1990). The Court's standard, in contrast, asks whether fair judgment is impossible, and if this test demands some direct inquiry to the judge's actual, rather than apparent, state of mind, it defeats the underlying goal of § 455(a): to avoid the appearance [****45] of partiality even when no partiality exists.

[*564] And in all events, the "impossibility of fair judgment" standard remains troubling due to its limited, almost preclusive character. As I interpret it, a § 455(a) challenge would fail even if it were shown that an unfair hearing were likely, for it could be argued that a fair hearing would be possible nonetheless. The integrity of the courts, as well as the interests of the parties and the public, are ill served by this rule. There are bound to be circumstances where a judge's demeanor or attitude would raise reasonable questions concerning impartiality but would not devolve to the point where one would think fair judgment impossible.

When the prevailing standard of conduct imposed by the law for many of society's enterprises is reasonableness, it seems most inappropriate to say that a judge is subject to disqualification only if concerns about his [**1162] or her predisposed state of mind, or other improper connections to the case, make a fair hearing impossible. That is too lenient a test when the integrity of the judicial system is at stake. Disputes arousing deep passions often come to the courtroom, and justice may [****46] appear imperfect to parties and their supporters disappointed by the outcome. This we cannot change. We can, however, enforce society's legitimate expectation that judges maintain, in fact and appearance, the conviction and discipline to resolve those disputes with detachment and impartiality.

The standard that ought to be [***497] adopted for all allegations of an apparent fixed predisposition, extrajudicial or otherwise, follows from the statute itself: Disqualification is required if an objective observer would entertain reasonable questions about the judge's impartiality. If a judge's attitude or state of mind leads a detached observer to conclude that a fair and impartial hearing is unlikely, the judge must be disqualified. Indeed, in such circumstances, I should think that any judge who understands the judicial office and oath would be the first to insist that another judge hear the case.

[*565] In matters of ethics, appearance and reality often converge as one. See *Offutt* v. *United States*, 348 U.S. 11, 14, 99 L. Ed. 11, 75 S. Ct. 11 (1954) ("Justice must satisfy the appearance of justice"); *Ex parte McCarthy*, [1924] 1 K. B. 256, 259 (1923) [****47] ("Justice should not only be done, but should manifestly and undoubtedly be seen to be done"). I do not see how

the appearance of fairness and neutrality can obtain if the bare possibility of a fair hearing is all that the law requires. Cf. *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 242, 64 L. Ed. 2d 182, 100 S. Ct. 1610 (1980) (noting the importance of "preserving both the appearance and reality of fairness," which "'generat[es] the feeling, so important to a popular government, that justice has been done'") (quoting *Joint Anti-Fascist Refugee Comm.* v. *McGrath*, 341 U.S. 123, 172, 95 L. Ed. 817, 71 S. Ct. 624 (1951) (Frankfurter, J., concurring)).

Although the source of an alleged disqualification may be relevant in determining whether there is a reasonable appearance of impartiality, that determination can be explained in a straightforward manner without resort to a nearly dispositive extrajudicial source factor. I would apply the statute as written to all charges of partiality, extrajudicial or otherwise, secure in my view that district and appellate judges possess the wisdom and good sense to distinguish substantial from insufficient [****48] allegations and that our rules, as so interpreted, are sufficient to correct the occasional departure.

II

The Court's effort to discern an "often dispositive" extra-judicial source factor in § 455(a) leads it to an additional error along the way. As noted above, the Court begins by explaining that the pejorative connotation of the term "bias or prejudice" demonstrates that the source of an alleged bias is significant under §§ 144 and 455(b)(1). The Court goes on to state that "it is unreasonable to interpret § 455(a) (unless the language *requires* it) as implicitly eliminating a limitation explicitly set forth in § 455(b)." *Ante*, at 553 (emphasis in original). That interpretation, the Court reasons, "would [*566] cause the statute, in a significant sense, to contradict itself." *Ante*, at 552.

We rejected that very understanding of the interplay between §§ 455(a) and (b) in *Liljeberg* v. *Health Services Acquisition Corp.*, 486 U.S. 847, 100 L. Ed. 2d 855, 108 S. Ct. 2194 (1988). Respondent in *Liljeberg* sought to disqualify a district judge under § 455(a) because the judge (in his capacity as trustee of a university) had a financial interest [****49] in the litigation, albeit an interest of which he was unaware. Petitioner opposed disqualification, and asked us to interpret § 455(a) in light of § 455(b)(4), which provides for disqualification only if the judge "knows that he, individually or as a [***498] fiduciary, . . . has a financial interest in the subject matter in controversy or in a party to the proceeding." According to petitioner, the explicit knowledge requirement in § 455(b)(4) [**1163] indicated that Congress intended a similar requirement to govern § 455(a). See *Liljeberg*, 486 U.S. at 859, n.8. Otherwise, petitioner contended, the knowledge requirement in § 455(b)(4) would be meaningless. *Ibid.*

In holding for respondent, we emphasized that there were "important differences" between subsections (a) and (b), and concluded that the explicit knowledge requirement under § 455(b)(4) does not apply to disqualification motions filed under § 455(a). *Id.*, at 859-860, and n.8. *Liljeberg* teaches, contrary to what the Court says today, that limitations inherent in the various provisions of § 455(b) do not, by their own force, govern § 455(a) as well. The structure [****50] of § 455 makes clear that subsections (a) and (b), while addressing many of the same underlying circumstances, are autonomous in operation. Section 455(b) commences with the charge that a judge "shall also disqualify himself in the following circumstances"; Congress' inclusion of the word "also" indicates that subsections (a) and (b) have independent force. Section 455(e), which permits parties to waive grounds for disqualification arising under § 455(a), but not § 455(b), provides further specific textual confirmation of the difference.

[*567] The principal distinction between §§ 455(a) and (b) is apparent from the face of the statute. Section 455(b) delineates specific circumstances where recusal is mandated; these include instances of actual bias as well as specific instances where actual bias is assumed. See 28 U.S.C. § 455(b)(1) ("personal bias or prejudice"); § 455(b)(2) (judge "served as [a] lawyer in the matter in controversy" while in private practice); § 455(b)(3) (same while judge served in government employment); § 455(b)(4) ("financial interest" in the litigation); § 455(b)(5) (judge "within the third degree of relationship" to a [****51] party, lawyer, or material witness). Section 455(a), in contrast, addresses the appearance of partiality, guaranteeing not only that a partisan judge will not sit, but also that no reasonable person will have that suspicion. See *Liljeberg, supra*, at 860.

Because the appearance of partiality may arise when in fact there is none, see, *e.g., Hall* v. *Small Business Admin*, 695 F.2d 175, 179 (CA5 1983); *United States* v. *Ritter*, 540 F.2d 459, 464 (CA10), cert. denied, 429 U.S. 951 (1976), the reach of § 455(a) is broader than that of § 455(b). One of the distinct concerns addressed by § 455(a) is that the appearance of impartiality be assured whether or not the alleged disqualifying circumstance is also addressed under § 455(b). In this respect, the statutory scheme ought to be understood as extending §

455(a) beyond the scope of § 455(b), and not confining § 455(a) in large part, as the Court would have it. See *ante*, at 553-554, n.2. The broader reach of § 455(a) is confirmed by the rule permitting its more comprehensive provisions, but not the absolute rules of § 455(b), to be waived. See 28 U.S.C. § 455 [****52] (e). And in all events, I suspect that any attempt [***499] to demarcate an "area of overlap" (*ante*, at 553) between §§ 455(a) and (b) will prove elusive in many instances.

Given the design of the statute, then, it is wrong to impose the explicit limitations of § 455(b) upon the more extensive protections afforded by § 455(a). See *Liljeberg, supra*, [*568] at 859-861, and n.8. The Court's construction of the statute undercuts the protection Congress put in place when enacting § 455(a) as an independent guarantee of judicial impartiality.

III

The Court describes in all necessary detail the unimpressive allegations of partiality, and the appearance thereof, in this case. The contested rulings and comments by the trial judge were designed to ensure the orderly conduct of petitioners' trial. Nothing in those rulings or comments raises any inference of bias or partiality. I concur in the judgment.

## References

32 Am Jur 2d, Federal Practice and Procedure 43, 46-49, 58, 59; 46 Am Jur 2d, Judges 166, 167, 170, 172, 179-181

7A Federal Procedure, L Ed, Courts and Judicial System 20:48, 20:70-20:72, 20:74, 20:76, [****53] 20:78, 20:94, 20:95

7 Federal Procedural Forms, L Ed, Criminal Procedure 20:796-20:800

2 Am Jur Proof of Facts 495, Bias or Prejudice

5 Am Jur Trials 27, Pretrial Procedures and Motions in Criminal Cases

28 USCS 144, 455

L Ed Digest, Judges 10

L Ed Index, Judges

ALR Index, Bias or Prejudice; Judges; Recusal

Annotation References:

Supreme Court's views as to construction and application of provisions of 28 USCS 2106 authorizing Supreme Court and other federal appellate courts to remand case and direct entry of such appropriate judgment or require such further proceedings as may be just under the circumstances. 55 L Ed 2d 872.

Construction and application of 28 USCS 455(a) providing for disqualification of justice, judge, magistrate, or referee in bankruptcy in any proceeding in which his impartiality might reasonably be questioned. 40 ALR Fed 954.

Disqualification of original trial judge to sit on retrial after reversal or mistrial--federal cases. 22 ALR Fed 709.

Disqualification of federal [****54] judge, under 28 USC 144, for acts and conduct occurring in courtroom during trial or in ruling upon issues or questions involved. 2 ALR Fed 917.

Disqualification from criminal proceeding of trial judge who earlier presided over disposition of case of coparticipant. 72 ALR4th 651.

Disqualification of judge for bias against counsel for litigant. 23 ALR3d 1416.

Disqualification of judge for having decided different case against litigant. 21 ALR3d 1369 .

End of Document

# United States v. Stevens

559 U.S. 460 (2010)

Cited in Opening Brief at: ix, 44

The standard of review citation is addressed in Response, Part III.B. Highlighted language appears at 559 U.S. at 468.

Caution
As of: September 14, 2026 6:49 PM Z

# United States v. Stevens

Supreme Court of the United States

October 6, 2009, Argued; April 20, 2010, Decided

No. 08-769

**Reporter**
559 U.S. 460 *; 130 S. Ct. 1577 **; 176 L. Ed. 2d 435 ***; 2010 U.S. LEXIS 3478 ****; 78 U.S.L.W. 4267; 38 Media L. Rep. 1577; 22 Fla. L. Weekly Fed. S 221

UNITED STATES, Petitioner v. ROBERT J. STEVENS

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT.

United States v. Stevens, 533 F.3d 218, 2008 U.S. App. LEXIS 15277 (3d Cir. Pa., 2008)

**Disposition:** Affirmed.

## Syllabus

[*460] [**1579] Congress enacted 18 U.S.C. § 48 to criminalize the commercial creation, sale, or possession of certain depictions of animal cruelty. The statute addresses only *portrayals* of harmful acts, not the underlying conduct. It applies to any visual or auditory depiction "in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed," if that conduct violates federal or state law where "the creation, sale, or possession takes place," § 48(c)(1). Another clause exempts depictions with "serious religious, political, scientific, educational, journalistic, historical, or artistic value." § 48(b). The legislative background of § 48 focused primarily on "crush videos," which feature the torture and killing of helpless animals and are said to appeal to persons with a specific sexual fetish. Respondent Stevens was indicted under § 48 for selling videos depicting dogfighting. [***439] He moved to dismiss, arguing that § 48 is facially invalid under the First Amendment. The District Court [**1580] denied his motion, and Stevens was convicted. The Third Circuit vacated the conviction and [****2] declared § 48 facially unconstitutional as a content-based regulation of protected speech.

*Held:* Section 48 is substantially overbroad, and therefore invalid under the First Amendment. Pp. 468-482, 176 L. Ed. 2d, at 443-452.

(a) Depictions of animal cruelty are not, as a class, categorically unprotected by the First Amendment. Because § 48 explicitly regulates expression based on content, it is " 'presumptively invalid,' . . . and the Government bears the burden to rebut that presumption." *United States* v. *Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817, 120 S. Ct. 1878, 146 L. Ed. 2d 865. Since its enactment, the First Amendment has permitted restrictions on a few historic categories of speech--including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct--that "have never been thought to raise any Constitutional problem," *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 572, 62 S. Ct. 766, 86 L. Ed. 1031. Depictions of animal cruelty should not be added to that list. While the prohibition of animal cruelty has a long history in American law, there is no evidence of a similar tradition prohibiting *depictions* of such cruelty. The Government's proposed test would broadly balance the value of the speech against its societal costs to determine whether [****3] the First Amendment even applies. But the First Amendment's free speech guarantee does not extend only to [*461] categories of speech that survive an ad hoc balancing of relative social costs and benefits. The Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. *New York* v. *Ferber*, 458 U.S. 747, 102 S. Ct. 3348, 73 L. Ed. 2d 1113, distinguished. Pp. 468-472, 176 L. Ed. 2d, at 443-446.

(b) Stevens's facial challenge succeeds under existing doctrine. Pp. 472-482, 176 L. Ed. 2d, at 446-452.

(1) In the First Amendment context, a law may be invalidated as overbroad if "a 'substantial number' of its applications are unconstitutional, ' "judged in relation to the statute's plainly legitimate sweep." ' *Washington State Grange* v. *Washington State Republican Party*, 552 U.S. 442, 449, n. 6, 128 S. Ct. 1184, 170 L. Ed. 2d

151. Stevens claims that common depictions of ordinary and lawful activities constitute the vast majority of materials subject to § 48. The Government does not defend such applications, but contends that the statute is narrowly limited to specific types of extreme material. Section 48's constitutionality thus turns on how broadly it is construed. Pp. 472-473, 176 L. Ed. 2d, at 446-447.

(2) Section 48 creates a criminal prohibition of alarming breadth. The statute's [****4] definition of a "depiction of animal cruelty" does not even require that the depicted conduct be cruel. While the words "maimed, mutilated, [and] tortured" convey cruelty, "wounded" and "killed" do not. Those words have little ambiguity and should be read according to their ordinary meaning. Section 48 does require that the depicted conduct be "illegal," but many federal and state laws concerning the proper treatment of animals are not designed to guard [***440] against animal cruelty. For example, endangered species protections restrict even the humane wounding or killing of animals. The statute draws no distinction based on the reason the conduct is made illegal.

Moreover, § 48 applies to any depiction of conduct that is illegal in the State in which the depiction is created, sold, or possessed, "regardless of whether the . . . wounding . . . or killing took place" there, § 48(c)(1). Depictions of entirely lawful conduct may run afoul of the ban if those depictions later find their way into [**1581] States where the same conduct is unlawful. This greatly expands § 48's scope, because views about animal cruelty and regulations having no connection to cruelty vary widely from place to place. Hunting [****5] is unlawful in the District of Columbia, for example, but there is an enormous national market for hunting-related depictions, greatly exceeding the demand for crush videos or animal fighting depictions. Because the statute allows each jurisdiction to export its laws to the rest of the country, § 48(a) applies to any magazine or video depicting lawful hunting that is sold in the Nation's Capital. Those seeking to comply with the law face a bewildering maze of regulations from at least 56 separate jurisdictions. Pp. 474-477, 176 L. Ed. 2d, at 447-450.

[*462] (3) Limiting § 48's reach to crush videos and depictions of animal fighting or other extreme cruelty, as the Government suggests, requires an unrealistically broad reading of the statute's exceptions clause. The statute only exempts material with "serious" value, and "serious" must be taken seriously. The excepted speech must also fall within one of § 48(b)'s enumerated categories. Much speech does not. For example, most hunting depictions are not obviously instructional in nature. The exceptions clause simply has no adequate reading that results in the statute's banning only the depictions the Government would like to ban.

Although the language of § 48(b) is drawn [****6] from the Court's decision in *Miller* v. *California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419, the exceptions clause does not answer every First Amendment objection. Under *Miller*, "serious" value shields depictions of sex from regulation as obscenity. But *Miller* did not determine that serious value could be used as a general precondition to protecting *other* types of speech in the first place. Even " 'wholly neutral futilities . . . come under the protection of free speech.' *Cohen* v. *California*, 403 U.S. 15, 25, 91 S. Ct. 1780, 29 L. Ed. 2d 284. The First Amendment presumptively extends to many forms of speech that do not qualify for § 48(b)'s serious-value exception, but nonetheless fall within § 48(c)'s broad reach. Pp. 477-480, 176 L. Ed. 2d, at 450-451.

(4) Despite the Government's assurance that it will apply § 48 to reach only "extreme" cruelty, this Court will not uphold an unconstitutional statute merely because the Government promises to use it responsibly. Nor can the Court construe this statutory language to avoid constitutional doubt. A limiting construction can be imposed only if the statute "is 'readily susceptible' to such a construction," *Reno* v. *American Civil Liberties Union*, 521 U.S. 844, 884, 117 S. Ct. 2329, 138 L. Ed. 2d 874. To read § 48 as the Government desires requires rewriting, not just [****7] reinterpretation. Pp. 480-481, 176 L. Ed. 2d, at 451-452.

[***441] (5) This construction of § 48 decides the constitutional question. The Government makes no effort to defend § 48 as applied beyond crush videos and depictions of animal fighting. It argues that those particular depictions are intrinsically related to criminal conduct or are analogous to obscenity (if not themselves obscene), and that the ban on such speech would satisfy the proper level of scrutiny. But the Government nowhere extends these arguments to other depictions, such as hunting magazines and videos, that are presumptively protected by the First Amendment but that remain subject to § 48. Nor does the Government seriously contest that these presumptively impermissible applications of § 48 far outnumber any permissible ones. The Court therefore does not decide whether a statute limited to crush videos or other depictions of extreme animal cruelty would be constitutional. Section

48 is not so [*463] limited but is instead substantially overbroad, and therefore invalid [**1582] under the First Amendment. Pp. 481-482, 176 L. Ed. 2d, at 452.

533 F.3d 218, affirmed.

**Counsel: Neal K. Katyal** argued the cause for petitioner.

**Patricia A. Millett** argued the cause for respondent.

**Judges:** Roberts, C. J., delivered the opinion of the Court, in which Stevens, Scalia, Kennedy, Thomas, Ginsburg, Breyer, and Sotomayor, JJ., [****8] joined. Alito, J., filed a dissenting opinion, *post*; p. 482.

**Opinion by:** ROBERTS

## Opinion

[*464] Chief Justice **Roberts** delivered the opinion of the Court.

Congress enacted 18 U.S.C. § 48 to criminalize the commercial creation, sale, or possession of certain depictions of animal cruelty. The statute does not address underlying acts harmful to animals, but only portrayals of such conduct. The question presented is whether the prohibition in the statute is consistent with the freedom of speech guaranteed by the First Amendment.

I

[1] Section 48 establishes a criminal penalty of up to five years in prison for anyone who knowingly "creates, sells, or possesses a depiction of animal cruelty," if done "for commercial [*465] gain" in interstate or foreign commerce. § 48(a).[1] A depiction of "animal cruelty" is defined as one "in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed," if that conduct violates federal or state law where "the creation, sale, or possession [***442] takes place." § 48(c)(1). In what is referred to [**1583] as the "exceptions clause," the law exempts from prohibition any depiction "that has serious religious, political, scientific, educational, journalistic, historical, or artistic value." § 48(b).

The legislative background of § 48 focused primarily on the interstate market for "crush videos." According to the House Committee Report on the bill, such videos feature the intentional torture and killing of helpless animals, including cats, dogs, monkeys, mice, and hamsters. H. R. Rep. No. 106-397, p. 2 (1999) (hereinafter H. R. Rep.). Crush videos often depict women slowly crushing animals to death "with their bare feet or while wearing high heeled shoes," [*466] sometimes while "talking to the animals in a kind of dominatrix patter" over "[t]he cries and squeals of the animals, obviously in great pain." *Ibid.* Apparently these depictions "appeal to persons with a very specific sexual fetish who find them sexually arousing or otherwise exciting." *Id.,* at 2-3. The acts depicted in crush videos are typically prohibited by the animal cruelty laws enacted by all 50 States and the District of Columbia. See Brief for United States 25, n. 7 (listing statutes). But crush videos rarely disclose the participants' identities, inhibiting prosecution of [****11] the underlying conduct. See H. R. Rep., at 3; accord, Brief for State of Florida et al. as *Amici Curiae* 11.

This case, however, involves an application of § 48 to depictions of animal fighting. Dogfighting, for example, is unlawful in all 50 States and the District of Columbia, see Brief for United States 26, n. 8 (listing statutes), and has been restricted by federal law since 1976. Animal Welfare Act Amendments of 1976, § 17, 90 Stat. 421, 7 U.S.C. § 2156. Respondent Robert J. Stevens ran a business, "Dogs of Velvet and Steel," and an associated

---

[1] The statute [****9] reads in full: [2] "§ 48. Depiction of animal cruelty "(a) Creation, Sale, or Possession.--Whoever knowingly creates, sells, or possesses a depiction of animal cruelty with the intention of placing that depiction in interstate or foreign commerce for commercial gain, shall be fined under this title or imprisoned not more than 5 years, or both."(b) Exception.--Subsection (a) does not apply to any depiction that has serious religious, political, scientific, educational, journalistic, historical, or artistic value."(c) Definitions.--In this section--"(1) the term 'depiction of animal cruelty' means any visual or auditory depiction, including any photograph, motion-picture film, video recording, electronic image, or sound recording of conduct in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed, if such conduct is illegal under Federal law or the law of the State in which the creation, sale, or possession takes place, regardless of whether the maiming, mutilation, torture, wounding, or killing took place in the State; and"(2) the term 'State' means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, [****10] Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any other commonwealth, territory, or possession of the United States."

Web site, through which he sold videos of pit bulls engaging in dogfights and attacking other animals. Among these videos were Japan Pit Fights and Pick-A-Winna: A Pit Bull Documentary, which include contemporary footage of dogfights in Japan (where such conduct is allegedly legal) as well as footage of American dogfights from the 1960's and 1970's.[2] A third video, Catch Dogs and Country Living, depicts the use of pit bulls to hunt wild boar, as well as a "gruesome" scene of a pit bull attacking a domestic farm pig. 533 F.3d 218, 221 (CA3 2008) (en banc). On the basis of these videos, Stevens was indicted on three counts of violating § 48.

[*467] Stevens moved to dismiss the indictment, arguing that § 48 is facially invalid under the First Amendment. The District Court denied the motion. It held that the depictions subject to § 48, like obscenity or child pornography, are categorically unprotected by the First Amendment. 2:04-cr-00051-ANB (WD Pa., Nov. [***443] 10, 2004), App. to Pet. for Cert. 65a-71a. It went on to hold that § 48 is not substantially overbroad, because the exceptions clause sufficiently narrows the statute to constitutional applications. *Id.,* at 71a-75a. The jury convicted Stevens on all counts, and the District Court sentenced him to three concurrent sentences of 37 months' imprisonment, followed by three years of supervised release. App. 37.

The en banc Third Circuit, over a three-judge dissent, declared § 48 facially unconstitutional and vacated Stevens's conviction. 533 F.3d 218. The Court of Appeals first held that § 48 regulates speech that is protected by the First Amendment. The Court declined [****13] to recognize a new category of unprotected speech for depictions [**1584] of animal cruelty, *id.,* at 224, and n. 6, and rejected the Government's analogy between animal cruelty depictions and child pornography, *id.,* at 224-232.

The Court of Appeals then held that § 48 could not survive strict scrutiny as a content-based regulation of protected speech. *Id.,* at 232. It found that the statute lacked a compelling Government interest and was neither narrowly tailored to preventing animal cruelty nor the least restrictive means of doing so. *Id.,* at 232-235. It therefore held § 48 facially invalid.

In an extended footnote, the Third Circuit noted that § 48 "might also be unconstitutionally overbroad," because it "potentially covers a great deal of constitutionally protected speech" and "sweeps [too] widely" to be limited only by prosecutorial discretion. *Id.,* at 235, n. 16. But the Court of Appeals declined to rest its analysis on this ground.

We granted certiorari. 556 U.S. 1181, 129 S. Ct. 1984, 173 L. Ed. 2d 1083 (2009).

II

[*468] The Government's primary submission is that § 48 necessarily complies with the Constitution because the banned depictions of animal cruelty, as a class, are categorically unprotected by the First Amendment. [****14] We disagree.

The First Amendment provides that [3] "Congress shall make no law . . . abridging the freedom of speech." [4] "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft* v. *American Civil Liberties Union*, 535 U.S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002) (internal quotation marks omitted). Section 48 explicitly regulates expression based on content: The statute restricts "visual [and] auditory depiction[s]," such as photographs, videos, or sound recordings, depending on whether they depict conduct in which a living animal is intentionally harmed. As such, § 48 is " 'presumptively invalid,' and the Government bears the burden to rebut that presumption." *United States* v. *Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000) (quoting *R. A. V.* v. *St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992); citation omitted).

"From 1791 to the present," however, the First Amendment has "permitted restrictions upon the content of speech in a few limited areas," and has never "include[d] a freedom to disregard these traditional limitations." *Id.,* at 382-383, 112 S. Ct. 2538, 120 L. Ed. 2d 305These "historic [***444] and traditional categories long familiar [****15] to the bar," *Simon & Schuster, Inc.* v. *Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 127, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991) (Kennedy, J., concurring in judgment)--including obscenity, *Roth* v. *United States*, 354 U.S. 476, 483, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957), defamation, *Beauharnais* v. *Illinois*, 343 U.S. 250, 254-255, 72 S. Ct. 725, 96 L. Ed. 919 (1952), fraud, *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council,*

[2] The [****12] Government contends that these dogfights were unlawful at the time they occurred, while Stevens disputes the assertion. Reply Brief for United States 25, n. 14 (hereinafter Reply Brief); Brief for Respondent 44, n. 18.

*Inc.*, 425 U.S. 748, 771, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976), incitement, *Brandenburg* v. *Ohio*, 395 U.S. 444, 447-449, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969) (*per curiam*), and speech integral to criminal conduct, *Giboney* v. *Empire Storage & Ice Co.*, 336 U.S. 490, 498, 69 S. Ct. 684, 93 L. Ed. 834 (1949) --are "well-defined [*469] and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem," *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 571-572, 62 S. Ct. 766, 86 L. Ed. 1031 (1942).

[**1585] The Government argues that "depictions of animal cruelty" should be added to the list. It contends that depictions of "illegal acts of animal cruelty" that are "made, sold, or possessed for commercial gain" necessarily "lack expressive value," and may accordingly "be regulated as *unprotected* speech." Brief for United States 10 (emphasis added). The claim is not just that Congress may regulate depictions of animal [****16] cruelty subject to the First Amendment, but that these depictions are outside the reach of that Amendment altogether--that they fall into a " 'First Amendment Free Zone.' *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S. Ct. 2568, 96 L. Ed. 2d 500 (1987).

As the Government notes, the prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the Colonies. Reply Brief 12, n. 8; see, *e.g.,* The Body of Liberties § 92 (Mass. Bay Colony 1641), reprinted in American Historical Documents 1000-1904, 43 Harvard Classics 66, 79 (C. Eliot ed. 1910) ("No man shall exercise any Tirranny or Crueltie towards any bruite Creature which are usuallie kept for man's use"). But we are unaware of any similar tradition excluding *depictions* of animal cruelty from "the freedom of speech" codified in the First Amendment, and the Government points us to none.

The Government contends that "historical evidence" about the reach of the First Amendment is not "a necessary prerequisite for regulation today," Reply Brief 12, n. 8, and that categories of speech may be exempted from the First Amendment's protection without any long-settled tradition of subjecting [****17] that speech to regulation. Instead, the Government points to Congress's " 'legislative judgment that . . . depictions of animals being intentionally tortured and killed [are] of such minimal redeeming value as to render [them] [*470] unworthy of First Amendment protection,' " Brief for United States 23 (quoting 533 F.3d, at 243 (Cowen, J., dissenting)), and asks the Court to uphold the ban on the same basis. The Government thus proposes that a claim of categorical exclusion should be considered under a simple balancing test: "Whether a given category of speech enjoys First Amendment protection depends upon a categorical balancing [***445] of the value of the speech against its societal costs." Brief for United States 8; see also *id.,* at 12.

As a free-floating test for First Amendment coverage, that sentence is startling and dangerous. [5] The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment [****18] simply on the basis that some speech is not worth it. The Constitution is not a document "prescribing limits, and declaring that those limits may be passed at pleasure." *Marbury* v. *Madison*, 5 U.S. 137, 1 Cranch 137, 178, 2 L. Ed. 60 (1803).

To be fair to the Government, its view did not emerge from a vacuum. As the Government correctly notes, this Court has often *described* historically unprotected categories of speech as being " 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' *R. A. V.*, *supra*, at 383, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (quoting *Chaplinsky*, *supra*, at 572, 62 S. Ct. 766, 86 L. Ed. 1031). In *New York* v. *Ferber*, 458 U.S. 747, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982), we noted that within [**1586] these categories of unprotected speech, "the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required," because "the balance of competing interests is clearly struck," *id.,* at 763-764, 102 S. Ct. 3348, 73 L. Ed. 2d 1113. The Government derives its proposed test from these descriptions in our precedents. See Brief for United States 12-13.

[*471] But such descriptions are just that--descriptive. They do not set forth a test that may be applied as a [****19] general matter to permit the Government to imprison any speaker so long as his speech is deemed valueless or unnecessary, or so long as an ad hoc calculus of costs and benefits tilts in a statute's favor.

When we have identified categories of speech as fully outside the protection of the First Amendment, it has not

been on the basis of a simple cost-benefit analysis. In *Ferber*, for example, we classified child pornography as such a category, 458 U.S., at 763, 102 S. Ct. 3348, 73 L. Ed. 2d 1113. We noted that the State of New York had a compelling interest in protecting children from abuse, and that the value of using children in these works (as opposed to simulated conduct or adult actors) was *de minimis*. *Id.,* at 756-757, 762, 102 S. Ct. 3348, 73 L. Ed. 2d 1113. But our decision did not rest on this "balance of competing interests" alone. *Id.*, at 764, 102 S. Ct. 3348, 73 L. Ed. 2d 1113. We made clear that *Ferber* presented a special case: The market for child pornography was "intrinsically related" to the underlying abuse, and was therefore "an integral part of the production of such materials, an activity illegal throughout the Nation." *Id.,* at 759, 761, 102 S. Ct. 3348, 73 L. Ed. 2d 1113. As we noted, " '[i]t rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing [****20] used as an integral part of conduct in violation of a valid criminal statute.' *Id.,* at 761-762, 102 S. [***446] Ct. 3348, 73 L. Ed. 2d 1113 (quoting *Giboney*, 336 U.S., at 498, 69 S. Ct. 684, 93 L. Ed. 2d 834). *Ferber* thus grounded its analysis in a previously recognized, long-established category of unprotected speech, and our subsequent decisions have shared this understanding. See *Osborne* v. *Ohio*, 495 U.S. 103, 110, 110 S. Ct. 1691, 109 L. Ed. 2d 98 (1990) (describing *Ferber* as finding "persuasive" the argument that the advertising and sale of child pornography was "an integral part" of its unlawful production (internal quotation marks omitted)); *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 249-250, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002) (noting that distribution and sale "were intrinsically related to the sexual abuse of children," giving the speech at issue "a proximate link to the crime from which it came" (internal quotation marks omitted)).

[*472] Our decisions in *Ferber* and other cases cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the scope of the First Amendment. Maybe there are some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law. But if so, there is no evidence that "depictions [****21] of animal cruelty" is among them. We need not foreclose the future recognition of such additional categories to reject the Government's highly manipulable balancing test as a means of identifying them.

III

Because we decline to carve out from the First Amendment any novel exception for § 48, we review Stevens's First Amendment challenge under our existing doctrine.

A

Stevens challenged § 48 on its face, arguing that any conviction secured under [**1587] the statute would be unconstitutional. The court below decided the case on that basis, 533 F.3d, at 231, n. 13, and we granted the Solicitor General's petition for certiorari to determine "whether 18 U.S.C. 48 is facially invalid under the Free Speech Clause of the First Amendment," Pet. for Cert. I.

To succeed in a typical facial attack, Stevens would have to establish "that no set of circumstances exists under which [§ 48] would be valid," *United States* v. *Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987), or that the statute lacks any "plainly legitimate sweep," *Washington* v. *Glucksberg*, 521 U.S. 702, 740, n. 7, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997) (Stevens, J., concurring in judgments) (internal quotation marks omitted). Which standard applies in a typical case is a matter of dispute that [****22] we need not and do not address, and neither *Salerno* nor *Glucksberg* is a speech case. Here the Government asserts that Stevens cannot prevail because § 48 is plainly legitimate as applied to crush videos and animal fighting depictions. Deciding this case through [*473] a traditional facial analysis would require us to resolve whether these applications of § 48 are in fact consistent with the Constitution.

[6] In the First Amendment context, however, this Court recognizes "a second type of facial challenge," whereby a law may be invalidated as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Washington State Grange* v. *Washington State Republican Party*, 552 U.S. 442, 449, [***447] n. 6, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008) (internal quotation marks omitted). Stevens argues that § 48 applies to common depictions of ordinary and lawful activities, and that these depictions constitute the vast majority of materials subject to the statute. Brief for Respondent 22-25. The Government makes no effort to defend such a broad ban as constitutional. Instead, the Government's entire defense of § 48 rests on interpreting the statute as narrowly limited to specific [****23] types of "extreme" material. Brief for United States 8. As the parties have presented the issue, therefore, the constitutionality of § 48 hinges on how

broadly it is construed. It is to that question that we now turn.[3]

[*474] B

As we explained two Terms ago, [7] "[t]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States* v. *Williams*, 553 U.S. 285, 293, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008). Because [**1588] § 48 is a federal statute, there is no need to defer to a state court's authority to interpret its own law.

We read § 48 to create a criminal prohibition of alarming breadth. To begin with, the text of the statute's ban on a "'depiction of animal cruelty'" nowhere requires that the depicted conduct be cruel. That text applies to "any . . . depiction" in which "a living animal is intentionally maimed, mutilated, tortured, wounded, or killed." § 48(c)(1). "[M]aimed, mutilated, [and] tortured" convey cruelty, but "wounded" or "killed" do not suggest any such limitation.

The Government contends that the terms in the definition should be read to require the additional element of "accompanying [****25] acts of cruelty." Reply Brief 6; see also Tr. of Oral Arg. 17-19. (The dissent hinges on the same assumption. See *post,* at 486-487, 489, 176 L. Ed. 2d, at 455, 457.) The Government bases this argument on the definiendum, "depiction of animal cruelty," cf. *Leocal* v. *Ashcroft*, 543 U.S. 1, 11, 125 S. Ct. 377, 160 L. Ed. 2d 271 (2004), and on " 'the commonsense canon of *noscitur a sociis*.' " Reply Brief 7 (quoting *Williams*, 553 U.S., at 294, 128 S. Ct. 1830, 170 L. Ed. 2d 650). As that canon recognizes, [8] an ambiguous term may be "given more precise content by the neighboring words with which it is associated." *Id.* at 294. Likewise, an unclear definitional phrase may take meaning from the term to be defined, see *Leocal*, *supra,* at 11, 125 S. Ct. 377, 160 L. Ed. 2d 271 (interpreting a " 'substantial [***448] risk' " of the "us[e]" of "physical force" as part of the definition of " 'crime of violence' ").

But the phrase "wounded . . . or killed" at issue here contains little ambiguity. The Government's opening brief properly applies the ordinary meaning of these words, stating for example that to " 'kill' is 'to deprive of life.' " Brief for United States 14 (quoting Webster's Third New International [*475] Dictionary 1242 (1993)). We agree that "wounded" and "killed" should be read according to their ordinary meaning. Cf. *Engine Mfrs. Assn.* v. *South Coast Air Quality Management Dist.*, 541 U.S. 246, 252, 124 S. Ct. 1756, 158 L. Ed. 2d 529 (2004). [****26] Nothing about that meaning requires cruelty.

While not requiring cruelty, § 48 does require that the depicted conduct be "illegal." But this requirement does not limit § 48 along the lines the Government suggests. There are myriad federal and state laws concerning the proper treatment of animals, but many of them are not designed to guard against animal cruelty. Protections of endangered species, for example, restrict even the humane "wound[ing] or kill[ing]" of "living animal[s]." § 48(c)(1). Livestock regulations are often designed to protect the health of human beings, and hunting and fishing rules (seasons, licensure, bag limits, weight requirements) can be designed to raise revenue, preserve animal populations, or prevent accidents. The text of § 48(c) draws no distinction based on the reason the intentional killing of an animal is made illegal, and includes, for example, the humane slaughter of a stolen cow.[4]

---

[3] The dissent contends that because there has not been a ruling on the validity of the statute as applied to Stevens, our consideration of his facial overbreadth claim is premature. *Post,* at 482, and n. 1, 483, 484, 176 L. Ed. 2d, at 452, 453 (opinion of Alito, J.). Whether or not that conclusion follows, here no as-applied claim has been preserved. Neither court below construed Stevens's briefs as adequately developing a separate attack on a defined subset of the statute's applications (say, dogfighting videos). See 533 F.3d 218, 231, n. 13 (CA3 2008) (en banc) ("Stevens brings a facial challenge to the statute"); App. to Pet. for Cert. 65a, 74a. Neither did the Government, see Brief for United States in No. 05-2497 (CA3), p. 28 (opposing "the appellant's facial challenge"); accord, Brief for United States 4. The sentence in Stevens's appellate brief mentioning his unrelated sufficiency-of-the-evidence challenge hardly developed a First Amendment as-applied claim. See *post,* at 1, n. 1. Stevens's constitutional [****24] argument is a general one. And unlike the challengers in *Washington State Grange*, Stevens does not "rest on factual assumptions . . . that can be evaluated only in the context of an as-applied challenge." 552 U.S., at 444, 128 S. Ct. 1184, 170 L. Ed. 2d 151.

[4] The citations in the dissent's appendix are beside the point. The cited statutes stand for the proposition that hunting is not covered by animal cruelty laws. But the reach of § 48 is, as we have explained, not restricted to depictions of conduct that violates a law specifically [****27] directed at animal cruelty. It simply requires that the depicted conduct be "illegal." § 48(c)(1). The Government implicitly admits as much, arguing

What is more, the application of § 48 to depictions of illegal conduct extends to conduct that is illegal in only a single [**1589] jurisdiction. Under subsection (c)(1), the depicted conduct need only be illegal in "the State in which the creation, sale, or possession takes place, regardless of whether the . . . wounding . . . or killing took place in [that] State." A depiction of entirely lawful conduct runs afoul of the ban if that depiction later finds its way into another State where the [*476] same conduct is unlawful. This provision greatly expands the scope of § 48, because although there may be "a broad societal consensus" against cruelty to animals, Brief for United States 2, there is substantial disagreement on what types of conduct are properly regarded as cruel. Both views about cruelty to animals and regulations having no connection to cruelty vary widely from place to place.

In [****28] the District of Columbia, for example, all hunting is unlawful. D. C. Code Munic. Regs., tit. 19, § 1560 (June 2004). Other jurisdictions permit or encourage hunting, and there is an enormous national market for hunting-related depictions in which a living animal is intentionally killed. Hunting periodicals have circulations in the hundreds of thousands or millions, see Mediaweek, Sept. 29, 2008, [***449] p. 28, and hunting television programs, videos, and Web sites are equally popular, see Brief for Professional Outdoor Media Association et al. as *Amici Curiae* 9-10. The demand for hunting depictions exceeds the estimated demand for crush videos or animal fighting depictions by several orders of magnitude. Compare *ibid.* and Brief for National Rifle Association of America, Inc., as *Amicus Curiae* 12 (hereinafter NRA Brief) (estimating that hunting magazines alone account for $135 million in annual retail sales) with Brief for United States 43-44, 46 (suggesting $1 million in crush video sales per year, and noting that Stevens earned $57,000 from his videos). Nonetheless, because the statute allows each jurisdiction to export its laws to the rest of the country, § 48(a) extends to *any* magazine or video [****29] depicting lawful hunting, so long as that depiction is sold within the Nation's Capital.

Those seeking to comply with the law thus face a bewildering maze of regulations from at least 56 separate jurisdictions. Some States permit hunting with crossbows, Ga. Code Ann. § 27-3-4(1) (2007); Va. Code Ann. § 29.1-519(A)(6) (Lexis 2008 Cum. Supp.), while others forbid it, Ore. Admin. Rule 635-065-0725 (2009), or restrict it only to the disabled, [*477] N. Y. Envir. Conserv. Law Ann. § 11-0901(16) (West 2005). Missouri allows the "canned" hunting of ungulates held in captivity, Mo. Code Regs. Ann., tit. 3, 10-9.560(1) (2009), but Montana restricts such hunting to certain bird species, Mont. Admin. Rule 12.6.1202(1) (2007). The sharp-tailed grouse may be hunted in Idaho, but not in Washington. Compare Idaho Admin. Code § 13.01.09.606 (2009) with Wash. Admin. Code § 232-28-342 (2009) .

The disagreements among the States--and the "commonwealth[s], territor[ies], or possession[s] of the United States," 18 U.S.C. § 48(c)(2) --extend well beyond hunting. State agricultural regulations permit different methods of livestock slaughter in different places or as applied to different animals. Compare, *e.g.,* Fla. Stat. Ann. § 828.23(5) [****30] (West 2006) (excluding poultry from humane slaughter requirements) with Cal. Food & Agric. Code Ann. § 19501(b) (West 2001) (including some poultry). California has recently banned cutting or "docking" the tails of dairy cattle, which other States permit. 2009 Cal. Legis. Serv. Ch. 344 (S. B. 135) (West). Even cockfighting, long considered immoral in much of America, see *Barnes* v. *Glen Theatre, Inc.*, 501 U.S. 560, 575, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991) (Scalia, J., concurring in judgment), is legal in Puerto Rico, see 15 Laws P. R. Ann. § 301 (Supp. [**1590] 2008); *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.*, 478 U.S. 328, 342, 106 S. Ct. 2968, 92 L. Ed. 2d 266 (1986), and was legal in Louisiana until 2008, see La. Rev. Stat. Ann. § 14:102.23 (West) (effective Aug. 15, 2008). An otherwise-lawful image of any of these practices, if sold or possessed for commercial gain within a State that happens to forbid the practice, falls within the prohibition of § 48(a).

C

The only thing standing between defendants who sell such depictions and five years in federal prison--other than the mercy of a prosecutor--is the statute's exceptions clause. Subsection (b) exempts from prohibition "any depiction that has serious religious, political, scientific, educational, [****31] journalistic, [*478] historical [***450] , or artistic value." The Government argues that this clause substantially narrows the statute's reach: News reports about animal cruelty have "journalistic" value; pictures of bullfights in Spain have "historical" value; and instructional hunting videos have "educational" value. Reply Brief 6. Thus,

---

that "instructional videos for hunting" are saved by the statute's exceptions clause, not that they fall outside the prohibition in the first place. Reply Brief 6.

the Government argues, § 48 reaches only crush videos, depictions of animal fighting (other than Spanish bullfighting, see Brief for United States 47-48), and perhaps other depictions of "extreme acts of animal cruelty." *Id.,* at 41.

The Government's attempt to narrow the statutory ban, however, requires an unrealistically broad reading of the exceptions clause. As the Government reads the clause, any material with "redeeming societal value," *id.*, at 9, 16, 23, " 'at least some minimal value,' " Reply Brief 6 (quoting H. R. Rep., at 4), or anything more than "scant social value," Reply Brief 11, is excluded under § 48(b). But the text says "serious" value, and "serious" should be taken seriously. We decline the Government's invitation--advanced for the first time in this Court--to regard as "serious" anything that is not "scant." (Or, as the dissent puts it, " 'trifling.' " [****32] *Post*, at 487, 176 L. Ed. 2d, at 456.) As the Government recognized below, "serious" ordinarily means a good bit more. The District Court's jury instructions required value that is "significant and of great import," App. 132, and the Government defended these instructions as properly relying on "a commonly accepted meaning of the word 'serious,' " Brief for United States in No. 05-2497 (CA3), p. 50.

Quite apart from the requirement of "serious" value in § 48(b), the excepted speech must also fall within one of the enumerated categories. Much speech does not. Most hunting videos, for example, are not obviously instructional in nature, except in the sense that all life is a lesson. According to Safari Club International and the Congressional Sportsmen's Foundation, many popular videos "have primarily entertainment value" and are designed to "entertai[n] the [*479] viewer, marke[t] hunting equipment, or increas[e] the hunting community." Brief for Safari Club International et al. as *Amici Curiae* 12. The National Rifle Association agrees that "much of the content of hunting media . . . is merely *recreational* in nature." NRA Brief 28. The Government offers no principled explanation why these depictions of hunting or depictions [****33] of Spanish bullfights would be *inherently* valuable while those of Japanese dogfights are not. The dissent contends that hunting depictions must have serious value because hunting has serious value, in a way that dogfights presumably do not. *Post,* at 487-488, 176 L. Ed. 2d, at 455-457. But § 48(b) addresses the value of the *depictions*, not of the underlying activity. There is simply no adequate reading of the exceptions clause that results in the statute's banning only the depictions the Government would like to ban.

[**1591] The Government explains that the language of § 48(b) was largely drawn from our opinion in *Miller* v. *California*, 413 U.S. 15, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973), which excepted from its definition of obscenity any material with "serious literary, artistic, political, or scientific value," *id.,* at 24, 93 S. Ct. 2607, 37 L. Ed. 2d 419. See Reply Brief 8, 9, and n. 5. According to the Government, this incorporation [***451] of the *Miller* standard into § 48 is therefore surely enough to answer any First Amendment objection. Reply Brief 8-9.

In *Miller* we held that "serious" value shields depictions of sex from regulation as obscenity. 413 U.S., at 24-25, 93 S. Ct. 2607, 37 L. Ed. 2d 419. Limiting *Miller*'s exception to "serious" value ensured that " '[a] quotation from Voltaire in the flyleaf of a book [would] not [****34] constitutionally redeem an otherwise obscene publication.' *Id.,* at 25, n. 7, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (quoting *Kois* v. *Wisconsin*, 408 U.S. 229, 231, 92 S. Ct. 2245, 33 L. Ed. 2d 312 (1972) (*per curiam*)). We did not, however, determine that serious value could be used as a general precondition to protecting *other* types of speech in the first place. *Most* of what we say to one another lacks "religious, political, scientific, educational, journalistic, historical, or artistic value" (let alone serious value), but it is still sheltered from Government regulation. Even " '[w]holly neutral futilities . . . come [*480] under the protection of free speech as fully as do Keats' poems or Donne's sermons.' *Cohen* v. *California*, 403 U.S. 15, 25, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) (quoting *Winters* v. *New York*, 333 U.S. 507, 528, 68 S. Ct. 665, 92 L. Ed. 840 (1948) (Frankfurter, J., dissenting); alteration in original).

Thus, the protection of the First Amendment presumptively extends to many forms of speech that do not qualify for the serious-value exception of § 48(b), but nonetheless fall within the broad reach of § 48(c).

D

Not to worry, the Government says: The Executive Branch construes § 48 to reach only "extreme" cruelty, Brief for United States 8, and it "neither has brought nor will bring a prosecution for anything [****35] less," Reply Brief 6-7. The Government hits this theme hard, invoking its prosecutorial discretion several times. See *id.,* at 6-7, 10, and n. 6, 19, 22, 125 S. Ct. 377, 160 L. Ed. 2d 271. But the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly. Cf.

*Whitman* v. *American Trucking Assns., Inc.*, 531 U.S. 457, 473, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001).

This prosecution is itself evidence of the danger in putting faith in Government representations of prosecutorial restraint. When this legislation was enacted, the Executive Branch announced that it would interpret § 48 as covering only depictions "of wanton cruelty to animals designed to appeal to a prurient interest in sex." See Statement by President William J. Clinton upon Signing H. R. 1887, 34 Weekly Comp. of Pres. Doc. 2557 (1999). No one suggests that the videos in this case fit that description. The Government's assurance that it will apply § 48 far more restrictively than its language provides is pertinent only as an implicit acknowledgment of the potential constitutional problems with a more natural reading.

[*481] Nor can we rely upon [****36] the canon of construction that "ambiguous statutory language [should] be construed to avoid serious constitutional doubts." *FCC* v. *Fox TV Stations, Inc.*, 556 U.S. 502, 516, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009). [9] "[T]his Court may [**1592] impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." [***452] *Reno v. ACLU*, 521 U.S. 844, 884, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997). We " 'will not rewrite a . . . law to conform it to constitutional requirements,' *id.,* at 884-885, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (quoting *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988); omission in original), for doing so would constitute a "serious invasion of the legislative domain," *United States* v. *Treasury Employees*, 513 U.S. 454, 479, n. 26, 115 S. Ct. 1003, 130 L. Ed. 2d 964 (1995), and sharply diminish Congress's "incentive to draft a narrowly tailored law in the first place," *Osborne,* 495 U.S., at 121, 110 S. Ct.1691, 109 L. Ed. 2d 98. To read § 48 as the Government desires requires rewriting, not just reinterpretation.

* * *

Our construction of § 48 decides the constitutional question; the Government makes no effort to defend the constitutionality of § 48 as applied beyond crush videos and depictions of animal fighting. It argues that those particular depictions [****37] are intrinsically related to criminal conduct or are analogous to obscenity (if not themselves obscene), and that the ban on such speech is narrowly tailored to reinforce restrictions on the underlying conduct, prevent additional crime arising from the depictions, or safeguard public mores. But the Government nowhere attempts to extend these arguments to depictions of any other activities--depictions that are presumptively protected by the First Amendment but that remain subject to the criminal sanctions of § 48.

Nor does the Government seriously contest that the presumptively impermissible applications of § 48 (properly construed) far outnumber any permissible ones. However "growing" and "lucrative" the markets for crush videos and dogfighting depictions might be, see Brief for United States [*482] 43, 46 (internal quotation marks omitted), they are dwarfed by the market for other depictions, such as hunting magazines and videos, that we have determined to be within the scope of § 48, See *supra*, at 13-14, 125 S. Ct. 377, 160 L. Ed. 2d 271. We therefore need not and do not decide whether a statute limited to crush videos or other depictions of extreme animal cruelty would be constitutional. We hold only that § 48 is not so [****38] limited but is instead substantially overbroad, and therefore invalid under the First Amendment.

The judgment of the United States Court of Appeals for the Third Circuit is affirmed.

It is so ordered.

**Dissent by:** ALITO

## Dissent

Justice **Alito**, dissenting.

The Court strikes down in its entirety a valuable statute, 18 U.S.C. § 48, that was enacted not to suppress speech, but to prevent horrific acts of animal cruelty--in particular, the creation and commercial exploitation of "crush videos," a form of depraved entertainment that has no social value. The Court's approach, which has the practical effect of legalizing the sale of such videos and is thus likely to spur a resumption of their production, is unwarranted. Respondent was convicted under § 48 for selling videos depicting dogfights. On appeal, he argued, among other things, that § 48 is unconstitutional [***453] as applied to the facts of this case, and he highlighted features of those videos that might distinguish them from other dogfight videos brought to our attention.[1] [*483] The Court of [**1593]

---

[1] Respondent argued at length that the evidence was

Appeals--incorrectly, in my view--declined to decide whether § 48 is unconstitutional as applied to respondent's videos and instead reached out to hold that the statute is facially [****39] invalid. Today's decision does not endorse the Court of Appeals' reasoning, but it nevertheless strikes down § 48 using what has been aptly termed the "strong medicine" of the overbreadth doctrine, *United States* v. *Williams*, 553 U.S. 285, 293, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008) (internal quotation marks omitted), a potion that generally should be administered only as "a last resort," *Los Angeles Police Dept.* v. *United Reporting Publishing Corp.*, 528 U.S. 32, 39, 120 S. Ct. 483, 145 L. Ed. 2d 451 (1999) (internal quotation marks omitted).

Instead of applying the doctrine of overbreadth, I would vacate the decision below and instruct the Court of Appeals on remand to decide whether the videos that respondent sold are constitutionally protected. If the question of overbreadth is to be decided, however, I do not think the present record supports the Court's conclusion that § 48 bans a substantial quantity of protected speech.

I

A party seeking to challenge the constitutionality of a statute generally must show that the statute violates the party's own rights. *New York* v. *Ferber*, 458 U.S. 747, 767, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982). The First Amendment overbreadth doctrine carves out a narrow exception to that general rule. See *id.*, at 768, 102 S. Ct. 3348, 73 L. Ed. 2d 1113; *Broadrick* v. *Oklahoma*, 413 U.S. 601, 611-612, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973). [****41] Because an overly broad law may deter constitutionally protected speech, the overbreadth doctrine allows a party to [*484] whom the law may constitutionally be applied to challenge the statute on the ground that it violates the First Amendment rights of others. See, *e.g.*, *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U.S. 469, 483, 109 S. Ct. 3028, 106 L. Ed. 2d 388 (1989) ("Ordinarily, the principal advantage of the overbreadth doctrine for a litigant is that it enables him to benefit from the statute's unlawful application *to someone else*"); see also *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 462, n. 20, 98 S. Ct. 1912, 56 L. Ed. 2d 444 (1978) (describing the doctrine as one "under which a person may challenge a statute that infringes protected speech even if the statute constitutionally might be applied to him").

[***454] The "strong medicine" of overbreadth invalidation need not and generally should not be administered when the statute under attack is unconstitutional as applied to the challenger before the court. As we said in *Fox*, *supra,* at 484-485, 109 S. Ct. 3028, 106 L. Ed. 2d 388, "[i]t is not the usual judicial practice, . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily--that is, before it is determined that the statute would be valid [****42] as [**1594] applied." Accord, *New York State Club Assn., Inc.* v. *City of New York*, 487 U.S. 1, 11, 108 S. Ct. 2225, 101 L. Ed. 2d 1 (1988); see also *Broadrick*, *supra,* at 613, 93 S. Ct. 2908, 37 L. Ed. 2d 830; *United Reporting Publishing Corp.*, *supra*, at 45, 120 S. Ct. 483, 145 L. Ed. 2d 451 (Stevens, J., dissenting).

I see no reason to depart here from the generally preferred procedure of considering the question of overbreadth only as a last resort.[2] Because the Court has addressed the overbreadth question, however, I will explain why I do not think that the record supports the conclusion that § 48, when properly interpreted, is overly broad.

II

The overbreadth doctrine "strike[s] a balance between competing social costs." *Williams*, 553 U.S., at 292, 128 S. Ct. 1830, 170 L. Ed. 2d 650. Specifically, the doctrine seeks to balance the "harmful effects" of "invalidating a law that in some of its applications is perfectly [*485]

insufficient to prove that the particular videos he sold lacked any serious scientific, educational, or historical value and thus fell outside the exception in § 48(b). See Brief for Appellant in No. 05-2497 (CA3), pp. 72-79. He added that, if the evidence in this case was held to be sufficient to take his videos outside the scope of the exception, then "this case presents . . . a situation" in which "a constitutional violation occurs." *Id.*, at 71. See also *id.*, at 47, 120 S. Ct. 483, 145 L. Ed. 2d 451 ("The applicability of 18 U.S.C. § 48 to speech which is not a crush video or an appeal to some prurient sexual interest constitutes a restriction of protected speech, and an unwarranted violation [****40] of the First Amendment's free speech guarantee"); Brief for Respondent 55 ("Stevens' speech does not fit within any existing category of unprotected, prosecutable speech"); *id.*, at 57 ("[T]he record as a whole demonstrates that Stevens' speech cannot constitutionally be punished"). Contrary to the Court, *ante,* at 473, n. 3, 176 L. Ed. 2d, at 447 (citing 533 F.3d 218, 231, n. 13 (CA3 2008) (en banc)), I see no suggestion in the opinion of the Court of Appeals that respondent did not preserve an as-applied challenge.

[2] For the reasons set forth below, this is not a case in which the challenged statute is unconstitutional in all or almost all of its applications.

constitutional" against the possibility that "the threat of enforcement of an overbroad law [will] dete[r] people from engaging in constitutionally protected speech." *Ibid.* "In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's [****43] overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Ibid.*

In determining whether a statute's overbreadth is substantial, we consider a statute's application to real-world conduct, not fanciful hypotheticals. See, *e.g.*, *id.*, at 301-302, 128 S. Ct. 1830, 170 L. Ed. 2d 650; see also *Ferber*, *supra,* at 773, 102 S. Ct. 3348, 73 L. Ed. 2d 1113;*Houston* v. *Hill*, 482 U.S. 451, 466-467, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987). Accordingly, we have repeatedly emphasized that an overbreadth claimant bears the burden of demonstrating, "from the text of [the law] *and from actual fact*," that substantial overbreadth exists. *Virginia* v. *Hicks*, 539 U.S. 113, 122, 123 S. Ct. 2191, 156 L. Ed. 2d 148 (2003) (quoting *New York State Club Assn.*, *supra,* at 14, 108 S. Ct. 2225, 101 L. Ed. 2d 1; emphasis added; internal quotation marks omitted; alteration in original). Similarly, "there must be a *realistic danger* that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984) (emphasis added).

III

In holding that § 48 violates the overbreadth rule, the Court declines to decide whether, as the Government maintains, [****44] § 48 is constitutional as [***455] applied to two broad categories of depictions that exist in the real world: crush videos and depictions of deadly animal fights. See *ante*, at 473, 481, 176 L. Ed. 2d, at 446, 452. Instead, the Court tacitly assumes for the sake of argument that § 48 is valid as applied to these depictions, but the Court concludes that § 48 reaches too much protected speech to survive. The Court relies primarily on depictions of hunters killing or wounding game and depictions of animals being slaughtered for food. I address the Court's examples below.

[*486] A

I turn first to depictions of hunting. As the Court notes, photographs and videos of hunters shooting game are common. See *ante,* at 476, 176 L. Ed. 2d, at 448-449. But hunting is legal in all 50 States, and § 48 applies only to a [**1595] depiction of conduct that is illegal in the jurisdiction in which the depiction is created, sold, or possessed. §§ 48(a), (c). Therefore, in all 50 States, the creation, sale, or possession for sale of the vast majority of hunting depictions indisputably falls outside § 48's reach.

Straining to find overbreadth, the Court suggests that § 48 prohibits the sale or possession in the District of Columbia of any depiction of hunting because the District--undoubtedly [****45] because of its urban character--does not permit hunting within its boundaries. *Ante*, at 475-476, 176 L. Ed. 2d, at 448. The Court also suggests that, because some States prohibit a particular type of hunting (*e.g.,* hunting with a crossbow or "canned" hunting) or the hunting of a particular animal (*e.g.*, the "sharp-tailed grouse"), § 48 makes it illegal for persons in such States to sell or possess for sale a depiction of hunting that was perfectly legal in the State in which the hunting took place. See *ante,* at 475-477, 176 L. Ed. 2d, at 448-449.

The Court's interpretation is seriously flawed. "When a federal court is dealing with a federal statute challenged as overbroad, it should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction." *Ferber*, 458 U.S., at 769, n. 24, 102 S. Ct. 3348, 73 L. Ed. 2d 1113. See also *Williams*, *supra,* at 307, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (Stevens, J., concurring) ("[T]o the extent the statutory text alone is unclear, our duty to avoid constitutional objections makes it especially appropriate to look beyond the text in order to ascertain the intent of its drafters").

Applying this canon, I would hold that § 48 does not apply to depictions of hunting. First, because § 48 targets depictions of "animal cruelty," [****46] I would interpret that term to apply only to depictions involving acts of animal cruelty as defined by applicable state or federal law, not to depictions [*487] of acts that happen to be illegal for reasons having nothing to do with the prevention of animal cruelty. See *ante*, at 475, 176 L. Ed. 2d, at 448 (interpreting "[t]he text of § 48(c) to ban a depiction of "the humane slaughter of a stolen cow"). Virtually all state laws prohibiting animal cruelty either expressly define the term "animal" to exclude wildlife or else specifically exempt lawful hunting activities,[3] so

---

[3] See Appendix, *infra* (citing statutes); B. Wagman, S. Waisman, & P. Frasch, Animal Law: Cases and Materials 92 (4th ed. 2010) ("Most anti-cruelty laws also include one or

[***456] the statutory prohibition set forth in § 48(a) may reasonably be interpreted not to reach most if not all hunting depictions.

Second, even if the hunting of wild animals were otherwise covered by § 48(a), I would hold that hunting depictions fall within the exception in § 48(b) for depictions that have "serious" (*i.e.,* not "trifling"[4] ) "scientific," "educational," or "historical" value. While there are certainly those who find hunting objectionable, the predominant view in this country has long been that hunting serves many important values, and it is clear that Congress shares that view. Since 1972, when Congress called upon the President to designate a [**1596] National Hunting and Fishing Day, see S. J. Res. 117, 92d Cong., 2d Sess. (1972), 86 Stat. 133, Presidents have regularly issued proclamations extolling the values served by hunting. See Presidential Proclamation No. 8421, 74 Fed. Reg. 49305 (Pres. Obama 2009) (hunting and fishing are "ageless pursuits" that promote "the conservation and restoration of numerous species and their natural habitats"); Presidential Proclamation No. 8295, [*488] 73 Fed. Reg. 57233 (Pres. Bush 2008) (hunters and anglers "add to our heritage and keep our wildlife populations healthy and strong," and "are [****48] among our foremost conservationists"); Presidential Proclamation No. 7822, 69 Fed. Reg. 59539 (Pres. Bush 2004) (hunting and fishing are "an important part of our Nation's heritage," and "America's hunters and anglers represent the great spirit of our country"); Presidential Proclamation No. 4682, 44 Fed. Reg. 53149 (Pres. Carter 1979) (hunting promotes conservation and an appreciation of "healthy recreation, peaceful solitude and closeness to nature"); Presidential Proclamation No. 4318, 39 Fed. Reg. 35315 (Pres. Ford 1974) (hunting furthers "appreciation and respect for nature" and preservation of the environment). Thus, it is widely thought that hunting has "scientific? value in that it promotes conservation, "historical" value in that it provides a link to past times when hunting played a critical role in daily life, and "educational" value in that it furthers the understanding and appreciation of nature and our country's past and instills valuable character traits. And if hunting itself is widely thought to serve these values, then it takes but a small additional step to conclude that depictions of hunting make a nontrivial contribution to the exchange of ideas. Accordingly, [****49] I would hold that hunting depictions fall comfortably within the exception set out in § 48(b).

I do not have the slightest doubt that Congress, in enacting § 48, had no intention of restricting the creation, sale, or possession of depictions of hunting. Proponents of the law made this point clearly. See H. R. Rep. No. 106-397, p. 8 (1999) (hereinafter H. R. Rep.) ("[D]epictions of ordinary hunting and fishing activities do not fall within the scope of the statute"); 145 Cong. Rec. 25894 (1999) (Rep. McCollum) ("[T]he sale of depictions [***457] of legal activities, such as hunting and fishing, would not be illegal under this bill"); *id.*, at 25895 (Rep. Smith) ("[L]et us be clear as to what this legislation will not do. It will in no way prohibit hunting, fishing , or wildlife videos"). Indeed, even *opponents* acknowledged [*489] that § 48 was not intended to reach ordinary hunting depictions. See *ibid.* (Rep. Scott); *id.*,at 25897 (Rep. Paul).

For [****50] these reasons, I am convinced that § 48 has no application to depictions of hunting. But even if § 48 did impermissibly reach the sale or possession of depictions of hunting in a few unusual situations (for example, the sale in Oregon of a depiction of hunting with a crossbow in Virginia or the sale in Washington State of the hunting of a sharp-tailed grouse in Idaho, see *ante*, at 476-477, 176 L. Ed. 2d, at 449), those isolated applications would hardly show that § 48 bans a substantial amount of protected speech.

B

Although the Court's overbreadth analysis rests primarily on the proposition that § 48 substantially restricts the sale and possession of hunting depictions, the Court cites a few additional examples, including depictions of methods of slaughter and the docking of the tails of dairy cows. See *ante*, at 477, 176 L. Ed. 2d, at 449.

Such examples do not show that the statute is substantially overbroad, for two [**1597] reasons. First, as explained above, § 48 can reasonably be construed to apply only to depictions involving acts of animal cruelty as defined by applicable state or federal law, and

more exemptions," which often "exclud[e] from coverage (1) whole classes of animals, such as wildlife or farm animals, or (2) specific activities, such as hunting"); Note, Economics and Ethics in the Genetic Engineering of Animals, 19 Harv. J. L. & Tech. 413, 432 (2006) ("Not surprisingly, state laws relating to the humane treatment of wildlife, including [****47] deer, elk, and waterfowl, are virtually non-existent").

[4] Webster's Third New International Dictionary 2073 (1976); Random House Dictionary of the English Language 1303 (1966). While the term "serious" may also mean ?weighty" or "important," *ibid.*, we should adopt the former definition if necessary to avoid unconstitutionality.

anticruelty laws do not ban the sorts of acts depicted in the Court's hypotheticals. See, *e.g.*, Idaho Code § 25-3514 (Lexis 2000) ("No part [****51] of this chapter [prohibiting cruelty to animals] shall be construed as interfering with or allowing interference with . . . [t]he humane slaughter of any animal normally and commonly raised as food, or for production of fiber . . . [or] [n]ormal or accepted practices of . . . animal husbandry"); Kan. Stat. Ann. § 21-4310(b) (2007) ("The provisions of this section shall not apply . . . with respect to farm animals, normal or accepted practices of animal husbandry, including the normal and accepted practices for the slaughter of such animals"); Md. Crim. Law Code Ann. § 10-603 (Lexis 2002) (sections prohibiting animal cruelty, "do not apply to . . . customary and normal veterinary [*490] and agricultural husbandry practices including dehorning, castration, tail docking, and limit feeding").

Second, nothing in the record suggests that anyone has ever created, sold, or possessed for sale a depiction of the slaughter of food animals or of the docking of the tails of dairy cows that would not easily qualify under the exception set out in § 48(b). Depictions created to show proper methods of slaughter or tail docking would presumably have serious "educational" value, and depictions created to [****52] focus attention on methods thought to be inhumane or otherwise objectionable would presumably have either serious "educational" or "journalistic" value or both. In short, the Court's examples of depictions involving the docking of tails and humane slaughter do not show that § 48 suffers from any overbreadth, much less substantial overbreadth.

The Court notes, finally, that cockfighting, which is illegal in all States, is still legal in Puerto Rico, *ante*, at 477, 176 L. Ed. 2d, at 449, and I take [***458] the Court's point to be that it would be impermissible to ban the creation, sale, or possession in Puerto Rico of a depiction of a cockfight that was legally staged in Puerto Rico.[5] But assuming for the sake of argument that this is correct, this veritable sliver of unconstitutionality would not be enough to justify striking down § 48 *in toto.*

In sum, we have a duty to interpret § 48 so as to avoid serious constitutional concerns, and § 48 may reasonably be construed not to reach almost all, if not all, of the depictions that the Court finds constitutionally protected. Thus, § 48 does not appear to have a large number of unconstitutional [*491] applications. Invalidation for overbreadth is appropriate only if the challenged statute suffers from *substantial* overbreadth--judged not just in absolute terms, but in relation to the statute's "plainly legitimate sweep." *Williams*, 553 U.S., at 292, 128 S. Ct. 1830, 170 L. Ed. 2d 650. As I explain in the following Part, § 48 has a substantial core of constitutionally permissible applications.

IV

A

1

As the Court of Appeals recognized, "the primary conduct that Congress [**1598] sought to address through its passage [of § 48] was the creation, sale, or possession of 'crush videos.' 533 F.3d 218, 222 (CA3 2008) (en banc). A sample crush video, which has been lodged with the Clerk, records the following event:

> "[A] kitten, secured to the ground, watches and shrieks in pain as a [****54] woman thrusts her high-heeled shoe into its body, slams her heel into the kitten's eye socket and mouth loudly fracturing its skull, and stomps repeatedly on the animal's head. The kitten hemorrhages blood, screams blindly in pain, and is ultimately left dead in a moist pile of blood-soaked hair and bone." Brief for Humane Society of United States as *Amicus Curiae* 2 (hereinafter Humane Society Brief).

It is undisputed that the *conduct* depicted in crush videos may constitutionally be prohibited. All 50 States and the District of Columbia have enacted statutes prohibiting animal cruelty. See 533 F.3d, at 223, and n. 4 (citing statutes); H. R. Rep., at 3. But before the enactment of § 48, the underlying conduct depicted in crush videos was nearly impossible to prosecute. These videos, which "often appeal to persons with a very specific sexual fetish," *id.*, at 2, were made in secret, generally without a live audience, and "the faces of the women inflicting the torture in the material often were not shown, nor could the location of the place where [*492] the cruelty was being inflicted or the date of the activity be ascertained from the depiction," *id.*, at 3.

[5] Since the Court has taken pains not to decide whether § 48 would be unconstitutional as applied to graphic dogfight videos, including those depicting fights occurring in countries where dogfighting is legal, I take it that the Court does not intend for its passing reference to cockfights to mean either that all depictions of cockfights, whether legal or illegal under local law, [****53] are protected by the First Amendment or that it is impermissible to ban the sale or possession in the States of a depiction of a legal cockfight in Puerto Rico.

Thus, law enforcement authorities [****55] often were not able to identify the parties responsible for the torture. See Punishing Depictions of Animal Cruelty and the Federal Prisoner Health Care Co-Payment [***459] Act of 1999: Hearing before the Subcommittee on Crime of the House Committee on the Judiciary, 106th Cong., 1st Sess., 1 (1999) (hereinafter Hearing on Depictions of Animal Cruelty). In the rare instances in which it was possible to identify and find the perpetrators, they "often were able to successfully assert as a defense that the State could not prove its jurisdiction over the place where the act occurred or that the actions depicted took place within the time specified in the State statute of limitations." H. R. Rep., at 3*;* see also 145 Cong. Rec. 25896 (Rep. Gallegly) ("[I]t is the prosecutors from around this country, Federal prosecutors as well as State prosecutors, that have made an appeal to us for this"); Hearing on Depictions of Animal Cruelty 21 ("If the production of the video is not discovered during the actual filming, then prosecution for the offense is virtually impossible without a cooperative eyewitness to the filming or an undercover police operation"); *id.*, at 34-35 (discussing example of case in [****56] which state prosecutor "had the defendant telling us he produced these videos," but where prosecution was not possible because the State could not prove where or when the tape was made).

In light of the practical problems thwarting the prosecution of the creators of crush videos under state animal cruelty laws, Congress concluded that the only effective way of stopping the underlying criminal conduct was to prohibit the commercial exploitation of the videos of that conduct. And Congress' strategy appears to have been vindicated. We are told that "[b]y 2007, sponsors of § 48 declared the crush video industry dead. Even overseas websites shut down in the wake of § 48. Now, after the Third Circuit's decision [facially invalidating the statute], crush videos are [*493] already back online." Humane Society Brief 5 (citations omitted).

2

The First Amendment protects freedom of speech, but it most certainly does not protect violent criminal conduct, even if [**1599] engaged in for expressive purposes. Crush videos present a highly unusual free speech issue because they are so closely linked with violent criminal conduct. The videos record the commission of violent criminal acts, and it appears that these crimes [****57] are committed for the sole purpose of creating the videos. In addition, as noted above, Congress was presented with compelling evidence that the only way of preventing these crimes was to target the sale of the videos. Under these circumstances, I cannot believe that the First Amendment commands Congress to step aside and allow the underlying crimes to continue.

The most relevant of our prior decisions is *Ferber*, 458 U.S. 747, 102 S. Ct. 3348, 73 L. Ed. 2d 1113, which concerned child pornography. The Court there held that child pornography is not protected speech, and I believe that *Ferber*'s reasoning dictates a similar conclusion here.

In *Ferber,* an important factor--I would say the most important factor--was that child pornography involves the commission of a crime that inflicts severe personal injury to the "children who are made to engage in sexual conduct for commercial purposes." *Id.,* at 753, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (internal quotation marks omitted). The *Ferber* Court repeatedly described the production of child pornography as child "abuse," [***460] "molestation," or "exploitation." See, *e.g.*, *id.*, at 749, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 ("In recent years, the exploitive use of children in the production of pornography has become a serious national problem"); *id.*, at 758, n. 9, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 [****58] ("Sexual molestation by adults is often involved in the production of child sexual performances"). As later noted in *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 249, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002), in *Ferber* "[t]he production of the work, not its content, was the target of the statute." See also 535 U.S., at [*494] 250, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (*Ferber* involved "speech that itself is the record of sexual abuse").

Second, *Ferber* emphasized the fact that these underlying crimes could not be effectively combated without targeting the distribution of child pornography. As the Court put it, "the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." 458 U.S., at 759, 102 S. Ct. 3348, 73 L. Ed. 2d 1113. The Court added:

> "[T]here is no serious contention that the legislature was unjustified in believing that it is difficult, if not impossible, to halt the exploitation of children by pursuing only those who produce the photographs and movies. . . . The most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties on persons selling,

> advertising, or otherwise promoting the [****59] product." *Id.*, at 759-760, 102 S. Ct. 3348, 73 L. Ed. 2d 1113.

See also *id*., at 761, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 ("The advertising and selling of child pornography provide an economic motive for and are thus an integral part of the production of such materials").

Third, the *Ferber* Court noted that the value of child pornography "is exceedingly modest, if not *de minimis,"* and that any such value was "overwhelmingly outweigh[ed]" by "the evil to be restricted." *Id.*, at 762-763, 102 S. Ct. 3348, 73 L. Ed. 2d 1113.

All three of these characteristics are shared by § 48, as applied to crush videos. First, the conduct depicted in crush videos is criminal in every State and the District of Columbia. Thus, any crush video made in this country records the actual commission of a criminal act that inflicts severe physical injury and excruciating pain and ultimately results in death. Those who [**1600] record the underlying criminal acts are likely to be criminally culpable, either as aiders and abettors or conspirators. And in the tight and secretive market for these videos, some who sell the videos or possess [*495] them with the intent to make a profit may be similarly culpable. (For example, in some cases, crush videos were commissioned by purchasers who specified the details of the acts that they wanted to [****60] see performed. See H. R. Rep., at 3; Hearing on Depictions of Animal Cruelty 27.) To the extent that § 48 reaches such persons, it surely does not violate the First Amendment.

Second, the criminal acts shown in crush videos cannot be prevented without targeting the conduct prohibited by § 48 --the creation, sale, and possession for sale of depictions of animal torture with the intention of realizing a commercial profit. The evidence [***461] presented to Congress posed a stark choice: Either ban the commercial exploitation of crush videos or tolerate a continuation of the criminal acts that they record. Faced with this evidence, Congress reasonably chose to target the lucrative crush video market.

Finally, the harm caused by the underlying crimes vastly outweighs any minimal value that the depictions might conceivably be thought to possess. Section 48 reaches only the actual recording of acts of animal torture; the statute does not apply to verbal descriptions or to simulations. And, unlike the child pornography statute in *Ferber* or its federal counterpart, 18 U.S.C. § 2252, § 48(b) provides an exception for depictions having any "serious religious, political, scientific, educational, journalistic, [****61] historical, or artistic value."

It must be acknowledged that § 48 differs from a child pornography law in an important respect: Preventing the abuse of children is certainly much more important than preventing the torture of the animals used in crush videos. It was largely for this reason that the Court of Appeals concluded that *Ferber* did not support the constitutionality of § 48. 533 F.3d, at 228 ("Preventing cruelty to animals, although an exceedingly worthy goal, simply does not implicate interests of the same magnitude as protecting children from physical and psychological harm"). But while protecting children is unquestionably *more* important than protecting animals, the [*496] Government also has a compelling interest in preventing the torture depicted in crush videos.

The animals used in crush videos are living creatures that experience excruciating pain. Our society has long banned such cruelty, which is illegal throughout the country. In *Ferber*, the Court noted that "virtually all of the States and the United States have passed legislation proscribing the production of or otherwise combating 'child pornography,' " and the Court declined to "second-guess [that] legislative judgment."[6] [****62] 458 U.S., at 758, 102 S. Ct. 3348, 73 L. Ed. 2d 1113. Here, likewise, the Court of Appeals erred in second-guessing the legislative judgment about the importance of preventing cruelty to animals.

Section 48's ban on trafficking in crush videos also helps to enforce the criminal [**1601] laws and to ensure that criminals do not profit from their crimes. See 145 Cong. Rec. 25897 (1999) (Rep. Gallegly) ("The state has an interest in enforcing its existing laws. Right now, the laws are not only being violated, but people are making huge profits from promoting the violations"); *id.,* at 10685 (1999) [****63] (same) (explaining that he introduced the House version of the bill because "criminals should not profit from [their] illegal acts"). We

---

[6] In other cases, we have regarded evidence of a national consensus as proof that a particular government interest is compelling. See *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U.S. 105, 118, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991) (State's compelling interest ?in ensuring that victims of crime are compensated by those who harm them" evidenced by fact that "[e]very State has a body of tort law serving exactly this interest"); *Roberts* v. *United States Jaycees*, 468 U.S. 609, 624-625, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984) (citing state laws prohibiting discrimination in public accommodations as evidence of the compelling governmental interest in ensuring equal access).

have already judged that taking the profit out of crime is a compelling [***462] interest. See *Simon & Schuster, Inc.* v. *Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 119, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991).

In short, *Ferber* is the case that sheds the most light on the constitutionality of Congress' effort to halt the production of crush videos. Applying the principles set forth in *Ferber*, I would hold that crush videos are no t protected by the First Amendment.

[*497] B

Application of the *Ferber* framework also supports the constitutionality of § 48 as applied to depictions of brutal animal fights. (For convenience, I will focus on videos of dogfights, which appear to be the most common type of animal fight videos.)

First, such depictions, like crush videos, record the actual commission of a crime involving deadly violence. Dogfights are illegal in every State and the District of Columbia, Brief for United States 26-27, and n. 8 (citing statutes), and under federal law constitute a felony punishable by imprisonment for up to five years, 7 U.S.C. § 2156 *et seq.* (2006 ed. and Supp. II); [****64] 18 U.S.C. § 49 (2006 ed., Supp. II).

Second, Congress had an ample basis for concluding that the crimes depicted in these videos cannot be effectively controlled without targeting the videos. Like crush videos and child pornography, dogfight videos are very often produced as part of a "low-profile, clandestine industry," and "the need to market the resulting products requires a visible apparatus of distribution." *Ferber,* 458 U.S., at 760, 102 S. Ct. 3348, 73 L. Ed. 2d 1113. In such circumstances, Congress had reasonable grounds for concluding that it would be "difficult, if not impossible, to halt" the underlying exploitation of dogs by pursuing only those who stage the fights. *Id.*, at 759-760, 102 S. Ct. 3348, 73 L. Ed. 2d 1113; see 533 F.3d, at 246 (Cowen, J., dissenting) (citing evidence establishing "the existence of a lucrative market for depictions of animal cruelty," including videos of dogfights, "which in turn provides a powerful incentive to individuals to create [such] videos").

The commercial trade in videos of dogfights is "an integral part of the production of such materials," *Ferber, supra,* at 761, 102 S. Ct. 3348, 73 L. Ed. 2d 1113. As the Humane Society explains, "[v]ideotapes memorializing dogfights are integral to the success of this criminal industry" for a variety of reasons. [****65] Humane Society Brief 5. For one thing, some dogfighting videos are made "solely for the purpose of selling the video (and not for a live audience)." *Id.*, at 9, 108 S. Ct. 2225, 101 L. Ed. 2d 1In addition, those who stage dogfights profit not just from the sale of the videos themselves, but from the [*498] gambling revenue they take in from the fights; the videos "encourage [such] gambling activity because they allow those reluctant to attend actual fights for fear of prosecution to still bet on the outcome." *Ibid.;* accord, Brief for Center on the Administration of Criminal Law as *Amicus Curiae* 12 ("Selling videos of dogfights effectively abets the underlying crimes by providing a market for dogfighting while allowing actual dogfights to remain underground"); *ibid.* ("These videos are part of a 'lucrative market' where videos are produced by a 'bare-boned, clandestine staff' in order to permit [**1602] the actual location of dogfights and the perpetrators of these underlying criminal activities to [***463] go undetected" (citation omitted)). Moreover, "[v]ideo documentation is vital to the criminal enterprise because it provides *proof* of a dog's fighting prowess--proof demanded by potential buyers and critical to the underground market." [****66] Humane Society Brief 9. Such recordings may also serve as " 'training' videos for other fight organizers." *Ibid.* In short, because videos depicting live dogfights are essential to the success of the criminal dogfighting subculture, the commercial sale of such videos helps to fuel the market for, and thus to perpetuate the perpetration of, the criminal conduct depicted in them.

Third, depictions of dogfights that fall within § 48's reach have by definition no appreciable social value. As noted, § 48(b) exempts depictions having any appreciable social value, and thus the mere inclusion of a depiction of a live fight in a larger work that aims at communicating an idea or a message with a modicum of social value would not run afoul of the statute.

Finally, the harm caused by the underlying criminal acts greatly outweighs any trifling value that the depictions might be thought to possess. As the Humane Society explains:

> "The abused dogs used in fights endure physical torture and emotional manipulation throughout their lives to [*499] predispose them to violence; common tactics include feeding the animals hot peppers and gunpowder, prodding them with sticks, and electrocution. Dogs are conditioned [****67] never to give up a fight, even if th ey will be gravely hurt or killed. As a result, dogfights inflict horrific injuries on the participating animals,

> including lacerations, ripped ears, puncture wounds and broken bones. Losing dogs are routinely refused treatment, beaten further as 'punishment' for the loss, and executed by drowning, hanging, or incineration." *Id.,* at 5-6, 108 S. Ct. 2225, 101 L. Ed. 2d 1 (footnotes omitted).

For these dogs, unlike the animals killed in crush videos, the suffering lasts for years rather than minutes. As with crush videos, moreover, the statutory ban on commerce in dogfighting videos is also supported by compelling governmental interests in effectively enforcing the Nation's criminal laws and preventing criminals from profiting from their illegal activities. See *Ferber*, *supra*, at 757-758, 102 S. Ct. 3348, 73 L. Ed. 2d 1113; *Simon & Schuster*, 502 U.S., at 119, 112 S. Ct. 501, 116 L. Ed. 2d 476.

In sum, § 48 may validly be applied to at least two broad real-world categories of expression covered by the statute: crush videos and dogfighting videos. Thus, the statute has a substantial core of constitutionally permissible applications. Moreover, for the reasons set forth above, the record does not show that § 48, properly interpreted, bans a substantial amount [****68] of protected speech in absolute terms. *A fortiori*, respondent has not met his burden of demonstrating that any impermissible applications of the statute are "substantial" in relation to its "plainly legitimate sweep." *Williams*, 553 U.S., at 292, 128 S. Ct. 1830, 170 L. Ed. 2d 650. Accordingly, I would reject respondent's claim that § 48 is facially unconstitutional under the overbreadth doctrine.

* * *

For these reasons, I respectfully dissent.

[*500] [***464] APPENDIX

As the following chart makes clear, virtually all state laws prohibiting animal cruelty either expressly define the term "animal" to exclude wildlife or else specifically exempt lawful hunting activities. [**1603]

Go to table1
[***468]

## References

U.S.C.S., Constitution, Amendment 1; 18 U.S.C.S. § 48

15 Matthew Bender §§101.51, 101.61 (Matthew Bender 3d ed.)

L Ed Digest, Animals § 14; Constitutional Law § 971

L Ed Index, Animals; Freedom of Speech and Press; Overbreadth of Statutes

Supreme Court's application of the rules of ejusdem generis and noscitur a sociis. 46 L. Ed. 2d 879.

Supreme [****78] Court's views as to overbreadth of legislation in connection with First Amendment rights. 45 L. Ed. 2d 725.

The Supreme Court and the right of free speech and press. 93 L. Ed. 1151, 2 L. Ed. 2d 1706, 11 L. Ed. 2d 1116, 16 L. Ed. 2d 1053, 21 L. Ed. 2d 976.

Indefiniteness of language as affecting validity of criminal legislation or judicial definition of common-law crime--Supreme Court cases. 96 L. Ed. 374, 16 L. Ed. 2d 1231.

**Table1 (**Return to related document text**)**

| | |
|---|---|
| Alaska | Alaska Stat. § 11.61.140(c)(4) (2008) ("It is a defense to a prosecution under this section that the conduct of the defendant . . . was necessarily incidental to lawful fishing, hunting or trapping activities") |
| Arizona | Ariz. Rev. Stat. Ann. §§ 13-2910(C)(1), (3) (West Supp. 2009) ("This section does not prohibit or restrict . . . T(t]he taking of wildlife or other activities permitted by or pursuant to title 17 . . . [or] [a]ctivities regulated by the Arizona game and fish department or the Arizona department of agriculture") |
| Arkansas | Ark. Code Ann. § 5-62-105(a) (Supp. 2009) ("This subchapter does not prohibit any of the following activities: . . . (9) Engaging in the taking of game or fish through hunting, trap- ping, [****69] or fishing, or engaging in any other activ- ity authorized by Arkansas Constitution, Amendment 35, by § 15-41-101 et seq., or by any Arkansas State Game and Fish Commission regulation promulgated under either Arkansas Constitution, Amendment 35, or statute") |
| California | Cal. Penal Code Ann. § 599c (West 1999) ("No part of this title shall be construed as interfer- ing with any of the laws of this state known as the 'game laws,' . . . or to interfere with the right to kill all animals used for food") |
| Colorado | Colo. Rev. Stat. Ann. § 18-9-201.5(2) (2009) ("In case of any conflict between this part 2 [prohib- iting cruelty to animals] or section 35-43-126, [Colo. Rev. Stat.], and the wildlife statutes of the state, said wildlife statutes shall control"), § 18-9-202(3) ("Nothing in this part 2 shall be construed to amend or in any manner change the authority of the wildlife commission, as established in title 33, [Colo. Rev. Stat.], or to prohibit any conduct therein authorized or permitted") |
| Connecticut | Conn. Gen. Stat. § 53-247(b) (2009) ("Any person who maliciously and intentionally maims, mutilates, tortures, wounds or kills an animal |

| | |
|---|---|
| | shall be fined not more than five thousand dollars or imprisoned not more than five years or both. The provisions of this subsection shall not apply to . . . any person . . . while lawfully engaged in the taking of wildlife") |
| Delaware | |
| | Del. Code Ann., Tit. 11, § 1325(f) (2007) [****70] ("This section shall not apply to the lawful hunting or trapping of animals as provided by law") |
| Florida | |
| | Fla. Stat. § 828.122(9)(b) (2007) ("This section shall not apply to . . . [a]ny person using animals to pursue or take wildlife or to participate in any hunting regulated or subject to being regulated by the rules and regulations of the Fish and Wildlife Conservation Commission") |
| Georgia | |
| | Ga. Code Ann. § 16-12-4(e) (2007) ("The provisions of this Code section shall not be construed as prohibiting conduct which is otherwise permitted under the laws of this state or of the United States, including, but not limited to . . . hunting, trapping, fishing, [or] wildlife management") |
| Hawaii | |
| | Haw. Rev. Stat. § 711-1108.5(1) (2008 Cum. Supp.) ("A person commits the offense of cruelty to animals in the first degree if the person intentionally or knowingly tortures, mutilates, or poisons or causes the torture, mutilation, or poisoning of any pet animal or equine animal resulting in serious bodily injury or death of the pet animal or equine animal") |
| Idaho | |
| | Idaho Code § 25-3515 (Lexis 2000) ("No part of this chapter shall be construed as interfering with, negating or preempting any of the laws or rules of the department of fish and game of this state . . . or to interfere with the right to kill, slaughter, bag or take [****71] all animals used for food") |
| Illinois | |
| | Ill. Comp. Stat., ch. 510, § 70/13 (West 2006) ("In case of any alleged conflict between this Act . . . |

and the 'Wildlife Code of Illinois' or 'An Act to define and require the use of humane methods in the handling, preparation for slaughter, and slaughter of livestock for meat or meat products to be offered for sale', . . . the provisions of those Acts shall prevail"(footnotes omitted)), § 70/3.03(b)(1) ("For the purposes of this Section, 'animal torture' does not include any death, harm, or injury caused to any animal by . . . any hunting, fishing, trapping, or other activity allowed under the Wildlife Code, the Wildlife Habitat Management Areas Act, or the Fish and Aquatic Life Code" (footnotes omitted))

Indiana

Ind. Code § 35-46-3-5(a) (West 2004) (subject to certain exceptions not relevant here, "this chapter [prohibiting "Offenses Relating to Animals"] does not apply to . . . [f]ishing, hunting, trapping, or other conduct authorized under [Ind. Code § ] 14-22")

Iowa

Iowa Code § 717B.2(5) (2009) ("This section [banning 'animal abuse'] shall not apply to . . . [a] person taking, hunting, trapping, or fishing for a wild animal as provided in chapter 481A"), § 717B.3A(2)*(e)* ("This section [banning 'animal torture'] shall not apply to . . . [a] person taking, hunting, trapping, or [****72] fishing for a wild animal as provided in chapter 481A")

Kansas

Kan. Stat. Ann. § 21-4310(b)(3) (2007) ("The provisions of this section shall not apply to . . . killing, attempting to kill, trapping, catching or taking of any animal in accordance with the provisions of chapter 32 [Wildlife, Parks and Recreation] or chapter 47 [Livestock and Domestic Animals] of the Kansas Statutes Annotated")

Kentucky

Ky. Rev. Stat. Ann. §§ 525.130(2)(a)), (e) (Lexis 2008) ("Nothing in this section shall apply to the killing of animals . . . [p]ursuant to a license to hunt, fish, or trap . . . [or] [f]or purposes relating to sporting activities"), § 525.130(3) ("Activities

| | |
|---|---|
| | of animals engaged in hunting, field trials, dog training other than training a dog to fight for pleasure or profit, and other activities authorized either by a hunting license or by the Department of Fish and Wildlife shall not constitute a violation of this section") |
| Louisiana | |
| | La. Rev. Stat. Ann. § 14:102.1(C)(1) (West Supp. 2010) ("This Section shall not apply to . . . [t]he lawful hunting or trapping of wildlife as provided by law") |
| Maine | |
| | Me. Rev. Stat. Ann., Tit. 17, § 1031(1)(G) (West Supp. 2009) (providing that hunting and trapping an animal is not a form of prohibited animal cruelty if "permitted pursuant to" parts of state code regulating the shooting of large game, inland fisheries, and wildlife) |
| Maryland [****73] | |
| | Md. Crim. Law Code Ann. § 10-603(3) (Lexis 2002) ("Sections 10-601 through 10-608 of this subtitle do not apply to . . . an activity that may cause unavoidable physical pain to an animal, including . . . hunting, if the person performing the activity uses the most humane method reasonably available") |
| Michigan | |
| | Mich. Comp. Laws Ann. §§ 750.50(11)(a), (b) (West Supp. 2009) ("This section does not prohibit the lawful killing of an animal pursuant to . . . [f]ishing . . . [h]unting, [or] trapping [as regulated by state law]"), §§ 750.50b(9)(a), (b)("This section does not prohibit the lawful killing of an animal pursuant to . . . [f]ishing . . . [h]unting, [or] trapping [as regulated by state law]") |
| Missouri | |
| | Mo. Rev. Stat. § 578.007(3) (2000) ("The provisions of sections 578.005 to 578.023 shall not apply to . . . [h]unting, fishing, or trapping as allowed by" state law) |
| Montana | |
| | Mont. Code Ann. § 45-8-211(4)(d) (2009) ("This |

| | |
|---|---|
| | section does not prohibit . . . lawful fishing, hunting, and trapping activities") |
| Nebraska | |
| | Neb. Rev. Stat. § 28-1013(4) (2008) (exempting "[c]ommonly accepted practices of hunting, fishing, or trapping") |
| Nevada | |
| | Nev. Rev. Stat. §§ 574.200(1), (3) (2007) (provisions of Nevada law banning animal cruelty "do not . . . [i]nterfere with any of the fish and game laws . . . [or] the right to kill all animals and fowl used for food") |
| New Hampshire | |
| | N. H. Rev. Stat. Ann. § 644:8(II) (West Supp. 2009) ("In this section, 'animal' means a domestic animal, a household pet or a wild animal in captivity") |
| New Jersey | |
| | N. J. Stat. Ann. § 4:22-16(c) (West 1998) ("Nothing contained in this article [****74] shall be construed to prohibit or interfere with . . . [t]he shooting or taking of game or game fish in such manner and at such times as is allowed or provided by the laws of this State") |
| New Mexico | |
| | N. M. Stat. Ann. § 30-18-1(I)(1) (Supp. 2009) ("The provisions of this section do not apply to . . . fishing, hunting, falconry, taking and trapping") |
| New York | |
| | N. Y. Agric. & Mkts. Law Ann. § 353-a(2) (West 2004) ("Nothing contained in this section shall be construed to prohibit or interfere in any way with anyone lawfully engaged in hunting, trapping, or fishing") |
| North Carolina | |
| | N. C. Gen. Stat. Ann. § 14-360(c)(1) (Lexis 2009) ("[T]his section shall not apply to . . . [t]he lawful taking of animals under the jurisdiction and regulation of the Wildlife Resources Commission . . .") |
| North Dakota | |

| | |
|---|---|
| | N. D. Cent. Code Ann. § 36-21.1-01(5)(a) (Lexis Supp. 2009) ("'Cruelty' or 'torture' . . . does not include . . . [a]ny activity that requires a license or permit under cChapter 20.1-03[which governs gaming and other licenses]") |
| Oregon | Ore. Rev. Stat. § 167.335 (2007) ("Unless gross negligence can be shown, the provisions of [certain statutes prohibiting animal cruelty] do not apply to . . . (7) [l]awful fishing, hunting and trapping activities") |
| Pennsylvania | 18 Pa. Cons. Stat. § 5511(a)(3)(ii) (2008) ("This subsection [banning killing, maiming, or poisoning of domestic animals or zoo animals] shall not apply to . . . the killing of any animal or fowl pursuant [****75] to . . . The Game Law"), § 5511(c)(1) ("A person commits an offense if he wantonly or cruelly illtreats, overloads, beats, otherwise abuses any animal, or neglects any animal as to which he has a duty of care") |
| Rhode Island | R. I. Gen. Laws § 4-1-3(a) (Lexis 1998) (prohibiting "[e]very owner, possessor, or person having the charge or custody of any animal" from engaging in certain acts of unnecessary cruelty), §§ 4-1-5(a), (b)(prohibiting only "[m]alicious" injury to or killing of animals and further providing that "[t]his section shall not apply to licensed hunters during hunting season or a licensed business killing animals for human consumption") |
| South Carolina | S. C. Code Ann. § 47-1-40(C) (Supp. 2009) ("This section does not apply to . . . activity authorized by Title 50 [consisting of laws on Fish, Game, and Watercraft]") |
| South Dakota | S. D. Codified Laws § 40-1-17 (2004) ("The acts and conduct of persons who are lawfully engaged in any of the activities authorized by Title 41 [Game, Fish, Parks and Forestry] . . . and persons who properly kill any animal used for |

food and sport hunting, trapping, and fishing as authorized by the South Dakota Department of Game, Fish and Parks, are exempt from the provisions of this chapter")

Tennessee

Tenn. Code Ann. § 39-14-201(1) (2010 Supp.) ("'Animal' means a domesticated living creature or a wild creature [****76] previously captured"), § 39-14-201(4) ("[N]othing in this part shall be construed as prohibiting the shooting of birds or game for the purpose of human food or the use of animate targets by incorporated gun clubs")

Texas

Tex. Penal Code Ann. § 42.092(a)(2) (West Supp. 2009) ("'Animal' means a domesticated living creature, including any stray or feral cat or dog, and a wild living creature previously captured. The term does not include an uncaptured wild living creature or a livestock animal"), § 42.092(f)(1)A) ("It is an exception to the application of this section that the conduct engaged in by the actor is a generally accepted and otherwise lawful . . . form of conduct occurring solely for the purpose of or in support of . . . fishing, hunting, or trapping")

Utah

Utah Code Ann. § 76-9-301(1)(b)(ii)(D) (Lexis 2008) ("'Animal' does not include . . . wildlife, as defined in Section 23-13-2, including protected and unprotected wildlife, if the conduct toward the wildlife is in accordance with lawful hunting, fishing, or trapping practices or other lawful practices"), § 76-9-301(9)(C) ("This section does not affect or prohibit . . . the lawful hunting of, fishing for, or trapping of, wildlife")

Vermont

Vt. Stat. Ann., Tit. 13, § 351b(1) (2009) ("This subchapter shall not apply to . . . activities regulated by the department of fish and wildlife pursuant to Part 4 [****77] of Title 10")

Virginia

Va. Code Ann. § 3.2-6570(D) (Lexis 2008) ("This section shall not prohibit authorized wildlife

| | |
|---|---|
| | management activities or hunting, fishing or trapping [as regulated by state law]") |
| Washington | |
| | Wash. Rev. Code § 16.52.180 (2008) ("No part of this chapter shall be deemed to interfere with any of the laws of this state known as the 'game laws' . . . or to interfere with the right to kill animals to be used for food") |
| West Virginia | |
| | W. Va. Code Ann. § 61-8-19(f) (Lexis Supp. 2009) ("The provisions of this section do not apply to lawful acts of hunting, fishing, [or] trapping") |
| Wisconsin | |
| | Wis. Stat. § 951.015(1) (2007-2008) ("This chapter may not be interpreted as controverting any law regulating wild animals that are subject to regulation under ch. 169 [regulating, among other things, hunting], [or] the taking of wild animals") |
| Wyoming | |
| | Wyo. Stat. Ann. § 6-3-203(m)(iv) (2009) ("Nothing in subsection (a) , (b) or (n) of this section shall be construed to prohibit . . . [t]he hunting, capture or destruction of any predatory animal or other wildlife in any manner not otherwise prohibited by law") |

**Table1 (**Return to related document text**)**

---

End of Document

# Bond v. United States

564 U.S. 211 (2011)

Cited in Opening Brief at: x

The standard of review citation is addressed in Response, Part III.B. Highlighted language appears at 564 U.S. at 217.

Q Questioned
As of: September 14, 2026 1:04 PM Z

# Bond v. United States

Supreme Court of the United States

February 22, 2011, Argued; June 16, 2011, Decided

No. 09-1227

**Reporter**

564 U.S. 211 *; 131 S. Ct. 2355 **; 180 L. Ed. 2d 269 ***; 2011 U.S. LEXIS 4558 ****; 79 U.S.L.W. 4490; 22 Fla. L. Weekly Fed. S 1156

CAROL ANNE BOND, Petitioner v. UNITED STATES

**Subsequent History:** Decision reached on appeal by, On remand at United States v. Bond, 681 F.3d 149, 2012 U.S. App. LEXIS 9057 (3d Cir. Pa., 2012)

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT.

United States v. Bond, 581 F.3d 128, 2009 U.S. App. LEXIS 20724 (2009)

**Disposition:** Reversed and remanded.

## Syllabus

[***273] [**2357] [*211] When petitioner Bond discovered that her close friend was pregnant by Bond's husband, she began harassing the woman. The woman suffered a minor burn after Bond put caustic substances on objects the woman was likely to touch. Bond was indicted for violating 18 U.S.C. § 229, which forbids knowing possession or use, for nonpeaceful purposes, of a chemical [**2358] that "can cause death, temporary incapacitation or permanent harm to humans," §§ 229(a); 229F(1); (7); (8), and which is part of a federal Act implementing a chemical weapons treaty ratified by the United States. The District Court denied Bond's motion to dismiss the § 229 charges on the ground that the statute exceeded Congress' constitutional authority to enact. She entered a conditional guilty plea, reserving the right to appeal the ruling on the statute's validity. She did just that, renewing her Tenth Amendment claim. The Third Circuit, however, accepted the Government's position that she lacked standing. The Government has since changed its view on Bond's standing.

*Held:* Bond has standing to challenge the federal [****2] statute on grounds that the measure interferes with the powers reserved to States. Pp. 216-220, 180 L. Ed. 2d, at 276-283.

(a) The Third Circuit relied on a single sentence in *Tennessee Elec. Power Co.* v. *TVA*, 306 U.S. 118, 59 S. Ct. 366, 83 L. Ed. 543. Pp. 216-220, 180 L. Ed. 2d, at 276-279.

(1) The Court has disapproved of *Tennessee Electric* as authoritative for purposes of Article III's case-or-controversy requirement. See *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U.S. 150, 152-154, 90 S. Ct. 827, 25 L. Ed. 2d 184. Here, Article III's standing requirement had no bearing on Bond's capacity to assert defenses in the District Court. And Article III's prerequisites are met with regard to her standing to appeal. Pp. 216 -217, 180 L. Ed. 2d, at 276-277.

(2) *Tennessee Electric* is also irrelevant with respect to prudential standing rules. There, the Court declined to reach the merits where private power companies sought to enjoin [***274] the federally chartered Tennessee Valley Authority (TVA) from producing and selling electric power, claiming that the statute creating the TVA exceeded the National Government's powers in violation of the Tenth Amendment. In doing so, the Court repeatedly stated that the problem with the power companies' suit was a lack of "standing" or a "cause of action," treating those concepts as interchangeable. [****3] *E.g.*, 306 U.S., at 139, 59 S. Ct. 366, 83 L. Ed. 543. The question [*212] whether a plaintiff states a claim for relief typically "goes to the merits" of a case, however, not to the dispute's justiciability, *Steel Co.* v. *Citizens for Better Environment*, 523 U.S. 83, 92, 118 S. Ct. 1003, 140 L. Ed. 2d 210, and conflation of the two concepts can cause confusion. This happened with *Tennessee Electric*'s Tenth Amendment discussion. The statement on which the Third Circuit relied here, see 306 U.S., at 144, 59 S. Ct. 366, 83 L. Ed. 543, should be read to refer to the absence of a cause of action for

injury caused by economic competition. To the extent the statement might instead be read to suggest a private party does not have standing to raise a Tenth Amendment issue, it is inconsistent with this Court's later precedents and should be deemed neither controlling nor instructive on the issue of standing as that term is now defined and applied. Pp. 217-220, 180 L. Ed. 2d, at 277-279.

(b) *Amicus,* appointed to defend the judgment, contends that for Bond to argue the National Government has interfered with state sovereignty in violation of the Tenth Amendment is to assert only a State's legal rights and interests. But in arguing that the Government has acted in excess of the authority that federalism defines, Bond seeks to vindicate [****4] her own constitutional interests. Pp. 220-226, 180 L. Ed. 2d, at 279-283.

(1) Federalism has more than one dynamic. In allocating powers between the States and National Government, federalism " 'secures to citizens the liberties that derive from the diffusion of sovereign power,' *New York* v. *United States*, 505 U.S. 144, 181, 112 S. Ct. 2408, 120 L. Ed. 2d 120. It enables States to enact positive law in [**2359] response to the initiative of those who seek a voice in shaping the destiny of their own times, and it protects the liberty of all persons within a State by ensuring that law enacted in excess of delegated governmental power cannot direct or control their actions. See *Gregory* v. *Ashcroft*, 501 U.S. 452, 458, 111 S. Ct. 2395, 115 L. Ed. 2d 410. Federalism's limitations are not therefore a matter of rights belonging only to the States. In a proper case, a litigant may challenge a law as enacted in contravention of federalism, just as injured individuals may challenge actions that transgress, *e.g.,* separation-of-powers limitations, see, *e.g., INS* v. *Chadha*, 462 U.S. 919, 103 S. Ct. 2764, 77 L. Ed. 2d 317. The claim need not depend on the vicarious assertion of a State's constitutional interests, even if those interests are also implicated. Pp. 220-224, 180 L. Ed. 2d, at 279-281.

(2) The Government errs in contending that Bond should be permitted to assert [****5] only that Congress could not enact the challenged statute under its enumerated powers but that standing should be denied if she argues that the statute interferes with state sovereignty. Here, Bond asserts that the public policy of Pennsylvania, enacted in its capacity as sovereign, has been displaced by that of the National Government. The law to [***275] which she is subject, the prosecution she seeks to counter, and the punishment she must face might not have come about had the [*213] matter been left for Pennsylvania to decide. There is no support for the Government's proposed distinction between different federalism arguments for purposes of prudential standing rules. The principles of limited national powers and state sovereignty are intertwined. Impermissible interference with state sovereignty is not within the National Government's enumerated powers, and action exceeding the National Government's enumerated powers undermines the States' sovereign interests. Individuals seeking to challenge such measures are subject to Article III and prudential standing rules applicable to all litigants and claims, but here, where the litigant is a party to an otherwise justiciable case or controversy, [****6] she is not forbidden to object that her injury results from disregard of the federal structure of the Government. Pp. 224 - 226, 180 L. Ed. 2d, at 281-283.

(c) The Court expresses no view on the merits of Bond's challenge to the statute's validity. P. 226, 180 L. Ed. 2d, at 283.

581 F.3d 128, reversed and remanded.

**Counsel: Paul D. Clement** argued the cause for petitioner.

**Michael R. Dreeben** argued the cause for respondent, supporting petitioner.

**Stephen R. McAllister** argued the cause as amicus curiae, by special leave of court, supporting the judgment below.

**Judges:** Kennedy, J., delivered the opinion for a unanimous Court. Ginsburg, J., filed a concurring opinion, in which Breyer, J., joined, *post*, p.226.

**Opinion by:** Kennedy

# Opinion

[**2360] [*214] Justice **Kennedy** delivered the opinion of the Court.

This case presents the question whether a person indicted for violating a federal statute has standing to challenge its validity on grounds that, by enacting it, Congress exceeded its powers under the Constitution, thus intruding upon the sovereignty and authority of the

States.

The indicted defendant, petitioner here, sought to argue the invalidity of the statute. She relied on the Tenth Amendment, and, by extension, on the premise that Congress exceeded its powers by enacting it in contravention of basic federalism principles. The statute, 18 U.S.C. § 229, was enacted to comply with a treaty; but petitioner contends that, at least in the present instance, the treaty cannot be the source of congressional power to regulate or prohibit her conduct.

The [****7] Court of Appeals held that because a State was not a party to the federal criminal proceeding, petitioner had no standing to challenge the statute as an infringement upon the powers reserved to the States. Having concluded that petitioner does have standing to challenge the federal statute on these grounds, this Court now reverses that determination. The merits of petitioner's challenge to the statute's validity are to be considered, in the first instance, by the Court of Appeals on remand and are not addressed in this opinion.

I

This case arises from a bitter personal dispute, leading to the criminal acts charged here. Petitioner Carol Anne Bond lived outside Philadelphia, Pennsylvania. After discovering that her close friend was pregnant and that the father was Bond's husband, Bond sought revenge. Bond subjected the woman to a campaign of harassing telephone calls and letters, acts that resulted in a criminal conviction [***276] on a minor state charge. Bond persisted in her hostile acts, placing caustic substances on objects the woman was likely to touch, including her mailbox, car door handle, and front [*215] doorknob. Bond's victim suffered a minor burn on her hand and contacted federal investigators, [****8] who identified Bond as the perpetrator.

Bond was indicted in the United States District Court for the Eastern District of Pennsylvania for, among other offenses, two counts of violating § 229. Section 229 forbids knowing possession or use of any chemical that “can cause death, temporary incapacitation or permanent harm to humans or animals” where not intended for a “peaceful purpose.” §§ 229(a); 229F(1); (7); (8). The statute was enacted as part of the Chemical Weapons Convention Implementation Act of 1998, 112 Stat. 2681-856, 22 U.S.C. § 6701 *et seq.;* 18 U.S.C. § 229 *et seq.* The Act implements provisions of the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on their Destruction, a treaty the United States ratified in 1997.

In the District Court, Bond moved to dismiss the § 229 charges, contending the statute was beyond Congress' constitutional authority to enact. The District Court denied the motion. Bond entered a conditional plea of guilty, reserving the right to appeal the ruling on the validity of the statute. She was sentenced to six years in prison.

In the Court of Appeals for the Third Circuit, Bond renewed her challenge [****9] to the statute, citing, among other authorities, [**2361] the Tenth Amendment to the Constitution. The Court of Appeals asked for supplemental briefs on the question whether Bond had standing to raise the Tenth Amendment as a ground for invalidating a federal statute in the absence of a State's participation in the proceedings.

In its supplemental brief in the Court of Appeals, the Government took the position that Bond did not have standing. The Court of Appeals agreed. 581 F.3d 128 (2009).

When Bond sought certiorari, the Government advised this Court that it had changed its position and that, in its view, Bond does have standing to challenge the constitutionality of § 229 on Tenth Amendment grounds. See Brief for [*216] United States (filed July 9, 2010). The Court granted certiorari, 562 U.S. 960, 131 S. Ct. 455, 178 L. Ed. 2d 285 (2010), and appointed an *amicus curiae* to defend the judgment of the Court of Appeals. Stephen McAllister, a member of the bar of this Court, filed an *amicus* brief and presented an oral argument that have been of considerable assistance to the Court.

II

To conclude that petitioner lacks standing to challenge a federal statute on grounds that the measure interferes with the powers reserved to States, the Court [****10] of Appeals relied on a single sentence from this Court's opinion in *Tennessee Elec. Power Co.* v. *TVA*, 306 U.S. 118, 59 S. Ct. 366, 83 L. Ed. 543 (1939). See 581 F.3d, at 136-138. As the Court of Appeals noted here, other Courts of Appeals have taken a similar approach. *E.g., United States v. Hacker, 565 F.3d 522, 525-527 (CA8 2009)*; *Oregon* v. *Legal Servs. Corp.*, 552 F.3d 965, 971-972 (CA9 2009);*Brooklyn Legal Servs. Corp.* v. *Legal Servs. Corp.*, 462 F.3d 219, 234-235 (CA2 2006); *Medeiros* v. [***277] *Vincent*, 431 F.3d 25, 33-36 (CA1 2005);*United States* v. *Parker*, 362 F.3d 1279, 1284-1285 (CA10 2004). That approach is in tension, if not

conflict, with decisions of some other Courts of Appeals. See *Gillespie* v. *Indianapolis*, 185 F.3d 693, 700-704 (CA7 1999); *Metrolina Family Practice Group, P. A.* v. *Sullivan*, 767 F. Supp. 1314 (WDNC 1989), aff'd 929 F.2d 693 (CA4 1991); *Atlanta Gas Light Co.* v. *United States Dept. of Energy*, 666 F.2d 1359, 1368, n. 16 (CA11 1982); see also *United States* v. *Johnson*, 632 F.3d 912, 918-921 (CA5 2011) (reserving issue); *Lomont* v. *O'Neill*, 285 F.3d 9, 14, n. 5, 350 U.S. App. D.C. 357 (CADC 2002) (same); *Nance* v. *EPA*, 645 F.2d 701, 716 (CA9 1981) (same).

*Tennessee Electric* is the appropriate place to begin. It should be [****11] clear that *Tennessee Electric* does not cast doubt on Bond's standing for purposes of Article III's case-or-controversy requirement. [1] This Court long ago disapproved of the case as authoritative respecting Article III limitations. [*217] *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U.S. 150, 152-154, 90 S. Ct. 827, 25 L. Ed. 2d 184 (1970). In the instant case, moreover, it is apparent--and in fact conceded not only by the Government but also by *amicus*--that Article III poses no barrier. [2] One who seeks to initiate or continue proceedings in federal court must demonstrate, among other requirements, both standing to obtain the relief requested, see *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992), and, in addition, an “ongoing interest in the dispute” on the part of the opposing party that is sufficient to establish “concrete adverseness.” *Camreta* v. *Greene*, 563 U.S. 692, 701, 131 S. Ct. 2020, 179 L. Ed. 2d 1118, 1125 (2011) (internal quotation marks omitted). When those conditions are met, Article III does not restrict the opposing party's ability to object to relief being sought at its expense. [**2362] The requirement of Article III standing thus had no bearing upon Bond's capacity to assert defenses in the District [****12] Court. As for Bond's standing to appeal, it is clear Article III's prerequisites are met. [3] Bond's challenge to her conviction and sentence “satisfies the case-or-controversy requirement, because the incarceration . . . constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction.” *Spencer* v. *Kemna*, 523 U.S. 1, 7, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998).

To resolve the case, this Court must consider next whether *Tennessee Electric* is irrelevant with respect to prudential rules of standing as well. The question in *Tennessee Electric* was whether a group of private power companies could bring suit to enjoin the federally chartered Tennessee Valley Authority (TVA) from producing and selling electric power. It was conceded that competition from the TVA would “inflict substantial damage” upon the power companies. 306 U.S., at 137, 59 S. Ct. 366, 83 L. Ed. 543. According to the companies, the federal statute authorizing the creation and operation of the TVA was invalid because, among other reasons, it exceeded the powers of the National Government in violation of the Tenth Amendment.

[*218] Declining to reach the merits, the Court concluded the power companies' lawsuit should be dismissed. It explained that the suit was [****13] premised on the principle that a person threatened with injury by conduct “which, but for statutory authority for its performance, would be a violation of his [***278] legal rights” could request an injunction from a court of equity and by this means test the validity of the statute. *Ibid.* But the Court concluded that the TVA, even if it were shorn of congressional statutory authority, had done nothing more than compete as a supplier of electricity. *Id.*, at 138, 59 S. Ct. 366, 83 L. Ed. 543. And since state law did not purport to grant any of the power companies a monopoly, there was no basis for a suit in which the TVA might be forced to invoke its congressional authorization. *Id.*, at 138-143, 59 S. Ct. 366, 83 L. Ed. 543.

In that part of its analysis, and throughout its opinion, the *Tennessee Electric* Court stated that the problem with the power companies' suit was a lack of “standing” or a “cause of action.” It treated those concepts as interchangeable. *E.g.*, *id.*, at 139, 59 S. Ct. 366, 83 L. Ed. 543 (no “standing” because no “legal cause of complaint”); *id.*, at 139-140, 59 S. Ct. 366, 83 L. Ed. 543 (no “standing” without “a cause of action or a right to sue”); *id.*, at 142, 59 S. Ct. 366, 83 L. Ed. 543 (“no standing,” no “right to sue for an injunction”); *id.*, at 144, 59 S. Ct. 366, 83 L. Ed. 543 (no Tenth Amendment “standing” and no Ninth Amendment “cause of action” [****14] for same reasons); see also Bellia, Article III and the Cause of Action, 89 Iowa L. Rev. 777, 826-830 (2004).

Even though decisions since *Tennessee Electric* have been careful to use the terms “cause of action” and “standing” with more precision, the distinct concepts can be difficult to keep separate. [4] If, for instance, the person alleging injury is remote from the zone of interests a statute protects, whether there is a legal injury at all and whether the particular litigant is one who may assert it can involve similar inquiries.*Steel Co.* v. *Citizens for Better Environment*, 523 U.S. 83, 96-97, 118 S. Ct. 1003, 140 L. Ed. 2d 210, and n. 2 (1998)

(noting that statutory standing and the existence of a cause of action are "closely connected" and "sometimes identical" questions).

[*219] Still, the question whether a plaintiff states a claim for relief "goes to the merits" in the typical case, not the justiciability of a dispute, *id.*, at 92, 118 S. Ct. 1003, 140 L. Ed. 2d 210, and conflation of the two concepts can cause confusion. This is the case with the Tenth Amendment discussion in *Tennessee [**2363] Electric*. The *Tennessee Electric* Court noted that "[a] distinct ground upon which standing to maintain the suit is said to rest is that the acts of the Authority cannot be [****15] upheld without permitting federal regulation of purely local matters reserved to the states or the people by the Tenth Amendment." 306 U.S., at 143, 59 S. Ct. 366, 83 L. Ed. 543. The Court rejected the argument, however, concluding the Tenth Amendment did not give one business a right to keep another from competing. *Id.*, at 144, 59 S. Ct. 366, 83 L. Ed. 543 ("The sale of government property in competition with others is not a violation of the Tenth Amendment).

The Court then added the sentence upon which the Court of Appeals relied in the instant case, the sentence that has been the source of disagreement among Courts of Appeals:

> "As we have seen there is no objection to the Authority's operations by the states, and, if this were not so, the appellants, absent the states or their officers, have no standing in this suit to raise any question under the amendment." *Ibid.*

The quoted statement was in the context of a decision which held that [***279] business competitors had no legal injury, and the word standing can be interpreted in that sense. On this reading, the statement reiterated an earlier point. The statement explained that the States in which the TVA operated exempted it from their public utilities regulations; and that even if the States had not [****16] done so and the TVA had violated those regulations, the regulations were for the States to enforce. See *id.*, at 141-142, 59 S. Ct. 366, 83 L. Ed. 543. They conferred no private right of action on business competitors. This reading is consistent with the *Tennessee Electric* Court's use of the term "standing" elsewhere in its opinion to refer to [*220] the existence of a state-law cause of action. A holding that state utilities regulations did not supply a cause of action against a competitor is of no relevance to the instant case, and we need not explore all of its implications. See also *Data Processing*, 397 U.S., at 157-158, 90 S. Ct. 827, 25 L. Ed. 2d 184 (cause of action under the Administrative Procedure Act, 5 U.S.C. § 702, permits suit based on injury from business competition).

Yet [5] the quoted statement also could be read to refer to standing in the sense of whether the power companies were the proper litigants to raise a Tenth Amendment issue. To the extent that might have been the intention of the *Tennessee Electric* Court, it is, for reasons to be explained, inconsistent with our later precedents. The sentence from *Tennessee Electric* that we have quoted and discussed should be deemed neither controlling nor instructive on the issue of standing as [****17] that term is now defined and applied.

III

*Amicus* contends that federal courts should not adjudicate a claim like Bond's because of the prudential rule that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth* v. *Seldin*, 422 U.S. 490, 499, 500, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975); see also *Kowalski* v. *Tesmer*, 543 U.S. 125, 129-130, 125 S. Ct. 564, 160 L. Ed. 2d 519 (2004). In *amicus*' view, to argue that the National Government has interfered with state sovereignty in violation of the Tenth Amendment is to assert the legal rights and interests of States and States alone. That, however, is not so. As explained below, Bond seeks to vindicate her own constitutional interests. [6] The individual, in a proper case, can assert injury from governmental action taken in [**2364] excess of the authority that federalism defines. Her rights in this regard do not belong to a State.

A

The federal system rests on what might at first seem a counterintuitive insight, that "freedom is enhanced by the [*221] creation of two governments, not one." *Alden* v. *Maine*, 527 U.S. 706, 758, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999). The Framers concluded that allocation of powers between the National Government and the States enhances [****18] freedom, first by protecting the integrity of the governments themselves, and second by protecting the people, from whom all governmental powers are derived.

[7] Federalism has more than one dynamic. It is true that the federal structure serves to grant and delimit the prerogatives and responsibilities of the States and the National Government vis-a-vis one another. The

allocation of powers in our federal system preserves the integrity, dignity, [***280] and residual sovereignty of the States. The federal balance is, in part, an end in itself, to ensure that States function as political entities in their own right.

But that is not its exclusive sphere of operation. Federalism is more than an exercise in setting the boundary between different institutions of government for their own integrity. "State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.' *New York* v. *United States*, 505 U.S. 144, 181, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992) (quoting *Coleman* v. *Thompson*, 501 U.S. 722, 759, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991) (Blackmun, J., dissenting)).

Some of these liberties are of a political character. [8] The federal structure allows local policies "more sensitive to the [****19] diverse needs of a heterogeneous society," permits "innovation and experimentation," enables greater citizen "involvement in democratic processes," and makes government "more responsive by putting the States in competition for a mobile citizenry." *Gregory* v. *Ashcroft*, 501 U.S. 452, 458, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991). Federalism secures the freedom of the individual. It allows States to respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power. True, of course, these objects cannot be vindicated by the Judiciary in the absence of a proper case [*222] or controversy; but the individual liberty secured by federalism is not simply derivative of the rights of the States.

[9] Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions. See *ibid.* By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power. When government acts in excess of its [****20] lawful powers, that liberty is at stake.

[10] The limitations that federalism entails are not therefore a matter of rights belonging only to the States. States are not the sole intended beneficiaries of federalism. See *New York*, *supra*, at 181, 112 S. Ct. 2408, 120 L. Ed. 2d 120. An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable. Fidelity to principles of federalism is not for the States alone to vindicate.

[**2365] The recognition of an injured person's standing to object to a violation of a constitutional principle that allocates power within government is illustrated, in an analogous context, by cases in which individuals sustain discrete, justiciable injury from actions that transgress separation-of-powers limitations. Separation-of-powers principles are intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well.

In the precedents [****21] of this Court, the claims of individuals--not of Government departments--have been the [***281] principal source of judicial decisions concerning separation of powers and checks and balances. For example, the requirement that a bill enacted by Congress be presented to the President for signature before it can become law gives the President [*223] a check over Congress' exercise of legislative power. See U.S. Const., Art. I, § 7. Yet individuals, too, are protected by the operations of separation of powers and checks and balances; and they are not disabled from relying on those principles in otherwise justiciable cases and controversies. In *INS* v. *Chadha*, 462 U.S. 919, 103 S. Ct. 2764, 77 L. Ed. 2d 317 (1983), it was an individual who successfully challenged the so-called legislative veto--a procedure that Congress used in an attempt to invalidate an executive determination without presenting the measure to the President. The procedure diminished the role of the Executive, but the challenger sought to protect not the prerogatives of the Presidency as such but rather his own right to avoid deportation under an invalid order. Chadha's challenge was sustained. A cardinal principle of separation of powers was vindicated at the insistence [****22] of an individual, indeed one who was not a citizen of the United States but who still was a person whose liberty was at risk.

*Chadha* is not unique in this respect. Compare *Clinton* v. *City of New York*, 524 U.S. 417, 433-436, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998) (injured parties have standing to challenge Presidential line-item veto), with *Raines* v. *Byrd*, 521 U.S. 811, 829-830, 117 S. Ct. 2312,

138 L. Ed. 2d 849 (1997) (Congress Members do not); see also, *e.g.*, *Free Enter. Fund* v. *Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 130 S. Ct. 3138, 177 L. Ed. 2d 706 (2010); *Plaut* v. *Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S. Ct. 1447, 131 L. Ed. 2d 328 (1995); *Bowsher* v. *Synar*, 478 U.S. 714, 106 S. Ct. 3181, 92 L. Ed. 2d 583 (1986); *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50, 102 S. Ct. 2858, 73 L. Ed. 2d 598 (1982); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 72 S. Ct. 863, 96 L. Ed. 1153, 62 Ohio Law Abs. 417 (1952); *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 55 S. Ct. 837, 79 L. Ed. 1570 (1935). [11] If the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object.

[12] Just as it is appropriate for an individual, in a proper case, to invoke separation-of-powers or checks-and-balances constraints, so too may a litigant, in a proper case, challenge a [*224] law as enacted in contravention of constitutional principles of federalism. [****23] That claim need not depend on the vicarious assertion of a State's constitutional interests, even if a State's constitutional interests are also implicated.

B

In this regard it is necessary to address a misconception in the position the Government now urges this Court to adopt. As [**2366] noted, the Government agrees that petitioner has standing to challenge the validity of § 229. That concession, however, depends on describing petitioner's claim in a narrow way. The Government contends petitioner asserts only that Congress could not enact the challenged statute under its enumerated powers. Were she to argue, the Government insists, that the statute "interferes with a specific aspect of state sovereignty," either instead of or in [***282] addition to her enumerated powers contention, the Court should deny her standing. Brief for United States 18 (filed Dec. 3, 2010).

The premise that petitioner does or should avoid making an "interference-with-sovereignty" argument is flawed. *Id.*, at 33. Here she asserts, for example, that the conduct with which she is charged is "local in nature" and "should be left to local authorities to prosecute" and that congressional regulation of that conduct "signals a massive [****24] and unjustifiable expansion of federal law enforcement into state-regulated domain." Record in No. 2:07-cr-00528-JG-1 (ED Pa.), Doc. 27, pp. 6, 19. The public policy of the Commonwealth of Pennsylvania, enacted in its capacity as sovereign, has been displaced by that of the National Government. The law to which petitioner is subject, the prosecution she seeks to counter, and the punishment she must face might not have come about if the matter were left for the Commonwealth of Pennsylvania to decide. Indeed, petitioner argues that under Pennsylvania law the expected maximum term of imprisonment she could have received [*225] for the same conduct was barely more than a third of her federal sentence.

There is no basis to support the Government's proposed distinction between different federalism arguments for purposes of prudential standing rules. [13] The principles of limited national powers and state sovereignty are intertwined. While neither originates in the Tenth Amendment, both are expressed by it. Impermissible interference with state sovereignty is not within the enumerated powers of the National Government, see *New York*, 505 U.S., at 155-159, 112 S. Ct. 2408, 120 L. Ed. 2d 120, and action that exceeds the National Government's [****25] enumerated powers undermines the sovereign interests of States. See *United States* v. *Lopez*, 514 U.S. 549, 564, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995). The unconstitutional action can cause concomitant injury to persons in individual cases.

[14] An individual who challenges federal action on these grounds is, of course, subject to the Article III requirements, as well as prudential rules, applicable to all litigants and claims. Individuals have "no standing to complain simply that their Government is violating the law." *Allen* v. *Wright*, 468 U.S. 737, 755, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984). It is not enough that a litigant "suffers in some indefinite way in common with people generally." *Frothingham*v. *Mellon*, 262 U.S. 447, 488 (1923) (decided with *Massachusetts* v. *Mellon*). If, in connection with the claim being asserted, a litigant who commences suit fails to show actual or imminent harm that is concrete and particular, fairly traceable to the conduct complained of, and likely to be redressed by a favorable decision, the Federal Judiciary cannot hear the claim. *Lujan*, 504 U.S., at 560-561, 112 S. Ct. 2130, 119 L. Ed. 2d 351. These requirements must be satisfied before an individual may assert a constitutional claim; and in some instances, the result may be that a State is the only entity [****26] capable of demonstrating the requisite injury.

In this case, however, where the litigant is a party to an otherwise justiciable case or controversy, she is not forbidden to object that her injury results from

disregard [**2367] of [*226] the federal structure of our Government. Whether the Tenth Amendment is regarded [***283] as simply a " 'truism,' *New York*, *supra*, at 156, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (quoting *United States* v. *Darby*, 312 U.S. 100, 124, 61 S. Ct. 451, 85 L. Ed. 609 (1941)), or whether it has independent force of its own, the result here is the same.

* * *

There is no basis in precedent or principle to deny petitioner's standing to raise her claims. The ultimate issue of the statute's validity turns in part on whether the law can be deemed "necessary and proper for carrying into Execution" the President's Article II, § 2, Treaty Power, see U.S. Const., Art. I, § 8, cl. 18. This Court expresses no view on the merits of that argument. It can be addressed by the Court of Appeals on remand.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

**Concur by:** GINSBURG

## Concur

Justice **Ginsburg**, with whom Justice **Breyer** joins, concurring.

I join the Court's opinion and write separately to make the [****27] following observation. Bond, like any other defendant, has a personal right not to be convicted under a constitutionally invalid law. See Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1331-1333 (2000); Monaghan, Overbreadth, 1981 S. Ct. Rev. 1, 3. See also *North Carolina* v. *Pearce*, 395 U.S. 711, 739, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969) (Black, J., concurring in part and dissenting in part) ("Due process . . . is a guarantee that a man should be tried and convicted only in accordance with valid laws of the land.").

In this case, Bond argues that the statute under which she was charged, 18 U.S.C. § 229, exceeds Congress' enumerated powers and violates the Tenth Amendment. Other defendants [*227] might assert that a law exceeds Congress' power because it violates the Ex Post Facto Clause, or the Establishment Clause, or the Due Process Clause. Whatever the claim, success on the merits would require reversal of the conviction. "An offence created by [an unconstitutional law]," the Court has held, "is not a crime." *Ex parte Siebold*, 100 U.S. 371, 376, 25 L. Ed. 717 (1880). "A [****28] conviction under [such a law] is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment." *Id.*, at 376-377, 25 L. Ed. 717. If a law is invalid as applied to the criminal defendant's conduct, the defendant is entitled to go free.

For this reason, a court has no "prudential" license to decline to consider whether the statute under which the defendant has been charged lacks constitutional application to her conduct. And that is so even where the constitutional provision that would render the conviction void is directed at protecting a party not before the Court. Our decisions concerning criminal laws infected with discrimination are illustrative. The Court must entertain the objection--and reverse the conviction--even if the right to equal treatment resides in someone other than the defendant. See *Eisenstadt* v. *Baird*, 405 U.S. 438, 452-455, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972) (reversing conviction for distributing contraceptives because the law banning distribution [***284] violated the recipient's right to equal protection); cf. *Craig* v. *Boren*, 429 U.S. 190, 192, 210, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976) (law penalizing sale of beer to males but not females aged 18 to 20 could not be enforced against vendor). See also *Grayned* v. *City of Rockford*, 408 U.S. 104, 107, n. 2, 92 S. Ct. 2294, 33 [**2368] L. Ed. 2d 222 (1972); [****29] *Welsh* v. *United States*, 398 U.S. 333, 361-362, 90 S. Ct. 1792, 26 L. Ed. 2d 308 (1970) (Harlan, J., concurring in result) (reversal required even if, going forward, Congress would cure the unequal treatment by extending rather than invalidating the criminal proscription).

In short, a law "beyond the power of Congress," for any reason, is "no law at all." *Nigro* v. *United States*, 276 U.S. 332, 341, 48 S. Ct. 388, 72 L. Ed. 600 (1928). [*228] The validity of Bond's conviction depends upon whether the Constitution permits Congress to enact § 229. Her claim that it does not must be considered and decided on the merits.

## References

U.S.C.S., Constitution, Article III

Federal Litigation Guide §§4.02-4.05 (Matthew Bender)

L Ed Digest, Parties § 2

L Ed Index, Parties

Supreme Court's view as to validity of federal legislation under Tenth Amendment, providing that powers not delegated to United States by Constitution nor prohibited by it to the states are reserved to the states or to the people. 72 L. Ed. 2d 956.

Requirements of Article III of Federal Constitution as affecting standing to challenge particular conduct as violative of federal law--Supreme Court cases. 70 L. Ed. 2d 941.

Supreme Court's view as to what is a “case or controversy” within the meaning of Article III of the Federal Constitution or an “actual controversy” within the meaning of the Declaratory Judgment Act (28 U.S.C.S. § 2201). 40 L. Ed. 2d 783.

---

End of Document

# United States v. Overholt

307 F.3d 1231 (10th Cir. 2002)

Cited in Opening Brief at: x

Counsel acknowledges that this decision does not support the proposition for which it was cited. See Response, Part III.B. No language is highlighted. The substituted authority, United States v. Jobson, follows.

Caution
As of: September 14, 2026 6:50 PM Z

# United States v. Overholt

United States Court of Appeals for the Tenth Circuit

October 10, 2002, Filed

Nos. 00-5074 and 00-5081

**Reporter**
307 F.3d 1231 *; 2002 U.S. App. LEXIS 21243 **; 33 ELR 20070; 55 ERC (BNA) 1972

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. MAC DEWAYNE OVERHOLT and KOTESWARA ATTALURI, Defendants-Appellants.

**Prior History:** [**1] APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA. (D.C. NOS. 98-CR-161-004-C, 98-CR-161-001-C).

United States v. Attaluri, 34 F. Supp. 2d 1280, 1999 U.S. Dist. LEXIS 5045.

**Disposition:** Mail fraud convictions reversed; all other convictions affirmed; sentences affirmed; restitution payment schedule remanded.

**Counsel:** William D. Lunn, Tulsa, Oklahoma, for Defendant-Appellant Attaluri.

Michael G. Katz, Federal Public Defender, and James P. Moran, Assistant Federal Public Defender, Denver, Colorado, on the brief for Defendant-Appellant Overholt.

Todd S. Aagaard, Attorney, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Plaintiff-Appellee in Case No. 00-5081 (John C. Cruden, Acting Assistant Attorney General, Washington, D.C., David E. O'Meilia, United States Attorney, Kevin Leitch, Assistant United States Attorney, Tulsa, Oklahoma, John A. Bryson and Andrew D. Goldsmith, Attorneys, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., with him on the brief in both cases).

**Judges:** Before EBEL, BALDOCK, and HARTZ, Circuit Judges.

**Opinion by:** Hartz

## Opinion

[*1235] **HARTZ**, Circuit Judge.

**Introduction.**

Defendant Koteswara Attaluri was president of Allied Environmental Services (Allied), which was hired to take petroleum-impacted wastewater from several Department of Defense [**2] installations and dispose of it properly. Allied employed Overholt Trucking, owned by Defendant DeWayne "Mac" Overholt, to perform hauling incident to the project. The gist of the charges against Defendants is that they unlawfully injected the wastewater into disposal wells and tried to cover up their crimes.

Allied, Attaluri, and Overholt were convicted under 18 U.S.C. § 371 on a charge that they entered into a conspiracy with five objects: (1) improperly disposing of petroleum-impacted wastewater, in violation of the Safe Drinking Water Act (SDWA), 42 U.S.C. §§ 300h, et seq.; (2) transporting hazardous wastes without a manifest, in violation of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6928(d)(1); (3) using the mails in the commission of a fraud, in violation of 18 U.S.C. § 1341; (4) using interstate wire communications in the commission of a [*1236] fraud, in violation of 18 U.S.C. § 1343; and (5) defrauding the United States by obstructing the lawful environmental protection functions of the Environmental Protection Agency (EPA) and the Department [**3] of Defense. In five special verdicts, the jury found that they conspired to commit each of the alleged objects of the conspiracy.

All three were also convicted of a substantive count of mail fraud. In addition, Overholt was convicted on two counts of discharging a pollutant into United States waters, in violation of the Clean Water Act (CWA), 33 U.S.C. §§ 1311(a), 1319(c)(2)(A); one count of illegally transporting hazardous waste, in violation of the RCRA; and one count of making false statements to the federal

government in the course of an investigation, in violation of 18 U.S.C. § 1001. Although Allied and Attaluri were also charged on the two CWA counts, they were acquitted. Co-defendant Gary Bicknell, an Allied employee, was acquitted of all charges against him. Attaluri was sentenced to a 55-month prison term; Overholt received an 87-month sentence. Each was ordered to pay restitution of $ 1,265,078.

Attaluri and Overholt raise numerous issues on appeal. (Allied did not appeal.) Attaluri claims that the jury instructions (1) did not accurately set forth the law regarding what wastes could be injected into the disposal wells used [**4] by Defendants, (2) misled the jury regarding what constitutes hazardous waste, and (3) improperly indicated that the offense of defrauding the United States did not require an intent to deceive. He also claims he was entitled to instructions that (4) the SDWA imposes criminal sanctions only on those who know the law they are violating and (5) the SDWA does not impose criminal penalties for violations committed in good faith ignorance of the law. In addition, Attaluri raises several challenges to the sufficiency of the evidence to support his conspiracy and mail fraud convictions; and Overholt challenges the sufficiency of the evidence to support any of his convictions except making false statements.

Both Defendants also claim various errors regarding their sentences. Attaluri contends on several grounds that the restitution award was improper and excessive, and complains that the district court did not set a payment schedule. He also contests two factors used to enhance his sentence under the United States Sentencing Guidelines, contending that the district court miscalculated the loss from fraud when applying U.S.S.G. § 2F1.l and should not have applied U.S.S.G. § 2Q1.2(b)(1)(A), [**5] because the waste was not discharged into the environment and did not contaminate the environment. Overholt contends that the district court improperly enhanced his sentence under U.S.S.G. § 3B1.1(a) for his role as an "organizer or leader of a criminal activity" and improperly considered two misdemeanors when determining his criminal history category.

Attaluri and Overholt appealed separately. We heard oral argument on Attaluri's appeal but, at the request of both the Government and Overholt, no oral argument was held in his case. Nevertheless, we consolidate these cases because of the overlap of facts and issues. We have jurisdiction under 28 U.S.C. § 1291. We reverse the mail fraud convictions and affirm all other convictions. We also affirm the sentences, except that we remand to the district court to set a payment schedule for restitution by Attaluri.

**I. Background.**

We begin with the factual background. Additional evidence will be described as needed in the discussion of the specific issues on appeal.

[*1237] ***The Defendants' Businesses and Disposal Wells.***

In 1994 Allied successfully bid to become a subcontractor on four Department [**6] of Defense contracts for the removal of underground petroleum storage tanks (USTs) at various military sites throughout the Midwest. The primary contractor would unearth the UST and rinse out any remaining oil sludge or chemical residue. Allied was responsible for hauling the rinsewater to its treatment facility at Bonner Springs, Kansas, where it was to remove any refined petroleum product (which it could sell) and properly dispose of the treated wastewater.

Allied hired independent trucking companies to fulfill its hauling needs. Overholt Trucking was hired from November 1994 to May 1995. Although Allied made representations to the government contractors that it would haul wastewater from Bonner Springs to publicly owned wastewater treatment facilities, Overholt truckers were often instructed to inject untreated wastewater into disposal wells in Oklahoma. On some occasions Overholt truckers picked up the wastewater from tanks at Bonner Springs. At other times they would arrive at Bonner Springs and simply pick up loads directly from other trucks coming in from the government sites. And at still other times, they would go to the government sites themselves, pick up the rinsewater, [**7] and proceed directly to a disposal well, bypassing Bonner Springs altogether. Overholt acted to conceal his company's use of the disposal wells by instructing his drivers to falsify bills of lading to misrepresent the origin and characteristics of the loads and by telling drivers to use the disposal wells at night.

The well owners eventually refused admittance to Overholt's drivers because of Overholt's delinquencies in paying disposal fees and their suspicions that his drivers were dumping illegal wastes. As an alternative, Overholt used the Peko tank battery, a collection of a dozen above-ground oil storage tanks (OSTs) near Drumright, Oklahoma. Despite never receiving permission to use the tanks, Overholt began instructing

his drivers to dump truckloads of wastewater there.

In addition to hauling, Overholt had a side-business trading in "burner fuel," a combustible product made from petroleum-based waste. Overholt would treat sludge built up in the bottom of OSTs with a chemical thinning agent, pump out the resulting "blended oil tank bottom" burner fuel, and sell it for use in industrial furnaces.

***The Hillside Dump.***

On December 31, 1994, one of Overholt's drivers, [**8] Bob Fleming, transported a truckload of wastewater from a military site to Oklahoma for dumping in a disposal well. When he arrived at the well, Fleming was unable to empty the truck's contents because the cold weather had frozen its exit valve. Fleming drove the truck to Overholt's property and left it there, explaining the situation to Overholt. Overholt attempted to fix the valve by beating on it with a hammer. The frozen valve broke, and the truck's contents started spilling down the adjacent hillside. Overholt waited for the spill to abate and replaced the valve. He finished his work around 4:00 a.m. and went to bed.

Early the next morning a neighbor of Overholt's awoke to find that the adjacent creek contained a black, smelly substance that gave off a "real forceful, pungent odor," and stung his eyes and nose. The neighbor called the local deputy sheriff and the Army Corps of Engineers to investigate. The spill was traced to the hill abutting Overholt's property, where a wide trail of dead vegetation led up the hill to Overholt's tanker truck, still parked in his yard.

[*1238] When Overholt arose that morning, he found the investigators on his property. While repeatedly disclaiming [**9] responsibility for the spill, he offered to clean it up and proceeded to vacuum the waste out of the creek. As soon as the investigators left, the neighbor observed Overholt dumping the pollutants back into the creek. Four to five days after the spill, the neighbor drove to Lake Keystone at the end of the creek and observed oil collecting on the shore. No further investigation into this incident was conducted.

***The Carburetor-Cleaner Incident and Subsequent Investigation.***

In the conduct of his burner fuel business, Overholt sometimes used as a thinner a carburetor cleaner containing ortho-dichlorobenzene, a chlorinated solvent listed as a hazardous material under EPA regulations. *See* 40 C.F.R. § 261.33(f), Hazardous Waste No. U070 (1,2 dichlorobenzene). On May 9, 1995, an Overholt driver hauled a large quantity of the carburetor cleaner to Bonner Springs and put it into one of the tanks to help extract the sludge. With some carburetor cleaner still in his truck, the driver then loaded the contents from another Bonner Springs tank and took it to Peko.

Later that day an Oklahoma Corporation Commission field inspector was driving past Peko [**10] when he noticed a tanker truck parked next to one of the tanks. Because he thought Peko had been abandoned, he decided to investigate. He saw a man next to the cab of the tanker truck, covered in open sores, working diligently to shovel dirt over a 10-foot puddle of a clear liquid that smelled like carburetor cleaner. The man said the liquid was oil. The inspector told the man that it was not oil and asked who owned it. The man said that he did not know. Frustrated with the man's stonewalling, the inspector copied down the tanker's license plate number and continued on his rounds.

After the license check revealed that the truck was Overholt's, the Oklahoma Department of Environmental Quality (ODEQ) launched an investigation. On May 12, ODEQ investigators first stopped at Peko, where vapor readings from the tanks' hatches indicated the presence of organic solvents. The investigation team then proceeded to Overholt's residence, where they noticed that one of the two tanker trucks parked there bore the license tag reported three days earlier. Overholt told the investigators he was hauling gas, oil, and diesel fuel for Allied, and that he was going to use these materials to make burner [**11] fuel. He stated that the tanker with the reported license tag contained burner fuel. Although at first he said the other tanker was empty, he then said it contained diesel fuel. As an investigator was taking samples, however, Overholt volunteered that he didn't know what would be in the oil because "you know how the government is."

On May 15 an ODEQ investigator contacted Attaluri to inquire about Allied's business relationship with Overholt Trucking. She asked him to provide documentation relating to that relationship. Two days later another ODEQ investigator followed up on the document request. Attaluri agreed to fax the requested documents that day, but no fax was sent. That same day Attaluri telephoned Overholt's residence and Overholt then telephoned one of his drivers to ask him to prepare a number of false, back-dated bills of lading indicating that he had hauled burner fuel from Bonner Springs to Peko every Wednesday between March 1, 1995, and April 26,

1995. The driver complied. The Attaluri residence received a call from Overholt's residence that evening. The next day Overholt mailed the falsified bills of lading to Attaluri.

[*1239] On May 19 an ODEQ investigative team performed [**12] tests that revealed ortho-dichlorobenzene contamination at Peko and at Overholt's residence. The ODEQ executed a search warrant for Overholt's residence on June 22. Additional soil samples confirmed the presence of ortho-dichlorobenzene. Six days later, investigators from the ODEQ and the Department of Defense interviewed Overholt at his home. Overholt told them that he had deposited 20 to 30 drums of carburetor cleaner into the two small OSTs on his property and that his drivers had taken some to Peko to clean out the tank bottoms there. The investigators told Overholt that the tanks contained ortho-dichlorobenzene, a hazardous material, and that he should not blend or otherwise dispose of anything in his tanker trucks or in the tanks on his property. When asked about the dead vegetation on his property and the appearance of a spill or a chemical dump, Overholt denied having knowledge of any chemical spills or dumps on his property.

Immediately thereafter, Overholt called Industrial Oil Service, a waste-oil hauling company not licensed to carry hazardous materials, and made arrangements to empty the OSTs on his property. When the driver arrived two days later, he told Overholt that [**13] he suspected the fluid in the OSTs was a solvent. Overholt insisted that it was diesel fuel. Before leaving, the driver required Overholt to sign a shipping manifest certifying that the tanker truck did not contain any hazardous wastes.

An ODEQ investigator further questioned Overholt on July 25. Overholt admitted to previously letting rinsewater from his trucks run down the hillside but stated that he would release only five to ten gallons a week, and claimed that he had not done so in over a year. Shortly thereafter, he admitted he would occasionally release hundreds of gallons of rinsewater at a time. The investigator then asked Overholt about the status of the ortho-dichlorobenzene that he had been told not to move. After initially responding that it was still there, he stated that it might not be. He explained that he had hired an oil recycler to pick up some oil from a red tank on his property, but because he was not present when the driver arrived, the company might have taken waste from the tanker truck containing the ortho-dichlorobenzene.

On November 15, 1995, an EPA investigative team obtained a warrant to search Allied's office. They found a file folder containing a [**14] copy of the applicable federal regulations for disposal wells. They also found near Attaluri's desk an envelope containing the false bills of lading prepared by Overholt's driver. The envelope was postmarked from Oklahoma on May 18, 1995, addressed to Allied, with Overholt and his wife listed on the return sticker. Attaluri told the investigators that Overholt was transporting usable oil, which he was free to process into burner fuel for himself. He said that the waste from this process was to be "deep-welled," and that there were no hazardous wastes in anything Overholt was hauling.

**II. <u>Challenges to the Convictions</u>.**

A. ***The Conspiracy Count***.

Attaluri and Overholt were both convicted of a conspiracy having five objects. The jury returned a general verdict of guilty of the conspiracy, and in five special verdicts stated that the Defendants conspired to achieve each of the alleged objects. Most of Defendants' challenges to the conspiracy conviction relate to fewer than all the objects of the conspiracy--usually only one. As a result, we need not address every challenge. The conviction can be upheld if we find no error regarding the conviction as to any one [**15] of the conspiratorial objects. *See* [*1240] *United States v. McNutt*, 908 F.2d 561, 565 (10th Cir. 1990) (upholding defendant's two-object conspiracy conviction when one of the charged objects was not a substantive violation of federal law, but the jury indicated by special verdict that it convicted on both objects).

At the same time, however, we note that the sentencing determinations challenged by Attaluri relate to more than one object of the conspiracy. The challenged restitution award is predicated on conduct related to defrauding the government. One of the challenges to the enhancement of his sentence also relates to the commission of fraud against the government, but a second challenge relates to the improper injection of wastes into disposal wells. We therefore will address his challenges with respect to those two alleged objects of the conspiracy, but we need not address other challenges to the verdict on the conspiracy count.

1. <u>Violation of SDWA</u>.

a. *Class II Disposal Wells*.

Attaluri's first challenge concerns the allegation that he

conspired to inject a nonpermitted liquid waste into a Class II disposal well. He argues that the injection was lawful [**16] under the governing regulations issued by the Oklahoma Corporation Commission. We reject the argument because the Oklahoma regulations are no more permissive than the federal law on which the jury was instructed.

Before addressing Attaluri's contentions, we review the pertinent provisions of the SDWA. The SDWA established a federally mandated, state-administered regulatory scheme for the protection of natural sources of drinking water. *See HRI, Inc. v. E.P.A.*, 198 F.3d 1224, 1232 (10th Cir. 2000). The Act delegates primary enforcement responsibility to the states. Each state was required to submit for approval by the EPA an "underground injection control program" designed "to assure that underground injection will not endanger drinking water sources." 42 U.S.C. § 300h-1(a)-(b). If the EPA did not approve a program, it was to fashion regulations applicable to the state. 42 U.S.C. § 300h-1(c).

All state programs must meet the EPA minimum requirements published in the Code of Federal Regulations. 42 U.S.C. § 300h(a), (b). The EPA regulations divide underground injection wells into five classes, [**17] each defined by what may be injected into wells of that class. 40 C.F.R. § 144.6. The regulations establish minimum construction and maintenance standards for each class. 40 C.F.R. pt. 146. This case involves "Class II" wells, which are "wells which inject fluids:

> (1) Which are brought to the surface in connection with natural gas storage operations, or conventional oil or natural gas production and may be commingled with waste waters from gas plants which are an integral part of production operations, unless those waters are classified as a hazardous waste at the time of injection.
>
> (2) For enhanced recovery of oil or natural gas; and
>
> (3) For storage of hydrocarbons which are liquid at standard temperature and pressure."

40 C.F.R. § 144.6(b).

Oklahoma's application for primary enforcement power over Class II wells was approved on December 2, 1981. *See* 40 C.F.R. § 147.1851. Oklahoma's program delegates regulatory authority over Class II wells to the Oklahoma Corporation Commission (OCC). *Id*. The OCC regulations divide wells into four categories: (1) enhanced recovery injection wells, [**18] (2) disposal wells, (3) storage wells, and (4) simultaneous injection wells. Okla. Admin. Code [OAC] 165:10-5-1. Each category is [*1241] a type of Class II well. Only the second category, "disposal wells," is at issue in this case. "A disposal well is a well which injects, for purposes other than enhanced recovery, those fluids brought to the surface in connection with oil or natural gas production." OAC 165:10-5-1(2).

The SDWA provides criminal penalties for willful violation "of an applicable underground injection control program." 42 U.S.C. § 300h-2(b). The Act defines "applicable underground injection control program" as "the program (or most recent amendment thereof) (1) which has been adopted by the State and which has been approved [by the EPA] under subsection (b) of this section . . . ." 42 U.S.C. § 300h-1(d).

Attaluri correctly contends that the Oklahoma regulatory scheme is the "applicable underground injection control program" in this case. He further contends, however, that the Oklahoma program allows the allegedly unlawful injections by Defendants. In particular, he contends that the injection wells Overholt used were [**19] "commercial disposal wells," which, in his view, could properly accept the injected chemicals.

Attaluri's brief-in-chief asserts (incorrectly, as we shall point out) that the following definition appears in the Oklahoma regulations at OAC 165:10-1-2:

> "Commercial disposal well" is one that: (a) is operated primarily for profit from the disposal of saltwater and/or other deleterious substances for a fee; and (b) disposes of saltwater and other deleterious substances transported by truck to the facilities used in conjunction with said disposal well or is a disposal well for which none of its owners is an owner in any of the oil and gas wells which produce the saltwater and/or other deleterious substances which will be disposed into said disposal well.

Because the chemicals that a commercial disposal well may accept include "deleterious substances," Attaluri infers that such a well can accept <u>all</u> deleterious substances. "Deleterious substances" are defined as "any chemical, salt water, oil field brine, waste oil, waste emulsified oil, basic sediment, mud, or injurious substance produced or used in the drilling, development, production, transportation, refining, and [**20] processing of oil, gas and/or brine mining." OAC 165:10-1-2. Attaluri notes that Allied was in the

business of recycling used oil, and that the Oklahoma regulations define "recycling" as "the reuse, processing, reclaiming, treating, neutralizing, or refining of materials and by-products into a product of beneficial use which, if discarded, would be *deleterious substances*." OAC 165:10-1-2 (emphasis added). He concludes that because Allied was an oil recycler, the byproducts of the business were deleterious substances, which, by definition, could be injected into a commercial disposal well.

Based on this argument, Attaluri challenges the following jury instruction given at trial:

> With reference to the conspiracy charged in Count 1, you are instructed that the government claims in Count 1 at page 7 that the defendants . . . conspired to violate or cause to be violated Title 42, United States Code, section 300h-2(b)(2), which provides that:
>
> Any person who violates any requirement of an applicable underground injection control program . . . if such violation is willful, such person . . .
>
> shall be guilty of an offense against the laws of the United [**21] States. The applicable underground injection control program the government claims were violated are:
>
> Title 40, Code of Federal Regulations, Part 144.11, which provides: [*1242]
>
> Any underground injection, except into a well authorized by rule or except as authorized by permit . . . is prohibited.
>
> And, Title 40, Code of Federal Regulations, Part 144.6(b)(1), which provides that Class II injection wells are classified as follows:
>
> Wells which inject fluids . . . Which are brought to the surface in connection with natural gas storage operations, or conventional oil or natural gas production and may be commingled with waste waters from gas plants which are an integral part of production operations, unless those waters are classified as a hazardous waste at the time of injection.

He argues that the instruction improperly refers to federal regulations rather than to Oklahoma law, which he contends was less restrictive, and that the district court should have given the following tendered instruction:

> The government has alleged that the defendants conspired to commit the crime of Wilful Injection of Liquid Waste Into a Class II Disposal Well without authority. The government must prove [**22] as to each defendant that he intended to break this law by agreeing to commit the following four (4) essential elements beyond a reasonable doubt:
>
> (1) Injected or caused to be injected
>
> (2) A non-permitted liquid waste
>
> (3) Into a Class II disposal well in Oklahoma
>
> (4) Without authority from the Oklahoma Corporation Commission
>
> The defendant must have wilfully agreed to commit each of the elements of the offense. [emphasis added]

Before addressing Attaluri's arguments, we note the standard of review. The argument on appeal was not raised below. Attaluri points to nothing in the record, nor have we found anything, indicating an objection by any defendant to the instruction given by the court. As for the proposed instruction, it does not suggest that the Oklahoma regulations are more permissive than the federal regulations. Nor have we been directed to, or found, any indication in the record that anyone so argued in district court. Therefore, we review for plain error. *See* *United States v. Fabiano*, 169 F.3d 1299, 1302-03 (10th Cir. 1999) (failure to object to a given instruction, even when the defendant offers his own instruction, does not put the district [**23] court "clearly on notice as to the asserted inadequacy," and thus plain-error review is appropriate). Following *Johnson v. United States*, 520 U.S. 461, 466-67, 137 L. Ed. 2d 718, 117 S. Ct. 1544 (1997), we have held:

> Under [the plain-error] standard, [the appellant] must show: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights. If these three requirements are met, then we may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

169 F.3d at 1303 (internal quotation marks, citation, and brackets in original omitted).

The district court's instruction defined the "applicable underground injection control program" as the prohibitions mandated in the EPA regulations, and it

specifically incorporated the definition of a Class II well as expressing what could legally be injected into the wells at issue in this case. The given instruction informed the jury that Defendants violated the law if they injected into these wells anything but "fluids . . . which are brought to the surface in connection with natural [**24] gas storage operations, or conventional oil or natural gas production and may be commingled with wastewaters from gas plants which [*1243] are an integral part of production operations, unless those waters are classified as a hazardous waste at the time of injection." Although it may have been preferable for the instruction to refer to the Oklahoma regulations, the instruction did not mislead the jury because, as we now explain, the substantive standard set forth in the instruction conforms to the Oklahoma regulations.

As previously stated, the Oklahoma regulation defines a "disposal well" as "a well which injects, for purposes other than enhanced recovery, those fluids brought to the surface in connection with oil or natural gas production." OAC 165:10-5-1(2). Comparing this definition to the definition of a Class II well in the jury instruction, it is clear that nothing can be injected into a disposal well that cannot be injected into a Class II well. In fact, Class II is a broader category of wells than disposal wells.

We are not persuaded by Attaluri's claim that a different result must follow because the wells here are "commercial disposal wells." Attaluri fails to recognize that [**25] commercial disposal wells are a subclass of disposal wells. The actual definition of "commercial disposal wells" in the Oklahoma regulations (not the misquote in Attaluri's brief-in-chief) is:

> "Commercial disposal well" means a disposal well which: (A) Is operated primarily for profit from the disposal of salt water and/or other deleterious substances for a fee; and (B) Disposes of salt water and/or other deleterious substances transported by truck to the facilities used in conjunction with said disposal well or is a disposal well for which none of its owners is an owner in any of the oil and gas wells which produce the salt water and/or other deleterious substances which will be disposed into said disposal well.

OAC 165:10-1-2 (emphasis added). (Attaluri's misquote replaced "a disposal well" by "one," an alteration that could lead to the misconstruction that a commercial disposal well is not necessarily a disposal well.)

The reference to "deleterious substances" in the definition of "commercial disposal well" does not imply that such a well can accept all deleterious substances. Because the well is a disposal well, it can accept only those deleterious substances [**26] that can be accepted by disposal wells. A disposal well can accept "fluids brought to the surface in connection with oil or natural gas production . . . ." OAC 165:10-5-1(2). These fluids may well contain deleterious substances, as recognized by subpart (B) of the definition of "commercial disposal well," which speaks of "a disposal well for which none of its owners is an owner in any of the *oil and gas wells which produce the salt water and/or other deleterious substances* which will be disposed into said disposal well." OAC 165:10-1-2 (emphasis added). But only deleterious substances from oil or gas production are permitted to be injected.

Our construction of the Oklahoma regulations is based on the natural reading of the language. Moreover, we would be loath to adopt an interpretation of the Oklahoma regulations that, as with Attaluri's interpretation, would make them more permissive than the minimum requirements set by the EPA, which all state programs are obliged to satisfy. Thus, we find no plain error in the jury instruction setting forth what substances could be injected into the wells at issue. Finally, we note that Attaluri devotes several pages of his brief-in-chief [**27] to a discussion of *United States v. Lewis*, No. CR-99-50-B, a case from the United States District Court for the Eastern District of Oklahoma. The defendant in *Lewis* was also prosecuted on a charge of improperly disposing of fluids down a commercial disposal [*1244] well. The district court in that case dismissed the charge, apparently adopting the view Attaluri urges here regarding what substances are permitted to be injected into such wells in Oklahoma. Because this court is not bound by that decision, *see Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253, 1257 (10th Cir. 1996), we have not reviewed the transcript of that trial (attached as part of the appendix to Attaluri's brief-in-chief) to determine whether the facts distinguish that case from this one. *See also Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1549 n.1 (10th Cir. 1992) (court of appeals will not review documents not before the district court). To the extent that the reasoning of that court is persuasive, Attaluri was, of course, free to present that reasoning on this appeal. Otherwise, that decision has no bearing here.

b. *Jury Instruction* [**28] *on Willfulness*.

In defining the alleged conspiratorial object of violating

the SDWA, the district court's instruction to the jury stated:

> Any person who violates any requirement of an applicable underground injection control program . . . *if such violation is willful*, such person . . . shall be guilty of an offense against the laws of the United States.

(emphasis added). Attaluri claims that the district court improperly instructed the jury on the meaning of "willful."

The jury instruction given at trial states that an act was committed "willfully" if it "was committed voluntarily and purposefully, with the specific intent to do something the law forbids; that is with bad purpose either to disobey or disregard the law." Attaluri submitted an instruction that reads: "To commit a crime willfully requires knowledge of the reporting or permit requirement and a specific intent to commit the crime, i.e., a purpose to disobey the law." In other words, Attaluri would require that the government prove not only that he acted "with bad purpose either to disobey the law or disregard the law," but also that he knew the specific provision of the law he violated.

The Supreme [**29] Court's jurisprudence concerning the state of mind required for a criminal offense does not provide the clearest of guidance in construing criminal statutes. *See generally* Note, *Mens Rea in Federal Criminal Law*, 111 Harv. L. Rev. 2402 (1998). In particular, the word "willfully" has been interpreted to have different meanings in different statutes. *See Spies v. United States*, 317 U.S. 492, 497, 87 L. Ed. 418, 63 S. Ct. 364 (1943) ("willful . . . is a word of many meanings").

Attaluri would have us apply the definition of the term adopted in *Ratzlaf v. United States*, 510 U.S. 135, 126 L. Ed. 2d 615, 114 S. Ct. 655 (1994). In that case, Ratzlaf needed to pay a $ 160,000 gambling debt to a Nevada casino. *Id.* at 137. He planned to make a $ 100,000 cash payment, but a casino official informed him that federal and state law would require the casino to report any cash payment exceeding $ 10,000. *Id*. The official and others suggested that Ratzlaf could pay the debt without triggering the reporting requirements if he used his cash to obtain cashiers checks of $ 10,000 or less from a variety of banks. *Id*. Ratzlaf [**30] did so, after the casino supplied a limousine to take him to the banks. *Id*.

Ratzlaf was charged under 31 U.S.C. §§ 5322(a) and 5324(3) for violating the Currency and Foreign Transactions Reporting Act by willfully structuring a transaction to evade the Act's reporting requirements. *Id*. The Supreme Court held that the statutory requirement of willfulness required proof that the defendant knew that his conduct was unlawful. [*1245] *Id*. at 145-49. It was not enough to know the reporting requirement and intend to circumvent it by structuring the transaction into sub-$ 10,000 transactions; the defendant must also have known that the law prohibited such structuring. *Id*.

Attaluri states: "The opinion in Ratzlaf expressed concern that persons engaged in 'small businesses' conducting activities 'not inevitably nefarious' could unintentionally become criminally liable for violating 'the complex of provisions' in which currency structuring laws 'are embedded.' This rationale applies to this case." Reply Br. at 13-14 (citation and miscitation omitted). He proceeds to argue that environmental regulations are now more complex than the tax laws [**31] and that the government's interpretation of willfulness would impose an improper risk on all people--from truckers to warehousemen to clerks--who "have anything to do with environmental related activities." *Id*. at 15.

We reject Attaluri's argument. He reads too much into *Ratzlaf* and fails to distinguish contrary authority. First, *Ratzlaf* must be understood in light of the specific statutory language involved. Two statutory provisions had to be construed together. Section 5324, which at the time contained no criminal penalty, made it unlawful to structure a transaction "for the purpose of evading a financial institution's reporting requirement." *Ratzlaf*, 510 U.S. at 136. Section 5322 made it a crime to "willfully violate" § 5324 and several other statutory provisions. The Supreme Court stated that the willfulness requirement of § 5322 would be rendered mere surplusage if the only required intent were an intent to evade the reporting requirements, because that intent was already required in § 5324. *Id*. at 140-41. The Court pointed out that the willfulness requirement of § 5322 had been given content by lower courts with respect to violations [**32] of other sections referenced in § 5322, *id*. at 141-42, and noted the general rule that "[a] term appearing in several places in a statutory text is generally read the same way each time it appears." *Id*. at 143.

It was in this context that the Court said that it "viewed §§ 5322(a) and 5324(3) mindful of the complex of provisions in which they are embedded." *Id*. at 141. The Court's reference to the "complex of provisions" was not, as presented in Attaluri's brief, a suggestion that it

was imposing the strict mens rea requirement because the law governing reporting financial transactions was complex.

To be sure, later in the opinion the *Ratzlaf* Court supported its interpretation of "willfully" by noting that "currency structuring is not inevitably nefarious." *Id*. at 144. But that discussion does not assist Attaluri, because his jury (unlike Ratzlaf's, *see United States v. Ratzlaf*, 976 F.2d 1280, 1282 (9th Cir. 1992)) was instructed that he was required to act "with bad purpose either to disobey the law or disregard the law"--which makes the conduct nefarious.

Rather than following *Ratzlaf* [**33] , we look to the Supreme Court's most recent opinion addressing the meaning of willful. In *Bryan v. United States*, 524 U.S. 184, 141 L. Ed. 2d 197, 118 S. Ct. 1939 (1998), the defendant was convicted of willfully dealing in firearms without a federal license and conspiring to do so. *Id.* at 189. The jury was instructed:

> A person acts willfully if he acts intentionally and purposely and with the intent to do something the law forbids, that is, with the bad purpose to disobey or to disregard the law. Now, the person need not be aware of the specific law or rule that his conduct may be violating. [*1246] But he must act with the intent to do something that the law forbids.

*Id*. at 190. The Supreme Court endorsed the instruction. It acknowledged *Ratzlaf*, as well as several tax-evasion cases, such as *Cheek v. United States*, 498 U.S. 192, 112 L. Ed. 2d 617, 111 S. Ct. 604 (1991), which required the jury to "find that the defendant was aware of the specific provision of the tax code that he was charged with violating." 524 U.S. at 194. But it distinguished those cases because they "involved highly technical [**34] statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct." *Id*. "As a result," the Court continued, "we held that these statutes 'carve out an exception to the traditional rule' that ignorance of the law is no excuse and require that the defendant have knowledge of the law." *Id*. at 194-95 (quoting *Cheek*, 498 U.S. at 200). Then, in a sentence that applies equally to this case, the Court said, "The danger of convicting individuals engaged in apparently innocent activity that motivated our decisions in the tax cases and *Ratzlaf* is not present here because the jury found that this petitioner knew that his conduct was unlawful." *Id*. at 195.

In our view, the charge against Attaluri does not belong within the exception to the rule that ignorance of the law is no excuse. First, as in *Bryan* itself, the willfulness instruction here eliminated "the danger of convicting individuals engaged in apparently innocent activity . . . because the jury found that [Attaluri] knew that his conduct was unlawful." *Id*. at 195.

Moreover, when addressing laws like the SDWA, the Supreme [**35] Court has been particularly resistant to requiring proof of knowledge of the law. In *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 29 L. Ed. 2d 178, 91 S. Ct. 1697 (1971), the charge was that the defendant had shipped sulfuric and hydrofluosilicic acid in interstate commerce but knowingly failed to describe the acids properly on the shipping papers. The Court rejected the argument that the government must prove that the defendant knew the regulation it was accused of violating. The opinion concluded, "Where . . . dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *Id*. at 565.

We assume that Attaluri is correct when he asserts that environmental regulations are now the most complex of federal regulations, exceeding even tax regulations. But we strongly doubt that as the federal government has sought to protect the environment by imposing more and more restrictions on those handling dangerous chemicals, Congress has intended to reduce [**36] the burden on such persons to inform themselves of what the law requires.

In short, we have no reason to believe that the word "willful" in 42 U.S.C. § 300h-2(b)(2) requires proof of knowledge of the regulation allegedly violated. We have no occasion to consider whether less is required than was set forth by the jury instruction in this case.

c. *Good Faith Instruction*.

Attaluri requested a "mistake of law" or "good faith" instruction with respect to all objects of the alleged conspiracy. The district court gave a good faith instruction with respect to the allegations of fraud but otherwise refused the request. On appeal Attaluri challenges the failure to instruct on the defense that he in good faith misunderstood the law regarding [*1247] what liquid waste could be injected into Oklahoma disposal wells.

"A defendant is entitled to a good faith instruction when he has interposed the defense of good faith, has requested the instruction, and when there is sufficient

evidence to support it." *United States v. Janusz*, 135 F.3d 1319, 1322 (10th Cir. 1998). We have held that when those conditions are met, a good faith instruction is required, even [**37] if an instruction on willfulness has been given. *United States v. Hopkins*, 744 F.2d 716, 718 (10th Cir. 1984) (en banc). On this issue we are an outlier. *See* *United States v. Sirang*, 70 F.3d 588, 594 (11th Cir. 1995) (comparing the 1st, 4th, 5th, 8th, and 11th Circuits, which do not require a good faith instruction for specific intent crimes, with the 10th Circuit, which does); *see also* *Green v. United States*, 474 U.S. 925, 88 L. Ed. 2d 266, 106 S. Ct. 259 (1985) (White, J., dissenting from denial of certiorari and noting the circuit split on the issue). We therefore assume that such an instruction would be required here if the factual predicates were present.

Attaluri relies on the testimony of several witnesses to support his claim. The evidence, however, establishes only the *witnesses'* opinions regarding the law, not Attaluri's. Three of these witnesses described conversations that occurred during the investigation of Overholt's hillside dump, yet nothing in the record suggests Attaluri ever knew about any of the conversations. Another witness was a former owner of a Class II well who testified that he generally understood [**38] that such wells could accept refined petroleum products, but, contrary to an assertion in Attaluri's brief, there was no evidence that he communicated his belief to Attaluri. A fifth witness was an Allied employee who stated that she signed bills of lading directing refined petroleum products to be delivered to disposal wells because she thought there was nothing wrong with such disposal. Finally, when Attaluri cites to testimony by an OCC employee who opined that it was difficult to know what could legally be put into a disposal well, he fails to note that the testimony was in a different trial. Absent from Attaluri's discussion is any evidence that he personally believed that the unlawful injection of chemical wastes into the Oklahoma disposal wells was actually lawful. Thus, he failed to satisfy the final element of the *Janusz* test and the district court was not required to give a mistake-of-law/good-faith-defense instruction. *See* *Janusz*, 135 F.3d at 1322-23.

2. Defrauding the United States.

One of the alleged objects of the conspiracy was "to defraud the United States by impeding, impairing, obstructing, and defeating the lawful function of the United [**39] States Environmental Protection Agency and the United States Department of Defense." Attaluri complains that the jury instruction and verdict form could lead the jury to believe that conduct, "even though done honestly or without deceitful purpose, that nevertheless impeded or created difficulties for a government agency, qualified as a federal crime." Br. at 37.

The argument is unfounded. The pertinent jury instruction was as follows:

> With further reference to the conspiracy charged in Count 1, you are instructed that the government claims the defendants . . . also conspired to defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions of the Environmental Protection Agency and the United States Department of Defense to limit environmental contamination, to enforce environmental protection standards and to dispose of military wastes properly. In regard to this allegation, you are instructed that the government must [*1248] prove beyond a reasonable doubt that the conspiracy had as a purpose to obstruct a lawful function of the government by deceitful or dishonest means and at least one act in furtherance of such purpose was accomplished. [**40] [emphasis added]

The instruction clearly conveys the requirement of deceit or dishonesty.

As for the verdict form, it stated simply:

> **VERDICT FORM # 1**
>
> as to KOTESWARA ATTALURI
>
> * * *
>
> **Count 1** NOT GUILTY ___
>
> GUILTY ___
>
> If you have found the defendant, KOTESWARA ATTALURI, guilty of Count 1, please indicate whether you unanimously find the defendant conspired to commit:
>
> * * *
>
> Defrauding the United States by Impeding, Impairing, Obstructing, and Defeating the Lawful Functions of the Environmental Protection Agency or the United States Department of Defense.
>
> Yes ___ No ___

The purpose of the verdict form is not to repeat the elements of the offense. The language on the form serves only to identify where the jury should indicate its verdict on each count or, in the case of the special verdicts, on each alleged object of the conspiracy. The form nowhere indicates the elements of a conspiracy charge, or even names the offenses in the other counts. The jury could not possibly have been misled into believing that it could ignore the elements instruction. As we have stated before: "The instructions submitted to the jury contained the language [**41] he argues should have been in the verdict form. The fact that the question on the verdict form does not contain the language the instructions contain is immaterial." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1301 (10th Cir. 1998).

3. Sufficiency of the Evidence.

a. *Attaluri Challenge*.

Attaluri challenges the sufficiency of the evidence of fraud against the government if Overholt's injection of wastes into Class II wells was lawful. Because we affirm that the injection was unlawful and Attaluri concedes that such a ruling would moot this challenge, we need not address it further.

b. *Overholt Challenge*.

Overholt argues that his conspiracy conviction must be overturned because there was insufficient evidence to prove he knew of the conspiracy's alleged common goal or objective. Stating that "the conspiracy's goal was to receive payment from the federal government for services that Allied did not render properly," Br. at 20, he asserts that he was unaware of Allied's specific contractual obligations to the government and hence could not have had the goal of defrauding the United States by illegally disposing of the waste. His only interest, he asserts, [**42] was to make a profit by transporting the waste wherever Allied instructed. This argument, however, relates to only the "fraud" objects of the alleged conspiracy. He does not challenge the sufficiency of the evidence with respect to the objects of violating the SDWA or RCRA. Therefore, we need not consider the argument's merits. *See McNutt*, 908 F.2d at 565.

B. ***Mail Fraud (Overholt and Attaluri).***

To convict of mail fraud, it is necessary to prove a use of the mails. The government relied on Overholt's mailing of fraudulent bills of lading to Attaluri on May 18, [*1249] 1995. Defendants contend that this mailing did not satisfy the requirements of the mail fraud statute. Overholt challenges his mail fraud conviction on the ground that there was insufficient evidence to establish that the bills of lading were false or that they were used or intended to be used to defraud anyone. Attaluri claims that he was an innocent recipient of Overholt's false bills of lading.

We review the sufficiency of the evidence *de novo*. *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir. 1999). The test is "whether taking the evidence--both direct and circumstantial, [**43] together with the reasonable inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id*. (internal quotation marks omitted).

On May 15, 1995, an ODEQ investigator contacted Attaluri to inquire about Allied's business relationship with Overholt Trucking. She asked Attaluri to provide her with documentation regarding the relationship. Two days later, ODEQ investigator Michael Freeman telephoned Attaluri and asked for "shipping papers of any materials that he had shipped to Mr. Overholt." Although Attaluri agreed to fax the requested documents to Freeman later in the day, the fax never came. At 3:18 p.m. on the same day, Attaluri telephoned Overholt's residence. The content of that conversation is unknown. At 5:55 p.m. Overholt telephoned one of his drivers, Bob Fleming. Fleming testified that Overholt "wanted to know if I'd make him up some bills [of lading] for each Wednesday from one certain date to another and put on it burner fuel, because he said the OCC was coming to check his paperwork." Fleming did so, but testified that "these are fake bills of lading[]," and that [**44] he never made the hauls referred to in the documents. At 7:27 that evening Overholt placed a telephone call to the Attaluri residence. The next day, May 18, Overholt mailed the falsified bills of lading to Attaluri at Allied. When EPA investigators searched Allied's offices on November 15, 1995, they found the bills of lading on Attaluri's desk, in a postmarked envelope with Overholt as the return addressee.

Fleming's testimony is sufficient for the jury to find beyond a reasonable doubt that the bills of lading were false and that Overholt had the requisite intent to defraud. Likewise, the timing of the mailing in relation to Freeman's telephone call to Attaluri, particularly in light of the telephone calls made within a few hours of Freeman's call, could properly establish that Attaluri was a knowing participant in this part of the scheme to

defraud.

Nevertheless, we must reverse the convictions for mail fraud. There is no evidence that Defendants ever used the fraudulent bills of lading. Perhaps this is merely fortuitous. Attaluri may have intended to provide them to Freeman or any other ODEQ investigator who followed up on Freeman's call, but no one followed up. Regardless, [**45] the jury was instructed that "the government must prove beyond a reasonable doubt, however, that the use of the mails furthered, or advanced, or carried out, in some way, the scheme or plan to defraud." Although we are not certain whether the instruction accurately states the law--the mail fraud statute says that the mailing must be "*for the purpose* of executing such scheme or artifice or attempting so to do," 18 U.S.C. § 1341 (emphasis added), which suggests that it suffices to have the purpose of advancing the scheme when the mailing occurs, *but see United States v. McClain*, 934 F.2d 822, 835 (7th Cir. 1991) (mail fraud conviction overturned because defendants never used the phony credentials obtained through the mail)--the government has not challenged [*1250] the instruction at trial or on appeal, so we adopt it as the law of the case. *See United States v. Romero*, 136 F.3d 1268, 1271-73 (10th Cir. 1998).

Despite our setting aside the convictions for mail fraud, the sentences are not thereby affected. Elimination of the mail fraud conviction would not change the ultimate offense level under the Sentencing Guidelines for either [**46] Defendant. Also, because our setting aside the mail fraud conviction would not compel the sentencing court to change in any way its assessment of the substance of Defendants' misconduct, we do not think it is a realistic possibility that eliminating the mail fraud conviction would alter the sentencing court's exercise of discretion in fixing the sentence within the guideline range.

C. ***Discharging Pollutant into Waters of the United States (Overholt).***

Overholt contends that there was insufficient evidence to convict him of the alleged Clean Water Act violation because the Government did not prove that the oily substance he dumped down the hillside entered the "waters of the United States." He does not challenge the definition of "Waters of the United States" in 40 C.F.R. § 122.2, which includes:

> (c) All other waters such as intrastate lakes, rivers, streams (including intermittent streams) . . . or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters: (1) Which are or could be used by interstate or foreign travelers for recreational or other purposes; [**47] [and]
>
> . . .
>
> (e) Tributaries of waters identified in paragraphs (a) through (d) of this definition . . . .

Nor does he deny that Keystone Lake, an intrastate body of water, is a "water[] of the United States." Overholt's argument appears to be simply that there was no evidence that the spill entered the lake.

The argument fails on two grounds. First, it was unnecessary for the government to prove that the spill entered the lake. Under the regulation, the creek, too, constituted "Waters of the United States," because it was a tributary of the lake. *See Quivira Mining Co. v. E.P.A.*, 765 F.2d 126, 129-30 (10th Cir. 1985) (noting cases holding that nonnavigable streams are "Waters of the United States" if they are tributaries of navigable waters). Overholt admits that several witnesses testified that the spill entered the creek. Second, there was sufficient evidence for the jury to find that the spill entered Keystone Lake itself. An Overholt neighbor testified that he drove to the end of the creek four or five days after the spill and saw oil collecting on the shores of Keystone Lake. Hence Overholt's conviction on this count must stand.

D. ***Transporting*** [**48] ***Hazardous Waste to Facility Without a Permit (Overholt).***

The indictment charged Overholt with knowingly causing the transportation of hazardous materials (carburetor cleaner) to a facility that was not permitted to accept them. He argues that there was insufficient evidence to convict him on this count because the Government failed to prove he knew that the facility where he sent the carburetor cleaner lacked a hazardous waste permit.

The RCRA provides criminal penalties for "any person who . . . knowingly transports or causes to be transported any hazardous waste identified or listed under this subchapter to a facility which does not have a permit under this subchapter . . . ." 42 U.S.C. § 6928(d)(1). Although this circuit has not spoken directly on the issue, [*1251] those courts that have considered the "knowingly" requirement under this statute agree that the Government must show that the defendant knew the facility did not have a hazardous waste permit. *See United States v. Speach*, 968 F.2d 795, 796 (9th

Cir. 1992); *United States v. Hayes Int'l Corp.*, 786 F.2d 1499, 1504 (11th Cir. 1986). Because the government does not [**49] argue otherwise on this appeal, we assume without deciding that the government had to prove that Overholt knew the hazardous waste was being transported to a facility without a permit.

ODEQ inspectors told Overholt that his storage tanks contained ortho-dichlorobenzene (a component of the carburetor cleaner) and instructed him not to remove it. Despite the inspectors' warnings, Overholt promptly arranged to dispose of the hazardous material. He called a trucking company, falsely telling it that he needed 3,000 gallons of diesel fuel hauled away. The trucking company did not have a permit to haul or store hazardous materials. Two days later, when the driver sent to do the job asked Overholt whether the tanks contained some kind of solvent, Overholt insisted that the substance was diesel fuel. Overholt signed a manifest stating that the load contained no hazardous materials. He did not ask anyone at the trucking company whether it carried a hazardous waste permit for its trucks or disposal facility. When Overholt was questioned a month later by an ODEQ investigator about what had happened to the hazardous material, he told a series of lies.

The jury could properly find beyond a reasonable [**50] doubt that Overholt would have had no reason to engage in his consistent pattern of deceit unless he knew the trucking company lacked a proper permit. *See United States v. Self*, 2 F.3d 1071, 1088 (10th Cir. 1993) ("Certainly, the government may prove a defendant had actual knowledge of a material and operative fact by proving deliberate acts committed by the defendant from which actual knowledge can be logically inferred.") (internal quotation marks omitted).

**III. <u>Sentencing Issues</u>.**

A. ***Overholt Challenges*.**

1. <u>Absence of Factual Findings</u>.

United States Sentencing Guideline (U.S.S.G.) § 3B1.1(a) provides for an increase in offense level if the defendant was the "organizer or leader of a criminal activity." Overholt objects to the application of this provision by the sentencing court because it failed to make specific findings of fact. He relies on Federal Rule of Criminal Procedure 32(c)(1), which states that at the sentencing hearing, "*for each matter controverted*, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account [**51] in, or will not affect, sentencing." (Emphasis added).

Overholt cannot invoke this rule, however, because he did not properly "controvert" the assertion that he was an organizer or leader. The probation office delivered Overholt's presentence report (PSR) to him on February 28, 2000. Yet he raised no objections to the PSR until his sentencing hearing on April 11, 2000--42 days later. Under Federal Rule of Criminal Procedure 32(b)(6)(B), objections to the PSR must be submitted within 14 days of receipt; the probation office must then submit the PSR, together with an addendum responding to any unresolved objections, at least seven days before the sentencing hearing. Fed. R. Crim. P. 32(b)(6)(C). Because Overholt's objections were untimely, the sentencing court could properly proceed as if no objection had been made. The court [*1252] was entitled to rely upon the PSR without making independent factual findings. *See United States v. Hardwell*, 80 F.3d 1471, 1500 (10th Cir. 1996) (district court not required to hear government's objections to PSR first raised at sentencing hearing); *United States v. Chung*, 261 F.3d 536, 538-39 (5th Cir. 2001) (district court [**52] not required to hear defendant's objections to PSR first raised at sentencing hearing).

2. <u>Criminal History Calculation</u>.

Overholt next challenges the determination of his criminal history category under the Sentencing Guidelines. The sentencing court set the category at level II based on two 1987 misdemeanor convictions in Oklahoma: (1) dispensing nonintoxicating alcoholic beverages without a license and (2) contributing to the delinquency of a minor. Overholt asserts that consideration of these offenses violated the Guidelines.

In calculating a defendant's criminal history category, the sentencing court must consider not only all felonies but also all misdemeanors and petty offenses, except as provided in U.S.S.G. § 4A1.2(c). Section 4A1.2 (c)(1) lists fifteen offenses that "are counted only if (A) the sentence was a term of probation of at least one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." Section 4A1.2 (c)(2) lists six offenses that are never considered: hitchhiking, juvenile status offenses and truancy, loitering, minor traffic infractions, public intoxication, and vagrancy. Any prior offense [**53] that is "similar" to a listed offense in either category is also excluded. U.S.S.G. § 4A1.2(c)(1)-(2).

Because Overholt failed to raise his challenge in district court, we review only for plain error. *United States v. Whitney*, 229 F.3d 1296, 1308 (10th Cir. 2000). Overholt's two offenses--dispensing nonintoxicating alcoholic beverages without a license and contributing to the delinquency of a minor--are not listed in § 4A1.2(c)(1) or (2). Therefore, Overholt's challenge can succeed only if his offense is "similar" to one listed. In assessing similarity, we "examine whether the underlying behavior necessary to commit the prior misdemeanor shares the same general characteristics as the behavior required to commit an offense expressly listed under (c)(1) or (c)(2)." *United States v. Perez de Dios*, 237 F.3d 1192, 1197 (10th Cir. 2001).

Overholt does not specify which of the twenty-one listed offenses is similar to distributing non-intoxicating alcoholic beverages without a license or contributing to the delinquency of a minor. He merely asserts that, like his prior offenses, all the listed offenses are of "relative insignificance." Such a vague argument [**54] is hardly helpful.

In any event, we fail to see a listed offense that is plainly similar to either of Overholt's prior offenses. The PSR describes the actions that formed the predicate for both of Overholt's convictions as "causing, aiding, abetting, and encouraging a planned event for high school students between the ages of sixteen and seventeen years old whereby the students were permitted to enter an establishment . . . and pay a $ 5.00 'cover charge' that permitted them to obtain and drink all the beer they wished to drink." None of the offenses listed in U.S.S.G. § 4A1.2(c) has anything to do with facilitating underage drinking. The Fourth Circuit has held that the Florida offense of selling alcohol to a minor is not similar to any of the offenses listed in § 4A1.2(c) because it does not share common elements with any of them. *United States v. Harris*, 128 F.3d 850, 855 (4th Cir. 1997) ("none involve selling alcohol; none involve transactions with minors"). Although we have noted [*1253] that the Fourth Circuit's "elements approach" is more restrictive than our own approach to similarity, *see Perez de Dios*, 237 F.3d at 1198, we believe the same result [**55] is required by our own approach. The district court did not plainly err when it included Overholt's prior misdemeanor convictions in his criminal history calculation.

B. ***Attaluri Challenges.***

1. Restitution.

Attaluri was ordered to pay restitution in the amount of $ 1,265,078. The probation office calculated this amount as the cost to the Coast Guard of removing the storage tanks from the Peko property and cleaning up the area.

On appeal Attaluri argues that this award is erroneous for several reasons: (1) the award violates the Ex Post Facto Clause; (2) federal law prohibits restitution awards from exceeding the value of the property restored; (3) the Coast Guard costs were unrelated to his conviction, because the Coast Guard was engaged in only "a routine cleanup operation in the area," Br. at 53; (4) the contamination of Peko was caused, at least in part, by persons other than Defendants; (5) Attaluri could not have reasonably foreseen Overholt's use of the Peko tank farm; (6) the cleanup was unnecessary; and (7) the restitution order failed to set a reasonable payment schedule. In district court Attaluri's sole objection to the restitution award was that he [**56] did not pollute the Peko property, Overholt did; he does not reassert that argument here. Thus Attaluri has abandoned the only argument he had preserved on this issue. We therefore will review only for plain error. *See United States v. Johnson*, 183 F.3d 1175, 1178-79 (10th Cir. 1999).

Attaluri's arguments that the Peko cleanup was not related to his offense, that the damage came from other sources, that Overholt's use of the tank farm was not foreseeable, and that the Peko cleanup was unnecessary are all purely factual issues unraised in district court. The PSR sets forth sufficient information to support the determination that the cleanup cost was a foreseeable consequence of Attaluri's criminal conduct. Attaluri's failure to raise his factual challenges at sentencing prevented the probation office from reviewing any of these disputes and prevented the district court from resolving them. In such circumstances, we consider the issue waived and will not find plain error. *See United States v. Saucedo*, 950 F.2d 1508, 1518 (10th Cir. 1991) (failure to assert factual challenge at sentencing waives the challenge), overruled on other grounds, *Stinson v. United States*, 508 U.S. 36, 123 L. Ed. 2d 598, 113 S. Ct. 1913 (1993); [**57] *see also United States v. Svacina*, 137 F.3d 1179, 1187 (10th Cir. 1998) ("This court has held repeatedly that factual disputes not brought to the attention of the [trial] court do not rise to the level of plain error.").

Because the value of the Peko property is a fact issue, we might also be able to rely on the same ground to dispose of Attaluri's claim that the restitution award could not properly exceed the value of the Peko property. Regardless, we find no plain error because if

there was error, it was not "clear or obvious under current law." *United States v. Hughes*, 191 F.3d 1317, 1322 (10th Cir. 1999) (internal quotation marks deleted) (stating test for plain error). Attaluri relies on a provision of the Mandatory Victim Restitution Act (MVRA) stating that when an offense results "in damage to or loss or destruction of property of a victim of the offense" and return of the property to the owner is "impossible, impracticable, or inadequate," the defendant "shall" be ordered to:

> pay an amount equal to- [*1254]
>
> (i) the greater of -
>
> (I) the value of the property on the date of the damage, loss, or destruction; or
>
> (II) the value of the property [**58] on the date of sentencing, less
>
> (ii) the value (as of the date the property is returned) of any part of the property that is returned; . . . .

18 U.S.C. § 3663A(b)(1)(B). (The identical language appears in the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663, except that it makes restitution discretionary by saying that the defendant "may," rather than "shall," be ordered to pay the designated amount.)

Attaluri contends that the property damaged here is the Peko property, so that restitution is limited to the value of that property. But the Coast Guard's loss was not as an owner of the Peko property. Its loss was a purely financial one; the property it lost was money. Purely financial losses have been recognized as proper subjects of restitution under both 18 U.S.C. § 3663 and § 3663A. *See United States v. Sapoznik*, 161 F.3d 1117, 1121-22 (7th Cir. 1998) (affirming order under the MVRA requiring a corrupt city police chief to repay the city one-fourth of his salary while on the take from the Mafia); *United States v. Sanga*, 967 F.2d 1332, 1335-36 (9th Cir. 1992) [**59] (affirming order under the VWPA requiring an alien smuggler to pay a victim held in virtual slavery the difference between a fair wage and the pittance he had paid her); *see also United States v. Lowell*, 256 F.3d 463 (7th Cir. 2001) (bankruptcy trustee compensated for time expended as a result of the defendant's efforts to cover up his crime).

Perhaps the above-quoted language in the restitution statutes could be read to say that when there is physical damage to property, the only permissible restitution is payment to the property owner of the amount calculated in accordance with that language, regardless of any financial loss to another victim who was not an owner of the property. But that perverse reading of the statute is certainly not "clear or obvious under current law." If it were, we question whether the Third Circuit would have upheld an order of restitution under the VWPA requiring the defendants to pay the Coast Guard's cost of cleaning up their pollution of navigable waters. *See United States v. West Indies Transp., Inc.*, 37 V.I. 579, 127 F.3d 299, 315 (3d Cir. 1997). Accordingly, we find no plain error with respect to this contention.

[**60] Attaluri's remaining arguments are legal challenges. First is Attaluri's claim that the restitution award violates the Ex Post Facto Clause, because his crime predated the enactment of the MVRA. As Attaluri recognizes, however, we have previously rejected the argument that the Ex Post Facto Clause applies to restitution, because the purpose of restitution is not punishment. *United States v. Nichols*, 169 F.3d 1255, 1279-80 (10th Cir. 1999).

Finally, Attaluri argues that the district court erred by failing to set a reasonable schedule for payment of the restitution award, as required by 18 U.S.C. § 3664(f)(2). The PSR provided an analysis of Attaluri's financial status. At the time of sentencing, the total value of his assets was $ 73,100. His net worth was negative because he had unsecured debt of $ 168,100, not including unpaid attorney fees in excess of $ 175,000. Although Attaluri held a graduate degree in chemistry, he had no monthly income. His wife had gross monthly income of $ 4,300, but their household expenses led to a monthly cash flow of negative $ 443. He was planning to file both personal and corporate bankruptcy. On the other [**61] hand, Attaluri hoped to obtain employment in the future and his parents had "some wealth," a portion of which he expected to inherit sometime in the future. The PSR concluded: "Any [*1255] restitution applicable in this case is mandatory. Based on the defendant's financial profile, he does not have the ability to pay a fine."

The district court ordered that the "restitution shall be paid in full immediately. Any amount not paid immediately shall be paid while in custody through the Bureau of Prisons' Inmate Financial Responsibility Program. Upon release from custody, any unpaid balance shall be paid as a condition of supervised release . . . ." The Government argues that remand for a payment schedule is unnecessary because the restitution order provides for an appropriate payment

schedule to be set by the Bureau of Prisons while he is incarcerated and by the probation office during his subsequent supervised release.

The district court well knew that Attaluri could not immediately pay the full amount of the restitution award. Thus, it was essentially delegating the preparation of a payment schedule to the Bureau of Prisons and the probation office. Our sister circuits are split on whether [**62] such delegation is lawful, although a majority forbid it. *Compare United States v. Porter*, 41 F.3d 68, 71 (2d Cir. 1994) (delegation not permitted); *United States v. Coates*, 178 F.3d 681, 685 (3d Cir. 1999) (same); *United States v. Johnson*, 48 F.3d 806, 808 (4th Cir. 1995) (same); *United States v. Albro*, 32 F.3d 173, 174 (5th Cir. 1994) (same); *United States v. Mohammad*, 53 F.3d 1426, 1438-39 (7th Cir. 1995) (same); *United States v. McGlothlin*, 249 F.3d 783, 785 (8th Cir. 2001) (same); *with Weinberger v. United States*, 268 F.3d 346, 360 (6th Cir. 2001) (permitting delegation); *United States v. Signori*, 844 F.2d 635, 641 (9th Cir. 1988) (same); *United States v. Fuentes*, 107 F.3d 1515, 1528 n.25 (11th Cir. 1997) (same, but criticizing binding circuit precedent). In our view, such delegation is improper and constitutes plain error.

The governing statute is 18 U.S.C. § 3664, entitled "Procedure for issuance and enforcement of order of restitution." This statute, particularly as amended by the Anti-terrorism and Effective Death Penalty Act (AEDPA) [**63] in 1996, clearly contemplates judicial control of restitution payment schedules. Section 3664(f)(2) requires the district court to set a payment schedule based on the defendant's financial resources. It states:

> Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of--
>
> (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;
>
> (B) projected earnings and other income of the defendant; and
>
> (C) any financial obligations of the defendant; including obligations to dependents.

The court is able to specify such a schedule because of the information provided in accordance with § 3664(d)(3), which states:

> Each defendant shall prepare and file with the probation officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, [**64] the financial needs and earning ability of the defendant and the defendant's dependents, and such other information that the court requires relating to such other factors as the court deems appropriate.

The court is granted considerable discretion in structuring a payment schedule. Section 3664(f)(3) provides:

> (A) A restitution order may direct the defendant to make a single, lump-sum [*1256] payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments. (B) A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.

Of course, the defendant's economic circumstances may change significantly over time. Perhaps the most persuasive reason for delegating the preparation or modification of the payment schedule to the Bureau of Prisons or the probation office is to allow for adjustments [**65] when economic circumstances change. *See Weinberger*, 268 F.3d at 362-64 (Cohn, J., concurring). But § 3664 specifically addresses what is to happen in such a situation. The court is to be notified of the change in circumstances and then may adjust the schedule accordingly. Section 3664(k) states:

> A restitution order shall provide that the defendant shall notify the court and the Attorney General of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution. The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim. The Attorney General shall certify to the court that the victim or victims owed restitution by the defendant have been notified of the change in circumstances. Upon receipt of the notification, the court may, on its own motion, or the

> motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require.

In light of this statutory scheme, we see no room for delegation by the district court with respect to payment schedules [**66] for restitution. We therefore reverse the restitution award and remand for the sole purpose of establishing a schedule for Attaluri's payment of the amount of restitution previously awarded. Although it may appear obtuse to hold that it is plain error to delegate the task of setting a payment schedule when there is contrary authority in other circuits, in each of those decisions either the opinion predated the AEDPA amendments to § 3664 or the present provisions of § 3664 were not brought to the attention of the court.

3. Enhancement of Sentence.

Attaluri's offense level was enhanced under U.S.S.G. § 2Q1.2(b)(1)(A), which provides:

> If the offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a hazardous or toxic substance or pesticide into the environment, increase by 6 levels . . . ."

The district court applied the provision because of the unlawful injection of liquid wastes into Class II disposal wells. Attaluri contends that his sentence enhancement under this guideline is improper because (1) he did not discharge anything into the "environment," and (2) the enhancement cannot apply unless the environment was actually [**67] contaminated. Although Attaluri argued in district court against the enhancement, he did so on the basis that he did not make a "repetitive" discharge. We therefore again review only for plain error.

In support of his first contention, Attaluri cites the CD-ROM dictionary, Encarta 1999, for the proposition that "environment" means the "natural world in which people, animals and plants live." Because the waste was injected 4000 feet below the surface, where no people or animals or [*1257] plants live, Attaluri concludes that he did not dump hazardous waste into the "environment."

There are, however, broader definitions of the word "environment" than Encarta provides, such as "surroundings," Webster's II New Riverside Dictionary 232 (rev. ed. 1996), and "that which environs; the objects or the region surrounding anything," Oxford English Dictionary (2d ed. 1989) (electronic). The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) definition of "environment" includes "any other surface water, ground water, drinking water supply, land surface *or subsurface strata*, or ambient air within the United States or under the jurisdiction of the United States." 42 U.S.C. § 9601 (8) [**68] (emphasis added). Such broader definitions certainly allow the inclusion of the Earth's upper crust as a part of the "environment."

The concern of § 2Q1.2(b)(1)(A) is harm to life from dangerous chemicals. We conclude that the "environment" encompasses at least those portions of the earth's crust whose contamination can impact human health. Although Attaluri contends that the waste injected into the disposal wells was trapped far below any water used for drinking, he misreads the record. The testimony at trial revealed that the principal function of the restrictions imposed by the Safe Drinking Water Act on injections into disposal wells is to prevent contamination of potential sources of drinking water. We therefore hold that injecting chemicals into such a well is a discharge into the "environment" for purposes of § 2Q1.2(b)(1)(A).

With respect to Attaluri's contention that § 2Q1.2(b)(1)(A) applies only when there is actual contamination of the environment, Attaluri claims to find support in *United States v. Ferrin*, 994 F.2d 658 (9th Cir. 1993). In *Ferrin* the defendant deposited hazardous waste into a dumpster. The waste was retrieved before the dumpster [**69] was emptied. *Id*. at 660. The court held that simply putting the waste into the dumpster did not trigger § 2Q1.2(b)(1)(A). *Id*. at 664. It relied on Application Note 5 to the section, which states in part, that "subsection (b)(1) assumes a discharge or emission into the environment resulting in actual environmental contamination." The court concluded that the section applies only when the environment is contaminated. *Id*. at 663. *But see United States v. Liebman*, 40 F.3d 544, 550-51 (2d Cir. 1994) (proof of actual contamination of the environment is not necessary); *United States v. Goldfaden*, 959 F.2d 1324, 1331 (5th Cir. 1992) (same); *United States v. Bogas*, 920 F.2d 363, 367-68 (6th Cir. 1990) (same); *United States v. Cunningham*, 194 F.3d 1186, 1201-02 (11th Cir. 1999) (same).

Yet even if we were to reject the majority view and follow *Ferrin*, Attaluri would not benefit. *Ferrin* stated that environmental contamination occurred whenever "the hazardous waste came into contact with land or water or was released into the air." 994 F.2d at 664. The court [**70] remanded to the district court to determine whether any gaseous hazardous waste escaped into the

atmosphere. *Id*. In short, the simple release of a toxic or harmful substance into the environment constitutes contamination. By dumping harmful substances into the disposal well, Defendants contaminated the environment. There was no plain error.

3. Amount of Loss from Fraud.

The district court increased Attaluri's offense level under U.S.S.G. § 2F1.1(b)(1)(H), because the loss to the victim--the United States--resulting from Attaluri's fraud exceeded $ 120,000. (Amendment 617 to the Sentencing Guidelines, effective November 1, 2001, repealed § 2F1.1 and moved its substance to [*1258] § 2B1.1) At sentencing Attaluri contended that the loss was not more than $ 40,000. If his argument had been adopted, Attaluri's offense level would have been 23 instead of 24.

The loss to the United States was the amount paid by the United States to Allied for disposal of waste that was unlawfully injected into disposal wells. The presentence report calculated that loss at $ 132,325.91 by using the figure of $ 199,825.91 for the total amount paid to Allied and then giving an offset of $ 67,500 [**71] for an estimated 150,000 gallons of wastewater disposed of lawfully from one of the government sites. Attaluri did not contest the $ 199,825.91 figure for the total amount paid Allied. But he did challenge the PSR's conclusions regarding the amount of wastewater disposed of properly.

We review the sentencing court's factual findings for clear error. *United States v. Vaziri*, 164 F.3d 556, 568 (10th Cir. 1999). The application note to § 2F1.1 stated, "For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, comment (n.9).

On appeal Attaluri directs our attention to a trial exhibit which, he contends, shows that significantly more than 150,000 gallons of wastewater were disposed of properly. Yet he did not reference that exhibit in his objection to the PSR. The sole basis of his objection to the PSR was a document showing how many gallons of wastewater were delivered by Allied to Waste Water Treatment, Inc., during the second half of 1995. The document failed, however, to indicate the source of the wastewater--whether a government [**72] facility or otherwise. The PSR response to Attaluri's objection was: "The defendant stated that the government's loss calculation was closer to $ 120,000 but did not detail how that number was calculated. The probation office is unaware of any other adjustments that would apply . . ." The sentencing court could properly agree. We refuse to reverse that determination on the basis of a trial exhibit not brought to the attention of the court at sentencing, so we need not determine whether the exhibit might have influenced the court if it had been properly presented.

**IV. Conclusion**.

We therefore REVERSE the convictions for mail fraud, otherwise AFFIRM the jury verdicts, and AFFIRM the sentences of both Defendants except that we REMAND to the district court to set a repayment schedule for the previously determined amount of restitution to be paid by Attaluri. [1]

End of Document

[1] We also grant Attaluri's Motion to File a Supplemental Appendix.

# United States v. Jobson

102 F.3d 214 (6th Cir. 1996)

Cited in Opening Brief at: Substituted for Overholt (Br. x)

Substituted authority. See Response, Part III.B. Highlighted language appears at 102 F.3d at 217.

Caution
As of: September 22, 2026 7:52 PM Z

# United States v. Jobson

United States Court of Appeals for the Sixth Circuit

December 10, 1996, Decided ; December 10, 1996, Filed

No. 95-1743

**Reporter**
102 F.3d 214 *; 1996 U.S. App. LEXIS 31840 **; 1996 FED App. 0378P (6th Cir.) ***; 45 Fed. R. Evid. Serv. (Callaghan) 1434

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. ERIC LEE JOBSON, Defendant-Appellant.

**Prior History:** [**1] ON APPEAL from the United States District Court for the Eastern District of Michigan.

**Disposition:** REVERSED and REMANDED.

**Counsel:** For UNITED STATES OF AMERICA, Plaintiff - Appellee: Patricia G. Blake, Krishna S. Dighe, ARGUED, BRIEFED, Office of the U.S. Attorney, Detroit, MI.

For ERIC LEE JOBSON, Defendant - Appellant: Jill Leslie Price, ARGUED BRIEFED, Leroy T. Soles, Federal Public Defenders Office, Detroit, MI.

**Judges:** Before: KENNEDY, JONES, and DAUGHTREY, Circuit Judges.

**Opinion by:** KENNEDY

## Opinion

[*217] KENNEDY, Circuit Judge. Defendant Eric Jobson appeals his jury conviction for possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). On appeal, defendant contends (1) that the prosecution's failure to preserve requested radio dispatch recordings violated his due process right to a fair trial; and (2) that the District Court committed error in admitting evidence of defendant's alleged involvement in gang activities and in failing to give [***2] adequate limiting instructions. For the reasons set forth below, we REVERSE.

### I. FACTS

Shortly before 9:20 p.m. on July 2, 1994, Officers Wasmund and Philpot of the Detroit Police Department (DPD), while on routine patrol, saw defendant walking north along Freer Street. Officer Wasmund, who recognized defendant as someone with whom he had previously dealt, testified that defendant was carrying a rifle that was partially concealed by a jacket he was holding. When defendant saw the officers, he began to run. The officers followed [**2] defendant to 4337 Freer Street, where they say defendant dropped the jacket and rifle on the porch and ran inside. Officer Wasmund followed defendant into the house and arrested him, while Officer Philpot retrieved the jacket and rifle. The weapon was a semi-automatic assault rifle.

Defendant was arrested and charged by state authorities with carrying a concealed weapon. Defendant was soon released, the charge dropped, and the case referred to federal prosecutors. Because of his ties to a gang known as the "Square Boys," the federal investigation was assigned to the Multi-Agency Gang Task Force. On July 11, a federal complaint charged defendant with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Defendant was arrested the following day.

Defendant was convicted on February 16, 1995 and was sentenced to sixty-three months imprisonment, three years of supervised release, and a mandatory assessment of $ 50.00.

### II. DISCUSSION

#### A. Destruction of Evidence

Defendant first claims that the District Court erred in denying defendant's motion to dismiss the indictment on the basis of the destruction of potentially exculpatory [***3] evidence, [**3] namely the DPD radio dispatch tape made during defendant's arrest on July 2, 1994. Defendant maintains that the tape recordings would have corroborated his claim that he was not carrying a

gun and that the police seized the gun from a room inside 4337 Freer Street. We review this issue de novo. *See United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993).

On August 3, 1994, defendant filed a motion for government agents to retain rough notes. The motion requested an order:

> requiring any and all government agents who have investigated the charges in this and related cases to retain and preserve all rough notes, rough drafts, *tape recordings*, memoranda, *radio log reports*, and work sheets taken as part of their investigation . . .

(emphasis added.) The government responded on September 9, 1994 that it had instructed its agents to preserve such evidence. On September 15, defendant filed a motion for discovery and inspection, requesting, *inter alia*, "tape recorded radio calls" made by the DPD. Because the Assistant United States Attorney (AUSA) handling the case was on vacation from September 15-23, 1994, he did not become aware of this discovery [**4] motion until counsel for defendant personally showed it to him in court on September 26. [*218] The AUSA raised the issue of the tape with Officer Wasmund on October 11, but by this time the tape had been erased. It was the policy of the DPD routinely to erase and reuse tapes within 90 days after their use, which in this case meant the tape had been erased on October 2, 1994.

On October 28, 1994, defendant filed a motion to dismiss the indictment, claiming that the tape was potentially exculpatory and that it was destroyed in bad faith. The AUSA responded that he had not learned of the request for the dispatch tape until September 26, when defense counsel showed him the September 15 discovery motion in court. The AUSA responded to the request two weeks later, but [***4] by then the tape had been erased. [1] The AUSA stated that he had no prior knowledge that radio dispatch tapes were routinely erased by the DPD after 90 days. The District Court denied defendant's motion to dismiss the indictment.

[**5] Under the Due Process Clause, the Supreme Court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence." *California v. Trombetta*, 467 U.S. 479, 485, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 73 L. Ed. 2d 1193, 102 S. Ct. 3440 (1982)). Under *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), the suppression of material exculpatory evidence violates a defendant's due process rights, irrespective of the good faith or bad faith of the prosecution. However, where the government fails to preserve evidence whose exculpatory value is indeterminate and only "potentially useful" to defendant, we apply a different test. *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988). In such a case, the defendant must show: (1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means. *See Youngblood*, 488 U.S. at 57-58; *Trombetta*, 467 U.S. at 488-89.

The first two elements of this tripartite test are inter-related. [**6] "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56-57 n. *. To establish bad faith, then, a defendant must prove "official [***5] animus" or a "conscious effort to suppress exculpatory evidence." *Trombetta*, 467 U.S. at 488.

While we disapprove of the government's dilatory response to defendant's discovery requests, we cannot say that it acted in bad faith. There is no evidence that anyone in the Detroit Police Department or the U.S. Attorney's office suspected that the tape was exculpatory. The tape was erased not as a result of malice, but routine police department policy. Though the government was negligent, perhaps even grossly negligent, in failing to preserve the tape, there is no evidence that it acted in bad faith. *See United States v. Deaner*, 1 F.3d 192, 200-01 (3d Cir. 1993) (government's destruction of marijuana before sentencing was not in bad faith, despite defendant's earlier discovery request for the marijuana); *see also United States v. Femia*, 9 F.3d 990, [**7] 993-94 (1st Cir. 1993) (government's destruction of tape recordings of conversations between defendant and alleged coconspirators did not violate due process, despite

[1] The government explained that it had not interpreted defendant's August 3, 1994 motion to preserve rough notes as calling for the preservation of the radio dispatch tape. The government viewed the request for "tape recordings" and "radio log reports" as referring to recordings made in the process of preparing reports.

government's gross negligence in failing to preserve the tapes). [2]

[*219] Even if the destruction of the tape had been in bad faith, however, defendant would not prevail. The Due Process Clause does not impose "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58. The government's constitutional duty to preserve evidence is limited to evidence that possesses an exculpatory value which was apparent [**8] before the evidence was destroyed. *Trombetta*, 467 U.S. at 489. [***6]

Defendant's contention that the dispatch tape would have supported his claim that the police recovered the gun from inside the building at 4337 Freer Street is no more than "mere speculation." *Jones v. McCaughtry*, 965 F.2d 473, 479 (7th Cir. 1992) (no violation of due process where destroyed evidence was of only speculative exculpatory value). There is no evidence of any kind that the dispatch tape would contain such exculpatory information. No one ever listened to the tape. Where "there is no indication that there was anything exculpatory" about destroyed evidence, due process has not been violated. *United States v. Braggs*, 23 F.3d 1047, 1051 (6th Cir. 1994).

Because the destruction of the dispatch tape was not in bad faith and the possibility that the tape had exculpatory value was not established, we hold that the District Court did not err in denying defendant's motion to dismiss the indictment.

**B. Admission of Defendant's Gang Affiliation**

Defendant also claims that the District Court committed error in admitting evidence concerning defendant's membership in a gang.

In its opening, [**9] the government told the jury that the defendant had been arrested by the Multi-Agency Gang Task Force and described the role of the Task Force in combatting gangs. The role of the Task Force was mentioned at several subsequent points during the trial. Officer Nardoni testified that defendant had on a prior occasion stated that he was a member of the Square Boys gang. He also testified that after defendant was arrested on July 12, defendant told Officer Nardoni that his gang "should have shot it out" with the police because the gang had more firepower than the police. DPD Officer Philpot testified that while he was arresting defendant on July 2, the other residents of 4337 Freer cursed him, using the nickname that "mostly gangs in the city know me by." Officer Philpot also testified that the Detroit Gang Squad was notified upon defendant's arrest.

[***7] The District Court sustained objections to two gangrelated remarks. First, the court sustained an objection to DPD Officer Wasmund's testimony that he was familiar with the Square Boys gang because of arrests for stolen vehicles and drive-by shootings. The court ordered the jury to disregard the offending testimony and denied a [**10] motion for mistrial. Second, the court sustained an objection to Border Patrol Agent Lindeman's testimony that the Border Patrol was involved in the Multi-Agency Task Force because some of the gangs were transporting guns into Canada.

Objections to the admissibility of the evidence concerning defendant's gang affiliation were raised several times before and during trial. In response to defendant's pretrial request for notice of FED. R. EVID. 404(b) evidence, [3] [**11] the government informed defendant of its possible intention to introduce evidence concerning, *inter alia*, defendant's gang membership. [4]

---

[2] We cannot help but note, however, that a timely response to an outstanding discovery request would have avoided the problem presented here. United States Attorneys would be well advised to apprise themselves of the procedures, whether local or federal, for the routine destruction of evidence potentially material to a case.

[3] Rule 404(b) reads:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

FED. R. EVID. 404(b).

[4] We are not certain that evidence of a defendant's gang membership is evidence of "other crimes, wrongs, or acts," as required for Rule 404(b) to apply. Such evidence might arguably be admitted as direct evidence, subject to the test of relevancy under FED. R. EVID. 401 and FED. R. EVID. 403's balancing of the probative value of the evidence against its potential prejudice to defendant. *See, e.g., United States v. Butler*, 71 F.3d 243 (7th Cir. 1995) (evidence of defendant's gang activities admissible as direct evidence in prosecution for possession of a firearm by a felon). However, both parties

At a hearing on September [*220] 26, 1994, the [***8] District Court held that the government had provided sufficient notice of potential 404(b) evidence, but the court declined to rule on its admissibility. At another pretrial hearing on November 28, 1994, the District Court found that defendant's statement that "we" have more firepower than the police and should have shot it out with them was relevant to knowledge and was more probative than prejudicial.

[**12] On the day of trial, defendant once more raised the 404(b) issue. Under the mistaken impression that it had previously ruled the gang membership admissible, the District Court indicated that it would stand by its original decision. [5] In fact, though, the court had merely ruled that [***9] the government had provided sufficient notice to defendant of potential 404(b) evidence and that the statement regarding firepower was admissible. The court had not previously ruled on the admissibility of gang membership.

[**13]

In reviewing a district court's decision to admit evidence under Rule 404(b), we first review for clear error the district court's factual finding that the prior act occurred. Second, we review *de novo* the district court's determination that the evidence was admissible for a legitimate purpose. Finally, we review for abuse of discretion the district court's determination that the probative value of the other acts evidence is not substantially outweighed by its prejudicial effect. *United States v. Merriweather*, 78 F.3d 1070, 1074 (6th Cir. 1996); *United States v. Gessa*, 971 F.2d 1257, 1261-62 (6th Cir. 1992) (en banc).

In ruling on the admissibility of uncharged misconduct under Rule 404(b), the district court must always determine:

> whether one of the factors justifying the admission of "other acts" evidence is material, that is, "in issue," in the case, and if so, whether the "other acts" evidence is probative of such factors. The court must also determine whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect.

*Merriweather*, 78 F.3d at 1075 (quoting *United States v. Johnson*, 27 F.3d 1186, 1190 [**14] (6th Cir. 1994)). We once again remind district courts to follow this analysis in determining the admissibility of evidence submitted under Rule 404(b).

There were two items of gang evidence the District Court admitted. First, the court admitted defendant's admission on some prior occasion when he was in contact with the police that he was a member of the Square Boys gang. Second, the court admitted defendant's statement during his federal arrest regarding the gang's firepower.

[***10] In holding the gang evidence admissible, the District Court implicitly found, without so stating, that defendant was a member of the Square Boys gang. Given Officer Nardoni's testimony that he had had prior contacts with defendant and that defendant had previously admitted to him that he was a member of the Square Boys, the District [*221] Court's determination was not clearly erroneous. Error in not making this finding on the record was harmless.

The government asserts that defendant's involvement in a gang is probative of knowledge, intent, and opportunity. The District Court did not identify for what purpose it was admitting the evidence of gang memberships, so we shall consider each of the

---

argued at trial and on appeal that the gang evidence should be considered under Rule 404(b). Because Rule 404(b) applies to the admission of evidence of "any conduct of the defendant which may bear adversely on the jury's judgment of his character," *United States v. Cooper*, 577 F.2d 1079, 1087-88 (6th Cir. 1978), we believe that Rule 404(b) probably ought to govern evidence of a defendant's gang membership where membership is not in fact necessary to prove an element or ultimate fact of the crime charged. Most jurors, after all, are likely to look unfavorably upon the joining of a street gang, particularly one involved with firearms.

[5] The relevant portion of the trial transcript is as follows:

[AUSA]: Judge, Your Honor ruled September 30th of last year that the 404(b) evidence that would be -- that has been disclosed to the defense includes the defendant's admitted gang membership.

THE COURT: Well, all right then, that's my ruling and that means the admission to the officers will have to be permitted.

[COUNSEL FOR DEFENDANT]: Your Honor, for the record, I think its -- it violates the Federal Rules of Evidence.

THE COURT: Well listen. Today is not the hearing. That order entered after I was fully apprised after what the two arguments were in this case. . . . That's the order that I entered when I was fully advised which I am now and I'll have to stand on that order.

government's [**15] asserted grounds. [6] Although the government is required under 18 U.S.C. § 922(g)(1) to prove defendant's knowledge of the firearm, *United States v. Chesney*, 86 F.3d 564, 572 (6th Cir. 1996), prior bad acts are not admissible to prove defendant's knowledge unless defendant places his mental state at issue or his knowledge of the firearm is not inferable from proof of possession itself. *United States v. Hatfield*, 815 F.2d 1068, 1072 (6th Cir. 1987). In the instant case, defendant's knowledge that what he was carrying in his arms was a gun was scarcely in issue. Defendant's theory of defense was that the gun was not his and that he did not have possession of it on July 2, 1994. He did not claim nor could there be any possible basis for his claiming that he did not know that a gun was in his possession.

[**16] Defendant's intent was also not in issue because the gun possession charge does not require proof of specific intent. *United States v. Bennett*, 975 F.2d 305, 308 (6th Cir. [***11] 1992). Were knowledge the only basis for admission of the gang evidence, any slight probative value it might have would be outweighed by its prejudice.

We hold, however, that defendant's gang membership would be admissible to establish his opportunity to commit the crime. Evidence used to establish opportunity is evidence that shows "access to or presence at the scene of the crime" or the possession of "distinctive or unusual skills or abilities employed in the commission of the crime charged." 1 MCCORMICK ON EVIDENCE § 190, at 807 (John William Strong ed., 4th ed. 1992); *see also United States v. Woods*, 613 F.2d 629, 636 (6th Cir. 1980) (in prosecution for armed robbery, evidence that defendant possessed firearms is admissible to show defendant's opportunity to commit crime charged). Given the testimony linking the Square Boys gang with the use of guns, [7] defendant's membership in the gang provided him with special access to guns. Although we recognize that most people not belonging to gangs [**17] have access to firearms, most people do not own or have access to semi-automatic assault rifles. Defendant's membership in the Street Boys gang undoubtedly made it easier and more likely for him to possess an assault rifle than for the average citizen. We hold, therefore, that defendant's gang membership would be admissible to show his opportunity to possess the gun recovered on July 2, 1994.

Absent additional error, we would remand this case to the District Court with the instruction to balance the probative value of the gang evidence as to opportunity against its potential for substantial prejudice, as required under FED. R. EVID. 403. The District Court did expressly determine that Rule 403 balancing favored the admissibility of defendant's statement that "we" have more firepower [***12] than [**18] the police and should have shot it out with them, but that finding related only to knowledge. While we have reluctantly expressed our willingness to assume, in the absence of an express balancing, that the district court implicitly held the balance to favor admissibility, *Merriweather*, 78 F.3d at 1078 n.1, the circumstances surrounding the admissibility of the gang evidence in this case persuades us that such an assumption would be inappropriate. As already noted, the District Court admitted the gang evidence under the erroneous belief that it had already ruled on the issue. We [*222] cannot assume, therefore, that the court ever engaged in the Rule 403 balancing. We would ordinarily remand to the District Court to conduct this required balancing. [8] *See United States v. Robinson*, 700 F.2d 205, 213, (5th Cir. 1983) (holding that where the district court fails to make an express finding that the probative value of 404(b) evidence outweighs its prejudice, the Court of Appeals should remand "unless the factors upon which the probative value/prejudice evaluation were made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling"). [**19]

We decline to remand the case, however, because we are convinced that the District Court's failure to instruct the jury as to the limited use of the 404(b) evidence deprived defendant of a fair trial. When evidence is admitted under Rule 404(b), the jury must be "clearly, simply, and correctly instructed concerning the narrow and limited purpose for which the evidence may be

[6] Our willingness to consider any possible ground to admit the evidence does not suggest that we approve of the District Court's silence on this matter. District courts should identify on the record which of the 404(b) factors justifies the admission of the other acts evidence. Unless it does so, it will be unable to instruct the jury as to the limited purpose for the evidence.

[7] Officer Nardoni testified that after arresting defendant on July 12, defendant looked at Nardoni's weapon and said, "I would have shot you if I had known that we got more fire power then [sic] that bullshit."

[8] In the weighing, the court may consider whether defendant's gang membership may inevitably become an issue in the case in view of defendant's defense of bias on the part of the police officers.

considered." *Johnson*, 27 F.3d at 1193. After admitting evidence under Rule 404(b), the district court "must carefully identify, in its instructions to the jury, the specific factor named in the rule that is relied upon to justify admission of the other acts evidence, explain why that factor is material, and warn the jurors against using the evidence to draw the inferences [***13] expressly forbidden in the first sentence of Rule 404(b)." [**20] *Id.* at 1194.

Before the District Court issued its final instructions to the jury, the defendant requested an instruction limiting the use of the gang evidence. While the request was somewhat inartfully presented, it was sufficient to alert the court to the necessity of identifying the 404(b) evidence. The District Court declined to give the instruction sought by defendant and instead instructed the jury as follows:

> You've heard testimony that the defendant committed some other acts other than the ones charged in the indictment. You cannot consider this testimony as evidence that the defendant committed the crime that he is on trial for now.
>
> Instead, you can only consider it in deciding for the purposes stated to you. You may only consider it for the purpose stated to you. Do not consider it for any other purpose.
>
> Remember the defendant is on trial here only for the offense of felon in possession of a firearm, not for the other acts. Do not return a guilty verdict unless the government proves the crime charged beyond a reasonable doubt.

These instructions were inadequate to safeguard against the impermissible use of the gang evidence because they do not [**21] inform the jury of the proper purpose for which the gang evidence could be considered. While the instructions indicate that the jury should consider the evidence only "for the purposes stated to you," the court never told the jury what these purposes were. In addition, no limiting instructions were given at the time the gang evidence was admitted. This is not a case, moreover, where the jurors would necessarily be aware of the other acts to which the court was referring so that the error could be found to be harmless. It is not enough for a district court to instruct jurors not to consider Rule 404(b) evidence as "evidence that the defendant committed the crime that he is on trial [***14] for now." The district court must expressly indicate the *precise purpose* for the other acts evidence. In this case, the District Court was obliged to instruct the jurors that they could consider the evidence of defendant's gang membership only to establish his opportunity to possess the firearm. Given the court's failure to provide an effective limiting instruction, the jurors "could not have had the vaguest notion of the limited proper purpose for which might have considered the evidence." [**22] *Merriweather*, 78 F.3d at 1076. We must assume, then, that the jury improperly considered the gang evidence on the direct issue of defendant's guilt, which is a clear violation of Rule 404(b). Under all the circumstances of this case, we conclude that the failure to issue an effective limiting instruction was not harmless.

[*223] **III.**

Having concluded that the conviction must be set aside, we decline to reach the remaining assignments of error.

**IV.**

For the foregoing reasons, the judgment of conviction is REVERSED and the case is REMANDED for a new trial.

---

End of Document

# United States v. Presser

844 F.2d 1275 (6th Cir. 1988)

Cited in Opening Brief at: x

Counsel acknowledges that this decision does not state the standard of review for which it was cited. See Response, Part III.B. The substituted authority, United States v. Davis, follows.

Caution
As of: September 14, 2026 6:51 PM Z

# United States v. Presser

United States Court of Appeals for the Sixth Circuit

February 2, 1988, Argued ; April 25, 1988, Decided ; April 25, 1988, Filed

No. 87-3896

**Reporter**
844 F.2d 1275 *; 1988 U.S. App. LEXIS 5428 **

United States of America, Plaintiff-Appellant, v. Jackie Presser; Harold Friedman; and Anthony Hughes, Defendants-Appellees

**Prior History:** [**1] On Appeal from the United States District Court for the Northern District of Ohio.

**Disposition:** Vacated and remanded.

**Counsel:** William S. Lynch, Stephen H. Jigger, Bernard A. Smith, Asst. U.S. Atty., Frank J. Marine, argued, for Appellant.

John Climaco, Presser, Paul S. Lefkowitz, Roger M. Synenberg, Michael L. Climaco [Hughes], Paul Cambria [Friedman], Lipsitz, Green, Fahringer, Roll, for Appellee.

**Judges:** Martin, Guy and Boggs, Circuit Judges.

**Opinion by:** BOGGS

## Opinion

[*1276] BOGGS, Circuit Judge.

The United States appeals a pre-trial order of the district court entered in its prosecution of Jackie Presser, Harold Friedman and Anthony Hughes. The district court ordered the government to disclose "any and all impeachment evidence in the possession of the prosecution which tends to negate guilt. . . ." The government argues that the district court lacked authority to issue the discovery order because it compels the disclosure of material exempted from pre-trial discovery by the Jencks Act, 18 U.S.C. § 3500, as well as material whose disclosure is not required under either Rule 16 of the Federal Rules of Criminal Procedure or *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), [**2] and its progeny. We agree with the government's contentions and, accordingly, vacate the order of the district court.

### I

On May 16, 1986, a federal grand jury handed up an indictment charging that Presser, Friedman and Hughes abused their positions as local union officers by conspiring to employ and by employing "ghost" employees at Local 507 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and Local 19 of the Bakery, Confectionary and Tobacco Workers International Union, AFL-CIO. The indictment charges that Presser, as the Secretary-Treasurer of Local 507, Friedman as President of Local 507 and of Local 19, and Hughes as the Recording Secretary for Local 507, caused union funds to be paid to supposed union employees Jack Nardi, Allen Friedman, George Argie, and Hughes, as a business agent for Local 19, for services [*1277] which the defendants knew none of the recipients of the funds had rendered.

The indictment charges that the defendants' actions violated provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962 (c) & (d), and of the Labor-Management Reporting [**3] and Disclosure Act (LMRDA), 29 U.S.C. §§ 439(b) & 501(c). The indictment also charges that Presser violated the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1027, by making false statements and concealing facts about the "ghost" employees on documents required to be maintained under ERISA.

The defendants have notified the government and the district court that they intend to defend against the charges, at least in part, on the ground that their actions were authorized by the government. The defendants claim that during the period of time charged in the indictment, Presser and Hughes were "cooperating citizens" for the Federal Bureau of Investigation (FBI) and that the FBI authorized their activities. The government has provided the defendants with sworn statements from the three FBI agents who supposedly

acted as contact agents for the defendants. [1] Although the statements may tend to support the defendants' claim that they were directed to employ the "ghost" employees by the FBI, the government maintains that the defendants' conduct was not in fact authorized and, consequently, that their defense is false.

[**4] On September 10, 1986, Presser and Hughes filed a motion for discovery of "all information to which they are entitled under Rule 16(a) of the Federal Rules of Criminal Procedure and . . . pursuant to *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963) and *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 481 (1985) . . . which may be favorable to the defendants or material to their guilt or punishment or which could lead to such favorable information or information material to their guilt or punishment." [2] Accompanying this broad discovery request were 211 specific requests for material related to the defendants' authorization defense.

[**5] On October 10, 1986, the government responded to the discovery motion. It agreed to provide before trial discovery of materials required to be disclosed by Rule 16 of the Federal Rules of Criminal Procedure and *Brady v. Maryland* but opposed the discovery of impeaching material about government witnesses because such material is exempt from pre-trial disclosure by the Jencks Act. The government also submitted materials to the district court *in camera* to determine their discoverability under the *Brady* doctrine.

In December 1986, Presser and Hughes filed a three-volume supplemental memorandum in support of their September 1986 discovery request for exculpatory material and impeachment evidence.

The government responded to this memorandum in January 1987, claiming that it already had provided the defendants with all exculpatory information it was required to disclose before trial concerning the authorization defense. The government stated that all impeachment evidence in its possession concerning a government witness's credibility, would be disclosed during trial in accordance with the Jencks Act.

In March 1987, the district court ordered the government to provide the [**6] defendants with immediate discovery of "all documents, memoranda, notes or interview reports . . . tangible objects and other information, including, but not limited to, videotapes, other recordings or any summaries or transcripts whether or not they are work [*1278] product which contains exculpatory material" and "all documents, memoranda, statements, affidavits, and depositions, if any, which have been provided by the government to members of the news media . . . ."

On April 30, 1987, the defendants filed another Supplemental Memorandum for Disclosure of Impeachment Material, contending that "impeachment material need not be exculpatory in order to invoke the Brady duty to disclose." Accordingly, the defendants requested "complete copies of any and all impeachment material relating to prospective witnesses in this case and, in particular, to government agents McCann, Foran and Friedrick."

The government responded to the April 1987 Supplemental Memorandum in May, reasserting its contention that impeachment materials for government witnesses need not be produced until trial under the Jencks Act. The government further responded that the *Brady* doctrine never requires the [**7] government to provide discovery of evidence unfavorable to the defendants, such as government evidence which could impeach defense witnesses.

On August 21, 1987, the district court granted the defendants' motion for disclosure of impeachment material stating: [3]

> Defendants specifically request that impeachment material, separate and apart from exculpatory material which this Court has previously ordered to be disclosed, is discoverable and request the production of such material. The governments' response to the above-mentioned motion first directs the Courts attention to a point which the parties do agree. The United States concedes that

[1] The three FBI agents were Robert Friedrick, Martin McCann and Patrick Foran. According to the government, Friedrick and McCann are no longer FBI agents.

[2] Fed.R.Crim.P. 16(a) lists specific kinds of evidence that must be disclosed to the defense before trial such as statements of the defendant, the defendant's prior criminal record, and reports of physical or mental examinations and tests that the government intends to use in its case-in-chief at trial or that are material to the preparation of the defense. The rule specifically states that it does not authorize the pre-trial disclosure of material exempted from pre-trial discovery by the Jencks Act. Fed.R.Crim.P. 16(a)(2).

[3] The district court's order is reproduced as it appears in the record.

it must disclose to the defendants impeaching materials within its possession relating to witnesses called by the government to testify against the defendants. However, the government raises two issues upon which the parties disagree. The issues are as follows: 1) must impeaching material be produced before trial or may they be produced at trial in time for the defendants to make use of them, and 2) must the government provide to the defendants impeaching materials *unfavorable* to the defense which the government may use to cross examine [**8] witnesses called to testify on behalf of the defendants.

The Supreme Court has defined impeachment material as 'evidence favorable to an accused . . . so that, if disclosed and use effectively, it may make the difference between conviction and acquittal.' *United States v. Bagley*, 473 U.S. [667], 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985). Impeachment evidence need not be exculpatory in the traditional sense of tending to negate guilt. Rather, such material deals with the credibility of witnesses.

In *Giglio v. United States*, 405 U.S. 150, 154, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972), the Supreme Court held that:

> When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule.

The general rule articulated in *Giglio*, is the Brady rule. See: *Brady v. Maryland*, 373 U.S. 206, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

In, addressing the issue of the timing of disclosure, this Court finds that any and all impeachment material in the possession of the prosecution is to be turned over to [**9] the defense forthwith. Specifically, regarding the impeachment testimony relating to government agents McLann, Foran, Friedrick and any other present or former agents this Court believes that these witnesses credibility will be material to the establishment of defendants authorization defense. Accordingly, defenses' motion for disclosure of impeachment material is Hereby Granted.

On September 4, 1987, the government filed a motion asking the court to reconsider its August 21, 1987, discovery order. In the motion the government stated that in the interests of narrowing the issues, it would comply with the discovery order by providing immediate discovery of any impeachment materials in its possession not [*1279] protected by the Jencks Act relating to government witnesses Allen Friedman, Jack Nardi and George Argie. [4] The government refused, however, to disclose Jencks Act materials related to those witnesses' testimony [**10] and also refused to disclose materials unfavorable to the defense which the government might use at trial to impeach defense witnesses or to rebut defenses.

The district court held a hearing on the government's motion for reconsideration on September 4, 1987. After the hearing, the court amended its August discovery order, attempting to clarify that the order required the immediate disclosure only of impeachment evidence in the possession of the government "which tends to negate guilt."

At the September 4, 1987, hearing, the government argued that it was not required to disclose Jencks Act impeachment material before trial and that it was not required to disclose impeachment material concerning [**11] defense witnesses at any time because such evidence is, in its view, unfavorable to the defense. Accordingly, the government informed the court that it did not intend to comply with the discovery order, even as amended, and requested the court to "impose the appropriate sanctions" so that the government could appeal the issue. The court orally responded:

> I will deny that request. You may try your case the way you wish to try it. You may find when you get to trial you may not get a witness on if you haven't complied with my order, and you can go about what you want to do, but that's my statement in regard to that, counsel.

**II**

Before resolving the substantive issue raised in this appeal, the court must first address the contention that it does not have jurisdiction over the appeal. Defendants-

---

[4] The government characterized these impeachment materials as "materials which relate to misconduct of these witnesses not resulting in convictions." The government also notified the court that its voluntary disclosure of this impeachment evidence was not a concession "that these materials are discoverable at this time."

appellees have filed a motion to dismiss the appeal on the ground that the lower court has not entered an order suppressing or excluding evidence. The government responds that the court's oral statement that the government's failure to comply with the discovery order will jeopardize its use of witnesses whose statements or other impeachment materials are withheld constitutes [**12] a conditional suppression order and, consequently, is sufficient to invoke this court's jurisdiction under 18 U.S.C. § 3731. [5]

18 U.S.C. § 3731 provides, *inter alia*,

> An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence . . . not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken [**13] for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

In *United States v. Battisti*, 486 F.2d 961 (6th Cir. 1973), this court discussed at length the appealability of a pre-trial discovery order under 18 U.S.C. § 3731. In that case, the district court ordered the government to disclose to the defense before trial the names and addresses of all Government witnesses and the known records of prior criminal convictions of prospective witnesses. The court's order provided:

> The failure of the Government to comply with this order will result in the exclusion of the testimony of the witness or witnesses to which the information pertains.

*Battisti*, 486 F.2d at 965.

While considering whether the district court's order in *Battisti* sufficiently indicated [*1280] that evidence would be excluded if the government did not comply with the discovery order, we noted that the statute mandates that "the provisions of this section shall be liberally construed to effectuate its purposes," which we concluded were to provide appellate review of district court [**14] decisions against the United States on specific matters before jeopardy attaches to a criminal prosecution. *See id.*, at 967. We also stated that

> perhaps the most convincing argument in favor of the appealability of the order in the present case is contained in the legislative history [of 18 U.S.C. § 3731]. It was the aim of Congress to give the Government a right to appeal discovery orders which go beyond the rules of criminal procedure. S. Rep. 91-1296 (91st Cong., 2d Sess.), p. 5,

*Ibid.* Accordingly, we concluded,

> the Supreme Court has observed that it is not the label but the substance of the ruling which determines the question of appealability . . . . The substance of the instant order is that the evidence will be excluded if the Government does not comply with the order. We conclude that this is an order 'excluding evidence' within the spirit, if not the literal wording, of 18 U.S.C. § 3731.

*Ibid.* (citation omitted).

Although we acknowledge that there is somewhat more ambiguity about the district court's future actions in this case than there was in *Battisti* [**15] , we view the district court's oral statement as evidencing an intent to exclude government evidence if the government does not comply with its discovery order and consequently, its statement qualifies as an appealable order "within the spirit, if not the literal wording, of 18 U.S.C. § 3731." Accordingly, this court has jurisdiction over this appeal under 18 U.S.C. § 3731. [6]

---

[5] In the alternative, the government requests the court to exercise its power to issue a writ of mandamus ordering the district court either to vacate the discovery order or to enter a suppression order so that the government may pursue an appeal. Because we hold that jurisdiction over the appeal exists under 18 U.S.C. § 3731, we do not reach the merits of the government's petition for a writ of mandamus.

[6] We are troubled by the district court's refusal to enter a written order sanctioning the government for its noncompliance with the discovery order after the government specifically requested such an order from the district court. A district court cannot abort the government's right to an appeal simply by declining to rule on a matter when asked to do so. Congress expressly provided the government with the right to appeal its contention that the district court does not have the authority to make this discovery order at this stage of the proceeding, that is, before jeopardy attaches. Indeed, once jeopardy does attach, the government is unable to appeal the issue unless it obtains a conviction and the defendant decides to seek an appeal.

[**16] **III**

The substantive issue to be resolved is whether the district court possessed the authority to order the government to disclose before trial "any and all impeachment evidence . . . which tends to negate guilt?" The district court concluded that the government is required to disclose the impeachment evidence by virtue of the rule of *Brady v. Maryland*, that the government is under a general duty to disclose evidence favorable to the accused. In support of its order, the court cited the Supreme Court decisions in *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972), and *United States v. Bagley*, 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985). In the district court's view, these decisions hold that impeachment evidence of key government witnesses is *Brady* material and therefore, subject to disclosure to the defense before trial.

Close examination of these decisions, particularly in the context of the Court's other decisions construing the dimensions of the *Brady* doctrine, leads us to conclude that the district court overstated the meaning of *Brady* and *Giglio*.

The Supreme Court repeatedly [**17] has emphasized that

> [*1281] the *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.

*Bagley*, 473 U.S. at 675 (footnotes omitted).

Since establishing the *Brady* rule, the Court has adhered to its subsequent statement that "there is no general constitutional right to discovery in a criminal case, and *Brady* did not create one . . . ." *Weatherford v. Bursey*, 429 U.S. 545, 559, 51 L. Ed. 2d 30, 97 S. Ct. 837 (1977). In fact, the Court has explained that the basis for the *Brady* rule, "the Due Process Clause[,] has little to say regarding the amount of discovery which the parties must be afforded." *Wardius v. Oregon*, 412 U.S. 470, 474, 37 L. Ed. 2d 82, 93 S. Ct. 2208 (1973). It speaks "to the balance of forces between the accused [**18] and his accuser." *Ibid*.

Thus, the *Brady* doctrine, in its purest form, is the rule of law that the Due Process Clause is violated when the government achieves a conviction through the use of perjured testimony, *e.g., Napue v. Illinois*, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959), or by withholding a confession of guilt by someone other than the accused, *e.g., Brady v. Maryland*, or by withholding evidence "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce," [7] *United States v. Agurs*, 427 U.S. 97, 107, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). The doctrine evolved out of the tenet of constitutional law that it is fundamentally unfair for the government to obtain a conviction in such circumstances, regardless of whether the government suppressed the evidence knowingly or unknowingly. However,

> unless the omission deprived the defendant of a fair trial, there [is] no constitutional violation requiring that the verdict be set aside . . . . to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is [**19] of sufficient significance to result in the denial of the defendant's right to a fair trial.

---

We also note that we do not view our decision that the district court's oral statement in this case is an appealable order under 18 U.S.C. § 3731 as conflicting with our holding in *United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984), that a written order of a judge should speak for itself and should not be varied by parol evidence as to what was meant by its provisions. In this case, the district court's discovery order was written but the sanction order was oral. The sanction order is the order which provides jurisdiction over the appeal and we have interpreted that order as it appears in the context of the record.

[7] An example of such evidence is "fingerprint evidence demonstrating that the defendant could not have fired the fatal shot." *Agurs*, 427 U.S. at 110 n.18.

In *Agurs*, the prosecutor failed to disclose to the defense the fact that the victim had a prior criminal record of guilty pleas to charges of assault and of carrying a deadly weapon. While this material was exculpatory in that it related to the defendant's claim of self-defense, the Court ultimately held that the failure to disclose the evidence did not constitute a *Brady* violation because there was no reasonable doubt about the defendant's guilt "whether or not the [omitted] evidence [was] considered, [and, thus,] no justification for a new trial." *Agurs*, 427 U.S. at 113.

*Agurs*, 427 U.S. at 108.

Accordingly, the obligation the *Brady* rule imposes on the government is

> the [**20] obligation to turn over evidence in its possession that is *both* favorable to the accused and material to guilt or punishment . . . . [A] majority of this Court has agreed, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S. Ct. 989, 1001, 94 L. Ed. 2d 40 (1987) (citations omitted) (emphasis added).

The Court also has made it clear that while the *Brady* rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure. If it fails to comply adequately with a discovery order requiring it to disclose *Brady* material, it acts at its own peril. *See Pennsylvania v. Ritchie*, [*1282] 107 S. Ct. at 1003; *accord Bagley*, 473 U.S. at 682-83. But significantly, if the government [**21] does fail to disclose *Brady* material, the defendant has a constitutional remedy for the nondisclosure *only* if the defendant can show that there is a reasonable probability that "the omission deprived the defendant of a fair trial." *Agurs*, 427 U.S. at 108.

In a footnote to *Agurs*, the Court dismissed an argument that the definition of material evidence under the *Brady* rule should "focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence." *Agurs*, 427 U.S. at 112 n.20. The Court stated:

> such a standard would be unacceptable for determining the materiality of what has been generally recognized as '*Brady* material' for two reasons. First, that standard would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor's entire case would always be useful in planning the defense. Second, such an approach would primarily involve an analysis of the adequacy of the notice given to the defendant by the State, and it has always been the Court's view that the notice [**22] component of due process refers to the charge rather than the evidentiary support for the charge.

*Ibid.*

The Court's decisions in *Giglio* and *Bagley* are not a departure from its reasoning in *Agurs* or from the Court's other *Brady* decisions. In both cases the Court held that the failure of the prosecution to disclose to the defense that the prosecution's key witnesses had personal interests at stake when they testified during the trials was material evidence which should have been disclosed pursuant to the *Brady* doctrine, because had the material been "disclosed and used effectively, it [might have made] the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676.

In *Giglio*, the prosecution had promised a coconspirator of the defendant that he would not be prosecuted if he testified against the defendant. The Court found it significant that the government's case against the defendant rested "almost entirely" upon the coconspirator's testimony. Consequently, the Court concluded that if the information had been disclosed to the defense, there was a reasonable probability that the defendant could have changed the [**23] outcome of the trial by attacking the credibility of the coconspirator's testimony. Accordingly, the Court vacated the defendant's conviction and remanded the case for a new trial. *Giglio*, 405 U.S. at 154-55.

Similarly, in the more recent case of *Bagley*, the prosecution failed to disclose to the defense that the government's two key witnesses, two private security guards, had a contract to supply information to the Bureau of Alcohol, Tobacco and Firearms, and that payment under the contract was conditioned upon whether the information supplied by the guards led to a successful prosecution of the defendant. The Court reasoned that because the defense specifically requested discovery of evidence of any inducements that had been made to the guards to testify against the defendant, the prosecutor's failure to disclose that such inducements existed made it likely that defense counsel believed the witnesses could not be impeached on the grounds of bias or interest. Consequently, the Court reasoned that the nondisclosure caused defense

counsel not to pursue that line of cross-examination. *See Bagley*, 473 U.S. at 683. However, because it also was possible [**24] that the defendant would have been convicted even if the information had been disclosed, the Court remanded the case for a determination of whether the nondisclosure involved "material" evidence under the *Brady* standard. *Bagley*, 473 U.S. at 684.

The Court's decisions in both *Giglio* and *Bagley* are consistent with the tenet on which the *Brady* doctrine is based, that it is fundamentally unfair for the government to achieve a conviction through the concealment of evidence which undermines the [*1283] strength of the government's case against the defendant.

Neither case, however, gives the defense a general right to pre-trial discovery of evidence impeaching defense witnesses, where the prosecution denies that any such material is exculpatory and material under *Brady*.

If impeachment evidence is within the ambit of the Jencks Act, then the express provisions of the Jencks Act control discovery of that kind of evidence. The clear and consistent rule of this circuit is that the intent of Congress expressed in the Act must be adhered to and, thus, the government may not be compelled to disclose Jencks Act material before trial. *See United States v. Algie*, 667 F.2d 569, 571 (6th Cir. 1982); [**25] *United States v. Carter*, 621 F.2d 238, 240 (6th Cir. 1980). Accordingly, neither *Giglio* nor *Bagley* alter the statutory mandate that any "statement" [8] in the government's possession related to the subject matter of a government witness's testimony shall not "be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a).

[**26] In the past, we have noted that the Act was designed to prevent defendants from engaging in "blind fishing expeditions" through the government's files, *see, e.g., United States v. Pope*, 574 F.2d 320, 324 (6th Cir. 1978), but at the same time, to assure defendants of their Sixth Amendment right to confront their accusers by compelling the government to produce statements useful for impeachment of government witnesses. *United States v. Carter*, 613 F.2d 256 (10th Cir. 1979). The Act accommodates both of these concerns by protecting the government's interests before trial and by protecting the defendant's rights at trial, since under the Act the impeachment material is disclosed in time to be used by the defense at trial.

We have found only one federal appellate court which has discussed whether material arguably exempted from pre-trial disclosure by the Jencks Act yet also arguably exculpatory material under the *Brady* doctrine must be disclosed before trial. The Third Circuit stated in *United States v. Higgs*, 713 F.2d 39 (3rd Cir. 1983), and also in *United States v. Starusko*, 729 F.2d 256 (3rd Cir. 1984), [**27] that it believes the *Brady* doctrine is not violated if *Brady* material is disclosed in time for its "effective" use at trial. *See Starusko*, 729 F.2d at 262; *Higgs*, 713 F.2d at 44.

We agree with this reasoning. Preserving the defendant's ability to defend himself effectively at trial is the underlying purpose of the criminal discovery rules. Therefore, so long as the defendant is given impeachment material, even exculpatory impeachment material, in time for use at trial, we fail to see how the Constitution is violated. [9] Any prejudice the defendant

---

[8] The Jencks Act defines "statement" as

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

[9] In *Starusko*, however, the Third Circuit did indicate that in its view, there may be special circumstances when the *Brady* doctrine may require the disclosure of Jencks Act material before trial. In the Third Circuit's view, the situation could arise when the Jencks Act material truly is exculpatory of the charge against the defendant. *See Starusko*, 729 F.2d at 262-65. The court implied however, that the *Brady* doctrine may require pre-trial disclosure in such a situation because of the due process foundation of the doctrine, that is, that it is fundamentally unfair of the prosecution to withhold from the defendant until trial material which seemingly does prove innocence and therefore, which could obviate the need for a trial altogether. The Third Circuit noted that a prosecutor who withholds such material most likely violates professional ethical canons. However, the court did not state that it was establishing the rule that if exculpatory material is disclosed in time for use at trial, but that the material could have been disclosed earlier, a violation of constitutional law has occurred. Given the court's explicit holding that disclosure in time for

[*1284] may suffer as a result of disclosure of the impeachment evidence during trial can be eliminated by the trial court ordering a recess in the proceedings in order to allow the defendant time to examine the material and decide how to use it.

[**28] Accordingly, the district court overstepped its authority when it ordered the government to disclose impeachment evidence before trial, even though the court later clarified that it was ordering the disclosure only of impeachment evidence "which tends to negate guilt." We have examined the record with great care, particularly the transcript of the September hearing on the government's motion for reconsideration, in order to discern exactly what the district court meant when it said that only evidence "which tends to negate guilt" is to be disclosed. Unfortunately, we have not been able to discover precisely how broad or how narrow the scope of the district court's order is. At times during the September hearing, the court indicated that the scope of its order is indeed, as broad as the government contends that it is, in that the court appears to have construed the *Brady* doctrine as requiring the disclosure of any evidence which relates to a potential defense, even if that evidence is harmful to the defense. [10] At other times during the proceeding, the court indicated that the scope of its discovery order actually is quite confined and merely reiterates what the government concedes [**29] is its general duty to disclose material which supports the defendants' claims of innocence. [11]

[**30] However, regardless of which construction we give the district court's order, we cannot uphold it. The broad construction of the order, that any impeachment evidence which is at all related to the defense's case is to be disclosed before trial, clearly is not supported by any decision of this court or of any other court. The narrow construction of the order may seem harmless. Under that construction, the government need disclose only traditional *Brady* material. Even so, the order cannot stand because of the court's accompanying threat to impose sanctions at trial against the government if it does not disclose the *Brady* material before trial. Here, the government has represented that it will comply with all of its *Brady* obligations in time for effective use of the *Brady* material at trial. The *Brady* doctrine did not create a constitutional right of pre-trial discovery in a criminal proceeding. *Weatherford v. Bursey*, 429 U.S. at 559. Thus, the district court cannot threaten the government with being unable to put on evidence at trial when the law does not require the pre-trial disclosure the court has tried to compel.

Our decision is supported [**31] not only by the previously discussed decisions of the Supreme Court construing the *Brady* doctrine, but also by the absence of any basis for the district court's order in Rule 16 of the Federal Rules of Criminal Procedure. Rule 16 requires the government to disclose to the defense before trial only specific categories of evidence. These categories include prior statements of the defendant, [*1285] the defendant's prior criminal record, documents, photographs, or tangible objects, which are within the custody or control of the government and which are material to the defense or intended for use by the government in its case-in-chief at trial or which were obtained from or belong to the defendant, and the results of any mental or physical examinations performed on the defendant which are material to the defense or which are intended for use by the

---

effective use at trial is all that the *Brady* doctrine requires, we do not read the *Starusko* decision as undermining the conclusion we have reached in this case.

[10] For example, at one point during the proceedings the court stated,

"I take the position whether it is Jencks or not, if it has any tendency to negate guilt, it should be turned over now."

> At another point during the hearing the following exchange took place:

THE COURT So your position is those inconsistent statements [of Agent Friedrick] should not be turned over?

MR. JIGGER: [For the Government]: That's right your Honor, because they are not helpful to the defense, and they do not come within the ambit of Brady and Bagley.

THE COURT: That's what Bagley is saying, it is saying it is a very close question sometimes, and my position is, if it is a close question, the Government is taking a big chance of not turning it over.

[11] At another time during the proceeding the following exchange took place:

MR. JIGGER: Furthermore, your Honor, with respect to material that is -- that would be utilized to impeach the defense, the Government suggests that if it is unfavorable to the defense it clearly does not come within the ambit of Brady, Bagley or any of those cases.

THE COURT: And I would say to you if it tends to negate guilt, it does.

MR. JIGGER: But it can't, your Honor.

THE COURT: I don't know. If it can't, then you are not violating my order so far as I am concerned.

government as evidence in its case-in-chief at trial. Rule 16 expressly exempts impeachment material subject to the Jencks Act from disclosure under its provisions. Fed.R.Crim.P. 16(a)(2). More importantly, the discovery afforded by Rule 16 is limited to the evidence referred to in its express provisions. The rule provides no authority [**32] for compelling the pre-trial disclosure of *Brady* material, *see United States v. Moore*, 439 F.2d 1107 (6th Cir. 1971), or of any other evidence not specifically mentioned by the rule. *See United States v. Roberts*, 811 F.2d 257, 258-59 (4th Cir. 1987) (*en banc*) (Rule 16 does not require discovery of coconspirator's statement); *accord United States v. Orr*, 825 F.2d 1537, 1541 (11th Cir. 1987); *United States v. Hoffman*, 794 F.2d 1429, 1432 (9th Cir. 1986) (Rule 16 does not require disclosure of the defendant's voluntary statements or of statements made to persons the defendant does not know are government agents); *United States v. Viserto*, 596 F.2d 531, 538 (2d Cir. 1979) (Rule 16 does not require disclosure of the defendant's statements inadvertently overheard and memorialized in notes taken by a witness).

We also find support for our decision in the fact that providing the defense with such a broad right of pre-trial discovery would vitiate an important function of the Jencks Act, the protection of potential government witnesses from threats of harm or other intimidation before the witnesses [**33] testify at trial. *See, e.g., Roberts*, 811 F.2d at 259. Clearly, the need to protect witnesses exists whether the witnesses are part of the government's case-in-chief or part of its potential evidence to rebut a possible defense. Accordingly, we conclude that the government cannot be compelled to disclose impeachment material which would be covered by the Jencks Act relating to any potential government witness, whether it be a witness in the case-in-chief or a rebuttal witness. Further, the government need not disclose impeaching material in its possession relating to any potential defense witness where that impeaching material does not meet the *Brady* test of being material *and* exculpatory.

The following hypothetical illustrates why we conclude that this rule is necessary. A defendant may be prepared to produce two witnesses who would swear falsely that they were with the defendant at the time he is charged with committing a crime. The government has knowledge of three people who can swear that they were with one of the defendant's alibi witnesses. The government's knowledge of these people, and any statements it may possess from them, are "impeachment evidence" [**34] and thus could, in the view of the court below, tend "to negate guilt" because the government's evidence affects the defense's alibi. However, if the government were required to disclose material concerning these potential impeachment witnesses before trial, the defense possibly could intimidate the three witnesses. The defense also would secure the tactical advantage of knowing which of its potential witnesses is least subject to impeachment.

The error in the district court's reasoning in this case is that it viewed all impeachment evidence that in any way relates to the defendants' authorization defense as "exculpatory" because it relates to their claim of innocence and, therefore, as *Brady* material that must be disclosed before trial. Its discovery order compels the pre-trial disclosure of material that falls within the scope of either the *Brady* doctrine or of the Jencks Act, both of which only require disclosure in time for effective use at trial, as well as the disclosure of impeachment evidence which lies outside the scope of these criminal discovery mechanisms and of Rule 16. [12]

[**35] [*1286] The court already has entered a general discovery order formally requiring the government to comply with the *Brady* rule. The government remains under its constitutional duty to provide the defense with exculpatory material in its possession and will have to face the consequences if it fails to comply with this duty. The decisions which have construed the *Brady* doctrine make it absolutely clear that the remedy for a *Brady* violation is a new trial and that the remedy is available to a defendant only after a first trial has ended in a conviction and only after a defendant shows that there is a reasonable probability that had the *Brady* evidence been disclosed in time for use at trial, the first trial would not have resulted in a conviction. We find no support in any decision construing the *Brady* doctrine for the proposition that a trial judge can threaten to refuse to let a government witness testify in order to sanction noncompliance with the *Brady* doctrine which comes to light before or during trial.

The district court's discovery order to disclose "any and

---

[12] Although a trial court may have some inherent power to enter specific orders compelling the disclosure of specific evidence when justice requires it, the court may not disregard the Jencks Act mandate. *See Napue*, 834 F.2d at 1318. However, in most criminal prosecutions, the *Brady* rule, Rule 16 and the Jencks Act, exhaust the universe of discovery to which the defendant is entitled. *See Napue*, 834 F.2d at 1316-17; *United States v. Bouye*, 688 F.2d 471, 473 (7th Cir. 1982).

all impeachment evidence" is based on too broad a view of what constitutes "evidence favorable [**36] to the accused and material to guilt or punishment." In essence, the district court concluded, on the bases of *Bagley* and of *Giglio*, that the defense has a constitutional right to know the tactical strengths and weaknesses of the government's case against it. The Supreme Court has never held that the Constitution creates such a right and we do not believe that it exists. Accordingly, the district court's discovery order is VACATED and the case is REMANDED for further proceedings.

---

End of Document

# United States v. Davis

306 F.3d 398 (6th Cir. 2002)

Cited in Opening Brief at: Substituted for Presser (Br. x)

Substituted authority. See Response, Part III.B. Highlighted language appears at 306 F.3d at 420.

Caution
As of: September 22, 2026 7:53 PM Z

# United States v. Davis

United States Court of Appeals for the Sixth Circuit

June 20, 2002, Argued ; September 25, 2002, Decided ; September 25, 2002, Filed

No. 00-1270

**Reporter**
306 F.3d 398 *; 2002 U.S. App. LEXIS 20300 **; 2002 FED App. 0329P (6th Cir.) ***

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. DAVID DEVON DAVIS, Defendant-Appellant.

**Subsequent History:** [**1] Writ of certiorari denied: Davis v. United States, 2003 U.S. LEXIS 1658 (U.S. Feb. 24, 2003).

**Prior History:** Appeal from the United States District Court for the Western District of Michigan at Grand Rapids. No. 99-00095. Gordon J. Quist, District Judge.

**Disposition:** Affirmed in part, vacated and remanded in part.

**Counsel:** ARGUED: Kevin M. Schad, SCHAD & COOK, Indian Springs, Ohio, for Appellant.

Andrew B. Birge, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

ON BRIEF: Kevin M. Schad, SCHAD & COOK, Indian Springs, Ohio, for Appellant.

Andrew B. Birge, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

David Devon Davis, Terre Haute, Indiana, Pro se.

**Judges:** Before: CLAY and GILMAN, Circuit Judges; HAYNES, District Judge. *

**Opinion by:** CLAY

## Opinion

[***2] [*403] CLAY, Circuit Judge. Defendant, David Devon Davis, appeals from the judgment of conviction and sentence entered by the district court following Defendant's jury trial convictions for aiding and abetting in the commission of two armed bank robberies, in violation of 18 U.S.C. § 2113(a) and (d), and of aiding and abetting in the using or carrying and brandishing of a firearm during and [**2] in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Defendant, through counsel, raises seven challenges to his sentence. Proceeding *pro se*, Defendant raises another three independent challenges. The challenges Defendant raises in this appeal go to the entire proceedings below, from alleged deficiencies [*404] in his indictment to sentencing errors. For the reasons that follow, we **AFFIRM** Defendant's convictions, but **VACATE AND REMAND** his sentence with respect to his restitution order. In all other respects, we **AFFIRM** Defendant's sentence.

### BACKGROUND

#### Procedural History

On June 28, 1999, a federal grand jury in Grand Rapids, Michigan returned a four-count indictment against Defendant, alleging two counts of aiding and abetting in two bank robberies, in violation of 18 U.S.C. § 2113 (a) and (d), and 18 U.S.C. § 2, and two counts of aiding and abetting in the use and brandishing of a firearm during the robberies, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). On September 16, 1999, the grand jury returned a superseding indictment alleging [**3] the [***3] same crimes, but with technical modifications to the indictment. Defendant was arraigned on the original indictment on July 19, 1999, and on the superseding indictment on September 21, 1999. Both times, Defendant pleaded not guilty to all charges. A three-day jury trial commenced on September 23, 1999, and after deliberations, the jury returned a verdict of guilty as to all counts. Defendant was sentenced to a term of 481 months' imprisonment, a $ 400 special assessment ($ 100 for each count), $ 4,790 in restitution, and five years

* The Honorable William J. Haynes, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

of supervised release. Defendant filed this timely appeal on March 2, 2000.

## Facts

1

### 1. Arraignment and Advisement of Possible Sentencing Range

At Defendant's first arraignment, a federal magistrate judge informed Defendant, and his then counsel Larry B. Woods, of the four charges against Defendant. The magistrate [**4] specifically informed Defendant that if he was convicted on count four of his indictment for aiding and abetting the use of a firearm during a crime of violence, he faced twenty-five years' imprisonment. At Defendant's second arraignment pertaining to the charges in the superseding indictment, the magistrate informed Defendant and his counsel, John R. Beason, of the same four charges, but advised Defendant that as to counts two and four, he faced a possible sentence of only seven years for each offense. Defendant represented that he understood the charges against him and the possible sentences he faced and pleaded not guilty both times. Defense counsel failed at any time to inform Defendant that he faced a twenty-five-year sentence if he was convicted of count four of the indictment.

### [***4] 2. Proof at Trial

At Defendant's trial, fourteen-year-old Jordell Steen testified that he robbed two banks on February 9, 1999 and was aided by Defendant, who was twenty-two years old at the time of the offense, and Antwand Hawkins. Steen testified that before Defendant arrived at Hawkins' house, Steen and Hawkins had talked about making some money, but made no mention of a bank robbery. [**5] Hawkins called Defendant, who when he arrived, asked Steen whether he (Steen) "was going to do that?" Steen testified that this referred to committing a bank robbery. Steen testified that Defendant told him he had better rob the bank. According to Steen, Defendant planned many of the details of the robbery and provided the firearms to be used.

[*405] Hawkins and Steen's account of what transpired varied somewhat. Hawkins testified that Steen needed to get out of town because the police were looking for him, and he wanted to rob a bank but did not know how to drive. Hawkins called Defendant and told him that Steen wanted to rob a bank but needed guns and a ride.

Steen testified that Hawkins and Defendant originally wanted him to rob a bank on "28th Street," but that because Steen had robbed that bank earlier, they thought it would be "too hot" to return there. Steen testified that Defendant then selected a bank on 3000 Eastern Avenue in Grand Rapids. Steen testified that Defendant lived in that area and said he was familiar with the bank Hawkins verified this account, testifying that Defendant told Steen that they would rob a bank that's "smoother."

Steen testified that before they arrived [**6] at the bank, Defendant gave him a gun and told him that it was already cocked and loaded. Steen testified that Defendant told him to go into the bank and ask for hundreds, fifties, and twenties, and that if anyone put dye in the bag with the cash, that he was to shoot that person. However, Hawkins testified that Defendant gave Steen one of the guns at his home, and told him not to shoot anyone.

[***5] Steen testified that Hawkins dropped him off in front of the bank and, pursuant to the plan, Steen went inside with a .38 firearm and demanded money. He testified that a man put money and, unbeknownst to Steen, dye, in a burgundy bag that Hawkins had given to Steen. After Steen got the bag, he ran to the side of bank where, according to the plan, he was to find clothes that Hawkins left for him. The dye in the bag exploded and Steen stated that it got on his hands. Steen left the money by a fence, which he testified Hawkins and Defendant told him to do, and changed into the clothes that were left there for him. He eventually left the gun on a nearby bridge. Steen testified that Defendant told Steen after he robbed the bank, changed clothes, and dropped the money off, he was either [**7] supposed to take a city bus back to Hawkins' house, or Hawkins and Defendant would pick him up.

After the first robbery was completed, Defendant and Hawkins picked up Steen in Defendant's car. Defendant and Hawkins went to look for the money but could not find it. Hawkins and Defendant took Steen to the house of one of Defendant's relatives so that Steen could wash the dye off his hands.

[1] The Facts are divided into discrete sections, and relate only to the specific portions of the proceedings below that Defendant challenges.

Defendant then decided that Steen should rob another bank. According to Steen, Defendant told him that Defendant had not "come down here for nothing." They drove to Old Kent Bank in Grand Rapids, and Defendant gave Steen the second gun, and told him to rob that bank. Steen testified that Defendant told him to demand hundreds, fifties and twenties, and also to tell the teller "to fill the money up" so that Steen could see if the teller were to put dye in the bag. After the robbery, Steen ran from the bank and jumped into Hawkins' car. Defendant followed in his car. Once back at Hawkins' home, which was also the home of his girlfriend, Defendant and Hawkins split the money and Steen returned Defendant's gun to him. Steen testified, however, that he stole fifty dollars of the money when Hawkins' back [**8] was turned.

Steen testified that after the robbery, Defendant told Steen that he was sending him to stay with some friends in [***6] Cleveland. He provided Steen money for a bus trip to Cleveland and with the name and number of the friend with whom Steen was to stay. After arriving in Cleveland, Steen realized the contact information was false. [*406] Steen slept in the bus terminal, garages and on the streets for a few days until he was aided by a woman, Mahogany Austin, who found him on the street one night and with whom he stayed for a month. Steen contacted Defendant from Cleveland, and testified that Defendant told him to go to New York and that there were friends there with whom Steen could reside. Steen received money from Austin's sister and stayed with Defendant's friends, who told Steen that in order to remain with them he would have to sell drugs. Steen testified that he overheard one of Defendant's friends speaking with Defendant on the phone, and that Defendant gave his friend orders to kill Steen. Steen testified that he managed to escape after a lengthy street chase.

**3. Juror taint**

At the end of the second day of the three-day trial, a juror, Karen Stephen, notified [**9] a member of the judge's staff that she worked with the mother of a government witness who had just testified. The district court advised the parties of this fact, and defense counsel suggested making Stephen an alternate. The following day, the district court again addressed the issue, and the prosecution reiterated the defense counsel's earlier suggestion. The district court stated that another possibility would be "to get Ms. Stephen in here," presumably for questioning. However, both parties agreed to allow all jurors, including Stephen, to remain on the jury, but to dismiss Stephen as an alternative at the end of the trial.

**4. Government's delay in disclosing witnesses and witness statements**

On the second day of trial, the prosecutor informed the district court that he had discovered two new witnesses, Heidi Austin and Joan Harry, that he might call to take the stand. The prosecutor [*407] told the court that he had only the day before discovered that Austin knew anything about the case. As for [***7] Harry, the prosecutor stated that he did not know that she had been subpoenaed until the day before. Defense counsel objected to the late naming of the new witnesses. He contended [**10] that the government had known about Austin for months and had not put her on the witness list. The district court overruled the objection, explaining that it knew of no federal criminal procedure rules that required the government to name their witnesses beforehand. Ultimately, only Harry testified on the third day of trial. Her testimony consisted of admitting that she did not know Defendant personally but knew that he used to visit her step-daughter.

On the third day of trial, the prosecutor informed the district court that he had forgotten to turn over to defense counsel audio tapes of phone calls that Hawkins made while in jail. Defense counsel told the district court that he had not had an opportunity to review those tapes and did not know whether they contained exculpatory or inculpatory information. The prosecutor told the court that there were approximately six to eight conversations on those tapes and admitted that he should have turned them over to the defense. The prosecutor proposed that at the end of the day, he would give defense counsel the tapes to review and that defense counsel should then be allowed to recall Hawkins and another witness, who also was on the tape, [**11] if he deemed it necessary. Defense counsel stated that he believed that was a satisfactory solution provided he was given enough time to listen to the tapes.

Defendant, however, informed his attorney that he did not want the trial to be postponed another day, and wanted the trial resolved that day. Defense counsel told the court that he believed the tapes might have some value. He stated that he had listened to one tape and believed that it might have some favorable information, but he did not know what was on the rest of the tapes.

The court then asked Defendant whether he understood that there may be information on the tapes that would be helpful to his case, and that no one, including the government, had any idea what was on the tapes because no one had listened to them all. The following colloquy then occurred: [***8]

> The Court: And I'm going to give your lawyer full opportunity to listen to those tapes, and the delay we're talking about is not long. It's only till tomorrow morning at nine o'clock. I mean, then we'll continue. But that will at least give Mr. Beason [defense counsel] an opportunity to listen to those tapes. Do you understand that?
>
> The Defendant: [**12] Yes, Your Honor.
>
> The Court: In addition to that, it's my judgment that by the time we get done with the last witness and the instructions and the closing arguments, the day is going to be just about done anyway, so maybe the jury will have to come back tomorrow anyway. They didn't seem to be very upset when I told them they'd probably have to come back tomorrow.
>
> The Defendant: Yes, Your Honor.
>
> The Court: I will give them an instruction, if you request it, that any delay in this case-in fact, I'll say that neither lawyer delayed the case; although I'll put it this way. Mr. Beason certainly has done nothing to delay the case and has a done a fine job representing you, so that there will be no bad inference toward you at all, sir. Do you understand that?
>
> The Defendant: Yes, Your Honor.
>
> The Court: If I were you, quite frankly, I would want my lawyer to listen to the tapes. Do you understand that? [***9]
>
> The Defendant: Yes, Your Honor.

(J.A. at 285-86.)

After Defendant again consulted with his attorney, defense counsel informed the court that Defendant was still "adamant" about wanting to conclude the trial. The prosecutor then stated that [**13] he had spoken with a Grand Rapids police officer, and could at that point summarize what was on the tapes, but the district court would not allow him to do so because the court did not want the record to reflect that anyone was relying on what the prosecutor might have said.

**5. Defendant's role in the offense**

At sentencing, Defendant claimed that he was innocent and played no role in any of the crimes for which he was convicted. Defendant also claimed that he advised his attorney to object to four different items contained in his presentence investigation report ("PSIR"). However, his attorney objected to only one issue. Defendant then advised the court that he objected to his role in the offense as an organizer in the offense. The district court then stated:

> All right. I would find-if the objection is made, and I'll take the objection now-that you should be enhanced for the two points on both paragraphs 46 and 47 in that, based on the testimony of Mr. Steen, you and Mr. Hawkins got Mr. Steen involved in this. I know that there is a statement from Mr. Hawkins that Steen suggested it; but, nonetheless, you two people, based on the testimony which I believe got him to the [**14] [*408] bank, gave him the gun, and then left in the car before he got back to you with the dye pack and the money. . . . He was a young boy at that time, although-albeit, not inexperienced in bank robberies, obviously.

(J.A. at 302-03.)

[***10] **DISCUSSION**

Defendant, either *pro se*, or through counsel, raises the following challenges to his conviction and/or sentence: (1) whether the evidence was sufficient to support his conviction for aiding and abetting in the bank robberies and using or carrying a firearm during those crimes; (2) whether the indictment was defective for failing to include all of the essential elements of the crimes charged; (3) whether the district court should have given a specific jury instruction that required the jury to unanimously agree on the specific affirmative acts Defendant performed in committing his aiding and abetting offenses; (4) whether counts two and four of Defendant's indictment must be dismissed because they are duplicitous; (5) whether Defendant's convictions violated the Double Jeopardy Clause or were otherwise multiplicitous; (6) whether the district court should have held a hearing or taken some other action upon discovering [**15] during trial that a juror knew the mother of a government witness; (7) whether the government engaged in misconduct by failing to disclose two witnesses pre-trial and failing to turn over possible exculpatory evidence to the defense, such that

his convictions must now be vacated; (8) whether trial counsel rendered ineffective assistance of counsel by, among other things, failing to advise defendant that he faced a mandatory twenty-five-year sentence for conviction under count four of his indictment; (9) whether the district court clearly erred in increasing defendant's offense level by two points, pursuant to USSG § 3B1.1, based on the court's findings regarding his role in the offenses; and (10) whether the district court plainly erred when it ordered that restitution be paid in full without establishing a schedule of payments. We will address each of these arguments in turn.

[***11] **A. Whether the evidence was sufficient to sustain his convictions for aiding and abetting in the bank robberies and using or carrying a firearm during that crime**

Defendant contends that the evidence was insufficient to sustain his conviction inasmuch as there was no physical evidence tying [**16] him to the offenses charged, and the jury should not have believed any of Steen's testimony because it was inconsistent on several points and "highly questionable" in general. We disagree, and hold that there was sufficient evidence to find Defendant guilty beyond a reasonable doubt of all of the crimes for which he was charged.

"When reviewing a claim of insufficient evidence, we examine the evidence in the light most favorable to the government and draw all inferences in the government's favor in order to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. Gibbs*, 174 F.3d 762, 774 (6th Cir. 1999) (citations omitted). "Circumstantial evidence alone may sustain a conviction under this deferential standard of review." *United States v. Adams*, 265 F.3d 420, 423 (6th Cir. 2001) (citations omitted).

In order to prove a violation of 18 U.S.C. § 2113(a) and (d), the government must show: (1) that by force or threat of force; (2) the defendant attempted to take from a person in another's presence an item of value; (3) that is in [*409] the custody or control [**17] of a bank; and (4) in doing so, placed in jeopardy the life of any person by use of a dangerous weapon or device. *United States v. Waldon*, 206 F.3d 597, 605 (6th Cir. 2000) (citing 18 U.S.C. § 2113(a)); *see also* 18 U.S.C. § 2113(d). In order to prove a violation of 18 U.S.C. § 924(c)(1)(A)(ii), the government had to show that during or in relation to a crime of violence, Defendant used or carried and brandished a firearm. *Id*. Defendant was charged and convicted for aiding and abetting in the commission of these crimes. To be convicted as an aider and abettor, the government had to prove that Defendant "offered assistance or encouragement to [***12] his principal in the commission of a substantive offense." *United States v. Webber*, 208 F.3d 545, 553 (6th Cir. 2000) (quoting *United States v. Ledezma*, 26 F.3d 636, 642 (6th Cir. 1994)). An aider and abettor may be punished as a principal. *United States v. Maselli*, 534 F.2d 1197, 1200 (6th Cir. 1976) (explaining that "one who causes another to commit an unlawful act is as guilty of the substantive [**18] offense as the one who actually commits the act"). This Court has also explained aiding and abetting in the following manner:

> Aiding and abetting requires that a defendant "in some sort associate himself with the venture, that he participates in it as something he wishes to bring about, and that he seek by his action to make it succeed." Thus, it has been said that aiding and abetting involves (1) an act by a defendant which contributes to the execution of a crime; and (2) the intent to aid in its commission.

*United States v. Lowery*, 60 F.3d 1199, 1202 (6th Cir. 1995) (citations and internal quotation marks omitted).

Steen testified that Defendant assisted him in robbing the banks and using firearms to do so by providing transportation, supplying the guns, picking out the banks to be robbed, and ushering Steen to a relative's house to wash dye off of his hand after the dye exploded on Steen after the first robbery. Steen also testified that Defendant told him to rob the banks, to request specific types of denominations while doing so, and to shoot anyone who put dye in the money bag. Many of the details of the robberies were corroborated by Hawkins, [**19] including that Defendant decided which banks to rob and provided Steen the firearms to commit the robberies. Construing the evidence in the light most favorable to the prosecution, the evidence was more than sufficient for the jury to find that Defendant contributed to the execution of both bank robberies and the firearm offenses, and that Defendant intended to aid in the commission of those crimes. *Lowery*, 60 F.3d at 1202.

Defendant contends that there was no physical evidence linking him to the banks. He argues that the proof showed [***13] that only Steen was in the banks and not Defendant. However, physical evidence is not required to sustain a conviction. *United States v. Evans*,

883 F.2d 496, 501-02 (6th Cir. 1989). Defendant further argues that although Steen testified that Defendant and Hawkins forced him to rob the banks, Hawkins testified that it was Steen who planned the robberies. However, to the extent there were inconsistencies with regard to who initiated the idea of robbing the banks and whether Defendant actually told Steen to rob the banks, the jury was able to make its own determinations. The jury obviously credited Steen's testimony [**20] over Hawkins' testimony, which was within the jury's province. *See United States v. Latouf*, 132 F.3d 320, 330-31 (6th Cir. 1997) (explaining that "issues of witness credibility are for the jury;" and the jury is entitled to "special deference" with regard to the "resolution of questions of credibility"). [*410] Further, "challenges to the credibility of a witness are not . . . challenges to the sufficiency of the evidence, but instead are challenges to the quality of the government's evidence." *Id*. (citing *United States v. Farley*, 2 F.3d 645, 652 (6th Cir. 1993)).

Defendant, however, appears to argue that Steen did not present "competent" testimony because Steen had been involuntarily committed at one point. To the extent Defendant raises such an argument, we reject it. There is no evidence in the record showing that Steen was incompetent to testify. At trial, defense counsel raised the fact that after Steen was taken into custody, he was hospitalized. Steen testified that he heard voices in his head. He also contended that "they" tried to say he was insane. On redirect, Steen testified that in his own criminal case, in which he pleaded guilty in juvenile [**21] court to bank robbery, the district court had him undergo a psychological examination. That judge found Steen competent. This is the only evidence regarding Steen's competency that Defendant points to in the record. Moreover, the federal rules of evidence provide that "every person is competent to be a witness . . . ." Fed. R. Evid. 601. According to the Advisory Committee Notes, "[a] witness wholly without capacity is difficult to imagine," and "the [***14] question is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence." *Id*. (citing 2 Wigmore §§ 501, 509); *see also United States v. Phibbs*, 999 F.2d 1053, 1070 (6th Cir. 1993) ("As long as a witness appreciates his duty to tell the truth, and is minimally capable of observing, recalling, and communicating events, his testimony should come in for whatever it is worth."). Further, the jury heard all of the evidence regarding Steen's alleged incompetence and any other impeaching evidence, and decided to credit his testimony. Once a jury has "ample opportunity" to hear the evidence impeaching a witness and still chooses to [**22] believe that witness, it is generally "not for this Court to substitute its opinion for that of the jury in determinations of credibility." *Latouf*, 132 F.3d at 331 (citing *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir. 1985)). Further, as noted previously, much of Steen's testimony regarding the details of the robberies was corroborated by Hawkins.

Finally, Defendant claims that Steen's version of the events that transpired during and after the robbery contained inconsistencies or otherwise made no sense. For instance, although Steen testified that he dropped the cash and firearm and changed clothes after the first robbery, neither Hawkins, Defendant, nor the authorities were able to find any of these items. Defendant also contends that Steen's story that Defendant tried to kill him made no sense inasmuch as Steen also testified that Defendant also helped him to move to Michigan and Cleveland. According to Defendant, if he wanted Steen dead, he could have killed him in Michigan or Cleveland and would not have helped him move to different places. However, even assuming the authorities were unable to find some of the items Steen testified he [**23] discarded or assuming Defendant did not intend to kill Steen as the latter testified, this has nothing to do with and in no way contradicts evidence that Steen robbed the banks. According to both Steen and Hawkins, Steen robbed the banks with Defendant's assistance and with weapons supplied by Defendant. We therefore find that there was sufficient evidence to support Defendant's convictions for the crimes charged.

[***15] **B. Whether the indictment was defective for failing to include all of the essential elements of the crimes charged**

Defendant first contends that his sentence of twenty-five years on count four [*411] must be vacated because he was indicted by the grand jury only for violations of 18 U.S.C. § 924(c)(1)(A)(ii), which carries a term of seven years' imprisonment, and not under 18 U.S.C. § 924(c)(1)(C)(1), which states that for a second or subsequent conviction, a defendant shall be sentenced to a twenty-five-year term of imprisonment. Defendant also claims that his indictment failed to allege the "essential element" of the type of firearm involved in the crime, and thus the indictment must be dismissed. Defendant further [**24] argues that the indictment was defective because it failed to state what, if any, affirmative act in furtherance of the crimes charged that he performed with respect to his aiding and abetting

offenses. Defendant contends that because the indictment failed to identify the specific acts that he was alleged to have performed, the indictment did not list every essential element of the crime and was thus deficient. We find none of these arguments persuasive.

This Court generally reviews challenges to the sufficiency of an indictment *de novo*. *United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999). However, where a defendant does not challenge an indictment until appeal, the "indictment must be construed liberally in favor of its sufficiency." *Id.; United States v. Harris*, 523 F.2d 172 (6th Cir. 1975). "Furthermore, unless the defendant can show prejudice, a conviction will not be reversed where the indictment is challenged only after conviction unless the indictment cannot within reason be construed to charge a crime." *Gatewood*, 173 F.3d at 986 (citation omitted).

Defendant primarily relies on *Castillo v. United States*, 530 U.S. 120, 147 L. Ed. 2d 94, 120 S. Ct. 2090 (2000), [**25] to support his argument that his indictment was defective for failing to include the type of firearm involved in the offenses. In *Castillo*, the Supreme Court dealt [***16] with the issue of whether under the firearm statute, the type of weapon involved was a sentencing factor or an element of the crime to be determined by a jury. *Id*. at 121. The Court ultimately held that Congress intended that firearm type be considered an element of a separate aggravated crime and not merely serve as sentencing factor. *Id*. at 131. In *Castillo*, the defendant's sentence was increased when at sentencing, the district court made a factual determination that the type of gun the defendant possessed included machine guns, and accordingly imposed a higher sentence as was prescribed by the statute. 530 U.S. at 122. In the instant case, however, Defendant was charged and convicted under the general firearm provision of 18 U.S.C. § 924(c)(1)(A). His sentence was not enhanced because of the type of firearm used in the crime, and his argument is without merit.

Likewise, Defendant's indictment was not defective and Defendant does [**26] not have to be resentenced, because his indictment did not charge him with a violation under § 924(c)(1)(C)(i). As stated, that provision provides that for a second or subsequent conviction under the firearm statute, a defendant must be sentenced to a term of twenty-five years. In the instant case, Defendant was convicted for two counts of violating § 924(c)(1)(A). The district court sentenced him to seven years for the first conviction (count two), and pursuant to § 924(c)(1)(C)(i), the court sentenced Defendant to twenty-five years for the second conviction (count four).

Defendant relies primarily on *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), to support his argument that because the fact of his second or subsequent conviction increased his sentence, that fact should have been alleged in the indictment. *Apprendi* held that "other than the fact of a prior [*412] conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id*. at 490. *Apprendi* also explained that a judge's role in sentencing a defendant [**27] is "constrained at its outer limits by the facts alleged in the indictment and found by the jury." *Id*. at 483 n.10. In the instant case, Defendant actually complains that a prior [***17] conviction for aiding and abetting in the brandishing of a firearm (count two) was used to enhance his sentence after a subsequent conviction for the same crime (count four). Therefore, under *Apprendi*, his sentence under count four could indeed be increased to twenty-five years, and § 924(c)(1)(C)(i) did not need to be pleaded in the indictment. *Id*. at 490. Morever, Defendant's argument is foreclosed by authority from the Supreme Court and this circuit. *See Deal v. United States*, 508 U.S. 129, 130, 124 L. Ed. 2d 44, 113 S. Ct. 1993 (1993) (holding that in case where defendant was convicted of six bank robberies and six counts of carrying a weapon in relation to that "crime of violence," pursuant to 18 U.S.C. § 924(c)(1), that second through sixth conviction constituted second or subsequent convictions within the meaning of the statute and the sentence could be enhanced accordingly); *United States v. Langan*, 263 F.3d 613, 627 (6th Cir. 2001) [**28] ("If a defendant is charged with and convicted of separate offenses to which § 924(c) applies, the separate convictions on the associated § 924(c) counts can be used to determine previous and subsequent convictions.").

Defendant next contends that the indictment was defective because it failed to state what, if any, affirmative act in furtherance of the crimes charged he performed. Defendant contends that because the indictment failed to identify the specific acts that he was alleged to have performed, the indictment did not list every essential element of the crime and was thus deficient. We disagree. As we have explained, the essential elements of aiding and abetting are (1) an act by the defendant that contributes to the commission of the crime, and (2) an intention to aid in the commission

of the crime. *Lowery*, 60 F.3d at 1202. An indictment is not defective merely because it does not explain in what respect the defendant aided or abetted. *See Harris*, 523 F.2d at 174 (holding that indictment that charged the defendant with aiding and abetting the commission of an armed bank robbery and assault with a dangerous weapon in violation of 18 U.S.C. §§ 2, [**29] 2113(a) and (d), fairly informed him of the crimes charged, enabled him to prepare and provide a [***18] defense, and provided a basis for a plea of double jeopardy if charged again with these offenses).

The indictment in the instant case charged Defendant with aiding and abetting in two bank robberies and in using, carrying, possessing and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 2 and 2113(a) and (d). Under the liberal standard of review with which we must consider the indictment, we are convinced that it provided Defendant with adequate notice of the crimes for which he was charged and was not constitutionally defective. *Gatewood*, 173 F.3d at 986; *Harris*, 523 F.2d at 174. Accordingly, Defendant's argument that his indictment was defective inasmuch as it failed to detail the specific affirmative acts he performed for each count is without merit.

**C. Whether the district court should have given a specific jury instruction that required the jury to unanimously agree on the specific affirmative acts Defendant performed in committing his aiding and abetting offenses**

Defendant [**30] contends that the jury was required to unanimously agree on what [*413] acts constituted aiding and abetting with regard to all four counts of conviction. Defendant argues that the jury verdict is unreliable in that the jury did not unanimously agree on the precise acts in which Defendant engaged while committing his offenses. Again, we disagree.

Defendant failed to object to the challenged jury instruction before the district court; therefore, this Court's review is for plain error. *United States v. Yang*, 281 F.3d 534, 551 (6th Cir. 2002); *United States v. King*, 169 F.3d 1035, 1040 (6th Cir. 1999). "An instruction is not plainly erroneous unless there was 'an egregious error, one that directly leads to a miscarriage of justice.'" *Id*. (quoting *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir. 1988)).

To support his argument, Defendant relies on *Richardson v. United States*, 526 U.S. 813, 143 L. Ed. 2d 985, 119 S. Ct. 1707 (1999). *Richardson* involved [***19] an appeal of a conviction for engaging in a "continuing criminal enterprise" ("CCE") in violation of 21 U.S.C. § 848. *Id*. at 815. [**31] That statute defines a "continuing criminal enterprise" as involving a violation of the drug statutes where such violation is a part of a continuing series of violations. 21 U.S.C. § 848(c). When instructing the jury concerning the "series of violations" requirement, the district court explained that the jury had to "unanimously agree that the defendant committed at least three federal narcotics offenses." *Richardson*, 526 U.S. at 816. However, the court further explained that they did not have to agree as to the particular three or more federal narcotics offenses committed by the defendant. *Id.* The jury convicted the defendant, but the Supreme Court reversed, and held that "unanimity in respect to each individual violation is necessary." *Id*.

In *Richardson*, the Supreme Court distinguished between elements of a crime, which it held had to be determined unanimously, and the means by which an element may be accomplished, which does not require unanimity. *Id*. at 817. The Court explained that a federal jury does not always need to "decide unanimously which of several possible sets of underlying brute facts make up a particular [**32] element, say, which of several possible means the defendant used to commit an element of the crime." *Id*.

One of the driving forces behind the Supreme Court's decision was the breadth of the CCE statute. The word "violations," which encompasses the "series of violations" that the jury had to find in order to convict under the CCE, covered two chapters of the Federal Criminal Code regarding drug crimes, which involved approximately ninety numbered sections. *Id*. at 819. Therefore, the CCE required that the defendant engage in a "continuing series of violations" of a broad range of specified criminal statutes. *Id*. The Court was concerned that the statute's word "'violations' covers many different kinds of behaviors of varying degrees of seriousness," and that failing to treat each violation as a separate element would create a risk that a guilty verdict might mask "wide disagreement among the jurors about what [***20] the defendant did, or did not, do." *Id*. The Court in *Richardson* noted that some of the various acts that may be alleged as violations for purposes of the "series" requirement of the CCE statute encompass a wide range of activities. [**33] *Id*.

In the instant case, § 2 of Title 18 provides "whoever commits an offense against the United States or aids,

abets, counsels, commands, induces or procures its commission or willfully causes an act to [*414] be done by himself or another is punishable as a principal." 18 U.S.C. § 2(a)-(b).

The district court instructed that the jury had to find that:

> Jordell Steen's actions satisfied each of the essential elements-of the elements of using or carrying a firearm . . . . Second, that the defendant did something to assist Jordell Steen in committing an armed bank robbery. Third, that at the time the defendant acted, he intended to assist or assisted Jordell Steen in committing the robbery with knowledge that he was armed.

(J.A. at 296.) The district court further instructed the jury that it could find Defendant guilty if it determined that he "intentionally helped, encouraged, commanded or induced another to commit the crime. A person who does this is called an aider and abetter." (Trial Transcript at 14-15, Jury Instructions.)

Contrary to Defendant's argument, the aiding and abetting statute is vastly different from the statute at issue in *Richardson*, [**34] and the finite terms listed under 18 U.S.C. § 2 describe various means by which the elements of the crime can be accomplished, and do not require jury unanimity as to each of these terms. *Richardson*, 526 U.S. at 817; *cf. United States v. Powell*, 226 F.3d 1181, 1194-96 (10th Cir. 2001) (rejecting the argument that under federal kidnapping statute, district court was required per *Richardson* to give jury unanimity instruction with regard to whether defendant "seized," "confined" or "inveigled," the victim, as those statutory terms represented means by which the kidnapping could be accomplished and not elements). [***21]

We also note that at least one sister circuit has squarely addressed and rejected Defendant's argument. *See United States v. Kim*, 196 F.3d 1079 (9th Cir. 1999). In *Kim*, the defendant was convicted of aiding and abetting the possession of stolen goods. *Id.* at 1081. The jury instructions provided that to convict defendant of aiding and abetting, the jury would have to find that he "helped, counseled, commanded, induced or procured, that is to get or bring about by some effort, [**35] [the principal] to commit [the] offense." *Id.* at 1081 n.3. The defendant argued, among other things, that his conviction could have resulted in different jurors finding that he had committed different acts. *Id.* at 1082. He contended that some jurors may have believed that he "commanded," while others may have considered that he "ordered" or "assisted" his co-defendant to possess stolen goods. *Id.* at 1083. Therefore, he argued that the district court should have given a special unanimity instruction such that the jurors could unanimously agree on the manner in which he carried out the crime. The Ninth Circuit rejected this argument, holding that the six prohibited acts listed in § 2 of Title 18 represent alternative ways in which a defendant may be held liable for the underlying offense. *Id.* According to the court, it was therefore unnecessary for the jury to unanimously agree on a specific classification of the defendant's conduct. *Id.* at 1083 (citing *Schad v. Arizona*, 501 U.S. 624, 115 L. Ed. 2d 555, 111 S. Ct. 2491 (1991)). The same reasoning holds true in this case, and although there may [**36] have been various means by which Defendant aided and abetted in the underlying offenses for which he was convicted, no unanimity instruction with regard to these various means was necessary. *Kim*, 196 F.3d at 1083; *Powell*, 226 F.3d at 1194-96.

**D. Whether counts two and four of defendant's indictment must be dismissed because they are duplicitous**

Defendant contends that counts two and four of the indictment [*415] charging him with violating 18 U.S.C. § 924(c) were duplicitous and must be dismissed because they charged two distinct offenses within each count. Whether an [***22] indictment is duplicitous is a legal question that this Court reviews *de novo*. *United States v. Campbell*, 279 F.3d 392, 398 (6th Cir. 2002). The government contends that Defendant has waived this issue inasmuch as he failed to raise it below, and pursuant to Fed. R. Crim. P. 12(b)(2), defects in an indictment, unless they pertain to jurisdiction, must be raised prior to trial. *See United States v. Adesida*, 129 F.3d 846, 849 (6th Cir. 1997). Where a defendant fails to raise the issue of duplicity before trial, the [**37] case will proceed to trial under the presumption that the district court will clear up any perceived error with proper jury instructions. *Id.*

However, this Court also has held that a defendant "may raise the alleged harm stemming from the duplicitous indictment at trial or on appeal even if he does not object to the duplicitous indictment before trial." *Id.* For instance, the defendant can raise the fact that because of the indictment, it is unclear whether the jury's verdict with respect to either offense was unanimous. *Id.* Such an error need not be raised before trial because it concerns not only a technical error but also a defendant's substantive rights, i.e., the right to a

unanimous jury verdict. *Id*.

Defendant contends that the firearm statute 18 U.S.C. § 924(c)(1)(A) charges two separate offenses: (1) using or carrying a firearm during and in relation to a crime of violence or drug trafficking crime; and (2) possessing a firearm in furtherance of such crime. The statute, in pertinent part, reads as follows:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of [**38] law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, [***23] in addition to the punishment provided for such crime of violence or drug trafficking crime . . . (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years . . . .

18 U.S.C. § 924(c)(1)(A)(ii).

Counts two and four of Defendant's indictment read as follows: "David Devon Davis, did, in furtherance of a crime of violence . . . that is the armed bank robbery charged in . . . the indictment, use, carry and possess and brandish a firearm in furtherance of that crime, and did aid and abet in this offense." (J.A. at 23, 25.) Defendant contends that the indictment charged him with "using or carrying" the firearm, which relates to one crime, and with "possessing" the firearm, which relates [**39] to another.

An indictment is duplicitous if it sets forth separate and distinct crimes in one count. *Campbell*, 279 F.3d at 398. "The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both." *United States. v. Washington*, 127 F.3d 510, 513 (6th Cir. 1997). "A general verdict of guilty will not reveal whether the jury found the defendant guilty of one crime and not guilty of the others, or guilty of all." *Id*. "The yardstick in determining whether there is duplicity or multiplicity is whether one offense or separate offenses are charged and . . . this is a difficult and subtle question." 2 Charles Alan Wright & Arthur R. Miller, Federal Practice and [*416] Procedure § 142, at 17 (3d ed. 1999). "The test announced most often in the cases is that offenses are separate if each requires proof of an additional fact that the other does not." *Id*. (footnotes omitted); *see also Adesida*, 129 F.3d at 849 (explaining that indictment contained a duplicitous count inasmuch as it charged two separate [**40] offenses, each requiring different proof); *United States v. Barnett*, 418 F.2d 309, 312 (6th Cir. 1969).

At least one district court has adopted Defendant's argument that 18 U.S.C. § 924(c)(1)(A) charges two separate [***24] offenses. *See United States v. Pleasant*, 125 F. Supp. 2d 173, 176 (E.D. Va. 2000) (holding that § 924(c) defines two separate crimes, and dismissing indictment as duplicitous where indictment charged an amalgam of conduct taken from different parts of the statute ).

However, whether, in fact, § 924(c) constitutes separate offenses is a question we need not resolve for purposes of the instant appeal. Even assuming § 924(c) constitutes two offenses, Defendant fails to show that his substantive rights were affected by any alleged errors in his indictment. *Adesida*, 129 F.3d at 849.

With regard to counts two and four, the district court instructed as follows:

> The crime of using a firearm *during and in relation* to a bank robbery as charged in Counts 2 and 4 of the indictment has three essential elements which are: One, a person committed a crime of violence, in this case, a [**41] bank robbery as described in Counts 1 and 3 of the indictment. Two, *during and in relationship to the commission, a firearm was used or carried.* Three during, the robbery, the firearm was brandished. Here are some definitions of the terms used in this statute: To "use a firearm" means to actively employ a firearm during the crime of violence. A firearm is "actively employed" if it is discharged, brandished, displayed or discussed during the crime. A firearm is used or carried "in relation to" a crime of violence when the firearm furthered the purpose the crime and its presence was not the result of coincidence.

(Trial Transcript at 14-15, Jury Instructions); *see also* J.A. at 296 (district court explaining to jury that it must be convinced the Steen's conduct satisfied each element of using or carrying a firearm that the court had previously described).

Juries are presumed to follow the instructions they are given. *See Washington v. Hofbauer*, 228 F.3d 689, 706

(6th Cir. 2000). To the extent Defendant complains that the jury [***25] may have reached a non-unanimous decision with regard to whether he either "possessed the firearm in furtherance of [**42] the crime" or "used or carried it during and in relation" to the underlying offense, that problem was clarified by explicit jury instructions. *Adesida*, 129 F.3d at 849; *see also Campbell*, 279 F.3d at 398 (explaining that "vice of duplicity" is that the jury might not reach a unanimous verdict on a particular offense) (citation omitted); *Nattier v. Coley*, 127 F.3d 655, 657-58 (8th Cir. 1997) (holding on *de novo* review that curative jury instruction corrected any duplicity that might have occurred in indictment by charging in one count two separate objects of an alleged conspiracy); 2 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 142, at 16 (3d ed. 1999). Accordingly, we reject Defendant's argument that his substantive rights were affected by any alleged duplicity in the indictment.

**E. Whether Defendant's convictions violated the Double Jeopardy Clause or were otherwise multiplicitous**

Defendant failed to raise his double jeopardy claim before the trial court, [*417] and thus this forfeited claim is reviewed only for plain error. *United States v. Branham*, 97 F.3d 835, 842 (6th Cir. 1996). [**43] "Rule 52(b) of the Federal Rules of Criminal Procedure provides us with authority to correct plain errors that were not raised during the proceedings before the district court." *Id*. (citing Fed. R. Crim. P. 52(b)). Under plain error review, before we can correct an error not raised below, Defendant must show that there was an error, that the error was plain, and that it affected his substantial rights. *United States v. Cotton*, 535 U.S. 625, 152 L. Ed. 2d 860, 122 S. Ct. 1781, 1785 (2002). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if . . . the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. (citing *Johnson v. United States*, 520 U.S. 461, 466-67, 137 L. Ed. 2d 718, 117 S. Ct. 1544 (1997)).

Defendant contends that counts one and two involve the exact same conduct and counts three and four involve the [***26] exact same conduct, thus violating the Double Jeopardy Clause. In other words, Defendant argues that his conviction under 18 U.S.C. § 2113(d) contemplated a firearm and therefore his conviction [**44] under § 924(c) violated the prohibition against double jeopardy. This Court has rejected similar arguments in the past.

"Generally, an indictment may not charge a single criminal offense in several counts without offending the rule against 'multiplicity' and implicating the double jeopardy clause." *United States v. Hart*, 70 F.3d 854, 859 (6th Cir. 1995) (citation omitted). "The Fifth Amendment prohibition against double jeopardy protects against three harms: second prosecution for an offense after initial acquittal, second prosecution for an offense after an initial conviction, and multiple punishments for the same offense." *United States v. Gibbons*, 994 F.2d 299, 301 (6th Cir. 1994) (citation omitted).

In *Gibbons*, the defendant challenged his conviction and sentence under two counts, conspiracy to distribute crack cocaine and conspiracy to use or carry a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). *Id*. The Court explained that inasmuch as the defendant challenged the constitutional validity of the two counts in the same indictment and his conviction and sentence based on those [**45] counts, he invoked the third double jeopardy concern, protection against a multiplicity of punishment. *Id*. "The general test for compliance with the double jeopardy clause looks to "whether each provision requires proof of a fact which the other does not." *Id*. (citing *Blockburger v. United States*, 284 U.S. 299, 304, 76 L. Ed. 306, 52 S. Ct. 180 (1932)). However, the Court explained that this test does not apply "where Congress has authorized punishments which would otherwise be inappropriately cumulative." *Id*. (citing *Whalen v. United States*, 445 U.S. 684, 688, 63 L. Ed. 2d 715, 100 S. Ct. 1432 (1980)). The Court further explained:

> "The question whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without [***27] determining what punishments the Legislative Branch has authorized." [*Whalen v. United States*, 445 U.S. 684, 688, 63 L. Ed. 2d 715, 100 S. Ct. 1432 (1980).] "Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not [**46] exceed its legislative authorization by imposing multiple punishments for the same offense." [*418] *Brown v. Ohio*, 432 U.S. 161, 165, 53 L. Ed. 2d 187, 97 S. Ct. 2221 (1977).

*Id*.

The Court held that 18 U.S.C. § 924(c)(1) is such a

statute. Congress made itself unequivocally clear that punishment for violation of that statute was to be imposed in addition to punishment for committing the predicate offense. *Id*.

Relying primarily on *Blockburger*, Defendant argues in his *pro se* brief that this Court must consider whether two offenses were committed in counts one and two. He makes the same argument for counts three and four. He contends that his convictions constitute double jeopardy because they are based on the same series of actions. Similarly, he also argues through counsel that the offense of aiding and abetting in the brandishing of a firearm under 18 U.S.C. § 924(c) punishes the same conduct as that provided for under 18 U.S.C. § 2113. Defendant was convicted of aiding and abetting in *two separate* bank robberies and while doing so placing lives at risk (18 U.S.C. § 2113 [**47] (a), (d)), (counts one and three), and of aiding and abetting in the use of dangerous weapons during and in relation to each bank robbery (18 U.S.C. § 924(c)), (counts two and four). [2]

[***28] As we held in *Gibbons*, "the general double jeopardy tests cannot be applied to section 924(c) since a section 924(c) charge is always predicated upon the violation of another statutory offense. . . . The [**48] underlying crime of violence . . . [on] which a section 924(c) conviction is, by definition, based will never require proof of any fact for which section 924(c) itself does not require proof." 994 F.2d at 302. Because Congress expressly provided that courts may impose punishment for a violation of § 924(c) in addition to the punishment imposed for the predicate felony, Defendant's double jeopardy arguments lack merit. *United States v. Moore*, 917 F.2d 215, 229-30 (6th Cir. 1990) (rejecting double jeopardy argument where a defendant's sentence is enhanced under § 924(c) when applied in connection with the predicate offense of armed robbery of a post office).

**F. Whether the district court should have held a hearing or taken some other action upon discovering during trial that a juror knew the mother of a government witness**

Defendant contends for the first time on appeal that the district court should have, among other things, declared a mistrial because during the second day of trial, a juror, Karen Stephen, informed the court that she worked with the mother of a government witness. Defendant failed to raise the issue below and we therefore review [**49] his claim for plain error. *See United States v. Maxwell*, 160 F.3d 1071, 1076 (6th Cir. 1998) (holding that Court would review for plain error defendant's argument that district court should have conducted a hearing to determine the effect on the jury of a revelation that one juror knew the defendant's mother).

At the end of the second day of trial, juror Stephen informed a member of the judge's staff that she worked with the [*419] mother of a government witness who had just testified. Defendant contends that instead of removing the juror immediately and determining whether there was any residual taint, the court improperly allowed the juror to remain and removed her only at the end of the proceedings, thereby [***29] requiring reversal of his conviction. He contends that this is especially so because the particular government witness was disclosed to the jury before trial. We disagree, and find no error that would require reversal of Defendant's conviction.

The Sixth Amendment to the Constitution guarantees a criminal defendant the right to trial by an impartial jury. *United States v. Henning*, 286 F.3d 914, 921 (6th Cir. 2002). Defendant primarily relies [**50] on *Wolfe v. Brigano*, 232 F.3d 499, 501 (6th Cir. 2000), to support his argument that the district court erred in not declaring a mistrial and conducting a hearing on the effect that Stephen's knowledge of the witness' mother had on the other jurors. We find *Wolfe* wholly distinguishable from the instant case.

In *Wolfe*, a case in which the defendant had preserved his error for appeal, the defendant had been convicted for murder in what the concurring opinion called a "sensational killing." 232 F.3d at 499 (Wellford, J., concurring). The defendant argued that the state trial court allowed a jury to convict him although there was evidence that at least four members of the jury were biased. *Id*. at 500. Agreeing with the defendant, this Court pointed out that two jurors noted during voir dire their close and longstanding relationships with the murder victim's parents. *Id*. at 501. A third juror admitted

[2] Defendant also claims that the bank robbery charges in his indictment violate the rule against multiplicity. However, he fails to explain the basis for this argument. The rule against multiplicity is violated only where an indictment charges a single offense in several counts. *United States v. Robinson*, 651 F.2d 1188, 1194 (6th Cir. 1981). Defendant was charged with committing two distinct and separate bank robberies. Each count therefore relates to the robbery of a different bank. Accordingly, the bank robbery charges do not violate the rule against multiplicity. *Id*.

to listening to and reading news accounts of the case and doubted whether she could put aside what she had read and heard, and decide the case based on the evidence at trial. *Id*. The fourth juror expressed doubt as [**51] to whether he would require the prosecution to prove its case beyond a reasonable doubt. *Id*. Despite these jurors' admissions of bias, the trial court allowed them to serve on the jury.

In the instant case, there is no evidence that any of the jurors, including Stephen, indicated that they could not render a fair and impartial verdict. *See Wolfe*, 232 F.3d at 502 (explaining that in determining whether the trial court erred in denying the defendant's for-cause challenges, this Court had to ask whether a juror's protestations of impartiality could be believed, and whether the juror swore that she could decide [***30] the case on the evidence). Further, "there is no constitutional prohibition in jurors simply knowing parties involved or having knowledge of the case." *Id.* (citing *McQueen v. Scroggy*, 99 F.3d 1302, 1320 (6th Cir. 1996)). Therefore, merely because Stephen knew the mother of a government witness, without more, does not rise to the level of prejudice for purposes of declaring a mistrial.

We also note that the district court suggested bringing Stephen into court, presumably for questioning, but that defense counsel and the prosecution [**52] both agreed to allowing Stephen to remain as a juror until the end of trial, and then dismissing her as an alternate. In addition, prior to opening statements, the district court instructed the jury not to discuss the case until they had heard all of the evidence and retired to deliberate. There is no evidence that this directive was not followed. Therefore, Defendant has not shown that he was prejudiced by the district court's failure to hold a hearing regarding whether Stephen's knowledge affected the other jurors for purposes of declaring a mistrial. *See United States v. Griffith*, 17 F.3d 865, 869, 880 (6th Cir. 1994) (rejecting an argument that the district court should have granted a mistrial based on juror misconduct, and [*420] explaining that where failure to hold a hearing on juror misconduct is raised for the first time on appeal, defendant must demonstrate that actual prejudice occurred); *see also Maxwell*, 160 F.3d at 1077 (holding that although one dismissed juror admitted during trial to knowing defendant's mother, district court did not err in failing to hold a hearing to determine possible taint on remaining jurors as the case did not involve [**53] *outside* contact with a juror or *statements among jurors* that indicated taint). The Court in *Maxwell* held that absent proof of actual prejudice that the defendant had not been tried by an impartial jury, such prejudice would not be presumed. *Id*. The same holds true here, as Defendant has advanced no proof, but only speculation that he was not tried and convicted by an impartial jury.

[***31] **G. Whether the government engaged in misconduct by failing to disclose two witnesses pre-trial and failing to turn over possible exculpatory evidence to the defense, such that his convictions must now be vacated**

Defendant contends that the government violated his due process rights and engaged in misconduct by (1) failing until the middle of trial to disclose two witnesses, and (2) failing to timely turn over tapes of Hawkins' conversations that were made while he was in jail. Defendant contends that when the tapes were finally revealed to him, he was placed in the position of requiring the jury to adjourn for the day to allow defense counsel time to review the tapes or proceeding with trial. He argues that the district court had already informed the jury at the beginning [**54] of the day that the case would be handed over to them that day. He contends that any delay would have been perceived by the jury as being his fault.

Defendant further contends that these alleged errors affected the fairness of the judicial proceedings in this case and warrant overturning his convictions. This Court reviews for abuse of discretion the trial court's choice of remedies, such as its failure to grant a mistrial, relating to the prosecutor's late disclosure of discoverable materials. *See, e.g., United States v. Ross*, 245 F.3d 577, 584 (6th Cir. 2001); *United States v. Pope*, 574 F.2d 320, 325-27 (6th Cir. 1978).

We find neither of Defendant's arguments meritorious. Defendant fails to point to any authority for the proposition that the government was required pre-trial to disclose its witnesses. "Ordinarily, a defendant is not entitled to a list of the names and addresses of the government's witnesses." *United States v. Perkins*, 994 F.2d 1184, 1190 (6th Cir. 1993) (citing Fed. R. Crim. P. 16)). In addition, Defendant fails to show that the government's failure to disclose the witnesses earlier was in bad faith or that he [**55] was prejudiced by the timing of the disclosure. Only one witness, Joan Harry, actually testified, and her entire testimony consisted of two pages of the entire trial transcript.

[***32] We also reject Defendant's arguments regarding the tapes of Hawkins' conversations. It is now

axiomatic that the prosecution "is required to disclose material exculpatory evidence to a criminal defendant." *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir. 1992) (citing *Brady v. Maryland*, 373 U.S. 83, 86-87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), *vacated on other grounds sub nom. United States v. Mohwish*, 507 U.S. 956, 122 L. Ed. 2d 754, 113 S. Ct. 1378 (1993)). However, "reversal for a *Brady* violation is required only where there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different." *Id.* (citation omitted). [*421] "Thus, *Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *Id.* Delay violates *Brady* only where the delay causes prejudice. *Id.* The Jencks Act, 18 U.S.C. § 3500, [**56] requires the prosecution to supply the defense with any material statement made by a witness to the government that is signed or otherwise verified by the declarant. *Id.* [3] "When *Brady* material sought by a defendant is covered by the Jencks Act . . . the terms of that Act govern the timing of the government's disclosure." *United States v. Bencs*, 28 F.3d 555, 561 (6th Cir. 1994).

We believe Defendant has failed to show that the delay in disclosing the tapes violated *Brady* inasmuch as he has yet to point to any information on the tapes that would have undermined Hawkins' [**57] testimony or even arguably changed the outcome of his trial. *See Patrick*, 965 F.2d at 1400. In any event, the government admitted at trial, and concedes on appeal, that the tapes were subject to the Jencks Act and should have been disclosed. It likely would have been preferable for Defendant's counsel to have reviewed the tapes for any possible exculpatory information. *See Bencs*, 28 F.3d at 560 [***33] (explaining that *Brady* requires the government to turn over any information that is both favorable to defendant and that pertains to the issue of guilt or innocence). However, the district court offered Defendant every opportunity to review the tapes. Further, the government recommended and defense counsel agreed that after defense counsel reviewed the tapes, he should be allowed to recall Hawkins if necessary for further cross-examination. Against the advice of the district court and his own counsel, Defendant refused to postpone his trial for one more day in order to allow his counsel to review the tapes. Under these circumstances, Defendant has failed to show that he was prejudiced by any violation of *Brady* or the Jencks Act. *See Patrick*, 965 F.2d at 1400 [**58] ("There is no prejudice from a tardy Jencks disclosure if the court gives the defendant the opportunity, upon disclosure, to recall the witness for cross-examination); *see also Bencs*, 28 F.3d at 561 (whether analyzed as violating either the Jencks Act or *Brady*, defendant's claim failed because witness statements were disclosed and only timing of disclosure was at issue, and defendant claimed that his trial preparation was hindered and, without explanation or example, that his cross-examination of the witnesses was not as effective as it might have been). Defendant was given every opportunity to review the tapes and to recall Hawkins if necessary, but he refused to do so.

Defendant contends, however, that the district court's suggestion to postpone the trial and allow his counsel to review the tapes was untenable because the jury would have perceived the defense as being responsible for the delay. Defendant points out that the district court had already told the jury that the case would be turned over to them that day. However, after it was apprised of the tapes, the district court not only offered to allow defense counsel time to review the tapes, but also offered [**59] to advise the jury that any delay was not Defendant's fault, and in fact was no one's fault. Without providing [*422] the district court with any explanation as to why he was so adamant about the trial ending on that day, Defendant merely told the court that he did not want to wait another day. Further, the district court explained that any delay would be minimal, considering the fact that by the time the last witness [***34] testified, the jury instructions were given, and the closing arguments were given, the day would be nearly over in any event. Still, Defendant failed to heed the advice of the court or his attorney, and refused to allow the case to be postponed so that his attorney could review the tapes. We find no error under these circumstances. *Ross*, 245 F.3d at 584; *Pope*, 574 F.2d at 325-27.

**H. Whether trial counsel rendered ineffective assistance of counsel by, among other things, failing to advise defendant that he faced a mandatory twenty-five-year sentence for conviction under count four of his indictment**

Ineffective assistance of counsel claims involve mixed questions of law and fact that this Court reviews *de*

[3] The Act provides, "In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500.

*novo*. *United States v. Fortson*, 194 F.3d 730, 736 (6th Cir. 1999). [**60] Claims of ineffective assistance of counsel are reviewed under a two-pronged test, in which Defendant must establish (1) that his lawyer's performance was deficient compared to an objective standard of reasonable performance, and (2) that there is a reasonable probability that his lawyer's errors prejudiced the outcome of the proceedings against him. *See Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)). A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Arredondo*, 178 F.3d at 782.

Defendant claims, through counsel and *pro se*, that his trial counsel rendered ineffective assistance by (1) failing to inform Defendant that if he proceeded to trial, he faced a mandatory twenty-five-year additional term of imprisonment for a successive conviction under 18 U.S.C. § 924(c) (count four of the indictment); (2) failing to challenge the adequacy of the indictment or prepare a defense; (3) failing to file any motions to suppress evidence, and failing to object to the admittance [**61] of prejudicial evidence; (4) failing to call key witnesses or adequately impeach key government witnesses; (5) failing to object to adverse rulings or object to improper [***35] jury instructions; (6) failing to review tape records of Hawkins; and (7) failing to move for a mistrial as a result of *Brady* violations.

This Court generally will not review ineffective assistance of counsel claims on direct appeal because the record is insufficiently developed to assess the merits of such claims. *See United States. v. Brown*, 276 F.3d 211, 217 (6th Cir. 2002); *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997). "This rule stems from the fact that a finding of prejudice is a prerequisite to a claim for ineffective assistance of counsel, . . . and appellate courts are not equipped to resolve factual issues. As a result, our court has routinely concluded that such claims are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop an adequate record on the issue." *Id*. In addition, "the trial process contains a myriad of complex decisions that, for strategic reasons, [**62] are sound when made, but may appear unsound with the benefit of hindsight. The defendant, thus, must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." [*423] *Fortson*, 194 F.3d at 736 (citation and internal quotation marks omitted).

**I. Whether the district court clearly erred in increasing Defendant's offense level by two points, pursuant to USSG § 3B1.1, based on the court's findings regarding his role in the offenses**

Defendant contends that the district court improperly enhanced his sentenced as an organizer, leader, manager or supervisor in the bank robberies, pursuant to USSG § 3B1.1(c). He contends that the evidence that Defendant actually controlled another person was contradictory. He points out that Steen was experienced in bank robberies, and that Hawkins testified that it was Steen who raised the idea of robbing the banks and who recruited Hawkins and Defendant to assist him. Defendant argues that the district court was swayed by the fact that Steen was only fourteen years old at the time of the offenses. We reject Defendant's arguments [***36] and find no error in the adjustment [**63] to Defendant's sentence for the role he played in the offenses.

"A district court's determination regarding a defendant's role in the offense is reversible only if clearly erroneous." *United States v. Washington*, 127 F.3d 510, 515 (6th Cir. 1997) (citation omitted). In reviewing this determination, we give due deference to the district court's application of the facts to the Sentencing Guidelines. *Id*. "The prosecution must prove a defendant's status (as an organizer, leader, manager or supervisor) by a preponderance of the evidence." *United States v. Gonzales*, 929 F.2d 213, 216 (6th Cir 1991) (citations omitted).

Section § 3B1.1(c) of the Sentencing Guidelines provides that "if the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." USSG § 3B1.1(c). For purposes of the instant case, in order "to qualify for the adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." *United States v. Gort-DiDonato*, 109 F.3d 318, 321 (6th Cir. 1997) (citing USSG § 3B1.1, [**64] comment. (n.2)). The Sentencing Guidelines also provide factors that the district court should consider in determining whether the adjustment is proper, which entail: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority

exercised over others. USSG § 3B1.1, comment. (n.4.); *see also United States v. Maliszewski*, 161 F.3d 992, 1017 (6th Cir. 1998). More than one person can be a leader or organizer of a criminal association. *Maliszewski*, 161 F.3d at 1017.

In imposing the two-level enhancement under USSG § 3B1.1, the district court relied primarily on Steen's trial testimony, which the court found credible. "The appellate [***37] courts generally do not review the district court's determinations regarding witness credibility." *United States v. Gessa*, 57 F.3d 493, 496 (6th Cir. 1991) (citation omitted). In any [**65] event, Steen's trial testimony, which was subject to cross-examination, is sufficient to affirm the district court's findings as to the role Defendant played in the bank robberies. *See United States v. Chalkias*, 971 F.2d 1206, 1215-16 (6th Cir. 1992).

As the district court pointed out, Steen testified that Defendant told him to [*424] rob the bank. Steen also testified that Defendant provided him the weapons and planned many of the details for the robberies. For instance, Steen testified that Defendant selected the banks to be robbed, advised him as to the types of bills to request, and told him to shoot anyone who put dye in the bag. Steen also testified that Defendant told him the escape route to take after he left the first bank. Steen further testified that Hawkins and Defendant transported him to the banks and left him there to rob them. Moreover, Steen testified that Hawkins and Defendant kept all of the money from the robberies, except for $ 50.00 that Steen stole from Hawkins when the latter's back was turned. Steen also testified that it was Defendant who told him to go to Cleveland and New York after Steen committed the robberies. Based on the foregoing, the record [**66] supports finding that Defendant controlled Steen's actions, planned and organized the details of the robberies, kept a large share of the fruits of the crime, and exercised decision-making authority with regard to the offenses. *Maliszewski*, 161 F.3d at 1017; USSG § 3B1.1, comment. (n.4.) Accordingly, Defendant's arguments that his sentence should not have been enhanced based on the role he played in the bank robberies are without merit. [4]

[**67] [***38] **J. Whether the district court plainly erred when it ordered that restitution be paid in full without establishing a schedule of payments**

Defendant contends that the district court erred when it ordered restitution to be paid in full immediately, despite the PSIR's finding that he was indigent. [5] Defendant claims that the court also failed to consider Defendant's other financial obligations, such as his obligations to his children, in imposing the restitution order. Defendant further complains that the district court failed to set forth a schedule of payments, but allowed the Bureau of Prisons ("BOP") to do so instead, and thus his sentence is illegal and must be vacated.

[**68] The district court ordered Defendant to pay restitution in the amount of $ 4,790, but waived a fine because of Defendant's inability to pay. The district court sentenced Defendant under the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. §§ 3663A-3664. Under the MVRA, "restitution is mandatory-regardless of a defendant's financial situation-when a defendant is convicted of a crime of violence, an offense against property, or an offense related [***39] to tampering with consumer [*425] products." *United States v. Vandeberg*, 201 F.3d 805, 812 (6th Cir. 2000); *see also* 18 U.S.C. § 3664(f)(1)(B) (explaining that court shall order restitution in full without consideration of defendant's financial circumstances). Therefore, despite Defendant's arguments to the contrary, in imposing restitution, the district court was precluded from considering Defendant's indigence or obligations to his children.

Defendant also contends, however, that the district court

---

[4] Defendant's reliance on *United States v. Walker*, 160 F.3d 1078 (6th Cir. 1998) to support his argument is misplaced. In *Walker*, this Court held that the district court clearly erred in finding that the defendant was a leader, organizer, manager, or supervisor in a drug distribution conspiracy inasmuch as no witness at trial or at sentencing discussed the defendant organizing the administrative details of the conspiracy or actually directing anyone's actions. *Id.* at 1091-92. The Court noted that not a single witness testified that the defendant had ever directed anyone to do anything. *Id*. By contrast, as we have explained, Steen testified that Defendant did in fact direct him to rob the bank and planned many of the details to carry out the scheme. Therefore, *Walker* is distinguishable.

[5] As for Defendant's financial condition, his PSIR stated:

According to a Personal Financial Statement, Probation From 48A, completed by Mr. Davis, he has no bank accounts, securities, real estate, life insurance, motor vehicles, or other assets. He denied having any charge accounts, lines of credit, or other liabilities. Based on his overall financial situation, it does not appear Mr. Davis possesses the financial means to pay a fine. It is recommended any potential prison earnings be utilized to pay restitution and the arrearage on child support.

(J.A. at 330, P 83.)

erred in failing to set up a payment plan. Pursuant to the MVRA,

> Upon determination of the amount of restitution owed to each victim, *the court shall*, [**69] pursuant to section 3572, specify in the restitution order the manner in which, and the schedule [*426] according to which, the restitution is to be paid, in consideration of (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; (B) projected earnings and other income of the defendant; and (C) any financial obligations of the defendant; including obligations to dependents.

18 U.S.C. § 3664(f)(1)(B)(2)(A)-(C) (emphasis added).

A restitution order may provide that the defendant pay the amount owed in one lump sum, in period payments or, if economic circumstances dictate, in nominal periodic payments until the restitution amount is paid in full. § 3664(f)(3)(A) and (B).

Defendant contends that the district court allowed the BOP to set a payment plan without considering his financial obligations to his dependents or the amount of money he actually earns from his prison job, which he claims in his brief is $ 15 a month. The government counters that pursuant to 18 U.S.C. § 3742(d), the payment of any restitution must be immediate unless the sentencing court determines [**70] that the interest of justice requires otherwise. The government also contends that assuming that the district court did implicitly [***40] delegate its authority to the BOP to create a payment schedule, such delegation was in compliance with authority from this circuit. *See Weinberger v. United States*, 268 F.3d 346 (6th Cir. 2001).

In *Weinberger*, this Court rejected the position taken by some circuits that "held that the determination of the rate and terms of restitution (including determination of the amount, time, and schedule of installment payments) is a core judicial function that may not be delegated to probation officers." *Id.* at 359 n.3. *Weinberger*, however, dealt with the MVRA's predecessor statute, the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663. *Weinberger*, 268 F.3d at 355. The Court held that the district court did not abuse its discretion in delegating the scheduling of the defendant's restitution payments while he was in prison through the Inmate Financial Responsibility Program ("IFRP"), which "allows for the development of a financial plan that allows inmates to pay [**71] enumerated obligations, such as restitution payments while incarcerated." *Id.* at 360-61; *see also Montano-Figueroa v. Crabtree*, 162 F.3d 548 (9th Cir. 1998) (same). We have yet to determine in a published opinion a district court's duties under the MVRA with regard to setting restitution payment schedules.

The MVRA applies to sentencing proceedings in cases, such as the present, where "the defendant was convicted on or after April 24, 1996." *United States v. Coates*, 178 F.3d 681, 683 (3d Cir. 1999) (citation omitted). Unlike the VWPA, the MVRA expressly states that "the court shall . . . specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid," and in doing so shall consider the factors delineated in the provision. 18 U.S.C. § 3664(f)(2) (2000). [6] The Third Circuit [***41] recognized the distinction between the two statutes in *Coates*. *See* 178 F.3d at 685 ("Unlike the MVRA, the VWPA provides the district courts with discretionary authority to schedule restitution payments."). In *Coates*, under plain error review, [**72] the Third Circuit based its decision to remand to the district court the restitution order in that case not only because of an improper delegation of the district court's duties to the probation office, but also because the district court failed to satisfy the MVRA's mandatory requirements under § 3664 that the district court alone "shall" set payment schedules. *Coates*, 178 F.3d at 685. We find the analysis in *Coates* persuasive, and believe that the district court in the instant case erred in failing to set Defendant's restitution payment schedule.

[**73] Our holding, however, does not preclude the district court from eliciting the assistance of others in

---

[6] The statute reads in pertinent part:

(2) Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of--

(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

(B) projected earnings and other income of the defendant; and

(C) any financial obligations of the defendant; including obligations to dependents.

18 U.S.C. § 3664(f)(2)(A)-(C).

setting such a schedule. Indeed, in an unpublished decision we approved of such an approach in setting a restitution payment schedule. *See United States v. Ayantayo*, 20 Fed. Appx. 486, 2001 U.S. App. LEXIS 21595, No. 99-2321, 2001 WL 1176331 (6th Cir. Sept. 27, 2001) (unpublished). In *Ayantayo* we rejected a defendant's argument that under the MVRA the district court "impermissibly delegated specification of the payment schedule to the probation officer," where the record showed that the court instead "merely sought a recommendation [but] retained final approval over the schedule." *Id*. at **2.

As the record currently stands, the terms of Defendant's payment schedule are unclear. He contends that a payment schedule was set by the Bureau of Prisons. However, there is [***42] no indication that the factors outlined under 18 U.S.C. § 3664(f)(2)(A)-(C) were considered in setting the payment schedule. For these reasons, we believe that the case should be remanded so that the district court, pursuant to the express terms of the MVRA, can set a payment schedule. *See United States v. Myers*, 198 F.3d 160 at 169 [**74] (holding that it was plain error for district court to order restitution in one lump sum without issuing a schedule of payments); *Coates*, 178 F.3d at 685 (same).

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Defendant's convictions, but **VACATE AND REMAND** his sentence with respect to his restitution order. In all other respects, Defendant's sentence is **AFFIRMED**.

---

End of Document

# United States v. Lawrence

308 F.3d 623 (6th Cir. 2002)

Cited in Opening Brief at: Substituted for Gaitan (Br. xi)

The brief cited United States v. Gaitan, 171 F. App'x 523 (6th Cir. 2006), which does not correspond to any decision; no printout exists. Lawrence is offered in its place. See Response, Part III.B. Highlighted language appears at 308 F.3d at 627.

Caution
As of: September 14, 2026 8:26 PM Z

# United States v. Lawrence

United States Court of Appeals for the Sixth Circuit

March 18, 2002, Argued ; October 28, 2002, Decided ; October 28, 2002, Filed

No. 00-5462

**Reporter**
308 F.3d 623 *; 2002 U.S. App. LEXIS 22416 **; 2002 FED App. 0371P (6th Cir.) ***

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. ALLEN LAWRENCE, JR., Defendant-Appellant.

**Subsequent History:** Appeal after remand at United States v. Lawrence, 2004 U.S. App. LEXIS 4112 (6th Cir. Ky., Mar. 1, 2004)

**Prior History:** [**1] Appeal from the United States District Court for the Eastern District of Kentucky at Lexington. No. 99-00039. Henry R. Wilhoit, Jr., District Judge.

**Disposition:** Affirmed in part, reversed and remanded in part.

**Counsel:** ARGUED: Kevin M. Schad, SCHAD & COOK, Indian Springs, Ohio, for Appellant.

Kevin C. Dicken, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee.

ON BRIEF: Kevin M. Schad, SCHAD & COOK, Indian Springs, Ohio, for Appellant.

Kevin C. Dicken, Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEYS, Lexington, Kentucky, for Appellee.

**Judges:** Before: BATCHELDER and CLAY, Circuit Judges; CARR, District Judge. *

**Opinion by:** JAMES G. CARR

## Opinion

[***2] [*625] JAMES G. CARR, District Judge. Defendant-appellant, Allen Lawrence, Jr., and his co-defendants were charged in a multi-count indictment alleging: one count of intent to distribute cocaine, in violation of 21 U.S.C. § 846; two counts of aiding and abetting in the possession of cocaine, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2; one count of money laundering, in violation [**2] of 18 U.S.C. § 1956; one count of possession of a machine gun, in violation of 18 U.S.C. § 922(o); and two counts of possession of a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c).

Lawrence pled not guilty. His pretrial suppression motion was denied. Thereafter, he requested leave to proceed pro se, which was granted. Trial commenced on December 6, 1999; on December 8, 1999, the jury returned a verdict of guilty as to all counts.

On March 3, 2000, Lawrence was sentenced to 188 months on the drug counts, with a consecutive 360 months on the weapons charges.

[*626] Lawrence appeals his conviction and sentence under 18 U.S.C. § 924(c), and his sentence pursuant to his conviction under 21 U.S.C. § 841(a). Additionally, Lawrence appeals his indictment and the district court's handling of his motion to suppress.

Lawrence raises seven assignments of error. For the following reasons, we: 1) reverse Lawrence's conviction as to count four of his superseding indictment; 2) vacate [***3] Lawrence's sentence as to count five and remand for re-sentencing; [**3] and 3) vacate Lawrence's sentence enhancement under sentencing guideline § 3C1.1 and remand for re-sentencing. As to the remaining assignments, we affirm the district court.

**BACKGROUND**

Shortly after 7:00 p.m. on April 19, 1999, police officers in Lexington, Kentucky, noticed a trash container placed for collection on a utility strip between the street and sidewalk by Lawrence's home. Several months earlier they had received a tip from an informant relating to the

* The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

Lawrence's drug-related activities.

The officers examined the trash in the container. The did not have warrant. As a result, the officers discovered plastic bags containing wrappers with cocaine residue.

On April 20, 1999, the police obtained and executed a warrant to search Lawrence's home, finding cocaine, crack cocaine, $ 23,000 in cash, two coolers with hollowed-out sides, and several firearms, including a machine gun and silencer. Lawrence and another individual present at the house, Danny Young, were subsequently arrested.

At the time of the arrest, the police claimed that Lawrence waived the rights prescribed by in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 Ohio Misc. 9, 36 Ohio Op. 2d 237 (1966), [**4] and made several incriminating statements, including: 1) all the drugs belonged to him; 2) his cocaine supplier gave him the machine gun; 3) he used runners, including Danny Young, to transport the drugs; and 4) he had distributed approximately forty kilograms of cocaine in Lexington over the past eight months. At trial, Lawrence denied making these statements, and further denied any involvement with the drugs found at his residence.

A federal grand jury returned an indictment charging Lawrence with various drug trafficking offenses, and a superseding indictment charging him with money laundering and forfeiture. Prior to trial, the district court denied [***4] Lawrence's motion to suppress the evidence found at his residence and his statement to the police. At trial, Lawrence pled not guilty, denied all charges, and requested to proceed pro se, which the court granted. On December 8, 1999, the jury returned a verdict of guilty on all counts.

At sentencing, Lawrence received 188 months imprisonment on the drug counts, with a consecutive 360 months on the weapons charges. The court increased the base offense level by two levels on the basis of a finding that he had obstructed justice [**5] by giving perjurious testimony at trial. On March 3, 2000, Lawrence filed his notice of appeal.

## DISCUSSION

### I. First Assignment of Error

Lawrence claims that the district court erred in denying his motion to suppress all the evidence resulting from the warrantless search of his trash cans. "In reviewing a district court's suppression determinations, this Court reviews findings of fact for clear error, and legal conclusions [*627] *de novo*." *United States v. Ivy*, 165 F.3d 397, 401 (6th Cir. 1998).

Lawrence challenges the trial court's factual determination relating to the location of his trash cans at the time the police searched them. At the suppression hearing the government offered testimony that the cans were on the utility strip in front of his house when they were searched. Lawrence offered testimony supporting his contention that the cans were at the side of his garage in an area that was not accessible to the public.

The district court chose to believe the government's witnesses over Lawrence's witnesses. Thus, the district court made a credibility determination, and "findings of fact anchored in credibility assessment are generally not subject to [**6] reversal upon appellate review." *Ivy*, 165 F.3d at 401. Additionally, "when there are two permissible views of the evidence, the fact finder's choice between them cannot be [***5] clearly erroneous." *Id.* at 401-02. Accordingly, we affirm the denial of Lawrence's motion to suppress.

### II. Second Assignment of Error

Lawrence next contends that the district court abused its discretion by failing to re-open the suppression hearing to enable him to challenge the validity of statements he made during and shortly after his arrest. The record, however, establishes that, prior to the initial suppression hearing, the government informed Lawrence's counsel that it intended to use the statements during trial. Additionally, Lawrence challenged the validity of the statements at trial. Thus, the record demonstrates that there was no reason to re-open the suppression hearing.

Lawrence also argues that the court erred by not allowing Victoria Nolan to testify in support of his suppression motion. Ms. Nolan, who had provided the police with information relied on in obtaining the search warrant for Lawrence's home, asserted her right against self-incrimination [**7] at the suppression hearing. The district court correctly noted that, even if Nolan's statements were excised from the search warrant affidavit, the remaining information obtained through the search of Lawrence's trash supplied sufficient probable cause for the search warrant. This being so, we cannot say that the district court's refusal to reopen the suppression hearing was an abuse of discretion.

In addition to these challenges, Lawrence also argues that the record indicates that the police officers failed to "knock and announce" prior to entering his home. *See United States v. Dice*, 200 F.3d 978, 982 (6th Cir. 2000) ("Absent certain exigent circumstances, it is unreasonable under the Fourth Amendment for an officer to enter a dwelling without first knocking and announcing his presence and authority."). Lawrence, however, failed to raise this issue below. Consequently, Lawrence waived this argument and this Court cannot hear his appeal. *United States v. Critton*, 43 F.3d 1089, 1093 (6th Cir. 1995) ("This court has held that we have [***6] no jurisdiction to hear appeals of suppression issues raised for the first time on appeal.").

**III. Third** [**8] **Assignment of Error**

Lawrence contends that there were numerous errors in the indictment and arraignment process that warranted an evidentiary hearing, which the district court failed to conduct. We find, however, that the district court did not abuse its discretion when it declined to hold the hearing sought by Lawrence.

[*628] Lawrence contends that the court should have held a hearing on his objections to his superseding indictment. At sentencing, Lawrence raised an objection alleging that he had been unable to obtain a copy of his superseding indictment and that the indictment had been missing from his case file, only to reappear prior to sentencing. The court, however, overruled this objection, finding it procedurally incorrect because Lawrence had not filed an objection to the presentence report, which included the indictment. In light of this reasoning, there was no need for the court to conduct an evidentiary hearing on Lawrence's objection to the superseding indictment.

Additionally, Lawrence waived any objections to defects in the superseding indictment at his arraignment. At that time, the court provided Lawrence and his counsel with a copy of the superseding indictment. The [**9] court offered Lawrence and counsel a four-day continuance to review the indictment, which they had not reviewed previously. Lawrence's counsel, however, stated that, with a short recess to make sure no surprises were contained in the new indictment, they would waive any defects in the indictment. The court provided the recess to enable Lawrence and counsel to review the new indictment. Lawrence then returned, stated that he was aware of the charges against him, and pled not guilty.

In addition to his challenge to the superseding indictment, Lawrence contends that the district court should have held a hearing to determine whether the grand jury proceeding [***7] complied with Fed. R. Crim. P. 6(f). Rule 6(f) requires that a "grand jury may indict only upon the concurrence of 12 or more jurors," and that the "indictment shall be returned by the grand jury, or through the foreperson or deputy foreperson on its behalf, to a federal magistrate judge in open court." The record indicates that the grand jury proceedings complied with Rule 6(f).

On November 19, 1999, Lawrence moved to dismiss the indictment and superseding indictment, claiming, among other things, that the indictment had [**10] not been returned in open court as required by Rule 6(f). The government filed an opposition to this motion, and on December 6, 1999, the court rejected Lawrence's motion. The record is clear that the grand jury proceeding complied with Rule 6(f). In fact, in denying Lawrence's motion, the court reviewed the grand jury record and concluded: "The original indictment there were 21 grand jurors concurred, and the superseding there were 20 grand jurors concurred. It shows that the indictment was returned in open court." (J.A. at 387).

Also under his third assignment of error, Lawrence asserts that the district court violated his "right to a speedy arraignment" under the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. § 3161. In making this argument, however, Lawrence misconstrues the Speedy Trial Act, which only requires an indictment, not an arraignment, within thirty days of arrest. 18 U.S.C. § 3161(b). The Speedy Trial Act ensures that a defendant is indicted, tried, and not unduly detained; it does not explicitly address the arraignment process.

Lawrence was arraigned on the superseding indictment on the same day the district court [**11] heard arguments on his motion to suppress. Even if Lawrence's arguments as to the delay were valid, his suppression motion, which was filed on June 11, 1999, tolled the Speedy Trial Act. 18 U.S.C. § 3161(h)(1)(F). Thus, we find that Lawrence has not shown that his trial was improperly delayed. [***8]

[*629] **IV. Fourth Assignment of Error**

Lawrence next challenges his conviction under 18 U.S.C. § 924(c) on the grounds that there was insufficient evidence presented at trial to support such a conviction. We review claims of insufficient evidence to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979).

In pertinent part 18 U.S.C. § 924(c) provides:

> any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment [**12] provided for such crime of violence or drug trafficking crime--
>
> (i) be sentenced to a term of imprisonment of not less than 5 years. [1]

Lawrence concedes ownership of all the firearms, including the machine gun, identified in counts four and five of the superseding indictment, but argues that there was insufficient evidence that his possession was "in furtherance of" a drug crime.

This Court recently answered the question of what the "in furtherance of" language of § 924(c) means in *United States v. Mackey*, 265 F.3d 457 (6th Cir. 2001). In *Mackey*, we determined that the "term 'furtherance' should be understood in its ordinary or natural meaning," which is "a helping forward: advancement, promotion." *Id.* at 460-61. Or put more plainly, "the weapon must promote or facilitate the [***9] [**13] crime." *Id.* at 461. Other courts have similarly interpreted the "in furtherance of" language found in § 924(c). *See United States v. Timmons*, 283 F.3d 1246, 1252 (11th Cir. 2002) (the prosecution must "establish that the firearm helped, furthered, promoted, or advanced the drug trafficking"); *United States v. Iiland*, 254 F.3d 1264, 1274 (10th Cir. 2001) (specific evidence must establish that guns were possessed "in furtherance of" the drug trafficking charge); *United States v. Ceballos-Torres*, 218 F.3d 409, 415 (5th Cir. 2000) ("Firearm possession that furthers, advances, or helps forward the drug trafficking offense violates the statute.").

These interpretations of the language in § 924(c) are consistent with the legislative history of the 1998 amendment to § 924(c), which responded to the Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137, 133 L. Ed. 2d 472, 116 S. Ct. 501 (1995). *See* H.R. Rep. No. 105-344, at 4 (1997). *Bailey* involved the prior version of the statute, which criminalized "using or carrying a firearm during and in relation to" drug trafficking. In *Bailey* [**14] , the Court confronted the question of what "use" meant in the context of this earlier version of § 924(c). After analyzing several definitions and uses of the word, the Court concluded that Congress had intended to criminalize only the "active employment" of a firearm, not mere possession. *Bailey*, 516 U.S. at 149.

The 1998 amendment to § 924(c) inserted the broader term "possession." Congress, however, limited the meaning of the term possession by including the phrase "in furtherance of." Thus, Congress chose to make § 924(c) more stringent than mere possession, but less stringent than active employment.

[*630] By way of guidance, the Judiciary Committee Report describes when a gun is possessed "in furtherance of" an underlying offense:

> The government must clearly show that a firearm was possessed to advance or promote the commission of the underlying offense. The mere presence of a firearm in an area where a criminal act occurs is not a sufficient basis for imposing this particular mandatory sentence. Rather, [***10] the government must illustrate through specific facts, which tie the defendant to the firearm, that the firearm was possessed to advance or [**15] promote the criminal activity.

H.R. Rep. No. 105-344, at 12 (footnotes omitted).

In light of Congress' intent not to penalize for the "mere presence" of a firearm, and our understanding of the plain meaning of the language of § 924(c), as amended, we review the circumstances leading to Lawrence's conviction.

Though Lawrence did not argue in his initial brief that the other three firearms listed in count five of the superseding indictment--a Ruger 9mm semi-automatic, an Interarms .357 revolver, and a Norinco Mac-90 rifle--were not possessed "in furtherance of" the underlying drug offense, he did assert that there was insufficient evidence to support the conviction in regards to those weapons in his reply brief. Mr. Lawrence's arguments regarding these weapons are, however, not well-taken. The jury's verdict regarding these weapons is supported by the close proximity of the weapons to the drugs and the fact that these weapons were found either loaded or with ammunition. It was quite reasonable for the jury to conclude that the weapons were placed strategically so that Lawrence could defend his drugs and money, thus satisfying the "in furtherance of" requirement of §

[1] Section 924(c)(1)(B)(ii) states that the applicable term of imprisonment for persons convicted of possessing a machine gun shall be a term of no less than thirty years.

924(c). [**16] *See Mackey*, 265 F.3d at 462 ("In order for the possession to be in furtherance of a drug crime, the firearm must be strategically located so that it is quickly and easily available for use.").

The same cannot be said as to Lawrence's possession of the machine gun and silencer. Here, all that was shown was that Lawrence possessed the firearm. Though the machine gun was obtained along with a shipment of cocaine from Lawrence's drug supplier, he had not purchased or otherwise acted affirmatively to acquire the weapon. Instead, the record establishes it was an unsolicited gift. When the machine gun was found, it was unloaded, placed in a cupboard, and wrapped in the same newspaper in which it was covered at the time of its delivery. There was no ammunition either at hand [***11] or on the premises. The government offered no evidence that Lawrence had ever displayed the weapon, mentioned his possession of it to anyone, or had ever fired it. From the information presented to the jury, it is at least as likely, if not more so, that Lawrence kept the machine gun as a trophy or quasi-souvenir, rather than to help him with his illegal narcotics trafficking.

Though the gun [**17] came into Lawrence's possession with a shipment of drugs, there is no indication that he possessed the gun to advance his illegalities. Because all evidence suggests that Lawrence obtained the machine gun as an unsolicited gift, it cannot be said that Lawrence's possession of the machine gun at the time of its delivery was designed to promote his drug trafficking. There is no indication that Lawrence knew even of the possibility of its existence until the weapon was in his hands. This is not to say that Mr. Lawrence's possession of the machine gun could not have satisfied the "in furtherance of" requirement of § 924(c) had Lawrence [*631] merely stated that the weapon would be used to advance his drug dealing or had he placed the weapon strategically to scare off would-be threats to his enterprise. But he did not do so. Instead, Lawrence merely stored the weapon. Nothing indicates that he intended to use the machine gun in future dealings. Without more evidence that Lawrence possessed the machine gun so that his drug trafficking might be furthered, we reverse his conviction as to count four of the indictment. Lawrence's sentence as to count five is vacated and the case is remanded for re-sentencing [**18] consistent with this opinion.

### V. Fifth Assignment of Error

Under his fifth assignment, Lawrence challenges his indictment, claiming the process was improper and rendered unreliable due to the prosecution's submission of highly inflammatory, irrelevant evidence to the grand jury. Lawrence failed to raise this issue prior to trial as required by Fed. R. Crim. P. 12(b): [***12]

> Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. *The following must be raised prior to trial*:
>
> (1) Defenses and objections based on defects in the institution of the prosecution; or
>
> (2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings);

(emphasis added).

"This court strictly applies Rule 12(b), and has repeatedly held that failure to raise 12(b) motions in a timely fashion precludes appellate review." *United States v. Oldfield*, 859 F.2d 392, 396 (6th Cir. 1988) [**19] (citing cases). Because Lawrence failed to raise his objection in a timely fashion, this court is precluded from reviewing Lawrence's fifth assignment of error. *Id.*; *see also United States v. Castro*, 908 F.2d 85, 89 (6th Cir. 1990) ("An indictment, valid on its face, is not subject to challenge on the ground that the grand jury acted on inadequate or incomplete evidence.").

### VI. Sixth Assignment of Error

Lawrence next contends that his sentencing enhancement for obstruction of justice based on his perjury was improper.

Section 3C1.1 of the Sentencing Guidelines authorizes a two level enhancement if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense . . ." U.S.S.G. § 3C1.1(A). The defendant's obstructive conduct must relate to the charged offense or to a closely related offense. *See* U.S.S.G. § 3C1.1(B). The Notes to [***13] § 3C1.1

provide a non-exhaustive list of the types of conduct that encompass a sentence enhancement for obstruction of justice, including "committing, suborning, or attempting [**20] to suborn perjury." U.S.S.G. § 3C1.1 n.4.

To determine what constitutes perjury under the guidelines, courts have relied on the definition the Supreme Court applied in *United States v. Dunnigan*, 507 U.S. 87, 122 L. Ed. 2d 445, 113 S. Ct. 1111 (1992). In *Dunnigan* the Court dealt directly with the issue of perjury and § 3C1.1. Perjury occurs when a witness, testifying under oath or affirmation, "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather [*632] than as a result of confusion, mistake, or faulty memory." *Id.* at 94.

In *Dunnigan* the Court explained that, though a defendant's right to testify at trial does not include a right to commit perjury, a defendant who is found guilty must not be penalized by an enhancement under § 3C1.1 simply for having testified on his or her own behalf. *See id.* at 95. To protect a defendant from this danger, and to avoid discouraging defendants from testifying truthfully at trial, the Court instituted constitutional requirements for the application of § 3C1.1. If a defendant objects to a sentence enhancement resulting from his or her trial [**21] testimony, the district court must review the evidence and make independent findings necessary to establish a willful impediment to or the obstruction of justice resulting from defendant's perjury. *Id.* When doing so, the court should address each element of the putative perjury in a separate and clear finding. *Id.* Alternatively, a court may conclude that enhancement is appropriate on the basis of a finding of obstruction of justice that encompasses all the factual predicates of perjury. *Id.*

This circuit has been consistent in its treatment of § 3C1.1 sentence enhancements. Prior to *Dunnigan*, we held that, at a minimum, if an obstruction of justice enhancement is to be given for false testimony, the sentencing judge, who has the unique opportunity to judge the credibility of the witness, is required to make a clear finding that the defendant has lied [***14] with respect to testimony given under oath. *United States v. Burnette*, 981 F.2d 874, 879 (6th Cir. 1992). Similarly, in *United States v. Clark*, 982 F.2d 965, 970 (6th Cir. 1993), we stated that, when assigning points for obstruction of justice, the district court should identify [**22] specifically which statements or actions by a defendant constitute an obstruction of justice.

Interpreting *Dunnigan*, however, we have clarified our earlier decisions, and set forth our own requirements for sentence enhancement in compliance with the Supreme Court's in *Dunnigan*. In addition to protecting defendants who testify at trial, these requirements provide a meaningful record to determine which statements the district court considered to be perjurious and whether the court found those statements to satisfy each element of perjury. *United States v. Sassanelli*, 118 F.3d 495, 501 (6th Cir. 1997). For a district court to enhance a defendant's sentence under § 3C1.1, the court must: 1) identify those particular portions of defendant's testimony that it considers to be perjurious; and 2) either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury. *United States v. Mise*, 240 F.3d 527, 531 (6th Cir. 2001) (citing *Sassanelli*, 118 F.3d at 501).

As indicated in *Sassanelli*, the second requirement was held by the Supreme Court [**23] to be necessary under § 3C1.1. *Sassanelli*, 118 F.3d at 501 (citing *United States v. Spears*, 49 F.3d 1136, 1143 (6th Cir. 1995)). The first of these requirements, however, is a rule of our own creation to assist us in our review of sentence enhancements under § 3C1.1, though we have never insisted on a rigid adherence to its terms. *Id.* Thus, a district court's findings will be adequate if: 1) the record is sufficiently clear to indicate which statements the district court considered perjurious; and 2) the district court found that the statements satisfied each element of perjury. *Id.*

Since *Dunnigan*, this Circuit has uniformly applied these requirements in cases involving sentence enhancements for [***15] perjury [*633] under § 3C1.1. In *United States v. Comer*, 93 F.3d 1271, 1282 (6th Cir. 1996), we upheld a sentence enhancement where the district court specified several false statements made by defendant and articulated why it considered them to be perjurious. [2] In a similar decision upholding a sentence enhancement, this circuit found the district court's findings sufficient when the court pointed specifically to conflicts [**24] between defendant's tape-recorded comments prior to trial and his trial testimony. *Mise*, 240 F.3d at 531.

In *United States v. McRae*, 156 F.3d 708, 713 (6th Cir. 1998), however, we vacated defendant's sentence

[2] In *Comer*, we explained: "We require the sentencing judge to identify specific instances justifying the enhancement for obstruction of justice." 93 F.3d at 1282.

enhancement where the district court failed to specify any areas of conflicting testimony or to make independent findings with respect to the elements of perjury in defendant's trial testimony. [3] We noted that an "enhancement may not be affirmed on an inference that the ruling was based upon the government's arguments." *Id.*

[**25] It will not be enough, therefore, for a court to recognize conflicting testimony and to resolve, in its own mind, which witness is credible; nor will it be sufficient for a sentencing judge to broadly consider everything defendant said at trial to be perjurious. *Spears*, 49 F.3d at 1143. The district court must be specific. As we explained in *Sassanelli*, a case in which the district court stated broadly that it considered almost everything defendant said at trial to be perjurious, the district court "did not identify any examples of such perjury, and it did not attempt to apply the elements of perjury to such examples, as required by *Dunnigan* and *Spears*." *Sassanelli*, [***16] 118 F.3d at 502. At a minimum, we require the district court to indicate which portions of defendant's testimony were perjurious, and to apply the elements of perjury to those portions of the testimony.

In the instant case, Lawrence argues that the district court failed to make proper findings of fact to support a determination that he committed perjury in his trial testimony which led to a two-level sentence enhancement for obstruction of justice under § 3C1.1. [**26] At the sentencing hearing, the court overruled Lawrence's objection to the enhancement and replied, generally, that it did not believe his testimony at trial, nor did the jury. The Court stated: "Well, I presided at the trial. I heard all of the testimony. There is no way that Danny Young was on his own, and I believe you were the person that was directing that. . . . In regard to obstruction of justice, I heard your testimony, and there was very little that I believed. I don't think there was very much the jury believed taking their verdict in the case." (J.A. at 557-58).

This is the same type of review of testimony that the district court had conducted in *Sassanelli*. Here, the district court made no indication which portions of defendant's testimony were perjurious nor did the court apply any of the elements of perjury to the testimony. Therefore, the court's finding is insufficient under our requirements for sentence enhancement under § 3C1.1. Accordingly, defendant's sentence is vacated with respect to the two-level enhancement under § 3C1.1, and [*634] remanded for re-sentencing consistent with this opinion.

**VII. Seventh Assignment of Error**

In his final assignment of error, [**27] Lawrence argues that the precise amount of drugs attributable to him should have been determined by the jury, and that the district court's determination, [4] by a preponderance of evidence, violated his [***17] rights under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). Because Lawrence failed to object to this finding in the district court, we review his challenge for plain error. *United States v. Page*, 232 F.3d 536, 543 (6th Cir. 2000).

In *Apprendi*, the Supreme Court held:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule . . . "It is unconstitutional for a legislature to remove from the jury the [**28] assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt."

530 U.S. at 490 (quoting *United States v. Jones*, 526 U.S. 227, 252-53, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (Stevens, J., concurring)) (citing *Jones*, 526 U.S. at 253 (Scalia, J., concurring)).

Here, a jury found Lawrence guilty of violating 21 U.S.C. § 841(a)(1), but because the jury did not determine the amount, under *Apprendi* Lawrence had to be sentenced at or below the twenty-year maximum prescribed in § 841(b)(1)(C). *See* *Page*, 232 F.3d at 543. This requirement was satisfied, since Lawrence received a sentence of 188 months' imprisonment.

Nonetheless, Lawrence argues that an *Apprendi* violation occurred because the court's determination

[3] In *McRae*, this Court held that to comply with *Dunnigan*, a district court must: 1) identify for the record at least some specific instances of conflicting testimony; 2) specify which portions the court finds materially perjurious; and 3) explain why the perjury was material. 156 F.3d at 713.

[4] At sentencing, the court adopted a finding of 8,452.18 grams of cocaine--the drug amounted listed in the presentence report.

established his minimum sentence under the Guidelines at 188 months. In so arguing, he proposes (1) that even if the increase of his minimum from 0 months to 188 months was only a product of the Guidelines, its factual basis should still have been [**29] established beyond a reasonable doubt by a jury, and (2) that any increase of a defendant's minimum sentence must be proven beyond a reasonable doubt, even if the defendant was in fact sentenced below the proper statutory maximum. We reject both of these propositions.

[***18] Regarding the former, *Apprendi* by its terms applies only where the finding "increases the penalty for a crime beyond the prescribed *statutory* maximum," 530 U.S. at 490 (emphasis added), and we have squarely held that *Apprendi* does not apply to the Guidelines. *See* *United States v. Garcia*, 252 F.3d 838, 843 (6th Cir. 2001) ("*Apprendi* does not purport to apply to penalties in excess of any particular range or based on any particular offense level under the Sentencing Guidelines."). *Accord* *United States v. Fields*, 346 U.S. App. D.C. 226, 251 F.3d 1041, 1043-44 (D.C. Cir. 2001) ("*Apprendi* does not apply to enhancements under the Sentencing Guidelines when the resulting sentence remains within the statutory maximum."); *United States Meshack*, 225 F.3d 556, 576 (5th Cir. 2000); *Talbott v. Indiana*, 226 F.3d 866, 869-70 [*635] (7th Cir. 2000). [**30] We consequently find this proposition meritless.

Whether *Apprendi* applies at all in cases where the defendant was sentenced below the statutory maximum, is governed by *Harris v. United States*, 536 U.S. 545, 153 L. Ed. 2d 524, 122 S. Ct. 2406 (2002). In *Harris*, four members of the Court explicitly said that facts affecting only a statutory minimum sentence need not be charged in the indictment or found by the jury beyond a reasonable doubt, and such facts may instead be found by the judge. 122 S. Ct. at 2418-19 (plurality opinion). A fifth justice, while not joining in that plurality opinion, opined that in his view, the Sixth Amendment does not even require the result the Court reached in *Apprendi*, much less that facts affecting the statutory minimum sentence be included in the indictment and found beyond a reasonable doubt. 122 S. Ct. at 2420-21 (Breyer, J., concurring in part and concurring in the judgment). Finally, the majority of the Court reaffirmed *McMillan v. Pennsylvania*, 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986), which upheld the constitutionality of a Pennsylvania statute that mandated a minimum sentence [**31] of five years for certain felonies where the judge found, by a preponderance of the evidence, that the defendant visibly possessed a firearm during the crime.

*Harris*, then, held that *Apprendi* is about statutory *maximums*, and it established that *Apprendi* does not apply to changes in the statutory minimum. Prior to *Harris*, we had [***19] held to the contrary that *Apprendi* did apply to statutory minimums. *See, e.g., United States v. Humphrey*, 287 F.3d 422, 447 (6th Cir. 2002), *United States v. Ramirez*, 242 F.3d 348, 351 (6th Cir. 2001), *United States v. Strayhorn*, 250 F.3d 462, 469-70 (6th Cir. 2001); *United States v. Rebmann*, 226 F.3d 521, 524 (6th Cir. 2000); *United States v. Flowal*, 234 F.3d 932, 936 (6th Cir. 2000). But *Harris* has clearly overruled our previous conclusion, and hence has overruled the portions of these and other prior cases that embody that conclusion. We consequently find that Lawrence's *Apprendi* challenge is meritless.

## CONCLUSION

For the foregoing reasons, we:

1) **REVERSE** Lawrence's conviction as to count four of his superseding [**32] indictment;

2) **VACATE** Lawrence's sentence as to count five and **REMAND** for re-sentencing;

3) **VACATE** Lawrence's sentence enhancement under § 3C1.1 and **REMAND** for re-sentencing; and

4) **AFFIRM** the district court as to the remaining assignments of error.

---

End of Document

# Sylvester v. United States

868 F.3d 503 (6th Cir. 2017)

Cited in Opening Brief at: 12

Highlighted language appears at 868 F.3d at 508.

Caution
As of: September 14, 2026 6:57 PM Z

# Sylvester v. United States

United States Court of Appeals for the Sixth Circuit

April 26, 2017, Argued; August 22, 2017, Decided; August 22, 2017, Filed

File Name: 17a0190p.06

No. 15-1782

**Reporter**
868 F.3d 503 *; 2017 U.S. App. LEXIS 15931 **; 2017 FED App. 0190P (6th Cir.) ***; 2017 WL 3597432

JAMES ROY SYLVESTER, JR., Petitioner-Appellant, v. UNITED STATES OF AMERICA, Respondent-Appellee.

**Subsequent History:** Rehearing, en banc, denied by Sylvester v. United States, 2017 U.S. App. LEXIS 22561 (6th Cir., Nov. 9, 2017)

**Prior History:** [**1] Appeal from the United States District Court for the Eastern District of Michigan at Detroit. Nos. 1:03-cr-20008-1; 2:10-cv-15151—David M. Lawson, District Judge.

Sylvester v. United States, 110 F. Supp. 3d 738, 2015 U.S. Dist. LEXIS 77932 ( E.D. Mich., June 16, 2015)

**Counsel:** ARGUED: Daniel J.T. Schuker, HOGAN LOVELLS US LLP, Washington, D.C., for Appellant.

Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

ON BRIEF: Daniel J.T. Schuker, HOGAN LOVELLS US LLP, Washington, D.C., for Appellant.

Janet Parker, UNITED STATES ATTORNEY'S OFFICE, Bay City, Michigan, Mark Chasteen, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

**Judges:** Before: MERRITT, GILMAN, and DONALD, Circuit Judges. DONALD, J., delivered the opinion of the court in which GILMAN, J., joined. MERRITT, J., delivered a separate dissenting opinion.

**Opinion by:** BERNICE BOUIE DONALD

## Opinion

[*506] [***2] BERNICE BOUIE DONALD, Circuit Judge. Petitioner James Roy Sylvester, Jr. was convicted by a federal jury of possession with intent to distribute five kilograms or more of cocaine, possession with intent to distribute five grams or more of cocaine base, possession of a firearm in furtherance of a drug-trafficking offense, felon in possession of a firearm, possession of marijuana, possession with intent to distribute oxycodone, diazepam, [**2] hydrocodone, and codeine, using interstate travel to acquire and transport five kilograms of cocaine, personally traveling in interstate commerce to acquire five kilograms of cocaine, and conspiracy to distribute and possess with the intent to distribute five kilograms or more of cocaine. He was sentenced to 35 years of imprisonment. A panel of this Court affirmed Sylvester's conviction and sentence on direct appeal. Sylvester then filed this present motion to vacate his sentence under 28 U.S.C. § 2255 on the grounds that his trial and appellate counsel rendered ineffective assistance in failing to pursue his claims of Speedy Trial Act violations. The district court dismissed Sylvester's motion, finding that Sylvester failed to show that he was prejudiced by his counsels' allegedly deficient performances. Because the district court correctly determined that Sylvester failed to show prejudice, we **AFFIRM** the order dismissing Defendant's § 2255 motion.

I.

A.

Sylvester was arrested in February 2003 in connection with a drug conspiracy intending to transport large quantities of cocaine and other illegal substances from California to Michigan. On February 26, 2003, a federal grand jury returned an indictment against [**3] Sylvester charging two counts of possession with intent to distribute various amounts of cocaine and crack cocaine. Later that same day, the government filed a first superseding indictment, changing the wording in counts one and two to reflect that Sylvester "knowingly" possessed the drugs referenced in the indictment (the "First Superseding Indictment"). On April 9, 2003, the government filed a [***3] second superseding

indictment adding a charge for knowing possession of a firearm in furtherance of a federal drug-trafficking crime (the "Second Superseding Indictment"). On May 28, a third superseding indictment was filed adding eight new charges against Sylvester. Over the next year and a half, the government filed five additional superseding indictments, three of which added either new charges or co-defendants, while the other two modified or revised existing charges. Sylvester went to trial on September 13, 2005, and on September 21, 2005 he was found guilty on twelve of the thirteen counts brought against him. He was sentenced to a total of thirty-five years in prison.

B.

In the underlying petition, Sylvester claims two violations of the Speedy Trial Act (the "Act"), relating to the First [**4] and Second Superseding Indictments. Regarding the First Superseding Indictment, the Speedy Trial Clock (the "Clock") started [*507] running on February 26, 2003, but was stopped the same day due to a detention motion filed by the government. The Clock restarted on March 3, 2003, when the trial court resolved the detention motion and ran until March 18, 2003, when Sylvester obtained new counsel and requested time for his new counsel to get up to speed on the case. The trial court tolled the Clock until May 4, 2003 in accordance with Sylvester's request. By that point, fourteen days had run off of the Speedy Trial Clock. On May 4, the Clock began running again and ran until July 9, 2003, when Sylvester again requested new counsel. At that point, the Speedy Trial Clock had run for seventy-nine days, already exceeding the seventy-day limit established by the Act. The trial court resolved Sylvester's request for new counsel on July 16, 2003, and the Clock began running again. The Clock stopped again on July 23, 2003 when the government requested clarification on the status of Sylvester's defense counsel.[1] By that point 85 days had run on the Speedy Trial Clock. The Clock was tolled until September [**5] 12, 2003, so that new counsel could be engaged, and again until November 6, 2003, so that counsel could get up to speed. On October 27, 2003, a fourth superseding indictment was filed adding a new defendant and restarting the Speedy Trial Clock.

[***4] The Second Superseding Indictment was filed on April 9, 2003. The Clock for the charge brought under that indictment should have started running on April 16, 2003, when Sylvester was re-arraigned, but the court had already tolled the Clock until May 4 in order for Sylvester's new counsel to become familiar with the case. Thus, the Clock for the charge brought under the Second Superseding Indictment started running on May 4 when the Clock resumed for the charges brought under First Superseding Indictment. The Clock ran until July 9, when Sylvester's counsel requested to withdraw from the case. At that point, 65 days had run on the Speedy Trial Clock for the Second Superseding Indictment. As described above the Clock resumed on July 16, 2003, and was tolled again on July 23. By that point, 71 days had run on the Speedy Trial Clock for the charge brought under the Second Superseding Indictment, exceeding the 70-day limit set by the Act. Sylvester [**6] makes no allegation of speedy trial violations after July 23, 2003, and the record shows that the remaining delay was largely the result of motions filed by the defense.

On November 19, 2004, Sylvester filed a motion to dismiss based on the pretrial delays. However, counsel never specified an exact violation. Rather Sylvester's counsel vaguely referred to an "unreasonable long delay of 348 days between Defendant's Arraignment and the Trial." *Id.* at ID # 464-65. After supplemental briefing, the district court denied the motion to dismiss. The district court stated that the defendant bears the burden of "producing a calendar and showing that more than seventy days have passed since the indictment (or first appearance) and trial has yet to begin." R. 145, ID # 679 (quoting *United States v. Jenkins*, 92 F.3d 430, 438 (6th Cir. 1996)). The trial court then incorrectly concluded that because Sylvester "was arraigned on a second superseding indictment that added a new charge[,] . . . the clock again restarted." *Id.* After his conviction, Sylvester directly appealed his conviction on the grounds that his "statutory and constitutional rights to a speedy trial were violated." *United States v. Sylvester*, [*508] 330 F. App'x 545, 546 (6th Cir. 2009). On appeal, Sylvester's counsel argued that "[s]uperseding indictments do not . . . affect [**7] the running of the statutory speedy trial clock." Brief for Appellant at 18, *Sylvester*, 330 F. App'x 545 (No. 06-1760). However, again, Sylvester's counsel failed to identify a specific violation of the Act, instead arguing that "it would appear that appellant Sylvester's trial did not commence until far more than the 70 days permitted by § 3161 had passed." Appellant's Supplemental Citation at 2, *Sylvester*, 330 Fed. Appx. 545. [***5] Citing the fact

[1] The District Court opinion notes that the Speedy Trial Clock paused on July 9 and resumed on July 16. It then incorrectly counts the days that elapsed against the Speedy Trial Clock. However, the district court's error appears to be only typographical.

that Sylvester's appellate counsel never provided specific information related to the alleged violations of the Act, a panel of this Court rejected Sylvester's Speedy Trial Act argument as forfeited. *Sylvester*, 330 F. App'x at 549.

Sylvester then filed a motion to vacate his sentence under 28 U.S.C. § 2255 on the grounds that his trial and appellate counsel rendered ineffective assistance in failing to adequately pursue his Speedy Trial Act claims. Although it held that the trial court erred in determining that the Speedy Trial Clock had not run and that Sylvester's counsel rendered deficient performance by not bringing specific violations to the attention of the court either at trial or on appeal, the district court denied Sylvester's motion on the ground that the deficient performance notwithstanding, Sylvester [**8] had not made a sufficient showing of ineffective assistance because he failed to show that he was prejudiced by his counsels' actions. The district court granted a certificate of appealability on this issue, and Sylvester filed a timely appeal.

II.

The Speedy Trial Act was enacted to "g[i]ve effect to a Federal defendant's right to a speedy trial under the Sixth Amendment." *United States v. Rojas-Contreras*, 474 U.S. 231, 238, 106 S. Ct. 555, 88 L. Ed. 2d 537 (1985) (Blackmun, J., concurring) (citation omitted). In furtherance of this goal, the Supreme Court established strict timelines for the various stages of the criminal trial process. *Id.* The Act requires that the relevant charges "be dismissed or otherwise dropped" in response to any violation of the Act's provisions. *See* 18 U.S.C. § 3162(a)(1). As relates to these proceedings, "[t]he Act, as amended, requires that a defendant be brought to trial within 70 days of his first appearance through counsel." *Rojas-Contreras*, 474 U.S. at 238-39 (Blackmun, J. concurring) (citing 18 U.S.C. § 3161(c)(1)). The Act also lists a number of events, or excludable delays, during which the Speedy Trial Clock is tolled for the purposes of calculating the seventy-day period. 18 U.S.C. § 3161(h).

Notably, the Act does not provide for a resetting of the Speedy Trial Clock for existing charges where the government has filed a superseding indictment adding new charges [**9] to existing ones. Sylvester's claims center around the First and Second Superseding Indictments, neither of which added new defendants. In fact, only the Second Superseding Indictment added any [***6] charges. The First Superseding Indictment, filed the same day as the initial indictment, merely makes a minor change to the original charges. Although this Circuit has not addressed this issue directly, the majority of our sister circuits have held that "[t]he filing of a superseding indictment does not affect the speedy trial clock for offenses charged in the original indictment." *United States v. Bermea*, 30 F.3d 1539, 1567 (5th Cir. 1994) (citations omitted); *United States v. Young*, 528 F.3d 1294, 1296 (11th Cir. 2008) ("[N]either the filing of a superseding indictment, nor the dismissal of an original indictment followed by the filing of a new indictment, resets [*509] the speedy-trial clock."); *United States v. Daychild*, 357 F.3d 1082, 1091 n.10 (9th Cir. 2004) ("The clock's start time in this case is unaffected by the superseding indictments."); *United States v. Marshall*, 935 F.2d 1298, 1302, 290 U.S. App. D.C. 179 (D.C. Cir. 1991) ("As a general rule, the filing of a superseding indictment does not affect the speedy trial clock for offenses either charged in the original indictment or required under double jeopardy principles to be joined with such charges."); *United States v. Long*, 900 F.2d 1270, 1275 (8th Cir. 1990) ("Because the Act does not re-start the 70 day clock when an indictment is dismissed and a second returned, but merely [**10] tolls the time between dismissal of the first and arraignment on the second, it would make no sense to re-start the clock upon the return of a superseding indictment without dismissal of the first.") (citation omitted); *United States v. Roman*, 822 F.2d 261, 263-64 (2d Cir. 1987) ("We can see no logical reason to apply a different rule to a superseding indictment simply because it is filed sooner, while the first indictment is still pending."); *United States v. Thomas*, 788 F.2d 1250, 1258 (7th Cir. 1986) ("The superseding indictment does not affect the running of the time on the three charges that were in the original indictment as well as the superseding indictment."); *United States v. Novak*, 715 F.2d 810, 819 (3d Cir. 1983) ("[W]henever the court determines from the face of the indictment that a superseding indictment charges an offense that is the same as, or required to be joined with, an offense charged in the original indictment within the meaning of subsection (h)(6) and the Double Jeopardy Clause, trial on that offense must commence within the time limitation for trial applicable to the original indictment."); *see also Rojas-Contreras*, 474 U.S. at 235-36 ("[W]here a superseding indictment adds new charges, trial of the original charges must begin within the time limit for commencement of trial on the original indictment or information") (quotation omitted) (citation omitted).

[***7] In light of this persuasive precedent, the district court determined [**11] that the Speedy Trial Clock exceeded seventy days for both the First and Second

Superseding indictments, the First Superseding Indictment by fifteen days and the Second Superseding Indictment by one day. Had the trial court been made aware of these violations, it would have been compelled by the Act to dismiss the charges in both indictments. 18 U.S.C. §§ 3161(c)(1), 3162(a)(2); *see also Zedner v. United States*, 547 U.S. 489, 507, 126 S. Ct. 1976, 164 L. Ed. 2d 749 (2006). Although "a defendant has no duty to bring himself to trial and has no duty to bring any delay to the court's attention," *United States v. Moss*, 217 F.3d 426, 431 (6th Cir. 2000), the Act "assigns the role of spotting violations of the Act to the defendant — for the obvious reason that they have the greatest incentive to perform this task." *Zedner*, 547 U.S. at 502-03.

A federal prisoner may successfully challenge his sentence under 28 U.S.C. § 2255 by showing that his sentence "was imposed in violation of the Constitution or laws of the United States." An ineffective assistance of counsel claim may be used to prove such a constitutional violation, even where the underlying claim "cannot otherwise be reviewed for the first time on a § 2255 motion." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). In reviewing claims of ineffective assistance of counsel, this Court applies the two prong test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). In order to satisfy the requirements set by *Strickland*, Sylvester must [**12] first show that [*510] his counsel provided deficient performance and second that the deficient performance prejudiced Sylvester's defense. *Strickland*, 466 U.S. at 687. The first prong requires Sylvester to "show that counsel's representation fell below an objective standard of reasonableness," and the second prong requires Sylvester to "show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. Although Sylvester has made a satisfactory showing that his counsel provided deficient performance, he has not shown that the deficient performance prejudiced his defense. Thus, the district court was correct in denying Sylvester's motion to vacate his sentence under § 2255.

1. Deficient Performance

A counsel provides deficient performance where the "counsel's representation f[alls] below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The *Strickland* [***8] Court held that petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential," and should be guided by a measure of "reasonableness under prevailing professional norms." *Id.* at 688-89. Counsel need not pursue every possible claim or defense in order to avoid a finding of deficient performance. *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009); *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2009) ("[A]ppellate counsel need not raise every nonfrivolous argument on direct appeal."). "[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [**13] counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quotation and citation omitted).

Sylvester's claims of deficient performance are based in his counsels' failure to fully pursue the argument for a dismissal based on a violation of the Speedy Trial Act, even, in the case of appellate counsel, where counsel was directed by this Court to clarify the Speedy Trial Act argument. Indeed, Judge Ryan, writing for this Court in response to Sylvester's direct appeal, stated that "[b]y any conventional measure of forfeiture, Sylvester has forfeited this [Speedy Trial] argument." *United States v. Sylvester*, 330 F. App'x 545, 550 (6th Cir. 2009). Because Sylvester has shown that his trial and appellate counsel failed to raise a meritorious claim regarding violations of the Speedy Trial Act, even where prompted by this Court, Sylvester has shown that his counsel rendered deficient performance. He has thus satisfied the first *Strickand* requirement.

The government also argues that the Speedy Trial Act does not expressly address a situation as the present one, where the government filed a superseding indictment while a prior indictment is still pending. The government is correct that the Act addresses only scenarios in which a subsequent indictment has been filed after the defendant successfully [**14] moves for dismissal or after the government moves to dismiss the prior indictment. However, as the Eleventh Circuit correctly noted, "the exclusion of the period of time between the dismissal of an indictment and the filing of a new indictment under § 3161(h)(6), as well as the Speedy Trial Act more generally, would make little sense if the government could reset the speedy-trial clock at will and effectively 'circumvent[] the speedy trial guarantee through the simple expedient of [***9] obtaining superseding indictments [*511] with minor corrections.'" *Young*, 528 F.3d at 1296 (quoting *Bermea*, 30 F.3d at 1567).

The government then argues that the facts in this case can be distinguished from the precedent of our sister circuits on this point because the Second Superseding Indictment did not just make minor changes, but rather added new charges. The government continues that where a superseding indictment adds new substantive charges, it should be considered as one of the "other proceedings" excluded from the 70-day clock by the Act. Under this argument, the 70-day period for the original indictment would begin to toll as soon as a subsequent indictment bringing more charges against the defendant was filed. It is unclear when, or if, the Clock would start [**15] running again on the original indictment. In spite of the government's contention that, like enumerated examples provided in the Act, a superseding indictment bringing new charges would toll the Clock only on the original charges, the effect of accepting this argument would be to restart the seventy-day clock with each superseding indictment that adds substantive charges. The government cites no precedent in which a court has adopted this argument, but rather points to this Court's obligation to grant "a broad interpretation as to what is a 'proceeding'" under the Act. *United States v. Robinson*, 887 F.2d 651, 656 (6th Cir. 1989). This thinly supported argument is not strong enough to create a circuit split on this issue.

Because the Speedy Trial Act was violated and those violations would have led to a dismissal of the charges brought under the First and Second Superseding Indictments, Sylvester's counsel rendered deficient performance by not bringing those violations to the attention of the court either at trial or on appeal. Although we find that Sylvester's counsel rendered deficient performance in not pursuing the Speedy Trial Act argument, we nevertheless deny Sylvester's § 2255 motion because Sylvester was not prejudiced by his counsels' inaction. [**16]

2. Prejudice

In order to prove that he has been prejudiced by his counsels' deficient performances, Sylvester must show by "a reasonable probability that, but for counsels' errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In making this showing, [***10] "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, Sylvester must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Although the trial court would have been required to dismiss the charges brought in the First and Second Superseding Indictments, it was within the trial court's discretion to dismiss the case with or without prejudice. 18 U.S.C. § 3161(a)(2); *United States v. Myers*, 666 F.3d 402, 404 (6th Cir. 2012). Where the defendant "has not demonstrated that, but for his trial and appellate attorneys' unprofessional errors, the district court or this court on direct appeal would have ordered dismissal of the prosecution with prejudice based on a Speedy Trial Act violation," he has not shown that counsels' deficient performance "chang[ed] the result of the proceeding." *McAuliffe v. United States*, 514 F. App'x 542, 546 (6th Cir. 2013). Because Sylvester cannot show that the trial court would have dismissed the First and Second Superseding Indictments with prejudice, he [**17] has not shown that he was [*512] prejudiced by his counsels' deficient performance.

In accordance with the Act, trial courts must take into account three factors "when deciding whether to dismiss an action with or without prejudice: 1) the seriousness of the offense; 2) the facts and circumstances that led to the dismissal; and 3) the impact of reprosecution on the administration of the Speedy Trial Act and on the administration of justice." *United States v. Moss*, 217 F.3d 426, 430 (6th Cir. 2000) (citing 18 U.S.C. § 3162(a)). Regarding the first factor, this Circuit has found the type of charges filed against Sylvester in the First and Second Superseding Indictments to be serious in assessing whether to dismiss a claim with or without prejudice due to a Speedy Trial Act violation. *See id.* at 431 (categorically labeling drug offenses as serious); *see also United States v. Carnes*, 309 F.3d 950, 957 (6th Cir. 2007) (finding possession of a firearm by a felon to be a serious offense).

Regarding the second factor, this Circuit considers whether the delay resulted from "prosecutorial bad faith," whether there was "any attempt to take advantage of the delay," and whether "defendant can show a pattern of negligence on the part of the United States Attorney's Office." *United States v. Howard*, 218 F.3d 556, 561 (6th Cir. 2000). "Where there is no affirmative misconduct by either party, the court's [**18] conclusion that this second factor authorizes dismissal with or without prejudice is a matter within its discretion." *United States v. Pierce*, 17 F.3d 146, 149 (6th Cir. 1994). [***11] There is no evidence of prosecutorial bad faith in the record. Nor does Sylvester point to any attempt to take tactical advantage of the delay. Finally, there is no evidence of a pattern of negligence on behalf of the United States Attorney's Office or the court.

Sylvester argues that errors made by the government in filing improper indictments, his own counsel failing to identify the error, and the trial court misconstruing the case law constitutes a pattern of neglect. Although Sylvester has pointed out a series of errors, he failed to identify a pattern of negligence on the part of the United States Attorney's Office. As a result, the second factor leans against dismissing the case with prejudice.

Regarding the third and final factor, "[t]he main considerations that courts have taken into account . . . are whether the defendant suffered actual prejudice as a result of the delay, and whether the government engaged in prosecutorial misconduct that must be deterred to ensure compliance with the Act." *Howard*, 218 F.3d at 562. In terms of [**19] the impact on Sylvester's liberty and finances, he was being held on other charges at the time of the violation and thus cannot make a claim of prejudice due to a loss of liberty. *See United States v. Taylor*, 487 U.S. 326, 341, 108 S. Ct. 2413, 101 L. Ed. 2d 297 (1988) (Where "respondent was being held to answer not only for the drug charges but also on a valid bench warrant," there was no "additional restrictions or burdens on his liberty as a result of the speedy trial violation.").

Sylvester instead argues that, due to the violative delay, two potential witnesses who would have supported his defense at trial passed away before the trial and were thus unavailable. One, his grandfather, could have offered testimony regarding the cash found in Sylvester's possession at the time of his arrest, while the other, Marvel Wooden, could have offered testimony regarding the weapon found at the time of arrest, which was allegedly given to Sylvester as collateral for money that Mr. Wooden owed him. The trial court has already found the absence of these witnesses non-prejudicial, and Sylvester has [*513] produced no new evidence to suggest that this previous finding was made in error. Further, because "there is no evidence here of prosecutorial misconduct that must be deterred to ensure [**20] compliance with the Act," the third factor supports dismissal without prejudice. *Pierce*, 17 F.3d at 149. Accordingly, Sylvester has not shown that the trial court would have dismissed the charges with prejudice. Because he has not shown that the charges would have been dismissed with prejudice, Sylvester has not shown [***12] that the result of the proceeding would have been different but for the deficient performance. *McAuliffe*, 514 F. App'x at 546.

III.

The district court correctly assessed that, even though Sylvester's trial and appellate counsel rendered deficient performance, Sylvester has not shown that he was prejudiced by that performance. Accordingly, we **AFFIRM** the district court's denial of Sylvester's § 2255 motion.

**Dissent by:** MERRITT

## Dissent

[***13] **DISSENT**

MERRITT, Circuit Judge, dissenting. I am not as convinced as my colleagues that there was no "prejudice" as a result of the death of two of Sylvester's potential witnesses during the inordinate delay caused by the eight superseding indictments. Apparently, one of the witnesses, Sylvester's grandfather, would have testified that there was an innocent explanation for Sylvester's possession of cash at the time of his arrest. The other witness would have testified that the weapon was given to Sylvester as collateral [**21] for money the witness owed him. The prosecutor during final argument called this claim simply a "cockamamie story." The prosecutor used the absent witnesses as a further basis for conviction instead of a basis for acquittal if the jury believed the witnesses' testimony.

The Supreme Court has said that we should be more open to claims of "prejudice," warning that "[i]f witnesses die or disappear during a delay, the prejudice is obvious." This statement appears in a Supreme Court opinion in *Barker v. Wingo*, 407 U.S. 514, 532, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), in which the Court said:

> Prejudice, of course, should be assessed in light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. *If witnesses die or disappear during a delay, the prejudice is obvious*.

*Id.* (emphasis added).

Hence, instead of dismissing the case, I would remand this case to the district court with [**22] instructions to

consider that the element of "prejudice" has been established and the court should reconsider the remedy in the case.

---

End of Document

# Hopson v. Gray

No. 5:21-cv-704, 2021 WL 4894311 (N.D. Ohio Oct. 20, 2021)

Cited in Opening Brief at: 16

Cited by the district court in R. 222. See Response, Parts III.A and III.D.

Neutral
As of: September 22, 2026 7:54 PM Z

# Hopson v. Gray

United States District Court for the Northern District of Ohio, Eastern Division

October 20, 2021, Decided; October 20, 2021, Filed

CASE NO. 5:21-cv-704

**Reporter**
2021 U.S. Dist. LEXIS 201675 *; 2021 WL 4894311

PEYTON HOPSON, PETITIONER, vs. WARDEN DAVID W. GRAY, RESPONDENT.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part, Petition denied by, Motion denied by, As moot In re Hopson, 2022 U.S. App. LEXIS 6129 (6th Cir., Mar. 9, 2022)

Appeal terminated, 04/29/2022

Certificate of appealability denied, Motion denied by, As moot Hopson v. Gray, 2022 U.S. App. LEXIS 18455 (6th Cir., July 5, 2022)

**Prior History:** Hopson v. Lioi, 2021 U.S. Dist. LEXIS 121888, 2021 WL 2688546 (S.D. Ohio, June 30, 2021)

**Counsel:** [*1] Peyton Hopson, Petitioner, Pro se, St. Clairsville, OH.

Warden David W. Gray, Respondent, Pro se, St.Clairsville, OH.

**Judges:** HONORABLE SARA LIOI, UNITED STATES DISTRICT JUDGE.

**Opinion by:** SARA LIOI

## Opinion

MEMORANDUM OPINION AND ORDER

Before the Court is the Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("petition") filed by *pro se* petitioner Peyton Hopson ("Hopson" or "petitioner"), and an addendum to the petition. (Doc. Nos. 2, 11.) Hopson originally filed the petition, along with motions for "expedited consideration" (Doc. No. 3) and "release of medical records" (Doc. No. 4), in the District Court for the Southern District of Ohio. Thereafter, the action was transferred to the Northern District of Ohio. (Doc. Nos. 1, 7.) After the case was transferred, Hopson filed a motion for this Court to recuse and transfer this action back to the Southern District, and an amendment to the motion for recusal. (Doc. Nos. 9, 10.)

For the reasons that follow, the motion to recuse is denied, the petition is dismissed, and the pending motions for expedited consideration and release of medical records are denied.

### I. BACKGROUND

Hopson is a state prisoner incarcerated at the Belmont Correctional Institution in St. Clairsville, Ohio. [*2] He is serving a sentence imposed upon him in 2014 by the Stark County Court of Common Pleas. (Doc. No. 2 ¶¶ 1-5.) Hopson originally filed the petition in the Southern District of Ohio. On March 31, 2021, the Southern District transferred the action to the Northern District of Ohio on the grounds that the petition challenges Hopson's conviction in Stark County, Ohio and, therefore, his petition should be transferred to the district court where the state court that convicted and sentenced him is located. (Doc. No. 1.) Hopson, however, does not challenge the lawfulness of his underlying Stark County convictions and sentence. Instead, he claims that his state imprisonment in Belmont Correctional Institution violates his constitutional rights under the Eighth Amendment to be free from cruel and unusual punishment on the basis that he suffers from chronic Hepatitis C ("HCV") and has been "categorically denied [the] curative treatment" that he has requested "based solely on a blanket policy promulgated and implemented by the Ohio Department of Rehabilitations and Corrections ("ODRC")."[1] (Doc.

[1] According to Hopson, a "state-of-the-art" curative treatment for HCV exists, but under ODRC policy, the treatment is available to prisoners only when the disease has reached a certain stage and the inmate meets certain criteria. Treatment of Hopson's HCV with Interferon is available to him. But

No. 2 at 8-9.[2] ) Hopson does not allege that he has pursued formal grievances within the prison system, or that he [*3] has raised his claim in the Ohio courts. Instead, he claims that the backlog of cases faced by Ohio's judicial branch resulting from the COVID-19 pandemic has rendered state remedies ineffective and inadequate to protect his constitutional right to be free from cruel and unusual punishment under the Eighth Amendment, and he should not be required to exhaust his state court remedies. (*Id.* at 5.)

Then on May 26, 2021, Hopson filed a civil rights action against the Court in the Southern District of Ohio (Case No. 2:21-cv-2784 ("SDOH Case").) The complaint in the SDOH Case alleges that, in violation of the Eighth Amendment, the undersigned has deprived Hopson of adequate medical care by not ordering the warden to respond to the transferred petition. (*See* SDOH Case Doc. No. 5.) In the SDOH Case, Hopson seeks $100,000.00 in damages against the undersigned. On June 8, 2021, Hopson filed a motion in the instant action for this Court to recuse (and amendment to the motion to recuse) and transfer this action back to the Southern District of Ohio. (*See* Doc. Nos. 9, 10.) The basis for Hopson's motion for recusal is that because he is seeking $100,000.00 in damages in the SDOH Case against the undersigned, the outcome [*4] of the instant action "could have a direct bearing on the award granted in the [SDOH Case]. Therefore, Judge Lioi has a personal financial interest in the outcome of the above captioned case." (Doc. No. 9 at 1.)

On June 30, 2021, Magistrate Judge Kimberly Jolson issued a report and recommendation ("R&R") in the SDOH Case recommending that the case against the undersigned be dismissed on two grounds—failure to state a claim upon which relief may be granted and judicial immunity. (*See* SDOH Case Doc. No. 4 at 4-5.) On July 23, 2021, Hopson filed an objection to the R&R. In order to allow the Southern District of Ohio time to issue a final judgment in the SDOH Case, the Court entered an order indicating that it would defer a ruling on Hopson's petition and motion to recuse until such time as such judgment was issued. (*See* Order [non-document] dated August 4, 2021.) But given that Hopson has filed a motion in the SDOH Case asking that court (1) "to stay adjudication" of that action, (2) serve the complaint in the SDOH Case upon the undersigned, and (3) order the undersigned to rule on Hopson's motion for recusal in the instant action (SDOH Case Doc. No. 8), and given that the Southern District [*5] of Ohio has not to date issued a final judgment in the SDOH Case (perhaps due to Hopson's request), the Court can no longer defer acting upon Hopson's pending motions and petition.

## II. MOTION TO RECUSE

The Court will first address Hopson's motion that the Court disqualify itself and transfer the case back to the Southern District of Ohio. In his motion to recuse, Hopson argues that because he seeks $100,000.00 in damages against the undersigned in the SDOH Case, the Court has a financial interest in the outcome of the instant action and should recuse pursuant to 28 U.S.C. § 455. (Doc. No. 9 at 1-2.)

"[A] judge is presumed to be impartial." *PNC Equip. Fin. v. Mariani*, 758 F. App'x 384, 391 (6th Cir. 2018) (citing *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 352 (6th Cir. 2007) (further citation omitted)). The burden of justifying disqualification falls upon the party seeking recusal. *Burley v. Gagacki*, 834 F.3d 606, 616 (6th Cir. 2016) ("The burden is on the moving party to justify disqualification.") (citing *Consol. Rail Corp. v. Yashinsky*, 170 F.3d 591, 597 (6th Cir. 1999)).

Under 28 U.S.C. § 455(b)(4), a judge should disqualify himself or herself in the following circumstances: "He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding[.]" [*6] The statute defines "financial interest" as follows:

---

Hopson complains that Interferon treatment has more side effects and is less effective than the "state-of-the-art" treatment, and the ODRC's "blanket policy" that he will only be eligible for the "state-of-the-art" treatment when his condition worsens is not based upon an "individualized medical determination." (Doc. No. 2 at 8-9.) Hopson alleges that respondent is deliberately indifferent to his medical needs because respondent is aware of his serious condition but "is without the authority to override the medical policy of the ODRC" and "is bound by ODRC policy to act with deliberate indifference to [his] serious medical need." (*Id.* at 11-12.) Contending that "no set of conditions of confinement would be sufficient under the given circumstances to protect [his] Eighth Amendment right to be free from cruel and unusual punishment" (*id.* at 17-18), he seeks "immediate release from custody." (*Id.* at 19.)

[2] Page number references are to the page numbers assigned to each individual document filed by the Court's electronic filing system.

"financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

**(i)** Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

**(ii)** An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

**(iii)** The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

**(iv)** Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

28 U.S.C. § 455(d)(4).

Hopson's claim for damages against the Court in the SDOH case does not fall within the statute's definition of financial interest. Nor does [*7] Hopson otherwise explain how the Court's decision in this action would impact the outcome of the SDOH Case. Hopson has not carried his burden to justify the disqualification of the Court pursuant to § 455(b)(4), and his motion on that basis is denied.

In the motion, Hopson also recites the language of 28 U.S.C. § 455(a), which provides that: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." (Doc. No. 9 at 1.) It appears that Hopson is suggesting the Court cannot be impartial in the instant action because its financial interest is implicated in the SDOH Case. For the reasons discussed above, the undersigned does not have a financial interest in the instant action as defined by the statute upon which to question the Court's impartiality. To the extent that Hopson is arguing that the Court cannot be impartial in the instant action simply because he has sued the Court in another jurisdiction, that argument is unavailing.

Section 455(a) requires recusal not only when there is actual partiality, but also when there is an "appearance" of partiality. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860, 108 S. Ct. 2194, 2203, 100 L. Ed. 2d 855 (1988). But to "'say that § 455(a) requires concern for appearances is not to say [*8] that it requires concern for mirages. The standard is an objective one[.]'" *United States v. Odeh*, No. 13-cr-20772, 2014 U.S. Dist. LEXIS 104486, 2014 WL 3767808, at *2 (E.D. Mich. July 31, 2014) (quoting *United States v. El-Gabrowny*, 844 F. Supp. 955, 961 (S.D.N.Y. 1994)). As the Sixth Circuit has explained, § 455(a) "'imposes an objective standard[.]'" *PNC Equip. Fin.*, 758 F. Appx at 390-91 (6th Cir. 2018) (quoting *Gagacki*, 834 F.3d at 616 (citing *United States v. Adams*, 722 F.3d 788, 837 (6th Cir. 2013))). Under that standard, "[t]he statute requires a judge to recuse 'if a reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality.'" *Ragozzine v. Youngstown State Univ.*, 783 F.3d 1077, 1079 (6th Cir. 2015) (quoting *Hughes v. United States*, 899 F.2d 1495, 1501 (6th Cir. 1990)). A judge need not recuse under § 455(a) "'based on the subjective view of a party, no matter how strongly that view is held.'" *In re Polyurethane Foam Antitrust Litig.*, No. 17-3361, 2017 U.S. App. LEXIS 25352, 2017 WL 8791098, at *4 (6th Cir. Dec. 14, 2017) (citing *United States v. Sammons*, 918 F.2d 592, 599 (6th Cir. 1990) (citation omitted)). For the reasons explained below and notwithstanding Hopson's subjective view to the contrary, Hopson has failed to establish that a reasonable person, knowing all the circumstances, would call into question the Court's impartiality in the instant action simply because Hopson filed the SDOH Case.

A United States magistrate judge in another jurisdiction has concluded that the SDOH Case lacks merit and has recommended dismissal of that action on two grounds—failure to state a claim and judicial immunity.[3] (*See* SDOH Case Doc. No. 4.) "[S]uits against public officials are common and a judge would likely not harbor bias against someone [*9] simply because the person named him in a meritless civil suit." *United States v. Houston*, No. 3:13-cr-10, 2013 U.S. Dist. LEXIS 106599, 2013 WL 3975405, at *13 (E.D. Tenn. July 29, 2013) (quoting *In re Taylor*, 417 F.3d 649, 652 (7th Cir. 2005)). In addition to filing the SDOH Case, Hopson also states

[3] The federal district judge assigned to the SDOH Case has not yet ruled on Hopson's objections to recommendation of the magistrate judge.

that he has filed a complaint of judicial misconduct against the undersigned. (*See* Doc. No. 10 at 7.) But the mere filing of a complaint of judicial misconduct is not a basis for recusal. Were it otherwise, litigants would be able to require the recusal of judges at will. *See Link v. Adamski*, No. 15-cv-819, 2015 U.S. Dist. LEXIS 95409, 2015 WL 4469694, at *2 (W.D. Pa. July 22, 2015) (collecting cases).

Having failed to establish that the Court has a financial interest in the outcome of the instant action, Hopson has not identified any other basis upon which a reasonable person would call into question the Court's impartiality under § 455(a) simply because he filed the SDOH Case. Section 455(a) "is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." *Switzer v. Berry*, 198 F.3d 1255, 1258 (10th Cir. 2000) (internal quotation marks and citation omitted). "Recusal is not required simply because one of the parties has initiated litigation against the presiding judge." *Callihan v. E. Kentucky Prod. Credit Ass'n*, 895 F.2d 1412 (Table) (6th Cir. 1990) (citing among authority *United States v. Studley*, 783 F.2d 934, 939-40 (9th Cir. 1986)); *see also United States v. Houston*, No. 3:13-cr-09, 2014 U.S. Dist. LEXIS 8444, 2014 WL 241589, at *2 (E.D. Tenn. Jan. 22, 2014) ("[A] judge's disqualification is neither required because one of the parties has initiated [*10] litigation against the presiding judge, nor does it summarily demonstrate partiality.") (citing *Callihan*); *United States v. Houston*, No. 3:13-cr-10, 2013 U.S. Dist. LEXIS 106599, 2013 WL 3975405, at *12 (E.D. Tenn. July 29, 2013) ("[N]umerous courts have held that filing a lawsuit against a judge is not sufficient to establish partiality under § 455(a).") (collecting cases); *Flint v. Whalin*, No. 3:11-cv-316, 2011 U.S. Dist. LEXIS 66200, 2011 WL 2471550, at *1 (W.D. Ky. June 21, 2011) ("The mere fact that [this judge] may be one of the numerous federal judges that [the plaintiff] has filed suit against is not sufficient to establish that [his] recusal from [this] case is warranted under 28 U.S.C. § 144 or § 455(a).") (alterations in original) (quoting *Azubuko v. Royal*, 443 F.3d 302, 304 (3d Cir. 2006)); *In re Martin-Trigona*, 573 F. Supp. 1237, 1243 (D. Conn. 1983) ("[I]t *is* clear that a judge is not disqualified under 28 U.S.C. § 455 . . . merely because a litigant sues or threatens to sue him.") (emphasis in original) (citing *United States v. Grismore*, 564 F.2d 929, 933 (10th Cir. 1977), *cert. denied*, 435 U.S. 954, 98 S. Ct. 1586, 55 L. Ed. 2d 806 (1978)). "To hold otherwise 'would allow litigants to judge shop by filing a suit against the presiding judge.'" *Flint*, 2011 U.S. Dist. LEXIS 66200, 2011 WL 2471550, at *1 (quoting *In re Taylor*, 417 F.3d at 652); *see also Cobble v. Value City Furniture*, 3:06-cv-631, 2008 U.S. Dist. LEXIS 37131, 2008 WL 1995086, at *1 (W.D. Ky. May 6, 2008) (citing 32 Am. Jur. 2d Federal Courts § 149 ("For a judge to be disqualified simply because the plaintiff has sued the judge would be to allow the plaintiff to manipulate the identity of the decision-maker and thus to engage in judge-shopping.")).

The decision of whether to recuse lies within the sound discretion of the Court. [*11] *Green v. Nevers*, 111 F.3d 1295, 1303 (6th Cir. 1997) (motions brought under § 455 "are entrusted to the sound discretion of the trial court") (citations omitted); *Ragozzine*, 2014 U.S. Dist. LEXIS 37843, 2014 WL 1153715, at *1 (same) (citing *United States v. Wilensky*, 757 F.2d 594, 599-600 (3d Cir. 1985)). While a judge has a duty to recuse when the moving party has met his burden to establish disqualification under the statute, "a federal judge has a duty to sit where not disqualified which is equally as strong as the duty to not sit where disqualified." *Laird v. Tatum*, 409 U.S. 824, 837, 93 S. Ct. 7, 34 L. Ed. 2d 50 (1972). For the reasons discussed above, the undersigned concludes that Hopson has not met his burden to establish that this Court must recuse itself from the instant action pursuant to §§ 455(a) or (b)(4); rather, the Court has a "duty to sit" and resolve the instant action. Accordingly, Hopson's motion for recusal is denied and the Court will proceed to consider Hopson's § 2254 habeas petition.

**III. § 2254 HABEAS PETITION**

Under 28 U.S.C. § 2243, federal district courts conduct an initial screening review of habeas corpus petitions. *Alexander v. Northern Bureau of Prisons*, 419 F. App'x 544, 545 (6th Cir. 2011) (citing 28 U.S.C. § 2243; *Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970)). A court must dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." Rule 4 of the Rules Governing Habeas Corpus Cases Under Section 2254; *see also Allen*, 424 F.2d at 141 (the district court has a duty to "screen out" habeas corpus petitions that lack [*12] of merit on their face). No response from the respondent is necessary when a petition is frivolous, obviously lacks merit, or where the necessary facts can be determined from the petition itself without consideration of a response. *Allen*, 424 F.2d at 141.

As an initial matter, it is not apparent that Hopson's claim is cognizable in habeas. The Supreme Court has made clear that constitutional challenges to the fact or

duration of a prisoner's confinement are the proper subject of a habeas corpus petition, not a civil rights complaint under 42 U.S.C. § 1983. *Preiser v. Rodriguez*, 411 U.S. 475, 499, 93. S. Ct. 1827, 36 L. Ed. 2d 439 (1973). Hopson does not challenge the fact or duration of his confinement with respect to his underlying Stark County convictions. Rather, he challenges the constitutionality of the medical care he is being provided during his otherwise lawful custody. Generally, such challenges are properly brought under 42 U.S.C. § 1983. *Id.* (Section 1983 action is the proper remedy for a prisoner asserting a constitutional challenge to conditions of prison life, but not to the fact or length of his custody). Hopson's Eighth Amendment claim regarding the constitutional sufficiency of his medical care is, on its face, the type of conditions-of-confinement claim the Sixth Circuit has found to be noncognizable on habeas corpus review. [*13] *See, e.g., Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004) (holding that "no grounds for habeas relief were established" where a prisoner alleged that his constitutional rights were violated as a result of delay and denial of medical treatment). Such alleged constitutional violations are properly brought pursuant to 42 U.S.C. § 1983. *Id.; see also Mann v. Ohio Dep't of Rehab. and Corr.*, 814 F. App'x 134) (6th Cir. 2020) (§ 1983 Eighth and Fourteenth Amendment claims challenging Ohio's policy for allocating HCV medication). To the extent that Hopson's Eighth Amendment deliberate indifference claim is noncognizable in habeas, the petition is dismissed without prejudice to Hopson raising his claims in an action brought pursuant to § 1983. *See Martin*, 319 F.3d at 714 (reversing and remanding, finding that rather than dismissing petitioner's habeas petition with prejudice, the district court should have dismissed the petition without prejudice to allow petitioner to raise his potential civil rights claims properly as a § 1983 action).

That said, Hopson seeks release from confinement, stating that no set of conditions would be sufficient to remedy the Eighth Amendment violation he alleges. Release from custody is the "heart of habeas corpus." *Wilson v. Williams*, 961 F.3d 829, 838 (6th Cir. 2020) ("The Supreme Court has held that release from confinement—the remedy petitioners seek here—is 'the heart of habeas corpus.'") (quoting *Preiser*, 411 U.S. at 498). And in *Wilson*, the Sixth Circuit permitted federal [*14] inmates to bring a habeas corpus action where they sought release from incarceration for a medically vulnerable subclass of inmates due to alleged conditions in the prison resulting from the COVID-19 pandemic where they claimed no set of conditions would be sufficient to remedy the alleged constitutional violation. *Wilson*, 961 F.3d at 838 ("Our precedent supports the conclusion that where a petitioner claims that no set of conditions would be constitutionally sufficient the claim should be construed as challenging the fact or extent, rather than the conditions, of the confinement."). Federal district courts within the Sixth Circuit have permitted state prisoners seeking release from prison conditions resulting from COVID-19 to bring their claims under 28 U.S.C. § 2254 and § 2241. *See e.g. Horner v. Belmont Corr. Inst.*, Case No. 2:20-cv-6118, 2021 U.S. Dist. LEXIS 29940, 2021 WL 540057, at *1-2 (S.D. Ohio Jan. 8, 2021) (citing cases); *Harp v. Nagy*, Case No. 2:20-cv-11866, 2021 U.S. Dist. LEXIS 93710 at *3 (E.D. Mich. May 18, 2021) (citing cases).

While Hopson seeks release from confinement, the factual circumstances of the instant action are distinguishable from *Wilson* with respect to Hopson's claim that there are no conditions of confinement sufficient to remedy the alleged constitutional violation. The unconstitutional condition he alleges would be remedied if he were afforded the "state-of-the-art" HCV treatment available to some Ohio prisoners under ODRC's [*15] medical policy. Indeed, other Ohio prisoners challenging the ODRC's HCV treatment policies have pursued remedies other than release. *See e.g. Mann*, 814 F. App'x at 135-36 (6th Cir. 2020) (remanding § 1983 action where Ohio prisoners claiming they were denied HCV medication under the ODRC's HCV treatment policy and seeking damages and injunctive relief); *see also Atkins v. Parker*, 972 F.3d 734, 738 (6th Cir. 2020) (inmates challenging Tennessee's HCV treatment policy under § 1983 and seeking declaratory and injunctive relief).

Nevertheless, the remedy Hopson seeks is "the heart of habeas corpus." To the extent his Eighth Amendment claim is cognizable in habeas corpus, the petition is dismissed without prejudice because Hopson has not exhausted his claims in state court.[4] Before a state prisoner may seek habeas relief under § 2254 (or § 2241), he must first exhaust his available state-court remedies. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999) ("Before a federal court may grant habeas relief to a state prisoner, the prisoner must

[4] The district court can and must raise the exhaustion issue *sua sponte* when it clearly appears that the habeas claims before the court have not first been presented to the state courts. *See Prather v. Rees*, 822 F.2d 1418, 1422 (6th Cir. 1987); *Allen*, 424 F.2d at 138-39.

exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). To fulfill the exhaustion requirement, a petitioner must present his federal claims to all levels of the state appellate system, [*16] including the state's highest court, in order to provide the state courts a full and fair opportunity to resolve the federal constitutional claims. *Id.* at 845; *see also Wagner v. Smith*, 581 F.3d 410, 414-15 (6th Cir. 2009) (to be properly exhausted, each claim must be "fairly presented" to both the state courts of appeals and state supreme court so that those courts have the opportunity to address the legal and factual basis for each claim) (citations omitted).

Hopson expressly acknowledges that he has not exhausted his claim in the Ohio courts. Citing *Workman v. Tate*, 957 F.2d 1339 (6th Cir. 1992), he contends exhaustion should be excused. (Doc. No. 2 at 14.) In *Workman*, the Sixth Circuit stated that inordinate delay may be a circumstance which would excuse the exhaustion of state court remedies and held that a habeas petitioner was excused from the exhaustion requirement where his "petition for post-conviction relief has languished in the state courts for more than three years." *Workman*, 957 F.2d at 1344. But Hopson has not demonstrated that his claim has been unreasonably delayed in the state courts. In fact, he does not indicate he has even attempted to present his claim there but simply asserts there is a backlog of state-court cases. This is insufficient to excuse the exhaustion requirement in a habeas [*17] action. *See. e.g., Porter v. White*, No. 01-cv-72798, 2001 U.S. Dist. LEXIS 11784, 2001 WL 902612, at *1 (E. D. Mich. Aug. 6, 2001) (dismissing habeas petition as unexhausted where petitioner argued that he should be excused from the exhaustion requirement on the basis that his appeal might take years to complete); *see also Johnson v. Bauman*, No. 2:19-cv-12423, 2020 U.S. Dist. LEXIS 182201, 2020 WL 5819567, at *2 (E.D. Mich. Sept. 30, 2020) (declining to excuse exhaustion requirement for state prisoner's § 2254 petition due to inordinate delay by the state courts where petitioner failed to show that his case has languished for years without any meaningful attention in the state courts), *reconsideration denied*, No. 2:19-cv-12423, 2020 U.S. Dist. LEXIS 218874, 2020 WL 6867787 (E.D. Mich. Nov. 23, 2020).

It is true that the Court may consider the merits of unexhausted habeas claims under unusual or exceptional circumstances, such as the COVID-19 global pandemic. *See Horner*, 2021 U.S. Dist. LEXIS 45419, 2021 WL 931481, at *3 (quoting *Blackburn v. Noble*, 479 F. Supp. 3d 531, 539 (E.D. Ky. Aug. 17, 2020) (citation omitted)). Hepatitis C, however, is neither unusual nor exceptional. As described by the U.S. Department of Health and Human Services National Institute of Health, "[i]n the United States, hepatitis C is the most common chronic viral infection found in blood[.]" *See* https://www.niddk.nih.gov/health-information/liver-disease/viral-hepatitis/hepatitis-c#common.

Accordingly, to the extent that Hopson's petition asserts cognizable habeas claims, the petition is dismissed without prejudice for [*18] failure to exhaust his state court remedies.

## IV. CONCLUSION

For the foregoing reasons, Hopson's motion for recusal and amendment thereto are denied. (Doc. Nos. 9, 10.) Further, it is apparent from the face of the petition that Hopson is not entitled to habeas corpus relief in federal district court and the petition is dismissed without prejudice. In light of the Court's dismissal of the petition, Hopson's motions for "expedited consideration" (Doc. No. 3) and "release of medical records" (Doc. No. 4) are moot and denied as such.

The Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b).

**IT IS SO ORDERED**.

Dated: October 20, 2021

/s/ Sara Lioi

**HONORABLE SARA LIOI**

**UNITED STATES DISTRICT JUDGE**

---

End of Document

# United States v. Perry

116 F.4th 578 (6th Cir. 2024)

Cited in Opening Brief at: 17

Cited by the district court in R. 223.

Positive
As of: September 14, 2026 6:57 PM Z

# United States v. Perry

United States Court of Appeals for the Sixth Circuit

June 11, 2024, Argued; September 4, 2024, Decided; September 4, 2024, Filed

File Name: 24a0210p.06

No. 23-1543

**Reporter**
116 F.4th 578 *; 2024 U.S. App. LEXIS 22413 **; 2024 FED App. 0210P (6th Cir.) ***

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. CHADRICK AKEEM PERRY, Defendant-Appellant.

**Notice:** RECOMMENDED FOR PARTIAL-TEXT PUBLICATION - This is a Partial Publication. Other issues raised by this appeal are addressed in an unpublished appendix to this opinion filed also on August 11, 1992.

**Prior History:** [**1] Appeal from the United States District Court for the Western District of Michigan at Grand Rapids. No. 1:20-cr-00163-1—Jane M. Beckering, District Judge.

United States v. Perry, 2020 U.S. Dist. LEXIS 194899 (W.D. Mich., Oct. 21, 2020)

**Counsel:** ARGUED: Paul L. Nelson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant.

Lauren Biksacky, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

ON BRIEF: Paul L. Nelson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant.

Lauren Biksacky, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

**Judges:** Before: COLE, GIBBONS, and READLER, Circuit Judges.

**Opinion by:** CHAD A. READLER

## Opinion

[*580] [***1] CHAD A. READLER, Circuit Judge. During his prosecution, Chadrick Perry was committed to a federal facility to restore his competency for trial. Delays in that process [***2] extended his pre-trial proceedings. Eventually, Perry pleaded guilty to being a felon in possession of ammunition. The district court imposed a sentence of 57 months' imprisonment.

On appeal, Perry raises two issues. One involves the Speedy Trial Act. Perry says the Act's timeliness requirements were violated while he awaited competency restoration treatment. The other implicates his sentence. Perry challenges the district court's determination [**2] that his prior conviction for aggravated domestic violence was a "crime of violence" under U.S.S.G. § 4B1.2(a), which resulted in an increase to his Guidelines range. Seeing no error on either front, we affirm.

I.

A federal grand jury indicted Perry for being a felon in possession of a firearm and ammunition. Following a not guilty plea in October 2020, Perry was detained at a county jail in Michigan pending trial. While preparing Perry's defense, his counsel came to the view that Perry's competency to stand trial should be evaluated. The district court agreed and granted Perry's motion to determine competency.

Perry then began a long journey through competency evaluation and treatment in the federal Bureau of Prisons. To allow for an evaluation, Perry was transported to a federal facility in Chicago. He remained there for two months, at which point a forensic psychologist deemed him competent to stand trial and recommended that he be returned to pre-trial detention in Michigan. Upon Perry's return, the district court held a competency hearing. The court delayed its competency determination, however, to honor two requests made by Perry: that he be allowed to furnish additional records for his psychologist [**3] in Chicago to evaluate, and that he undergo a second, separate evaluation by a different psychologist at a federal facility in North

Carolina.

After evaluating Perry, the two forensic psychologists came to different conclusions. Even after review of the additional records, the provider in Chicago continued to deem Perry competent to stand trial. But the examiner in North Carolina determined that Perry was not competent to stand trial. At a subsequent hearing in September 2021, the parties, in light of the latter medical diagnosis, agreed that Perry should be committed to the custody of the Attorney [***3] General under 18 U.S.C. § 4241(d) for competency restoration treatment—a request the district court likewise granted.

Perry was designated to the North Carolina facility for competency restoration on September 30, 2021. For reasons that the government has not fully explained, he did not arrive there until March 1, 2022. Once in North Carolina, Perry underwent treatment by mental health professionals. A few months later, the providers issued a report stating that Perry was competent to stand trial. Following a hearing, the district court found Perry's competence restored and set a date for trial.

With his case [**4] moving forward again, Perry moved to dismiss the indictment due to alleged violations of the Speedy Trial Act. Perry asserted that the 152-day period between his designation to be treated in North Carolina and his ultimate arrival there counted against the Speedy Trial Act's 70-day clock for bringing a defendant to trial. The district court denied the motion. In the district court's view, "the entire time from when the [court] deemed [Perry] mentally incompetent to stand trial" in September 2021 "until [it] ruled [*581] [Perry's] competency restored" the following September was "fully excluded under [18 U.S.C.] § 3161(h)(4) as a delay resulting from 'the fact that [Perry was] mentally incompetent or physically unable to stand trial.'"

With that, Perry pleaded guilty to one count of the indictment, being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). He did so pursuant to a conditional plea agreement, which allowed him to appeal the denial of his motion to dismiss. His case proceeded to sentencing. The probation office recommended that Perry's otherwise applicable base offense level be increased on the ground that Perry's 2013 state conviction for aggravated domestic violence was a predicate crime of violence. *See* U.S.S.G. § 2K2.1(a)(4). Doing so resulted in [**5] a Guidelines range of 51-63 months of imprisonment.

Perry objected to that recommendation. In his view, the prior conviction for domestic violence was not a crime of violence, meaning the proper Guidelines range was 30-37 months. At sentencing, the district court overruled Perry's objection and imposed a within-Guidelines sentence of 57 months. This timely appeal followed.

[***4] II.

A. We consider first Perry's challenge under the Speedy Trial Act. *See* 18 U.S.C. § 3161 *et seq.* We review the district court's interpretation of the Act de novo, *United States v. Zabawa*, 719 F.3d 555, 561 (6th Cir. 2013), and its factual findings for clear error, *United States v. Marks*, 209 F.3d 577, 586 (6th Cir. 2000).

Beginning with first principles, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. CONST. amend. VI. Through the Speedy Trial Act, the basis for Perry's motion to dismiss, Congress set out a framework for honoring that guarantee. *See Betterman v. Montana*, 578 U.S. 437, 445, 136 S. Ct. 1609, 194 L. Ed. 2d 723 (2016). To that end, the Speedy Trial Act "comprehensively regulates the time within which a trial must begin." *Zedner v. United States*, 547 U.S. 489, 500, 126 S. Ct. 1976, 164 L. Ed. 2d 749 (2006). At its core is a straightforward command—a defendant must be brought to trial within 70 days from the date of arrest, the filing of the indictment or information, or the defendant's first appearance in court, whichever occurs last. *See* 18 U.S.C. § 3161(c)(1). If the defendant's trial does not [**6] commence within that period, the indictment must be dismissed, either with or without prejudice. *Id.* § 3162(a)(2).

As today's case reflects, what is sometimes less straightforward is determining how to apply the statutory exceptions to the 70-day clock. Certain periods are not counted toward the Act's calculations. *See id.* § 3161(h). Examples include delays resulting from "any interlocutory appeal," *id.* § 3161(h)(1)(C), "consideration by the court of a proposed plea agreement," *id.* § 3161(h)(1)(G), and "the absence or unavailability of . . . an essential witness," *id.* § 3161(h)(3)(A). So long as the triggering event occurs, the excepted periods "shall be excluded." *Id.* § 3161(h); *see United States v. Tinklenberg*, 563 U.S. 647, 655, 131 S. Ct. 2007, 179 L. Ed. 2d 1080 (2011) ("The whole paragraph [Section 3161(h)] can be read as requiring the automatic exclusion of the . . . specific sublist . . . .").

Two exclusion periods are at issue here. One is § 3161(h)(4), which omits from the 70-day calculation "[a]ny period of delay resulting from the fact that the

defendant is mentally incompetent or physically unable to stand trial." 18 U.S.C. § 3161(h)(4). Another is [***5] § 3161(h)(1), which excludes various "period[s] of delay resulting from other proceedings concerning the defendant." [*582] *Id.* § 3161(h)(1). Relevant "proceedings" include time dedicated to the "transportation of any defendant from another district, or to and from places [**7] of examination or hospitalization . . . ." *Id.* § 3161(h)(1)(F). This latter exclusion, it bears noting, has an exclusion of its own, one that presumes unreasonable "any time consumed in excess of ten days from the date [of] an order of removal or an order directing such transportation, and the defendant's arrival at the destination . . . ." *Id.*

Perry argues that time between when he was designated for competency restoration in North Carolina (September 30, 2021) and when he arrived there (March 1, 2022) counts as time spent in transportation under § 3161(h)(1)(F). Because that provision presumptively authorizes only ten days of transportation time, the remaining days, Perry contends, must count toward his Speedy Trial Act clock. And as the total number of non-excludable days exceeds 70, he adds, his prosecution violates the Speedy Trial Act.

Standing alone, the transportation provision might not save Perry's prosecution from dismissal under the Speedy Trial Act. But in this case, we must also consider § 3161(h)(4). Again, that provision excludes from Speedy Trial Act calculations "[a]ny period of delay resulting from" the district court's determination that Perry was mentally incompetent to stand trial, a period that encompasses the entire duration of Perry's transport from Michigan to North [**8] Carolina. An examiner in North Carolina determined that Perry was not competent for purposes of trial. Not long thereafter, the district court committed Perry to the custody of the Attorney General. The time following Perry's commitment qualifies as "delay resulting from the fact that [Perry] is mentally incompetent or physically unable to stand trial." 18 U.S.C. § 3161(h)(4). And "*any* period of delay" that falls under § 3161(h)(4) "*shall* be excluded" from Speedy Trial Act calculations. *Id.* §§ 3161(h), 3161(h)(4) (emphasis added).

On its face, this text is unambiguous and mandatory. Read together, the terms "any" and "shall" are absolute prohibitions on counting against the Speedy Trial Act deadline time that results from a defendant being deemed incompetent to stand trial. *See Babb v. Wilkie*, 589 U.S. 399, 405 n.2, 140 S. Ct. 1168, 206 L. Ed. 2d 432 (2020) ("The word 'any' has an expansive meaning" (cleaned up)); *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 311, 140 S. Ct. 1308, 206 L. Ed. 2d 764 (2020) ("When, as is the case here, [***6] Congress distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty." (cleaned up)). As a result, the entire period between the district court's order finding Perry not competent to stand trial and the court's order deeming his competence restored must be excluded from the Act's calculations.

In short, the terms of the Speedy Trial Act require us to read § 3161(h)(1)(F) in tandem with § 3161(h)(4), the latter [**9] of which independently paused the Act's 70-day countdown during Perry's period of incompetency. That conclusion makes sense not only as a textual matter, but also as a constitutional one. After all, trying a defendant deemed incompetent to assist in his defense violates due process. *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S. Ct. 1373, 134 L. Ed. 2d 498 (1996) (citing *Medina v. California*, 505 U.S. 437, 453, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992)). Perry's approach would penalize the government for failing to bring to trial a defendant who could not lawfully be tried.

We are not alone in that understanding. At least four circuits have harmonized §§ 3161(h)(1)(F) and (h)(4) in the same way. *See United States v. Minton*, 99 F.4th 692, 695 [*583] (4th Cir. 2024) ("[T]here was no proceeding pending when the [delay] took place because [the defendant] had already been declared incompetent . . . . [T]he relevant provision here is Section 3161(h)(4), not Section 3161(h)(1)(F)." (cleaned up)); *United States v. Romero*, 833 F.3d 1151, 1155 (9th Cir. 2016), *cert. denied*, 583 U.S. 875, 138 S. Ct. 192, 199 L. Ed. 2d 129 (2017); *United States v. Patterson*, 872 F.3d 426, 433-34 (7th Cir. 2017); *United States v. Pendleton*, 665 F. App'x 836, 839 (11th Cir. 2016) (per curiam) ("[I]f a defendant is mentally incompetent under § 3161(h)(4), that time is excludable even if there is also a transportation delay that is unreasonably long and thus not excludable under § 3161(h)(1)(F)."). No other circuit, to our knowledge, has held otherwise.

Perry's reliance on *United States v. Turner*, 602 F.3d 778 (6th Cir. 2010), does not alter the result. *Turner* involved the interplay between §§ 3161(h)(1)(A) and (h)(1)(F)—both of which fall within § 3161(h)(1)'s consideration of exclusions for "other proceedings concerning the defendant." Subsection (h)(1)(A) excludes delays resulting [**10] from "any proceeding[s], including any examinations, to

determine" mental competency. And § 3161(h)(1)(F) concerns delays resulting from transportation to and from examinations and hospitalizations. In *Turner*, we concluded that § 3161(h)(1)(F) presumptively limits § 3161(h)(1)(A), thereby imposing a ten-day limit on excludable transportation time in connection with proceedings to determine [***7] competency before a court has weighed in on a defendant's fitness for trial. *Turner*, 602 F.3d at 785. But that does not matter here, when, again, the exclusion in Perry's case arises out of § 3161(h)(4) and its broad carve-out for any delays resulting from a defendant's mental incompetence. This appeal thus does not depend on the interplay between §§ 3161(h)(1)(A) and (h)(1)(F). *Cf. Zabawa*, 719 F.3d at 562 (holding that exclusion under § 3161(h)(1)(D) for a pending motion trumped transportation provision in § 3161(h)(1)(F)). Again, periods covered by § 3161(h)(4) "shall be excluded" in determining Perry's status under the Speedy Trial Act.

* * *

While permissible under the Speedy Trial Act, the delay in providing Perry necessary competency restoration services may reflect broader concerns. Perry waited over 150 days from his designation to North Carolina to his arrival there. On the one hand, Perry's treatment seemingly was deferred due to COVID-19-related delays as well as the U.S. Marshals Service's [**11] protocol for coordinating long-distance inmate transport. On the other hand, there likewise appears to be some delay tied to the lack of bedspace in North Carolina and the inability of existing federal medical facilities to service all 94 judicial districts nationwide.

As courts, our charge is to enforce the Speedy Trial Act as written. At the same time, we can fairly lament the seeming inability to provide more timely accommodations to Perry and, it appears, others. *See United States v. Donnelly*, 41 F.4th 1102, 1104 (9th Cir. 2022) (per curiam); *United States v. Mouton*, No. 20-CR-00501, 2023 U.S. Dist. LEXIS 98904, 2023 WL 3872206, at *3-4 (S.D. Tex. June 7, 2023) ("From May 2021 until May 2023, [BOP's Chief of Psychological Evaluations] testified about these delays on 17 occasions to federal courts in nine states. During this same period, she submitted written declarations about these delays on 35 occasions to federal courts in 23 states and the District of Columbia." (internal citations omitted)). While worrisome, these issues are not before us.

B. That leaves Perry's sentencing challenge. Readers familiar with federal sentencing practices will be well aware that the Sentencing Guidelines in various [*584] places instruct district courts to increase a defendant's sentencing range if the defendant has one or more prior convictions for a crime of violence. That is the case, for instance, [**12] in U.S.S.G. § 2K2.1(a)(4)(A), [***8] which increases the base offense level for a defendant who engages in certain types of firearm offenses and has previously been convicted of a "crime of violence." The Guidelines, in turn, define a "crime of violence" to include any felony that "has as an element the use, attempted use, or threatened use of physical force against the person of another." *Id.* § 4B1.2(a)(1). Against this backdrop, the district court determined that Perry's conviction for aggravated domestic violence in Michigan, prohibited by Mich. Comp. Laws § 750.81a(3), was a crime of violence for purposes of U.S.S.G. § 2K2.1(a)(4)(A). Perry challenges that conclusion, an issue we review with fresh eyes. *United States v. Havis*, 927 F.3d 382, 384 (6th Cir. 2019) (en banc) (per curiam) (applying de novo review in resolving whether an offense is a crime of violence under the Guidelines).

All agree that Perry was convicted of committing felony domestic violence (aggravated) under subsection 3 of Mich. Comp. Laws § 750.81a. That provision criminalizes "commit[ting] an assault and battery" against a spouse, former spouse, domestic co-habitant, or intimate partner, and "inflict[ing] serious or aggravated injury upon [the victim] without intending to commit murder or to inflict great bodily harm less than murder." Mich. Comp. Laws § 750.81a(2)-(3). Our task is to determine whether the just-described offense "necessarily" [**13] involved the use of physical force, thereby satisfying U.S.S.G. § 4B1.2(a). *See Borden v. United States*, 593 U.S. 420, 424, 141 S. Ct. 1817, 210 L. Ed. 2d 63 (2021); *United States v. Doggart*, 947 F.3d 879, 887 (6th Cir. 2020).

The Supreme Court offers helpful directives on the point. It has interpreted the phrase "physical force" to mean "force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140, 130 S. Ct. 1265, 176 L. Ed. 2d 1 (2010) (interpreting 18 U.S.C. § 924(e)(2)(B)(i)); *see also United States v. Burris*, 912 F.3d 386, 392 (6th Cir. 2019) (en banc) (recognizing that § 4B1.2(a)(1) uses the same definition). And that manner of force, we are told, "does not require any particular degree of likelihood or probability that the force used will cause physical pain or injury; only *potentiality*." *Stokeling v. United States*, 586 U.S. 73, 84, 139 S. Ct. 544, 202 L. Ed. 2d 512 (2019)

(emphasis added).

Now compare that understanding with Perry's statute of conviction, starting with the phrase "assault and battery." Separated by "and," the terms "assault" and "battery" indicate a conjunctive requirement. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 116 (2012) ("Under the conjunctive/disjunctive canon, *and* [***9] combines items while *or* creates alternatives."). What does it mean for a defendant to commit an assault *and* battery in Michigan? An assault is "either an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v. Starks*, 473 Mich. 227, 701 N.W.2d 136, 140 (Mich. 2005) (citations omitted). Battery, for [**14] its part, is "an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *Id.* (citations omitted).

We turn next to the statutory requirement that the assault and battery have the effect of "inflict[ing] serious or aggravated injury" upon a victim. Michigan defines "inflict" as "to lay on as a stroke, blow, or wound; to impose as something that must be suffered or endured; to [*585] cause to be borne." *People v. McBurrows*, 504 Mich. 308, 934 N.W.2d 748, 758 (Mich. 2019) (cleaned up). Infliction similarly requires "direct interaction with the victim." *Id.* As a result, one cannot inflict an injury indirectly by, say, providing drugs to an unknown victim through an intermediate dealer. *Id.*

That leaves the statutory phrase "serious or aggravated injury." Michigan courts have defined that manner of harm to be "a physical injury that requires immediate medical treatment or that causes disfigurement, impairment of health, or impairment of a part of the body." *People v. Frechette*, No. 360905, 2024 Mich. App. LEXIS 677, 2024 WL 302118, at *2 (Mich. Ct. App. Jan. 25, 2024) (quoting *People v. Norris*, 236 Mich. App. 411, 600 N.W.2d 658, 661 n.3 (Mich. 1999)).

Putting all these concepts together, it becomes evident that Perry's assault and battery offense necessarily involved the use of physical force. U.S.S.G. § 4B1.2(a). The battery component of the offense confirms as much. A battery, again, [**15] is an intentional and harmful touching which directly causes (inflicts) a physical injury requiring immediate medical attention or causing disfigurement or impairment of the body (a serious or aggravated injury). That plainly satisfies the Supreme Court's definition of physical force, which, recall, merely requires force "capable of causing" physical injury. *See Johnson*, 559 U.S. at 140. That being the case, Perry's offense is a crime of violence. *Cf. De Leon Castellanos v. Holder*, 652 F.3d 762, 766 (7th Cir. 2011) ("Battery causing bodily harm entails physical force because some sort of physical pain or damage . . . is required to convict . . . . *Johnson* held that so long as the force [***10] involved is capable of causing physical pain or injury to another person [the] physical force requirement [is] satisfied." (cleaned up)).

Perry's response is to emphasize the "assault" component of the offense. He reminds us that we must look to the least culpable conduct criminalized by the elements of the statute. *See United States v. Thomas*, 969 F.3d 583, 584 (6th Cir. 2020) (per curiam). And to his eye, "the least culpable force that can be used" to commit assault under Michigan law "is an attempt to commit an offensive touching," which, in practice, may not cause a physical injury. Even if so, Perry could not have been convicted under § 750.81a(3) by committing [**16] an assault alone. Rather, he must have also committed a battery. We cannot read that term out of the statute, as Perry seemingly would have us do. *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 70, 131 S. Ct. 716, 178 L. Ed. 2d 603 (2011).

Perry's reliance on *United States v. Morris*, 885 F.3d 405 (6th Cir. 2018), does not change our thinking. There, we held that Michigan's non-aggravated domestic violence offense was not a "crime of violence." 885 F.3d at 412. Note that the statute at issue used the disjunctive assault *or* battery. *See* Mich. Comp. Laws § 750.81. And Perry, of course, was convicted under a different statute, one that requires the commission of both an "assault and battery," making *Morris* a poor guide here.

We affirm Perry's conviction and sentence.

---

**End of Document**

# Savoy v. United States

604 F.3d 929 (6th Cir. 2010)

Cited in Opening Brief at: 17

Cited by the district court in R. 224. Highlighted language appears at 604 F.3d at 932–33.

Positive
As of: September 14, 2026 6:58 PM Z

# Savoy v. United States

United States Court of Appeals for the Sixth Circuit

April 28, 2010, Submitted; May 12, 2010, Decided; May 12, 2010, Filed

File Name: 10a0131p.06

No. 08-6240

**Reporter**
604 F.3d 929 *; 2010 U.S. App. LEXIS 9652 **; 2010 FED App. 0131P (6th Cir.) ***

RAYMOND SAVOY, Plaintiff-Appellant, v. UNITED STATES OF AMERICA, Defendant-Appellee.

**Prior History:** [**1] Appeal from the United States District Court for the Western District of Tennessee at Jackson. No. 07-01025--James D. Todd, District Judge.

Savoy v. United States, 2008 U.S. Dist. LEXIS 131921 (W.D. Tenn., Aug. 29, 2008)

United States v. Savoy, 280 Fed. Appx. 504, 2008 U.S. App. LEXIS 12529 (6th Cir.) (6th Cir. Tenn., June 5, 2008)

**Counsel:** ON BRIEF: R. Leigh Grinalds, ASSISTANT UNITED STATES ATTORNEY, Jackson, Tennessee, for Appellee.

Raymond Savoy, Fort Worth, Texas, Pro se.

**Judges:** Before: BATCHELDER, Chief Judge; MOORE and COOK, Circuit Judges.

**Opinion by:** KAREN NELSON MOORE

## Opinion

[*932] [***1] KAREN NELSON MOORE, Circuit Judge. Raymond Savoy appeals the district court's partial denial of his motion for return of property. This matter arises as a proceeding ancillary to Savoy's criminal prosecution for child-pornography related charges in the United States District Court for the Western District of Tennessee. *United States v. Savoy*, 280 F. App'x 504, 506 (6th Cir.), *cert. denied*, 129 S. Ct. 742, 172 L. Ed. 2d 739 (2008). This court has previously affirmed Savoy's convictions for violating 18 U.S.C. §§ 2251(a) and 2252(a)(4)(B) for using minors to engage in sexually explicit conduct to produce videotapes and for possessing those videotapes, which stemmed from evidence seized at the Rocky Top Tavern, Savoy's place [***2] of business. While executing a search warrant at the Rocky Top Tavern for "'intoxicating liquors and all records, papers, ledgers, [**2] pictures, or devices used in the storage, sale, transportation, distribution or manufacture of [said liquors] . . . contrary to the Laws of the State of Tennessee,'" officers discovered videotapes in Savoy's locked office that Savoy indicated were used for his video-surveillance system in the Tavern. *Id*. at 506 (alteration in original). The officers seized "[s]ixty VHS tapes . . . , two hundred ninety-one photographs, the components of the surveillance system, and a television." Doc. 8 (Dist. Ct. Order at 1 n.2). The government used four of the videotapes depicting minors as evidence in Savoy's criminal prosecution.

After his conviction, Savoy, now a federal prisoner, filed a Federal Rule of Criminal Procedure 41(g) motion for return of property, seeking the return of all of the seized property not admitted into evidence in his trial, with the exception of the surveillance system. The district court engaged in an in camera review of the photographs and videotapes and granted Savoy's motion with regard to all items except those videos and photographs whose subjects were minors and those videos whose subjects were adults who were not aware that they were being recorded. The district court [**3] found that Savoy was not entitled to lawful possession of those adult videotapes under Tennessee Code Annotated § 39-13-605. Savoy appeals the district court's judgment with regard to the adult videos only.

### I. DISCUSSION

#### A. Partial Denial of Savoy's Motion to Return Property

We review for abuse of discretion the denial of a Rule 41 motion for return of property, which involves "essentially a civil equitable proceeding." *United States v. Duncan*, 918 F.2d 647, 654 (6th Cir. 1990) (internal quotation marks and alteration omitted), *cert. denied*, 500 U.S. 933, 111 S. Ct. 2055, 114 L. Ed. 2d 461 (1991); *United States v. Headley*, 111 F. App'x 808, 809 (6th Cir. 2004) (unpublished order). "What we are concerned with is whether the district court properly balanced the competing equities in deciding whether return was in order." *Duncan*, 918 F.2d at 654. "'The general rule is that seized property, other than contraband, should be returned to its rightful owner once the criminal proceedings have terminated.'" *United States v. Hess*, 982 F.2d 181, 186 (6th Cir. 1992) (quoting *United States v. LaFatch*, 565 F.2d 81, 83 (6th Cir. 1977)). Under Rule 41, "'[a] district court has both the jurisdiction and [***3] the duty to return the contested [**4] property once the government's need for it has ended.'" *United States v. Bowker*, 372 F.3d 365, 387 (6th Cir. 2004) (quoting *Hess*, 982 F.2d at 187), *vacated on other grounds by* 543 U.S. 1182, 125 S. Ct. 1420, 161 L. Ed. 2d 181, *reinstated by* 125 F. App'x 701 (2005). "However, the person seeking return of [*933] property must show that they are lawfully entitled to possess it." *United States v. Headley*, 50 F. App'x 266, 267 (6th Cir. 2002) (unpublished order); *accord Sovereign News Co. v. United States*, 690 F.2d 569, 577 (6th Cir. 1982), *cert. denied*, 464 U.S. 814, 104 S. Ct. 69, 78 L. Ed. 2d 83 (1983); *United States v. Francis*, 646 F.2d 251, 262 (6th Cir.) (holding that Rule 41 places the burden on the claimant), *cert. denied*, 454 U.S. 1082, 102 S. Ct. 637, 70 L. Ed. 2d 616 (1981).

Rule 41 provides, in relevant part:

> (g) Motion to Return Property. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in [**5] later proceedings.

FED. R. CRIM. P. 41(g). We have held "that Rule 41(g) 'clearly contemplates a hearing "on any issue of fact necessary to the decision of the motion."'" *Bowker*, 372 F.3d at 387 (quoting *Hess*, 982 F.2d at 186). Here, the district court looked to state law to determine whether Savoy was entitled to lawful possession of the adult videotapes. Under Tennessee Code Annotated § 39-13-605,

> (a) It is an offense for a person to knowingly photograph, or cause to be photographed an individual, when the individual is in a place where there is a reasonable expectation of privacy, without the prior effective consent of the individual . . . if the photograph:
>
> > (1) Would offend or embarrass an ordinary person if such person appeared in the photograph; and
> >
> > (2) Was taken for the purpose of sexual arousal or gratification of the defendant.
>
> (b) As used in this section, unless the context otherwise requires, "photograph" means . . . any videotape or live television transmission of any individual so that the individual is readily identifiable.
>
> (c) All photographs taken in violation of this section shall be confiscated and, after their use as evidence, destroyed.

[***4] TENN. CODE ANN. § 39-13-605. The [**6] district court found that "the tapes were made using a hidden camera, and the females were not aware that they were being taped in various stages of nudity and/or performing sex acts." Doc. 8 (Dist. Ct. Op. at 3). But the court did not make an explicit finding as to whether the females were "'in a place where there is a reasonable expectation of privacy'" as required under § 39-13-605. Savoy argues "that the individual's [sic] in the video's [sic] did not have an expectancy of privacy in a public tavern that was equipped with video surveillance." Appellant Br. at 3. The government responds that "while it is not reasonable to expect that one's nude body would not be viewable by those present, there is a reasonable expectation of privacy from recording." [1] Appellee Br. at 7. [*934] Savoy thus

---

[1] The government, noting the dearth of case law related to § 39-13-605, attempts to utilize an analogy to the Wisconsin Court of Appeals's [**7] treatment of a "similar" Wisconsin statute, Wisconsin Statute § 942.09. Appellee Br. at 7-8 (citing *State v. Jahnke*, 2009 WI App 4, 316 Wis. 2d 324, 762 N.W.2d 696 (Wis. Ct. App. 2008)). However, the relevant language of the Wisconsin statute--"'while that person is nude *in a circumstance in which he or she has* a reasonable expectation of privacy'"--justified the court of appeals's inquiry into the

argues that the "reasonable expectation of privacy" inquiry requires a single analysis of the circumstances presented by the "place," and the government counters that the inquiry requires a separate analysis of the circumstances of each "individual" recorded in the "place."

We conclude that Savoy's approach is closer to the plain language of the statute and that under the plain language of the statute we must decide what is "a place where there is a reasonable [**8] expectation of privacy" under § 39-13-605 and whether the Rocky Top Tavern would meet that standard. [2]

[***5] [**9] **1. Statutory Language: "when the individual is in a place where there is a reasonable expectation of privacy**"

Our research uncovered only four Tennessee cases that even mention § 39-13-605, [3] and only two that state the facts of conviction. In *State v. Castrejon*, No. M2005-01886-CCA-R3-CD, 2006 Tenn. Crim. App. LEXIS 281, 2006 WL 1097486 (Tenn. Crim. App. Apr. 6, 2006) (unpublished opinion), the court upheld the defendant's consecutive sentence for conviction under § 39-13-605 for videotaping himself touching a minor while she slept. 2006 Tenn. Crim. App. LEXIS 281, [WL] at *1. In *State v. Dickens*, No. M2003-00783-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 306, 2004 WL 735025 (Tenn. Crim. App. Apr. 6, 2004), the court upheld, against a sufficiency challenge, the defendant's conviction for criminal attempt to commit unlawful photographing in violation of § 39-13-605 for attempting to take a picture of a naked woman over the top of the wall in a closed, locked tanning-booth stall that was "designed to ensure privacy." 2004 Tenn. Crim. App. LEXIS 306, [WL] at *1-2, *4. Neither court engaged in any analysis of whether the offense occurred in "a place where there is a reasonable expectation of privacy." However, the *Dickens* court's sufficiency analysis focused not on the woman's expectation of privacy within the tanning booth [**10] but rather on the place itself, stating "that each tanning room is designed to ensure privacy. The doors lock from the inside and, although the walls do not extend all the way to the ceiling, it would be difficult [*935] to see over them without standing on something." 2004 Tenn. Crim. App. LEXIS 306, [WL] at *4. The court thus focused on whether the place itself--the tanning room--could give rise to a reasonable expectation of privacy and not whether the individual then in the place had a reasonable expectation of privacy. Although the statute seems designed to protect the privacy interests of the individual subject to the photograph, the statute considers that privacy interest with reference to the individual's presence "in a place where there is a reasonable expectation of privacy." [4]

---

viewpoint of the individual subject to the recording at issue. *Jahnke*, 762 N.W.2d at 698 & n.4 (quoting Wis. Stat. § 942.09(2)(am)1) (emphasis added). This language in Wisconsin differs from the language at issue in Tennessee Code Annotated § 39-13-605 in a materially significant way. Even so, we note that the Wisconsin Court of Appeals distinguished the reasonable expectation of privacy held by a private person recorded in the defendant's private bedroom from the lack of a reasonable expectation of privacy that an exotic dancer "who dance[s] nude before multiple patrons *in a club open to the public*" would enjoy. *Id*. at 700 (emphasis added).

[2] The district court also did not make an explicit finding that the videos, if made in violation of § 39-13-605, constituted "contraband," but instead seemed to assume that if it was a crime to make the videos then it was a crime to possess the videos. *See* Doc. 8 (Dist. Ct. Op. at 2-3). Although Savoy does not raise this issue on appeal, we conclude that the district court did not abuse its discretion in treating the videotapes as contraband. BLACK'S LAW DICTIONARY (9th ed. 2009) defines contraband in part as "[g]oods that are unlawful to possess" and "derivative contraband" as "[p]roperty whose possession becomes unlawful when it is used in committing an illegal act." Under Tennessee Code Annotated § 39-13-605(c), "[a]ll photographs taken in violation of this section shall be confiscated and, after their use as evidence, destroyed." We read this provision to imply that it is also unlawful to possess such items and that they are contraband. *See One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 699-700, 85 S. Ct. 1246, 14 L. Ed. 2d 170 (1965) (distinguishing between "per se contraband" and "derivative contraband").

[3] Tennessee Code Annotated § 39-13-607 utilizes the same language--"in a place where there is a reasonable expectation of privacy"--to codify the offense of observation without consent. Unfortunately the Tennessee courts have not interpreted the phrase under this statute, either.

[4] The Tennessee Legislature has proposed an amendment that replaces "is in a place where there is" with "has" such that the provision would read "when the individual [**11] has a reasonable expectation of privacy." S.B. 3219, 106th Leg., 2d Sess. (Tenn. 2009); H.B. 3277, 106th Leg., 2d Sess. (Tenn. 2009). This amendment, if it passes, would support the government's position that we must analyze the reasonable expectation of privacy held by each individual on the videotapes. However, we are bound to interpret the statute as it was written at the time applicable to Savoy's claim, i.e., in 2005 when the videos were seized and Savoy was prosecuted.

[***6] The Tennessee courts have produced a wealth of case law on places where a person may or may not have "a reasonable expectation of privacy." Most recently, the Tennessee Supreme Court upheld the Court of Criminal Appeals's decision "rejecting the Sixth Circuit bright-line rule that a resident always has a reasonable expectation of privacy in a secured common area" in favor of "the totality of the circumstances test . . . for determining the reasonableness of an expectation of privacy." *State v. Talley*, 307 S.W.3d 723, 2010 Tenn. LEXIS 147, 2010 WL 987072, at *6-7 (Tenn. Mar. 19, 2010). Applying this test, the court held that "the Defendant [resident] did not have a reasonable expectation of privacy in the commonly shared, interior hallway [**12] of a condominium complex" because no resident "could unilaterally exclude others rightfully within the hallway," residents had collectively allowed non-residents to have intermittent access to the common areas, and there was "no evidence that the defendant had taken any precautions to maintain his privacy in the common areas of the building." 2010 Tenn. LEXIS 147, [WL] at *7-8. The court noted that "[a]s a general rule, unlocked or unsecured common areas of apartment buildings do not qualify for any reasonable expectation of privacy." 2010 Tenn. LEXIS 147, [WL] at *6 n.4.

Based on the Tennessee Court of Criminal Appeals's application of § 39-13-605 and the Tennessee Supreme Court's approach to the privacy inquiry, we conclude that a totality-of-the-circumstances test should apply for determining whether a place may give rise to a reasonable expectation of privacy under § 39-13-605, recognizing that "[t]he Fourth Amendment protects people, not places, and provides sanctuary for citizens wherever they have a legitimate expectation of privacy." *Minnesota v. Olson*, 495 U.S. 91, 96 n.5, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990) (internal quotation marks omitted). "But the extent to which the Fourth Amendment protects people may depend upon where those people are." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998). [**13] Therefore we must determine whether, under the totality of the circumstances at issue in each videotape, an individual in the Rocky Top Tavern would be justified in asserting that he or she is "in a place where there is a reasonable expectation of privacy."

[***7] **2. The Rocky Top Tavern**

Although the district court did not make findings with respect to the contents of the videos aside from their unsuspecting adult female subjects, this court has previously [*936] stated the facts related to the videotapes as follows:

> During the search, officers discovered a locked room, which Defendant Savoy opened for them. Mr. Savoy described this room as his office. The room contained a single bed, a desk, a television (TV), a video cassette recorder (VCR), and several videotapes. Defendant advised officers that the TV and VCR were used in relation to his video-surveillance system. According to the officers, Mr. Savoy consented to the officers viewing the videotapes on his TV and VCR. Agents played the tapes to determine whether they contained illegal liquor or beer sales. However, the tapes actually depicted sex acts between Mr. Savoy and unknown females, what appeared to be minor females removing their clothing [**14] and dancing, and sexual acts between a male and what appeared to be a minor female. Officers then found a camera and microphone hidden in a hollowed-out two-by-four (2 x 4) stud behind the bar. The camera and microphone were not readily visible to persons inside the bar, and were recovered only after Defendant Savoy advised agents of their respective location. The officers seized all of the videotapes for further review.

*Savoy*, 280 F. App'x at 506 (footnote omitted). Because Savoy was charged with child-pornography related offenses, this court discussed only the contents of the videos admitted into evidence at trial, and those tapes depicted only minors--not the adult females in the videotapes at issue here. However, this court recounted that the videotapes admitted into evidence at trial depicted minor females in various states of nudity and/or engaged in sex acts "behind the bar." *Id*. at 507. None of the four videotapes admitted into evidence contained footage from within the "locked room," and it seems that the camera captured events solely in the area "behind the bar" because the camera was located "behind the bar." *See id*. at 506-07.

Our inquiry is therefore confined to the business [**15] premises of the Rocky Top Tavern. "An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700, 107 S. Ct. 2636, 96 L. Ed. 2d 601 (1987); *see also Carter*, 525 U.S. at 90-91; *Autoworld Specialty Cars,* [***8] *Inc. v. United States*, 815 F.2d 385, 388 (6th Cir. 1987) ("'[Proprietor] did not have any reasonable expectation of privacy in areas of

the store where the public was invited to enter and to transact business.'" (quoting *Maryland v. Macon*, 472 U.S. 463, 469, 105 S. Ct. 2778, 86 L. Ed. 2d 370 (1985))). Tennessee courts have recognized that even when a person visits "another's [private] home for a short period of time and is essentially at the location to conduct a business transaction, the [person] possesses no expectation of privacy in the home." *Kyles v. State*, No. W2004-00374-CCA-R3-PC, 2005 Tenn. Crim. App. LEXIS 251, 2005 WL 645161, at *5 (Tenn. Crim. App. Mar. 16, 2005) (unpublished opinion) (citing *Carter*, 525 U.S. at 89-91). And the Tennessee courts abide by the "now-classic principle: 'What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . *But what he seeks to preserve as private, [**16] even in an area accessible to the public, may be constitutionally protected*.'" *State v. Medford*, No. W2002-00226-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 914, 2003 WL 22446575, at *8 (Tenn. Crim. App. Oct. 21, 2003) (unpublished opinion) (quoting *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)); *see State v. Ross*, 49 S.W.3d 833, 843 & n.9 (Tenn. 2001). "Public accessibility, in other words, does not invariably defeat a reasonable expectation of privacy." *Medford*, 2003 Tenn. Crim. App. LEXIS 914, 2003 WL 22446575, at *8; *see State v. Munn*, 56 S.W.3d 486, 494-95 [*937] (Tenn. 2001) (holding that defendant who requested to be alone with parent in police-station interview room and to have the recording equipment turned off had reasonable expectation of privacy from being recorded by hidden audio and video recording system after police complied with both requests and closed the door behind them when they left the room); *State v. Roode*, 643 S.W.2d 651 (Tenn. 1982) (holding that helicopter surveillance of area of defendant's property within public view did not violate reasonable expectation of privacy). However, there is no reasonable expectation of privacy "in areas of [a business] where the public was invited to enter and to transact business." *Maryland v. Macon*, 472 U.S. 463, 469, 105 S. Ct. 2778, 86 L. Ed. 2d 370 (1985); [**17] *see State v. Heller*, No. W2007-01455-CCA-R3-CD, 2008 Tenn. Crim. App. LEXIS 556, 2008 WL 2901581, at *7-9 (Tenn. Crim. App. July 24, 2008) (unpublished opinion) (holding that defendant had standing to challenge search of his person at a business but not to challenge the search of the business itself because present only as casual visitor without a reasonable expectation of privacy); *State v. Norton*, No. E2001-01903-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 592, 2002 WL 1585634, at *8 (Tenn. Crim. App. July 18, 2002) [***9] (unpublished opinion) (noting that owner had no reasonable expectation of privacy in his tavern because it was open to the public at the time the search warrant was executed, but expressly not ruling on privacy interests of customers present).

The district court failed to make findings of fact to support that the "reasonable expectation of privacy" element of § 39-13-605 was satisfied under the totality of the circumstances here. Without such findings, we are unable to determine whether the district court abused its discretion in assuming that the element was satisfied because each videotape presents a unique set of circumstances that requires a fact-intensive totality-of-the-circumstances inquiry to determine whether the Rocky Top Tavern [**18] qualifies as "a place where there is a reasonable expectation of privacy" under the circumstances of each recording. The videotapes were entered into the record in the district court, but neither Savoy nor the government has presented any evidence as to whether the adult females in the requested videos were present at the Rocky Top Tavern for anything other than business purposes at the time that the nudity and/or sexual activity occurred and was recorded. Because findings of fact are the province of the district court, and the district court has already conducted a review of the twenty videotapes at issue, we vacate the district court's judgment with regard to the adult videotapes and remand for further proceedings consistent with this opinion. The district court must determine whether each videotape in question was recorded while the Rocky Top Tavern was open to the public for business purposes, what specific areas of the bar premises the hidden camera captured in each video (whether the videos contain only footage from "behind the bar" or within public view), and whether any steps were taken in an attempt to maintain the privacy of the activities that occurred in each video. *See [**19] Heller*, 2008 Tenn. Crim. App. LEXIS 556, 2008 WL 2901581, at *8; [5] *Carter*, 525 [*938] U.S. at 88-91 (holding that

---

[5] In determining whether a business patron had standing to challenge the search of the business itself, the *Heller* court specifically listed "seven factors to be considered when determining if a legitimate expectation of privacy exists," including:

(1) ownership of the property; (2) whether the defendant [**20] has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the placed [sic] searched; (4) whether the defendant has the right to exclude other[s] from the place; (5) whether he has exhibited a subjective expectation that the place would remain free from intrusion by the state; (6) whether the defendant took normal

defendant's [***10] expectation of privacy in premises owned by another depends on the purpose of the visit); *Lowe v. Clift*, 2007 U.S. Dist. LEXIS 52523, 2007 WL 2112672, at *4 (E.D. Tenn. 2007) (unpublished opinion) ("Moreover, patrons of a venue into which the public is invited do not have a reasonable expectation of privacy--they necessarily encounter others who observe their presence and behavior." (citing *Macon*, 472 U.S. at 469)). Only after the district court makes findings of fact that enable it to determine whether the "reasonable expectation of privacy" element of Tennessee Code Annotated § 39-13-605 was satisfied under the totality of the circumstances for each videotape individually may the court determine whether Savoy is or is not entitled to lawfully possess each videotape for purposes of his Rule 41(g) motion for return of property.

**B. Consideration of Search Warrant for Rule 41 Analysis**

Savoy argues that the district court in reviewing his Rule 41(g) motion should have "consider[ed] the validity of the State Search Warrant, and whether it went outside the scope of 'things to be searched,[] and/or items to be seized[]' before deciding to only return some of the property to Appellant's designee" because the search warrant was "obtained because of the sale of liquor in an establishment licensed for the sale of beer only." Appellant Br. at 3; *see also id*. at 4. This argument has no merit because this court has already decided that the videotapes [**21] that were used in Savoy's prosecution were properly seized, *Savoy*, 280 F. App'x at 510-11, and the same rationale applies to the adult videotapes at issue here. An earlier panel of this court held that the "seizure of Defendant's videotapes was valid because the tapes were reasonably related to the offense that formed the basis of his search warrant," in accordance with the Supreme Court's holding in *Harris v. United States*, 331 U.S. 145, 67 S. Ct. 1098, 91 L. Ed. 1399 (1947), "that a law enforcement agent in making a valid search may seize property found on the premises being searched which is the subject matter of a different crime, even though the officer was not aware that such property was on the premises when the search was initiated." *Savoy*, 280 [***11] F. App'x at 511. The fact that the adult videotapes were not later used in Savoy's prosecution for child pornography charges does not impact our analysis. [6]

**C. Additional Request Not Filed with District Court**

Savoy acknowledges that [**22] he did not include in his Motion for Return of Personal Property a specific request for the return of his video surveillance equipment, but he argues that the district court should have addressed its return anyway because "[a] Pro se litigant should not be required to list every little piece of property that was seized." Appellant Br. at 5. Although "we are mindful to construe [pro se] arguments liberally," *El Bey v. Roop*, 530 F.3d 407, 413 (6th Cir. 2008), a claimant may abandon a claim to seized items by not requesting their return in the request filed for the other items seized, *see McBean v. United States*, 43 F. App'x 853, 855 (6th Cir. 2002) (unpublished order). Aside from the liberal construction afforded pro [*939] se filings, Savoy presents no arguments on appeal as to why the district court should have returned his video surveillance equipment. Savoy's motion was not a general request for all property seized but rather made specific requests for the return of the videotapes, photographs, and negatives. [7] Savoy's failure to request the return of his surveillance equipment in the district court precludes us from considering the propriety of return of that property in the first instance. [**23] *See* Fed. R. Crim. P. 41(g); *El Bey*, 530 F.3d at 412. Savoy may present this request to the district court on remand.

**II. CONCLUSION**

For the above reasons, we vacate the district court's judgment with regard to the twenty videotapes at issue in this appeal, and we remand for the district court to make findings of fact that will enable it to determine

---

precautions to maintain his privacy; and (7) whether he was legitimately on the premises.

> *Heller*, 2008 Tenn. Crim. App. LEXIS 556, 2008 WL 2901581, at *8 (quoting *State v. Oody*, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991)); *accord Talley*, 2010 Tenn. LEXIS 147, 2010 WL 987072, at *5.

---

[6] The legality of the initial seizure of the adult videotapes would not alter our analysis under Rule 41(g) because the same analysis applies "where the initial seizure was lawful and where it was unlawful." *Francis*, 646 F.2d at 262 n.7.

[7] Although Savoy's motion did not reference the television, the district court ordered the television's return because the government had no objection to its return--this stands in contrast with the government's objection in the district court to the return of the surveillance system. *See* Doc. 7 (Dist. Ct. Order at 1-2).

whether, consistent with Federal Rule of [***12] Criminal Procedure 41(g), Savoy is entitled to lawful possession of the videotapes under Tennessee Code Annotated § 39-13-605.

---

End of Document

# United States v. Shepard

No. 4:10-cr-01032-CKJ, ECF No. 744 (D. Ariz. Feb. 17, 2012)

Cited in Opening Brief at: 17

Order cited in Mr. Kuhl’s pro se motion, R. 229 (PACER copy). See Response, Part III.A.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

MOSES SHEPARD,

Defendant.

No. CR 10-1032-TUC-CKJ

**ORDER**

This Court has issued an Order affirming the pre-trial duties of and procedures utilized by advisory/standby counsel as set forth by Magistrate Judge Charles R. Pyle. The Court finds it appropriate to set forth post-trial duties and procedures to be followed by Moses Shepard ("Shepard") and advisory/standby counsel.

Accordingly, IT IS ORDERED advisory/standby counsel shall:

1. Respond to appropriate requests for assistance such as researching non-frivolous legal issues or conducting portions of the sentencing proceeding.

2. Actively consult with and make unsolicited suggestions to Shepard concerning what is in his best interest.

3. Remain prepared to conduct the sentencing proceeding should permission for self-representation be withdrawn.

4. Abide by Mr. Shepard's strategic decisions.

5. Not be required to type Shepard's pleadings.

6. Not act in passive or purely clerical or ministerial roles.

7. Screen each motion, document, or objection Shepard seeks to file with the Court. Advisory/standby counsel shall use their professional judgment and file

only the pleadings that are not repetitive of previous motions, documents, or objections filed by Shepard, that make sense, that cite law in support of a request, and are not Shepard's irrelevant commentary on his discontent with the criminal proceedings.

8. Exercise their professional judgment in performing their advisory/standby counsel duties and in advising Shepard of the best possible sentencing or mitigation defense to be presented within the parameters of Shepard's chosen strategy.

IT IS FURTHER ORDERED that, if any further motions are filed by advisory/standby counsel and Shepard wishes to adopt such motions, Shepard shall file a notice advising the Court that he adopts the motion within two weeks of the filing of the motion.

IT IS FURTHER ORDERED:

1. Any objection(s) to the presentence report shall be filed no later than 14 days after receiving the presentence report pursuant to Fed.R.Crim.P. 32(f)(2).

2. Any response to the objection(s) to the presentence report shall be filed no later than 11 days after receiving the objection(s).

3. Any sentencing memorandum shall be filed no later than 5 business days prior to sentencing.

4. Any party seeking to continue a sentencing date shall file a Motion to Continue no later than two (2) business days prior to the date of hearing. Additionally, counsel shall telephonically notify chambers when sentencing is within two (2) business days.

5. Failure to comply with this Order may result in the imposition of sanctions.

DATED this 17th day of February, 2012.

Cindy K. Jorgenson
Cindy K. Jorgenson
United States District Judge

# United States v. Pulido

133 F.4th 1256 (11th Cir. 2025)

Cited in Opening Brief at: 24

Named in the brief without a reporter citation, as cited by Mr. Kuhl in R. 357, PageID.3741. Highlighted language appears at 133 F.4th at 1271.

Positive
As of: September 14, 2026 7:01 PM Z

# United States v. Pulido

United States Court of Appeals for the Eleventh Circuit

April 8, 2025, Filed

No. 22-10709

**Reporter**
133 F.4th 1256 *; 2025 U.S. App. LEXIS 8264 **; 2025 LX 98425; 30 Fla. L. Weekly Fed. C 2059; 2025 WL 1036987

UNITED STATES OF AMERICA, Plaintiff-Appellee, versus JORDAN JYSAE PULIDO, ROBERTO SANTANA JIMENEZ, Defendants-Appellants.

**Subsequent History:** Rehearing denied by, En banc United States v. Pulido, 2025 U.S. App. LEXIS 16365 (July 2, 2025)

US Supreme Court certiorari denied by Pulido v. United States, 2025 U.S. LEXIS 4125 (U.S., Nov. 10, 2025)

**Prior History:** [**1] Appeals from the United States District Court for the Middle District of Florida. D.C. Docket No. 8:20-cr-00292-VMC-CPT-1.

United States v. Pulido, 2022 U.S. Dist. LEXIS 31924, 2022 WL 562351 (M.D. Fla., Feb. 23, 2022)

**Counsel:** For UNITED STATES OF AMERICA, Plaintiff - Appellee: Julia Kapusta, U.S. Attorney Service - Middle District of Florida, U.S. Attorney, USAO, TAMPA, FL; Linda Julin McNamara, Oberheiden, PC, TAMPA, FL.

For JORDAN JYSAE PULIDO, Defendant - Appellant: Adeel Bashir, Laura Daines, Samuel Landes, Alec Fitzgerald Hall, Federal Public Defender's Office, TAMPA, FL; Katherine Grace Howard, Federal Public Defender's Office, ORLANDO, FL.

For ROBERTO SANTANA JIMENEZ, Defendant - Appellant: Frank W. McDermott, McDermott Law Firm, P.A., ST PETERSBURG, FL.

**Judges:** Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges. ROSENBAUM, Circuit Judge, Concurring.

**Opinion by:** NEWSOM

## Opinion

[*1263] NEWSOM, Circuit Judge:

Jordan Pulido started an online relationship with a Croatian girl, I.G., and with the aid of his father, Roberto Jimenez, eventually traveled to Croatia to have sex with her—and then, again with his father's help, brought her to the United States, where he continued to have sex with her. A grand jury indicted Pulido on multiple counts: (1) using the internet to persuade, induce, entice, or coerce a minor to engage [**2] in sexual activity; (2) traveling with the intent to engage in illicit sexual conduct; (3) conspiring to transport a minor with the intent that she engage in sexual activity; and (4) transporting a minor with the intent that she engage in sexual activity. The grand jury separately indicted Jimenez for conspiring with Pulido to transport a minor with intent that she engage in sexual activity.

Before trial, Pulido moved to dismiss his indictment on several grounds, to suppress evidence found on various electronic devices, and to exclude testimony about I.G.'s sexual predisposition. The district court denied Pulido's motions, and Pulido and his father went to trial together. Both Pulido and Jimenez filed motions for a judgment of acquittal at the close of the government's case, which the court denied. After a nine-day trial, a jury convicted both Pulido and Jimenez on all counts. Jimenez moved for a new trial and a mistrial, and Pulido joined the new-trial motion. The district court denied the defendants' post-trial motions. The court thereafter enhanced Jimenez's sentence on the grounds that he had exercised both (1) "undue influence" and (2) "custody, care, or supervisory control" over [**3] I.G.

On appeal, Pulido challenges the district court's denials of his pre- and post-trial motions, including his motion for judgment of acquittal. Jimenez challenges the district court's denial of his motion for judgment of acquittal, his post-trial motions, and the court's imposition of two sentencing enhancements. After careful review, and with the benefit of oral argument, we affirm in all

respects save one: We vacate Pulido's conviction on the enticement count and remand for resentencing on the ground that the indictment was duplicitous.

**I**

Pulido, then a 23-year-old man, developed an online relationship with I.G., a 14-year-old Croatian girl, that, all told, spanned some 10 months, from the fall of 2017 to the summer of 2018. I.G. initially [*1264] told Pulido that she was 15 but later admitted to him that she was only 14. Pulido and I.G.'s friendship eventually developed into a romantic relationship, and the two "officially" became boyfriend and girlfriend by the end of March 2018.

Pulido and I.G.'s relationship was intimate. They shared their social-media passwords, for instance, so that they couldn't keep any secrets from one another. The two also discussed marriage and children, and at [**4] one point Pulido even told I.G. that he had bought her a ring. Importantly, Pulido told I.G. that the legal age to consent to sex in Croatia was 15. During video chats, Pulido and I.G. would engage in what Pulido referred to as "pillow talk"; Pulido masturbated on camera for I.G. and directed her to do the same for him.

Jimenez played an active role in Pulido's relationship with I.G. Pulido kept Jimenez apprised of his communications with I.G. and told his father that he had been "trying to convince [I.G.] to have sex with [him]." Ex. 30(G) part 1 at 82, Doc. 231-67. Jimenez often advised Pulido on what to say to I.G., and he told Pulido that I.G. was "the one who ha[d] to start something" and to "[k]eep [his] class" "[e]ven with girls that are old eno[u]gh." *Id.* at 82-83. Jimenez also communicated directly with I.G. on social media. He lectured I.G. about her behavior with other boys, told her that she wasn't sufficiently committed to Pulido, and scolded her for making mistakes in the relationship.

In June 2018, with Jimenez's financial assistance, Pulido traveled to Croatia the day before I.G.'s fifteenth birthday. Before the trip, he had told I.G. over social media that he wanted [**5] to have sex with her and perform oral sex on her during his visit. During their chats, Pulido and I.G. sometimes used a code, with the number "15"—the age of consent in Croatia and I.G.'s impending birthday—signifying sex.

Pulido proposed to I.G. the day she turned fifteen. The two had sex shortly thereafter and a number of other times during his stay. They didn't always use protection, and Jimenez, who had stayed behind in Florida, advised them—after falsely holding himself out as a doctor—about how they could avoid pregnancy.

Pulido stayed in Croatia for six weeks. At the end of Pulido's trip, Jimenez invited I.G. and her family to Florida for a visit. Pulido helped them apply for passports and visas, and Jimenez planned the trip and paid for their applications and airline tickets.

In July 2018, Pulido, I.G., and I.G.'s mother, brother, and sister traveled to Florida. Pulido and I.G. continued to have sex in Florida, usually at Pulido's initiation. When, after two weeks, I.G. and her family were set to return to Croatia, Jimenez instructed one of Pulido's brothers to hide I.G.'s passport and ID, and called his travel agent to cancel I.G.'s return ticket.

The night before I.G. and her [**6] family were supposed to leave, Pulido's family told I.G.'s brother and sister that I.G. wasn't going with them. Pulido and Jimenez convinced I.G. to tell her mother the same thing. I.G. testified at trial that she didn't want to stay in Florida but felt like she had to. I.G.'s mother told her that she had to return to Croatia with the family.

Early the next morning, Pulido and I.G. went to a restaurant and sat there for hours. I.G.'s mother realized when she woke up that I.G. wasn't in the house and panicked. When I.G.'s mother said she wanted to call the police, Jimenez told her that she shouldn't because Pulido would have I.G. request asylum—meaning that no one could see I.G. for months and he wouldn't be able to help get her home. Jimenez promised I.G.'s mother that he would help return I.G. safely to Croatia. In [*1265] fact, at the same time, Jimenez was texting Pulido to keep him informed regarding I.G.'s family's departure. When I.G. received a message from her mother while she and Pulido were in the restaurant parking lot, Pulido told her how to reply. After I.G.'s family left for the airport, she and Pulido returned to his house.

I.G. testified that when she told Pulido and Jimenez [**7] the next morning that she wanted to go home, they got angry. Jimenez yelled at I.G. for being irresponsible and not appreciating all the sacrifices that they had made for her. He told I.G. that he would try to get her a ticket back to Croatia as soon as possible, but he also repeatedly told her that he couldn't find one. According to Jimenez's travel agent, after he cancelled I.G.'s initial return flight, he never contacted her to book a new one.

At the same time Jimenez said he was trying to find I.G. a flight back to Croatia, he and Pulido were restricting her ability to communicate with her mother, allowing her to use their phones only briefly, and telling her what to say when she did so. I.G. further testified that, in the meantime, Jimenez completed asylum paperwork for her, had her sign it, and took her to see an immigration lawyer.

Eventually, I.G. was able to tell her mother that she wanted to come home. I.G.'s mother contacted the police, who promptly intervened. Florida Department of Law Enforcement officials were dispatched to Pulido's house for a welfare check, where Jimenez greeted and spoke with them about the situation. Jimenez told the agents that I.G. had indicated that [**8] she wanted to stay in Florida and showed them the immigration form that he said I.G. had completed.

During their visit, the agents asked to speak with I.G., so Jimenez went and got her. The officers spoke with I.G. alone and, after hearing her version of events and assessing the situation, they asked to speak with Pulido but were told that he wasn't there.

The agents contacted the Florida Department of Children and Families, which took I.G. into temporary custody. I.G. reunited with her mother at the Tampa airport a few days later, and the two flew back to Croatia together.

During interviews with various law-enforcement officers in the United States, I.G. denied having sex with Pulido. But once she was back in Croatia, I.G. admitted that she and Pulido had indeed had sex. I.G. said that she changed her mind about telling investigators because she had started to lose feelings for Pulido and that it was more important for them to know the truth than for her to avoid embarrassment.

Meanwhile, Pulido had fled to Mexico the day after Florida officials took temporary custody of I.G. He remained there until a family member informed him that it was safe to return. Homeland Security Investigations [**9] Special Agent Tavey Garcia, who had been assigned to I.G.'s case, advised Customs and Border Protection ("CBP") officers to be on the lookout for Pulido's return to the United States and to seize all of his electronic devices for a border search. Notwithstanding her alert, Pulido returned to the United States in September 2018 without detection.

Pulido traveled to Mexico again in May 2019. When he reentered the United States in early June, CBP agents stopped him, seized his iPhone and MacBook, and sent the devices to Agent Garcia.

Agent Garcia gave the iPhone and MacBook to a computer analyst who performed forensic searches of the devices by copying all of their data and making the [*1266] devices' files available for review.[1] The resulting report contained photographs of Pulido and I.G. cuddling and kissing, headshots of I.G. and her family used for their passports and visas, I.G.'s asylum application, screenshots of messages to I.G. on various social media platforms (*e.g.*, Facebook, WhatsApp), and iMessage and Skype chats. Agent Garcia reviewed the reports for both devices and took notes that she included in a written report.

**II**

A grand jury indicted both Pulido and Jimenez on a variety of [**10] charges. In particular, it charged Pulido with four counts: (1) using the internet to knowingly persuade, induce, entice, and coerce someone under the age of 18 to engage in sexual activity for which a person could be charged with a criminal offense, in violation of 18 U.S.C. § 2422(b); (2) traveling with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b); (3) conspiring to transport a minor with intent that she engage in sexual activity, in violation of 18 U.S.C. § 2423(a) and (e); and (4) transporting a minor with intent that she engage in sexual activity, in violation of 18 U.S.C. § 2423(a). The grand jury indicted Jimenez on one count of conspiring to transport a minor with intent that she engage in sexual activity, in violation of 18 U.S.C. §§ 2423(a) and (e).

Pulido moved to dismiss the indictment against him on several grounds. He contended that (1) the enticement count was duplicitous because although it nominally charged him with only one crime, it in fact improperly charged two or more separate and distinct offenses; (2) the traveling-with-intent count was unconstitutional because the statute on which it was predicated

---

[1] A "forensic" search of an electronic device (alternatively called an "advanced" search) is distinct from a "basic" or "manual" search. *See Alasaad v. Mayorkas*, 988 F.3d 8, 13 (1st Cir. 2021) (noting that CBP policy categorizes an "advanced" search as one "in which an Officer connects external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or analyze its contents") (quotation marks and citation omitted).

exceeded Congress's Foreign Commerce Clause power and impermissibly burdened his rights of "travel and free thought"; and (3) the transportation-of-a-minor [**11] counts were legally insufficient because they failed to identify an underlying Florida statute that he intended to violate.

The district court denied Pulido's motion. The court rejected Pulido's duplicitousness contention, reasoning that enticement of a minor is a "continuing offense" and, therefore, that the count was not duplicitous as charged.[2] The district court also held that the traveling-with-intent statute was constitutional, and that the transportation-of-a-minor counts were legally sufficient.

Before trial, Pulido moved to suppress evidence recovered from his iPhone and MacBook. Pulido contended that the agents' review of the messages on his electronic devices violated the Fourth Amendment. In particular, he argued that under [*1267] the so-called "border search" exception, officials may make a warrantless search only for contraband and that, in doing so, they may only take a cursory glance. Relying on *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014), Pulido asserted that officials needed, but lacked, a warrant to search his devices, or, at the very least, needed probable cause or reasonable suspicion to believe that they contained contraband. A magistrate judge held an evidentiary hearing and then recommended denying Pulido's motion, concluding [**12] that the border-search exception isn't limited to contraband and that the officers' search didn't violate the Fourth Amendment. Over objection, the district court accepted the magistrate judge's recommendation and denied Pulido's motion to suppress.

Pulido and [*1268] Jimenez separately moved in limine to exclude two items of evidence. Pulido sought to exclude I.G.'s testimony that she was predisposed to chastity on the ground that it was inadmissible under Federal Rule of Evidence 412(a)(2), which bars the introduction of evidence offered to prove a victim's sexual predisposition. The district court denied the motion without prejudice, preferring to decide the matter at trial.[3] Jimenez moved to exclude evidence about his immigration status on the ground that it was irrelevant and prejudicial, but the government agreed that his legal status was irrelevant to the charged crime and explained that it had no intention of presenting any such evidence.

Several issues arose during trial that have given rise to challenges on appeal. First, there were a few translation issues at the start of I.G.'s mother's testimony. For instance, during the first 27 minutes of her testimony, the government's lawyer initially asked I.G.'s mother questions in English, [**13] and she attempted to answer in English with some difficulty, raising a concern that she might not be properly understanding the questions. To ameliorate that risk, the judge asked her to answer in Croatian and allow an interpreter to translate. Even then, though, the judge also expressed concern that some of the interpreter's translations were summaries rather than word-for-word recitations.

Second, when the government called Agent Garcia to testify, Jimenez requested a sidebar conference because he was concerned that Garcia would testify that he was in the country illegally. The government repeatedly assured the judge that it had no intention of eliciting that information and that it only envisioned Garcia testifying that Jimenez wasn't a medical doctor. Immediately after the conference, though, when the prosecutor asked Garcia if she could determine whether Jimenez was a doctor, she responded that "[b]ased on [her] investigation, [she] determined that Mr. Jimenez entered the United States legally in the '80s, but he remained in the United States—." Trial Tr. Day 7 at 140:18-24, Doc. 218. Jimenez promptly objected, and the judge struck Garcia's response from the record and instructed [**14] the jury to disregard it. When Jimenez later moved for a mistrial based on Agent Garcia's testimony about his immigration status, the judge (while acknowledging that the testimony was "really inappropriate") reserved ruling on the issue. *Id.* at 165:5, 7; 168:19.

At the close of the government's case, Pulido moved for a judgment of acquittal on the same duplicitousness

---

[2] "A continuing offense is a continuous, unlawful act or series of acts set on foot by a single impulse ...." *United States v. Midstate Horticultural Co.*, 306 U.S. 161, 166, 59 S. Ct. 412, 83 L. Ed. 563 (1939) (quotation marks and citation omitted). It "is not complete upon the first act, but instead continues to be perpetrated over time." *United States v. Rojas*, 718 F.3d 1317, 1320 (11th Cir. 2013) (quotation marks and citation omitted). Conspiracy and possession of a firearm are illustrative examples. *See United States v. Gilbert*, 136 F.3d 1451, 1453 n.4 (11th Cir. 1998) (conspiracy); *United States v. Rivera*, 77 F.3d 1348, 1351 (11th Cir. 1996) (possession of a firearm).

[3] At trial, Pulido lodged repeated objections when I.G. testified about her predisposition to chastity, which the district court overruled.

ground that he had raised in his motion to dismiss. Jimenez separately moved for a judgment of acquittal, arguing that no reasonable juror could find beyond a reasonable doubt that he was guilty of the conspiracy. Specifically, he contended, there was no evidence that he intended to transport I.G. to Florida for the purpose of her engaging in unlawful sexual acts there. The district court denied both motions, and the jury convicted Pulido and Jimenez on all counts.

Following the verdict, Jimenez moved for a new trial based on (1) the translation irregularities involving I.G.'s mother's testimony, (2) the admission of evidence regarding I.G.'s virginity and sexual inexperience, and (3) Agent Garcia's testimony regarding his immigration status. Pulido joined Jimenez's motion, which the district court denied on all counts. [**15] The district court acknowledged that the law generally requires continuous word-for-word translation, but it held that the summaries didn't render the trial fundamentally unfair in the light of all the evidence presented: I.G.'s mother testified for more than four and a half hours, and only the first 27 minutes were in English; when she testified in English, her responses indicated that she understood the questions. The court further held that I.G.'s testimony about her sexual inexperience was admissible under Rule 412. That rule, the court concluded, protects alleged victims from cross-examination about their sexual histories and sexual dispositions; it does not prevent a victim from producing relevant evidence regarding her virginity, chastity, etc. And finally, the court held that Agent Garcia's testimony necessitated neither a new trial nor a mistrial because (1) her statement was unelicited and unresponsive, (2) it was followed immediately by a curative instruction, and (3) there was substantial evidence of Jimenez's guilt.

At sentencing, the district court enhanced Jimenez's sentence over his objection. As relevant here, the court applied both (1) a two-level enhancement under U.S.S.G. § 2G1.3(b)(1)(B) on the [**16] ground that Jimenez exercised "custody, care, or supervisory control" over I.G. and (2) a two-level enhancement under § 2G1.3(b)(2)(B) on the ground that he exercised "undue influence" over her.

Pulido and Jimenez both appealed.

## III

We divide our discussion into two parts. We first address Pulido's challenges to the district court's orders denying his motion to dismiss, his motion to suppress, and his motion for a new trial.[4] We then consider Jimenez's motion for acquittal based on sufficiency of the evidence, his motion for a mistrial, and his challenges to the two sentence enhancements.

### A

#### 1

Pulido first argues that the district court erred in denying his motion to dismiss. In particular, he contends (1) that the enticement-of-a-minor count is duplicitous, (2) that the traveling-with-intent count violates the Foreign Commerce Clause, and (3) that the traveling-with-intent count impermissibly burdens his rights of travel and "free thought."[5] We'll take each challenge in turn.

[*1269] **a**

Pulido contends that the district court should have dismissed his indictment on the ground that the enticement-of-a-minor count was "duplicitous."[6] Although the issue is not without some complexity, we agree with him.[7]

---

[4] For reasons explained below, we find that we needn't reach Pulido's Rule 412 argument that the district court erred in refusing to exclude evidence that I.G. was predisposed to chastity.

[5] Pulido initially contended that the transportation-of-a-minor count was legally insufficient, but he has since conceded that a decision issued after his indictment forecloses his insufficiency challenge, and he raises that challenge before us solely to preserve it. *See United States v. Doak*, 47 F.4th 1340, 1352-53 (11th Cir. 2022).

[6] For ease of reference, we will refer to "enticement" as a stand-in for the four distinct means of violating 18 U.S.C. § 2422(b): persuading, inducing, enticing, and coercing a minor to engage in sexual activity.

[7] We normally review a district court's decision to deny a motion to dismiss for abuse of discretion, *United States v. Di Pietro*, 615 F.3d 1369, 1370 n.1 (11th Cir. 2010), but because determining whether an indictment was duplicitous requires a legal inquiry, we review the decision here de novo, *see United States v. Burton*, 871 F.2d 1566, 1573 (11th Cir. 1989); *United States v. Hassoun*, 476 F.3d 1181, 1185 (11th Cir. 2007). But, as with most non-structural errors, we will assess the district court's holding for harmlessness. *Cf. Hicks v. Head*, 333 F.3d 1280, 1285 (11th Cir. 2003) ("[I]f the defendant had counsel

"A count in an indictment [**17] is duplicitous if it charges two or more separate and distinct offenses." *United States v. Seher*, 562 F.3d 1344, 1360 (11th Cir. 2009) (quotation marks and citation omitted). The risk of a duplicitous count is that "(1) [a] jury may convict a defendant without unanimously agreeing on the same offense; (2) [a] defendant may be prejudiced in a subsequent double jeopardy defense; and (3) [a] court may have difficulty determining the admissibility of evidence." *United States v. Deason*, 965 F.3d 1252, 1267 (11th Cir. 2020) (citation omitted). To determine whether a count is duplicitous, we "look to the text of the underlying statute" and consider "what conduct constitutes a single offense." *Id.* (citations omitted).

The indictment here charged Pulido with violating 18 U.S.C. § 2422(b), in conjunction with Fla. Stat. §§ 800.04(4)(a) and (b). Section 2422(b) reads as follows:

> Whoever, using . . . any . . . facility or means of interstate or foreign commerce, . . . knowingly persuades, induces, entices, or coerces an individual who has not attained the age of 18 years, to engage in . . . any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years of life.

Here, the criminal "sexual activity" that served as the hook for § 2422(b)'s application was "lewd or lascivious battery" [**18] under Fla. Stat. § 800.04(4). At the relevant time, that statute read as follows:

> (a) A person commits lewd or lascivious battery by:
>
> 1. Engaging in sexual activity with a person 12 years of age or older but less than 16 years of age; or
>
> 2. Encouraging, forcing, or enticing any person less than 16 years of age to engage in sadomasochistic abuse, sexual bestiality, prostitution, or any other act involving sexual activity.

Fla. Stat. § 800.04(4)(a) (2014). The Florida statute defines "sexual activity" as "the oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any other object." *Id.*§ 800.04(1)(a). [*1270] Accordingly, for our purposes, Pulido violated § 2422(b) if he enticed I.G. to have oral, vaginal, or anal intercourse with him.

Importantly here, "[t]he underlying criminal conduct that Congress expressly proscribed in passing § 2422(b) is the persuasion, inducement, enticement, or coercion of the minor rather than the sex act itself." *United States v. Murrell*, 368 F.3d 1283, 1286, 95 Fed. Appx. 1283 (11th Cir. 2004).[8] Thus, put simply, a person can be guilty of violating § 2422(b) if he entices a minor to engage in sexual activity, regardless of whether the sexual activity ever occurs. *See id.* at 1287.

Pulido contends before us that because § 2422(b) criminalizes the act of enticement itself, the criminal [**19] offense is complete the moment the minor is enticed. It's possible, he argues, for a minor to have been enticed on multiple occasions regardless of when—or again, even whether—any sexual activity occurred. In such a case, Pulido contends, an indictment would need to list multiple enticement offenses to cover each criminal act. He faults his indictment for listing only one enticement count to cover a 10-month period during which he and I.G. engaged in numerous conversations about sex and had numerous sexual encounters. This is problematic, he says, because it allows for the possibility that the jurors didn't unanimously agree on the *same* act of enticement. By way of illustration, Pulido posits that some jurors might have concluded that he enticed I.G. in messages that he sent before he traveled to Croatia; others might have concluded that he did so while he was in Croatia; and still others might have found that he did so only when he and I.G. returned to Florida.

The government denies that the indictment was duplicitous. It contends that enticement can be demonstrated through a pattern of activity because, it says, "[w]e know enticing a child to engage in illicit sexual activity is ordinarily [**20] a process, not a discrete act; each act in the process need not be charged separately."[9] Br. of Appellee at 49-53.

---

and was tried by an impartial adjudicator, there is a strong presumption that any other [non-structural] errors that may have occurred are subject to harmless-error analysis." (quoting *Rose v. Clark*, 478 U.S. 570, 579, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986))); *cf. United States v. Deason*, 965 F.3d 1252, 1267-68 & n.3 (11th Cir. 2020) (stating that charging duplicitous counts is not a structural error).

[8] Although *Murrell* arose under § 2422(b)'s "attempts" clause, *see*368 F.3d at 1286, its description of what constitutes a violation applies equally to the completed version of the crime.

[9] The government argued before the district court that § 2422(b) is a "continuing offense." As already explained, *see supra* at 9-10 n.2, a continuing offense is a crime that "is not

It seems to us that Pulido and the government are talking past one another. It's true, as the government asserts, that it can point to a pattern of activity to prove the commission of the enticement offense. But it's also true that such a pattern culminates in a discrete episode of enticement. In that moment, the instant when the minor has been enticed after days (or weeks, or months) of conduct by the defendant, the § 2422(b) offense has occurred.

So, as applied to this case, it may be that it took Pulido weeks or months to entice I.G. to engage in illicit sexual activity with him. But the moment that Pulido was able to move I.G.'s mental state from one of hesitation to one of agreement *for the first time*, he violated § 2422(b). Subsequent episodes in which he successfully moved her mind would constitute distinct acts of enticement, and thus independent [*1271] violations of the statute. By failing to charge multiple enticement counts in a case that involved a 10-month relationship, numerous online conversations about sex, and multiple sexual encounters in both Croatia and Florida, the [**21] government produced an indictment that creates the risk that the jury "may [have] convict[ed Pulido] without unanimously agreeing on the same offense." *Deason*, 965 F.3d at 1267. And that makes the § 2422(b) count duplicitous.

**ii**

Before vacating the § 2422(b) count and conviction, we must assess whether allowing the count to go to trial was harmless. It wasn't.

"The harmless-error test is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Cannon*, 987 F.3d 924, 947 (11th Cir. 2021) (quotation marks and citation omitted). The government has the burden to prove that an error was harmless. *Id.*

Here, the government contends that any duplicitousness was harmless because "[t]here is no risk that the jury found Pulido guilty without unanimously agreeing that Pulido's conduct satisfied the elements of enticement." Br. of Appellee at 55. It asserts that the district court's instruction requiring the jury to unanimously agree to the method of the commission (*i.e.*, whether Pulido persuaded, induced, enticed, or coerced) was sufficient to allay any concerns about lack of unanimity.

That is incorrect. The problem isn't that the jury might not have unanimously agreed to the *method* by which Pulido violated § 2422(b). Rather, the [**22] problem is that it might not have unanimously agreed about the *moment* that I.G. was enticed. I.G. testified at trial that she and Pulido had sex several times in Croatia, and also frequently in Florida at Pulido's initiation. The government never demonstrated the moment at which I.G. was enticed, nor did it seek to prove I.G.'s mental state at any particular point during the 10-month period. With so many episodes of sexual activity—each of which may (or may not) have been induced by one or more acts of enticement—we cannot say that the government has carried its burden of proving harmlessness beyond a reasonable doubt.

* * *

Because the enticement-of-a-minor count was duplicitous, and because the error wasn't harmless, we vacate Pulido's conviction on that count and remand with instructions for the district court to dismiss it.

**b**

Pulido next asserts that the district court should have dismissed his traveling-with-intent count on the ground that Congress violated the Foreign Commerce Clause in enacting § 2423(b).[10]

The Constitution authorizes Congress "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. "Neither [we] nor the Supreme Court has thoroughly explored the scope of the Foreign Commerce Clause." *United States v. Baston*, 818 F.3d 651, 667 (11th Cir. 2016). But we have assumed (without deciding) in [**23] recent cases that Congress's authority under the Foreign Commerce Clause is at least as broad as its authority under the Interstate Commerce Clause. *Id.* at 668; *United States*

complete upon the first act, but instead continues to be perpetrated over time." *Rojas*, 718 F.3d at 1320. Significantly, though, "offenses should not be considered continuing unless the explicit language of the . . . statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing offense." *Id.* (quotation marks and citation omitted and alteration adopted). The government seems to have abandoned its continuing-offense theory on appeal.

[10] We review de novo a district court's denial of a motion to dismiss on constitutional grounds. *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1377 n.3 (11th Cir. 2011).

*v. Davila-Mendoza*, 972 F.3d 1264, 1271 (11th Cir. 2020). "In other words," we have said:

> [*1272] Congress's power under the Foreign Commerce Clause includes at least the power to regulate the "channels" of commerce between the United States and other countries, the "instrumentalities" of commerce between the United States and other countries, and activities that have a "substantial effect" on commerce between the United States and other countries.

*Baston*, 818 F.3d at 668 (citing *Gonzales v. Raich*, 545 U.S. 1, 16-17, 125 S. Ct. 2195, 162 L. Ed. 2d 1 (2005).

Pulido resists that equivalency. He accepts that Congress can regulate "the use of the channels of [foreign] commerce," and "the instrumentalities of [foreign] commerce, or persons or things in [foreign] commerce, even though the threat may only come from [intranational] activities." *See*Br. of Appellant Pulido at 55-56 (quoting *United States v. Lopez*, 514 U.S. 549, 558, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995)). But, he says, the "substantial effects" category recognized in the Inter-state Commerce Clause context shouldn't extend to Foreign Commerce Clause cases like this one. *Id.* And, the argument goes, because the conduct for which he has been charged—traveling with an intent to engage in illicit sexual conduct with I.G.—is a non-commercial act, his § 2423(b) count would have to rest on a "substantial effects" rationale.

We disagree. This isn't a "substantial effects" case; [**24] it's a "channels of [foreign] commerce" case. The power over channels of commerce under the Interstate Commerce Clause permits Congress to "keep the channels of interstate commerce free from immoral and injurious uses." *Lopez*, 514 U.S. at 558 (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256, 85 S. Ct. 348, 13 L. Ed. 2d 258 (1964)). Because § 2423(b) criminalizes traveling in foreign commerce with an intent to engage in illicit sexual activity, it's directed at people who, for example, buy plane tickets—as Pulido did here—to commit illicit activity in foreign countries. That is a regulation of a channel of foreign commerce with a purpose of keeping it "free from immoral and injurious uses." *Id.*

Because we conclude that Congress acted within its Foreign Commerce Clause power to regulate the channels of foreign commerce when it enacted § 2423(b), we hold that the travel-with-intent count was constitutional as applied to Pulido.[11] Accordingly, we affirm the district court's judgment on that count.

**c**

Pulido finally contends that the district court should have dismissed his indictment on the ground that § 2423(b) impermissibly burdens his rights of "travel and free thought" under the First and Fifth Amendments.[12] We are unpersuaded.

To be clear, contrary to Pulido's framing, § 2423(b) doesn't criminalize "thought" in the abstract. Nor does it "prohibit traveling with an immoral thought, [**25] or even with an amorphous intent to engage in sexual activity with a minor." *United [*1273] States v. Tykarsky*, 446 F.3d 458, 471 (3d Cir. 2006). Rather, it criminalizes a concrete act—namely, the act of traveling in foreign commerce with the purpose of committing an illegal sex act with a minor. And "no federal court has ever held that an individual has a fundamental right to travel for an illicit purpose." *Id.* at 472 (quotation marks and citation omitted).

It remains unclear whether Pulido challenges § 2423(b) on its face or as applied. To the extent that he challenges the statute's constitutionality facially, he hasn't demonstrated that it "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 769-70, 143 S. Ct. 1932, 216 L. Ed. 2d 692 (2023) (quotation marks and citation omitted). And to the extent that Pulido challenges § 2423(b) as applied to his case, he did far more than think immoral thoughts or travel with amorphous intentions—he bought a plane ticket, traveled to Croatia, and had sex with a 15-year-old girl.[13]

---

[11] In concluding that the enactment of § 2423(b) was a valid exercise of Congress's Foreign Commerce Clause power over channels of foreign commerce, we join our sister circuits. *See, e.g., United States v. Han*, 230 F.3d 560, 562-63 (2d Cir. 2000); *United States v. Tykarsky*, 446 F.3d 458, 470 (3d Cir. 2006); *United States v. Bredimus*, 352 F.3d 200, 205-08 (5th Cir. 2003); *United States v. Stokes*, 726 F.3d 880, 894-95 (7th Cir. 2013).

[12] As with Pulido's Foreign Commerce Clause argument, we review de novo the district court's denial of his motion to dismiss on First and Fifth Amendment grounds. *Ibarguen-Mosquera*, 634 F.3d at 1377 n.3.

[13] *See United States v. Gamache*, 156 F.3d 1, 8 (1st Cir. 1998)

Because Pulido has not sustained his burden to show that § 2423(b) unconstitutionally burdens his First or Fifth Amendment rights either facially or as applied, we affirm the district court's denial of his motion to dismiss on this count.

**2**

Pulido next challenges the district court's [**26] denial of his motion to suppress evidence found on his iPhone and MacBook because, he says, the searches of those devices violated the Fourth Amendment. More specifically, he contends that the district court erred in holding that the Fourth Amendment's "border search" exception covers the warrantless, suspicionless searches of his devices.[14]

We apply a two-step analysis to evaluate the validity of a search at the border. *United States v. Alfaro-Moncada*, 607 F.3d 720, 726 (11th Cir. 2010). Step one focuses on whether there was statutory authority to conduct the search. *Id.* (citing *United States v. Ramsey*, 431 U.S. 606, 611-15, 97 S. Ct. 1972, 52 L. Ed. 2d 617 (1977)). Step two asks whether the search was reasonable under the Fourth Amendment. *Id.* (citing *Ramsey*, 431 U.S. at 615-16). Here, no one disputes that there was statutory authority, so we proceed directly to the Fourth Amendment reasonableness inquiry.

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, . . . papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Under Supreme Court precedent, police generally need a warrant to conduct a search. *United States v. Vergara*, 884 F.3d 1309, 1312 (11th Cir. 2018). "[F]rom before the adoption of the Fourth Amendment," however, border searches "have been considered to be 'reasonable' by the single fact that the person or item in question has entered into our country from outside." *Ramsey*, 431 U.S. at 619. This is because border searches implicate the "long-standing [**27] right of the sovereign to protect itself," *id.* at 616, a right that is "at its zenith at the international border," *United States v. Flores-Montano*, 541 U.S. 149, 152, 124 S. Ct. 1582, 158 L. Ed. 2d 311 (2004). And [*1274] because the government has such a strong interest in searching at the border, "the balance between the interests of the government and the privacy right of the individual is struck more favorably to the government." *Alfaro-Moncada*, 607 F.3d at 728.

In that vein, we have held that border searches never require a warrant—or even probable cause—to be reasonable. *Vergara*, 884 F.3d at 1312 (citing *Ramsey*, 431 U.S. at 619). Indeed, we have gone further to say that "we require reasonable suspicion at the border only 'for highly intrusive searches of a person's body such as a strip search or an x-ray examination.'" *Id.* (quoting *Alfaro-Moncada*, 607 F.3d at 729). And even more specifically, and more relevantly here, we have held that "the Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border." *United States v. Touset*, 890 F.3d 1227, 1231 (11th Cir. 2018); *see also id.* at 1233 ("The Supreme Court has never required reasonable suspicion for a search of property at the border, however non-routine and intrusive, and neither have we."). Together, *Vergara* and *Touset* make this an easy affirmance.

Not so, Pulido says. Despite our decisions' categorical language, he asserts that we should treat searches of private messages on cell phones differently [**28] for two reasons. First, relying on *Riley v. California*, 573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014), in which the Supreme Court held that an officer's search of a cell phone didn't fall within the Fourth Amendment's search-incident-to-arrest exception, Pulido insists that searching a cell phone is so intrusive of a person's privacy that it (in effect) warrants an exception to the border-search exception. Second, he contends that searching private text messages on a person's devices exceeds the historical justification for the border-search exception—namely, detecting contraband—and, therefore, that the exception's indulgent reasonableness rule shouldn't apply.

We rejected similar *Riley*-based arguments in *Vergara* and *Touset*. In *Vergara*, we stated expressly that "[b]order searches have long been excepted from warrant and probable cause requirements, and the holding of *Riley* does not change this rule." 884 F.3d at 1312-13. And in *Touset*, we reiterated that "[a]lthough the Supreme Court stressed in *Riley* that the search of a cell phone risks a significant intrusion on privacy, our decision in *Vergara* made clear that *Riley*, which

("[A]ppellant, at a minimum, engaged in a *series of acts* long past the 'mere thinking' stage.... [I]t can hardly be claimed that punishment for 'mere thought' is at issue.").

[14] In reviewing a motion-to-suppress decision, "we review the district court's factual findings for clear error and its legal conclusions *de novo*." *United States v. Vergara*, 884 F.3d 1309, 1312 (11th Cir. 2018) (citation omitted).

involved the search-incident-to-arrest exception, does not apply to searches at the border." 890 F.3d at 1234. In particular, we explained in *Touset* that in those instances when we have required [**29] reasonable suspicion for a border search, we have defined "intrusiveness" by reference to bodily integrity—"the indignity that will be suffered by the person being searched." *Id.* (citation omitted). Intrusiveness, therefore, is a function of the "personal indignity" that a search causes, not of its scope or extent. *Id.* And in *Touset*, "we fail[ed] to see how the personal nature of data stored on electronic devices could trigger this kind of [personal] indignity" when existing precedent recognized no such afront to one's personal dignity even in the search of his home. *Id.* (citing *Alfaro-Moncada*, 607 F.3d at 729, 732). Simply put, we said that "[p]roperty and persons are different." *Id.* (citing *Flores-Montano*, 541 U.S. at 152).

*Vergara* and *Touset* likewise foreclose Pulido's argument that government officials exceeded the scope of the border-search exception, which, he says, is limited by the government's sovereign interest in excluding contraband from the country. [*1275] Forensically extracting and then reading all his private messages, Pulido contends, transgresses the scope of a permissible border search. But again, *Vergara* and *Touset* are not so easily cabined. Neither opinion purports to restrict the operation of the border-search exception to searches for contraband. To [**30] the contrary, both opinions use categorical language. *See, e.g., Vergara*, 884 F.3d at 1312 ("[W]e require reasonable suspicion at the border*only* for highly intrusive searches of a person's body ...." (emphasis added) (quotation marks and citation omitted)); *Touset*, 890 F.3d at 1233 ("The Supreme Court has never required reasonable suspicion for a search of property at the border, however non-routine and intrusive, and neither have we."); *id.* at 1234 ("Property and persons are different."); *id.* at 1231 ("[T]he Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border.").

Because our precedents in the border-search context state both (1) that we require reasonable suspicion only for highly intrusive searches of a person's body and (2) that forensic searches of electronic devices don't require any level of suspicion, we affirm the district court's holding that the government's search of Pulido's iPhone and MacBook didn't violate the Fourth Amendment.

**3**

Pulido finally challenges the district court's denial of his new-trial motion based on translation irregularities during I.G.'s mother's testimony, which he contends violated his due-process rights.[15]

For constitutional purposes, we must determine whether any of the irregularities rendered Pulido's [**31] trial "fundamentally unfair." *United States v. Gomez*, 908 F.2d 809, 811 (11th Cir. 1990) (quotation marks and citation omitted). The "general standard" requires continuous word-for-word translation of everything relating to the trial. *United States v. Joshi*, 896 F.2d 1303, 1309 (11th Cir. 1990). "'[O]ccasional lapses,'" however, "will not render [a] trial 'fundamentally unfair'" because "defendants have no constitutional 'right' to flawless, word for word [interpretations]." *Gomez*, 908 F.2d at 811 (citation omitted). "[I]nterpreters should nevertheless strive to translate exactly what is said," and "courts should discourage interpreters from 'embellishing' or 'summarizing' live testimony." *Id.*

Pulido asserts that the interpretation irregularities during I.G.'s mother's testimony rendered his trial fundamentally unfair. In particular, he says (1) that I.G.'s mother struggled to understand the interpreter's accent and got confused listening to both English and Croatian, and (2) that some interpretations were notably shorter than I.G.'s mother's responses, indicating that they weren't accurate translations. The district court disagreed, and so do we.

The district court reasonably allowed I.G.'s mother to answer questions in English but encouraged her to use the interpreter if she was unsure. While the court noted some irregularities [**32] in I.G.'s mother's testimony, it exercised due care to ensure that any errors were remedied. Once the court observed that I.G.'s mother was having difficulty responding in English, it directed her to answer in Croatian and allow [*1276] the interpreter to translate her answers into English. It also sustained Jimenez's objection to ensure that all remaining questions asked to I.G.'s mother would be translated to her in Croatian. It then reminded the interpreter that the translations of her testimony needed to be word-for-word. The interpreter had assured the

[15] "We review the district court's denial of a motion for new trial for abuse of discretion." *United States v. Sweat*, 555 F.3d 1364, 1367 (11th Cir. 2009). We review de novo questions of law, including whether a defendant's due-process rights have been violated. *See United States v. Underwood*, 446 F.3d 1340, 1345 (11th Cir. 2006); *United States v. Savage*, 701 F.2d 867, 868 n.1 (11th Cir. 1983).

court moments before that he was translating everything and not summarizing. And in its order denying the motion for a new trial, the court emphasized that the portion of I.G.'s mother's testimony that was in English occupied only 27 minutes out of four and a half hours she spent on the stand. The court further confirmed that for these 27 minutes, I.G.'s mother understood what she was being asked.[16]

Accordingly, we hold that any interpretation errors didn't render the trial fundamentally unfair. The district court didn't abuse its discretion in denying the new trial motion, and we affirm its decision in that respect.

* * *

To summarize, with [**33] respect to Pulido's challenges, we hold as follows: First, we affirm the district court's rejection of Pulido's challenges to his indictment except for his contention that the enticement count was duplicitous; on that count, we vacate his conviction and remand for resentencing with instructions that the enticement count be dismissed. Second, we affirm the district court's decision declining to suppress the evidence found on Pulido's electronic devices. Third, we hold that the district court did not abuse its discretion in denying Pulido a new trial based on the translation irregularities that attended I.G.'s mother's testimony.

**B**

We turn, then, to Jimenez. We start with the district court's rejection of his motion for judgment of acquittal, followed by the court's denial of his motion for a mistrial, and conclude with the court's imposition of two sentencing enhancements.

**1**

Jimenez first challenges the district court's denial of his motion for judgment of acquittal, in which he asserted that there was insufficient evidence to convict him of conspiring to transport I.G. in violation of 18 U.S.C. §§ 2423(a) and (e).[17] In particular, Jimenez argues that the record was devoid of evidence that he intended for I.G. [**34] to engage in sexual activity in the United States. We disagree.

"To support a conspiracy conviction, the government must prove 1) an agreement to commit an unlawful act and 2) an overt act by one of the conspirators in furtherance of the conspiracy." *United States v. Parker*, 839 F.2d 1473, 1477 (11th Cir. 1998). "A conspiracy may, indeed usually [*1277] must, be proven through circumstantial evidence." *Ibarguen-Mosquera*, 634 F.3d at 1385. The substantive offense underlying Jimenez's conspiracy conviction prohibits "knowingly transport[ing] an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2423(a). When charging a person with conspiracy to commit a substantive offense, the conspiracy "cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself." *United States v. Ross*, 131 F.3d 970, 980-81 (11th Cir. 1997) (quoting *Ingram v. United States*, 360 U.S. 672, 678, 79 S. Ct. 1314, 3 L. Ed. 2d 1503, 1959-2 C.B. 334 (1959)). So the government had to prove that Jimenez had, as at least one of his purposes in transporting I.G. to the United States, an intent that she have sex with Pulido. *See United States v. Doak*, 47 F.4th 1340, 1354 (11th Cir. 2022). "[A]n alternative plausible innocent explanation is not enough [**35] to prove that the conduct was not motivated by illicit sexual activity." *Id.* at 1355 (quotation marks and citation omitted).

Jimenez focuses on the intent element. He explains that while he had conversations with Pulido and I.G. about sex, the government failed to provide evidence that he had the requisite knowledge or intent that the two would

---

[16] Additionally, we conclude that there was no "cumulative error." *See* Br. of Appellant Pulido at 67. There was, at most, only one error—the district court's refusal to exclude evidence of I.G.'s predisposition for chastity. And because we have vacated the enticement count of Pulido's indictment, we needn't reach Pulido's Rule 412 challenge to that ruling.

[17] "We review *de novo* a district court's denial of judgment of acquittal on sufficiency of evidence grounds." *United States v. Fleury*, 20 F.4th 1353, 1367 (11th Cir. 2021) (citation omitted). "[W]e view the evidence in the light most favorable to the prosecution and draw all reasonable inferences and credibility choices in its favor." *Id.* (quotation marks and citation omitted). "[W]e will uphold the denial of judgment of acquittal—and affirm the guilty verdict—if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

have sex in the United States. He asserts (1) that any conversations about sex were conducted while Pulido was in Croatia where sex with I.G. was legal and (2) that those conversations don't demonstrate that he intended for Pulido and I.G. to continue having sex in the United States.

The government responds that the circumstantial evidence introduced at trial supports the jury's verdict that at least one reason for I.G. coming to the United States was for her and Pulido to have sex. With respect to Jimenez's intent, in particular, the government emphasized that he (1) coached Pulido how to convince I.G. to have sex with him; (2) knew about the sexual activity between Pulido and I.G.; (3) spoke with I.G. regarding her sexual experiences; (4) pretended to be a doctor and instructed I.G. how she could avoid pregnancy; (5) hid Pulido's relationship with I.G. [**36] from her family; (6) paid for I.G.'s plane ticket to the United States; (7) helped ensure that I.G. didn't return to Croatia with her family; (8) filled out asylum paperwork for I.G.; (9) limited I.G.'s ability to communicate with her mother; and (10) obstructed I.G.'s efforts to return to Croatia.

We agree with the government that a reasonable jury could conclude that Jimenez conspired to transport I.G. to the United States with an intent that she engage in sex with Pulido while she was here. Jimenez knew about the sexual nature of the relationship between Pulido and I.G. He actively coached Pulido how to convince I.G. to have sex with him. He communicated with I.G. directly through social media about her sexual activity, even going so far as pretending to be a doctor to advise her how to avoid pregnancy. And, with full awareness of the nature of I.G.'s relationship with Pulido, Jimenez paid for her plane ticket to the United States. When I.G. arrived in Florida, Jimenez tried to hide her relationship with Pulido from her family. And when I.G. was scheduled to return to Croatia with her family, Jimenez helped ensure that she stayed behind, and when that was successful, he filled out [**37] asylum paperwork for her and limited her ability to communicate with her mother. That is more than enough. Accordingly, we [*1278] affirm the district court's denial of Jimenez's motion for judgment of acquittal.

**2**

Jimenez next challenges the district court's denial of his motion for a mistrial or a new trial, which focused on Agent Garcia's testimony about his immigration status.[18]

A district court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The decision to grant a new trial is within "the sound discretion of the trial court." *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985). This determination rests with the district court because it "is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury." *United States v. Blakey*, 960 F.2d 996, 1000 (11th Cir. 1992).

We have held that to obtain a new trial a defendant must show that his "substantial rights [were] prejudicially affected" and, further, that such prejudice occurs "when there is a reasonable probability that, but for the remarks, the outcome of the trial would have been different." *United States v. Emmanuel*, 565 F.3d 1324, 1334 (11th Cir. 2009) (quotation marks and citation omitted). "Prejudicial testimony will not mandate a mistrial where there is significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a [**38] substantial impact on the jury." *United States v. Anderson*, 782 F.2d 908, 916 (11th Cir. 1986) (citation omitted). Additionally, "[w]hen a curative instruction has been given to address some improper and prejudicial evidence, we will reverse only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition." *United States v. Harriston*, 329 F.3d 779, 787 n.4 (11th Cir. 2003) (quotation marks and citation omitted).

The district court refused to grant a mistrial or new trial because, it found, Jimenez hadn't demonstrated that Agent Garcia's testimony caused a miscarriage of justice. We agree and, in doing so, decline Jimenez's invitation to adopt a per se rule that every mention of a defendant's illegal immigration status is incurably prejudicial.

Like the district court, we are troubled by Agent Garcia's testimony, which wasn't responsive to the question she was asked and which she offered sua sponte. Her testimony is doubly troubling given (1) that Jimenez had successfully moved in limine before trial to exclude any reference to his immigration status and (2) that the testimony was offered almost immediately after counsel had a sidebar with the district judge about the risks of such evidence.

---

[18] We review the denial of both types of motions for abuse of discretion. *United States v. Valois*, 915 F.3d 717, 723 n.2 (11th Cir. 2019) (mistrial); *Sweat*, 555 F.3d at 1367 (new trial).

Even so, as the district court explained in denying Jimenez's motion, Garcia's testimony [**39] was "stray, . . . unelicited, and unresponsive." *United States v. Pulido*, No. 8:20-CR-292-VMC-CPT, 2022 U.S. Dist. LEXIS 31924, 2022 WL 562351, at *7 (M.D. Fla. Feb. 23, 2022). Moreover, the district court acted quickly to sustain Jimenez's objection, struck the testimony from the record, and gave a curative instruction that the jury should disregard it. *Cf. United States v. Valois*, 915 F.3d 717, 726 (11th Cir. 2019) ("We presume that the jury followed the district court's curative instructions." (citation omitted)). Finally, the other evidence of Jimenez's guilt was substantial, further reducing the likelihood [*1279] that Garcia's testimony had a meaningful impact on the jury. *See supra* at 34-35.[19]

Accordingly, we affirm the district court's denial of Jimenez's motion for a mistrial or a new trial.

### 3

Jimenez lastly challenges two sentencing enhancements. In particular, he contends that the district court erred in applying a two-level "undue influence" enhancement under U.S.S.G. § 2G1.3(b)(2)(B) and a two-level "custody, care, or supervisory control" enhancement under U.S.S.G. § 2G1.3(b)(1)(B).[20] We'll take each in turn.

#### a

Section 2G1.3(b)(2)(B) directs a district court to increase a defendant's offense level by two if he "unduly influenced a minor to engage in prohibited sexual conduct." We have explained that "[b]ecause undue influence is a factual finding, we review for clear error." *United States v. Whyte*, 928 F.3d 1317, 1336 (11th Cir. 2019).

Comment 3(B), which we followed in *Whyte*, states that a [**40] reviewing court should "closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior." *Id.* (quoting U.S.S.G. § 2G1.3(b)(2)(B), cmt. 3(B)). The same comment provides that there is a rebuttable presumption of undue influence if the defendant is at least 10 years older than his minor victim. *Id.* In determining whether a defendant has rebutted the presumption, the court should consider whether the defendant's conduct "displayed an abuse of superior knowledge, influence and resources." *Id.* (citation omitted).[21]

Jimenez claims that even though he was more than 10 years older than I.G. and helped to pay for I.G. and her family [*1280] to come to the United States, he didn't abuse any superior knowledge, influence, or resources. The government responds by emphasizing that Jimenez (1) purchased I.G.'s plane ticket to the United States; (2) refused to rebook I.G.'s flight home; (3) controlled I.G.'s access to her mother after she returned to Croatia; (4) prepared I.G.'s asylum paperwork; (5) told a law enforcement officer that he shouldn't have spoken to

---

[19] *Sanchez v. Davis*, 888 F.3d 746 (5th Cir. 2018) (Costa, J., single-judge order), on which Jimenez relies, is distinguishable. First, and most obviously, the single-judge order there resolved only a threshold procedural issue, not the merits of any claim. A federal habeas corpus petitioner had sought a certificate of appealability requesting permission to challenge a district court's rejection of his contention that his state-court trial counsel had rendered ineffective assistance when he failed to object to a question about his immigration status. In *Sanchez*, the judge concluded only that the petitioner had met the baseline showing necessary to the issuance of a COA—namely, that "jurists of reason" could disagree with the district court's resolution of the claim. *Id.* at 749, 751-52; *see also*28 U.S.C. § 2253(c)(2). Second, and in any event, there are conspicuous factual distinctions. To be sure, Judge Costa stated that "a defendant's illegal status is considered so inflammatory that it is often the subject of motions in limine, the point of which is to ensure that testimony is not revealed to the jury that is so prejudicial that even a subsequent instruction to disregard cannot undo the damage." *Davis*, 888 F.3d at 751. He also noted that "the introduction of even a single impermissible mention of a defendant's immigration status is often a highly prejudicial bell that cannot be unrung." *Id.* at 752. Notably, though, in granting the COA, Judge Costa emphasized "a jury note showing that [the petitioner's] unlawful status was a topic during deliberations." *Id.* Here, there is no such smoking gun.

[20] We review a sentencing court's application of the Guidelines de novo and its factual determinations for clear error. *United States v. Demarest*, 570 F.3d 1232, 1239 (11th Cir. 2009).

[21] We have since clarified that the commentary can't alter the scope of an unambiguous provision of the Sentencing Guidelines. *See United States v. Dupree*, 57 F.4th 1269, 1273-77 (11th Cir. 2023) (en banc). We don't read Comment 3(B) as expanding § 2G1.3(b)(2)(B). Moreover, Jimenez hasn't argued that *Dupree* abrogated or otherwise undermined our decision in *Whyte* in this respect; rather, he contends that he has rebutted the presumption of undue influence articulated in the commentary.

I.G. without Jimenez's permission; (6) misleadingly told I.G. that he was a doctor so that [**41] she would talk to him about sex; and (7) instructed I.G. to tell her mother that she wouldn't be returning to Croatia.

For purposes of assessing whether the undue-influence enhancement applies, we consider a broad range of "[r]elevant conduct." U.S.S.G. § 1B1.3; *see also United States v. Castaneda-Pozo*, 877 F.3d 1249, 1251 (11th Cir. 2017). In particular, we may consider not only Jimenez's conduct "during" and "in preparation for" the offense of conspiring to transport I.G. to the United States but also any post-offense conduct aimed at "attempting to avoid detection or responsibility." U.S.S.G. § 1B1.3(a)(1)(B). "Relevant conduct" further includes all harm that "resulted from" or "that was the object of" the acts and omissions by Jimenez, *id.*§ 1B1.3(a)(3), and "any other information specified in the applicable guideline," *id.*§ 1B1.3(a)(4).

We hold that the district court did not clearly err in finding that Jimenez exercised undue influence over I.G. By spending his own money to pay for I.G.'s visa application and fly her to the United States, Jimenez used his "resources" to "influence" I.G.'s decision to travel. By posing as a doctor and then discussing I.G.'s fertility with her, he used his superior "knowledge" to "influence" her decisions regarding when and how to engage in sexual activity with Pulido. And by instructing [**42] I.G. to tell her mother that she wouldn't be returning to Croatia, promising—but then refusing—to book her flight home, and controlling I.G.'s communications with her mother after she returned to Croatia, he used his "influence" to compromise the voluntariness of her decision to stay in the United States. Given this evidence, we hold that the district court correctly applied the undue-influence enhancement, and we affirm its decision in that respect.

**b**

Last up: Jimenez's challenge to the district court's imposition of the "custody, care, or supervisory control" enhancement. Section 2G1.3(b)(1)(B) instructs a sentencing court to enhance the offense level by two if a minor involved in a sex-related crime "was otherwise in the custody, care, or supervisory control of the defendant." U.S.S.G. § 2G1.3(b)(1)(B). Jimenez contends that the district court erroneously imposed this enhancement because, among other reasons, he didn't have custody of I.G. until after he had completed his offense conduct.

The district court applied the enhancement because, in its view, Jimenez was responsible for all conduct in furtherance of the conspiracy, which it described as "getting I.G. to have sex with Pulido." Sentencing Tr. at 17:4-6, Doc. 285. We agree. [**43]

To begin, the commentary to § 2G1.3 makes clear that the enhancement is "intended to have broad application"—such that, for instance, it may be imposed even where a minor is only "temporarily" entrusted to the defendant. U.S.S.G. § 2G1.3 cmt. n.2(A). Moreover, for reasons already explained, in assessing the appropriateness of Jimenez's sentence, we may consider all "[r]elevant conduct"—*i.e.*, not only his actions undertaken in preparation for and during the conspiracy, but also his actions [*1281] thereafter that were aimed at "attempting to avoid detection or responsibility," as well as any harm that "resulted from" or "that was the object of" his acts and omissions. U.S.S.G. §§ 1B1.3 (a)(1)(B), (a)(3).

Here, the case that I.G. was entrusted to Jimenez's care is straightforward. At the very least, Jimenez unquestionably exercised supervisory control over I.G. when she stayed at his home in Florida after her family returned to Croatia. The district court found that I.G.'s mother entrusted her daughter to Jimenez, and I.G. physically lived in his house for the week following her family's departure. Jimenez hasn't demonstrated that this factual determination was clearly erroneous. *See Demarest*, 570 F.3d at 1239. Accordingly, we agree that when I.G. lived under Jimenez's roof for a full [**44] week—without her family there with her—he assumed a caretaker-like status over her, *see United States v. Isaac*, 987 F.3d 980, 992 (11th Cir. 2021) (applying the enhancement where the defendant acted as a temporary caretaker charged with looking after the victim's wellbeing), and we therefore affirm the district court's application of the "custody, care, or supervisory control" enhancement.

**IV**

For the foregoing reasons, we **AFFIRM**the district court's judgment on all matters related to Pulido except his enticement count. On that issue, we **VACATE** his conviction and **REMAND** for resentencing in accordance with this opinion and with instructions that the enticement count be dismissed. We **AFFIRM**the district court's judgment on all matters related to Jimenez.

**AFFIRMED** in part, **VACATED** in part, and **REMANDED**

in part.

**Concur by:** ROSENBAUM

## Concur

ROSENBAUM, Circuit Judge, Concurring:

I join the Majority Opinion in full but write separately to highlight two points about our decision to vacate Pulido's 18 U.S.C. § 2422(b) conviction. First, our Circuit's strict approach to duplicitous indictments requires us to vacate Pulido's conviction, even though our sister circuits may have upheld it. Second, our decision will require the government to charge § 2422(b) violations by the enticement, not by the victim. [**45] And that defies the reality of the crime Congress intended to prevent.

As the Majority Opinion points out, a defendant violates § 2422(b) when the defendant *entices* the minor to engage in illegal sexual activity, Maj. Op. at 17—that is, when the minor, in part because of the defendants' actions, *decides* to engage in illegal sexual activity with the defendant. Throughout an entire relationship, a defendant may engage many times in illegal sexual activity with a minor.

So it's no stretch to say that a count alleging a single violation of § 2422(b) based on a victim's entire relationship with a defendant may include multiple enticements (and thus multiple § 2422(b) violations under our precedent).

But it does not necessarily follow under the statutory text that an indictment is improper just because it alleges § 2422(b) violations by victim, rather than by enticement. After all, outside our Circuit, the government routinely charges § 2422(b) violations by the victim, not the enticement—and courts routinely uphold those conviction without discussion of potential duplicity issues. *See, e.g., United States v. Greaux-Gomez*, 52 F.4th 426, 440 (1st Cir. 2022); *United States v. Harris*, 991 F.3d 552, 554 (4th Cir. 2021).

But our duplicity precedent differs from that of other circuits. We have made clear that "two distinct offenses" must be "alleged [*1282] in a separate [**46] and distinct count of the indictment." *United States v. Schlei*, 122 F.3d 944, 979 (11th Cir. 1997) (quoting *Bins v. United States*, 331 F.2d 390, 393 (5th Cir.), *cert. denied*, 379 U.S. 880, 85 S. Ct. 149, 13 L. Ed. 2d 87 (1964)).[1] And under our prior-precedent rule, that precedent binds us. *See United States v. Davis*, 730 F.2d 669, 672 (11th Cir. 1984). So we must enforce our rule and require the government to charge individually the distinct enticements that occur throughout a victim's entire relationship with a defendant.

Other circuits, by contrast, have not taken such a strict approach to duplicitous indictments. Some have adopted a "general rule that criminal charges may aggregate multiple individual actions that otherwise could be charged as discrete offenses as long as all of the actions are part of 'a single scheme.'" *United States v. Moloney*, 287 F.3d 236, 240 (2d Cir. 2002) (quoting *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981)); *see also United States v. Canas*, 595 F.2d 73, 78-79 (1st Cir. 1979). In other words, just because the government *can* charge multiple violations separately does not mean that it *must* do so. And that makes some sense. When the "essence" of the alleged crime is a "single scheme," the risk of unfairness to the defendant is "slight," *Margiotta*, 646 F.2d at 733, because a jury must unanimously agree that the totality of the defendant's conduct violates the pertinent statute.

That is especially true for how the government prosecutes § 2422(b) offenses. The essence of the offense is often a "single scheme": a prolonged, impermissible sexual relationship with a minor. [**47] So when a jury convicts a defendant of perpetrating such a relationship in violation § 2422(b), it necessarily unanimously concludes that the defendant caused the minor's mental state to change from not agreeing to engage in a sexual relationship with the defendant to agreeing to do so. To be sure, without a proper instruction,[2] there is the chance that jurors do not

---

[1] All Fifth Circuit decisions issued by the close of business on September 30, 1981, are binding precedent in this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[2] Because a duplicitous indictment is not a structural error, we assess in each case whether the duplicitous count was harmless. *See United States v. Deason*, 965 F.3d 1252, 1267 (11th Cir. 2020). And an instruction to the jury may render a duplicitous indictment harmless. *See United States v. Damrah*, 412 F.3d 618, 623, 124 Fed. Appx. 976 (6th Cir. 2005) (concluding a unanimity instruction rendered any duplicity harmless); *Cf. Schlei*, 122 F.3d at 980 (concluding duplicity doomed the indictment and noting the "absence of a unanimity instruction"). For instance, if the district court had instructed

debate and agree on the exact *instance* when the victim's mental state changed. But even in that case, there is no dispute that the jurors unanimously agreed that the defendant violated the statute.

Still, our precedent forecloses us from entertaining such contentions. And that leads me to my second point: our precedent will force the government to charge § 2422(b) violations by the enticement, rather than the victim, which defies the reality of the crime Congress enacted § 2422(b) to prevent.

Congress amended § 2422(b) to its modern form in 1996 to combat the growing [*1283] trend of "cyberpredators interacting with minors online." Andriy Pazuniak, *A Better Way to Stop Online Predators: Encouraging A More Appealing Approach to § 2422(b)*, 40 SETON HALL L. REV. 691, 696 (2010). Congress was concerned that "[t]he anonymous nature of the on-line relationship allows users to misrepresent their age, gender, [**48] or interests. [So] [p]erfect strangers can reach into the home and befriend a child." H.R. REP. NO. 105-557, at 12 (1998), *reprinted in* 1998 U.S.C.C.A.N. 678, 680. In other words, Congress sought to prevent the harm and trauma of an inappropriate and illegal sexual relationship that a cyberpredator's single but ongoing enticement caused.

And that makes sense because, as a matter of reality, a victim's second and later sexual acts with the same predator are often further consequences of the initial (and continuing) enticement. After all, once a predator has, over days, weeks, months, or even years, changed a victim's mind so that the victim acquiesces in the first sexual act, the victim's reluctance to engage in sexual acts with the predator has been breached. So the victim may be more likely to acquiesce in additional sexual acts without further enticement. And in any case, even if further enticement occurs, it's often fair to say that the initial enticement was vital to convincing the victim's later sexual acts. So charging § 2422(b) violations by each sexual act enticed throughout that relationship ignores both reality and the core ill Congress sought to combat.

That, in turn, leads to some [**49] odd, and even harmful, results. For starters, it may be impossible to ascertain whether a victim's state of mind changed multiple times throughout their relationship with the defendant or whether the victim's entire relationship with the defendant derived from the initial enticement. But because the government must charge individual enticements separately, it will likely have to parse the victim's sexual activities by the event to effectively capture each time the victim's state of mind changed (or if it never did). And beyond the practical issues that may pose for a witness who may struggle to remember their thoughts and feelings at such a granular level, it will force the victim to relive before a grand jury and in open court harsher versions of the trauma they already endured.

Plus, the government will charge multiple times a crime that already carries a ten-year mandatory-minimum sentence with the possibility of up to life in prison. 18 U.S.C. § 2422(b). Congress vested judges with the discretion to determine the proper sentence within that range based on the totality of the facts before them. But forcing the government to charge by the enticement, rather than the victim, multiplies the statutory [**50] minimum; it eliminates the application of our usual sentencing practices that secure uniform and proportionate punishments; and, in some cases, it may even impose an effectively automatic life sentence.

This is all to say the Majority Opinion arrives at the correct disposition under our precedent, but I have deep concerns about the correctness of our precedent. Congress enacted § 2422(b) to prevent the instigation of illegal sexual relationships with minors online. It understood that a single enticement, inducement, persuasion, or coercion could instigate a prolonged sexual relationship that inflicts immense and lasting trauma on minor victims. And the government has routinely charged § 2422(b) violations on that understanding. But our duplicity jurisprudence—an anomaly compared to that of other circuits—will now force the United States to charge and try cases by the enticement, rather than the victim. And that departs from the reality [*1284] of the crime the defendant perpetrated, all while harming the victim in the process.

---

the jurors that they must unanimously agree as to at least one instance where Pulido persuaded, induced, enticed, or coerced I.G. to engage in illegal sexual activity during the course of their relationship, then we could have been sure that the jury unanimously agreed as to at least one completed § 2422(b) offense. Any duplicity would have been harmless, and we would have upheld the conviction.

End of Document

# Faretta v. California

422 U.S. 806 (1975)

Cited in Opening Brief at: 25, 34, and passim

Highlighted language appears at 422 U.S. at 835.

Caution
As of: September 14, 2026 12:17 PM Z

# Faretta v. Cal.

Supreme Court of the United States

Argued November 19, 1974 ; June 30, 1975

No. 73-5772

**Reporter**
422 U.S. 806 *; 95 S. Ct. 2525 **; 45 L. Ed. 2d 562 ***; 1975 U.S. LEXIS 83 ****

FARETTA *v.* CALIFORNIA

**Prior History:** [****1] CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT

## Syllabus

The Sixth Amendment as made applicable to the States by the Fourteenth guarantees that a defendant in a state criminal trial has an independent constitutional right of self-representation and that he may proceed to defend himself *without* counsel when he voluntarily and intelligently elects to do so; and in this case the state courts erred in forcing petitioner against his will to accept a state-appointed public defender and in denying his request to conduct his own defense. Pp. 812-836.

Vacated and remanded.

STEWART, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, WHITE, MARSHALL, and POWELL, JJ., joined. BURGER, C. J., filed a dissenting opinion, in which BLACKMUN and REHNQUIST, JJ., joined, *post,* p. 836. BLACKMUN, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post,* p. 846.

**Counsel:** *Jerome B. Falk, Jr.,* by appointment of the Court, 417 U.S. 906, argued the cause for petitioner. With him on the briefs was *Roger S. Hanson.*

*Howard* [****2] *J. Schwab,* Deputy Attorney General of California, argued the cause for respondent. With him on the brief were *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *S. Clark Moore,* Assistant Attorney General, and *Russell Iungerich* and *Donald J. Oeser,* Deputy Attorneys General. *

**Judges:** Burger, Douglas, Brennan, Stewart, White, Marshall, Blackmun, Powell, Rehnquist

**Opinion by:** STEWART

## Opinion

[*807] [***566] [**2527] MR. JUSTICE STEWART delivered the opinion of the Court.

[1][2A]The Sixth and Fourteenth Amendments of our Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right [****3] to the assistance of counsel before he can be validly convicted and punished by imprisonment. This clear constitutional rule has emerged from a series of cases decided here over the last 50 years. [1] The question before us now is whether a defendant in a state criminal trial has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so. Stated another way, the question is whether a State may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense. It is not an easy question, but we have concluded that a State may not constitutionally do so.

I

Anthony Faretta was charged [****4] with grand theft in

---

* *John E. Thorne, pro se,* filed a brief as *amicus curiae.*

[1] See *e.g., Powell* v. *Alabama,* 287 U.S. 45; *Johnson* v. *Zerbst,* 304 U.S. 458; *Betts* v. *Brady,* 316 U.S. 455; *Gideon* v. *Wainwright,* 372 U.S. 335; *Argersinger* v. *Hamlin,* 407 U.S. 25.

an information filed in the Superior Court of Los Angeles County, Cal. At the arraignment, the Superior Court Judge assigned to preside at the trial appointed the public defender to represent Faretta. Well before the date of trial, however, Faretta requested that he be permitted to represent himself. Questioning by the judge revealed that Faretta had once represented himself in a criminal prosecution, that he had a high school education, and that he did not want to be represented by the public defender because he believed that that office was "very loaded down with… a heavy case load." The judge [*808] responded that he believed Faretta was "making a mistake" and emphasized that in further proceedings Faretta would receive no special favors. [2] Nevertheless, after establishing that Faretta wanted to represent himself and did not want a [**2528] lawyer, the judge, in a "preliminary ruling," accepted Faretta's waiver of the assistance of counsel. The judge indicated, however, that he might reverse this ruling if it later appeared that Faretta was unable adequately to represent himself.

[****5] Several [***567] weeks thereafter, but still prior to trial, the judge *sua sponte* held a hearing to inquire into Faretta's ability to conduct his own defense, and questioned him specifically about both the hearsay rule and the state law governing the challenge of potential jurors. [3] [****6] After [**2529] consideration [*809] of Faretta's answers, and observation of his demeanor, the

[2] The judge informed Faretta:

"You are going to follow the procedure. You are going to have to ask the questions right. If there is an objection to the form of the question and it is properly taken, it is going to be sustained. We are going to treat you like a gentleman. We are going to respect you. We are going to give you every chance, but you are going to play with the same ground rules that anybody plays. And you don't know those ground rules. You wouldn't know those ground rules any more than any other lawyer will know those ground rules until he gets out and tries a lot of cases. And you haven't done it."

[3] The colloquy was as follows:

"THE COURT: In the Faretta matter, I brought you back down here to do some reconsideration as to whether or not you should continue to represent yourself.

"How have you been getting along on your research?

"THE DEFENDANT: Not bad, your Honor.

"Last night I put in the mail a 995 motion and it should be with the Clerk within the next day or two.

"THE COURT: Have you been preparing yourself for the intricacies of the trial of the matter?

"THE DEFENDANT: Well, your Honor, I was hoping that the case could possibly be disposed of on the 995.

"Mrs. Ayers informed me yesterday that it was the Court's policy to hear the pretrial motions at the time of trial. If possible, your Honor, I would like a date set as soon as the Court deems adequate after they receive the motion, sometime before trial.

"THE COURT: Let's see how you have been doing on your research.

"How many exceptions are there to the hearsay rule?

"THE DEFENDANT: Well, the hearsay rule would, I guess, be called the best evidence rule, your Honor. And there are several exceptions in case law, but in actual statutory law, I don't feel there is none.

"THE COURT: What are the challenges to the jury for cause?

"THE DEFENDANT: Well, there is twelve peremptory challenges.

"THE COURT: And how many for cause?

"THE DEFENDANT: Well, as many as the Court deems valid.

"THE COURT: And what are they? What are the grounds for challenging a juror for cause?

"THE DEFENDANT: Well, numerous grounds to challenge a witness -- I mean, a juror, your Honor, one being the juror is perhaps suffered, was a victim of the same type of offense, might be prejudiced toward the defendant. Any substantial ground that might make the juror prejudice[d] toward the defendant.

"THE COURT: Anything else?

"THE DEFENDANT: Well, a relative perhaps of the victim.

"THE COURT: Have you taken a look at that code section to see what it is?

"THE DEFENDANT: Challenge a juror?

"THE COURT: Yes.

"THE DEFENDANT: Yes, your Honor. I have done --

"THE COURT: What is the code section?

"THE DEFENDANT: On voir diring a jury, your Honor?

"THE COURT: Yes.

judge ruled that Faretta had not made an intelligent and knowing [***568] waiver of his right to the assistance [*810] of counsel, and also ruled that Faretta had no constitutional right to conduct his own defense. [4] The judge, accordingly, reversed his earlier ruling permitting self-representation and again appointed the public defender to represent Faretta. Faretta's subsequent request for leave to act as cocounsel was rejected, as were his efforts to make certain motions on his own behalf. [5] Throughout [*811] the subsequent trial, the judge required that Faretta's defense be conducted only through the appointed lawyer from the public defender's office. At the conclusion of the trial, the jury found Faretta guilty as charged, and the judge sentenced him to prison.

The California Court of Appeal, relying upon a then-recent California Supreme Court decision that had expressly decided the issue, [6] [****8] affirmed the trial judge's ruling that Faretta had no federal or state

---

"THE DEFENDANT: I am not aware of the section right offhand.

"THE COURT: What code is it in?

"THE DEFENDANT: Well, the research I have done on challenging would be in Witkins Jurisprudence.

"THE COURT: Have you looked at any of the codes to see where these various things are taken up?

"THE DEFENDANT: No, your Honor, I haven't.

"THE COURT: Have you looked in any of the California Codes with reference to trial procedure?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: What codes?

"THE DEFENDANT: I have done extensive research in the Penal Code, your Honor, and the Civil Code.

"THE COURT: If you have done extensive research into it, then tell me about it.

"THE DEFENDANT: On empaneling a jury, your Honor?

"THE COURT: Yes.

"THE DEFENDANT: Well, the District Attorney and the defendant, defense counsel, has both the right to 12 peremptory challenges of a jury. These 12 challenges are undisputable. Any reason that the defense or prosecution should feel that a juror would be inadequate to try the case or to rule on a case, they may then discharge that juror.

"But if there is a valid challenge due to grounds of prejudice or some other grounds, that these aren't considered in the 12 peremptory challenges. There are numerous and the defendant, the defense and the prosecution both have the right to make any inquiry to the jury as to their feelings toward the case."

[4] The judge concluded:

"[T]aking into consideration the recent case of People versus Sharp, where the defendant apparently does not have a constitutional right to represent himself, the Court finds that the ends of justice and requirements of due process require that the prior order permitting the defendant to represent himself in pro per should be and is hereby revoked. That privilege is terminated."

[5] Faretta also urged without success that he was entitled to counsel of his choice, and three times moved for the appointment of a lawyer other than the public defender. These motions, too, were denied.

[6] *People* v. *Sharp,* 7 Cal. 3d 448, 499 P. 2d 489.

When Sharp was tried the California Constitution expressly provided that the accused in a criminal prosecution had the right "to appear and defend, in person and with counsel." Cal. Const., Art. 1, § 13. In an earlier decision the California Supreme Court had held that this language meant that the accused had the right to appear by himself or with counsel. *People* v. *Mattson,* 51 Cal. 2d 777, 336 P. 2d 937. This view was rejected in *Sharp,* the California Supreme Court there holding that the defendant in a criminal prosecution has no right under the State or the Federal Constitution to represent himself at trial. See generally Y. Kamisar, W. LaFave & J. Israel, Modern Criminal Procedure 57-60 (4th ed. 1974); Note, 10 Calif. Western L. Rev. 196 (1973); Note, 24 Hastings L.J. 431 (1973); Comment, 64 J. Crim. L. 240 (1973).

Although immaterial to the court's decision, shortly before *Sharp* was decided on appeal the California Constitution had been amended to delete the right of self-representation from Art. 1, § 13, and to empower the legislature expressly "to require the defendant in a felony case to have the assistance of counsel." The new statutes on their face require counsel only in capital cases. See Cal. Penal Code §§ 686(2), 686.1, 859, 987 (1970 and Supp. 1975). In other than capital cases the accused retains by statutory terms a right "to appear and defend in person and with counsel." § 686 (2). However, this language tracks the old language of Art. 1, § 13, of the California Constitution; and in construing the constitutional language in *Sharp* to exclude any right of self-representation under former Art. 1, § 13, of the State Constitution, the California Supreme Court also stated that § 686 (2) does not provide any right of self-representation.

constitutional right [*812] to represent himself. [7] Accordingly, the appellate court affirmed Faretta's conviction. A petition for rehearing was denied without opinion, and the California Supreme Court denied review. [8] We [***569] granted [**2530] certiorari. 415 U.S. 975. [****7]

[****9] II

In the federal courts, the right of self-representation has been protected by statute since the beginnings of our Nation. Section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92, enacted by the First Congress and signed by President Washington one day before the Sixth Amendment [*813] was proposed, provided that "in all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of… counsel…." The right is currently codified in 28 U.S.C. § 1654.

With few exceptions, each of the several States also accords a defendant the right to represent himself in any criminal case. [9] [****10] The Constitutions of 36 States explicitly confer that right. [10] [****11] Moreover, many state courts have [*814] expressed the view that the right is also supported by the Constitution of the United States. [11]

This [***570] Court has more than once indicated the same view. In *Adams* v. *United States ex rel. McCann,* 317 U.S. 269, 279, the Court recognized that the Sixth Amendment right to the assistance of counsel implicitly

---

[7] The Court of Appeal also held that the trial court had not "abused its discretion in concluding that Faretta had not made a knowing and intelligent waiver of his right to be represented by counsel," since "Faretta did not appear aware of the possible consequences of waiving the opportunity for skilled and experienced representation at trial."

[8] The California courts' conclusion that Faretta had no constitutional right to represent himself was made in the context of the following not unusual rules of California criminal procedure: An indigent criminal defendant has no right to appointed counsel of his choice. See *Drumgo* v. *Superior Court,* 8 Cal. 3d 930, 506 P. 2d 1007; *People* v. *Miller,* 7 Cal. 3d 562, 574, 498 P. 2d 1089, 1097 *People* v. *Massie,* 66 Cal. 2d 899, 910, 428 P. 2d 869, 876-877; *People* v. *Taylor,* 259 Cal. App. 2d 448, 450-451, 66 Cal. Rptr. 514, 515-517. The appointed counsel manages the lawsuit and has the final say in all but a few matters of trial strategy. See, *e.g., People* v. *Williams,* 2 Cal. 3d 894, 905, 471 P. 2d 1008, 1015; *People* v. *Foster,* 67 Cal. 2d 604, 606-607, 432 P. 2d 976, 977-978; *People* v. *Monk,* 56 Cal. 2d 288, 299, 363 P. 2d 865, 870-871; see generally *Rhay* v. *Browder,* 342 F. 2d 345, 349 (CA9). A California conviction will not be reversed on grounds of ineffective assistance of counsel except in the extreme case where the quality of representation was so poor as to render the trial a "farce or a sham." *People* v. *Ibarra,* 60 Cal. 2d 460, 386 P. 2d 487; see *People* v. *Miller, Id.,* at 573, 498 P. 2d, at 1096-1097; *People* v. *Floyd,* 1 Cal. 3d 694, 709, 464 P. 2d 64, 73; *People* v. *Hill,* 70 Cal. 2d 678, 689, 452 P. 2d 329, 334; *People* v. *Reeves,* 64 Cal. 2d 766, 774, 415 P. 2d 35, 39.

[9] See, *e.g., Mackreth* v. *Wilson,* 31 Ala. App. 191, 15 So. 2d 112; *Cappetta* v. *State,* 204 So. 2d 913 (Fla. Dist. Ct. App.); *Lockard* v. *State,* 92 Idaho 813, 451 P. 2d 1014; *People* v. *Nelson,* 47 Ill. 2d 570, 268 N.E. 2d 2; *Blanton* v. *State,* 229 Ind. 701, 98 N.E. 2d 186; *Westberry* v. *State,* 254 A. 2d 44 (Me.); *Allen* v. *Commonwealth,* 324 Mass. 558, 87 N.E. 2d 192; *People* v. *Haddad,* 306 Mich. 556, 11 N.W. 2d 240; *State* v. *McGhee,* 184 Neb. 352, 167 N.W. 2d 765; *Zasada* v. *State,* 19 N.J. Super. 589, 89 A. 2d 45; *People* v. *McLaughlin,* 291 N. Y. 480, 53 N.E. 2d 356; *State* v. *Pritchard,* 227 N.C. 168, 41 S.E. 2d 287; *State* v. *Hollman,* 232 S.C. 489, 102 S.E. 2d 873; *State* v. *Thomlinson,* 78 S.D. 235, 100 N.W. 2d 121; *State* v. *Penderville,* 2 Utah 2d 281, 272 P. 2d 195; *State* v. *Woodall,* 5 Wash. App. 901, 491 P. 2d 680. See generally Annot., 77 A.L.R. 2d 1233 (1961); 5 R. Anderson, Wharton's Criminal Law and Procedure § 2016 (1957).

[10] Some States grant the accused the right to be heard, or to defend, in person *and* by counsel: Ariz. Const., Art. 2, § 24; Ark. Const., Art. 2, § 10; Colo. Const., Art. 2, § 16; Conn. Const., Art. 1, § 8; Del. Const., Art. 1, § 7; Idaho Const., Art. 1, § 13; Ill. Const., Art. 1, § 8; Ind. Const., Art. 1, § 13; Ky. Const. Bill of Rights, § 11; Mo. Const., Art. 1, § 18 (a); Mont. Const., Art. 3, § 16; Nev. Const., Art. 1, § 8; N.H. Const., pt. 1, Art. 15; N.M. Const., Art. 2, § 14; N. Y. Const., Art. 1, § 6; N.D. Const., Art. 1, § 13; Ohio Const., Art. 1, § 10; Okla. Const., Art. 2, § 20; Ore. Const., Art. 1, § 11; Pa. Const., Art. 1, § 9; S.D. Const., Art. 6, § 7; Tenn. Const., art. 1, § 9; Utah Const., Art. 1, § 12; Vt. Const., c. 1, Art. 10; Wis. Const., Art. 1, § 7; see La. Const., Art. 1, § 9.

Others grant the right to defend in person *or* by counsel: Kan. Const. Bill of Rights, § 10; Mass. Const., pt. 1, Art. 12; Neb. const., Art. 1, § 11; Wash. Const., Art. 1, § 22.

Still others provide the accused the right to defend either by himself, by counsel, or both: Ala. Const., Art. 1, § 6; Fla. Const., Art. 1, § 16; Me. Const., Art. 1, § 6; Miss. Const., Art. 3, § 26; S.C. Const., Art. 1, § 14; Tex. Const., Art. 1, § 10.

[11] See, *e.g., Lockard* v. *State, supra; People* v. *Nelson, supra; Blanton* v. *State, supra; Zasada* v. *State, supra; People* v. *McLaughlin, supra; State* v. *Mems,* 281 N.C. 658, 190 S.E. 2d 164; *State* v. *Verna,* 9 Ore. App. 620, 498 P. 2d 793.

embodies a "correlative right to dispense with a lawyer's help." The [**2531] defendant in that case, indicted for federal mail fraud violations, insisted on conducting his own defense without benefit of counsel. He also requested a bench trial and signed a waiver of his right to trial by jury. The prosecution consented to the waiver of a jury, and the waiver was accepted by the court. [****12] The defendant was convicted, but the Court of Appeals reversed the conviction on the ground that a person accused of a felony could not competently waive his right to trial by jury except upon the advice of a lawyer. This Court reversed and reinstated the conviction, holding that "an accused, in the exercise of a free and intelligent choice, and with the considered approval of the court, may waive trial by jury, and so likewise may he competently and intelligently waive his Constitutional right to assistance of counsel." *Id.,* at 275.

The *Adams* case does not, of course, necessarily resolve the issue before us. It held only that "the Constitution [*815] does not force a lawyer upon a defendant." *Id.,* at 279. [12] Whether the Constitution forbids a State from forcing a lawyer upon a defendant is a different question. But the Court in *Adams* did recognize, albeit in dictum, an affirmative right of self-representation:

> "The right to assistance of counsel [****13] and the *correlative right to dispense with a lawyer's help* are not legal formalisms. They rest on considerations that go to the substance of an accused's position before the law....
>
> "... What were contrived as protections for the accused should not be turned into fetters.... To deny an accused a choice of procedure in circumstances in which he, though a layman, is as capable as any lawyer of making an intelligent choice, is to impair the worth of great Constitutional safeguards by treating them as empty verbalisms.
>
> "... When the administration of the criminal law... is hedged about as it is by the Constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of these safeguards... is to imprison a man in his privileges and call it the Constitution." *Id.,* at 279-280 (emphasis added).

[****14] In other settings as well, the Court has indicated that [*816] a defendant has a [***571] constitutionally protected right to represent himself in a criminal trial. For example, in *Snyder* v. *Massachusetts,* 291 U.S. 97, the Court held that the Confrontation Clause of the Sixth Amendment gives the accused a right to be present at all stages of the proceedings where fundamental fairness might be thwarted by his absence. This right to "presence" was based upon the premise that the "defense may be made easier if the accused is permitted to be present at the examination of jurors or the summing up of counsel, *for it will be in his power,* if present, to give advice or suggestion or *even to supersede his lawyers altogether and conduct the trial himself." Id.,* at 106 (emphasis added). And in *Price* v. *Johnston,* 334 U.S. 266, the Court, in holding that a convicted person had no absolute right to argue his own appeal, said this holding was in "sharp contrast" to his "recognized privilege [**2532] of conducting his own defense at the trial." *Id.,* at 285.

The United States Courts of Appeals [****15] have repeatedly held that the right of self-representation is protected by the Bill of Rights. In *United States* v. *Plattner,* 330 F. 2d 271, the Court of Appeals for the Second Circuit emphasized that the Sixth Amendment grants the accused the rights of confrontation, of compulsory process for witnesses in his favor, and of assistance of counsel as minimum procedural requirements in federal criminal prosecutions. The right to the assistance of counsel, the court concluded, was intended to supplement the other rights of the defendant, and not to impair "the absolute and primary right to conduct one's own defense *in propria persona." Id.,* at 274. The court found support for its decision in the language of the 1789 federal statute; in the statutes and rules governing criminal procedure, see 28 U.S.C. § 1654, and Fed. Rule Crim. Proc. 44; in the many state constitutions that expressly guarantee self-representation; [*817] and in this Court's recognition of the right in *Adams* and *Price.* On these grounds, the

---

[12] The holding of *Adams* was reaffirmed in a different context in *Carter* v. *Illinois,* 329 U.S. 173, 174-175, where the Court again adverted to the right of self-representation:

"Neither the historic conception of Due Process nor the vitality it derives from progressive standards of justice denies a person *the right to defend himself* or to confess guilt. Under appropriate circumstances the Constitution requires that counsel be tendered; it does not require that under all circumstances counsel be forced upon a defendant." (Emphasis added.) See also *Moore* v. *Michigan,* 355 U.S. 155, 161.

Court of Appeals held that implicit in the Fifth Amendment's guarantee of due process of law, and [****16] implicit also in the Sixth Amendment's guarantee of a right to the assistance of counsel, is "the right of the accused personally to manage and conduct his own defense in a criminal case." 330 F. 2d, at 274. See also *United States ex rel. Maldonado* v. *Denno,* 348 F. 2d 12, 15 (CA2); *MacKenna* v. *Ellis,* 263 F. 2d 35, 41 (CA5); *United States* v. *Sternman,* 415 F. 2d 1165, 1169-1170 (CA6); *Lowe* v. *United States,* 418 F. 2d 100, 103 (CA7); *United States* v. *Warner,* 428 F. 2d 730, 733 (CA8); *Haslam* v. *United States,* 431 F. 2d 362, 365 (CA9); compare *United States* v. *Dougherty,* 154 U.S. App. D.C. 76, 86, 473 F. 2d 1113, 1123 (intimating right is constitutional but finding it unnecessary to reach issue) with *Brown* v. *United States,* 105 U.S. App. D.C. 77, 79-80, 264 F. 2d 363, 365-366 (plurality opinion stating right is no more than statutory in nature).

This Court's past recognition of the right of self-representation, the federal-court authority holding the right to be of constitutional dimension, [****17] and the state constitutions pointing to the right's fundamental nature form a consensus not easily ignored. "[T]he mere fact that a path is a [***572] beaten one," Mr. Justice Jackson once observed, "is a persuasive reason for following it." [13] We confront here a nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so.

[*818] III

[2B]This consensus is soundly premised. The right of self-representation finds support in the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged.

A

[3] [4] [****18] [5]The Sixth Amendment includes a compact statement of the rights necessary to a full defense:

> "In all criminal prosecutions, the accused shall enjoy the right… to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

Because these rights are basic to our adversary system of criminal justice, they are part of the "due process of law" that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States. [14] The rights to notice, [**2533] confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice -- through the calling and interrogation of favorable witnesses, the cross-examination of [****19] adverse witnesses, and the orderly introduction of evidence. In short, the Amendment constitutionalizes the right in an adversary criminal trial to make a defense as we know it. See *California* v. *Green,* 399 U.S. 149, 176 (Harlan, J., concurring).

[*819] [2C] [6] [7A] [8A]The Sixth Amendment does not provide merely that [****20] a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining witnesses in his favor." Although not stated in the Amendment in so many words, the right to self-representation -- to make one's own defense personally -- is thus necessarily implied by the structure of the Amendment. [15] The right to defend [*820] [***573] is

[13] Jackson, Full Faith and Credit -- The Lawyer's Clause of the Constitution, 45 Col. L. Rev. 1, 26 (1945).

[14] *Gideon* v. *Wainwright,* 372 U.S. 335, and *Argersinger* v. *Hamlin,* 407 U.S. 25 (right to counsel); *Pointer* v. *Texas,* 380 U.S. 400 (right of confrontation); *Washington* v. *Texas,* 388 U.S. 14 (right to compulsory process). See also *In re Oliver,* 333 U.S. 257, 273.

[15] This Court has often recognized the constitutional stature of rights that, though not literally expressed in the document, are essential to due process of law in a fair adversary process. It is now accepted, for example, that an accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings, *Snyder* v. *Massachusetts,* 291 U.S. 97; to testify on his own behalf, see *Harris* v. *New York,* 401 U.S. 222, 225; *Brooks* v. *Tennessee,* 406 U.S. 605, 612; cf. *Ferguson* v. *Georgia,* 365 U.S. 570; and to be convicted only if his guilt is proved beyond a reasonable doubt, *In re Winship,* 397 U.S. 358; *Mullaney* v. *Wilbur,* 421 U.S. 684.

The inference of rights is not, of course, a mechanical

given directly to the accused; for it is he who suffers the consequences if the defense fails.

[8B] [7B]

[****21] [9] [10]The counsel provision supplements this design. It speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant -- not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an [**2534] assistant, but a master; [16] and the right to make a defense is stripped of the personal character upon which the Amendment insists. It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. Cf. *Henry* v. *Mississippi,* 379 U.S. 443, 451; *Brookhart* v. *Janis,* 384 U.S. 1, 7-8; [****22] *Fay* v. *Noia,* 372 U.S. 391, 439. This allocation can only be justified, however, by the defendant's consent, at the [*821] outset, to accept counsel as his representative. An unwanted counsel "represents" the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed [***574] him by the Constitution, for, in a very real sense, it is not *his* defense.

[****23] B

The Sixth Amendment, when naturally read, thus implies a right of self-representation. This reading is reinforced by the Amendment's roots in English legal history.

In the long history of British criminal jurisprudence, there was only one tribunal that ever adopted a practice of forcing counsel upon an unwilling defendant in a criminal proceeding. The tribunal was the Star Chamber. That curious institution, which flourished in the late 16th and early 17th centuries, was of mixed executive and judicial character, and characteristically departed from common-law traditions. For those reasons, and because it specialized in trying "political" offenses, the Star Chamber has for centuries symbolized disregard of basic individual rights. [17] The Star Chamber not merely allowed but required defendants to have counsel. The defendant's answer to an indictment was not accepted unless it was signed by counsel. When counsel refused to sign the answer, for whatever reason, the defendant was [*822] considered to have confessed. [18] [***575] Stephen commented on

---

exercise. In *Singer* v. *United States,* 380 U.S. 24, the Court held that an accused has no right to a bench trial, despite his capacity to waive his right to a jury trial. In so holding, the Court stated that "[the] ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right." *Id.,* at 34-35. But that statement was made only *after* the Court had concluded that the Constitution does not affirmatively protect any right to be tried by a judge. Recognizing that an implied right must arise independently from the design and history of the constitutional text, the Court searched for, but could not find, any "indication that the colonists considered the ability to waive a jury trial to be of equal importance to the right to demand one." *Id.,* at 26. Instead, the Court could locate only "isolated instances" of a right to trial by judge, and concluded that these were "clear departures from the common law." *Ibid.*

We follow the approach of *Singer* here. Our concern is with an *independent* right of self-representation. We do not suggest that this right arises mechanically from a defendant's power to waive the right to the assistance of counsel. See *supra,* at 814-815. On the contrary, the right must be independently found in the structure and history of the constitutional text.

[16] Such a result would sever the concept of counsel from its historic roots. The first lawyers were personal friends of the litigant, brought into court by him so that he might "take 'counsel' with them" before pleading. 1 F. Pollock & F. Maitland, The History of English Law 211 (2d ed. 1909). Similarly, the first "attorneys" were personal agents, often lacking any professional training, who were appointed by those litigants who had secured royal permission to carry on their affairs through a representative, rather than personally. *Id.,* at 212-213.

[17] "The court of star chamber was an efficient, somewhat arbitrary arm of royal power. It was at the height of its career in the days of the Tudor and Stuart kings. Star chamber stood for swiftness and power; it was not a competitor of the common law so much as a limitation on it - a reminder that high state policy could not safely be entrusted to a system so chancy as English law…." L. Friedman, A History of American Law 23 (1973). See generally 5 W. Holdsworth, A History of English Law 155-214 (1927).

[18] "The proceedings before the Star Chamber began by a Bill 'engrossed in parchment and filed with the clerk of the court.' It must, like the other pleadings, be signed by counsel…. However, counsel were obliged to be careful what they signed.

this procedure: "There is something specially repugnant to justice in using rules of practice in such a manner as [*823] [****24] to debar a prisoner from defending [**2535] himself, especially when the professed object of the rules so used is to provide for his defence." 1 J. Stephen, A History of the Criminal Law of England 341-342 (1883). The Star Chamber was swept away in 1641 by the revolutionary fervor of the Long Parliament. The notion of obligatory counsel disappeared with it.

[****25] By the common law of that time, it was not representation by counsel but self-representation that was the practice in prosecutions for serious crime. At one time, every litigant was required to "appear before the court in his own person and conduct his own cause in his own words." [19] [****26] While a right to counsel developed early in civil cases and in cases of misdemeanor, a prohibition against the assistance of counsel continued for centuries in prosecutions for felony or treason. [20] Thus, in the 16th and 17th centuries the accused felon or traitor stood alone, with neither counsel nor the benefit of other rights - to notice, confrontation, and compulsory process - that we now associate with a genuinely fair adversary proceeding. The trial was merely a "long argument between the prisoner and the [*824] counsel for the Crown.', [21] As harsh as this now seems, at least "the prisoner was allowed to make what statements he liked.... Obviously this public oral trial presented [**2536] many more opportunities to a prisoner than the secret enquiry

---

If they put their hands to merely frivolous pleas, or otherwise misbehaved themselves in the conduct of their cases, they were liable to rebuke, suspension, a fine, or imprisonment." Holdsworth, *supra,* n. 17, at 178-179. Counsel, therefore, had to be cautious that any pleadings they signed would not unduly offend the Crown. See 1 J. Stephen, A History of the Criminal Law of England 340-341 (1883).

This presented not merely a hypothetical risk for the accused. Stephen gives the following account of a criminal libel trial in the Star Chamber:

"In 1632 William Prynne was informed against for his book called *Histrio Mastix.* Prynne's answer was, amongst other things, that his book had been licensed, and one of the counsel, Mr. Holbourn, apologized, not without good cause, for his style.... His trial was, like the other Star Chamber proceedings, perfectly decent and quiet, but the sentence can be described only as monstrous. He was sentenced to be disbarred and deprived of his university degrees; to stand twice in the pillory, and to have one ear cut off each time; to be fined # 5,000; and to be perpetually imprisoned, without books, pen, ink, or paper....

"Five years after this, in 1637, Prynne, Bastwick, and Burton, were tried for libel, and were all sentenced to the same punishment as Prynne had received in 1632, Prynne being branded on the cheeks instead of losing his ears.

"The procedure in this case appears to me to have been as harsh as the sentence was severe, though I do not think it has been so much noticed.... Star Chamber defendants were not only allowed counsel, but were required to get their answers signed by counsel. The effect of this rule, and probably its object was, that no defence could be put before the Court which counsel would not take the responsibility of signing -- a responsibility which, at that time, was extremely serious. If counsel would not sign the defendant's answer he was taken to have confessed the information. Prynne's answer was of such a character that one of the counsel assigned to him refused to sign it at all, and the other did not sign it till after the proper time. Bastwick could get no one to sign his answer. Burton's answer was signed by counsel, but was set aside as impertinent. Upon the whole, the case was taken to be admitted by all the three, and judgment was passed on them accordingly...." Stephen, *supra,* at 340-341.

That Prynne's defense was foreclosed by the refusal of assigned counsel to endorse his answer is all the more shocking when it is realized that Prynne was himself a lawyer. I. Brant, The Bill of Rights 106 (1965). On the operation of the Star Chamber generally, see Barnes, Star Chamber Mythology, 5 Am. J. Legal Hist. 1-11 (1961), and Barnes, Due Process and Slow Process in the Late Elizabethan-Early Stuart Star Chamber, 6 Am. J. Legal Hist. 221-249, 315-346 (1962).

---

[19] Pollock & Maitland, *supra,* n. 16, at 211.

[20] *Ibid.* See also Stephen, *supra,* n. 18, at 341.

[21] *Id* ., at 326.

The trial would begin with accusations by counsel for the Crown. The prisoner usually asked, and was granted, the privilege of answering separately each matter alleged against him:

"[T]he trial became a series of excited altercations between the prisoner and the different counsel opposed to him. Every statement of counsel operated as a question to the prisoner,... the prisoner either admitting or denying or explaining what was alleged against him. The result was that... the examination of the prisoner... was the very essence of the trial, and his answers regulated the production of the evidence.... As the argument proceeded the counsel [for the Crown] would frequently allege matters which the prisoner denied and called upon them to prove. The proof was usually given by reading depositions, confessions of accomplices, letters, and the like.... When the matter had been fully inquired into... the presiding judge 'repeated' or summed up to the jury the matters alleged against the prisoner, and the answers given by him; and the jury gave their verdict." *Id.,* at 325-326.

based on written depositions, which, on the continent, had taken the place of a trial…." [22]

[****27] With the Treason Act of 1695, there began a long and important era of reform in English criminal procedure. The 1695 statute granted to the accused traitor the rights to a copy of the indictment, to have his witnesses testify under oath, and "to [***576] make… full Defence, by Counsel learned in the Law." [23] It also provided for court appointment of counsel, *but only if the accused so desired.* [24] [****29] [*825] Thus, as new rights developed, the accused retained his established right "to make what statements he liked." [25] The right to counsel was viewed as guaranteeing a choice between representation by counsel and the traditional practice of self-representation. The ban on counsel in felony cases, which had been substantially eroded in the courts, [26] was finally eliminated by statute in 1836. [27] In more recent years, Parliament has provided for court appointment of counsel in serious criminal cases, but only at the accused's request. [28] At no point in this process of reform in England was counsel ever forced upon the [*826] defendant. The common-law rule, succinctly stated in *R.* v. *Woodward,* [1944] K.B. 118, 119, [1944] 1 All E.R. 159, 160, [****28] has evidently always been that "no person charged with a criminal offence can have counsel forced upon him against his will." [29] See 3 Halsbury's [**2537] Laws of England p1141, pp. 624-625 (4th ed. 1973); *R.* v. *Maybury,* 11 L.T.R. (n.s.) 566 (Q.B. 1865).

[****30] C

In the American Colonies the insistence [***577] upon a right of self-representation was, if anything, more fervent than in England.

The colonists brought with them an appreciation of the virtues of self-reliance and a traditional distrust of lawyers. When the Colonies were first settled, "the lawyer was synonymous with the cringing Attorneys-General and Solicitors-General of the Crown and the arbitrary Justices of the King's Court, all bent on the conviction of those who opposed the King's prerogatives, and twisting the law to secure convictions." [30] [****31] This prejudice gained strength in the Colonies where "distrust [*827] of lawyers became an institution." [31] Several Colonies prohibited

---

[22] Holdsworth, *supra,* n. 17, at 195-196.

[23] 7 Will. 3, c. 3, § 1. The right to call witnesses under oath was extended to felony cases by statute in 1701. 1 Anne, Stat. 2, c. 9, § 3.

[24] The statute provided, in pertinent part, that the accused "shall be received and admitted to make his and their full Defence, by Counsel learned in the Law, and to make any Proof that he or they can produce by lawful Witness or Witnesses, who shall then be upon Oath, for his and their just Defence in that Behalf; and in case any Person or Persons so accused or indicted shall desire Counsel, the Court before whom such Person or Persons shall be tried, or some Judge of that Court, shall and is hereby authorized and required immediately, upon his or their Request, to assign to such Person and Persons such and so many Counsel, not exceeding Two, as the Person or Persons shall desire, to whom such Counsel shall have free Access at all seasonable Hours; any Law or Usage to the contrary notwithstanding."

[25] Holdsworth, *supra,* n. 17, at 195.

[26] In Mary Blandy's 1752 murder trial, for example, the court declared that counsel for the defendant could not only speak on points of law raised by the defense, but could also examine defense witnesses and cross-examine those of the Crown. 18 How. St. Tr. 1117. Later in that century judges often allowed counsel for the accused "to instruct him what questions to ask, or even to ask questions for him, with respect to matters of fact… [or] law." 4 W. Blackstone, Commentaries *355-356.

[27] 6 & 7 Will. 4, c. 114, § 1. The statute provided in pertinent part that the accused "shall be admitted, after the Close of the Case for the Prosecution, to make full Answer and Defence thereto by Counsel learned in the Law, or by Attorney in Courts where Attornies practise as Counsel."

[28] See, *e.g.,* Poor Prisoners' Defence Act, 1903, 3 Edw. 7, c. 38, § 1; Poor Prisoners' Defense Act, 1930, 20 & 21 Geo. 5, c. 32; Legal Aid and Advice Act, 1949, 12 & 13 Geo. 6, c. 51.

[29] Counsel had been appointed for the defendant Woodward but withdrew shortly before trial. When the trial court appointed a substitute counsel, the defendant objected: "I would rather not have legal aid. I would rather conduct the case myself." The trial court insisted, however, that the defendant proceed to trial with counsel, and a conviction resulted. On appeal, the Crown did not even attempt to deny a basic right of self-representation, but argued only that the right had been waived when the accused accepted the first counsel. The Court of Appeal rejected this argument: "The prisoner right at the beginning [of the trial] said that he wished to defend himself… and he was refused what we think was his right to make his own case to the jury instead of having it made for him by counsel." This, the court held, was an "injustice to the prisoner," and "although there was a good deal of evidence against the prisoner," the court quashed the conviction.

[30] C. Warren, A History of the American Bar 7 (1911).

[31] D. Boorstin, The Americans; The Colonial Experience 197

pleading for hire in the 17th century. [32] The prejudice persisted into the 18th century as "the lower classes came to identify lawyers with the upper class." [33] The years of Revolution and Confederation saw an upsurge of antilawyer sentiment, a "sudden revival, after the War of the Revolution, of the old dislike and distrust of lawyers as a class." [34] In the heat of these sentiments the Constitution was forged.

This is not to say that the Colonies were slow to recognize the value of counsel in criminal cases. Colonial judges soon departed from ancient English practice and allowed accused felons the aid of counsel for their defense. [35] [****33] At the same time, however, the basic right of [*828] self-representation was never questioned. We have found no instance where a colonial court required a defendant in a criminal case to accept as his representative an unwanted lawyer. Indeed, even where counsel was permitted, [****32] the general practice continued to be self-representation. [36]

The [***578] right of self-representation was guaranteed in many colonial charters and declarations of rights. These early [**2538] documents establish that the "right to counsel" meant to the colonists a right to choose between pleading through a lawyer and representing oneself. [37] [****34] After the [*829] Declaration of Independence, the right of self-representation, along with other rights basic to the making of a defense, entered the new state

(1958).

[32] For example, the Massachusetts Body of Liberties (1641) in Art. 26 provided:

"Every man that findeth himselfe unfit to plead his owne cause in any Court shall have Libertie to imploy any man against whom the Court doth not except, to helpe him, Provided he give him noe fee or reward for his paines…."

Pleading for hire was also prohibited in 17th century Virginia, Connecticut, and the Carolinas. Friedman, *supra,* n. 17, at 81.

[33] *Id.,* at 82.

[34] Warren, *supra,* n. 30, at 212.

[35] For example, Zephaniah Swift, in one of the first American colonial treatises on law, made clear that a right to counsel was recognized in Connecticut. He wrote:

"We have never admitted that cruel and illiberal principle of the common law of England, that when a man is on trial for his life, he shall be refused counsel, and denied those means of defence, which are allowed, when the most trifling pittance of property is in question. The flimsy pretence, that the court are to be counsel for the prisoner will only heighten our indignation at the practice: for it is apparent to the least consideration, that a court can never furnish a person accused of a crime with the advice, and assistance necessary to make his defence….

"Our ancestors, when they first enacted their laws respecting crimes, influenced by the illiberal principles which they had imbibed in their native country, denied counsel to prisoners to plead for them to any thing but points of law. It is manifest that there is as much necessity for counsel to investigate matters of fact, as points of law, if truth is to be discovered." 2 Z. Swift, A System of the Laws of the State of Connecticut 398-399 (1796).

Similarly, colonial Virginia at first based its court proceedings on English judicial customs, but "[b]y the middle of the eighteenth century the defendant was permitted advice of counsel if he could afford such services." H. Rankin, Criminal Trial Proceedings in the General Court of Colonial Virginia 67, 89 (1965).

[36] See, *e.g., Id* ., at 89-90.

[37] See, *e.g.,* the Massachusetts Body of Liberties, Art. 26 (1641), *supra,* n. 32.

Similarly, the Concessions and Agreements of West New Jersey, in 1677, provided, for all cases, civil and criminal, "that no person or persons shall be compelled to fee any attorney or councillor to plead his cause, but that all persons have free liberty to plead his own cause, if he please."

The Pennsylvania Frame of Government of 1682, perhaps "the most influential of the Colonial documents protecting individual rights," 1 B. Schwartz, The Bill of Rights: A Documentary History 130 (1971) (hereinafter Schwartz), provided:

"That, in all courts all persons of all persuasions may freely appear in their own way, and according to their own manner, and there personally plead their own cause themselves; or, if unable, by their friends…."

That provision was no doubt inspired by William Penn's belief that an accused should go free if he could personally persuade a jury that it would be unjust to convict him. In England, 12 years earlier, Penn, after preaching a sermon in the street, had been indicted and tried for disturbing the peace. Penn conceded that he was "unacquainted with the formality of the law," but requested that he be given a fair hearing and the "liberty of making my defence." The request was granted, Penn represented himself, and although the judges jailed him for contempt, the jury acquitted him of the charge. "The People's Ancient and Just Liberties Asserted, in the Trial of William Penn and William Mead, 1670," reproduced in 1 Schwartz 144, 147. See The Trial of William Penn, 6 How. St. Tr. 951 (1670), cited in *Illinois* v. *Allen,* 397 U.S. 337, 353 (opinion of DOUGLAS, J.).

constitutions in wholesale fashion. [38] [****35] The right to counsel was clearly thought to [*830] supplement the primary right of the accused to defend himself, [39] utilizing his personal [**2539] rights to notice, confrontation, and [***579] compulsory process. And when the Colonies or newly independent States provided by statute rather than by constitution for court appointment of counsel in criminal cases, they also meticulously preserved the right of the accused to defend himself personally. [40]

[****36] [*831] The recognition of the right of self-representation was not limited to the state lawmakers. As we have noted, § 35 of the Judiciary Act of 1789, signed one day before the Sixth Amendment was proposed, guaranteed in the federal courts the right of all parties to "plead and manage their own causes personally or by the assistance of… counsel." 1 Stat. 92. See 28 U.S.C. § 1654. At the time James Madison drafted the Sixth Amendment, some state constitutions guaranteed an accused the right to be heard "by himself" and by counsel; others provided that an accused was to be "allowed" counsel. [41] The various state proposals for the Bill of Rights had similar variations in terminology. [42] [*832] In each case,

---

[38] Article IX of the Pennsylvania Declaration of Rights in 1776 guaranteed "[t]hat in all prosecutions for criminal offences, a man hath a right to be heard by himself and his council…." The Vermont Declaration of Rights (Art. X) in 1777 protected the right of self-representation with virtually identical language. The Georgia Constitution (Art. LVIII) in 1777 declared that its provisions barring the unauthorized practice of law were "not intended to exclude any person from that inherent privilege of every *freeman,* the liberty to plead his own cause." In 1780 the Massachusetts Declaration of Rights, Art. XII, provided that the accused had a right to be heard "by himself, or his counsel at his election." The New Hampshire Bill of Rights (Art. XV) in 1783 affirmed the right of the accused "to be fully heard in his defence by himself, and counsel." In 1792 the Delaware Constitution (Art. I, § 7) preserved the right in language modeled after Art. IX of the Pennsylvania Declaration of Rights. Similarly, in 1798 Georgia included in its Constitution (Art. III, § 8) a provision that protected the right of the accused to defend "by himself or counsel, or both." Other state constitutions did not express in literal terms a right of self-representation, but those documents granted all defense rights to the accused personally and phrased the right of counsel in such fashion as to imply the existence of the antecedent liberty. See Del. Declaration of Rights, § 14 (1776) (right "to be allowed counsel"); Md. Declaration of Rights, Art. XIX (1776) (right "to be allowed counsel"); N.J. Const., Art. XVI (1776) (criminals to have "same privileges of… counsel, as their prosecutors"); N. Y. Const., Art. XXXIV (1777) ("shall be allowed counsel").

[39] The Founders believed that self-representation was a basic right of a free people. Underlying this belief was not only the antilawyer sentiment of the populace, but also the "natural law" thinking that characterized the Revolution's spokesmen. See P. Kauper, The Higher Law and the Rights of Man in a Revolutionary Society, a lecture in the American Enterprise Institute for Public Policy Research series on the American Revolution, Nov. 7, 1973, extracted in 18 U. of Mich. Law School Law Quadrangle Notes, No. 2, p. 9 (1974). For example, Thomas Paine, arguing in support of the 1776 Pennsylvania Declaration of Rights, said:

"Either party… has a natural right to plead his own cause; this right is consistent with safety, therefore it is retained; but the parties may not be able,… therefore the civil right of pleading by proxy, that is, by a council, is an appendage to the natural right [of self-representation]…." Thomas Paine on a Bill of Rights, 1777, reprinted in 1 Schwartz 316.

[40] Statutes providing for appointment of counsel on request of the accused were enacted by Delaware in 1719, 1 Laws of the State of Delaware, 1700-1797, p. 66 (Adams 1797); by Pennsylvania in 1718, 3 Stats. at Large of Pennsylvania 199 (Busch 1896); and by South Carolina in 1731, Laws of the Province of South Carolina 518-519 (Trott 1736). Appointment was also the practice in Connecticut in the latter part of the 18th century; appointment apparently was sometimes made even when the accused failed to request counsel, if he appeared in need of a lawyer, but there is no indication appointment was ever made over the objection of the accused. See Swift, *supra,* n. 35, at 392. Free-choice appointment remained the rule as the new Republic emerged. See the 1791 statute of New Hampshire, Laws of New Hampshire 247 (Melcher 1792), and the 1795 statute of New Jersey, § 2, Acts of the Nineteenth General Assembly of the State of New Jersey 1012.

[41] See counsel provisions in n. 38, *supra.*

[42] In ratifying the Constitution, three States urged that a right-to-counsel provision be added by way of amendment. Virginia and North Carolina proposed virtually identical packages of a defendant's rights, each including the provision that an accused be "allowed" counsel. 2 Schwartz 841, 967. The package proposed by New York provided that the accused "ought to… have… the assistance of Council for his defense." *Id.,* at 913. The idea of proposing amendments upon ratification had begun with the Pennsylvania dissenters from ratification, whose proposed package of a defendant's rights provided for the accused's "right… to be heard by himself and his counsel." *Id.,* at 664-665. It can be seen that Madison's precise formulation - "the right… to have the Assistance of Counsel for his defence" - varied in phrasing from each of the proposals. "The available debates on the various proposals throw no light on the significance or the interpretation which

however, the counsel provision was embedded in a package of defense rights granted personally to the accused. There is no indication that the differences in phrasing about "counsel" reflected any differences of principle about self-representation. No State or Colony had ever forced counsel upon an accused; no spokesman had ever suggested that such a practice would be tolerable, much less advisable. If anyone [***580] had thought that the [****37] Sixth Amendment, as drafted, failed to protect the long-respected right of self-representation, there would undoubtedly have been some debate or comment on the issue. But there was none.

[****38] In sum, there is no evidence that the colonists and the Framers ever doubted the right of self-representation, or imagined that this right might be considered inferior to the right of assistance of counsel. To the contrary, the colonists and the Framers, as well as their English ancestors, always conceived of the right to counsel as an "assistance" for the accused, to be used at his option, in defending himself. The Framers selected in the Sixth Amendment a form of [**2540] words that necessarily implies the right of self-representation. That conclusion is supported by centuries of consistent history.

IV

There can be no blinking the fact that the right of an accused to conduct his own defense seems to cut against the grain of this Court's decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel. See *Powell* v. *Alabama,* 287 U.S. 45; *Johnson* v. *Zerbst,* 304 U.S. 458; *Gideon* v. *Wainwright,* 372 U.S. 335; *Argersinger* v. *Hamlin,* 407 U.S. 25. For it is surely true that the basic thesis [****39] of those decisions is that the help of a lawyer is essential to assure [*833] the defendant a fair trial. [43] And a strong argument can surely be made that the whole thrust of those decisions must inevitably lead to the conclusion that a State may constitutionally impose a lawyer upon even an unwilling defendant.

[****40] [11A]But it is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want. The value of state-appointed counsel was not unappreciated by the Founders, [44] yet the notion of compulsory counsel was utterly foreign to them. And whatever else may be [***581] said of those who wrote the Bill of Rights, surely there can be no [*834] doubt that they understood the inestimable worth of free choice. [45]

[11B]

[****41] [12] [13A] [14A] [15A] [16A]It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to

---

Congress attributed to the right to counsel." W. Beaney, The Right to Counsel in American Courts 23 (1955).

[43] As stated by Mr. Justice Sutherland in *Powell* v. *Alabama,* 287 U.S. 45:

"Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect. If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." *Id.,* at 69.

[44] See n. 38, *supra,* for colonial appointment statutes that predate the Sixth Amendment. Federal law provided for appointment of counsel in capital cases at the request of the accused as early as 1790, 1 Stat. 118.

[45] See, *e.g.,* U.S. Const., Amdt. 1. Freedom of choice is not a stranger to the constitutional design of procedural protections for a defendant in a criminal proceeding. For example, "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so." *Harris* v. *New York,* 401 U.S. 222, 225. See *Brooks* v. *Tennessee,* 406 U.S. 605, 612; *Ferguson* v. *Georgia,* 365 U.S. 570. Cf. *Brown* v. *United States,* 356 U.S. 148.

believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend [**2541] is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It [****42] is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law." *Illinois* v. *Allen,* 397 U.S. 337, 350-351 (BRENNAN, J., concurring). [46]

[13B] [14B] [15B] [16B]

[****43] [*835] V

[17]When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. *Johnson* v. *Zerbst,* 304 U.S., at 464-465. Cf. *Von Moltke* v. *Gillies,* 332 U.S. 708, 723-724 (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to [***582] choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Adams* v. *United States ex rel. McCann,* 317 U.S., at 279.

[18A][19] [****44] Here, weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faretta that he thought it was a mistake not to accept [*836] the assistance of counsel, and that Faretta would be required to follow all the "ground rules" of trial procedure. [47] We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on *voir dire.* [48] For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.

[18B]In forcing Faretta, under [****45] these circumstances, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense. Accordingly, the judgment before us is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

**Dissent by:** BURGER; BLACKMUN

## Dissent

[**2542] MR. CHIEF JUSTICE **BURGER**, with whom MR. JUSTICE BLACKMUN and MR. JUSTICE REHNQUIST join, dissenting.

This case, like *Herring* v. *New York, post,* p. 853, announced today, is another example of the judicial tendency to constitutionalize what is thought "good." That effort fails on its own terms here, because there is nothing desirable or useful in permitting every accused person, even the most uneducated and inexperienced,

[46] We are told that many criminal defendants representing themselves may use the courtroom for deliberate disruption of their trials. But the right of self-representation has been recognized from our beginnings by federal law and by most of the States, and no such result has thereby occurred. Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. See *Illinois* v. *Allen,* 397 U.S. 337. Of course, a State may -- even over objection by the accused -- appoint a "standby counsel" to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. See *United States* v. *Dougherty,* 154 U.S. App. D.C. 76, 87-89, 473 F. 2d 1113, 1124-1126. The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law. Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of "effective assistance of counsel."

[47] See n. 2, *supra.*

[48] See n. 3, *supra.*

to insist upon conducting his own defense to criminal charges. [1] Moreover, there is no constitutional basis for [*837] the Court's holding, and it can only add to the problems of an already malfunctioning criminal justice system. I therefore dissent.

[****46] I

[***583] The most striking feature of the Court's opinion is that it devotes so little discussion to the matter which it concedes is the core of the decision, that is, discerning an independent basis in the Constitution for the supposed right to represent oneself in a criminal trial. [2] See *ante,* at 818-821, and n. 15. Its ultimate assertion that such a right is tucked between the lines of the Sixth Amendment is contradicted by the Amendment's language and its consistent judicial interpretation.

As the Court seems to recognize, *ante,* at 820, the conclusion that the rights guaranteed by the Sixth Amendment are "personal" to an accused reflects nothing more than the obvious fact that it is he who is on trial and therefore has need of a defense. [3] But neither that nearly [*838] [****47] trivial proposition nor the language of the Amendment, which speaks in uniformly mandatory terms, leads to the further conclusion that the right to counsel is merely supplementary and may be dispensed with at the whim of the accused. Rather, this Court's decisions have consistently included the right to counsel as an integral part of the bundle making up the larger "right to a defense as we know it." For example, in *In re Oliver,* 333 U.S. 257 (1948), the Court reversed a summary contempt conviction at the hands of a "one-man grand jury," and had this to say:

> "We… hold that failure to afford the petitioner a reasonable opportunity to defend himself against the charge of false and evasive swearing was a denial of due process of law. A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense - a right to his day in court - are basic in our system of jurisprudence; and these rights include, as a minimum, a right [**2543] to examine the witnesses against him, to offer testimony, and to be represented by counsel." *Id.,* at 273.

See also *Argersinger* v. *Hamlin,* 407 U.S. 25, 27-33 (1972); [****48] *Gideon* v. *Wainwright,* 372 U.S. 335, 344 (1963).

The reason for this hardly requires explanation. The fact of the matter is that in all but an extraordinarily small number of cases an accused will lose whatever defense he may have if he undertakes to conduct the trial himself. The Court's opinion in *Powell* v. *Alabama,* 287 U.S. 45 (1932), puts the point eloquently:

> [***584] "Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may [*839] be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. [****49] If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble

---

[1] Absent a statute giving a right to self-representation, I believe that trial courts should have discretion under the Constitution to insist upon representation by counsel if the interests of justice so require. However, I would note that the record does not support the Court's characterization of this case as one in which that occurred. Although he requested, and initially was granted, permission to proceed *pro se,* petitioner has expressed no dissatisfaction with the lawyer who represented him and has not alleged that his defense was impaired or that his lawyer refused to honor his suggestions regarding how the trial should be conducted. In other words, to use the Court's phrase, petitioner has never contended that *"his* defense" was not fully presented. Instances of overbearing or ineffective counsel can be dealt with without contriving broad constitutional rules of dubious validity.

[2] The Court deliberately, and in my view properly, declines to characterize this case as one in which the defendant was denied a fair trial. See *Herring* v. *New York, post,* at 871 (REHNQUIST, J., dissenting).

[3] The Court's attempt to derive support for its position from the fact that the Sixth Amendment speaks in terms of the "Assistance of Counsel" requires little comment. It is most curious to suggest that an accused who exercises his right to "assistance" has thereby impliedly consented to subject himself to a "master." *Ante,* at 820. And counsel's responsibility to his client and role in the litigation do not vary depending upon whether the accused would have preferred to represent himself.

intellect." *Id.,* at 69.

Obviously, these considerations do not vary depending upon whether the accused actively desires to be represented by counsel or wishes to proceed *pro se.* Nor is it accurate to suggest, as the Court seems to later in its opinion, that the quality of his representation at trial is a matter with which only the accused is legitimately concerned. See *ante,* [****50] at 834. Although we have adopted an adversary system of criminal justice, see *Gideon* v. *Wainwright, supra,* the prosecution is more than an ordinary litigant, and the trial judge is not simply an automaton who insures that technical rules are adhered to. Both are charged with the duty of insuring that justice, in the broadest sense of that term, is achieved in every criminal trial. See *Brady* v. *Maryland,* 373 U.S. 83, 87, and n. 2 (1963); *Berger* v. *United States,* 295 U.S. 78, 88 (1935). That goal is ill-served, and the integrity of and public confidence in the system are undermined, when an easy conviction is obtained due to the defendant's ill-advised decision to waive counsel. The damage thus inflicted is not mitigated by the lame explanation that the defendant simply availed himself of the "freedom" "to go to jail under his own banner…." *United States ex rel. Maldonado* [*840] v. *Denno,* 348 F. 2d 12, 15 (CA2 1965). The system of criminal justice should not be available as an instrument of self-destruction.

In short, both the "spirit and the logic" of the Sixth Amendment are that [****51] every person accused of crime shall receive the fullest possible defense; in the vast majority of cases this command can be honored only by means of the expressly guaranteed right to counsel, and the trial judge is in the best position to determine whether the accused is capable of conducting his defense. True freedom of choice and society's interest in seeing that justice is achieved can be vindicated only if the trial court retains discretion to reject any attempted waiver of counsel and insist that the accused be tried according to the Constitution. This discretion is as critical an element of basic fairness as a trial judge's discretion to decline to accept a plea of [**2544] guilty. See *Santobello* v. *New York,* 404 U.S. 257, 262 (1971).

[***585] II

The Court's attempt to support its result by collecting dicta from prior decisions is no more persuasive than its analysis of the Sixth Amendment. Considered in context, the cases upon which the Court relies to "beat its path" either lead it nowhere or point in precisely the opposite direction.

In *Adams* v. *United States ex rel. McCann,* 317 U.S. 269 (1942), and *Carter* v. *Illinois,* 329 U.S. 173 (1946), [****52] the defendants had competently waived counsel but later sought to renounce actions taken by them while proceeding *pro se.* In both cases this Court upheld the convictions, holding that neither an uncounseled waiver of jury trial nor an uncounseled guilty plea is inherently defective under the Constitution. The language which the Court so carefully excises from those opinions relates, not to an affirmative right of self-representation, but to [*841] the consequences of waiver. [4] In *Adams,* for example, Mr. Justice Frankfurter was careful to point out that his reference to a defendant's "correlative right to dispense with a lawyer's help" meant only that "[h]e may waive his Constitutional right to assistance of counsel…," 317 U.S., at 279. See *United States* v. *Warner,* 428 F. 2d 730, 733 (CA8 1970). But, as the Court recognizes, the power to *waive* a constitutional right does not carry with it the right to insist upon its opposite. *Singer* v. *United States,* 380 U.S. 24, 34-35 (1965).

[****53] Similarly, in *Carter* the Court's opinion observed that the Constitution "does not require that *under all circumstances* counsel be forced upon a defendant," citing *Adams.* 329 U.S., at 174-175 (emphasis added). I, for one, find this statement impossible to square with the Court's present holding that an accused is absolutely entitled to *dispense* with a lawyer's help under all conditions. Thus, although *Adams* and *Carter* support the Court's conclusion that a defendant who represents himself may not thereafter disaffirm his deliberate trial decisions, see *ante,* at 834-835, n. 46, they provide it no comfort regarding the primary issue in this case. [5]

---

[4] Indeed, the portion of the Court's quotation which warns against turning constitutional protections into "fetters" refers to the right to trial by jury, not the right to counsel. See *Adams* v. *United States ex rel. McCann,* 317 U.S. 269, 279 (1942). This Court has, of course, squarely held that there is no constitutional right to dispense with a jury. *Singer* v. *United States,* 380 U.S. 24 (1965).

[5] No more relevant is *Snyder* v. *Massachusetts,* 291 U.S. 97 (1934). The reference in that case to an accused's "power… to supersede his lawyers" simply helped explain why his defense might "be made easier" if he were "permitted to be present at the examination of jurors or the summing up of counsel…." *Id.,* at 106. Mr. Justice Cardozo's opinion for the Court made plain that this right was rooted in considerations of fundamental

[****54] [*842] Far more nearly in point is *Price* v. *Johnston,* 334 U.S. 266 [***586] (1948), where this Court held that, although the courts of appeals possess the power to command that a prisoner be produced to argue his own appeal, the exercise of that power is a matter of sound judicial discretion. An examination of the whole of the Court's reasoning on this point is instructive:

> "The discretionary nature of the power in question grows out of the fact that a prisoner has no absolute right to argue his own appeal or even to be present at the proceedings in an appellate court. The absence of that [**2545] right is in sharp contrast to his constitutional prerogative of being present in person at each significant stage of a felony prosecution, and to his recognized privilege of conducting his own defense at the trial. Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. Among those so limited is the otherwise unqualified right given by § 272 of the Judicial Code, 28 U.S.C. § 394 [now § 1654], to parties [****55] in all the courts of the United States to 'plead and manage their own causes personally.'" *Id.,* at 285-286 (citations omitted).

It barely requires emphasis that this passage contrasts the "constitutional prerogative" to be present at trial with the "recognized privilege" of self-representation, and strongly implies that the latter arises only from the federal statute. It is difficult to imagine a position less consistent with *Price* v. *Johnston* than that taken by the Court today.

[*843] The Court of Appeals cases relied upon by the Court are likewise dubious authority for its views. Only one of those cases, *United States* v. *Plattner,* 330 F. 2d 271 (CA2 1964), even attempted a reasoned analysis of the issue, and the decision in that case was largely based upon the misreading of *Adams* and *Price* which the Court perpetuates in its opinion today. See 330 F.2d at 275. In every other case cited *ante,* at 817, the Courts of Appeals assumed that the right of self-representation was constitutionally based but found that the right had not been violated and affirmed the conviction under review. It is highly [****56] questionable whether such holdings would even establish the law of the Circuits from which they came.

In short, what the Court represents as a well-traveled road is in reality a constitutional trail which it is blazing for the first time today, one that has not even been hinted at in our previous decisions. Far from an interpretation of the Sixth Amendment, it is a perversion of the provision to which we gave full meaning in *Gideon* v. *Wainwright* and *Argersinger* v. *Hamlin.*

III

Like MR. JUSTICE BLACKMUN, I hesitate to participate in the Court's attempt to use history to take it where legal analysis cannot. Piecing together shreds of English legal history and early state constitutional and statutory provisions, without a full elaboration of the context in which they occurred or any evidence that they were relied upon by the drafters of our Federal Constitution, creates more questions than it answers [***587] and hardly provides the firm foundation upon which the creation of new constitutional rights should rest. We are well reminded that this Court once employed an exhaustive analysis of English and colonial practices regarding the [*844] right to counsel [****57] to justify the conclusion that it was fundamental to a fair trial and, less than 10 years later, used essentially the same material to conclude that it was not. Compare *Powell* v. *Alabama,* 287 U.S., at 60-65, with *Betts* v. *Brady,* 316 U.S. 455, 465-471 (1942).

As if to illustrate this point, the single historical fact cited by the Court which would appear truly relevant to ascertaining the meaning of the Sixth Amendment proves too much. As the Court points out, *ante,* at 831, § 35 of the Judiciary Act of 1789 provided a statutory right to self-representation in federal criminal trials. The text of the Sixth Amendment, which expressly provides only for a right to counsel, was proposed the day after the Judiciary Act was signed. It can hardly be suggested that the Members of the Congress of 1789, then few in number, were unfamiliar with the Amendment's carefully structured language, which had been under discussion since the 1787 Constitutional Convention. And it would be [**2546] most remarkable to suggest, had the right to conduct one's own defense been considered so critical as to require constitutional protection, that it would [****58] have been left to implication. Rather, under traditional canons of construction, *inclusion* of the right in the Judiciary Act and its *omission* from the constitutional amendment drafted at the same time by many of the same men, supports the conclusion that the

---

fairness, and was to be distinguished from those conferred by the Confrontation Clause. See *id.,* at 107. The Court's present reliance on the *Snyder* dicta is therefore misplaced. See n. 2, *supra.*

omission was intentional.

There is no way to reconcile the idea that the Sixth Amendment impliedly guaranteed the right of an accused to conduct his own defense with the contemporaneous action of the Congress in passing a statute explicitly giving that right. If the Sixth Amendment created a right to self-representation it was unnecessary for Congress to enact any statute on the subject at all. [*845] In this case, therefore, history ought to lead judges to conclude that the Constitution leaves to the judgment of legislatures, and the flexible process of statutory amendment, the question whether criminal defendants should be permitted to conduct their trials *pro se.* See *Betts* v. Brady, *supra.* And the fact that we have not hinted at a contrary view for 185 years is surely entitled to some weight in the scales. [6] Cf. *Jackman* v. *Rosenbaum Co.,* 260 U.S. 22, 31 (1922). [****59]

IV

Society has the right to expect that, when courts find new rights implied in the Constitution, their potential effect upon the resources of our criminal justice system will be considered. However, such considerations are conspicuously absent from the Court's opinion in this case.

It hardly needs repeating that [***588] courts at all levels are already handicapped by the unsupplied demand for competent advocates, with the result that it often takes far longer to complete a given case than experienced counsel would require. If we were to assume that there will be widespread exercise of the newly discovered constitutional right to self-representation, it would almost certainly follow that there will be added congestion in the courts and that the quality of justice will suffer. Moreover, [****60] the Court blandly assumes that once an accused has elected to defend himself he will be bound by his choice and not be heard to complain of it later. *Ante,* at 834-835, n. 46. This assumption ignores the role of appellate review, for the reported cases are replete with instances of a convicted defendant being relieved of a [*846] deliberate decision even when made *with the advice of counsel.* See *Silber* v. *United States,* 370 U.S. 717 (1962). It is totally unrealistic, therefore, to suggest that an accused will always be held to the consequences of a decision to conduct his own defense. Unless, as may be the case, most persons accused of crime have more wit than to insist upon the dubious benefit that the Court confers today, we can expect that many expensive and good-faith prosecutions will be nullified on appeal for reasons that trial courts are now deprived of the power to prevent. [7]

[****61] MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

Today the Court holds that the Sixth Amendment guarantees to every defendant in a state criminal trial the right to proceed without counsel whenever he [**2547] elects to do so. I find no textual support for this conclusion in the language of the Sixth Amendment. I find the historical evidence relied upon by the Court to be unpersuasive, especially in light of the recent history of criminal procedure. Finally, I fear that the right to self-representation constitutionalized today frequently will cause procedural confusion without advancing any significant strategic interest of the defendant. I therefore dissent.

I

The starting point, of course, is the language of the Sixth Amendment:

> "In all criminal prosecutions, the accused shall [*847] enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process [****62] for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

It is self-evident that the Amendment [***589] makes no direct reference to self-representation. Indeed, the Court concedes that the right to self-representation is "not stated in the Amendment in so many words." *Ante,* at 819.

---

[6] The fact that Congress has retained a statutory right to self-representation suggests that it has also assumed that the Sixth Amendment does not guarantee such a right. See 28 U.S.C. § 1654.

[7] Some of the damage we can anticipate from a defendant's ill-advised insistence on conducting his own defense may be mitigated by appointing a qualified lawyer to sit in the case as the traditional "friend of the court." The Court does not foreclose this option. See *ante,* at 834-835, n. 46.

It could be argued that the right to assistance of counsel necessarily carries with it the right to waive assistance of counsel. The Court recognizes, however, *ante,* at 819-820, n. 15, that it has squarely rejected any mechanical interpretation of the Bill of Rights. Mr. Chief Justice Warren, speaking for a unanimous Court in *Singer* v. *United States,* 380 U.S. 24, 34-35 (1965), stated: "The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right."

Where then in the Sixth Amendment does one find this right to self-representation? According to the Court, it is "necessarily implied by the structure of the Amendment." *Ante,* at 819. The Court's chain of inferences is delicate and deserves scrutiny. The Court starts with the proposition that the Sixth Amendment [****63] is "a compact statement of the rights necessary to a full defense." *Ante,* at 818. From this proposition the Court concludes that the Sixth Amendment "constitutionalizes the right in an adversary criminal trial to make a defense as we know it." *Ibid.* Up to this point, at least as a general proposition, the Court's reasoning is unexceptionable. [*848] The Court, however, then concludes that because the specific rights in the Sixth Amendment are personal to the accused, the accused must have a right to exercise those rights personally. Stated somewhat more succinctly, the Court reasons that because the accused has a personal right to "a defense as we know it," he necessarily has a right to make that defense personally. I disagree. Although I believe the specific guarantees of the Sixth Amendment are personal to the accused, I do not agree that the Sixth Amendment guarantees any particular procedural method of asserting those rights. If an accused has enjoyed a speedy trial by an impartial jury in which he was informed of the nature of the accusation, confronted with the witnesses against him, afforded the power of compulsory process, and represented effectively by competent [****64] counsel, I do not see that the Sixth Amendment requires more.

The Court suggests that thrusting counsel upon the accused against his considered wish violates the logic of the Sixth Amendment because counsel is to be an assistant, not a master. The Court seeks to support its conclusion by historical analogy to the notorious procedures of the Star Chamber. The potential for exaggerated analogy, however, is markedly diminished when one recalls that petitioner is seeking an absolute right to [**2548] self-representation. This is not a case where defense counsel, against the wishes of the defendant or with inadequate consultation, has adopted a trial strategy that significantly affects one of the accused's constitutional rights. For such overbearing conduct by counsel, there is a remedy. *Brookhart* v. *Janis,* 384 U.S. 1 (1966); *Fay* v. *Noia,* 372 U.S. 391, 439 (1963). [***590] Nor is this a case where distrust, animosity, or other personal differences between the accused and his would-be counsel have rendered effective representation unlikely or impossible. [*849] See *Brown* v. *Craven,* 424 F.2d 1166, 1169-1170 (CA9 1970). [****65] See also *Anders* v. *California,* 386 U.S. 738 (1967). Nor is this even a case where a defendant has been forced, against his wishes to expend his personal resources to pay for counsel for his defense. See generally *Fuller* v. *Oregon,* 417 U.S. 40 (1974); *James* v. *Strange,* 407 U.S. 128 (1972). Instead, the Court holds that any defendant in any criminal proceeding may insist on representing himself regardless of how complex the trial is likely to be and regardless of how frivolous the defendant's motivations may be. I cannot agree that there is anything in the Due Process Clause or the Sixth Amendment that requires the States to subordinate the solemn business of conducting a criminal prosecution to the whimsical -- albeit voluntary -- caprice of every accused who wishes to use his trial as a vehicle for personal or political self-gratification.

The Court seems to suggest that so long as the accused is willing to pay the consequences of his folly, there is no reason for not allowing a defendant the right to self-representation. *Ante,* at 834. See also *United States ex rel. Maldonado* v. *Denno,* 348 F. 2d 12, 15 (CA2 1965) [****66] ("[E]ven in cases where the accused is harming himself by insisting on conducting his own defense, respect for individual autonomy requires that he be allowed to go to jail under his own banner if he so desires…"). That view ignores the established principle that the interest of the State in a criminal prosecution "is not that it shall win a case, but that justice shall be done." *Berger* v. *United States,* 295 U.S. 78, 88 (1935). See also *Singer* v. *United States,* 380 U.S., at 37. For my part, I do not believe that any amount of *pro se* pleading can cure the injury to society of an unjust result, but I do believe that a just result should prove to be an effective balm for almost any frustrated *pro se* defendant.

[*850] II

The Court argues that its conclusion is supported by the historical evidence on self-representation. It is true that self-representation was common, if not required, in 18th century English and American prosecutions. The Court

points with special emphasis to the guarantees of self-representation in colonial charters, early state constitutions, and § 35 of the first Judiciary Act as evidence contemporaneous [****67] with the Bill of Rights of widespread recognition of a right to self-representation.

I do not participate in the Court's reliance on the historical evidence. To begin with, the historical evidence seems to me to be inconclusive in revealing the original understanding of the language of the Sixth Amendment. At the time the Amendment was first proposed, both the right to self-representation and the right to assistance of counsel in federal prosecutions were guaranteed by statute. The Sixth Amendment expressly constitutionalized the right to assistance of counsel but remained conspicuously silent on [***591] any right of self-representation. The Court believes that this silence of the Sixth Amendment as to the latter right is evidence of the Framers' belief that the right was so obvious and fundamental that it did not need to be included "in so many words" in order to be [**2549] protected by the Amendment. I believe it is at least equally plausible to conclude that the Amendment's silence as to the right of self-representation indicates that the Framers simply did not have the subject in mind when they drafted the language.

The paucity of historical support for the Court's [****68] position becomes far more profound when one examines it against the background of two developments in the more recent history of criminal procedure. First, until the middle of the 19th century, the defendant in a criminal proceeding in this country was almost always disqualified [*851] from testifying as a witness because of his "interest" in the outcome. See generally *Ferguson* v. *Georgia,* 365 U.S. 570 (1961). Thus, the ability to defend "in person" was frequently the defendant's only chance to present his side of the case to the judge or jury. See, *e.g.,* *Wilson* v. *State,* 50 Tenn. 232 (1871). Such Draconian rules of evidence, of course, are now a relic of the past because virtually every State has passed a statute abrogating the common-law rule of disqualification. See *Ferguson* v. *Georgia,* 365 U.S., at 575-577, 596. With the abolition of the common-law disqualification, the right to appear "in person" as well as by counsel lost most, if not all, of its original importance. See Grano, The Right to Counsel: Collateral Issues Affecting Due Process, 54 Minn. L. Rev. 1175, 1192-1194 (1970).

The [****69] second historical development is this Court's elaboration of the right to counsel. The road the Court has traveled from *Powell* v. *Alabama,* 287 U.S. 45 (1932), to *Argersinger* v. *Hamlin,* 407 U.S. 25 (1972), need not be recounted here. For our purposes, it is sufficient to recall that from start to finish the development of the right to counsel has been based on the premise that representation by counsel is essential to ensure a fair trial. The Court concedes this and acknowledges that "a strong argument can surely be made that the whole thrust of those decisions must inevitably lead to the conclusion that a State may constitutionally impose a lawyer upon even an unwilling defendant." *Ante,* at 833. Nevertheless, the Court concludes that self-representation must be allowed despite the obvious dangers of unjust convictions in order to protect the individual defendant's right of free choice. As I have already indicated, I cannot agree to such a drastic curtailment of the interest of the State in seeing that justice is done in a real and objective sense.

[*852] III

In conclusion, I note briefly the procedural problems that, I suspect, [****70] today's decision will visit upon trial courts in the future. Although the Court indicates that a *pro se* defendant necessarily waives any claim he might otherwise make of ineffective assistance of counsel, *ante,* at 834-835, n. 46, the opinion leaves open a host of other procedural questions. Must every defendant [***592] be advised of his right to proceed *pro se?* If so, when must that notice be given? Since the right to assistance of counsel and the right to self-representation are mutually exclusive, how is the waiver of each right to be measured? If a defendant has elected to exercise his right to proceed *pro se,* does he still have a constitutional right to assistance of standby counsel? How soon in the criminal proceeding must a defendant decide between proceeding by counsel or *pro se?* Must he be allowed to switch in midtrial? May a violation of the right to self-representation ever be harmless error? Must the trial court treat the *pro se* defendant differently than it would professional counsel? I assume that many of these questions will be answered with finality in due course. Many of them, however, such as the standards of waiver and the treatment [****71] of the *pro se* defendant, will haunt the trial of every defendant who elects to exercise his right to self-representation. The procedural [**2550] problems spawned by an absolute right to self-representation will far outweigh whatever tactical advantage the defendant may feel he has gained by electing to represent himself.

If there is any truth to the old proverb that "one who is his own lawyer has a fool for a client," the Court by its

opinion today now bestows a *constitutional* right on one to make a fool of himself.

## References

21 Am Jur 2d, Criminal Law 310

USCS, Constitution, 6th and 14th Amendments

US L Ed Digest, Criminal Law 46, 46.3

ALR Digests, Criminal Law 110, 111

L Ed Index to Annos, Criminal Law

ALR Quick Index, Assistance of Counsel; Criminal Law

Federal Quick Index, Assistance of Counsel; Criminal Law

Annotation References:

Accused's right, under Federal Constitution, to be present at his trial. 25 L Ed 2d 931.

Federal constitutional right to confront witnesses. 23 L Ed 2d 853.

What provisions of the [****72] Federal Constitution's Bill of Rights are applicable to the states. 18 L Ed 2d 1388; 23 L Ed 2d 985.

Accused's right to counsel under the Federal Constitution . 93 L Ed 137; 2 L Ed 2d 1644; 9 L Ed 2d 1260; 18 L Ed 2d 1420.

Right of defendant in criminal case to conduct defense in person, or to participate with counsel. 77 ALR2d 1233.

---

End of Document

# Estelle v. Williams

425 U.S. 501 (1976)

Cited in Opening Brief at: 30

See Response, Part III.G. Highlighted language appears at 425 U.S. at 504–05 and 512–13.

Caution
As of: September 14, 2026 7:01 PM Z

# Estelle v. Williams

Supreme Court of the United States

Argued October 7, 1975. ; May 3, 1976

No. 74-676

**Reporter**

425 U.S. 501 *; 96 S. Ct. 1691 **; 48 L. Ed. 2d 126 ***; 1976 U.S. LEXIS 50 ****

ESTELLE, CORRECTIONS DIRECTOR *v.* WILLIAMS

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

## Syllabus

[****1] Respondent, who was charged with a criminal offense and held Sin custody awaiting trial, asked a jail officer on the morning of trial for his civilian clothes to wear at trial; no action was taken. During *voir dire* his counsel expressly referred to respondent's jail attire. At no time before or during the ensuing jury trial was the issue raised to the trial judge concerning the jail attire. Respondent, whose conviction was upheld on appeal, sought federal habeas corpus. The District Court denied relief but the Court of Appeals reversed. Though there was evidence that in the county where the trial occurred the majority of nonbailed defendants were tried in jail clothes, there was no evidence that such a practice was followed if timely objection was made to the trial judge; and the practice of the particular trial judge was to permit any accused who so desired to be tried in civilian garb. *Held:* Although the State cannot, consistent with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, the failure to make an objection to the court as to being tried in such clothes negates the presence of the compulsion [****2] necessary to establish a constitutional violation. Nothing in the record here warrants a conclusion that respondent was compelled to stand trial in jail garb or that there was sufficient reason to excuse the failure to raise the issue before trial. Pp. 503-513.I

500 F. 2d 206, reversed and remanded.

BURGER, C.J., delivered the opinion of the Court, in which STEWART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. POWELL, J., filed a concurring opinion, in which STEWART, J., joined, *post,* p. 513. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. 515. STEVENS, J., took no part in the consideration or decision of the case.

**Counsel:** *Dunklin Sullivan,* Assistant Attorney General of Texas, argued the cause for petitioner. With him on the brief were *John L. Hill,* Attorney General, *David M. Kendall,* First Assistant Attorney General, and *Joe B. Dibrell* and *Lonny F. Zwiener,* Assistant Attorneys General.

*Ben L.* [****3] *Aderholt,* by appointment of the Court, 421 U.S. 907, argued the cause and filed a brief for respondent. [REPORTER'S NOTE: *Mr. Aderholt* represented the respondent before this Court only. Cf. *post,* at 513-514, 514, and 523.]

**Judges:** BURGER, STEWART, WHITE, BLACKMUN, POWELL, REHNQUIST, BRENNAN, MARSHALL, STEVENS, took no part in the consideration or decision of the case.

**Opinion by:** BURGER

## Opinion

[*502] [***129] [**1692] MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

[1A]We granted certiorari in this case to determine whether an accused who is compelled to wear identifiable prison clothing at his trial by a jury is denied due process or equal protection of the laws.

In November 1970, respondent Williams was convicted in state court in Harris County, Tex., for assault with intent to commit murder with malice. The crime occurred during an altercation between respondent and

his former landlord on the latter's property. The evidence showed that respondent returned to the apartment complex where he had formerly resided to visit a female tenant. While there, respondent and his former landlord became involved in a quarrel. Heated words were exchanged, and a fight ensued. Respondent struck the landlord with a knife in the neck, chest, and abdomen, severely wounding him.

Unable to post bond, respondent was held in custody while awaiting [****4] trial. When he learned that he was to go on trial, respondent asked an officer at the jail for his civilian clothes. This request was denied. As a result, respondent appeared at trial in clothes that were distinctly marked as prison issue. Neither respondent nor his counsel raised an [***130] objection to the prison attire at any time.

[*503] A jury returned a verdict of guilty on the charge of assault with intent to murder with malice. The Texas Court of Criminal Appeals affirmed the conviction. *Williams* v. *State,* 477 S.W. 2d 24 (1972). Williams then sought release in the United States District Court on a petition for a writ of habeas corpus. Although holding that requiring a defendant to stand trial in prison garb was inherently unfair, the District Court denied relief on the ground that the error was harmless.

The Court of Appeals reversed on the basis of its own prior holding in *Hernandez* v. *Beto,* 443 F. 2d 634 (CA5), cert. denied, 404 U.S. 897 (1971). 500 F. 2d 206. The Fifth Circuit disagreed with the District Court solely on the issue of harmless error.

(1)

[2][3]The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. [****5] *Drope* v. *Missouri,* 420 U.S. 162, 172 (1975). The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice. Long ago this Court stated: S

"The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin* v. *United States,* 156 U.S. 432, 453 (1895).I

[**1693] [4]To implement the presumption, courts must be alert to factors that may undermine the fairness of the factfinding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364 (1970).

[*504] [5]The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. *Estes* v. *Texas,* 381 U.S. 532 (1965);*In re Murchison,* 349 [****6] U.S. 133 (1955).Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience.

The potential effects of presenting an accused before the jury in prison attire need not, however, be measured in the abstract. Courts have, with few exceptions, [1] determined that an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption so basic to the adversary system. *Gaito* v. *Brierley,* 485 F. 2d 86 (CA3 1973); *Hernandez* v. *Beto, supra;* [***131] *Brooks* v. *Texas,* 381 F. 2d 619 (CA5 1967); *Commonwealth* v. *Keeler,* 216 Pa. Super. 193, 264 A. 2d 407 (1970); *Miller* v. *State,* 249 Ark. 3, 457 S.W. 2d 848 (1970); *People* v. *Shaw,* 381 Mich. 467, 164 N.W. 2d 7 (1969); *People* v. *Zpata,* 220 Cal. App. 2d 903, 34 Cal. Rptr. 171 (1963), cert. denied, 377 U.S. 406 (1964); *Eaddy* v. *People,* 115 Colo. 488, 174 P. 2d 717 (1946). The American Bar Association's Standards for Criminal Justice also disapprove the practice. ABA Project on Standards for Criminal Justice, Trial by Jury § 4.1 (b), p. [****7] 91 (App. Draft 1968). This is a recognition that the constant reminder of the accused's condition implicit in such distinctive, [*505] identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that, not unlike placing a jury in the custody of deputy sheriffs

---

[1] None of the authorities relied on by petitioner expressly approves the practice. Several cases hold, however, that a showing of actual prejudice must be made by a defendant seeking to have his conviction overturned on this ground. *Hall* v. *Cox,* 324 F. Supp. 786 (WD Va. 1971); *McFalls* v. *Peyton,* 270 F. Supp. 577 (WD Va. 1967), aff'd, 401 F. 2d 890 (CA4 1968), cert. denied, 394 U.S. 951 (1969).

who were also witnesses for the prosecution, an unacceptable risk is presented of impermissible factors coming into play. *Turner* v. *Louisiana,* 379 U.S. 466, 473 (1965).

That such factors cannot always be avoided is manifest in *Illinois* v. *Allen,* [****8] 397 U.S. 337 (1970), where we expressly recognized that "the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant…," *id.,* at 344; yet the Court upheld the practice when necessary to control a contumacious defendant. For that reason, the Court authorized removal of a disruptive defendant from the courtroom or, alternatively, binding and gagging of the accused until he agrees to conduct himself properly in the courtroom.

[6]Unlike physical restraints, permitted under *Allen, supra,*compelling an accused to wear jail clothing furthers no essential state policy. That it may be more convenient for jail administrators, a factor quite unlike the substantial need to impose physical restraints upon contumacious defendants, [2] provides no justification for the practice. Indeed, the State of Texas asserts no interest whatever in maintaining this procedure.

[****9]

[**1694] [7]Similarly troubling is the fact that compelling the accused to stand trial in jail garb operates usually against only those who cannot post bail prior to trial. Persons who can secure release are not subjected to this condition. To impose the condition on one category of defendants, over objection, would be repugnant to the [*506] concept of equal justice embodied in the Fourteenth Amendment. *Griffin* v. *Illinois,* 351 U.S. 12 (1956).

(2)

The Fifth Circuit, in this as well as in prior decisions, has not purported to adopt a *per se* rule invalidating all convictions where a defendant had appeared in identifiable prison clothes. That court has held, for instance, that the harmless-error doctrine is applicable to this line of [***132] cases. 500 F. 2d, at 210-212. See also *Thomas* v. *Beto,* 474 F. 2d 981, cert. denied, 414 U.S. 871 (1973); *Hernandez* v. *Beto, supra,* at 637. Other courts are in accord. *Bentley* v. *Crist,* 469 F. 2d 854, 856 (CA9 1972); *Watt* v. *Page,* 452 F. 2d 1174, 1176-1177 (CA10), cert. denied, 405 U.S. 1070 (1972). In this case, the Court of Appeals quoted the language of Mr. Justice Douglas, speaking for [****10] the Court in *Harrington* v. *California,* 395 U.S. 250 (1969): S

"We held in *Chapman* v. *California* that 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' We said that… not all 'trial errors which violate the Constitution automatically call for reversal.'" *Id.,* at 251-252 (citations omitted).I

In *Chapman* v. *California,* 386 U.S. 18 (1967), the Court, speaking through Mr. Justice Black, held: S

"We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. Such a holding, as petitioners correctly point out, would require an automatic reversal of their convictions and make further discussion unnecessary. We decline to adopt any such rule. All 50 States have harmless-error statutes or rules, and the United [*507] States long ago through its Congress established for its courts the rule that judgments shall not be reversed for 'errors or defects which do not affect the substantial rights of the parties.'… We conclude that there may be some constitutional errors [****11] which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id.,* at 21-22 (citation and footnote omitted).I

In other situations, when, for example, the accused is being tried for an offense committed in confinement, or in an attempted escape, courts have refused to find error in the practice. In *United States ex rel. Stahl* v. *Henderson,* 472 F. 2d 556 (CA5), cert. denied, 411 U.S. 971 (1973), the Court of Appeals declined to overturn a conviction where the defendant, albeit tried in jail clothes, was charged with having murdered another inmate while confined in prison. "No prejudice can result from seeing that which is already known." 472 F. 2d, at 557. In the present case, the Court of Appeals concluded: S"A different result may be appropriate where the defendant is on trial for an offense allegedly committed while he was in prison, because the jury would learn of his incarceration in any event." 500 F. 2d, at 209 n. 5.I

[2] The contumacious defendant brings his plight upon himself and presents the court with a limited range of alternatives. Obviously, a defendant cannot be allowed to abort a trial and frustrate the process of justice by his own acts.

Contra: *People* v.*Roman,* 35 N.Y. 2d 978, 324 N.E. 2d 885 (1975).

Consequently, [****12] the courts have refused to embrace a mechanical rule vitiating any conviction, regardless of the circumstances, where the accused appeared before the jury in prison garb. Instead, they have recognized [***133] that the particular evil proscribed is [**1695] compelling a defendant, against his will, to be tried in jail attire. The [*508] reason for this judicial focus upon compulsion is simple; instances frequently arise where a defendant prefers to stand trial before his peers in prison garments. The cases show, for example, that it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury. *Anderson* v. *Watt,* 475 F. 2d 881, 882 (CA10 1973); *Watt* v. *Page, supra,* at 1176. Cf. *Garcia* v. *Beto,* 452 F. 2d 655, 656 (CA5 1971). This is apparently an accepted practice in Texas courts, *Barber* v. *State,* 477 S.W. 2d 868, 870 (Tex. Crim. App. 1972), including the court where respondent was tried.

[8A]Courts have therefore required an accused to object to being tried in jail garments, just as he must invoke or abandon other rights. [3] The Fifth Circuit has held: "A defendant may not remain silent [****13] and willingly go to trial in prison garb and thereafter claim error." *Hernandez* v. *Beto,* 443 F. 2d, at 637. The essential meaning of the [*509] Court of Appeals' decision in *Hernandez* has been described by that court as follows: S"We held [in *Hernandez]* that the defendant and his attorney had the burden to make known that the defendant desired to be tried in civilian clothes before the state could be accountable for his being tried in jail clothes…." *United States ex rel. Stahl* v. *Henderson,* 472 F.2d, at 557. [4]I

Similarly, the Ninth Circuit has indicated that the courts must determine whether an accused "was in fact compelled to wear prison clothing at his state court trial." *Bentley* v. *Crist,* 469 F. 2d, at 856. See also *Dennis* v. *Dees,* 278 F. Supp. 354, 359 [***134] (ED La. 1968), disapproved on other grounds, *United States ex rel. Stahl* v. *Henderson, supra,* at 557; *People* v. *Roman,* 35 N.Y. 2d, at 978-979, 324 N.E. 2d, at 885-886; *People* v. *Shaw,* 381 Mich. 467, 164 N.W. 2d 7 (1969).

[****14]

(3)

[9A]The record is clear that no objection was [****15] made to the [*510] trial judge concerning the jail attire either before or at any time during the trial. This omission plainly did not result from any lack of appreciation of the issue, for respondent had raised the question with the jail attendant prior to trial. [**1696] At trial, defense counsel expressly referred to respondent's attire during *voir dire.* The trial judge was thus informed that respondent's counsel was fully conscious of the

---

[3] We are not confronted with an alleged relinquishment of a fundamental right of the sort at issue in *Johnson* v. *Zerbst,* 304 U.S. 458 (1938). There, the Court understandably found it difficult to conceive of an accused making a knowing decision to forgo the fundamental right to the assistance of counsel, absent a showing of conscious surrender of a known right. The Court has not, however, engaged in this exacting analysis with respect to strategic and tactical decisions, even those with constitutional implications, by a counseled accused. See, *e.g., On Lee* v. *United States,* 343 U.S. 747, 749 n. 3 (1952). Cf. Fed. Rule Crim. Proc. 11.

[8B]The Second Circuit has noted in a different context:

"Federal courts, including the Supreme Court, have declined to notice [alleged] errors not objected to below even though such errors involve a criminal defendant's constitutional rights." *United States* v. *Indiviglio,* 352 F. 2d 276, 280 (1965), cert. denied, 383 U.S. 907 (1966).

The reason for this rule is clear: if the defendant has an objection, there is an obligation to call the matter to the court's attention so the trial judge will have an opportunity to remedy the situation.

[4] Significantly, in the *Henderson* case the Fifth Circuit interpreted *Hernandez* as requiring the accused to take affirmative steps to apprise the trial court of his desire to be tried in civilian clothes. The *Hernandez* court had simply found, under the circumstances presented there, that the defendant "had met his burden." 472 F. 2d, at 557. This interpretation is particularly meaningful since the author of the *Hernandez* opinion was a member of the panel in the subsequent decision in *Henderson.* Moreover, the court in *Hernandez* indicated:

"We do not paint with a broad brush these types of cases. Each case must be considered in its own factual context." 443 F. 2d, at 637.

Moreover, there is nothing in the record in *Hernandez* to suggest that the state trial judge had, as here, a longstanding practice, known to members of the bar, to permit any defendant to change into civilian clothes on request. See *infra,* at 510-511.

situation. [5]

Despite respondent's failure to raise the issue at trial, the Court of Appeals held: S

"Waiver of the objection cannot be inferred merely from [****16] failure to object if trial in prison garb is customary in the jurisdiction." 500 F. 2d, at 208.I

TThe District Court had concluded that at the time of respondent's trial the majority of nonbailed defendants in Harris County were indeed tried in jail clothes. From this, the Court of Appeals concluded that the practice followed in respondent's case was customary. *Ibid.*

However, that analysis ignores essential facts adduced at the evidentiary hearing. Notwithstanding the evidence as to the general practice in Harris County, there was no finding that nonbailed defendants were compelled to stand trial in prison garments if timely objection was made to the trial judge. On the contrary, the District Court concluded that the practice of the particular judge presiding in respondent's case was to permit any accused who so desired to change into civilian clothes: S

"There is no doubt but that the [judge] had a [*511] practice of allowing defendants to stand trial in civilian clothing, if requested, a practice evidently followed by certain of the other judges as well." *Williams* v. *Beto,* 364 F. Supp. 335, 343 (1973). [6]I

[****17] The state judge's policy was confirmed at the evidentiary hearing by the prosecutor and by a defense attorney who practiced in the judge's court.

Significantly, at the evidentiary hearing respondent's trial counsel did not intimate that he feared any adverse consequences attending an objection to the procedure. [7] There is nothing to suggest that there would have been any prejudicial effect on [***135] defense counsel had he made objection, given the decisions on this point in that jurisdiction. Four years before respondent's trial the United States Court of Appeals for the Fifth Circuit had held: "It is inherently unfair to try a defendant for crime while garbed in his jail uniform…." *Brooks* v. *Texas,* 381 F. 2d, at 624. Similarly, the Texas Court of Criminal Appeals had held: "[E]very effort should be made to avoid trying an accused while in jail garb." *Ring* v. *State,* 450 S.W. 2d 85, 88 (1970). [8] Prior Texas cases [*512] had made it clear that an objection should be interposed. See *Wilkinson* v. *State,* 423 S.W. 2d 311, 313 (Tex. Crim. App. 1968); *Ring* v. *State, supra,* at 88.

[****18]

[**1697] [9B]Nothing in this record, therefore, warrants a conclusion that respondent was compelled to stand trial in jail garb or that there was sufficient reason to excuse the failure to raise the issue before trial. [9] Nor can the trial judge be faulted for not asking the respondent or his counsel whether he was deliberately going to trial in jail clothes. To impose this requirement suggests that the trial judge operates under the same burden here as he would in the situation in *Johnson* v. *Zerbst,* 304 U.S. 458 (1938), where the issue

[5] The evidence showed that respondent was a Caucasian in his sixties. At the evidentiary hearing, he testified that he felt he had no real case to present at trial. The testimony of several eyewitnesses was clear and consistent. Under these circumstances, a desire to elicit jury sympathy would have been a reasonable approach and one which the trial judge might reasonably have assumed was deliberately undertaken.

[6] This was based on the state judge's affidavit, which stated in part:

"I have never compelled a defendant to go to trial in jail clothes, and on every occasion when a defendant or his attorney requested that he be allowed to wear civilian clothes at his trial I have granted the request." 364 F. Supp., at 338.

[7] Counsel testified that on a prior occasion, a different state judge had overruled his objection to the trial of his client in jail clothes. He also testified that he had seen other defendants dressed in jail garments in the courtroom where respondent was tried.

[8] The Texas courts had admittedly not established a rigid rule invalidating the practice *per se.* Instead, the courts ordinarily looked to whether actual injury or prejudice had resulted from the defendant's appearance in jail garb. *Garcia* v. *State,* 429 S.W. 2d 468, 471 (Tex. Crim. App. 1968); *Xanthull* v. *State,* 403 S.W. 2d 807, 809 (Tex. Crim. App. 1966). But these cases provided ample grounds for objection to the procedure, since they at least implicitly recognized that reversible error could result from the practice. Similarly, the 1970 decision in *Xanthull* v. *Beto,* 307 F. Supp. 903 (SD Tex.), did not render fruitless any objection on respondent's part. Instead, that case, like various state cases, simply imposed a burden on federal habeas petitioners to show actual prejudice resulting from a jury trial in jail garments.

[9] It is not necessary, if indeed it were possible, for us to decide whether this was a defense tactic or simply indifference. In either case, respondent's silence precludes any suggestion of compulsion.

concerned whether the accused willingly stood trial without the benefit of counsel. Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system.

[9C]

[****19] [1B]Accordingly, although the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, the failure to make an objection to the court as to being tried in such clothes, for whatever [*513] reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation. [10]

The judgment of the Court of Appeals is therefore reversed, and the cause is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

**Concur by:** POWELL

## Concur

[***136] MR. JUSTICE POWELL, with whom MR. JUSTICE STEWART joins, concurring.

I concur in the opinion [****20] of the Court. As the Court's opinion and the dissenting opinion take such divergent views of the case, I write separately to identify specifically the considerations I deem controlling.

Respondent, Harry Lee Williams, was tried while clad in prison issue. Despite differences over the relevance of "compulsion" in this case, the Court opinion and the dissenting opinion essentially agree that a defendant has a constitutional right not to be so tried. The disagreement is over the significance to be attributed to Williams' failure to object at trial.

As relevant to this case, there are two situations in which a conviction should be left standing despite the claimed infringement of a constitutional right. The first situation arises when it can be shown that the substantive right in question was consensually relinquished. The other situation arises when a defendant has made an "inexcusable procedural default" in failing to object at a time when a substantive right could have been [*514] protected. Hart, Foreword: The Time Chart of the Justices, 73 Harv. L. Rev. 84, 118 (1959); see American Bar Association Project on Standards for Criminal Justice, Post-Conviction Remedies 35-37 [****21] (App. Draft 1968).

Williams was represented by retained, experienced counsel. It is conceded that his counsel was fully aware of the "prison garb" issue [1] and elected to raise no objection simply because he thought objection would be futile. The record also shows that the state judge who presided at Williams' trial "had a practice of allowing defendants [**1698] to stand trial in civilian clothing, if requested…." 364 F. Supp. 335, 343 (1973). It thus is apparent that had an objection been interposed by Williams to trial in prison garb, the issue here presented would not have arisen.

This case thus presents a situation that occurs frequently during a criminal trial - namely, a defendant's failing [****22] to object to an incident of trial that implicates a constitutional right. As is often the case in such situations, a timely objection would have allowed its cure. As is also frequently the case with such trial-type rights as that involved here, counsel's failure to object in itself is susceptible of interpretation as a tactical choice. *Ante,* at 507-508.

It is my view that a tactical choice or procedural default of the nature of that involved here ordinarily should operate, [2] as a matter of federal law, to preclude [*515]

---

[10] Petitioner has contended in his brief and in oral argument that the Court of Appeals' decision in *Hernandez* should not be applied retroactively. The petition for certiorari did not raise this issue and our disposition of the case renders it unnecessary to decide it.

[1] Williams' counsel did not claim, nor indeed could he have claimed, that a new issue was involved. Both the Court of Appeals for the Fifth Circuit and the Texas courts had recognized that trial in prison garb could be constitutional error as an impingement upon the presumption of innocence. *Ante,* at 511-512.

[2] Even when confronted by such a procedural default, discretion might sometimes be exercised to overturn a

the later raising [***137] of the substantive right. [3] We generally disfavor inferred waivers of constitutional rights. See *Johnson* v. *Zerbst,* 304 U.S. 458, 464 (1939); *Barker* v. *Wingo,* 407 U.S. 514, 525-526 (1972). That policy, however, need not be carried to the length of allowing counsel for a defendant deliberately to forgo objection to a curable trial defect, even though he is aware of the factual and legal basis for an objection, simply because he thought objection would be futile. [4]

[****23]

**Dissent by:** BRENNAN

## Dissent

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL concurs, dissenting.

I dissent. The Court's statement that "[t]he defendant's clothing is so likely to be a continuing influence throughout the trial that... an unacceptable risk is presented of impermissible factors" affecting the jurors' judgment, thus presenting the possibility of an unjustified verdict of guilt, *ante,* at 505, concedes that respondent's trial in identifiable prison garb [1] constituted a denial of [*516] due process of law. The judgment setting aside respondent's conviction is nevertheless reversed on the ground that respondent was not *compelled* by the State to wear the prison garb. The Court does not - for on this record plainly the Court could not - rest the reversal on a finding that respondent knowingly, voluntarily, and intelligently consented to be tried in such attire, and thus had waived his due process right. *Johnson* v. *Zerbst,* 304 U.S. 458 (1938). Rather, for the first time, the Court confines due process protections by *defining* a right that materially affects the fairness and accuracy of the factfinding process in terms of state *compulsion,* a concept which, [****24] although relevant in the context of the Fifth Amendment's privilege against self-incrimination, is simply inapposite to constitutional analysis concerning due process in criminal proceedings. The end result of this definitional approach is to impute the effect of waiver to the failure of respondent [**1699] or his counsel to apprise the trial judge of respondent's objection to being tried in prison garb. This not only results in an illogical delineation of the particular right involved in this case, but also introduces into this Court's jurisprudence a novel and dangerously unfair test of surrender of basic constitutional [***138] rights to which I cannot agree. [2]

---

conviction on the familiar principles of plain error. See *United States* v. *Indiviglio,* 352 F. 2d 276 (CA2 1965).

[3] Previous cases of this Court make clear that a federal-law bar can be raised to the untimely presentation of constitutional claims. See *Fay* v. *Noia,* 372 U.S. 391, 433-434 (1963); *Henry* v. *Mississippi,* 379 U.S. 443, 451-452 (1965).

[4] The right involved here is a trial-type right. As a consequence, an attorney's conduct may bind the client. See *Henry* v. *Mississippi, supra,* at 451-452; cf. *Brookhart* v. *Janis,* 384 U.S. 1 (1966). The entitlement of courts ordinarily to rely on counsel to advise a defendant and to make timely assertion of rights even when the validity of a guilty plea is at issue was a factor in *McMann* v. *Richardson,* 397 U.S. 759, 766-771 (1970).

[1] Respondent appeared at trial wearing a white T-shirt with "Harris County Jail" stenciled across the back, oversized white dungarees that had "Harris County Jail" stenciled down the legs, and shower thongs. Both of the principal witnesses for the State at respondent's trial referred to him as the person sitting in the "uniform." Record on Appeal in Tex. Ct. of Crim. App. 108, 141 (No. 73-3854).

[2] In holding that only the "compelled" wearing of prison garb is constitutionally proscribed, the Court understandably cites no precedent for its startling result. For the only area in which the concept of compulsion is relevant to the definition of a substantive right is the Fifth Amendment privilege against self-incrimination. See, *e.g., Garner* v. *United States,* 424 U.S. 648 (1976). But by its terms the Self-Incrimination Clause of the Fifth Amendment speaks only to an individual's being "compelled" to be a witness against himself; due process rights to a fair trial do not, however, depend on the existence of state "compulsion." Moreover, it is clear that even in the Fifth Amendment's self-incrimination context, where state "compulsion" is required, steps should be taken to ensure that constitutional rights only be knowingly and voluntarily waived. See, *e.g., Maness* v. *Meyers,* 419 U.S. 449, 466-467 (1975). See also nn. 5, 6, *infra.*

The Court's reliance on *Illinois* v. *Allen,* 397 U.S. 337 (1970), is particularly inexplicable. See *ante,* at 505. For the Court in *Allen* held that "courts must indulge every reasonable presumption against the loss of constitutional rights, *Johnson* v. *Zerbst,* 304 U.S. 458, 464 (1938)," and further held that the accused could only be deprived of his right to be present at trial "if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently

[****25]

[****26] [*517] I

The Court concedes that respondent was denied due process of law: there is a due process violation if the State denies an accused's objection to being tried in such garb, *ante,* at 504-505, 505, 512, 512-513, and as will be developed, there is no relevant constitutional difference concerning that due process right if the accused has not objected to the practice.

One of the essential due process safeguards that attends the accused at his trial is the benefit of the presumption of innocence - "that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'" *In re Winship,* 397 U.S. 358, 363 (1970), quoting *Coffin* v. *United States,* 156 U.S. 432, 453 (1895). See also, *e.g., Deutch* v. *United States,* 367 U.S. 456, 471 (1961); *Sinclair* v. *United States,* 279 U.S. 263, 296-297 (1929). [*518] This presumption of innocence is given concrete substance by the due process requirement that imposes on the prosecution the burden of proving the guilt of the accused beyond a reasonable doubt. "The accused during a criminal prosecution has at stake interests of immense importance, [****27] both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt." *In re Winship, supra,* at 363-364. The [***139] "prime instrument for reducing the risk of convictions resting on factual error," *id.,* at 363, is the reasonable-doubt standard. When an accused is tried in identifiable prison garb, the dangers of denial of a fair trial and the possibility of a verdict not based on the evidence are obvious.

Identifiable prison garb robs an accused of the respect and dignity accorded other [**1700] participants in a trial and constitutionally due the accused as an element of the presumption of innocence, and surely tends to brand him in the eyes of the jurors with an unmistakable mark of guilt. Jurors may speculate that the accused's pretrial incarceration, although often the result of his inability to raise bail, is explained by the fact he poses a danger to the community or has a prior criminal record; a significant [****28] danger is thus created of corruption of the factfinding process through mere suspicion. The prejudice may only be subtle and jurors may not even be conscious of its deadly impact, but in a system in which every person is presumed innocent until proved guilty beyond a reasonable doubt, the Due Process Clause forbids toleration of the risk. Jurors required by the presumption of innocence to accept the accused as a peer, an individual like themselves who is innocent until proved guilty, may well [*519] see in an accused garbed in prison attire an obviously guilty person to be recommitted by them to the place where his clothes clearly show he belongs. It is difficult to conceive of any other situation more fraught with risk to the presumption of innocence and the standard of reasonable doubt.

Trial in identifiable prison garb also entails additional dangers to the accuracy and objectiveness of the factfinding process. For example, an accused considering whether to testify in his own defense must weigh in his decision how jurors will react to his being paraded before them in such attire. It is surely reasonable to be concerned whether jurors will be less likely to credit the [****29] testimony of an individual whose garb brands him a criminal. And the problem will most likely confront the indigent accused who appears in prison garb only because he was too poor to make bail. In that circumstance, the Court's concession that no prosecutorial interest is served by trying the accused in prison clothes, *ante,* at 505, has an ironical ring. [3]

In light of the effect of trial in prison garb in denying the accused the benefit of the presumption of innocence and undercutting the reasonable-doubt standard, it escapes me how the Court can delineate the right established in this case as the right not to be *compelled* to wear prison garb. If, as the Court holds, the clothes of the accused who has unsuccessfully [****30] objected to wearing prison garb (and thus is "compelled" to wear them) unconstitutionally disadvantages his case, obviously the prison clothes of the nonobjecting accused are similarly [*520] unconstitutionally disadvantageous. From the *jury's* perspective, the situations of the [***140] objecting and the non-

with the decorum and respect inherent in the concept of courts and judicial proceedings." 397 U.S., at 343. *Allen* thus requires knowing, voluntary, and intelligent waiver of the constitutional right to be present at trial, the standard that in my view also applies to trial in prison garb.

[3] The Court suggests that accused persons freely choose to wear prison garb, *ante,* at 505-506, 507-508, but mentions no case of a person free on bail (and thus truly able to make a voluntary choice with respect to what to wear at trial) who asked to wear prison garb at his trial.

objecting defendants are in every respect identical; if the clothes of the accused who has objected to the court will create improper negative inferences in the minds of the jurors, so too must the clothes of the nonobjecting accused. Nothing in logic or experience suggests that jurors, who need have no knowledge that an objection was lodged with the court, will react any differently in the two situations. It baffles me how the Court, having conceded that trial in identifiable prison garb denigrates the accused's presumption of innocence, can then make the constitutional determination turn on whether or not the accused informed the trial court that he objected; since an objection is irrelevant to the purpose underlying the prohibition of trial in prison garb, the Court's delineation of the due process right in this case - confining the due process safeguard to situations of [****31] state "compulsion" - is irrational on its face. [4]

[****32] [*521] To be sure, an accused may knowingly, voluntarily, and intelligently consent to be tried in prison garb. *Johnson* v.*Zerbst,* 304 U.S. 458 [**1701] (1938). But the Court, without any reason for departing from this standard, has simply subverted it by promulgating the novel and dangerous doctrine that a basic due process safeguard, affecting the fairness and accuracy of the factfinding procedure, is a contingent right that does not even come into existence until it is affirmatively asserted. Is the Court today thus signaling the demise of the *Johnson* v. *Zerbst* voluntary [***141] waiver test as the standard for determination of the surrender of constitutional protections? [5] [*522]

---

[4] The Court states that "[t]he cases show… that it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury." *Ante,* at 508. Insofar as this suggests that the practice is prevalent, I am confident that there are simply no empirical data to support the statement. In any event, prevalence of the practice does not explain the limitation of the acknowledged infirmity to cases of *compelled* appearance in prison clothes.

In a single reported case, *Garcia* v. *Beto,* 452 F. 2d 655 (CA5 1971), a defense attorney testified that given the particular circumstances of the case, in which he sought to portray his client as a drunk, he thought that by emphasizing the difference between the accused and the jurors he would be aided in making that defense. The Fifth Circuit found that this deliberate trial strategy constituted a waiver of the right to be tried in civilian clothes. Although the other cases cited by the Court today noted the *Garcia* opinion, none involved such a trial tactic. See *Watt* v. *Page,* 452 F. 2d 1174, 1176 (CA10 1972) (noting that cases refer to the "possibility" that there may be a trial strategy and remanding for an evidentiary hearing on the matter); *Anderson* v. *Watt,* 475 F. 2d 881, 882 (CA10 1973) (affirming grant of habeas relief since no trial strategy was shown); *Barber* v. *State,* 477 S.W. 2d 868, 870 (Tex. Crim. App. 1972) (asserting that the Fifth Circuit in *Garcia* noted that a defendant "often wants to be tried in jail clothing and that it is common for a defense counsel to prove before the jury how long the accused has been confined in jail"; however, no demonstration was made that such was true in Barber's case or in any case other than *Garcia,* and the *Garcia* case never suggested that the practice was "common"). The single instance in which a defense attorney, confronted with the fact his client was being tried in prison garb, attempted to employ that fact to invoke jury sympathy and thereby waived any right he otherwise had to trial in civilian garb, hardly supports the Court's conclusion that defendants "frequently" hope to benefit by this "tactic," *ante,* at 508, or the concurring opinion's similarly myopic statement that "counsel's failure to object in itself is susceptible of interpretation as a tactical choice," *ante,* at 514. See also n. 3, *supra.* In any event, even if there were situations in which trial in prison garb was deliberately employed as a defense tactic, that would only justify a decision that those individuals waived their rights. Cf., *e.g., Barker* v. *Wingo,* 407 U.S. 514, 525-529 (1972).

[5] Indeed, although acknowledging that trial in prison garb destroys the presumption of innocence, the Court proclaims that "[w]e are not confronted with an alleged relinquishment of a fundamental right of the sort at issue in *Johnson* v. *Zerbst," ante,* at 508 n. 3. It is difficult to see where such assertions, which are flatly inconsistent with this Court's precedents, see n. 6, *infra,* will cease. For example, since an accused has the right of self-representation in criminal trials, see *Faretta* v. *California,* 422 U.S. 806 (1975), will the Court now say that unless an indigent accused was *compelled* to forgo appointed counsel, he was simply exercising the right to represent himself, even if he was unaware of the right to court-appointed counsel? Cf, *e.g., Powell* v. *Alabama,* 287 U.S. 45 (1932); *Johnson* v. *Zerbst,* 304 U.S. 458 (1938); *Gideon* v. *Wainwright,* 372 U.S. 335 (1963); *Argersinger* v. *Hamlin,* 407 U.S. 25 (1972). And has the Court signaled that unless the accused makes and the State rejects a motion for a speedy trial, there is automatically no constitutional violation? Cf., *e.g., Barker* v. *Wingo, supra,* at 523-530. Or perhaps the Court will hold that there is no constitutional violation if an accused does not object to jury instructions that would otherwise deny him his due process right to be convicted only if the State proves every element of the offense beyond a reasonable doubt, since there has not been any state "compulsion"? Cf., *e.g., Mullaney* v. *Wilbur,* 421 U.S. 684 (1975). See also, *e.g., Camp* v. *Arkansas,* 404 U.S. 69 (1971). Such possibilities are legion, for this Court has often recognized constitutional rights even though the accused did not explicitly demand them during his trial. Thus, whether the Court's decision is read as importing the privilege against self-incrimination's "compulsion" notion into areas in which it properly has no applicability, or as abrogating the traditional waiver standard for rights affecting the fairness and accuracy

For certainly if failure to object [**1702] to trial in prison garb, even where the accused has not been shown to know that he might object, surrenders so basic a constitutional [*523] right as that securing fairness and accuracy of the factfinding process, the Court has totally eviscerated the traditional doctrine that loss of such rights cannot be presumed from inaction. [6]

[****33] II

JUSTICES POWELL and STEWART concur in this evisceration of fundamental due process rights, but on the basis of a rationale essentially different [***142] from the rationale of the Court's opinion. In that circumstance their joining in the Court's opinion is puzzling. For although the opinion of the Court, admittedly obscure, may be interpreted either as importing the concept of "compulsion" into areas to which it is inapposite or as diluting the standard for waiver of fundamental constitutional rights, the concurring opinion would prefer to reverse the Court of Appeals on the ground that respondent - or more properly, respondent's attorney - committed "an inexcusable procedural default" or "tactical choice" that precludes his present assertion of this substantive right. *Ante,* at 513, 514. Because the concurring opinion obfuscates various issues, and because the import of this statement and the true rationale of the concurring opinion are brought into better focus by today's opinion for the Court in *Francis* v. *Henderson, post,* p. 536, which does properly present a question of procedural default, it [*524] is essential to delineate two separate concepts relating to [****34] methods by which criminal defendants may yield or lose constitutional rights.

One concept is that of "waiver" which, at least with respect to constitutional rights affecting the fairness and accuracy of the factfinding process, means that the accused has engaged in conduct which may be characterized as "an intentional relinquishment or abandonment of a known right or privilege." *Johnson* v. *Zerbst,* 304 U.S., at 464; see n. 6, *supra.* If an accused has knowingly waived rights to which he was otherwise entitled, he has not, on the merits of his claim, been unconstitutionally deprived of anything. A separate concept is that of "procedural default," which involves the manner in which an accused may forfeit rights by not asserting them according to the strictures of a State's procedural rules. If the accused has committed a procedural default, there may never be an adjudication of the underlying constitutional claim on the merits. That problem was addressed in *Fay* v. *Noia,* 372 U.S. 391 (1963), which held that "the federal habeas judge may in his discretion deny relief to an applicant who has deliberately by-passed the orderly procedure of the state courts and [****35] in so doing has forfeited his state court remedies." *Id.,* [**1703] at 438. However, *Fay* was emphatic that it was to be "very clear that this grant of discretion is not to be interpreted as a permission to introduce legal fictions into federal habeas corpus," *id.,* at 439, and unambiguously explained that the "deliberate by-pass" test for procedural defaults was the analogue of the "knowing and intelligent" waiver standard for loss of constitutional rights in the absence of a procedural rule concerning their assertion: S

"The classic definition of waiver enunciated in *Johnson* v.*Zerbst,* 304 U.S. 458, 464 - 'an [*525] intentional relinquishment or abandonment of a known right or privilege' - furnishes the controlling standard. If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state [***143] courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused

---

of the factfinding process, it is a marked and indefensible departure from constitutional principles which have long been settled. Moreover, such notions may have a pervasive impact on habeas corpus proceedings. Will the Court eventually employ these principles to overrule the "deliberate by-pass" test of *Fay* v. *Noia,* 372 U.S. 391 (1963), and the holding that an adequate state procedural ground that precludes review by appeal does not mean that an accused cannot "pursue vindication of his federal claim in a federal habeas corpus proceeding in which the procedural default will not alone preclude consideration of his claim," *Henry* v. *Mississippi,* 379 U.S. 443, 452 (1965)? The concurring opinion would put such a gloss on the opinion for the Court, and the opinion today in *Francis* v. *Henderson, post,* p. 536, confirms that my fears are not groundless.

[6] Certainly a basic tenet of this Court's jurisprudence has consistently been that constitutional rights affecting the fairness and accuracy of the factfinding process are not lost unless the State demonstrates "an intentional relinquishment or abandonment of a known right or privilege." *Johnson* v.*Zerbst, supra,* at 464; *Barker* v.*Wingo,* supra at 525-529. See generally, *e.g., Schneckloth* v.*Bustamonte,* 412 U.S. 218, 235-246 (1973); *id.,* at 276 (BRENNAN, J., dissenting); *id.,* at 277 (MARSHALL, J., dissenting). By defining the due process right in prison-garb cases in terms of state compulsion, the Court opens the door for the complete abandonment of this waiver doctrine.

to entertain his federal [****36] claims on the merits - though of course only after the federal court has satisfied itself, by holding a hearing or by some other means, of the facts bearing upon the applicant's default.... At all events we wish it clearly understood that the standard here put forth depends on the considered choice of the petitioner....A choice made by counsel not participated in by the petitioner does not automatically bar relief. Nor does a state court's finding of waiver bar independent determination of the question by the federal courts on habeas, for waiver affecting federal rights is a federal question." *Ibid.*I

See also *Francis* v. *Henderson, post,* at 543-545, and n. 2 (BRENNAN, J., dissenting). When an accused has deliberately bypassed the State's mechanisms for adjudicating constitutional rights, a federal court generally need not address the merits of the underlying constitutional claim; as a corollary, when the state courts address the constitutional claim on the merits, the State may not seek to prohibit habeas relief on the ground that the accused was precluded from raising the claim due to a procedural default. See, *e.g., Lefkowitz* v. *Newsome,* 420 U.S. 283, [****37] 292 n. 9 (1975).

With this background in mind, two glaring [*526] inadequacies in the concurring opinion become manifest. First, the issue of procedural default under state law is not presented by this case. The Texas Court of Criminal Appeals did not render its decision on state procedural grounds but on its view of federal waiver doctrine as expounded in another Court of Appeals for the Fifth Circuit opinion. See *Williams* v. *State,* 477 S.W. 2d 24, 26-27 (1972). The issue of procedural default was never raised by the State or addressed by any court below, and it is simply indefensible to seize this ground as a purported justification under which to perpetuate respondent's unconstitutional confinement. See also n. 10, *infra.*

Second, and even more basic, the concurring opinion, without reference to the holding of *Fay* and without citing any precedent, would reverse the Court of Appeals under a standard which directly repudiates *Fay* and which implicitly undermines its precedential value with respect to the assertion in habeas proceedings of all constitutional rights. The concurring opinion, which converts the "deliberate by-pass" test of *Fay* [****38] into an "inexcusable" default test, would find an "inexcusable" procedural default in the mere failure to object to an unconstitutional practice, reasoning that if there had been a timely objection the unconstitutional action would have been remedied. Such logic could, as a hindsight matter, probably be invoked any time counsel inadvertently or inexplicably fails to object contemporaneously to the deprivation of his client's fundamental rights, and the *Fay* knowing-and-intelligent-bypass test would thus be rendered a hollow shell. Indeed, [**1704] the concurring opinion would also appear to shift the *Fay* burden of proof, in a case in which an unconstitutional [***144] deprivation of an accused's rights has been shown, by requiring the accused to show that the default was not "inexcusable" rather than requiring the State to show that the default was "deliberate."

[*527] Moreover, *Fay* required that the decision not to assert most constitutional rights be the informed choice of the accused himself rather than of his counsel. The concurring opinion would alter this aspect of *Fay* when "trial-type rights" are involved. The concurring opinion provides no principled content, however, [****39] to that term. [7] How is the right of a defendant to the presumption of innocence - as impinged when the State hales the accused, clad in prison garb, before a judge who is supposedly charged with ensuring the fairness of a trial - more a "trial-type" right than is the right to a jury trial, the requirement that the State prove every element of the crime by proof beyond a reasonable doubt, or the right to counsel itself? The concurring opinion would apparently undermine settled doctrines concerning waiver or loss of these rights without ever addressing the departure of its methodology from the unswerving path charted by the Court's precedents. [8] And if actions

[7] The phrase "trial-type" rights might conceivably have some value with reference to potential constitutional challenges - for example, Confrontation Clause challenges to the introduction of hearsay evidence - which arise spontaneously during the course of the trial and concerning which there may be inadequate opportunity for counsel to consult with his client. The concurrence, however, invokes "trial-type" rights almost talismanically, with no indication of what the term connotes.

[8] All of these rights have been held by this Court to be violated unless the accused himself knowingly and intelligently waived them, and the burden of proof of demonstrating their waiver, which may not be presumed on a silent record, rests on the State. Surely the Court would not adulterate those standards in the context of procedural defaults. See *Francis* v. *Henderson, post,* at 553 n. 4 (BRENNAN, J., dissenting). Indeed, the knowing-and-deliberate-bypass test of *Fay* has been applied as the standard for measuring procedural defaults in such other situations affecting fundamental rights as the failure to take a timely appeal, the failure to challenge in a timely manner the introduction of unconstitutionally seized

of [*528] counsel are to bind an accused in such "trial-type" situations, it would seem that the Court has an obligation to elucidate the standards by which counsel's actions are to be judged, particularly in a case such as this in which ineffective assistance of counsel is alleged. See nn. 13, 15, *infra.*

[****40] In any event, if the concurring opinion means that my Brothers STEWART and POWELL are forsaking the teaching of precedents such as *Fay,* I respectfully suggest that they have the clear responsibility not to do so by indirection, and to explicate at least the contours and outer limits of the novel and dangerous doctrines which they are formulating. See generally *Francis* v. *Henderson, post,* p. 542 (BRENNAN, J., dissenting). It is simply unacceptable that my Brethren, who concede that respondent was convicted in derogation of his constitutionally secured presumption of innocence, should nevertheless sanction his unconstitutional confinement on the basis of "procedural default" principles which are neither articulated nor justified in a case calling for such analysis, see [***145] *Francis* v. *Henderson,* and which are then conjured up as the ground for decision in a case in which those unarticulated principles are not even legitimately implicated. This hardly passes as reasoned adjudication, and is a grave disservice both to this Court and to the litigants who must come before it.

III

Even under the Court's standard of *compelled* appearance, the judgment of the [****41] Court of Appeals should be affirmed. The Court's holding relies on the *per curiam* statement of the Court of Appeals for the [**1705] Fifth Circuit [*529] on petition for rehearing in *Hernandez* v. *Beto,* 443 F. 2d 634, 637, cert. denied, 404 U.S. 897 (1971), that a defendant may not willingly proceed to trial in prison garb and later protest that fact. *Ante,* at 508-509. [9] Yet applying the standard of *Hernandez,* see 364 F. Supp. 335, 340 (1973), the District Court in this case expressly found that respondent had *not* willingly gone to trial in identifiable prison garb, and that finding was affirmed by the Court of Appeals. Significantly, the District Court stated, *id.,* at 343 (emphasis supplied): S

"It is clear from the record in this case and consistent with the evidence adduced in *Dennison,* the companion case, that prior to *Hernandez* there did exist a common practice in Harris County courts to try incarcerated defendants in jail clothing unless they were able to secure some dispensation....

"There is no doubt but that the [judge] had a [*530] practice of allowing defendants to stand trial in civilian clothing, if requested, a practice [****42] evidently followed by certain of the other judges as well.... However, the record does not reveal that [the judge's] practice was publicly known or that it was known to defendants or their counsel. More reasonably, *at times material to the [respondent's] criminal trial it was the standard practice to have all defendants in custody dressed alike* without any policy such as that employed by [the judge] being uniformly adopted by all or even a majority of the criminal district judges in Harris County. Instead, *the evidence points to the strong likelihood that the trial climate at that time acted as a natural deterrent* [***146] *to the raising of objections to what was commonplace -* a trial in jail clothes, even assuming that defendants or their counsel thought about the problem and considered its legal implications. In the absence of such consideration it can scarcely be concluded that either [respondent] or his trial counsel knowingly, willingly and voluntarily waived the right to be tried in civilian clothing."I

Since the Court does not hold that that finding of the two

---

evidence, and the failure to object to a prosecutor's closing comments on a defendant's failure to testify at trial. See, *e.g., Fay; Kaufman* v. *United States,* 394 U.S. 217 (1969); *Camp* v. *Arkansas,* 404 U.S. 69 (1971).

[9] In *Hernandez,* no formal objection was made to the trial judge. 443 F. 2d, at 636. Although the Fifth Circuit on petition for rehearing stated that a "defendant may not remain silent and willingly go to trial in prison garb and thereafter claim error," *id.,* at 637, it is clear that the court was addressing the question from a traditional waiver perspective. The court continued, *ibid.:* "In this case Hernandez' counsel did not object to the jail clothing because, from past experience, he thought that a motion for change of attire would have been a frivolous motion. We cannot accept this as a voluntary waiver by Hernandez." In the present case, the factual situation as found by the District Court is virtually identical to that found in *Hernandez.* The Court would distinguish *Hernandez,* however, on the ground that there was nothing in the record of that case to "suggest that the state trial judge had, as here, a longstanding practice, known to members of the bar, to permit any defendant to change into civilian clothes on request." *Ante,* at 509 n. 4. In addition to failing to take account of the suspect nature of the trial judge's affidavit, see n. 15, *infra,* this statement ignores the District Court's finding that there was *no* indication that this purported practice was publicly known or known to respondent or his counsel. See *infra,* at 530, 532-534, and n. 14.

courts is clearly erroneous, the finding is conclusive on us for the purpose of deciding the merits [10] and [****43] compels affirmance of the Court of Appeals.

[****44] [*531] [**1706] Indeed, even if the Court is *sub silentio* re-evaluating the factual findings concurred in by the two courts, the re-evaluation is not supported by the record. The Court states that defense counsel had nothing to fear from an objection, *ante,* at 511, yet the District Court found that the prevalent trial climate deterred the making of such objections. Further, the Court omits mention of the significant finding of the District Court that the practice followed in respondent's case was customary in the jurisdiction. The Court also omits mention of the fact that there was uncontradicted evidence that respondent's counsel failed to object only because objection was perceived to be futile, and that counsel had no purpose to elicit jury sympathy or otherwise acquiesce in the practice for purposes of trial tactics. [11] More crucial, the Court states that defense counsel was "conscious" of the problem of trial in jail garb, since he mentioned the point at *voir dire,* and that the judge was thus "informed" of counsel's knowledge. *Ante,* at 510. [*532] This impliedly suggests that the trial judge is for that reason relieved of his obligation affirmatively [****45] to inquire whether respondent actually desired to be tried in such garb, for the trial judge might conclude that respondent was engaging [***147] in a deliberate trial tactic to elicit jury sympathy. The record is wholly devoid of any basis for that analysis.

The jury's attention to respondent's jail garb was first directed by the *prosecution* on *voir dire.* [12] Indeed, it was done so matter-of-factly as to highlight the prevalence of the practice in the Harris County courts. If the trial judge was truly sensitive to the problem and willing, as suggested, to sustain any objection that was raised to the practice, it is curious that the comments provoked no reaction from him. The Court suggests that it mattered not at all because the case against respondent was so strong that respondent had "no real case" and the testimony of eyewitnesses was [****46] "clear and [*533] consistent." *Ante,* at 510 n. 5. Even if true (and I do not share the Court's view of the strength of the trial evidence), that would not relieve the trial judge of his duty to inquire whether respondent was satisfied to proceed to trial in prison garb, [13] particularly

[10] The "two-court" rule is the "long-established practice not to reverse findings of fact concurred in by two lower courts unless shown to be clearly erroneous. See, *e. g., Blau* v. *Lehman,* 368 U.S. 403, 408-409 (1962); *Faulkner* v. *Gibbs,* 338 U.S. 267, 268 (1949); *United States* v. *Dickinson,* 331 U.S. 745, 751 (1947); *United States* v. *Commercial Credit Co.,* 286 U.S. 63, 67 (1932); *United States* v. *Chemical Foundation,* 272 U.S. 1, 14 (1926); *Baker* v. *Schofield,* 243 U.S. 114, 118 (1917); *Towson* v. *Moore,* 173 U.S. 17, 24 (1899); cf. *Boulden* v. *Holman,* 394 U.S. 478, 480-481 (1969)." *Neil* v. *Biggers,* 409 U.S. 188, 202 (1972) (BRENNAN, J., concurring in part and dissenting in part). The Court implies that only the Court of Appeals made such findings and that in doing so it failed to take account of relevant evidence before the District Court. *Ante,* at 510-511. The District Court, presented with all of the data cited by the Court, nevertheless concluded that the trial climate was such that objections to trial in prison garb were deterred; the number of cases involving this issue, particularly the substantial number emanating from Harris County courts, merely reinforced that finding.

Moreover, there is no reason in this case why the Court should reassess the finding of two courts that respondent did not willingly proceed to trial in prison garb. Petitioner did not challenge that holding in his petition for a writ of certiorari, and sought resolution *only* of the basic question whether trial in prison garb is so inherently prejudicial that it destroys the presumption of innocence.

[11] See, *e. g.,* App. 47-49, 58-59, 62-63; Tr. 5 (concession by petitioner here during habeas evidentiary hearing that trial tactics were not involved in this case).

[12] The prosecutor, addressing his remarks to a specific member of the jury panel, stated:

"This defendant is sitting in jail clothes. I am assuming he's been in jail to the time of this trial. You are not to take this into consideration. The fact a man is in jail clothes shouldn't make you feel he is guilty any more than if he were in street clothes.

"The second thing, often times evidence will come out that a person has been in jail for seven months or eight months awaiting trial. By the same token, this should not be taken into consideration on your verdict, because you are supposed to go straight down the line, guilty or not guilty, and not let how a person is dressed influence your decision." Exhibits, pp. 30-31.

Subsequently the prosecutor, again addressing a single juror, stated, *id.,* at 33:

"You have heard the questions I asked. I have gone over reasonable doubt, gone over the business of how the defendant was dressed, the fact he may or may not have been in the jail all this time."

If the jurors had ignored respondent's garb until then, these statements surely directed their attention to it.

[13] "In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of

[**1707] since the judge had no knowledge at that time that respondent had "no real case." Indeed, the judge's uncommunicated good intentions and alleged sensitivity to prison garb are highly questionable in light of respondent's evidence that of the six cases involving nonbailed defendants tried in the same judge's courtroom during the two months surrounding respondent's case, every accused appeared in prison garb. [14] And the reasonableness [***148] of respondent's [*534] perception that trial objection would be futile is accentuated by the fact that the deputy sheriff had already denied respondent's explicit request to wear at trial the clothes in which he was arrested.

[****47] At least, in light of the District Court's finding that there was no knowing and voluntary waiver and that trial objections were deterred by the then prevalent trial climate, I should think the Court would remand for further factual development concerning the practice in Harris County at the time of respondent's trial. [15] But [*535] the record before us plainly calls for an affirmance of the Court of Appeals.

[****48]

## References

21 Am Jur 2d, Criminal Law 239

USCS, Constitution, 14th Amendment

US L Ed Digest, Constitutional Law 500, 839.5

ALR Digests, Constitutional Law 429, 675

L Ed Index to Annos, Criminal Law; Prisons and Prisoners

ALR Quick Index, Criminal Law; Prisons and Convicts

Federal Quick Index, Criminal Law; Prisons and

---

assuring its proper conduct and of determining questions of law." *Herron* v. *Southern Pacific Co.,* 283 U.S. 91, 95 (1931). "Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused." *Glasser* v. *United States,* 315 U.S. 60, 71 (1942). "If truth and fairness are not to be sacrificed, the judge must exert substantial control over the proceedings." *Geders* v. *United States, ante,* at 87. If the law relating to trial in prison garb was so clear, see *ante,* at 511-512, n. 8; concurring opinion, *ante,* at 514 n. 1, the devastating impact of such garb on the presumption of innocence so pervasive, and the trial judge's sensitivity so genuine, invocation of the "adversary system," see *ante,* at 512; concurring opinion, *ante,* at 515 n. 4, cannot justify the trial judge's failure to inquire into the matter, which certainly did not escape his attention. "[I]f the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel, and… judges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts." *McMann* v. *Richardson,* 397 U.S. 759, 771 (1970). See *Francis* v. *Henderson, post,* at 553 n. 4 (BRENNAN, J., dissenting).

[14] See Williams' Exhibits 2-6. The cases involving nonbailed defendants constituted 50% of the jury cases before the trial judge during that period. See Williams' Exhibit 7. Respondent's trial counsel was aware that other defendants were appearing before the same trial judge in prison garb. App. 58-59.

[15] A remand for further factual development is particularly appropriate if the Court believes that it has delineated the due process contours of trial in prison garb differently than did the District Court, since the District Court might not have analyzed all factors relevant to state "compulsion." For example, respondent objected to introduction of the trial judge's affidavit on the ground that it was not taken pursuant to the Federal Rules of Civil Procedure and thus afforded respondent's counsel no opportunity to cross-examine the judge and inquire into such matters as the number of times objections had actually been made to the practice of trial in prison garb, especially before the *Hernandez* decision, which brought about the elimination of the practice in Harris County courts. The fact that the Court seems to have delineated the right differently than did the lower courts is highlighted by the fact that the petition asked "Whether a defendant's trial in jail clothing destroys the 'presumption of innocence' so as to deny him a fair trial," Pet. for Cert. 2, while the Court states the question presented to be "whether an accused who is *compelled* to wear identifiable prison clothing at his trial by a jury is denied due process or equal protection of the laws," *ante,* at 502 (emphasis supplied). Moreover, it is particularly incongruous, if the Court is actually premising its holding, as the concurring opinion suggests, on a proceduraly, defaulty ground never presented or explored below, that the Court is reversing on the merits of the prison-garb issue rather than remanding for an inquiry as to whether the alleged procedural default forecloses an inquiry into the merits of respondent's claims. See *supra,* at 523-526.

The Court of Appeals did not address respondent's contention that respondent was denied effective assistance of counsel, in light of its holding with respect to respondent's prison-garb contention. When the Court of Appeals now addresses the issue on remand, it should of course do so in light of the fact that the Court today declares that there were "ample grounds" for an objection to trial in prison garb, see *ante,* at 512 n. 8, concurring opinion, *ante,* at 514 n. 1, and the fact that trial counsel concededly had no tactical or other reason for desiring that respondent be tried in prison garb, see n. 11, *supra.*

Prisoners

Annotation References:

Propriety and prejudicial effect of compelling accused to wear prison clothing at jury trial. 26 ALR Fed 535.

---

End of Document

# Godinez v. Moran

509 U.S. 389 (1993)

Cited in Opening Brief at: 31

Counsel acknowledges that this decision holds the opposite of the proposition for which it was cited. See Response, Part III.B. Highlighted language appears at 509 U.S. at 391, 398, and 402.

Q Questioned
As of: September 14, 2026 7:02 PM Z

# Godinez v. Moran

Supreme Court of the United States

April 21, 1993, Argued ; June 24, 1993, Decided

No. 92-725

**Reporter**
509 U.S. 389 *; 113 S. Ct. 2680 **; 125 L. Ed. 2d 321 ***; 1993 U.S. LEXIS 4396 ****; 61 U.S.L.W. 4749; 93 Cal. Daily Op. Service 4675; 93 Daily Journal DAR 7933; 7 Fla. L. Weekly Fed. S 499

SALVADOR GODINEZ, WARDEN, PETITIONER v. RICHARD ALLAN MORAN

**Subsequent History:** [****1] As Amended July 30, 1993.

**Prior History:** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** 972 F.2d 263, reversed and remanded.

## Syllabus

After respondent Moran pleaded not guilty to three counts of first-degree murder and two psychiatrists concluded that he was competent to stand trial, he informed the Nevada trial court that he wished to discharge his attorneys and change his pleas to guilty. The court found that Moran understood "the nature of the criminal charges against him" and was "able to assist in his defense"; that he was "knowingly and intelligently" waiving his right to the assistance of counsel; and that his guilty pleas were "freely and voluntarily" given. He was ultimately sentenced to death. When Moran subsequently sought state postconviction relief, the trial court held an evidentiary hearing before rejecting his claim that he was mentally incompetent [****2] to represent himself, and the State Supreme Court dismissed his appeal. A Federal District Court denied his petition for a writ of habeas corpus, but the Court of Appeals reversed. It concluded that due process required the trial court to hold a hearing to evaluate and determine Moran's competency before it accepted his decisions to waive counsel and plead guilty. It also found that the postconviction hearing did not cure the error, holding that the trial court's ruling was premised on the wrong legal standard because competency to waive constitutional rights requires a higher level of mental functioning than that required to stand trial. The court reasoned that, while a defendant is competent to stand trial if he has a rational and factual understanding of the proceedings and is capable of assisting his counsel, he is competent to waive counsel or plead guilty only if he has the capacity for reasoned choice among the available alternatives.

*Held*: The competency standard for pleading guilty or waiving the right to counsel is the same as the competency standard for standing trial: whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable [****3] degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him," *Dusky* v. *United States*, 362 U.S. 402, 4 L. Ed. 2d 824, 80 S. Ct. 788 *(per curiam)*. There is no reason for the competency standard for either of those decisions to be higher than that for standing trial. The decision to plead guilty, though profound, is no more complicated than the sum total of decisions that a defendant may have to make during the course of a trial, such as whether to testify, whether to waive a jury trial, and whether to crossexamine witnesses for the prosecution. Nor does the decision to waive counsel require an appreciably higher level of mental functioning than the decision to waive other constitutional rights. A higher standard is not necessary in order to ensure that a defendant is competent to represent himself, because the ability to do so has no bearing upon his competence to *choose* self-representation, *Faretta* v. *California*, 422 U.S. 806, 836, 45 L. Ed. 2d 562, 95 S. Ct. 2525. When, in *Westbrook* v. *Arizona*, 384 U.S. 150, 16 L. Ed. 2d 429, 86 S. Ct. 1320 (*per curiam*), this Court vacated a lower court ruling because there had [****4] been no "hearing or inquiry into the issue of [the petitioner's] competence to waive his constitutional right to the assistance of counsel," it did not mean to suggest that the *Dusky* formulation is not a high enough standard in cases in which the defendant seeks to waive counsel. Rather, the "competence to waive" language was simply a

shorthand for the "intelligent and competent waiver" requirement of *Johnson* v. *Zerbst*, 304 U.S. 458, 468, 82 L. Ed. 1461, 58 S. Ct. 1019. Thus, *Westbrook* stands only for the unremarkable proposition that when a defendant seeks to waive his right to counsel, a determination that he is competent to stand trial is not enough; the waiver must also be intelligent and voluntary before it can be accepted. While States are free to adopt competency standards that are more elaborate than the *Dusky* formulation, the Due Process Clause does not impose them. Pp. 396-402.

**Counsel:** David F. Sarnowski, Chief Deputy Attorney General of Nevada, argued the cause for petitioner. With him on the brief were Frankie Sue Del Papa, Attorney General, and Brooke A. Nielsen, Assistant Attorney General.

Amy L. Wax argued the cause for the United States as amicus curiae urging reversal. With her on the brief were Acting Solicitor General Bryson, Acting Assistant Attorney General Keeney, and Joel M. Gershowitz.

Cal J. Potter III, by appointment of the Court, 506 U.S. 1046, argued the cause for respondent. With him on the brief was Edward M. Chikofsky. *

**Judges:** THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and WHITE, O'CONNOR, and SOUTER, JJ., joined, and in Parts I, II-B, and III of which SCALIA and KENNEDY, JJ., joined. KENNEDY, J., filed an opinion [****5] concurring in part and concurring in the judgment, in which SCALIA, J., joined, post, p. 402. BLACKMUN, J., filed a dissenting opinion, in which STEVENS, J., joined, post, p. 409.

**Opinion by:** THOMAS

## Opinion

[*391] [***327] [**2682] JUSTICE THOMAS delivered the opinion of the Court.

[1A]This case presents the question whether the competency standard for pleading guilty or waiving the right to counsel is higher than the competency standard for standing trial. We hold that it is not.

I

On August 2, 1984, in the early hours of the morning, respondent entered the Red Pearl Saloon in Las Vegas, Nevada, and shot the bartender and a patron four times each with an automatic pistol. He then walked behind the bar and removed the cash register. Nine days later, respondent arrived at the apartment of his former wife and opened fire on her; five of his seven shots hit their target. Respondent then shot himself in the abdomen and attempted, without success, to slit his wrists. Of the four victims of respondent's gunshots, only respondent himself survived. On August 13, respondent summoned police to his hospital bed and confessed to the killings.

After respondent pleaded not guilty to three counts of first-degree murder, the trial court ordered that he be examined by a pair [****6] of psychiatrists, both of whom concluded that he was competent to stand trial. [1] The State thereafter announced [*392] its intention to seek [**2683] the death penalty. On November 28, 1984, 2 1/2 months after the psychiatric evaluations, respondent again appeared before the trial court. At this time respondent informed the court that he wished to discharge his attorneys and change his pleas to guilty. The reason for the request, according to respondent, was to prevent the presentation of mitigating evidence at his sentencing.

[****7] On the basis of the psychiatric reports, the trial court found that respondent

> [***328] "is competent in that he knew the nature and quality of his acts, had the capacity to determine right from wrong; that he understands the nature of the criminal charges against him and is able to assist in his defense of such charges, or

* Kent S. Scheidegger and Charles L. Hobson filed a brief for the Criminal Justice Legal Foundation as amicus curiae urging reversal.

Briefs of amici curiae urging affirmance were filed for the American Civil Liberties Union et al. by Steven R. Shapiro, Diann Y. Rust-Tierney, John A. Powell, and Bruce J. Winick; for the American Psychiatric Association et al. by James W. Ellis and Barbara E. Bergman; and for the National Association of Criminal Defense Lawyers by Jon May.

[1] One of the psychiatrists stated that there was "not the slightest doubt" that respondent was "in full control of his faculties" insofar as he had the "ability to aid counsel, assist in his own defense, recall evidence and . . . give testimony if called upon to do so." App. 8. The other psychiatrist believed that respondent was "knowledgeable of the charges being made against him"; that he had the ability to "assist his attorney, in his own defense, if he so desired"; and that he was "fully cognizant of the penalties if convicted." *Id.*, at 17.

against the pronouncement of the judgment thereafter; that he knows the consequences of entering a plea of guilty to the charges; and that he can intelligently and knowingly waive his constitutional right to assistance of an attorney." App. 21.

The court advised respondent that he had a right both to the assistance of counsel and to self-representation, warned him of the "dangers and disadvantages" of self-representation, *id.*, at 22, inquired into his understanding of the proceedings and his awareness of his rights, and asked why he had chosen to represent himself. It then accepted respondent's waiver of counsel. The court also accepted respondent's guilty pleas, but not before it had determined that respondent was not pleading guilty in response to threats or promises, that he understood the nature of the charges against him and the consequences of pleading [****8] guilty, that he was aware of the [*393] rights he was giving up, and that there was a factual basis for the pleas. The trial court explicitly found that respondent was "knowingly and intelligently" waiving his right to the assistance of counsel, *ibid*., and that his guilty pleas were "freely and voluntarily" given, *id*., at 64. [2]

On January 21, 1985, a three-judge court sentenced respondent to death for each of the murders. The Supreme Court of Nevada affirmed respondent's sentences for the Red Pearl Saloon murders, but reversed his sentence for the murder of his ex-wife and [****9] remanded for imposition of a life sentence without the possibility of parole. *Moran* v. *State*, 103 Nev. 138, 734 P.2d 712 (1987).

On July 30, 1987, respondent filed a petition for post-conviction relief in state court. Following an evidentiary hearing, the trial court rejected respondent's claim that he was "mentally incompetent to represent himself," concluding that "the record clearly shows that he was examined by two psychiatrists both of whom declared [him] competent." App. to Pet. for Cert. D-8. The Supreme Court of Nevada dismissed respondent's appeal, *Moran* v. *Warden*, 105 Nev. 1041, 810 P.2d 335, and we denied certiorari, 493 U.S. 874 (1989).

Respondent then filed a habeas petition in the United States District Court for the District of Nevada. The District Court denied the petition, but the Ninth Circuit reversed. 972 F.2d 263 (1992). The Court of Appeals concluded that the "record in this case" should have led the trial court to "entertain a good faith doubt about [respondent's] competency to make a voluntary, knowing, [****10] and intelligent [*394] waiver of constitutional [***329] rights," [**2684] *id*., at 265, [3] and that the Due Process Clause therefore "required the court to hold a hearing to evaluate and determine [respondent's] competency . . . before it accepted his decision to discharge counsel and change his pleas," *ibid*. Rejecting petitioner's argument that the trial court's error was "cured by the postconviction hearing," *ibid*., and that the competency determination that followed the hearing was entitled to deference under 28 U.S.C. § 2254(d), the Court of Appeals held that "the state court's postconviction ruling was premised on the wrong legal standard of competency," 972 F.2d at 266. "Competency to waive constitutional rights," according to the Court of Appeals, "requires a higher level of mental functioning than that required to stand trial"; while a defendant is competent to stand trial if he has "a rational and factual understanding of the proceedings and is capable of assisting his counsel," a defendant is competent to waive counsel or plead guilty only if he has "the capacity for 'reasoned choice' among the [****11] alternatives available to him." *Ibid*. The Court of Appeals determined that the trial court had "erroneously applied the standard for evaluating competency to stand trial, instead of the correct 'reasoned choice' standard," *id*., at 266-267, and further concluded that when examined "in light of the correct legal standard," the record did not support a finding that respondent was "mentally capable of the reasoned choice required for a valid waiver of constitutional rights," *id*., at 267. [4] The Court of Appeals accordingly

[2] During the course of this lengthy exchange, the trial court asked respondent whether he was under the influence of drugs or alcohol, and respondent answered as follows: "Just what they give me in, you know, medications." *Id*., at 33. The court made no further inquiry. The "medications" to which respondent referred had been prescribed to control his seizures, which were a byproduct of his cocaine use. See App. to Pet. for Cert. D-4.

[3] The specific features of the record upon which the Court of Appeals relied were respondent's suicide attempt; his desire to discharge his attorneys so as to prevent the presentation of mitigating evidence at sentencing; his "monosyllabic" responses to the trial court's questions; and the fact that he was on medication at the time he sought to waive his right to counsel and plead guilty. 972 F.2d at 265.

[4] In holding that respondent was not competent to waive his constitutional rights, the court placed heavy emphasis on the fact that respondent was on medication at the time he sought to discharge his attorneys and plead guilty. See *id*., at 268.

instructed [*395] the District Court to issue the writ of habeas corpus within 60 days, "unless the state court allows [respondent] to withdraw his guilty pleas, enter new pleas, and proceed to trial with the assistance of counsel." *Id.*, at 268.

[****12] Whether the competency standard for pleading guilty or waiving the right to counsel is higher than the competency standard for standing trial is a question that has divided the Federal Courts of Appeals [5] and [***330] state [**2685] courts of last resort. [6] [*396] We granted certiorari to resolve the conflict. 506 U.S. 1033 (1992).

[****13] II

[2]A criminal defendant may not be tried unless he is competent, *Pate* v. *Robinson*, 383 U.S. 375, 378, 15 L. Ed. 2d 815, 86 S. Ct. 836 (1966), and he may not waive his right to counsel or plead guilty unless he does so "competently and intelligently," *Johnson* v. *Zerbst*, 304 U.S. 458, 468, 82 L. Ed. 1461, 58 S. Ct. 1019 (1938); accord, *Brady* v. *United States*, 397 U.S. 742, 758, 25 L. Ed. 2d 747, 90 S. Ct. 1463 (1970). [****14] In *Dusky* v. *United States*, 362 U.S. 402, 4 L. Ed. 2d 824, 80 S. Ct. 788 (1960) *(per curiam)*, we held that the standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Ibid.* (internal quotation marks omitted). Accord, *Drope* v. *Missouri*, 420 U.S. 162, 171, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975) ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial"). While we have described the standard for competence to stand trial, however, we have never expressly articulated a standard for competence to plead guilty or to waive the right to the assistance of counsel.

[1B][3A][4A]Relying in large part upon our decision in *Westbrook* v. *Arizona*, 384 U.S. 150, 16 L. Ed. 2d 429, 86 S. Ct. 1320 (1966)*(per curiam)*, the Ninth Circuit adheres to the view that the competency standard for pleading [****15] guilty or waiving the right to counsel is higher than the competency standard for standing trial. See *Sieling* v. *Eyman*, 478 F.2d 211, 214-215 (1973) (first Ninth Circuit [*397] decision applying heightened standard). In *Westbrook*, a two-paragraph *per curiam* opinion, we vacated the lower court's judgment affirming

---

[5] While the Ninth Circuit and the District of Columbia Circuit, see *United States* v. *Masthers*, 176 U.S. App. D.C. 242, 247, 539 F.2d 721, 726 (1976), have employed the "reasoned choice" standard for guilty pleas, every other Circuit that has considered the issue has determined that the competency standard for pleading guilty is identical to the competency standard for standing trial. See *Allard* v. *Helgemoe*, 572 F.2d 1, 3-6 (CA1), cert. denied, 439 U.S. 858, 58 L. Ed. 2d 166, 99 S. Ct. 175 (1978); *United States* v. *Valentino*, 283 F.2d 634, 635 (CA2 1960) *(per curiam); United States ex rel. McGough* v. *Hewitt*, 528 F.2d 339, 342, n. 2 (CA3 1975); *Shaw* v. *Martin*, 733 F.2d 304, 314 (CA4), cert. denied, 469 U.S. 873, 83 L. Ed. 2d 159, 105 S. Ct. 230 (1984); *Malinauskas* v. *United States*, 505 F.2d 649, 654 (CA5 1974); *United States* v. *Harlan*, 480 F.2d 515, 517 (CA6), cert. denied, 414 U.S. 1006, 38 L. Ed. 2d 242, 94 S. Ct. 364 (1973); *United States ex rel. Heral* v. *Franzen*, 667 F.2d 633, 638 (CA7 1981); *White Hawk* v. *Solem*, 693 F.2d 825, 829-830, n. 7 (CA8 1982), cert. denied, 460 U.S. 1054, 75 L. Ed. 2d 934, 103 S. Ct. 1505 (1983); *Wolf* v. *United States*, 430 F.2d 443, 444 (CA10 1970); *United States* v. *Simmons*, 961 F.2d 183, 187 (CA11 1992), cert. denied, 507 U.S. 989, 123 L. Ed. 2d 156, 113 S. Ct. 1591 (1993). Three of those same Circuits, however, have indicated that the competency standard for waiving the right to counsel is "vaguely higher" than the competency standard for standing trial, see *United States ex rel. Konigsberg* v. *Vincent*, 526 F.2d 131, 133 (CA2 1975), cert. denied, 426 U.S. 937, 49 L. Ed. 2d 388, 96 S. Ct. 2652 (1976); *United States* v. *McDowell*, 814 F.2d 245, 250 (CA6), cert. denied, 484 U.S. 980, 98 L. Ed. 2d 492, 108 S. Ct. 478 (1987); *Blackmon* v. *Armontrout*, 875 F.2d 164, 166 (CA8), cert. denied, 493 U.S. 939, 107 L. Ed. 2d 326, 110 S. Ct. 337 (1989), and one of them has stated that the two standards "may not always be coterminous," *United States* v. *Campbell*, 874 F.2d 838, 846 (CA1 1989). Only the Ninth Circuit applies the "reasoned choice" standard to waivers of counsel, and only the Seventh Circuit, see *United States* v. *Clark*, 943 F.2d 775, 782 (1991), cert. pending, No. 92-6439, has held that the competency standard for waiving counsel is identical to the competency standard for standing trial. The Fourth Circuit has expressed the view that the two standards are "closely linked." *United States* v. *McGinnis*, 384 F.2d 875, 877 (1967) *(per curiam)*, cert. denied, 390 U.S. 990, 19 L. Ed. 2d 1296, 88 S. Ct. 1187 (1968).

[6] Compare, *e.g., State* v. *Sims*, 118 Ariz. 210, 215, 575 P.2d 1236, 1241 (1978) (heightened standard for guilty plea); and *Pickens* v. *State*, 96 Wis. 2d 549, 567-568, 292 N.W.2d 601, 610-611 (1980) (heightened standard for waiver of counsel), with *People* v. *Heral*, 62 Ill. 2d 329, 334, 342 N.E.2d 34, 37 (1976) (identical standard for pleading guilty and standing trial); and *People* v. *Reason*, 37 N.Y.2d 351, 353-354, 334 N.E.2d 572, 574, 372 N.Y.S.2d 614 (1975) (identical standard for waiving counsel and standing trial).

the petitioner's conviction, [***331] because there had been "a hearing on the issue of [the petitioner's] competence to stand trial," but "no hearing or inquiry into the issue of his competence to waive his constitutional right to the assistance of counsel." 384 U.S. at 150. The Ninth Circuit has reasoned that the "clear implication" of *Westbrook* is that the *Dusky* formulation is not "a high enough standard" for determining whether a defendant is competent to waive a constitutional right. *Sieling, supra*, at 214. [7] We think the Ninth Circuit has read too much into *Westbrook*, and we think it errs in applying two different competency standards. [8]

[3B]

[4B]

[****16] [**2686] A

[1C]The standard adopted by the Ninth Circuit is whether a defendant who seeks to plead guilty or waive counsel has the capacity for "reasoned choice" among the alternatives available to him. How this standard is different from (much less higher than) the *Dusky* standard -- whether the defendant has a "rational understanding" of the proceedings -- is not readily apparent to us. In fact, respondent himself opposed certiorari on the ground that the difference between the two standards is merely one of "terminology," Brief in Opposition 4, and he devotes little space in his brief on the merits [****17] to a defense of the Ninth Circuit's standard, see, *e.g.*, Brief for [*398] Respondent 17-18, 27, 32; see also Tr. of Oral Arg. 33 ("Due process does not require [a] higher standard, [it] requires a separate inquiry"). [9] But even assuming that there is some meaningful distinction between the capacity for "reasoned choice" and a "rational understanding" of the proceedings, we reject the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard.

We begin with the guilty plea. A defendant who stands trial is likely to be presented with choices that entail relinquishment of the same rights [****18] that are relinquished by a defendant who pleads guilty: He will ordinarily have to decide whether to waive his "privilege against compulsory self-incrimination," *Boykin* v. *Alabama*, 395 U.S. 238, 243, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (1969), by taking the witness stand; if the option is available, he may have to decide whether to waive his "right to trial by jury," *ibid*.; and, in consultation with counsel, he may have to decide whether to waive his "right to confront [his] accusers," *ibid*., by declining [***332] to cross-examine witnesses for the prosecution. A defendant who pleads not guilty, moreover, faces still other strategic choices: In consultation with his attorney, he may be called upon to decide, among other things, whether (and how) to put on a defense and whether to raise one or more affirmative defenses. In sum, *all* criminal defendants -- not merely those who plead guilty -- may be required to make important decisions once criminal proceedings have been initiated. And while the decision to plead guilty is undeniably a profound one, it is no more complicated than the sum total of decisions that a defendant may be called upon to make during the course of a trial. (The [****19] decision to plead guilty is also made over a shorter period of [*399] time, without the distraction and burden of a trial.) This being so, we can conceive of no basis for demanding a higher level of competence for those defendants who choose to plead guilty. If the *Dusky* standard is adequate for defendants who plead not guilty, it is necessarily adequate for those who plead guilty.

Nor do we think that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an

---

[7] A criminal defendant waives three constitutional rights when he pleads guilty: the privilege against self-incrimination, the right to a jury trial, and the right to confront one's accusers. *Boykin* v. *Alabama*, 395 U.S. 238, 243, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (1969).

[8] Although this case comes to us by way of federal habeas corpus, we do not dispose of it on the ground that the heightened competency standard is a "new rule" for purposes of *Teague* v. *Lane*, 489 U.S. 288, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (1989), because petitioner did not raise a *Teague* defense in the lower courts or in his petition for certiorari. See *Parke* v. *Raley*, 506 U.S. 20, 26, 121 L. Ed. 2d 391, 113 S. Ct. 517 (1992); *Collins* v. *Youngblood*, 497 U.S. 37, 41, 111 L. Ed. 2d 30, 110 S. Ct. 2715 (1990).

[9] We have used the phrase "rational choice" in describing the competence necessary to withdraw a certiorari petition, *Rees* v. *Peyton*, 384 U.S. 312, 314, 16 L. Ed. 2d 583, 86 S. Ct. 1505 (1966) *(per curiam)*, but there is no indication in that opinion that the phrase means something different from "rational understanding."

appreciably higher level of mental functioning than the decision to waive other constitutional rights. Respondent suggests that a higher competency standard is necessary because a defendant who represents himself "'must have greater powers of comprehension, judgment, and reason than would be necessary to stand trial with the aid of an attorney.'" Brief for Respondent 26 (quoting Silten & Tullis, Mental Competency in Criminal Proceedings, 28 Hastings L.J. 1053, 1068 (1977)). Accord, Brief for National [**2687] Association of Criminal Defense Lawyers as *Amicus Curiae* 10-12. [****20] But this argument has a flawed premise; the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself. [10] In *Faretta* v. *California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), we [*400] held that a defendant choosing self-representation must do so "competently and intelligently," *id.*, at 835, but we made it clear that the defendant's "technical legal knowledge" is "not relevant" to the determination whether he is competent to waive his right to counsel, *id.*, at 836, [***333] and we emphasized that although the defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored," *id.*, at 834. Thus, while "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts," *ibid.*, a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation. [11]

[****21] [****22] B

[5A]A finding that a defendant is competent to stand trial, however, is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. *Parke* v. *Raley*, 506 U.S. 20, 28-29, 121 L. Ed. 2d 391, 113 S. Ct. 517 (1992) (guilty plea); *Faretta, supra*, at 835 (waiver of counsel). In this [*401] sense there *is* a "heightened" standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of *competence*. [12]

[5B]

---

[10] It is for this reason that the dissent's reliance on *Massey* v. *Moore*, 348 U.S. 105, 99 L. Ed. 135, 75 S. Ct. 145 (1954), is misplaced. When we said in *Massey* that "one might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel," *id.*, at 108, we were answering a question that is quite different from the question presented in this case. Prior to our decision in *Gideon* v. *Wainwright*, 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792 (1963), the appointment of counsel was required only in those state prosecutions in which "special circumstances" were present, see *id.*, at 350-351 (Harlan, J., concurring), and the question in *Massey* was whether a finding that a defendant is competent to stand trial compels a conclusion that there are no "special circumstances" justifying the appointment of counsel. The question here is not whether a defendant who is competent to stand trial has no right to have counsel appointed; it is whether such a defendant is competent to waive the right to counsel that (after *Gideon*) he under all circumstances has.

[11] We note also that the prohibition against the trial of incompetent defendants dates back at least to the time of Blackstone, see *Medina* v. *California*, 505 U.S. 437, 446, 120 L. Ed. 2d 353, 112 S. Ct. 2572 (1992); *Drope* v. *Missouri*, 420 U.S. 162, 171-172, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975); *Youtsey* v. *United States*, 97 F. 937, 940 (CA6 1899) (collecting "common law authorities"), and that "by the common law of that time, it was not representation by counsel but self-representation that was the practice in prosecutions for serious crime," *Faretta* v. *California*, 422 U.S. at 823; accord, *id.*, at 850 (BLACKMUN, J., dissenting) ("self-representation was common, if not required, in 18th century English and American prosecutions"). It would therefore be "difficult to say that a standard which was designed to determine whether a defendant was capable of defending himself" is "inadequate when he chooses to conduct his own defense." *People* v. *Reason*, 37 N.Y.2d at 354, 334 N.E.2d at 574.

[12] The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. See *Drope* v. *Missouri, supra*, at 171 (defendant is incompetent if he "lacks the *capacity* to understand the nature and object of the proceedings against him") (emphasis added). The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced. See *Faretta* v. *California, supra*, at 835 (defendant waiving counsel must be "made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open'") (quoting *Adams* v. *United States ex rel. McCann*, 317 U.S. 269, 279, 87 L. Ed. 268, 63 S. Ct. 236 (1942)); *Boykin* v. *Alabama*, 395 U.S. at 244 (defendant pleading guilty must have "a full understanding of what the plea connotes and of its consequence").

[****23] [**2688] [5C][6A][7A]This two-part inquiry [13] is what we had in mind in *Westbrook*. When we distinguished between "competence to stand trial" and "competence to waive [the] constitutional right to the assistance of [***334] counsel," 384 U.S. at 150, we were using "competence to waive" as a shorthand for the "intelligent and competent waiver" requirement of *Johnson* v. *Zerbst*. This much is clear from the fact that we quoted that very language from *Zerbst* immediately after noting that the trial court had not determined whether the petitioner was competent to waive his right to counsel. See 384 U.S. at 150 ("'This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused'") (quoting *Johnson* v. *Zerbst*, 304 U.S. at 465). Thus, *Westbrook* stands only for the unremarkable proposition [*402] that when a defendant seeks to waive his right to counsel, a determination that he is competent to stand trial is not enough; the waiver must also be intelligent and voluntary before it can be accepted. [14]

[6B]

[7B]

[****24] III

[5D][7C][8]Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel. While psychiatrists and scholars may find it useful to classify the various kinds and degrees of competence, and while States are free to adopt competency standards that are more elaborate than the *Dusky* formulation, the Due Process Clause does not impose these additional requirements. Cf. *Medina* v. *California*, 505 U.S. 437, 446-453, 120 L. Ed. 2d 353, 112 S. Ct. 2572 (1992).The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered*.

**Concur by:** KENNEDY (In Part)

## Concur

JUSTICE KENNEDY, with whom JUSTICE SCALIA joins, concurring in part and concurring in the judgment.

I am in full agreement with the Court's decision that the competency standard for pleading guilty and waiving the right to counsel is the same [****25] as the test of competency to stand trial. As I have some reservations about one part of the Court's opinion and take a somewhat different path to reach my conclusion, it is appropriate to make some further observations.

The Court compares the types of decisions made by one who goes to trial with the decisions required to plead guilty and waive the right to counsel. This comparison seems to suggest that there may have been a heightened standard of [*403] competency required by the Due Process Clause if the decisions were not equivalent. I have serious doubts about that proposition. In discussing the standard for a criminal defendant's competency to make decisions affecting his case, we should not confuse the content of the standard with the occasions for its application.

[***335] We must leave aside in this case any question whether a defendant is absolved of criminal responsibility due to his mental state at the time he committed criminal acts and any [**2689] later question about whether the defendant has the minimum competence necessary to undergo his sentence. What is at issue here is whether the defendant has sufficient competence to take part in a criminal proceeding and to make the decisions throughout [****26] its course. This is not to imply that mental competence is the only aspect of a defendant's state of mind that is relevant during criminal proceedings. Whether the defendant has made a knowing, intelligent, and voluntary decision to make certain fundamental choices during the course of criminal proceedings is another subject of judicial inquiry. That both questions might be implicated at any given point, however, does not mean that the inquiries cease to be discrete. And as it comes to us, this case

[13] We do not mean to suggest, of course, that a court is required to make a competency determination in every case in which a defendant seeks to plead guilty or to waive his right to counsel. As in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's competence. See *Drope* v. *Missouri, supra*, at 180-181; *Pate* v. *Robinson*, 383 U.S. 375, 385, 15 L. Ed. 2d 815, 86 S. Ct. 836 (1966).

[14] In this case the trial court explicitly found both that respondent was competent and that his waivers were knowing and voluntary. See *supra*, at 392-393.

involves only the standard for determining competency.

This Court set forth the standard for competency to stand trial in *Dusky* v. *United States*, 362 U.S. 402, 4 L. Ed. 2d 824, 80 S. Ct. 788 (1960) *(per curiam)*: "The 'test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him.'" *Ibid*. In my view, both the Court of Appeals and respondent read "competency to stand trial" in too narrow a fashion. We have not suggested that the *Dusky* competency standard applies during the course of, but not before, [****27] trial. Instead, that standard is applicable from the time of arraignment through the return of a verdict. Although the *Dusky* standard refers to "ability to consult [*404] with [a] lawyer," the crucial component of the inquiry is the defendant's possession of "a reasonable degree of rational understanding." In other words, the focus of the *Dusky* formulation is on a particular level of mental functioning, which the ability to consult counsel helps identify. The possibility that consultation will occur is not required for the standard to serve its purpose. If a defendant elects to stand trial and to take the foolish course of acting as his own counsel, the law does not for that reason require any added degree of competence. See *ante*, at 399-400, n. 10.

The Due Process Clause does not mandate different standards of competency at various stages of or for different decisions made during the criminal proceedings. That was never the rule at common law, and it would take some extraordinary showing of the inadequacy of a single standard of competency for us to require States to employ heightened standards. See *Medina* v. *California*, 505 U.S. 437, 446-447, 120 L. Ed. 2d 353, 112 S. Ct. 2572 (1992). Indeed, [****28] we should only overturn Nevada's use of a single standard if it "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Ibid.* (quoting *Patterson* v. *New York*, 432 U.S. 197, 202, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977)).

The historical treatment of competency that supports Nevada's single standard has its roots in English common law. Writing in the 18th century, Blackstone described the [***336] effect of a defendant's incompetence on criminal proceedings:

> "If a man in his sound memory commits a capital offence, and before arraignment for it, he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defence?" 4 W. Blackstone, Commentaries *24.

Accord, 1 M. Hale, Pleas of the Crown *34-*35. [*405] Blackstone drew no distinction between madness for purposes of pleading and madness for purposes of going to trial. An English case arising in the Crown Court in 1865 indicates that a single standard was applied to assess competency at the time of [****29] arraignment, the time of pleading, and throughout the course of trial. See *Regina* v. *Southey*, 4 Fos. & Fin. 864, 872, n. a, 176 Eng. Rep. 825, 828, n. a (N. P. 1865) ("Assuming the prisoner [**2690] to be insane at the time of arraignment, he cannot be tried *at all*, with or without counsel, for, even assuming that he has appointed counsel at a time when he was sane, it is not fit that he should be tried, as he cannot understand the evidence, nor the proceedings, and so is unable to instruct counsel, or to withdraw his authority if he acts improperly, as a prisoner may always do"); *id.*, at 877, n. a, 176 Eng. Rep. at 831, n. a ("If [the defendant] be so insane as not to understand the nature of the proceedings, he cannot plead").

A number of 19th-century American cases also referred to insanity in a manner that suggested there was a single standard by which competency was to be assessed throughout legal proceedings. See, *e.g., Underwood* v. *People*, 32 Mich. 1, 3 (1875) ("Insanity, when discovered, was held at common law to bar any further steps against a prisoner, [****30] at whatever stage of the proceedings"); *Crocker* v. *State*, 60 Wis. 553, 556, 19 N.W. 435, 436 (1884) ("At common law, if a person, after committing a crime, became insane, he was not arraigned during his insanity, but was remitted to prison until such incapacity was removed. The same was true where he became insane after his plea of not guilty and before trial"); *State* v. *Reed*, 41 La. Ann. 581, 582, 7 So. 132 (1889) ("It is elementary that a man cannot plead, or be tried, or convicted, or sentenced, while in a state of insanity"). See also 2 J. Bishop, Commentaries on Law of Criminal Procedure §§ 664, 667 (2d ed. 1872) ("[A] prisoner cannot be tried, sentenced, or punished" unless he is "mentally competent to make a rational defense").

[*406] Other American cases describe the standard by which competency is to be measured in a way that supports the idea that a single standard, parallel to that

articulated in *Dusky*, is applied no matter at what point during legal proceedings a competency question should arise. For example, in *Freeman* v. *People*, 4 Denio 2 (N. Y. 1847), [****31] it was held: "If . . . a person arraigned for a crime, is capable of understanding the nature and object of the proceedings going on against him; if he rightly comprehends his own condition in reference to such proceedings, and can conduct his defence in a rational manner, he is, for the purpose of being tried, to be deemed sane." *Id.*, at 24-25. Because the competency question was posed in *Freeman* at the time the defendant [***337] was to be arraigned, *id.*, at 19, the *Freeman* court's conception of competency to stand trial was that of a single standard to be applied throughout.

An even more explicit recitation of this common-law principle is found in *Hunt* v. *State*, 248 Ala. 217, 27 So. 2d 186 (Ala. 1946). In the course of the opinion in that case, there was a discussion of the common-law rule regarding a defendant's competency to take part in legal proceedings:

> "The rule at common law . . . is that if at any time while criminal proceedings are pending against a person accused of a crime, the trial court either from observation or upon suggestion of counsel has facts brought to his attention which [****32] raise a doubt of the sanity of defendant, the question should be settled before further steps are taken. . . . The broad question to be determined then is whether the defendant is capable of understanding the proceedings and of making his defense, and whether he may have a full, fair and impartial trial." *Id.*, at 191 (citation omitted).

At common law, therefore, no attempt was made to apply different competency standards to different stages of criminal proceedings or to the variety of decisions that a defendant [*407] must make during the course of those proceedings. See *Commonwealth* v. *Woelfel*, 121 Ky. 48, 88 S.W. 1061, 1062 (Ky. 1905); *Jordan* v. *State*, 124 Tenn. 81, 135 S.W. 327, 328-329 (Tenn. 1911); *State* v. *Seminary*, 165 La. 67, 115 So. 370, 371-372 (La. 1927); *State ex rel. Townsend* v. *Bushong*, 146 Ohio St. 271, 272, 65 N.E.2d 407, 408 (1946) *(per curiam); Moss* v. *Hunter*, 167 F.2d 683, 684-685 (CA10 1948). Commentators have agreed that the common-law standard of competency to stand trial, which [****33] [**2691] parallels the *Dusky* standard, has been applied throughout criminal proceedings, not just to the formal trial. See H. Weihofen, Mental Disorder as a Criminal Defense 428-429, 431 (1954) ("It has long been the rule of the common law that a person cannot be required to plead to an indictment or be tried for a crime while he is so mentally disordered as to be incapable of making a rational defense"); S. Brakel, J. Parry, and A. Weiner, The Mentally Disabled and the Law 695-696 (3d ed. 1985) ("It has traditionally been presumed that competency to stand trial means competency to participate in all phases of the trial process, including such pretrial activities as deciding how to plead, participating in plea bargaining, and deciding whether to assert or waive the right to counsel").

That the common law did not adopt heightened competency standards is readily understood when one considers the difficulties that would be associated with more than one standard. The standard applicable at a given point in a trial could be difficult to ascertain. For instance, if a defendant decides to change his plea to guilty after a trial has commenced, one court might apply the competency [****34] standard for undergoing trial while another court might use the standard for pleading guilty. In addition, the subtle nuances among different standards are likely to be difficult to differentiate, as evidenced by the lack of any clear distinction between a "rational understanding" and a "reasoned choice" in this case. See *ante*, at 398.

[*408] It is true, of course, that if a defendant [***338] stands trial instead of pleading guilty, there will be more occasions for the trial court to observe the condition of the defendant to determine his mental competence. Trial courts have the obligation of conducting a hearing whenever there is sufficient doubt concerning a defendant's competence. See *Drope* v. *Missouri*, 420 U.S. 162, 180-181, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975). The standard by which competency is assessed, however, does not change. Respondent's counsel conceded as much during oral argument, making no attempt to defend the contrary position of the Court of Appeals. See, *e.g.*, Tr. of Oral Arg. 22 ("This is not a case of heightened standards"); *id.*, at 31 ("We didn't argue a heightened standard. We did not argue a heightened standard to the Ninth Circuit, nor did we necessarily [****35] argue a heightened standard at any juncture in this case"); *id.*, at 33 ("Due process does not require this higher standard, but requires a separate inquiry").

A single standard of competency to be applied throughout criminal proceedings does not offend any "'principle of justice so rooted in the traditions and conscience of our people as to be ranked as

fundamental.'" *Medina*, 505 U.S. at 446. Nothing in our case law compels a contrary conclusion, and adoption of a rule setting out varying competency standards for each decision and stage of a criminal proceeding would disrupt the orderly course of trial and, from the standpoint of all parties, prove unworkable both at trial and on appellate review.

I would avoid the difficult comparisons engaged in by the Court. In my view, due process does not preclude Nevada's use of a single competency standard for all aspects of the criminal proceeding. Respondent's decision to plead guilty and his decision to waive counsel were grave choices for him to make, but as the Court demonstrates in Part II-B, there is a heightened standard, albeit not one concerned with competence, that must be met before a defendant is allowed [****36] to make those decisions.

[*409] With these observations, I concur in the judgment and in Parts I, II-B, and III of the Court's opinion.

**Dissent by:** BLACKMUN

## Dissent

JUSTICE BLACKMUN, with whom JUSTICE STEVENS joins, dissenting.

Today, the majority holds that a standard of competence designed to measure a defendant's [**2692] ability to consult with counsel and to assist in preparing his defense is constitutionally adequate to assess a defendant's competence to waive the right to counsel and represent himself. In so doing, the majority upholds the death sentence for a person whose decision to discharge counsel, plead guilty, and present no defense well may have been the product of medication or mental illness. I believe the majority's analysis is contrary to both common sense and longstanding case law. Therefore, I dissent.

I

As a preliminary matter, the circumstances under which respondent Richard Allan Moran waived his right to an attorney and pleaded guilty to capital murder bear elaboration. For, although the majority's exposition of the events is accurate, the most significant facts are omitted or relegated to footnotes.

[***339] In August 1984, after killing three people and wounding himself in an attempt to commit suicide, [****37] Moran was charged in a Nevada state court with three counts of capital murder. He pleaded not guilty to all charges, and the trial court ordered a psychiatric evaluation. At this stage, Moran's competence to represent himself was not at issue.

The two psychiatrists who examined him therefore focused solely upon his capacity to stand trial with the assistance of counsel. Dr. Jack A. Jurasky found Moran to be "in full control of his faculties insofar as his ability to aid counsel, assist in his own defense, recall evidence and to give testimony if called upon to do so." App. 8. Dr. Jurasky, however, did express some reservations, observing: "Psychologically, [*410] and perhaps legally speaking, this man, because he is expressing and feeling considerable remorse and guilt, may be inclined to exert less effort towards his own defense." *Ibid*. Nevertheless, under the circumstances, Dr. Jurasky felt that Moran's depressed state of mind was not "necessarily a major consideration." *Ibid*. Dr. William D. O'Gorman also characterized Moran as "very depressed," remarking that he "showed much tearing in talking about the episodes that led up to his present incarceration, particularly in talking [****38] about his ex-wife." *Id.*, at 15-16. But Dr. O'Gorman ultimately concluded that Moran "is knowledgeable of the charges being made against him" and "can assist his attorney, in his own defense, if he so desires." *Id.*, at 17.

In November 1984, just three months after his suicide attempt, Moran appeared in court seeking to discharge his public defender, waive his right to counsel, and plead guilty to all three charges of capital murder. When asked to explain the dramatic change in his chosen course of action, Moran responded that he wished to represent himself because he opposed all efforts to mount a defense. His purpose, specifically, was to prevent the presentation of any mitigating evidence on his behalf at the sentencing phase of the proceeding. The trial judge inquired whether Moran was "presently under the influence of any drug or alcohol," and Moran replied: "Just what they give me in, you know, medications." *Id.*, at 33. Despite Moran's affirmative answer, the trial judge failed to question him further regarding the type, dosage, or effect of the "medications" to which he referred. Had the trial judge done so, he would have discovered that Moran was being administered [****39] simultaneously four different prescription drugs -- phenobarbital, dilantin, inderal, and vistaril. Moran later testified to the numbing effect of these drugs, stating: "I guess I really didn't care about anything . . . . I wasn't very concerned about

anything that [*411] was going on . . . as far as the proceedings and everything were going." *Id.*, at 92. [1]

[***340] [**2693] Disregarding the mounting evidence of Moran's disturbed mental state, the trial judge accepted Moran's waiver of counsel and guilty [****40] pleas after posing a series of routine questions regarding his understanding of his legal rights and the offenses, to which Moran gave largely monosyllabic answers. In a string of affirmative responses, Moran purported to acknowledge that he knew the import of waiving his constitutional rights, that he understood the charges against him, and that he was, in fact, guilty of those charges. One part of this exchange, however, highlights the mechanical character of Moran's answers to the questions. When the trial judge asked him whether he killed his ex-wife "deliberately, with premeditation and malice aforethought," Moran unexpectedly responded: "No. I didn't do it -- I mean, I wasn't looking to kill her, but she ended up dead." *Id.*, at 58. Instead of probing further, the trial judge simply repeated the question, inquiring again whether Moran had acted deliberately. Once again, Moran replied: "I don't know. I mean, I don't know what you mean by deliberately. I mean, I pulled the trigger on purpose, but I didn't plan on doing it; you know what I mean?" *Id.*, at 59. Ignoring the ambiguity of Moran's responses, the trial judge reframed the question to elicit an affirmative answer, [****41] stating: "Well, I've previously explained to you what is meant by deliberation and premeditation. Deliberate means that you arrived at or determined as a result of careful thought and weighing the consideration [*412] for and against the proposed action. Did you do that?" This time, Moran responded: "Yes." *Ibid.*

It was only after prodding Moran through the plea colloquy in this manner that the trial judge concluded that he was competent to stand trial and that he voluntarily and intelligently had waived his right to counsel. Accordingly, Moran was allowed to plead guilty and appear without counsel at his sentencing hearing. Moran presented no defense, called no witness, and offered no mitigating evidence on his own behalf. Not surprisingly, he was sentenced to death.

II

It is axiomatic by now that criminal prosecution of an incompetent defendant offends the Due Process Clause of the Fourteenth Amendment. See *Medina* v. *California*, 505 U.S. 437, 120 L. Ed. 2d 353, 112 S. Ct. 2572 (1992); *Riggins* v. *Nevada*, 504 U.S. 127, 138, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992) (KENNEDY, J., concurring); *Drope* v. *Missouri*, 420 U.S. 162, 171, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975); *Pate* v. *Robinson*, 383 U.S. 375, 378, 15 L. Ed. 2d 815, 86 S. Ct. 836 (1966). [****42] The majority does not deny this principle, nor does it dispute the standard that has been set for competence to stand trial with the assistance of counsel: whether the accused possesses "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope*, 420 U.S. at 171. Accord, *Dusky* v. *United States*, 362 U.S. 402, 4 L. Ed. 2d 824, 80 S. Ct. 788 (1960). My disagreement with the majority turns, then, upon another standard -- the one for assessing a defendant's competence to waive counsel and represent himself.

The majority "reject[s] the notion that competence to plead guilty or to [***341] waive the right to counsel must be measured by a standard that is higher than (or even different from)" the standard for competence to stand trial articulated in *Dusky* and *Drope. Ante*, at 398. But the standard for competence to stand trial is specifically designed to measure a defendant's ability to "consult with counsel" and to "assist in preparing his defense." A finding that a defendant is [*413] competent to stand trial establishes only [**2694] that he is capable of aiding his attorney in [****43] making the critical decisions required at trial or in plea negotiations. The reliability or even relevance of such a finding vanishes when its basic premise -- that counsel will be present -- ceases to exist. The question is no longer whether the defendant can proceed with an attorney, but whether he can proceed alone and uncounseled. I do not believe we place an excessive burden upon a trial court by requiring it to conduct a specific inquiry into that question at the juncture when a defendant whose competency already has been questioned seeks to waive counsel and represent himself.

The majority concludes that there is no need for such a

[1] Moran's medical records, read in conjunction with the Physician's Desk Reference (46 ed. 1992), corroborate his testimony concerning the medications he received and their impact upon him. The records show that Moran was administered dilantin, an antiepileptic medication that may cause confusion; inderal, a beta-blocker antiarrhythmic that may cause light-headedness, mental depression, hallucinations, disorientation, and short-term memory loss; and vistaril, a depressant that may cause drowsiness, tremors, and convulsions. App. 97-98.

hearing because a defendant who is found competent to stand trial with the assistance of counsel is, *ipso facto*, competent to discharge counsel and represent himself. But the majority cannot isolate the term "competent" and apply it in a vacuum, divorced from its specific context. A person who is "competent" to play basketball is not thereby "competent" to play the violin. The majority's monolithic approach to competency is true to neither life nor the law. Competency for one purpose does not necessarily translate to competency for another purpose. [****44] See Bonnie, The Competence of Criminal Defendants: A Theoretical Reformulation, 10 Behav. Sci. & L. 291, 299 (1992); R. Roesch & S. Golding, Competency to Stand Trial 10-13 (1980). Consistent with this commonsense notion, our cases always have recognized that "a defendant's mental condition may be relevant to more than one legal issue, each governed by distinct rules reflecting quite different policies." *Drope*, 420 U.S. at 176. See *Jackson* v. *Indiana*, 406 U.S. 715, 739, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972). To this end, this Court has required competency evaluations to be specifically tailored to the context and purpose of a proceeding. See *Rees* v. *Peyton*, 384 U.S. 312, 314, 16 L. Ed. 2d 583, 86 S. Ct. 1505 (1966) (directing court "to determine [petitioner's] mental competence in the present posture of things").

[*414] In *Massey* v. *Moore*, 348 U.S. 105, 108, 99 L. Ed. 135, 75 S. Ct. 145 (1954), for example, the Court ruled that a defendant who had been found competent to stand trial with the assistance of counsel should have been given a hearing as to his competency to represent himself because "one might not be insane in the sense of being incapable [****45] of standing trial and yet lack the capacity to stand trial without benefit of counsel." [2] And in *Westbrook* v. *Arizona*, 384 U.S. 150, 16 L. Ed. 2d 429, 86 S. Ct. 1320 (1966), the Court reiterated the requirement [***342] that the determination of a defendant's competency be tailored to the particular capacity in question, observing: "Although petitioner received a hearing on the issue of his competence to stand trial, there appears to have been no hearing or inquiry into the issue of his competence to waive his constitutional right to the assistance of counsel and proceed, as he did, to conduct his own defense." See also *Medina*, 505 U.S. at 446-448 (distinguishing between a claim of incompetence and a plea of not guilty by reason of insanity); *Riggins*, 504 U.S. at 140-144 (KENNEDY, J., concurring) (distinguishing between functional competence and competence to stand trial).

[****46] Although the Court never has articulated explicitly the standard for determining competency to represent oneself, it has hinted at its contours. In *Rees* v. *Peyton, supra*, it required an evaluation of competence that was designed to measure the abilities necessary for a defendant to make a decision under analogous circumstances. In that case, a capital defendant who had filed a petition for certiorari ordered his attorney to [**2695] withdraw the petition and forgo further legal proceedings. The petitioner's counsel advised the Court that he could not conscientiously do so without a psychiatric examination of his client because there was some doubt as to [*415] his client's mental competency. Under those circumstances, this Court directed the lower court to conduct an inquiry as to whether the defendant possessed the "capacity to appreciate his position and make a *rational choice* with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." 384 U.S. at 314 (emphasis added). Certainly [****47] the competency required for a capital defendant to proceed *without the advice of counsel* at trial or in plea negotiations should be no less than the competency required for a capital defendant to proceed *against the advice of counsel* to with-draw a petition for certiorari. The standard applied by the Ninth Circuit in this case -- the "reasoned choice" standard -- closely approximates the "rational choice" standard set forth in *Rees*. [3]

Disregarding the plain language of *Westbrook* and *Massey*, the majority in effect overrules those cases *sub* [****48] *silentio*. [4] From the constitutional right of self-

---

[2] The majority's attempt to distinguish *Massey* as a pre-*Gideon* v. *Wainwright*, 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792 (1963), case, *ante*, at 399-400, n. 10, is simply irrelevant. For, as the majority itself concedes, *Massey* stands only for the proposition that the two inquiries are different -- competency to stand trial with the assistance of counsel is not equivalent to competency to proceed alone.

[3] According to the majority, "there is no indication . . . that the phrase ['rational choice'] means something different from 'rational understanding.'" *Ante*, at 398, n. 9. What the majority fails to recognize is that, in the distinction between a defendant who possesses a "rational understanding" of the proceedings and one who is able to make a "rational choice," lies the difference between the capacity for passive and active involvement in the proceedings.

[4] According to the majority, "*Westbrook* stands only for the unremarkable proposition" that a determination of competence

representation established in *Faretta* v. *California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 [***343] (1975), the majority extrapolates that "a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* [*416] self-representation." *Ante*, at 400. But *Faretta* does not confer upon an *incompetent* defendant a constitutional right to conduct his own defense. Indeed, Faretta himself was "literate, competent, and understanding," and the record showed that "he was voluntarily exercising his informed free will." 422 U.S. at 835. "Although a defendant need not himself have the skill and experience of a lawyer," *Faretta's* right of self-representation is confined to those who are able to choose it "competently and intelligently." *Ibid*. The *Faretta* Court was careful to emphasize that the record must establish that the defendant "'knows what he is doing and his choice is made with eyes open.'" *Ibid.*, quoting *Adams* v. *United States ex rel. McCann*, 317 U.S. 269, 279, 87 L. Ed. 268, 63 S. Ct. 236 (1942).

[****49] The majority asserts that "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself." *Ante*, at 399. But this assertion is simply incorrect. The majority's attempt to extricate the competence to waive the right to counsel from the competence to represent oneself is unavailing, because the former decision necessarily entails the latter. It is obvious that a defendant who waives counsel must represent himself. Even Moran, who pleaded guilty, was required to defend himself during the penalty phase of the proceedings. And a defendant who is utterly incapable of conducting his own defense cannot be considered "competent" to make such a decision, any more than a person who chooses to leap out of a window in the belief that he can fly can be considered "competent" to make such a choice.

[**2696] The record in this case gives rise to grave doubts regarding respondent Moran's ability to discharge counsel and represent himself. Just a few months after he attempted to commit suicide, Moran essentially volunteered himself for execution: He sought to waive the right to counsel, to plead guilty [****50] to capital murder, and to prevent the presentation of any mitigating evidence on his behalf. The psychiatrists' reports [*417] supplied one explanation for Moran's self-destructive behavior: his deep depression. And Moran's own testimony suggested another: the fact that he was being administered simultaneously four different prescription medications. It has been recognized that such drugs often possess side effects that may "compromise the right of a medicated criminal defendant to receive a fair trial . . . by rendering him unable or unwilling to assist counsel." *Riggins*, 504 U.S. at 142 (KENNEDY, J., concurring). Moran's plea colloquy only augments the manifold causes for concern by suggesting that his waivers and his assent to the charges against him were not rendered in a truly voluntary and intelligent fashion. Upon this evidence, there can be no doubt that the trial judge should have conducted another competency evaluation to determine Moran's capacity to waive the right to counsel and represent himself, instead of relying upon the psychiatrists' reports [***344] that he was able to stand trial with the assistance of counsel. [5]

[****51] To try, convict, and punish one so helpless to defend himself contravenes fundamental principles of fairness and impugns the integrity of our criminal justice system. I cannot condone the decision to accept, without further inquiry, the self-destructive "choice" of a person who was so deeply medicated and who might well have been severely mentally ill. I dissent.

## References

21 Am Jur 2d, Criminal Law 67, 96, 97, 470, 471, 474; 21A Am Jur 2d, Criminal Law 760, 768, 989, 990

16 Federal Procedure, L Ed, Habeas Corpus 41:166, 41:167

8 Am Jur Pl & Pr Forms (Rev), Criminal Procedure, Forms 201-205

40 Am Jur Proof of Facts 2d 171, Defendant's Competency to Stand Trial

27 Am Jur Trials 1, Representing the Mentally Disabled Criminal Defendant

USCS, Constitution, Amendment 14

to stand trial is not sufficient to waive the right to counsel; "the waiver must also be intelligent and voluntary before it can be accepted." *Ante*, at 401-402. But the majority's attempt to transform a case about the competency to waive counsel into a case about the voluntariness of a waiver needlessly complicates this area of the law. Perhaps competence to waive rights is incorporated into a voluntariness inquiry, but there is no necessary link between the two concepts.

[5] Whether this same evidence implies that Moran's waiver of counsel and guilty pleas were also involuntary remains to be seen. Cf. *Miller* v. *Fenton*, 474 U.S. 104, 88 L. Ed. 2d 405, 106 S. Ct. 445 (1985) (voluntariness is a mixed question of law and fact entitled to independent federal review).

L Ed Digest, Criminal Law 46.7, 53, 59

L Ed Index, Attorneys at Law; Guilty Plea; Incompetent or Insane Persons

ALR Index, Attorney or Assistance of Attorney; Estoppel and Waiver; Guilty Plea; Incompetent and Insane [****52] Persons

Annotation References:

Supreme Court's views as to validity, under due process clause of Federal Constitution's Fourteenth Amendment, of state provisions concerning accused's competence to stand trial. 120 L Ed 2d 1037.

Supreme Court's views as to what constitutes valid waiver of accused's federal constitutional right to counsel. 101 L Ed 2d 1017.

Federal constitutional right to confront witnesses-- Supreme Court cases. 98 L Ed 2d 1115.

Validity of guilty pleas-- Supreme Court cases. 25 L Ed 2d 1025.

Compliance with federal constitutional requirement that guilty pleas be made voluntarily and with understanding, in federal cases involving allegedly mentally incompetent state convicts. 38 ALR Fed 238.

Necessity and sufficiency of competency hearings, as judged by federal constitutional standards, in federal cases involving validity of guilty pleas entered by allegedly incompetent state convicts. 37 ALR Fed 356.

---

End of Document

# Mapp v. Ohio

367 U.S. 643 (1961)

Cited in Opening Brief at: 31

Highlighted language appears at 367 U.S. at 655.

Q Questioned
As of: September 22, 2026 4:02 AM Z

# Mapp v. Ohio

Supreme Court of the United States

March 29, 1961, Argued ; June 19, 1961, Decided

No. 236

**Reporter**
367 U.S. 643 *; 81 S. Ct. 1684 **; 6 L. Ed. 2d 1081 ***; 1961 U.S. LEXIS 812 ****; 84 A.L.R.2d 933; 86 Ohio L. Abs. 513; 16 Ohio Op. 2d 384

MAPP v. OHIO

**Prior History:** [****1] APPEAL FROM THE SUPREME COURT OF OHIO.

**Disposition:** 170 Ohio St. 427, 166 N. E. 2d 387, reversed.

## Syllabus

All evidence obtained by searches and seizures in violation of the Federal Constitution is inadmissible in a criminal trial in a state court. *Wolf* v. *Colorado*, 338 U.S. 25, overruled insofar as it holds to the contrary. Pp. 643-660.

**Counsel:** A. L. Kearns argued the cause for appellant. With him on the brief was Walter L. Greene.

Gertrude Bauer Mahon argued the cause for appellee. With her on the brief was John T. Corrigan.

Bernard A. Berkman argued the cause for the American Civil Liberties Union et al., as amici curiae, urging reversal. With him on the brief was Rowland Watts.

**Judges:** Warren, Black, Frankfurter, Douglas, Clark, Harlan, Brennan, Whittaker, Stewart

**Opinion by:** CLARK

## Opinion

[*643] [***1083] [**1685] MR. JUSTICE CLARK delivered the opinion of the Court.

Appellant stands convicted of knowingly having had in her possession and under her [****2] control certain lewd and lascivious books, pictures, and photographs in violation of § 2905.34 of Ohio's Revised Code. [1] As officially stated in the syllabus to its opinion, the Supreme Court of Ohio found that her conviction was valid though "based primarily upon the introduction in evidence of lewd and lascivious books and pictures unlawfully seized during an unlawful search of defendant's home . . . ." 170 Ohio St. 427-428, 166 N. E. 2d 387, 388.

[*644] On May 23, 1957, three Cleveland police officers arrived at appellant's residence in that city pursuant to information that "a person [was] hiding out in the home, who was [****3] wanted for questioning in connection with a recent bombing, and that there was a large amount of policy paraphernalia being hidden in the home." Miss Mapp and her daughter by a former marriage lived on the top floor of the two-family dwelling. Upon their arrival at that house, the officers knocked on the door and demanded entrance but appellant, after telephoning her attorney, refused to admit them without a search warrant. They advised their headquarters [***1084] of the situation and undertook a surveillance of the house.

The officers again sought entrance some three hours later when four or more additional officers arrived on the [**1686] scene. When Miss Mapp did not come to the door immediately, at least one of the several doors to the house was forcibly opened [2] and the policemen

---

[1] The statute provides in pertinent part that

"No person shall knowingly . . . have in his possession or under his control an obscene, lewd, or lascivious book [or] . . . picture . . . .

"Whoever violates this section shall be fined not less than two hundred nor more than two thousand dollars or imprisoned not less than one nor more than seven years, or both."

[2] A police officer testified that "we did pry the screen door to

gained admittance. Meanwhile Miss Mapp's attorney arrived, but the officers, having secured their own entry, and continuing in their defiance of the law, would permit him neither to see Miss Mapp nor to enter the house. It appears that Miss Mapp was halfway down the stairs from the upper floor to the front door when the officers, in this highhanded manner, broke into the hall. She demanded [****4] to see the search warrant. A paper, claimed to be a warrant, was held up by one of the officers. She grabbed the "warrant" and placed it in her bosom. A struggle ensued in which the officers recovered the piece of paper and as a result of which they handcuffed appellant because she had been "belligerent" [*645] in resisting their official rescue of the "warrant" from her person. Running roughshod over appellant, a policeman "grabbed" her, "twisted [her] hand," and she "yelled [and] pleaded with him" because "it was hurting." Appellant, in handcuffs, was then forcibly taken upstairs to her bedroom where the officers searched a dresser, a chest of drawers, a closet and some suitcases. They also looked into a photo album and through personal papers belonging to the appellant. The search spread to the rest of the second floor including the child's bedroom, the living room, the kitchen and a dinette. The basement of the building and a trunk found therein were also searched. The obscene materials for possession of which she was ultimately convicted were discovered in the course of that widespread search.

[****5] At the trial no search warrant was produced by the prosecution, nor was the failure to produce one explained or accounted for. At best, "There is, in the record, considerable doubt as to whether there ever was any warrant for the search of defendant's home." 170 Ohio St., at 430, 166 N. E. 2d, at 389. The Ohio Supreme Court believed a "reasonable argument" could be made that the conviction should be reversed "because the 'methods' employed to obtain the [evidence] . . . were such as to 'offend "a sense of justice,"'" but the court found determinative the fact that the evidence had not been taken "from defendant's person by the use of brutal or offensive physical force against defendant." 170 Ohio St., at 431, 166 N. E. 2d, at 389-390.

The State says that even if the search were made without authority, or otherwise unreasonably, it is not prevented from using the unconstitutionally seized evidence at trial, citing *Wolf* v. *Colorado*, 338 U.S. 25 (1949), in which this Court did indeed hold "that in a prosecution in a State court for a State crime the Fourteenth Amendment [*646] does not forbid the admission of evidence obtained [****6] by an unreasonable search and seizure." At p. 33. On this appeal, of which we have noted probable jurisdiction, 364 U.S. 868, [***1085] it is urged once again that we review that holding. [3]

I.

Seventy-five years ago, in *Boyd* v. *United States*, 116 U.S. 616, 630 (1886), considering the [**1687] Fourth [4] and Fifth Amendments as running "almost into each other" [5] on the facts before it, this Court held that the doctrines of those Amendments

"apply to all invasions on the part of [****7] the government and its employes of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, [*647] that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property . . . . Breaking into a house and opening boxes and drawers are

---

gain entrance"; the attorney on the scene testified that a policeman "tried . . . to kick in the door" and then "broke the glass in the door and somebody reached in and opened the door and let them in"; the appellant testified that "The back door was broken."

[3] Other issues have been raised on this appeal but, in the view we have taken of the case, they need not be decided. Although appellant chose to urge what may have appeared to be the surer ground for favorable disposition and did not insist that *Wolf* be overruled, the *amicus curiae*, who was also permitted to participate in the oral argument, did urge the Court to overrule *Wolf*.

[4] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[5] The close connection between the concepts later embodied in these two Amendments had been noted at least as early as 1765 by Lord Camden, on whose opinion in *Entick* v. *Carrington*, 19 Howell's State Trials 1029, the *Boyd* court drew heavily. Lord Camden had noted, at 1073:

"It is very certain, that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem, that search for evidence is disallowed upon the same principle. There too the innocent would be confounded with the guilty."

circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation . . . [of those Amendments]."

The Court noted that

"constitutional provisions for the security of person and property should be liberally construed. . . . It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." At p. 635.

In this jealous regard for maintaining the integrity of individual rights, the Court gave life to Madison's prediction that "independent tribunals of justice . . . will be [****8] naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." I Annals of Cong. 439 (1789). Concluding, the Court specifically referred to the use of the evidence there seized as "unconstitutional." At p. 638.

[****9] Less than 30 years after *Boyd*, this Court, in *Weeks* v. *United States*, 232 U.S. 383 (1914), stated that

"the Fourth Amendment . . . put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints [and] . . . forever secure[d] the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law . . . and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system [***1086] with the enforcement of the laws." At pp. 391-392.

[*648] Specifically dealing with the use of the evidence unconstitutionally seized, the Court concluded:

"If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken [**1688] from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy [****10] as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land." At p. 393.

Finally, the Court in that case clearly stated that use of the seized evidence involved "a denial of the constitutional rights of the accused." At p. 398. Thus, in the year 1914, in the *Weeks* case, this Court "for the first time" held that "in a federal prosecution the Fourth Amendment barred the use of evidence secured through an illegal search and seizure." *Wolf* v. *Colorado, supra*, at 28. This Court has ever since required of federal law officers a strict adherence to that command which this Court has held to be a clear, specific, and constitutionally required -- even if judicially implied -- deterrent safeguard without insistence upon which the Fourth Amendment would have been reduced to "a form of words." Holmes, J., *Silverthorne Lumber Co*. v. *United States*, 251 U.S. 385, 392 (1920). It meant, quite simply, that "conviction by means [****11] of unlawful seizures and enforced confessions . . . should find no sanction in the judgments of the courts . . . ," *Weeks* v. *United States, supra*, at 392, and that such evidence "shall not be used at all." *Silverthorne Lumber Co*. v. *United States, supra*, at 392.

[*649] There are in the cases of this Court some passing references to the *Weeks* rule as being one of evidence. But the plain and unequivocal language of *Weeks* -- and its later paraphrase in *Wolf* -- to the effect that the *Weeks* rule is of constitutional origin, remains entirely undisturbed. In *Byars* v. *United States*, 273 U.S. 28 (1927), a unanimous Court declared that "the doctrine [cannot] . . . be tolerated *under our constitutional system*, that evidences of crime discovered by a federal officer in making a search without lawful warrant may be used against the victim of the unlawful search where a timely challenge has been interposed." At pp. 29-30 (emphasis added). The Court, in *Olmstead* v. *United States*, 277 U.S. 438 (1928), in unmistakable language restated the *Weeks* rule:

"The striking outcome of [****12] the *Weeks* case and those which followed it was the sweeping declaration that the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction if obtained by government officers through a violation of the Amendment." At p. 462.

In *McNabb* v. *United States*, 318 U.S. 332 (1943), we note this statement:

"[A] conviction in the federal courts, the foundation of which is [***1087] evidence obtained in disregard of liberties deemed fundamental by the Constitution, cannot stand. *Boyd* v. *United States . . . Weeks* v. *United States* . . . . And this Court has, on

Constitutional grounds, set aside convictions, both in the federal and state courts, which were based upon confessions 'secured by protracted and repeated questioning of ignorant and untutored persons, in whose minds the power of officers was greatly magnified' [*650] . . . or 'who have been unlawfully held incommunicado without advice of friends or counsel' . . . ." At pp. 339-340.

Significantly, in *McNabb*, the Court did then pass on to formulate a rule of evidence, saying, "in the view we take of [**1689] [****13] the case, however, it becomes unnecessary to reach the Constitutional issue [for] . . . the principles governing the admissibility of evidence in federal criminal trials have not been restricted . . . to those derived solely from the Constitution." At pp. 340-341.

II.

In 1949, 35 years after *Weeks* was announced, this Court, in *Wolf* v. *Colorado, supra*, again for the first time, [6] discussed the effect of the Fourth Amendment upon the States through the operation of the Due Process Clause of the Fourteenth Amendment. It said:

"We have no hesitation in saying that were a State affirmatively to sanction such police incursion into privacy it would run counter to the guaranty of the Fourteenth Amendment." At p. 28.

Nevertheless, after declaring that the "security of one's privacy against arbitrary intrusion by the police" is "implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause," cf. *Palko* v. *Connecticut*, 302 U.S. 319 (1937), and announcing that it "stoutly adhere[d]" to the *Weeks* decision, the Court decided that the *Weeks* exclusionary rule would not [****14] then be imposed upon the States as "an essential ingredient of the right." 338 U.S., at 27-29. The Court's reasons for not considering essential to the [*651] right to privacy, as a curb imposed upon the States by the Due Process Clause, that which decades before had been posited as part and parcel of the Fourth Amendment's limitation upon federal encroachment of individual privacy, were bottomed on factual considerations.

While they are not basically relevant to a decision that the exclusionary rule is an essential ingredient of the Fourth Amendment as the right it embodies is vouchsafed against the States by the Due Process Clause, we will consider the current validity of the factual grounds upon which *Wolf* was based.

The Court in *Wolf* first stated that "the contrariety of views of the States" on the adoption of the exclusionary [****15] rule of *Weeks* was "particularly impressive" (at p. 29); and, in this connection, that it could not "brush aside the experience of States which deem the incidence of such conduct by the police too slight to call for a deterrent remedy . . . by overriding the [States'] relevant rules of evidence." At pp. 31-32. While in 1949, prior to the *Wolf* case, almost two-thirds of the States [***1088] were opposed to the use of the exclusionary rule, now, despite the *Wolf* case, more than half of those since passing upon it, by their own legislative or judicial decision, have wholly or partly adopted or adhered to the *Weeks* rule. See *Elkins* v. *United States*, 364 U.S. 206, Appendix, pp. 224-232 (1960). Significantly, among those now following the rule is California, which, according to its highest court, was "compelled to reach that conclusion because other remedies have completely failed to secure compliance with the constitutional provisions . . . ." *People* v. *Cahan*, 44 Cal. 2d 434, 445, 282 P. 2d 905, 911 (1955). In connection with this California case, we note that the second basis elaborated in *Wolf* in support of its failure [****16] to enforce the exclusionary doctrine against the States was that "other means of protection" have been afforded "[**1690] the [*652] right to privacy." [7] 338 U.S., at 30. The experience of California

---

[6] See, however, *National Safe Deposit Co.* v. *Stead*, 232 U.S. 58 (1914), and *Adams* v. *New York*, 192 U.S. 585 (1904).

[7] Less than half of the States have any criminal provisions relating directly to unreasonable searches and seizures. The punitive sanctions of the 23 States attempting to control such invasions of the right of privacy may be classified as follows:

*Criminal Liability of Affiant for Malicious Procurement of Search Warrant.* -- Ala. Code, 1958, Tit. 15, § 99; Alaska Comp. Laws Ann., 1949, § 66-7-15; Ariz. Rev. Stat. Ann., 1956, § 13-1454; Cal. Pen. Code § 170; Fla. Stat., 1959, § 933.16; Ga. Code Ann., 1953, § 27-301; Idaho Code Ann., 1948, § 18-709; Iowa Code Ann., 1950, § 751.38; Minn. Stat. Ann., 1947, § 613.54; Mont. Rev. Codes Ann., 1947, § 94-35-122; Nev. Rev. Stat. §§ 199.130, 199.140; N. J. Stat. Ann., 1940, § 33:1-64; N. Y. Pen. Law § 1786, N. Y. Code Crim. Proc. § 811; N. C. Gen. Stat., 1953, § 15-27 (applies to "officers" only); N. D. Century Code Ann., 1960, §§ 12-17-08, 29-29-18; Okla. Stat., 1951, Tit. 21, § 585, Tit. 22, § 1239; Ore. Rev. Stat. § 141.990; S. D. Code, 1939 (Supp. 1960), § 34.9904; Utah Code Ann., 1953, § 77-54-21.

that such other remedies have been worthless and futile is buttressed by the experience of other States. The obvious futility of relegating the Fourth Amendment to the protection of other remedies has, moreover, been [*653] recognized by this Court since *Wolf*. See *Irvine* v. *California*, 347 U.S. 128, 137 (1954).

[****17] [1][2]Likewise, time has set its face against what *Wolf* called the "weighty testimony" of *People* v. *Defore*, 242 N. Y. 13, 150 N. E. 585 (1926).There Justice (then Judge) Cardozo, rejecting adoption of the *Weeks* exclusionary rule in New York, had said that "the Federal rule as it stands is either too strict or too lax." 242 N. Y., at 22, 150 N. E., at 588. However, the force of that reasoning has been largely vitiated by later decisions of this Court. These include the recent discarding of the "silver platter" doctrine which allowed federal judicial use of evidence seized in violation of the Constitution [***1089] by state agents, *Elkins* v. *United States, supra*; the relaxation of the formerly strict requirements as to standing to challenge the use of evidence thus seized, so that now the procedure of exclusion, "ultimately referable to constitutional safeguards," is available to anyone even "legitimately on [the] premises" unlawfully searched, *Jones* v. *United States*, 362 U.S. 257, 266-267 (1960); [****18] and, finally, the formulation of a method to prevent state use of evidence unconstitutionally seized by federal agents, *Rea* v. *United States*, 350 U.S. 214 (1956). Because there can be no fixed formula, we are admittedly met with "recurring questions of the reasonableness of searches," but less is not to be expected when dealing with a Constitution, and, at any rate, "reasonableness is in the first instance for the [trial court] . . . to determine." *United States* v. *Rabinowitz*, 339 U.S. 56, 63 [**1691] (1950).

It, therefore, plainly appears that the factual considerations supporting the failure of the *Wolf* Court to include the *Weeks* exclusionary rule when it recognized the enforceability of the right to privacy against the States in 1949, while not basically relevant to the constitutional consideration, could not, in any analysis, now be deemed controlling.

[*654] III.

Some five years after *Wolf*, in answer to a plea made here Term after Term that we overturn its doctrine on applicability of the *Weeks* exclusionary rule, this Court indicated that such should not be done until the States had "adequate opportunity [****19] to adopt or reject the [*Weeks*] rule." *Irvine* v. *California, supra*, at 134. There again it was said:

"Never until June of 1949 did this Court hold the basic search-and-seizure prohibition in any way applicable to the states under the Fourteenth Amendment." *Ibid*.

[3]And only last Term, after again carefully re-examining the *Wolf* doctrine in *Elkins* v. *United States, supra*, the Court pointed out that "the controlling principles" as to search and seizure and the problem of admissibility "seemed clear" (at p. 212) until the announcement in *Wolf* "that the Due Process Clause of the Fourteenth Amendment does not itself require state courts to adopt the exclusionary rule" of the *Weeks* case. At p. 213. At the same time, the Court pointed out, "the underlying constitutional doctrine which *Wolf* established . . . that the Federal Constitution . . . prohibits unreasonable searches and seizures by state officers" had undermined the "foundation upon which the admissibility of stateseized evidence in a federal trial originally rested . [****20] . . ." *Ibid*. The Court concluded that it was therefore obliged to hold, although it chose the narrower ground on which to do so, that all evidence obtained by an unconstitutional search and seizure was inadmissible in a federal court regardless of

---

*Criminal Liability of Magistrate Issuing Warrant Without Supporting Affidavit.* -- N. C. Gen. Stat., 1953, § 15-27; Va. Code Ann., 1960 Replacement Volume, § 19.1-89.

*Criminal Liability of Officer Willfully Exceeding Authority of Search Warrant.* -- Fla. Stat. Ann., 1944, § 933.17; Iowa Code Ann., 1950, § 751.39; Minn. Stat. Ann., 1947, § 613.54; Nev. Rev. Stat. § 199.450; N. Y. Pen. Law § 1847, N. Y. Code Crim. Proc. § 812; N. D. Century Code Ann., 1960, §§ 12-17-07, 29-29-19; Okla. Stat., 1951, Tit. 21, § 536, Tit. 22, § 1240; S. D. Code, 1939 (Supp. 1960), § 34.9905; Tenn. Code Ann., 1955, § 40-510; Utah Code Ann., 1953, § 77-54-22.

*Criminal Liability of Officer for Search with Invalid Warrant or no Warrant.* -- Idaho Code Ann., 1948, § 18-703; Minn. Stat. Ann., 1947, §§ 613.53, 621.17; Mo. Ann. Stat., 1953, § 558.190; Mont. Rev. Codes Ann., 1947, § 94-3506; N. J. Stat. Ann., 1940, § 33:1-65; N. Y. Pen. Law § 1846; N. D. Century Code Ann., 1960, § 12-17-06; Okla. Stat. Ann., 1958, Tit. 21, § 535; Utah Code Ann., 1953, § 76-28-52; Va. Code Ann., 1960 Replacement Volume, § 19.1-88; Wash. Rev. Code §§ 10.79.040, 10.79.045.

its source. Today we once again examine *Wolf's* constitutional documentation of the right to privacy free from unreasonable state intrusion, and, after its dozen years on our books, are led by it to close the only [*655] courtroom door remaining [***1090] open to evidence secured by official lawlessness in flagrant abuse of that basic right, reserved to all persons as a specific guarantee against that very same unlawful conduct. We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court.

IV.

[4]Since the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against [****21] them by the same sanction of exclusion as is used against the Federal Government. Were it otherwise, then just as without the *Weeks* rule the assurance against unreasonable federal searches and seizures would be "a form of words," valueless and undeserving of mention in a perpetual charter of inestimable human liberties, so too, without that rule the freedom from state invasions of privacy would be so ephemeral and so neatly severed from its conceptual nexus with the freedom from all brutish means of coercing evidence as not to merit this Court's high regard as a freedom "implicit in the concept of ordered liberty." At the time that the Court held in *Wolf* that the Amendment was applicable to the States through the Due Process Clause, the cases of this Court, as we have seen, had steadfastly held that as to federal officers the Fourth Amendment included the exclusion of the evidence seized in violation [**1692] of its provisions. Even *Wolf* "stoutly adhered" to that proposition. The right to privacy, when conceded operatively enforceable against the States, was not susceptible of destruction by avulsion of the sanction upon which its protection and enjoyment had always [****22] been deemed dependent under the *Boyd, Weeks* and *Silverthorne* cases. Therefore, in extending the substantive protections of due process to all constitutionally unreasonable searches -- state or federal -- it was [*656] logically and constitutionally necessary that the exclusion doctrine -- an essential part of the right to privacy -- be also insisted upon as an essential ingredient of the right newly recognized by the *Wolf* case. In short, the admission of the new constitutional right by *Wolf* could not consistently tolerate denial of its most important constitutional privilege, namely, the exclusion of the evidence which an accused had been forced to give by reason of the unlawful seizure. To hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment. Only last year the Court itself recognized that the purpose of the exclusionary rule "is to deter -- to compel respect for the constitutional guaranty in the only effectively available way -- by removing the incentive to disregard it." *Elkins* v. *United States, supra*, at 217.

[5]Indeed, [****23] we are aware of no restraint, similar to that rejected today, conditioning the enforcement of any other basic constitutional right. The right to privacy, no less important than any other right carefully and particularly reserved to the people, would stand in marked contrast to all other rights declared as "basic to a free society." *Wolf* v. *Colorado, supra*, at 27. This Court has not hesitated to enforce as strictly against the States as it does against the Federal Government the rights of free speech and of a free press, the rights to notice and to a fair, public trial, including, [***1091] as it does, the right not to be convicted by use of a coerced confession, however logically relevant it be, and without regard to its reliability. *Rogers* v. *Richmond*, 365 U.S. 534 (1961). And nothing could be more certain than that when a coerced confession is involved, "the relevant rules of evidence" are overridden without regard to "the incidence of such conduct by the police," slight or frequent. Why should not the same rule apply to what is tantamount to coerced testimony by way of unconstitutional seizure of goods, papers, effects, documents, [****24] etc.? We find that, [*657] as to the Federal Government, the Fourth and Fifth Amendments and, as to the States, the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an "intimate relation" [8] in their perpetuation of "principles of humanity and civil liberty [secured] . . . only after years of struggle," *Bram* v. *United States*, 168 U.S. 532, 543-544 (1897). They express "supplementing phases of the same constitutional purpose -- to maintain inviolate large areas of personal privacy." *Feldman* v. *United States*, 322 U.S. 487, 489-490 (1944). The philosophy of each Amendment and of each freedom is complementary to, although not dependent upon, that of the other in its sphere of influence -- the very least that together they assure in either sphere is that no man is to be convicted on unconstitutional evidence. Cf. *Rochin*

---

[8] But compare *Waley* v. *Johnston*, 316 U.S. 101, 104, and *Chambers* v. *Florida*, 309 U.S. 227, 236, with *Weeks* v. *United States*, 232 U.S. 383, and *Wolf* v. *Colorado*, 338 U.S. 25.

v. *California*, 342 U.S. 165, 173 (1952).

[****25] [**1693] V.

[6] [7]Moreover, our holding that the exclusionary rule is an essential part of both the Fourth and Fourteenth Amendments is not only the logical dictate of prior cases, but it also makes very good sense. There is no war between the Constitution and common sense. Presently, a federal prosecutor may make no use of evidence illegally seized, but a State's attorney across the street may, although he supposedly is operating under the enforceable prohibitions of the same Amendment. Thus the State, by admitting evidence unlawfully seized, serves to encourage disobedience to the Federal Constitution which it is bound to uphold. Moreover, as was said in *Elkins*, "the very essence of a healthy federalism depends upon the avoidance of needless conflict between [*658] state and federal courts." 364 U.S., at 221. Such a conflict, hereafter needless, arose this very Term, in *Wilson* v. *Schnettler*, 365 U.S. 381 (1961), in which, and in spite of the promise made by *Rea*, we gave full [****26] recognition to our practice in this regard by refusing to restrain a federal officer from testifying in a state court as to evidence unconstitutionally seized by him in the performance of his duties. Yet the double standard recognized until today hardly put such a thesis into practice. In nonexclusionary States, federal officers, being human, were by it invited to and did, as our cases indicate, step across [***1092] the street to the State's attorney with their unconstitutionally seized evidence. Prosecution on the basis of that evidence was then had in a state court in utter disregard of the enforceable Fourth Amendment. If the fruits of an unconstitutional search had been inadmissible in both state and federal courts, this inducement to evasion would have been sooner eliminated. There would be no need to reconcile such cases as *Rea* and *Schnettler*, each pointing up the hazardous uncertainties of our heretofore ambivalent approach.

[8]Federal-state cooperation in the solution of crime under constitutional standards will be promoted, if only by recognition of their now mutual obligation to [****27] respect the same fundamental criteria in their approaches. "However much in a particular case insistence upon such rules may appear as a technicality that inures to the benefit of a guilty person, the history of the criminal law proves that tolerance of shortcut methods in law enforcement impairs its enduring effectiveness." *Miller* v. *United States*, 357 U.S. 301, 313 (1958). Denying shortcuts to only one of two cooperating law enforcement agencies tends naturally to breed legitimate suspicion of "working arrangements" whose results are equally tainted. *Byars* v. *United States*, 273 U.S. 28 (1927); *Lustig* v. *United States*, 338 U.S. 74 (1949).

[*659] There are those who say, as did Justice (then Judge) Cardozo, that under our constitutional exclusionary doctrine "the criminal is to go free because the constable has blundered." *People* v. *Defore*, 242 N. Y., at 21, 150 N. E., at 587. In some cases this will undoubtedly be the result. [9] But, as was [**1694] said in *Elkins*, "there is another consideration -- the imperative of judicial integrity." 364 U.S., at 222. The criminal [****28] goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence. As Mr. Justice Brandeis, dissenting, said in *Olmstead* v. *United States*, 277 U.S. 438, 485 (1928): "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. . . . If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." Nor can it lightly be assumed that, as a practical matter, adoption of the exclusionary rule fetters law enforcement. Only last year this Court expressly considered that contention and found that "pragmatic evidence of a sort" to the contrary was not wanting. *Elkins* v. *United States, supra*, at 218. The Court noted that

"The federal courts themselves have operated under the exclusionary rule of *Weeks* for almost half [***1093] a century; [*660] yet it has not been suggested either

---

9

[9]As is always the case, however, state procedural requirements governing assertion and pursuance of direct and collateral constitutional challenges to criminal prosecutions must be respected. We note, moreover, that the class of state convictions possibly affected by this decision is of relatively narrow compass when compared with *Burns* v. *Ohio*, 360 U.S. 252, *Griffin* v. *Illinois*, 351 U.S. 12, and *Herman* v. *Claudy*, 350 U.S. 116. In those cases the same contention was urged and later proved unfounded. In any case, further delay in reaching the present result could have no effect other than to compound the difficulties.

that the Federal Bureau of Investigation [10] has thereby been rendered ineffective, [****29] or that the administration of criminal justice in the federal courts has thereby been disrupted. Moreover, the experience of the states is impressive. . . . The movement towards the rule of exclusion has been halting but seemingly inexorable." *Id*., at 218-219.

[****30] The ignoble shortcut to conviction left open to the State tends to destroy the entire system of constitutional restraints on which the liberties of the people rest. [11] Having once recognized that the right to privacy embodied in the Fourth Amendment is enforceable against the States, and that the right to be secure against rude invasions of privacy by state officers is, therefore, constitutional in origin, we can no longer permit that right to remain an empty promise. Because it is enforceable in the same manner and to like effect as other basic rights secured by the Due Process Clause, we can no longer permit it to be revocable at the whim of any police officer who, in the name of law enforcement itself, chooses to suspend its enjoyment. Our decision, founded on reason and truth, gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice.

[****31] The judgment of the Supreme Court of Ohio is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded*.

**Concur by:** BLACK; DOUGLAS

## Concur

[*661] MR. JUSTICE BLACK, concurring.

For nearly fifty years, since the decision of this Court in *Weeks* v. *United States*, [1] federal courts have refused to permit the introduction into evidence against an accused of his papers and effects obtained by "unreasonable searches and seizures" in violation of the Fourth Amendment. In *Wolf* v. *Colorado*, decided in 1948, however, this Court held that "in [**1695] a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure." [2] I concurred in that holding on these grounds:

"For reasons stated in my dissenting opinion in *Adamson* v. *California*, 332 U.S. 46, 68, I agree with the conclusion of the Court that the Fourth Amendment's prohibition of 'unreasonable searches and seizures' is enforceable against the states. Consequently, I should be for reversal of this case if I thought the Fourth Amendment [****32] not only prohibited 'unreasonable searches and seizures,' but also, of itself, barred the use of evidence so unlawfully obtained. But I agree with what appears to [***1094] be a plain implication of the Court's opinion that the federal exclusionary rule is not a command of the Fourth Amendment but is a judicially created rule of evidence which Congress might negate." [3]

I am still not persuaded that the Fourth Amendment, standing alone, would be enough to bar the introduction into evidence against an accused of papers and effects seized from him in violation of its commands. For the Fourth Amendment does not itself contain any provision expressly precluding the use of such evidence, and I am [*662] extremely doubtful that such a provision could properly be inferred from nothing more than the basic command against unreasonable searches and seizures. Reflection on the problem, [****33] however, in the light of cases coming before the Court since *Wolf*, has led me to conclude that when the Fourth Amendment's ban against unreasonable searches and seizures is considered together with the Fifth Amendment's ban against compelled self-incrimination, a constitutional basis emerges which not only justifies but actually requires the exclusionary rule.

The close interrelationship between the Fourth and Fifth

---

[10] See the remarks of Mr. Hoover, Director of the Federal Bureau of Investigation, FBI Law Enforcement Bulletin, September, 1952, pp. 1-2, quoted in *Elkins* v. *United States*, 364 U.S. 206, 218-219, note 8.

[11] Cf. *Marcus* v. *Search Warrant, post*, p. 717.

[1] 232 U.S. 383, decided in 1914.

[2] 338 U.S. 25, 33.

[3] *Id*., at 39-40.

Amendments, as they apply to this problem, [4] [****35] has long been recognized and, indeed, was expressly made the ground for this Court's holding in *Boyd* v. *United States*. [5] There the Court fully discussed this relationship and declared itself "unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself." [6] It was upon this ground that Mr. Justice Rutledge largely relied in his dissenting opinion in the *Wolf* case. [7] And, although I rejected the argument at that time, its force has, for me at least, become compelling with the more thorough understanding of the problem brought on by recent cases. In the final analysis, it seems to me [****34] that the *Boyd* doctrine, though perhaps not required by the express language of the Constitution strictly construed, is amply justified from an historical standpoint, soundly based in [**1696] reason, [*663] and entirely consistent with what I regard to be the proper approach to interpretation of our Bill of Rights -- an approach well set out by Mr. Justice Bradley in the *Boyd* case:

"Constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." [8]

The [***1095] case of *Rochin* v. *California*, [9] which we decided three years after the *Wolf* case, authenticated, I think, the soundness of Mr. Justice Bradley's and Mr. Justice Rutledge's reliance upon the [****36] interrelationship between the Fourth and Fifth Amendments as requiring the exclusion of unconstitutionally seized evidence. In the *Rochin* case, three police officers, acting with neither a judicial warrant nor probable cause, entered Rochin's home for the purpose of conducting a search and broke down the door to a bedroom occupied by Rochin and his wife. Upon their entry into the room, the officers saw Rochin pick up and swallow two small capsules. They immediately seized him and took him in handcuffs to a hospital where the capsules [*664] were recovered by use of a stomach pump. Investigation showed that the capsules contained morphine and evidence of that fact was made the basis of his conviction of a crime in a state court.

When the question of the validity of that conviction was brought here, we were presented with an almost perfect example of the interrelationship between the Fourth and Fifth Amendments. Indeed, every member of this Court who participated in the [****37] decision of that case recognized this interrelationship and relied on it, to some extent at least, as justifying reversal of Rochin's conviction. The majority, though careful not to mention the Fifth Amendment's provision that "no person . . . shall be compelled in any criminal case to be a witness against himself," showed at least that it was not unaware that such a provision exists, stating: "Coerced confessions offend the community's sense of fair play and decency. . . . It would be a stultification of the responsibility which the course of constitutional history has cast upon this Court to hold that in order to convict a man the police cannot extract by force what is in his mind but can extract what is in his stomach." [10] The methods used by the police thus were, according to the majority, "too close to the rack and the screw to permit of constitutional differentiation," [11] and the case was reversed on the ground that these methods had violated the Due Process Clause of the Fourteenth Amendment

---

[4] The interrelationship between the Fourth and the Fifth Amendments in this area does not, of course, justify a narrowing in the interpretation of either of these Amendments with respect to areas in which they operate separately. See *Feldman* v. *United States*, 322 U.S. 487, 502-503 (dissenting opinion); *Frank* v. *Maryland*, 359 U.S. 360, 374-384 (dissenting opinion).

[5] 116 U.S. 616.

[6] *Id.*, at 633.

[7] 338 U.S., at 47-48.

[8] 116 U.S., at 635. As the Court points out, Mr. Justice Bradley's approach to interpretation of the Bill of Rights stemmed directly from the spirit in which that great charter of liberty was offered for adoption on the floor of the House of Representatives by its framer, James Madison: "If they [the first ten Amendments] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." I Annals of Congress 439 (1789).

[9] 342 U.S. 165.

[10] *Id.*, at 173.

[11] *Id.*, at 172.

in that the [**1697] treatment accorded Rochin was of a kind that "shocks the conscience," "offend[s] 'a sense of justice'" and fails to "respect certain decencies of civilized [****38] conduct." [12]

I concurred in the reversal of the *Rochin* case, but on the ground that the Fourteenth Amendment made the Fifth Amendment's provision against self-incrimination [*665] applicable to the States and that, given a broad rather than a narrow construction, that provision barred the introduction of this "capsule" evidence just as much as it would have forbidden the use of words Rochin might have been coerced to speak. [13] [****39] In reaching this conclusion I cited and relied on the *Boyd* case, the constitutional doctrine of which was, of course, necessary to my disposition of the case. At that time, however, these views were very definitely in [***1096] the minority for only MR. JUSTICE DOUGLAS and I rejected the flexible and uncertain standards of the "shock-the-conscience test" used in the majority opinion. [14]

Two years after *Rochin*, in *Irvine* v. *California*, [15] we were again called upon to consider the validity of a conviction based on evidence which had been obtained in a manner clearly unconstitutional and arguably shocking to the conscience. The five opinions written by this Court in that case demonstrate the utter confusion and uncertainty that had been brought about by the *Wolf* and *Rochin* decisions. In concurring, MR. JUSTICE CLARK emphasized the unsatisfactory nature of the Court's "shock-the-conscience test," saying that this "test" "makes for such uncertainty and unpredictability that it would be impossible to foretell -- other than by guesswork -- just how brazen the invasion of the intimate privacies of one's home must be in order to shock itself into the protective arms of the Constitution. In truth, the practical result of this *ad hoc* approach is simply that when five Justices are sufficiently revolted by local police action, a conviction is overturned and a guilty [****40] man may go free." [16]

[*666] Only one thing emerged with complete clarity from the *Irvine* case -- that is that seven Justices rejected the "shock-the-conscience" constitutional standard enunciated in the *Wolf* and *Rochin* cases. But even this did not lessen the confusion in this area of the law because the continued existence of mutually inconsistent precedents together with the Court's inability to settle upon a majority opinion in the *Irvine* case left the situation at least as uncertain as it had been before. [17] Finally, today, we clear up that uncertainty. As I understand the Court's opinion in this case, we again reject the confusing "shock-the-conscience" standard of the *Wolf* and *Rochin* cases and, instead, set aside this state conviction in reliance upon the precise, intelligible and more predictable constitutional doctrine enunciated in the *Boyd* case. I fully agree with Mr. Justice Bradley's opinion [****41] that the two Amendments upon which the *Boyd* doctrine rests are of vital importance in our constitutional scheme of liberty and that both are entitled to a liberal rather than a niggardly interpretation. The courts of the country are entitled to know with as much certainty as possible what scope they cover. The Court's opinion, in my judgment, dissipates the doubt and uncertainty in this field of constitutional law and I am persuaded, for this and other reasons stated, to depart from my prior views, to accept the *Boyd* doctrine [**1698] as controlling in this state case and to join the Court's judgment and opinion which are in accordance with that constitutional doctrine.

MR. JUSTICE DOUGLAS, concurring.

Though I have joined the opinion of the Court, I add a few words. This criminal proceeding started with a lawless search and seizure. The police entered a home [*667] forcefully, and seized [****42] documents that were later used to convict the occupant of a crime.

She lived alone with her fifteen-year-old daughter in the second-floor flat of a duplex in Cleveland. At about 1:30 in the afternoon of May 23, 1957, three policemen arrived at this house. They rang the bell, and [***1097] the appellant, appearing at her window, asked them what they wanted. According to their later testimony, the policemen had come to the house on information from "a confidential source that there was a person hiding out in the home, who was wanted for questioning in connection with a recent bombing." [1] To the

---

[12] *Id.*, at 172, 173.

[13] *Id.*, at 174-177.

[14] For the concurring opinion of MR. JUSTICE DOUGLAS see *id.*, at 177-179.

[15] 347 U.S. 128.

[16] *Id.*, at 138.

[17] See also *United States* v. *Rabinowitz*, 339 U.S. 56, 66-68 (dissenting opinion).

[1] This "confidential source" told the police, in the same breath,

appellant's question, however, they replied only that they wanted to question her and would not state the subject about which they wanted to talk.

The appellant, who had retained an attorney in connection with a pending civil matter, told the police she would call him [****43] to ask if she should let them in. On her attorney's advice, she told them she would let them in only when they produced a valid search warrant. For the next two and a half hours, the police laid siege to the house. At four o'clock, their number was increased to at least seven. Appellant's lawyer appeared on the scene; and one of the policemen told him that they now had a search warrant, but the officer refused to show it. Instead, going to the back door, the officer first tried to kick it in and, when that proved unsuccessful, he broke the glass in the door and opened it from the inside.

The appellant, who was on the steps going up to her flat, demanded to see the search warrant; but the officer refused to let her see it although he waved a paper in front of her face. She grabbed it and thrust it down the front of her dress. The policemen seized her, took the paper [*668] from her, and had her handcuffed to another officer. She was taken upstairs, thus bound, and into the larger of the two bedrooms in the apartment; there she was forced to sit on the bed. Meanwhile, the officers entered the house and made a complete search of the four rooms of her flat and of the basement [****44] of the house.

The testimony concerning the search is largely nonconflicting. The approach of the officers; their long wait outside the home, watching all its doors; the arrival of reinforcements armed with a paper; [2] [****45] breaking into the house; putting their hands on appellant and handcuffing her; numerous officers ransacking through every room and piece of furniture, while the appellant sat, a prisoner in her own bedroom. There is direct conflict in the testimony, however, as to where the evidence which is the basis of this case was found. To understand the meaning of that conflict, one must understand that this case is based [**1699] on the knowing possession [3] of four little pamphlets, a couple of photographs and a little pencil doodle -- all [***1098] of which are alleged to be pornographic.

According to the police officers who participated in the search, these articles were found, some in appellant's [*669] dressers and some in a suitcase found by her bed. According to appellant, most of the articles were found in a cardboard box in the basement; one in the suitcase beside her bed. All of this material, appellant -- and a friend of hers -- said were odds and ends belonging to a recent boarder, a man who had left suddenly for New York and had been detained there. As the Supreme Court of Ohio read the statute under which appellant is charged, she is guilty of the crime whichever story is true.

The Ohio Supreme Court [****46] sustained the conviction even though it was based on the documents obtained in the lawless search. For in Ohio evidence obtained by an unlawful search and seizure is admissible in a criminal prosecution at least where it was not taken from the "defendant's person by the use of brutal or offensive force against defendant." *State* v. *Mapp*, 170 Ohio St. 427, 166 N. E. 2d, at 388, syllabus 2; *State* v. *Lindway*, 131 Ohio St. 166, 2 N. E. 2d 490. This evidence would have been inadmissible in a federal prosecution. *Weeks* v. *United States*, 232 U.S. 383; *Elkins* v. *United States*, 364 U.S. 206. For, as stated in the former decision, "The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints . . . ." *Id*., 391-392. It was therefore held that evidence obtained (which in that case was documents and correspondence) from a home without any warrant was not admissible in a federal prosecution.

We held in *Wolf* v. *Colorado*, 338 U.S. 25, that the Fourth Amendment was applicable [****47] to the States by reason of the Due Process Clause of the

that "there was a large amount of policy paraphernalia being hidden in the home."

[2] The purported warrant has disappeared from the case. The State made no attempt to prove its existence, issuance or contents, either at the trial or on the hearing of a preliminary motion to suppress. The Supreme Court of Ohio said: "There is, in the record, considerable doubt as to whether there ever was *any* warrant for the search of defendant's home. . . . Admittedly . . . there was no warrant authorizing a search . . . for any 'lewd, or lascivious book . . . print, [or] picture.'" 170 Ohio St. 427, 430, 166 N. E. 2d 387, 389. (Emphasis added.)

[3] Ohio Rev. Code, § 2905.34: "No person shall knowingly . . . have in his possession or under his control an obscene, lewd, or lascivious book, magazine, pamphlet, paper, writing, advertisement, circular, print, picture . . . or drawing . . . of an indecent or immoral nature . . . . Whoever violates this section shall be fined not less than two hundred nor more than two thousand dollars or imprisoned not less than one nor more than seven years, or both."

Fourteenth Amendment. But a majority held that the exclusionary rule of the *Weeks* case was not required of the States, that they could apply such sanctions as they chose. That position had the necessary votes to carry the day. But with all respect it was not the voice of reason or principle.

[*670] As stated in the *Weeks* case, if evidence seized in violation of the Fourth Amendment can be used against an accused, "his right to be secure against such searches and seizures is of no value, and . . . might as well be stricken from the Constitution." 232 U.S., at 393.

When we allowed States to give constitutional sanction to the "shabby business" of unlawful entry into a home (to use an expression of Mr. Justice Murphy, *Wolf* v. *Colorado*, at 46), we did indeed rob the Fourth Amendment of much meaningful force. There are, of course, other theoretical remedies. One is disciplinary action within the hierarchy of the police system, including prosecution of the police officer for a crime. Yet as Mr. Justice Murphy said in *Wolf* v. *Colorado*, at 42, "Self-scrutiny is a lofty ideal, but its [****48] exaltation reaches new heights if we expect a District Attorney to prosecute himself or his associates for well-meaning [**1700] violations of the search and seizure clause during a raid the District Attorney or his associates have ordered."

The only remaining remedy, if exclusion [***1099] of the evidence is not required, is an action of trespass by the homeowner against the offending officer. Mr. Justice Murphy showed how onerous and difficult it would be for the citizen to maintain that action and how meagre the relief even if the citizen prevails. 338 U.S. 42-44. The truth is that trespass actions against officers who make unlawful searches and seizures are mainly illusory remedies.

Without judicial action making the exclusionary rule applicable to the States, *Wolf* v. *Colorado* in practical effect reduced the guarantee against unreasonable searches and seizures to "a dead letter," as Mr. Justice Rutledge said in his dissent. See 338 U.S., at 47.

*Wolf* v. *Colorado, supra*, was decided in 1949. The immediate result was a storm of constitutional controversy which only today finds its end. I believe that this is [****49] an appropriate case in which to put an end to the asymmetry which *Wolf* imported into the law. See [*671] *Stefanelli* v. *Minard*, 342 U.S. 117; *Rea* v. *United States*, 350 U.S. 214; *Elkins* v. *United States, supra;* *Monroe* v. *Pape*, 365 U.S. 167. It is an appropriate case because the facts it presents show -- as would few other cases -- the casual arrogance of those who have the untrammelled power to invade one's home and to seize one's person.

It is also an appropriate case in the narrower and more technical sense. The issues of the illegality of the search and the admissibility of the evidence have been presented to the state court and were duly raised here in accordance with the applicable Rule of Practice. [4] The question was raised in the notice of appeal, the jurisdictional statement and in appellant's brief on the merits. [5] It is true that argument was mostly directed to another issue in the case, but that is often the fact. See *Rogers* v. *Richmond*, 365 U.S. 534, 535-540. Of course, an earnest advocate of a position always believes that, had he only an additional opportunity [****50] for argument, his side would win. But, subject to the sound discretion of a court, all argument must at last come to a halt. This is especially so as to an issue about which this Court said last year that "The arguments of its antagonists and of its proponents have been so many times marshalled as to require no lengthy elaboration here." *Elkins* v. *United States, supra*, 216.

Moreover, continuance of *Wolf* v. *Colorado* in its full vigor breeds the unseemly shopping around of the kind revealed [****51] in *Wilson* v. *Schnettler*, 365 U.S. 381. Once evidence, inadmissible in a federal court, is admissible in [*672] a state court a "double standard" exists which, as the Court points out, leads to "working arrangements" that undercut federal policy and reduce some aspects of law enforcement to shabby business. The rule that supports that practice does [***1100] not have the force of reason behind it.

Memorandum of MR. JUSTICE STEWART.

[10]Agreeing fully with Part I of MR. JUSTICE HARLAN's dissenting opinion, [**1701] I express no view as to the merits of the constitutional issue which the Court today decides. I would, however, reverse the judgment in this case, because I am persuaded that the

---

[4] "The notice of appeal . . . shall set forth the questions presented by the appeal . . . . Only the questions set forth in the notice of appeal or fairly comprised therein will be considered by the court." Rule 10 (2)(c), Rules of the Supreme Court of the United States.

[5] "Did the conduct of the police in procuring the books, papers and pictures placed in evidence by the Prosecution violate Amendment IV, Amendment V, and Amendment XIV Section 1 of the United States Constitution . . . ?"

provision of § 2905.34 of the Ohio Revised Code, upon which the petitioner's conviction was based, is, in the words of MR. JUSTICE HARLAN, not "consistent with the rights of free thought and expression assured against state action by the Fourteenth Amendment."

**Dissent by:** HARLAN

## Dissent

MR. JUSTICE HARLAN, whom MR. JUSTICE **FRANKFURTER** and MR. JUSTICE **WHITTAKER** join, dissenting.

In overruling [****52] the *Wolf* case the Court, in my opinion, has forgotten the sense of judicial restraint which, with due regard for *stare decisis*, is one element that should enter into deciding whether a past decision of this Court should be overruled. Apart from that I also believe that the *Wolf* rule represents sounder Constitutional doctrine than the new rule which now replaces it.

I.

From the Court's statement of the case one would gather that the central, if not controlling, issue on this appeal is whether illegally state-seized evidence is Constitutionally admissible in a state prosecution, an issue which would of course face us with the need for re-examining *Wolf*. However, such is not the situation. For, although that question was indeed raised here and below among appellant's subordinate points, the new and [*673] pivotal issue brought to the Court by this appeal is whether § 2905.34 of the Ohio Revised Code making criminal the *mere* knowing possession or control of obscene material, [1] and under which appellant has been convicted, is consistent with the rights of free thought and expression assured against state action by the Fourteenth Amendment. [2] That was the [****53] principal issue which was decided by the Ohio Supreme Court, [3] which was tendered by appellant's Jurisdictional Statement, [4] [****54] and which was [***1101] briefed [5] [****55] and argued [6] in this Court.

---

[1] The material parts of that law are quoted in note 1 of the Court's opinion. *Ante*, p. 643.

[2] In its note 3, *ante*, p. 646, the Court, it seems to me, has turned upside down the relative importance of appellant's reliance on the various points made by him on this appeal.

[3] See 170 Ohio St. 427, 166 N. E. 2d 387. Because of the unusual provision of the Ohio Constitution requiring "the concurrence of at least all but one of the judges" of the Ohio Supreme Court before a state law is held unconstitutional (except in the case of affirmance of a holding of unconstitutionality by the Ohio Court of Appeals), Ohio Const., Art. IV, § 2, the State Supreme Court was compelled to uphold the constitutionality of § 2905.34, despite the fact that four of its seven judges thought the statute offensive to the Fourteenth Amendment.

[4] Respecting the "substantiality" of the federal questions tendered by this appeal, appellant's Jurisdictional Statement contained the following:

"The Federal questions raised by this appeal are substantial for the following reasons:

"The Ohio Statute under which the defendant was convicted violates one's sacred right to own and hold property, which has been held inviolate by the Federal Constitution. The right of the individual 'to read, to believe or disbelieve, and to think without governmental supervision is one of our basic liberties, but to dictate to the mature adult what books he may have in his own private library seems to be a clear infringement of the constitutional rights of the individual' (Justice Herbert's dissenting Opinion, Appendix 'A'). Many convictions have followed that of the defendant in the State Courts of Ohio based upon this very same statute. Unless this Honorable Court hears this matter and determines once and for all that the Statute is unconstitutional as defendant contends, there will be many such appeals. When Sections 2905.34, 2905.37 and 3767.01 of the Ohio Revised Code [the latter two Sections providing exceptions to the coverage of § 2905.34 and related provisions of Ohio's obscenity statutes] are read together, . . . they obviously contravene the Federal and State constitutional provisions; by being convicted under the Statute involved herein, and in the manner in which she was convicted, Defendant-Appellant has been denied due process of law; a sentence of from one (1) to seven (7) years in a penal institution for alleged violation of this unconstitutional section of the Ohio Revised Code deprives the defendant of her right to liberty and the pursuit of happiness, contrary to the Federal and State constitutional provisions, for circumstances which she herself did not put in motion, and is a cruel and unusual punishment inflicted upon her contrary to the State and Federal Constitutions."

[5] The appellant's brief did not urge the overruling of *Wolf*. Indeed it did not even cite the case. The brief of the appellee merely relied on *Wolf* in support of the State's contention that appellant's conviction was not vitiated by the admission in evidence of the fruits of the alleged unlawful search and seizure by the police. The brief of the American and Ohio Civil Liberties Unions, as *amici*, did in one short concluding paragraph of its argument "request" the Court to re-examine and overrule *Wolf*, but without argumentation. I quote in full

[*674] [**1702] In this posture of things, I think it fair to say that five members of this Court have simply "reached out" to overrule *Wolf*. With all respect for the views of the majority, and recognizing that *stare decisis* carries different [*675] weight in Constitutional adjudication than it does in nonconstitutional decision, I can perceive no justification for regarding this case as an appropriate occasion for re-examining *Wolf*.

The action of the Court finds no support in the rule that decision of Constitutional issues should be avoided wherever possible. For in overruling *Wolf* the Court, instead of passing upon the validity of Ohio's § 2905.34, has simply chosen between two Constitutional questions. Moreover, I submit that it has chosen the more difficult and less appropriate of the two questions. [****56] The Ohio statute which, as construed by the State Supreme Court, punishes knowing possession or control of obscene material, irrespective of the purposes of such possession or control (with exceptions not here applicable) [7] [****57] and irrespective of whether the accused had any reasonable [**1703] opportunity to rid himself of the material after discovering that it was obscene, [8] surely presents [***1102] a Constitutional [*676] question which is both simpler and less far-reaching than the question which the Court decides today. It seems to me that justice might well have been done in this case without overturning a decision on which the administration of criminal law in many of the States has long justifiably relied.

Since the demands of the case before us do not require us to reach the question of the validity of *Wolf*, I think this case furnishes a singularly inappropriate occasion for reconsideration of that decision, if reconsideration is indeed warranted. Even the most cursory examination will reveal that the doctrine of the *Wolf* case has been of continuing importance in the administration of state criminal law. Indeed, certainly as regards its "nonexclusionary" aspect, *Wolf* did no more than articulate the then existing assumption among the States that the federal cases enforcing the exclusionary rule "do not bind [the States], for they construe provisions of the Federal Constitution, the Fourth and Fifth Amendments, not applicable to the States." *People* v. *Defore*, 242 N. Y. 13, 20, 150 N. E. 585, 587. [****58] Though, of course, not reflecting the full measure of this continuing reliance, I find that during the last three Terms, for instance, the issue of the inadmissibility of illegally state-obtained evidence appears on an average of about fifteen times per Term just in the *in forma pauperis* cases summarily disposed of by us. This would indicate both that the issue which is now being decided may well have untoward practical ramifications respecting state cases long since disposed of in reliance on *Wolf*, and that were we determined to re-examine that doctrine we would not lack future opportunity.

The occasion which the Court has taken here is in the context of a case where the question was briefed not at

---

this part of their brief:

"This case presents the issue of whether evidence obtained in an illegal search and seizure can constitutionally be used in a State criminal proceeding. We are aware of the view that this Court has taken on this issue in *Wolf* v. *Colorado*, 338 U.S. 25. It is our purpose by this paragraph to respectfully request that this Court re-examine this issue and conclude that the ordered liberty concept guaranteed to persons by the due process clause of the Fourteenth Amendment necessarily requires that evidence illegally obtained in violation thereof, not be admissible in state criminal proceedings."

[6] Counsel for appellant on oral argument, as in his brief, did not urge that *Wolf* be overruled. Indeed, when pressed by questioning from the bench whether he was not in fact urging us to overrule *Wolf*, counsel expressly disavowed any such purpose.

[7] "2905.37 LEGITIMATE PUBLICATIONS NOT OBSCENE.

"Sections 2905.33 to 2905.36, inclusive, of the Revised Code do not affect teaching in regularly chartered medical colleges, the publication of standard medical books, or regular practitioners of medicine or druggists in their legitimate business, nor do they affect the publication and distribution of bona fide works of art. No articles specified in sections 2905.33, 2905.34, and 2905.36 of the Revised Code shall be considered a work of art unless such article is made, published, and distributed by a bona fide association of artists or an association for the advancement of art whose demonstrated purpose does not contravene sections 2905.06 to 2905.44, inclusive, of the Revised Code, and which is not organized for profit."

§ 3767.01 (C)

'This section and sections 2905.34, . . . 2905.37 . . . of the Revised Code shall not affect . . . any newspaper, magazine, or other publication entered as second class matter by the post-office department."

[8] The Ohio Supreme Court, in its construction of § 2905.34, controlling upon us here, refused to import into it any other exceptions than those expressly provided by the statute. See note 7, *supra*. Instead it held that "If anyone looks at a book and finds it lewd, he is forthwith, under this legislation, guilty . . . ."

all and argued only extremely tangentially. The unwisdom of overruling *Wolf* without full-dress argument [*677] is aggravated by the circumstance that that decision is a comparatively recent one (1949) to which three members of the present majority have at one time or other expressly subscribed, one to be sure with explicit misgivings. [9] I would think that our obligation to the States, on whom we impose this new rule, as well as the obligation of orderly adherence to [****59] our own processes would demand that we seek that aid which adequate briefing and argument lends to the determination of an important issue. It certainly has never been a postulate of judicial power that mere altered disposition, or subsequent membership on the Court, is sufficient warrant for overturning a deliberately decided rule of Constitutional law.

[**1704] [****60] Thus, if the Court were bent on reconsidering *Wolf*, I think that there would soon have presented itself an appropriate opportunity in which we could have had the benefit of full briefing and argument. In any event, at the very least, the present case should have been set [***1103] down for reargument, in view of the inadequate briefing and argument we have received on the *Wolf* point. To all intents and purposes the Court's present action amounts to a summary reversal of *Wolf*, without argument.

I am bound to say that what has been done is not likely to promote respect either for the Court's adjudicatory process or for the stability of its decisions. Having been unable, however, to persuade any of the majority to a different procedural course, I now turn to the merits of the present decision.

[*678] II.

Essential to the majority's argument against *Wolf* is the proposition that the rule of *Weeks* v. *United States*, 232 U.S. 383, excluding in federal criminal trials the use of evidence obtained in violation of the Fourth Amendment, derives not from the "supervisory power" of this Court over the federal judicial system, but from Constitutional [****61] requirement. This is so because no one, I suppose, would suggest that this Court possesses any general supervisory power over the state courts. Although I entertain considerable doubt as to the soundness of this foundational proposition of the majority, cf. *Wolf* v. *Colorado*, 338 U.S., at 39-40 (concurring opinion), I shall assume, for present purposes, that the *Weeks* rule "is of constitutional origin."

At the heart of the majority's opinion in this case is the following syllogism: (1) the rule excluding in federal criminal trials evidence which is the product of an illegal search and seizure is "part and parcel" of the Fourth Amendment; (2) *Wolf* held that the "privacy" assured against federal action by the Fourth Amendment is also protected against state action by the Fourteenth Amendment; and (3) it is therefore "logically and constitutionally necessary" that the *Weeks* exclusionary rule should also be enforced against the States. [10]

[****62] This reasoning ultimately rests on the unsound premise that because *Wolf* carried into the States, as part of "the concept of ordered liberty" embodied in the Fourteenth Amendment, the principle of "privacy" underlying the Fourth Amendment (338 U.S., at 27), it must follow that whatever configurations of the Fourth Amendment have been developed in the particularizing federal precedents are likewise to be deemed a part of "ordered liberty," [*679] and as such are enforceable against the States. For me, this does not follow at all.

It cannot be too much emphasized that what was recognized in *Wolf* was not that the Fourth Amendment *as such* is enforceable against the States as a facet of due process, a view of the Fourteenth Amendment which, as *Wolf* itself pointed out (338 U.S., at 26), has long since been discredited, but the principle of privacy "which is at the core of the Fourth Amendment." ( *Id*., at 27.) It would not be proper to expect or impose any precise equivalence, either as regards the scope of the right or the means of its implementation, between the requirements of the Fourth and Fourteenth Amendments. For [****63] the Fourth, unlike what was said in *Wolf* of the Fourteenth, does not state a general principle only; it is a particular command, having its setting in a pre-existing legal context on which both [***1104] interpreting decisions and enabling statutes must at least build.

---

[9] See *Wolf* v. *Colorado*, 338 U.S., at 39-40; *Irvine* v. *California*, 347 U.S. 128, 133-134, and at 138-139. In the latter case, decided in 1954, Mr. Justice Jackson, writing for the majority, said (at p. 134): "We think that the *Wolf* decision should not be overruled, for the reasons so persuasively stated therein." Compare *Schwartz* v. *Texas*, 344 U.S. 199, and *Stefanelli* v. *Minard*, 342 U.S. 117, in which the *Wolf* case was discussed and in no way disapproved. And see *Pugach* v. *Dollinger*, 365 U.S. 458, which relied on *Schwartz*.

[10] Actually, only four members of the majority support this reasoning. See pp. 685-686, *infra*.

[**1705] Thus, even in a case which presented simply the question of whether a particular search and seizure was constitutionally "unreasonable" -- say in a tort action against state officers -- we would not be true to the Fourteenth Amendment were we merely to stretch the general principle of individual privacy on a Procrustean bed of federal precedents under the Fourth Amendment. But in this instance more than that is involved, for here we are reviewing not a determination that what the state police did was Constitutionally permissible (since the state court quite evidently assumed that it was not), but a determination that appellant was properly found guilty of conduct which, for present purposes, it is to be assumed the State could Constitutionally punish. Since there is not the slightest suggestion that Ohio's policy is "affirmatively to sanction . . . police incursion into privacy" (338 U.S., at 28), [****64] compare *Marcus* v. *Search Warrants, post*, p. 717, what the Court is now doing is to impose [*680] upon the States not only federal substantive standards of "search and seizure" but also the basic federal remedy for violation of those standards. For I think it entirely clear that the *Weeks* exclusionary rule is but a remedy which, by penalizing past official misconduct, is aimed at deterring such conduct in the future.

I would not impose upon the States this federal exclusionary remedy. The reasons given by the majority for now suddenly turning its back on *Wolf* seem to me notably unconvincing.

First, it is said that "the factual grounds upon which *Wolf* was based" have since changed, in that more States now follow the *Weeks* exclusionary rule than was so at the time *Wolf* was decided. While that is true, a recent survey indicates that at present one-half of the States still adhere to the common-law non-exclusionary rule, and one, Maryland, retains the rule as to felonies. Berman and Oberst, Admissibility of Evidence Obtained by an Unconstitutional Search and Seizure, 55 N. W. L. Rev. 525, 532-533. But in any case surely all this is beside [****65] the point, as the majority itself indeed seems to recognize. Our concern here, as it was in *Wolf*, is not with the desirability of that rule but only with the question whether the States are Constitutionally free to follow it or not as they may themselves determine, and the relevance of the disparity of views among the States on this point lies simply in the fact that the judgment involved is a debatable one. Moreover, the very fact on which the majority relies, instead of lending support to what is now being done, points away from the need of replacing voluntary state action with federal compulsion.

The preservation of a proper balance between state and federal responsibility in the administration of criminal justice demands patience on the part of those who might like to see things move faster among the States in this respect. Problems of criminal law enforcement vary [*681] widely from State to State. One State, in considering the totality of its legal picture, may conclude that the need for embracing the *Weeks* rule is pressing because other remedies are unavailable or inadequate to secure compliance with the substantive Constitutional principle involved. Another, [****66] though equally solicitous of Constitutional rights, may choose to pursue one purpose at a [***1105] time, allowing all evidence relevant to guilt to be brought into a criminal trial, and dealing with Constitutional infractions by other means. Still another may consider the exclusionary rule too rough-and-ready a remedy, in that it reaches only unconstitutional intrusions which eventuate in criminal prosecution of the victims. Further, a State after experimenting with the *Weeks* rule for a time may, because of unsatisfactory experience with it, decide to revert to a non-exclusionary rule. And so on. From the standpoint of Constitutional permissibility in pointing a State in one direction or another, I do not see at all why "time has set its [**1706] face against" the considerations which led Mr. Justice Cardozo, then chief judge of the New York Court of Appeals, to reject for New York in *People* v. *Defore*, 242 N. Y. 13, 150 N. E. 585, the *Weeks* exclusionary rule. For us the question remains, as it has always been, one of state power, not one of passing judgment on the wisdom of one state course or another. In my view this Court should continue [****67] to forbear from fettering the States with an adamant rule which may embarrass them in coping with their own peculiar problems in criminal law enforcement.

Further, we are told that imposition of the *Weeks* rule on the States makes "very good sense," in that it will promote recognition by state and federal officials of their "mutual obligation to respect the same fundamental criteria" in their approach to law enforcement, and will avoid "'needless conflict between state and federal courts.'" Indeed the majority now finds an incongruity [*682] in *Wolf's* discriminating perception between the demands of "ordered liberty" as respects the basic right of "privacy" and the means of securing it among the States. That perception, resting both on a sensitive regard for our federal system and a sound recognition of this Court's remoteness from particular state problems, is for me the strength of that decision.

An approach which regards the issue as one of

achieving procedural symmetry or of serving administrative convenience surely disfigures the boundaries of this Court's functions in relation to the state and federal courts. Our role in promulgating the *Weeks* rule and its [****68] extensions in such cases as *Rea, Elkins*, and *Rios* [11] was quite a different one than it is here. There, in implementing the Fourth Amendment, we occupied the position of a tribunal having the ultimate responsibility for developing the standards and procedures of judicial administration within the judicial system over which it presides. Here we review state procedures whose measure is to be taken not against the specific substantive commands of the Fourth Amendment but under the flexible contours of the Due Process Clause. I do not believe that the Fourteenth Amendment empowers this Court to mould state remedies effectuating the right to freedom from "arbitrary intrusion by the police" to suit its own notions of how things should be done, as, for instance, the California Supreme Court did in *People* v. *Cahan*, 44 Cal. 2d 434, 282 P. 2d 905, with reference to procedures in the California courts or as this Court did in *Weeks* for the lower federal courts.

[****69] A [***1106] state conviction comes to us as the complete product of a sovereign judicial system. Typically a case will have been tried in a trial court, tested in some final appellate [*683] court, and will go no further. In the comparatively rare instance when a conviction is reviewed by us on due process grounds we deal then with a finished product in the creation of which we are allowed no hand, and our task, far from being one of over-all supervision, is, speaking generally, restricted to a determination of whether the prosecution was Constitutionally fair. The specifics of trial procedure, which in every mature legal system will vary greatly in detail, are within the sole competence of the States. I do not see how it can be said that a trial becomes unfair simply because a State determines that evidence may be considered by the trier of fact, regardless of how it was obtained, if it is relevant to the one issue with which the trial is concerned, the guilt or innocence of the accused. Of course, a court may use its procedures as an incidental means of pursuing other ends than the correct resolution of the controversies before it. Such indeed is [**1707] the [****70] *Weeks* rule, but if a State does not choose to use its courts in this way, I do not believe that this Court is empowered to impose this much-debated procedure on local courts, however efficacious we may consider the *Weeks* rule to be as a means of securing Constitutional rights.

Finally, it is said that the overruling of *Wolf* is supported by the established doctrine that the admission in evidence of an involuntary confession renders a state conviction Constitutionally invalid. Since such a confession may often be entirely reliable, and therefore of the greatest relevance to the issue of the trial, the argument continues, this doctrine is ample warrant in precedent that the way evidence was obtained, and not just its relevance, is Constitutionally significant to the fairness of a trial. I believe this analogy is not a true one. The "coerced confession" rule is certainly not a rule that any illegally obtained statements may not be used in evidence. I would suppose that a statement which is procured during [*684] a period of illegal detention, *McNabb* v. *United States*, 318 U.S. 332, is, as much as unlawfully seized evidence, illegally obtained, [****71] but this Court has consistently refused to reverse state convictions resting on the use of such statements. Indeed it would seem the Court laid at rest the very argument now made by the majority when in *Lisenba* v. *California*, 314 U.S. 219, a state-coerced confession case, it said (at 235):

"It may be assumed [that the] treatment of the petitioner [by the police] . . . deprived him of his liberty without due process and that the petitioner would have been afforded preventive relief if he could have gained access to a court to seek it.

"But illegal acts, as such, committed in the course of obtaining a confession . . . do not furnish an answer to the constitutional question we must decide. . . . The gravamen of his complaint is the unfairness of the *use* of his confessions, and what occurred in their procurement is relevant only as it bears on that issue." (Emphasis supplied.)

The point, then, must be that in requiring exclusion of an involuntary [***1107] statement of an accused, we are concerned not with an appropriate remedy for what the police have done, but with something which is regarded as going to the heart of our concepts of fairness [****72] in judicial procedure. The operative assumption of our procedural system is that "Ours is the accusatorial as opposed to the inquisitorial system. Such has been the characteristic of Anglo-American criminal justice since it freed itself from practices borrowed by the Star Chamber from the Continent whereby the accused was interrogated in secret for hours on end." *Watts* v. *Indiana*, 338 U.S. 49, 54. See *Rogers* v. *Richmond*, 365

---

[11] *Rea* v. *United States*, 350 U.S. 214; *Elkins* v. *United States*, 364 U.S. 206; *Rios* v. *United States*, 364 U.S. 253.

U.S. 534, 541. The pressures brought to bear against an accused leading to a confession, unlike an unconstitutional violation of privacy, do not, apart [*685] from the use of the confession at trial, necessarily involve independent Constitutional violations. What is crucial is that the trial defense to which an accused is entitled should not be rendered an empty formality by reason of statements wrung from him, for then "a prisoner . . . [has been] made the deluded instrument of his own conviction." 2 Hawkins, Pleas of the Crown (8th ed., 1824), c. 46, § 34. That this is a *procedural right*, and that its violation occurs at the time his improperly obtained statement is admitted at trial, is manifest. For [****73] without this right all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in [**1708] a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police.

This, and not the disciplining of the police, as with illegally seized evidence, is surely the true basis for excluding a statement of the accused which was unconstitutionally obtained. In sum, I think the coerced confession analogy works strongly *against* what the Court does today.

In conclusion, it should be noted that the majority opinion in this case is in fact an opinion only for the *judgment* overruling *Wolf*, and not for the basic rationale by which four members of the majority have reached that result. For my Brother BLACK is unwilling to subscribe to their view that the *Weeks* exclusionary rule derives from the Fourth Amendment itself (see *ante*, p. 661), but joins the majority opinion on the premise that its end result can be achieved by bringing the Fifth Amendment to the aid of the Fourth (see *ante*, pp. 662-665). [12] On [****74] that score I need only say that whatever the validity of [*686] the "Fourth-Fifth Amendment" correlation which the *Boyd* case (116 U.S. 616) found, see 8 Wigmore, Evidence (3d ed. 1940), § 2184, we have only very recently again reiterated the long-established doctrine of this Court that the Fifth Amendment privilege against self-incrimination is not applicable to the States. See *Cohen* v. *Hurley*, 366 U.S. 117.

I regret that I find so unwise in principle and so inexpedient in policy a decision motivated by the high purpose of increasing respect for Constitutional rights. But in the last analysis I think this Court can increase respect for the Constitution only if it rigidly respects the limitations which the Constitution [***1108] places upon it, and respects as well the principles inherent in its own processes. In the present case I think we exceed both, and [****75] that our voice becomes only a voice of power, not of reason.

[12] My Brother STEWART concurs in the Court's judgment on grounds which have nothing to do with *Wolf*.

## References

Admissibility of evidence obtained by illegal search and seizure

Annotation References:

1. Admissibility of evidence obtained by illegal search, 24 ALR 1408; 32 ALR 408; 41 ALR 1145; 52 ALR 477; 88 ALR 348; 134 ALR 819; 150 ALR 566. As to modern (prior to the Mapp Case) status of rule, see 50 ALR2d 531. See also 93 L ed 1797; 96 L ed 145; 98 L ed 581; 100 L ed 239; 6 L ed 2d 1544 (dealing with United States Supreme Court cases in point).

2. Right of privacy, 138 ALR 22; 168 ALR 446; 14 ALR2d 750.

3. Constitutionality of federal and state regulation of obscene literature, 1 L ed 2d 2211; 4 L ed 2d 1821.

4. The Supreme Court and the right of free speech and press, 93 L ed 1151; 2 L ed 2d 1706.

**End of Document**

# Silverthorne Lumber Co. v. United States

251 U.S. 385 (1920)

Cited in Opening Brief at: 32

Highlighted language appears at 251 U.S. at 392.

Q Questioned
As of: September 14, 2026 7:02 PM Z

# Silverthorne Lumber Co. v. United States

Supreme Court of the United States

Argued December 12, 1919 ; January 26, 1920

No. 358

**Reporter**
251 U.S. 385 *; 40 S. Ct. 182 **; 64 L. Ed. 319 ***; 1920 U.S. LEXIS 1685 ****; 3 A.F.T.R. (P-H) 3016; 24 A.L.R. 1426; 17 Ohio L. Rep. 514

SILVERTHORNE LUMBER COMPANY, INC., ET AL. *v.* UNITED STATES

**Prior History:** [****1] ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF NEW YORK

## Syllabus

The Fourth Amendment protects a corporation and its officers from compulsory production of the corporate books and papers for use in a criminal proceeding against them, when the information upon which the subpoenas were framed was derived by the Government through a previous unconstitutional search and seizure, planned and executed by its officials under color of a void writ; provided the defense of the Amendment be seasonably interposed, and not first raised as a collateral issue at the trial of the indictment. P. 391. *Weeks* v. *United States*, 232 U.S. 383, followed. *Adams* v. *New York*, 192 U.S. 585, distinguished.

The rights of a corporation against unlawful search and seizure are to be protected even if it be not protected by the Fifth Amendment from compulsory production of incriminating documents. P. 392.

Reversed.

THE case is stated in the opinion.

**Counsel:** *Mr. William D. Guthrie*, with whom *Mr. Henry W. Killeen*, *Mr. James O. Moore*, *Mr. Frederic D. McKenney* and *Mr. Myer Cohen* were on the briefs, for plaintiffs in error.

*Mr. Assistant Attorney* [****2] *General Stewart*, with whom *Mr. W. C. Herron* was on the brief, for the United States:

The question whether the subpoenas authorized an unreasonable search and seizure is separate from the question whether obedience would unconstitutionally compel self-incrimination. The Fourth and Fifth Amendments are distinct. *Hale* v. *Henkel*, 201 U.S. 43, 71, 72; *Wilson* v. *United States*, 221 U.S. 361, 371.

The subpoenas are as specific as was reasonably possible. A subpoena *duces tecum*, like a search warrant, must necessarily be, to some extent, a demand for discovery. *Consolidated Rendering Co.* v. *Vermont*, 207 U.S. 541, 553, 554; *Wilson* v. *United States, supra*, 376; *Wheeler* v. *United States*, 226 U.S. 478. Whether the terms of a subpoena violate the requirements of the Fourth Amendment can not be determined by its effect upon business convenience of the corporation.

The validity of an arrest or seizure is to be determined by the condition obtaining when objection is made. If then valid, the fact that a prior arrest or seizure, effective in bringing about the valid action, was entirely or partially illegal is immaterial and tenders a collateral [****3] issue. This rule is firmly established. *Gelston* v. *Hoyt*, 3 Wheat. 246, 310; *Wood* v. *United States*, 16 Pet. 342, 359; *Mahon* v. *Justice*, 127 U.S. 700, 708; *Pettibone* v. *Nichols*, 203 U.S. 192, 216, 217; *Kelly* v. *Griffin*, 241 U.S. 6, 12, 13.

Where liberty of the person is involved, a valid detention is not affected by prior illegal arrests even though the present detention is made possible solely through them. Papers and books are not entitled to any greater immunity. *Adams* v. *New York*, 176 N.Y. 351, 358; s.c. 192 U.S. 585, 594-598; *Perlman Rim Corporation* v. *Firestone Tire Co.*, 244 Fed. Rep. 304; affd. 247 U.S. 7, 15; *United States* v. *Hart*, 214 Fed. Rep. 655; *Stroud* v. *United States*, 251 U.S. 15; *Kerrch* v. *United States*, 171 Fed. Rep. 366; *Johnson* v. *United States*, 228 U.S. 457; *United States* v. *Wilson*, 163 Fed. Rep. 338; *New York Central R. R. Co.* v. *United States*, 165 Fed. Rep. 833;

*United States* v. *McHie*, 196 Fed. Rep. 586; *In re Rosenwasser Bros.*, 254 Fed. Rep. 171.

Certain decisions, where a motion to return papers was granted or an impounding order refused, [****4] can all, with one exception, be explained upon the ground that the papers would not have been admissible in evidence as against a claim of immunity under the Fifth Amendment, and, hence, to bring in or retain them would have been idle. *United States* v. *Mills*, 185 Fed. Rep. 318; *United States* v. *McHie*, 194 Fed. Rep. 894; *United States* v. *Mounday*, 208 Fed. Rep. 186; *United States* v. *Jones*, 230 Fed. Rep. 262; *United States* v. *Abrams*, 230 U.S. 313; *United States* v. *Friedberg*, 233 Fed. Rep. 313; *Veeder* v. *United States*, 252 Fed. Rep. 414; *In re Marx*, 255 Fed. Rep. 344. The one exception is the case of *In re Tri-State Coal & Coke Co.*, 253 Fed. Rep. 605, where the court clearly overlooked the rule that a corporation can not plead immunity from self-incrimination and that therefore the books, etc., in question, in so far as relevant, should have been retained by the court, irrespective of the invalidity of the search warrant.

*Weeks* v. *United States*, 232 U.S. 383, is, in so far as the Fourth Amendment is concerned, a case where the trial court should have refused to retain custody of the papers, not because of anything [****5] connected with the original unlawful seizure, but because of the defendant's claim of immunity under the Fifth Amendment, the papers being the private papers of an individual seized at his residence. We respectfully submit, therefore, that according to the settled principles of the law the subsequent valid subpoenas issued by the court in the case at bar were not in any way vitiated or weakened in authority or effect by reason of the prior illegal seizure.

A corporation, either state or federal, can not plead immunity from self-incriminating testimony under the Fifth Amendment as to its books and papers. *Hale* v. *Henkel, supra*, 74, 75; *Nelson* v. *United States*, 201 U.S. 92; *Alexander* v. *United States*, 201 U.S. 117; *American Tobacco Co.* v. *Werckmeister*, 207 U.S. 284; *Hammond Packing Co.* v. *Arkansas*, 212 U.S. 322, 347-349; *Wilson* v. *United States, supra*, 382, 383; *American Lithographic Co.* v. *Werckmeister*, 221 U.S. 603, 611; *Baltimore & Ohio R. R. Co.* v. *Interstate Commerce Comm.*, 221 U.S. 612, 622, 623; *Wheeler* v. *United States, supra*, 489.

This has been the uniform rule of the lower federal courts, so far as [****6] we have been able to discover. *International Mining Co.* v. *Pennsylvania R. R. Co.*, 152 Fed. Rep. 557; *United States* v. *Philadelphia & Reading Ry. Co.*, 225 Fed. Rep. 301; *Orvig* v. *New York & Bermudez Co.*, 229 Fed. Rep. 293; *In re Rosenwasser Bros., supra*; *New York Central R. R. Co.* v. *United States*, 165 Fed. Rep. 833. The decisions were not rested on the special right of the State to inquire into the abuse of franchises granted by itself, through proceedings in the nature of *quo warranto*. The United States is not foreign to the several States in the sense that it cannot effectively execute its laws as to corporations doing business under state charters.

The Fifth Amendment is coextensive with the common law. What the latter granted or grants, the Amendment secures, no more, no less. *State* v. *Quarles*, 13 Arkansas, 307, 311; *State* v. *Fuller*, 34 Montana, 12, 19. Therefore, when this court decided that a corporation has no constitutional immunity from self-incrimination, it necessarily decided that it had no common-law immunity. This is clearly brought out in the *Wilson Case*, 221 U.S. 386, where the court cited the English [****7] cases and held them not controlling.

In *Twining* v. *New Jersey*, 211 U.S. 78, the question whether the privilege against self-incrimination is included in the legal content of the term "due process of law," mooted in *Adams* v. *New York* and the *Consolidated Rendering Co. Case*, was fully considered, and it was held that it was not.

If a corporation is not entitled at any time or under any circumstances to plead compulsory self-incrimination as to the books and papers, -- if it is not entitled as to such books and papers to the privileges guaranteed by the Fifth Amendment, -- then it can not indirectly obtain the benefit of this Amendment by objecting to the manner in which the Government got its information resulting in perfectly lawful compulsory production. The case does not differ from one where the witness does not plead self-incrimination, as to which see *Blair* v. *United States*, 250 U.S. 273. Such a witness could be compelled to produce relevant testimony, though the knowledge that he had it and of its precise extent had been derived from illegal acts of public officials.

Illegal action of subordinate public officials can not forever prevent the United [****8] States from securing by legal process relevant evidence of a violation of its laws where no right under the Fifth Amendment can be successfully set up. *Flagg* v. *United States*, 233 Fed. Rep. 481, 487; *Adams* v. *New York, supra*, 597, 598. In *Weeks* v. *United States, supra*, there was a denial by the court of a petition for the return of the papers. This amounted to the issuance by the court of a subpoena *duces tecum* for them (see *Kelly* v. *Griffin, supra*,) or to an impounding order, and hence to compulsory process

for their production as evidence. It was for this reason that this court reversed the judgment, and not because of their reception as evidence. And this seems to be the view taken by all the lower federal courts who have had occasion to consider the matter, except the Court of Appeals for the Second Circuit. See, *e.g., Lyman* v. *United States*, 241 Fed. Rep. 945; *Rice* v. *United States*, 251 Fed. Rep. 778; *Laughter* v. *United States*, 259 Fed. Rep. 94; *Flagg* v. *United States*, 233 Fed. Rep. 481; *Fitter* v. *United States*, 258 Fed. Rep. 567. Cf. *Linn* v. *United States*, 251 Fed. Rep. 476, 480; *New York* [****9] *Central R. R. Co.* v. *United States*, 165 Fed. Rep. 833. The Lumber Company, not being entitled to object under the Fifth Amendment to the use as evidence of the papers in question, can not object to lawful, sufficiently definite subpoenas to produce them because the knowledge of their existence and of their contents was derived from a prior illegal seizure. To sanction such objection would be to offer a premium to a witness who could successfully conceal from the State the possession of relevant evidence of the violation of its criminal laws.

**Judges:** White, McKenna, Holmes, Day, Van Devanter, Pitney, McReynolds, Brandeis, Clarke

**Opinion by:** HOLMES

## Opinion

[*390] [**182] [***321] MR. JUSTICE HOLMES delivered the opinion of the court.

This is a writ of error brought to reverse a judgment of the District Court fining the Silverthorne Lumber Company two hundred and fifty dollars for contempt of court and ordering Frederick W. Silverthorne to be imprisoned until he should purge himself of a similar contempt. The contempt in question was a refusal to obey subpoenas and an order of Court of produce books and documents of the company before the grand jury to be used in regard to [****10] alleged violation of the statutes of the United States by the said Silverthorne and his father. One ground of the refusal was that the order of the Court infringed the rights of the parties under the Fourth Amendment of the Constitution of the United States.

The facts are simple. An indictment upon a single specific charge having been brought against the two Silverthornes mentioned, they both were arrested at their homes early in the morning of February 25, 1919, and were detained in custody a number of hours. While they were thus detained representatives of the Department of Justice and the United States marshal without a shadow of authority went to the office of their company and made a clean sweep of all the books, papers and documents found there. All the employees were taken or directed to go to the office of the District Attorney of the United States to which also the books, &c., were taken at once. An application was made as soon as might be to the District [*391] Court for a return of what thus had been taken unlawfully. It was opposed by the District Attorney so far as he had found evidence against the plaintiffs in error, and it was stated that the evidence so [****11] obtained was before the grand jury. Color had been given by the District Attorney to the approach of those concerned in the act by an invalid subpoena for certain documents relating to the charge in the indictment then on file. Thus the case is not that of knowledge acquired through the wrongful act of a stranger, but it must be assumed that the Government planned or at all events ratified the whole performance. Photographs and copies of material papers were made and a new indictment was framed based upon the knowledge thus obtained. The District Court ordered a return of the originals but impounded the photographs and copies. Subpoenas to produce the originals then were served and on the refusal of the plaintiffs in error to produce them the Court made an order that the subpoenas should be complied with, although it had found that all the papers had been seized in violation of the parties' constitutional rights. The refusal to obey this order is the contempt alleged. The Government now, while in form repudiating and condemning the illegal seizure, seeks to maintain its right to avail itself of the knowledge obtained by that means which otherwise it would not have had.

The [****12] proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act. *Weeks* v. *United States*, 232 U.S. 383, to be sure, had established that laying the papers directly before the grand jury was [*392] unwarranted, but [**183] it is taken to mean only that two steps are required instead of one. In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. 232 U.S. 393. The essence of a

provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be [****13] proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed. The numerous decisions, like *Adams* v. *New York*, 192 U.S. 585, holding that a collateral inquiry into the mode in which evidence has been got will not be allowed when the question is raised for the first time at the trial, are no authority in the present proceeding, as is explained in *Weeks* v. *United States*, 232 U.S. 383, 394, 395.Whether some of those decisions have gone too far or have given wrong reasons it is unnecessary to inquire; the principle applicable to the present case seems to us plain. It is stated satisfactorily in *Flagg* v. *United States*, [***322] 233 Fed. Rep. 481, 483. In *Linn* v. *United States*, 251 Fed. Rep. 476, 480, it was thought that a different rule applied to a corporation, on the ground that it was not privileged from producing its books and papers. But the rights of a corporation against unlawful search and seizure are to be protected even if the same result might have been achieved in a lawful way.

*Judgment reversed*.

THE CHIEF JUSTICE and MR. [****14] JUSTICE PITNEY dissent.

---

End of Document

# Wong Sun v. United States

371 U.S. 471 (1963)

Cited in Opening Brief at: 32, 33, 54

Highlighted language appears at 371 U.S. at 484 and 487–88.

Caution
As of: September 14, 2026 7:02 PM Z

# Wong Sun v. United States

Supreme Court of the United States

March 29 and April 2, 1962, Argued ; January 14, 1963, Decided

No. 36

**Reporter**
371 U.S. 471 *; 83 S. Ct. 407 **; 9 L. Ed. 2d 441 ***; 1963 U.S. LEXIS 2431 ****

WONG SUN ET AL. v. UNITED STATES

**Subsequent History:** [****1] Restored to calendar for reargument June 4, 1962. Reargued October 8, 1962.

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** 288 F.2d 366, reversed and cause remanded.

## Syllabus

In a trial in a Federal District Court without a jury, petitioners were convicted of fraudulent and knowing transportation and concealment of illegally imported heroin, in violation of 21 U. S. C. § 174. Although the Court of Appeals held that the arrests of both petitioners without warrants were illegal, because not based on "probable cause" within the meaning of the Fourth Amendment nor "reasonable grounds" within the meaning of the Narcotics Control Act of 1956, it affirmed their convictions, notwithstanding the admission in evidence over their timely objections of (1) statements made orally by petitioner Toy in his bedroom at the time of his arrest; (2) heroin surrendered to the agents by a third party as a result of those statements; and (3) unsigned statements made by each petitioner several days after his arrest, and after [****2] being lawfully arraigned and released on his own recognizance. The Court of Appeals held that these items were not the fruits of the illegal arrests, and, therefore, were properly admitted in evidence. *Held*:

1. On the record in this case, there was neither reasonable grounds nor probable cause for Toy's arrest, since the information upon which it was based was too vague and came from too untested a source to accept it as probable cause for the issuance of an arrest warrant; and this defect was not cured by the fact that Toy fled when a supposed customer at his door early in the morning revealed that he was a narcotics agent. Pp. 479-484.

2. On the record in this case, the statements made by Toy in his bedroom at the time of his unlawful arrest were the fruits of the agents' unlawful action, and they should have been excluded from evidence. Pp. 484-487.

3. The narcotics taken from a third party as a result of statements made by Toy at the time of his arrest were likewise fruits of the unlawful arrest, and they should not have been admitted as evidence against Toy. Pp. 487-488.

4. After exclusion of the foregoing items of improperly admitted evidence, the only proofs remaining [****3] to sustain Toy's conviction are his and his codefendant's unsigned statements; any admissions of guilt in Toy's statement require corroboration; no reference to Toy in his codefendant's statement constitutes admissible evidence corroborating any admission by Toy; and Toy's conviction must be set aside for lack of competent evidence to support it. Pp. 488-491.

5. In view of the fact that, after his unlawful arrest, petitioner Wong Sun had been lawfully arraigned and released on his own recognizance and had returned voluntarily several days later when he made his unsigned statement, the connection between his unlawful arrest and the making of that statement was so attenuated that the unsigned statement was not the fruit of the unlawful arrest and, therefore, it was properly admitted in evidence. P. 491.

6. The seizure of the narcotics admitted in evidence invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial. Pp. 491-492.

7. Any references to Wong Sun in his codefendant's statement were incompetent to corroborate Wong Sun's

admissions, and Wong Sun is entitled to a new trial, because it is not clear from the record whether [****4] or not the trial court relied upon his codefendant's statement as a source of corroboration of Wong Sun's confession. Pp. 492-493.

**Counsel:** Edward Bennett Williams, acting under appointment by the Court, 368 U.S. 973, reargued the cause and filed a supplemental brief for petitioners. Sol A. Abrams also filed a brief for petitioners.

J. William Doolittle reargued the cause for the United States. On the brief were Solicitor General Cox, Assistant Attorney General Miller, Beatrice Rosenberg and J. F. Bishop.

**Judges:** Warren, Black, Douglas, Clark, Harlan, Brennan, Stewart, White, Goldberg

**Opinion by:** BRENNAN

## Opinion

[*472] [***446] [**409] MR. JUSTICE BRENNAN delivered the opinion of the Court.

The petitioners were tried without a jury in the District Court for the Northern District of California under a two-count indictment for violation of the Federal Narcotics [*473] Laws, 21 U. S. C. § 174. [1] They were acquitted under the first count which charged a conspiracy, but convicted under the second [**410] count which charged the substantive offense of fraudulent and knowing transportation and concealment [****5] of illegally imported heroin. The Court of Appeals for the Ninth Circuit, one judge dissenting, affirmed the convictions. 288 F.2d 366. We granted certiorari. 368 U.S. 817. We heard [***447] argument in the 1961 Term and reargument this Term. 370 U.S. 908.

[****6] About 2 a. m. on the morning of June 4, 1959, federal narcotics agents in San Francisco, after having had one Hom Way under surveillance for six weeks, arrested him and found heroin in his possession. Hom Way, who had not before been an informant, stated after his arrest that he had bought an ounce of heroin the night before from one known to him only as "Blackie Toy," proprietor of a laundry on Leavenworth Street.

About 6 a. m. that morning six or seven federal agents went to a laundry at 1733 Leavenworth Street. The sign [*474] above the door of this establishment said "Oye's Laundry." It was operated by the petitioner James Wah Toy. There is, however, nothing in the record which identifies James Wah Toy and "Blackie Toy" as the same person. The other federal officers remained nearby out of sight while Agent Alton Wong, who was of Chinese ancestry, rang the bell. When petitioner Toy appeared and opened the door, Agent Wong told him that he was calling for laundry and dry cleaning. Toy replied that he didn't open until 8 o'clock and told the agent to come back at that time. Toy started to close the door. Agent Wong thereupon took his badge from his pocket and said, [****7] "I am a federal narcotics agent." Toy immediately "slammed the door and started running" down the hallway through the laundry to his living quarters at the back where his wife and child were sleeping in a bedroom. Agent Wong and the other federal officers broke open the door and followed Toy down the hallway to the living quarters and into the bedroom. Toy reached into a nightstand drawer. Agent Wong thereupon drew his pistol, pulled Toy's hand out of the drawer, placed him under arrest and handcuffed him. There was nothing in the drawer and a search of the premises uncovered no narcotics.

One of the agents said to Toy ". . . [Hom Way] says he got narcotics from you." Toy responded, "No, I haven't been selling any narcotics at all. However, I do know somebody who has." When asked who that was, Toy said, "I only know him as Johnny. I don't know his last name." However, Toy described a house on Eleventh Avenue where he said Johnny lived; he also described a

[1] 21 U. S. C. § 174:

"Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $ 20,000. For a second or subsequent offense (as determined under section 7237 (c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $ 20,000.

"Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

bedroom in the house where he said "Johnny kept about a piece" [2] of heroin, and where he and Johnny had smoked some of the drug the night before. The agents [*475] left immediately for Eleventh Avenue and located the [****8] house. They entered and found one Johnny Yee in the bedroom. After a discussion with the agents, Yee took from a bureau drawer several tubes containing in all just less than one ounce of heroin, and surrendered them. Within the hour Yee and Toy were taken to the Office of the Bureau [**411] of Narcotics. Yee there stated that the heroin had been brought to him some four days earlier by petitioner Toy and another Chinese known to him only as "Sea Dog."

Toy was questioned as to the identity of "Sea Dog" and said that "Sea Dog" was Wong Sun. Some agents, including Agent Alton Wong, took Toy to Wong Sun's neighborhood where Toy pointed out a multifamily dwelling where he said Wong [***448] Sun lived. Agent Wong rang a downstairs door bell and a buzzer sounded, opening the door. The officer identified himself as a narcotics agent to a woman on the landing and asked "for Mr. Wong." The woman was the wife of petitioner Wong Sun. She said that Wong Sun was "in the [****9] back room sleeping." Alton Wong and some six other officers climbed the stairs and entered the apartment. One of the officers went into the back room and brought petitioner Wong Sun from the bedroom in handcuffs. A thorough search of the apartment followed, but no narcotics were discovered.

Petitioner Toy and Johnny Yee were arraigned before a United States Commissioner on June 4 on a complaint charging a violation of 21 U. S. C. § 174. Later that day, each was released on his own recognizance. Petitioner Wong Sun was arraigned on a similar complaint filed the next day and was also released on his own recognizance. [3] [*476] Within a few days, both petitioners and Yee were interrogated at the office of the Narcotics Bureau by Agent William Wong, also of Chinese ancestry. [4] The agent advised each of the three of his right to withhold information which might be used against him, and stated to each that he was entitled to the advice of counsel, though it does not appear that any attorney was present during the questioning of any of the three. The officer also explained to each that no promises or offers of immunity or leniency were being or could be [****10] made.

[****11] The agent interrogated each of the three separately. After each had been interrogated the agent prepared a statement in English from rough notes. The agent read petitioner Toy's statement to him in English and interpreted certain portions of it for him in Chinese. Toy also read the statement in English aloud to the agent, said there were corrections to be made, and made the corrections in his own hand. Toy would not sign the statement, however; in the agent's words "he wanted to know first if the other persons involved in the case had signed theirs." Wong Sun had considerable difficulty understanding the [*477] statement in English and the agent restated its substance in Chinese. Wong Sun refused to sign the statement although he admitted the accuracy of its contents. [5]

Hom Way did not testify at petitioners' trial. The Government offered Johnny Yee as its principal witness but excused him after he [***449] invoked [****12] the privilege [**412] against self-incrimination and flatly repudiated the statement he had given to Agent William Wong. That statement was not offered in evidence nor was any testimony elicited from him identifying either petitioner as the source of the heroin in his possession, or otherwise tending to support the charges against the petitioners.

The statute expressly provides that proof of the accused's possession of the drug will support a conviction under the statute unless the accused satisfactorily explains the possession. The

---

[2] A "piece" is approximately one ounce.

[3] The Record of the arraignment proceedings recites that arrest warrants were issued, on the arraignment dates, for the arrest of both petitioners and Yee. It was conceded in the trial court, however, that no arrest warrants were outstanding at the time of the actual arrests on June 4.

The Record also states that bond was initially fixed for each of the petitioners and for Yee in the amount of $ 5,000, on the recommendation of the United States Attorney. Later on the respective arraignment days, again on motion of the United States Attorney, it was ordered that each of the three be released on his own recognizance.

[4] Because neither statement was ever signed, the blanks in which the dates were to have been inserted were never filled in. The heading of Toy's statement suggests that it was made on June 5, although Agent William Wong at the trial suggested he had only talked informally with Toy on that date, the formal statement not being made until June 9. The agent also testified that Wong Sun's statement was made June 9, although a rubber-stamp date beneath the agent's own signature at the foot of the statement reads, "June 15, 1959."

[5] The full texts of both statements are set forth in an Appendix to this opinion.

Government's evidence tending to prove the petitioners' possession (the petitioners offered no exculpatory testimony) consisted of four items which the trial court admitted over timely objections that they were inadmissible as "fruits" of unlawful arrests or of attendant searches: (1) the statements made orally by petitioner Toy in his bedroom at the time of his arrest; (2) the heroin surrendered to the agents by Johnny Yee; (3) petitioner Toy's pretrial unsigned statement; and (4) petitioner Wong Sun's similar statement. The dispute below and here has [****13] centered around the correctness of the rulings of the trial judge allowing these items in evidence.

The Court of Appeals held that the arrests of both petitioners were illegal because not based on "'probable cause' within the meaning of the Fourth Amendment" nor "reasonable grounds" within the meaning of the Narcotic [*478] Control Act of 1956. [6] The court said as to Toy's arrest, "There is no showing in this case that the agent knew Hom Way to be reliable," and, furthermore, found "nothing in the circumstances occurring at Toy's premises that would provide sufficient justification for his arrest without a warrant." 288 F.2d, at 369, 370. As to Wong Sun's arrest, the Court said "there is no showing that Johnnie Yee was a reliable informer." The Court of Appeals nevertheless held that the four items of proof were not the "fruits" of the illegal arrests and that they were therefore properly admitted in evidence.

[1]

[****14] The Court of Appeals rejected two additional contentions of the petitioners. The first was that there was insufficient evidence to corroborate the petitioners' unsigned admissions of possession of narcotics. The court held that the narcotics in evidence surrendered by Johnny Yee, together with Toy's statements in his bedroom at the time of arrest corroborated petitioners' admissions. The second contention [***450] was that the confessions were [*479] inadmissible because they were not signed. The Court of Appeals held on this point that the petitioners were not prejudiced, since the agent might properly have testified to the substance of the conversations which produced the statements.

We believe that significant differences between the cases of the two petitioners require separate discussion of each. We shall first consider the case of petitioner Toy.

[**413] I.

[2A][3][4]The Court of Appeals found there was neither reasonable grounds nor [****15] probable cause for Toy's arrest. Giving due weight to that finding, we think it is amply justified by the facts clearly shown on this record. It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion, see *Henry* v. *United States*, 361 U.S. 98, 101, though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause -- evidence which would "warrant a man of reasonable caution in the belief" that a felony has been committed, *Carroll* v. *United States*, 267 U.S. 132, 162 -- must be measured by the facts of the particular case. The history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would "leave law-abiding citizens at the mercy of the officers' whim or caprice." [7] *Brinegar* v. *United States*, 338 U.S. 160, 176.

[****16] [5] [2B]Whether or not the requirements of

---

[6] 26 U. S. C. § 7607:

"The Commissioner, Deputy Commissioner, Assistant to the Commissioner, and agents, of the Bureau of Narcotics of the Department of the Treasury, and officers of the customs (as defined in section 401 (1) of the Tariff Act of 1930, as amended; 19 U. S. C., sec. 1401 (1)), may --

"(1) carry firearms, execute and serve search warrants and arrest warrants, and serve subpenas and summonses issued under the authority of the United States, and

"(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs (as defined in section 4731) or marihuana (as defined in section 4761) where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

The terms "probable cause" for purposes of the Fourth Amendment and "reasonable grounds" as used in the statute, mean substantially the same. *Draper* v. *United States*, 358 U.S. 307, 310, n. 3; *United States* v. *Walker*, 246 F.2d 519, 526.

[7] See *Giordenello* v. *United States*, 357 U.S. 480, 485-487; *Johnson* v. *United States*, 333 U.S. 10, 16-17. See generally Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 673, 695-701 (1924).

reliability and particularity of the information on which an officer may act are more stringent where an arrest warrant is absent, they surely cannot be less stringent than where an arrest warrant is obtained. Otherwise, a principal incentive now [*480] existing for the procurement of arrest warrants would be destroyed. [8] The threshold question in this case, therefore, is whether the officers could, on the information which impelled [***451] them to act, have procured a warrant for the arrest of Toy. We think that no warrant would have issued on evidence then available.

[****17] [6]The narcotics agents had no basis in experience for confidence in the reliability of Hom Way's information; he had never before given information. And yet they acted upon his imprecise suggestion that a person described only as "Blackie Toy," the proprietor of a laundry somewhere on Leavenworth Street, had sold one ounce of heroin. We have held that identification of the suspect by a reliable informant may constitute probable cause for arrest where the information given is sufficiently accurate to lead the officers directly to the suspect. *Draper* v. *United States*, 358 U.S. 307. That rule does not, however, fit this case. For aught that the record discloses, Hom Way's accusation merely invited the officers to roam the length of Leavenworth Street (some 30 blocks) in search of one "Blackie Toy's" laundry -- and whether by chance or other [*481] means (the record does not say) they came upon petitioner Toy's laundry, which bore not his name over the door, [**414] but the unrevealing label "Oye's." Not the slightest intimation appears on the record, or was made on oral argument, [****18] to suggest that the agents had information giving them reason to equate "Blackie" Toy and James Wah Toy -- *e. g.*, that they had the criminal record of a Toy, or that they had consulted some other kind of official record or list, or had some information of some kind which had narrowed the scope of their search to this particular Toy.

[2C][7][8] It is conceded that the officers made no attempt to obtain a warrant for Toy's arrest. The simple fact is that on the sparse information at the officers' command, no arrest warrant could have issued consistently with Rules 3 and 4 of the Federal Rules of Criminal Procedure. *Giordenello* v. *United States*, 357 U.S. 480, 486. [9] The arrest warrant procedure serves to insure that the deliberate, impartial judgment of a judicial officer will be interposed [*482] between the citizen and the police, to assess [****19] the weight and credibility of the information which the complaining officer adduces as probable cause. Cf. *Jones* v. *United States*, 362 U.S. 257, 270. To hold that an officer may act in his own, unchecked discretion upon [***452] information too vague and from too untested a source to permit a judicial officer to accept it as probable cause for an arrest warrant, would subvert this fundamental policy.

[****20] [9A]

The Government contends, however, that any defects in the information which somehow took the officers to petitioner Toy's laundry were remedied by events which

---

[8] Our discussion implies no view whether a search warrant should be obtained where a search is conducted incident to a valid arrest, cf. *United States* v. *Rabinowitz*, 339 U.S. 56, for nothing in this case turns on the presence or absence of a search warrant. Since the officers had obtained an arrest warrant in *Rabinowitz*, the question before us here was not there presented. As to the question before us, see *Wrightson* v. *United States*, 222 F.2d 556, 559-560:

"But, if officers can arrest without a warrant and never be required to disclose the facts upon which they based their belief of probable cause -- if, in other words, they have an untouchable power to arrest without a warrant, -- why would they ever bother to get a warrant? And the same obvious conclusion follows if the courts, when an arrest is attacked as illegal, will assume, without facts, that an arrest without a warrant was for probable cause. To strike down all factual requirements in respect to probable cause for arrests without a warrant, while maintaining them for the issuance of a warrant, would be to blast one of the support columns of justice by law."

[9] We noted in *Giordenello* that Rules 3 and 4 of the Federal Rules of Criminal Procedure provide that an arrest warrant shall issue only upon a sworn complaint setting forth "the essential facts constituting the offense charged," and showing "that there is probable cause to believe that an offense has been committed and that the defendant has committed it . . . ." The Fourth Amendment, from which the requirements of the Rules derive, provides that ". . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* . . . the persons or things to be seized." (Emphasis added.) The requirement applies both to arrest and search warrants. A description of a suspect merely as "Blackie Toy," operator of a laundry somewhere on Leavenworth Street, hardly is information "particularly describing . . . the person . . . to be seized." Such information is no better than the wholesale or "dragnet" search warrant, which we have condemned. See, *e. g.*, *Marron* v. *United States*, 275 U.S. 192, 196; see generally Kaplan, Search and Seizure: A No-Man's Land in the Criminal Law, 49 Calif. L. Rev. 474, 480-482 (1961).

occurred after they arrived. Specifically, it is urged that Toy's flight down the hall when the supposed customer at the door revealed that he was a narcotics agent adequately corroborates the suspicion generated by Hom Way's accusation. Our holding in *Miller* v. *United States*, 357 U.S. 301, is relevant here, and exposes the fallacy of this contention. We noted in that case that the lawfulness of an officer's entry to arrest without a warrant "must be tested by criteria identical with those embodied in 18 U. S. C. § 3109, which deals with entry to execute a search warrant." 357 U.S., at 306. That statute requires that an officer must state his authority and his purpose at the threshold, and be refused admittance, before he may break open the door. We held that when an officer insufficiently or unclearly identifies his office or his mission, the occupant's flight from the door must [****21] be regarded as ambiguous conduct. We expressly reserved the question "whether the unqualified requirements of the rule admit of an exception justifying noncompliance in exigent circumstances." 357 U.S., at 309. In the instant case, Toy's flight from the door afforded no surer an inference of guilty knowledge than did the suspect's conduct in the *Miller* case. Agent Wong did [**415] eventually disclose that he was a narcotics officer. However, he affirmatively misrepresented his mission at the [*483] outset, by stating that he had come for laundry and dry cleaning. And before Toy fled, the officer never adequately dispelled the misimpression engendered by his own ruse. Cf. *Gouled* v. *United States*, 255 U.S. 298; *Gatewood* v. *United States*, 209 F.2d 789.

Moreover, he made no effort at that time, nor indeed at any time thereafter, to ascertain whether the man at the door was the "Blackie Toy" named by Hom Way. Therefore, this is not the case we hypothesized in *Miller* where "without an express announcement of purpose, the facts known to officers would justify them in being virtually certain" that the person [****22] at the door knows their purpose. 357 U.S., at 310. Toy's refusal to admit the officers and his flight down the hallway thus signified a guilty knowledge no more clearly than it did a natural desire to repel an apparently unauthorized intrusion. [10] Here, as in *Miller*, [*484] the Government [***453] claims no extraordinary circumstances -- such as the imminent destruction of vital evidence, or the need to rescue a victim in peril -- see 357 U.S., at 309 -- which excused the officer's failure truthfully to state his mission before he broke in.

[****23] [10] [11] [2D] [9B] A contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked. Cf. *Henry* v. *United States*, 361 U.S. 98, 104. That result would have the same essential vice as a proposition we have consistently rejected -- that a search unlawful at its inception may be validated by what it turns up. *Byars* v. *United States*, 273 U.S. 28; *United States* v. *Di Re*, 332 U.S. 581, 595. Thus we conclude that the Court of Appeals' finding that the officers' uninvited entry into Toy's living quarters was unlawful and that the bedroom arrest which followed was likewise unlawful, was fully justified on the evidence. It remains to be seen what consequences flow from this conclusion.

II.

It is conceded [****24] that Toy's declarations in his bedroom are to be excluded [**416] if they are held to be "fruits" of the agents' unlawful action.

[12]In order to make effective the fundamental constitutional guarantees of sanctity of the home and

---

[10] Although the question presented here is only whether the petitioner's flight justified an inference of guilt sufficient to generate probable cause for his arrest, and not whether his flight would serve to corroborate proof of his guilt at trial, the two questions are inescapably related. Thus it is relevant to the present case that we have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime. In *Alberty* v. *United States*, 162 U.S. 499, 511, this Court said:

". . . it is not universally true that a man, who is conscious that he has done a wrong, 'will pursue a certain course not in harmony with the conduct of a man who is conscious of having done an act which is innocent, right and proper;' since it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.'"

See also *Hickory* v. *United States*, 160 U.S. 408; *Allen* v. *United States*, 164 U.S. 492; *Starr* v. *United States*, 164 U.S. 627; and for the views of two Courts of Appeals see *Vick* v. *United States*, 216 F.2d 228, 233 (C. A. 5th Cir.) ("One motive is about as likely as another. Appellant may be guilty, but his conviction cannot rest upon mere conjecture and suspicion"); cf. *Cooper* v. *United States*, 218 F.2d 39, 41 (C. A. D. C. Cir.) ("After all, innocent people caught in a web of circumstances frequently become terror-stricken"). But cf. *United States* v. *Heitner*, 149 F.2d 105 (C. A. 2d Cir.).

inviolability of the person, *Boyd* v. *United States*, 116 U.S. 616, this Court held nearly half a century ago that evidence seized during an unlawful search could not constitute proof against the victim of the search. *Weeks* v. *United States*, 232 U.S. 383. The exclusionary prohibition extends as well to the indirect as the direct products of such invasions. *Silverthorne Lumber Co*. v. *United States*, 251 U.S. 385. [*485] Mr. Justice Holmes, speaking for the Court in that case, in holding that the Government might not make use of information obtained during an unlawful search to subpoena from the victims the very documents illegally viewed, expressed succinctly the policy of the broad exclusionary rule:

[13] [****25] "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts [***454] thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." 251 U.S., at 392.

[14][15]The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in *Silverman* v. *United States*, 365 U.S. 505, that the Fourth Amendment may protect against the overhearing of verbal statements [****26] as well as against the more traditional seizure of "papers and effects." Similarly, testimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies. *McGinnis* v. *United States*, 227 F.2d 598. Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the "fruit" of official illegality than the more common tangible fruits of the unwarranted intrusion. [11] See [*486] *Nueslein* v. *District of Columbia*, 115 F.2d 690. Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence. Either in terms of deterring lawless conduct by federal officers, *Rea* v. *United States*, 350 U.S. 214, or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained, *Elkins* v. *United States*, 364 U.S. 206, the danger in relaxing the exclusionary rules in the case of verbal [****27] evidence would seem too great to warrant introducing such a distinction.

[16] The Government argues that Toy's statements to the officers in his bedroom, although closely consequent upon the invasion which we hold unlawful, were nevertheless admissible because they resulted from "an intervening independent act of a free will." This contention, however, takes insufficient account of the circumstances. Six or seven officers had broken the door and followed on Toy's heels into the bedroom where his wife and child were sleeping. He had been almost immediately handcuffed and arrested. Under such circumstances it is unreasonable to infer that Toy's response was sufficiently an act of free [**417] [****28] will to purge the primary taint of the unlawful invasion. [12]

[****29]

[*487] [17] The [***455] Government also contends that Toy's declarations should be admissible because they were ostensibly exculpatory rather than incriminating. There are two answers to this argument. First, the statements soon turned out to be incriminating,

---

[11] See Kamisar, Illegal Searches or Seizures and Contemporaneous Incriminating Statements: A Dialogue on a Neglected Area of Criminal Procedure, 1961 U. of Ill. Law Forum 78, 84-96. But compare Maguire, Evidence of Guilt (1959), 187-190.

[12] See Lord Devlin's comment: "It is probable that even today, when there is much less ignorance about these matters than formerly, there is still a general belief that you must answer all questions put to you by a policeman, or at least that it will be the worse for you if you do not." Devlin, The Criminal Prosecution in England (1958), 32. Even in the absence of such oppressive circumstances, and where an exclusionary rule rests principally on nonconstitutional grounds, we have sometimes refused to differentiate between voluntary and involuntary declarations. See Hogan and Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Geo. L. J. 1, 26-27 (1958). For illustrative situations where a voluntary act of the accused has been held insufficient to cure the otherwise unlawful acquisition of evidence, see *Bynum* v. *United States*, 262 F.2d 465 (holding inadmissible fingerprints made by defendant after unlawful arrest); *United States* v. *Watson*, 189 F.Supp. 776 (excluding narcotics voluntarily surrendered by accused in the course of an unauthorized search). The Ninth Circuit Court of Appeals from which the instant case comes has recognized in an analogous context, that "all declarations and statements under the compulsion of the things so seized, are affected by the vice of primary illegality. . . ." *Takahashi* v. *United States*, 143 F.2d 118, 122.

for they led directly to the evidence which implicated Toy. Second, when circumstances are shown such as those which induced these declarations, it is immaterial whether the declarations be termed "exculpatory." [13] Thus we find no substantial reason to omit Toy's declarations from the protection of the exclusionary rule.

III.

[18] [****30] We now consider whether the exclusion of Toy's declarations requires also the exclusion of the narcotics taken from Yee, to which those declarations led the police. The prosecutor candidly told the trial court that "we wouldn't have found those drugs except that Mr. Toy helped us to." Hence this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence "from an independent source," *Silverthorne Lumber Co*. v. *United States*, 251 U.S. 385, 392; nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." *Nardone* v. *United States*, 308 U.S. 338, 341.We need not hold that all evidence [*488] is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently [****31] distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959). We think it clear that the narcotics were "come at by the exploitation of that illegality" and hence that they may not be used against Toy.

IV.

It remains only to consider Toy's unsigned statement. We need not decide whether, in light of the fact that Toy was free on his own recognizance when he made the statement, that statement was a fruit of the illegal arrest. Cf. *United States* v. *Bayer*, 331 U.S. 532. Since [**418] we have concluded that his declarations in the bedroom and the narcotics surrendered by Yee should not have been admitted in evidence against him, the only proofs remaining to sustain his conviction are his and Wong [***456] Sun's unsigned statements. Without scrutinizing the contents of Toy's ambiguous recitals, we conclude that no reference to Toy in Wong Sun's statement constitutes admissible evidence corroborating any admission by Toy. We arrive at this conclusion upon two clear lines of decisions which converge to require it. One line of our decisions establishes that criminal confessions and admissions of guilt require extrinsic corroboration; [****32] the other line of precedents holds that an out-of-court declaration made after arrest may not be used at trial against one of the declarant's partners in crime.

[19]It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or [*489] confession of the accused. [14] We observed in *Smith* v. *United States*, 348 U.S. 147, 153, that the requirement of corroboration is rooted in "a long history of judicial experience with confessions and in the realization that sound law enforcement requires police investigations which extend beyond the words of the accused." In *Opper* v. *United States*, 348 U.S. 84, 89-90, we elaborated the reasons for the requirement:

"In our country the doubt persists that the zeal of the agencies of prosecution to protect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the aberration or weakness of [****33] the accused under the strain of suspicion may tinge or warp the facts of the confession. Admissions, retold at a trial, are much like hearsay, that is, statements not made at the pending trial. They had neither the compulsion of the oath nor the test of cross-examination."

[22][23][24][25] [****34] It is true that in *Smith* v. *United States, supra*, we held that although "corroboration is necessary for all elements of the offense established by admissions alone," extrinsic proof was sufficient which "merely fortifies the truth of the confession, without independently establishing the crime charged . . . ." 348

---

[13] Moreover, we held in *Opper* v. *United States*, 348 U.S. 84, 92, that even where exculpatory statements are voluntary and thus clearly admissible, they require at least the degree of corroboration required of incriminating statements.

[14] For the history and development of the corroboration requirement, see 7 Wigmore, Evidence (3d ed. 1940), §§ 2070-2071; Note, Proof of the Corpus Delicti Aliunde the Defendant's Confession, 103 U. of Pa. L. Rev. 638-649 (1955). For the present scope and application of the rule, see 2 Underhill, Criminal Evidence (5th ed. 1956), §§ 402-403. For a comprehensive collection of cases, see Annot., 45 A. L. R. 2d 1316 (1956).

U.S., at 156.[15] [****37] [*490] However, Wong Sun's unsigned confession does not furnish competent corroborative evidence. [***457] The second governing principle, likewise well settled in our decisions, is that an out-of-court declaration made after arrest may not be used at trial against one of the declarant's partners in crime. While such a statement is "admissible against the others [**419] where it is in furtherance of the criminal undertaking . . . all such responsibility is at an end when the conspiracy ends." *Fiswick* v. *United States*, 329 U.S. 211, 217. We have consistently refused to broaden that very narrow exception to the traditional hearsay rule which admits statements of a codefendant made in furtherance [****35] of a conspiracy or joint undertaking.[16] See *Krulewitch* v. *United States*, 336 U.S. 440, 443-445. And where postconspiracy declarations have been admitted, we have carefully ascertained that limiting instructions kept the jury from considering the contents with respect to the guilt of anyone but the declarant. *Lutwak* v. *United States*, 344 U.S. 604, 618-619; *Delli Paoli* v. *United States*, 352 U.S. 232, 236-237. We have never ruled squarely on the question presented here, whether a codefendant's statement might serve to corroborate even where it will not suffice to convict.[17] We see [*491] no warrant for a different result so long as the rule which regulates the use of out-of-court statements is one of admissibility, rather than simply of weight, of the evidence. The import of our previous holdings is that a co-conspirator's hearsay statements may be admitted against the accused for no purpose whatever, unless made during and in furtherance of the conspiracy. Thus as to Toy the only possible source of corroboration [****36] is removed and his conviction must be set aside for lack of competent evidence to support it.

[20] [21]

V.

[26] [27] [28] We turn now to the case of the other petitioner, Wong Sun. We have no occasion to disagree with the finding of the Court of Appeals that his arrest, also, was without probable cause or reasonable grounds. At all events no evidentiary consequences turn upon that question. For Wong Sun's unsigned [****38] confession was not the fruit of that arrest, and was therefore properly admitted at trial. On the evidence that Wong Sun had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, we hold that the connection between the arrest and the statement had "become so attenuated as to dissipate the taint." *Nardone* v. *United States*, 308 U.S. 338, 341. The fact that the statement was unsigned, whatever bearing this may have upon its weight [***458] and credibility, does not render it inadmissible; Wong Sun understood and adopted its substance, though he could not comprehend the English words. The petitioner has never suggested any impropriety in the interrogation itself which would require the exclusion of this statement.

[29]We must then consider the admissibility of the narcotics surrendered by Yee. Our holding, *supra*, that this [*492] ounce of heroin was inadmissible against Toy does not compel a like result with respect to Wong Sun. The exclusion of the narcotics as to Toy was required solely [****39] by their tainted relationship to information unlawfully obtained from Toy, and not by any official impropriety connected with their surrender by Yee. The seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial. Cf. *Goldstein* v. *United States*, 316 U.S. 114.[18]

---

[15] Where the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable. A notable example is the principle that an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim. See 7 Wigmore, Evidence (3d ed. 1940), § 2072, n. 5. There need in such a case be no link, outside the confession, between the injury and the accused who admits having inflicted it. But where the crime involves no tangible *corpus delicti*, we have said that "the corroborative evidence must implicate the accused in order to show that a crime has been committed." 348 U.S., at 154. Finally, we have said that one uncorroborated admission by the accused does not, standing alone, corroborate an unverified confession. *United States* v. *Calderon*, 348 U.S. 160, 165.

[16] See Developments in the Law -- Criminal Conspiracy, 72 Harv. L. Rev. 922, 989-990 (1959).

[17] Cf. Williams, The Proof of Guilt (1958), 135: "Even where . . . the evidence of an accomplice becomes admissible against his fellows, it remains suspect evidence, because of the tainted source from which it comes. The accomplice may no longer have anything to fear or hope from the way in which he gives his evidence; yet he may mistakenly entertain such a fear or hope, or he may wish by his evidence against others to gratify some spite against them."

[18] This case is not like *Jones* v. *United States*, 362 U.S. 257,

[30] [31] However, [****40] [**420] for the reasons that Wong Sun's statement was incompetent to corroborate Toy's admissions contained in Toy's own statement, any references to Wong Sun in Toy's statement were incompetent to corroborate Wong Sun's admissions. Thus, the only competent source of corroboration for Wong Sun's statement was the heroin itself. We cannot be certain, however, on this state of the record, that the trial judge may not also have considered the contents of Toy's statement as a source of corroboration. Petitioners raised as one ground of objection to the introduction of the statements the claim that each statement, "even if it were a purported admission or confession or declaration against interest of a defendant . . . would not be binding upon the other defendant." The trial judge, in allowing the statements in, apparently overruled all of petitioners' objections, including this one. Thus we presume that he considered all portions of both statements as bearing upon the guilt of both petitioners.

We intimate no view one way or the other as to whether the trial judge might have found in the narcotics alone sufficient evidence to corroborate Wong Sun's admissions [*493] that he [****41] delivered heroin to Yee and smoked heroin at Yee's house around the date in question. But because he might, as the factfinder, have found insufficient corroboration from the narcotics alone, we cannot be sure that the scales were not tipped in favor of conviction by reliance upon the inadmissible Toy statement. This is particularly important because of the nature of the offense involved here.

[32] Surely, under the narcotics statute, the discovery of heroin raises a presumption that someone -- generally the possessor -- violated the law. As to him, once possession alone is proved, the other elements of the offense -- transportation and concealment with knowledge of the illegal [***459] importation of the drug -- need not be separately demonstrated, much less corroborated. 21 U. S. C. § 174. Thus particular care ought to be taken in this area, when the crucial element of the accused's possession is proved solely by his own admissions, that the requisite corroboration be found among [****42] the evidence which is properly before the trier of facts. We therefore hold that petitioner Wong Sun is also entitled to a new trial.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered*.

[For concurring opinion of MR. JUSTICE DOUGLAS, see *post*, p. 497.]

[For dissenting opinion of MR. JUSTICE CLARK, see *post*, p. 498.]

APPENDIX TO OPINION OF THE COURT.

Statement of JAMES WAH TOY taken on June 5, 1959, concerning his knowledge of WONG SUN's narcotic trafficking

I have known WONG SUN for about 3 months. I know him as SEA DOG which is what everyone calls him. [*494] I first met him in Marysville, California, during a Chinese holiday. I drove him back to San Francisco on that occasion. Sometimes he asks me to drive him home and to different places in San Francisco.

Sometime during April or May of this year, he asked me to drive him out to JOHNNY YEE's house, at 11th and Balboa Streets. He asked me to call JOHNNY and tell him we were coming. When [**421] we got there we went into the house and WONG SUN took a paper package out of his pocket [****43] and put it on the table. Then both WONG SUN and JOHNNY YEE opened the package. I don't know how much heroin was in it, but I know it was more than 10 spoons. I asked them if I could have some for myself and they said yes. I took a little bit and went across the room and smoked it in a cigarette.

WONG SUN and JOHNNY YEE talked for about 10 or 15 minutes, but they were talking in low tones so that I could not hear what they were saying. I didn't see any money change hands, because I wasn't paying too much attention. WONG SUN and I then left the house and drove. I drove WONG SUN to his home and he gave me $ 15.00. He said the money was for driving him out there.

I have driven WONG SUN out to JOHNNY YEE's house about 5 times altogether. Each time WONG SUN gave me $ 10 or $ 15 for doing it and also, Johnny gave me a little heroin -- enough to put in 3 or 4 cigarettes. The last time I drove WONG SUN out to YEE's house was

---

where the person challenging the seizure of evidence was lawfully on the premises at the time of the search. Nor is it like *Chapman* v. *United States*, 365 U.S. 610, where we held that a landlord could not lawfully consent to a search of his tenant's premises. See generally Edwards, Standing to Suppress Unreasonably Seized Evidence, 47 N. W. U. L. Rev. 471 (1952).

last Tuesday, May 26, 1959. On Wednesday night June 3, 1959, at about 10:00 p. m., I called JOHNNY YEE and told him that "I'm coming out pretty soon -- I don't have anything." He said okay, so I drove out there. When I got there I went in the house and Johnny [****44] gave me a paper of heroin. The bindle had about enough for 5 or 6 cigarettes. I didn't give him any money and he didn't ask for any. He gives it to me just out of friendship. He has given me heroin like this quite a few times. I don't remember how many times. I have known HOM WEI [*495] about 2 or 3 years but I have never dealt in narcotics with him. I have known ED FONG about 1 year and I have never dealt in narcotics with him, either. I have heard people that I know in the Hop Sing Tong Club talk about HOM WEI dealing in narcotics but [***460] nothing about ED FONG. I do not know JOHN MOW LIM or BILL FONG. The only connection I have now is JOHNNY YEE.

I have carefully read the foregoing statement, which was made of my own free will, without promise of reward or immunity and not under duress. I have been given ample opportunity to make corrections have initialed or signed each page as evidence thereof and hereby state that this statement is true to the best of my knowledge and belief.

JAMES WAH TOY

. . . .

JAMES WAH TOY did not wish to sign this statement at this time. He stated he may change his mind at a later date. However, [****45] I read this statement to him and in addition he read it also and stated that the contents thereof were true to the best of his knowledge. Corrections made were by JAMES WAH TOY without his initials.

/s/ WILLIAM WONG

William Wong, Narcotic Agent

STATEMENT OF WONG SUN

I met JAMES TOY approximately the middle of March, this year, at Marysville, California, during a Chinese celebration. We returned to San Francisco together and we discussed the possible sale of heroin. I told JAMES that I could get a piece of heroin for $ 450 from a person known as BILL.

Shortly after returning to San Francisco, JAMES told me he wanted me to get a piece. I asked him who it was [*496] for and he told me it was for JOHNNY. He gave me $ 450 and I obtained a piece of heroin from BILL. I did this on approximately 8 occasions, however, at least one of these times the heroin was not for JOHNNY -- for another friend of JAMES TOY. JOHNNY would pay JAMES $ 600 for each piece.

On several occasions after I had obtained the piece for JAMES I would drive with him to JOHNNY's house, 606 11th Avenue, and we would go upstairs to the bedroom. There, all three of us would smoke some of the heroin and JAMES [****46] would give the piece to JOHNNY. I also went with JAMES on approximately [**422] 3 other occasions when he did not take any heroin and then we smoked at JOHNNY's and we would also get some for our own use.

About 4 days before I was arrested (arrested on June 4, 1959) JAMES called me at home about 7 o'clock in the evening and told me to come by. I went to the laundry and JAMES told me to get a piece. I called BILL and arranged to meet him. JAMES gave me $ 450 which I gave to BILL when I met him. BILL called me about one hour later at the laundry and I met him. He gave me one piece, which I gave to JAMES, and JAMES immediately thereafter called JOHNNY. We drove to 606 -- 11th Ave. at approximately midnight and JAMES gave the piece to JOHNNY. It was contained in a rubber contraceptive in a small brown paper bag.

Again on June 3rd, the night before I was arrested, I met JAMES at the laundry, prior to 11 o'clock in the evening, and JAMES telephoned JOHNNY at EV -- 6-9336. Then we went out to JOHNNY's and smoked heroin and also had one paper for our own use later. We were there approximately 1/2 hour and then left.

The laundry mentioned is OYE's [***461] LAUNDRY, 1733 [****47] Leavenworth Street, which is run by JAMES TOY. I do not know JOHNNY's last name and know him only [*497] through JAMES TOY. As well as the few times at JOHNNY's home, I have seen JOHNNY on a number of occasions at the laundry.

I have carefully read the foregoing statement, consisting of 2 pages which was made of my own free will, without promise of reward or immunity and not under duress. I have been given ample opportunity to make corrections, have initialed or signed each page as evidence thereof and hereby state that this statement is true to the best of my knowledge and belief.

WONG SUN

. . . .

WONG SUN, being unable to read English, did not sign this statement. However, I read this statement to him and he stated that the contents thereof were true to the best of his knowledge.

/s/ WILLIAM WONG

William Wong, Narcotic Agent

**Concur by:** DOUGLAS

## Concur

MR. JUSTICE DOUGLAS, concurring.

While I join the Court's opinion I do so because nothing the Court holds is inconsistent with my belief that there having been time to get a warrant, probable cause alone could not have justified the arrest of petitioner Toy without a warrant.

I adhere to the [****48] views I expressed in *Jones* v. *United States*, 362 U.S. 257, 273. What I said in the *Jones* case had been earlier stated by Mr. Justice Jackson, writing for the Court in *Johnson* v. *United States*, 333 U.S. 10 (another narcotics case):

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection [*498] consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." Pp. 13-14. And see *Chapman* v. *United States*, 365 U.S. 610, 615-616.

The Court finds it unnecessary to reach that constitutional question. I mention [**423] it only [****49] to reiterate that the *Johnson* case represents the law and is in no way eroded by what we fail to decide today.

**Dissent by:** CLARK

## Dissent

MR. JUSTICE CLARK, with whom MR. JUSTICE HARLAN, MR. JUSTICE **STEWART** and MR. JUSTICE **WHITE** join, dissenting.

The Court has made a Chinese puzzle out of this simple case involving four participants: Hom Way, Blackie Toy, Johnny Yee and "Sea Dog" Sun. In setting aside the convictions of Toy and Sun it has dashed to pieces the heretofore recognized standards of probable cause necessary to secure an arrest warrant or to make an arrest without [***462] one. Instead of dealing with probable cause as involving "probabilities," "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *Brinegar* v. *United States*, 338 U.S. 160, 175 (1949), the Court sets up rigid, mechanical standards, applying the 20-20 vision of hindsight in an area where the ambiguity and immediacy inherent in unexpected arrest are present. While probable cause must be based on more than mere suspicion, *Henry* v. *United States*, 361 U.S. 98, 104 (1959), it does [*499] [****50] not require proof sufficient to establish guilt. *Draper* v. *United States*, 358 U.S. 307, 312 (1959). The sole requirement heretofore has been that the knowledge in the hands of the officers at the time of arrest must support a "man of reasonable caution in the belief" that the subject had committed narcotic offenses. *Carroll* v. *United States*, 267 U.S. 132, 162 (1925). That decision is faced initially not in the courtroom but at the scene of arrest where the totality of the circumstances facing the officer is weighed against his split-second decision to make the arrest. This is an everyday occurrence facing law enforcement officers, and the unrealistic, enlarged standards announced here place an unnecessarily heavy hand upon them. I therefore dissent.

I.

The first character in this affair is Hom Way, who was arrested in possession of narcotics and told the officers early that morning that he had purchased an ounce of heroin on the previous night from Blackie Toy, who operated a laundry on Leavenworth Street. Narcotics agents, armed with this information from a person they had known for six weeks and who was under arrest for possession of [****51] narcotics, immediately sought out Blackie Toy, the second character. The laundry was located without difficulty (as far as the record shows) from the information furnished by Hom Way. The Court gratuitously reads into the record its supposition that Hom Way "merely invited the officers to roam the length of Leavenworth Street (some 30 blocks) in search of one 'Blackie Toy's' laundry . . . ." On the contrary, the identification of "Blackie" and the directions to his

laundry were sufficiently accurate for the officers -- two of whom were of Chinese ancestry -- to find Blackie at his laundry within an hour. I cannot say in the face of this record that this was a "roaming" performance [*500] up and down Leavenworth Street. To me it was efficient police work by officers familiar with San Francisco and the habits and practices of its Chinese-American inhabitants. Indeed, the information was much more explicit than that approved by this Court in *Draper* v. *United States, supra*.

There are other indicia of reliability, however. Here the informer, believed by the officers to be reliable, * was under arrest when he implicated himself in the [**424] purchase [****52] of an ounce of heroin the previous night. Since he was in possession [***463] of narcotics and his information related to a narcotics sale in which he was the buyer, the officers had good reason to rely on Hom Way's knowledge. See *Rodgers* v. *United States*, 267 F.2d 79 (C. A. 9th Cir. 1959), and *Thomas* v. *United States*, 281 F.2d 132 (C. A. 8th Cir.), cert. denied, 364 U.S. 904 (1960). As to his credibility, he was confronted with prosecution for possession of narcotics and well knew that any discrepancies in his story might go hard with him. Furthermore, the statement was a declaration against interest which stripped Hom Way of any explanation for his possession of narcotics and made certain the presumption of 21 U. S. C. § 174. I do not see what stronger and more reliable information one could have to establish probable cause for the arrest without warrant of Blackie Toy.

[****53] But even assuming there was no probable cause at this point, the Government produced additional evidence to support the lawfulness of Blackie's arrest. In broad daylight, about 6:30 on the same morning that Hom Way was arrested, one of the officers of Chinese ancestry, Agent Alton Wong, knocked on Blackie Toy's laundry door. When Wong told him that he wanted laundry, Blackie [*501] opened the door and advised him to return at 8 a. m. Wong testified that he then "pulled out [his] badge" and announced that he was a narcotics agent. Blackie slammed the door in Wong's face and ran down the hall of the laundry. Wong broke through the door after him -- calling again that he was "a narcotics Treasury agent." Only when Blackie reached the family bedroom was Wong able to arrest him, as he reached into a nightstand drawer, apparently looking for narcotics. Agent Wong immediately confronted him with Hom Way's accusation that Blackie Toy had sold him narcotics. Blackie denied selling narcotics, but he did not deny knowing Hom Way and later admitted knowing him. There is no basis in *Miller* v. *United States*, 357 U.S. 301 (1958), for the Court's conclusion that Blackie's [****54] flight "signified . . . a natural desire [by Toy] to repel an apparently unauthorized intrusion. . . ." As I see it this is incredible in the light of the record. Nor is there any support in the record that "before Toy fled, the officer never adequately dispelled the misimpression engendered by his own ruse." On the contrary the officer's showing of his badge and announcement that he was a narcotics agent immediately put Blackie in flight behind the slamming door. To conclude otherwise takes all prizes as a *non sequitur*. As he pursued, Wong continued to identify himself as a narcotics agent. I ask, how could he more clearly announce himself and his purpose?

This Court has often held unexplained flight -- as here -- from an officer to be strong evidence of guilt. *E. g., Husty* v. *United States*, 282 U.S. 694 (1931); *Brinegar* v. *United States, supra*, at p. 166, n. 7; see *Henry* v. *United States, supra*, where the Court was careful to distinguish its facts from those of "fleeing men or men acting furtively." 361 U.S., at 103. Moreover, as the Government has always emphasized, this is particularly true [****55] in narcotics cases where delay may have serious consequences, *i. e.*, the hiding [*502] or destruction [***464] of the drugs. This Court noted without disapproval in *Miller* v. *United States, supra*, the state decisions holding that "justification for noncompliance [with the rule] exists in exigent circumstances, as, for example, when the officers may in good faith believe . . . that the person to be arrested is fleeing or attempting to destroy evidence. *People* v. *Maddox*, 46 Cal. 2d 301, 294 P. 2d 6." 357 U.S., at 309. And the Court continued, "It may be that, without an express announcement of purpose, the facts known to officers would justify them in being virtually certain [**425] that the petitioner already knows their purpose so that an announcement would be a useless gesture. Cf. *People* v. *Martin*, 45 Cal. 2d 755, 290 P. 2d 855; Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 798, 802 (1924)." *Id.*, at 310.

The Court places entire reliance on the decision in *Miller*. I submit that it is inapposite. That case involved interpretation of the law of the [****56] District of Columbia. *Id.*, at 306. The arrest was at night, and the door was broken in just as the defendant began to close

---

* One of the officers testified at the trial that he had known Hom Way for six weeks. In response to the question whether Hom Way was a reliable informer, the officer replied, "I believe so, yes, sir."

it. Thus there was no flight but only what the officers believed to be an attempt to bar their entrance. The only identification given by the officers occurred before the defendant opened the door, when "in a low voice" through the closed door they answered the defendant's query as to who was there by saying, "Police." *Id*., at 303. The facts in *Miller* differ significantly from this case both in the clarity of identification by the officers and in the character and extent of the defendant's conduct. For that reason, the conclusions that Blackie's flight is evidence to support probable cause and that the officers gave sufficient notice to permit lawful entry are supported rather than weakened by the Court's decision in *Miller*.

The information from Hom Way and Blackie Toy's unexplained flight cannot be viewed "in two separate, logic-tight compartments. . . . Together they composed [*503] a picture meaningful to a trained, experienced observer." *Christensen* v. *United States*, 104 U. S. App. D. C. 35, 36, 259 F.2d 192, 193 (1958). [****57] I submit that the officers as reasonable men properly concluded that the petitioner was the "Blackie Toy" who Hom Way informed them had committed a felony and that his immediate arrest -- as he ran through his hall -- was lawful and was imperative in order to prevent his escape. In view of this there is no "poisonous tree" whose fruits we must evaluate, and Blackie's declaration at the time of the arrest and the narcotics found in Yee's possession are admissible in evidence. The trial court found that evidence sufficiently corroborative of Toy's confession, and the Court of Appeals affirmed. For the same reasons discussed, *infra*, as to Wong Sun, I see no occasion to overturn these consistent findings of two courts.

II.

As to "Sea Dog," Wong Sun, there is no disagreement that his confession and the narcotics found in Yee's possession were admissible in evidence against him. The question remains as to whether there was sufficient independent evidence to corroborate the confession. Such evidence "does not have to prove the offense beyond a reasonable doubt, [***465] or even by a preponderance . . . ." *Smith* v. *United States*, 348 U.S. 147, 156 (1954). [****58] The requirement is satisfied "if the corroboration merely fortifies the truth of the confession, without independently establishing the crime charged . . . ." *Ibid*.; see also *Opper* v. *United States*, 348 U.S. 84 (1954). Wong Sun's confession stated in part that about four days before his arrest he and Toy delivered an ounce of heroin to Yee and that on the night before his arrest -- the night of June 3, 1959 -- he and Toy smoked some heroin at Yee's house. On June 4, 1959, the officers found at Yee's residence quantities of heroin totaling "just less than one ounce." In light [*504] of this evidence, I am unable to say that the trial court and the Court of Appeals erred in holding that Wong Sun's confession was sufficiently corroborated.

The Court does not reach a contrary conclusion as to corroboration, but it grants Wong Sun a new trial on the ground that the trial court "may" also "have considered the contents of Toy's statement as a source of corroboration" of it. This point was not raised as a question here nor was it discussed in the briefs. Despite this the Court goes to some lengths to develop a chain of inferences [**426] in finding prejudicial [****59] error. This might be plausible where the case was tried to a jury, as were all the cases cited by the Court. Indeed, I find no case where such presumption of error was applied, as here, to a trial before a judge. The Court admits that the heroin found in Johnny Yee's possession might itself be sufficient corroboration, but it reverses on the excuse that the judge "may" have considered Toy's confession as well. I see no reason for this assumption where a federal judge is the trier of the fact, and I would therefore affirm the judgment as to both petitioners.

## References

Annotation References:

1. What constitutes "probable cause" or "reasonable grounds" justifying arrest of narcotics suspect without warrant. 3 L ed 2d 1736.

2. Admissibility of evidence obtained by illegal search. 24 ALR 1408; 32 ALR 408; 41 ALR 1145; 52 ALR 477; 88 ALR 348; 134 ALR 819; 150 ALR 566. See also 93 L ed 1797; 96 L ed 145; 98 L ed 581; 100 L ed 239; 6 L ed 2d 1544 (dealing with United States Supreme Court cases in point). [****60] As to modern (prior to Mapp v Ohio) status of rule, see 50 ALR2d 531. As to status of rule after Mapp v Ohio, see 84 ALR2d 959.

3. Sufficiency of corroborative evidence in connection with extrajudicial confessions or admissions in federal criminal prosecutions. 99 L ed 110.

4. Corroboration of extrajudicial confession or admission. 127 ALR 1130, 45 ALR2d 1316.

5. Admissibility as against conspirator of extrajudicial declarations of coconspirator. 1 L ed 2d 278.

6. Interest in property as requisite of accused's standing to raise question of constitutionality of search and

seizure. 96 L ed 66, 4 L ed 2d 1999.

7. Nature of interest, or connection with, premises searched as affecting standing to attack legality of search. 78 ALR2d 246.

8. Admissibility in evidence of unsigned confession. 23 ALR2d 919.

---

End of Document

# United States v. Ganias

824 F.3d 199 (2d Cir. 2016) (en banc)

Cited in Opening Brief at: 32

The en banc court did not decide the Fourth Amendment question. See Response, Part III.C. Highlighted language appears at 824 F.3d at 200.

Caution
As of: September 14, 2026 7:03 PM Z

# United States v. Ganias

United States Court of Appeals for the Second Circuit

September 30, 2015, Argued; May 27, 2016, Decided

No. 12-240-cr

**Reporter**
824 F.3d 199 *; 2016 U.S. App. LEXIS 9706 **; 117 A.F.T.R.2d (RIA) 2016-1841

UNITED STATES OF AMERICA, Appellee, -v.- STAVROS M. GANIAS, Defendant-Appellant.

**Subsequent History:** US Supreme Court certiorari denied by Ganias v. United States, 137 S. Ct. 569, 196 L. Ed. 2d 445, 2016 U.S. LEXIS 7337 (U.S., Dec. 5, 2016)

**Prior History:** United States v. Ganias, 2011 U.S. Dist. LEXIS 67806 (D. Conn., June 24, 2011)

**Disposition:** Appeal from the judgment of the United States District Court for the District of Connecticut (Thompson, J.), convicting Defendant-Appellant Stavros Ganias of two counts of tax evasion, in violation of 26 U.S.C. § 7201. Ganias argues that the Government retained non-responsive data on mirrored hard drives acquired pursuant to a 2003 search warrant in violation of the Fourth Amendment, and that evidence acquired pursuant to a 2006 search of that data should thus have been suppressed. Because we find that the Government relied in good faith on the 2006 warrant, we need not and do not decide whether the Government violated the Fourth Amendment, and we affirm the judgment of the district court.

AFFIRMED.

**Counsel:** [**1] SANDRA S. GLOVER (Sarala V. Nagala, Anastasia Enos King, Jonathan N. Francis, Assistant United States Attorneys; Wendy R. Waldron, Senior Counsel, U.S. Dep't of Justice, on the brief), for Deirdre M. Daly, United States Attorney for the District of Connecticut, for Appellee United States of America.

STANLEY A. TWARDY, JR., Day Pitney LLP, Stamford, CT (Daniel E. Wenner, John W. Cerreta, Day Pitney LLP, Hartford, CT, on the brief), for Defendant-Appellant Stavros Ganias.

Counsel for amici curiae are listed in Appendix A.

**Judges:** Before: KATZMANN, Chief Circuit Judge, JACOBS, CABRANES, POOLER, RAGGI, WESLEY, HALL, LIVINGSTON, LYNCH, CHIN, LOHIER, CARNEY, and DRONEY, Circuit Judges. LIVINGSTON and LYNCH, JJ., filed the majority opinion in which KATZMANN, C.J., JACOBS, CABRANES, RAGGI, WESLEY, HALL, CARNEY, and DRONEY, JJ., joined in full, and POOLER and LOHIER, JJ., joined in full as to Parts I and III and in part as to Part II. LOHIER, J., filed a concurring opinion in which POOLER, J., joined. CHIN, J., filed a dissenting opinion.

**Opinion by:** DEBRA ANN LIVINGSTON; GERARD E. LYNCH

## Opinion

[*200] DEBRA ANN LIVINGSTON and GERARD E. LYNCH, CIRCUIT JUDGES:

Defendant-Appellant Stavros Ganias appeals from a judgment of the United [**2] States District Court for the District of Connecticut (Thompson, *J.*) convicting him, after a jury trial, of two counts of tax evasion in violation of 26 U.S.C. § 7201. He challenges his conviction on the ground that the Government violated his Fourth Amendment rights when, after lawfully copying three of his hard drives for off-site review pursuant to a 2003 search warrant, it retained these full forensic copies (or "mirrors"), which included data both responsive and non-responsive to the 2003 warrant, while its investigation continued, and ultimately searched the non-responsive data pursuant to a second warrant in 2006. Ganias contends that the Government had successfully sorted the data on the mirrors responsive to the 2003 warrant from the non-responsive data by January 2005, and that the retention of the mirrors thereafter (and, by extension, the 2006 search, which would not have been possible but for that retention) violated the Fourth Amendment. He argues that evidence obtained in executing the 2006 search warrant

should therefore have been suppressed.

We conclude that the Government relied in good faith on the 2006 warrant, and that this reliance was objectively reasonable. Accordingly, we need not decide whether retention [**3] of the forensic mirrors violated the Fourth Amendment, and we AFFIRM the judgment of the district court.

## I

[*201] **A. Background**[1]

In August 2003, agents of the U.S. Army Criminal Investigation Division ("Army CID") received an anonymous tip that Industrial Property Management ("IPM"), a company providing security for and otherwise maintaining a government-owned property in Stratford, Connecticut, pursuant to an Army contract, had engaged in misconduct in connection with that work. In particular, the informant alleged that IPM, owned by James McCarthy, had billed the Army for work that IPM employees had done for one of McCarthy's other businesses, American Boiler, Inc. ("AB"), and for construction work performed for IPM's operations manager at his home residence. The informant told the agents, including Special Agent Michael Conner, that IPM and AB's financial books were maintained by Stavros Ganias, a former Internal Revenue Service ("IRS") agent, who conducted business as [**4] Taxes International. On the basis of the informant's information, as well as extensive additional corroboration, Agent Conner prepared an affidavit seeking three warrants to search the offices of IPM, AB, and Taxes International for evidence of criminal activity.[2] Nothing in the record suggests that Ganias himself was suspected of any crimes at that time.

In a warrant dated November 17, 2003, U.S. Magistrate Judge William I. Garfinkel authorized the search of Taxes International. The warrant authorized agents to seize, *inter alia*, "[a]ll books, records, documents, materials, computer hardware and software and computer associated data relating to the business, financial and accounting operations of [IPM] and [AB]." J.A. 433. It further authorized seizure of "[a]ny of the items described [in the warrant] . . . which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment, including . . . fixed hard disks, or removable hard disk cartridges, software or memory in any [**5] form." *Id.* The warrant also specifically authorized a number of digital search protocols, though it did not state that *only* these protocols were permitted.[3] The warrant authorized seizure of all hardware relevant to the alleged crimes.[4]

---

[1] These facts are drawn from the district court decision denying Ganias's motion to suppress and from testimony at the suppression hearing and at Ganias's jury trial. With few exceptions noted herein, the facts in this case are not in dispute.

[2] Specifically, Agent Conner sought evidence relating to violations of 18 U.S.C. § 287 (making false claims) and § 641 (stealing government property).

[3] The warrant specified as follows:

The search procedure of the electronic data contained in computer operating software or memory devices may include the following techniques:

(a) surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

(b) "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

(c) "scanning" storage areas to discover and possibly recover recently deleted files;

(d) "scanning" storage areas for deliberately hidden files; or

(e) performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

J.A. 433-34.

[4] In his attached affidavit, Agent Conner offered three reasons why it was [**6] necessary for the agents to take entire hard drives off-site for subsequent search rather than search the hard drives on-site: First, he stated that computer searches had to be conducted by computer forensics experts, who "us[ed] . . . investigative techniques" to both "protect the integrity of the evidence . . . [and] detect hidden, disguised, erased, compressed, password protected, or encrypted files." J.A. 448-49. Because of "[t]he vast array" of software and hardware available, it would not always be possible "to know before a search which expert is qualified to analyze the [particular] system and its data." J.A. 450. Thus, the appropriate experts could not be expected, in all cases, to accompany agents to the relevant site to be searched. Second, Agent Conner affirmed that such searches often must occur in "a laboratory or other controlled environment" given

[*202] On November 19, 2003, Army CID agents executed the search warrants. Because the warrants authorized the seizure of computer hardware and software, in addition to paper documents, Agent Conner sought the help, in executing the warrants, of agents from the Army CID's Computer Crimes Investigation Unit ("CCIU"), a unit with specialized expertise in digital forensics and imaging. At Ganias's office, the CCIU agents — and in particular Special Agent David Shaver — located three computers. Rather than take the physical hard drives, which would have significantly impaired Ganias's ability to conduct his business, Agent Shaver created mirror images: exact copies of all of the data stored thereon, down to the bit.[5] Ganias was present at his office during the creation of the mirrors, spoke with the agents, and was aware that mirrored copies of his three hard drives had been created and taken off-site.[6] There is no dispute that the forensic mirrors taken from Ganias's office contained all of the computerized data maintained by Ganias's business, including not only [**8] material related to IPM or AB, but also Ganias's own personal [*203] financial records, and the records of "many other" accounting clients of Ganias: businesses of various sorts having no connection to the Government's criminal investigation.[7] J.A. 464, 14.

The next day, Agent Shaver consolidated the eleven mirrored hard drives from all three searches (including the three from Ganias's office) onto a single external hard drive which he provided to Agent Conner. Agent Conner, in turn, provided this hard drive to the evidence custodian of the Army CID, who stored it at Fort Devens, Massachusetts. There the consolidated drive remained, unaltered and untouched, throughout the events relevant to this case. Around the same time, Agent Shaver created two additional copies of the mirrored drives on two sets of nineteen DVDs. After providing these DVD sets to Agent Conner, Agent Shaver then purged the external hard drives onto which he had originally written the mirrors. At this point, a week after [**11] the search, three complete copies of the mirrors of Ganias's hard drives existed: an untouched copy stowed away in an evidence locker and two copies available for forensic analysis.[8]

---

the sensitivity of the digital storage media. J.A. 449-50. And third, he stated that "[t]he search process can take weeks or months, depending on the particulars of the hard drive to be searched." J.A. 449. The district court found, in denying Ganias's motion to suppress, that, as a result of technological limitations in 2003 and the complexities [**7] of searching digital data, "[a] full [on-site] search would have taken months to complete." *United States v. Ganias*, No. 3:08CR00224 (AWT), 2011 U.S. Dist. LEXIS 67806, 2011 WL 2532396, at *2 (D. Conn. June 24, 2011).

[5] Hard drives are storage media comprising numerous bits — units of data that may be expressed as ones or zeros. Mirroring involves using a commercially available digital software (in the present case, though not always, EnCase) to obtain a perfect, forensic replica of the sequence of ones and zeros written onto the original hard drive. During the mirroring, EnCase acquires metadata about the mirroring process, writing an unalterable record of who creates the copy and when the copy is created. It also assigns the mirror a "hash value" — a unique code that can be used to verify whether, upon subsequent examination of the mirror at any later date, even a single one or zero has been altered from the original reproduction.

[6] Testifying at the suppression hearing, Agent Conner explained that the decision to take mirrors, rather than the hard drives themselves, reflected a desire to mitigate the burden on Ganias and his business. *See* J.A. 140-41. The [**9] district court credited this testimony, concluding that the agents "used a means less intrusive to the individual whose possessions were seized than other means they were authorized to use." *Ganias*, 2011 U.S. Dist. LEXIS 67806, 2011 WL 2532396, at *8. The district court, further, explicitly found that the 2003 warrant authorized the Government to take these mirrors, 2011 U.S. Dist. LEXIS 67806, [WL] at *10, a position Ganias has not challenged on appeal, and that runs directly counter to the dissent's seeming suggestions that the Government somehow acted improperly when it mirrored Ganias's hard drives or that this initial seizure went beyond the scope of the 2003 warrant, *see, e.g.*, Dissent at 3 (noting that "although the Government had a warrant for documents relating to only two of defendant-appellant Stavros Ganias's accounting clients, it seized *all* the data from three of his computers"); *id.* at 40 (stating that "the Government . . . entered Ganias's premises with a warrant to seize certain papers and indiscriminately seized — and *retained* — all papers instead").

[7] Ganias claimed before the district court that when he expressed some concern about the scope of the data being seized, an agent assured him that the agents were only looking for files related to AB and IPM, and that irrelevant files "would [**10] be purged once they completed their search" for such files. J.A. 428. The district court made no finding to this effect, however. It is undisputed, moreover, that Ganias became aware in February 2006 that the Government retained the mirrors and sought to search them in connection with Ganias's own tax reporting. At no time thereafter did Ganias seek return of the mirrors pursuant to Federal Rule of Criminal Procedure 41(g) or otherwise contact a case agent to seek their return or destruction.

[8] These copies were identical digital replicas of Ganias's hard

Though internal protocols required that specialized digital forensic analysts search the mirrored hard drives, the paper files were not subject to such limitations. Thus, shortly after the November 19 seizure, the Army CID agents began to analyze the non-digital files seized pursuant to the warrant. These files suggested that IPM had made payments to a third company whose owner, according to the Connecticut Department of Labor, was a full-time employee of an insurance company who received no wages from any source other than [**12] that insurance company. This and other red flags spurred Agent Conner to contact the Criminal Investigation Division of the IRS, which subsequently joined the investigation.

In early February 2004, as he and his fellow agents continued to follow leads from the paper files, Agent Conner sent one of the two DVD sets containing the forensic mirrors to the Army Criminal Investigation Laboratory ("ACIL") in Forest Park, Georgia, accompanied by a copy of one of the three search warrants. In early June, the ACIL assigned Gregory Norman, a digital evidence examiner, to perform a forensic analysis. Around the same time, Special Agent Michelle Chowaniec, who replaced Agent Conner as the primary case agent for the Army CID in late March, provided the second set of DVDs to the IRS agent assigned to the case, Special Agent Paul Holowczyk. Agent Holowczyk in turn, passed it on, by way of intermediaries, to Special Agent Vita Paukstelis, a computer investigative specialist. [*204] By the end of June 2004, computer experts for the Army CID and the IRS — Norman and Agent Paukstelis, respectively — had received copies of the digital evidence (which, as the district court found, were "encoded so that only agents [**13] with forensic software not directly available to the case agents could view [them]," *Ganias*, 2011 U.S. Dist. LEXIS 67806, 2011 WL 2532396, at *7), and forensic examination began.

Norman commenced his analysis in late June by loading the eleven mirrored drives into EnCase — the same software with which Agent Shaver initially created the mirrors — so that he could search the data thereon. After looking at the search warrants, he created a number of keywords, with which he searched for potentially relevant data. Initially, the search returned far too many results for practicable review (more than 17,000 hits); thus, Norman requested new keywords from Agent Chowaniec. On the basis of these new keywords, he was able to narrow his search and ultimately identify several files he thought might be of interest to the investigation, all of which he put on a single CD.[9] Some of these files he was able personally to examine, to determine whether they were responsive to the warrant; a few (including the QuickBooks file labeled "Steve_ga.qbw," which was ultimately searched pursuant to the 2006 warrant, J.A. 467) Norman could not open without a specific software edition of QuickBooks to which he did not have immediate access. However, as these files (like the [**14] others) contained keywords that were taken from the narrower list and generated on the basis of the warrant, Norman included the QuickBooks files in the CD he ultimately sent to Agent Chowaniec along with a report.[10] On July 23, 2004, Chowaniec received this CD. Norman, in turn, returned the nineteen DVDs to Army CID's evidence custodian in Boston for safekeeping.

Norman's counterpart in the IRS, Agent Paukstelis — who, in addition to receiving the search warrant with her set of DVDs, also received a list of companies, addresses, and key individuals relating to the investigation, along with "a handwritten notation next to the name 'Taxes International' that stated '(return preparer) do not search,'" *Ganias*, 2011 U.S. Dist. LEXIS 67806, 2011 WL 2532396, at *3 — conducted her analysis over a period of about four months. Because she worked for the IRS, she limited her search to the three mirrored drives from Taxes International. Though Agent Paukstelis used ILook, a different [**15] software program, to review the mirrored hard drives, she too could not open QuickBooks files without the relevant proprietary software. Still, though she could not open these files, she believed, based on the information to which she had access, that they were within the scope of the warrant; thus, in October 2004, she copied this data, in concert with other responsive data, onto a

drives as mirrored on November 19, 2003. Notably, the original hard drives in Ganias's computers had already been significantly altered since the Government mirrored them. Ganias explains in his brief before this Court that "[t]wo days after the execution of the November 2003 warrant, [he] reviewed his personal QuickBooks file and . . . . *corrected over 90 errors in earlier journal entries*." Appellant Br. at 15 n.7 (emphasis added).

[9] The rest of the data remained on the DVDs, where agents would not be able to access it without specific forensic software. *See Ganias*, 2011 U.S. Dist. LEXIS 67806, 2011 WL 2532396, at *7.

[10] Norman describes the storage device he sent to Chowaniec as a "DVD," J.A. 218; the district court described it as a "CD," *Ganias*, 2011 U.S. Dist. LEXIS 67806, 2011 WL 2532396, at *4. The distinction is immaterial.

CD, three copies of which she sent to Agent Holowczyk and Special Agent Amy Hosney, also with the IRS. In light of the note she had received with her DVD set as well as the list of relevant entities, Agent Paukstelis avoided, to the degree she could, searching any files of Taxes International that did not appear to be directly relevant to that list. On November 30, 2004, Paukstelis also provided a "restoration" of the mirrors of the Taxes International hard drives to Special Agent [*205] George Francischelli, an IRS computer specialist assigned to the case.[11]

Agents Chowaniec and [**16] Conner, after receiving Norman's CD and report in late July, conducted initial reviews of the data. Like Norman and Agent Paukstelis, however, they could not open the QuickBooks files. At the same time, the agents were busy, in the words of Agent Chowaniec, "tracking down other leads[,] . . . [issuing] grand jury subpoenas, . . . doing interviews of subcontractors and identifying subcontractors from the papers that [the agents had] received from the search warrants." J.A. 294-95. In October, Agents Hosney and Chowaniec attempted, together, to review the QuickBooks files, but again lacked the relevant software to do so. Finally, in November 2004, Agent Chowaniec, having acquired the appropriate software, opened two IPM QuickBooks files on her office computer, and then in December, Agents Hosney and Chowaniec, using the restoration provided by Agent Paukstelis, looked at additional IPM QuickBooks files. Though they had the entirety of the mirrored data before them (the only time throughout the investigation that the case agents had direct access to a software interface permitting them to view essentially all of the data stored on the mirrors), they carefully limited their search: Agent [**17] Hosney testified that they "only looked at the QuickBooks files for Industrial Property Management and American Boiler . . . [b]ecause those were the only two companies named in the search warrant attachment." J.A. 340. They did, however, observe that other files existed — both on the CD Norman had provided and on the restoration — in particular, the files Agent Hosney ultimately searched in 2006.

Ganias contends that there is no dispute that by this point, the agents had finished "identifying and segregating the files within the November 2003 warrant's scope." Appellant Reply Br. at 5. In actuality, the record is unclear as to whether the forensic examination of the mirrored computers pursuant to the initial search warrant had indeed concluded as a forward-looking matter, rather than from the perspective of hindsight.[12] The district court did not find any facts decisive to this question. It is, further, undisputed that the investigation into McCarthy, IPM, and AB was ongoing at this time, and that this investigation would culminate in an indictment of McCarthy in 2008 secured in large part [*206] through reliance on evidence responsive to the 2003 warrant and located on the mirrored copies of Ganias's [**18] hard drives. *See* Indictment, *United States v. McCarthy*, No. 3:08cr224 (EBB) (D. Conn. Oct. 31, 2008), ECF No. 1. When asked why, at this time or any time later, Agent Conner did not return or destroy the data stored on the mirrors that did not appear directly to relate to the crimes alleged in the warrant, Agent Conner explained that "[the] investigation was still . . . open" and that, generally, items would be "released back to the owner" once an investigation was closed. J.A. 123. He further noted that the Army CID "would not routinely go into DVDs to delete data, as we're altering the original data that was seized." J.A. 122.[13]

---

[11] A "restoration" is a software interface that enables a user (potentially a jury) to view data on a mirror as such data would have appeared to a person accessing the data on the original storage device at the time the mirror was created. *Ganias*, 2011 U.S. Dist. LEXIS 67806, 2011 WL 2532396, at *4.

[12] At the suppression hearing, Agent Chowaniec testified, in response to the question whether "as of mid-December, [her] forensic analysis was completed": "That's correct, of the computers." J.A. 322. But when asked later, "[D]id you know [in December 2004] you wouldn't need to look at any information that had been provided by Greg Norman on that CD anymore in the course of this investigation," Agent Chowaniec responded, "No," and when further asked, "Did you know you wouldn't require further analysis by Greg Norman or any other examiner at the Army lab in Georgia after [**19] December of 2004," Agent Chowaniec again responded, "No." J.A. 324. Agent Conner similarly answered with uncertainty when asked a related question. *See* J.A. 145 ("I didn't know the entire universe of information that was contained within the DVDs that were sent to [Norman] for analysis. I knew only what he sent back to me saying this is what I found off your keyword search."). The dissent disputes our conclusion that the record was unclear on this point, arguing, through citation to Agent Chowaniec's testimony, that "the record . . . shows otherwise." Dissent at 19. The district court found no facts on this issue, and the record, as demonstrated above, is indeed unclear.

[13] Agent Conner's explanation for why the Government did not, as a matter of policy in this or other cases, delete mirrored drives or otherwise require segregation or deletion of non-responsive data, is not a model of clarity: in addition to citing concerns of evidentiary integrity and suggesting a policy of

Over the next year, the agents continued to investigate IPM and AB. Analysis of the paper files taken pursuant to the November 2003 search warrant revealed potential errors in AB's tax returns that seemed to omit income reflected in checks deposited into IPM's account. Aware that Ganias had prepared these tax returns and deposited the majority of [**21] these checks, Agent Hosney came to suspect that Ganias was engaged in tax-related crimes.[14] She did not, however, return to the restoration or otherwise open any of Ganias's digital financial documents or files associated with [*207] Taxes International.[15] Instead, Agent Hosney subpoenaed Ganias's bank records from 1999 to 2003 and accessed his income tax returns for the same period. On July 28, 2005, the IRS — believing Ganias to be involved both personally and as an accomplice or co-conspirator in tax evasion — officially expanded the investigation to include him.

On February 14, 2006, Ganias, accompanied by his lawyer, met in a proffer session with Agent Hosney and others involved in the investigation.[16] That day or shortly thereafter, Agent Hosney asked Ganias for consent to access his personal QuickBooks files and those of his business, Taxes International — data Agent Hosney knew to be present on the forensic mirrors but which she had not accessed. When, by April 24, 2006 (two and a half months later), Ganias had failed to respond (either by consenting, objecting, or filing a motion under Federal Rule of Criminal Procedure 41(g) for return of seized property), Agent Hosney sought a search warrant to search the mirrored drives again.[17] In her search warrant affidavit, Agent Hosney pointed to bank records, income tax forms, and additional evidence to demonstrate that she had probable cause to believe that Ganias had violated 26 U.S.C. § 7201 (by committing tax evasion) and § 7206(1) (by making false declarations).[18] She further noted that the items to be

---

non-deletion or return prior to the end of an investigation, he noted that "you never know what data you may need in the future," J.A. 122, and at one point referred to the DVDs as "the government's property, not Mr. Ganias'[s] [**20] property," J.A. 146. The dissent seizes on this single sentence during Agent Conner's cross-examination as the smoking gun of the Government's bad faith, citing it on no fewer than four occasions. *See* Dissent at 3, 8, 33, 37. The district court, however, did not find facts explicating Agent Conner's testimony or placing it within the context of the explanations that he and other agents offered for retention of the mirrors. The court did note in its legal analysis that "[a] copy of the evidence was preserved in the form in which it was taken." *Ganias*, 2011 U.S. Dist. LEXIS 67806, 2011 WL 2532396, at *8. Further, the Government on appeal provides numerous rationales — many echoing those articulated by Agent Conner *throughout* his testimony — for why retention of a forensic mirror may be necessary during the pendency of an investigation, none of which amounts to the argument that the mirror is simply "government[] property."

[14] The dissent suggests that "[w]hat began nearly thirteen years ago as an investigation by the Army into two of Ganias's business clients *somehow* evolved into an unrelated investigation by the IRS into Ganias's personal affairs, largely because" the Government retained the mirrored copies of Ganias's hard drives. Dissent at 40 (emphasis added). In fact, Agent Hosney's affidavit in support of the 2006 warrant explains that the Government suspected Ganias of underreporting his income because of evidence that Ganias had assisted McCarthy in underreporting income from *McCarthy's* companies — evidence which led to an indictment of *both* McCarthy and Ganias for [**22] conspiracy to commit tax fraud. Further, when Agent Hosney developed this suspicion — which was hardly "unrelated" to the initial investigation — she did not turn to the mirrors, but instead engaged in old-fashioned investigatory work, "examin[ing Ganias's tax returns] more closely to determine if his own income was underreported." J.A. 465, 18. She then reviewed deposits in his bank account, cross-referenced bank records and tax returns, and finally presented this evidence in a proffer session to Ganias — all without once looking at any non-responsive information on the mirrors. Only after she had acquired independent probable cause — and only after extensive evidence suggested Ganias may have committed a crime — did Agent Hosney seek a second warrant to search the mirrors. It is, in short, no mystery how the investigation of McCarthy, IPM, and AB came to include Ganias, and, further, an inaccurate statement of the record to suggest that this "evolution" had anything to do with the retention of the mirrors.

[15] Agent Hosney explained in her testimony: "[W]e couldn't look at that file because it wasn't — Steve Ganias and Taxes International were not listed on the original Attachment B, items [**23] to be seized." J.A. 348.

[16] According to Agent Hosney, in that proffer session Ganias claimed "that he failed to record income from his own business [to his QuickBook files] as a result of a computer flaw in the QuickBooks software . . . [but that,] . . . although he attempted to duplicate the software error, he was unable to do so." J.A. 467, 28. Agent Hosney contacted Intuit, Inc., which released QuickBooks, to determine [**25] whether such an error might have affected, generally, the pertinent version of the software, and was told that the company was aware of no such "widespread malfunction." J.A. 469, 35.

[17] U.S. Magistrate Judge William I. Garfinkel, who had authorized the 2003 warrant, authorized this 2006 warrant as well. J.A. 430, 454.

[18] Ganias did not contest before the district court, and does not

searched were "mirror images of computers seized on November 19, 2003 from the offices of Taxes International," J.A. 461, 7; that information material to the initial investigation had been located on these mirrors and that, "[d]uring the investigation," [**24] such information had been "analyzed in detail," J.A. 464, 15; that Ganias was not, at the time of the initial seizure, under investigation, J.A. 461, 3 ("On July 28, 2005, the Government's investigation was expanded to include an examination of whether Ganias, McCarthy's accountant and former IRS Revenue Agent, violated the federal tax laws."); and thus that, though Agent Hosney believed that the second mirrored drive, called TaxInt_2, was "the primary computer for Taxes International," J.A. 463, 13, she could not search Ganias's personal or business files as "[p]ursuant to the 2003 search warrant, only files for [AB] and IPM could be viewed," J.A. 464, 14. The magistrate judge issued the warrant, Agent Hosney searched the referenced data, and ultimately the Government indicted Ganias for tax evasion.

**B. Procedural History**

In February 2010, Ganias moved to suppress the evidence Agent Hosney acquired pursuant to the 2006 warrant. After a two- [*208] day hearing, the district court denied the motion on April 14, 2010, and issued a written decision on June 24, 2011. In that decision, the district court found, *inter alia*, that the forensic examination of the mirrored drives "was conducted within the limitations imposed by the [2003] warrant" and that "[a] copy of the evidence was preserved in the form in which it was taken." *Ganias*, 2011 U.S. Dist. LEXIS 67806, 2011 WL 2532396, at *8. Judge Thompson observed that Ganias "never moved for destruction or return of the data, which could have led to the seized [**26] pertinent data being preserved by other means." *Id.* The district court concluded that the Government's retention of the mirrored drives — and thus its subsequent search of those drives pursuant to a warrant — did not violate the Fourth Amendment. Having found no Fourth Amendment violation, the district court did not reach the question of good faith. 2011 U.S. Dist. LEXIS 67806, [WL] at *9.

At trial, the Government introduced information in Ganias's QuickBooks files as evidence against him, in particular highlighting the fact that payments made to him by clients such as IPM were characterized as "owner's contributions," which prevented QuickBooks from recognizing them as income.[19] On the basis of this and other evidence, the jury convicted Ganias of two counts of tax evasion, and the district court sentenced him to two terms of 24 months' incarceration, to be served concurrently.

Ganias appealed. On review of his conviction, a panel of this Court concluded, unanimously, that the Government had violated the Fourth Amendment; in a divided decision, the panel then ordered suppression of the evidence obtained in executing the 2006 warrant and vacated the jury verdict. We subsequently ordered this rehearing *en banc* in regards to, first, the existence of a Fourth Amendment violation and, second, the appropriateness of suppression.[20]

**II**

"On appeal from a district court's ruling on [**28] a motion to suppress evidence, 'we review legal conclusions de novo and findings of fact for clear error.'" *United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015); (quoting *United States v. Freeman*, 735 F.3d 92, 95 (2d Cir. 2013)). We may uphold the validity of a judgment "on any ground that finds support in the

---

contest on appeal, that this evidence — none of which was acquired through search of non-responsive data on the mirrors — created sufficient probable cause for the 2006 warrant.

[19] Many of these entries existed *only* on the QuickBooks files that the Government had accessed on the mirrors, as a result of Ganias's amendments to the entries on his hard drives days after the execution of the 2003 warrant. At trial, Ganias testified that his characterization of the payments as "owner's contributions" was simply a good faith mistake, and not evidence of intent to commit [**27] tax evasion, a claim that the Government labeled implausible in light of Ganias's extensive experience as an IRS agent and accountant.

[20] Specifically, we asked the parties to brief the following two issues:

(1) Whether the Fourth Amendment was violated when, pursuant to a warrant, the government seized and cloned three computer hard drives containing both responsive and non-responsive files, retained the cloned hard drives for some two-and-a-half years, and then searched the non-responsive files pursuant to a subsequently issued warrant; and(2) Considering all relevant factors, whether the government agents in this case acted reasonably and in good faith such that the files obtained from the cloned hard drives should not be suppressed.

> *United States v. Ganias*, 791 F.3d 290 (2d Cir. 2015) (mem.).

record." *Headley v. Tilghman*, 53 F.3d 472, 476 (2d Cir. 1995).

The district court concluded that the conduct of the agents in this case comported fully with the Fourth Amendment, and [*209] thus did not reach the question whether they also acted in good faith. Because we conclude that the agents acted in good faith, we need not decide whether a Fourth Amendment violation occurred. We thus affirm the district court on an alternate ground. Nevertheless, though we offer no opinion on the existence of a Fourth Amendment violation in this case, we make some observations bearing on the reasonableness of the agents' actions, both to illustrate the complexity of the questions in this significant Fourth Amendment context and to highlight the importance of careful consideration of the technological contours of digital search and seizure for future cases.

"The touchstone of the Fourth Amendment is reasonableness . . . ." *United States v. Miller*, 430 F.3d 93, 97 (2d Cir. 2005) (alteration omitted); (quoting *United States v. Knights*, 534 U.S. 112, 118, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001)). As relevant here, "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness." *United States v. Leon*, 468 U.S. 897, 922, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984); (alteration omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 267, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) (White, J., concurring in judgment)). [**29] Nevertheless, both the scope of a seizure permitted by a warrant,[21] and the reasonableness of government conduct in executing a valid warrant,[22] can present Fourth Amendment [*210] issues. Ganias thus argues that the Government violated the Fourth Amendment in this case, notwithstanding the two warrants that issued, by retaining complete forensic copies of his three hard drives during the pendency of its investigation.

According to Ganias, when law enforcement officers execute a warrant for a hard drive or forensic mirror that contains data that, as here, cannot feasibly be sorted into responsive and non-responsive categories on-site, "the Fourth Amendment demands, at the very least, that

[21] Specifically, courts have long recognized that a prohibition on "general warrants" — warrants completely lacking in particularity — was a central impetus for the ratification of the Fourth Amendment;. See, e.g., *Riley v. California*, 134 S. Ct. 2473, 2494, 189 L. Ed. 2d 430 (2014) (noting, in the context of evaluating the reasonableness of a warrantless search of a cell phone, that "[o]ur cases have recognized that the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity" and that "opposition to such searches was in fact one of the driving forces behind the Revolution itself"); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311, 98 S. Ct. 1816, 56 L. Ed. 2d 305 (1978) (noting, in the context of evaluating the reasonableness of warrantless inspections of business premises, that "[t]he particular offensiveness" of [**30] general warrants "was acutely felt by the merchants and businessmen whose premises and products were inspected" under them); *Stanford v. Texas*, 379 U.S. 476, 486, 85 S. Ct. 506, 13 L. Ed. 2d 431 (1965) ("[T]he Fourth . . . Amendment[] guarantee[s] . . . that no official . . . shall ransack [a person's] home and seize his books and papers under the unbridled authority of a general warrant . . . ."); *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013); ("The chief evil that prompted the framing and adoption of the Fourth Amendment was the 'indiscriminate searches and seizures' conducted by the British 'under the authority of "general warrants."'" (quoting *Payton v. New York*, 445 U.S. 573, 583, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980))).

We agree with the dissent that "the precedents are absolutely clear that general warrants are unconstitutional." Dissent at 30. To the degree that the dissent would go further, however, and find it "absolutely clear" to a reasonable government agent in 2005 that the retention of a lawfully acquired mirror during the pendency of an investigation and the subsequent search of data on that mirror pursuant to a second warrant would implicate the ban on general warrants, we respectfully disagree.

[22] See, e.g., *L.A. Cty. v. Rettele*, 550 U.S. 609, 614-16, 127 S. Ct. 1989, 167 L. Ed. 2d 974 (2007); (applying the reasonableness standard to evaluate whether police officers' manner of executing a valid warrant violated the Fourth Amendment); *Wilson v. Layne*, 526 U.S. 603, 611, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) ("[T]he Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the [**31] authorized intrusion . . . ."); *Dalia v. United States*, 441 U.S. 238, 258, 99 S. Ct. 1682, 60 L. Ed. 2d 177 (1979) ("[T]he manner in which a warrant is executed is subject to later judicial review as to its reasonableness."); *Terebesi v. Torreso*, 764 F.3d 217, 235 (2d Cir. 2014) ("[T]he method used to execute a search warrant . . . [is] as a matter of clearly established constitutional law, subject to Fourth Amendment protections . . . ."), *cert. denied sub nom. Torresso v. Terebesi*, 135 S. Ct. 1842, 191 L. Ed. 2d 723 (2015) (mem.); *Lauro v. Charles*, 219 F.3d 202, 209 (2d Cir. 2000) ("[T]he Fourth Amendment's proscription of unreasonable searches and seizures 'not only . . . prevent[s] searches and seizures that would be unreasonable if conducted at all, but also . . . ensure[s] reasonableness in the manner and scope of searches and seizures that are carried out.'" (all but first alteration in original) (quoting *Ayeni v. Mottola*, 35 F.3d 680, 684 (2d Cir. 1994))).

the officers expeditiously complete their off-site search and then promptly return (or destroy) files outside the warrant's scope."[23] Appellant Br. at 18. Arguing that a culling process took place here and that it had concluded by, at the latest, January 2005, Ganias faults the Government for retaining the mirrored drives — including [**32] storing one forensic copy in an evidence locker for safekeeping.[24] It was this retention, he argues, that constituted the Fourth Amendment violation — a violation that, in turn, made the 2006 search of the data itself unconstitutional as, but for this retention, the search could never have occurred.

To support this argument, Ganias relies principally on *United States v. Tamura*, 694 F.2d 591 (9th Cir. 1982), a Ninth Circuit case involving the search and seizure of physical records. In *Tamura* (unlike the present case, in which a warrant specifically authorized the agents to seize hard drives and to search them off-site) officers armed [**34] only with a warrant authorizing them to seize specific "records" instead seized numerous boxes of printouts, file [*211] drawers, and cancelled checks for off-site search and sorting. *Id.* at 594-95. After the officers had clearly sorted the responsive paper documents from the non-responsive ones, they refused — despite request — to return the non-responsive paper files. *Id.* at 596-97. The Ninth Circuit concluded that both the unauthorized seizure of voluminous material not specified in the warrant and the retention of the seized documents violated the Fourth Amendment.[25] *Id.* at 595, 597; see also *Andresen v. Maryland*, 427 U.S. 463, 482 n.11, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976) ("[W]e observe that to the extent [seized] papers were not within the scope of the warrants or were otherwise improperly seized, the State was correct in returning them voluntarily and the trial judge was correct in suppressing others. . . . In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized. . . . [R]esponsible officials [conducting such searches], including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy."); cf. *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) ("[W]hen items outside the scope of [**35] a valid warrant are seized, the normal remedy is suppression and return of those items . . . .").

Because we resolve this case on good faith grounds, we need not decide the relevance, if any, of *Tamura* (or, more broadly, the validity of Ganias's Fourth Amendment claim). We note, however, that there are reasons to doubt whether *Tamura* (to the extent we would indeed follow it) answers the questions before us. First, on its facts, *Tamura* is distinguishable from this case, insofar as the officers there seized for off-site review records that the warrant did not authorize them to seize,[26] and retained those records even after their

[23] On appeal, Ganias does not question the scope or validity of the 2003 warrant. The district court found that the 2003 warrant authorized the Government to mirror Ganias's hard drives for off-site review, *Ganias*, 2011 U.S. Dist. LEXIS 67806, 2011 WL 2532396, at *10; that the warrant, though authorizing such seizure, was sufficiently particularized and not a "general warrant," *id.*; that, absent mirroring for off-site review, on-site review would have taken months, 2011 U.S. Dist. LEXIS 67806, [WL] at *2; and that mirroring thus minimized any intrusion on Ganias's business, 2011 U.S. Dist. LEXIS 67806 [WL] at *8; *cf.* Fed. R. Crim. P. 41(e)(2)(B) (which, as amended in 2009, permits a warrant to "authorize the seizure of electronic storage media or the seizure or copying of electronically stored information," and notes that "[u]nless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant"); Fed. R. Crim. P. 41(e)(2)(B) advisory committee's note to 2009 amendments (explaining that, because "[c]omputers and other electronic storage media commonly contain such large [**33] amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location[, t]his rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant"). Ganias does not contest these conclusions on appeal but contends, instead, that considerations *underlying* the prohibition on general warrants may require that, if the government lawfully mirrors an entire hard drive containing non-responsive as well as responsive information for off-site review, it may not then retain the mirror throughout the pendency of its investigation.

[24] As already noted, the district court made no finding as to when or whether forensic examination of the mirrors pursuant to the 2003 warrant was completed.

[25] The Ninth Circuit declined to reverse the defendant's conviction, as no improperly seized document was admitted at trial, and as blanket suppression was not warranted. See *Tamura*, 694 F.2d at 597.

[26] The fact that the officers in *Tamura* lacked a warrant for the initial seizure was not incidental to the decision: the *Tamura* court explicitly found that it was the lack of a warrant that made the initial seizure — even if otherwise understandable in light of the voluminous material to be reviewed — a violation of

return was requested. Here, in contrast, the warrant authorized the seizure of the hard drives, not merely particular records, and Ganias did not request return or destruction of the mirrors (even after he was indisputably alerted to the Government's continued retention of them) by, for instance, filing a motion for such return pursuant to Federal Rule of Criminal Procedure 41(g). Second, and more broadly, even if the facts of *Tamura* were otherwise [**36] on point, Ganias's invocation of *Tamura*'s reasoning rests on an analogy between paper files intermingled in a file cabinet and digital data on a hard drive. Though we do not take any position on the ultimate disposition of the constitutional questions herein, we nevertheless pause to address the appropriateness of this analogy, which is often invoked (including by the dissent) and bears examination.

The central premise of Ganias's reliance on *Tamura* is that the search of a digital storage medium is analogous to the search of a file cabinet. The analogy has some force, particularly as seen from the perspective of the affected computer user. Computer users — or at least, average users (in contrast to, say, digital forensics experts) — typically experience computers as filing cabinets, as that is precisely how [*212] user interfaces are designed to be perceived by such users. [**37] [27] Given that the file cabinet analogy (at least largely) thus captures an average person's subjective experience with a computer interface, the analogy may shed light on a user's subjective expectations of privacy regarding data maintained on a digital storage device. Because we experience digital files as discrete items, and because we navigate through a computer as through a virtual storage space, we may expect the law similarly to treat data on a storage device as comprised of distinct, severable files, even if, in fact, "[s]torage media do not naturally divide into parts." Josh Goldfoot, *The Physical Computer and the Fourth Amendment*, 16 Berkeley J. Crim. L. 112, 131 (2011). In this case, for example, a person in Ganias's situation could well understand the "files" on his hard drives containing information relating to IPM and AB as separate from the "files" containing his personal financial information and that of other clients. Indeed, the very fact that the Government sought additional search authorization via the 2006 warrant when it established probable cause to search Ganias's personal files indicates that the Government too understood — and credited — this distinction.

That said, though it may have some relevance to our inquiry, the file cabinet analogy is only that — an analogy, and an imperfect one. *Cf.* James Boyle, *The Public Domain* 107 (2008) ("Analogies are only bad when they ignore the key difference between the [**39] two things being analyzed."). Though to a user a hard drive may seem like a file cabinet, a digital forensics expert reasonably perceives the hard drive simply as a coherent physical storage medium for digital data — data that is interspersed *throughout* the medium, which itself must be maintained and accessed with care, lest this data be altered or destroyed.[28] *See* [*213]

---

the Fourth Amendment. *See* 694 F.2d at 596.

[27] *See* Daniel B. Garrie & Francis M. Allegra, Fed. Judicial Ctr., *Understanding Software, the Internet, Mobile Computing, and the Cloud: A Guide for Judges* 8-14 (2015) [**38] (contrasting "operating systems . . . [which] hide the hardware resources behind abstractions to provide an environment that is more user-friendly," *id.* at 13, with machine language, assembly language, high-level languages, data structures, and algorithms); Josh Goldfoot, *The Physical Computer and the Fourth Amendment*, 16 Berkeley J. Crim. L. 112, 117 (2011) (contrasting two perspectives on digital storage media — the "internal perspective," or how "the user experiences [such media,] as parcels of information, grouped into files, or even into smaller units such as spreadsheet rows" and the "external perspective," or how the actual computer functions, in which "files are not . . . 'things' at all," but "groupings of data . . . inseparably tied to the storage medium," created by the computer by manipulating "chunks of physical matter [such as regions on a hard drive] whose state is altered to record information").

[28] *See* Eoghan Casey, *Digital Evidence and Computer Crime* 472, 474-96 (3d ed. 2011) (highlighting the fact that forensic examination of storage media can create tiny alterations, which necessitates care on the part of examiners in acquiring, searching, and preserving that data); *id.* at 477-78 (describing the importance of protecting digital storage media from "dirt, fluids, humidity, impact, excessive heat and cold, strong magnetic fields, and static electricity"); Michael W. Graves, *Digital Archaeology: The Art and Science of Digital Forensics* 95 (2014) ("Computer data is extremely volatile and easily deleted, and can be destroyed, either [**41] intentionally or accidentally, with a few mouse clicks."); Bill Nelson et al., *Guide to Computer Forensics and Investigations* 160 (5th ed. 2015) (emphasizing the importance of "maintain[ing] the integrity of digital evidence in the lab" by creating a read-only copy prior to analysis); Jonathan L. Moore, *Time for an Upgrade: Amending the Federal Rules of Evidence to Address the Challenges of Electronically Stored Information in Civil Litigation*, 50 Jurimetrics J. 147, 153 (2010) ("[All electronically stored information is] prone to manipulation[;] . . . [such] alteration can occur intentionally or inadvertently."); Int'l Org. for Standardization & Int'l Electrotechnical Comm'n, *Guidelines for Identification, Collection, Acquisition, and Preservation of*

Goldfoot, *supra*, at 114 (arguing digital storage media are physical objects like "drugs, blood, or clothing"); Wayne Jekot, *Computer Forensics, Search Strategies, and the Particularity Requirement*, 7 U. Pitt. J. Tech. L. & Pol'y, art. 5, at 1, 30 (2007) ("[A] computer does not simply hold data, it is *composed* of data."). Even the most conventional "files" — word documents and spreadsheets such as those the Government searched in this case — are not maintained, like files in a file cabinet, in discrete physical locations separate and distinct from other files. They are in fact "fragmented" on a storage device, potentially across physical locations. Jekot, *supra*, at 13. "Because of the manner in which data is written to the hard drive, rarely will one file be stored intact in one place on a hard drive," *id.*; so-called "files" are stored in multiple locations and in multiple [**40] forms, *see* Goldfoot, *supra*, at 127-28.[29] And as a corollary to this fragmentation, the computer stores unseen information about any given "file" — not only metadata about when the file was created or who created it, *see* Michael W. Graves, *Digital Archaeology: The Art and Science of Digital Forensics* 94-95 (2014), but also prior versions or edits that may still exist "in the document or associated temporary files on [the] disk" — further interspersing the data corresponding to that "file" across the physical storage medium, Eoghan Casey, *Digital Evidence and Computer Crime* 507 (3d ed. 2011).

"Files," in short, are not as discrete as they may appear to a user. Their interspersion throughout a digital storage medium, moreover, may affect the degree to which it is feasible, in a case involving search pursuant to a warrant, to fully extract and segregate responsive data from non-responsive data. To be clear, we do not suggest that it is impossible to do so in any particular or in every case; we emphasize only that in assessing the reasonableness, for Fourth Amendment purposes, of the search and seizure of digital evidence, we must be attuned to the technological features unique to digital media as a whole and to those relevant in a particular case — features that simply do not exist in the context of paper files.

These features include an additional complication affecting the validity of the file cabinet analogy: namely, that a good deal of the information that a forensic examiner may seek on a digital storage device (again, because [**43] it is a coherent and complex forensic object and not a file cabinet) does not even remotely fit into the typical user's conception of a "file." *See* Daniel B. Garrie & Francis M. Allegra, Fed. Judicial Ctr., *Understanding Software, the Internet, Mobile Computing, and the Cloud: A Guide for Judges* 39 (2015) ("Forensic software gives a forensic examiner access to electronically stored information (ESI) that is otherwise unavailable to a typical computer user."). Forensic investigators may, *inter alia*, search for and discover evidence that a file was [*214] deleted as well as evidence sufficient to reconstruct a deleted file — evidence that can exist in so-called "unallocated" space on a hard drive. *See* Casey, *supra*, at 496; Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 542, 545 (2005); Fed. Judicial Ctr., *supra*, at 40 ("A host of information can lie in the interstices between the allocated spaces."). They may seek responsive metadata about a user's activities, or the manner in which information has been stored, to show such things as knowledge or intent, or to create timelines as to when information was created or accessed.[30] Forensic examiners will sometimes seek evidence on a storage medium that something *did not happen*: "If a defendant claims he [**44] is innocent because a computer virus committed the crime, the absence of a virus on his hard drive is 'dog that did not bark' negative evidence that disproves his story. . . . To prove something is not on a hard drive, it is necessary to look at every place on the drive where it might be found and confirm it is not there."[31] Goldfoot, *supra*, at

*Digital Evidence* 17 (2012) [hereinafter ISO/IEC, Guidelines] (emphasizing the importance of careful storage and transport techniques and noting that "[s]poliation can result from magnetic degradation, electrical degradation, heat, high or low humidity exposure, as well as shock and vibration").

[29] *See* Goldfoot, *supra* ("Storage media do not naturally divide into parts," *id.* at 131; "it is difficult to agree . . . on where the subcontainers begin and end," *id.* at 113.); Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 557 (2005) ("[V]irtual files [**42] are not robust concepts. Files are contingent creations assembled by operating systems and software."); *see also* Orin S. Kerr, *Executing Warrants for Digital Evidence: The Case for Use Restrictions on Nonresponsive Data*, 48 Tex. Tech L. Rev. 1, 32 (2015) ("What does it mean to 'delete' data?").

[30] See *Fharmacy Records v. Nassar*, 379 F. App'x 522, 525 (6th Cir. 2010) (describing testimony of a digital forensics expert in a copyright case that the number and physical location of a file on an Apple Macintosh — which saves files sequentially on its storage medium — demonstrated that the file had been back-dated).

[31] Indeed, in this very case, as already noted, *see supra* note 16, Ganias at one point claimed that a "software error" or "computer flaw" prevented him from recording certain income

141; see also *United States v. O'Keefe*, 461 F.3d 1338, 1341 (11th Cir. 2006) ("[The government's expert] testified that the two viruses he found on [the defendant's] computer were not capable of 'downloading and uploading child pornography and sending out advertisements.'").[32]

[*215] Finally, because of the complexity of the data thereon and the manner in which it is stored, the nature of digital storage presents potential challenges to parties seeking to preserve digital evidence, authenticate it at trial, and establish its integrity for a fact-finder — challenges that materially differ from those in the paper file context. First, the extraction of specific data files to some other medium can alter, omit, or even destroy portions of the information contained in the original storage medium. Preservation of the original medium or a complete mirror may therefore be necessary in order to safeguard the integrity of evidence that has been lawfully obtained or to authenticate it at trial. Graves, *supra*, at 95-96 ("[The investigator] must be able to prove that the information presented came from where he or she claims and was not altered in any way during examination, and that there was no opportunity for it to have been replaced or altered in the interim."); *see also* Casey, *supra*, at 480 ("Even after copying data from a computer or piece of storage media, digital investigators generally retain the original evidential item in a secure location for future [**48] reference.").[33] The preservation of data, moreover, is not simply a concern for law enforcement. Retention of the original storage medium or its mirror may also be necessary to afford criminal defendants access to that medium or its forensic copy so that, relying on forensic experts of their own, they may challenge the authenticity or reliability of evidence allegedly retrieved. See, e.g., *United States v. Kimoto*, 588 F.3d 464, 480 (7th Cir. 2009) (quoting the defendant's motion as stating: "Upon beginning their

---

in his QuickBooks files. J.A. 467, 28. Data confirming the existence, or non-existence, of an error affecting the particular installation of a program on a given digital storage device could be, in a hypothetical case, relevant to the [**45] probity of information otherwise located thereupon.

[32] We note that some of these inferences may be limited to — or at least of more relevance to — traditional magnetic disk drives, which have long been the primary digital storage technology. "Generally when data is deleted from a [traditional hard disk drive], the data is retained until new data is written onto the same location. If no new data is written over the deleted data, then the forensic investigator can recover the deleted data, albeit in fragments." Alastair Nisbet et al., *A Forensic Analysis and Comparison of Solid State Drive Data Retention with TRIM Enabled File Systems*, Proceedings of the 11th Australian Digital Forensics Conference 103 (2013). In contrast, the technology used in solid state drives "requires a cell to be completely erased or zeroed-out before a further write can be committed," *id.* at 104, and in part because such erasure can be time consuming, solid state drives incorporate protocols which "zero-delete data locations . . . as a matter of course," thereby "reduc[ing] the data that can be retrieved from the drive by [a] forensic investigator," *id.* at 103. *See also* Graeme B. Bell & Richard Boddington, *Solid State Drives: The Beginning of the End for Current Practice in Digital Forensic Recovery?*, 5 J. Digital Forensics, Sec. & L., no. 3, 2010, at 1, 12 (stating that, in connection with such storage devices, "evidence indicating 'no data' does not authoritatively prove that data did not exist at the time of capture"). [**46] That is not to say that studies indicate that deleted information is *never* recoverable from any model of solid state drive. *See, e.g.*, Christopher King & Timothy Vidas, *Empirical Analysis of Solid State Disk Data Retention When Used with Contemporary Operating Systems*, 8 Digital Investigation 111, 113 (2011) (citing a study suggesting that data deleted from a particular solid state drive was recoverable in certain contexts); Gabriele Bonetti et al., *A Comprehensive Black-Box Methodology for Testing the Forensic Characteristics of Solid-State Drives*, Proceedings of the 29th Annual Computer Security Applications Conference 277 (2013) (observing that, though several tested solid state drives contained no recoverable deleted data, one model contained "high[ly] recoverab[le]" quantities of such data). The point is simply that there may be material differences among different varieties of storage media that, in turn, make certain [**47] factors cited herein more or less relevant to a given inquiry.

[33] We do not suggest that authentication of evidence from computerized records is impossible absent retention of an entire hard drive or mirror. Authentication is governed by Federal Rule of Evidence 901, which requires only that "the proponent must produce evidence [**49] sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). As we have stated, "[t]his requirement is satisfied 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'" *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (citation omitted) ;(quoting *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991)). "[T]he burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood." *Id.* (alteration omitted); (quoting *United States. v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994)). The weight of digital evidence admitted at trial, however, may be undermined by challenges to its integrity — challenges which proper preservation might have otherwise avoided.

work, [digital analysis experts] advised [the defendant's] Counsel that the discovery provided to the defense did not appear to be a complete forensic copy, and that such was necessary to verify the data as accurate and unaltered.").[34] Defendants may also require access to a forensic copy to conduct an independent analysis of precisely what the government's forensic expert did — potentially altering evidence in a manner material to the case — or to locate exculpatory evidence that the government missed.[35]

[**51] [*216] Notwithstanding any other distinctions between this case and *Tamura*, then, the Government plausibly argues that, because digital storage media constitute coherent forensic objects with contours more complex than — and materially distinct from — file cabinets containing interspersed paper documents, a digital storage medium or its forensic copy may need to be retained, during the course of an investigation and prosecution, to permit the accurate extraction of the primary evidentiary material sought pursuant to the warrant; to secure metadata and other probative evidence stored in the interstices of the storage medium; and to preserve, authenticate, and effectively present at trial the evidence thus lawfully obtained. To be clear, we do not decide the ultimate merit of this argument as applied to the circumstances of this case.[36] Nor do we gainsay the [*217] privacy concerns

[34] Where, as in this case, a mirror containing responsive data has been lawfully seized from a third-party custodian, this concern cannot be avoided simply by returning the original medium to the party from whom it was seized. A third-party custodian may need to utilize a hard drive in ways that will alter the data, and will likely have no incentive to retain a mirrored copy of drives [**50] as they once existed but that are of no further use to the custodian.

[35] See *Kimoto*, 588 F.3d at 480-81 ("[The defendant] argued that the failure to provide him with a complete forensic copy of all digital files impaired his ability to prepare a defense. . . . [The defendant] submitted that he should not be punished 'because the Government failed to properly preserve or maintain a digital forensic copy of the data.'"); Casey, *supra*, at 510-11 (discussing a case study in which, due to forensic investigators' own mistakes, discovery of digital evidence confirming a murder suspect's alibi was greatly delayed); *see also id.* at 508-510 (detailing the importance of experts reporting their processes); Fed. Judicial Ctr., *supra*, at 41 ("The forensic examiner . . . generate[s] reports, detailing the protocols and processes that he or she followed . . . . The forensic reports must provide enough data to allow an independent third-party examiner to recreate the exact environment that yielded the report's findings and observations."); Darren R. Hayes, *A Practical Guide to Computer Forensics Investigations* 116 (2015) ("[B]ecause forensics is a science, the process by which the evidence was acquired must be repeatable, with the same results."); ISO/IEC, *Guidelines*, *supra*, at 7 (emphasizing the importance of repeatability and reproducibility).

[36] That said, it is important to correct a misunderstanding in the dissent's analysis, as it pertains to these factors and their application here. The dissent suggests that the Government can have had no interest in retention, as "[t]he agents could not have been keeping non-responsive files [in order to authenticate and defend the probity of responsive files] for the purpose of proceeding against Ganias, as [in December 2004] they did not yet suspect [him] of criminal wrongdoing." Dissent at 22. This argument misunderstands the Government's position: the Government was not retaining the mirrors in late 2004 and 2005 in the hopes of proceeding against Ganias; it was retaining the mirrors as part of its ongoing investigation of James McCarthy and his two companies, AB and IPM — an investigation that would culminate in an indictment of McCarthy in 2008 secured through extensive reliance on responsive data recovered from the mirrored copies of Ganias's hard drives. The dissent's focus on Ganias, the owner of the hard drives the Government mirrored, and not McCarthy, a third-party defendant, thus permits the dissent to dismiss out-of-hand Government [**52] interests that, properly viewed, are significant — whether or not ultimately dispositive. *See* Dissent at 24 ("As a practical matter, a claim of data tampering would easily fall flat where, as here, the owner kept his original computer and the Government gave him a copy of the mirror image."); *id.* at 25-26 (dismissing the Government's *Brady* concern by noting that "[t]he Government is essentially arguing that it must hold on to the materials so that it can give them back to the defendant," a concern that the dissent argues "can be obviated simply by returning the non-responsive files to the defendant in the first place"). Perhaps in some situations, in which the owner of computerized data seized pursuant to a search warrant is the expected defendant in a criminal proceeding, problems of authentication or probity could be handled by stipulations, and *Brady* issues might be mooted by the return of the data to the defendant — though we express no view on those questions. As this case illustrates, however, when the owner of hard drives mirrored by the government is a third party who is not the expected target of the investigation, the government's interests in retention take on an additional layer of complexity. A stipulation [**53] with Ganias about the authenticity or probity of data extracted from his computers would not have affected the ability of the original targets of the investigation to raise challenges to authenticity or probity. Nor would returning the mirrors to Ganias — who at that point, absent a stipulation to the contrary, could presumably have destroyed or altered them, intentionally or accidentally — have protected the interests of those anticipated defendants in conducting their

implicated when the government retains a hard drive or forensic mirror containing personal information irrelevant to the ongoing investigation, even if such information is never viewed. We discuss the aptness and limitations of Ganias's analogy and the Government's response simply to highlight the complexity of the relevant questions for future cases and to underscore the importance, in answering such questions, of engaging with the technological specifics.[37]

In emphasizing such specifics, we reiterate that we do not mean to thereby minimize or ignore the privacy concerns implicated when a hard drive or forensic mirror is retained, even pursuant to a warrant. The seizure of a computer hard drive, and its subsequent retention by the government, can give the government possession of a vast trove of personal information about the person to whom the drive belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure. Indeed, another weakness of the file cabinet analogy is that no file cabinet [**56] has the capacity to contain as much information as the typical computer hard drive. In 2005, Professor Orin Kerr noted that the typical personal computer hard drive had a storage capacity of about eighty gigabytes, which he estimated could hold text files equivalent to the "information contained in the books on one floor of a typical academic library." *Kerr, Searches and Seizures in a Digital World, supra*, at [*218] 542. By 2011, computers were being sold with one terabyte of capacity — about twelve times the size of Professor Kerr's library floor. Paul Ohm, Response, *Massive Hard Drives, General Warrants, and the Power of Magistrate Judges*, 97 Va. L. Rev. In Brief 1, 6 (2011). The *New York Times* recently reported that commercially available storage devices can hold "16 petabytes of data, roughly equal to 16 billion thick books." Quentin Hardy, *As a Data Deluge Grows, Companies Rethink Storage*, N.Y. Times, Mar. 15, 2016, at B3.

Moreover, quantitative measures fail to capture the significance of the data kept by many individuals on their computers. Tax records, diaries, personal photographs, electronic books, electronic media, medical data, records of internet searches, banking and shopping information — all may be kept in the same device, interspersed [**57] among the evidentiary material that justifies the seizure or search. Cf. *Riley v. California*, 134 S. Ct. 2473, 2489-90, 189 L. Ed. 2d 430 (2014) (explaining that even microcomputers, such as cellphones, have "immense storage capacity" that may contain "every piece of mail [people] have received for the past several months, every picture they have taken, or every book or article they have read," which can allow the "sum of an individual's private life [to] be reconstructed"); *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) ("[A]dvances in technology and the centrality of computers in the lives of average people have rendered the computer hard drive akin to a residence in terms of the scope and quantity of private information it may contain."). While physical searches

---

own forensic examination of the data in search of exculpatory evidence or to replicate and criticize the Government's inspection procedures.

[37] Of course, engaging with the specifics requires acknowledging and emphasizing that technologies rapidly evolve, and that the specifics change. *See* John Sammons, *The Basics of Digital Forensics* 170 (2012) (commenting that digital forensics faces the "blinding speed of technology [and] new game-changing technologies such as cloud computing and solid state hard drives . . . just to name a few"). In discussing the technological specifics of computer hard drives, we have primarily addressed a particular form of electronic storage that has become conventional. *See supra* note 32. Newer [**54] forms of emerging storage technology, or future developments, may work differently and thus present different challenges. *See, e.g.*, Bell & Boddington, *supra*, at 3, 6, 14 (observing that "the peculiarity of 'deleted, but not forgotten' data which so often comes back to haunt defendants in court is in many ways a bizarre artefact of hard drive technology" and that increasingly popular solid state drives can "modify themselves very substantially without receiving instructions to do so from a computer," and thus predicting that "recovery of deleted files and old metadata will become extremely difficult, if not impossible" as solid state storage devices utilizing a particular deletion protocol called "TRIM" become more prevalent); King & Vidas, *supra*, at 111 ("We show that on a TRIM-enabled [solid state drive], using an Operating System (OS) that supports TRIM, . . . in most cases no data can be recovered."); *id.* at 113 ("[M]ost [solid state drive] manufacturers have a TRIM-enabled drive model currently on the market."). *But see* Bonetti et al., *supra*, at 270-71, 278 (making clear that solid state drives, which differ considerably among models and vendors, may yield differing levels of deleted-file recoverability, depending upon their utilization of TRIM and other deletion protocols, erasing patterns, [**55] compression, and wear leveling protocols). Solid state drives, of course, are just one example. *Cf.* Bell & Boddington, *supra*, at 3 ("It is . . . in the nature of computing that we perceive regular paradigm shifts in the ways that we store and process information."). The important point is that considerations discussed in this opinion may well become obsolete at some future point, the challenges facing forensic examiners and affected parties may change, and courts dealing with these problems will need to become conversant with the particular forms of technology involved in a given case and the evidentiary challenges presented by those forms.

for paper records or other evidence may require agents to rummage at least cursorily through much private material, the reasonableness of seizure and subsequent retention by the government of such vast quantities of irrelevant private material was rarely if ever presented in cases prior to the age of digital storage, and has never before been considered justified, or even practicable, in such cases. Even as we recognize that search and seizure of digital media is, in some ways, distinct from what has come before, we must remain mindful of the privacy [**58] interests that necessarily inform our analysis.[38]

We note, however, that parties with an interest in retained storage media are not without recourse. As noted above, Ganias never sought the return of any seized material, either by negotiating with the Government or by motion to the court. Though negotiated stipulations regarding the admissibility or integrity of evidence may not always suffice to satisfy reasonable interests of the government in retention during the pendency of an investigation,[39] such [*219] stipulations [**59] may make return feasible in a proper case, and can be explored.

A person from whom property is seized by law enforcement may move for its return under Federal Rule of Criminal Procedure 41(g).[40] Rule 41(g) permits a defendant or any "person aggrieved" by either an unlawful or *lawful* deprivation of property, see *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1173 (9th Cir. 2010) (en banc) (per curiam), to move for its return, Fed. R. Crim. P. 41(g). Evaluating such a motion, a district court "must receive evidence on any factual issue necessary to decide the motion," and, in the event that the motion is granted, may "impose reasonable conditions to protect access to the property and its use in later proceedings." *Id.* Since we resolve this case [**60] on other grounds, we need not address whether Ganias's failure to make such a motion forfeited any Fourth Amendment objection he might otherwise have had to the Government's retention of the mirrors. But we agree with the district court that, as a pragmatic matter, such a motion "would have given a court the opportunity to consider 'whether the government's interest could be served by an alternative to retaining the property,' and perhaps to order the [mirrors] returned to Ganias, all while enabling the court to 'impose reasonable conditions to protect access to the property and its use in later proceedings.'" *Ganias*, 2011 U.S. Dist. LEXIS 67806, 2011 WL 2532396, at *8 (citation omitted); (first quoting *In re Smith*, 888 F.2d 167, 168, 281 U.S. App. D.C. 154 (D.C. Cir. 1989) (per curiam); then quoting Fed. R. Crim. P. 41(g)).

Rule 41(g) thus provides [**61] a potential mechanism, in at least some contexts, for dealing with the question of retention at a time when the government may be expected to have greater information about the data it seeks and the best process through which to search and present that data in court. It is worth observing, then, that Rule 41(g) constitutes a statutory solution (as opposed to a purely judicially constructed one) to at least one facet of the retention problem.[41] Statutory

---

[38] The dissent extensively addresses these privacy interests. As this opinion makes clear, we do not disagree with the proposition that the seizure and retention of computer hard drives or mirrored copies of those drives implicate such concerns and raise significant Fourth Amendment questions. We do not agree, however, for reasons we have also discussed at length, with the dissent's dismissal of the countervailing government concerns. However these issues are ultimately resolved, we believe that the Government's arguments are, at a minimum, sufficiently forceful that it is unwise to try to reach definitive conclusions about the constitutional issues in a case that can be decided on other grounds.

[39] For instance, as we have previously noted, where, as here, the owner of the records is not (at least at the time of the seizure) the target of the investigation, a stipulation from that party may not serve the government's need to establish the authenticity or integrity of evidence it may seek to use, and access to the records by that party will not necessarily satisfy the need of potential future defendants to test the processes used by the government to extract or accurately characterize data culled from a hard drive. In some cases, however, negotiated solutions may be practicable.

[40] Rule 41(g) provides as follows:

**Motion to Return Property**. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

[41] The advisory committee notes to [**63] the 2009 amendments to Federal Rule of Criminal Procedure 41(e)(2)(B) contemplate that Rule 41(g) may indeed constitute such a solution. Regarding specifically the seizure of electronic storage media or the search of electronically stored information, the advisory committee notes observe that though

approaches, of course, do not relieve courts from their obligation to interpret the Constitution; nevertheless, such approaches have, historically, provided one mechanism for safeguarding privacy interests while, at the same time, addressing the needs of law enforcement in the face of technological change. Indeed, when Congress addressed wiretapping in the Omnibus Crime Control [*220] and Safe Streets Act of 1968, the Senate Judiciary Committee issued a report reflecting precisely this ambition — to provide a framework through which law enforcement might comport with the demands of the Constitution and meet important law enforcement interests. *See* S. Rep. No. 90-1097, at 66-76 (1968) (describing the construction of the then-Omnibus Crime Control and Safe [**62] Streets of Act of 1967, which laid out comprehensive rules for when and how law enforcement could intercept wire and oral communications through electronic surveillance, as a Congressional attempt to respond to and synthesize, first, technological change, *id.* at 67, second, ineffective or unclear state statutory regimes, *id.* at 69, third, evolving Supreme Court precedent, *id.* at 74-75, and fourth, law enforcement concerns, *id.* at 70); *see also id.* at 66 ("Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized."). The Act did not seek to supplant the role of the courts, nor could it have done so, but it did demonstrate the intuitive proposition that Congress can and should be a partner in the process of fleshing out the contours of law-enforcement policy in a shifting technological landscape. In acknowledging the role of Rule 41(g), then, we seek also to suggest that search and seizure of electronic media may, no less than wiretapping, merit not only judicial review but also legislative analysis; courts need not act alone.

As we have said, we need not resolve the ultimate question whether the Government's retention of forensic copies of Ganias's hard drives during the pendency of its investigation violated the Fourth Amendment. We conclude, moreover, that we should not decide this question on the present record, which does not permit a full assessment of the complex and rapidly evolving technological issues, and the significant privacy concerns, relevant to its consideration.[42] Having noted Ganias's [**64] argument, [*221] we do not decide its

---

the rule does not create

a presumptive national or uniform time period within which . . . off-site copying or review of . . . electronically stored information would take place, . . . [i]t was not the intent of the amendment to leave the property owner without . . . a remedy[:] . . . Rule 41(g) . . . provides a process for the "person aggrieved" to seek an order from the court for a return of the property, including storage media or electronically stored information, under reasonable circumstances.

---

[42] The dissent faults us for our caution in this regard, suggesting that "the prevailing scholarly consensus has been that the [original *Ganias*] panel largely got it right." Dissent at 5 n.5. With respect, the dissent mischaracterizes the scholarly response. As an initial matter, the dissent cites Professor Kerr as having concluded that the panel "largely got it right." *Id.* In fact, Kerr's analysis of the original panel opinion is generally critical, not complimentary. *See* Kerr, *Executing Warrants for Digital Evidence, supra*, at 32 (critiquing the panel for going too far and thus offering a "particularly strong version" of Kerr's approach). Assessing the original panel's analysis, Kerr first concludes that, given the technological contours of electronic media, an affirmative obligation to delete could be "difficult to implement," just as it could be difficult to ascertain at what point in the process such a "duty [would be] triggered." *Id.* Second, Kerr concludes that — to the degree that restrictions should be placed upon what the government may do with non-responsive data that must, for pragmatic reasons, be retained — a restriction preventing the government from viewing [**65] data pursuant to a search warrant acquired with independent probable cause is unnecessary "to restore the basic limits of search warrants in a world of digital evidence." *Id.* at 33.

Apart from this citation to Kerr and to two student notes (which reach differing conclusions about the merits of the panel opinion), the articles the dissent cites (as is evident from the carefully worded parentheticals the dissent itself provides) are not evaluations of the original panel opinion, but instead provide largely descriptive accounts of the opinion and its relation to other case law in the context of making other points. The signed article that comes the closest to providing a normative critique of the panel's opinion concludes that "*perhaps* the panel's answer is broadly the right answer," but rejects the panel's — and the dissent's — reasoning. Stephen E. Henderson, *Fourth Amendment Time Machines (and What They Might Say About Police Body Cameras)*, 18 U. Pa. J. Const. L. 933, 948 (2016) (emphasis added); *see id.* at 947 (concluding that, because "in 2003 and in 2006 the government obtained a warrant demonstrating particularized suspicion towards Ganias's data, and in each instance agents thereafter only looked for the responsive data," it was inapt for the original [**66] panel to conclude that the Government's position would transform a warrant for electronic data into a "general warrant"). We do not opine on these issues here, but we see no scholarly consensus on the complicated questions implicated in this case that would suggest caution is ill-advised in a matter where these questions need not be answered to reach a resolution. Caution, although not always satisfying, is sometimes the most appropriate approach.

merits. We instead turn to the question of good faith.

**III**

The Government argues that, because it acted in good faith throughout the pendency of this case, any potential violation of the Fourth Amendment does not justify the extraordinary remedy of suppression. See *Davis v. United States*, 564 U.S. 229, 237, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011); (noting the "heavy toll" exacted by suppression, which "requires courts to ignore reliable, trustworthy evidence," and characterizing suppression as a "bitter pill," to be taken "only as a 'last resort'" (quoting *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006))); accord *United States v. Clark*, 638 F.3d 89, 99 (2d Cir. 2011). In particular, the Government urges that its "reliance on the 2006 warrant," which it obtained after disclosing to the magistrate judge all relevant facts regarding its retention of the mirrored files, "fits squarely within the traditional *Leon* exception for conduct taken in reliance on a search warrant issued by a neutral and [**67] detached magistrate judge."[43] Government Br. at 59; see *Leon*, 468 U.S. at 922. For the following reasons, we agree.

In *Leon*, the Supreme Court determined that the exclusion of evidence is inappropriate when the government acts "in objectively reasonable reliance" on a search warrant, even when the warrant is subsequently invalidated. 468 U.S. at 922; see also *Clark*, 638 F.3d at 100 ("[I]n *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection."). Such reliance, however, must be objectively reasonable. See *Leon*, 468 U.S. at 922-23 ("[I]t is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." (footnote omitted)). [**68] Thus, to assert good faith reliance successfully, officers must, *inter alia*, disclose all potentially adverse information to the issuing judge. See *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir.) ("The good faith exception to the exclusionary rule does not protect searches by officers who fail to provide all potentially adverse information to the issuing judge . . . ."), *aff'd and amended*, 91 F.3d 331 (2d Cir. 1996) (per curiam); see also *United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985) (finding good faith reliance on a warrant, under *Leon*, where officers, first, committed a constitutional violation they did not [*222] reasonably know, at the time, was unconstitutional — a warrantless canine sniff — and second, in relying on evidence from this sniff in a warrant application, fully revealed the fact of the canine sniff to a magistrate judge), *cert. denied by Fisher v. United States*, 474 U.S. 819, 106 S. Ct. 66, 106 S. Ct. 67, 88 L. Ed. 2d 54 (1985); and *Rice v. United States*, 479 U.S. 818, 107 S. Ct. 78, 93 L. Ed. 2d 34 (1986).

Ganias argues that reliance on the 2006 warrant is misplaced for two reasons. First, he urges that the alleged constitutional violation here (unlawful retention of the mirrored drives) had "long since" ripened into a violation by April 2006, when the second warrant was obtained, Appellant Br. at 55-56, and attests that "[n]othing [in *Leon*] suggests that the police, *after* they engage in misconduct, can then 'launder their prior unconstitutional behavior by [**69] presenting the fruits of it to a magistrate,'" *id.* at 56; (quoting *State v. Hicks*, 146 Ariz. 533, 707 P.2d 331, 333 (Ariz. Ct. App. 1985)). Second, Ganias argues that, even if "a subsequent warrant can ever appropriately purge the taint of an earlier violation, the agent must, at the very least, 'provide all potentially adverse information' regarding the earlier illegality 'to the issuing [magistrate] judge,'" a requirement that he argues was not satisfied here. *Id.* at 58; (quoting *Reilly*, 76 F.3d at 1280). Ganias's arguments are unavailing.

First, Ganias relies on this Court's decision in *Reilly* to argue categorically that agents who have engaged in a predicate Fourth Amendment violation may not rely on a subsequently issued warrant to establish good faith. *Reilly*, however, stands for no such thing. In *Reilly*, officers unlawfully intruded on the defendant's curtilage, discovering about twenty marijuana plants, before they departed and obtained a search warrant based on a "bare-bones" description of their intrusion and resulting observations which this Court found "almost calculated to mislead." *Reilly*, 76 F.3d at 1280; *see also id.* ("[The affidavit] simply . . . stated that [the officers] walked along Reilly's property until they found an area where

[43] The Government also contends: (1) that it relied in good faith on the 2003 warrant in retaining the mirrors; and (2) that its behavior was in no way culpable, rendering exclusion inappropriate, *see* Government Br. at 51; see also *Herring v. United States*, 555 U.S. 135, 144, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009); ("[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."); accord *Davis*, 564 U.S. at 237. Given our conclusion that the Government relied in good faith on the 2006 warrant, we need not address these additional arguments.

marijuana plants were grown. It did not describe this area to the Judge[,] . . . [**70] [and it] gave no description of the cottage, pond, gazebo, or other characteristics of the area. . . . [The omitted information] was crucial. Without it, the issuing judge could not possibly make a valid assessment of the legality of the warrant that he was asked to issue."). We rejected the government's argument that the officers were entitled to rely on the warrant, noting that the officers had "undert[aken] a search that caused them to invade what they could not fail to have known was potentially . . . curtilage," and that they thereafter "failed to provide [the magistrate issuing the warrant] with an account of what they did," so that the magistrate was unable to ascertain whether the evidence on which the officers relied in seeking the warrant was "itself obtained illegally and in bad faith." *Id.* at 1281. In such circumstances, *Leon* did not — and does not — permit good faith reliance on a warrant. See *Leon*, 468 U.S. at 923 (observing that an officer's reliance on a warrant is not *objectively reasonable* if he "misled [the magistrate with] information in an affidavit that [he] knew was false or would have known was false except for his reckless disregard of the truth").

The present case, however, is akin not to *Reilly*, but [**71] to this Court's decision in *Thomas*, which the *Reilly* panel carefully distinguished, while reaffirming. See *Reilly*, 76 F.3d at 1281-82;. In *Thomas*, an agent, acting without a warrant, used a dog trained to detect narcotics to conduct a "canine sniff" at a dwelling. 757 F.2d at 1367. The agent presented evidence acquired as a result of the sniff to a "neutral [*223] and detached magistrate" who, on the basis of this and other evidence, determined that the officer had probable cause to conduct a subsequent search of the dwelling in question. *Id.* at 1368. The defendant moved to suppress the evidence found in executing the search warrant, arguing that the antecedent canine sniff constituted a warrantless, unconstitutional search and that the evidence acquired from that sniff was dispositive to the magistrate judge's finding of probable cause. See *id.* at 1366. This Court agreed on both counts: first deciding, as a matter of first impression in our Circuit, that the canine sniff at issue constituted a search, *id.* at 1367, and second determining that, absent the evidence acquired from this search, the warrant was not supported by probable cause, *id.* at 1368. The *Thomas* panel nevertheless concluded that suppression was inappropriate because the agent's reliance on the warrant was objectively [**72] reasonable: "The . . . agent brought his evidence, including [a factual description of the canine sniff], to a neutral and detached magistrate. That magistrate determined that probable cause to search existed, and issued a search warrant. There is nothing more the officer could have or should have done under these circumstances to be sure his search would be legal." *Id.*

*Reilly* carefully distinguished *Thomas*, and in a manner that makes apparent that it is *Thomas* that is dispositive here. First, the *Reilly* panel noted that *Thomas* was unlike *Reilly*, in that the agent in *Thomas* disclosed all crucial facts for the legal determination in question to the magistrate judge. *Reilly*, 76 F.3d at 1281. Then, the *Reilly* panel articulated another difference: while in *Reilly*, "the officers undertook a search that caused them to invade what they could not fail to have known was potentially Reilly's curtilage," in *Thomas*, the agent "did not have any significant reason to believe that what he had done [conducting the canine sniff] was unconstitutional." *Id.*; see also id. ("[U]ntil *Thomas* was decided, no court in this Circuit had held that canine sniffs violated the Fourth Amendment."). Thus, the predicate act in *Reilly* tainted the subsequent search [**73] warrant, whereas the predicate act in *Thomas* did not. The distinction did not turn on whether the violation found was *predicate*, or prior to, the subsequent search warrant on which the officers eventually relied, but on whether the officers' reliance on the warrant was reasonable.

Contrary to Ganias's argument, then, it is not the case that good faith reliance on a warrant is never possible in circumstances in which a predicate constitutional violation has occurred. The agents in *Thomas* committed such a violation, but they had no "significant reason to believe" that their predicate act was indeed unconstitutional, *Reilly*, 76 F.3d at 1281, and the issuing magistrate was apprised of the relevant conduct, so that the magistrate was able to determine whether any predicate illegality precluded issuance of the warrant. In such circumstances, invoking the good faith doctrine does not "launder [the agents'] prior unconstitutional behavior by presenting the fruits of it to a magistrate," as Ganias suggests. Appellant Br. at 56 (quoting *Hicks*, 707 P.2d at 333). In such cases, the good faith doctrine simply reaffirms *Leon*'s basic lesson: that suppression is inappropriate where reliance on a warrant was "objectively reasonable." *Leon*, 468 U.S. at 922.[44]

---

[44] Insofar [**74] as Ganias argues that *Thomas*'s and *Reilly*'s holdings are limited to when the alleged predicate violation is a *search* that taints the warrant, but do not extend to circumstances in which the alleged predicate violation is a seizure or unlawful retention, we discern no justification for this

[*224] Such is the case here. First, Agent Hosney provided sufficient information in her affidavit to apprise the magistrate judge of the pertinent facts regarding the retention of the mirrored copies of Ganias's hard drives — the alleged constitutional violation [**75] on which he relies. Agent Hosney explained that the mirror images in question had been "seized on November 19, 2003 from the offices of Taxes International," J.A. 461, 7; that information material to the initial investigation of a third party had been located on the mirrors and "analyzed in detail," J.A. 464, 15; that Ganias was not, at the time of the original seizure, under investigation, J.A. 461, 3; that, "[p]ursuant to [that initial warrant]," Agent Hosney could not search Ganias's personal or business files as the warrant authorized search only of "files for [AB] and IPM," J.A. 464, 14; and that Ganias's personal data — which Agent Hosney was not authorized to search — was *on those mirrored drives*, J.A. 467, 27, and thus, *a fortiori*, had been there for the past two and a half years. The magistrate judge was thus informed of the fact that mirrors containing data non-responsive to the 2003 warrant had been retained for several years past the initial execution of that warrant and, to the degree it was necessary, that data responsive to the 2003 warrant had been analyzed in detail. The magistrate therefore had sufficient information on which to determine whether such retention precluded [**76] issuance of the 2006 warrant;. Cf. *Thomas*, 757 F.2d at 1368 ("The magistrate, whose duty it is to interpret the law, determined that the canine sniff could form the basis for probable cause . . . .").

Ganias disagrees, arguing, in particular, that, though Agent Hosney alerted the magistrate that the mirrors had been retained for several years; that data responsive to the original warrant had been both located and extensively analyzed; and that those of Ganias's QuickBooks files that Agent Hosney wanted to search were non-responsive to the original warrant, the Hosney affidavit did not go far enough in that it failed to disclose that the agents "had been retaining the non-responsive records for a full 16 months *after* the files within the November 2003 warrant's scope had been identified." Appellant Br. at 60. As an initial matter, the Government *did* alert the magistrate that it had located responsive data on the mirrors *and* conducted extensive analysis of that responsive material, and it is not clear what else the Government should have said: the district court did not determine — nor does the record show — that by January 2005, as Ganias contends, the Government had determined, as a forward-looking matter, [**77] that it had performed all forensic searches of data responsive to the 2003 warrant that might prove necessary over the course of its investigation. Compare J.A. 322 (Q: "So it's fair to say that as of mid-December [2004], your forensic analysis was completed at that time?" Agent Chowaniec: "That's correct, of the computers."), *with* J.A. 324 (Q: "Did you know you wouldn't require further analysis by Greg Norman or any other examiner at the Army lab in Georgia after December of 2004?" Agent [*225] Chowaniec: "No."); *see supra* note 12. Nor would it be reasonable to expect additional detail in the affidavit on this point, even assuming Ganias's contention to be correct that the Government had both finished its segregation *and* provided insufficient facts to alert the magistrate judge to that reality, given the dearth of precedent suggesting its relevance. Cf. *Clark*, 638 F.3d at 105 ("[W]here the need for specificity in a warrant or warrant affidavit on a particular point was not yet settled or was otherwise ambiguous, we have declined to find that a well-trained officer could not reasonably rely on a warrant issued in the absence of such specificity."); cf. *Reilly*, 76 F.3d at 1280 (noting that the affidavit in that case, in clear contrast to the [**78] affidavit in this one, was "almost calculated to mislead").

Second, here, as in *Thomas*, it is also clear that the agents, as the panel put it in *Reilly*, "did not have any significant reason to believe that what [they] had done was unconstitutional," *Reilly*, 76 F.3d at 1281 — that their retention of the mirrored hard drives, while the investigation was ongoing, was anything but routine. At the time of the retention, no court in this Circuit had held that retention of a mirrored hard drive during the pendency of an investigation could violate the Fourth Amendment, much less that such retention would do so in the circumstances presented here. *See id.* (noting that suppression was inappropriate in *Thomas* in part because no relevant precedent established that canine sniffs of a dwelling "violated the Fourth Amendment").[45]

---

distinction. But for the canine search in *Thomas* — the predicate violation — there would have been no subsequent warrant pursuant to which the government searched the dwelling and on whose legality it relied in conducting that search. But for the retention in this case — the alleged predicate violation — there could have been no subsequent search warrant pursuant to which the Government searched the relevant evidence and on whose legality the Government relied in conducting that search. To credit Ganias's distinction would be to replace the underlying directive that reliance on a warrant be "objectively reasonable," *Leon*, 468 U.S. at 922, with an arbitrary formalism.

[45] The closest decision Ganias [**79] can locate is *United*

Moreover, as noted above, the 2003 warrant authorized the lawful seizure not merely of particular records or data, but of the hard drives themselves, or in the alternative the creation of mirror images of the drives to be removed from the premises for later forensic evaluation, and set no greater limit on the Government's retention of those materials than on any other evidence whose seizure it authorized.

Finally, the record here is clear that the agents acted reasonably throughout the investigation. They sought authorization in 2003 to seize the hard drives and search them off-site; they minimized the disruption to Ganias's business by taking full forensic mirrors; they searched the mirrors only to the extent authorized by, first, the 2003 warrant, and then the warrant issued in 2006; they were never alerted that Ganias sought the return of the mirrors; and they alerted the magistrate judge to these [**80] pertinent facts in applying for the second warrant. In short, the agents acted reasonably in relying on the 2006 warrant to search for evidence of Ganias's tax evasion. This case fits squarely within *Leon* so that, assuming, *arguendo*, that a Fourth Amendment violation occurred, suppression was not warranted.

We conclude that the Government relied in good faith on the 2006 search warrant and thus AFFIRM the judgment of the [*226] district court. Given this determination, we do not reach the specific Fourth Amendment question posed to us today.

**Appendix A**

*Amici Curiae*

Alan R. Friedman (*counsel of record*), Samantha V. Ettari, Noah Hertz-Bunzl, Kramer Levin Naftalis & Frankel LLP, New York, NY, *for Amicus Curiae the Center for Constitutional Rights, in support of Defendant-Appellant*.

Tanya L. Forsheit, Baker & Hostetler LLP, Los Angeles, CA, and William W. Hellmuth, Baker & Hostetler LLP, Washington, DC (*representing Amicus Curiae Center for Democracy & Technology*); Alex Abdo, Nathan Freed Wessler, Jason D. Williamson, American Civil Liberties Union Foundation, New York, NY; Dan Barrett, American Civil Liberties Union of Connecticut, Hartford, CT; Faiza Patel, Brennan Center for Justice at NYU School of Law, New York, NY; Hanni Fakhoury, [**81] Electronic Frontier Foundation, San Francisco, CA; Laura M. Moy, Open Technology Institute/New America, Washington, DC, *for Amici Curiae Center for Democracy & Technology, American Civil Liberties Union, American Civil Liberties Union of Connecticut, Brennan Center for Justice at NYU School of Law, Electronic Frontier Foundation, and New America's Open Technology Institution, in support of Defendant-Appellant*.

Marc Rotenberg (*counsel of record*), Alan Butler, Electronic Privacy Information Center, Washington, DC, *for Amicus Curiae Electronic Privacy Information Center, in support of Defendant-Appellant*.

Colleen P. Cassidy (*of counsel*), Federal Defenders of New York, Inc., Southern District of New York, New York, NY; James Egan, Office of the Federal Public Defender, Northern District of New York, Syracuse, NY, *for Amicus Curiae Federal Public Defenders Within the Second Circuit, in support of Defendant-Appellant*.

Todd M. Hinnen, Perkins Coie LLP, Seattle, WA, and Amanda Andrade, Perkins Coie LLP, Washington, DC, *for Amicus Curiae Google Inc., in support of Defendant-Appellant*.

Miranda E. Fritz, Eli B. Richlin, Thompson Hine LLP, New York, NY; Richard D. Willstatter, Green & Willstatter, [**82] White Plains, NY; Joel B. Rudin, Law Offices of Joel B. Rudin, P.C., New York, NY, *for Amicus Curiae National Association of Criminal Defense Lawyers, in support of Defendant-Appellant*.

Michael L. Yaeger, Barry A. Bohrer, Schulte Roth & Zabel LLP, New York, NY, *for Amicus Curiae New York Council of Defense Lawyers, in support of*

---

*States v. Tamura*, 694 F.2d at 594-95, an out-of-circuit case that concerned intermingled paper files, the removal of which was unauthorized and the return of which had been vigorously sought by the affected parties. Whatever relevance that case may have by analogy, it is not sufficient to alert a reasonable agent to the existence of a serious Fourth Amendment problem: for to suggest that a holding applicable to retaining *intermingled paper files* specifically demanded to be returned clearly resolves a question about retention of a *physical digital storage medium* (the return of which had been neither suggested nor requested) would be "like saying a ride on horseback is materially indistinguishable from a flight to the moon." *Riley*, 134 S. Ct. at 2488.

> *Defendant-Appellant*.
>
> Mahesha P. Subbaraman, Subbaraman PLLC, Minneapolis, MN, *for Amicus Curiae Restore the Fourth, Inc., in support of Defendant-Appellant*.

**Concur by:** LOHIER

## Concur

LOHIER, Circuit Judge, joined by POOLER, Circuit Judge, concurring:

I concur fully in Part I of the majority opinion, which accurately recites the facts, and Part III, which affirms based on the narrow ground that the Government relied in good faith on the 2006 search warrant obtained in this case. It bears emphasizing that Part III contains the only holding in the majority opinion. I also concur insofar as the majority opinion clarifies that under appropriate circumstances it may be helpful for litigants to use the mechanism provided by Rule 41(g) of the Federal Rules of Criminal Procedure when faced with the Government's retention of electronic data.

**Dissent by:** CHIN

## Dissent

CHIN, *Circuit Judge*, dissenting:

I respectfully dissent.

Over two hundred fifty years ago, agents of [**83] the King of England, with warrant in hand, entered the home of John Entick. They rummaged through boxes and trunks, cabinets and bureaus. They were looking for evidence of known instances of seditious libel, but they took "all the papers and books without exception." *Entick v. Carrington*, 19 How. St. Tr. 1029, 1064 (C.P. 1765). In holding that Entick's rights were violated, the court explained:

> Papers are the owner's goods and chattels: they are his dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection; and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and carried away, the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect. Where is the written law that gives any magistrate such a power? I can safely answer, there is none; and therefore it is too much for us without such authority to pronounce a practice legal, which would be subversive of all the comforts of society.

*Id.* at 1066.

*Entick* was not lost on the Framers. As the Supreme Court has noted, "its propositions were in the minds of those who framed the fourth amendment to the constitution, and were considered as sufficiently explanatory of what was meant by unreasonable [**84] searches and seizures." *Boyd v. United States*, 116 U.S. 616, 626-27, 6 S. Ct. 524, 29 L. Ed. 746 (1886). And enshrined in the Fourth Amendment is the foundational principle that the Government cannot come into one's home looking for some papers and, without suspicion of broader criminal wrongdoing, indiscriminately take all papers instead.

In this case, the Government argues that when those papers are inside a computer, the result is different. It argues that when computers are involved, it is free to overseize files for its convenience, including files outside the scope of a warrant, and retain them until it has found a reason for their use. In essence, the Government contends that it is entitled to greater latitude in the computer age. I disagree. If anything, the protections of the Fourth Amendment are even more important in the context of modern technology, for the Government has a far greater ability to intrude into a person's private affairs.[1]

[*227] Here, although the Government had a warrant for documents relating to only two of defendant-

---

[1] See, e.g., *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) ("[A]dvances in technology and the centrality of computers in the lives of average people have rendered the computer hard drive akin to a residence in terms of the scope and quantity of private information it may contain."); *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) ("The modern development of the personal computer and its ability to store and intermingle a huge array of one's personal [**85] papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs . . . ."); Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 569 (2005) (explaining that computers have become the equivalent of "postal services, playgrounds, jukeboxes, dating services, movie theaters, daily planners, shopping malls, personal secretaries, virtual diaries, and more").

appellant Stavros Ganias's accounting clients, it seized *all* the data from three of his computers, including wholly unrelated personal files and files of other clients. The Government did so solely as a matter of convenience, and not because it suspected Ganias or any of his other clients of wrongdoing. The Government was able to extract the responsive files some thirteen months later. But instead of returning the non-responsive files, the investigators retained them, because, as one agent testified, they "viewed the data as the government's property, not Mr. Ganias's property." J. App. 146.[2] Some sixteen months later, almost two-and-a-half years after the files were first seized, the Government [**86] found an unrelated reason to prosecute Ganias -- his personal tax evasion -- and it sought judicial authorization to reexamine the data that was still in its possession. The Government contends that this conduct did not violate the Fourth Amendment, and that, even if it did, suppression was not warranted because its agents acted in good faith.

I disagree. I would hold, as the panel held unanimously, that the Government violated Ganias's Fourth Amendment rights when it retained Ganias's non-responsive files for nearly two-and-a-half years and then reexamined the files for evidence of additional crimes. *United States v. Ganias*, 755 F.3d 125, 133-40 (2d Cir. 2014). I would also hold, as two members of the panel did, that the Government's actions are not excused by the good faith exception. *Id.* at 140-41;. But see *id.* at 141 (Hall, *J.*, dissenting in part).[3] Accordingly, I dissent.

## I.

I consider first whether Ganias's Fourth Amendment rights were violated. The majority addresses the question at length, with some twenty-five pages of scholarly discussion about the Fourth Amendment in the digital age, but it reaches no conclusion. *E.g.*, Maj. Op. at 3, 22, 27, 38, 45, 47-48. Although we reheard the case *en banc* (at our own request and not at the request of any party), and despite the benefit of additional briefing and oral argument from the parties as well as eight *amicus* briefs,[4] the Court declines to rule [*228] on the question, "offer[ing] no opinion on the existence of a Fourth Amendment violation in this case." *Id.* at 22. I would reach the question, and I would hold, as did the panel, that the Fourth Amendment was indeed violated.[5]

---

[2] Throughout this dissent I refer as a matter of convenience to data on Ganias's hard drive as "files" or "documents." Of course, computers contain a variety of types of data, including data that we do not utilize as discrete "files" or "documents" (*e.g.*, metadata, the operating system, the BIOS).

[3] The third member of the panel was the Honorable Jane A. Restani of the United States Court of International Trade, who sat by designation. [**87] Judge Restani was not eligible to participate in the *en banc* proceedings. *See* 28 U.S.C. § 46(c).

[4] All eight *amici* urged that we find a Fourth Amendment violation. Brief for *Amicus Curiae* Center for Constitutional Rights as *Amicus Curiae* in Support of Appellant, *Ganias*, No. 12-240-cr (July 29, 2015), 2015 WL 4597942; Brief for *Amici Curiae* Center for Democracy & Technology, ACLU, et al. in Support of Defendant-Appellant, *Ganias*, No. 12-240-cr (July 29, 2015), 2015 WL 4597943; Brief of *Amici Curiae* Electronic Privacy Information Center in Support of Appellant [**88] and Urging Affirmance, *Ganias*, No. 12-240-cr (July 29, 2015), 2015 WL 4610149; Brief on Rehearing *En Banc* for *Amici Curiae* Federal Public Defenders Within the Second Circuit in Support of Appellant Stavros M. Ganias, No. 12-240-cr (July 29, 2015), 2015 WL 4597956; Brief of Google Inc. as Amicus Curiae Supporting Defendant-Appellant, *Ganias*, No. 12-240-cr (July 29, 2015), 2015 WL 4597960; *Amicus Curiae* Brief of the National Ass'n of Criminal Defense Lawyers in Support of Defendant-Appellant and Urging Reversal, *Ganias*, No. 12-240-cr (July 29, 2015), 2015 WL 4597959; Brief for *Amicus Curiae* New York Council of Defense Lawyers in Support of Appellant, *Ganias*, No. 12-240-cr (July 29, 2015), 2015 WL 4597958; Brief of *Amicus Curiae* Restore the Fourth, Inc. in Support of Defendant-Appellant Stavros M. Ganias, *Ganias*, No. 12-240-cr (July 29, 2015), 2015 WL 4597961.

[5] I note also that the prevailing scholarly consensus has been that the panel largely got it right with its Fourth Amendment approach. *E.g.*, Stephen E. Henderson, *Fourth Amendment Time Machines (and What They May Say About Police Body Cameras)*, 18 U. Pa. J. Const. L. 933, 947 (2016) ("I agree, though I differ from the panel's reasoning."); Orin S. Kerr, *Executing Warrants for Digital Evidence: The Case [**89] for Use Restrictions on Nonresponsive Data*, 48 Tex. Tech L. Rev. 1, 30-33 (2015) (concluding that "[t]he basic approach mirrors the ongoing seizure approach recommended in this Article" and that "*Ganias* properly focuses on the reasonableness of the ongoing seizure of the nonresponsive files," while labeling the panel opinion as "a particularly strong version" that "courts could adopt"); *see also United States v. Ganias*, 755 F.3d 125 (2d Cir. 2014);, 128 Harv. L. Rev. 743, 747-50 (2014) (concluding that "[t]he *Ganias* court's opinion properly held that Ganias's Fourth Amendment rights were violated, and it rightly recognized the importance of the particularity requirement in the context of electronic evidence," but arguing that the panel could have "issued a narrower opinion"). *But see* Note, *Digital Duplications and the Fourth Amendment*, 129 Harv. L. Rev. 1046, 1059-64 (2016) (arguing the retention at issue should have been considered as a

**A.**

The facts are largely undisputed. Ganias was providing tax and accounting services to individuals and small businesses, including Industrial Property Management, Inc. ("IPM") and American Boiler. In November 2003, the Army, as part of an investigation of those two entities, subpoenaed from Ganias:

> All books, records, documents, materials, computer hardware and software and computer associated data relating to the business, financial and accounting operations of [IPM] and American Boiler . . . .

J. App. 433. Two Army computer specialists and another Army investigator came to Ganias's office, and they saw three computers. They [**91] made identical copies of the hard drives of those computers to take [*229] with them -- that is, they cloned the hard drives by making exact replicas ("mirror images") on blank hard drives. In the course of doing so, they took data and files not "relating to the business, financial and accounting operations of [IPM] and American Boiler." *Id.* In fact, they took from those hard drives all of Ganias's data, including files relating to his personal affairs.

Back in their offices, the Army investigators copied the data taken from Ganias's computers onto "two sets of 19 DVDs," one of which was "maintained as evidence" while the other was kept as a "working copy." Special App. 11. It took the Army Criminal Investigation Division some seven months to begin reviewing the files, but before it began doing so, it invited the Internal Revenue Service (the "IRS") to join the investigation. The Army and the IRS thereafter proceeded separately, reviewing the mirror images for files responsive to the warrant.

By December 2004, approximately thirteen months after the seizure, some four months of which was spent locating a copy of the off-the-shelf consumer software known as QuickBooks, Army and IRS investigators [**92] were able to isolate and extract the files covered by the warrant, that is, the files relating to IPM and American Boiler. The investigators were aware that, because of the constraints of the warrant, they were not permitted to review any other computer records. Indeed, the investigators were careful, at least until later, to review only data covered by the November 2003 warrant.

The investigators did not, however, purge or delete or return the non-responsive files. To the contrary, they retained the files because they "viewed the data as the government's property, not Mr. Ganias's property." J. App. 146.[6] Their view was that while items seized from an owner will be returned after an investigation closes, all of the electronic data here was evidence that was to be protected and preserved. As one agent testified, "[W]e would not routinely go into DVDs to delete data, as we're altering the original data that was seized. And you never know what data you may need in the future. . . . I don't normally go into electronic data and start deleting evidence off of DVDs stored in my evidence room." *Id.* at 122.

In late 2004, IRS investigators discovered accounting irregularities regarding transactions between IPM and American Boiler in the documents taken from Ganias's office. After subpoenaing and reviewing the relevant bank records in 2005, they began to suspect that Ganias was not properly reporting American Boiler's income. Accordingly, on July 28, 2005, some twenty months after the seizure of his computer files, the Government officially expanded its investigation to include possible tax violations by Ganias. Further investigation in 2005 and early 2006 indicated that

---

"search" and not a "seizure"). Others have likewise commented that the panel opinion fits with current Supreme Court jurisprudence, including, in particular, *Riley v. California*, 134 S. Ct. 2473;. *E.g.*, Alan Butler, *Get a Warrant: The Supreme Court's New Course for Digital Privacy Rights After Riley - California*, 10 Duke J. Const. L. & Pub. Pol'y 83, 112-13 (2014) ("The rule adopted in *Ganias* is consistent with the scope of privacy interests in digital data outlined in *Riley*, and other courts will be more likely to adopt the rule in light of the [**90] Supreme Court's decision."); Laura K. Donohue, *Section 702 and the Collection of International Telephone and Internet Content*, 38 Harv. J.L. & Pub. Pol'y 117, 238-41 (2015) (commenting that, like the panel opinion, *Riley* "similarly supports a Fourth Amendment use restriction on lawfully obtained information" and concluding that "[e]ven though the government might have legally obtained the information at the front end, it could not search the information for evidence of criminal activity absent a warrant, supported by probable cause"); Paul Ohm, *The Life of Riley*, 48 Tex. Tech L. Rev. 133, 138-39 (2015) (anticipating that future courts could find Ganias supportable under Riley).

[6] The majority suggests that I "seize[] on this single sentence . . . as the smoking gun of the Government's [**93] bad faith." Maj. Op. at 16 n.13. The testimony is what it is: a statement under oath by a law enforcement officer explaining the Government's actions. Moreover, as discussed below, there is more than just this single sentence to show the lack of good faith. *See infra* Part II.B.

Ganias had been improperly reporting income for both his clients, leading the Government to suspect that he also might have been underreporting his own income.

At that point, the IRS case agent wanted to review Ganias's personal financial records, and she knew, from her review of the seized computer records, that they were among the files in the DVD [**94] copies of Ganias's hard drives. The case agent was aware, however, that Ganias's personal financial [*230] records were beyond the scope of the November 2003 warrant, and consequently she did not believe that she could review the non-responsive files, even though they were already in the Government's possession.

In February 2006, the Government asked Ganias and his counsel for permission to access certain of his personal files that were contained in the materials seized in November 2003. Ganias did not respond, and thus, on April 24, 2006, the Government obtained another warrant to search the preserved mirror images of Ganias's personal financial records taken in 2003. At that point, the mirror images had been in the Government's possession for almost two-anda-half years. **B**.

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). In adopting the Fourth Amendment, the Framers were principally concerned about "indiscriminate searches and seizures" conducted "under the authority of 'general warrants.'" *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013); (quoting *Payton v. New York*, 445 U.S. 573, 583, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)). General warrants were ones "not grounded upon a sworn oath of a specific infraction by a particular individual, and thus not limited in scope and application." *Maryland v. King*, 569 U.S. 435, 133 S. Ct. 1958, 1980, 186 L. Ed. 2d 1 (2013). The Fourth Amendment guards against this practice by [**95] providing that a warrant will issue only if: (1) the Government establishes probable cause to believe the search will uncover evidence of a specific crime; and (2) the warrant states with particularity the areas to be searched and the items to be seized. *Galpin*, 720 F.3d at 445-46.

The latter requirement, in particular, "makes general searches . . . impossible" because it "prevents the seizure of one thing under a warrant describing another." *Id.* at 446; (quoting *Marron v. United States*, 275 U.S. 192, 196, 48 S. Ct. 74, 72 L. Ed. 231, Treas. Dec. 42528 (1927)). This restricts the Government's ability to remove all of an individual's papers for later examination because it is generally unconstitutional to seize any item not described in the warrant. See *Horton v. California*, 496 U.S. 128, 140, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990); *United States v. Tamura*, 694 F.2d 591, 595 (9th Cir. 1982). Certain exceptions have been made in those "comparatively rare instances where documents [we]re so intermingled that they [could not] feasibly be sorted on site." *Tamura*, 694 F.2d at 595-96. These circumstances might occur, for example, where potentially relevant documents are interspersed through a large number of boxes or file cabinets. See *id.* at 595. But in those cases, the off-site review had to be monitored by a neutral magistrate and non-responsive documents were to be returned after the relevant items were identified. *Id.* at 596-97.

In the computer age, off-site review has become much more common. The ability [**96] of computers to store massive volumes of information presents logistical problems in the execution of search warrants, and files on a computer hard drive are often "so intermingled that they cannot feasibly be sorted on site." *Id.* at 595. Forensic analysis of electronic data may take weeks or months to complete, and it would be impractical for agents to occupy an individual's home or office, or retain an individual's computer, for such extended periods of time. It is now also unnecessary. Today, advancements in technology enable the Government to create a mirror image of an individual's hard drive, which can be searched as if it were the actual hard drive [*231] but without otherwise interfering with the individual's use of his home, office, computer, or files. Indeed, the Federal Rules of Criminal Procedure now provide that a warrant for computer data presumptively "authorizes a later review of the media or information consistent with the warrant." Fed. R. Crim. P. 41(e)(2)(B).

But these practical necessities must still be balanced against our possessory and privacy interests, which have become more susceptible to deprivation in the computer age. A computer does not consist simply of "papers," but now contains the quantity of [**97] information found in a person's residence or greater. See *Riley v. California*, 134 S. Ct. 2473, 2489, 189 L. Ed. 2d 430 (2014); *Galpin*, 720 F.3d at 446. Virtually the entirety of a person's life may be captured as data: family photographs, correspondence, medical history, intimate details about how a person spends each passing moment of each day. GPS-enabled devices reveal our whereabouts. A person's internet search history may disclose her mental deliberations, whether

or not those thoughts were favored by the Government, the public at large, or even that person's own family. Smartphones "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers." *Riley*, 134 S. Ct. at 2489; *see also* Michael D. Shear, David E. Sanger & Katie Benner, *In the Apple Case*, *a Debate Over Data Hits Home*, N.Y. Times (Mar. 13, 2016) ("It is a minicomputer stuffed with every detail of a person's life: photos of children, credit card purchases, texts with spouses (and nonspouses), and records of physical movements."). From a mere data storage device, a forensic analyst could reconstruct a "considerable chunk of a person's life." Kerr, *supra* note 1, at 569. All of this information is captured when the Government, in executing a search warrant, makes a mirror [**98] image of a hard drive.

We know only general descriptions of what was in Ganias's three hard drives -- "personal and financial information," including information on other tax and accounting clients (*e.g.*, social security numbers) that was private to them -- but the Fourth Amendment requires us to consider broadly the ramifications of computer seizures. J. App. 428. If Ganias were a doctor, his computer might have contained the entire medical history of hundreds of individuals. If Ganias were a teacher, his computer could have contained educational information on dozens of students and communications with their families. If Ganias were not an individual but a corporation like Apple, Dropbox, Google, or Microsoft that stores individuals' information in the "cloud," the Government would have captured an untold vastness of information on millions of individuals. *See* Jim Kerstetter, *Microsoft Goes on Offensive Against Justice Department*, N.Y. Times (Apr. 15, 2016) ("When customer information is stored in a giant data center run by companies like Google, Apple and Microsoft, investigators can go straight to the information they need, even getting a judge to order the company to keep quiet about it."); *see [**99] also* Andrew Keane Woods, *Against Data Exceptionalism*, 68 Stan. L. Rev. 729, 743 (2016) ("Twenty years ago, a kidnapper might have confessed to a crime by writing in his diary. . . . Today the same admission is just as likely to be stored online. . . .").

To safeguard individuals' possessory and privacy interests, when the Government seeks to review mirror images off-site, we are careful to subject the Government's conduct to the rule of reasonableness. See, e.g., *United States v. Ramirez*, 523 U.S. 65, 71, 118 S. Ct. 992, 140 L. Ed. 2d 191 (1998) ("The general touchstone of reasonableness [*232] which governs Fourth Amendment analysis governs the method of execution of the warrant." (citation omitted)). The advisory committee's notes to the 2009 amendment of the Federal Rules of Criminal Procedure shed some light on what is "reasonable" in this context. Specifically, the committee rejected "a presumptive national or uniform time period within which any subsequent offsite copying or review of the media or electronically stored information would take place." Fed. R. Crim. P. 41(e)(2)(B) advisory committee's notes to 2009 amendments. The committee noted that several variables -- storage capacity of media, difficulties created by encryption or electronic booby traps, and computer-lab workload -- influence the duration of a forensic analysis and counsel [**100] against a "one size fits all" time period. *Id.* In combination, these factors might justify an off-site review lasting for a significant period of time. They do not, however, provide an "independent basis" for retaining any electronic data "other than [those] specified in the warrant." *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1171 (9th Cir. 2010) (*en banc*) (*per curiam*).

Hence, for these practical considerations, the Government may, consistent with the Fourth Amendment, overseize electronically stored data when executing a warrant. But overseizure is exactly what it sounds like. It is a seizure that *exceeds* or *goes beyond* what is otherwise authorized by the Fourth Amendment. It is an overseizure of evidence that may be reasonable, in light of the practical considerations.

But once the Government is able to extract the responsive documents, its right to the overseizure of evidence comes to an end. This obvious principle has long been adhered to in the context of physical documents, such as when the Government seizes entire file cabinets for off-site review. See *Tamura*, 694 F.2d at 596-97 ("We likewise doubt whether the Government's refusal to return the seized documents not described in the warrant was proper."); see also *Andresen v. Maryland*, 427 U.S. 463, 482 n.11, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976) ("[T]o the extent such papers were not within the scope of the warrants or were otherwise [**101] improperly seized, the State was correct in returning them voluntarily . . . ."). By logical extension, at least in a situation where responsive computer files can be extracted without harming other government interests, this principle would apply with equal force. See *CDT*, 621 F.3d at 1175-76 (using "file cabinets" as a starting analogy for analyzing digital privacy issues). Once responsive files are segregated or

extracted, the retention of non-responsive documents is no longer reasonable, and the Government is obliged, in my view, to return or dispose of the non-responsive files within a reasonable period of time. See *CDT*, 621 F.3d at 1179 (Kozinski, *J.*, concurring) ("Once the data has been segregated . . . any remaining copies should be destroyed or . . . returned . . . ."). At that point, the Government's overseizure of files and continued retention of non-responsive documents becomes the equivalent of an unlawful general warrant. See *CDT*, 621 F.3d at 1176 (majority opinion) (noting "serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant"); cf. *United States v. Jones*, 565 U.S. 400, 132 S. Ct. 945, 955-56, 181 L. Ed. 2d 911 (2012) (Sotomayor, *J.*, concurring) (warning that "Government can store . . . records and efficiently mine them for information years [**102] into the future").

In the circumstances here, the Government violated Ganias's right against unreasonable searches and seizures. The Government overseized Ganias's data in [*233] November 2003, taking both responsive and non-responsive documents. By December 2004, the responsive documents had been segregated and extracted. Yet, instead of returning or deleting the non-responsive files, the Government retained them for another year and a half, until it finally developed a justification to search them again for unrelated reasons. Without some independent basis for retaining the non-responsive documents in the interim, however, in my view the Government clearly violated Ganias's rights under the Fourth Amendment.

The majority comments that it is "unclear" whether the Government had segregated the files relating to IPM and American Boiler from non-responsive files by December 2004. Maj. Op. at 15-16 & n.12. But the record shows that by October 2004, the Government had placed files thought to be responsive onto a CD. Referring to this event at rehearing *en banc*, the Government stated:

> There does come a point where we often identify a subset of documents that are responsive, *and you could even call it segregating [**103]* . In this case, they put them onto a separate disc as working copies and sent [them] to the case agents.

Oral Arg. 32:12-43 (emphasis added). And as an agent then testified, "as of mid-December, [the] forensic analysis was completed." J. App. 322. In other words, the responsive files were segregated.

The majority posits that perhaps the agents did not consider the forensic analysis as to IPM and American Boiler completed "as a forward-looking matter" as of December 2004. Maj. Op. at 15, 58. The record, however, shows otherwise, and, at a minimum, it is clear that the segregation of the files was essentially complete at that point. Moreover, this factual distinction is both speculative and irrelevant. The Fourth Amendment should not be held in abeyance on the off-chance that later developments might cause agents to want to reexamine documents preliminarily determined to be non-responsive. Indeed, the Fourth Amendment recognizes that some degree of perfection must be sacrificed to safeguard liberties. By barring the Government from simply taking *everything* through the use of a general warrant, the Fourth Amendment contemplates that investigators may miss *something*. With computers, another search term can always be concocted and data [**104] can always be further crunched. But the fact that another iota of evidence might be uncovered at some point down the road does not defeat the rights protected by the Fourth Amendment;. Cf. *Riley*, 134 S. Ct. at 2491 ("[T]he Founders did not fight a revolution to gain the right to government agency protocols.").

**C.**

I next turn to the Government's arguments as to why the Fourth Amendment was not violated. The Government offers several "legitimate governmental interests" that it contends permit it to hold onto data long after it has been seized, sorted, and segregated, even though the data includes irrelevant, personal information. *See* Gov't Br. 29. During the *en banc* process, the Government suggested that these interests permit it to retain data for the duration of the prosecution. *See id.* at 17, 29; Oral Arg. 27:38-57.[7]

[*234] At the outset, in evaluating the legitimacy of these reasons in relation to this case, I note what is *not [**105]* implicated here. This is not a case where the defendant's non-responsive files had independent evidentiary value -- for instance, in a prosecution where

---

[7] In contrast, before the original panel, the Government argued: "Where the warrant does not specify a time period in which the review must be conducted -- like the November 2003 warrant -- this Court has allowed the government to retain computer material indefinitely and 'without temporal limitation.'" First Gov't Br. 30 (quoting *United States v. Anson*, 304 F. App'x 1, 3 (2d Cir. 2008)).

the charge was that evidence had been destroyed, *e.g.*, 18 U.S.C. § 1519, it would be relevant that certain documents were *not* on the hard drive.[8] This is also not a case where the manner in which a responsive file was stored could be used to prove knowledge or intent, as might be the situation in a child pornography prosecution. And this is not a case where the physical hard drive itself is of evidentiary value -- the fact that Ganias's files were actually found inside a computer did not make his guilt more or less probable. Finally, this is not a case where the Government seized Ganias's hard drive to proceed against him. Instead, the Government retained Ganias's hard drive for some two-and-a-half years without suspecting him of criminal wrongdoing, and the agency that ultimately suspected him of illicit tax activity (the IRS) was not even involved at the outset.

The Government argues that it has the right to retain non-responsive files so that, at trial, *responsive* files will be more easily authenticated or of greater evidentiary weight. Once again, the Government's argument obscures the issues in *this* case. The agents could not have been keeping non-responsive files for the purpose of proceeding against Ganias, as they did not yet suspect Ganias of criminal wrongdoing.

Further, even if the authentication concern is genuine, "[t]he bar for authentication of evidence is not particularly high." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007). Indeed, as long as *a* reasonable juror *could* find that evidence was authentic we permit that evidence to be introduced. *Id.; see* Fed. R. Evid. 901(a). Meeting this minimal burden is not difficult -- all the Government [**107] need do is to introduce as a trial witness one of its agents who handled the data. See *Tamura*, 694 F.2d at 597.

The Government presses the point by arguing that by keeping the hard drives, it could *more easily* preserve the chain of custody and authenticate by "calculat[ing] . . . a 'hash value' for the original and th[e] [mirror] image." Gov't Br. 30. A "hash value" is an alphanumeric marker (*e.g.*, "ABC123") for data that stays the same *if and only if* the data is not altered. Thus, if a hard drive and its mirror image have the same hash value, the files in the mirror image are exact replicas; whereas if the Government purges data from the mirror image, then hash values would not match. Hash values thus make authentication easy. *See* Fed. R. Evid. 901(b)(4).

The hashing argument, however, is not persuasive. First, the Government would have to call an expert just to explain to a jury what a hash value was, as it did here. *See* Fed. R. Evid. 702(a); Trial Tr. 128-30. This is no less burdensome than simply having an agent testify as to the chain of custody. Second, as the Government acknowledged at rehearing *en banc*, it can hash individual files that it has segregated. *See* Oral Arg. 31:08-30. This practice is not a hypothetical possibility: the Government [*235] has done so before, [**108] see, e.g., *United States v. Hock Chee Koo*, 770 F. Supp. 2d 1115, 1123 (D. Or. 2011), and the Government did so in this very case for Ganias's QuickBooks files, *see* Trial Tr. 147-54. *See generally* Richard P. Salgado, *Fourth Amendment Search and the Power of the Hash*, 119 Harv. L. Rev. F. 38, 40-41 (2005) ("Many digital analysis tools can be configured to calculate separate hash values of each individual file . . . ."). The Government's ability to authenticate individual files by hashing them undercuts its assertion that it must retain non-responsive files to authenticate responsive ones. Hashing appears to make it easier for the Government to comply with the Fourth Amendment, not harder.

Next, the Government contends that it has an interest in retaining computer evidence in its "original form" to preserve "the integrity and usefulness of computer evidence during a criminal prosecution." Gov't Br. 32. This contention is unpersuasive. The Government can always preserve a copy of the *responsive* files to protect against degradation -- indeed, the Government points to no reason why a hard drive with all of Ganias's files would be less prone to degradation than a hard drive with some of his files. Moreover, even assuming there is some slight prosecutorial advantage gained by being able to show juries what a computer interface looked like in its "original form," [**109] this benefit surely does not justify a violation of basic Fourth Amendment rights.

In a similar vein, the Government argues that retention of mirror images "preserves the evidentiary value of computer evidence itself" and might "refute claims . . . of

---

[8] The majority twice relatedly suggests that the entire mirror image might be relevant here because Ganias made allusion to a "computer flaw" or "software error" in QuickBooks that did not allow [**106] him to properly split deposited checks. *See* Maj. Op. at 18 n.16, 34 n.31. The issue surely could be resolved by retaining only the responsive files and a copy of the pertinent version of QuickBooks. Moreover, even assuming there is some speculative value to retaining entire mirror images to prove the non-existence of a glitch, it would hardly be reasonable to rule that these practical frustrations of everyday technology provide the Government license to keep everything.

data tampering." Gov't Br. 31-34. As a practical matter, a claim of data tampering would easily fall flat where, as here, the owner kept his original computer and the Government gave him a copy of the mirror image.[9] More generally, the Government can argue in every case that overseized evidence will have some bearing on the "evidentiary value" of other, properly seized evidence at trial. When the Government makes authorized seizures of folders of financial information from a file cabinet, it could argue that it is entitled to seize the entire cabinet to demonstrate to a jury that folders were preserved in their original form. Or the Government might like to seize nearby, carefully organized folders of medical information to rebut a claim of incompleteness by showing how meticulous the defendant was. Or the Government might seek to seize a folder of children's report cards to show that the defendant normally kept information from a certain time period. [**110] Permitting the Government to keep non-responsive files merely to strengthen the evidentiary value of responsive files would eviscerate the Fourth Amendment.

Remarkably, the Government also argues that it should be allowed to hold on to overseized data for the *defendant's* benefit -- so that it can comply with its discovery obligations and duty to disclose exculpatory materials under Brady. See generally *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The Government is essentially arguing that it must hold on to the materials so that it can give them back to the defendant. Of course, this is not a genuine concern -- the problem can be obviated simply by returning the non-responsive files to the defendant in the first place.

The Government further argues that it should be permitted to retain forensic mirror [*236] images so that it may search the images for material responsive to a warrant "as the case evolves." Gov't Br. 35. At base, this is a blanket assertion that the Government can seize first and investigate later. See *CDT*, 579 F.3d at 998 (criticizing [**111] approach as: "Let's take everything back to the lab, have a good look around and see what we might stumble upon."). This is the equivalent of a general warrant, and the Fourth Amendment simply does not permit it.

Finally, the Government suggests that the availability of Federal Rule of Criminal Procedure 41(g) weighs in favor of the reasonableness of its actions. Rule 41(g) provides that a person aggrieved by an unlawful seizure "may move for the property's return." This rule, however, cannot shift the Government's burden under the Fourth Amendment onto the defendant. Pointing fingers at Ganias does not help the Government meet its *own* obligation to be reasonable.

The Government's arguments thus fail. In my view, Ganias's Fourth Amendment rights were violated when the Government unreasonably continued to hold on to his non-responsive files long after the responsive files had been extracted to reexamine when it subsequently saw need to do so.

**II**.

Instead of ruling on the question of whether the Government's actions violated the Fourth Amendment, the majority relies on the good faith exception to the exclusionary rule, and concludes that suppression was not warranted because the Government relied in good faith on the 2006 warrant and that this reliance was objectively reasonable. *See* Maj. Op. at 3.

[**112] **A**.

Even where a search or seizure violates the Fourth Amendment, the Government is not automatically precluded from using the unlawfully obtained evidence in a criminal prosecution. *United States v. Julius*, 610 F.3d 60, 66 (2d Cir. 2010). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009).

To balance these interests, we have adopted the "good faith" exception, in certain circumstances, as a carve-out to the exclusionary rule. See *Davis v. United States*, 564 U.S. 229, 237-39, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011). When a warrant is present, an agent's objectively reasonable good faith reliance on and abidance by the warrant generally makes exclusion an inappropriate remedy. See *United States v. Leon*, 468 U.S. 897, 922, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Likewise, government agents act in good faith when they perform "searches conducted in objectively reasonable reliance on binding appellate precedent."

[9] Though the record is silent as to this point, the Government told the Court at rehearing *en banc* that it gave Ganias a copy of the forensic mirror image so that he could conduct his own analysis. *See* Oral Arg. 30:28-31:05.

*Davis*, 564 U.S. at 232. When agents act in good faith, the exclusionary rule will usually not apply. See *United States v. Aguiar*, 737 F.3d 251, 259 (2d Cir. 2013). "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance." *United States v. Voustianiouk*, 685 F.3d 206, 215 (2d Cir. 2012); (quoting *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992)).

Furthermore, evidence will be suppressed only where the benefits of deterring the Government's unlawful actions appreciably outweigh the [**113] costs of suppressing the evidence -- "a high obstacle [*237] for those urging . . . application" of the rule. *Herring*, 555 U.S. at 141; (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364-65, 118 S. Ct. 2014, 141 L. Ed. 2d 344 (1998)); see *Davis*, 564 U.S. at 232. "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis*, 564 U.S. at 238; (quoting *Herring*, 555 U.S. at 144). "The principal cost of applying the [exclusionary] rule is, of course, letting guilty and possibly dangerous defendants go free -- something that 'offends basic concepts of the criminal justice system.'" *Herring*, 555 U.S. at 141; (quoting *Leon*, 468 U.S. at 908).

**B.**

The Government contends that it relied in good faith both on the 2003 warrant and the 2006 warrant. The majority, without supporting its holding with the 2003 warrant, concludes that the agents acted reasonably in relying on the 2006 warrant to search for evidence of Ganias's tax evasion, and that suppression therefore was not warranted. *See* Majority Op. at 44-55. I disagree, and would hold that neither warrant provided a good faith basis for retaining the non-responsive files long after the responsive files had been extracted.

**(1)**

I first turn to the 2003 warrant. The Government's retention of Ganias's non-responsive files pursuant to the 2003 warrant was [**114] hardly lawful or in good faith. The Government, in keeping the entirety of the mirror images, kept substantial amounts of "computer associated data" that did not "relat[e] to the business, financial and accounting operations of [IPM] and American Boiler." J. App. 433. This sort of retention following a "widespread seizure" was not explicitly authorized by the 2003 warrant, *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000); (quoting *United States v. Matias*, 836 F.2d 744, 748 (2d Cir. 1988)), and, as discussed, amounted to a general search. Likewise, the Government points to no binding appellate precedent that allows it to retain files outside the scope of a warrant when the responsive files can be feasibly extracted. Instead the Fourth Amendment baseline is that the Government may not take and then *keep* papers without a warrant "particularly describing . . . the persons or things to be seized." U.S. Const. amend. IV.

The Government argues nonetheless that the agents had an objectively reasonable good faith belief that their post-warrant conduct was lawful, because no precedent held that they could *not* do what they did. The argument fails, in my view, for the precedents are absolutely clear that general warrants are unconstitutional and that government agents authorized to come into one's home to seize papers for a limited purpose may [**115] not indiscriminately seize and retain all papers instead. Any agent who professes to have the ability to do so merely because computers are involved is not acting in good faith.

Moreover, the Government's formulation of "the 'good faith' exception w[ould] swallow the exclusionary rule." *Davis*, 564 U.S. at 258 (Breyer, J., dissenting). The Government is essentially arguing that the absence of binding appellate precedent addressing the overseizure and retention of computer files excuses the agents' actions. But it has always been the case that agents must rely on *something* for their reliance to be objective. That is, officers must "learn 'what is required of [*238] them' . . . and . . . conform their conduct to these rules." *Davis*, 564 U.S. at 241 (majority opinion); (quoting *Hudson v. Michigan*, 547 U.S. 586, 599, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006)); see also *id.* at 250 (Sotomayor, J., concurring) ("[W]hen police decide to conduct a search or seizure in the absence of case law (or other authority) specifically sanctioning such action, exclusion of the evidence obtained may deter Fourth Amendment violations . . . ."). Here, the basic principles were well settled and provided ample guidance. And even if the warrant and our precedent were unclear as to what was allowed, the answer was not for agents to venture alone into uncharted constitutional territory. [**116] See *United States v. Johnson*, 457 U.S. 537, 561, 102 S. Ct. 2579, 73 L. Ed. 2d 202 (1982) ("[I]n close cases, law enforcement officials would have little incentive to err on the side of constitutional

behavior."). Rather, the answer was for the agents to seek out a magistrate to authorize the *continued retention* of Ganias's non-responsive files. See *CDT*, 621 F.3d at 1179 (Kozinski, J., concurring). Once the responsive files were extracted, the Government could have asked to keep non-responsive files for use during a prosecution or for the purpose of trial and allowed a magistrate to balance the Government's need against Ganias's Fourth Amendment interests. *See Leon*, 468 U.S. at 916 (noting we would not "punish the errors of judges and magistrates"). The Government did not do that, but instead retained the non-responsive files for another year and a half before seeking judicial guidance.

More troublingly, the agents here knew what they were supposed to do -- their actions were "deliberate." *Davis*, 564 U.S. at 238; (quoting *Herring*, 555 U.S. at 144). The agents *knew* they were supposed to return or delete overseized data. When asked whether he was "to return those items or destroy those items that don't pertain to your lawful authority to seize those particular items" after a "reasonable period" of off-site review, the testifying agent answered, "Yes, sir." J. App. 145-46; see [**117] also *id.* at 428 (Ganias corroborating that the agent "assured me that those materials and files not authorized under the warrant and not belonging to American Boiler and IPM would be purged once they completed their search"). Instead of following this protocol, that agent testified that the investigators "viewed the data as the government's property, not Mr. Ganias' property." *Id.* at 146; *see also id.* at 122 ("And you never know what data you may need in the future."). In other words, the agents "knew that limits of the warrant w[ere] not be[ing] honored." *United States v. Foster*, 100 F.3d 846, 852 (10th Cir. 1996). This knowledge of the need to return or delete non-responsive files compels a conclusion that the agents did not rely in good faith on the 2003 warrant or any appellate precedent (binding or non-binding) and that the deterrence value of suppression here is substantial.

**(2)**

I next turn to the 2006 warrant. On April 24, 2006, the Government sought a warrant -- seeking to search "Images of three (3) hard drives seized on November 19, 2003 from the offices of Steve M. Ganias" -- to investigate him personally. J. App. 455. A magistrate judge issued the warrant, and the Government searched the mirror images.

For the purpose of deterring Fourth Amendment violations, the relevant inquiry is whether [**118] the agents acted in good faith when they committed the violation. See *Leon*, 468 U.S. at 916 ("[T]he exclusionary rule is designed to [*239] deter police misconduct . . . ."). The agents here could not have relied in good faith on the 2006 warrant because it was issued almost two-and-a-half years after the files were first overseized, and some sixteen months after the responsive files had been extracted. That is, the agents did not rely on the 2006 warrant to retain non-responsive files because that warrant came into being only *after* the Fourth Amendment violation occurred. An agent can only rely on something that exists "at the time of the search." *Aguiar*, 737 F.3d at 259; see *Davis*, 131 S. Ct. at 2428 (asking if search was in "objectively reasonable reliance on binding judicial precedent" as of "the time of the search").

In other words, the later 2006 warrant could not cure the prior illegal retention of Ganias's data when agents did not rely on it to retain that data. A warrant is not a Band-Aid that the Government may seek when it realizes its Fourth Amendment violation has been discovered. *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 1.3(f) (5th ed. 2015) ("When the magistrate issued the warrant, he did not endorse past activity; he only authorized future activity."). [**119] As we have previously held, "Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble." *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996).

The Government and the majority rely on a line of cases that includes *United States v. Reilly*, 76 F.3d 1271, and its predecessor, *United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985);. In *Reilly*, we affirmed the *Thomas* principle that illegally obtained evidence need not be excluded where the agents later obtained a warrant by providing a magistrate "the details of their dubious pre-warrant conduct" and where "'there was nothing more the officer could have or should have done under the[] circumstances to be sure his search would be legal.'" *Reilly*, 76 F.3d at 1282 (alterations omitted); (quoting *Thomas*, 757 F.2d at 1368). We required, however, that the officer "did not have any significant reason to believe that what he had done was unconstitutional." *Id.* at 1281.[10]

---

[10] As an initial observation, the *Thomas* principle is not free from doubt. *Reilly* acknowledged that *Thomas* is difficult to square with the holdings of many of our sister circuits without

In this case, the agents did *not* present to the magistrate judge all of "the details of their dubious pre-warrant conduct." *Id.* at 1282. Though the majority points out that the agents disclosed to the magistrate judge in 2006 that the mirror images were seized in November 2003, that Ganias was not then under investigation, and that the mirror images included files outside the scope of the original warrant, this information was not sufficient on its own to permit the magistrate judge to evaluate whether the relevant constitutional violation occurred. *See* Maj. Op. at 56-57. The agents did not disclose that they had segregated responsive files from non-responsive files and extracted the responsive files and that for some time they did not have other, anticipated uses for the non-responsive files. Without this information relating to whether the Government still had a legitimate use for the mirror image during the retention, it simply would not have been [*240] feasible for a magistrate judge to consider the legitimacy of the continued retention of the mirror image. See *United States v. Vasey*, 834 F.2d 782, 789 (9th Cir. 1987) ("Typically, warrant applications are requested and authorized under severe time [**121] constraints.").

Likewise, unlike in *Thomas*, there was more that the Government could have done prior to 2006 to ensure that its conduct was legal. See *Thomas*, 757 F.2d at 1368. As noted above, it could have gone to a magistrate judge much earlier for permission to retain the non-responsive computer files.

Finally, the Government *did* have significant reason to believe that its conduct was unconstitutional. As noted, an agent testified that he knew he was supposed to "return those items or destroy those items that d[idn't] pertain to [his] lawful authority to seize those particular items." J. App. 145-46. And any reasonable law enforcement agent would have understood that it was unreasonable to "view[] [private property] as the government's property" or to treat the 2003 warrant as a general warrant. *Id.* at 146. Furthermore, the language of the 2003 warrant clearly set parameters for what was lawful: only data "relating to" IPM and American Boiler could be kept. *Id.* at 433.

At bottom, in holding that the Government acted with objectively reasonable reliance on the 2006 warrant, the majority condones creative uses of government power to interfere with individuals' possessory interests and to invade their privacy. Without specifically [**122] opining on whether the Government can retain overseized, non-responsive files, the majority has crafted a formula for the Government to do just that. The Government only needs to: obtain a warrant to seize computer data, overseize by claiming files are intermingled (they always will be), keep overseized data until the however distant future, and then (when probable cause one day develops) ask for another warrant to search what it has kept. The rule that we have fashioned does nothing to deter the Government from continually retaining papers that are, though initially properly seized, not responsive to or particularly described in a warrant. Instead of deterring future violations, we have effectively endorsed them.

The Government bears the burden of proving "the objective reasonableness of the officers' good faith reliance." *Voustianiouk*, 685 F.3d at 215; (quoting *George*, 975 F.2d at 77). It has not met that burden here. To the contrary, the agents exhibited a deliberate or reckless or grossly negligent disregard for Ganias's rights, see *Davis*, 564 U.S. at 238, and, in my view, the benefits of deterring the Government's unlawful actions here appreciably outweigh the costs of suppression, see *Herring*, 555 U.S. at 141; see also *Davis*, 564 U.S. at 232; *Pa. Bd. of Prob. & Parole*, 524 U.S. at 364-65.

**III.**

In the discussion of lofty constitutional principles, [**123] we sometimes forget the impact that our rulings and proceedings may have on individuals and their families. Here, there has been a cloud hanging over Ganias's head for nearly thirteen years, impacting every aspect of his life and the lives of those around him. The cloud is still there now.

The wheels of justice have spun ever so slowly in this case. The Government seized Ganias's files in November 2003, nearly thirteen years ago. He was indicted, in 2008, some eight years ago. He waited two-and-a-half years for a trial, and after he was found guilty, he waited roughly [*241] another ten months to be sentenced. He appealed his conviction, but it took another year for his appeal to be heard, and then another year for the appeal to be decided.

---

attempting to reconcile conflicting case law. See *id.* at 1282; ("Other courts have criticized *Thomas* . . . ."); e.g., *United States v. McGough*, 412 F.3d 1232, 1240 (11th Cir. 2005); *United States v. O'Neal*, 17 F.3d 239, 243 (8th Cir. 1994); *United States v. Scales*, 903 F.2d 765, 768 (10th Cir. 1990); *United States v. Vasey*, 834 F.2d 782, 789 (9th Cir. 1987). Indeed, the language that exclusion may be avoided when the Government "did not have any significant reason to believe that what [it] had done was [**120] unconstitutional," *Reilly*, 76 F.3d at 1282, may one day prove to be too lax.

The panel issued its decision on June 17, 2014. The panel held that the Government violated Ganias's Fourth Amendment rights and rejected its reliance on the good faith exception. On August 15, 2014, the Government filed a petition for rehearing, seeking panel rehearing only, not rehearing *en banc*, and seeking rehearing only with respect to the good faith exception. In other words, the Government did not seek rehearing on whether the Fourth Amendment was violated, and it did not seek rehearing [**124] *en banc* on either issue.

Yet, on June 29, 2015, more than a year after the panel decision, more than a year after Ganias thought he had won a substantial victory, this Court, on its own initiative, elected to rehear the case *en banc* -- with respect to *both* issues. The Court did so ostensibly to provide guidance in a novel and difficult area of law. But, after a year-long *en banc* process, no guidance has come forth. The Court took on an issue at Ganias's expense and then quickly retreated, relying instead on an issue that was not worthy of *en banc* review.

Ganias's non-responsive files are in the Government's custody still. What began nearly thirteen years ago as an investigation by the Army into two of Ganias's business clients somehow evolved into an unrelated investigation by the IRS into Ganias's personal affairs, largely because the Government did precisely what the Fourth Amendment forbids: it entered Ganias's premises with a warrant to seize certain papers and indiscriminately seized -- and *retained* -- all papers instead.

I respectfully dissent.

---

**End of Document**