# EXHIBIT A

## Part 2 of 2

United States v. Kuhl, No. 25-2065 (6th Cir.)

LexisNexis printouts of the authorities cited in the Opening Brief, in order of first appearance, with substituted authorities following the citations they replace. Highlighting identifies the language supporting each cited proposition.

*Part 2 contains Franks v. Delaware through Horton v. California.*

# Franks v. Delaware

438 U.S. 154 (1978)

Cited in Opening Brief at: 33

See Response, Part III.G.

Caution
As of: September 14, 2026 7:03 PM Z

# Franks v. Delaware

Supreme Court of the United States

February 27, 1978, Argued ; June 26, 1978, Decided

No. 77-5176

**Reporter**
438 U.S. 154 *; 98 S. Ct. 2674 **; 57 L. Ed. 2d 667 ***; 1978 U.S. LEXIS 127 ****

FRANKS v. DELAWARE

**Prior History:** [****1] CERTIORARI TO THE SUPREME COURT OF DELAWARE.

**Disposition:** 373 A. 2d 578, reversed and remanded.

## Syllabus

Prior to petitioner's Delaware state trial on rape and related charges and in connection with his motion to suppress on Fourth Amendment grounds items of clothing and a knife found in a search of his apartment, he challenged the truthfulness of certain factual statements made in the police affidavit supporting the warrant to search the apartment, and sought to call witnesses to prove the misstatements. The trial court sustained the State's objection to such proposed testimony and denied the motion to suppress, and the clothing and knife were admitted as evidence at the ensuing trial, at which petitioner was convicted. The Delaware Supreme Court affirmed, holding that a defendant under *no* circumstances may challenge the veracity of a sworn statement used by police to procure a search warrant. *Held*: Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable [****2] cause, the Fourth Amendment, as incorporated in the Fourteenth Amendment, requires that a hearing be held at the defendant's request. The trial court here therefore erred in refusing to examine the adequacy of petitioner's proffer of misrepresentation in the warrant affidavit. Pp. 155-156; 164-172.

(a) To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. The allegation of deliberate falsehood or of reckless disregard must point out specifically with supporting reasons the portion of the warrant affidavit that is claimed to be false. It also must be accompanied by an offer of proof, including affidavits or sworn or otherwise reliable statements of witnesses, or a satisfactory explanation of their absence. P. 171.

(b) If these requirements as to allegations and offer of proof are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required, but if the remaining content is insufficient, the defendant is entitled [****3] under the Fourth and Fourteenth Amendments to a hearing. Pp. 171-172.

(c) If, after a hearing, a defendant establishes by a preponderance of the evidence that the false statement was included in the affidavit by the affiant knowingly and intentionally, or with reckless disregard for the truth, and the false statement was necessary to the finding of probable cause, then the search warrant must be voided and the fruits of the search excluded from the trial to the same extent as if probable cause was lacking on the face of the affidavit. Pp. 155-156.

**Counsel:** Donald W. Huntley argued the cause and filed briefs for petitioner.

Harrison F. Turner, Deputy Attorney General of Delaware, argued the cause for respondent. With him on the brief was Richard R. Wier, Jr., Attorney General. *

**Judges:** BLACKMUN, J., delivered the opinion of the

---

* Briefs of amici curiae were filed by Solicitor General McCree, Assistant Attorney General Civiletti, Kenneth S. Geller, Jerome M. Feit, and Paul J. Brysh for the United States, and by Bruce J. Ennis for the American Civil Liberties Union.

Court, in which BRENNAN, STEWART, WHITE, MARSHALL, POWELL, and STEVENS, JJ., joined, REHNQUIST, J., filed a dissenting opinion, [****4] in which BURGER, C. J., joined, post, p. 180.

**Opinion by:** BLACKMUN

# Opinion

[*155] [***672] [**2676] MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents an important and longstanding issue of Fourth Amendment law. Does a defendant in a criminal proceeding ever have the right, under the Fourth and Fourteenth Amendments, subsequent to the *ex parte* issuance of a search warrant, to challenge the truthfulness of factual statements made in an affidavit supporting the warrant?

[1] [2]In the present case the Supreme Court of Delaware held, as a matter of first impression for it, that a defendant under *no* circumstances may so challenge the veracity of a sworn statement used by police to procure a search warrant. We reverse, and we hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was [*156] included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury [****5] or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

I

The controversy over the veracity of the search warrant affidavit in this case arose in connection with petitioner Jerome Franks' state conviction for rape, kidnaping, and burglary. On Friday, March 5, 1976, Mrs. Cynthia Bailey told police in Dover, Del., that she had been confronted in her home earlier that morning by a man with a knife, and that he had sexually assaulted her. She described her assailant's age, race, height, build, and facial hair, and gave a detailed description of his clothing as consisting of a white thermal undershirt, [**2677] black pants with a silver or gold buckle, a brown leather three-quarter-length coat, and a dark knit cap that he wore pulled down around his eyes.

That same day, petitioner Franks coincidentally was taken into custody for an assault involving a 15-year-old [****6] girl, Brenda B. , six days earlier. After his formal arrest, and while awaiting a bail hearing in Family Court, petitioner allegedly stated to Robert McClements, the youth officer accompanying him, that he was surprised the bail hearing was "about Brenda B. . I know her. I thought you said Bailey. I don't know her." Tr. 175, 186. At the time of this statement, the police allegedly had not yet recited to petitioner his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966).

[*157] [***673] On the following Monday, March 8, Officer McClements happened to mention the courthouse incident to a detective, Ronald R. Brooks, who was working on the Bailey case. Tr. 186, 190-191. On March 9, Detective Brooks and Detective Larry D. Gray submitted a sworn affidavit to a Justice of the Peace in Dover, in support of a warrant to search petitioner's apartment. [1] In paragraph 8 of the affidavit's "probable cause page" mention was made of petitioner's statement to McClements. In paragraph 10, it was noted that the description of the assailant given to the police by Mrs. Bailey included the above-mentioned clothing. Finally, the affidavit also described the [****7] attempt made by police to confirm that petitioner's typical outfit matched that of the assailant. Paragraph 15 recited: "On Tuesday, 3/9/76, your affiant contacted Mr. James Williams and Mr. Wesley Lucas of the Delaware Youth Center where Jerome Franks is employed and did have personal conversation with both these people." Paragraphs 16 and 17 respectively stated: "Mr. James Williams revealed to your affiant that the normal dress of Jerome Franks does consist of a white knit thermal undershirt and a brown leather jacket," and "Mr. Wesley Lucas revealed to your affiant that in addition to the thermal undershirt and jacket, Jerome Franks often wears a dark green knit hat."

The warrant was issued on the basis of this affidavit. App. 9. Pursuant to the warrant, police searched petitioner's apartment and found a white thermal undershirt, a knit hat, dark pants, and a leather jacket, and, on petitioner's kitchen table, a single-blade knife. [****8] All these ultimately were introduced in evidence

---

[1] The affidavit is reproduced as Appendix A to this opinion. *Post*, at 172.

at trial.

Prior to the trial, however, petitioner's counsel filed a written motion to suppress the clothing and the knife found in the search; this motion alleged that the warrant on its face did not show probable cause and that the search and seizure were [*158] in violation of the Fourth and Fourteenth Amendments. *Id*., at 11-12. At the hearing on the motion to suppress, defense counsel orally amended the challenge to include an attack on the veracity of the warrant affidavit; he also specifically requested the right to call as witnesses Detective Brooks, Wesley Lucas of the Youth Center, and James D. Morrison, formerly of the Youth Center. [2] *Id*., at 14-17. Counsel asserted that Lucas and Morrison would testify that neither had been personally interviewed by the warrant affiants, and that, although they might have talked to another [***674] police officer, any information given by them to that officer was "somewhat different" from what was recited in the affidavit. [**2678] *Id*., at 16. Defense counsel charged that the misstatements were included in the affidavit not inadvertently, but in "bad faith." *Id* [****9] ., at 25. Counsel also sought permission to call Officer McClements and petitioner as witnesses, to seek to establish that petitioner's courthouse statement to police had been obtained in violation of petitioner's *Miranda* rights, and that the search warrant was thereby tainted as the fruit of an illegally obtained confession. *Id*., at 17, 27.

[****10] In rebuttal, the State's attorney argued in detail, App. 15-24, (a) that Del. Code Ann., Tit. 11, §§ 2306, 2307 (1974), contemplated that any challenge to a search warrant was to be limited to questions of sufficiency based on the face of the affidavit; (b) that, purportedly, a majority of the States whose [*159] practice was not dictated by statute observed such a rule; [3] [****12] and (c) that federal cases on the issue were to be distinguished because of Fed. Rule Crim. Proc. 41 (e). [4] He also noted that [*160] this Court had reserved the general issue of subfacial challenge to veracity in *Rugendorf* v. *United States*, 376 U.S. 528, 531-532 (1964), when it disposed of that case on the ground that, even if a veracity challenge were permitted, the alleged factual inaccuracies in that case's affidavit "were of only peripheral relevancy to the showing of probable cause, and, not being within the personal knowledge of the affiant, did not go to the integrity of the

[2] The references in paragraphs 15 and 16 of the warrant affidavit's probable-cause page to "James Williams" appear to have been intended as references to James D. Morrison, who was petitioner's supervisor at the Youth Center. Tr. 269. This misapprehension on the part of the State continued until shortly before trial. Eleven days prior to trial, the prosecution requested the Clerk of the Kent County Superior Court to summon "James Williams, Delaware Youth Center," for petitioner's trial. In his return on the summons, Record Doc. No. 16, the Kent County Sheriff stated that he "[served] the within summons upon . . . James Williams (Morrison)." The summons actually delivered was made out in the name of James Morrison.

[3] It appears this is no longer the majority rule among the States. Compare Comment, 7 Seton Hall L. Rev. 827, 844 (1976) (about half of the States have addressed the issue, and the weight of authority is "slightly in favor" of permitting veracity challenges), with *North Carolina* v. *Wrenn*, 417 U.S. 973 (1974) (WHITE, J., dissenting from denial of certiorari) (majority of state decisions prohibit subsequent impeachment of an affidavit).

By our count, 19 States, and perhaps as many as 21, permit veracity challenges; 5 of these apparently rely on statutory provisions in so holding. Five States have disposed of particular veracity challenges on the ground there was no misstatement, or that any misstatement was immaterial or unintentional, without opining what would be done when there is a deliberate and material misrepresentation. There are now only 11 States that prohibit veracity challenges outright. Another two have barred impeachment challenges that seemed directed at the conclusory nature of affidavit allegations rather than at their veracity.

The case law is detailed in Appendix B. *Post*, at 176.

[4] This reasoning is misplaced. The Federal Courts of Appeals decisions allowing a defendant to challenge the veracity of a warrant affidavit rest on a constitutional footing. See *United States* v. *Belculfine*, 508 F.2d 58, 61, 63 (CA1 1974); *United States* v. *Dunnings*, 425 F.2d 836, 839-840 (CA2 1969), cert. denied, 397 U.S. 1002 (1970); *United States* v. *Armocida*, 515 F.2d 29, 41 (CA3), cert. denied *sub nom.* *Gazal* v. *United States*, 423 U.S. 858 (1975); *United States* v. *Lee*, 540 F.2d 1205, 1208-1209 (CA4), cert. denied, 429 U.S. 894 (1976); *United States* v. *Thomas*, 489 F.2d 664, 668, 671 (CA5 1973), cert. denied, 423 U.S. 844 (1975); *United States* v. *Luna*, 525 F.2d 4, 8 (CA6 1975), cert. denied, 424 U.S. 965 (1976); *United States* v. *Carmichael*, 489 F.2d 983, 988-989 (CA7 1973) (en banc); *United States* v. *Marihart*, 492 F.2d 897, 898 (CA8), cert. denied, 419 U.S. 827 (1974); *United States* v. *Damitz*, 495 F.2d 50, 54-56 (CA9 1974); *United States* v. *Harwood*, 470 F.2d 322, 324-325 (CA10 1972).

Of all the Federal Courts of Appeals, only one now apparently refrains from permitting challenges to affidavit veracity. See *United States* v. *Watts*, 176 U. S. App. D. C. 314, 317-318 n. 5, 540 F.2d 1093, 1096-1097 n. 5 (1976); *United States* v. *Branch*, 178 U. S. App. D. C. 99, 102 n. 2, 545 F.2d 177, 180 n. 2 (1976).

affidavit." *Id*., at 532. [***675] The State objected to petitioner's "going behind [the warrant affidavit] in any way," and argued that the court must decide petitioner's motion [****11] "on the four corners" of the affidavit. App. 21.

[****13] The trial court sustained the State's objection to petitioner's proposed evidence. *Id*., at 25, 27. The motion to suppress was denied, and the clothing and knife were admitted as evidence at the ensuing trial. Tr. 192-196. Petitioner was convicted. In a written motion for judgment of acquittal and/or new trial, Record Doc. No. 23, petitioner repeated his objection to the admission of the evidence, stating that he "should [**2679] have been allowed to impeach the Affidavit used in the Search Warrant to show purposeful misrepresentation of information contained therein." *Id*., at 2. The motion was denied, and petitioner was sentenced to two consecutive terms of 25 years each and an additional consecutive life sentence.

On appeal, the Supreme Court of Delaware affirmed. 373 A. 2d 578 (1977). It agreed with what it deemed to be the "majority rule" that no attack upon the veracity of a warrant affidavit could be made:

"We agree with the majority rule for two reasons. First, it is the function of the issuing magistrate to determine the reliability of information and credibility of affiants in deciding whether the requirement of probable cause has been [****14] met. There has been no need demonstrated for interfering with this function. Second, neither the probable cause nor suppression hearings are adjudications of guilt or innocence; the matters asserted by defendant are [*161] more properly considered in a trial on the merits." *Id*., at 580.

Because of this resolution, the Delaware Supreme Court noted that there was no need to consider petitioner's "other contentions, relating to the evidence that would have been introduced for impeachment purposes." *Ibid*.

Franks' petition for certiorari presented only the issue whether the trial court had erred in refusing to consider his allegation of misrepresentation in the warrant affidavit. [5] Because of the importance of the question, and because of the conflict among both state and federal courts, we granted certiorari. 434 U.S. 889 (1977).

[****15] II

It may be well first to note how we are compelled to reach the Fourth Amendment issue proffered in this case. In particular, the State's proposals of an independent and adequate state ground and of harmless error do not dispose of the controversy.

[3][4]Respondent argues that petitioner's trial counsel, who is not the attorney representing him in this Court, failed to include the challenge to the veracity of the warrant affidavit in the written motion to [***676] suppress filed before trial, contrary to the requirement of Del. Super. Ct. Rule Crim. Proc. 41 (e) that a motion to suppress "shall state the grounds upon which it is made." The Supreme Court of Delaware, however, disposed of petitioner's Fourth Amendment claim on the merits. A ruling on the merits of a federal question by the highest state court leaves the federal question open to review [*162] in this Court. *Manhattan Life Ins. Co.* v. *Cohen*, 234 U.S. 123, 134 (1914); *Raley* v. *Ohio*, 360 U.S. 423, 436-437 (1959); *Boykin* v. *Alabama*, 395 U.S. 238, 241-242 (1969).

[5]Respondent next suggests that any error here was harmless. Assuming, *arguendo*, [****16] respondent says, that petitioner's Fourth Amendment claim was valid, and that the warrant should have been tested for veracity and the evidence excluded, it is still clear beyond a reasonable doubt that the evidence complained of did not contribute to petitioner's conviction. *Chambers* v. *Maroney*, 399 U.S. 42, 52-53 (1970). This contention falls of its own weight. The sole issue at trial was that of consent. Petitioner admitted, App. 37, that he had engaged in sexual relations with Mrs. Bailey on the day in question. She testified, Tr. 50-51, 69-70, that she had not consented to this, and that petitioner, upon first encountering her in the house, had threatened her with a knife to force her to submit. Petitioner claimed that she had given full consent and [**2680] that no knife had been present. *Id*., at 254, 271. To corroborate its contention that consent was

---

[5] Franks did not raise in his petition the issue of his *Miranda* challenge to the courthouse statement given to police and the use of that statement in the warrant affidavit. The propriety of the trial court's refusal to hear testimony on that subject is therefore not before us. It also appears that Franks did not take that issue to the Supreme Court of Delaware. See Opening Brief for Appellant, No. 259, 1976 (Del. Sup. Ct.).

lacking, the State introduced in evidence a stainless steel, wooden-handled kitchen knife found by the detectives on the kitchen table in petitioner's apartment four days after the alleged rape. *Id*., at 195-196; Magistrate's Return on the Search Warrant March 9, 1976, Record Doc. No. [****17] 23. Defense counsel objected to its admission, arguing that Mrs. Bailey had not given any detailed description of the knife alleged to be involved in the incident and had claimed to have seen the knife only in "pitch blackness." Tr. 195. The State obtained its admission, however, as a knife that matched the description contained in the search warrant, and Mrs. Bailey testified that the knife allegedly used was, like the knife in evidence, single-edged and not a pocket knife, and that the knife in evidence was the same length and thickness as the knife used in the crime. *Id*., at 69, 114-115. The State carefully elicited from Detective Brooks the fact that this was the only knife found in petitioner's [*163] apartment. *Id*., at 196. Although respondent argues that the knife was presented to the jury as "merely exemplary of the generic class of weapon testimonially described by the victim," Brief for Respondent 15-16, the State at trial clearly meant to suggest that this was the knife that had been used against Mrs. Bailey. Had the warrant been quashed, and the knife excluded from the trial as evidence, we cannot say with any assurance that the jury would have reached [****18] the same decision on the issue of consent, particularly since there was countervailing evidence on that issue.

We should note, in addition, why this case cannot be treated as was the situation in *Rugendorf* v. *United* [***677] *States*. There the Court held that no Fourth Amendment question was presented when the claimed misstatements in the search warrant affidavit "were of only peripheral relevancy to the showing of probable cause, *and*, not being within the personal knowledge of the affiant, did not go to the integrity of the affidavit." 376 U.S., at 532 (emphasis added). *Rugendorf* emphasized that the "erroneous statements . . . were not those of the affiant" and thus "[failed] to show that the affiant was in bad faith or that he made any misrepresentations to the Commissioner in securing the warrant." *Id*., at 533. [6] Here, [*164] whatever the judgment may be as to the relevancy of the alleged misstatements, the integrity of the affidavit was directly placed in issue by petitioner in his allegation that the affiants did not, as claimed, speak directly to Lucas and Morrison. Whether such conversations took place is surely [****19] a matter "within the personal knowledge of the [affiants]." We also might note that although respondent's brief puts forth that the alleged misrepresentations in the affidavit were of little importance in establishing probable cause, Brief for Respondent 16, respondent at oral argument appeared to disclaim any reliance on *Rugendorf*. Tr. of Oral Arg. 30.

[****20] III

[6][7][8]Whether the Fourth and Fourteenth Amendments, and the derivative exclusionary [**2681] rule made applicable to the States under *Mapp* v. *Ohio*, 367 U.S. 643 (1961), ever mandate that a defendant be permitted to attack the veracity of a warrant affidavit after the warrant has been issued and executed, is a question that encounters conflicting values. The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search. In deciding today that, in certain circumstances, a challenge to a warrant's veracity must be permitted, we derive our ground from language of the Warrant Clause itself, which surely takes the affiant's good faith as its premise: "[No] Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." Judge Frankel, in *United States* v. *Halsey*, 257 F.Supp. 1002, 1005 [***678] (SDNY 1966), aff'd, Docket No. 31369 (CA2, June 12, 1967) (unreported), put the matter simply: "[When] the Fourth Amendment demands a factual showing sufficient to comprise [****21] 'probable cause,' the obvious assumption is that there will be a [*165] *truthful* showing" (emphasis in original).

[6] The *Rugendorf* affidavit, sworn to by FBI Special Agent Moore, contained two alleged inaccuracies: a double hearsay statement that petitioner Samuel Rugendorf was the manager of Rugendorf Brothers Meat Market, and a double hearsay statement that he was associated with his brother, Leo, in the meat business. As to the second, the affidavit stated that a confidential informant told FBI Special Agent McCormick about the Rugendorf brothers' association, and McCormick told affiant Moore. As to the first, the affidavit stated that the information was given by Chicago Police Officer Kelleher to Special Agent McCormick, who in turn relayed it to affiant Moore. Kelleher testified that he did not so inform McCormick, but the petitioner in *Rugendorf* had failed to pursue the discrepancy: He did not seek a deposition from McCormick, who was in the hospital at the time of trial, and did not seek a postponement to enable McCormick to be present. 376 U.S., at 533 n. 4. In characterizing the affidavit in *Rugendorf* as raising no question of integrity, the Court took as its premise that police could not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity.

This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true. It is established law, see *Nathanson* v. *United States*, 290 U.S. 41, 47 (1933); *Giordenello* v. *United States*, 357 U.S. 480, 485-486 (1958); *Aguilar* v. *Texas*, 378 U.S. 108, 114-115 (1964), that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter. If an informant's tip is the source of information, the affidavit must recite "some of the underlying circumstances from which the informant concluded" that relevant [****22] evidence might be discovered, and "some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, . . . was 'credible' or his information 'reliable.'" *Id.*, at 114. Because it is the magistrate who must determine independently whether there is probable cause, *Johnson* v. *United States*, 333 U.S. 10, 13-14 (1948); *Jones* v. *United States*, 362 U.S. 257, 270-271 (1960), it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment.

In saying this, however, one must give cognizance to competing values that lead us to impose limitations. They perhaps can best be addressed by noting the arguments of respondent and others against allowing veracity challenges. The arguments are several:

First, respondent argues that the exclusionary rule, created in *Weeks* v. *United States*, 232 U.S. 383 (1914), is not a [*166] personal constitutional right, but only a judicially created remedy extended where its benefit [****23] as a deterrent promises to outweigh the societal cost of its use; that the Court has declined to apply the exclusionary rule when illegally seized evidence is used to impeach the credibility of a defendant's testimony, *Walder* v. *United States*, 347 U.S. 62 (1954), is used in a grand jury proceeding, *United States* v. *Calandra*, 414 U.S. 338 (1974), or is used in a civil trial, *United States* v. *Janis*, 428 U.S. 433 (1976); and that the Court similarly has restricted application of the Fourth Amendment exclusionary rule in federal habeas corpus review of a state conviction. See [**2682] *Stone* v. *Powell*, 428 U.S. 465 (1976). Respondent argues that applying the exclusionary rule to another situation -- the deterrence [***679] of deliberate or reckless untruthfulness in a warrant affidavit -- is not justified for many of the same reasons that led to the above restrictions; interfering with a criminal conviction in order to deter official misconduct is a burden too great to impose on society.

Second, respondent argues that a citizen's privacy interests are adequately protected by a requirement [****24] that applicants for a warrant submit a sworn affidavit and by the magistrate's independent determination of sufficiency based on the face of the affidavit. Applying the exclusionary rule to attacks upon veracity would weed out a minimal number of perjurious government statements, says respondent, but would overlap unnecessarily with existing penalties against perjury, including criminal prosecutions, departmental discipline for misconduct, contempt of court, and civil actions.

Third, it is argued that the magistrate already is equipped to conduct a fairly vigorous inquiry into the accuracy of the factual affidavit supporting a warrant application. He may question the affiant, or summon other persons to give testimony at the warrant proceeding. The incremental gain from a post-search adversary proceeding, it is said, would not be great.

[*167] Fourth, it is argued that it would unwisely diminish the solemnity and moment of the magistrate's proceeding to make his inquiry into probable cause reviewable in regard to veracity. The less final, and less deference paid to, the magistrate's determination of veracity, the less initiative will he use in that task. Denigration of the [****25] magistrate's function would be imprudent insofar as his scrutiny is the last bulwark preventing any particular invasion of privacy before it happens.

Fifth, it is argued that permitting a post-search evidentiary hearing on issues of veracity would confuse the pressing issue of guilt or innocence with the collateral question as to whether there had been official misconduct in the drafting of the affidavit. The weight of criminal dockets, and the need to prevent diversion of attention from the main issue of guilt or innocence, militate against such an added burden on the trial courts. And if such hearings were conducted routinely, it is said, they would be misused by defendants as a convenient source of discovery. Defendants might even use the hearings in an attempt to force revelation of the

identity of informants.

Sixth and finally, it is argued that a post-search veracity challenge is inappropriate because the accuracy of an affidavit in large part is beyond the control of the affiant. An affidavit may properly be based on hearsay, on fleeting observations, and on tips received from unnamed informants whose identity often will be properly protected from revelation under *McCray* v. *Illinois*, 386 U.S. 300 (1967). [****26]

None of these considerations is trivial. Indeed, because of them, the rule announced today has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded. But neither do the considerations cited by respondent and others have a fully controlling weight; we conclude that they are insufficient to [***680] justify an *absolute* ban on postsearch impeachment of veracity. On this side of the balance, also, there are pressing considerations:

[*168] First, a flat ban on impeachment of veracity could denude the probable-cause requirement of all real meaning. The requirement that a warrant not issue "but upon probable cause, supported by Oath or affirmation," would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile. It is this specter of intentional falsification that, we think, has evoked such widespread opposition [**2683] to the flat nonimpeachment rule from the commentators, [7] from the American Law Institute [****27] in its Model Code of Pre-Arraignment Procedure, § SS290.3 (1) (Prop. Off. Draft 1975), from the federal courts of appeals, and from state courts. On occasion, of course, an instance of deliberate falsity will be exposed and confirmed without a special inquiry either at trial, see *United States ex rel. Petillo* v. *New Jersey*, 400 F.Supp. 1152, 1171-1172 (NJ 1975), vacated and remanded by order *sub nom. Albanese* v. *Yeager*, 541 F.2d 275 (CA3 1976), or at a hearing on the sufficiency of the affidavit, cf. *United States* v. *Upshaw*, 448 F.2d 1218, 1221-1222 (CA5 1971), cert. denied, 405 U.S. 934 (1972). [*169] A flat nonimpeachment rule would bar re-examination of the warrant even in these cases.

[****28] Second, the hearing before the magistrate not always will suffice to discourage lawless or reckless misconduct. The pre-search proceeding is necessarily *ex parte*, since the subject of the search cannot be tipped off to the application for a warrant lest he destroy or remove evidence. The usual reliance of our legal system on adversary proceedings itself should be an indication that an *ex parte* inquiry is likely to be less vigorous. The magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations. The pre-search proceeding will frequently be marked by haste, because of the understandable desire to act before the evidence disappears; this urgency will not always permit the magistrate to make an extended independent examination of the affiant or other witnesses.

Third, the alternative sanctions of a perjury prosecution, administrative discipline, contempt, or a civil suit are not likely to fill the gap. *Mapp* v. *Ohio* implicitly rejected [***681] the adequacy of these alternatives. Mr. Justice Douglas noted this in his concurrence in *Mapp*, 367 U.S., at 670, where he [****29] quoted from *Wolf* v. *Colorado*, 338 U.S. 25, 42 (1949): "'Self-scrutiny is a lofty ideal, but its exaltation reaches new heights if we expect a District Attorney to prosecute himself or his associates for well-meaning violations of the search and seizure clause during a raid the District Attorney or his associates have ordered.'"

Fourth, allowing an evidentiary hearing, after a suitable preliminary proffer of material falsity, would not diminish the importance and solemnity of the warrant-issuing process. It is the *ex parte* nature of the initial hearing, rather than the magistrate's capacity, that is the reason for the review. A magistrate's determination is presently

[7] Mascolo, Impeaching the Credibility of Affidavits for Search Warrants: Piercing the Presumption of Validity, 44 Conn. Bar J. 9, 19, 25-28 (1970); Kipperman, Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence, 84 Harv. L. Rev. 825, 830-832 (1971); Grano, A Dilemma for Defense Counsel: Spinelli-Harris Search Warrants and the Possibility of Police Perjury, 1971 U. Ill. Law Forum 405, 456; Forkosh, The Constitutional Right to Challenge the Content of Affidavits in Warrants Issued Under the Fourth Amendment, 34 Ohio St. L. J. 297, 306, 308, 340 (1973); Sevilla, The Exclusionary Rule and Police Perjury, 11 San Diego L. Rev. 839, 869 (1974); Herman, Warrants for Arrest or Search: Impeaching the Allegations of a Facially Sufficient Affidavit, 36 Ohio St. L. J. 721, 738-739, 750 (1975); Note, 15 Buffalo L. Rev. 712, 716-717 (1966); Note, 51 Cornell L. Q. 822, 825-826 (1966); Note, 34 Ford. L. Rev. 740, 745 (1966); Note, 67 Colum. L. Rev. 1529, 1530-1531 (1967); Comment, 19 UCLA L. Rev. 96, 108, 146 (1971); Comment, 63 J. Crim. L., C. & P. S. 41, 48, 50 (1972); Note, 23 Drake L. Rev. 623, 638-639 (1974); Comment, 7 Seton Hall L. Rev. 827, 859-860 (1976).

subject to review before trial as to *sufficiency* without any undue interference [*170] with the dignity of the magistrate's function. Our reluctance today to extend the rule of exclusion beyond instances of deliberate misstatements, and those of reckless disregard, leaves a broad field where the magistrate is the sole protection of a citizen's Fourth Amendment rights, namely, in instances where police have been merely negligent in checking or recording the facts relevant to a probable-cause [****30] determination.

[**2684] Fifth, the claim that a post-search hearing will confuse the issue of the defendant's guilt with the issue of the State's possible misbehavior is footless. The hearing will not be in the presence of the jury. An issue extraneous to guilt already is examined in any probable-cause determination or review of probable cause. Nor, if a sensible threshold showing is required and sensible substantive requirements for suppression are maintained, need there be any new large-scale commitment of judicial resources; many claims will wash out at an early stage, and the more substantial ones in any event would require judicial resources for vindication if the suggested alternative sanctions were truly to be effective. The requirement of a substantial preliminary showing should suffice to prevent the misuse of a veracity hearing for purposes of discovery or obstruction. And because we are faced today with only the question of the integrity of the affiant's representations as to his own activities, we need not decide, and we in no way predetermine, the difficult question whether a reviewing court must ever require the revelation of the identity of an informant once [****31] a substantial preliminary showing of falsity has been made. *McCray* v. *Illinois*, 386 U.S. 300 (1967), the Court's earlier disquisition in this area, concluded only that the Due Process Clause of the Fourteenth Amendment did not require the State to expose an informant's identity routinely, upon a defendant's mere demand, when there was ample evidence in the probable-cause hearing to show that the informant was reliable and his information credible.

Sixth and finally, as to the argument that the exclusionary [*171] rule should not be extended to a "new" area, we cannot regard any such extension really to be at issue here. Despite the deep skepticism of Members of this Court as to the wisdom [***682] of extending the exclusionary rule to collateral areas, such as civil or grand jury proceedings, the Court has not questioned, in the absence of a more efficacious sanction, the continued application of the rule to suppress evidence from the State's case where a Fourth Amendment violation has been substantial and deliberate. See *Brewer* v. *Williams*, 430 U.S. 387, 422 (1977) (BURGER, C. J., dissenting); *Stone* v. *Powell*, 428 U.S., at 538 [****32] (WHITE, J., dissenting). We see no principled basis for distinguishing between the question of the sufficiency of an affidavit, which also is subject to a post-search reexamination, and the question of its integrity.

IV

[9] [10] [11]In sum, and to repeat with some embellishment what we stated at the beginning of this opinion: There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that [****33] of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless [*172] disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. [8] On the other [**2685] hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

[12]Because of Delaware's absolute rule, its courts did not have occasion to consider the proffer put forward by petitioner Franks. Since the framing [****34] of suitable rules to govern proffers is a matter properly left to the States, we decline ourselves to pass on petitioner's

---

[8] Petitioner conceded that if what is left is sufficient to sustain probable cause, the inaccuracies are irrelevant. Tr. of Oral Arg. 3, 13. Petitioner also conceded that if the warrant affiant had no reason to believe the information was false, there was no violation of the Fourth Amendment. *Id*., at 16-17.

proffer. The judgment of the Supreme Court of Delaware is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered*.

APPENDIX A TO OPINION OF THE COURT

J. P. COURT #7

IN THE MATTER OF: Jerome Franks, B/M, DOB: 10/9/54 and 222 S. Governors Ave., Apt. #3, Dover, Delaware. A two room apartment located on the South side, second floor, of a white block building on [***683] the west side of S. Governors Avenue, Between Loockerman Street and North Street, in the City of Dover. The ground floor of this building houses Wayman's Barber Shop.

STATE OF DELAWARE

COUNTY OF KENT ss:

Be it remembered that on this 9th day of March A. D. [*173] 1976 before me John Green, personally appeared Det. Ronald R. Brooks and Det. Larry Gray of the Dover Police Department who being by me duly sworn depose and say:

That they have reason to believe and do believe that in the 222 S. Governors Avenue, Apartment #3, Dover, Delaware. A two room apartment located on the south side second floor of a white block building on [****35] the west side of S. Governors Avenue between Loockerman Street and North Street in the City of Dover. The ground floor of this building houses Wayman's Barber Shop the occupant of which is Jerome Franks there has been and/or there is now located and/or concealed certain property in said house, place, conveyance and/or on the person or persons of the occupants thereof, consisting of property, papers, articles, or things which are the instruments of criminal offense, and/or obtained in the commission of a crime, and/or designated to be used in the commission of a crime, and not reasonably calculated to be used for any other purpose and/or the possession of which is unlawful, papers, articles, or things which are of an evidentiary nature pertaining to the commission of a crime or crimes specified therein and in particular, a white knit thermal undershirt; a brown 3/4 length leather jacket with a tie-belt; a pair of black mens pants; a dark colored knit hat; a long thin bladed knife or other instruments or items relating to the crime.

Articles, or things were, are, or will be possessed and/or used in violation of Title 11, Sub-Chapter D, Section 763, Delaware Code in that [see attached [****36] probable-cause page].

Wherefore, affiants pray that a search warrant may be issued authorizing a search of the aforesaid 222 S. Governors Avenue, Apartment #3, Dover, Delaware. A two room apartment located on the south side second floor of a white block building on the west side of S. Governors Avenue [*174] between Loockerman St. and North Street, in the City of Dover in the manner provided by law.

/s/ Det. Ronald R. Brooks

Affiant

/s/ Det. Larry D. Gray

Affiant

SWORN to (or affirmed) and subscribed before me this 9th day of March A. D. 1976.

/s/ John [illegible] Green

Judge Ct 7

[**2686] The facts tending to establish probable cause for the issuance of this search warrant are:

1. On Saturday, 2/28/76, Brenda L. B. , W/F/15, reported to the Dover Police Department that she had been kidnapped and raped.

2. An investigation of this complaint was conducted by Det. Boyce Failing of the Dover Police Department.

[***684] 3. Investigation of the aforementioned complaint revealed that Brenda B. -- -- -- , while under the influence of drugs, was taken to 222 S. Governors Avenue, Apartment 3, Dover, Delaware.

4. Investigation of the aforementioned complaint revealed that [****37] 222 S. Governors Avenue, Apartment #3, Dover, Delaware, is the residence of Jerome Franks, B/M DOB: 10/9/54.

5. Investigation of the aforementioned complaint revealed that on Saturday, 2/2[8]/76, Jerome Franks did have sexual contact with Brenda B. -- -- -- without her consent.

6. On Thursday, 3/4/76 at the Dover Police Department, Brenda B. -- -- -- revealed to Det. Boyce Failing that Jerome Franks was the person who committed the

Sexual Assault against her.

7. On Friday, 3/5/76, Jerome Franks was placed under [*175] arrest by Cpl. Robert McClements of the Dover Police Department, and charged with Sexual Misconduct.

8. On 3/5/76 at Family Court in Dover, Delaware, Jerome Franks did, after being arrested on the charge of Sexual Misconduct, [make] a statement to Cpl. Robert McClements, that he thought the charge was concerning Cynthia Bailey not Brenda B. -- -- -- .

9. On Friday, 3/5/76, Cynthia C. Bailey, W/F/21 of 132 North Street, Dover, Delaware, did report to Dover Police Department that she had been raped at her residence during the night.

10. Investigation conducted by your affiant on Friday, 3/5/76, revealed the perpetrator of the crime to be an unknown black male, approximately [****38] 5'7', 150 lbs., dark complexion, wearing white thermal undershirt, black pants with a belt having a silver or gold buckle, a brown leather 3/4 length coat with a tie belt in the front, and a dark knit cap pulled around the eyes.

11. Your affiant can state, that during the commission of this crime, Cynthia Bailey was forced at knife point and with the threat of death to engage in sexual intercourse with the perpetrator of the crime.

12. Your affiant can state that entry was gained to the residence of Cynthia Bailey through a window located on the east side of the residence.

13. Your affiant can state that the residence of Jerome Franks is within a very short distance and direct sight of the residence of Cynthia Bailey.

14. Your affiant can state that the description given by Cynthia Bailey of the unknown black male does coincide with the description of Jerome Franks.

15. On Tuesday, 3/9/76, your affiant contacted Mr. James Williams and Mr. Wesley Lucas of the Delaware Youth Center where Jerome Franks is employed and did have personal [***685] conversation with both these people.

[*176] 16. On Tuesday, 3/9/76, Mr. James Williams revealed to your affiant that the normal dress of [****39] Jerome Franks does consist of a white knit thermal undershirt and a brown leather jacket.

17. On Tuesday, 3/9/76, Mr. Wesley Lucas revealed to your affiant that in addition to the thermal undershirt and jacket, Jerome Franks often wears a dark green knit hat.

18. Your affiant can state that a check of official records reveals that in [**2687] 1971 Jerome Franks was arrested for the crime of rape and subsequently convicted with Assault with intent to Rape.

APPENDIX B TO OPINION OF THE COURT

States permitting veracity challenges include:

Alabama: *McConnell* v. *State*, 48 Ala. App. 523, 526-528, 266 So. 2d 328, 330-333 (Crim. App.), cert. denied, 289 Ala. 746, 266 So. 2d 334 (1972).

Alaska: *Davenport* v. *State*, 515 P. 2d 377, 380 (1973).

Arizona: *State* v. *Payne*, 25 Ariz. App. 454, 456, 544 P. 2d 671, 673 (1976); cf. *State* v. *Pike*, 113 Ariz. 511, 513-514, 557 P. 2d 1068, 1070-1071 (1976) (en banc).

Colorado: *People* v. *Arnold*, 186 Colo. 372, 377-378, 527 P. 2d 806, 809 (1974) (en banc).

[****40]

Iowa: *State* v. *Boyd*, 224 N. W. 2d 609, 616 (1974) (en banc).

Louisiana: *State* v. *Melson*, 284 So. 2d 873, 874-875 (1973), limiting *State* v. *Anselmo*, 260 La. 306, 313-322, 256 So. 2d 98, 101-104 (1971), cert. denied, 407 U.S. 911 (1972).

Massachusetts: *Commonwealth* v. *Reynolds*, 374 Mass. 142, 149-151, 370 N. E. 2d 1375, 1379-1380 (1977).

[*177] Minnesota: *State* v. *Luciow*, 308 Minn. 6, 10-13, 240 N. W. 2d 833, 837-838 (1976) (en banc).

Montana: *State* v. *Nanoff*, 160 Mont. 344, 348, 502 P. 2d 1138, 1140 (1972), *sub silentio* overruling *State* v. *English*, 71 Mont. 343, 350, 229 P. 727, 729 (1924).

New Hampshire: *State* v. *Spero*, 177 N. H. 199, 204-205, 371 A. 2d 1155, 1158 (1977) (based on State Constitution).

Pennsylvania: *Commonwealth* v. *Hall*, 451 Pa. 201, 204, 302 A. 2d 342, 344 (1973).

South Carolina: *State* v. *Sachs*, 264 S. C. 541, 556, 216 S. E. 2d 501, 509 (1975).

[****41]

Vermont: *State* v. *Dupaw*, 134 Vt. 451, 452-453, 365 A. 2d 967, 968 (1976).

Washington: *State* v. *Lehman*, 8 Wash. App. 408, 414, 506 P. 2d 1316, 1321 (1973) (Div. 3); *State* v. *Goodlow*, 11 Wash. App. 533, 535, 523 P. 2d 1204, 1206 (1974) (Div. 1); cf. *State* v. *Manly*, 85 Wash. 2d 120, 125, 530 P. 2d 306, 309 (en banc), cert. denied, 423 U.S. 855 (1975).

[***686] Five States, whose practice is dictated or may be dictated by statute, also permit veracity challenges:

California: *Theodor* v. *Superior Court*, 8 Cal. 3d 77, 90, 100-101, 501 P. 2d 234, 243, 251 (1972) (en banc); see Cal. Penal Code Ann. §§ 1538.5, 1539, 1540 (West 1970 and Supp. 1978).

New York: *People* v. *Alfinito*, 16 N. Y. 2d 181, 185-186, 211 N. E. 2d 644, 646 (1965); *People* v. *Slaughter*, 37 N. Y. 2d 596, 600, 338 N. E. 2d 622, 624 (1975); see N. Y. Code Crim. Proc. §§ 813-c, 813-d, 813-e (McKinney [*178] Supp. 1970-1971), superseded by N. Y. Crim. Proc. [****42] Law, Art. 710 (McKinney Supp. 1977-1978).

North Carolina: See N. C. Gen. Stat. § 15A-978 (1978).

Oregon: *State* v. *Wright*, 266 Ore. 163, 168-169, n. 3, 511 P. 2d 1223, 1225-1226, n. 3 (1973) (en banc); see Ore. Rev. Stat. § 133.693 (1977).

Utah: *State* v. *Bankhead*, 30 Utah 2d 135, 138, 514 P. 2d 800, 802 (1973); see Utah Code Ann. §§ 77-54-17, 77-54-18 (1953).

Two other States are more doubtful, but seem to allow veracity challenges:

Michigan: *People* v. *Burt*, 236 Mich. 62, 74, 210 N. W. 97, 101 (1926).

New Mexico: *State* v. *Baca*, 84 N. M. 513, 515, 505 P. 2d 856, 858 (1973) (dictum).

The following States have disposed of particular veracity challenges on the ground the affidavits were in fact not false, or that any misstatements were immaterial or unintentional or were not by the affiant himself:

Florida: *McDougall* v. *State*, 316 So. 2d 624, 625 (Dist. Ct. App. 1975).

Georgia: *Williams* v. *State*, 232 Ga. 213, 213-214, 205 S. E. 2d 859, 860 (1974); *Lee* v. *State*, 239 Ga. 769, 773-774, 238 S. E. 2d 852, 856 (1977); [****43] *Birge* v. *State*, 143 Ga. App. 632, 633, 239 S. E. 2d 395, 397 (1977).

Indiana: *Moore* v. *State*, 159 Ind. App. 381, 385-386, 307 N. E. 2d 92, 94-95 (1974); *Grzesiowski* v. *State*, 168 Ind. App. 318, 328, 343 N. E. 2d 305, 312 (1976); but see *Seager* v. *State*, 200 Ind. 579, 582, 164 N. E. 274, 275 (1928).

[*179] Ohio: *State* v. *Dodson*, 43 Ohio App. 2d 31, 35-36, 332 N. E. 2d 371, 374-375 (1974).

Wisconsin: *Scott* v. *State*, 73 Wis. 2d 504, 511-512, 243 N. W. 2d 215, 219 (1976).

Cf. Maine: *State* v. *Koucoules*, 343 A. 2d 860, 865 n. 3 (1974).

[**2688] Eleven States flatly prohibit veracity challenges:

Arkansas: *Liberto* v. *State*, 248 Ark. 350, 356-357, 451 S. W. 2d 464, 468 (1970) (alternative holding); cf.

*Powell* v. *State*, 260 Ark. 381, 383, 540 S. W. 2d 1, 2 (1976).

Connecticut: *State* v. *Williams*, 169 Conn. 322, 327-329, 363 A. 2d 72, 76-77 (1975).

[****44]

Illinois: *People* v. *Bak*, 45 Ill. 2d 140, 144-146, 258 N. E. 2d 341, 343-344, cert. denied, 400 U.S. 882 (1970); *People* v. *Stansberry*, 47 Ill. 2d 541, 544, 268 N. E. 2d 431, 433, cert. denied, 404 U.S. 873 (1971).

Kansas: *State* v. *Lamb*, 209 Kan. 453, 467-468, 497 P. 2d 275, 287 [***687] (1972); *State* v. *Sanders*, 222 Kan. 189, 194-196, 563 P. 2d 461, 466-467 (alternative holding), cert. denied, 434 U.S. 833 (1977).

Kentucky: *Caslin* v. *Commonwealth*, 491 S. W. 2d 832, 834 (1973).

Maryland: *Smith* v. *State*, 191 Md. 329, 334-336, 62 A. 2d 287, 289-290 (1948), cert. denied, 336 U.S. 925 (1949); *Tucker* v. *State*, 244 Md. 488, 499-500, 224 A. 2d 111, 117-118 (1966), cert. denied, 386 U.S. 1024 (1967); *Dawson* v. *State*, 11 Md. App. 694, 713-715, 276 A. 2d 680, 690-691 (1971).

Mississippi: *Wood* v. *State*, 322 So. 2d 462, 465 (1975).

[****45] [*180] New Jersey: *State* v. *Petillo*, 61 N. J. 165, 173-179, 293 A. 2d 649, 653-656 (1972), cert. denied, 410 U.S. 945 (1973); but see 61 N. J., at 178 n. 1, 293 A. 2d, at 656 n. 1.

Oklahoma: *Brown* v. *State*, 565 P. 2d 697 (Crim. App. 1977), overruling *McCaskey* v. *State*, 534 P. 2d 1309, 1311-1312 (Crim. App. 1975), and *Henderson* v. *State*, 490 P. 2d 786, 789 (Crim. App. 1971), and reaffirming *Gaddis* v. *State*, 447 P. 2d 42 (Crim. App. 1968).

Tennessee: *Owens* v. *State*, 217 Tenn. 544, 553, 399 S. W. 2d 507, 511 (1965); *Poole* v. *State*, 4 Tenn. Crim. 41, 53-54, 467 S. W. 2d 826, 832, cert. denied, *ibid*. (1971).

Texas: *Phoenix* v. *State*, 488 S. W. 2d 759, 765 (Crim. App. 1972); *Oubre* v. *State*, 542 S. W. 2d 875, 877 (Crim. App. 1976).

Two States have prohibited challenges that were directed seemingly against the conclusory nature of the affidavits, rather than their veracity.

Missouri: [****46] *State* v. *Brugioni*, 320 Mo. 202, 206, 7 S. W. 2d 262, 263 (1928).

Rhode Island: *State* v. *Seymour*, 46 R. I. 257, 260, 126 A. 755, 756 (1924), partially overruled, *State* v. *LeBlanc*, 100 R. I. 523, 528-529, 217 A. 2d 471, 474 (1966); but see *State* v. *Cofone*, 112 R. I. 760, 766-767, 315 A. 2d 752, 755-756 (1974).

**Dissent by:** REHNQUIST

## Dissent

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

The Court's opinion in this case carefully identifies the factors which militate against the result which it reaches, and emphasizes their weight in attempting to limit the circumstances [*181] under which an affidavit supporting a search warrant may be impeached. I am not ultimately persuaded, however, that the Court is correct as a matter of constitutional [***688] law that the impeachment of such an affidavit must be permitted under the circumstances described by the Court, and I am thoroughly persuaded that the barriers which the Court believes that it is erecting against misuse of the impeachment process are frail indeed.

I

The Court's reliance [****47] on *Johnson* v. *United States*, 333 U.S. 10 (1948), for the proposition that a determination by a neutral magistrate is a prerequisite to the sufficiency of an application for a warrant is obviously correct. In that case the Court said:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which

reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a [**2689] neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Id.*, at 13-14.

The notion that there may be incorrect or even deliberately falsified information presented to a magistrate in the course of an effort to obtain a search warrant does not render the proceeding before a magistrate any different from any other factfinding procedure known to the law. The Court here says that "it would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, [****48] were to stand beyond impeachment." *Ante*, at 165. I do not believe that this flat statement survives careful analysis.

If the function of the warrant requirement is to obtain the determination of a neutral magistrate as to whether sufficient [*182] grounds have been urged to support the issuance of a warrant, that function is fulfilled at the time the magistrate concludes that the requirement has been met. Like any other determination of a magistrate, of a court, or of countless other factfinding tribunals, the decision may be incorrect as a matter of law. Even if correct, some inaccurate or falsified information may have gone into the making of the determination. But unless we are to exalt as the *ne plus ultra* of our system of criminal justice the absolute correctness of every factual determination made along the tortuous route from the filing of the complaint or the issuance of an indictment to the final determination that a judgment of conviction was properly obtained, we shall lose perspective as to the purposes of the system as well as of the warrant requirement of the Fourth and Fourteenth Amendments. Much of what Mr. Justice Harlan said in his separate opinion [****49] in *Mackey* v. *United States*, 401 U.S. 667 (1971), with respect to collateral relief from a criminal conviction is likewise applicable to collateral impeachment of a search warrant:

"At some point, the criminal process, if it is to function at all, must turn its attention from whether a man ought properly to be incarcerated to how he is to be treated once convicted. If law, criminal or [***689] otherwise, is worth having and enforcing, it must at some time provide a definitive answer to the questions litigants present or else it never provides an answer at all. Surely it is an unpleasant task to strip a man of his freedom and subject him to institutional restraints. But this does not mean that in so doing, we should always be halting or tentative. No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved.

[*183] "A rule of law that fails to take account of these finality interests would do more than subvert the criminal [****50] process itself. It would also seriously distort the very limited resources society has allocated to the criminal process. While men languish in jail, not uncommonly for over a year, awaiting a first trial on their guilt or innocence, it is not easy to justify expending substantial quantities of the time and energies of judges, prosecutors, and defense lawyers litigating the validity under present law of criminal convictions that were perfectly free from error when made final. [Citation omitted.] This drain on society's resources is compounded by the fact that issuance of the habeas writ compels a State that wishes to continue enforcing its laws against the successful petitioner to relitigate facts buried in the remote past through presentation of witnesses whose memories of the relevant events often have dimmed. This very act of trying stale facts may well, ironically, produce a second trial no more reliable as a matter of getting at the truth than the first." *Id.*, at 690-691.

[**2690] I am quite confident that if our system of justice were not administered by judges who were once lawyers, it might well be less satisfactory than it now is. But I am equally [****51] confident that one improvement which would manifest itself as a result of such a change would be a willingness, reflected in almost all callings in our society except lawyers, to refrain from constant relitigation, whether in the form of collateral attack, appeal, retrial, or whatever, of issues that have originally been decided by a competent authority.

It would be extraordinarily troubling in any system of criminal justice if a verdict or finding of guilt, later conclusively shown to be based on false testimony, were to result in the incarceration of the accused notwithstanding this fact. But the Court's reference to the "unthinkable imposition" of not allowing the impeachment of an affiant's testimony in support [*184] of a search warrant is a horse of quite another color. Particularly in view of the many hurdles which the prosecution must surmount to ultimately obtain and retain a finding of guilt in the light of the many

constitutional safeguards which surround a criminal accused, it is essential to understand the role of a search warrant in the process which may lead to the conviction of such an accused. The warrant issued on impeachable testimony has, by hypothesis, [****52] turned up incriminating and admissible evidence [***690] to be considered by the jury at the trial. The fact that it was obtained by reason of an impeachable warrant bears not at all on the innocence or guilt of the accused. The only conceivable harm done by such evidence is to the accused's rights under the Fourth and Fourteenth Amendments, which have nothing to do with his guilt or innocence of the crime with which he is charged.

Given the definitive exposition of the warrant requirement quoted above from *Johnson* v. *United States*, 333 U.S., at 13-14, it seems to me it would be quite reasonable for this Court, consistently with the Fourth and Fourteenth Amendments, to adopt any one of three positions with respect to the impeachability of a search warrant which had been in fact issued by a neutral magistrate who satisfied the requirements of *Shadwick* v. *Tampa*, 407 U.S. 345 (1972).

First, it could decide that the warrant requirement was satisfied when such a magistrate had been persuaded, and allow no further collateral attack on the warrant. In *Aguilar* v. *Texas*, 378 U.S. 108 (1964), the Court in reliance [****53] on *Giordenello* v. *United States*, 357 U.S. 480 (1958), a case concededly decided pursuant to Fed. Rule Crim. Proc. 4, nonetheless held that the determination by a magistrate that the affidavit submitted to him made out "probable cause" for purposes of the Fourth and Fourteenth Amendments was subject to later judicial review as to the sufficiency of the affidavit. This rule was later reaffirmed in *Spinelli* v. *United States*, 393 U.S. 410 (1969). The Court has thus for more than a decade [*185] rejected the first possible stopping place in judicial re-examination of affidavits in support of warrants, and held that the legal determination as to probable cause was subject to collateral attack. While this conclusion does not seem to me to flow inexorably from the Fourth Amendment, I think that it makes a good deal of sense in light of the fact that a magistrate need not be a trained lawyer, see *Shadwick, supra*, and therefore may not be versed in the latest nuances of what is or what is not "probable cause" for purposes of the Fourth Amendment.

But to allow collateral examination of an affidavit in support of a warrant [****54] on a legal ground such as that is quite different from the rejection of the second possible stopping place as the Court does today. Magistrates need not be lawyers, but lawyers have no monopoly on determining whether or not an affiant who appears before them is or is not telling the truth. Indeed, a magistrate whose time may be principally spent in conducting preliminary hearings and trying petty offenses may have every bit as good a feel for the veracity of a particular witness as a judge of a court of general jurisdiction.

[**2691] True, a warrant is issued *ex parte*, without an opportunity for the person whose effects are to be seized to impeach the testimony of the affiant. The proceeding leading to the issuance of a warrant is, therefore, obviously less reliable and less likely to be a searching inquiry into the truth of the affiant's statements than is a full-dress adversary proceeding. But it is at this point that I part company with the Court in its underlying [***691] assumption that somehow a full-dress adversary proceeding will virtually guarantee a truthful answer to the question of whether or not the affiant seeking the warrant falsified his testimony. A [****55] full-dress adversary proceeding is undoubtedly a better vehicle than an *ex parte* proceeding for arriving at the truth of any particular inquiry, but it is scarcely a guarantee of truth. Mr. Justice Jackson in his [*186] opinion concurring in the result in *Brown* v. *Allen*, 344 U.S. 443 (1953), observed with respect to purely legal issues decided by this Court:

"However, reversal by a higher court is not proof that justice is thereby better done. There is no doubt that if there were a super-Supreme Court, a substantial proportion of our reversals of state courts would also be reversed. We are not final because we are infallible, but we are infallible only because we are final." *Id*., at 540.

The same is surely true of a judge's review of the factual determinations of a magistrate; a larger percentage of the judge's findings as to the truth of an affiant's statement may be objectively correct than the percentage of the magistrate's determinations which are, but neither one is going to be 100 percent. Since once the warrant is issued and the search is made, the privacy interest protected by the Fourth and Fourteenth Amendments is [****56] breached, a subsequent determination that it was wrongfully breached cannot possibly restore the privacy interest. See *United States* v. *Calandra*, 414 U.S. 338 (1974). Since the evidence obtained pursuant to the warrant is by hypothesis

relevant and admissible on the issue of guilt, the only purpose served by suppression of such evidence is deterrence of falsified testimony on the part of affiant in the future. Without attempting to summarize the many cases in which this Court has discussed the balance to be struck in such situations, see *United States* v. *Peltier*, 422 U.S. 531 (1975), I simply do not think the game is worth the candle in this situation.

As the Court's opinion points out, the other jurisdictions which have considered this question are divided, although a majority of them favor the result reached by the Court today. The signed articles and student law review notes which the Court refers to in its opinion are not there, I trust, to be considered *en bloc* or by some process of counting without weighing. Presumably, to the extent that their reasoning [*187] commends itself to the courts which are committed to [****57] decide these questions, that reasoning will find its way into the opinions of those courts; to the extent that the reasoning does not so commend itself, the piece containing the reasoning does not weigh in the scales of decision simply because it appeared in a periodical devoted to the discussion of legal questions.

II

The Court has commendably, in my opinion, surrounded the right to impeach the affidavit relied upon to support the issuance of a warrant with numerous limitations. My fear, and I do not think it an unjustified one, is that these limitations will quickly be subverted in actual practice. The Court states:

" [***692] Nor, if a sensible threshold showing is required and sensible substantive requirements for suppression are maintained, need there be any new large-scale commitment of judicial resources; many claims will wash out at an early stage, and the more substantial ones in any event would require judicial resources for vindication if the suggested alternative sanctions were truly to be effective. The [**2692] requirement of a substantial preliminary showing should suffice to prevent the misuse of a veracity hearing for purposes of discovery or obstruction." [****58] *Ante*, at 170.

I greatly fear that this generalized language will afford insufficient protection against the natural tendency of ingenious lawyers charged with representing their client's cause to ceaselessly undermine the limitations which the Court has placed on impeachment of the affidavit offered in support of a search warrant. I am sure that the Court is sincere in its expressed hope that the doctrine which it adopts will not lead to "any new large-scale commitment of judicial resources," but in the end I am led once more to echo the [*188] observation contained in another opinion of Mr. Justice Jackson:

"The case which irresistibly comes to mind as the most fitting precedent is that of Julia who, according to Byron's reports, 'whispering "I will ne'er consent," -- consented.'" *Everson* v. *Board of Education*, 330 U.S. 1, 19 (1947) (dissenting opinion).

Since I would not "consent" even to the extent that the Court does in its opinion, I dissent from that opinion and would affirm the judgment of the Supreme Court of Delaware.

## References

68 Am Jur 2d, Searches and Seizures 66

7 Federal Procedural Forms [****59] L Ed, Criminal Procedure, 20:581 et seq.

22 Am Jur Pl & Pr Forms (Rev), Searches and Seizures, Forms 41 et seq.

5 Am Jur Trials 331, Excluding Illegally Obtained Evidence

USCS, Constitution, Fourth and Fourteenth Amendments

US L Ed Digest, Search and Seizure 27

ALR Digests, Search and Seizure 9

L Ed Index to Annos, Search and Seizure

ALR Quick Index, Search and Seizure

Federal Quick Index, Search and Seizure

Annotation References:

Supreme Court cases determining whether admission of evidence at criminal trial in violation of federal constitutional rule is prejudicial error or harmless error. 31 L Ed 2d 921.

Admissibility of evidence obtained by illegal search and seizure . 50 ALR2d 531; 93 L Ed 1797, 96 L Ed 145, 98 L Ed 581, 100 L Ed 239, 6 L Ed 2d 1544.

Propriety of considering hearsay or other incompetent evidence in establishing probable cause for issuance of search warrant. 10 ALR3d 359.

Sufficiency of affidavit for search warrant based on

affiant's belief, based in turn on information, investigation, etc., by one whose name is not [****60] disclosed. 14 ALR2d 605.

Search warrants: disputing matters stated in supporting affidavit. 5 ALR2d 394.

---

End of Document

# United States v. Leon

468 U.S. 897 (1984)

Cited in Opening Brief at: 33

Highlighted language appears at 468 U.S. at 923.

Caution
As of: September 14, 2026 7:04 PM Z

# United States v. Leon

Supreme Court of the United States

January 17, 1984, Argued ; July 5, 1984, Decided

No. 82-1771

**Reporter**
468 U.S. 897 *; 104 S. Ct. 3405 **; 82 L. Ed. 2d 677 ***; 1984 U.S. LEXIS 153 ****; 52 U.S.L.W. 5155

UNITED STATES v. LEON ET AL.

**Subsequent History:** [****1] Petition for Rehearing Denied September 18, 1984

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** 701 F.2d 187, reversed.

## Syllabus

Acting on the basis of information from a confidential informant, officers of the Burbank, Cal., Police Department initiated a drug-trafficking investigation involving surveillance of respondents' activities. Based on an affidavit summarizing the police officers' observations, Officer Rombach prepared an application for a warrant to search three residences and respondents' automobiles for an extensive list of items. The application was reviewed by several Deputy District Attorneys, and a facially valid search warrant was issued by a state-court judge. Ensuing searches produced large quantities of drugs and other evidence. Respondents were indicted for federal drug offenses, and filed motions to suppress the evidence seized pursuant to the warrant. After an evidentiary hearing, the District Court granted [****2] the motions in part, concluding that the affidavit was insufficient to establish probable cause. Although recognizing that Officer Rombach had acted in good faith, the court rejected the Government's suggestion that the Fourth Amendment exclusionary rule should not apply where evidence is seized in reasonable, good-faith reliance on a search warrant. The Court of Appeals affirmed, also refusing the Government's invitation to recognize a good-faith exception to the rule. The Government's petition for certiorari presented only the question whether a good-faith exception to the exclusionary rule should be recognized.

*Held*:

1. The Fourth Amendment exclusionary rule should not be applied so as to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid. Pp. 905-925.

(a) An examination of the Fourth Amendment's origin and purposes makes clear that the use of fruits of a past unlawful search or seizure works no new Fourth Amendment wrong. The question whether the exclusionary sanction is appropriately imposed in a particular case [****3] as a judicially created remedy to safeguard Fourth Amendment rights through its deterrent effect, must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence. Indiscriminate application of the exclusionary rule -- impeding the criminal justice system's truth-finding function and allowing some guilty defendants to go free -- may well generate disrespect for the law and the administration of justice. Pp. 906-908.

(b) Application of the exclusionary rule should continue where a Fourth Amendment violation has been substantial and deliberate, but the balancing approach that has evolved in determining whether the rule should be applied in a variety of contexts -- including criminal trials -- suggests that the rule should be modified to permit the introduction of evidence obtained by officers reasonably relying on a warrant issued by a detached and neutral magistrate. Pp. 908-913.

(c) The deference accorded to a magistrate's finding of probable cause for the issuance of a warrant does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based, [****4] and the courts must also insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubber stamp for the

police. Moreover, reviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause. However, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Admitting evidence obtained pursuant to a warrant while at the same time declaring that the warrant was somehow defective will not reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests. Pp. 913-917.

(d) Even assuming that the exclusionary rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity. In the ordinary case, an officer cannot be expected to question the [****5] magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law, and penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations. Pp. 918-921.

(e) A police officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable. Suppression remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth, or if the issuing magistrate wholly abandoned his detached and neutral judicial role. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient [****6] -- *i. e.*, in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid. Pp. 922-925.

2. In view of the modification of the exclusionary rule, the Court of Appeals' judgment cannot stand in this case. Only respondent Leon contended that no reasonably well trained police officer could have believed that there existed probable cause to search his house. However, the record establishes that the police officers' reliance on the state-court judge's determination of probable cause was objectively reasonable. Pp. 925-926.

**Counsel:** Solicitor General Lee argued the cause for the United States. With him on the briefs were Assistant Attorney General Trott, Deputy Solicitor General Frey, Kathryn A. Oberly, and Robert J. Erickson.

Barry Tarlow argued the cause for respondent Leon. With him on the brief were Norman Kaplan and Thomas V. Johnston. Roger L. Cossack argued the cause for respondents Stewart et al. With him on the brief was Jay L. Lichtman. *

---

* Briefs of amici curiae urging reversal were filed for the State of California by John K. Van De Kamp, Attorney General, William D. Stein, Chief Assistant Attorney General, and Clifford K. Thompson, Jr., Deputy Attorney General; for the State of Kansas et al. by Wilkes C. Robinson, Dan M. Peterson, Robert T. Stephan, Attorney General of Kansas, John D. Ashcroft, Attorney General of Missouri, Mark V. Meierhenry, Attorney General of South Dakota, and Bronson C. La Follette, Attorney General of Wisconsin; for the Criminal Justice Legal Foundation by Christopher N. Heard; for the National District Attorneys Association, Inc., by Newman A. Flanagan, Austin J. McGuigan, John M. Massameno, Edwin L. Miller, Jr., Jack E. Yelverton, and James P. Manak; and for Seven Former Members of the Attorney General's Task Force on Violent Crime et al. by David L. Crump, Frank G. Carrington, Griffin B. Bell, Wayne W. Schmidt, James P. Manak, Fred E. Inbau, Rufus L. Edmisten, Attorney General of North Carolina, and David S. Crump, Deputy Attorney General.

Briefs of amici curiae urging affirmance were filed for the Bar Association of San Francisco et al. by James J. Brosnahan; for the Arkansas Trial Lawyers Association et al. by John Wesley Hall, Jr.; for the Association of Trial Lawyers of America by Sidney Bernstein; and for the Texas Criminal Defense Lawyers Association et al. by Gerald H. Goldstein and Marvin Miller.

Briefs of amici curiae were filed for the Committee on Criminal Law of the Association of the Bar of the City of New York by Peter L. Zimroth and Barbara D. Underwood; for the Illinois State Bar Association by Michael J. Costello, Albert Hofeld, William J. Martin, and Joshua Sachs; for the Minnesota State Bar Association by Ronald L. Seeger, Steven H. Goldberg, and Bruce H. Hanley; for the National Association of Criminal Defense Lawyers et al. by Marshall W. Krause, Steffan B. Imhoff, and Charles Scott Spear; for the National Association for the Advancement of Colored People et al. by Steven P. Lockman, John M. Campbell, and Thomas I. Atkins; for the

[****7]

**Judges:** WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a concurring opinion, post, p. 927. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, post, p. 928. STEVENS, J., filed a dissenting opinion, post, p. 960.

**Opinion by:** WHITE

# Opinion

[*900] [***684] [**3409] JUSTICE **WHITE** delivered the opinion of the Court.

[1A]This case presents the question whether the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. To resolve this question, we must consider once again the tension between the sometimes competing goals of, on the one hand, deterring official misconduct and removing inducements to unreasonable invasions of privacy and, on the other, establishing procedures under which criminal defendants are "acquitted [*901] or convicted [****8] on the basis of all the evidence which exposes the truth." *Alderman* v. *United States*, 394 U.S. 165, 175 (1969).

I

In August 1981, a confidential informant of unproven reliability informed an officer of the Burbank Police Department that two persons known to him as "Armando" and "Patsy" were selling large quantities of cocaine and methaqualone from their residence at 620 Price Drive in Burbank, Cal. The informant also indicated that he had witnessed a sale of methaqualone by "Patsy" at the residence approximately five months earlier and had observed at that time a shoebox containing a large amount of cash that belonged to "Patsy." He further declared that "Armando" and "Patsy" generally kept only small quantities of drugs at their residence and stored the remainder at another location in Burbank.

On the basis of this information, the Burbank police initiated an extensive investigation focusing first on the Price Drive residence and later on two other residences as well. Cars parked at the Price Drive residence were determined to belong to respondents Armando Sanchez, who had previously been arrested for possession of marihuana, and Patsy Stewart, who had [****9] no criminal record. During the course of the investigation, officers observed an automobile belonging to respondent Ricardo Del Castillo, who had previously been arrested for possession of 50 pounds of marihuana, arrive at the Price Drive residence. The driver of that car entered the house, exited shortly thereafter carrying a small paper sack, and drove away. A check of Del Castillo's probation records led the officers to respondent Alberto Leon, whose telephone number Del Castillo had listed as his employer's. Leon had been arrested in 1980 on drug charges, and a companion had informed the police at that time that Leon was heavily involved in the importation of drugs into this country. Before the current investigation began, the Burbank officers had [*902] learned that an informant had told a Glendale police officer that Leon stored a large quantity of methaqualone at his residence in Glendale. During the course of this investigation, the Burbank officers learned that Leon was living at 716 South Sunset Canyon in Burbank.

Subsequently, the officers observed [***685] several persons, at least one of whom had prior drug involvement, arriving at the Price Drive residence [****10] and leaving with small packages; observed a variety of other material activity at the two residences as well as at a condominium at 7902 Via Magdalena; and witnessed a variety of relevant activity involving respondents' automobiles. The officers also observed respondents Sanchez and Stewart board separate flights for Miami. The pair later returned to Los Angeles together, consented to a search of their luggage that revealed only a small amount of marihuana, and left the airport. Based on these and other observations summarized in the affidavit, App. 34, Officer Cyril Rombach of the Burbank Police Department, an experienced and well-trained narcotics investigator, prepared an application for a warrant to search 620 Price Drive, 716 South Sunset Canyon, 7902 Via Magdalena, and automobiles registered [**3410] to each of the respondents for an extensive list of items believed to be related to respondents' drug-

National Legal Aid and Defender Association by Kenneth M. Mogill; and for Dan Johnston, County Attorney, Polk County, Iowa, by Mr. Johnston, pro se.

trafficking activities. Officer Rombach's extensive application was reviewed by several Deputy District Attorneys.

A facially valid search warrant was issued in September 1981 by a State Superior Court Judge. The ensuing searches produced large quantities of drugs at the [****11] Via Magdalena and Sunset Canyon addresses and a small quantity at the Price Drive residence. Other evidence was discovered at each of the residences and in Stewart's and Del Castillo's automobiles. Respondents were indicted by a grand jury in the District Court for the Central District of California and charged with conspiracy to possess and distribute cocaine and a variety of substantive counts.

[*903] The respondents then filed motions to suppress the evidence seized pursuant to the warrant. [1] The District Court held an evidentiary hearing and, while recognizing that the case was a close one, see *id*., at 131, granted the motions to suppress in part. It concluded that the affidavit was insufficient to establish probable cause, [2] [****13] but did not suppress all of the evidence as to all of the respondents because none of the respondents had standing to challenge all [***686] of the searches. [3] In [*904] response to a request from the Government, the court made clear that Officer Rombach had acted in good faith, but it rejected the Government's suggestion that the Fourth Amendment exclusionary rule should not apply where evidence is seized in reasonable, good-faith [****12] reliance on a search warrant. [4]

[****14] The District Court denied the Government's motion for reconsideration, *id*., at 147, and a divided panel of the Court of Appeals for the Ninth Circuit affirmed, judgt. order reported at 701 F.2d 187 (1983). The Court of Appeals first concluded that Officer Rombach's affidavit could not establish probable cause to search the Price Drive residence. To the extent that the affidavit set forth facts demonstrating the basis of the informant's knowledge of criminal activity, the information included was fatally stale. The affidavit, moreover, failed to establish the informant's credibility. [**3411] Accordingly, the Court of Appeals concluded that the information provided by the informant was inadequate under both prongs of the two-part test established in *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969). [5]

---

[1] Respondent Leon moved to suppress the evidence found on his person at the time of his arrest and the evidence seized from his residence at 716 South Sunset Canyon. Respondent Stewart's motion covered the fruits of searches of her residence at 620 Price Drive and the condominium at 7902 Via Magdalena and statements she made during the search of her residence. Respondent Sanchez sought to suppress the evidence discovered during the search of his residence at 620 Price Drive and statements he made shortly thereafter. He also joined Stewart's motion to suppress evidence seized from the condominium. Respondent Del Castillo apparently sought to suppress all of the evidence seized in the searches. App. 78-80. The respondents also moved to suppress evidence seized in the searches of their automobiles.

[2] "I just cannot find this warrant sufficient for a showing of probable cause.

. . . .

"There is no question of the reliability and credibility of the informant as not being established.

"Some details given tended to corroborate, maybe, the reliability of [the informant's] information about the previous transaction, but if it is not a stale transaction, it comes awfully close to it; and all the other material I think is as consistent with innocence as it is with guilt.

. . . .

"So I just do not think this affidavit can withstand the test. I find, then, that there is no probable cause in this case for the issuance of the search warrant. . . ." *Id*., at 127.

[3] The District Court concluded that Sanchez and Stewart had standing to challenge the search of 620 Price Drive; that Leon had standing to contest the legality of the search of 716 South Sunset Canyon; that none of the respondents had established a legitimate expectation of privacy in the condominium at 7902 Via Magdalena; and that Stewart and Del Castillo each had standing to challenge the searches of their automobiles. The Government indicated that it did not intend to introduce evidence seized from the other respondents' vehicles. *Id*., at 127-129. Finally, the court suppressed statements given by Sanchez and Stewart. *Id*., at 129-130.

[4] "On the issue of good faith, obviously that is not the law of the Circuit, and I am not going to apply that law.

"I will say certainly in my view, there is not any question about good faith. [Officer Rombach] went to a Superior Court judge and got a warrant; obviously laid a meticulous trail. Had surveilled for a long period of time, and I believe his testimony -- and I think he said he consulted with three Deputy District Attorneys before proceeding himself, and I certainly have no doubt about the fact that that is true." *Id*., at 140.

[5] In *Illinois* v. *Gates*, 462 U.S. 213 (1983), decided last Term, the Court abandoned the two-pronged *Aguilar-Spinelli* test for determining whether an informant's tip suffices to establish probable cause for the issuance of a warrant and substituted

The officers' independent investigation neither cured the staleness nor corroborated the details of the informant's declarations. The Court of Appeals then considered whether the affidavit formed a proper basis for the [*905] search of the Sunset Canyon residence. In [****15] its view, the affidavit included no facts indicating the basis for the informants' statements concerning respondent Leon's criminal activities and was devoid of information establishing the informants' reliability. Because these deficiencies had not been cured by the police investigation, the District Court properly suppressed the fruits of the search. The Court of Appeals refused the Government's invitation to recognize a good-faith exception to the Fourth Amendment exclusionary rule. App. to Pet. for Cert. 4a.

[2]The Government's petition for certiorari expressly declined to seek review of the lower courts' [****16] determinations that the search warrant was unsupported by probable cause and presented only the question "[whether] the Fourth Amendment exclusionary rule should be modified [***687] so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." We granted certiorari to consider the propriety of such a modification. 463 U.S. 1206 (1983). Although it undoubtedly is within our power to consider the question whether probable cause existed under the "totality of the circumstances" test announced last Term in *Illinois* v. *Gates*, 462 U.S. 213 (1983), that question has not been briefed or argued; and it is also within our authority, which we choose to exercise, to take the case as it comes to us, accepting the Court of Appeals' conclusion that probable cause was lacking under the prevailing legal standards. See this Court's Rule 21.1(a).

We have concluded that, in the Fourth Amendment context, the exclusionary rule can be modified somewhat without jeopardizing its ability to perform its intended functions. Accordingly, we reverse the judgment of the Court of Appeals.

[****17] II

[3]Language in opinions of this Court and of individual Justices has sometimes implied that the exclusionary rule is a necessary corollary of the Fourth Amendment, *Mapp* v. [*906] *Ohio*, 367 U.S. 643, 651, 655-657 (1961);*Olmstead* v. *United States*, 277 U.S. 438, 462-463 (1928), or that the rule is required by the conjunction of the Fourth and Fifth Amendments. *Mapp* v. *Ohio, supra*, at 661-662 (Black, J., concurring); *Agnello* v. *United States*, 269 U.S. 20, 33-34 (1925). These implications need not detain us long. The Fifth Amendment theory has not withstood critical analysis or the test of time, see *Andresen* v. *Maryland*, 427 U.S. 463 (1976), and the Fourth Amendment "has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons." *Stone* v. *Powell*, 428 U.S. 465, 486 (1976).

A

[4] [****18] The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure "[works] no new Fourth Amendment wrong." *United States* v. *Calandra*, 414 U.S. 338, 354 (1974). The wrong condemned by the Amendment is "fully accomplished" by the unlawful search or seizure itself, *ibid*., and [**3412] the exclusionary rule is neither intended nor able to "cure the invasion of the defendant's rights which he has already suffered." *Stone* v. *Powell, supra*, at 540 (WHITE, J., dissenting). The rule thus operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States* v. *Calandra, supra*, [***688] at 348.

Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is "an issue [****19] separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Illinois* v. *Gates, supra*, at 223. Only the former question is currently before us, and it must [*907] be resolved by weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective.

The substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights have long been a source of concern. "Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of

in its place a "totality of the circumstances" approach.

governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." *United States* v. *Payner*, 447 U.S. 727, 734 (1980). An objectionable collateral consequence of this interference with the criminal justice system's truth-finding function is that some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains. [****20] [6] Particularly [*908] when law enforcement [***689] officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system. *Stone* v. *Powell*, 428 U.S., at 490. Indiscriminate application of the exclusionary rule, therefore, may well "[generate] disrespect for the law and administration of justice." *Id*., at 491. Accordingly, "[as] with [**3413] any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States* v. *Calandra, supra*, at 348; see *Stone* v. *Powell, supra*, at 486-487; *United States* v. *Janis*, 428 U.S. 433, 447 (1976).

[****21] B

Close attention to those remedial objectives has characterized our recent decisions concerning the scope of the Fourth Amendment exclusionary rule. The Court has, to be sure, not seriously questioned, "in the absence of a more efficacious sanction, the continued application of the rule to suppress evidence [*909] from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate. . . ." *Franks* v. *Delaware*, 438 U.S. 154, 171 (1978); *Stone* v. *Powell, supra*, at 492. Nevertheless, the balancing approach that has evolved in various contexts -- including criminal trials -- "forcefully [suggests] that the exclusionary rule be more generally modified to permit the introduction of evidence obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." *Illinois* v. *Gates*, 462 U.S., at 255 (WHITE, J., concurring in judgment).

In *Stone* v. *Powell, supra*, the Court emphasized the costs of the exclusionary rule, expressed its [****22] view that limiting the circumstances under which Fourth Amendment claims could be raised in federal habeas corpus proceedings would not reduce the rule's deterrent effect, *id*., at 489-495, and held that a state prisoner who has been afforded a full and fair opportunity to litigate a Fourth Amendment claim may not obtain federal habeas relief on the ground that unlawfully obtained evidence had been introduced at his trial. Cf. *Rose* v. *Mitchell*, 443 U.S. 545, 560-563 (1979). Proposed extensions of the exclusionary rule to proceedings other than the criminal trial itself have been evaluated and rejected under the same analytic approach. In *United States* v. *Calandra*, for example,

---

[6] Researchers have only recently begun to study extensively the effects of the exclusionary rule on the disposition of felony arrests. One study suggests that the rule results in the nonprosecution or nonconviction of between 0.6% and 2.35% of individuals arrested for felonies. Davies, A Hard Look at What We Know (and Still Need to Learn) About the "Costs" of the Exclusionary Rule: The NIJ Study and Other Studies of "Lost" Arrests, 1983 A. B. F. Res. J. 611, 621. The estimates are higher for particular crimes the prosecution of which depends heavily on physical evidence. Thus, the cumulative loss due to nonprosecution or nonconviction of individuals arrested on felony drug charges is probably in the range of 2.8% to 7.1%. *Id*., at 680. Davies' analysis of California data suggests that screening by police and prosecutors results in the release because of illegal searches or seizures of as many as 1.4% of all felony arrestees, *id*., at 650, that 0.9% of felony arrestees are released, because of illegal searches or seizures, at the preliminary hearing or after trial, *id*., at 653, and that roughly 0.05% of all felony arrestees benefit from reversals on appeal because of illegal searches. *Id*., at 654. See also K. Brosi, A Cross-City Comparison of Felony Case Processing 16, 18-19 (1979); U.S. General Accounting Office, Report of the Comptroller General of the United States, Impact of the Exclusionary Rule on Federal Criminal Prosecutions 10-11, 14 (1979); F. Feeney, F. Dill, & A. Weir, Arrests Without Convictions: How Often They Occur and Why 203-206 (National Institute of Justice 1983); National Institute of Justice, The Effects of the Exclusionary Rule: A Study in California 1-2 (1982); Nardulli, The Societal Cost of the Exclusionary Rule: An Empirical Assessment, 1983 A. B. F. Res. J. 585, 600. The exclusionary rule also has been found to affect the plea-bargaining process. S. Schlesinger, Exclusionary Injustice: The Problem of Illegally Obtained Evidence 63 (1977). But see Davies, *supra*, at 668-669; Nardulli, *supra*, at 604-606.

Many of these researchers have concluded that the impact of the exclusionary rule is insubstantial, but the small percentages with which they deal mask a large absolute number of felons who are released because the cases against them were based in part on illegal searches or seizures. "[Any] rule of evidence that denies the jury access to clearly probative and reliable evidence must bear a heavy burden of justification, and must be carefully limited to the circumstances in which it will pay its way by deterring official unlawlessness." *Illinois* v. *Gates*, 462 U.S., at 257-258 (WHITE, J., concurring in judgment). Because we find that the rule can have no substantial deterrent effect in the sorts of situations under consideration in this case, see *infra*, at 916-921, we conclude that it cannot pay its way in those situations.

we declined to allow grand jury witnesses to refuse to answer questions based on evidence obtained from an unlawful search or seizure since "[any] incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best." 414 U.S., at 348. [***690] Similarly, in *United States* v. *Janis, supra*, we permitted the use in federal civil proceedings of evidence illegally seized by [****23] state officials since the likelihood of deterring police misconduct through such an extension of the exclusionary rule was insufficient to outweigh its substantial social costs. In so doing, we declared that, "[if] . . . the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is unwarranted." *Id.*, at 454.

[*910] [5]As cases considering the use of unlawfully obtained evidence in criminal trials themselves make clear, it does not follow from the emphasis on the exclusionary rule's deterrent value that "anything which deters illegal searches is thereby commanded by the Fourth Amendment." *Alderman* v. *United States*, 394 U.S., at 174. In determining whether persons aggrieved solely by the introduction of damaging evidence unlawfully obtained from their co-conspirators or codefendants could seek suppression, for example, we found that the additional benefits of such an extension of the exclusionary rule would not outweigh its costs. *Id.*, at 174-175. Standing to invoke the rule has thus been [****24] limited to cases in which the prosecution seeks to use the fruits of an illegal search or seizure against the victim of police misconduct. *Rakas* v. *Illinois*, 439 U.S. 128 (1978); *Brown* v. *United States*, 411 U.S. 223 (1973); *Wong Sun* v. *United States*, 371 U.S. 471, 491-492 (1963). Cf. *United States* v. *Payner*, 447 U.S. 727 (1980).

[6][7]Even defendants with standing to challenge the introduction in their criminal [**3414] trials of unlawfully obtained evidence cannot prevent every conceivable use of such evidence. Evidence obtained in violation of the Fourth Amendment and inadmissible in the prosecution's case in chief may be used to impeach a defendant's direct testimony. *Walder* v. *United States*, 347 U.S. 62 (1954). See also *Oregon* v. *Hass*, 420 U.S. 714 (1975); *Harris* v. *New York*, 401 U.S. 222 (1971). [****25] A similar assessment of the "incremental furthering" of the ends of the exclusionary rule led us to conclude in *United States* v. *Havens*, 446 U.S. 620, 627 (1980), that evidence inadmissible in the prosecution's case in chief or otherwise as substantive evidence of guilt may be used to impeach statements made by a defendant in response to "proper cross-examination reasonably suggested by the defendant's direct examination." *Id.*, at 627-628.

[8]When considering the use of evidence obtained in violation of the Fourth Amendment in the prosecution's case in chief, moreover, we have declined to adopt a *per se* or "but for" rule [*911] that would render inadmissible any evidence that came to light through a chain of causation that began with an illegal arrest. *Brown* v. *Illinois*, 422 U.S. 590 (1975); *Wong Sun* v. *United States, supra*, at 487-488. We also have held that a witness' testimony may be admitted even when his identity was [****26] discovered in [***691] an unconstitutional search. *United States* v. *Ceccolini*, 435 U.S. 268 (1978). The perception underlying these decisions -- that the connection between police misconduct and evidence of crime may be sufficiently attenuated to permit the use of that evidence at trial -- is a product of considerations relating to the exclusionary rule and the constitutional principles it is designed to protect. *Dunaway* v. *New York*, 442 U.S. 200, 217-218 (1979); *United States* v. *Ceccolini, supra*, at 279. [7] In short, the "dissipation of the taint" concept that the Court has applied in deciding whether exclusion is appropriate in a particular case "attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Brown* v. *Illinois, supra*, at 609 (POWELL, J., concurring in part). Not surprisingly in view of this purpose, an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus. *Dunaway* v. *New York, supra*, at 218; [****27] *Brown* v. *Illinois, supra*, at 603-604.

The same attention to the purposes underlying the exclusionary rule also has characterized decisions not involving the scope of the rule itself. We have not

[7] "*Brown*'s focus on 'the causal connection between the illegality and the confession' reflected the two policies behind the use of the exclusionary rule to effectuate the Fourth Amendment. Where there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts." *Dunaway* v. *New York*, 442 U.S., at 217-218 (citation omitted).

required suppression of the fruits of a search incident to an arrest made in good-faith reliance on a substantive criminal statute that subsequently [*912] is declared unconstitutional. *Michigan* v. *DeFillippo*, 443 U.S. 31 (1979). [****28] [8] [****29] Similarly, although the Court has been unwilling to conclude that new Fourth Amendment principles are always to have only prospective effect, *United States* v. [**3415] *Johnson*, 457 U.S. 537, 560 (1982), [9] no [***692] Fourth Amendment decision marking a "clear break with the past" has been applied retroactively. See *United States* v. *Peltier*, 422 U.S. 531 (1975); *Desist* v. *United States*, 394 U.S. 244 (1969); *Linkletter* v. *Walker*, 381 U.S. 618 (1965). [10] The propriety [*913] of retroactive application of a newly announced Fourth Amendment principle, moreover, has been assessed largely in terms of the contribution retroactivity might make to the deterrence of police misconduct. *United States* v. *Johnson, supra*, at 560-561; *United States* v. *Peltier, supra*, at 536-539, 542.

[****30] As yet, we have not recognized any form of good-faith exception to the Fourth Amendment exclusionary rule. [11] But the balancing approach that has evolved during the years of experience with the rule provides strong support for the modification currently urged upon us. As we discuss below, our evaluation of the costs and benefits of suppressing reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate leads to the conclusion that such evidence should be admissible in the prosecution's case in chief.

[****31] III

A

Because a search warrant "provides the detached scrutiny of a neutral magistrate, [**3416] which is a more reliable safeguard [*914] against improper [***693] searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime,'" *United States* v. *Chadwick*, 433 U.S. 1, 9 (1977) (quoting *Johnson* v.

---

[8] We have held, however, that the exclusionary rule requires suppression of evidence obtained in searches carried out pursuant to statutes, not yet declared unconstitutional, purporting to authorize searches and seizures without probable cause or search warrants. See, *e. g., Ybarra* v. *Illinois*, 444 U.S. 85 (1979); *Torres* v. *Puerto Rico*, 442 U.S. 465 (1979); *Almeida-Sanchez* v. *United States*, 413 U.S. 266 (1973); *Sibron* v. *New York*, 392 U.S. 40 (1968); *Berger* v. *New York*, 388 U.S. 41 (1967). "Those decisions involved statutes which, by their own terms, authorized searches under circumstances which did not satisfy the traditional warrant and probable-cause requirements of the Fourth Amendment." *Michigan* v. *DeFillippo*, 443 U.S. at 39. The substantive Fourth Amendment principles announced in those cases are fully consistent with our holding here.

[9] The Court held in *United States* v. *Johnson*, that a construction of the Fourth Amendment that did not constitute a "clear break with the past" is to be applied to all convictions not yet final when the decision was handed down. The limited holding, see 457 U.S., at 562, turned in part on the Court's judgment that "[failure] to accord *any* retroactive effect to Fourth Amendment rulings would 'encourage police or other courts to disregard the plain purport of our decisions and to adopt a let's-wait-until-it's-decided approach.'" *Id*., at 561 (emphasis in original) (quoting *Desist* v. *United States*, 394 U.S. 244, 277 (1969) (Fortas, J., dissenting)). Contrary to respondents' assertions, nothing in *Johnson* precludes adoption of a good-faith exception tailored to situations in which the police have reasonably relied on a warrant issued by a detached and neutral magistrate but later found to be defective.

[10] Our retroactivity decisions have, for the most part, turned on our assessments of "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Stovall* v. *Denno*, 388 U.S. 293, 297 (1967). As we observed earlier this Term:

"In considering the reliance factor, this Court's cases have looked primarily to whether law enforcement authorities and state courts have justifiably relied on a prior rule of law said to be different from that announced by the decision whose retroactivity is at issue. Unjustified 'reliance' is no bar to retroactivity. This inquiry is often phrased in terms of whether the new decision was foreshadowed by earlier cases or was a 'clear break with the past.'" *Solem* v. *Stumes*, 465 U.S. 638, 645-646 (1984).

[11] Members of the Court have, however, urged reconsideration of the scope of the exclusionary rule. See, *e. g., Stone* v. *Powell*, 428 U.S. 465, 496 (1976) (BURGER, C. J., concurring); *id*., at 536 (WHITE, J., dissenting); *Illinois* v. *Gates*, 462 U.S., at 254-267 (WHITE, J., concurring in judgment); *Brown* v. *Illinois*, 422 U.S. 590, 609-612 (1975) (POWELL, J., concurring in part); *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 261-271 (1973) (POWELL, J., concurring); *California* v. *Minjares*, 443 U.S. 916 (1979) (REHNQUIST, J., dissenting from denial of stay). One Court of Appeals, no doubt influenced by these individual urgings, has adopted a form of good-faith exception to the exclusionary rule. *United States* v. *Williams*, 622 F.2d 830 (CA5 1980) (en banc), cert. denied, 449 U.S. 1127 (1981).

*United States*, 333 U.S. 10, 14 (1948)), we have expressed a strong preference for warrants and declared that "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *United States* v. *Ventresca*, 380 U.S. 102, 106 (1965). See *Aguilar* v. *Texas*, 378 U.S., at 111. Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according "great deference" to a magistrate's determination. *Spinelli* v. *United States*, 393 U.S., at 419. [****32] See *Illinois* v. *Gates*, 462 U.S., at 236; *United States* v. *Ventresca, supra*, at 108-109.

[9][10]Deference to the magistrate, however, is not boundless. It is clear, first, that the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based. *Franks* v. *Delaware*, 438 U.S. 154 (1978). [12] Second, the courts must also insist that the magistrate purport to "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." *Aguilar* v. *Texas, supra*, at 111. See *Illinois* v. *Gates, supra*, at 239. A magistrate failing to "manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application" and who acts instead as "an adjunct law enforcement officer" cannot provide valid authorization for an otherwise unconstitutional search. *Lo-Ji Sales,* [****33] *Inc*. v. *New York*, 442 U.S. 319, 326-327 (1979).

[*915] [11][12]Third, reviewing courts will not defer to a warrant based on an affidavit that does not "provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois* v. *Gates*, 462 U.S., at 239. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Ibid*. See *Aguilar* v. *Texas, supra*, at 114-115;*Giordenello* v. *United States*, 357 U.S. 480 (1958); [****34] *Nathanson* v. *United States*, 290 U.S. 41 (1933).[13] [***694] Even if the warrant application was supported by more than a "bare bones" affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the [**3417] warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances, *Illinois* v. *Gates, supra*, at 238-239, or because the form of the warrant was improper in some respect.

[****35] Only in the first of these three situations, however, has the Court set forth a rationale for suppressing evidence obtained pursuant to a search warrant; in the other areas, it has simply excluded such evidence without considering whether [*916] Fourth Amendment interests will be advanced. To the extent that proponents of exclusion rely on its behavioral effects on judges and magistrates in these areas, their reliance is misplaced. First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. [14]

---

[12] Indeed, "it would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." 438 U.S., at 165.

[13] See also *Beck* v. *Ohio*, 379 U.S. 89 (1964), in which the Court concluded that "the record . . . does not contain a single objective fact to support a belief by the officers that the petitioner was engaged in criminal activity at the time they arrested him." *Id*., at 95. Although the Court was willing to assume that the arresting officers acted in good faith, it concluded:

"'[Good] faith on the part of the arresting officers is not enough.' *Henry* v. *United States*, 361 U.S. 98, 102. If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Id*., at 97.

We adhere to this view and emphasize that nothing in this opinion is intended to suggest a lowering of the probable-cause standard. On the contrary, we deal here only with the remedy to be applied to a concededly unconstitutional search.

[14] Although there are assertions that some magistrates become rubber stamps for the police and others may be unable effectively to screen police conduct, see, *e. g*., 2 W. LaFave, Search and Seizure § 4.1 (1978); Kamisar, Does (Did) (Should) The Exclusionary Rule Rest on a "Principled Basis" Rather than an "Empirical Proposition"?, 16 Creighton L. Rev. 565, 569-571 (1983); Schroeder, Deterring Fourth Amendment Violations: Alternatives to the Exclusionary Rule,

[****36] Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate. [15] [****38] Many of the factors [*917] that indicate [***695] that the exclusionary rule cannot provide an effective "special" or "general" deterrent for individual offending law enforcement officers [16] apply as well to judges or magistrates. And, to the extent that the rule is thought to operate as a "systemic" deterrent on a wider audience, [17] it clearly can have no such effect on individuals empowered to issue search warrants. Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them. Imposition of the exclusionary sanction is not necessary meaningfully to inform judicial officers of their errors, and we cannot conclude that admitting evidence obtained [**3418] pursuant to a warrant while at the same time declaring that the warrant was somehow defective will in any way [****37] reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests. [18]

[****39] [*918] B

[13]If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, therefore, it must alter the behavior of individual law enforcement officers or the policies of their departments. One could argue that applying the exclusionary rule in cases where the police failed to demonstrate probable cause in the warrant application deters future inadequate presentations or "magistrate shopping" and thus promotes the ends of the Fourth Amendment. Suppressing evidence obtained pursuant to a technically defective warrant supported by probable cause also might encourage officers to scrutinize more closley the form of the warrant and to point out suspected judicial errors. We find such arguments speculative and conclude that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule. [19]

---

69 Geo. L. J. 1361, 1412 (1981), we are not convinced that this is a problem of major proportions. See L. Tiffany, D. McIntyre, & D. Rotenberg, Detection of Crime 119 (1967); Israel, Criminal Procedure, the Burger Court, and the Legacy of the Warren Court, 75 Mich. L. Rev. 1319, 1414, n. 396 (1977); P. Johnson, New Approaches to Enforcing the Fourth Amendment 8-10 (Working Paper, Sept. 1978), quoted in Y. Kamisar, W. LaFave, & J. Israel, Modern Criminal Procedure 229-230 (5th ed. 1980); R. Van Duizend, L. Sutton, & C. Carter, The Search Warrant Process, ch. 7 (Review Draft, National Center for State Courts, 1983).

[15] As the Supreme Judicial Court of Massachusetts recognized in *Commonwealth* v. *Sheppard*, 387 Mass. 488, 506, 441 N. E. 2d 725, 735 (1982):

"The exclusionary rule may not be well tailored to deterring judicial misconduct. If applied to judicial misconduct, the rule would be just as costly as it is when it is applied to police misconduct, but it may be ill-fitted to the job-created motivations of judges. . . . [Ideally] a judge is impartial as to whether a particular piece of evidence is admitted or a particular defendant convicted. Hence, in the abstract, suppression of a particular piece of evidence may not be as effective a disincentive to a neutral judge as it would be to the police. It may be that a ruling by an appellate court that a search warrant was unconstitutional would be sufficient to deter similar conduct in the future by magistrates."

But see *United States* v. *Karathanos*, 531 F.2d 26, 33-34 (CA2), cert. denied, 428 U.S. 910 (1976).

[16] See, *e. g., Stone* v. *Powell*, 428 U.S., at 498 (BURGER, C. J., concurring); Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 709-710 (1970).

[17] See, *e. g., Dunaway* v. *New York*, 442 U.S. 220, 221 (1979) (STEVENS, J., concurring); Mertens & Wasserstrom, The Good Faith Exception to the Exclusionary Rule: Deregulating the Police and Derailing the Law, 70 Geo. L. J. 365, 399-401 (1981).

[18] Limiting the application of the exclusionary sanction may well increase the care with which magistrates scrutinize warrant applications. We doubt that magistrates are more desirous of avoiding the exclusion of evidence obtained pursuant to warrants they have issued than of avoiding invasions of privacy.

Federal magistrates, moreover, are subject to the direct supervision of district courts. They may be removed for "incompetency, misconduct, neglect of duty, or physical or mental disability." 28 U. S. C. § 631(i). If a magistrate serves merely as a "rubber stamp" for the police or is unable to exercise mature judgment, closer supervision or removal provides a more effective remedy than the exclusionary rule.

[19] Our discussion of the deterrent effect of excluding evidence obtained in reasonable reliance on a subsequently invalidated warrant assumes, of course, that the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant. Cf. *Massachusetts* v. *Sheppard, post*, at 989,

n. 6 ("[It] was not unreasonable for the police in this case to rely on the judge's assurances that the warrant authorized the search they had requested").

[****40] [14]We [***696] have frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment. "No empirical researcher, proponent or opponent of the rule, has yet been able to establish with any assurance whether the rule has a deterrent effect. . . ." *United States* v. *Janis*, 428 U.S., at 452, n. 22. But even assuming that the rule effectively [*919] deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.

As we observed in *Michigan* v. *Tucker*, 417 U.S. 433, 447 (1974), and reiterated in *United States* v. *Peltier*, 422 U.S., at 539:

"The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has [****41] deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."

The *Peltier* Court continued, *id*., at 542:

[**3419] "If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."

See also *Illinois* v. *Gates*, 462 U.S., at 260-261 (WHITE, J., concurring in judgment); *United States* v. *Janis, supra*, at 459; *Brown* v. *Illinois*, 422 U.S., at 610-611 (POWELL, J., concurring in part). [20] In short, where the officer's [***697] [****42] conduct is objectively reasonable,

[*920] "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." *Stone* v. *Powell*, 428 U.S., at 539-540 (WHITE, J., dissenting).

[****43] This is particularly true, we believe, when an

[20] We emphasize that the standard of reasonableness we adopt is an objective one. Many objections to a good-faith exception assume that the exception will turn on the subjective good faith of individual officers. "Grounding the modification in objective reasonableness, however, retains the value of the exclusionary rule as an incentive for the law enforcement profession as a whole to conduct themselves in accord with the Fourth Amendment." *Illinois* v. *Gates*, 462 U.S., at 261, n. 15 (WHITE, J., concurring in judgment); see *Dunaway* v. *New York*, 442 U.S., at 221 (STEVENS, J., concurring). The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits. *United States* v. *Peltier*, 422 U.S. 531, 542 (1975). As Professor Jerold Israel has observed:

"The key to the [exclusionary] rule's effectiveness as a deterrent lies, I believe, in the impetus it has provided to police training programs that make officers aware of the limits imposed by the fourth amendment and emphasize the need to operate within those limits. [An objective good-faith exception] is not likely to result in the elimination of such programs, which are now viewed as an important aspect of police professionalism. Neither is it likely to alter the tenor of those programs; the possibility that illegally obtained evidence may be admitted in borderline cases is unlikely to encourage police instructors to pay less attention to fourth amendment limitations. Finally, [it] should not encourage officers to pay less attention to what they are taught, as the requirement that the officer act in 'good faith' is inconsistent with closing one's mind to the possibility of illegality." Israel, *supra* n. 14, at 1412-1413 (footnotes omitted).

officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope. [21] [****44] In most [*921] such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. "[Once] the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." *Id.*, at 498 (BURGER, C. J., concurring). Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations. [22]

[****45] [*922] [**3420] C

[***698] [15A]We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion. We do not suggest, however, that exclusion is always inappropriate in cases where an officer has obtained a warrant and abided by its terms. "[Searches] pursuant to a warrant will rarely require any deep inquiry into reasonableness," *Illinois* v. *Gates*, 462 U.S., at 267 (WHITE, J., concurring in judgment), for "a warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search." *United States* v. *Ross*, 456 U.S. 798, 823, n. 32 (1982). Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, cf. *Harlow* v. *Fitzgerald*, 457 U.S. 800, 815-819 (1982), [****46] [23] [****47] and it is

---

[21] According to the Attorney General's Task Force on Violent Crime, Final Report (1981), the situation in which an officer relies on a duly authorized warrant

"is a particularly compelling example of good faith. A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions. Accordingly, we believe that there should be a rule which states that evidence obtained pursuant to and within the scope of a warrant is prima facie the result of good faith on the part of the officer seizing the evidence." *Id.*, at 55.

[22] To the extent that JUSTICE STEVENS' conclusions concerning the integrity of the courts, *post*, at 976-978, rest on a foundation other than his judgment, which we reject, concerning the effects of our decision on the deterrence of police illegality, we find his argument unpersuasive. "Judicial integrity clearly does not mean that the courts must never admit evidence obtained in violation of the Fourth Amendment." *United States* v. *Janis*, 428 U.S. 433, 458, n. 35 (1976). "While courts, of course, must ever be concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for the exclusion of highly probative evidence." *Stone* v. *Powell*, 428 U.S., at 485. Our cases establish that the question whether the use of illegally obtained evidence in judicial proceedings represents judicial participation in a Fourth Amendment violation and offends the integrity of the courts

"is essentially the same as the inquiry into whether exclusion would serve a deterrent purpose. . . . The analysis showing that exclusion in this case has no demonstrated deterrent effect and is unlikely to have any significant such effect shows, by the same reasoning, that the admission of the evidence is unlikely to encourage violations of the Fourth Amendment." *United States* v. *Janis, supra*, at 459, n. 35.

Absent unusual circumstances, when a Fourth Amendment violation has occurred because the police have reasonably relied on a warrant issued by a detached and neutral magistrate but ultimately found to be defective, "the integrity of the courts is not implicated." *Illinois* v. *Gates, supra*, at 259, n. 14 (WHITE, J., concurring in judgment). See *Stone* v. *Powell*, 428 U.S., at 485, n. 23; *id.*, at 540 (WHITE, J., dissenting); *United States* v. *Peltier*, 422 U.S. 531, 536-539 (1975).

[23] [15B]

In *Harlow*, we eliminated the subjective component of the qualified immunity public officials enjoy in suits seeking damages for alleged deprivations of constitutional rights. The situations are not perfectly analogous, but we also eschew inquiries into the subjective beliefs of law enforcement officers who seize evidence pursuant to a subsequently invalidated warrant. Although we have suggested that, "[on] occasion, the motive with which the officer conducts an illegal search may have some relevance in determining the propriety of applying the exclusionary rule," *Scott* v. *United States*, 436 U.S. 128, 139, n. 13 (1978), we believe that "sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources." *Massachusetts* v. *Painten*, 389 U.S. 560, 565 (1968) (WHITE, J., dissenting). Accordingly, our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the

clear that in some circumstances [*923] the officer [24] will have no reasonable grounds for believing that the warrant was properly issued.

[**3421] [16]Suppression therefore remains an appropriate remedy if the magistrate [***699] or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. [****48] *Franks* v. *Delaware*, 438 U.S. 154 (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc*. v. *New York*, 442 U.S. 319 (1979); in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown* v. *Illinois*, 422 U.S., at 610-611 (POWELL, J., concurring in part); see *Illinois* v. *Gates, supra*, at 263-264 (WHITE, J., concurring in judgment). Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient -- *i. e.*, in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid. Cf. *Massachusetts* v. *Sheppard, post*, at 988-991.

In so limiting the suppression remedy, we leave untouched the probable-cause standard and [****49] the various requirements for a valid warrant. Other objections to the modification of [*924] the Fourth Amendment exclusionary rule we consider to be insubstantial. The good-faith exception for searches conducted pursuant to warrants is not intended to signal our unwillingness strictly to enforce the requirements of the Fourth Amendment, and we do not believe that it will have this effect. As we have already suggested, the good-faith exception, turning as it does on objective reasonableness, should not be difficult to apply in practice. When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time.

[17]Nor are we persuaded that application of a good-faith exception to searches conducted pursuant to warrants will preclude review of the constitutionality of the search or seizure, deny needed guidance from the courts, or freeze Fourth Amendment law in its present state. [25] There is no need for courts to adopt the inflexible practice of always deciding whether the officers' conduct manifested [****50] objective good faith before turning to the question whether the Fourth Amendment has been violated. Defendants seeking suppression of the fruits of allegedly unconstitutional searches or seizures undoubtedly raise live controversies which Art. III empowers federal courts to adjudicate. As cases addressing questions of good-faith immunity under 42 U. S. C. § 1983, compare *O'Connor* v. *Donaldson*, 422 U.S. 563 (1975), with *Procunier* v. *Navarette*, 434 U.S. 555, 566, n. 14 [***700] (1978), and cases involving the harmless-error doctrine, compare *Milton* v. *Wainwright*, 407 U.S. 371, 372 (1972), with *Coleman* v. *Alabama*, 399 U.S. 1 (1970), make clear, courts have considerable [*925] discretion in conforming their decisionmaking processes to the exigencies of particular cases.

[****51] [18]If the resolution of a particular Fourth Amendment question is necessary to guide future action by law enforcement officers and magistrates, nothing will prevent reviewing courts from deciding that question [**3422] before turning to the good-faith issue. [26]

---

circumstances -- including whether the warrant application had previously been rejected by a different magistrate -- may be considered.

[24] References to "officer" throughout this opinion should not be read too narrowly. It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination. Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a "bare bones" affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search. See *Whiteley* v. *Warden*, 401 U.S. 560, 568 (1971).

[25] The argument that defendants will lose their incentive to litigate meritorious Fourth Amendment claims as a result of the good-faith exception we adopt today is unpersuasive. Although the exception might discourage presentation of insubstantial suppression motions, the magnitude of the benefit conferred on defendants by a successful motion makes it unlikely that litigation of colorable claims will be substantially diminished.

[26] It has been suggested, in fact, that "the recognition of a 'penumbral zone,' within which an inadvertent mistake would

Indeed, it frequently will be difficult to determine whether the officers acted reasonably without resolving the Fourth Amendment issue. Even if the Fourth Amendment question is not one of broad import, reviewing courts could decide in particular cases that magistrates under their supervision need to be informed of their errors and so evaluate the officers' good faith only after finding a violation. In other circumstances, those courts could reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith. We have no reason to believe that our Fourth Amendment jurisprudence would suffer by allowing reviewing courts to exercise an informed discretion in making this choice.

[****52] IV

When the principles we have enunciated today are applied to the facts of this case, it is apparent that the judgment of the Court of Appeals cannot stand. The Court of Appeals applied the prevailing legal standards to Officer Rombach's warrant application and concluded that the application could not support the magistrate's probable-cause determination. In so doing, the court clearly informed the magistrate that he [*926] had erred in issuing the challenged warrant. This aspect of the court's judgment is not under attack in this proceeding.

Having determined that the warrant should not have issued, the Court of Appeals understandably declined to adopt a modification of the Fourth Amendment exclusionary rule that this Court had not previously sanctioned. Although the modification finds strong support in our previous cases, the Court of Appeals' commendable self-restraint is not to be criticized. We have now reexamined the purposes of the exclusionary rule and the propriety of its application in cases where officers have relied on a subsequently invalidated search warrant. Our conclusion is that the rule's purposes will only rarely be served by applying it in such circumstances.

[****53] [1B] [19] [20]In the absence of an [***701] allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause. Only respondent Leon has contended that no reasonably well trained police officer could have believed that there existed probable cause to search his house; significantly, the other respondents advance no comparable argument. Officer Rombach's application for a warrant clearly was supported by much more than a "bare bones" affidavit. The affidavit related the results of an extensive investigation and, as the opinions of the divided panel of the Court of Appeals make clear, provided evidence sufficient to create disagreement among thoughtful and competent [****54] judges as to the existence of probable cause. Under these circumstances, the officers' reliance on the magistrate's determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion is inappropriate.

Accordingly, the judgment of the Court of Appeals is

*Reversed*.

**Concur by:** BLACKMUN (In Part)

## Concur

[*927] JUSTICE BLACKMUN, concurring.

The Court today holds that evidence obtained in violation of the Fourth Amendment by officers acting in objectively reasonable reliance on a search warrant issued by a neutral and detached magistrate need not be excluded, as a matter of federal law, [**3423] from the case in chief of federal and state criminal prosecutions. In so doing, the Court writes another chapter in the volume of Fourth Amendment law opened by *Weeks* v. *United States*, 232 U.S. 383 (1914). I join the Court's opinion in this case and the one in *Massachusetts* v. *Sheppard, post*, p. 981, because I believe that the rule announced today advances the legitimate interests of the criminal justice system without sacrificing the individual rights protected by the Fourth Amendment. I write separately, [****55] however, to underscore what I regard as the unavoidably provisional nature of today's decisions.

As the Court's opinion in this case makes clear, the Court has narrowed the scope of the exclusionary rule

---

not call for exclusion, . . . will make it less tempting for judges to bend fourth amendment standards to avoid releasing a possibly dangerous criminal because of a minor and unintentional miscalculation by the police." Schroeder, *supra* n. 14, at 1420-1421 (footnote omitted); see Ashdown, Good Faith, the Exclusionary Remedy, and Rule-Oriented Adjudication in the Criminal Process, 24 Wm. & Mary L. Rev. 335, 383-384 (1983).

because of an empirical judgment that the rule has little appreciable effect in cases where officers act in objectively reasonable reliance on search warrants. See *ante*, at 918-921. Because I share the view that the exclusionary rule is not a constitutionally compelled corollary of the Fourth Amendment itself, see *ante*, at 905-906, I see no way to avoid making an empirical judgment of this sort, and I am satisfied that the Court has made the correct one on the information before it. Like all courts, we face institutional limitations on our ability to gather information about "legislative facts," and the exclusionary rule itself has exacerbated the shortage of hard data concerning the behavior of police officers in the absence of such a rule. See *United States* v. *Janis*, 428 U.S. 433, 448-453 (1976). Nonetheless, we cannot escape the responsibility to [***702] decide the question before us, however imperfect our information may be, and I am prepared [****56] to join the Court on the information now at hand.

[*928] What must be stressed, however, is that any empirical judgment about the effect of the exclusionary rule in a particular class of cases necessarily is a provisional one. By their very nature, the assumptions on which we proceed today cannot be cast in stone. To the contrary, they now will be tested in the real world of state and federal law enforcement, and this Court will attend to the results. If it should emerge from experience that, contrary to our expectations, the good-faith exception to the exclusionary rule results in a material change in police compliance with the Fourth Amendment, we shall have to reconsider what we have undertaken here. The logic of a decision that rests on untested predictions about police conduct demands no less.

If a single principle may be drawn from this Court's exclusionary rule decisions, from *Weeks* through *Mapp* v. *Ohio*, 367 U.S. 643 (1961), to the decisions handed down today, it is that the scope of the exclusionary rule is subject to change in light of changing judicial understanding about the effects of the rule outside the confines of the courtroom. [****57] It is incumbent on the Nation's law enforcement officers, who must continue to observe the Fourth Amendment in the wake of today's decisions, to recognize the double-edged nature of that principle.

**Dissent by:** BRENNAN; STEVENS

## Dissent

JUSTICE BRENNAN, with whom JUSTICE **MARSHALL** joins, dissenting. *

Ten years ago in *United States* v. *Calandra*, 414 U.S. 338 (1974), I expressed the fear that the Court's decision "may signal that a majority of my colleagues have positioned themselves to reopen the door [to evidence secured by official lawlessness] still further and abandon altogether the exclusionary rule in search-and-seizure cases." *Id*., at 365 (dissenting opinion). Since then, in case after case, I have witnessed the Court's gradual but determined strangulation [*929] of the rule. [1] It now appears that the Court's victory over the Fourth Amendment is complete. That today's [****58] decisions represent the *piece de resistance* of the Court's past efforts cannot be doubted, for today the Court sanctions the use in the prosecution's case in chief of illegally obtained evidence against the individual whose rights have been violated -- a result that had previously been thought to be foreclosed.

The Court seeks to justify this result on the ground that the "costs" of adhering to the exclusionary rule in cases like those before us exceed the "benefits." But the language of [***703] deterrence and [****59] of cost/benefit analysis, if used indiscriminately, can have a narcotic effect. It creates an illusion of technical precision and ineluctability. It suggests that not only constitutional principle but also empirical data support the majority's result. When the Court's analysis is examined carefully, however, it is clear that we have not been treated to an honest assessment of the merits of the exclusionary rule, but have instead been drawn into a curious world where the "costs" of excluding illegally obtained evidence loom to exaggerated heights and where the "benefits" of such exclusion are made to disappear with a mere wave of the hand.

The majority ignores the fundamental constitutional

* [This opinion applies also to No. 82-963, *Massachusetts* v. *Sheppard, post*, p. 981.]

[1] See, *e. g., United States* v. *Peltier*, 422 U.S. 531, 544 (1975) (BRENNAN, J., dissenting); *United States* v. *Janis*, 428 U.S. 433, 460 (1976) (BRENNAN, J., dissenting); *Stone* v. *Powell*, 428 U.S. 465, 502 (1976) (BRENNAN, J., dissenting); *Michigan* v. *DeFillippo*, 443 U.S. 31, 41 (1979) (BRENNAN, J., dissenting); *United States* v. *Havens*, 446 U.S. 620, 629 (1980) (BRENNAN, J., dissenting).

importance of what is at stake here. While the machinery of law enforcement and indeed the nature of crime itself have changed dramatically since the Fourth Amendment became part of the Nation's fundamental law in 1791, what the Framers understood then remains true today -- that the task of combating crime and convicting the guilty will in every era seem of such critical and pressing concern that we may be lured by the temptations of expediency into forsaking our [*930] commitment to protecting [****60] individual liberty and privacy. It was for that very reason that the Framers of the Bill of Rights insisted that law enforcement efforts be permanently and unambiguously restricted in order to preserve personal freedoms. In the constitutional scheme they ordained, the sometimes unpopular task of ensuring that the government's enforcement efforts remain within the strict boundaries fixed by the Fourth Amendment was entrusted to the courts. As James Madison predicted in his address to the First Congress on June 8, 1789:

"If [these rights] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." 1 Annals of Cong. 439.

If those independent tribunals lose their resolve, however, as the Court has done today, and give way to the seductive call of expediency, the vital guarantees of the Fourth Amendment are reduced to nothing more than a "form [****61] of words." *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 392 (1920).

A proper understanding of the broad purposes sought to be served by the Fourth Amendment demonstrates that the principles embodied in the exclusionary rule rest upon a far firmer constitutional foundation than the shifting sands of the Court's deterrence rationale. But even if I were to accept the Court's chosen method of analyzing the question posed by these cases, I would still conclude that the Court's decision cannot be justified.

I

The Court holds that physical evidence seized by police officers reasonably relying upon a warrant issued by a detached [*931] and neutral magistrate [***704] is admissible in the prosecution's case in chief, even though a reviewing court has subsequently determined either that the warrant was defective, No. 82-963, or that those officers failed to demonstrate when applying for the warrant that there was probable cause to conduct the search, No. 82-1771. I have no doubt that these decisions will prove in time to have been a grave mistake. But, as troubling and important as today's new doctrine may be for the administration of criminal [****62] justice in this country, the mode of analysis used to generate that doctrine also requires critical examination, for it may prove in the long run to pose the greater threat to our civil liberties.

A

At bottom, the Court's decision turns on the proposition that the exclusionary rule is merely a "'judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right.'" *Ante*, at 906, quoting *United States* v. *Calandra*, 414 U.S., at 348. The germ of that idea is found in *Wolf* v. *Colorado*, 338 U.S. 25 (1949), and although I had thought that such a narrow conception of the rule had been forever put to rest by our decision in *Mapp* v. *Ohio*, 367 U.S. 643 (1961), it has been revived by the present Court and reaches full flower with today's decision. The essence of this view, as expressed initially in the *Calandra* opinion and as reiterated today, is that the sole "purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the privacy of one's person, house, papers, or effects. The wrong condemned is the [****63] unjustified governmental invasion of these areas of an individual's life. That wrong . . . is *fully accomplished* by the original search without probable cause." 414 U.S., at 354 (emphasis added); see also *ante*, at 906. This reading of the Amendment implies that its proscriptions are directed solely at those government agents who may actually invade an individual's constitutionally [*932] protected privacy. The courts are not subject to any direct constitutional duty to exclude illegally obtained evidence, because the question of the admissibility of such evidence is not addressed by the Amendment. This view of the scope of the Amendment relegates the judiciary to the periphery. Because the only constitutionally cognizable injury has already been "fully accomplished" by the police by the time a case comes before the courts, the Constitution is not itself violated if the judge decides to admit the tainted evidence. Indeed, the most the judge *can* do is wring his hands and hope that perhaps by

excluding such evidence he can deter future transgressions by the police.

Such a reading appears plausible, because, as critics of the exclusionary rule never [****64] tire of repeating, [2] the Fourth Amendment makes no express provision for the exclusion of [***705] evidence secured in violation of its commands. A short answer to this claim, of course, is that many of the Constitution's most vital imperatives are stated in general terms and the task of giving meaning to these precepts is therefore left to subsequent judicial decisionmaking in the context of concrete cases. The nature of our Constitution, as Chief Justice Marshall long ago explained, "requires that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves." *McCulloch* v. *Maryland*, 4 Wheat. 316, 407 (1819).

A more direct answer may be supplied by recognizing that the Amendment, like other provisions of the Bill [****65] of Rights, restrains the power of the government as a whole; it does not specify only a particular agency and exempt all others. The judiciary is responsible, no less than the executive, for ensuring that constitutional rights are respected.

[*933] When that fact is kept in mind, the role of the courts and their possible involvement in the concerns of the Fourth Amendment comes into sharper focus. Because seizures are executed principally to secure evidence, and because such evidence generally has utility in our legal system only in the context of a trial supervised by a judge, it is apparent that the admission of illegally obtained evidence implicates the same constitutional concerns as the initial seizure of that evidence. Indeed, by admitting unlawfully seized evidence, the judiciary becomes a part of what is in fact a single governmental action prohibited by the terms of the Amendment. [3] [****67] Once that connection between the evidence-gathering role of the police and the evidence-admitting function of the courts is acknowledged, the plausibility of the Court's interpretation becomes more suspect. Certainly nothing in the language or history of the Fourth Amendment suggests [****66] that a recognition of this evidentiary link between the police and the courts was meant to be foreclosed. [4] [****68] [***706] It is difficult to give any meaning [*934] at all to the limitations imposed by the Amendment if they are read to proscribe only certain conduct by the police but to allow other agents of the same government to take advantage of evidence secured by the police in violation of its requirements. [5]

---

[2] See, *e. g.*, Wilkey, The Exclusionary Rule: Why Suppress Valid Evidence?, 62 Judicature 215 (1978); S. Schlesinger, Exclusionary Injustice (1977).

[3] In deciding to enforce the exclusionary rule as a matter of state law, the California Supreme Court clearly recognized this point:

"When, as in the present case, the very purpose of an illegal search and seizure is to get evidence to introduce at a trial, the success of the lawless venture depends entirely on the court's lending its aid by allowing the evidence to be introduced. It is no answer to say that a distinction should be drawn between the government acting as law enforcer and the gatherer of evidence and the government acting as judge." *People* v. *Cahan*, 44 Cal. 2d 434, 445, 282 P. 2d 905, 912 (1955).

For a thoughtful examination of this point, see Schrock & Welsh, Up from Calandra: The Exclusionary Rule as a Constitutional Requirement, 59 Minn. L. Rev. 251, 289-307 (1974).

[4] Examination of the early state declarations of rights which formed the models for the Fourth Amendment reveals that they were aimed as much at explicitly limiting the manner in which government could gather evidence as at protecting individual privacy. For example, the Massachusetts Constitution of 1780 provided:

"Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil Officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued, but in cases, and with the formalities prescribed by the laws." Art. XIV of the Declaration of Rights of 1780.

See generally T. Taylor, Two Studies in Constitutional Interpretation 41-43 (1969); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 51-105 (1970); J. Lanynski, Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation 30-48 (1966); Stewart, The Road to *Mapp* v. *Ohio* and Beyond: The Origins, Development, and Future of the Exclusionary Rule in Search-and-Seizure Cases, 83 Colum. L. Rev. 1365, 1369 (1983).

[5] In *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385 (1920), the Court expressly recognized this point in rejecting

The Amendment therefore must be read to condemn not only the initial unconstitutional invasion of privacy -- which is done, after all, for the purpose of securing evidence -- but also the subsequent use of any evidence so obtained.

[****69] [*935] The Court evades this principle by drawing an artificial line between the constitutional rights and responsibilities that are engaged by actions of the police and those that are engaged when a defendant appears before the courts. According to the Court, the substantive protections of the Fourth Amendment are wholly exhausted at the moment when police unlawfully invade an individual's privacy and thus no substantive force remains to those protections at the time of trial when the government seeks to use evidence obtained by the police.

I submit that such a crabbed reading of the Fourth Amendment casts aside the teaching of those Justices who first formulated the exclusionary rule, and rests ultimately on an impoverished understanding of judicial responsibility in our constitutional scheme. For my part, "[the] right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" comprises a personal right to exclude all evidence secured by means of unreasonable searches and seizures. The right to be free from the initial invasion of privacy and the right of exclusion are coordinate components of the central embracing [****70] right to be free from unreasonable searches and seizures.

Such a conception of the rights secured by the Fourth Amendment was unquestionably the original basis of what has come to be called the exclusionary rule when it was first formulated in *Weeks* v. *United States*, 232 U.S. 383 [***707] (1914). There the Court considered whether evidence seized in violation of the Fourth Amendment by a United States Marshal could be admitted at trial after the defendant had moved that the evidence be returned. Significantly, although the Court considered the Marshal's initial invasion of the defendant's home to be unlawful, it went on to consider a question that "involves the right of the court in a criminal prosecution to retain for the purposes of evidence the letters and correspondence of the accused, seized in his house in his absence without his authority, by a United States Marshal holding no [*936] warrant for . . . the search of his premises." *Id*., at 393. In answering that question, Justice Day, speaking for a unanimous Court, expressly recognized that the commands of the Fourth Amendment were addressed to both the courts and the Executive [****71] Branch:

"The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and *the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws*. The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures . . . should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights." *Id*., at 391-392.

The heart of the *Weeks* opinion, and for me the beginning of wisdom about the Fourth Amendment's proper meaning, is found in the following passage:

"If letters and private documents can . . . be seized [****72] and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and [federal] officials to bring the guilty to punishment, praiseworthy as they are, are not to be

---

the Government's contention that it should be permitted to make use of knowledge obtained in violation of the Fourth Amendment:

"The Government now while in form repudiating and condemning the illegal seizure, seeks to maintain its right to avail itself of the knowledge obtained by that means which otherwise it would not have had.

"The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them. . . . In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. *The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." Id*., at 391-392 (citations omitted) (emphasis added).

aided by the sacrifice of those great [*937] principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land. The United States Marshal could only have invaded the house of the accused when armed with a warrant issued as required by the Constitution. . . . Instead, he acted without sanction of law, doubtless prompted by the desire to bring further proof to the aid of the Government, and under color of his office undertook to make a seizure of private papers in direct violation of the constitutional prohibition against such action. . . . To sanction such proceedings would be to affirm by [***708] judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution, [****73] intended for the protection of the people against such unauthorized action." *Id*., at 393-394.

What this passage succinctly captures is the essential recognition, ignored by the present Court, that seizures are generally executed for the purpose of bringing "proof to the aid of the Government," *id*., at 393, that the utility of such evidence in a criminal prosecution arises ultimately in the context of the courts, and that the courts therefore cannot be absolved of responsibility for the means by which evidence is obtained. As the Court in *Weeks* clearly recognized, the obligations cast upon government by the Fourth Amendment are not confined merely to the police. In the words of Justice Holmes: "If the search and seizure are unlawful as invading personal rights secured by the Constitution those rights would be infringed yet further if the evidence were allowed to be used." *Dodge* v. *United States*, 272 U.S. 530, 532 (1926). As the Court further explained in *Olmstead* v. *United States*, 277 U.S. 438 (1928):

"The striking outcome of the *Weeks* case and those which followed it was the sweeping declaration [****74] that the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction if obtained by government officers through a [*938] violation of the Amendment. Theretofore many had supposed under the ordinary common law rules, if the tendered evidence was pertinent, the method of obtaining it was unimportant. . . . But in the *Weeks* case, and those which followed, this Court decided with great emphasis, and established as the law for the federal courts, that the protection of the Fourth Amendment would be much impaired unless it was held that not only was the official violator of the rights under the Amendment subject to an action at the suit of the injured defendant, but also that the evidence thereby obtained could not be received." *Id*., at 462-463.

That conception of the rule, in my view, is more faithful to the meaning and purpose of the Fourth Amendment and to the judiciary's role as the guardian of the people's constitutional liberties. In contrast to the present Court's restrictive reading, the Court in *Weeks* recognized that, if the Amendment is to have any meaning, police and the courts cannot [****75] be regarded as constitutional strangers to each other; because the evidence-gathering role of the police is directly linked to the evidence-admitting function of the courts, an individual's Fourth Amendment rights may be undermined as completely by one as by the other.

B

From the foregoing, it is clear why the question whether the exclusion of evidence would deter future police misconduct was never considered a relevant concern in the early cases [***709] from *Weeks* to *Olmstead*. [6] In those formative decisions, the Court plainly understood that the exclusion of illegally obtained evidence was compelled not by judicially fashioned [*939] remedial purposes, but rather by a direct constitutional command. A new phase in the history of the rule, however, opened with the Court's decision in *Wolf* v. *Colorado*, 338 U.S. 25 (1949). Although that decision held that the security of one's person and privacy protected by the Fourth Amendment was "implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause" of the Fourteenth Amendment, *id*., at 27-28, quoting *Palko* v. *Connecticut*, 302 U.S. 319, 325 (1937), [****76] the Court went on, in what can only be regarded as a *tour de force* of constitutional obfuscation, to say that the "ways of enforcing such a basic right raise questions of a different order," 338 U.S., at 28. Notwithstanding the force of the *Weeks* doctrine that the Fourth Amendment required exclusion, a state court was free to admit illegally seized evidence, according to the Court in *Wolf*, so long as the State had devised some other "effective" means of vindicating a defendant's Fourth Amendment rights. 338 U.S., at 31.

Twelve years later, in *Mapp* v. *Ohio*, 367 U.S. 643 (1961), however, the [****77] Court restored the original understanding of the *Weeks* case by overruling the

---

[6] See generally Kamisar, Does (Did) (Should) The Exclusionary Rule Rest on a "Principled Basis" Rather than an "Empirical Proposition"?, 16 Creighton L. Rev. 565, 598-599 (1983); Mertens & Wasserstrom, The Good Faith Exception to the Exclusionary Rule: Deregulating the Police and Derailing the Law, 70 Geo. L. J. 365, 379-380 (1981).

holding of *Wolf* and repudiating its rationale. Although in the course of reaching this conclusion the Court in *Mapp* responded at certain points to the question, first raised in *Wolf*, of whether the exclusionary rule was an "effective" remedy compared to alternative means of enforcing the right, see 367 U.S., at 651-653, it nevertheless expressly held that "all evidence obtained by searches and seizures in violation of the Constitution is, *by that same authority*, inadmissible in a state court." *Id*., at 655 (emphasis added). In the Court's view, the exclusionary rule was not one among a range of options to be selected at the discretion of judges; it was "an essential part of both the Fourth and Fourteenth Amendments." *Id*., at 657. Rejection of the *Wolf* approach was constitutionally required, the Court explained, because "the admission of the new constitutional right by *Wolf* could not consistently tolerate denial of [*940] its most important constitutional privilege, namely, the exclusion of the evidence which an accused had [****78] been forced to give by reason of the unlawful seizure. To hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment." 367 U.S., at 656. [***710] Indeed, no other explanation suffices to account for the Court's holding in *Mapp*, since the only possible predicate for the Court's conclusion that the States were bound by the Fourteenth Amendment to honor the *Weeks* doctrine is that the exclusionary rule was "part and parcel of the Fourth Amendment's limitation upon [governmental] encroachment of individual privacy." 367 U.S., at 651. [7]

[****79] Despite this clear pronouncement, however, the Court since *Calandra* has gradually pressed the deterrence rationale for the rule back to center stage. See, *e. g., United States* v. *Peltier*, 422 U.S. 531 (1975); *United States* v. *Janis*, 428 U.S. 433 (1976); *Stone* v. *Powell*, 428 U.S. 465 (1976). The various arguments advanced by the Court in this campaign have only strengthened my conviction that the deterrence theory is both misguided and unworkable. First, [*941] the Court has frequently bewailed the "cost" of excluding reliable evidence. In large part, this criticism rests upon a refusal to acknowledge the function of the Fourth Amendment itself. If nothing else, the Amendment plainly operates to disable the government from gathering information and securing evidence in certain ways. In practical terms, of course, this restriction of official power means that some incriminating evidence inevitably will go undetected if the government obeys these constitutional restraints. It is the loss of that evidence that is the "price" our society pays for enjoying the freedom and privacy safeguarded by the Fourth [****80] Amendment. Thus, some criminals will go free *not*, in Justice (then Judge) Cardozo's misleading epigram, "because the constable has blundered," *People* v. *Defore*, 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926), but rather because official compliance with Fourth Amendment requirements makes it more difficult to catch criminals. Understood in this way, the Amendment directly contemplates that some reliable and incriminating evidence will be lost to the government; therefore, it is [***711] not the exclusionary rule, but the Amendment itself that has imposed this cost. [8]

---

[7] Indeed, the Court in *Mapp* expressly noted that the "factual considerations" raised in *Wolf* concerning the effectiveness of alternative remedies "are not basically relevant to a decision that the exclusionary rule is an essential ingredient of the Fourth Amendment." 367 U.S., at 651. It is true that in *Linkletter* v. *Walker*, 381 U.S. 618 (1965), in holding that *Mapp* was not to be applied retroactively, the Court described the exclusionary rule as the "only effective deterrent to lawless police action," 381 U.S., at 636, thereby suggesting that the rule rested on a deterrence rationale. But, as I have explained on another occasion, "[the] emphasis upon deterrence in *Linkletter* must be understood in the light of the crucial fact that the States had justifiably relied from 1949 to 1961 upon *Wolf* . . . , and consequently, that application of *Mapp* would have required the wholesale release of innumerable convicted prisoners, few of whom could have been successfully retried. In that circumstance, *Linkletter* held not only that retrospective application of *Mapp* would not further the goal of deterrence but also that it would not further 'the administration of justice and the integrity of the judicial process.' 381 U.S., at 637." *United States* v. *Calandra*, 414 U.S. 338, 359-360 (1974) (dissenting opinion).

[8] Justice Stewart has explained this point in detail in a recent article:

"Much of the criticism leveled at the exclusionary rule is misdirected; it is more properly directed at the Fourth Amendment itself. It is true that, as many observers have charged, the effect of the rule is to deprive the courts of extremely relevant, often direct evidence of the guilt of the defendant. But these same critics fail to acknowledge that, in many instances, the same extremely relevant evidence would not have been obtained had the police officer complied with the commands of the fourth amendment in the first place. . . .

". . . The exclusionary rule places no limitations on the actions of the police. The fourth amendment does. The inevitable result of the Constitution's prohibition against unreasonable searches and seizures and its requirement that no warrant shall issue but upon probable cause is that police officers who obey its strictures will catch fewer criminals. . . . [That] is the price the framers anticipated and were willing to pay to ensure

[****81] [*942] In addition, the Court's decisions over the past decade have made plain that the entire enterprise of attempting to assess the benefits and costs of the exclusionary rule in various contexts is a virtually impossible task for the judiciary to perform honestly or accurately. Although the Court's language in those cases suggests that some specific empirical basis may support its analyses, the reality is that the Court's opinions represent inherently unstable compounds of intuition, hunches, and occasional pieces of partial and often inconclusive data. In *Calandra*, for example, the Court, in considering whether the exclusionary rule should apply in grand jury proceedings, had before it no concrete evidence whatever concerning the impact that application of the rule in such proceedings would have either in terms of the long-term costs or the expected benefits. To the extent empirical data are available regarding the general costs and benefits of the exclusionary rule, such data have shown, on the one hand, as the Court acknowledges today, that the costs are not as substantial as critics have asserted in the past, see *ante*, at 907-908, n. 6, and, on the other hand, [****82] that while the exclusionary rule may well have certain deterrent effects, it is extremely difficult to determine with any degree of precision whether the incidence of unlawful conduct by police is now lower than it was prior to *Mapp*. See *United States* v. *Janis*, 428 U.S., at 449-453, and n. 22; *Stone* v. *Powell*, 428 U.S., at 492, n. 32. [9] [****83] The [*943] Court has sought to turn this uncertainty to its advantage by casting the burden of proof upon proponents of the rule, see, *e. g., United States* v. *Janis, supra*, [***712] at 453-454. "Obviously," however, "the assignment of the burden of proof on an issue where evidence does not exist and cannot be obtained is outcome determinative. [The] assignment of the burden is merely a way of announcing a predetermined conclusion." [10]

By remaining within its redoubt of empiricism and by basing the rule solely on the deterrence rationale, the Court has robbed the rule of legitimacy. A doctrine that is explained as if it were an empirical proposition but for which there is only limited empirical support is both inherently unstable and an easy mark for critics. The extent of this Court's fidelity to Fourth Amendment requirements, however, should not turn on such statistical uncertainties. I share the view, expressed by Justice [****84] Stewart for the Court in *Faretta* v. *California*, 422 U.S. 806 (1975), that "[personal[liberties are not rooted in the law of averages." *Id*., at 834. Rather than seeking to give effect to the liberties secured by the Fourth Amendment through guesswork about deterrence, the Court should restore to its proper place the principle framed 70 years ago in *Weeks* that an individual whose privacy has been invaded in violation of the Fourth Amendment has a right grounded in that Amendment to prevent the government from subsequently making use of any evidence so obtained.

[*944] II

Application of that principle clearly requires affirmance in the two cases decided today. In the first, *United States* v. *Leon*, No. 82-1771, it is conceded by the Government and accepted by the Court that the affidavit filed by the police officers in support of their application for a search warrant failed to provide a sufficient basis on which a neutral and detached magistrate could conclude that there was probable cause to issue the warrant. Specifically, it is conceded that the officers' application for a warrant was based in part on information supplied [****85] by a confidential informant of unproven reliability that was over five months old by the time it was relayed to the police. Although the police conducted an independent investigation on the basis of

---

the sanctity of the person, the home, and property against unrestrained governmental power." Stewart, 83 Colum. L. Rev., at 1392-1393.

See also Dellinger, Of Rights and Remedies: The Constitution as a Sword, 85 Harv. L. Rev. 1532, 1563 (1972) ("Under the exclusionary rule a court attempts to maintain the status quo that would have prevailed if the constitutional requirement had been obeyed").

[9] See generally on this point, Davies, A Hard Look at What We Know (and Still Need to Learn) About the "Costs" of the Exclusionary Rule: The NIJ Study and Other Studies of "Lost" Arrests, 1983 A. B. F. Res. J. 611, 627-629; Canon, Ideology and Reality in the Debate over the Exclusionary Rule: A Conservative Argument for its Retention, 23 S. Tex. L. J. 559, 561-563 (1982); Critique, On the Limitations of Empirical Evaluations of the Exclusionary Rule: A Critique of the Spiotto Research and United States v. Calandra, 69 Nw. U. L. Rev. 740 (1974).

[10] Dworkin, Fact Style Adjudication and the Fourth Amendment: The Limits of Lawyering, 48 Ind. L. J. 329, 332-333 (1973). See also White, Forgotten Points in the "Exclusionary Rule" Debate, 81 Mich. L. Rev. 1273, 1281-1282 (1983) (balancing of deterrent benefits and costs is an "inquiry [that] can never be performed in an adequate way and the reality is thus that the decision must rest not upon those grounds, but upon prior dispositions or unarticulated intuitions that are never justified"); Canon, *supra*, at 564; Kamisar, 16 Creighton L. Rev., at 646.

this tip, both the District Court and the Court of Appeals concluded that the additional information gathered by the officers failed to corroborate the details of the informant's tip and was "as consistent with innocence as . . . with guilt." App. to Pet. for Cert. 10a. The warrant, therefore, should never have issued. Stripped of the authority of the warrant, the conduct of these officers was plainly unconstitutional -- it amounted to nothing less than a naked invasion of the privacy of respondents' homes without the requisite justification demanded by the Fourth Amendment. In order to restore the Government to the position it would have occupied had this [***713] unconstitutional search not occurred, therefore, it was necessary that the evidence be suppressed. As we said in *Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971), the Warrant Clause is not "an inconvenience to be somehow 'weighed' against the claims of police efficiency. It is, or should be, an important [****86] working part of our machinery of government, operating as a matter of course to check the 'well-intentioned but mistakenly overzealous executive officers' who are part of any system of law enforcement." *Id*., at 481 (footnote omitted).

A close examination of the facts of this case reveals that this is neither an extraordinary nor indeed a very costly step. [*945] The warrant had authorized a search for cocaine, methaqualone tablets, and miscellaneous narcotics paraphernalia at several locations: a condominium at 7902 Via Magdalena in Los Angeles; a residence at 620 Price Drive in Burbank; a residence at 716 South Sunset Canyon in Burbank; and four automobiles owned respectively by respondents Leon, Sanchez, Stewart, and Del Castillo. App. 31-33. Pursuant to this warrant, the officers seized approximately four pounds of cocaine and over 1,000 methaqualone tablets from the Via Magdalena condominium, nearly one pound of cocaine from the Sunset Canyon residence, about an ounce of cocaine from the Price Drive residence, and certain paraphernalia from Del Castillo's and Stewart's automobiles. On the basis of this and other evidence, the four respondents were charged [****87] with violating 21 U. S. C. § 846 for conspiring to possess and distribute cocaine, and § 841(a)(1) for possessing methaqualone and cocaine with intent to distribute. The indictment specifically alleged that respondents had maintained the Via Magdalena condominium as a storage area for controlled substances which they distributed to prospective purchasers. App. 27-28.

At the suppression hearing, the District Court determined that none of the respondents had a sufficient expectation of privacy to contest the search of the Via Magdalena condominium, that respondents Stewart and Sanchez could challenge the search of their home at Price Drive, that respondent Leon was entitled to challenge the search of his home at Sunset Canyon, and that respondents Del Castillo and Stewart could contest the search of their cars. Given its finding that probable cause to issue the warrant was lacking, the District Court ruled that the evidence from the Price Drive residence could not be used against respondents Stewart and Sanchez, that evidence from the Sunset Canyon residence could not be used against Leon, and that evidence obtained from both Del Castillo's and Stewart's [****88] automobiles could not be used against them. App. to Pet. for Cert. 10a-13a.

[*946] The tenor of the Court's opinion suggests that this order somehow imposed a grave and presumably unjustifiable cost on society. Such a suggestion, however, is a gross exaggeration. Since the indictment focused upon a conspiracy among all respondents to use the Via Magdalena condominium as a storage area for controlled substances, and since the bulk of the evidence seized was from that condominium and was [***714] plainly admissible under the District Court's order, the Government would clearly still be able to present a strong case to the jury following the court's suppression order. I emphasize these details not to suggest how the Government's case would fare before the jury but rather to clarify a point that is lost in the Court's rhetorical excesses over the costs of the exclusionary rule -- namely, that the suppression of evidence will certainly tend to weaken the Government's position but it will rarely force the Government to abandon a prosecution. Cf. *infra*, at 950-951, and n. 11. In my view, a doctrine that preserves intact the constitutional rights of the accused, and, at [****89] the same time, is sufficiently limited to permit society's legitimate and pressing interest in criminal law enforcement to be served should not be so recklessly discarded. It is a doctrine that gives life to the "very heart of the Fourth Amendment directive: that . . . a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises." *United States* v. *United States District Court*, 407 U.S. 297, 316 (1972).

In the second case before the Court, *Massachusetts* v. *Sheppard*, No. 82-963, the State concedes and the Court accepts that the warrant issued to search respondent's home completely failed to state with

particularity the things to be seized. Indeed, the warrant expressly and particularly described things such as "controlled [substances]" and "other paraphernalia used in, for, or in connection with the unlawful possession or use of any controlled substance" that the police had no reason whatsoever to believe were to be found in [*947] respondent's home. App. 17a. [****90] Given the Fourth Amendment's requirement that "no Warrants shall issue, but upon probable cause . . . and particularly describing the . . . things to be seized," this warrant should never have been issued. The police who entered respondent's home, therefore, were without constitutional authority to do so.

Although the Court's opinion tends to overlook this fact, the requirement of particularity is not a mere "technicality," it is an express constitutional command. *Ybarra* v. *Illinois*, 444 U.S. 85, 92 (1979); *Lo-Ji Sales, Inc*. v. *New York*, 442 U.S. 319 (1979); *Stanford* v. *Texas*, 379 U.S. 476 (1965); *Marron* v. *United States*, 275 U.S. 192, 196 (1927). The purpose of that requirement is to prevent precisely the kind of governmental conduct that the faulty warrant at issue here created a grave risk of permitting -- namely, a search that was not narrowly and particularly limited to the things that a neutral and detached magistrate had reason to believe might be found at respondent's home. Although it is true, as JUSTICE STEVENS observes, see *post*, at 964, that the affidavit submitted by the police [****91] set forth with particularity those items that they sought authority to search for, it is nevertheless clear that the warrant itself -- the document which actually gave the officers legal authority to invade respondent's privacy -- made no mention [***715] of these items. And, although it is true that the particular officers who applied for the warrant also happened to execute it and did so in accordance with the limits proposed in their affidavit, this happenstance should have no bearing on the central question whether these officers secured that prior judicial authority to conduct their search required by the Fourth Amendment. As we made clear in *United States* v. *United States District Court, supra*, at 317 (footnote omitted), "[the] Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised." See also *Katz* v. *United States*, 389 U.S. 347, 356-357 (1967) ("this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime [*948] and voluntarily confined their activities to the least intrusive means [****92] consistent with that end"). Had the warrant actually been enforced by officers other than those who prepared the affidavit, the same result might not have occured; indeed, the wholly erroneous nature of the warrant might have led such officers to feel at liberty to roam throughout respondent's home in search of drugs. Cf. *Whiteley* v. *Warden*, 401 U.S. 560 (1971). I therefore fail to see how a search pursuant to such a fundamentally defective warrant can be characterized as "reasonable."

What the Framers of the Bill of Rights sought to accomplish through the express requirements of the Fourth Amendment was to define precisely the conditions under which government agents could search private property so that citizens would not have to depend solely upon the discretion and restraint of those agents for the protection of their privacy. Although the self-restraint and care exhibited by the officers in this case is commendable, that alone can never be a sufficient protection for constitutional liberties. I am convinced that it is not too much to ask that an attentive magistrate take those minimum steps necessary to ensure that every warrant he issues describes with [****93] particularity the things that his independent review of the warrant application convinces him are likely to be found in the premises. And I am equally convinced that it is not too much to ask that well-trained and experienced police officers take a moment to check that the warrant they have been issued at least describes those things for which they have sought leave to search. These convictions spring not from my own view of sound criminal law enforcement policy, but are instead compelled by the language of the Fourth Amendment and the history that led to its adoption.

III

Even if I were to accept the Court's general approach to the exclusionary rule, I could not agree with today's result. [*949] There is no question that in the hands of the present Court the deterrence rationale has proved to be a powerful tool for confining the scope of the rule. In *Calandra*, for example, the Court concluded that the "speculative and undoubtedly minimal advance in the deterrence of police misconduct," was insufficient to outweigh the "expense of substantially impeding the role of the grand jury." 414 U.S., at 351-352. [***716] In *Stone* v. *Powell*, the Court found [****94] that "the additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs." 428 U.S., at 493. In *United States* v. *Janis*, 428 U.S. 433 (1976), the Court concluded that "exclusion from federal civil proceedings of evidence unlawfully seized by a state criminal enforcement officer has not been shown

to have a sufficient likelihood of deterring the conduct of the state police so that it outweighs the societal costs imposed by the exclusion." *Id*., at 454. And in an opinion handed down today, the Court finds that the "balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings held by the [Immigration and Naturalization Service]." *INS* v. *Lopez-Mendoza, post*, at 1050.

Thus, in this bit of judicial stagecraft, while the sets sometimes change, the actors always have the same lines. Given this well-rehearsed pattern, one might have predicted with some assurance how the present case would unfold. First there is the ritual incantation of the "substantial social costs" exacted by the [****95] exclusionary rule, followed by the virtually foreordained conclusion that, given the marginal benefits, application of the rule in the circumstances of these cases is not warranted. Upon analysis, however, such a result cannot be justified even on the Court's own terms.

At the outset, the Court suggests that society has been asked to pay a high price -- in terms either of setting guilty persons free or of impeding the proper functioning of trials -- as a result of excluding relevant physical evidence in cases [*950] where the police, in conducting searches and seizing evidence, have made only an "objectively reasonable" mistake concerning the constitutionality of their actions. See *ante*, at 907-908. But what evidence is there to support such a claim?

Significantly, the Court points to none, and, indeed, as the Court acknowledges, see *ante*, at 907-908, n. 6, recent studies have demonstrated that the "costs" of the exclusionary rule -- calculated in terms of dropped prosecutions and lost convictions -- are quite low. Contrary to the claims of the rule's critics that exclusion leads to "the release of countless guilty criminals," *Bivens* v. *Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 416 (1971) [****96] (BURGER, C. J., dissenting), these studies have demonstrated that federal and state prosecutors very rarely drop cases because of potential search and seizure problems. For example, a 1979 study prepared at the request of Congress by the General Accounting Office reported that only 0.4% of all cases actually declined for prosecution by federal prosecutors were declined primarily because of illegal search problems. Report of the Comptroller General of the United States, Impact of the Exclusionary Rule on Federal Criminal Prosecutions 14 (1979). If the GAO data are restated as a percentage of *all* arrests, the study shows that only 0.2% of all felony arrests are declined for prosecution because [***717] of potential exclusionary rule problems. See Davies, A Hard Look at What We Know (and Still Need to Learn) About the "Costs" of the Exclusionary Rule: The NIJ Study and Other Studies of "Lost" Arrests, 1983 A. B. F. Res. J. 611, 635. [11] Of course, these data describe [*951] only the costs attributable to the exclusion of evidence in all cases; the costs due to the exclusion of evidence in the narrower category of cases where police have made objectively [****97] reasonable mistakes must necessarily be even smaller. The Court, however, ignores this distinction and mistakenly weighs the aggregated costs of exclusion in *all* cases, irrespective of the circumstances that led to exclusion, see *ante*, at

[11] In a series of recent studies, researchers have attempted to quantify the actual costs of the rule. A recent National Institute of Justice study based on data for the 4-year period 1976-1979 gathered by the California Bureau of Criminal Statistics showed that 4.8% of all cases that were declined for prosecution by California prosecutors were rejected because of illegally seized evidence. National Institute of Justice, Criminal Justice Research Report -- The Effects of the Exclusionary Rule: A Study in California 1 (1982). However, if these data are calculated as a percentage of all arrests, they show that only 0.8% of all arrests were rejected for prosecution because of illegally seized evidence. See Davies, 1983 A. B. F. Res. J., at 619.

In another measure of the rule's impact -- the number of prosecutions that are dismissed or result in acquittals in cases where evidence has been excluded -- the available data again show that the Court's past assessment of the rule's costs has generally been exaggerated. For example, a study based on data from nine midsized counties in Illinois, Michigan, and Pennsylvania reveals that motions to suppress physical evidence were filed in approximately 5% of the 7,500 cases studied, but that such motions were successful in only 0.7% of all these cases. Nardulli, The Societal Cost of the Exclusionary Rule: An Empirical Assessment, 1983 A. B. F. Res. J. 585, 596. The study also shows that only 0.6% of all cases resulted in acquittals because evidence had been excluded. *Id*., at 600. In the GAO study, suppression motions were filed in 10.5% of all federal criminal cases surveyed, but of the motions filed, approximately 80-90% were denied. GAO Report, at 8, 10. Evidence was actually excluded in only 1.3% of the cases studied, and only 0.7% of all cases resulted in acquittals or dismissals after evidence was excluded. *Id*., at 9-11. See Davies, *supra*, at 660. And in another study based on data from cases during 1978 and 1979 in San Diego and Jacksonville, it was shown that only 1% of all cases resulting in nonconviction were caused by illegal searches. F. Feeney, F. Dill, & A. Weir, Arrests Without Conviction: How Often They Occur and Why (National Institute of Justice 1983). See generally Davies, *supra*, at 663.

907, against the potential benefits associated with only those cases in which evidence is excluded because police reasonably but mistakenly believe that their conduct does not violate the Fourth Amendment, see *ante*, at 915-921. When such faulty scales are used, it is little wonder that the balance tips in favor of restricting the application of the rule.

[****98] [*952] What then supports the Court's insistence that this evidence be admitted? Apparently, the Court's only answer is that even though the costs of exclusion are not very substantial, the potential deterrent effect in these circumstances is so marginal that exclusion cannot be justified. The key to the Court's conclusion in this respect is its belief that the prospective deterrent effect of the exclusionary rule operates only in those situations in which police officers, when deciding whether to go forward with some particular search, have reason to know that their planned conduct will violate the requirements of the Fourth Amendment. See *ante*, at 919-921. If these officers in fact understand (or reasonably [***718] should understand because the law is well settled) that their proposed conduct will offend the Fourth Amendment and that, consequently, any evidence they seize will be suppressed in court, they will refrain from conducting the planned search. In those circumstances, the incentive system created by the exclusionary rule will have the hoped-for deterrent effect. But in situations where police officers reasonably (but mistakenly) believe that their planned [****99] conduct satisfies Fourth Amendment requirements -- presumably either (a) because they are acting on the basis of an apparently valid warrant, or (b) because their conduct is only later determined to be invalid as a result of a subsequent change in the law or the resolution of an unsettled question of law -- then such officers will have no reason to refrain from conducting the search and the exclusionary rule will have no effect.

At first blush, there is some logic to this position. Undoubtedly, in the situation hypothesized by the Court, the existence of the exclusionary rule cannot be expected to have any deterrent effect on the particular officers at the moment they are deciding whether to go forward with the search. Indeed, the subsequent exclusion of any evidence seized under such circumstances appears somehow "unfair" to the particular officers involved. As the Court suggests, these officers have acted in what they thought was an appropriate [*953] and constitutionally authorized manner, but then the fruit of their efforts is nullified by the application of the exclusionary rule. *Ante*, at 920-921.

The flaw in the Court's argument, however, is that its logic captures [****100] only one comparatively minor element of the generally acknowledged deterrent purposes of the exclusionary rule. To be sure, the rule operates to some extent to deter future misconduct by individual officers who have had evidence suppressed in their own cases. But what the Court overlooks is that the deterrence rationale for the rule is not designed to be, nor should it be thought of as, a form of "punishment" of individual police officers for their failures to obey the restraints imposed by the Fourth Amendment. See *United States* v. *Peltier*, 422 U.S., at 556-557 (BRENNAN, J., dissenting). Instead, the chief deterrent function of the rule is its tendency to promote institutional compliance with Fourth Amendment requirements on the part of law enforcement agencies generally. [12] [****102] Thus, [***719] as the Court has previously [*954] recognized, "over the long term, [the] demonstration [provided by the exclusionary rule] that our society attaches serious consequences to violation of constitutional rights is thought to encourage those who formulate law enforcement policies, and the officers who implement them, to incorporate Fourth Amendment ideals into their [****101] value system." *Stone* v. *Powell*, 428 U.S., at 492. It is only through such an institutionwide mechanism that information concerning Fourth Amendment standards can be effectively

---

[12] As Justice Stewart has observed:

"[The] exclusionary rule is not designed to serve a specific deterrence function; that is, it is not designed to punish the particular police officer for violating a person's fourth amendment rights. Instead, the rule is designed to produce a 'systematic deterrence': the exclusionary rule is intended to create an incentive for law enforcement officials to establish procedures by which police officers are trained to comply with the fourth amendment because the purpose of the criminal justice system -- bringing criminals to justice -- can be achieved only when evidence of guilt may be used against defendants." Stewart, 83 Colum. L. Rev., at 1400.

See also Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 709-710 (1970) ("The exclusionary rule is not aimed at special deterrence since it does not impose any direct punishment on a law enforcement official who has broken the rule. . . . The exclusionary rule is aimed at affecting the wider audience of all law enforcement officials and society at large. It is meant to discourage violations by individuals who have never experienced any sanction for them"); Mertens & Wasserstrom, 70 Geo. L. J., at 399-401; Kamisar, 16 Creighton L. Rev., at 597, n. 204.

communicated to rank-and-file officers. [13]

[****103] [*955] If the overall educational effect of the exclusionary rule is considered, application of the rule to even those situations in which individual police officers have acted on the basis of a reasonable but mistaken belief that their conduct was authorized can still be expected to have a considerable long-term deterrent effect. If evidence is consistently excluded in these circumstances, police departments will surely be prompted to instruct their officers to devote greater care and attention to providing sufficient information to establish probable cause when applying for a warrant, and to review with some attention the form of the warrant that they have been issued, rather than automatically assuming that whatever document the magistrate has signed will necessarily [***720] comport with Fourth Amendment requirements.

After today's decisions, however, that institutional incentive will be lost. Indeed, the Court's "reasonable mistake" exception to the exclusionary rule will tend to put a premium on police ignorance of the law. Armed with the assurance provided by today's decisions that evidence will always be admissible whenever an officer has "reasonably" relied upon [****104] a warrant, police departments will be encouraged to train officers that if a warrant has simply been signed, it is reasonable, without more, to rely on it. Since in close cases there will no longer be any incentive to error on the side of constitutional behavior, police would have every reason to adopt a "let's-wait-until-it's-decided" approach in situations in which there is a question about a warrant's validity or the basis for its issuance. Cf. *United States* v. *Johnson*, 457 U.S. 537, 561 (1982). [14]

[****105] [*956] Although the Court brushes these concerns aside, a host of grave consequences can be expected to result from its decision to carve this new exception out of the exclusionary rule. A chief consequence of today's decisions will be to convey a clear and unambiguous message to magistrates that their decisions to issue warrants are now insulated from subsequent judicial review. Creation of this new exception for good-faith reliance upon a warrant implicitly tells magistrates that they need not take much care in reviewing warrant applications, since their mistakes will from now on have virtually no consequence: If their decision to issue a warrant was

[13] Although specific empirical data on the systemic deterrent effect of the rule are not conclusive, the testimony of those actually involved in law enforcement suggests that, at the very least, the *Mapp* decision had the effect of increasing police awareness of Fourth Amendment requirements and of prompting prosecutors and police commanders to work towards educating rank-and-file officers. For example, as former New York Police Commissioner Murphy explained the impact of the *Mapp* decision: "I can think of no decision in recent times in the field of law enforcement which had such a dramatic and traumatic effect. . . . I was immediately caught up in the entire program of reevaluating our procedures, which had followed the *Defore* rule, and modifying, amending, and creating new policies and new instructions for the implementation of *Mapp*. . . . Retraining sessions had to be held from the very top administrators down to each of the thousands of foot patrolmen." Murphy, Judicial Review of Police Methods in Law Enforcement: The Problem of Compliance by Police Departments, 44 Texas L. Rev. 939, 941 (1966).

Further testimony about the impact of the *Mapp* decision can be found in the statement of Deputy Commissioner Reisman: "The *Mapp* case was a shock to us. We had to reorganize our thinking, frankly. Before this, nobody bothered to take out search warrants. Although the U.S. Constitution requires warrants in most cases, the U.S. Supreme Court had ruled that evidence obtained without a warrant -- illegally, if you will -- was admissible in state courts. So the feeling was, why bother? Well, once that rule was changed we knew we had better start teaching our men about it." N. Y. Times, Apr. 28, 1965, p. 50, col. 1. A former United States Attorney and now Attorney General of Maryland, Stephen Sachs, has described the impact of the rule on police practices in similar terms: "I have watched the rule deter, routinely, throughout my years as a prosecutor. . . . [Police-prosecutor] consultation is customary in all our cases when Fourth Amendment concerns arise. . . . In at least three Maryland jurisdictions, for example, prosecutors are on twenty-four hour call to field search and seizure questions presented by police officers." Sachs, The Exclusionary Rule: A Prosecutor's Defense, 1 Crim. Justice Ethics 28, 30 (Summer/Fall 1982). See also LaFave, The Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith," 43 U. Pitt. L. Rev. 307, 319 (1982); Mertens & Wasserstrom, *supra*, at 394-401.

[14] The authors of a recent study of the warrant process in seven cities concluded that application of a good-faith exception where an officer relies upon a warrant "would further encourage police officers to seek out the less inquisitive magistrates and to rely on boilerplate formulae, thereby lessening the value of search warrants overall. Consequently, the benefits of adoption of a broad good faith exception in terms of a few additional prosecutions appears to be outweighed by the harm to the quality of the entire search warrant process and the criminal justice system in general." R. Van Duizend, L. Sutton, & C. Carter, The Search Warrant Process: Preconceptions, Perceptions, and Practices 8-12 (Review Draft, National Center for State Courts, 1983). See also Stewart, 83 Colum. L. Rev., at 1403.

correct, the evidence will be admitted; if their decision was incorrect but the police relied in good faith on the warrant, the evidence will also be admitted. Inevitably, the care and attention devoted to such an inconsequential chore will dwindle. Although the Court is correct to note that magistrates do not share the same stake in the outcome of a criminal case as the police, they nevertheless need to appreciate that their role is of some moment in order to continue performing the important task of carefully reviewing warrant [****106] applications. Today's decisions effectively remove that incentive. [15]

[****107] [*957] Moreover, [***721] the good-faith exception will encourage police to provide only the bare minimum of information in future warrant applications. The police will now know that if they can secure a warrant, so long as the circumstances of its issuance are not "entirely unreasonable," *ante*, at 923, all police conduct pursuant to that warrant will be protected from further judicial review. [16] The clear incentive that operated in the past to establish probable cause adequately because reviewing courts would examine the magistrate's judgment carefully, see, *e. g., Franks* v. *Delaware*, 438 U.S. 154, 169-170 (1978); *Jones* v. *United States*, 362 U.S. 257, 271-272 (1960); *Giordenello* v. *United States*, 357 U.S. 480, 483 (1958), has now been so completely vitiated that the police need only show that it was not "entirely unreasonable" under the circumstances [*958] of a particular case for them to believe that the warrant they were issued was valid. See *ante*, at 923. The long-run effect unquestionably will be to undermine the integrity of the warrant process.

[****108] Finally, even if one were to believe, as the Court apparently does, that police are hobbled by inflexible and hypertechnical warrant procedures, today's decisions cannot be justified. This is because, given the relaxed standard for assessing probable cause established just last Term in *Illinois* v. *Gates*, 462 U.S. 213 (1983), the Court's newly fashioned good-faith exception, when applied in the warrant context, will rarely, if ever, offer any greater flexibility for police than the *Gates* standard already supplies. In *Gates*, the Court held that "[the] task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*., at 238. The task of a reviewing court is confined to determining whether "the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." *Ibid*. Given such a relaxed standard, it is virtually inconceivable that a reviewing court, when faced with a defendant's motion to suppress, [****109] could first find that a warrant was invalid under the new *Gates* standard, but then, at the [***722] same time, find that a police officer's reliance on such an invalid warrant was nevertheless "objectively reasonable" under the test announced today. [17] Because the two standards overlap so completely, it is unlikely that a warrant could be found invalid under *Gates* and yet the police reliance upon it could be seen

---

[15] Just last Term in *Illinois* v. *Gates*, 462 U.S. 213 (1983), the Court noted:

"Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." *Id*., at 239.

After today's decisions, there will be little reason for reviewing courts to conduct such a conscientious review; rather, these courts will be more likely to focus simply on the question of police good faith. Despite the Court's confident prediction that such review will continue to be conducted, see *ante*, at 924-925, it is difficult to believe that busy courts faced with heavy dockets will take the time to render essentially advisory opinions concerning the constitutionality of the magistrate's decision before considering the officer's good faith.

[16] As the Court of Appeals for the Second Circuit has observed in this regard:

"If a magistrate's issuance of a warrant were to be, as the government would have it, an all but conclusive determination of the validity of the search and of the admissibility of the evidence seized thereby, police officers might have a substantial incentive to submit their warrant applications to the least demanding magistrates, since once the warrant was issued, it would be exceedingly difficult later to exclude any evidence seized in the resulting search even if the warrant was issued without probable cause. . . . For practical purposes, therefore, the standard of probable cause might be diluted to that required by the least demanding official authorized to issue warrants, even if this fell well below what the Fourth Amendment required." *United States* v. *Karathanos*, 531 F.2d 26, 34 (1976).

[17] See Kamisar, *Gates*, "Probable Cause," "Good Faith," and Beyond, 69 Iowa L. Rev. 551, 588-589 (1984); Wasserstrom, The Incredible Shrinking Fourth Amendment, 21 Am. Crim. L. Rev. 257 (1984); LaFave, 43 U. Pitt. L. Rev., at 307.

as objectively reasonable; otherwise, we would have to entertain the mind-boggling [*959] concept of objectively reasonable reliance upon an objectively unreasonable warrant.

This paradox, as JUSTICE STEVENS suggests, see *post*, at 961-962, perhaps explains the Court's unwillingness to remand No. 82-1771 for [****110] reconsideration in light of *Gates*, for it is quite likely that on remand the Court of Appeals would find no violation of the Fourth Amendment, thereby demonstrating that the supposed need for the good-faith exception in this context is more apparent than real. Therefore, although the Court's decisions are clearly limited to the situation in which police officers reasonably rely upon an apparently valid warrant in conducting a search, I am not at all confident that the exception unleashed today will remain so confined. Indeed, the full impact of the Court's regrettable decisions will not be felt until the Court attempts to extend this rule to situations in which the police have conducted a warrantless search solely on the basis of their own judgment about the existence of probable cause and exigent circumstances. When that question is finally posed, I for one will not be surprised if my colleagues decide once again that we simply cannot afford to protect Fourth Amendment rights.

IV

When the public, as it quite properly has done in the past as well as in the present, demands that those in government increase their efforts to combat crime, it is all too easy for those government [****111] officials to seek expedient solutions. In contrast to such costly and difficult measures as building more prisons, improving law enforcement methods, or hiring more prosecutors and judges to relieve the overburdened court systems in the country's metropolitan areas, the relaxation of Fourth Amendment standards seems a tempting, costless means of meeting the public's demand for better law enforcement. In the long run, however, we as a society pay a heavy price for such expediency, because as Justice Jackson observed, the rights guaranteed in the Fourth Amendment [*960] "are not mere second-class rights but belong in the catalog of indispensable freedoms." *Brinegar* v. *United States*, 338 U.S. 160, 180 (1949) (dissenting opinion). Once lost, such rights are difficult to recover. There is hope, however, that in time this or some later Court will restore these precious freedoms to their rightful place as a primary protection for our citizens against overreaching officialdom.

I dissent.

JUSTICE STEVENS, concurring in the judgment in No. [***723] 82-963, *post*, p. 981, and dissenting in No. 82-1771.

It is appropriate to begin with the plain language of [****112] the Fourth Amendment:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Court assumes that the searches in these cases violated the Fourth Amendment, yet refuses to apply the exclusionary rule because the Court concludes that it was "reasonable" for the police to conduct them. In my opinion an official search and seizure cannot be both "unreasonable" and "reasonable" at the same time. The doctrinal vice in the Court's holding is its failure to consider the separate purposes of the two prohibitory Clauses in the Fourth Amendment.

The first Clause prohibits unreasonable searches and seizures and the second prohibits the issuance of warrants that are not supported by probable cause or that do not particularly describe the place to be searched and the persons or things to be seized. We have, of course, repeatedly held that warrantless searches are presumptively unreasonable, [1] [*961] and [****113] that there are only a few carefully delineated exceptions to that basic presumption. [2] But when such an exception has been recognized, analytically we have necessarily concluded that the warrantless activity was not "unreasonable" within the meaning of the first Clause. Thus, any Fourth Amendment case may present two separate questions: whether the search was conducted pursuant to a warrant issued in accordance with the second Clause, and, if not, whether it was nevertheless "reasonable" within the meaning of the first. On these questions, the constitutional text requires that we speak with one voice. We cannot intelligibly assume, *arguendo*, that a search

---

[1] See, *e. g., Payton* v. *New York*, 445 U.S. 573, 586 (1980); *Chimel* v. *California*, 395 U.S. 752, 762-763 (1969).

[2] See, *e. g., Coolidge* v. *New Hampshire*, 403 U.S. 443, 474-475 (1971); *Vale* v. *Louisiana*, 399 U.S. 30 (1970).

was constitutionally unreasonable but that the seized evidence is admissible because the same search was reasonable.

[****114] I

In No. 82-963, the Supreme Judicial Court of Massachusetts determined that a warrant which purported to authorize a search of respondent's home had been issued in violation of the Warrant Clause. In its haste to make new law, this Court does not tarry to consider this holding. Yet, as I will demonstrate, this holding is clearly wrong; I would reverse the judgment on that ground alone.

In No. 82-1771, there is also a substantial question whether the warrant complied with the Fourth Amendment. There was a strong dissent [***724] on the probable-cause issue when *Leon* was before the Court of Appeals, and that dissent has been given added force by this Court's intervening decision in *Illinois* v. *Gates*, 462 U.S. 213 (1983), which constituted a significant development in the law. It is probable, though admittedly not certain, that the Court of Appeals would now conclude that the warrant in *Leon* satisfied the Fourth Amendment if it were given the opportunity to reconsider the issue in the light of *Gates*. Adherence to our normal [*962] practice following the announcement of a new rule would therefore postpone, and probably obviate, the need [****115] for the promulgation of the broad new rule the Court announces today. [3]

It is, of course, disturbing that the Court chooses one case in which there was no violation of the Fourth Amendment, and another in which there is grave doubt on the question, in order to promulgate a "good faith" exception to the Fourth Amendment's exclusionary rule. The Court's explanation for its failure to decide the merits of the Fourth Amendment question in No. 82-963 is that it "is a factbound issue of little importance," *Massachusetts* v. *Sheppard, post*, at 988, n. 5. In No. 82-1771, the Court acknowledges that the case could be remanded to the Court of Appeals for reconsideration in light of *Gates*, yet does not bother to explain why [****116] it fails to do so except to note that it is "within our power" to decide the broader question in the case. *United States* v. *Leon, ante*, at 905. The Court seems determined to decide these cases on the broadest possible grounds; such determination is utterly at odds with the Court's traditional practice as well as any principled notion of judicial restraint. Decisions made in this manner are unlikely to withstand the test of time.

Judges, more than most, should understand the value of adherence to settled procedures. By adopting a set of fair procedures, and then adhering to them, courts of law ensure that justice is administered with an even hand. "These are subtle matters, for they concern the ingredients of what constitutes justice. Therefore, justice must satisfy the appearance of justice." *Offutt* v. *United States*, 348 U.S. 11, 14 (1954). Of course, this Court has a duty to face questions of constitutional law when necessary to the disposition of an actual case or controversy. *Marbury* v. *Madison*, 1 Cranch [*963] 137, 177 (1803). But when the Court goes beyond what is necessary to decide the case before it, it can only [****117] encourage the perception that it is pursuing its own notions of wise social policy, rather than adhering to its judicial role. I do not believe the Court should reach out to decide what is undoubtedly a profound question concerning the administration of criminal justice before assuring itself that this question is actually and of necessity presented by the concrete facts before the Court. Although it may appear that the [***725] Court's broad holding will serve the public interest in enforcing obedience to the rule of law, for my part, I remain firmly convinced that "the preservation of order in our communities will be best ensured by adherence to established and respected procedures." *Groppi* v. *Leslie*, 436 F.2d 331, 336 (CA7 1971) (en banc) (STEVENS, J., dissenting), rev'd, 404 U.S. 496 (1972).

II

In No. 82-963, there is no contention that the police officers did not receive appropriate judicial authorization for their search of respondent's residence. A neutral and detached judicial officer had correctly determined that there was probable cause to conduct a search. Nevertheless, the Supreme Judicial Court suppressed the fruits of the [****118] search because the warrant did not particularly describe the place to be searched and the things to be seized.

The particularity requirement of the Fourth Amendment has a manifest purpose -- to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to

---

[3] In his petition for certiorari in *Leon*, the Solicitor General did not seek plenary review, but only that the petition "be disposed of as appropriate in light of the Court's decision in *Illinois* v. *Gates*," Pet. for Cert. in *United States* v. *Leon*, No. 82-1771, p. 10.

search, the requirement ensures that the search is carefully tailored to its justification, and does not resemble the wide-ranging general searches that the Framers intended to prohibit. [4] In this [*964] case the warrant did not come close to authorizing a general search. [5]

[****119] The affidavit supporting the application for the warrant correctly identified the things to be seized, and on its face the affidavit indicated that it had been presented to the judge who had issued the warrant. [6] Both the police officers and the judge were fully aware of the contents of the affidavit, and therefore knew precisely what the officers were authorized to search for. Since the affidavit was available for after-the-fact review, the Massachusetts courts could readily ascertain the limits of the officers' authority under the warrant. In short, the judge who issued the warrant, the police officers who executed it, and the reviewing courts all were able easily to ascertain the precise scope of the authorization provided by the warrant.

All that our cases require is that a warrant contain a description sufficient [***726] to enable the officers who execute it to ascertain with reasonable effort where they are to search and [****120] what they are to seize. [7] The test is whether the executing officers' discretion has been limited in a way that forbids a general search. [8] Here there was no question that the [*965] executing officers' discretion had been limited -- they, as well as the reviewing courts, knew the precise limits of their authorization. There was simply no "occasion or opportunity for officers to rummage at large," *Zurcher* v. *Stanford Daily*, 436 U.S. 547, 566 (1978). [9]

The only Fourth Amendment interest that is arguably implicated by the "defect" in the warrant is the citizen's interest in being able to [****121] ascertain the limits of the officers' authorization by examining the warrant. [10] [****122] Respondent, however, was not home at the time the warrant was executed, and therefore had no occasion to see the warrant. The two persons who were present when the warrant was executed, respondent's mother and sister, did not read the warrant or ask to have it read. "[The] general rule [is] that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman* v. *United States*, 394 U.S. 165, 174 (1969). Thus, respondent, who has standing to assert only his own Fourth Amendment interests, [11] cannot complain that his interest in ascertaining the limits of the officers' authority under the search warrant was infringed. [12] In short, our [*966] precedents construing

[4] See *Andresen* v. *Maryland*, 427 U.S. 463, 480 (1976); *Stanley* v. *Georgia*, 394 U.S. 557, 569-572 (1969) (Stewart, J., concurring in result); *Stanford* v. *Texas*, 379 U.S. 476, 481-482, 485 (1965); *Go-Bart Importing Co*. v. *United States*, 282 U.S. 344, 357 (1931); *Marron* v. *United States*, 275 U.S. 192, 195-196 (1927).

[5] Indeed, the "defect" in the warrant was that it authorized -- albeit mistakenly -- a search for quite particular "things to be seized," controlled substances, rather than the evidence described in the affidavit supporting the warrant application. This "defect" posed no risk of a general search. On its face, the warrant correctly identified the place to be searched. Thus, the threshold invasion of privacy -- entry into respondent's home -- was properly and specifically authorized. Moreover, the four corners of the warrant plainly indicate that it was not intended to authorize a search for controlled substances. On the cover of the warrant the caption "Controlled Substances" had been crossed out, and an "addendum" to the warrant authorized a search for and seizure of a rifle and ammunition, indicating that the warrant was not limited to controlled substances.

[6] The issuing judge attested to the affiant's signature on the affidavit.

[7] See *Steele* v. *United States*, 267 U.S. 498, 503 (1925).

[8] See *Lo-Ji Sales, Inc*. v. *New York*, 442 U.S. 319, 325 (1979); *Andresen* v. *Maryland*, 427 U.S., at 480-482; *Marcus* v. *Search Warrant*, 367 U.S. 717, 732-733 (1961).

[9] See also *Coolidge* v. *New Hampshire*, 403 U.S., at 467.

[10] See *Illinois* v. *Gates*, 462 U.S. 213, 236 (1983); *United States* v. *Chadwick*, 433 U.S. 1, 9 (1977); *Camara* v. *Municipal Court*, 387 U.S. 523, 532 (1967).

[11] See, *e. g., Rawlings* v. *Kentucky*, 448 U.S. 98, 104-106 (1980); *Rakas* v. *Illinois*, 439 U.S. 128 (1978).

[12] Even if respondent had standing to assert his right to be able to ascertain the officers' authority from the four corners of the warrant, it is doubtful that he could succeed. On its face the warrant authorized a search of respondent's residence, "42 Deckard Street." Had respondent read the warrant he would have had no reason to question the officers' right to enter the premises. Moreover, the face of the warrant indicated that the caption "Controlled Substances" had been stricken, and at the bottom of the warrant an addendum authorized the search for and seizure of a rifle and ammunition. The supporting affidavit, which the police had with them when they executed the warrant, and which was attested by the same judge who had issued the warrant, described in detail the items which the police were authorized to search for and to seize.

the particularity requirement of the Warrant Clause unambiguously demonstrate that this warrant did not violate the Fourth Amendment.

III

Even if it be assumed that there was a technical violation of the particularity requirement in [****123] No. 82-963, it by no means follows that the "warrantless" search in that case was "unreasonable" within the [***727] meaning of the Fourth Amendment. For this search posed none of the dangers to which the Fourth Amendment is addressed. It was justified by a neutral magistrate's determination of probable cause and created no risk of a general search. It was eminently "reasonable."

In No. 82-1771, however, the Government now admits -- at least for the tactical purpose of achieving what it regards as a greater benefit -- that the substance, as well as the letter, of the Fourth Amendment was violated. The Court therefore assumes that the warrant in that case was not supported by probable cause, but refuses to suppress the evidence obtained thereby because it considers the police conduct to satisfy a "newfangled" nonconstitutional standard of reasonableness. [13] Yet if the Court's assumption is correct -- if there was no probable cause -- it must follow that it was "unreasonable" [*967] for the authorities to make unheralded entries into and searches of private dwellings and automobiles. The Court's conclusion that such searches undertaken without probable cause can nevertheless [****124] be "reasonable" is totally without support in our Fourth Amendment jurisprudence.

[****125] Just last Term, the Court explained what probable cause to issue a warrant means:

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois* v. *Gates*, 462 U.S., at 238.

Moreover, in evaluating the existence [***728] of probable cause, reviewing courts must give substantial deference to the magistrate's determination. [14] [****127] In doubtful cases the warrant [*968] should be sustained. [15] The judgment as to whether there is probable cause must be made in a practical and nontechnical manner. [16] The probable-cause standard

---

[13] I borrow the adjective from Justice Clark, who so characterized the warrants authorized by the Court in *Camara* v. *Municipal Court*, 387 U.S. 523 (1967), but not authorized by the Constitution itself. In an opinion joined by Justice Harlan and Justice Stewart, he wrote:

"Today the Court renders this municipal experience, which dates back to Colonial days, for naught by overruling *Frank* v. *Maryland* [359 U.S. 360 (1959)] and by striking down hundreds of city ordinances throughout the country and jeopardizing thereby the health, welfare, and safety of literally millions of people.

"But this is not all. It prostitutes the command of the Fourth Amendment that 'no Warrants shall issue, but upon probable cause' and sets up in the health and safety codes area inspection a newfangled 'warrant' system that is entirely foreign to Fourth Amendment standards. It is regrettable that the Court wipes out such a long and widely accepted practice and creates in its place such enormous confusion in all of our towns and metropolitan cities in one fell swoop." *See* v. *City of Seattle*, 387 U.S. 541, 547 (1967) (dissenting in both *Camara* and *See*).

The kind of doctrinal difficulties in the two lines of cases engendered by the Court's creation of a newfangled warrant, compare *Marshall* v. *Barlow's, Inc.*, 436 U.S. 307 (1978), with *Donovan* v. *Dewey*, 452 U.S. 594 (1981), can be expected to grow out of the Court's creation of a new double standard of reasonableness today. Ironically, as I have previously suggested, the failure to consider both Clauses of the Amendment infects both lines of decision. See *Michigan* v. *Clifford*, 464 U.S. 287, 301-303 (1984) (STEVENS, J., concurring in judgment); *Dewey*, 452 U.S., at 606-608 (STEVENS, J., concurring); *Michigan* v. *Tyler*, 436 U.S. 499, 513 (1978) (STEVENS, J., concurring in part and concurring in judgment); *Barlow's*, 436 U.S., at 325-339 (STEVENS, J., dissenting).

[14] See *Massachusetts* v. *Upton*, 466 U.S. 727, 732-733 (1984) (*per curiam*); *Illinois* v. *Gates*, 462 U.S., at 236; *United States* v. *Harris*, 403 U.S. 573, 577-583 (1971) (plurality opinion); *Spinelli* v. *United States*, 393 U.S. 410, 419 (1969); *Aguilar* v. *Texas*, 378 U.S. 108, 111 (1964); *Jones* v. *United States*, 362 U.S. 257, 271 (1960).

[15] See *Illinois* v. *Gates*, 462 U.S., at 237, n. 10; *United States* v. *Ventresca*, 380 U.S. 102, 109 (1965).

[16] See *Massachusetts* v. *Upton*, 466 U.S., at 732 (*per curiam*);

therefore gives law enforcement officers ample room to engage in any reasonable law enforcement activity. What is more, the standard has been familiar to the law enforcement profession for centuries. [17] In an opinion written in 1949, and endorsed by the Court last Term in *Gates*, we explained:

"These long-prevailing [****126] standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." *Brinegar* v. *United States*, 338 U.S. 160, 176.

Thus, if the majority's assumption is correct, that even after paying heavy deference to the magistrate's finding and resolving all doubt in its favor, there is no probable cause here, then by definition -- as a matter of constitutional law -- [*969] the officers' conduct was unreasonable. [18] [****128] The Court's own hypothesis is that there was no fair likelihood that the officers would find evidence of a crime, and hence there was no reasonable law enforcement justification for their conduct. [19]

The [***729] majority's contrary conclusion rests on the notion that it must be reasonable for a police officer to rely on a magistrate's finding. Until today that has plainly not been the law; it has been well settled that even when a magistrate issues a warrant there is no guarantee that the ensuing search and seizure is constitutionally reasonable. Law enforcement officers have long been on notice that despite the magistrate's decision a warrant will be invalidated if the officers did not provide sufficient facts to enable the magistrate to evaluate the existence of probable cause responsibly and independently. [20] [****130] Reviewing courts have always [****129] inquired into whether the magistrate acted properly in issuing the warrant -- not merely whether the officers acted properly in executing it. See *Jones* v. *United States*, 362 U.S. 257, 271-272 (1960). [21] Indeed, just last Term, in *Gates*, after noting [*970] that "'the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for [concluding]' that probable cause existed,'" 462 U.S., at 238-239 (quoting *Jones*, 362 U.S., at 271), the Court added:

"Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur,

*Illinois* v. *Gates*, 462 U.S., at 231; *United States* v. *Ventresca*, 380 U.S., at 108.

[17] See, *e. g.*, 2 M. Hale, Pleas of the Crown 150 (1st Am. ed. 1847).

[18] "[If] nothing said under oath in the warrant application demonstrates the need for an unannounced search by force, the probable-cause requirement is not satisfied. In the absence of some other showing of reasonableness, the ensuing search violates the Fourth Amendment." *Zurcher* v. *Stanford Daily*, 436 U.S. 547, 583 (1978) (STEVENS, J., dissenting).

[19] As the majority recognizes, *United States* v. *Leon, ante*, at 915, n. 13, an officer's good faith cannot make otherwise "unreasonable" conduct reasonable. See *Terry* v. *Ohio*, 392 U.S. 1, 22 (1968); *Beck* v. *Ohio*, 379 U.S. 89, 97 (1964); *Henry* v. *United States*, 361 U.S. 98, 102 (1959). The majority's failure to appreciate the significance of that recognition is inexplicable.

[20] See *Franks* v. *Delaware*, 438 U.S. 154, 165, 169-170 (1978); *Whiteley* v. *Warden*, 401 U.S. 560, 564 (1971); *Spinelli* v. *United States*, 393 U.S., at 415-416; *United States* v. *Ventresca*, 380 U.S., at 108-109; *Aguilar* v. *Texas*, 378 U.S., at 113-115; *Nathanson* v. *United States*, 290 U.S. 41 (1933); *Byars* v. *United States*, 273 U.S. 28 (1927).

[21] In making this point in *Franks* v. *Delaware*, 438 U.S. 154 (1978), JUSTICE BLACKMUN wrote for the Court: "We see no principled basis for distinguishing between the question of the sufficiency of an affidavit, which is also subject to a post-search examination, and the question of its integrity." *Id.*, at 171. Yet today the Court justifies its holding in part by distinguishing veracity claims, *United States* v. *Leon, ante*, at 922-923, thereby distinguishing what we previously held could not be distinguished on a principled basis. Just why it should be less reasonable for an innocent officer to rely on a warrant obtained by another officer's fraud than for him to rely on a warrant that is not supported by probable cause is entirely unclear to me.

courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." 462 U.S. at 239. [22]

[****131] Thus, under our cases it has never been "reasonable" for the police to rely on the mere fact that a warrant has issued; the police have always known that if they fail to supply the [***730] magistrate with sufficient information, the warrant will be held invalid and its fruits excluded. [23]

The notion that a police officer's reliance on a magistrate's warrant is automatically appropriate is one the Framers of [*971] the Fourth Amendment would have vehemently rejected. The precise problem that the Amendment was intended to address was *the unreasonable issuance* [****132] *of warrants* . As we have often observed, the Amendment was actually motivated by the practice of issuing general warrants -- warrants which did not satisfy the particularity and probable-cause requirements. [24] [****133] The resentments which led to the Amendment were directed at the issuance of *warrants* unjustified by particularized evidence of wrongdoing. [25] Those who sought to amend the Constitution to include a Bill of Rights repeatedly voiced the view that the evil which had to be addressed was the issuance of warrants on insufficient evidence. [26] As Professor Taylor has written:

[*972] "[Our] constitutional fathers were not concerned about warrantless searches, but about overreaching warrants. It is perhaps too much to say that they feared the warrant more than the search, but it is plain enough that the warrant was the prime object of their concern. Far from looking at the warrant as a protection against unreasonable searches, they saw it as an authority for unreasonable and oppressive searches. . . ." T. Taylor, [***731] Two Studies in Constitutional Interpretation 41 (1969).

In short, the Framers of the Fourth Amendment were deeply suspicious [****134] of warrants; in their minds the paradigm of an abusive search was the execution of a warrant not based on probable cause. The fact that colonial officers had magisterial authorization for their conduct when they engaged in general searches surely did not make their conduct "reasonable." The Court's view that it is consistent with our Constitution to adopt a rule that it is presumptively reasonable to rely on a defective warrant is the product of constitutional amnesia. [27]

---

[22] Judicial review of magisterial determinations is all the more necessary since the magistrate acts without benefit of adversarial presentation; his determination partakes of the unreliability inherent in any *ex parte* proceeding. See *Franks* v. *Delaware*, 438 U.S., at 169.

[23] The majority seems to be captivated by a vision of courts invalidating perfectly reasonable police conduct because of "technical" violations of the Fourth Amendment. In my view there is no such thing as a "technical" violation of the Fourth Amendment. No search or seizure can be unconstitutional unless it is "unreasonable." By definition a Fourth Amendment violation cannot be reasonable. My analysis of No. 82-963 illustrates this point.

[24] See, *e. g., Steagald* v. *United States*, 451 U.S. 204, 220 (1981); *Payton* v. *New York*, 445 U.S., at 583-584; *Lo-Ji Sales, Inc*. v. *New York*, 442 U.S., at 325; *Marshall* v. *Barlow's, Inc*., 436 U.S., at 327-328 (STEVENS, J., dissenting); *United States* v. *Chadwick*, 433 U.S., at 7-8; *Chimel* v. *California*, 395 U.S., at 760-762; *Stanford* v. *Texas*, 379 U.S., at 480-485; *Marcus* v. *Search Warrant*, 367 U.S., at 727-729; *Henry* v. *United States*, 361 U.S., at 100-101; *Frank* v. *Maryland*, 359 U.S. 360, 363-365 (1959); *United States* v. *Rabinowitz*, 339 U.S. 56, 69-70 (1950) (Frankfurter, J., dissenting); *Marron* v. *United States*, 275 U.S., at 195-196; *Weeks* v. *United States*, 232 U.S. 383, 390-391 (1914); *Boyd* v. *United States*, 116 U.S. 616, 624-630 (1886).

[25] See J. Landynski, Search and Seizure and the Supreme Court 19-47 (1966); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 53-98 (1937); R. Rutland, The Birth of the Bill of Rights 11 (rev. ed. 1983); Marke, The Writs of Assistance Case and the Fourth Amendment, in Essays in Legal History in Honor of Felix Frankfurter 351 (M. Forkosch ed. 1966).

[26] See 1 The Bill of Rights: A Documentary History 473, 488-489, 508 (B. Schwartz ed. 1971); 2 *id*., at 658, 665, 730, 733-734, 805-806, 815, 841-842, 913, 968. In fact, the original version of the Fourth Amendment contained only one clause providing that the right to be protected against unreasonable searches and seizures "shall not be violated by warrants issuing. . . ." The change to its present form broadened the coverage of the Amendment but did not qualify the unequivocal prohibition against the issuance of warrants without probable cause. See 2 *id*., at 1112; N. Lasson, *supra* n. 25, at 101-103.

[27] "It makes all the difference in the world whether one recognizes the central fact about the Fourth Amendment, namely, that it was a safeguard against recurrence of abuses so deeply felt by the Colonies as to be one of the potent causes of the Revolution, or one thinks of it as merely a requirement for a piece of paper." *United States* v. *Rabinowitz*, 339 U.S., at 69 (Frankfurter, J., dissenting).

IV

In *Brinegar*, Justice Jackson, after observing that "[indications] are not wanting that Fourth Amendment freedoms [****135] are tacitly marked as secondary rights, to be relegated to a deferred position," 338 U.S., at 180 (dissenting opinion), continued:

"These, I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and [*973] seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.

. . . .

"Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing [****136] incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are, many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear.

"Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty. . . . So a search against Brinegar's car must be regarded as a search of the car of Everyman." *Id.*, at 180-181.

Justice Jackson's reference to his [***732] experience at Nuremberg should remind us of the importance of considering the consequences of today's decision for "Everyman."

The exclusionary rule is designed to prevent violations of the Fourth Amendment. [28] [****138] "Its purpose is to deter -- to compel [*974] respect for the constitutional guaranty in the only effectively available way, by removing the incentive to disregard it." *Elkins* v. *United States*, 364 U.S. 206, 217 (1960). [29] If the police cannot use evidence [****137] obtained through warrants issued on less than probable cause, they have less incentive to seek those warrants, and magistrates have less incentive to issue them.

Today's decisions do grave damage to that deterrent function. Under the majority's new rule, even when the police know their warrant application is probably insufficient, they retain an incentive to submit it to a magistrate, on the chance that he may take the bait. No longer must they hesitate and seek additional evidence

---

[28] For at least two reasons, the exclusionary rule is a better remedy than a civil action against an offending officer. Unlike the fear of personal liability, it should not create excessive deterrence; moreover, it avoids the obvious unfairness of subjecting the dedicated officer to the risk of monetary liability for a misstep while endeavoring to enforce the law. Society, rather than the individual officer, should accept the responsibility for inadequate training or supervision of officers engaged in hazardous police work. What THE CHIEF JUSTICE wrote, some two decades ago, remains true today:

"It is the proud claim of a democratic society that the people are masters and all officials of the state are servants of the people. That being so, the ancient rule of *respondeat superior* furnishes us with a simple, direct and reasonable basis for refusing to admit evidence secured in violation of constitutional or statutory provisions. Since the policeman is society's servant, his acts in the execution of his duty are attributable to the master or employer. Society as a whole is thus responsible and society is 'penalized' by refusing it the benefit of evidence secured by the illegal action. This satisfies me more than the other explanations because it seems to me that society -- in a country like ours -- *is* involved in and *is* responsible for what is done in its name and by its agents. Unlike the Germans of the 1930's and early '40's, we cannot say 'it is all The Leader's doing. I am not responsible.' In a representative democracy we are responsible, whether we like it or not. And so each of us is involved and each is in this sense responsible when a police officer breaks rules of law established for our common protection." Burger, Who Will Watch the Watchman?, 14 Am. U. L. Rev. 1, 14 (1964) (emphasis in original) (footnote omitted).

[29] See *Stone* v. *Powell*, 428 U.S. 465, 484 (1976); *United States* v. *Janis*, 428 U.S. 433, 443, n. 12 (1976); *United States* v. *Calandra*, 414 U.S. 338, 347-348 (1974); *Terry* v. *Ohio*, 392 U.S., at 29; *Tehan* v. *United States ex rel. Shott*, 382 U.S. 406, 413 (1966); *Mapp* v. *Ohio*, 367 U.S. 643, 656 (1961).

in doubtful cases. Thus, what we [*975] said two Terms ago about a rule that would prevent exclusion except in cases in which the authorities violate well-settled law applies fully to the rule the Court adopts today:

"If, as the Government argues, all rulings resolving unsettled Fourth Amendment questions should be nonretroactive, then, [****139] in close cases law enforcement officials would have little incentive to err on the side of constitutional behavior. Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the [***733] area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question. Failure to accord *any* retroactive effect to Fourth Amendment rulings would 'encourage police or other courts to disregard the plain purport of our decisions and to adopt a let's-wait-until-it's-decided approach.'" *United States* v. *Johnson*, 457 U.S. 537, 561 (1982) (emphasis in original) (footnote omitted) (quoting *Desist* v. *United States*, 394 U.S. 244, 277 (1969) (Fortas, J., dissenting)). [30]

[****140] The Court is of course correct that the exclusionary rule cannot deter when the authorities have no reason to know that their conduct is unconstitutional. But when probable cause is lacking, then by definition a reasonable person under the circumstances would not believe there is a fair likelihood that a search will produce evidence of a crime. Under such circumstances well-trained professionals must know that they are violating the Constitution. The Court's approach -- [*976] which, in effect, encourages the police to seek a warrant even if they know the existence of probable cause is doubtful -- can only lead to an increased number of constitutional violations.

Thus, the Court's creation of a double standard of reasonableness inevitably must erode the deterrence rationale that still supports the exclusionary rule. But we should not ignore the way it tarnishes the role of the judiciary in enforcing the Constitution. For the original rationale for the exclusionary rule retains its force as well as its relevance:

"The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures . . . should find no sanction in the [****141] judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights." *Weeks* v. *United States*, 232 U.S. 383, 392 (1914). [31] [****143]

[***734] Thus, "Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional [*977] rights of citizens by permitting unhindered governmental use of the fruits of such invasions. . . ." *Terry* v. *Ohio*, 392 U.S. 1, 13 (1968). [32] As the Court correctly notes, [33] we have refused to apply the exclusionary rule to collateral contexts in which its marginal efficacy is questionable;

---

[30] See also LaFave, The Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith," 43 U. Pitt. L. Rev. 307, 358 (1982); Stewart, The Road to *Mapp* v. *Ohio* and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases, 83 Colum. L. Rev. 1365, 1401-1403 (1983); Wasserstrom, The Incredible Shrinking Fourth Amendment, 21 Am. Crim. L. Rev. 257, 395-397 (1984).

[31] The Court continued:

"The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land. The United States Marshal could only have invaded the house of the accused when armed with a warrant issued as required by the Constitution, upon sworn information and describing with reasonable particularity the things for which the search was to be made. Instead, he acted without sanction of law, doubtless prompted by the desire to bring further proof to the aid of the Government, and under color of his office undertook to make a seizure of private papers in direct violation of the constitutional prohibition against such action. Under such circumstances, without sworn information and particular description, not even an order of court would have justified such procedure. . . . To sanction such proceedings would be to affirm by judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action." 232 U.S., at 393-394.

[32] See *United States* v. *Peltier*, 422 U.S. 531, 536 (1975); *Lee* v. *Florida*, 392 U.S. 378, 385-386 (1968); *Berger* v. *New York*, 388 U.S. 41, 50 (1967); *Mapp* v. *Ohio*, 367 U.S., at 647-650; *Byars* v. *United States*, 273 U.S., at 33-34.

[33] *United States* v. *Leon, ante*, at 908-913.

until today, however, every time the police have violated the applicable commands of the Fourth Amendment a court has been prepared to vindicate that Amendment by preventing the use of evidence so obtained in the prosecution's case in chief against those whose rights have been violated. [34] Today, for the first time, this Court holds that although the Constitution has been violated, no court should do anything about it at any time and in any proceeding. [****142] [35] [****144] In my judgment, [*978] the Constitution requires more. Courts simply cannot escape their responsibility for redressing constitutional violations if they admit evidence obtained through unreasonable searches and seizures, since the entire point of police conduct that violates the Fourth Amendment is to obtain evidence for use at trial. If such evidence is admitted, then the courts become not merely the final and necessary link in an unconstitutional chain of events, but its actual motivating force. "If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed." *Olmstead* v. *United States*, 277 U.S. 438, 470 [***735] (1928) (Holmes, J., dissenting). Nor should we so easily concede the existence of a constitutional violation for which there is no remedy. [36] To do so is to convert a Bill of *Rights* into an unenforced honor code that the police may follow in their discretion. The Constitution requires more; it requires a *remedy*. [37] If the Court's new rule is to be followed, the Bill of Rights should be renamed.

[****145] [*979] It is of course true that the exclusionary rule exerts a high price -- the loss of probative evidence of guilt. But that price is one courts have often been required to pay to serve important social goals. [38] [****146] That price is also one the Fourth Amendment requires us to pay, assuming as we must that the Framers intended that its strictures "shall not be violated." For in all such cases, as Justice Stewart has observed, "the same extremely relevant evidence would not have been obtained had the police officer complied with the commands of the fourth amendment in the first place." [39]

---

[34] Indeed, we have concluded that judicial integrity is not compromised by the refusal to apply the exclusionary rule to collateral contexts precisely because the defendant is able to vindicate his rights in the primary context -- his trial and direct appeal therefrom. See *Stone* v. *Powell*, 428 U.S., at 485-486.

[35] As the majority recognizes, *United States* v. *Leon, ante*, at 922-923, and n. 23, in all cases in which its "good faith" exception to the exclusionary rule would operate, there will also be immunity from civil damages. See also *United States* v. *Ross*, 456 U.S. 798, 823, n. 32 (1982); *Stadium Films, Inc*. v. *Baillargeon*, 542 F.2d 577, 578 (CA1 1976); *Madison* v. *Manter*, 441 F.2d 537 (CA1 1971). See generally *Pierson* v. *Ray*, 386 U.S. 547 (1967). The Court amazingly suggests that in some cases in which suppression would not be appropriate courts should nevertheless adjudicate the merits of Fourth Amendment claims to provide guidance to police and magistrates but not a remedy. *United States* v. *Leon, ante*, at 925. Not only is the propriety of deciding constitutional questions in the absence of the strict necessity to do so open to serious question, see *Bowen* v. *United States*, 422 U.S. 916, 920 (1975), but such a proceeding, in which a court would declare that the Constitution had been violated but that it was unwilling to do anything about it, seems almost a mockery: "[The] assurance against unreasonable federal searches and seizures would be 'a form of words,' valueless and undeserving of mention in a perpetual charter of inestimable human liberties." *Mapp* v. *Ohio*, 367 U.S., at 655. See also *Segura* v. *United States, ante*, at 838-840 (STEVENS, J., dissenting).

[36] "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury* v. *Madison*, 1 Cranch 137, 163 (1803). See generally Schrock & Welsh, Up From Calandra: The Exclusionary Rule as a Constitutional Requirement, 59 Minn. L. Rev. 251, 350-372 (1974).

[37] See Stewart, 83 Colum. L. Rev., at 1383-1384 (footnotes omitted) ("In my opinion, however, the framers did not intend the Bill of Rights to be no more than unenforceable guiding principles -- no more than a code of ethics under an honor system. The proscriptions and guarantees in the amendments were intended to create legal rights and duties"). See also Ervin, The Exclusionary Rule: An Essential Ingredient of the Fourth Amendment, 1983 S. Ct. Rev. 283. In fact, if the Constitution of the United States does not compel use of the exclusionary rule, *Mapp* v. *Ohio*, 367 U.S. 643 (1961), which the majority does not purport to question, could not have been decided as it was. See *id*., at 655 ("We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court").

[38] The exclusion of probative evidence in order to serve some other policy is by no means unique to the Fourth Amendment. In his famous treatise on evidence, Dean Wigmore devoted an entire volume to such exclusionary rules, which are common in the law of evidence. See 8 J. Wigmore, Evidence (J. McNaughton rev. 1961) (discussing, *inter alia*, marital privilege, attorney-client privilege, communications among jurors, state secrets privilege, physician-patient privilege, priest-penitent privilege).

[39] Stewart, 83 Colum. L. Rev., at 1392 (footnote omitted). See

"[The] forefathers thought this was not too great a price to pay for that decent privacy of home, papers and effects which is indispensable to individual dignity and self-respect. They may have overvalued privacy, but I am not disposed to set their command at naught." *Harris* v. *United States*, 331 U.S. 145, 198 (1947) (Jackson, J., dissenting). [40]

We could, of course, facilitate the process of administering justice to [***736] those who violate the criminal laws by ignoring the commands of the Fourth Amendment -- indeed, by ignoring [*980] the entire Bill of Rights -- but it is the very purpose of a Bill of Rights to identify values that may not be sacrificed to expediency. In a just society those [****147] who govern, as well as those who are governed, must obey the law.

While I concur in the Court's judgment in No. 82-963, I would vacate the judgment in No. 82-1771 and remand the case to the Court of Appeals for reconsideration in the light of *Gates*. Accordingly, I respectfully dissent from the disposition in No. 82-1771.

## References

Admissibility in criminal case of evidence obtained by law enforcement officer allegedly relying reasonably and in good faith on defective warrant

29 Am Jur 2d, Evidence 416

12 Federal Procedure, L Ed, Evidence 33:389

7 Federal Procedural Forms, L Ed, Criminal Procedure 20:585 et seq.

22 Am Jur Pl & Pr Forms (Rev), Searches and Seizures Form 41 et seq.

5 Am Jur Trials 331, Excluding Illegally Obtained Evidence

USCS, Constitution, Fourth Amendment

US L Ed Digest, Evidence 681, 681.5

L Ed Index to Annos, Search and Seizure

ALR Quick Index, Exclusion or Suppression of Evidence

Federal Quick Index, Exclusion of Evidence; Suppression of Evidence

Annotation References:

Admissibility in criminal case of evidence obtained by [****148] law enforcement officer allegedly relying reasonably and in good faith on defective warrant. 82 L Ed 2d 1054.

Admissibility of evidence obtained by illegal search and seizure. 6 L Ed 2d 1544; 50 ALR2d 531.

Federal Constitution as affecting admissibility of evidence obtained by illegal search and seizure. 84 ALR2d 959.

End of Document

---

also Traynor, Mapp v. Ohio at Large in the Fifty States, 1962 Duke L. J. 319, 322 ("Ah, but surely the guilty should not go free? However grave the question, it seemed improperly directed at the exclusionary rule. The hard answer is in the United States Constitution as well as in state constitutions. They make it clear that the guilty would go free if the evidence necessary to convict could only have been obtained illegally, just as they would go free if such evidence were lacking because the police had observed the constitutional restraints upon them").

[40] See also *United States* v. *Di Re*, 332 U.S. 581, 595 (1948).

# United States v. Baker

807 F.2d 1315 (6th Cir. 1986)

Cited in Opening Brief at: 38

See Response, Part III.G. Highlighted language appears at 807 F.2d at 1320.

Caution
As of: September 14, 2026 7:04 PM Z

# United States v. Baker

United States Court of Appeals for the Sixth Circuit

November 13, 1986, Argued ; December 29, 1986, Decided ; December 29, 1986, Filed

No. 86-5455

**Reporter**
807 F.2d 1315 *; 1986 U.S. App. LEXIS 36329 **

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. ROBERT JUNIOR BAKER, Defendant-Appellant

**Prior History:** [**1] On Appeal from the United States District Court for the Middle District of Tennessee.

**Counsel:** Henry A. Martin, Federal Public Defender for Appellant.

Joe B. Brown, United States Attorney, Harold McDonough, for Appellee.

**Judges:** Kennedy and Norris, Circuit Judges; and Contie, Senior Circuit Judge.

**Opinion by:** CONTIE

## Opinion

[*1317] CONTIE, Senior Circuit Judge.

Robert Junior Baker is appealing from two district court orders. The first order held that Baker did not have the mental competency to participate in the probation revocation proceedings against him, and placed him in the temporary custody of the United States Attorney General for treatment pursuant to 18 U.S.C. § 4241(d). In its second order, [**2] the district court placed Baker in the continued custody of the Attorney General pursuant to 18 U.S.C. § 4246(a); [1] having found Baker to be suffering from a mental disease or defect and that his release would pose a substantial risk of injury to another person, Baker was ordered to be held in a federal mental health treatment facility for an indefinite period of time.

Appellant argues that his initial commitment pursuant to section 4241 was invalid because he did not lack the mental capacity to understand the nature of the probation revocation proceedings and he was competent to waive his right to such proceedings. Regarding the district court's second commitment order, appellant asserts that he was denied his liberty without due process, that the district court lacked the power to commit him in that the court failed to adhere to the procedures outlined in section [**3] 4246(a), and that the order violated the Tenth Amendment.

For the reasons stated below, we hold that: (1) the district court's initial commitment of Baker was valid only up to a period of four months; and (2) Baker's continued commitment pursuant to section 4246 was secured without statutory authority and in violation of his due process rights.

**I.**

Appellant herein, Robert Baker, was sentenced to nine-months incarceration on July 14, 1983, after pleading guilty to a charge of possessing an unregistered firearm in violation of 26 U.S.C. § 5861(d). Appellant served five months and twenty-nine days of this sentence; the remaining time was suspended, and he was placed on probation for three years.

While still on probation, appellant was arrested for driving under the influence of alcohol. Based on this arrest, as well as appellant's failure to contact and report to his probation officer as instructed, a probation violator's warrant was issued on August 23, 1985. Baker was taken into custody on September 4, 1985 pursuant to the warrant, and a probation revocation hearing was scheduled for September 20, 1985 before United States District Court Judge [**4] Thomas A. Higgins. At the September 20th hearing, Baker asserted through counsel that he wished to waive his right to challenge the probation revocation proceedings; rather, he would prefer to serve the remainder of his sentence so that he would not have to report to a probation officer in the

[1] Hereinafter, all references to statutory provisions will be to Title 18, United States Code, unless otherwise specified.

future.

During the course of this hearing the government questioned Baker's mental competency to understand the nature of the probation revocation proceedings. Following an exchange between the district court and Baker, [2] the court determined [*1318] that it was necessary for Baker to undergo a psychiatric examination to ascertain whether he had the mental competency to waive his right to challenge the revocation of his probationary status. Baker's counsel did not raise an objection to having his client undergo this initial psychiatric examination.

[**5] On September 30, 1985, a second hearing was conducted. At this hearing the government maintained that Baker was not competent to proceed with the probation revocation hearing and that he should therefore be committed to the custody of the United States Attorney General and be placed in the care of a psychiatric facility pursuant to section 4241(d). The government relied on a report prepared by a psychiatrist, Dr. Kenner, which indicated that Baker was suffering from schizophrenia and was not competent to understand the proceedings against him. Dr. Kenner specifically reported that Baker believed that his only defense was somehow dependent on a replay of the President's news broadcasts and that the court reporter was a messenger from God who could save him.

In response, Baker's counsel asserted that Baker was competent enough to understand the nature of a probation revocation hearing; that is, that he understood that the probation revocation hearing would determine whether he stayed on probation or served his remaining sentence in jail. Although Baker's counsel acknowledged that Baker's overall competency was in question, he maintained that his client was sufficiently competent [**6] to comprehend the choice he faced and to make that choice. Baker was then questioned by his counsel and the court, and he consistently maintained that he would prefer to serve 60 days in jail than to remain on probation.

The district court thereafter concluded that Baker was "presently suffering from mental disease or defect rendering him incompetent mentally to understand, despite his assertions, the nature and consequences of the proceedings against him," that he was "a danger to himself and to society and that he [was] in desperate need of . . . psychiatric treatment. . . ." The court, relying on section 4241(d), placed Baker in the custody of the Attorney General and an order reflecting this decision was issued on October 1, 1985. Pursuant to the court's order, Baker was committed to a psychiatric hospital -- the Federal Correctional Institute in Butner, North Carolina (hereinafter referred to as Butner) -- "for such time as is necessary to determine whether there is a substantial probability that in the foreseeable future the defendant will attain the capacity to permit the proceedings to continue."

On March 6, 1986, the government filed a motion to dismiss the probation [**7] violator's warrant. There is nothing in the record which indicates that the

---

[2] The record suggests that on September 20, 1985, appellant was probably suffering from some sort of mental illness. Appellant related to the court that something had come out of the television and had been "looking for signs, . . . looking for wonders, signs on me, tattoos. . . ." Further, the following exchange took place:

The Court: Now, do you want to have a hearing and challenge the Government's proof?

Mr. Baker: Yes, Your Honor.

The Court: You do?

Mr. Baker: I will not -- excuse me, I'll not accept the mark of the beast which is three sixes. I asked -- begged, if Your Honor please, I begged them doctors, they said I was crazy in seeing things coming through the T.V. I begged, -- got on my knees and I begged the Lord, what is it. I was looking at the T.V., it was coming through the T.V. to me. I didn't know where it was coming from.

The Court: Well, I note you don't have shoes on. Why aren't you wearing your shoes?

Mr. Baker: I asked the good Lord, I'll walk the way he did if I can save everybody from the hell I've been through. I'll wipe the dust off my feet in protest against --

The Court: Against what?

Mr. Baker: Against Ronald Reagan.

The Court: Why are you protesting against the President?

Mr. Baker: For the simple reason I carried him long enough. I'll not carry him any more, not in my mind, not in -- I just want to be free.

The Court: Now, you want to have a hearing and let the Government present its proof?

Mr. Baker: To put the mark of the beast on me? Yes, Your Honor, I would.

government had filed any motion with the district court prior to this date or that a hearing had been held with respect to Baker's competency and continued commitment. The motion to dismiss noted that it was unlikely that Baker would attain competency in the foreseeable future so as to enable the probation revocation proceedings to continue. It was also noted that, were the motion granted, Baker would be placed in the custody of the state of Tennessee since there was an outstanding warrant for his arrest based on an alleged parole violation.

A hearing was held on this motion the following day, March 7th. At this hearing, the government pointed out to the court [*1319] that Baker's condition had not improved, presumably because he was not taking medication. Further, Baker's psychiatric staff had determined that although Baker had refused to accept medication, they would not medicate Baker by force because he did not pose a threat of danger to himself or anyone at Butner. The government argued that its motion to dismiss was filed primarily because it did not believe it could show that Baker would pose [**8] a danger to others were he released, which was a prerequisite to continued civil commitment under section 4246. It was also noted that Baker had served more time than he would have had his probation been revoked. Baker did not oppose the government's motion.

The district court, before ruling on the motion, asked to hear from Dr. O'Brien, one of Butner's psychiatrists. In response to the court's questions, Dr. O'Brien testified that although Baker was not a threat to himself or anyone at Butner, he had threatened harm to his ex-wife and one of her relatives. Based on these threats, O'Brien opined that Baker would pose "a potential danger to someone in the community," and that he felt "uncomfortable with letting [Baker] out, back out into the community."

Dr. O'Brien further explained, in response to questions raised by Baker's counsel, that Baker's threats toward his ex-wife stemmed from Baker's belief that someone had been harming and possibly molesting his daughters. O'Brien acknowledged that he did not know whether Baker's daughters in fact had been molested and that no investigation had been conducted to verify or refute Baker's assertion; [3] however, were Baker's belief based [**9] in fact rather than delusion, Dr. O'Brien agreed that Baker's angry response would not have been inappropriate.

[**10] Following O'Brien's testimony, the government withdrew its motion to dismiss. Thereafter, the court ruled from the bench that Baker was to remain in the custody of the Attorney General pursuant to section 4246 because he was suffering from a mental disease or defect and that his release would create a substantial risk of bodily injury to another person. An order was issued to this effect on March 10, 1986. The March 10th order also stated that Baker was to be hospitalized for treatment until his release would not pose a risk of injury to another or until "it can be certified to this court that a state facility will assume the custody, care, and treatment of the defendant. . . ." In the meantime, the court ordered that the superintendent of Butner was "to determine whether a certificate as described in Title 18, United States Code, Section 4246(a) can be filed with the court. . . ."

On March 18, 1986, appellant filed a motion for a thirty-day extension to file a notice of appeal which was granted by the district court. On April 2, 1986, appellant filed two motions with the district court. One motion requested the court to reconsider and set aside its March [**11] 10th order and to grant a new hearing. The other requested the court to set aside the March 10th order, to dismiss all the proceedings against Baker and to release him from custody. Before these motions were ruled on, however, Baker filed a notice of appeal from the October 1, 1985 and March 10, 1986 commitment orders. Accordingly, the district court ruled, on April 23, 1986, that it lacked jurisdiction to consider Baker's April 2, 1986 motions.

[*1320] It is in this procedural posture that the case comes before us on appeal.

---

[3] In discussing this matter further with the district court, Dr. O'Brien made the following statements:

The problem I'm having, how do I justify for keeping him there when I can't even determine whether his situation that he described is valid or not valid, based on reality or not based on reality? To what degree have his daughters actually been molested? Is his anger justified? How do I determine that? And right now I'm just working with him and based on that, and previous behavior, and the things that he has said that have delusional components to them, I'm saying that, you know, that potentially he is dangerous. I have to say that. And what he is saying is that "I'm not going to change my position. I feel my daughters are in jeopardy. I'll still, you know, if someone is harming them, I'll still try and protect them." And so we are at sort of a stalemate. How do I determine what is reality based and what is not?

**II.**

**A.**

Appellant argues that he was sufficiently competent, even if only limitedly so, to waive his right to challenge the probation violation proceedings. Since he was competent to waive this right, he asserts that his initial commitment pursuant to 18 U.S.C. § 4241 was erroneous and that the district court therefore lacked authority to proceed under section 4246 at the second hearing. His argument, therefore, only challenges the sufficiency of evidence upon which the district court based its initial commitment decision on September 30, 1985.

While there is testimony in the record from which one could conclude [**12] that Baker understood the difference between being in jail and being on probation, there is also evidence which suggests that Baker was, as a result of his mental disease or defect, unable to understand the nature of the probation revocation hearing. Judging the credibility and mental capacity of witnesses and resolving conflicts in the evidence are within the unique capacity of the factfinder; and, since we cannot find the district court's factual findings regarding Baker's mental competency to be clearly erroneous, *see* Fed. R. Civ. P. 52(a), we do not find an infirmity with regard to Baker's initial commitment.

**B.**

However, inasmuch as appellant claims that his confinement since September 1985 has been illegal, we feel compelled to address the length of his commitment pursuant to the authority of section 4241. Section 4241(d) specifies that the Attorney General is to hospitalize for treatment the individual committed pursuant to this section,

> (1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to [**13] proceed; and
>
> (2) for an additional reasonable period of time until --
>
> > (A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the trial to proceed; or
> >
> > (B) the pending charges against him are disposed of according to law;
>
> whichever is earlier.

18 U.S.C. § 4241(d). We believe that this provision requires that a determination as to the individual's mental condition be made within four months, and that the individual cannot be held pursuant to section 4241 in excess of four months unless the court finds that the individual is likely to attain competency within a reasonable time.

In the instant case, appellant was held from September 30, 1985 until March 1986 before the government filed a motion to dismiss the probation violator's warrant. This confinement was clearly in excess of four months, and there is nothing in the record to indicate that his period of confinement was properly extended. Therefore, although the court's initial commitment of appellant on September 30th was valid, [**14] we hold that there was no authority to confine appellant beyond the four months authorized by section 4241(d).

**III.**

**A.**

Appellant raises several challenges to his continued commitment pursuant to the March 10, 1986 order. Specifically, he argues that since the district court failed to follow the procedures outlined in section 4246, the court was without authority to commit him for an indefinite period of time; similarly, the procedures adopted by the district court were inadequate under the Due Process Clause. He further argues that his commitment was in contravention of the Tenth Amendment. The government [*1321] asserts that this court is without jurisdiction to review these arguments because appellant failed to raise them in the proceedings below. We reject the government's position.

While courts of appeals generally refuse to consider issues not passed upon by lower courts, *Sigmon Fuel Co. v. TVA*, 754 F.2d 162, 164-65 (6th Cir. 1985),

> the matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual [**15] cases. . . . Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, . . . or

where "injustice might otherwise result."

*Singleton v. Wulff*, 428 U.S. 106, 121, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976) (quoting *Hormel v. Helvering*, 312 U.S. 552, 557, 85 L. Ed. 1037, 61 S. Ct. 719 (1941)). In the instant case, substantial questions have been raised regarding the propriety of appellant's commitment; because of the significance of appellant's liberty interest at stake, we find it necessary to address appellant's claims in order to "prevent manifest injustice and to promote procedural efficiency." *United States v. Cheama*, 783 F.2d 165, 168 (10th Cir. 1986). [4] We recognize this to be a very limited exception to our previous pronouncement in *Sigmon Fuel*.

[**16] **B**.

Appellant argues that he never received notification that the March 7, 1986 hearing was going to be a section 4246 civil commitment hearing. Since the government had filed a motion to dismiss charges and no certificate pursuant to section 4246(a) had been issued, Baker asserts that he was not adequately notified that the government intended to commit him for an indefinite period of time. Having been denied adequate notice, Baker asserts that he was denied the opportunity to prepare to rebut the government's evidence and to put on witnesses in his own defense; therefore, he argues that he was deprived of his liberty without due process. In addition, Baker argues that because a certificate was not issued pursuant to section 4246(a), the court was without statutory authority to commit him involuntarily for an indefinite period of time. We find the appellant's arguments persuasive.

The civil commitment of an individual into a mental hospital is a significant deprivation of liberty, particularly when that commitment is of indefinite duration; such a deprivation, therefore, must be accompanied by procedural safeguards which adhere to due process requirements. *See Vitek v. Jones*, 445 U.S. 480, 494, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980) [**17] (the transfer of a prisoner to a mental health facility "implicate[s] a liberty interest protected by the Due Process Clause"); *Addington v. Texas*, 441 U.S. 418, 425, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979) (a "civil commitment for any purpose" deprives a person of liberty and invokes the protection of the Due Process Clause); *United States v. Perry*, 788 F.2d 100, 113 (3d Cir.) ("A civil detention order results in the deprivation of the most fundamental of all personal liberties."), *cert. denied*, 479 U.S. 864, 107 S. Ct. 218, 93 L. Ed. 2d 146 (1986). In determining what process is due, a court must consider the nature of the liberty interest at stake, the "risk of an erroneous deprivation of such interest" when certain procedures are used, and the government's interest in utilizing the procedures being challenged. *Mathews v. Eldridge*, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976).

Congress, in structuring the laws providing for the civil commitment of offenders who have a mental disease or defect, was cognizant of the substantial liberty interest at stake and set forth procedural guidelines [*1322] [**18] to be followed before such individuals could be committed. A review of the statutory provisions dealing with indefinite commitments, and the legislative history behind them, is a proper starting point for analyzing appellant's claims.

Section 4246 provides in relevant part:

> **(a) Institution of proceeding**. -- If the director of a facility in which a person is hospitalized certifies that a person whose sentence is about to expire, or who has been committed to the custody of the Attorney General pursuant to section 4241(d), or against whom all criminal charges have been dismissed solely for reasons related to the mental condition of the person, is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available, he shall transmit the certificate to the clerk of the court for the district in which the person is confined. The clerk shall send a copy of the certificate to the person, and to the attorney for the Government, and, if the person was committed pursuant [**19] to section 4241(d), to the clerk of the court that ordered the commitment. The court shall order a hearing to determine whether the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another. A certificate filed under this subsection shall stay the

[4] *Cheama* is a case similar to the case before this court; however, unlike the court in *Cheama*, we do not believe the record requires further development before we can reach the merits of the issues presented.

release of the person pending completion of procedures contained in this section.

**(b) Psychiatric or psychological examination and report**. -- Prior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247(b) and (c).

**(c) Hearing**. -- The hearing shall be conducted pursuant to the provisions of section 4247(d).

**(d) Determination and disposition**. -- If, after the hearing, the court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious [**20] damage to property of another, the court shall commit the person to the custody of the Attorney General. The Attorney General shall release the person to the appropriate official of the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment. The Attorney General shall make all reasonable efforts to cause such a State to assume such responsibility. If, notwithstanding such efforts, neither such State will assume such responsibility, the Attorney General shall hospitalize the person for treatment in a suitable facility, until --

(1) such a State will assume such responsibility; or

(2) the person's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another;

whichever is earlier. The Attorney General shall continue periodically to exert all reasonable efforts to cause such a State to assume such responsibility for the person's custody, care, and treatment.

. . .

Section 4247(d), [**21] referred to in section 4246(c) above, sets forth requirements for the commitment hearing itself. That section provides that the individual shall be represented by counsel and "shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his own behalf, and to confront and cross-examine [*1323] witnesses who appear at the hearing." These hearing procedures were included explicitly to comply with due process requirements. *See* S. Rep. No. 225, 98th Cong., 2d Sess., *reprinted in* 1984 U.S. Code Cong. & Ad. News 3182, 3418, 3434.

The most significant provision of section 4246 for the purposes of this appeal is subsection (a). That provision specifies the procedures which are to be followed *before* a section 4246 commitment hearing is held. Specifically, the director of the mental health facility has the responsibility "to determine preliminarily whether the defendant should be released." *Id.* at 3433. The director must certify three things: (1) that the individual is suffering from a mental disease or defect; (2) that his release would pose a substantial risk of bodily injury to another or serious damage to property of another; and (3) that [**22] suitable state arrangements for his care are not available. A certificate to this effect is to be transmitted to the clerk of the court for the district in which the individual is confined, and copies are to be mailed to the individual and the attorney for the government. "Upon receipt of the certificate," *id.*, the district court must schedule and hold a hearing which complies with due process requirements to determine whether the individual is suffering from a mental disease or defect and whether his release would pose a threat of bodily injury or property damage.

The government does not attempt to argue that a section 4246 certificate was issued prior to the March 7th commitment hearing, but simply asserts in its brief before this court that a certificate was not issued because one was not requested. Similarly, the government maintains that the March 7th hearing complied with due process requirements because Baker was represented by counsel, was permitted to testify and was provided an opportunity to present his own witnesses and cross-examine the government's witness. In response to appellant's argument that he was not properly notified that the March 7th hearing was going [**23] to be a section 4246 commitment hearing, the government appears to argue that the March 7th hearing was always intended to be a hearing on appellant's competence although the government does not support this claim with any evidence. We are totally unpersuaded by the government's position.

One of the most fundamental requirements of due

process is that an individual must receive adequate notice of the charges or claims being asserted against him. We believe that subsection (a) of section 4246 sets forth a very clear requirement that an individual be notified that a commitment hearing will be held in the future and what the basis for that hearing is. Since a certificate was not filed with the court in the district in which defendant is confined, nor was defendant notified that a section 4246 certificate was filed, we find that defendant did not receive constitutionally adequate notice of the claims which he had to defend against.

Further, without such notification, the hearing procedures outlined in section 4247(d) are without force. Notice is required to provide an individual with a *meaningful* opportunity to challenge the government's evidence; an individual who has not been [**24] notified of the government's intention to commit the person indefinitely or of the grounds relied on by the government, simply has not been afforded an opportunity to present his own witnesses and to challenge adequately the government's evidence.

An example of the unfairness which might arise when proper notification is not given is Baker's assertion that he was not afforded a meaningful opportunity to rebut the government's proof regarding his potential for future dangerousness. [5] It is essential that an individual be provided a [*1324] meaningful opportunity to challenge the government's proof so that the committing court has the benefit of an adversary proceeding. This includes being notified as to the nature of the government's evidence, as well as having an opportunity to present witnesses on one's behalf.

[**25] The certificate not only serves a notification function under the Due Process Clause, but it also acts as a partial guarantee that the section 4246 commitment procedures will be "used only in those rare circumstances where a person has no permanent residence or there are no State authorities willing to accept him for commitment." 1984 U.S. Code Cong. & Ad. News at 3432. Congress' decision to limit the use of these procedures was a result of its belief that it "is essentially the function of the States" to provide care and treatment to mentally ill individuals whose sentences are about to expire or who no longer face federal charges because of their illness. *Id. See also Addington v. Texas*, 441 U.S. 418, 426, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979); *United States v. Cohen*, 236 U.S. App. D.C. 36, 733 F.2d 128, 137 (D.C. Cir. 1984) (en banc); *Higgins v. United States*, 205 F.2d 650, 652 (9th Cir.), *cert. dismissed*, 346 U.S. 870, 74 S. Ct. 134, 98 L. Ed. 379 (1953). By placing the initial burden on the director of the facility to make the necessary determinations, a section 4246 hearing may not be necessary if an [**26] appropriate state facility will accept the individual or if it is believed that the individual does not pose a danger to the community.

In the instant case, the district court, in essence, sua sponte called a section 4246 hearing before the requisite findings were made by the director at Butner. The court was operating under the incorrect assumption that Baker could be retained in federal custody until it was certified to the court that the state *would* agree to assume his care; in contrast, a section 4246 hearing cannot be conducted and a section 4246 commitment order cannot be issued until it has been certified to the court that the state *will not* accept the individual. [6] Further, a certificate must be filed in, and a section 4246 hearing must be held in, the district in which the individual is confined, not the district in which he had initially been charged with an offense.

[**27] We hold, therefore, that by failing to adhere to the procedures outlined in section 4246, the district court lacked statutory authority to commit Baker and deprived Baker of his liberty without due process.

**C.**

Finally, appellant argues that the district court's order

---

[5] Although the government states that Dr. O'Brien was Baker's witness, the record indicates that Dr. O'Brien was cross-examined by Baker's counsel, and there is nothing in the record to support the government's claim. Further, even had Dr. O'Brien been Baker's witness, Baker was not put on notice as to the nature of the testimony to be solicited from O'Brien.

[6] In addition, section 4246(d) provides that, once an individual is found to be suffering from a mental disease or defect and to be potentially dangerous, the district court is merely to commit the individual to the Attorney General's custody; the Attorney General, in turn, is then required to release the individual to the state if the state will assume responsibility for the individual. The Attorney General is required "to make all reasonable efforts to cause such a State to assume such responsibility." Subsection (d) further provides that the individual is only to be hospitalized until the state assumes the responsibility for his care, or the individual gets better. There is nothing in the statute which indicates that further court action is necessary, or even contemplated, before an individual can be released to the state. *Cf.* 18 U.S.C. § 4246(e) (where a court order is necessary for an individual to be discharged on the basis that he has recovered or is no longer dangerous).

committing him indefinitely is in contravention of the Tenth Amendment to the Constitution. In essence, appellant asserts that the federal government lacks the power to civilly commit individuals who may be permanently mentally ill and who have already served their time in prison and do not face additional charges.

The Tenth Amendment provides that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." This amendment has been described as a "truism" in the sense that it does not function as a limitation on Congress' power to act, but merely reiterates that whatever power was not granted to the federal government cannot be exercised by the federal government. *See United States v.* [*1325] *Darby*, 312 U.S. 100, 124, 85 L. Ed. 609, 61 S. Ct. 451 (1941). Therefore, when a federal statute [**28] has been challenged under the Tenth Amendment, the proper inquiry is whether Congress has the power, pursuant to its enumerated powers, to enact the specific piece of legislation. *Cf. Gordon v. United States*, 117 U.S. 697, 705, 29 L. Ed. 1017, 6 S. Ct. 970 (1886); [7] *Greenwood v. United States*, 350 U.S. 366, 375, 100 L. Ed. 412, 76 S. Ct. 410 (1956) (Congress has the power pursuant to the Necessary and Proper Clause to provide for the temporary commitment of individuals who are incompetent to stand trial); *United States v. Cohen*, 236 U.S. App. D.C. 36, 733 F.2d 128, 137 and n. 15 (D.C. Cir. 1984) (en banc) (where it was noted that the Court in *Greenwood* carved out an exception to the Tenth Amendment).

[**29] Had Baker's commitment pursuant to section 4246 been valid, this issue would be properly before us; inasmuch as the district court did not adhere to the statutory scheme and Baker's commitment was in violation of the statute, however, we believe this is not the appropriate case to consider the limits of Congress' power.

**IV.**

In conclusion, we find that although the appellant's initial commitment pursuant to section 4241 was proper, there was no authority to confine appellant beyond the statutorily authorized four months since no further action was taken to extend his commitment. We also conclude that the district court lacked statutory authority to issue its March 10, 1986 order and that Baker was thereby deprived of his liberty without due process when he was committed for an indefinite period of time.

In determining the appropriate relief to be granted, two considerations influence our decision. First, we note that defendant brought a direct appeal from the district court's commitment orders and did not file a habeas corpus petition. Second, after this case was placed on our appellate docket, the director of Butner filed what purports to be a section 4246 certificate [**30] with the clerk of courts in the district in which Baker is confined. Since section 4246(a) provides that such a certificate stays the release of Baker pending further procedures, and inasmuch as he is confined outside our jurisdiction, we find that we are without authority to order his release. Accordingly, we have jurisdiction only to order, which we do at this time, that the district court's March 10, 1986 order be VACATED in accordance with our conclusions set forth herein.

---

**End of Document**

---

[7] The decision of the Supreme Court to dismiss the *Gordon v. United States* case is found at 69 U.S. (2 Wall.) 561, 17 L. Ed. 921 (1864). The opinion of Chief Justice Taney, appearing in the appendix to volume 117 of the United States Reports, was reported to have been "carefully considered by the members of the court in reaching the conclusion reported in 2 Wall. 561; and it was proposed to make it the basis of the opinion . . . ." 117 U.S. at 697. The paper was not rediscovered until after Chief Justice Taney's death, however. It was then printed in volume 117 with an explanatory preamble, including a note that this was the "last judicial paper" prepared by Chief Justice Taney.

# United States v. Dawson

64 F.4th 1227 (11th Cir. 2023)

Cited in Opening Brief at: 38

See Response, Part III.G. Highlighted language appears at 64 F.4th at 1230 and 1240.

Positive
As of: September 14, 2026 7:05 PM Z

# United States v. Dawson

United States Court of Appeals for the Eleventh Circuit

April 5, 2023, Filed

No. 21-11425

**Reporter**
64 F.4th 1227 *; 2023 U.S. App. LEXIS 8129 **; 2023 WL 2781361

UNITED STATES OF AMERICA, Plaintiff-Appellee, versus EDGAR JOHN DAWSON, JR., Defendant-Appellant.

**Subsequent History:** US Supreme Court certiorari denied by Dawson v. United States, 144 S. Ct. 343, 217 L. Ed. 2d 184, 2023 U.S. LEXIS 4284, 2023 WL 7117028 (U.S., Oct. 30, 2023)

**Prior History:** [**1] Appeal from the United States District Court for the Middle District of Florida. D.C. Docket No. 6:20-cr-00077-WWB-GJK-1.

United States v. Poulo, 491 F. Supp. 3d 1244, 2020 U.S. Dist. LEXIS 188530, 2020 WL 5914126 (M.D. Fla., Sept. 29, 2020)

**Disposition:** AFFIRMED.

**Counsel:** For UNITED STATES OF AMERICA, Plaintiff - Appellee: Roberta Josephina Bodnar, U.S. Attorney's Office - FLM, OCALA, FL; David Paul Rhodes, U.S. Attorney Service - Middle District of Florida, U.S. Attorney, U.S. Attorney's Office, TAMPA, FL.

For EDGAR JOHHN DAWSON, JR., Defendant - Appellant: Adeel Bashir, Federal Public Defender's Office, TAMPA, FL; Ali Kamalzadeh, Gurney Law, PLLC, ORLANDO, FL; Rosemary Cakmis, Law Office of Rosemary Cakmis, ORLANDO, FL; James T. Skuthan, Federal Public Defender's Office, ORLANDO, FL.

**Judges:** Before WILSON, BRANCH, and LAGOA, Circuit Judges.

**Opinion by:** LAGOA

## Opinion

[*1230] LAGOA, Circuit Judge:

This appeal asks us to determine whether an adult who films himself exposing his genitals and masturbating in the presence of a child where the child is the object of sexual desire in the film "uses" that child to engage in sexually explicit conduct for purposes of 18 U.S.C. § 2251(a). We hold that the above conduct fits squarely within the language of the statute.

### I. FACTUAL AND PROCEDURAL HISTORY

### A. Underlying Facts

In July 2020, a federal grand jury indicted Edgar Dawson, Jr. for two counts [**2] of distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1) ("Counts One and Two"), and five counts of sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(a)[1] and (e) ("Counts Three through Seven").

---

[1] Section 2251(a) provides:

(a) Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been [**3] transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting

The parties stipulated to the following facts related to Counts Three through Seven for the bench trial. In March 2020, FBI Special Agent Robert Schwinger was acting undercover in a Kik chatroom—an online social media application—called "Daugh Fun Time."[2] In that chatroom, Schwinger observed Dawson posting images, videos, and messages, including two images of a fully clothed eleven-year-old girl on an exercise mat.

Dawson then posted a video of the same child in the cha-troom. In that video, which formed the basis for Count Three, the child was kneeling on the exercise mat in a yoga pose, with her torso lowered over her knees, her forehead on the ground, and her feet under her buttocks. Dawson was filming her from behind, and he then panned the camera down to show that his penis was exposed and erect and that he was masturbating. He then panned the camera back up to the child.

After he posted this video in the chatroom, other members of the group chat asked who the child was. In response, Dawson posted three more videos, which formed the [**4] bases for Counts Four through Six. Count Four was based on a thirteen-second video showing the same fully clothed eleven-year-old child sitting at a dining room table with her face visible and voice audible. Dawson sat at the head of the table and panned the camera down to show himself masturbating under the table while he and the child talked.

[*1231] Count Five was based on a six-second video showing the same fully clothed child as she continued to sit at the dining room table with the top of her head visible. Dawson panned the camera down to show himself masturbating as he stood inches behind her and then panned the camera back up to show the child's head as they continued to converse.

Count Six was based on a four-second video with Dawson standing directly behind the same fully clothed child and the camera pointed downwards to show he was masturbating. He then ejaculated onto the floor. The child was not in the camera frame at first, but eventually, the back of her head was shown on the video before Dawson panned the camera back down to show his penis. At the end of the video, both Dawson's penis and the child are visible. Later in the group chat, Dawson revealed that the child was his daughter [**5] and that he "love[d] jerking off in [her] panties."

Count Seven was based off a later interaction between Dawson and Metropolitan Department Detective Tim Palchak. Palchak, like Schwinger, was operating in an undercover capacity as an administrator of a Kik chatroom that Dawson entered. Palchak asked Dawson to verify his authenticity, and in response, Dawson sent Palchak a private message with a live image of his daughter. His daughter was fully clothed and lying on the floor. Palchak asked Dawson to hold up four fingers in a new picture to verify he had immediate access to the child, which Dawson then did. While Dawson and Palchak conversed, Dawson told Palchak that he was a forty-one-year-old male in the United States with a twelve-year-old daughter. When Palchak asked what Dawson did with the child, Dawson replied, "Cum on her when she is sleeping. But sometimes I cum on her from behind," and "I jerked off on the top of head [sic] this weekend while she was eating lunch. She never even noticed. . . . Ill [sic] do it again for you soon."

That same day, Dawson sent Palchak a fourteen-second video that he took in the child's bedroom where she was seated at a desk while fully clothed. [**6] The top of the child's head, her forearm, and her hands were visible as she drew and spoke to Dawson. About one second into the video, Dawson panned the camera down to show his exposed and erect penis while he masturbated and spoke to the child. He then panned the camera back to the top of her head as she continued to speak. Dawson then panned the camera back down to his penis and continued to masturbate. About ten seconds into the video, his penis brushed up against the child's hair as she continued to draw, and moved as a result of the contact. This video formed the basis for Count Seven.

The FBI executed a search warrant on Dawson's residence and then interviewed him. In the interview, Dawson admitted to using the Kik application to distribute child pornography to other Kik users. He also admitted to taking videos of himself masturbating in the presence of his daughter and including her in the videos. When asked if it was arousing to him to have his daughter sitting in his presence while he masturbated, Dawson admitted that it was, and he explained the purpose of the videos was to post them and "get off" on them. Dawson stated he never showed his penis to his daughter and later stated [**7] she never knew or understood what he was doing.

The FBI also interviewed the child. During that forensic interview, the child explained that nobody had ever taken pictures of her genitals or naked body. When

interstate or foreign commerce or mailed.

[2] According to the government, this is short for "Daughter Fun Time."

asked if she had ever seen anyone masturbate or touch their genitals, the child shook her head.

[*1232] **B. Procedural History**

After being indicted, Dawson moved to dismiss Counts Three through Seven, arguing that the evidence did not support those Counts. The district court denied this motion, noting that it was inappropriate to evaluate the merits of the evidence at the motion to dismiss stage.

Dawson waived his right to a jury trial, and the district court proceeded with a bench trial. After the parties moved to admit their evidence, Dawson argued that Counts Three through Seven were outside the scope of the conduct prohibited by 18 U.S.C. § 2251(a) and made an oral motion for judgment of acquittal on those Counts. Dawson argued that the videos did not show child pornography, that the child was not engaged in any sexually explicit conduct, and that the child was unaware of Dawson masturbating. Rather, Dawson argued, the videos showed an adult engaging in his own sexual act, and the child was not involved, [**8] citing the Seventh Circuit's decision in *United States v. Howard*, 968 F.3d 717 (7th Cir. 2020), for support. In that case, the Seventh Circuit, facing similar facts of an adult male masturbating over a fully clothed, sleeping child, found that the defendant's conduct was outside the scope of § 2251(a). *Id.* at 718. Dawson argued that Congress intended to criminalize the production and exploitation of children where the child was the focal point of the pornography, was actively engaged in the sexually explicit conduct, or was being used sexually with regard to the sexual activity. Here, he contended, that would require the child to be actively engaging in Dawson's masturbation.

The district court questioned Dawson about the part of the video that formed the basis for Count Seven where his penis touched his daughter's hair. Dawson's counsel argued that in *Howard*, the Seventh Circuit did not find prohibited conduct when the defendant's penis touched the child's lips, which was more egregious conduct than Dawson's penis touching his daughter's hair. The district court disagreed with this reading of *Howard*, noting that the Seventh Circuit never reached the issue of whether the defendant touching the child's lips with his penis was prohibited conduct because the government [**9] abandoned the issue on appeal in that case, and the district court mused that there may have been a different result if that issue was preserved. Dawson concluded his oral motion by arguing that this was a statutory construction case and that, under the principle of *noscitur a sociis*,[3] the term "uses" in § 2251(a) should be understood in context and accordance with the other verbs surrounding it: "employ[]," "persuade[]," "induce[]," "entice[]," and "coerce[]." That is, because all the neighboring verbs require the child's active engagement in the sexually explicit conduct, so too does "uses."

The government countered that the phrase "child pornography" was not in § 2251(a) and should not be read into it. Additionally, according to the government, there are multiple ways for a person to violate § 2251(a), including the passive use of a child in sexually explicit conduct. The government argued that Dawson used the child to engage in sexually explicit conduct, the child was his sexual "muse," the presence of the child was the reason for making the videos, and the child was used as a prop in the videos. Addressing Dawson's *noscitur a sociis* argument, the government contended that each verb in the [**10] statute required different degrees of will, with "coerce" being the most forceful and "use" being the least forceful, and that each verb therefore had to be read differently.

[*1233] The district court took Counts Three through Seven under advisement but found Dawson guilty of Counts One and Two at the end of the bench trial. After the trial, the district court issued an opinion and order denying Dawson's oral motion for a judgment of acquittal on Counts Three through Seven. The district court held that the government proved beyond a reasonable doubt that an actual minor was depicted in the videos underlying Counts Three through Seven, and the videos were transported in interstate commerce through the internet. The district court then concluded that § 2251(a) does not require the child to be actively engaged in sexually explicit conduct, and thus Dawson's conduct was prohibited by the statute.

Because § 2251(a) does not define "uses," the district court looked to the ordinary meaning of the word to construe its meaning. Mindful that it had to look at the context of the words surrounding "uses," the district court defined the word as "to put into action or service: avail oneself of" or "to carry out a purpose [**11] or action by means of." It explained that, even though "uses" is surrounded by more active verbs, there is an active component to the notion of "use" in that a perpetrator can "use" a minor to engage in sexually

---

[3] *Noscitur a sociis* is a Latin phrase that means "it is known from its associates."

explicit conduct without the minor's conscious or active participation.

The district court explained that although the videos "depict[ed] a fully clothed child engaged in innocuous behavior," the "innocent depictions became . . . lascivious when [Dawson] record[ed] himself masturbating in the child's presence [and] purposefully pann[ed] the camera from the child to his erect penis." The district court also stated that Dawson made it "apparent that the child [was] the object of his desire when he touch[ed] the child with his penis while masturbating in the video that formed the basis for Count Seven." The district court explained that Dawson's intent was clear from the videos, but even if his intent was unclear from the videos, his intent to exploit the child for a sexual purpose was shown by his exchanges with like-minded individuals in chat rooms and his admission that he was aroused by masturbating in the presence of his child. These exchanges confirmed that Dawson's conduct [**12] was not purely adult sexual behavior but was premised on the use of the child as a sexual object to help Dawson "get off." After construing § 2251(a) not to require the active participation of the minor and considering the evidence of the stipulated facts and other exhibits, the district court found Dawson guilty of Counts Three through Seven because he took videos of himself masturbating in the child's presence, and therefore, used a minor to engage in sexually explicit conduct to produce a visual depiction of such conduct in violation of § 2251(a).

The district court sentenced Dawson to a total of 600 months' imprisonment—240 months' imprisonment for Counts One and Two, to run concurrently with each other, and 360 months' imprisonment for Counts Three through Seven, to run concurrently with each other and consecutive to Counts One and Two—to be followed by five years of supervised release. Dawson did not challenge his conviction under Counts One and Two for violating 18 U.S.C. § 2252A(a)(2), but timely appealed his convictions for Counts Three through Seven.[4]

## [*1234] II. STANDARD OF REVIEW

We review *de novo* both the interpretation of a criminal statute and the denial of a motion for judgment of acquittal based [**13] on the sufficiency of the evidence. *United States. v. Pirela Pirela*, 809 F.3d 1195, 1198 (11th Cir. 2015).

## III. ANALYSIS

On appeal, Dawson argues that he did not violate § 2251(a) because the videos underlying his convictions for Counts Three through Seven depicted an adult engaging in solo, adult-only, sexually explicit conduct near a fully clothed minor who was neither the focal point of the images, depicted as a sexual object, nor otherwise involved in the sexual act. He contends that the key verb in § 2251(a) for this case is "uses," and that the district court erred because he did not "use" his daughter. Dawson contends that the *noscitur a sociis* canon gives the word "uses" a contextual meaning much like its five companion words in the statute, "employs, persuades, induces, entices, or coerces," which require the minor, not merely the offender, to engage in the sexually explicit conduct. In support, Dawson notes that the word "uses" is limited by the adverbial prepositional phrase "to engage in."[5] Dawson relies primarily on the Seventh Circuit's decision in *Howard* to support his conclusions. In *Howard*, the Seventh Circuit reasoned that the government's interpretation to punish offenders even when the minor is not engaged in sexually explicit conduct would result in punishing offenders [**14] when the minor is far away, such as "in a neighbor's yard or across the street." *See* 968 F.3d at 721-22. Dawson argues that without a proper textual limitation, the government's interpretation is absurd because it would lead to criminalizing sexually explicit conduct involving a faraway minor who does not appear in the images at all. Dawson further contends that his interpretation of § 2251(a) is correct because it aligns with the statutory scheme set forth by Congress, which prohibits only those images that depict minors engaging in sexually explicit conduct, not images where the minors are

---

[4] This case was consolidated with *United States v. Poulo*, No. 21-10667, for purposes of oral argument. *Poulo* raises the same issue of statutory interpretation—whether a defendant "uses" a minor to engage in sexually explicit conduct for the purposes of 18 U.S.C. § 2251(a) when the defendant makes a visual depiction of himself engaging in sexually explicit conduct nearby a fully clothed minor who is not herself actively engaging in any sexual conduct. The district court in that case, like the district court here, concluded that § 2251(a) criminalizes "visual depictions of sexually explicit conduct where the minor child is a passive participant." *United States v. Poulo*, 491 F. Supp. 3d 1244, 1252-53 (M.D. Fla. 2020). We address *Poulo*'s appeal in a separate opinion.

[5] Dawson concedes, however, that the minor's engagement does not have to be active and that passive engagement suffices.

merely present while sexually explicit conduct occurs.

Additionally, in the event that this Court finds the statute to be ambiguous, Dawson requests, for the first time on appeal, that we apply the rule of lenity to read § 2251(a) to exclude his conduct. Finally, building on his prior arguments, Dawson argues that since he did not use his daughter to engage in sexually explicit conduct, these videos do not constitute a violation of the statute.

In response, the government relies on the ordinary meaning of the word "uses" to argue that Dawson "used" his eleven-year-old daughter to engage in sexually explicit conduct. It asserts that [**15] Dawson "used" the child since he "employed" her, "availed himself" of her, and "carried out a purpose or action by means of" the child because, by his own admission, he was sexually aroused to masturbate in the child's presence, and the child was the reason for his sexually explicit conduct and recordings. Thus, the government argues that, while Dawson's use of the child is not the typical § 2251(a) case, i.e., one involving the lascivious display of the minor's [*1235] own genitals, Dawson nonetheless used the child under the ordinary meaning of the term by making her the object of his sexual desires. In support, the government cites *United States v. Lohse*, 797 F.3d 515, 521 (8th Cir. 2015), where the Eighth Circuit held that the defendant who had photographed himself naked next to a sleeping child had "used" the child. To the extent that Dawson relies on *noscitur a sociis*, the government argues that the verbs in the statute prohibit a broad range of conduct with each verb connoting a different degree of will imposed on the child. The government contends that the word "use" implies a more passive involvement of the child in a way that the other verbs do not and covers the conduct at issue here.

In response to Dawson's contention that the adverbial preposition [**16] phrase "to engage in" must be read to limit the word "use" and require the engagement of the minor in the sexually explicit conduct, the government first argues that the child was engaged in the sexually explicit conduct, although unknowingly, because she was made "a crucial component" of the videos and Dawson's conduct. The government then argues that it does not matter whether the child was engaged in the sexually explicit conduct because the relevant section of the statute does not require the minor to engage in the sexually explicit conduct, unlike other sections of the statute, and also because Congress defined sexually explicit conduct to cover the "lascivious exhibition of the anus, genitals, or pubic area of *any person*." 18 U.S.C. § 2256(2)(A)(v) (emphasis added). The government also argues that Dawson's concern that the government's interpretation imposes no limitation and would criminalize sexually explicit conduct involving faraway minors who do not appear in the image or video at all is unfounded because the government's interpretation requires the minor's presence to be the object of the offender's sexual desire, as it was in this case. As for Dawson's statutory scheme argument, the government [**17] contends that its reading of § 2251(a) furthers the statutory objective of protecting children against sexual exploitation and fits within the broader purpose of the statute to prevent the "sexual exploitation of children."

Finally, the government argues that Dawson failed to raise the issue of lenity below, so plain error review applies, and he cannot show plain error in the district court's failure to apply the rule of lenity.

We proceed by first interpreting the word "use" in the statute and hold that Dawson's conduct constitutes a "use" of his daughter in violation of the statute. Next, we consider the rule of lenity and hold that the rule is inapplicable here.

**A. The Meaning of "Use" in 18 U.S.C. § 2251(a)**

"Section 2251(a) is the 'production' section of a broad regulatory scheme that prohibits the production, receipt, distribution, and possession of child pornography." *United States v. Ruggiero*, 791 F.3d 1281, 1284 (11th Cir. 2015) (citing 18 U.S.C. §§ 2251-52, 2252A). Section 2251(a) makes it illegal for "[a]ny person [to] employ[], use[], persuade[], induce[], entice[], or coerce[] any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct . . . ." 18 U.S.C. § 2251(a). Under the statute's definition section, [**18] sexually explicit conduct includes "masturbation" and the "lascivious exhibition of the . . . genitals, or pubic area of any person." *Id.* § 2256(2)(A)(iii), (v). A lascivious exhibition is that which "excites sexual desires" or is "salacious." *United States v. Grzybowicz*, 747 F.3d 1296, 1305-06 [*1236] (11th Cir. 2014) (alteration adopted) (quoting *United States v. Williams*, 444 F.3d 1286, 1299 (11th Cir. 2006), *rev'd on other grounds*, 553 U.S. 285, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008)).

Here, we are asked to decide whether an offender "uses" a minor in violation of § 2251(a) only by having the minor engage in sexually explicit conduct, or

whether an offender "uses" a minor when the minor's presence is the object and focal point of the offender's sexual desire as the offender, not the minor, engages in the sexually explicit conduct. This is an issue of first impression in our Circuit.

Before delving into the text of the statute, we highlight a few relevant principles of statutory interpretation that will aid in our analysis. The starting point for statutory interpretation is the language of the statute. *United States v. Aldrich*, 566 F.3d 976, 978 (11th Cir. 2009). "The 'cardinal canon' of statutory interpretation is that 'courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'" *Id.* (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992)). If the language of the statute is clear and unambiguous, we will go no further and will employ that plain [**19] meaning. *Pirela Pirela*, 809 F.3d at 1199. Courts must give effect to every clause and every word of a statute, so that no clause or word is superfluous, void, or insignificant. *Aldrich*, 566 F.3d at 978-79. When a statute does not define a term, "[t]he plain meaning of the text 'controls unless the language is ambiguous or leads to absurd results.'" *United States v. Vineyard*, 945 F.3d 1164, 1171 (11th Cir. 2019) (quoting *United States v. Carrell*, 252 F.3d 1193, 1198 (11th Cir. 2001)).

As an initial matter, "we look to the plain and ordinary meaning of the statutory language as it was understood at the time the law was enacted." *United States v. Chinchilla*, 987 F.3d 1303, 1308 (11th Cir. 2021). And "one of the ways to figure out that meaning is by looking at dictionaries in existence around the time of enactment." *Id.* (quoting *Equal Emp. Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1026 (11th Cir. 2016)). The applicable edition of *Black's Law Dictionary* defines the verb "use" as "[t]o make use of, to convert to one's service, to avail one's self of, to employ." *Use, Black's Law Dictionary* at 1381 (5th ed. 1979).[6] An ordinary reading of § 2251(a) thus suggests that a minor is "used" if she is "ma[de] use of" in a sexually explicit videotape or if an adult "avail[s himself] of" the child's presence as the object of his sexual desire by masturbating in her presence.

As relevant here, we conclude that the adverbial prepositional phrase "to engage in," which limits the word "use," [**20] does not require the minor to be actively engaged in sexually explicit conduct for several reasons. First, comparing the language in § 2251(a) to the language in the neighboring 18 U.S.C. § 2252(a) makes evident that the adverbial prepositional phrase "to engage in" does not require the minor to be the one who is actively engaged in sexually explicit conduct. Section 2252(a) prohibits, among other things, the transportation or shipping of visual depictions that "involve[] the use of a minor engaging in sexually explicit conduct." In § 2252(a), [*1237] Congress specifically used the phrase "use of a minor engaging in sexually explicit conduct," whereas in § 2251(a), it used the phrase "uses . . . any minor to engage in sexually explicit conduct." That difference suggests that Congress intended to criminalize a more passive use of a minor when it came to the production of images that sexually exploit children under § 2251(a). Congress could have used the narrower "minor engaging in sexually explicit conduct" language it employed in the next section, but it chose to write § 2251(a) differently. That difference must be given significance, namely in establishing that the minor need not be the one engaging in sexually explicit conduct, and the minor's passive involvement in [**21] the offender's sexually explicit conduct is sufficient for the purposes of § 2251(a). Second, Congress defined sexually explicit conduct to cover the "lascivious exhibition of the anus, genitals, or pubic area of *any person*," again indicating that the minor need not be the one engaged in sexually explicit conduct. 18 U.S.C. § 2256(2)(A)(v) (emphasis added). Therefore, although the statute criminalizes an offender who uses a minor by lasciviously exhibiting the minor's genitals, it also criminalizes an offender who uses a minor to engage in the sexually explicit conduct of lasciviously exhibiting the offender's genitals.

The plain meaning of a statutory term, however, does not turn solely on dictionary definitions of its component words in isolation. "Rather, '[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.'" *Yates v. United States*, 574 U.S. 528, 537, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015) (alterations in original) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)). Under the canon of *noscitur a sociis*, "a word is known by the company it keeps." *Id.* at 543; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*

---

[6] Section 2251(a) was enacted in 1978 as part of the Protection of Children Against Sexual Exploitation Act of 1977, Pub. L. No. 95-225, 92 Stat. 7 (1978). The definition of "use" in the fourth edition of *Black's*, published in 1968, is identical to the 1979 definition. *See Use, Black's Law Dictionary* at 1710 (4th ed. 1968) ("To make use of, to convert to one's service, to avail one's self of, to employ.").

§ 31, at 195 (2012). [**22] Put differently, *noscitur a sociis* "counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008).

Despite Dawson's insistence, however, our reading of § 2251(a) is not undermined by the doctrine of *noscitur a sociis*. The Seventh Circuit held that the other five verbs in the statute "require some action by the offender to cause the *minor*'s direct engagement in sexually explicit conduct," indicating that the word "use" in the statute requires some direct, active engagement by the minor. *Howard*, 968 F.3d at 722 (emphasis in original). But, when read together, these verbs suggest a continuum of participation by the minor covering a broad range of criminal conduct. On the passive end of the spectrum are the verbs "employs" and "uses," suggesting the passive involvement of the minor, rather than the active engagement of the minor, in the offender's sexually explicit conduct. In the middle of the spectrum are the verbs "persuades," "induces," and "entices," suggesting a more active role of the minor in the sexually explicit conduct. And at the very active end of the spectrum is the verb "coerces," suggesting the offender exerting considerable influence on the minor to cause the [**23] minor to engage in the sexually explicit conduct. Importantly, these verbs do not all require the same level of either external force imposed on the minor or active engagement on the part of the minor in the sexually explicit conduct. To read an active participatory role of the child into each verb renders [*1238] their differences superfluous. Instead, it appears Congress intended to penalize a broad spectrum of activities in this statute, with varying levels of involvement by the minor. Thus, our construction of § 2251(a) establishes that a minor must be involved in the offender's sexually explicit conduct, but that the minor need not necessarily be actively engaging in his or her own sexually explicit conduct. This reading aligns with both the *noscitur a sociis* canon and the surplusage canon by understanding the companion words in context and also in relation to one another. This reading is also in step with our case law, as we have concluded that "the actus reus element of § 2251(a) is broad." *United States v. Lee*, 29 F.4th 665, 673 (11th Cir. 2022).

Here, Dawson's daughter is not merely present in the videos where Dawson happens to be exposing his penis and masturbating. Rather, Dawson's daughter—or to be more precise, her presence—is being used as the object [**24] of Dawson's sexual desire as he engages in sexually explicit conduct. Dawson panned the camera from the child to himself masturbating and back to the child, recording his exposed and erect penis in close proximity to the child—even going so far as to touch her hair with his penis in one video. Dawson further admitted that having his eleven-year-old in his presence while he masturbated was arousing. Because Dawson's daughter was passively involved in Dawson's sexually explicit conduct by serving as the object of Dawson's sexual desire, Dawson's actions constituted the use of a minor to engage in sexually explicit conduct in violation of the statute.[7]

Contrary to the Seventh Circuit in *Howard*, we do not believe this interpretation poses a slippery slope problem. *See* 968 F.3d at 721. The Seventh Circuit warned that the passive interpretation of the term "uses" may make the statute too broad: "The crime could be committed even if the child who is the object of the offender's sexual interest is in a neighbor's yard or across the street." *Id.* But the statute ultimately requires fact-specific determinations. In the above hypothetical, the child across the street is not being "used" to engage in sexually explicit [**25] conduct in the same way Dawson "used" his daughter. Here, unlike in the *Howard* hypothetical, Dawson admitted that he found the act of masturbating to his daughter *in her presence* sexually arousing. In other words, it was the child's presence that Dawson found sexually arousing, which is a circumstance entirely different from the *Howard* hypothetical where the child is not immediately present.

With the law settled, the outcome is clear. The statutory elements for an offense committed in violation of § 2251(a) are: "(1) employing, using, persuading, inducing, enticing, or coercing a minor to engage in any sexually explicit conduct to produce any visual depiction of such conduct (or for transmitting a live visual depiction of such conduct); and (2) a jurisdictional

---

[7] Even if we were to adopt Dawson's interpretation of the statute to require the minor, not the offender, to engage in the sexually explicit conduct, the record establishes that Dawson's daughter unknowingly engaged in sexually explicit conduct by virtue of her presence serving as the object of Dawson's sexual desire. Put differently, interpreting for the sake of argument that the adverbial preposition phrase "to engage in" sexually explicit conduct requires the minor to engage in sexually explicit conduct, Dawson still "used" his daughter in violation of § 2251(a) because he made her unwittingly and passively engage in sexually explicit conduct when he used her presence as the object of his sexual desire during filmed masturbation. And, as noted above, Dawson concedes that the minor's engagement does not have to be active and that passive engagement suffices.

nexus—i.e., a nexus to interstate [*1239] commerce." *Lee*, 29 F.4th at 671 (citing § 2251(a)).

Here, Dawson used the presence of his eleven-year-old daughter as the object of his sexual desire as he engaged in sexually explicit conduct by masturbating in her presence. He recorded this conduct and distributed it over the internet. He does not challenge the district court's finding that the child was under eighteen years old, or that the visual depictions were transported or transmitted [**26] in interstate commerce. Therefore, the district court did not err in denying the motion for judgment of acquittal.

## B. The Rule of Lenity

For the first time on appeal, Dawson requests that we apply the rule of lenity to read § 2251(a) to exclude his conduct. The government responds that plain error review should apply to this argument because Dawson failed to raise it below.

As an initial matter, the government's contention that plain-error review applies is unavailing. "[P]arties cannot waive the application of the correct law or stipulate to an incorrect legal test." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 923 (11th Cir. 2018); *accord Lee*, 29 F.4th at 669 n.2 (finding that a defendant could not waive the application of the *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), test in connection with asserting a violation of the Double Jeopardy Clause). Indeed, a party cannot waive lenity any more than it can waive the plain meaning of a word or the canon of *noscitur a sociis*.

Turning to the rule of lenity itself, the rule "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514, 128 S. Ct. 2020, 170 L. Ed. 2d 912 (2008). The rule of lenity applies only when, after consulting traditional canons of statutory interpretation, the court is left with an ambiguous statute. *Shular v. United States*, 140 S. Ct. 779, 787, 206 L. Ed. 2d 81 (2020). "To invoke the rule of lenity, the court 'must conclude that there is a grievous [**27] ambiguity or uncertainty in the statute.'" *United States v. Baldwin*, 774 F.3d 711, 733 (11th Cir. 2014) (quoting *Muscarello v. United States*, 524 U.S. 125, 138-39, 118 S. Ct. 1911, 141 L. Ed. 2d 111 (1998)). The simple existence of some statutory ambiguity is not sufficient to warrant the application of the rule of lenity because most statutes are ambiguous to some degree. *Muscarello*, 524 U.S. at 138. It applies only when, after seizing everything the court can from which aid can be derived to determine the meaning of a statute, the court can "no more than guess as to what Congress intended." *Id.* (quoting *United States v. Wells*, 519 U.S. 482, 499, 117 S. Ct. 921, 137 L. Ed. 2d 107 (1997)).

As discussed above, the traditional tools of statutory interpretation provide sufficient clarity on the meaning of § 2251(a). Moreover, while we recognize that there is a division of judicial authority between the Seventh Circuit and the Eighth and Third Circuits, a statute is not "'ambiguous' for purposes of lenity merely because there is 'a division of judicial authority' over its proper construction." *Reno v. Koray*, 515 U.S. 50, 64-65, 115 S. Ct. 2021, 132 L. Ed. 2d 46 (1995) (quoting *Moskal v. United States*, 498 U.S. 103, 108, 111 S. Ct. 461, 112 L. Ed. 2d 449 (1990)). Rather, there must be a "grievous ambiguity" in the statute, which is not the case here. Accordingly, the rule of lenity does not apply.

## [*1240] IV. CONCLUSION

For the reasons discussed, we hold that Dawson's conduct falls within the scope of the conduct prohibited by 18 U.S.C. § 2251(a). Dawson used his eleven-year old daughter to engage in sexually explicit conduct by masturbating [**28] in her presence, which he found sexually arousing. We therefore affirm his convictions for sexual exploitation of a minor in violation of § 2251(a).

**AFFIRMED**.

---

End of Document

# United States v. Howard

968 F.3d 717 (7th Cir. 2020)

Cited in Opening Brief at: 38

See Response, Part III.G. Highlighted language appears at 968 F.3d at 718.

Q Questioned
As of: September 14, 2026 7:05 PM Z

# United States v. Howard

United States Court of Appeals for the Seventh Circuit

November 14, 2019, Argued; August 3, 2020, Decided

No. 19-1005

**Reporter**
968 F.3d 717 *; 2020 U.S. App. LEXIS 24360 **; 2020 WL 4435573

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. MATTHEW HOWARD, Defendant-Appellant.

**Prior History:** [**1] Appeal from the United States District Court for the Western District of Wisconsin. No. 17-cr-81-wmc — William M. Conley, Judge.

**Counsel:** For United States of America, Plaintiff - Appellee: Julie Suzanne Pfluger, Attorney, Office of The United States Attorney, Madison, WI.

For Matthew Howard, Defendant - Appellant: Joseph Aragorn Bugni, Attorney, Shelley M. Fite, Attorney, Federal Defender Services of Wisconsin, Inc., Madison, WI.

**Judges:** Before SYKES, Chief Judge, and MANION and KANNE, Circuit Judges.

**Opinion by:** SYKES

## Opinion

[*718] SYKES, *Chief Judge*. Matthew Howard was charged with seven crimes relating to possession, receipt, distribution, and production of child pornography. *See* 18 U.S.C. § 2252(a)(2), (a)(4); *id.* § 2251(a). He pleaded guilty to five; the remaining counts—accusing him of producing child pornography in violation of § 2251(a)—proceeded to trial.

The statute mandates a minimum 15-year prison term for "[a]ny person who employs, uses, persuades, induces, entices, or coerces any minor to engage in ... any sexually explicit conduct for the purpose of producing any visual depiction of such conduct." § 2251(a), (e). Howard's case represents a peculiar application of the statute. The videos in question do not depict a child engaged in sexually explicit conduct; they show Howard [**2] masturbating next to a fully clothed and sleeping child. In other words, the videos are not child pornography.

The government's theory is that Howard violated the statute by "using" the clothed and sleeping child as an object of sexual interest to produce a visual depiction of *himself* engaged in solo sexually explicit conduct. Over Howard's objection, the district judge submitted the case to the jury with instructions that permitted conviction on the government's theory. The jury found him guilty. Howard appeals, challenging only his convictions on these two counts.

The government's interpretation of § 2251(a) stretches the statute beyond the natural reading of its terms considered in context. Accordingly, the two convictions cannot stand. We vacate the judgment on these counts and remand for resentencing.

### I. Background

In August 2017 law enforcement received a tip about online activity involving child pornography that traced to Howard's IP address. An investigation eventually led to a search of Howard's residence in Madison, Wisconsin. A forensic search of his [*719] computer revealed a large collection of child pornography.

A grand jury returned a superseding indictment charging Howard with seven crimes: [**3] two counts of producing child pornography in violation of § 2251(a), two counts each of receiving and distributing child pornography in violation of § 2252(a)(2), and one count of possessing child pornography in violation of § 2252(a)(4)(B). Howard pleaded guilty to the five charges involving receipt, distribution, and possession; those convictions are not at issue here. He denied that he had produced child pornography in violation of § 2251(a).

Unlike the typical case under this statute, the videos underlying these counts do not depict a child engaged in sexually explicit poses or conduct. Rather, they show Howard masturbating over a sleeping and fully clothed

child.

More specifically, the first video captures a lengthy online chat between Howard and several strangers about their mutual sexual interest in children. This video is about 21 minutes long, and much of it contains the content of this online conversation. Later in the video, the camera on Howard's computer is activated, capturing an image of his nine-year-old niece, fully clothed and asleep on the floor. As the online chat continues, Howard types "excuse me while I be a perv." The video then shows him masturbating several inches above his sleeping niece's clothed buttocks. [**4]

The second video is similar, though much shorter—only 23 seconds long. It too shows his niece, again sleeping and fully clothed, with Howard masturbating above her head. After a few seconds, Howard hovers very close to her face, with his erect penis near—and possibly momentarily touching—her lips while she sleeps.

Howard's attorney acknowledged that his client's conduct was reprehensible and perhaps criminal under state law but challenged whether it fell within the scope of § 2251(a). The defense sought a bench trial, but the government objected. The judge was unwilling to compel the government to accept a bench trial, so the case was scheduled for a jury trial on these two remaining counts. Because the content of the videos could not be—and was not—disputed, the outcome turned on the jury instructions, which were extensively litigated.

As noted, the statute mandates a lengthy prison term for "[a]ny person who employs, uses, persuades, induces, entices, or coerces any minor to engage in ... any sexually explicit conduct for the purpose of producing any visual depiction of such conduct." § 2251(a), (e). The definition of "sexually explicit conduct" contains a detailed list of qualifying conduct. 18 U.S.C. § 2256(2)(A). The government [**5] relied on two possibilities: "masturbation" and "lascivious exhibition of the ... genitals ... of any person." § 2256(2)(A)(iii), (A)(v). The videos depict Howard engaged in both kinds of conduct; his niece, as we've noted, is asleep and fully clothed.

A magistrate judge initially proposed jury instructions drawn from the Seventh Circuit Pattern Instructions, adapted for use in this case. The proposed substantive instruction explained that the government had to prove beyond a reasonable doubt that "[t]he defendant, for the purpose of producing a visual depiction of such conduct, knowingly used [his niece] to take part in sexually explicit conduct."

Howard requested several changes: (1) replace the phrase "to take part in," which does not appear in the statute, with the phrase "to engage in," which *does* appear in the statute; (2) move the phrase "for the purpose of producing a visual depiction of [*720] such conduct" to the end of the sentence; and (3) define the phrase "such conduct" by reference to the statutory definition of "child pornography," i.e., a visual depiction that "involves the use of a minor engaging in sexually explicit conduct." *Id.* § 2256(8)(A). Putting all these changes together, the instruction proposed by [**6] the defense required the government to prove that Howard "knowingly used [his niece] to engage in sexually explicit conduct for the purpose of producing a visual depiction of her engaging in sexually explicit conduct."

The government objected, arguing that § 2251(a) doesn't use the words "child pornography" and therefore isn't limited to persons who create child pornography. In the government's view, Howard could be convicted for producing a video of *himself* engaged in solo sexually explicit conduct so long as he somehow "used" the minor victim to do so. The prosecutor planned to urge the jury to convict him because he "used" his niece as an object of sexual interest for the purpose of making a video of himself masturbating and lasciviously displaying his genitals.

The district judge saw flaws in both the pattern instruction and Howard's proposed modification. He noted the novelty of the case and commented that the government's charging decision "push[ed] the factual envelope" of the statute's coverage. He questioned the government's pursuit of these charges—especially after Howard pleaded guilty to the other counts and was already facing a lengthy prison term. In the end, the judge settled on [**7] compromise language to "track[] as closely to the statutory language as possible."

The final instruction on the elements of the offense stated, in relevant part:

> To sustain either of the charges against the defendant, the government must prove these elements:
>
> (1) At the time charged in the count you are considering, [Howard's niece] was under the age of eighteen years; [and]
>
> (2) The defendant knowingly used [his niece] to engage in sexually explicit conduct for the purpose

of producing a visual depiction of such conduct.

To reflect the government's theory of the case, the instructions identified the sexually explicit conduct at issue in both counts as "masturbation" or "lascivious exhibition of the genitals ... of any person."

Thus, the decisive question of statutory interpretation—whether § 2251(a) requires proof that the defendant did something to cause *a minor* to engage in sexually explicit conduct for the purpose of photographing or filming it—was implicitly answered in the negative. Or perhaps it's more accurate to say that the legal question about the scope of the statute was submitted to the jury as if it were a question of fact.

But of course there were no factual disputes. The trial was quick [**8] (just one day), and in closing arguments the parties debated only whether the undisputed facts came within the scope of the statute.

Howard's attorney argued that although his client's conduct was deplorable and likely criminal in other ways, it fell outside the statute because Howard did not do anything to have *his niece* "engage in" sexually explicit conduct for the purposes of creating a visual image of it. The government argued that the defense lawyer was mistaken about the statute's meaning:

> This isn't about what [his niece] did or didn't do. The law says you look at did the defendant use [his niece] to engage in masturbation, did the defendant use [his niece] to exhibit his genitals. It doesn't say anything about what [his niece] engaged in.

[*721] The government urged the jury to find Howard guilty because he "used" his niece in the sense that she was the "focus" of his sexual attraction and "the reason" he masturbated and exhibited his genitals in the videos.

After deliberating for just 20 minutes, the jury found Howard guilty on both counts. He moved for judgment of acquittal or a new trial with proper jury instructions, essentially reiterating his legal argument about the correct interpretation [**9] of the statute. The judge denied the motions and sentenced Howard to concurrent terms of 25 years in prison on each count, along with shorter concurrent terms on the counts to which he had earlier pleaded guilty.

**II. Discussion**

This odd case raises a novel question about the interpretation of § 2251(a). The statute is titled "Sexual exploitation of children," but it's not a general exploitation crime like those found in state criminal codes. The offense is codified in Chapter 110 of Title 18 with other child-pornography crimes and imposes steep criminal penalties on anyone who produces child pornography with a nexus to interstate commerce.

More specifically, the statute mandates a minimum 15-year prison term for

> *Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in*, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, *any sexually explicit conduct for the purpose of producing any visual depiction of such conduct* ... .

§ 2251(a) (emphases added).[1] As Howard reads the statute, a person commits [**10] this offense if he takes one of the listed actions to cause *a minor victim* to engage in sexually explicit conduct for the purpose of producing a visual depiction of it.

The government takes a radically different view, arguing that it does not matter whether the minor victim engaged in any sexually explicit conduct. On the government's reading, § 2251(a) sweeps much more broadly, covering someone like Howard—who made a video of *his own* solo sexually explicit conduct—*if* the offender somehow "uses" a child as an object of sexual interest.

The government's interpretation is strained and implausible. Indeed, taken to its logical conclusion, it does not require the presence of a child on camera at all. The crime could be committed even if the child who is the object of the offender's sexual interest is in a neighbor's yard or across the street. The government resists the hypothetical by protesting that such "incidental uses" of a child would fall outside the scope of the statute. But nothing in the government's interpretation contains that limiting principle.

The most natural and contextual reading of the statutory language requires the government to prove that the

---

[1] The statute's jurisdictional element requires that the offender must know or have reason to know that the visual depiction will be transmitted in interstate commerce, use material that has traveled in interstate commerce, or has been transmitted using a means or facility of or affecting interstate commerce. 18 U.S.C. § 2251(a). This element is not at issue here.

offender took one of the listed actions [**11] to cause *the minor* to engage in sexually explicit conduct for the purpose of creating a visual image of that conduct. The six verbs that appear in the statute—"employs, uses, persuades, induces, entices, or coerces"—all describe means by which an exploiter [*722] might accomplish the end of having a child engage in sexually explicit conduct in order to capture a visual image of it. That is, they broadly describe the means by which someone might produce child pornography.

The government insists that the verb "uses"—the alternative at issue here—is broader than the other five and is expansive enough to encompass a case like Howard's that does not involve a visual image depicting the minor *herself* engaged in sexually explicit conduct. The word "use" is undoubtedly broad in the abstract, but under the venerable doctrine of *noscitur a sociis*, a word "is known by the company it keeps," and we must "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Yates v. United States*, 574 U.S. 528, 543, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995)).

Accordingly, the word "uses" in this statute must be construed in context with the other verbs that surround it. When read in this commonsense way, the word has a more limited meaning than the [**12] government proposes. *See United States v. Williams*, 553 U.S. 285, 294, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008) (explaining that the meaning of broad statutory language is "narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated"); *see also Lagos v. United States*, 138 S. Ct. 1684, 1688-89, 201 L. Ed. 2d 1 (2018); *McDonnell v. United States*, 136 S. Ct. 2355, 2368-69, 195 L. Ed. 2d 639 (2016). Five of the six verbs on this statutory list require some action by the offender to cause the *minor's* direct engagement in sexually explicit conduct. The sixth should not be read to have a jarringly different meaning. The *noscitur a sociis* canon has force here and constrains our interpretation of the word "uses."

The government also argues that the word "any" preceding the phrase "sexually explicit conduct" signals that *any* person's sexually explicit conduct suffices. Not so. The word "any" as a modifier of "sexually explicit conduct" is a term of expansion, but it doesn't tell us *who* must engage in the sexually explicit conduct. The answer to the "who" question becomes clear when the statutory text is read in context and as a coherent whole rather than seizing on small parts of it and reading those parts in isolation.

Our interpretation of the statute has the virtue of consistency with the comprehensive scheme that Congress [**13] created to combat child pornography. Laws dealing with a single subject, or *in pari materia* ("in a like matter"), "should if possible be interpreted harmoniously." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 252-55 (2012). Here, Congress crafted a comprehensive scheme to prohibit the receipt, distribution, sale, production, possession, solicitation, and advertisement of child pornography. *See United States v. Maxwell*, 446 F.3d 1210, 1216-17 (11th Cir. 2006). This statutory scheme broadly covers material depicting minors engaged in sexually explicit conduct. Specifically, this cluster of statutes penalizes advertising, 18 U.S.C. § 2251(d)(1); transporting, *id.* § 2252(a)(1)(A); receiving or distributing, *id.* § 2252(a)(2)(A); selling, *id.* § 2252(a)(3)(B); and possessing or accessing, *id.* § 2252(a)(4)(B), material involving "the *use of a minor engaging in* sexually explicit conduct." (Emphasis added.) The government's interpretation of § 2251(a) creates an odd statutory mismatch, penalizing the production of material that is not child pornography.

[*723] The government counters that the term "child pornography" does not appear in § 2251(a). That's true, but unilluminating. The phrase "child pornography" does not appear in any of the foregoing statutes either.[2] The absence of the term "child pornography" in § 2251(a) does not explain [**14] why the statute would cover such a vastly broader range of visual images than the rest of §§ 2251 and 2252.

The government relies on *United States v. Lohse*, 797 F.3d 515 (8th Cir. 2015), but that case is unhelpful. The defendant there raised a drive-by argument that § 2251(a) "requires either active participation by the minor or active sexual conduct to an unconscious minor by an

---

[2] Another statute in this group, 18 U.S.C. § 2252A, broadly prohibits a wide spectrum of activities involving "child pornography," defined as material involving "the use of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(A). The definition also covers "virtual" child pornography—computer generated images that appear to involve an actual minor engaging in sexually explicit conduct. § 2256(8)(B), (8)(C).

adult defendant." *Id.* at 521 (quotation marks omitted). The argument was both unpreserved in the district court and poorly developed on appeal. Indeed, the Eighth Circuit could not tell if the defendant was challenging the jury instructions or the sufficiency of the evidence. To the extent that he was raising a claim of instructional error, the court summarily found "no plain error" and said no more about the legal issue. *Id.* That unexplained ruling sheds no light on the interpretive question presented here, which was fully aired in the district court and robustly briefed on appeal.

The government's remaining cases are also unhelpful: all involved visual images clearly depicting minors engaged in sexually explicit conduct. *See United States v. Laursen*, 847 F.3d 1026, 1030 n.2 (9th Cir. 2017) (minor nude and in pornographic poses); *United States v. Wright*, 774 F.3d 1085, 1087 (6th Cir. 2014) (minor nude and masturbating); *Ortiz-Graulau v. United States*, 756 F.3d 12, 15, 18 (1st Cir. 2014) ("sexually explicit photographs" of a minor); *United States v. Engle*, 676 F.3d 405, 411, 418 (4th Cir. 2012) (video of a defendant and a minor having sex); [**15] *United States v. Fadl*, 498 F.3d 862, 864 (8th Cir. 2007) (minors "engaged in sexually explicit conduct"); *United States v. Sirois*, 87 F.3d 34, 37 (2d Cir. 1996) (minors "engaged in sexual acts"); *see also United States v. Finley*, 726 F.3d 483, 488-89 (3d Cir. 2013) ("explicit contact" made with sleeping minor); *United States v. Vowell*, 516 F.3d 503, 507 (6th Cir. 2008) ("various sexual acts" performed on the body of a sleeping and drugged minor); *United States v. Wolf*, 890 F.2d 241, 242 (10th Cir. 1989) (partially nude and sleeping minor).

The government staked its entire case for conviction on a mistaken interpretation of the statute. The parties seem to agree that if Howard's reading of the statute is correct, the judgment on these two counts must be vacated and the case remanded for dismissal of these counts and resentencing on the remaining convictions, which are unchallenged. For clarity, we asked the government's attorney at oral argument if she wanted to retry the case if we accepted Howard's interpretation of the statute. She did not request that opportunity, and we take that as a waiver.[3]

[*724] We therefore VACATE the judgment on the § 2251(a) convictions and remand to the district court with instructions to dismiss these counts and revisit Howard's sentence as needed. We AFFIRM the judgment in all other respects.

---

End of Document

---

[3] As we've explained, the second video shows Howard masturbating very close to his niece's face while she sleeps and perhaps momentarily touching her lips with his penis. Perhaps this could be characterized as an attempt at oral sex, which might qualify as engaging the child in sexually explicit conduct under a different part of the definition of that term. *See* 18 U.S.C. § 2256(2)(A)(i). But the government did not frame its case in this way in the district court and did not raise this as a possible alternative theory on appeal.

# United States v. Wright

774 F.3d 1085 (6th Cir. 2014)

Cited in Opening Brief at: 38

Highlighted language appears at 774 F.3d at 1091.

Caution
As of: September 14, 2026 7:06 PM Z

# United States v. Wright

United States Court of Appeals for the Sixth Circuit

December 23, 2014, Decided; December 23, 2014, Filed

File Name: 14a0305p.06

No. 13-2735

**Reporter**
774 F.3d 1085 *; 2014 U.S. App. LEXIS 24392 **; 2014 FED App. 0305P (6th Cir.) ***; 2014 WL 7270564

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. THOMAS L. WRIGHT, Defendant-Appellant.

**Subsequent History:** US Supreme Court certiorari denied by Wright v. United States, 191 L. Ed. 2d 727, 2015 U.S. LEXIS 2643 (U.S., Apr. 20, 2015)

**Prior History:** [**1] Appeal from the United States District Court for the Western District of Michigan at Grand Rapids. No. 1:12-cr-00130-1—Robert Holmes Bell, District Judge.

United States v. Wright, 2013 U.S. Dist. LEXIS 5691 (W.D. Mich., Jan. 15, 2013)

**Counsel:** ON BRIEF: Dennis C. Kolenda, DICKINSON WRIGHT PLLC, Grand Rapids, Michigan, Charles E. Chamberlain, WILLEY & CHAMBERLAIN, Grand Rapids, Michigan, for Appellant.

Daniel Y. Mekaru, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

**Judges:** Before: DAUGHTREY, McKEAGUE, and WHITE, Circuit Judges.

**Opinion by:** HELENE N. WHITE

## Opinion

[*1086] [***1] HELENE N. WHITE, Circuit Judge. Following a bench trial, the district court found Wright guilty on five counts of sexual exploitation of a minor, 18 U.S.C. § 2251(a), (e), and one count each of transporting images of a minor engaged in sexually explicit conduct, 18 U.S.C. § 2252(a)(1) & (b)(1) (count 6), and possession of child pornography, 18 U.S.C. § 2252A (count 7). Wright appeals his convictions on counts 1 through 6. We AFFIRM.

[***2] **I.**

The sole witnesses were two agents of the Department of Homeland Security, Investigations unit (HSI). Special Agent Michael George testified that after receiving a lead from a Texas child-pornography investigation,[1] he and forensic examiner [*1087] Special Agent Timothy Kruithoff interviewed Wright at his residence outside Bangor, Michigan, on March 24, [**2] 2011. Wright consented to the interview and explained that when J.S. was sixteen Wright had hired him to mow the lawn and perform other chores at Wright's home and at the equestrian center Wright owns and operates across the street from his home. Wright admitted that he began a sexual relationship with J.S., and photographed J.S. in the nude when J.S. was sixteen. This sexual relationship was ongoing when Agents George and Kruithoff interviewed Wright. Wright was sixty-two and J.S. was eighteen at the time of the interview.[2]

Wright consented to the search and seizure of equipment from his home office, including an Apple desktop computer, a laptop computer, three thumb drives, a Fuji camera, a digital video camera, external hard drives, [**3] and two camera storage devices. Wright explained that the nude images of him and J.S. were on his desktop and thumb drives, and the nude images of J.S. when he was sixteen were located on a

---

[1] Wright sent nude images he took of J.S. at age sixteen to Timothy E. Whittington in Euless, Texas, via the internet. Whittington replied with nude photographs of himself and his ten-year-old son. After federal authorities interviewed Whittington and seized his computer in December 2010, they learned that an email address belonging to Wright had sent and received nude photographs of a minor. This investigation ensued.

[2] The parties stipulated to J.S.'s birthdate.

thumb drive.

HSI forensic computer analyst Special Agent Blair Babcock testified at trial that he examined the seized equipment and that the only nude photographs found of J.S. were taken in Florida on March 4, 6, and 9, 2009. Wright was also nude in a number of those photographs. Email messages and credit-card statements introduced at trial confirmed that Wright and J.S. stayed at a Florida hotel from March 4 to 10, 2009. Wright stated to the Probation Officer who prepared the PSR that because the age of consent in Michigan is sixteen,[3] Wright did not believe that photographing J.S. in the nude was illegal. Twenty-one of these Florida photographs are the [***3] subject of counts 1 through 3 (sexual exploitation of minor) and count 6 (transportation of images).

Also, a video camera that Wright installed in his office at the equestrian center recorded J.S. masturbating in July and August 2009, when J.S. was seventeen. Two such video recordings formed the bases of the fourth and fifth counts of sexual exploitation of a minor.

At the close of the prosecution's proofs, Wright moved for acquittal on counts 1 through 6 under Fed. R. Crim P. 29.[4] The district court denied the motion and the defense rested without presenting a case. The district court sentenced Wright to concurrent fifteen-year terms on each of counts 1 through 6, and a concurrent ten-year term on count 7. PID 529. Wright appeals his convictions on counts 1 through 6.

**II. Insufficiency Claim (counts 1 through 5)**

Wright first argues that there was insufficient evidence to convict him of sexual exploitation of a minor under 18 U.S.C. § 2251(a) because the Government failed to prove that he "used" J.S. for the purpose of "producing" a visual depiction of sexually explicit conduct. Wright maintains that the district court misapprehended [*1088] the "use" element of § 2251(a), and that this court should adopt the Ninth Circuit's interpretation [**5] of "use." Appellant Br. at 12.

We review de novo Wright's challenges to the sufficiency of the evidence, and "[t]o the extent that the question turns on statutory interpretation, rather than on the sufficiency of the evidence, we review the issue de novo." *United States v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000). "A defendant challenging the sufficiency of the evidence bears a very heavy burden." *United States v. Prince*, 214 F.3d 740, 746 (6th Cir. 2000) (citation omitted). The question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). We will reverse a conviction "only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991).

[***4] Sexual exploitation of a minor is addressed in § 2251(a), which provides in pertinent part:

> (a) Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of *producing* any visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce [**6] or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce . . . or if such visual depiction has actually been transported . . . in or affecting interstate or foreign commerce.

(Emphasis added.) "Minor" is defined as any person under the age of eighteen. 18 U.S.C. § 2256(1). As pertinent here, "sexually explicit conduct":

> Means actual or simulated —
>
> . . . .
>
> (iii) masturbation;
>
> . . . .
>
> (v) lascivious exhibition of the genitals or pubic area of any person . . . .

[3] The age of consent in Michigan is sixteen. *See* Mich. Comp. Laws §§ 750.520b, 750.520c, 750.520d. Florida's statutory rape law provides: "A person 24 years of age or older who engages in sexual activity with a person 16 or 17 years of age commits a felony of the second degree . . ." unless the [**4] minor is emancipated. Fla. Stat. Ann. § 794.05(1)-(2).

[4] Wright does not appeal his conviction of possessing child pornography (count 7).

18 U.S.C. § 2256(2)(A). "Producing" means "producing, directing, manufacturing, issuing, publishing or advertising." 18 U.S.C. § 2256(3).

**A. "Use" Element of § 2251(a)**

Questions of statutory interpretation are reviewed under a three-step framework:

> [F]irst, a natural reading of the full text; second, the common-law meaning of the statutory terms; and finally, consideration of the statutory and legislative history for guidance. The natural reading of the full text requires that we examine the statute for its plain meaning, including the language and design of the statute as a whole. If the statutory language is not clear, we may examine the relevant [**7] legislative history.

*Elgharib v. Napolitano*, 600 F.3d 597, 601 (6th Cir. 2010) (citations omitted). Where, as here, a statutory term is undefined, "we give it its ordinary meaning." *United States v. Santos*, 553 U.S. 507, 511, 128 S. Ct. 2020, 170 L. Ed. 2d 912 (2008). "'As in all cases of statutory construction, our task is to interpret the words of [the statute] in light of the purposes Congress sought to serve.'" [***5] *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 118, 103 S. Ct. 986, [*1089] 74 L. Ed. 2d 845 (1983) (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 608, 99 S. Ct. 1905, 60 L. Ed. 2d 508 (1979)).

No published decision of this court has interpreted the term "use" in § 2251(a).[5] The district court agreed with the Second, Fourth, and Eighth Circuits, that the "use" element is satisfied if a minor is photographed in order to create pornography. *United States v. Wright*, No. 1:12-CR-130, 2013 U.S. Dist. LEXIS 5691, 2013 WL 164096, at *4-5 (W.D. Mich. Jan. 15, 2013). We agree as well.

**1.**

Wright contends that only the Ninth Circuit has properly interpreted the "use" element of § 2251, as requiring "proof of active or coercive conduct by a defendant upon a minor," *United States v. Overton*, 573 F.3d 679, 692 (9th Cir. 2009), and declaring that § 2251 "simply makes illegal [**8] the *inducement* of children into sexual conduct for the purpose of creating visual depictions of that conduct," *United States v. Smith*, 795 F.2d 841, 845 (9th Cir. 1986) (emphasis added). Wright argues that because J.S. initiated the nude photography sessions, § 2251 does not apply.

Wright's reliance on *Overton* is misplaced. The principal issue in *Overton* was whether double jeopardy barred convictions under both § 2251(a) and (b). *Overton*, 573 F.3d at 691-96. *Overton* did not address the question what constitutes "active or coercive conduct." The other circuits that have addressed the parameters of the "use" element acknowledge that there is "an active component to the notion of 'use.'" The district court in the instant case required active "use" as well:

> According to Defendant, [§ 2251(a)] requires that the defendant did something to cause the minor to engage in sexually explicit conduct and that the defendant did so with the specific intent to produce a visual depiction of that conduct. Defendant contends that there is no evidence about the circumstances under which the Florida pictures were taken—the purpose for taking the photos, who came up with the idea, who decided on the poses, who took which photographs, what camera was used, and whether features such as remote or time-delayed mechanisms [**9] were used. Defendant notes that the government failed to introduce [***6] other nude photos taken on the Florida trip that were of a playful or jovial nature, suggesting a lack of coercion.
>
> . . . .
>
> "There is undoubtedly an active component to the notion of 'use.'" *United States v. Sirois*, 87 F.3d 34, 41 (2d Cir. 1996). However, the Second Circuit held in *Sirois* that the "use" component is "fully satisfied for the purposes of the child pornography statute if a child is photographed in order to create pornography." *Id*.

*Wright*, 2013 U.S. Dist. LEXIS 5691, 2013 WL 164096, at *4-5.

Nor does the Ninth Circuit's decision in *Smith* support Wright, as it too does not address what conduct constitutes "use." Rather, *Smith* addressed whether §

---

[5] Sixth Circuit Pattern Jury Instruction 16.01, which addresses the elements of § 2251(a), suggests that proof of conduct beyond the act of photographing or videorecording a minor is not required: "The basic conduct covered by this instruction is producing a visual image of a minor engaging in sexually explicit conduct." Sixth Cir. Pattern J.I. 16.01, committee commentary.

2251(a) and § 2252 require the Government to prove that the defendant intended to distribute the images, and concluded they do not. 795 F.2d at 845-46 ("Neither [*1090] section requires that the defendant's ultimate goal be distribution of the visual depiction.").

**B. Four Circuits Agree that the "Use" Element of § 2251 is Satisfied if a Minor is Photographed in Order to Create Pornography**

The Second Circuit held that the "use" element of § 2251 is "fully satisfied . . . if a child is photographed in order to create pornography," *United States v. Sirois*, 87 F.3d 34, 41 (2d Cir. 1996), upholding the district court's refusal to define the terms "employing, using, or persuading" in § 2251(a) as requiring [**10] a defendant to act to manipulate or take advantage of a minor:

> Sirois claims that the government urged the jury to interpret the word "use" too broadly. In its summation, the prosecution analogized Coupe and Miller to a vase being photographed; each was "used" to create a visual depiction. Sirois, instead, wanted to define "use" more narrowly, to mean "take some acts which manipulate or take advantage of a minor." The defense argues that, at the very least, any "use" by Sirois must have occurred prior to the photographed sexual activity, since the other activities proscribed by § 2251(a)—enticing, inducing, persuading, coercing—must all happen before the sexual activity.
>
> Sirois also argues that some clarificatory instruction was warranted, especially in view of the recent debate over the meaning of the word "use" in 18 U.S.C. § 924(c), which prohibits "use" of a firearm in certain circumstances. Sirois points to *Bailey v. United States*, 516 U.S. 137, __, 116 S. Ct. 501, 505, 133 L. Ed. 2d 472 [] (1995), and the Supreme Court holding that under § 924(c), "use" of a firearm entails active employment, not merely possession, of a gun. *See also [***7] Smith v. United States*, 508 U.S. 223, 113 S. Ct. 2050, 124 L. Ed. 2d 138 [] (1993) (ruling that bartering a gun for drugs constitutes "use" of a firearm under § 924(c)).
>
> Although the word "use" may pose "interpretational difficulties" [**11] in certain contexts, *id*., we do not believe that it creates problems here. As the Supreme Court pointed out in *Bailey*, the "ordinary or natural" meaning of the word "use" can be variously stated as "[t]o convert to one's service," "to employ," "to avail oneself of," and "to carry out a purpose or action by means of." 516 U.S. at __, 116 S. Ct. at 506 (quoting *Smith*, 508 U.S. at 229 []) (internal quotation marks omitted). There is undoubtedly an active component to the notion of "use." But that component is fully satisfied for the purposes of the child pornography statute if a child is photographed in order to create pornography.
>
> . . . .
>
> Although some of the other actions listed in § 2251(a), such as "enticing, inducing, and persuading" will most often occur before the depicted activity, that is not so of the word "use." . . . .
>
> In short, we believe that the meaning of "use" in § 2251(a) is within the typical juror's everyday understanding of the word.

*Sirois*, 87 F.3d at 41.[6]

The Eighth Circuit followed *Sirois* in *United States v. Fadl*, 498 F.3d 862, 866 [*1091] (8th Cir. 2007) (observing, "we agree . . . that the 'use' component 'is fully satisfied for the purposes of the child pornography statute if a child is photographed in order to create pornography.'" (quoting *Sirois*, 87 F.3d at 41)); *see also United States v. Vanhorn*, 740 F.3d 1166, 1168 (8th Cir. 2014) (same) (quoting *Sirois*, 87 F.3d at 41); *United States v. McCloud*, 590 F.3d 560, 566 (8th Cir. 2009) ("A defendant 'uses' a minor for purposes of § 2251(a) if he photographs the minor engaging in sexually explicit conduct to create a visual depiction of such conduct."); *accord United States v. Engle*, 676 F.3d 405, 419 n.9 (4th Cir. 2012) (quoting *McCloud*, 590 F.3d at 566)).

Most recently, the First Circuit in a case of first impression followed the Second, Fourth, and Eighth Circuits' interpretation of the term "use" in [***8] *Ortiz-*

---

[6] *Sirois* addressed other arguments Wright advances here, including that the term "use" in § 2251(a) should be interpreted as the Supreme Court interpreted "use" for purposes of 18 U.S.C. § 924(c)(1) in *Bailey v. United States*, 516 U.S. 137, 142-43, 116 S. Ct. 501, 133 L. Ed. 2d 472 (1995) (holding that § 924(c)(1) "requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative [**12] factor in relation to the predicate offense."). Appellant Br. at 15. *Sirois* acknowledged another argument Wright advances—that the verbs in § 2251(a) other than "use"—"persuade, induce, entice, and coerce"—are terms of causation and imply action. 87 F.3d at 41. *See* Appellant Br. at 16-17.

*Graulau v. United States*, 756 F.3d 12, 18-19 (1st Cir. 2014) (holding that "the statutory definition of 'use' is met when a defendant makes a minor the subject of a visual depiction by intentionally photographing the minor engaging in sexually explicit conduct") (citing *Engle*, 676 F.3d at 418 n.9; *McCloud*, 590 F.3d at 566; *Sirois*, 87 F.3d at 42, and other cases).

In sum, the Ninth Circuit in *Overton* and *Smith [**13]* did not address the quantum or quality of evidence required to establish "use" under § 2251(a); the Second Circuit acknowledged in *Sirois*, which directly addressed what evidence is required to establish "use," that there is "an active component to the notion of 'use,'" but held that photographing a minor in order to create pornography suffices; and the Fourth, Eighth, and First Circuits also hold that the "use" element is satisfied if a minor is photographed in order to create pornography. Contrary to Wright's argument, there is no circuit split on the issue. We believe that these decisions are consistent with the ordinary understanding of "use" as well as the intent of the statute. We thus reject Wright's claim that the Government had to prove that he caused J.S. to engage in the conduct photographed and recorded.

**C. "Producing" Element of § 2251**

Wright also argues that the Government failed to prove the "producing" element of § 2251(a) (defined in § 2256(3)). This argument pertains to counts 1 through 5. Counts 4 and 5 charged that in July and August 2009 Wright surreptitiously created videos of J.S. while he masturbated in front of a computer in Wright's office, and that Wright produced the videos using a camera [**14] and desktop computer that were manufactured outside of the State of Michigan.

Section 2256(3) provides that "'producing' means producing, directing, manufacturing, issuing, publishing, or advertising." As the Eighth Circuit observed in *Fadl*, "producing" is defined broadly and non-technically:

> Fadl's next contention concerns the meaning of the term "producing." "Producing" is defined as "producing, directing, manufacturing, issuing, publishing, or advertising." 18 U.S.C. § 2256(3). Fadl contends that this definition "implies directorial, editorial, or managerial role, and an ultimate goal of commercial production." Accordingly, Fadl asserts [*1092] that because he neither took a directorial role nor intended that the photographs be disseminated commercially, his conduct was not punishable under the statute. We disagree. The fact that "producing" is retained in the definition and placed alongside other [***9] terms indicates that Congress intended to retain a non-technical definition of the term "producing" (that is, in the sense of creating or making), but also sought to expand its scope to include activities that may not be generally considered to fall within the typical meaning of the term. We therefore conclude that list of terms [**15] in the definition reflects Congress's intention to enact a broad definition of "producing" that encompasses the varied means by which an individual might actively participate in the creation and distribution of child pornography.

*Fadl*, 498 F.3d at 866-67 (internal citation omitted). The First Circuit followed *Fadl* in *United States v. Poulin*, 631 F.3d 17 (1st Cir. 2011):

> We find that Congress did not intend so technical a definition of the term "produced" as Poulin would have it. Such a holding comports with Congress' list of assorted terms defining "producing," along with our own precedent and that of many of our sister courts. *See, e.g., id*. [18 U.S.C. § 2256(3) (defining "producing" as used in § 2251(a)]; *United States v. Ortiz-Graulau*, 526 F.3d 16, 19 (1st Cir. 2008) (interpreting § 2251(a) to require only that a visual depiction be made); *United States v. Fadl*, 498 F.3d 862, 867-68 (8th Cir. 2007) (finding Congress intended a nontechnical definition of "producing" and sought to include activities not generally considered to fall within the typical meaning of the term); *United States v. Smith*, 459 F.3d 1276, 1297-98 (11th Cir. 2006) (finding "producing" not unduly technical or ambiguous); *United States v. Angle*, 234 F.3d 326, 341 (7th Cir. 2000) (rejecting restrictive definition and holding that images copied onto computer diskettes are "produced"); *Robinson*, 137 F.3d at 653-54 (noting evidence of photographs taken with camera and film manufactured outside of state was offered to show "production" using materials shipped in interstate commerce); [**16] *United States v. Lacy*, 119 F.3d 742, 750 (9th Cir. 1997) (finding images copied onto computer were created and therefore "produced"). *But see United States v. Wilson*, 182 F.3d 737, 741-43 (10th Cir. 1999) (finding images recorded onto diskettes that traveled interstate insufficient to satisfy "production" requirement).

*Poulin*, 631 F.3d at 22.

The district court in the instant case concluded that

although there was no direct evidence that Wright took the Florida photographs, there was sufficient circumstantial evidence that Wright actively participated in the creation of the photographs. Wright was in some of the photographs, the photos were taken in Wright's hotel room during a trip to Florida he arranged, the images were found on a thumb drive in Wright's office in Michigan, and Wright admitted taking nude photographs of J.S. when J.S. was under the age of eighteen. *Wright*, 2013 U.S. Dist. LEXIS 5691,2013 WL 164096, at *7-8. As to the video recordings of J.S. masturbating, the district court noted that [***10] they were taken in Wright's home office and stored on the hard drive of Wright's computer. 2013 U.S. Dist. LEXIS 5691, [WL] at *9. We find no clear error in the court's factual findings and no legal error in its reliance on *Fadl* and *Poulin*, which interpret "producing" broadly and non-technically. Thus, the Government produced sufficient evidence that Wright "produced" the photographs and videos.

[*1093] **III. Transporting**

Finally, [**17] regarding count 6, Wright argues that although the Government was required to prove his "use" of a minor engaging in sexually explicit conduct, the district court mistakenly "seemed to accept that the crime was committed merely by transporting the visual depictions." Appellant Br. at 24. The district court's opinion is clear that it required the Government to prove both that the visual depictions involved the use of a minor engaging in sexually explicit conduct and that they were transported. *Wright*, 2013 U.S. Dist. LEXIS 5691, 2013 WL 164096, at *11-12.

**IV.**

We AFFIRM the district court in all respects.

---

End of Document

# United States v. Hillie

39 F.4th 674 (D.C. Cir. 2022)

Cited in Opening Brief at: 39

Highlighted language appears at 39 F.4th at 691.

Caution
As of: September 14, 2026 7:06 PM Z

# United States v. Hillie

United States Court of Appeals for the District of Columbia Circuit

April 20, 2021, Argued; September 17, 2021, Decided

No. 19-3027

**Reporter**
39 F.4th 674 *; 457 U.S. App. D.C. 333 **; 2021 U.S. App. LEXIS 40263 ***; 2022 WL 2333936

UNITED STATES OF AMERICA, APPELLEE v. CHARLES HILLIE, APPELLANT

**Subsequent History:** [***1] Reissued June 28, 2022

**Prior History:** Appeal from the United States District Court for the District of Columbia. (No. 1:16-cr-00030-1).

United States v. Hillie, 14 F.4th 677, 454 U.S. App. D.C. 294, 2021 U.S. App. LEXIS 28000 (Sept. 17, 2021)

**Counsel:** Richard Seligman, appointed by the court, argued the cause and filed the briefs for appellant.

David Goodhand, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Elizabeth Trosman and John P. Mannarino, Assistant U.S. Attorneys.

**Judges:** Before: HENDERSON, ROGERS and WILKINS, Circuit Judges. Opinion for the Court filed by Circuit Judge WILKINS. Opinion dissenting in part filed by Circuit Judge HENDERSON.

**Opinion by:** WILKINS

## Opinion

[**336] [*677] WILKINS, CIRCUIT JUDGE: A jury found Appellant Charles Hillie guilty of two counts of sexual exploitation of a minor, under 18 U.S.C. § 2251(a); four counts of attempted sexual exploitation of a minor, under 18 U.S.C. § 2251(e); one count of possession of images of a minor engaging in sexually explicit conduct, under 18 U.S.C. § 2252(a)(4)(B); and various counts relating to sexual abuse of children and minors, under D.C. law. The District Court sentenced Hillie to a total of 354 consecutive months of imprisonment—180 months on the counts of sexual exploitation of a minor, attempted sexual exploitation of a minor, and possession of images of a minor engaging in sexually explicit conduct; and 174 months [***2] on the remaining counts.

Hillie appeals, raising several claims. He argues that there was insufficient evidence to support his convictions of sexual exploitation of a minor, attempted sexual exploitation of a minor, and possession of images of a minor engaging in sexually explicit conduct. He argues that the District Court erroneously instructed the jury. He also argues that the District Court erroneously admitted certain testimony. And he argues that the District Court erroneously denied his motion to sever the counts of sexual exploitation of a minor, attempted sexual exploitation of a minor, and possession of images of a minor engaging in sexually explicit conduct from the remaining counts.

For the reasons given below, we agree with Hillie that there was insufficient evidence to support his convictions of sexual exploitation of a minor, attempted sexual exploitation of a minor, and possession of images of a minor engaging in sexually explicit conduct. Accordingly, we vacate Hillie's convictions on those counts. We reject Hillie's other claims.

### I.

We begin with the procedural background and a summary of the evidence presented at trial. "Because we are reviewing a jury verdict of guilt, [***3] we recount the evidence in the light most favorable to the Government." *United States v. Bostick*, 791 F.3d 127, 135, 416 U.S. App. D.C. 304 (D.C. Cir. 2015).

Between 2005 and 2015, Hillie lived on and off with his girlfriend, Jo. A, and her two minor daughters, JAA and JA. Between 2007 and 2014, Hillie sexually abused JAA and JA by penetrating JAA's vulva with his finger on one occasion, touching JAA's buttocks with his hand on two occasions, touching JAA's breast with his hand on one occasion, touching JA's breast with his hand on two

occasions, touching JA's vulva with his hand on one occasion, and touching JA's buttocks with his hand on one occasion.

On July 29, 2015, the Government filed a criminal complaint in the Superior Court of the District of Columbia accusing Hillie of first-and second-degree child sexual abuse. Law enforcement officers then secured a search warrant to locate and seize a laptop computer and camera belonging to Hillie. The officers executed the search warrant, arrested Hillie, and recovered his laptop and camera. The officers then secured a separate warrant to search the contents of the laptop and camera. The search revealed six videos. The contents of all six videos are relevant to the issues raised on appeal, but two are particularly so. [***4]

The first video is 29 minutes and 49 seconds long. It depicts Hillie positioning a camera underneath a bed in JAA's bedroom. [*678] [**337] Hillie walks back and forth from the camera several times, looking at it from different angles and adjusting its position. Eventually, Hillie exits the bedroom, leaving the camera behind, still recording. Later, JAA enters the bedroom. For several minutes she walks around the room, clothed, dancing and singing to herself. She proceeds to undress, standing almost directly in front of the camera. While undressing, she bends over in front of the camera, exposing her genitals to the camera for approximately nine seconds. After she has undressed, she sits slightly to the left of the camera and appears to clean her genitals and legs with a towel. While she does this, her breasts and pubic hair are visible but her genitals are not. She proceeds to apply lotion to her body for approximately 11 minutes. While she does this, her breasts are visible and her pubic hair is occasionally visible but her genitals are not. She proceeds to stand up and walk naked around the room. While she walks, her pubic area is intermittently visible for periods of approximately one or two seconds. [***5] She then dresses and exits the room. After JAA exits the room, Hillie returns and retrieves the camera.

The second video is 12 minutes and 25 seconds long. It depicts Hillie positioning a camera in a bathroom ceiling vent, directly above a toilet. Hillie then leaves the bathroom. Shortly after, Jo. A enters, sits on the toilet, stands up, and leaves. JAA and another minor, whom the Government refers to as KA, *see* ECF No. 55, at 4, proceed to enter the bathroom. JAA proceeds to sit on the toilet. The upper part of JAA's buttocks is visible for approximately 20 seconds while she sits on the toilet. Because the camera is directly above the toilet, JAA's genitals are not visible. JAA stands up and KA proceeds to sit on the toilet. The upper part of KA's buttocks is visible for approximately 20 seconds, but her genitals are not visible. JAA proceeds to wipe KA's pubic area with a washcloth. KA's pubic area is not visible while she does this, although occasionally the upper part of KA's buttocks is visible. KA proceeds to leave the bathroom. After she has left, JAA removes her pants and underwear and proceeds to wipe her pubic area with a washcloth. JAA's pubic area is visible for approximately [***6] 16 seconds while she does this. JAA proceeds to dress and exit the bathroom. Jo. A then enters and sits on the toilet again. Jo. A then stands up, looks up at the ceiling vent, sees the camera, and removes it.

The remaining four videos depict Hillie hiding a video camera in a bathroom ceiling vent and a bedroom dresser, but do not depict JAA's or JA's genitals or pubic area. *See* ECF No. 55, at 6-7.

On January 18, 2017, the Government filed a 17-count superseding indictment. (The Government had filed an earlier superseding indictment, on March 22, 2016, which Hillie successfully moved to dismiss.) Counts 1 and 2 charged Hillie with sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(a), in relation to Hillie's production of the two videos in which JAA's genitals and pubic area are visible as described above. Count 3 charged Hillie with possession of images of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4)(B), in relation to Hillie's possession of those same two videos in which JAA's genitals and pubic area are visible. Counts 4-7 charged Hillie with attempted sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(a) and (e), in relation to Hillie's production of each of the four remaining [***7] videos. Count 8 charged Hillie with first-degree child [**338] sexual abuse, under D.C. Code §§ 22-3008, 3020(a)(2), (5), in relation to Hillie's touching of JAA's vulva, but not his production of any of the videos. Counts 9-11 and 13-17 charged Hillie with second-degree child [*679] sexual abuse, under D.C. Code §§ 22-3009, 3020(a)(2), (5), in relation to his touching of JAA and JA's buttocks, breasts, and vulvas, but not his production of any of the videos. Count 12 charged Hillie with second-degree sexual abuse of a minor, under D.C. Code §§ 22-3009.02, 3020(a)(5), in relation to his touching of JAA's buttocks, but not his production of any of the videos.

A jury trial began on March 29, 2018. On April 3, 2018, after the close of the evidence, Hillie moved for a judgment of acquittal on all counts. The District Court

denied his motion with respect to all counts except one of the D.C. criminal charges (count 11), which the Court dismissed as multiplicitous. On April 4, 2018, the jury returned a verdict of guilty on all remaining counts. On April 2, 2019, the District Court sentenced Hillie to 180 months of imprisonment on each of counts 1-2 and 4-7, and 120 months of imprisonment on count 3, to run concurrently to each other but consecutive to remaining counts; to 102 months of imprisonment on [***8] count 8, and 24 months of imprisonment on each of counts 9, 10, and 12, to run concurrently with each other and the term of imprisonment on count 8 but consecutive to remaining counts; and to 72 months of imprisonment on each of counts 13-17, to run concurrently to each other but consecutive to remaining counts.

Hillie timely appealed his convictions on all counts.

**II.**

Hillie challenges the sufficiency of the evidence as to counts 1-7.

Hillie challenged the sufficiency of the evidence below on two grounds. First, he argued that there was insufficient evidence to support his convictions on counts 1-3 because the videos related to those counts did not depict a minor engaging in sexually explicit conduct. *See* Def.'s Second Mot. to Dismiss Counts 1-7 of the Indictment, ECF No. 50, at 1, 4. Second, he argued that there was insufficient evidence to support his convictions on counts 1-7 because the evidence did not establish that he intended to produce depictions of a minor engaging in sexually explicit conduct. *Id.* at 1, *see also* Mem. Op. Denying Def.'s Second Mot. to Dismiss Counts 1-7 of the Indictment, ECF No. 81, at 2.

Hillie raises the same arguments on appeal. This Court must review them [***9] "viewing the evidence in the light most favorable to the government, and affirming a guilty verdict where any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Littlejohn*, 489 F.3d 1335, 1338, 376 U.S. App. D.C. 499 (D.C. Cir. 2007) (internal quotation marks and brackets omitted) (quoting *United States v. Wahl*, 290 F.3d 370, 375, 351 U.S. App. D.C. 284 (D.C. Cir. 2002)). "By thus asking only whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, our deferential review impinges upon jury discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *United States v. Torres*, 894 F.3d 305, 436 U.S. App. D.C. 363, 369 (D.C. Cir. 2018) (internal quotation marks omitted).

As both parties agreed at oral argument, our "limited determination on sufficiency review . . . does not rest on how the jury was instructed," *Musacchio v. United States*, 577 U.S. 237, 243, 136 S. Ct. 709, 193 L. Ed. 2d 639 (2016), but rather on how a properly instructed jury would assess the evidence, Oral Arg. Rec. 12:10-13:15, 56:46-59:15. *See, e.g., United States v. Staggers*, 961 F.3d 745, 756 (5th Cir.) ("Sufficiency is measured against the actual elements of the offense, not the elements stated in the jury instructions," citing *Musacchio*)), *cert. denied*, [*680] [**339] 141 S. Ct. 388, 208 L. Ed. 2d 103 (2020); *United States v. Wheat*, 988 F.3d 299, 312 (6th Cir. 2021) (same); *United States v. Ramos*, 814 F.3d 910, 916 (8th Cir. 2016), as corrected (Feb. 23, 2016) (same); *United States v. Wyatt*, 964 F.3d 947, 951 (10th Cir. 2020) (same). *Cf. Boyle v. United Techs. Corp.*, 487 U.S. 500, 513-14, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988) (holding that where evidence in a civil trial does not suffice to support a jury verdict for plaintiff under a properly formulated [***10] defense, judgment may be entered for defendant on appeal despite the fact that defendant did not object to jury instructions "that expressed the defense differently, and in a fashion that would support a verdict") (collecting cases). To allow a conviction to stand where the defendant's conduct "fails to come within the statutory definition of the crime," *Griffin v. United States*, 502 U.S. 46, 59, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991), or despite insufficient evidence to support it, would violate the Due Process Clause. *See Musacchio*, 577 U.S. at 243. And to allow a defendant to be retried for a charge that the Government previously failed to prove at trial would violate the Double Jeopardy Clause. *See Burks v. United States*, 437 U.S. 1, 15-17, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978). A defendant does not "waive" his rights under either of those clauses by failing to present the correct interpretation of the offense to the district court. *Cf. id.* at 17-18 ("It cannot be meaningfully said that a person 'waives' his right to a judgment of acquittal by moving for a new trial. Moreover, . . . an appellate court is authorized by [28 U.S.C.] § 2106 to 'go beyond the particular relief sought' in order to provide that relief which would be 'just under the circumstances.'" (internal citations omitted)). Accordingly, we assess Hillie's challenges to the sufficiency of the evidence as we would had the jury been instructed correctly.

**A.**

We begin with [***11] Hillie's argument that there was insufficient evidence to support his convictions on counts 1-3 because the videos related to those counts do not depict JAA engaging in sexually explicit conduct.

Counts 1 and 2 charged Hillie with sexual exploitation of a minor, under 18 U.S.C. § 2251(a), in relation Hillie's production of the two videos in which JAA's genitals and pubic area are visible. Section 2251(a) provides, in relevant part, that:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . shall be punished as provided under subsection (e)[.]

18 U.S.C. § 2251(a).

Count 3 charged Hillie with possession of images of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4)(B), in relation to Hillie's possession of those same two videos. As relevant for our purposes, § 2252(a)(4)(B) prohibits the knowing possession of videos and any other matter containing a visual depiction produced using materials mailed or transported in interstate commerce if "(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and (ii) such visual depiction is of such conduct."

Thus, Congress [***12] defined the sexual exploitation and possession of child pornography offenses as applying to videos that depict "a minor engaging in sexually explicit conduct."

Congress also provided a definition of [*681] "sexually explicit conduct," which, as relevant for our purposes, states as follows:

> [**340] "sexually explicit conduct" means actual or simulated—
>
> > (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
> >
> > (ii) bestiality;
> >
> > (iii) masturbation;
> >
> > (iv) sadistic or masochistic abuse; or
> >
> > (v) lascivious exhibition of the anus, genitals, or pubic area of any person

18 U.S.C. § 2256(2)(A).

The Government acknowledges that only part (v) of the definition is at issue here, because neither of the two videos depicted sexual intercourse, bestiality, masturbation, or sadistic or masochistic abuse. *See, e.g.*, Govt's Br. at 42-48. Thus, the only contested issue is whether a reasonable jury could find that the two videos underlying counts 1-3 each depict conduct that could be described as a "lascivious exhibition of the anus, genitals, or pubic area of any person."

We are not writing on a blank slate, because the Supreme Court has provided guidance as to how [***13] to construe the same or similar phrasing in a line of cases going back nearly fifty years. The first such case is *Miller v. California*, in which the Court considered a First Amendment challenge to a state statute prohibiting the mailing of unsolicited "obscene matter." 413 U.S. 15, 17, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973). In upholding the California statute, the Court held that it must be construed as limited to works depicting patently offensive "sexual conduct specifically defined by . . . state law," *id.* at 24, and gave as examples "ultimate sexual acts, normal or perverted, actual or simulated," as well as "representation[s] or descriptions of masturbation, excretory functions, and *lewd exhibition of the genitals*," *id.* at 25 (emphasis added). The Court described its holding as applying only to patently offensive "'hard core' sexual conduct." *Id.* at 27. In *United States v. 12 200-Foot Reels of Super 8mm. Film*, decided the same day as *Miller*, the Court clarified that the "standards for testing the constitutionality of state legislation regulating obscenity" announced in *Miller* "are applicable to federal legislation." 413 U.S. 123, 129-30, 93 S. Ct. 2665, 37 L. Ed. 2d 500 (1973). The Court noted its "duty to authoritatively construe federal statutes where 'a serious doubt of constitutionality is raised' and 'a construction of the statute is fairly possible by which [***14] the question may be avoided.'" *Id.* at 130 n.7 (quoting *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369, 91 S. Ct. 1400, 28 L. Ed. 2d 822 (1971) (opinion of White, J.)). Explaining that "[i]f and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral' as used to describe regulated material" in federal statutes, "we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific '*hard core*' *sexual conduct* given as examples in *Miller v. California." Id.* (emphasis added).

In *New York v. Ferber*, the Court rejected a constitutional overbreadth challenge to a New York statute prohibiting "the use of a child in a sexual performance," defined as a performance "includ[ing] sexual conduct by a child." 458 U.S. 747, 750-51, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982). The statute further defined "sexual conduct" as meaning "actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or *lewd exhibition of the genitals."* *Id.* at 751 (emphasis [*682] [**341] added). The Court held that child pornography may be regulated without infringing on the First Amendment, regardless of whether it is obscene, because of the harm it causes to the children who appear in it. *Id.* at 756-58. "[T]he question under the *Miller* test of whether [***15] a work, taken as a whole, appeals to the prurient interest of the average person," the Court explained, "bears no connection to the issue of whether a child has been physically or psychologically harmed in the production of the work." *Id.* at 761. The Court emphasized, however, that "[t]here are, of course, limits on the category of child pornography which, like obscenity, is unprotected by the First Amendment." *Id.* at 764. For instance, the Court explained, "[t]he category of 'sexual conduct' proscribed must . . . be suitably limited and described." *Id.* The Court held that the New York law at issue was suitably limited. "The forbidden acts to be depicted," the Court explained, "are listed with sufficient precision and represent the kind of conduct that, if it were the theme of a work, could render it legally obscene: 'actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or *lewd exhibition of the genitals*.'" *Id.* at 765 (emphasis added). The Court noted that "[t]he term 'lewd exhibition of the genitals,'" in particular, "is not unknown in this area and, indeed, was given in *Miller* as an example of a permissible regulation." *Id.* The Court reiterated that "the reach [***16] of the statute is directed at the *hard core* of child pornography," *id.* at 773 (emphasis added), repeating the characterization of prohibited "sexual conduct" that was articulated in *Miller*.

In *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994), the Court rejected a constitutional-overbreadth challenge to the possession-of-child-pornography statute, 18 U.S.C. § 2252(a), the basis for Count 3 in this case. The Court noted that Congress had amended the statute in 1984 to broaden "its application to those sexually explicit materials that, while not obscene as defined by *Miller v. California*, could be restricted without violating the First Amendment as explained by *New York v. Ferber." X-Citement Video*, 513 U.S. at 74 (internal citations omitted). The Court rejected vagueness and overbreadth challenges to the statutory term "lascivious exhibition of the . . . genitals," as used in § 2256(2)(A)(v), because, as the Court of Appeals had explained, "'[l]ascivious' is no different in its meaning than 'lewd,' a commonsensical term whose constitutionality was specifically upheld in *Miller v. California* and in *Ferber*," *United States v. X-Citement Video, Inc.*, 982 F.2d 1285, 1288 (9th Cir. 1992) (internal quotation marks and citations omitted) (alteration in original); *see also X-Citement Video*, 513 U.S. at 78-79 (adopting the reasoning of the Court of Appeals). In so doing, the Court expressly engrafted the "hard core" characterization of the prohibited "lascivious exhibition of the genitals" [***17] from *Miller* onto the construction of the federal child pornography statute. In dissent, Justice Scalia indicated his agreement with that aspect of the Court's holding. *Id.* at 84 (Scalia, J., dissenting) ("'[S]exually explicit conduct,' as defined in the statute, does not include mere nudity, but only *conduct* that consists of 'sexual intercourse . . . between persons of the same or opposite sex,' 'bestiality,' 'masturbation,' 'sadistic or masochistic abuse,' and 'lascivious exhibition of the genitals or pubic area.' What is involved, in other words, is not the clinical, the artistic, nor even the risqué, but *hard-core [*683] [**342] pornography*." (second emphasis added)).

In *United States v. Williams*, 553 U.S. 285, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008), the Court considered a constitutional overbreadth challenge to the promotion of child pornography statute, 18 U.S.C. § 2252A(a)(3)(B), which uses the same definition of "sexually explicit conduct" as the offenses for which Hillie was convicted in counts 1-7. The Court rejected the overbreadth challenge based, in part, on its finding that "sexually explicit conduct" includes only conduct akin to that defined by the New York statute upheld in *Ferber*. "[T]he [statutory] definition of 'sexually explicit conduct,'" the Court observed, "is very similar to the definition of 'sexual [***18] conduct' in the New York statute we upheld against an overbreadth challenge in *Ferber." Williams*, 553 U.S. at 296. "Congress," the Court continued, "used essentially the same constitutionally approved definition in the present Act. If anything, the fact that the defined term here is 'sexually *explicit* conduct,' rather than (as in *Ferber*) merely 'sexual conduct,' renders the definition more immune from facial constitutional attack." *Id.* Just as in *X-Citement Video*, the Court in *Williams* made clear that "sexually explicit conduct" as used in the federal child pornography

statutes must be construed consistently with the "sexual conduct" prohibited in *Ferber*.

In sum, *Ferber* explained that the Court had previously construed the phrase "lewd exhibition of the genitals" in *Miller*, and that the phrase referred to "the hard core of child pornography." *Ferber*, 458 U.S. at 764-65, 773. In *X-Citement Video*, the Court found that the term "lascivious exhibition of the genitals" as currently used in § 2256(2)(A)(v), has the same meaning as "lewd exhibition of the genitals," as that phrase was construed in *Miller* and *Ferber. X-Citement Video*, 513 U.S. at 78-79. And in *Williams*, the Court reaffirmed that § 2256(2)(A)'s definition of "sexually explicit conduct" means essentially the same thing as the definition of "sexual conduct" at issue in *Ferber*, except that the conduct defined by § 2256(2)(A) must be, if [***19] anything, more "hard-core" than the conduct defined by the New York law at issue in *Ferber*, given that the federal statute prohibits "sexually explicit conduct" rather than merely "sexual conduct," as in the state law. *Williams*, 553 U.S. at 296.

These constructions were necessary antecedents to determining whether the statutes at issue in *Ferber, X-Citement Video*, and *Williams* were overbroad, *see Williams*, 553 U.S. at 293 ("[t]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers"), and are therefore binding holdings, *see In re Grand Jury Investigation*, 916 F.3d 1047, 1053, 439 U.S. App. D.C. 406 (D.C. Cir. 2019). We are of course bound by this directly applicable Supreme Court precedent, U.S. CONST. ART. III, § 1; *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917, 104 L. Ed. 2d 526 (1989), and, as the Court has explained, we must faithfully apply those precedents where the same statutory language is at issue, as it is here:

> It is this Court's responsibility to say what a [federal] statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law. *A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction*.

[*684] [**343] *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 312-13, 114 S. Ct. 1510, 128 L. Ed. 2d 274 (1994) (emphasis added). [***20] Additionally, the Court's authoritative construction of statutory language must be followed in subsequent prosecutions because it is that construction which provides fair notice to citizens of what conduct is proscribed. *Cf. Bouie v. City of Columbia*, 378 U.S. 347, 353, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964) (unexpected or unforeseen authoritative judicial construction that broadens clear and more precise statutory language violates due process).

Moreover, although Hillie did not argue in the District Court that "lascivious exhibition of the genitals" must be construed consistent with *Miller* and its progeny, he argued persistently that to obtain convictions under § 2251, the Government was required to prove that he captured video footage of JAA engaging in overt sexual activity. *See, e.g.*, Def.'s Second Mot. to Dismiss Counts 1-7 of the Indictment, ECF No. 50, at 1, 4 ("None of the videos show any actual sexual activity or . . . any conduct that could remotely be considered lascivious."); Aug. 3, 2017 Tr., ECF No. 148, at 64-65 (arguing that a lascivious exhibition "has to be . . . sexual in nature," not "just somebody dressing or undressing or going to the bathroom"); Apr. 3, 2018 Afternoon Tr. at 52-53 (moving for a judgment of acquittal, arguing that "there's no evidence beyond [***21] a reasonable doubt that Mr. Hillie intended to make a video with sexually explicit conduct"); Apr. 4, 2018 Morning Tr. at 21-22 (objecting to a jury instruction that "the image need not depict overt sexual activity or behavior").

He makes the same core argument on appeal. *See, e.g.*, Appellant's Br. at 24 ("[The terms] 'sexual intercourse,' 'bestiality,' 'masturbation,' and 'sadistic or masochistic abuse[,]' . . . are graphic, sexual terms referring to sexually explicit conduct or behavior and a 'lascivious exhibition' must be equally graphic with regard to the conduct or child's behavior depicted."); *id.* at 25 ("[A]n image, even one with nudity, must depict conduct that is objectively sexual [in order for its creator to be convicted under 18 U.S.C. § 2251(a)]."); *id.* at 27 ("The trial court's interpretation of the statute as not requiring the image to 'depict overt sexual activity or behavior' is in direct contradiction to the clear language of the statute and the intent of [C]ongress . . . [that] the Act not apply to nude asexual activities."); *id.* at 28 ("The videos of [JAA] showering, toileting and self-grooming did not depict sexually explicit conduct. [JAA] . . . does not perform any sexual acts, [***22] pose sexually, or say or do anything sexual. Instead, she uses the toilet, washes her pubic area with a washcloth, and grooms herself in the bathroom."). "And once an argument is before us, it is our job to get the relevant case law right. Indeed, a party cannot forfeit or waive

recourse to a relevant case just by failing to cite it." *Flyers Rights Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 748 n.6, 431 U.S. App. D.C. 150 (D.C. Cir. 2017) (internal citations omitted); *see also Elder v. Holloway*, 510 U.S. 510, 516, 114 S. Ct. 1019, 127 L. Ed. 2d 344 (1994) (when deciding a "question of law," a court "should * * * use its full knowledge of its own [and other relevant] precedents") (second alteration in original; internal quotation marks and citation omitted); *United States v. Rapone*, 131 F.3d 188, 196-97, 327 U.S. App. D.C. 338 (D.C. Cir. 1997). Therefore, although Hillie did not cite *Ferber, X-Citement Video*, and *Williams* in his briefs, we are bound to follow them in evaluating his argument that to sustain his convictions under § 2251, the Government was required to prove that he captured video footage of JAA engaging in overt sexual activity.

[*685] [**344] Based on the foregoing, we construe "lascivious [**345] exhibition of the anus, genitals, or pubic area of any person" in 18 U.S.C. § 2256(2)(A)(v) to mean that the minor displayed his or her anus, genitalia, or pubic area in a manner connoting that the minor, or any person or thing appearing with the minor in the image, exhibits sexual desire or an inclination [***23] to engage in *any* type of sexual activity. *See* Webster's Third New Int'l Dictionary (1981) (defining "lascivious" to mean, among others, "inclined to lechery: lewd, lustful"); Black's Law Dictionary (5th Ed. 1979) (defining "lascivious" as, among others, "tending to incite lust" and "lewd"). This construction is consistent with the phrase "sexually explicit conduct," of which the "lascivious exhibition of the genitals" is one form. As *Williams* explained:

> "Sexually *explicit* conduct" connotes actual depiction of the sex act rather than merely the suggestion that it is occurring. And "simulated" sexual intercourse is not sexual intercourse that is merely suggested, but rather sexual intercourse that is explicitly portrayed, even though (through camera tricks or otherwise) it may not actually have occurred. The portrayal must cause a reasonable viewer to believe that the actors actually engaged in that conduct on camera.

553 U.S. at 297. Further, just as *Williams* relied upon the *noscitur a sociis* canon to interpret the promotion of child pornography statute, 18 U.S.C. § 2252A(a)(3)(B), *id.* at 294-95, we believe it has relevance here. Because "lascivious exhibition of the anus, genitals, or pubic area" appears in a list with "sexual intercourse," "bestiality," [***24] "masturbation," and "sadistic or masochistic abuse," its "meaning[] [is] narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." *Id.* at 294. Thus, the "lascivious exhibition of the anus, genitals, or pubic area" must be performed in a manner that connotes the commission of a sexual act, which is consistent with how the prosecutors construed "lewd exhibition of the genitals" when asking the Supreme Court to uphold the New York statute in *Ferber. See* Brief for Petitioner, *Ferber*, 458 U.S. 747, 102 S. Ct. 3348, 73 L. Ed. 2d 1113, 1982 WL 608534, at *24 (1982) ("Notably, the statute, in defining sexual conduct, does not include simple nudity, although it does prohibit lewd exhibition of the genitals. Nudity is prohibited only when it is accompanied by simulated sexual conduct, that is, the explicit depiction of the prohibited acts. N.Y. Penal Law § 263.00 (3) & (6). In not prohibiting simple nudity, the statute allows producers ample room to express an idea, convey a message or tell a story about the sexual conduct of children."). Further, this construction is consistent with the Court's repeated description of the conduct prohibited by the terms "sexual conduct" and "sexually explicit conduct" in child pornography statutes [***25] as "hard core" sexual conduct, as described above.

To be clear, this construction of the statute—although it is informed by First Amendment caselaw—is not a holding that Congress has run up against a constitutional limit on its authority to criminalize conduct like Hillie's. In fact, both federal law and the law of the District of Columbia contain prohibitions on voyeurism. *See* 18 U.S.C. § 1801; D.C. Code § 22-3531. And we see no barrier to imposition of enhanced penalties when the victim is a minor. *Cf. Ferber*, 458 U.S. at 756-57. The First Amendment cases are instructive simply in that they shed light on the meaning that Congress ascribed to the statutory term "lascivious [*686] exhibition of the anus, genitals, or pubic area of any person."

Applying this construction to the evidence introduced at trial, we conclude that no rational trier of fact could find JAA's conduct depicted in the videos related to counts 1-3 to be a "lascivious exhibition of the anus, genitals, or pubic area of any person," as defined by § 2256(2)(A). To fall within the definition of "lascivious exhibition of the . . . genitals," JAA's conduct depicted in the videos must consist of her displaying her anus, genitalia or pubic area in a lustful manner that connotes the commission of a sexual act. As the dissent agrees [***26] (pp. 10-11), none of the conduct in which JAA engages in the two videos at issue comes close. The videos depict JAA

engaged in ordinary grooming activities, some dancing, and nothing more. While JAA disrobes and her nude body is shown, along with fleeting views of her pubic area, JAA never engages in any sexual conduct whatsoever, or any activity connoting a sex act. There is certainly nothing that could be reasonably described as "hard core," sexually explicit conduct. The depiction of JAA's conduct does not even suggest "sexual coyness or a willingness to engage in sexual activity." Dissent at 10. We agree and highlight that we view the evidence in the same way as our dissenting colleague: the evidence against Hillie showed no sexual conduct or coyness by JAA nor anyone else. Accordingly, we hold that no rational trier of fact could find JAA's conduct depicted in the videos to be a "lascivious exhibition of the . . . genitals" as defined by § 2256(2)(A). We therefore vacate Hillie's convictions on counts 1-3 and direct the District Court to enter a judgment of acquittal on those counts.

In reaching this conclusion, we reject the Government's argument (adopted by the dissent) that "lascivious [***27] exhibition of the genitals," as defined in § 2256(2)(A), should be construed in accordance with the so-called *Dost* factors. *See United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986). In *Dost*, the court held that "lascivious exhibition of the genitals" should be determined by "look[ing] to the following factors, among any others that may be relevant in the particular case:"

> (1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
>
> (2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
>
> (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
>
> (4) whether the child is fully or partially clothed, or nude;
>
> (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;
>
> (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Id.* at 832.

There are several reasons why *Dost* is unpersuasive. First, the *Dost* court misinterpreted a single floor statement of a single Senator, *id.* at 831 (erroneously referring to Senator Specter as "Rep. Specter"), to conclude that when Congress amended the definition of "sexually explicit conduct" in 1984, [***28] substituting "lascivious" for "lewd," Congress's intent "was to broaden the scope of the existing 'kiddie porn' laws." *Id.* Even while acknowledging that "'lewd' and 'lascivious' have frequently been used interchangeably," the *Dost* court nonetheless concluded that "Congress believed that the term 'lewd' . . . was too restrictive since it had been closely associated with the more stringent standard of obscenity." *Id.* at 831 & n.4. As [*687] [**346] stated above, this reasoning has been rejected by the Supreme Court, because "'[l]ascivious' is no different in its meaning than 'lewd,'" *X-Citement Video*, 982 F.2d at 1288 (internal quotation marks and citations omitted); *X-Citement Video*, 513 U.S. at 78-79 (adopting the reasoning of the Court of Appeals), so this 1984 wording change did not affect the scope of the statute. *See also Roth v. United States*, 354 U.S. 476, 487 n.20, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957) (equating "lascivious" with "lewd"). Consequently, the fundamental premise of *Dost*, that the 1984 amendment of the definition of "sexually explicit conduct" broadened the reach of the federal statute, is fatally flawed.

Second, because of its erroneous premise that "lascivious" had a broader meaning than "lewd," the *Dost* court completely ignored the holdings of *Miller*, 413 U.S. at 527, and *12 200-Ft. Reels of Super 8mm Film*, 413 U.S. at 130 n.7, that "lewd exhibition of the genitals" refers to "hard core" sexual [***29] conduct. Indeed, rather than relying upon the authoritative construction of "lewd exhibition" in these Supreme Court cases, the *Dost* court approvingly cited a district court opinion that concluded that "there are no cases interpreting the word 'lewd' as used in this [the federal child pornography] statute," 636 F. Supp. at 831-32 (citing *United States v. Nemuras*, 567 F. Supp. 87, 89 (D. Md. 1983), *aff'd* 740 F.2d 286 (4th Cir. 1984)), and crafted its own definition.

When upholding *Dost*, the Ninth Circuit rejected a vagueness challenge to the statutory language "lascivious exhibition of the genitals," because "'lascivious' is no different in its meaning than 'lewd,' a commonsensical term whose constitutionality was specifically upheld in *Miller v. California*. . . ." *United States v. Wiegand*, 812 F.2d 1239, 1243 (9th Cir. 1987). But without any explanation, *Wiegand* did not abide by *Miller's* construction of "lewd exhibition of the genitals," even though the Supreme Court had previously explained that "[i]f and when . . . a 'serious doubt' is raised as to the vagueness of the words 'obscene,'

'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral' as used to describe regulated material" in federal statutes, "we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific '*hard core*' *sexual conduct* given as examples [***30] in *Miller v. California." 12 200-Foot Reels of Super 8mm. Film*, 413 U.S. at 130 n.7 (emphasis added). Instead, *Wiegand* adopted a modification of the six-factor test created by the district court in *Dost*. 812 F.2d at 1243-45. Even if the relevancy of using *Miller, 12 200-Foot Reels of Super 8mm. Film*, and *Ferber* to construe the federal statute was unclear at the time of *Dost* and *Wiegand, but see Hamling v. United States*, 418 U.S. 87, 105-07, 113-14, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974) (explaining that *12 200-Foot Reels of Super 8mm. Film* held that the statutory constructions from *Miller* authoritatively applied to federal statutes with same language), their pertinence is now clear given *X-Citement Video*, 513 U.S. at 78-79, and *Williams*, 553 U.S. at 296, for the reasons explained above. (Even though "[t]he first step in overbreadth analysis is to construe the challenged statute," *United States v. Stevens*, 559 U.S. 460, 474, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010) (quoting *Williams*, 553 U.S. at 293), the dissent (pp. 13-14 n.19) suggests that none of these Supreme Court precedents, all of which involved overbreadth challenges, actually construed the statutory language.)

Third, the *Dost* court erroneously concluded that whether a photo or video depicts "a minor engaged in sexually explicit [*688] [**347] activity" depends in part on whether the photo or video "is designed to elicit a sexual response in the viewer, albeit perhaps not the 'average viewer,' but perhaps in the pedophile viewer." 636 F. Supp. at 832. The Ninth Circuit agreed, stating that "[t]he picture of a child 'engaged [***31] in sexually explicit conduct' within the meaning of 18 U.S.C. §§ 2251 and 2252 . . . is a picture of a child's sex organs displayed lasciviously—that is, so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur." *Wiegand*, 812 F.2d at 1244.

The Supreme Court expressly rejected this line of reasoning in *Williams*. When construing the federal promotion of child pornography offense, the Court explained that the statute cannot "apply to someone who subjectively believes that an innocuous picture of a child is 'lascivious.'" *Williams*, 553 U.S. at 301. Instead, "[t]he defendant must believe that the picture contains certain material, and that material in fact (and not merely in his estimation) must meet the statutory definition. Where the material at issue is a harmless picture of a child in a bathtub and the defendant, knowing that material, erroneously believes that it constitutes a 'lascivious exhibition of the genitals,' the statute has no application." *Id.* This is because the statutory terms "visual depiction"—in § 2251(a) and § 2252(a)(4)(B)—and "lascivious exhibition"—in § 2256(2)(A)(v)—refer to different things. Sections 2251(a) and 2252(a)(4)(B) require the defendant to have produced or possessed a visual depiction of "a minor [or any minor] engaging in sexually explicit conduct," with sexually [***32] explicit conduct defined as, among other things, a "lascivious exhibition of the . . . genitals," 18 U.S.C. § 2256(2)(A)(v). The statutory term "lascivious exhibition" therefore refers to the minor's conduct that the visual depiction depicts, and not the visual depiction itself. That is why the Supreme Court repeatedly describes "lascivious exhibition of the genitals" to mean depictions showing a minor engaged in "hard core" sexual conduct, not visual depictions that "elicit a sexual response in the viewer," as the *Dost* court concluded. Writing for the Court in *Williams*, and placing emphasis on the word "explicit," Justice Scalia explained that "'[s]exually *explicit* conduct' connotes actual depiction of the sex act rather than merely the suggestion that it is occurring," 553 U.S. at 297, but the *Dost* factors stray too far from this basic teaching, allowing a depiction that portrays sexually *implicit* conduct in the mind of the viewer to be caught in the snare of a statute that prohibits creating a depiction of sexually *explicit* conduct performed by a minor or by an adult with a minor.

The dissent argues (pp. 11-14) that this construction of the statute is contrary to the legislative purpose of protecting children from exploitation and psychological [***33] harm. Not so. Our construction is consistent with this purpose because it protects children from persons who, with the purpose of creating a visual depiction, solicit minors to engage in sexually explicit conduct or engage in sexually explicit conduct with minors. Besides, a broadly stated legislative purpose cannot trump more narrowly worded statutory text. *See West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98, 111 S. Ct. 1138, 113 L. Ed. 2d 68 (1991) ("The best evidence of . . . [legislative] purpose is the statutory text adopted by both Houses of Congress and submitted to the President."); *Nichols v. United States*, 578 U.S. 104, 136 S. Ct. 1113, 1119, 194 L. Ed. 2d 324 (2016) ("Yet 'even the most formidable argument concerning the statute's purposes could not overcome the clarity we find in the statute's text.'" (quoting *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4, [*689] [**348] 133 S. Ct. 596, 184

L. Ed. 2d 433 (2012))). Furthermore, the Supreme Court was well aware of any relevant legislative purpose when it construed "lewd exhibition of the genitals" in *Ferber, see* 458 U.S. at 756-59, 764-65, and "lascivious exhibition of the genitals" in *Williams, see* 553 U.S. at 296-97, 300-02.

For all these reasons, we decline to adopt the *Dost* factors, and thus we find unpersuasive those decisions of our sister circuits that follow the *Dost* factors, or that use *Dost* as the foundation for construing "lascivious exhibition of the anus, genitals, or pubic area," rather than *Miller* and its progeny, including *Ferber, X-Citement Video* [***34] , and *Williams. See United States v. Rivera*, 546 F.3d 245, 252-53 (2d Cir. 2008); *Salmoran v. AG United States*, 909 F.3d 73, 80 n.11 (3d Cir. 2018); *United States v. McCall*, 833 F.3d 560, 563 (5th Cir. 2016); *United States v. Hodge*, 805 F.3d 675, 680 (6th Cir. 2015); *United States v. Petroske*, 928 F.3d 767, 773 (8th Cir. 2019); *United States v. Perkins*, 850 F.3d 1109, 1121 (9th Cir. 2017); *United States v. Isabella*, 918 F.3d 816, 831 (10th Cir. 2019).

Other decisions of our sister circuits, as well as a state Supreme Court, have appropriately cautioned against treating the *Dost* factors as a definition for "lascivious exhibition." *See United States v. Amirault*, 173 F.3d 28, 32 (1st Cir. 1999) (concluding that "the *Dost* factors are generally relevant and provide some guidance in evaluating whether the display in question is lascivious," emphasizing that "these factors are neither comprehensive nor necessarily applicable in every situation," and that "there may be other factors that are equally if not more important in determining whether a photograph contains a lascivious exhibition"); *United States v. Spoor*, 904 F.3d 141, 151 (2d Cir. 2018) (limiting "the role of the sixth *Dost* factor," insofar as "the defendant's subjective intent alone is not sufficient to find the content lascivious"); *United States v. Price*, 775 F.3d 828, 839-40 (7th Cir. 2014) (holding that district court did not plainly err by instructing jury on *Dost* factors, but declining to endorse the factors and "discourag[ing] their routine use"); *State v. Whited*, 506 S.W.3d 416, 437 (Tenn. 2016) (rejecting "the use of the *Dost* factors as a 'test' or an analytical framework for determining whether certain materials constitute child pornography," also defined as a lascivious exhibition of the genitals); *United States v. Steen*, 634 F.3d 822, 829 (5th Cir. 2011) (Higginbotham, J., concurring) ("The sixth factor, which asks whether the [***35] visual depiction was intended to elicit a sexual response in the viewer, is especially troubling. Congress did not make production of child pornography turn on whether the maker or viewer of an image was sexually aroused, and this *Dost* factor encourages both judges and juries to improperly consider a non-statutory element." (footnote omitted)).

In rejecting the *Dost* factors as a definition of "lascivious exhibition," we do not mean to suggest that evidence concerning all matters described in the factors is irrelevant or inadmissible at trial. For example, evidence pertaining to the fifth *Dost* factor, that "the visual depiction suggests sexual coyness or a willingness to engage in sexual activity," 636 F. Supp. at 832, may substantially overlap with the construction that we have adopted here. If the factor is properly framed to focus on whether the conduct depicted in the visual depiction suggests coyness or a willingness to engage in sexual activity, it may indeed shed light on whether an exhibition of the genitals is conducted "in a lustful manner that connotes the commission of a sexual act," *see supra* at 17-19, and is therefore a "lascivious exhibition." Today this court simply [*690] [**349] rejects the practice of instructing [***36] the jury on the *Dost* factors as a matter of course, or in a manner that suggests those factors are sufficient to determine whether given conduct, depicted visually, constitutes a "lascivious exhibition of the anus, genitals, or pubic area of any person."

**B.**

We turn to the sufficiency of the evidence for counts 4-7, which charged Hillie with attempted sexual exploitation of a minor, under 18 U.S.C. § 2251(e). These counts were based on Hillie's actions creating the four videos made by hiding a video camera in a bathroom ceiling vent and in a bedroom dresser.

"The crime of attempt consists of (1) an intent to do an act or to bring about certain consequences which would in law amount to [the] crime [which the defendant is charged with attempting]; and (2) an act in furtherance of that intent which . . . goes beyond mere preparation." *United States v. Washington*, 106 F.3d 983, 1005, 323 U.S. App. D.C. 175 (D.C. Cir. 1997) (quoting 2 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW 18 (1986) (internal alterations omitted)); *see also Braxton v. United States*, 500 U.S. 344, 349, 111 S. Ct. 1854, 114 L. Ed. 2d 385 (1991).

In assessing the sufficiency of the evidence for counts 4-7, we must therefore determine, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could find that Hillie

intended to "employ[], use[], [***37] persuade[], induce[], entice[], or coerce[] any minor to engage in . . . any sexually explicit conduct," that he intended to do so "for the purpose of producing any visual depiction of such conduct," 18 U.S.C. § 2251(a), and that he took an act in furtherance of that intent that went beyond mere preparation. When construing the *scienter* requirement for the possession of child pornography offense under 18 U.S.C. § 2252, the Supreme Court noted that the "concern with harsh penalties loom[ed] . . . large," since the offense carried a potential prison sentence of 10 years. *X-Citement Video*, 513 U.S. at 72 (citing *Staples v. United States*, 511 U.S. 600, 616, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994)). The concern looms equally large here, if not even more so, given that a conviction of attempted sexual exploitation of a minor under 18 U.S.C. § 2251(e) carries a mandatory minimum sentence of 15 years and a maximum sentence of 30 years. Consequently, we must take particular care not to require any lower showing of intent than mandated by the statute or the Constitution.

The Government does not argue that Hillie intended to persuade, induce, entice, or coerce JAA to engage in sexually explicit conduct; rather the Government's theory is that Hillie somehow intended to "employ" or "use" JAA to engage in sexually explicit conduct. *See* Joint Statement re Proposed [***38] Jury Instructions and Verdict Form, ECF No. 85, at 63, 68 (Government's proposed instructions); Final Jury Instructions, ECF No. 95, at 13. Nor does the Government argue that Hillie intended for himself to engage in sexually explicit conduct with JAA, as the phrase "employ[] [or] use[] . . . a[] minor to engage in . . . sexually explicit conduct" might seem to require. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY (1976) (defining "employ" to mean, among others, "to make use of" and "to use or engage the services of"); BLACK'S LAW DICTIONARY (4th ed. 1951) (defining "employ" to mean, among others, "to engage one's service").

Instead, the Government argues that by hiding his video camera in the bedroom and bathroom, Hillie attempted to "use" or "employ" JAA to engage in sexually explicit conduct so that he could videotape such [*691] [**350] conduct. This construction of "employ" and "use" is not disputed by Hillie, and has been accepted by several of our sister circuits. *See United States v. Sirois*, 87 F.3d 34, 41 (2d Cir. 1996); *United States v. Fadl*, 498 F.3d 862, 866 (8th Cir. 2007); *United States v. Wright*, 774 F.3d 1085, 1091 (6th Cir. 2014); *United States v. Theis*, 853 F.3d 1178, 1181-82 (10th Cir. 2017); *United States v. Laursen*, 847 F.3d 1026, 1032-33 (9th Cir. 2017); *cf. United States v. Howard*, 968 F.3d 717, 721-22 (7th Cir. 2020) ("use" in section 2251(a) requires proof that the defendant "cause[d] the *minor* to engage in sexually explicit conduct for the purpose of creating a visual image of that conduct") (emphasis in original). It seems correct, because if [***39] a defendant pays a minor to allow him to film her masturbating, then he induces a minor to engage in sexually explicit conduct with the intent that she engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct. *See* 18 U.S.C. 2251(a). Likewise, if a defendant, knowing that a minor masturbates in her bedroom, surreptitiously hides a video camera in the bedroom and films her doing so, then he uses or employs, i.e., avails himself of, a minor to engage in sexually explicit conduct (with herself) with the intent that she engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct. *See id.* Accordingly, the only issue before us is whether the evidence was sufficient to prove that Hillie attempted to "employ[] [or] use[] . . . [JAA] to engage in . . . [lascivious exhibition of her genitals]" for the purpose of videotaping JAA's lascivious exhibition. *See* 18 U.S.C. § 2251(a).

As we have previously noted, "'when causing a particular result is an element of the crime,' the defendant [is] guilty of attempt when he intended to cause such a result and 'd[id] or omit[ted] to do anything with the purpose of causing or with the belief that it [would] cause [***40] such result without further conduct on his part.'" *United States v. Hite*, 769 F.3d 1154, 1162, 413 U.S. App. D.C. 66 (D.C. Cir. 2014) (second, third, and fourth alterations in original) (quoting BLACK'S LAW DICTIONARY (6th ed. 1990)). Here, that means the Government was required to prove that Hillie intended to use JAA to engage in the lascivious exhibition of her genitals by displaying her anus, genitalia, or pubic area in a lustful manner that connotes the commission of a sexual act.

Requiring the Government to prove that Hillie intended for JAA to engage in such sexually explicit conduct is important not just because that is the proper construction of the statute, but also to distinguish Hillie's conduct from the offense of voyeurism, *see* D.C. Code § 22-3531, which prohibits the nonconsensual recording of the private parts of a person by placing a hidden camera in a bathroom or a bedroom. As we have explained,

> The sufficiency of the evidence warrants particular scrutiny when the evidence strongly indicates that a

> defendant is guilty of a crime other than that for which he was convicted, but for which he was not charged. Under such circumstances, a trier of fact, particularly a jury, may convict a defendant of a crime for which there is insufficient evidence to vindicate its judgment [***41] that the defendant is blameworthy. Compelling evidence that a defendant is guilty of some crime is not, however, a cognizable reason for finding a defendant guilty of another crime.

*United States v. Salamanca*, 990 F.2d 629, 638, 300 U.S. App. D.C. 384 (D.C. Cir. 1993). For reasons not explained in the briefing, the Government did not bring D.C. Code attempted voyeurism charges. (Hillie conceded in his brief that "there was overwhelming evidence [*692] [**351] that he had engaged in voyeurism" as defined by the D.C. statute. Appellant's Br. at 40.)[1] Thus, the jury was faced with a choice between holding Hillie completely blameless, even though he engaged in heinous, apparently criminal conduct, or convicting him of attempted sexual exploitation of a minor, even if the evidence did not support that charge. This was the precise danger we expressed in *Salamanca*.

We conclude that the evidence in this case, viewed in the light most favorable to the Government, is such that no rational trier of fact could find that Hillie intended to use JAA to display her anus, genitalia, or pubic area in a lustful manner that connotes the commission of a sexual act, and that Hillie took a substantial step towards doing so. Where the jury can find an essential element of the offense only through speculation, the [***42] evidence is insufficient. *See United States v. Slatten*, 865 F.3d 767, 795, 431 U.S. App. D.C. 420 (D.C. Cir. 2017); *United States v. Harrison*, 103 F.3d 986, 991-92, 322 U.S. App. D.C. 280 (D.C. Cir. 1997); *United States v. Carter*, 522 F.2d 666, 682, 173 U.S. App. D.C. 54 (D.C. Cir. 1975). Here, the Government introduced no evidence from which the jury, without speculation, could reasonably infer that Hillie intended to capture video footage of JAA not just in the nude, but of her engaging in sexually explicit conduct as we have construed the term. Indeed, the Government produced no evidence that JAA engaged in "sexually explicit conduct," as defined by the plain text of the statute, let alone evidence that Hillie knew if and when she tended to engage in such conduct. Nor does the dissent provide any explanation as to why the evidence in this case was sufficient with respect to these counts. Absent such evidence, the jury could not conclude that Hillie intended to use JAA to engage in sexually explicit conduct—as opposed to mere ordinary grooming—without venturing "beyond the bounds of legitimate inference and into the realm of speculation and conjecture," *Carter*, 522 F.2d at 682. We therefore vacate Hillie's convictions on counts 4-7 and direct the District Court to enter a judgment of acquittal on those counts.

## IV.

Hillie also raises two arguments challenging his convictions on counts 8-17. We reject both.

First, Hillie argues that the District Court impermissibly [***43] admitted various testimony in violation of the Confrontation Clause and Federal Rules of Evidence 403 and 802. Specifically, Hillie argues that the District Court erred by admitting (1) evidence that JA and her father had reported to a detective in 2012 and 2013 that Hillie had abused JA, which the Government sought to introduce so as to provide context for the origins and timeline of the Government's investigation of Hillie; (2) testimony by JAA that JA had told her (JAA) that Hillie had abused her (JA) and that she (JA) wanted to press charges, which the Government sought to introduce so as to provide context for JAA's decision to recount details to the grand jury that she had not disclosed in an earlier report; and (3) testimony by JAA and JA's mother, Jo. A, that *her* mother—JAA's and JA's grandmother—had told her (Jo. A) that she thought that Hillie had touched JAA and JA inappropriately, which the Government sought to introduce so as to provide context for Jo. A's cooperation with its investigation of Hillie.

We review the District Court's evidentiary rulings for abuse of discretion, *United States v. Alexander*, 331 F.3d 116, 121, [*693] [**352] 356 U.S. App. D.C. 299 (D.C. Cir. 2003), which Hillie cannot show. All of the evidence that Hillie challenges was relevant for the reasons given by the Government. And none of it was admitted [***44] for its truth, so it was not hearsay and did not violate the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 59 n.9, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). Moreover, the District Court provided

[1] The federal voyeurism statute applies only in the special maritime and territorial jurisdiction of the United States, *see* 18 U.S.C. § 1801, so it is inapplicable here.

limiting instructions, and JAA and JA testified directly about their abuse by Hillie, *see, e.g.*, J.A. 430, and so even if the District Court erred by admitting the challenged evidence, its error was not prejudicial. *See United States v. DeLoach*, 654 F.2d 763, 771, 210 U.S. App. D.C. 48 (D.C. Cir. 1980) (admission of hearsay evidence not prejudicial where the jury heard other, non-hearsay testimony conveying the same information); *cf. United States v. Moore*, 651 F.3d 30, 62, 397 U.S. App. D.C. 148 (D.C. Cir. 2011) (*per curiam*) (limiting instructions cured prejudice from minor instances of prosecutorial misconduct).

Second, Hillie argues that the District Court erred by denying his motion to sever counts 1-7 from counts 8-17. Whether relief should be granted from prejudicial joinder under Rule 14 is a decision that lies within the discretion of the trial court, and which this Court reviews for abuse of discretion. *United States v. Brown*, 16 F.3d 423, 426-27, 305 U.S. App. D.C. 1 (D.C. Cir. 1994). Hillie claims that the District Court abused its discretion because joinder prevented him from "negotiat[ing] a plea [with regard to the D.C. child abuse charges] or go[ing] to trial and vigorously cross [***45] examin[ing] the child witnesses on their bias or inconsistent statements." Appellant's Br. at 48; *see also* Reply Br. at 19. We do not agree. True, had the charges been severed, Hillie could have cross examined the child witnesses in the trial concerning the D.C. Code offenses while declining to cross examine the child witnesses in the trial concerning the federal offenses, thereby limiting the risks associated with such cross examination to one trial only. But were that enough to show abuse of discretion, any defendant facing multiple charges could demand to have them severed simply by asserting that he wished to limit his exposure to the risks associated with vigorous cross examination. *Cf. Baker v. United States*, 401 F.2d 958, 976, 131 U.S. App. D.C. 7 (D.C. Cir. 1968) ("Appellant [asserts] that 'a timely and bona fide election by the accused to testify as to some counts and not as to others requires a Rule 14 severance.' . . . Such a rule, in fact, would divest the court of all control over the matter of severance and entrust it to the defendant."). Moreover, Hillie does not dispute that even in separate trials, the evidence of the other offenses would be admissible under Federal Rules of Evidence 404(b) or 414. *See* Fed. R. Evid. 414(a) ("In a criminal case in which a defendant is accused of child molestation, the court [***46] may admit evidence that the defendant committed any other child molestation."); Fed. R. Evid. 414(d)(2) ("'child molestation' means a crime under federal law or under state law . . . involving . . . any conduct prohibited by 18 U.S.C. chapter 110 . . . [or] contact between any part of the defendant's body . . . and a child's genitals or anus"). We therefore conclude that the District Court did not abuse its discretion in finding that any prejudice from joinder was outweighed by the conservation of resources achieved by a single trial.[2]

[*694] [**353] **V.**

For the foregoing reasons, we vacate Hillie's convictions as to counts 1-7 and leave his remaining convictions intact.

*So ordered*.

**Dissent by:** KAREN LECRAFT HENDERSON

## Dissent

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting: Although I agree with my colleagues that Charles Hillie's challenges to the district court's evidentiary rulings and to his motion to sever are meritless, Maj. Op. 32-34, I vigorously part company with their reversal of several of Hillie's convictions. The majority concludes that Hillie's convictions cannot stand because the videos in evidence do not show that *the innocent minor victim* exhibited sexual desire or behavior—a conclusion contrary to both the statutory text and [***47] our sister circuits' decisions. I believe the jury was correctly charged and that sufficient evidence supports Hillie's convictions. Accordingly, I would affirm the district court judgment in its entirety and respectfully dissent.

### I

First, a brief recitation of the relevant facts.[1] In 2005

---

[2] Hillie also argues that the District Court abused its discretion because joinder (1) prevented him from "limiting the inflammatory, emotional evidence about the D.C. child abuse charges in the federal case," and (2) prevented him from "potentially put[ting] on testimony, perhaps through the defendant, that the video evidence was not for the purpose of producing child pornography, but rather a voyeuristic pursuit." Appellant's Br. at 48. Because we vacate Hillie's convictions on counts 1-7 while leaving Hillie's convictions on the D.C. counts intact, however, those arguments are moot.

[1] A fuller factual background is set out in the district court's first

Hillie began a relationship with the mother of the two minor victims in this case—J.A.A. (born in 1997) and J.A. (born in 2002)—and lived with them sporadically over a ten-year period. *United States v. Hillie* (*Hillie II*), 289 F. Supp. 3d 188, 191-92 (D.D.C. 2018); *Hillie I*, 227 F. Supp. 3d at 66. After years of sexual abuse, J.A.A. disclosed to the District of Columbia Metropolitan Police Department that she had previously "discovered nude photographs of herself on the family's pink laptop computer, and that the photos had been taken without her knowledge." *Hillie I*, 227 F. Supp. 3d at 67. In August 2015 Hillie was arrested and the pink laptop was seized. *Id.* Authorities recovered multiple videos that Hillie created by surreptitiously filming or attempting to film J.A.A. in her bedroom and bathroom. *Id.* These videos capture J.A.A.—when she was 15 years old or younger—entirely nude or nude from the waist down, cleaning her private parts and other parts of her body and urinating. *Id.; Hillie II*, 289 F. Supp. 3d at 199. J.A.A. and J.A. testified that Hillie rubbed their breasts, [***48] buttocks and vaginas on multiple occasions and J.A.A. further testified that Hillie digitally penetrated her vulva once. A federal grand jury returned a 17-count indictment against Hillie, charging him with seven violations of federal law and ten child sex abuse offenses in violation of D.C. law. *Hillie I*, 227 F. Supp. 3d at 62-63. Relevant to my dissent are Counts One and Two, charging Production of Child Pornography in violation of 18 U.S.C. § 2251(a), Count Three, charging Possession of Child Pornography in violation of 18 U.S.C. § 2252(a)(4), and Counts Four through Seven, charging Attempted Sexual Exploitation of a Minor in violation of 18 U.S.C. § 2251(e).

**II**

**A. JURY CHARGE**

Relying on the United States Supreme Court's decision in *Musacchio v. United [*695] [**354] States*, 577 U.S. 237, 136 S. Ct. 709, 193 L. Ed. 2d 639 (2016)—and the parties' representations during oral argument—the majority opinion ostensibly declines to review the jury instructions and instead analyzes only the sufficiency of the evidence. Maj. Op. 7-8. The parties' representations during oral argument, however, do not bind us; more importantly, I believe the majority misreads *Musacchio*, which makes clear that a predicate necessary to its holding is the erroneous jury instruction:

> We first address how a court should assess a sufficiency challenge *when a jury instruction adds an element* to the charged crime [***49] and the Government fails to object. We hold that, when a jury instruction sets forth all the elements of the charged crime but *incorrectly adds one more element*, a sufficiency challenge should be assessed against the elements of the charged crime, not against the *erroneously* heightened command in the jury instruction.

*Id.* at 243 (emphases added). Accordingly, before reaching Hillie's sufficiency of the evidence challenge, I believe we must first address the jury charge.

Hillie challenges several parts of the jury charge, including the district court's instruction on what constitutes a "lascivious exhibition."[2] 18 U.S.C. § 2251(a) provides that no person shall "use[] . . . any minor to engage in . . . any *sexually explicit* conduct for the purpose of producing any visual depiction of such conduct," *id.* (emphasis added); and § 2252(a)(4)(B) provides that no person shall "knowingly possess[] . . . films, video tapes, or other matter which contain any visual depiction . . . if . . . the producing of such visual depiction involves the use of a minor engaging in *sexually explicit* conduct [and] such visual depiction is of such conduct," *id.* (emphasis added). "Sexually explicit conduct" includes the "lascivious exhibition of the anus, genitals, [***50] or pubic area of any person." *Id.* § 2256(2)(A). "Lascivious exhibition" is not further defined. It is up to the factfinder to determine whether a visual depiction constitutes a "lascivious exhibition" under the statute. *See Hillie II*, 289 F. Supp. 3d. at 194-95 (collecting cases).

To guide the jury in determining whether a visual depiction includes a lascivious exhibition, numerous circuits use the six factors set out in *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986): the so-called *Dost* factors. They are:

> 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area; 2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally

order, *United States v. Hillie (Hillie I*), 227 F. Supp. 3d 57, 66-67 (D.D.C. 2017).

[2] Hillie's challenges to the jury instructions on other grounds—including the interstate commerce and "used or employed" elements of his offenses and Hillie's "single-mindedness" vel non—I find to be without merit.

> associated with sexual activity; 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; 4) whether the child is fully or partially clothed, or nude; 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; 6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Id.* at 832.[3] The district court's "lascivious exhibition" charge included the *Dost* factors, as well as, *inter alia*, the following introductory paragraph:

> [*696] [**355] "Lascivious" means exciting sexual desires [***51] or salacious. And "lascivious exhibition" means indecent exposure of the genitals or pubic area, usually to excite lust. Not every exposure of the genitals or pubic area is a lascivious exhibition, and the fact that a minor is depicted nude, on its own, is not enough for that visual depiction to qualify as a lascivious exhibition. But, for an image to constitute a lascivious exhibition, *the minor is not required to exhibit lust*, wantonness, or sexual coyness, and the image *need not depict overt sexual activity* or behavior.

Appellant's Appendix 518 (emphases added).[4] On appeal, Hillie focuses primarily on the validity of the sixth *Dost* factor ("whether the visual depiction is intended or designed to elicit a sexual response in the viewer") as well as the third and fourth sentences of the introductory paragraph quoted *supra*.

Hillie objected to the "overt sexual activity" portion of the instruction in district court and, accordingly, our review of that instruction is de novo. *United States v. Wilson*, 605 F.3d 985, 1018, 390 U.S. App. D.C. 368 (D.C. Cir. 2010) (per curiam). We ask "whether, taken as a whole, [the instructions] accurately state the governing law and provide the jury with sufficient understanding of the issues and applicable standards." *Wilson*, 605 F.3d at 1018 (alteration in original) [***52] (quoting *United States v. Washington*, 106 F.3d 983, 1002, 323 U.S. App. D.C. 175) (D.C. Cir. 1997) (per curiam)). Whether Hillie objected to the *Dost* factors—and more specifically the sixth *Dost* factor—is far from clear. I assume *arguendo* that Hillie objected and therefore review the *Dost* factors portion of the jury charge de novo. Reviewing the entire "lascivious exhibition" instruction de novo, I believe the district court accurately stated the law and properly instructed the jury on the challenged elements.

First, I agree with most circuits—including the Second,[5] Third,[6] Fifth,[7] Sixth,[8] Eighth,[9] Ninth[10] and Tenth[11] Circuits[12] — [*697] [**356] that the *Dost* factors are an appropriate, non-exclusive set of factors and would

---

[3] *Dost* adds that "[o]f course, a visual depiction need not involve all of these factors to be a 'lascivious exhibition of the genitals or pubic area.' The determination will have to be made based on the overall content of the visual depiction, taking into account the age of the minor." *Id.*

[4] The district court added that the list of *Dost* factors "is not exhaustive, and a visual depiction need not satisfy all of these factors or any particular factor to be deemed a lascivious exhibition. Instead, these factors are meant to guide you in determining whether the depiction is a lascivious exhibition of the genitalia or pubic area as you consider the overall content of the material. It is for you to decide the weight or lack of weight to be given to any of these factors." *Id.* at 519.

[5] *United States v. Rivera*, 546 F.3d 245, 253 (2d Cir. 2008). Noting that the sixth *Dost* factor has been subject to criticism, *Rivera* explained "[s]ome of this criticism is mitigated once one distinguishes between the production of child pornography and possession," as *Dost* involved production and the 6th *Dost* factor has more limited relevance in a case of possession only. *Id.* at 252. Hillie was convicted of possession and production of child pornography so that any concern about the *Dost* factors in a case involving possession of child pornography only is absent.

[6] *United States v. Villard*, 885 F.2d 117, 122 (3d Cir. 1989).

[7] *United States v. McCall*, 833 F.3d 560, 563 (5th Cir. 2016); *United States v. Rubio*, 834 F.2d 442, 448 (5th Cir. 1987); *5th Cir. Pattern Jury Instrs*. (*Crim. Cases*) 2.84 (2019).

[8] *United States v. Brown*, 579 F.3d 672, 680 (6th Cir. 2009); *6th Cir. Pattern Crim. Jury Instrs*. 16.01 (2021).

[9] *United States v. Ward*, 686 F.3d 879, 882 (8th Cir. 2012); *8th Cir. Manual of Model Crim. Jury Instrs*. 6.18.2252A (2020).

[10] *United States v. Perkins*, 850 F.3d 1109, 1121 (9th Cir. 2017); *United States v. Overton*, 573 F.3d 679, 686-87 (9th Cir. 2009).

[11] *United States v. Wells*, 843 F.3d 1251, 1253-54 (10th Cir. 2016).

[12] The Eleventh Circuit applied the factors in an unpublished opinion, *United States v. Hunter*, 720 F. App'x 991, 996 (11th Cir. 2017), but also noted that the *Dost* factors serve as the basis for that Circuit's pattern jury instructions, *United States v. Grzybowicz*, 747 F.3d 1296, 1306 n.8 (11th Cir. 2014); *see also 11th Cir. Pattern Jury Instrs. (Crim. Cases)* 83.4A (2020).

approve their use by our Circuit.[13] As noted by the Second Circuit, the *Dost* factors "are not mandatory, formulaic or exclusive. As factors, they mitigate the risk that jurors will react to raw images in a visceral way, rely on impulse or revulsion, or lack any framework for reasoned dialogue in the jury room. In short, the *Dost* factors impose useful discipline on the jury's deliberations." *Rivera*, 546 F.3d at 253. Even the First and Seventh Circuits, which discourage the use of the *Dost* factors, do not do so categorically. The First Circuit does not prohibit use of the *Dost* factors but recognizes they are problematic if treated as [***53] "exhaustive" and therefore "accorded . . . the same status as the statutory definition itself." *United States v. Frabizio*, 459 F.3d 80, 86-90 (1st Cir. 2006). The Seventh Circuit also "discourage[d] . . . routine use" of the *Dost* factors because they "may not helpfully elucidate the statutory standard," instead "seem[ing] like a command to take a detailed and mechanical walk through a checklist." *United States v. Price*, 775 F.3d 828, 839-40 (7th Cir. 2014). Those cautions are diminished here by the district court's full instruction, emphasizing the *Dost* factors as only a guide, non-exhaustive and discretionary.[14]

I also believe that the district court properly instructed the jury that the visual depiction "need not depict overt sexual activity or behavior." The Eighth Circuit has explained that even if the child in the visual depiction is "not acting in an obviously sexual manner, suggesting coyness or a willingness to engage in sexual activity, [that] does not necessarily indicate that the videos themselves were not or were not intended to be lascivious." *United States v. Johnson*, 639 F.3d 433, 440 (8th Cir. 2011). As discussed *infra*, because "lasciviousness is not a characteristic of the child photographed but of the exhibition which the [***54] photographer sets up for an audience that consists of himself or like-minded pedophiles," *Wells*, 843 F.3d at 1255 (alteration accepted) (emphasis omitted) (internal quotations omitted), "even images of children acting innocently can be considered lascivious if they are intended to be sexual," *Johnson*, 639 F.3d at 440; *see also United States v. Holmes*, 814 F.3d 1246, 1251-52 (11th Cir. 2016) ("depictions of otherwise innocent conduct may in fact constitute a 'lascivious exhibition of the genitals or pubic area' of a minor based on the actions of the individual creating the depiction").[15] Accordingly, I would affirm [*698] [**357] the district court's instruction that the statute does not require the depiction of a minor's "overt sexual activity or behavior."

**B. SUFFICIENCY OF EVIDENCE**

Having concluded that the jury was properly instructed, I turn to Hillie's sufficiency of the evidence challenges. "When reviewing sufficiency claims, we generally accept the jury's guilty verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In so doing, we view the evidence in the light most favorable to the Government." *United States v. Williams*, 784 F.3d 798, 801, 415 U.S. App. D.C. 15 (D.C. Cir. 2015) (internal citations and quotations omitted). In other words, we ask if "*any* rational juror could have [***55] found the elements of the crime beyond a reasonable doubt." *United States v. Borda*, 848 F.3d 1044, 1053, 427 U.S. App. D.C. 404 (D.C. Cir. 2017). Viewing the evidence in the light most favorable to the government, I believe that a rational juror could have found the elements of Counts One through Seven proven beyond a reasonable doubt, including that the videos constituted visual depictions of a "lascivious exhibition."[16]

---

[13] Our Circuit has "not yet had occasion to consider the *Dost* factors, or any other potential means of defining 'lascivious.'" *United States v. Torres*, 894 F.3d 305, 310 n.3, 436 U.S. App. D.C. 363 (D.C. Cir. 2018).

[14] In *Price*, the Seventh Circuit emphasized that "the intent and motive of the photographer can be a relevant consideration in evaluating whether an image depicts a lascivious display" with the "relevance of a defendant's motive and intent [turning] on the facts of the case." *Id.* at 839 (internal quotations omitted). That Circuit later held that "lascivious exhibition" includes an analysis of the creator's intent. *United States v. Miller*, 829 F.3d 519, 525-26 (7th Cir. 2016).

[15] Hillie argues that the *noscitur a sociis* canon requires that "lascivious exhibition" be read together with the other "graphic, sexual terms" in § 2256 to require that "lascivious exhibition" be "equally graphic," Appellant's Br. 24, and relies on the Third Circuit's *United States v. Knox* opinion, 32 F.3d 733, 745 (3d Cir. 1994). *Knox*, however, concluded that a "lascivious exhibition" did not require nudity or that the children be engaged in overt, graphic sexual behavior. *See id.* at 747.

[16] Hillie asserts that we should review whether the videos constituted visual depictions of a "lascivious exhibition" under a mixed question of law and fact standard. Appellant's Br. 14-15. The Fifth Circuit has found that "our sister courts of appeal are split" as to the correct "standard of review for lasciviousness determinations." *United States v. Steen*, 634 F.3d 822, 825-26 (5th Cir. 2011) (per curiam) (collecting cases). Under any standard of review, I would find sufficient

Again using the *Dost* factors, I believe that the first *Dost* factor—the focal point of the video—is met. Hillie spent almost one minute in some of the videos adjusting the recording device: he angled the device upward in J.A.A.'s bedroom from a low vantage point and manipulated it inside the bathroom vent to capture the toilet and entrance to the shower. He also surreptitiously placed and turned on the recording device immediately before J.A.A. entered the bathroom and bedroom, before she was likely to enter and undress. It would not be irrational for a juror to conclude that Hillie meant for J.A.A.'s genitals to be the focal point of the visual depictions. *See Wells*, 843 F.3d at 1256 ("Though Wells did not edit the videos, freeze-frame particular images from them, or zoom in on [the child], he did not have to do so to make his stepdaughter's genitals the focal point of the videos."); [***56] *Miller*, 829 F.3d at 525 ("There is no requirement in the statute that the creator zoom in on the pubic area. Nor is there a requirement that the pubic area be the sole focus of the depiction. Determining the focus of a depiction or whether it is 'otherwise sexually suggestive' is properly left to the fact finder.") (citation omitted).

On the second *Dost* factor, a rational juror could conclude that J.A.A.'s bedroom and the bathroom are sexually suggestive settings. Other circuits have found bedrooms and bathrooms to be potentially sexually suggestive locations. *United States v. Larkin*, 629 F.3d 177, 183 (3d Cir. 2010) ("showers and bathtubs are frequent hosts to fantasy sexual encounters as portrayed on television and in film. It is potentially as much of a setting for fantasy sexual activity as is an adult's bedroom"); *Wells*, 843 F.3d at 1256; *Miller*, 829 F.3d at 525.

A rational juror would also unquestionably conclude that the fourth *Dost* factor applies, as J.A.A. appears nude or partially nude in the videos. And on the sixth *Dost* factor, a rational juror could easily conclude that the videos were intended or designed to elicit a sexual response from the viewer, given the surreptitious nature of the videos and J.A.A.'s testimony regarding [*699] [**358] Hillie's long-term sexual interest in and sexual abuse of her. *See Wells*, 843 F.3d at 1256-57. Although the [***57] third and fifth *Dost* factors do not apply—given that J.A.A. was not depicted in an unnatural pose or inappropriate attire and the depiction does not suggest sexual coyness or a willingness to engage in sexual activity—"a visual depiction need not involve *all* of [the *Dost*] factors to be a 'lascivious exhibition of the genitals or pubic area.'" *Dost*, 636 F. Supp at 832 (first emphasis added). Altogether, then, I would hold that a rational juror could have concluded that the government proved each element of the federal child pornography possession charge, the production charges and the attempted sexual exploitation of a minor charges beyond a reasonable doubt.[17]

My colleagues, however, reach the opposite conclusion based on their conclusion that the statute requires that the "lascivious exhibition" be on the minor's part. Maj. Op. 23-24. That is a perversion of the statute's language and its purpose and I emphatically disagree. As noted *supra*, 18 U.S.C. § 2251(a) provides that no person shall "use[] . . . any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct."[18] To be guilty of producing child pornography, then, a person must use a minor to engage in [***58] a lascivious exhibition of the child's anus, genitals or pubic area, for the purpose of producing a visual depiction thereof. Accepting the majority's definition of "lascivious" as "a lustful manner that connotes the commission of" sexual activity, Maj. Op. 19, I believe it is absurd to suggest that the statute *requires* the minor victim to exhibit a "lustful manner." Reading the statute that way is contrary to the purpose for which the Congress enacted the federal child pornography statute: "Congress aimed the federal child pornography statute at combatting 'the use of children as subjects of pornographic materials[, which] is harmful to the physiological, emotional, and mental health of the

evidence supported the jury verdict.

[17] My colleagues are concerned about defining "lascivious exhibition" too broadly, potentially capturing any exhibition exciting sexual desire in the viewer and criminalizing constitutionally-protected images. Maj. Op. 10-15, 17-19. The sixth *Dost* factor, however, asks "whether the visual depiction is intended or designed to elicit a sexual response in the viewer," which looks at the intent or design of the creator of the visual depiction, not a particular viewer's response. *See Villard*, 885 F.2d at 125 ("Although it is tempting to judge the *actual* effect of the photographs on the viewer, we must focus instead on the *intended* effect on the viewer." (emphases in original)). Here, the location, placement and adjustment of the recording device by Hillie, as well as his sexual abuse of J.A.A., make clear that a reasonable juror, viewing the evidence in the light most favorable to the government, could conclude that Hillie both produced and possessed child pornography when he surreptitiously recorded J.A.A.

[18] I focus here on the language of the "production" statute, 18 U.S.C. § 2251(a), although, as noted *supra*, the relevant language of the "possession" statute, *id.* § 2252(a)(4), is substantively similar.

child.'" *Knox*, 32 F.3d at 745 (alteration in original) (quoting *New York v. Ferber*, 458 U.S. 747, 758, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982)). As the Ninth Circuit phrased it:

> The crime punished by the statutes against the sexual exploitation of children . . . is the offense against the child—the harm "to the physiological, emotional, and mental health" of the child, *Ferber*, 458 U.S. at 758, the "psychological harm," *id.* at 775 (O'Conner, J., concurring), the invasion of the child's "vulnerability." *Id.* at 776 (Brennan, J., concurring). These harms collectively are the consequential damages [*700] [**359] that flow from the trespass against the dignity [***59] of the child. . . . When a child is made the target of the pornographer-photographer, the statute will not suffer the insult to the human spirit, that the child should be treated as a thing.

*United States v. Wiegand*, 812 F.2d 1239, 1245 (9th Cir. 1987).

I am hardly alone in reading the statute not to require that lasciviousness be exhibited by the minor. Other circuits that have considered the question—including the Eighth, Ninth, Tenth and Eleventh Circuits—have concluded that lasciviousness is "not the work of the child, whose innocence is not in question, but of the producer or editor of the video." *Holmes*, 814 F.3d at 1252 (quoting *United States v. Horn*, 187 F.3d 781, 790 (8th Cir. 1999)); *see Wells*, 843 F.3d at 1254 (§ 2251(a) does not "'place[] the onus of lust on the child being photographed.' Rather, a visual depiction of a minor is 'a lascivious exhibition because the photographer arrays it to suit his peculiar lust.'" (alterations accepted) (emphases omitted) (quoting *United States v. Wolf*, 890 F.2d 241, 245 (10th Cir. 1989)); *Wiegand* 812 F.2d at 1244 ("The picture of a child 'engaged in sexually explicit conduct' . . . is a picture of a child's sex organs displayed lasciviously—that is, so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur."); *see also McCall*, 833 F.3d at 563 n.4 (explaining Fifth Circuit precedent holds "it is the *depiction*—not the minor—that must bring forth the genitals or pubic area to [***60] excite or stimulate").[19]

Put another way, "[l]asciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or like-minded pedophiles." *Holmes*, 814 F.3d at 1252 (quoting *Wiegand*, 812 F.2d at 1244). Lasciviousness could not be required of J.A.A., a minor whom Hillie surreptitiously videotaped during presumably private moments in her bathroom and bedroom, during which she unknowingly exhibited her private parts. On the other hand, lasciviousness *was* a characteristic of the exhibition choreographed by Hillie, captured through his surreptitious set up of the recording device in locations where he thought J.A.A. was likely to be nude and at angles which were likely to capture her private parts. I would conclude that there was abundant evidence, weighing all [*701] [**360] of the evidence in the light most favorable to the government, to lead a rational juror to conclude that the Government proved all of the elements of Counts One through Seven beyond a reasonable doubt.

Accordingly, I respectfully dissent.

---

End of Document

---

[19] Like every other circuit that has addressed this question, I do not think that the Supreme Court has ever defined the "lascivious exhibition" of private parts. My colleagues disagree. Maj. Op. 10-15, 23-24. They first cite two cases that treat statutes regulating "lewd" or "lascivious" materials as constitutional. *See Miller v. California*, 413 U.S. 15, 25, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1972); *New York v. Ferber*, 458 U.S. 747, 751, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982). They also rely on the Supreme Court's affirmance of [***61] a Ninth Circuit decision interpreting the terms "lascivious" and "lewd" to have the same meaning. *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78-79, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994). And finally, the majority cites a case concluding that the federal child pornography statute and analogous statutes in earlier pornography cases define "sexually explicit conduct" similarly. *United States v. Williams*, 553 U.S. 285, 296, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008). But none of this precedent purports to explain what constitutes "lascivious exhibition" of private parts. In fact they explain that the Government *can* regulate "lascivious exhibitions" of private parts. *See X-Citement Video*, 513 U.S. at 78; *Williams*, 553 U.S. at 300-01. To me, the Supreme Court caselaw manifests that 18 U.S.C. § 2252(a) lacks any constitutional infirmity (like vagueness or overbreadth) that requires a limiting construction. My colleagues observe parenthetically that I "suggest[] that none of these precedents . . . actually construed the statutory language." Maj. Op. 23. I think they may have missed my point, which is that the Supreme Court has never construed "lascivious exhibition," the statutory language *sub judice*.

# Kolender v. Lawson

461 U.S. 352 (1983)

Cited in Opening Brief at: 43

Highlighted language appears at 461 U.S. at 357.

Q Questioned
As of: September 14, 2026 7:07 PM Z

# Kolender v. Lawson

Supreme Court of the United States

November 8, 1982, Argued ; May 2, 1983, Decided

No. 81-1320

**Reporter**
461 U.S. 352 *; 103 S. Ct. 1855 **; 75 L. Ed. 2d 903 ***; 1983 U.S. LEXIS 159 ****; 51 U.S.L.W. 4532

KOLENDER, CHIEF OF POLICE OF SAN DIEGO, ET AL. v. LAWSON

**Prior History:** [****1] APPEAL FROM THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** 658 F.2d 1362, affirmed and remanded.

## Syllabus

A California statute requires persons who loiter or wander on the streets to identify themselves and to account for their presence when requested by a peace officer. The California Court of Appeal has construed the statute to require a person to provide "credible and reliable" identification when requested by a police officer who has reasonable suspicion of criminal activity sufficient to justify a stop under the standards of *Terry* v. *Ohio*, 392 U.S. 1. The California court has defined "credible and reliable" identification as "carrying reasonable assurance that the identification is authentic and providing means for later getting in touch with the person who has identified himself." Appellee, who had been arrested and convicted under the statute, brought an action in Federal District Court challenging the statute's constitutionality. The District Court held the statute unconstitutional and enjoined its enforcement, and the Court of Appeals affirmed.

*Held*: The statute, as drafted and as construed by the state court, is unconstitutionally [****2] vague on its face within the meaning of the Due Process Clause of the Fourteenth Amendment by failing to clarify what is contemplated by the requirement that a suspect provide a "credible and reliable" identification. As such, the statute vests virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute and must be permitted to go on his way in the absence of probable cause to arrest. Pp. 355-361.

**Counsel:** A. Wells Petersen, Deputy Attorney General of California, argued the cause for appellants. With him on the briefs were George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, and Jay M. Bloom, Deputy Attorney General.

Mark D. Rosenbaum, by invitation of the Court, 459 U.S. 964, argued the cause as amicus curiae in support of the judgment below. With him on the brief were Dennis M. Perluss, Fred Okrand, Mary Ellen Gale, Robert H. Lynn, and Charles S. Sims. *

[****3]

**Judges:** O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. BRENNAN, J., filed a concurring opinion, post, p. 362. WHITE, J., filed a dissenting opinion, in which REHNQUIST, J., joined, post, p. 369.

**Opinion by:** O'CONNOR

---

* Briefs of amici curiae urging reversal were filed by William L. Cahalan, Edward Reilly Wilson, and Timothy A. Baughman for the Wayne County Prosecutor's Office; and by Wayne W. Schmidt, James P. Manak, and Fred E. Inbau for Americans for Effective Law Enforcement, Inc., et al.

Briefs of amici curiae urging affirmance were filed by Eugene G. Iredale for the California Attorneys for Criminal Justice; and by Michael Ratner for the Center for Constitutional Rights.

Briefs of amici curiae were filed by John K. Van de Kamp, Harry B. Sondheim, and John W. Messer for the Appellate Committee of the California District Attorneys Association; by Dan Stormer, John Huerta, and Peter Schey for the National Lawyers Guild et al.; and by Quin Denvir and William Blum for the State Public Defender of California.

## Opinion

[*353] [***906] [**1856] JUSTICE **O'CONNOR** delivered the opinion of the Court.

[1A]This appeal presents a facial challenge to a criminal statute that requires persons who loiter or wander on the streets to provide a "credible and reliable" identification and to account for their presence when requested by a peace officer under circumstances that would justify a stop under the standards of *Terry* v. *Ohio*, 392 U.S. 1 (1968). [1] We conclude that the statute as it has been construed is unconstitutionally vague within the meaning of the Due Process Clause of the Fourteenth Amendment by failing to clarify what is contemplated [*354] by the requirement that a suspect provide a "credible and reliable" identification. [***907] Accordingly, we affirm the judgment of the court below.

[****4] I

Appellee Edward Lawson was detained or arrested on approximately 15 occasions between March 1975 and January 1977 pursuant to Cal. Penal Code Ann. § 647(e) (West 1970). [2] Lawson was prosecuted only twice, and was convicted once. The second charge was dismissed.

[****5] Lawson then brought a civil action in the District Court for the Southern District of California seeking a declaratory judgment that § 647(e) is unconstitutional, a mandatory injunction to restrain enforcement of the statute, and compensatory and punitive damages against the various officers who detained him. The District Court found that § 647(e) was overboard because "a person who is stopped on less than probable cause cannot be punished for failing to identify himself." App. to Juris. Statement A-78. The District Court enjoined enforcement of the statute, but held that Lawson could not recover damages because the officers involved acted in the good-faith belief that each detention or arrest was lawful.

Appellant H. A. Porazzo, Deputy Chief Commander of the California Highway Patrol, appealed the District Court decision to the Court of Appeals for the Ninth Circuit. Lawson [*355] cross-appealed, arguing that he [**1857] was entitled to a jury trial on the issue of damages against the officers. The Court of Appeals affirmed the District Court determination as to the unconstitutionality of § 647(e). 658 F.2d 1362 (1981). The appellate court determined [****6] that the statute was unconstitutional in that it violates the Fourth Amendment's proscription against unreasonable searches and seizures, it contains a vague enforcement standard that is susceptible to arbitrary enforcement, and it fails to give fair and adequate notice of the type of conduct prohibited. Finally, the Court of Appeals reversed the District Court as to its holding that Lawson was not entitled to a jury trial to determine the good faith of the officers in his damages action against them, and remanded the case to the District Court for trial.

The officers appealed to this Court from that portion of the judgment of the Court of Appeals which declared § 647(e) unconstitutional and which enjoined its enforcement. We noted probable jurisdiction pursuant to 28 U. S. C. § 1254(2). 455 U.S. 999 (1982).

II

[2][3A][4A][5A]In the courts below, Lawson mounted an attack on the [***908] facial validity of § 647(e). [3] "In

---

[1] -

California Penal Code Ann. § 647(e) (West 1970) provides:

"Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: . . . (e) Who loiters or wanders upon the streets or from place to place without apparent reason or business and who refuses to identify himself and to account for his presence when requested by any peace officer so to do, if the surrounding circumstances are such as to indicate to a reasonable man that the public safety demands such identification."

[2] The District Court failed to find facts concerning the particular occasions on which Lawson was detained or arrested under § 647(e). However, the trial transcript contains numerous descriptions of the stops given both by Lawson and by the police officers who detained him. For example, one police officer testified that he stopped Lawson while walking on an otherwise vacant street because it was late at night, the area was isolated, and the area was located close to a high crime area. Tr. 266-267. Another officer testified that he detained Lawson, who was walking at a late hour in a business area where some businesses were still open, and asked for identification because burglaries had been committed by unknown persons in the general area. *Id.*, at 207. The appellee states that he has never been stopped by police for any reason apart from his detentions under § 647(e).

[3] The appellants have apparently never challenged the propriety of declaratory and injunctive relief in this case. See *Steffel* v. *Thompson*, 415 U.S. 452 (1974). Nor have

evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered." *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, n. 5 (1982). [****7] As construed by the California Court of Appeal, [4] § 647(e) requires that an individual [*356] provide "credible and reliable" identification when requested by a police officer who has reasonable suspicion of criminal activity sufficient to justify a *Terry* detention. [5] [****9] *People* v. *Solomon*, 33 Cal. App. 3d 429, [**1858] 108 Cal. Rptr. 867 [*357] (1973). "Credible and reliable" identification is defined by the State Court of Appeal as identification "carrying reasonable assurance that the identification is authentic and providing means for later getting in touch with the person who has identified himself." *Id.*, at 438, 108 Cal. Rptr., at 873. In addition, a suspect may be required to "*account for his presence* . . . to the extent that it assists in producing credible and reliable identification . . . ." *Id.*, at 438, 108 Cal. Rptr., at 872. Under the [***909] terms of the statute, failure of the individual to provide "credible and reliable" identification permits the arrest. [6]

[****8] [3B] [4B]

[5B]

III

[6]Our Constitution is designed to maximize individual freedoms within a framework of ordered liberty. Statutory limitations on those freedoms are examined for substantive authority and content as well as for definiteness or certainty of expression. See generally M. Bassiouni, Substantive Criminal Law 53 (1978).

[7][8]As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc., supra;* [****10] *Smith* v.

---

appellants ever challenged Lawson's standing to seek such relief. We note that Lawson has been stopped on approximately 15 occasions pursuant to § 647(e), and that these 15 stops occurred in a period of less than two years. Thus, there is a "credible threat" that Lawson might be detained again under § 647(e). See *Ellis* v. *Dyson*, 421 U.S. 426, 434 (1975).

[4] In *Wainwright* v. *Stone*, 414 U.S. 21, 22-23 (1973), we held that "[for] the purpose of determining whether a state statute is too vague and indefinite to constitute valid legislation 'we must take the statute as though it read precisely as the highest court of the State has interpreted it.' *Minnesota ex rel. Pearson* v. *Probate Court*, 309 U.S. 270, 273 (1940)." The Court of Appeals for the Ninth Circuit noted in its decision that the state intermediate appellate court has construed the statute in *People* v. *Solomon*, 33 Cal. App. 3d 429, 108 Cal. Rptr. 867 (1973), that the State Supreme Court has refused review, and that *Solomon* has been the law of California for nine years. In these circumstances, we agree with the Ninth Circuit that the *Solomon* opinion is authoritative for purposes of defining the meaning of § 647(e). See 658 F.2d 1362, 1364-1365, n. 3 (1981).

[5] The *Solomon* court apparently read *Terry* v. *Ohio*, 392 U.S. 1 (1968), to hold that the test for a *Terry* detention was whether the officer had information that would lead a reasonable man to believe that the intrusion was appropriate. The Ninth Circuit noted that according to *Terry*, the applicable test under the Fourth Amendment requires that the police officer making a detention "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S., at 21. The Ninth Circuit then held that although what *Solomon* articulated as the *Terry* standard differed from what *Terry* actually held, "[we] believe that the *Solomon* court meant to incorporate in principle the standards enunciated in *Terry*." 658 F.2d, at 1366, n. 8. We agree with that interpretation of *Solomon*. Of course, if the *Solomon* court misread *Terry* and interpreted § 647(e) to permit investigative detentions in situations where the officers lack a reasonable suspicion of criminal activity based on objective facts, Fourth Amendment concerns would be implicated. See *Brown* v. *Texas*, 443 U.S. 47 (1979).

In addition, the *Solomon* court appeared to believe that both the *Terry* detention *and* frisk were proper under the standard for *Terry* detentions, and since the frisk was more intrusive than the request for identification, the request for identification *must* be proper under *Terry*. See 33 Cal. App. 3d, at 435, 108 Cal. Rptr., at 870-871. The Ninth Circuit observed that the *Solomon* analysis was "slightly askew." 658 F.2d, at 1366, n. 9. The court reasoned that under *Terry*, the frisk, as opposed to the detention, is proper only if the detaining officer reasonably believes that the suspect may be armed and dangerous, in addition to having an articulable suspicion that criminal activity is afoot.

[6] In *People* v. *Caylor*, 6 Cal. App. 3d 51, 56, 85 Cal. Rptr. 497, 501 (1970), the court suggested that the State must prove that a suspect detained under § 647(e) was loitering or wandering for "evil purposes." However, in *Solomon*, which the court below and the parties concede is "authoritative" in the absence of a California Supreme Court decision on the issue, there is no discussion of any requirement that the State prove "evil purposes."

*Goguen*, 415 U.S. 566 (1974); *Grayned* v. *City of Rockford*, 408 U.S. 104 (1972); *Papachristou* v. *City of Jacksonville*, 405 U.S. 156 (1972); *Connally* v. *General Construction Co.*, 269 U.S. 385 (1926). Although the doctrine focuses [*358] both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine -- the requirement that a legislature establish minimal guidelines to govern law enforcement." *Smith*, 415 U.S., at 574. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Id*., at 575. [7]

[****11] [9A]Section 647(e), as presently drafted and as construed by the state courts, contains no standard for determining what a suspect has to do in order to satisfy the requirement to provide a "credible and reliable" identification. As such, the statute vests virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute and must be permitted to go on his way in the absence of probable cause to arrest. An individual, whom police may think is suspicious but do not have probable cause to believe has committed a crime, is entitled to continue to walk the public streets "only at the whim of any police officer" who happens to stop that individual under § 647(e). *Shuttlesworth* v. *City of Birmingham*, 382 U.S. 87, 90 [**1859] (1965). [***910] Our concern here is based upon the "potential for arbitrarily suppressing First Amendment liberties. . . ." *Id*., at 91. In addition, § 647(e) implicates consideration of the constitutional right to freedom of movement. See *Kent* v. *Dulles*, 357 U.S. 116, 126 (1958); *Aptheker* v. *Secretary of State*, 378 U.S. 500, 505-506 (1964). [****12] [8]

[9B]

[****13] [*359] Section 647(e) is not simply a "stop-and-identify" statute. Rather, the statute requires that the individual provide a "credible and reliable" identification that carries a "reasonable assurance" of its authenticity, and that provides "means for later getting in touch with the person who has identified himself." *Solomon*, 33 Cal. App. 3d, at 438, 108 Cal. Rptr., at 872-873. In addition, the suspect may also have to account for his presence "to the extent it assists in producing [*360] credible and reliable identification." *Id*., at 438, 108 Cal. Rptr., at 872.

[10A]At oral argument, the appellants confirmed that a suspect violates § 647(e) unless "the officer [is] satisfied

---

[7] Our concern for minimal guidelines finds its roots as far back as our decision in *United States* v. *Reese*, 92 U.S. 214, 221 (1876):

"It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of government."

[8] In his dissent, JUSTICE WHITE claims that "[the] upshot of our cases . . . is that whether or not a statute purports to regulate constitutionally protected conduct, it should not be held unconstitutionally vague on its face unless it is vague in all of its possible applications." *Post*, at 370. The description of our holdings is inaccurate in several respects. First, it neglects the fact that we permit a facial challenge if a law reaches "a substantial amount of constitutionally protected conduct." *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 494 (1982). Second, where a statute imposes criminal penalties, the standard of certainty is higher. See *Winters* v. *New York*, 333 U.S. 507, 515 (1948). This concern has, at times, led us to invalidate a criminal statute on its face even when it could conceivably have had some valid application. See, *e. g., Colautti* v. *Franklin*, 439 U.S. 379, 394-401 (1979); *Lanzetta* v. *New Jersey*, 306 U.S. 451 (1939). The dissent concedes that "the overbreadth doctrine permits facial challenge of a law that reaches a substantial amount of conduct protected by the First Amendment. . . ." *Post*, at 371. However, in the dissent's view, one may not "confuse vagueness and overbreadth by attacking the enactment as being vague as applied to conduct other than his own." *Post*, at 370. But we have traditionally viewed vagueness and overbreadth as logically related and similar doctrines. See, *e. g., Keyishian* v. *Board of Regents*, 385 U.S. 589, 609 (1967); *NAACP* v. *Button*, 371 U.S. 415, 433 (1963). See also Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 110-113 (1960).

No authority cited by the dissent supports its argument about facial challenges in the arbitrary enforcement context. The dissent relies heavily on *Parker* v. *Levy*, 417 U.S. 733 (1974), but in that case we deliberately applied a less stringent vagueness analysis "[because] of the factors differentiating military society from civilian society." *Id*., at 756. *Hoffman Estates, supra*, also relied upon by the dissent, does not support its position. In addition to reaffirming the validity of facial challenges in situations where free speech or free association are affected, see 455 U.S., at 494, 495, 498-499, the Court emphasized that the ordinance in *Hoffman Estates* "simply regulates business behavior" and that "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow." *Id*., at 499, 498.

that the identification is reliable." Tr. of Oral Arg. 6. In giving examples of how suspects would satisfy the requirement, appellants explained that a jogger, who was not carrying identification, could, depending on the particular officer, be required to answer a series of questions concerning the route that he followed to arrive at the place where the officers detained him, [9] or could satisfy the identification requirement [***911] simply [****14] by reciting his name and address. See *Id*., at 6-10.

[10B]

[1B][11]It is clear that the full discretion accorded to the police to determine whether the suspect has provided a "credible and reliable" identification necessarily "[entrusts] [**1860] lawmaking 'to the moment-to-moment judgment of the policeman on his beat.'" *Smith, supra*, at 575 (quoting *Gregory* v. *Chicago*, 394 U.S. 111, 120 (1969) (Black, J., concurring)). Section 647(e) "furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups [****15] deemed to merit their displeasure,'" *Papachristou*, 405 U.S., at 170 (quoting *Thornhill* v. *Alabama*, 310 U.S. 88, 97-98 (1940)), and "confers on police a virtually unrestrained power to arrest and charge persons with a violation." *Lewis* v. *City of New Orleans*, 415 U.S. 130, 135 (1974) (POWELL, J., concurring in result). In providing that a detention under § 647(e) may occur only where there is the level of suspicion sufficient to justify a *Terry* stop, the State ensures the existence of "neutral limitations on the conduct of individual officers." *Brown* v. *Texas*, 443 [*361] U.S., at 51.Although the initial detention is justified, the State fails to establish standards by which the officers may determine whether the suspect has complied with the subsequent identification requirement.

[12]Appellants stress the need for strengthened law enforcement tools to combat the epidemic of crime that plagues our Nation. The concern of our citizens with curbing criminal activity is certainly a matter requiring the attention of all branches of government. As weighty as this concern is, however, it cannot [****16] justify legislation that would otherwise fail to meet constitutional standards for definiteness and clarity. See *Lanzetta* v. *New Jersey*, 306 U.S. 451 (1939). Section 647(e), as presently construed, requires that "suspicious" persons satisfy some undefined identification requirement, or face criminal punishment. Although due process does not require "impossible standards" of clarity, see *United States* v. *Petrillo*, 332 U.S. 1, 7-8 (1947), this is not a case where further precision in the statutory language is either impossible or impractical.

IV

[1C] [13A]We conclude § 647(e) is unconstitutionally vague on its face because it encourages arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute. [10] Accordingly, the judgment of [*362] the Court of Appeals is affirmed, [***912] and the case is remanded for further proceedings consistent with this opinion.

[13B]

[****17] *It is so ordered*.

**Concur by:** BRENNAN

# Concur

[9] To the extent that § 647(e) criminalizes a suspect's failure to answer such questions put to him by police officers, Fifth Amendment concerns are implicated. It is a "settled principle that while the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes they have no right to compel them to answer." *Davis* v. *Mississippi*, 394 U.S. 721, 727, n. 6 (1969).

[10] Because we affirm the judgment of the court below on this ground, we find it unnecessary to decide the other questions raised by the parties because our resolution of these other issues would decide constitutional questions in advance of the necessity of doing so. See *Burton* v. *United States*, 196 U.S. 283, 295 (1905); *Liverpool, N. Y. & P. S.S. Co.* v. *Commissioners of Emigration*, 113 U.S. 33, 39 (1885). See also *Ashwander* v. *TVA*, 297 U.S. 288, 346-347 (1936) (Brandeis, J., concurring). The remaining issues raised by the parties include whether § 647(e) implicates Fourth Amendment concerns, whether the individual has a legitimate expectation of privacy in his identity when he is detained lawfully under *Terry*, whether the requirement that an individual identify himself during a *Terry* stop violates the Fifth Amendment protection against compelled testimony, and whether inclusion of the *Terry* standard as part of a criminal statute creates other vagueness problems. The appellee also argues that § 647(e) permits arrests on less than probable cause. See *Michigan* v. *DeFillippo*, 443 U.S. 31, 36 (1979).

JUSTICE **BRENNAN**, concurring.

I join the Court's opinion; it demonstrates convincingly that the California statute at issue in this case, Cal. Penal Code Ann. § 647(e) (West 1970), as interpreted by California courts, is unconstitutionally vague. Even if the defect identified by the Court were cured, however, I would hold that this statute violates the Fourth [**1861] Amendment. [1] Merely to facilitate the general law enforcement objectives of investigating and preventing unspecified crimes, States may not authorize the arrest and criminal prosecution of an individual for failing to produce identification or further information on demand by a police officer.

[****18] [*363] It has long been settled that the Fourth Amendment prohibits the seizure and detention or search of an individual's person unless there is probable cause to believe that he has committed a crime, except under certain conditions strictly defined by the legitimate requirements of law enforcement and by the limited extent of the resulting intrusion on individual liberty and privacy. See *Davis* v. *Mississippi*, 394 U.S. 721, 726-727 (1969). The scope of that exception to the probable-cause requirement for seizures of the person has been defined by a series of cases, beginning with *Terry* v. *Ohio*, 392 U.S. 1 (1968), holding that a police officer with reasonable suspicion of criminal activity, based on articulable facts, may detain a suspect [***913] briefly for purposes of limited questioning and, in so doing, may conduct a brief "frisk" of the suspect to protect himself from concealed weapons. See, *e. g., United States* v. *Brignoni-Ponce*, 422 U.S. 873, 880-884 (1975); *Adams* v. *Williams*, 407 U.S. 143, 145-146 (1972). Where probable cause is lacking, we have expressly declined to [****19] allow significantly more intrusive detentions or searches on the *Terry* rationale, despite the assertion of compelling law enforcement interests. "For all but those narrowly defined intrusions, the requisite 'balancing' has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause." *Dunaway* v. *New York*, 442 U.S. 200, 214 (1979). [2]

[****20] [*364] *Terry* and the cases following it give full recognition to law enforcement officers' need for an "intermediate" response, short [**1862] of arrest, to suspicious circumstances; the power to effect a brief detention for the purpose of questioning is a powerful tool for the investigation and prevention of crimes. Any person may, of course, direct a question to another person in passing. The *Terry* doctrine permits police officers to do far more: If they have the requisite reasonable suspicion, they may use a number of devices with substantial coercive impact on the person to whom they direct their attention, including an official "show of authority," the use of physical force to restrain him, and a search of the person for weapons. *Terry* v. *Ohio, supra*, at 19, n. 16; see *Florida* v. *Royer*, 460 U.S. 491, 498-499 (1983) (opinion of WHITE, J.); *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980) (opinion

---

[1] We have not in recent years found a state statute invalid directly under the Fourth Amendment, but we have long recognized that the government may not "authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct." *Sibron* v. *New York*, 392 U.S. 40, 61 (1968). In *Sibron*, and in numerous other cases, the Fourth Amendment issue arose in the context of a motion by the defendant in a criminal prosecution to suppress evidence against him obtained as the result of a police search or seizure of his person or property. The question thus has always been whether particular conduct by the police violated the Fourth Amendment, and we have not had to reach the question whether state law purporting to authorize such conduct also offended the Constitution. In this case, however, appellee Edward Lawson has been repeatedly arrested under authority of the California statute, and he has shown that he will likely be subjected to further seizures by the police in the future if the statute remains in force. See *Los Angeles* v. *Lyons, ante*, at 105-109; *Gomez* v. *Layton*, 129 U. S. App. D. C. 289, 394 F.2d 764 (1968). It goes without saying that the Fourth Amendment safeguards the rights of those who are not prosecuted for crimes as well as the rights of those who are.

[2] A brief detention is usually sufficient as a practical matter to accomplish all legitimate law enforcement objectives with respect to individuals whom the police do not have probable cause to arrest. For longer detentions, even though they fall short of a full arrest, we have demanded not only a high standard of law enforcement necessity, but also objective indications that an individual would not consider the detention significantly intrusive. Compare *Dunaway* v. *New York*, 442 U.S., at 212-216 (seizure of suspect without probable cause and custodial interrogation in police station violates Fourth Amendment), and *Davis* v. *Mississippi*, 394 U.S. 721, 727-728 (1969) (suspect may not be summarily detained and taken to police station for fingerprinting but may be ordered to appear at a specific time), with *Michigan* v. *Summers*, 452 U.S. 692, 701-705 (1981) (suspect may be detained in his own home without probable cause for time necessary to search the premises pursuant to a valid warrant supported by probable cause). See also *Florida* v. *Royer*, 460 U.S. 491, 500 (1983) (opinion of WHITE, J.) ("least intrusive means" requirement for searches not supported by probable cause).

of Stewart, J.). During such an encounter, few people will ever feel free not to cooperate fully with the police by answering their questions. Cf. 3 W. LaFave, Search and Seizure § 9.2, pp. [****21] 53-55 (1978). Our case reports are replete with examples of suspects' cooperation during *Terry* encounters, even when the suspects have a great deal to lose by cooperating. See, *e. g., Sibron* v. *New York*, 392 U.S. 40, 45 (1968); *Florida* v. *Royer, supra*, at 493-495.

The price of that effectiveness, [***914] however, is intrusion on individual interests protected by the Fourth Amendment. We have held that the intrusiveness of even these brief stops for purposes of questioning is sufficient to render them "seizures" under the Fourth Amendment. See *Terry* v. *Ohio*, 392 U.S., at 16. For precisely that reason, the scope of seizures of the person on less than probable cause that *Terry* [*365] permits is strictly circumscribed to limit the degree of intrusion they cause. *Terry* encounters must be brief; the suspect must not be moved or asked to move more than a short distance; physical searches are permitted only to the extent necessary to protect the police officers involved during the encounter; and, most importantly, the suspect must be free to leave after a short time and to decline to answer the [****22] questions put to him.

"[The] person may be briefly detained against his will while pertinent questions are directed to him. Of course, the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation." *Id*., at 34 (WHITE, J., concurring).

Failure to observe these limitations converts a *Terry* encounter into the sort of detention that can be justified only by probable cause to believe that a crime has been committed. See *Florida* v. *Royer*, 460 U.S., at 501 (opinion of WHITE, J.); *id*., at 509-511 (BRENNAN, J., concurring in result); *Dunaway* v. *New York, supra*, at 216.

The power to arrest -- or otherwise to prolong a seizure until a suspect had responded to the satisfaction of the police officers -- would undoubtedly elicit cooperation from a high percentage of even those very few individuals not sufficiently coerced by a show of authority, brief physical detention, and a frisk. We have never claimed that expansion of the power of police officers to act [****23] on reasonable suspicion alone, or even less, would further no law enforcement interests. See, *e. g., Brown* v. *Texas*, 443 U.S. 47, 52 (1979). But the balance struck by the Fourth Amendment between the public interest in effective law enforcement and the equally public interest in safeguarding individual freedom and privacy from arbitrary governmental interference forbids such expansion. See *Dunaway* v. *New York, supra; United States* v. *Brignoni-Ponce*, 422 U.S., at 878. Detention beyond the limits [*366] of *Terry* without probable cause would improve the effectiveness of legitimate police investigations by only a small margin, [**1863] but it would expose individual members of the public to exponential increases in both the intrusiveness of the encounter and the risk that police officers would abuse their discretion for improper ends. Furthermore, regular expansion of *Terry* encounters into more intrusive detentions, without a clear connection to any specific underlying crimes, is likely to exacerbate ongoing tensions, where they exist, between the police and the public. See Report of the National [****24] Advisory Commission on Civil Disorders 157-168 (1968).

[***915] In sum, under the Fourth Amendment, police officers with reasonable suspicion that an individual has committed or is about to commit a crime may detain that individual, using some force if necessary, for the purpose of asking investigative questions. [3] They may ask their questions in a way calculated to obtain an answer. But they may not *compel* an answer, and they must allow the person to leave after a reasonably brief period of time unless the information they have acquired during the encounter has given them probable cause sufficient to justify an arrest. [4]

---

[3] Police officers may have a similar power with respect to persons whom they reasonably believe to be material witnesses to a specific crime. See, *e. g*., ALI Model Code of Pre-Arraignment Procedure § 110.2(1)(b) (Proposed Official Draft 1975).

[4] Of course, some reactions by individuals to a properly limited *Terry* encounter, *e. g*., violence toward a police officer, in and of themselves furnish valid grounds for arrest. Other reactions, such as flight, may often provide the necessary information, in addition to that which the officers already possess, to constitute probable cause. In some circumstances it is even conceivable that the mere fact that a suspect refuses to answer questions once detained, viewed in the context of the facts that gave rise to reasonable suspicion in the first place, would be enough to provide probable cause. A court confronted with such a claim, however, would have to evaluate

[****25] California cannot abridge this constitutional rule by making it a crime to refuse to answer police questions during a [*367] *Terry* encounter, any more than it could abridge the protections of the Fifth and Sixth Amendments by making it a crime to refuse to answer police questions once a suspect has been taken into custody. To begin, the statute at issue in this case could not be constitutional unless the intrusions on Fourth Amendment rights it occasions were necessary to advance some specific, legitimate state interest not already taken into account by the constitutional analysis described above. Yet appellants do not claim that § 647(e) advances any interest other than general facilitation of police investigation and preservation of public order -- factors addressed at length in *Terry, Davis*, and *Dunaway*. Nor do appellants show that the power to arrest and to impose a criminal sanction, in addition to the power to detain and to pose questions under the aegis of state authority, is so necessary in pursuit of the State's legitimate interests as to justify the substantial additional intrusion on individuals' rights. Compare Brief for Appellants 18-19 (asserting [****26] that § 647(e) is justified by state interest in "detecting and preventing crime" and "protecting the citizenry from criminal acts"), and *People* v. *Solomon*, 33 Cal. App. 3d 429, 436-437, 108 Cal. Rptr. 867, 872 (1973) (§ 647(e) justified by "the public need involved," *i. e.*, "protection of society against crime"), with *United States* v. *Brignoni-Ponce, supra*, at 884 (federal interest in immigration control permits stops at the border itself without reasonable suspicion), and *California* v. *Byers*, 402 U.S. 424, 456-458 (1971) (Harlan, J., concurring in judgment) (state interest in regulating automobiles justifies making it a crime to refuse to stop after an automobile accident and report it). Thus, because the State's interests extend only so far as to justify the limited searches and seizures defined by [***916] *Terry*, the balance of interests described in that case and its progeny must control.

Second, it goes without saying that arrest and the threat of a criminal sanction [**1864] have a substantial impact on interests protected by the Fourth Amendment, far more severe than [*368] [****27] we have ever permitted on less than probable cause. Furthermore, the likelihood that innocent persons accosted by law enforcement officers under authority of § 647(e) will have no realistic means to protect their rights compounds the severity of the intrusions on individual liberty that this statute will occasion. The arrests it authorizes make a mockery of the right enforced in *Brown* v. *Texas*, 443 U.S. 47 (1979), in which we held squarely that a State may not make it a crime to refuse to provide identification on demand in the absence of reasonable suspicion. [5] [****29] If § 647(e) remains in force, the validity of such arrests will be open to challenge only after the fact, in individual prosecutions for failure to produce identification. Such case-by-case scrutiny cannot vindicate the Fourth Amendment rights of persons like appellee, many of whom will not even be prosecuted after they are arrested, see *ante*, at 354. A pedestrian approached by police officers has no way of knowing whether the officers have "reasonable suspicion" -- without which they may not demand identification even under § 647(e), *ante*, at 356, and n. 5 -- because that condition depends [****28] solely on the objective facts known to the officers and evaluated in light of their experience, see *Terry* v. *Ohio*, 392 U.S., at 30; *United States* v. *Brignoni-Ponce*, 422 U.S., at 884-885. The pedestrian will know that to assert his rights may subject him to arrest and all that goes with it: new acquaintances among jailers, lawyers, prisoners, and bail bondsmen, firsthand knowledge of local jail conditions, a "search incident to arrest," and the expense of defending against a possible prosecution. [6] The only response to be [*369] expected is compliance with the officers' requests, whether or not they are based on reasonable suspicion, and without regard to the possibility of later vindication in court. Mere reasonable suspicion does not justify subjecting the innocent to such a dilemma. [7]

---

it carefully to make certain that the person arrested was not being penalized for the exercise of his right to refuse to answer.

[5] In *Brown* we had no need to consider whether the State can make it a crime to refuse to provide identification on demand during a seizure permitted by *Terry*, when the police have reasonable suspicion but not probable cause. See 443 U.S., at 53, n. 3.

[6] Even after arrest, however, he may not be forced to answer questions against his will, and -- in contrast to what appears to be normal procedure during *Terry* encounters -- he will be so informed. See *Miranda* v. *Arizona*, 384 U.S. 436 (1966). In fact, if he indicates a desire to remain silent, the police should cease questioning him altogether. *Id.*, at 473-474.

[7] When law enforcement officers have probable cause to believe that a person has committed a crime, the balance of interests between the State and the individual shifts significantly, so that the individual may be forced to tolerate restrictions on liberty and invasions of privacy that possibly will never be redressed, even if charges are dismissed or the individual is acquitted. Such individuals may be arrested, and

[****30] [***917] By defining as a crime the failure to respond to requests for personal information during a *Terry* encounter, and by permitting arrests upon commission of that crime, California attempts in this statute to compel what may not be compelled under the Constitution. Even if § 647(e) were not unconstitutionally vague, the Fourth Amendment would prohibit its enforcement.

**Dissent by:** WHITE

## Dissent

JUSTICE WHITE, with whom JUSTICE REHNQUIST joins, dissenting.

The usual rule is that the alleged vagueness of a criminal statute must be judged in light of the conduct that is charged to be violative of the statute. See, *e. g., United States* v. *Mazurie*, 419 U.S. 544, 550 (1975); *United States* v. *Powell*, 423 U.S. 87, 92-93 (1975). If the actor is given sufficient notice that [**1865] his conduct is within the proscription of the statute, his conviction is not vulnerable on vagueness grounds, even if as applied to other conduct, the law would be unconstitutionally vague. None of our cases "suggests that one who has received fair warning of the criminality of his own conduct from the statute in question is nonetheless entitled to [*370] attack it [****31] because the language would not give similar fair warning with respect to other conduct which might be within its broad and literal ambit. One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker* v. *Levy*, 417 U.S. 733, 756 (1974). The correlative rule is that a criminal statute is not unconstitutionally vague on its face unless it is "impermissibly vague in all of its applications." *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 497 (1982).

These general rules are equally applicable to cases where First Amendment or other "fundamental" interests are involved. The Court has held that in such circumstances "more precision in drafting may be required because of the vagueness doctrine in the case of regulation of expression," *Parker* v. *Levy, supra*, at 756; a "greater degree of specificity" is demanded than in other contexts. *Smith* v. *Goguen*, 415 U.S. 566, 573 (1974). But the difference in such cases "relates to how strict a test of vagueness shall be applied in judging a particular criminal statute." *Parker* v. *Levy*, 417 U.S., at 756. [****32] It does not permit the challenger of the statute to confuse vagueness and overbreadth by attacking the enactment as being vague as applied to conduct other than his own. See *ibid*. Of course, if his own actions are themselves protected by the First Amendment or other constitutional provision, or if the statute does not fairly warn that it is proscribed, he may not be convicted. But it would be unavailing for him to claim that although he knew his own conduct was unprotected and was plainly enough forbidden by the statute, others may be in doubt as to whether their acts are banned by the law.

The upshot of our cases, therefore, is that whether or not a statute purports to regulate constitutionally [***918] protected conduct, it should not be held unconstitutionally vague on its face unless it is vague in all of its possible applications. If any fool would know that a particular category of conduct would be within the reach of the statute, if there is an unmistakable core that a reasonable person would know is forbidden by the [*371] law, the enactment is not unconstitutional on its face and should not be vulnerable to a facial attack in a declaratory judgment action such [****33] as is involved in this case. Under our cases, this would be true, even though as applied to other conduct the provision would fail to give the constitutionally required notice of illegality.

Of course, the overbreadth doctrine permits facial challenge of a law that reaches a substantial amount of conduct protected by the First Amendment; and, as I have indicated, I also agree that in First Amendment cases the vagueness analysis may be more demanding. But to imply, as the majority does, *ante*, at 358-359, n. 8, that the overbreadth doctrine requires facial invalidation of a statute which is not vague as applied to a defendant's conduct but which is vague as applied to other acts is to confound vagueness and overbreadth, contrary to *Parker* v. *Levy, supra*.

If there is a range of conduct that is clearly within the reach of the statute, law enforcement personnel, as well as putative arrestees, are clearly on notice that arrests for such conduct are authorized by the law. There would be nothing arbitrary or discretionary about such arrests. If the officer arrests for an act that both he and

---

they may not resist. But probable cause, and nothing less, represents the point at which the interests of law enforcement justify subjecting an individual to any significant intrusion beyond that sanctioned in *Terry*, including either arrest or the need to answer questions that the individual does not want to answer in order to avoid arrest or end a detention.

the lawbreaker know is clearly barred by the statute, it seems to [****34] me an untenable exercise of judicial review to invalidate a state conviction because in some other circumstance the officer may arbitrarily misapply the statute. That the law might not give sufficient guidance to arresting officers [**1866] with respect to other conduct should be dealt with in those situations. See, *e. g., Hoffman Estates, supra*, at 504. It is no basis for fashioning a further brand of "overbreadth" and invalidating the statute on its face, thus forbidding its application to identifiable conduct that is within the State's power to sanction.

I would agree with the majority in this case if it made at least some sense to conclude that the requirement to provide "credible and reliable identification" after a valid stop on reasonable suspicion of criminal conduct is "impermissibly vague in all of its applications." *Hoffman Estates* v. *Flipside*, [*372] *supra*, at 495. [*] But the [***919] statute is not vulnerable on this ground; and the majority, it seems to me, fails to demonstrate that it is. Suppose, for example, an officer requests identification information from a suspect during a valid *Terry* stop and the [****35] suspect answers: "Who I am is just none of your business." Surely the suspect would know from the statute that a refusal to provide any information at all would constitute a violation. It would be absurd to suggest that in such a situation only the unfettered discretion of a police officer, who has legally stopped a person on reasonable suspicion, would serve to determine whether a violation of the statute has occurred.

"It is self-evident that there is a whole range of conduct that anyone with at least a semblance of common sense would know is [a failure to provide credible and reliable identification] and that would be covered by the statute . . . . In these instances, there would be ample notice to the actor and no room for undue discretion by enforcement officers. There may be a variety of other conduct that might or might not be claimed [to have failed to meet the statute's requirements] by the State, but unpredictability in those situations does not change the certainty in others." *Smith* v. *Goguen*, 415 U.S., at 584 (WHITE, J., concurring in judgment).

See *id*., at 590 (BLACKMUN, J., joined by BURGER, C. J., agreeing with WHITE, [****36] J., on the vagueness issue). Thus, even if, as the majority cryptically asserts, the statute here [*373] implicates First Amendment interests, it is not vague on its face, however more strictly the vagueness doctrine should be applied. The judgment below should therefore not be affirmed but reversed and appellee Lawson remitted to challenging the statute as it has been or will be applied to him.

[****37] The majority finds that the statute "contains no standard for determining what a suspect has to do in order to satisfy the requirement to provide a 'credible and reliable' identification." *Ante*, at 358. At the same time, the majority concedes that "credible and reliable" has been defined by the state court to mean identification that carries reasonable assurance that the identification is authentic and that provides means for later getting in touch with the person. The narrowing construction given this statute by the state court cannot be likened to the "standardless" statutes involved in the cases cited by the majority. For example, *Papachristou* v. *City of Jacksonville*, 405 U.S. 156 (1972), involved a statute that made it a crime to be a "vagrant." The statute provided:

"'Rogues and vagabonds, or dissolute persons who go about begging, common gamblers, . . . common drunkards, common night walkers, . . . lewd, wanton and lascivious persons, . . . common railers and brawlers, persons wandering or strolling around from place to place without [**1867] any lawful purpose or object, habitual loafers, . . . shall be deemed vagrants.'" *Id*., at 156-157, n. 1.

[****38] In *Lewis* v. *City of New Orleans*, 415 U.S. 130, 132 (1974), [***920] the statute at issue made it a crime "'for any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty.'" The present statute, as construed by the state courts, does not fall in the same category.

---

[*] The majority attempts to underplay the conflict between its decision today and the decision last Term in *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc*., by suggesting that we applied a "less strict vagueness test" because economic regulations were at issue. The Court there also found that the ordinances challenged might be characterized as quasi-criminal or criminal in nature and held that because at least some of respondent's conduct clearly was covered by the ordinance, the facial challenge was unavailing even under the "relatively strict test" applicable to criminal laws. 455 U.S., at 499-500.

The statutes in *Lewis* v. *City of New Orleans* and *Smith* v. *Goguen, supra*, as well as other cases cited by the majority clearly involved threatened infringements of First Amendment [*374] freedoms. A stricter test of vagueness was therefore warranted. Here, the majority makes a vague reference to potential suppression of First Amendment liberties, but the precise nature of the liberties threatened is never mentioned. *Shuttlesworth* v. *City of Birmingham*, 382 U.S. 87 (1965), is cited, but that case dealt with an ordinance making it a crime to "'stand or loiter upon any street or sidewalk . . . after having been requested by any police officer to move on,'" *id*., at 90, and the First Amendment concerns implicated [****39] by the statute were adequately explained by the Court's reference to *Lovell* v. *City of Griffin*, 303 U.S. 444 (1938), and *Schneider* v. *State*, 308 U.S. 147 (1939), which dealt with the First Amendment right to distribute leaflets on city streets and sidewalks. There are no such concerns in the present case.

Of course, if the statute on its face violates the Fourth or Fifth Amendment -- and I express no views about that question -- the Court would be justified in striking it down. But the majority apparently cannot bring itself to take this course. It resorts instead to the vagueness doctrine to invalidate a statute that is clear in many of its applications but which is somehow distasteful to the majority. As here construed and applied, the doctrine serves as an open-ended authority to oversee the States' legislative choices in the criminal law area and in this case leaves the State in a quandary as to how to draft a statute that will pass constitutional muster.

I would reverse the judgment of the Court of Appeals.

## References

Supreme Court's views regarding validity of criminal disorderly conduct statutes [****40] under void-for-vagueness doctrine

21 Am Jur 2d, Criminal Law 15-17; 39 Am Jur 2d, Highways, Streets, and Bridges 250

7 Am Jur Pl & Pr Forms (Rev), Constitutional Law, Forms 21, 38

USCS, Constitution, 14th Amendment

US L Ed Digest, Statutes 18, 18.9

L Ed Index to Annos, Certainty and Definiteness; Criminal Law; Due Process of Law

ALR Quick Index, Certainty and Definiteness; Criminal Law; Due Process of Law; Loitering

Federal Quick Index, Certainty and Definiteness; Criminal Law; Due Process of Law; Loitering

Annotation References:

Supreme Court's views regarding validity of criminal disorderly conduct statutes under void-for-vagueness doctrine. 75 L Ed 2d 1049.

Indefiniteness of language as affecting validity of criminal legislation or judicial definition of common-law crime. 96 L Ed 374, 16 L Ed 2d 1231.

Validity of loitering statutes and ordinances. 25 ALR3d 836.

Validity of vagrancy statutes and ordinances. 25 ALR3d 792. [****41]

---

End of Document

# Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.

455 U.S. 489 (1982)

Cited in Opening Brief at: 43

See Response, Part III.G. Highlighted language appears at 455 U.S. at 499.

Q Questioned
As of: September 14, 2026 7:07 PM Z

# Hoffman Estates v. Flipside, Hoffman Estates

Supreme Court of the United States

December 9, 1981, Argued ; March 3, 1982, Decided

No. 80-1681

**Reporter**
455 U.S. 489 *; 102 S. Ct. 1186 **; 71 L. Ed. 2d 362 ***; 1982 U.S. LEXIS 78 ****; 50 U.S.L.W. 4267

VILLAGE OF HOFFMAN ESTATES ET AL. v. THE FLIPSIDE, HOFFMAN ESTATES, INC.

**Subsequent History:** [****1] Petition for Rehearing Denied April 26, 1982.

**Prior History:** APPEAL FROM THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

**Disposition:** 639 F.2d 373, reversed and remanded.

## Syllabus

An ordinance of appellant village requires a business to obtain a license if it sells any items that are "designed or marketed for use with illegal cannabis or drugs." Guidelines define the items (such as "roach clips," which are used to smoke cannabis, "pipes," and "paraphernalia"), the sale of which is required to be licensed. Appellee, which sold a variety of merchandise in its store, including "roach clips" and specially designed pipes used to smoke marihuana, upon being notified that it was in possible violation of the ordinance, brought suit in Federal District Court, claiming that the ordinance is unconstitutionally vague and overbroad, and requesting injunctive and declaratory relief and damages. The District Court upheld the ordinance and awarded judgment to the village defendants. The Court of Appeals reversed on the ground that the ordinance is unconstitutionally vague on its face.

*Held*: The ordinance is not facially overbroad or vague but is reasonably clear in its application to appellee. [****2] Pp. 494-505.

(a) In a facial challenge to the overbreadth and vagueness of an enactment, a court must first determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and should uphold such challenge only if the enactment is impermissibly vague in all of its applications. Pp. 494-495.

(b) The ordinance here does not violate appellee's First Amendment rights nor is it overbroad because it inhibits such rights of other parties. The ordinance does not restrict speech as such but simply regulates the commercial marketing of items that the labels reveal may be used for an illicit purpose and thus does not embrace noncommercial speech. With respect to any commercial speech interest implicated, the ordinance's restriction on the manner of marketing does not appreciably limit appellee's communication of information, except to the extent it is directed at commercial activity promoting or encouraging illegal drug use, an activity which, if deemed "speech," is speech proposing an illegal transaction and thus subject to government regulation [****3] or ban. It is irrelevant whether the ordinance has an overbroad scope encompassing other persons' commercial speech, since the overbreadth doctrine does not apply to commercial speech. Pp. 495-497.

(c) With respect to the facial vagueness challenge, appellee has not shown that the ordinance is impermissibly vague in all of its applications. The ordinance's language "designed . . . for use" is not unconstitutionally vague on its face, since it is clear that such standard encompasses at least an item that is principally used with illegal drugs by virtue of its objective features, *i. e.*, features designed by the manufacturer. Thus, the "designed for use" standard is sufficiently clear to cover at least some of the items that appellee sold, such as "roach clips" and the specially designed pipes. As to the "marketed for use" standard, the guidelines refer to the display of paraphernalia and to the proximity of covered items to otherwise uncovered items, and thus such standard requires scienter on the part of the retailer. Under this test, appellee had ample warning that its marketing activities

required a license, and by displaying a certain magazine and certain books dealing [****4] with illegal drugs physically close to pipes and colored rolling paper, it was in clear violation of the guidelines, as it was in selling "roach clips." Pp. 499-503.

(d) The ordinance's language is sufficiently clear that the speculative danger of arbitrary enforcement does not render it void for vagueness in a pre-enforcement facial challenge. Pp. 503-504.

**Counsel:** Richard N. Williams argued the cause and filed briefs for appellants.

Michael L. Pritzker argued the cause and filed a brief for appellee. *

[****5]

**Judges:** MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. WHITE, J., filed an opinion concurring in the judgment, post, p. 507. STEVENS, J., took no part in the consideration or decision of the case.

**Opinion by:** MARSHALL

# Opinion

[*491] [***367] [**1189] JUSTICE MARSHALL delivered the opinion of the Court.

[1A] [2A]This case presents a pre-enforcement facial challenge to a drug paraphernalia ordinance on the ground that it is unconstitutionally vague and overbroad. The ordinance in question requires a business to obtain a license if it sells any items that are "designed or marketed for use with illegal cannabis or drugs." Village of Hoffman Estates Ordinance No. 969-1978. The United States Court of Appeals for the Seventh Circuit held that the ordinance is vague on its face. 639 F.2d 373 (1981). We noted probable jurisdiction, 452 U.S. 904 (1981), and now reverse.

I

For more than three years prior to May 1, 1978, appellee The Flipside, Hoffman Estates, Inc. (Flipside), sold a variety of merchandise, including phonographic records, smoking accessories, novelty devices, and jewelry, in [****6] its store located in the [**1190] village of Hoffman Estates, Ill. (village). [1] [****7] On February [*492] 20, 1978, the village enacted an ordinance regulating drug paraphernalia, to be effective May 1, 1978. [2] The ordinance makes it unlawful for any person "to sell any items, effect, paraphernalia,

---

* Ronald A. Zumbrun and John H. Findley filed a brief for Community Action Against Drug Abuse as amicus curiae urging reversal.

Charles A. Trost filed a brief for American Businesses for Constitutional Rights as amicus curiae urging affirmance.

Briefs of amici curiae were filed for the State of Arkansas et al. by Steve Clark, Attorney General of Arkansas, J. D. MacFarlane, Attorney General of Colorado, Carl R. Ajello, Attorney General of Connecticut, Richard S. Gebelein, Attorney General of Delaware, Jim Smith, Attorney General of Florida, and Mitchell D. Franks, David H. Leroy, Attorney General of Idaho, Linley E. Pearson, Attorney General of Indiana, Robert T. Stephan, Attorney General of Kansas, William J. Guste, Jr., Attorney General of Louisiana, James E. Tierney, Attorney General of Maine, Stephen H. Sachs, Attorney General of Maryland, and Paul F. Strain, Dennis M. Sweeney, and Linda H. Lamone, Assistant Attorneys General, Paul L. Douglas, Attorney General of Nebraska, Richard H. Bryan, Attorney General of Nevada, James R. Zazzali, Attorney General of New Jersey, Jeff Bingaman, Attorney General of New Mexico, Rufus L. Edmisten, Attorney General of North Carolina, and David S. Crump and James L. Wallace, Jr., Deputy Attorneys General, Jan Eric Cartwright, Attorney General of Oklahoma, Leroy S. Zimmerman, Attorney General of Pennsylvania, Mark White, Attorney General of Texas, David L. Wilkinson, Attorney General of Utah, and Kenneth O. Eikenberry, Attorney General of Washington; and for the Village of Wilmette, Illinois, by Robert J. Mangler.

[1] More specifically, the District Court found:

"[Flipside] sold literature that included 'A Child's Garden of Grass,' 'Marijuana Grower's Guide,' and magazines such as 'National Lampoon,' 'Rolling Stone,' and 'High Times.' The novelty devices and tobacco-use related items plaintiff displayed and sold in its store ranged from small commodities such as clamps, chain ornaments and earrings through cigarette holders, scales, pipes of various types and sizes, to large water pipes, some designed for individual use, some which as many as four persons can use with flexible plastic tubes. Plaintiff also sold a large number of cigarette rolling papers in a variety of colors. One of plaintiff's displayed items was a mirror, about seven by nine inches with the word 'Cocaine' painted on its surface in a purple color. Plaintiff sold cigarette holders, 'alligator clips,' herb sifters, vials, and a variety of tobacco snuff." 485 F.Supp. 400, 403 (ND Ill. 1980).

[2] The text of the ordinance is set forth in the Appendix to this opinion.

accessory or thing which is designed or marketed for use with illegal cannabis or drugs, as defined by Illinois Revised Statutes, without obtaining a license therefor." The license fee is $ 150. A business must also file affidavits that the licensee and its employees have not been convicted of a drug-related offense. Moreover, the business must keep a record of each sale of a regulated item, including the name and address of the [***368] purchaser, to be open to police inspection. No regulated item may be sold to a minor. A violation is subject to a fine of not less than $ 10 and not more than $ 500, and each day that a violation continues gives rise to a separate offense. A series of licensing guidelines prepared by the Village Attorney define "Paper," "Roach Clips," "Pipes," and "Paraphernalia," the sale of which is required to be licensed. [3]

[*493] After an administrative inquiry, the village determined that Flipside and one other store appeared to be in violation of the ordinance. [****8] The Village Attorney notified Flipside of the existence of the ordinance, and made a copy of the ordinance and guidelines available to Flipside. Flipside's owner asked for guidance concerning which items were covered by the ordinance; the Village Attorney advised him to remove items in a certain section of the store "for his protection," and he did so. App. 71. The items included, according to Flipside's description, a clamp, chain ornaments, an "alligator" clip, key chains, necklaces, earrings, cigarette holders, glove stretchers, scales, strainers, a pulverizer, squeeze bottles, pipes, water pipes, pins, an herb sifter, mirrors, vials, cigarette rolling papers, and tobacco snuff. On May 30, 1978, instead of applying for a license or seeking clarification via the administrative procedures that the village had established for its licensing ordinances, [4] Flipside filed this lawsuit in the United States District Court for the Northern District of Illinois.

[****9] [**1191] The complaint alleged, *inter alia*, that the ordinance is unconstitutionally vague and overbroad, and requested injunctive and declaratory relief and damages. The District Court, after hearing testimony, declined to grant a preliminary injunction. The case was tried without a jury on additional evidence and stipulated testimony. The court issued [*494] an opinion upholding the constitutionality of the ordinance, and awarded judgment to the village defendants. 485 F.Supp. 400 (1980).

The Court of Appeals reversed on the ground that the ordinance is unconstitutionally vague on its face. The court reviewed the language of the ordinance and guidelines and found it vague with respect to certain conceivable applications, such [***369] as ordinary pipes or "paper clips sold next to *Rolling Stone* magazine." 639 F.2d, at 382. It also suggested that the "subjective" nature of the "marketing" test creates a danger of arbitrary and discriminatory enforcement against those with alternative lifestyles. *Id*., at 384. Finally, the court determined that the availability of administrative review or guidelines cannot [****10] cure the defect. Thus, it concluded that the ordinance is impermissibly vague on its face.

II

[3] [4A] [5A] [6A]In a facial challenge to the overbreadth and vagueness of a law, [5] [****11] a court's first task is

---

[3] The guidelines provide:

"LICENSE GUIDELINES FOR ITEMS, EFFECT, PARAPHERNALIA, ACCESSORY OR THING WHICH IS DESIGNED OR MARKETED FOR USE WITH ILLEGAL CANNABIS OR DRUGS

"Paper -- white paper or tobacco oriented paper not necessarily designed for use with illegal cannabis or drugs may be displayed. Other paper of colorful design, names oriented for use with illegal cannabis or drugs and displayed are covered.

"Roach Clips -- designed for use with illegal cannabis or drugs and therefore covered.

"Pipes -- if displayed away from the proximity of nonwhite paper or tobacco oriented paper, and not displayed within proximity of roach clips, or literature encouraging illegal use of cannabis or illegal drugs are not covered; otherwise, covered.

"Paraphernalia -- if displayed with roach clips or literature encouraging illegal use of cannabis or illegal drugs it is covered."

[4] Ordinance No. 932-1977, the Hoffman Estates Administrative Procedure Ordinance, was enacted prior to the drug paraphernalia ordinance, and provides that an interested person may petition for the adoption of an interpretive rule. If the petition is denied, the person may place the matter on the agenda of an appropriate village committee for review. The Village Attorney indicated that no interpretive rules had been adopted with respect to the drug paraphernalia ordinance because no one had yet applied for a license. App. 68.

[5] A "facial" challenge, in this context, means a claim that the law is "invalid *in toto* -- and therefore incapable of any valid application." *Steffel* v. *Thompson*, 415 U.S. 452, 474 (1974). In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state

to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. [6] If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates [*495] no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. [7] A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law.

[4B]

[5B] [6B]

[****12] The Court of Appeals in this case did not explicitly consider whether the ordinance reaches constitutionally protected conduct and is overbroad, nor whether the ordinance is vague in all of its applications. Instead, the court determined that the ordinance is void for vagueness because it is unclear in *some* of its applications to the [**1192] conduct of Flipside and of other hypothetical parties. [***370] Under a proper analysis, however, the ordinance is not facially invalid.

III

[1B]We first examine whether the ordinance infringes Flipside's First Amendment rights or is overbroad because it inhibits the First Amendment rights of other parties. Flipside makes the exorbitant claim that the village has imposed a "prior restraint" on speech because the guidelines treat the proximity of drug-related literature as an indicium that paraphernalia are "marketed for use with illegal cannabis or [*496] drugs." Flipside also argues that because the presence of drug-related designs, logos, or slogans on paraphernalia may trigger enforcement, the ordinance infringes "protected symbolic speech." Brief for Appellee 25.

These arguments do not long detain us. First, the village has not [****13] directly infringed the noncommercial speech of Flipside or other parties. The ordinance licenses and regulates the sale of items displayed "with" or "within proximity of" "literature encouraging illegal use of cannabis or illegal drugs," Guidelines, *supra* n. 3, but does not prohibit or otherwise regulate the sale of literature itself. Although drug-related designs or names on cigarette papers may subject those items to regulation, the village does not restrict speech as such, but simply regulates the commercial marketing of items that the labels reveal may be used for an illicit purpose. The scope of the ordinance therefore does not embrace noncommercial speech.

[7] [8] [9A] [10A]Second, insofar as any *commercial* speech interest is implicated here, it is only the attenuated interest in displaying and marketing merchandise in the manner that the retailer desires. We doubt that the village's restriction on the manner of marketing appreciably limits Flipside's communication of information [8] -- with one obvious and telling exception. The ordinance is expressly directed at commercial activity promoting or encouraging illegal drug use. If that activity is deemed "speech," then it is

---

court or enforcement agency has proffered. *Grayned* v. *City of Rockford*, 408 U.S. 104, 110 (1972).

[6] In making that determination, a court should evaluate the ambiguous as well as the unambiguous scope of the enactment. To this extent, the vagueness of a law affects overbreadth analysis. The Court has long recognized that ambiguous meanings cause citizens to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." *Baggett* v. *Bullitt*, 377 U.S. 360, 372 (1964), quoting *Speiser* v. *Randall*, 357 U.S. 513, 526 (1958); see *Grayned, supra*, at 109; cf. *Young* v. *American Mini Theatres, Inc*., 427 U.S. 50, 58-61 (1976).

[7] "[Vagueness] challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States* v. *Mazurie*, 419 U.S. 544, 550 (1975). See *United States* v. *Powell*, 423 U.S. 87, 92-93 (1975); *United States* v. *National Dairy Products Corp*., 372 U.S. 29, 32-33, 36 (1963). "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker* v. *Levy*, 417 U.S. 733, 756 (1974). The rationale is evident: to sustain such a challenge, the complainant must prove that the enactment is vague "'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' *Coates* v. *City of Cincinnati*, 402 U.S. 611, 614 (1971). Such a provision simply has *no* core." *Smith* v. *Goguen*, 415 U.S. 566, 578 (1974).

[8] Flipside explained that it placed items that the village considers drug paraphernalia in locations near a checkout counter because some are "point of purchase" items and others are small and apt to be shoplifted. App. 43. Flipside did not assert that its manner of placement was motivated in any part by a desire to communicate information to its customers.

speech [****14] proposing an illegal transaction, which a government may regulate or ban entirely. *Central Hudson Gas & Electric Corp*. v. *Public Service Comm'n*, 447 U.S. 557, 563-564 (1980); *Pittsburgh Press Co*. v. *Human Relations Comm'n*, 413 U.S. 376, 388 (1973). Finally, it is irrelevant whether the ordinance has an [*497] overbroad scope encompassing protected commercial speech of other persons, because the overbreadth doctrine does not apply to commercial speech. *Central Hudson, supra*, at 565, n. 8. [9]

[9B] [10B]

[****15] [***371] [**1193] IV

A

[2B]A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process. To succeed, however, the complainant must demonstrate that the law is impermissibly vague in all of its applications. Flipside makes no such showing.

[*498] The standards for evaluating vagueness were enunciated in *Grayned* v. *City of Rockford*, 408 U.S. 104, 108-109 (1972):

"Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and [****16] discriminatory applications" (footnotes omitted).

[11]These standards should not, of course, be mechanically applied. The degree of vagueness that the Constitution tolerates -- as well as the relative importance of fair notice and fair enforcement -- depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, [10] [****17] and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. [11] Indeed, the regulated enterprise may have the ability [***372] to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. [12] The Court has also expressed greater tolerance of [*499] enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. [13] And the

---

[9] Flipside also argues that the ordinance is "overbroad" because it could extend to "innocent" and "lawful" uses of items as well as uses with illegal drugs. Brief for Appellee 10, 33-35. This argument seems to confuse vagueness and overbreadth doctrines. If Flipside is objecting that it cannot determine whether the ordinance regulates items with some lawful uses, then it is complaining of vagueness. We find that claim unpersuasive in this pre-enforcement facial challenge. See *infra*, at 497-504. If Flipside is objecting that the ordinance would inhibit innocent uses of items found to be covered by the ordinance, it is complaining of denial of substantive due process. The latter claim obviously lacks merit. A retailer's right to sell smoking accessories, and a purchaser's right to buy and use them, are entitled only to minimal due process protection. Here, the village presented evidence of illegal drug use in the community. App. 37. Regulation of items that have some lawful as well as unlawful uses is not an irrational means of discouraging drug use. See *Exxon Corp*. v. *Governor of Maryland*, 437 U.S. 117, 124-125 (1978).The hostility of some lower courts to drug paraphernalia laws -- and particularly to those regulating the sale of items that have many innocent uses, see, *e. g*., 639 F.2d 373, 381-383 (1981); *Record Revolution No. 6, Inc*. v. *City of Parma*, 638 F.2d 916, 928 (CA6 1980), vacated and remanded, 451 U.S. 1013 (1981) -- may reflect a belief that these measures are ineffective in stemming illegal drug use. This perceived defect, however, is not a defect of clarity. In the unlikely event that a state court construed this ordinance as prohibiting the sale of all pipes, of whatever description, then a seller of corncob pipes could not complain that the law is unduly vague. He could, of course, object that the law was not intended to cover such items.

[10] *Papachristou* v. *City of Jacksonville*, 405 U.S. 156, 162 (1972) (dictum; collecting cases).

[11] See, *e. g., United States* v. *National Dairy Products Corp*., 372 U.S. 29 (1963). Cf. *Smith* v. *Goguen*, 415 U.S., at 574.

[12] See *Joseph E. Seagram & Sons, Inc*. v. *Hostetter*, 384 U.S. 35, 49 (1966); *McGowan* v. *Maryland*, 366 U.S. 420, 428 (1961).

[13] See *Barenblatt* v. *United States*, 360 U.S. 109, 137 (1959) (Black, J., with whom Warren, C. J., and Douglas, J., joined, dissenting); *Winters* v. *New York*, 333 U.S. 507, 515 (1948).

Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed. [14]

Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to [****18] inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech [**1194] or of association, a more stringent vagueness test should apply. [15]

B

[2C]This ordinance simply regulates business behavior and contains a scienter requirement with respect to the alternative "marketed for use" standard. The ordinance nominally imposes only civil penalties. However, the village concedes that the ordinance is "quasi-criminal," and its prohibitory and stigmatizing effect may warrant a relatively strict test. [16] [*500] Flipside's facial challenge fails because, under the test appropriate to either a quasi-criminal or a criminal law, the ordinance is sufficiently clear as applied to Flipside.

[****19] The ordinance requires Flipside to obtain a license if it sells "any items, effect, paraphernalia, accessory or thing which is designed or marketed for use with illegal cannabis or drugs, as defined by the Illinois Revised Statutes." Flipside expresses no uncertainty about which drugs this description encompasses; as the District Court noted, 485 F.Supp., at 406, Illinois law clearly defines cannabis and numerous other controlled drugs, including cocaine. Ill. Rev. Stat., ch. 56 1/2, paras. 703 and 1102(g) (1980). On the other hand, the words "items, effect, paraphernalia, accessory or thing" do not identify the type of merchandise that the village [***373] desires to regulate. [17] Flipside's challenge thus appropriately focuses on the language "designed or marketed for use." Under either the "designed for use" or "marketed for use" standard, we conclude that at least some of the items sold by Flipside are covered. Thus, Flipside's facial challenge is unavailing.

[****20] *1. "Designed for use"*

The Court of Appeals objected that "designed . . . for use" is ambiguous with respect to whether items must be inherently suited only for drug use; whether the retailer's intent or manner of display is relevant; and whether the intent of a third party, the manufacturer, is critical, since the manufacturer is the "designer." 639 F.2d, at 380-381. For the reasons that follow, we conclude that this language is not unconstitutionally vague on its face.

The Court of Appeals' speculation about the meaning of "design" is largely unfounded. The guidelines refer to "paper [*501] of colorful design" and to other specific items as conclusively "designed" or not "designed" for illegal use. [18] [****22] A principal meaning [**1195] of

---

[14] See, *e. g., Colautti* v. *Franklin*, 439 U.S. 379, 395 (1979); *Boyce Motor Lines* v. *United States*, 342 U.S. 337, 342 (1952); *Screws* v. *United States*, 325 U.S. 91, 101-103 (1945) (plurality opinion). See Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 87, n. 98 (1960).

[15] See, *e. g., Papachristou, supra; Grayned*, 408 U.S., at 109.

[16] The village stipulated that the purpose of the ordinance is to discourage use of the regulated items. App. 33. Moreover, the prohibitory and stigmatizing effects of the ordinance are clear. As the Court of Appeals remarked, "few retailers are willing to brand themselves as sellers of drug paraphernalia, and few customers will buy items with the condition of signing their names and addresses to a register available to the police." 639 F.2d, at 377. The proposed register is entitled, "Retail Record for Items Designed or Marketed for Use with Illegal Cannabis or Drugs." Record, Complaint, App. B. At argument, counsel for the village admitted that the ordinance is "quasi-criminal." Tr. of Oral Arg. 4-5.

[17] The District Court apparently relied principally on the growing vernacular understanding of "paraphernalia" as drug-related items, and therefore did not separately analyze the meaning of "designed or marketed for use." 485 F.Supp., at 405-407. We agree with the Court of Appeals that a regulation of "paraphernalia" alone would not provide much warning of the nature of the items regulated. 639 F.2d, at 380.

[18] The guidelines explicitly provide that "white paper . . . may be displayed," and that "Roach Clips" are "designed for use with illegal cannabis or drugs *and therefore* covered" (emphasis added). The Court of Appeals criticized the latter definition for failing to explain what a "roach clip" is. This criticism is unfounded because that technical term has sufficiently clear meaning in the drug paraphernalia industry. Without undue burden, Flipside could easily determine the meaning of the term. See American Heritage Dictionary of the English Language 1122 (1980) (defining "roach" as "[the] butt of a marijuana cigarette"); R. Lingeman, Drugs from A to Z: A Dictionary 213-214 (1969) (defining "roach" and "roach holder"). Moreover, the explanation that a retailer may display certain paper "not necessarily designed for use" clarifies that the ordinance at least embraces items that are necessarily designed for use with cannabis or illegal drugs.

"design" is "[to] fashion according to a plan." Webster's New International Dictionary of the English Language 707 (2d ed. 1957). Cf. *Lanzetta* v. *New Jersey*, 306 U.S. 451, 454, n. 3 (1939). It is therefore plain that the standard encompasses at least an item that is principally used with illegal drugs by virtue of its objective features, *i. e.*, features designed by the manufacturer. A business [****21] person of ordinary intelligence would understand that this term refers to the design of the manufacturer, not the intent of the retailer or customer. It is also sufficiently clear that items which are principally used for nondrug purposes, such as ordinary pipes, are not "designed for use" with illegal drugs. Moreover, no issue of fair warning is present in this case, since Flipside concedes that the phrase refers to structural characteristics of an item. [19]

[*502] The [***374] ordinance and guidelines do contain ambiguities. Nevertheless, the "designed for use" standard is sufficiently clear to cover at least some of the items that Flipside sold. The ordinance, through the guidelines, explicitly regulates "roach clips." Flipside's co-operator admitted that the store sold such items, see Tr. 26, 30, and the village Chief of Police testified that he had never seen a "roach clip" used for any purpose other [****23] than to smoke cannabis. App. 52. The Chief also testified that a specially designed pipe that Flipside marketed is typically used to smoke marihuana. *Ibid*. Whether further guidelines, administrative rules, or enforcement policy will clarify the more ambiguous scope of the standard in other respects is of no concern in this facial challenge.

*2. "Marketed for use"*

Whatever ambiguities the "designed . . . for use" standard may engender, the alternative "marketed for use" standard is transparently clear: it describes a retailer's intentional display and marketing of merchandise. The guidelines refer to the display of paraphernalia, and to the proximity of covered items to otherwise uncovered items. A retail store therefore must obtain a license if it deliberately displays its wares in a manner that appeals to or encourages illegal drug use. The standard requires scienter, since a retailer could scarcely "market" items "for" a particular use without intending that use.

Under this test, Flipside had ample warning that its marketing activities required a license. Flipside displayed the magazine High Times and books entitled Marijuana Grower's Guide, Children's Garden of [****24] Grass, and The Pleasures of Cocaine, physically close to pipes and colored rolling papers, in clear violation of the guidelines. As noted above, Flipside's co-operator admitted that his store sold "roach clips," which are principally used for illegal purposes. Finally, in the [*503] same section of the store, Flipside had posted the sign, "You must be 18 or older to purchase any head supplies." [20] Tr. 30.

V

[12A][13]The Court of Appeals also held that the ordinance provides insufficient standards for enforcement. Specifically, the court feared that the ordinance might be used to harass individuals with alternative lifestyles and views. 639 F.2d, at 384.In reviewing a business regulation for facial vagueness, however, the principal inquiry is whether the law affords fair warning [**1196] of what is proscribed. Moreover, this [****25] emphasis is almost inescapable in reviewing a pre-enforcement challenge to a law. Here, no evidence has been, or could be, introduced to indicate whether the ordinance has been enforced in a discriminatory manner or with the aim of inhibiting unpopular speech. The language of the ordinance is sufficiently clear that the speculative danger of arbitrary enforcement does not render the ordinance void for vagueness. Cf. *Papachristou* v. *City of Jacksonville*, 405 U.S. 156, 168-171 [***375] (1972); *Coates* v. *City of Cincinnati*, 402 U.S. 611, 614 (1971).

[12B]We do not suggest that the risk of discriminatory enforcement is insignificant here. Testimony of the Village Attorney who drafted the ordinance, the village President, and the Police Chief revealed confusion over whether the ordinance applies to certain items, as well as extensive reliance on the "judgment" of police

[19] "It is readily apparent that under the Hoffman Estates scheme, the 'designed for use' phrase refers to the physical characteristics of items deemed *per se* fashioned for use with drugs; and that, if any intentional conduct is implicated by the phrase, it is the intent of the 'designer' (i. e. patent holder or manufacturer) whose intent for an item or 'design' is absorbed into the physical attributes, or structural 'design' of the finished product." Brief for Appellee 42-43. Moreover, the village President described drug paraphernalia as items *"[manufactured]* for that purpose and marketed for that purpose." App. 82 (emphasis added).

[20] The American Heritage Dictionary of the English Language 606 (1980) gives the following alternative definition of "head": "Slang. One who is a frequent user of drugs."

officers to give meaning to the ordinance and to enforce it fairly. At this stage, however, we are not prepared to hold that this risk jeopardizes the entire ordinance. [21]

[12C]

[****26] [*504] Nor do we assume that the village will take no further steps to minimize the dangers of arbitrary enforcement. The village may adopt administrative regulations that will sufficiently narrow potentially vague or arbitrary interpretations of the ordinance. In economic regulation especially, such administrative regulation will often suffice to clarify a standard with an otherwise uncertain scope. We also find it significant that the village, in testimony below, primarily relied on the "marketing" aspect of the standard, which does not require the more ambiguous item-by-item analysis of whether paraphernalia are "designed for" illegal drug use, and which therefore presents a lesser risk of discriminatory enforcement. "Although it is possible that specific future applications . . . may engender concrete problems of constitutional dimension, it will be time enough to consider any such problems when they arise." *Joseph E. Seagram & Sons, Inc*. v. *Hostetter*, 384 U.S. 35, 52 (1966). [22]

[****27] VI

[14]Many American communities have recently enacted laws regulating or prohibiting the sale of drug paraphernalia. [*505] To determine whether these laws are wise or effective is not, of course, the province of this Court. See *Ferguson* v. *Skrupa*, 372 U.S. 726, 728-730 (1963).We hold only that such legislation is not facially overbroad or vague if it does not reach constitutionally protected conduct and is reasonably clear in its application to the complainant.

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings [***376] consistent with this opinion.

*It is so ordered*.

JUSTICE STEVENS took no part in the consideration or decision of this case.

[**1197] APPENDIX TO OPINION OF THE COURT

Village of Hoffman Estates Ordinance No. 969-1978

AN ORDINANCE AMENDING THE MUNICIPAL CODE OF THE VILLAGE OF HOFFMAN ESTATES BY PROVIDING FOR REGULATION OF ITEMS DESIGNED OR MARKETED FOR USE WITH ILLEGAL CANNABIS OR DRUGS

WHEREAS, certain items designed or marketed for use with illegal drugs are being retailed within the Village of Hoffman Estates, Cook County, Illinois, and

WHEREAS, it is recognized that [****28] such items are legal retail items and that their sale cannot be banned, and

WHEREAS, there is evidence that these items are designed or marketed for use with illegal cannabis or drugs and it is in the best interests of the health, safety and welfare of the citizens of the Village of Hoffman Estates to regulate within the Village the sale of items designed or marketed for use with illegal cannabis or drugs.

NOW THEREFORE, BE IT ORDAINED by the President and Board of Trustees of the Village of Hoffman Estates, Cook County, Illinois as follows:

[*506] *Section 1*: That the Hoffman Estates Municipal Code be amended by adding thereto an additional Section, Section 8-7-16, which additional section shall read as follows:

Sec. 8-7-16 -- ITEMS DESIGNED OR MARKETED FOR USE WITH ILLEGAL CANNABIS OR DRUGS

A. License Required:

---

[21] The theoretical possibility that the village will enforce its ordinance against a paper clip placed next to Rolling Stone magazine, 639 F.2d, at 382, is of no due process significance unless the possibility ripens into a prosecution.

[22] The Court of Appeals also referred to potential Fourth Amendment problems resulting from the recordkeeping requirement, which "implies that a customer who purchases an item 'designed or marketed for use with illegal cannabis or drugs' intends to *use* the item with illegal cannabis or drugs. A further implication could be that a customer is subject to police scrutiny or even to a search warrant on the basis of the purchase of a legal item." *Id*., at 384. We will not address these Fourth Amendment issues here. In a pre-enforcement challenge it is difficult to determine whether Fourth Amendment rights are seriously threatened. Flipside offered no evidence of a concrete threat below. In a postenforcement proceeding Flipside may attempt to demonstrate that the ordinance is being employed in such an unconstitutional manner, and that it has standing to raise the objection. It is appropriate to defer resolution of these problems until such a showing is made.

It shall be unlawful for any person or persons as principal, clerk, agent or servant to sell any items, effect, paraphernalia, accessory or thing which is designed or marketed for use with illegal cannabis or drugs, as defined by Illinois Revised Statutes, without obtaining a license therefor. Such licenses shall be in addition to any or all other licenses held [****29] by applicant.

B. Application:

Application to sell any item, effect, paraphernalia, accessory or thing which is designed or marketed for use with illegal cannabis or drugs shall, in addition to requirements of Article 8-1, be accompanied by affidavits by applicant and each and every employee authorized to sell such items that such person has never been convicted of a drug-related offense.

C. Minors:

It shall be unlawful to sell or give items as described in Section 8-7-16A in any form to any male or female child under eighteen years of age.

D. Records:

Every licensee must keep a record of every item, effect, paraphernalia, accessory or thing which is designed or marketed for use with illegal cannabis or drugs which is sold and this record shall be open [***377] to the inspection of any police officer at any time during the hours of business. Such record shall contain the name and address of the purchaser, the name and quantity of the product, the date and time of the sale, and the licensee or agent of the licensee's signature, such records shall be retained for not less than two (2) years.

[*507] E. Regulations:

The applicant shall comply with all applicable regulations [****30] of the Department of Health Services and the Police Department.

*Section 2*: That the Hoffman Estates Municipal Code be amended by adding to Sec. 8-2-1 Fees: Merchants (Products) the additional language as follows:

Items designed or marketed for use with illegal cannabis or drugs $ 150.00

*Section 3*: Penalty. Any person violating any provision of this ordinance shall be fined not less than ten dollars ($ 10.00) nor more than five hundred dollars ($ 500.00) for the first offense and succeeding offenses during the same calendar year, and each day that such violation shall continue shall be deemed a separate and distinct offense.

[**1198] *Section 4*: That the Village Clerk be and is hereby authorized to publish this ordinance in pamphlet form.

*Section 5*: That this ordinance shall be in full force and effect May 1, 1978, after its passage, approval and publication according to law.

**Concur by:** WHITE

## Concur

JUSTICE WHITE, concurring in the judgment.

I agree that the judgment of the Court of Appeals must be reversed. I do not, however, believe it necessary to discuss the overbreadth problem in order to reach this result. The Court of Appeals held the ordinance to be void for vagueness; [****31] it did not discuss any problem of overbreadth. That opinion should be reversed simply because it erred in its analysis of the vagueness problem presented by the ordinance.

I agree with the majority that a facial vagueness challenge to an economic regulation must demonstrate that "the enactment is impermissibly vague in all of its applications." *Ante*, at 495. I also agree with the majority's statement that the "marketed for use" standard in the ordinance is "sufficiently clear." There is, in my view, no need to go any further: If it [*508] is "transparently clear" that some particular conduct is restricted by the ordinance, the ordinance survives a facial challenge on vagueness grounds.

Technically, overbreadth is a standing doctrine that permits parties in cases involving First Amendment challenges to government restrictions on noncommercial speech to argue that the regulation is invalid because of its effect on the First Amendment rights of others not presently before the Court. *Broadrick* v. *Oklahoma*, 413 U.S. 601, 612-615 (1973). Whether the appellee may make use of the overbreadth doctrine depends, in the first instance, on whether or not it [****32] has a colorable claim that the ordinance infringes on constitutionally protected, [***378] noncommercial speech of others. Although appellee claims that the ordinance does have such an effect, that argument is tenuous at best and should be left to the lower courts for an initial determination.

Accordingly, I concur in the judgment reversing the

decision below.

## References

16 Am Jur 2d, Constitutional Law 522; 56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions 367

USCS, Constitution, 1st Amendment

US L Ed Digest, Constitutional Law 952, 954; Municipal Corporations 37.7

L Ed Index to Annos, Freedom of Speech, Press, Religion and Assembly; Licenses and License Taxes; Municipal Corporations

ALR Quick Index, Freedom of Speech and Press; Licenses and Permits; Municipal Corporations

Federal Quick Index, Freedom of Speech and Press; Licenses and Permits; Municipal Corporations

Annotation References:

Supreme Court's views as to overbreadth of legislation in connection with [****33] First Amendment rights. 45 L Ed 2d 725.

Supreme Court's application of vagueness doctrine to noncriminal statutes or ordinances . 40 L Ed 2d 823.

---

End of Document

# New York v. Ferber

458 U.S. 747 (1982)

Cited in Opening Brief at: 44

See Response, Part III.G.

Caution
As of: September 14, 2026 7:07 PM Z

# New York v. Ferber

Supreme Court of the United States

April 27, 1982, Argued ; July 2, 1982, Decided

No. 81-55

**Reporter**
458 U.S. 747 *; 102 S. Ct. 3348 **; 73 L. Ed. 2d 1113 ***; 1982 U.S. LEXIS 12 ****; 50 U.S.L.W. 5077; 8 Media L. Rep. 1809

NEW YORK v. FERBER

**Prior History:** [****1] CERTIORARI TO THE COURT OF APPEALS OF NEW YORK.

**Disposition:** 52 N. Y. 2d 674, 422 N. E. 2d 523, reversed and remanded.

## Syllabus

A New York statute prohibits persons from knowingly promoting a sexual performance by a child under the age of 16 by distributing material which depicts such a performance. The statute defines "sexual performance" as any performance that includes sexual conduct by such a child, and "sexual conduct" is in turn defined as actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals. Respondent bookstore proprietor was convicted under the statute for selling films depicting young boys masturbating, and the Appellate Division of the New York Supreme Court affirmed. The New York Court of Appeals reversed, [****2] holding that the statute violated the First Amendment as being both underinclusive and overbroad. The court reasoned that in light of the explicit inclusion of an obscenity standard in a companion statute banning the knowing dissemination of similarly defined material, the statute in question could not be construed to include an obscenity standard, and therefore would prohibit the promotion of materials traditionally entitled to protection under the First Amendment.

*Held*: As applied to respondent and others who distribute similar material, the statute in question does not violate the First Amendment as applied to the States through the Fourteenth Amendment. Pp. 753-774.

(a) The States are entitled to greater leeway in the regulation of pornographic depictions of children for the following reasons: (1) the legislative judgment that the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child, easily passes muster under the First Amendment; (2) the standard of *Miller* v. *California*, 413 U.S. 15, for determining what is legally obscene is not a satisfactory solution to the child pornography [****3] problem; (3) the advertising and selling of child pornography provide an economic motive for and are thus an integral part of the production of such materials, an activity illegal throughout the Nation; (4) the value of permitting live performances and photographic reproductions of children engaged in lewd exhibitions is exceedingly modest, if not *de minimis*; and (5) recognizing and classifying child pornography as a category of material outside the First Amendment's protection is not incompatible with this Court's decisions dealing with what speech is unprotected. When a definable class of material, such as that covered by the New York statute, bears so heavily and pervasively on the welfare of children engaged in its production, the balance of competing interests is clearly struck, and it is permissible to consider these materials as without the First Amendment's protection. Pp. 756-764.

(b) The New York statute describes a category of material the production and distribution of which is not entitled to First Amendment protection. Accordingly, there is nothing unconstitutionally "underinclusive" about the statute, and the State is not barred by the First Amendment from prohibiting [****4] the distribution of such unprotected materials produced outside the State. Pp. 764-766.

(c) Nor is the New York statute unconstitutionally overbroad as forbidding the distribution of material with serious literary, scientific, or educational value. The substantial overbreath rule of *Broadrick* v. *Oklahoma*, 413 U.S. 601, applies. This is the paradigmatic case of a state statute whose legitimate reach dwarfs its arguably impermissible applications. "[Whatever]

overbreadth may exist should be cured through case-by-case analysis of the fact situations to which [the statute's] sanctions, assertedly, may not be applied." *Broadrick* v. *Oklahoma, supra*, at 615-616. Pp. 766-774.

**Counsel:** Robert M. Pitler argued the cause for petitioner. With him on the briefs was Mark Dwyer.

Herald Price Fahringer argued the cause for respondent. With him on the brief was Paul J. Cambria, Jr. [*]

[****5]

**Judges:** WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and O'CONNOR, JJ., joined. O'CONNOR, J., filed a concurring opinion, post, p. 774. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, post, p. 775. BLACKMUN, J., concurred in the result. STEVENS, J., filed an opinion concurring in the judgment, post, p. 777.

**Opinion by:** WHITE

## Opinion

[*749] [***1117] [**3350] JUSTICE WHITE delivered the opinion of the Court.

[1A]At issue in this case is the constitutionality of a New York criminal statute which prohibits persons from knowingly promoting sexual performances by children under the age of 16 by distributing material which depicts such performances.

I

In recent years, the exploitative use of children in the production of pornography has become a serious national problem. [1] [****7] The Federal Government [***1118] and 47 States have sought to combat the problem with statutes specifically directed at the production of child pornography. At least half of such statutes do not require that the materials produced be legally [****6] obscene. Thirty-five States and the United States Congress have also passed legislation prohibiting the distribution of such materials; 20 States prohibit the distribution of material depicting children engaged in sexual conduct [**3351] without requiring that the material be legally obscene. [2]

---

[*] Briefs of amici curiae urging reversal were filed by Edmund J. Burns, Gregory A. Loken, and William A. Cahill, Jr., for Covenant House; and by John J. Walsh for Morality in Media, Inc.

Michael A. Bamberger filed a brief for the American Booksellers Association, Inc., et al., as amici curiae urging affirmance.

Bruce A. Taylor filed a brief for Charles H. Keating, Jr., et al., as amici curiae.

[1] "[Child] pornography and child prostitution have become highly organized, multimillion dollar industries that operate on a nationwide scale." S. Rep. No. 95-438, p. 5 (1977). One researcher has documented the existence of over 260 different magazines which depict children engaging in sexually explicit conduct. *Ibid*. "Such magazines depict children, some as young as three to five years of age . . . . The activities featured range from lewd poses to intercourse, fellatio, cunnilingus, masturbation, rape, incest and sado-masochism." *Id*., at 6. In Los Angeles alone, police reported that 30,000 children have been sexually exploited. Sexual Exploitation of Children, Hearings before the Subcommittee on Select Education of the House Committee on Education and Labor, 95th Cong., 1st Sess., 41-42 (1977).

[2] In addition to New York, 19 States have prohibited the dissemination of material depicting children engaged in sexual conduct regardless of whether the material is obscene. Ariz. Rev. Stat. Ann. § 13-3553 (Supp. 1981-1982); Colo. Rev. Stat. § 18-6-403 (Supp. 1981); Del. Code Ann., Tit. 11, §§ 1108, 1109 (1979); Fla. Stat. § 847.014 (1981); Haw. Rev. Stat. § 707-751 (Supp. 1981); Ky. Rev. Stat. §§ 531.320, 531.340-531.360 (Supp. 1980); La. Rev. Stat. Ann. § 14:81.1(A)(3) (West Supp. 1982); Mass. Gen. Laws Ann., ch. 272, § 29A (West Supp. 1982-1983); Mich. Comp. Laws Ann. § 750.145c(3) (1982-1983); Miss. Code Ann. § 97-5-33(4) (Supp. 1981); Mont. Code Ann. § 45-5-625 (1981); N. J. Stat. Ann. § 2C:24-4(b)(5) (West 1981); Okla. Stat., Tit. 21, § 1021.2 (1981); Pa. Stat. Ann., Tit. 18, § 6312(c) (Purdon 1982-1983); R. I. Gen. Laws § 11-9-1.1 (1981); Tex. Penal Code Ann. § 43.25 (1982); Utah Code Ann. § 76-10-1206.5(3) (Supp. 1981); W. Va. Code § 61-8C-3 (Supp. 1981); Wis. Stat. § 940.203(4) (1979-1980).

Fifteen States prohibit the dissemination of such material only if it is obscene. Ala. Code §§ 13-7-231, 13-7-232 (Supp. 1981); Ark. Stat. Ann. § 41-4204 (Supp. 1981); Cal. Penal Code Ann. § 311.2(b) (West Supp. 1982) (general obscenity statute); Ill. Rev. Stat., ch. 38, para. 11-20a(b)(1) (1979); Ind. Code § 35-30-10.1-2 (1979); Me. Rev. Stat. Ann., Tit. 17, § 2923(1) (Supp. 1981-1982); Minn. Stat. §§ 617.246(3) and (4) (1980); Neb. Rev. Stat. § 28-1463(2) (1979); N. H. Rev. Stat. Ann. § 650:2(II) (Supp. 1981); N. D. Cent. Code § 12.1-27.1-01 (1976) (general obscenity statute); Ohio Rev. Code Ann. §

[****8] [*750] New York is one of the 20. In 1977, the New York Legislature enacted Article 263 of its Penal Law. N. Y. Penal Law, Art. 263 (McKinney 1980). Section 263.05 criminalizes as a class C felony the use of a child in a sexual performance:

"A person is guilty of the use of a child in a sexual performance if knowing the character and content thereof he employs, authorizes or induces a child less than sixteen years of age to engage in a sexual performance or being a parent, legal guardian or custodian of such child, [*751] he consents to the participation by such child in a sexual performance."

A "[sexual] performance" is defined as "any performance or part thereof [***1119] which includes sexual conduct by a child less than sixteen years of age." § 263.00(1). "Sexual conduct" is in turn defined in § 263.00(3):

"'Sexual conduct' means actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition [****9] of the genitals."

A performance is defined as "any play, motion picture, photograph or dance" or "any other visual representation exhibited before an audience." § 263.00(4).

At issue in this case is § 263.15, defining a class D felony: [3]

"A person is guilty of promoting a sexual performance by a child when, knowing the character and content thereof, he produces, directs or promotes any performance which includes sexual conduct by a child less than sixteen years of age."

To "promote" is also defined:

"'Promote' means to procure, manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmute, publish, distribute, circulate, disseminate, present, exhibit or advertise, or to offer or agree to do the same." § 263.00(5).

[**3352] A companion provision bans only the knowing dissemination [****10] of obscene material. § 263.10.

This case arose when Paul Ferber, the proprietor of a Manhattan [*752] bookstore specializing in sexually oriented products, sold two films to an undercover police officer. The films are devoted almost exclusively to depicting young boys masturbating. Ferber was indicted on two counts of violating § 263.10 and two counts of violating § 263.15, the two New York laws controlling dissemination of child pornography. [4] After a jury trial, Ferber was acquitted of the two counts of promoting an obscene sexual performance, but found guilty of the two counts under § 263.15, which did not require proof that the films were obscene. Ferber's convictions were affirmed without opinion by the Appellate Division of the New York [****11] State Supreme Court. 74 App. Div. 2d 558, 424 N. Y. S. 2d 967 (1980).

The New York Court of Appeals reversed, holding that § 263.15 violated the First Amendment. 52 N. Y. 2d 674, 422 N. E. 2d 523 (1981). The court began by noting that in light of § 263.10's explicit inclusion of an obscenity standard, § 263.15 could not be construed to include such a standard. Therefore, "the statute would . . . prohibit the promotion of materials which are traditionally entitled to constitutional protection from government interference under the First Amendment." 52 N. Y. 2d, at 678, 422 N. E. 2d, at 525. Although the court recognized the State's "legitimate interest in protecting the welfare of minors" and noted that this "interest may transcend First Amendment concerns," *id.*, at 679, 422 N. E. 2d, at 525-526, [****12] it

---

2907.321(A) (1982); Ore. Rev. Stat. § 163.485 (1981); S. D. Codified Laws §§ 22-22-24, 22-22-25 (1979); Tenn. Code Ann. § 39-1020 (Supp. 1981); Wash. Rev. Code § 9.68A.030 (1981). The federal statute also prohibits dissemination only if the material is obscene. 18 U. S. C. § 2252(a) (1976 ed., Supp. IV) Two States prohibit dissemination only if the material is obscene as to minors. Conn. Gen. Stat. § 53a-196b (1981); Va. Code § 18.2-374.1 (1982).

Twelve States prohibit only the use of minors in the production of the material. Alaska Stat. Ann. § 11.41.455 (1978); Ga. Code § 26-9943a(b) (1978); Idaho Code § 44-1306 (1977); Iowa Code § 728.12 (1981); Kan. Stat. Ann. § 21-3516 (1981); Md. Ann. Code, Art. 27, § 419A (Supp. 1981); Mo. Rev. Stat. § 568.060(1)(b) (1978); Nev. Rev. Stat. § 200.509 (1981); N. M. Stat. Ann. § 30-6-1 (Supp. 1982); N. C. Gen. Stat. § 14-190.6 (1981); S. C. Code § 16-15-380 (Supp. 1981); Wyo. Stat. § 14-3-102(a)(v)(E) (1978).

[3] Class D felonies carry a maximum punishment of imprisonment for up to seven years as to individuals, and as to corporations a fine of up to $ 10,000. N. Y. Penal Law §§ 70.00, 80.10 (McKinney 1975). Respondent Ferber was sentenced to 45 days in prison.

[4] A state judge rejected Ferber's First Amendment attack on the two sections in denying a motion to dismiss the indictment. 96 Misc. 2d 669, 409 N. Y. S. 2d 632 (1978).

nevertheless found two fatal defects in the New York statute. Section [***1120] 263.15 was underinclusive because it discriminated against visual portrayals of children engaged in sexual activity by not also prohibiting the distribution of films of other dangerous activity. It was also overbroad because it prohibited the distribution of materials produced outside the State, as well as materials, such as medical books and educational sources, which [*753] "deal with adolescent sex in a realistic but nonobscene manner." 52 N. Y. 2d, at 681, 422 N. E. 2d, at 526. Two judges dissented. We granted the State's petition for certiorari, 454 U.S. 1052 (1981), presenting the single question:

"To prevent the abuse of children who are made to engage in sexual conduct for commercial purposes, could the New York State Legislature, consistent with the First Amendment, prohibit the dissemination of material which shows children engaged in sexual conduct, regardless of whether such material is obscene?"

II

The Court of Appeals proceeded on the assumption that the standard of obscenity incorporated in § 263.10, which follows the guidelines enunciated [****13] in *Miller* v. *California*, 413 U.S. 15 (1973), [5] constitutes the appropriate line dividing protected from unprotected expression by which to measure a regulation directed at child pornography. It was on the premise that "nonobscene adolescent sex" could not be singled out for special treatment that the court found § 263.15 "strikingly underinclusive." Moreover, the assumption that the constitutionally permissible regulation of pornography could not be more extensive with respect to the distribution of material depicting children may also have led the court to conclude that a narrowing construction of § 263.15 was unavailable.

The Court of Appeals' assumption was not unreasonable in light of our decisions. This case, however, constitutes our first [**3353] examination of a statute directed at and limited to depictions of [****14] sexual activity involving children. We believe our inquiry should begin with the question of whether a State has somewhat more freedom in proscribing works which portray sexual acts or lewd exhibitions of genitalia by children.

[*754] A

In *Chaplinsky* v. *New Hampshire*, 315 U.S. 568 (1942), the Court laid the foundation for the excision of obscenity from the realm of constitutionally protected expression:

"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene . . . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may [***1121] be derived from them is clearly outweighed by the social interest in order and morality." *Id*., at 571-572 (footnotes omitted).

Embracing this judgment, the Court squarely held in *Roth* v. *United States*, 354 U.S. 476 (1957), that "obscenity is not within the area of constitutionally protected speech or press. [****15] " *Id*., at 485. The Court recognized that "rejection of obscenity as utterly without redeeming social importance" was implicit in the history of the First Amendment: The original States provided for the prosecution of libel, blasphemy, and profanity, and the "universal judgment that obscenity should be restrained [is] reflected in the international agreement of over 50 nations, in the obscenity laws of all of the 48 states, and in the 20 obscenity laws enacted by Congress from 1842 to 1956." *Id*., at 484-485 (footnotes omitted).

*Roth* was followed by 15 years during which this Court struggled with "the intractable obscenity problem." *Interstate Circuit, Inc*. v. *Dallas*, 390 U.S. 676, 704 (1968) (opinion of Harlan, J.). See, *e. g., Redrup* v. *New York*, 386 U.S. 767 (1967). Despite considerable vacillation over the proper definition of obscenity, a majority of the Members of the Court remained firm in the position that "the States have a legitimate interest in prohibiting dissemination or exhibition of obscene material [****16] when the mode of dissemination carries with it a significant danger of offending the sensibilities [*755] of unwilling recipients or of exposure to juveniles." *Miller* v. *California, supra*, at 18-19 (footnote omitted); *Stanley* v. *Georgia*, 394 U.S. 557, 567 (1969); *Ginsberg* v. *New York*, 390 U.S. 629, 637-643 (1968); *Interstate Circuit, Inc*. v. *Dallas, supra*, at 690; *Redrup* v. *New York, supra*, at 769; *Jacobellis* v. *Ohio*, 378 U.S. 184, 195 (1964).

[5] N. Y. Penal Law § 235.00(1) (McKinney 1980); *People* v. *Illardo*, 48 N. Y. 2d 408, 415, and n. 3, 399 N. E. 2d 59, 62-63, and n. 3 (1979).

Throughout this period, we recognized "the inherent dangers of undertaking to regulate any form of expression." *Miller* v. *California, supra*, at 23. Consequently, our difficulty was not only to assure that statutes designed to regulate obscene materials sufficiently defined what was prohibited, but also to devise substantive limits on what fell within the permissible scope of regulation. In *Miller* v. *California, supra*, a majority of the Court agreed that a "state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, [****17] which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Id.*, at 24. Over the past decade, we have adhered to the guidelines expressed in *Miller*, [6] which subsequently [***1122] [**3354] has been followed in the regulatory schemes of most States. [7]

[****18] [*756] B

The *Miller* standard, like its predecessors, was an accommodation between the State's interests in protecting the "sensibilities of unwilling recipients" from exposure to pornographic material and the dangers of censorship inherent in unabashedly content-based laws. Like obscenity statutes, laws directed at the dissemination of child pornography run the risk of suppressing protected expression by allowing the hand of the censor to become unduly heavy. For the following reasons, however, we are persuaded that the States are entitled to greater leeway in the regulation of pornographic depictions of children.

*First*. It is evident beyond the need for elaboration that a State's interest in "safeguarding the physical and psychological [*757] well-being of a minor" is "compelling." *Globe Newspaper Co.* v. *Superior Court*, 457 U.S. 596, 607 (1982). "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens." *Prince* v. *Massachusetts*, 321 U.S. 158, 168 (1944). Accordingly, we have sustained legislation aimed at protecting the physical and emotional [****19] well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights. In *Prince* v. *Massachusetts, supra*, the Court held that a statute prohibiting use of a child to distribute [***1123] literature on the street was valid notwithstanding the statute's effect on a First Amendment activity. In *Ginsberg* v. *New York, supra*, we sustained a New York

---

[6] *Hamling* v. *United States*, 418 U.S. 87 (1974); *Jenkins* v. *Georgia*, 418 U.S. 153 (1974); *Ward* v. *Illinois*, 431 U.S. 767 (1977); *Marks* v. *United States*, 430 U.S. 188 (1977); *Pinkus* v. *United States*, 436 U.S. 293 (1978).

[7] Thirty-seven States and the District of Columbia have either legislatively adopted or judicially incorporated the *Miller* test for obscenity. Ala. Code § 13A-12-150 (Supp. 1981); Ariz. Rev. Stat. Ann. § 13-3501(2) (1978); Ark. Stat. Ann. § 41-3502(6) (Supp. 1981); Colo. Rev. Stat. § 18-7-101(2) (Supp. 1981); Del. Code Ann., Tit. 11, § 1364 (1979); *Lakin* v. *United States*, 363 A. 2d 990 (D. C. 1976); Ga. Code § 26-2101(b) (1978); Haw. Rev. Stat. § 712-1210(6) (Supp. 1981); Idaho Code § 18-4101(A) (1979); Iowa Code § 728.4 (1981) (only child pornography covered); Ind. Code § 35-30-10.1-1(c) (1979); Kan. Stat. Ann. § 21-4301 (2)(a) (1981); Ky. Rev. Stat. § 531.010(3) (1975); La. Rev. Stat. Ann. §§ 14:106(A)(2) and (A)(3) (West Supp. 1982); *Ebert* v. *Maryland State Bd. of Censors*, 19 Md. App. 300, 313 A. 2d 536 (1973); Mass. Gen. Laws Ann., ch. 272, § 31 (West Supp. 1982-1983); *People* v. *Neumayer*, 405 Mich. 341, 275 N. W. 2d 230 (1979); *State* v. *Welke*, 298 Minn. 402, 216 N. W. 2d 641 (1974); Mo. Rev. Stat. § 573.010(1) (1978); Neb. Rev. Stat. § 28-807(9) (1979); Nev. Rev. Stat. § 201.235 (1981); N. H. Rev. Stat. Ann. § 650:1(IV) (Supp. 1981); N. J. Stat. Ann. § 2C:34-2 (West 1981); N. Y. Penal Law § 235.00(1) (McKinney 1980); N. C. Gen. Stat. § 14-190.1(b) (1981); N. D. Cent. Code § 12.1-27.1-01(4) (1976); *State* v. *Burgun*, 56 Ohio St. 2d 354, 384 N. E. 2d 255 (1978); *McCrary* v. *State*, 533 P. 2d 629 (Okla. Crim. App. 1974); Ore. Rev. Stat. § 167.087(2) (1981); Pa. Stat. Ann., Tit. 18, § 5903(b) (Purdon Supp. 1982-1983); R. I. Gen. Laws § 11-31-1 (1981); S. C. Code § 16-15-260(a) (Supp. 1981); S. D. Codified Laws § 22-24-27(10) (1979); Tenn. Code Ann. § 39-3001(1) (Supp. 1981); Tex. Penal Code Ann. § 43.21(a) (1982); Utah Code Ann. § 76-10-1203(1) (1978); Va. Code § 18.2-372 (1982); 1982 Wash. Laws., ch. 184, § 1(2).

Four States continue to follow the test approved in *Memoirs* v. *Massachusetts*, 383 U.S. 413 (1966). Cal. Penal Code Ann. § 311(a) (West Supp. 1982); Conn. Gen. Stat. § 53a-193 (1981); Fla. Stat. § 847.07 (1981); Ill. Rev. Stat., ch. 38, para. 11-20(b) (1979). Five States regulate only the distribution of pornographic material to minors. Me. Rev. Stat. Ann., Tit. 17, § 2911 (Supp. 1981-1982); Mont. Code Ann. § 45-8-201 (1981); N. M. Stat. Ann. § 30-37-2 (Supp. 1982); Vt. Stat. Ann., Tit. 13, § 2802 (1974); W. Va. Code § 61-8A-2 (1977). Three state obscenity laws do not fall into any of the above categories. Miss. Code Ann. § 97-29-33 (1973), declared invalid in *ABC Interstate Theatres, Inc.* v. *State*, 325 So. 2d 123 (Miss. 1976); Wis. Stat. § 944.21(1)(a) (1979-1980), declared invalid in *State* v. *Princess Cinema of Milwaukee, Inc.*, 96 Wis. 2d 646, 292 N. W. 2d 807 (1980); Wyo. Stat. § 6-5-303 (1977). Alaska has no current state obscenity law.

A number of States employ a different obscenity standard with respect to material distributed to children. See, *e. g.*, Fla. Stat. § 847.0125 (1981).

law protecting children from exposure to nonobscene literature. [**3355] Most recently, we held that the Government's interest in the "well-being of its youth" justified special treatment of indecent broadcasting received by adults as well as children. *FCC* v. *Pacifica Foundation*, 438 U.S. 726 (1978).

The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance. The legislative findings accompanying passage of the New York laws reflect this concern:

"[There] has been a proliferation of exploitation of children as subjects in sexual performances. The care of children is a sacred trust and should not be abused by those who seek to profit through a commercial [****20] network based upon the exploitation of children. The public policy of the state demands the protection of children from exploitation through sexual performances." 1977 N. Y. Laws, ch. 910, § 1. [8]

[*758] [2A]We shall not second-guess this legislative judgment. Respondent has not intimated that we do so. Suffice it to say that virtually all of the States and the United States have passed legislation proscribing the production of or otherwise combating "child pornography." The legislative judgment, as well as the judgment found in the relevant [****21] literature, is that the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child. [9] That judgment, we think, easily [***1124] passes muster under the First Amendment.

[****22] [*759] *Second*. The distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children in at least two ways. First, the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. [10] [****24] Second, the distribution

---

[8] In addition, the legislature found "the sale of these movies, magazines and photographs depicting the sexual conduct of children to be so abhorrent to the fabric of our society that it [urged] law enforcement officers to aggressively seek out and prosecute . . . the peddlers . . . of this filth by vigorously applying the sanctions contained in this act." 1977 N. Y. Laws, ch. 910, § 1.

[9] "[The] use of children as . . . subjects of pornographic materials is very harmful to both the children and the society as a whole." S. Rep. No. 95-438, p. 5 (1977). It has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults. Schoettle, Child Exploitation: A Study of Child Pornography, 19 J. Am. Acad. Child Psychiatry 289, 296 (1980) (hereafter cited as Child Exploitation); Schoettle, Treatment of the Child Pornography Patient, 137 Am. J. Psychiatry 1109, 1110 (1980); Densen-Gerner, Child Prostitution and Child Pornography: Medical, Legal, and Societal Aspects of the Commercial Exploitation of Children, reprinted in U.S. Dept. of Health and Human Services, Sexual Abuse of Children: Selected Readings 77, 80 (1980) (hereafter cited as Commercial Exploitation) (sexually exploited children predisposed to self-destructive behavior such as drug and alcohol abuse or prostitution). See generally Burgess & Holmstrom, Accessory-to-Sex: Pressure, Sex, and Secrecy, in A. Burgess, A. Groth, L. Holmstrom, & S. Sgroi, Sexual Assault of Children and Adolescents 85, 94 (1978); V. De Francis, Protecting the Child Victim of Sex Crimes Committed by Adults 169 (1969); Ellerstein & Canavan, Sexual Abuse of Boys, 134 Am. J. Diseases of Children 255, 256-257 (1980); Finch, Adult Seduction of the Child: Effects on the Child, Medical Aspects of Human Sexuality 170, 185 (Mar. 1973); Groth, Sexual Trauma in the Life Histories of Rapists and Child Molesters, 4 Victimology 10 (1979). Sexual molestation by adults is often involved in the production of child sexual performances. Sexual Exploitation of Children, A Report to the Illinois General Assembly by the Illinois Legislative Investigating Commission 30-31 (1980). When such performances are recorded and distributed, the child's privacy interests are also invaded. See n. 10, *infra*.

[10] As one authority has explained:

"[Pornography] poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography." Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L. Rev. 535, 545 (1981).

See also Child Exploitation 292 ("[It] is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions"); Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation, 12 U. Mich. J. Law Reform 295, 301 (1979) (hereafter cited as Use in Pornography) (interview with child psychiatrist) ("The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child").

Thus, distribution of the material violates "the individual interest in avoiding disclosure of personal matters." *Whalen* v.

[**3356] network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled. Indeed, there is no serious contention that the legislature was unjustified in believing that it is difficult, if [*760] not impossible, to halt the exploitation of children by pursuing only those who produce the photographs and movies. While the production of pornographic materials is a low-profile, clandestine industry, the need to market the resulting products requires a visible apparatus of distribution. The most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product. Thirty-five States [****23] and Congress have concluded that restraints on the distribution of pornographic materials are required in order to effectively combat the problem, and there is a body of literature and testimony to support these legislative conclusions. [11] [***1125] Cf. *United States* v. *Darby*, 312 U.S. 100 (1941) (upholding federal restrictions on sale of goods manufactured in violation of Fair Labor Standards Act).

[****25] [3]Respondent does not contend that the State is unjustified in pursuing those who distribute child pornography. Rather, he argues that it is enough for the State to prohibit the distribution of materials that are legally obscene under the *Miller* test. While some States may find that this approach properly accommodates its interests, it does not follow [*761] that the First Amendment prohibits a State from going further. The *Miller* standard, like all general definitions of what may be banned as obscene, does not reflect the State's particular and more compelling interest in prosecuting those who promote the sexual exploitation of children. Thus, the question under the *Miller* test of whether a work, taken as a whole, appeals to the prurient interest of the average person bears no connection to the issue of whether a child has been physically or psychologically harmed in the production of the work. Similarly, a sexually explicit depiction need not be "patently offensive" in order to have required the sexual exploitation of a child for its production. In addition, a [**3357] work which, [****26] taken on the whole, contains serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography. "It is irrelevant to the child [who has been abused] whether or not the material . . . has a literary, artistic, political or social value." Memorandum of Assemblyman Lasher in Support of § 263.15. We therefore cannot conclude that the *Miller* standard is a satisfactory solution to the child pornography problem. [12]

[****27] *Third*. The advertising and selling of child pornography provide an economic motive for and are thus an integral part of the production of such materials, an activity illegal throughout the Nation. [13] [****28] "It

---

*Roe*, 429 U.S. 589, 599 (1977). Respondent cannot undermine the force of the privacy interests involved here by looking to *Cox Broadcasting Corp*. v. *Cohn*, 420 U.S. 469 (1975), and *Smith* v. *Daily Mail Publishing Co*., 443 U.S. 97 (1979), cases protecting the right of newspapers to publish, respectively, the identity of a rape victim and a youth charged as a juvenile offender. Those cases only stand for the proposition that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need . . . of the highest order." *Id*., at 103.

[11] See Sexual Exploitation of Children, Hearings before the Subcommittee on Crime of the House Judiciary Committee, 95th Cong., 1st Sess., 34 (1977) (statement of Charles Rembar) ("It is an impossible prosecutorial job to try to get at the acts themselves"); *id*., at 11 (statement of Frank Osanka, Professor of Social Justice and Sociology) ("[We] have to be very careful . . . that we don't take comfort in the existence of statutes that are on the books in the connection with the use of children in pornography . . . . There are usually no witnesses to these acts of producing pornography"); *id*., at 69 (statement of Investigator Lloyd Martin, Los Angeles Police Department) (producers of child pornography use false names making difficult the tracing of material back from distributor). See also L. Tribe, American Constitutional Law 666, n. 62 (1978); Note, Child Pornography: A New Role for the Obscenity Doctrine, 1978 U. Ill. Law Forum 711, 716, n. 29; Use in Pornography 315 ("passage of criminal laws aimed at producers without similar regulation of distributors will arguably shift the production process further underground").

[12] In addition, legal obscenity under *Miller* is a function of "contemporary community standards." 413 U.S., at 24. "It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City." *Id*., at 32. It would be equally unrealistic to equate a community's toleration for sexually oriented material with the permissible scope of legislation aimed at protecting children from sexual exploitation. Furthermore, a number of States rely on stricter obscenity tests, see n. 7, *supra*, under which successful prosecution for child pornography may be even more difficult.

[13] One state committee studying the problem declared: "The act of selling these materials is guaranteeing that there will be

rarely has been suggested that [*762] the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal [***1126] statute." *Giboney* v. *Empire Storage & Ice Co*., 336 U.S. 490, 498 (1949). [14] We note that were the statutes outlawing the employment of children in these films and photographs fully effective, and the constitutionality of these laws has not been questioned, the First Amendment implications would be no greater than that presented by laws against distribution: enforceable production laws would leave no child pornography to be marketed. [15]

[****29] *Fourth*. The value of permitting live performances and photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not *de minimis*. We consider it unlikely that visual depictions of children performing sexual acts or lewdly exhibiting their genitals would often constitute an important and necessary part of a literary performance [*763] or scientific or educational work. As a state judge in this case observed, if it were necessary for literary or artistic value, a person over the statutory age who perhaps looked younger could be utilized. [16] Simulation outside of the prohibition of the statute could provide another alternative. Nor is there any question here of censoring a particular literary theme or portrayal of sexual activity. The First Amendment interest [**3358] is limited to that of rendering the portrayal somewhat more "realistic" by utilizing or photographing children.

[****30] [2B]*Fifth*. Recognizing and classifying child pornography as a category of material outside the protection of the First Amendment is not incompatible with our earlier decisions. "The question whether speech is, or is not, protected by the First Amendment often depends on the content of the speech." *Young* v. *American Mini Theatres, Inc*., 427 U.S. 50, 66 (1976) (opinion of STEVENS, J., joined by BURGER, C. J., and WHITE and REHNQUIST, JJ.). See also *FCC* v. *Pacifica Foundation*, 438 U.S. 726, 742-748 (1978) (opinion of STEVENS, J., joined by BURGER, C. J., and REHNQUIST, J.). "[It] is the content of [an] utterance that determines whether it is a protected epithet or an unprotected 'fighting comment.'" *Young* v. *American* [***1127] *Mini Theatres, Inc., supra*, at 66. See *Chaplinsky* v. *New Hampshire*, 315 U.S. 568 (1942). Leaving aside the special considerations when public officials are the target, *New York Times Co*. v. *Sullivan*, 376 U.S. 254 (1964), a libelous publication is not protected [****31] by the Constitution. *Beauharnais* v. *Illinois*, 343 U.S. 250 (1952). Thus, it is not rare that a content-based classification of speech has been accepted because it may be appropriately generalized that within the confines of the given classification, the evil to be restricted so overwhelmingly outweighs [*764] the expressive interests, if any, at stake, that no process of case-by-case adjudication is required. When a definable class of material, such as that covered by § 263.15, bears so heavily and pervasively on the welfare of children engaged in its production, we think the balance of competing interests is clearly struck and that it is permissible to consider these materials as without the protection of the First Amendment.

C

[4]There are, of course, limits on the category of child pornography which, like obscenity, is unprotected by the First Amendment. As with all legislation in this sensitive area, the conduct to be prohibited must be adequately

---

additional abuse of children." Texas House Select Committee on Child Pornography: Its Related Causes and Control 132 (1978). See also Commercial Exploitation 80 ("Printed materials cannot be isolated or removed from the process involved in developing them").

[14] In *Giboney*, a unanimous Court held that labor unions could be restrained from picketing a firm in support of a secondary boycott which a State had validly outlawed. In *Pittsburgh Press Co*. v. *Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973), the Court allowed an injunction against a newspaper's furtherance of illegal sex discrimination by placing of job advertisements in gender-designated columns. The Court stated:

"Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Id*., at 389.

[15] In this connection we note that 18 U. S. C. § 2251 (1976 ed., Supp. IV), making it a federal offense for anyone to use children under the age of 16 in the production of pornographic materials, embraces all "sexually explicit conduct" without imposing an obscenity test. In addition, half of the state laws imposing criminal liability on the producer do not require the visual material to be legally obscene. Use in Pornography 307-308.

[16] 96 Misc. 2d, at 676, 409 N. Y. S. 2d, at 637. This is not merely a hypothetical possibility. See Brief for Petitioner 25 and examples cited therein.

defined by the applicable state law, as written or authoritatively construed. Here the nature of the harm to be combated requires [****32] that the state offense be limited to works that *visually* depict sexual conduct by children below a specified age. [17] The category of "sexual conduct" proscribed must also be suitably limited and described.

[2C]The test for child [****33] pornography is separate from the obscenity standard enunciated in *Miller*, but may be compared to it for the purpose of clarity. The *Miller* formulation is adjusted in the following respects: A trier of fact need not find that the material appeals to the prurient interest of the average person; it is not required that sexual conduct portrayed be done so in a patently offensive manner; and the material at issue need not be considered as a whole. We note that the distribution [*765] of descriptions or other depictions of sexual conduct, not otherwise obscene, which do not involve live performance or photographic or other visual reproduction of live performances, retains First Amendment protection. As with obscenity laws, criminal responsibility may not be imposed without some element of scienter on the part of the defendant. *Smith* v. *California*, 361 U.S. 147 [**3359] (1959); *Hamling* v. *United States*, 418 U.S. 87 (1974).

[***1128] D

Section 263.15's prohibition incorporates a definition of sexual conduct that comports with the above-stated principles. The forbidden acts to be depicted are listed with sufficient precision [****34] and represent the kind of conduct that, if it were the theme of a work, could render it legally obscene: "actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals." § 263.00(3). The term "lewd exhibition of the genitals" is not unknown in this area and, indeed, was given in *Miller* as an example of a permissible regulation. 413 U.S., at 25. A performance is defined only to include live or visual depictions: "any play, motion picture, photograph or dance . . . [or] other visual representation exhibited before an audience." § 263.00(4). Section 263.15 expressly includes a scienter requirement.

[1B] [5A]We hold that § 263.15 sufficiently describes a category of material the production and distribution of which is not entitled to First Amendment protection. It is therefore clear that there is nothing unconstitutionally "underinclusive" about a statute that singles out this category of material for proscription. [****35] [18] It also follows that the State is not barred by [*766] the First Amendment from prohibiting the distribution of unprotected materials produced outside the State. [19]

[****36] III

It remains to address the claim that the New York statute is unconstitutionally overbroad because it would forbid the distribution of material with serious literary, scientific, or educational value or material which does not threaten the harms sought to be combated by the State. Respondent prevailed on that ground below, and it is to that issue that we now turn.

---

[17] Sixteen States define a child as a person under age 18. Four States define a child as under 17 years old. The federal law and 16 States, including New York, define a child as under 16. Illinois and Nebraska define a child as a person under age 16 or who appears as a prepubescent. Ill. Rev. Stat., ch. 38, para. 11-20a(a)(1)(A) (1979); Neb. Rev. Stat. § 28-1463 (1979). Indiana defines a child as one who is or appears to be under 16. Ind. Code. §§ 35-30-10.1-2, 35-30-10.1-3 (1979). Kentucky provides for two age classifications (16 and 18) and varies punishment according to the victim's age. Ky. Rev. Stat. §§ 531.300-531.370 (Supp. 1980). See Use in Pornography 307, n. 71 (collecting statutes).

[18] [5B]

*Erznoznik* v. *City of Jacksonville*, 422 U.S. 205 (1975), relied upon by the Court of Appeals, struck down a law against drive-in theaters showing nude scenes if movies could be seen from a public place. Since nudity, without more is protected expression, *id.*, at 213, we proceeded to consider the underinclusiveness of the ordinance. The Jacksonville ordinance impermissibly singled out movies with nudity for special treatment while failing to regulate other protected speech which created the same alleged risk to traffic. Today, we hold that child pornography as defined in § 263.15 is unprotected speech subject to content-based regulation. Hence, it cannot be underinclusive or unconstitutional for a State to do precisely that.

[19] It is often impossible to determine where such material is produced. The Senate Report accompanying federal child pornography legislation stressed that "it is quite common for photographs or films made in the United States to be sent to foreign countries to be reproduced and then returned to this country in order to give the impression of foreign origin." S. Rep. No. 95-438, p. 6 (1977). In addition, States have not limited their distribution laws to material produced within their own borders because the maintenance of the market itself "leaves open the financial conduit by which the production of such material is funded and materially increases the risk that [local] children will be injured." 52 N. Y. 2d 674, 688, 422 N. E. 2d 523, 531 (1981) (Jasen, J., dissenting).

The New York Court of Appeals recognized that overbreadth scrutiny has been limited with respect to conduct-related regulation, *Broadrick* v. *Oklahoma*, 413 U.S. 601 (1973), but it did not apply the test enunciated in *Broadrick* because the challenged [***1129] statute, in its view, was directed at "pure speech." The court went on to find that § 263.15 was fatally overbroad: "[The] statute would prohibit the showing of any play or movie in which a child portrays a defined sexual act, real or simulated, in a nonobscene manner. It would also prohibit the sale, showing, or distributing of medical or educational materials containing photographs of such acts. [*767] Indeed, by its terms, the statute would prohibit those who oppose such portrayals from providing illustrations [**3360] [****37] of what they oppose." 52 N. Y. 2d, at 678, 422 N. E. 2d, at 525.

[6] [7]While the construction that a state court gives a state statute is not a matter subject to our review, *Wainwright* v. *Stone*, 414 U.S. 21, 22-23 (1973); *Gooding* v. *Wilson*, 405 U.S. 518, 520 (1972), this Court is the final arbiter of whether the Federal Constitution necessitated the invalidation of a state law. It is only through this process of review that we may correct erroneous applications of the Constitution that err on the side of an overly broad reading of our doctrines and precedents, as well as state-court decisions giving the Constitution too little shrift. A state court is not free to avoid a proper facial attack on federal constitutional grounds. *Bigelow* v. *Virginia*, 421 U.S. 809, 817 (1975). By the same token, it should not be compelled to entertain an overbreadth attack when not [****38] required to do so by the Constitution.

A

[8] [9A] [10A]The traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court. *Broadrick* v. *Oklahoma, supra*, at 610; *United States* v. *Raines*, 362 U.S. 17, 21 (1960); *Carmichael* v. *Southern Coal & Coke Co.*, 301 U.S. 495, 513 (1937); *Yazoo & M. V. R. Co.* v. *Jackson Vinegar Co.*, 226 U.S. 217, 219-220 (1912). In *Broadrick*, we recognized that this rule reflects two cardinal principles of our constitutional order: the personal nature of constitutional rights, *McGowan* v. *Maryland*, 366 U.S. 420, 429 (1961), and prudential limitations on constitutional adjudication. [20] [****40] In *United States* v. *Raines, supra*, at 21, we [*768] [****39] noted the "incontrovertible proposition" that it "'would indeed be undesirable for this Court to consider [***1130] every conceivable situation which might possibly arise in the application of complex and comprehensive legislation,'" (quoting *Barrows* v. *Jackson*, 346 U.S. 249, 256 (1953)). By focusing on the factual situation before us, and similar cases necessary for development of a constitutional rule, [21] we face "flesh-and-blood" [22] legal problems with data "relevant and adequate to an informed judgment." [23] This practice also fulfills a valuable institutional purpose: it allows state courts the opportunity to construe a law to avoid constitutional infirmities.

What has come to be known as the First Amendment overbreadth doctrine is one of [**3361] the few exceptions to this principle and must be justified by "weighty countervailing policies." *United States* v. *Raines, supra*, at 22-23. The doctrine is predicated on the sensitive nature of protected expression: "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions by a statute susceptible of application to protected [****41] expression." *Village of Schaumburg* v. [*769] *Citizens for a Better Environment*, 444 U.S. 620, 634 (1980); *Gooding* v. *Wilson, supra*, at 521. It is for this reason that we have allowed persons to attack

---

[20] In addition to prudential restraints, the traditional rule is grounded in Art. III limits on the jurisdiction of federal courts to actual cases and controversies.

[9B] [10B]"This Court, as is the case with all federal courts, 'has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' *Liverpool, New York & Philadelphia S.S. Co.* v. *Commissioners of Emigration*, 113 U.S. 33, 39." *United States* v. *Raines*, 362 U.S. 17, 21 (1960).

[21] Overbreadth challenges are only one type of facial attack. A person whose activity may be constitutionally regulated nevertheless may argue that the statute under which he is convicted or regulated is invalid on its face. See, *e. g., Terminiello* v. *City of Chicago*, 337 U.S. 1, 5 (1949). See generally Monaghan, Overbreadth, 1981 S. Ct. Rev. 1, 10-14.

[22] A. Bickel, The Least Dangerous Branch 115-116 (1962).

[23] Frankfurter & Hart, The Business of the Supreme Court at October Term, 1934, 49 Harv. L. Rev. 68, 95-96 (1935).

overly broad statutes even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity. *Dombrowski* v. *Pfister*, 380 U.S. 479, 486 (1965); *Thornhill* v. *Alabama*, 310 U.S. 88, 97-98 (1940); *United States* v. *Raines, supra*, at 21-22; *Gooding* v. *Wilson, supra*, at 521.

[11][12A][13A][14A]The scope of the First Amendment overbreadth doctrine, like most exceptions to established principles, must be carefully tied to the circumstances in which facial invalidation of a statute [****42] is truly warranted. Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is "strong medicine" and have employed it with hesitation, and then "only as a last resort." *Broadrick*, 413 U.S., at 613. We have, in consequence, insisted that the overbreadth involved be "substantial" before the statute involved will be invalidated on its face. [24]

[****43] [*770] [***1131] In *Broadrick*, we explained the basis for this requirement:

"[The] plain import of our cases is, at the very least, that facial overbreadth adjudication is an exception to our traditional rules of practice and that its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct -- even if expressive -- falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect -- at best a prediction -- cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. Cf. *Alderman* v. *United States*, 394 U.S. 165, 174-175 (1969)." *Id*., at 615.

[15A]We [****44] accordingly held that "particularly where conduct and not merely speech is [**3362] involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Ibid*. [25]

[****45] [*771] *Broadrick* examined a regulation involving restrictions on political campaign activity, an area not considered "pure speech," and thus it was unnecessary to consider the proper overbreadth test when a law arguably reaches traditional forms of expression such as books and films. As we intimated in *Broadrick*, the requirement of substantial overbreadth extended "at the very least" to cases involving conduct plus speech. This case, which poses the question squarely, convinces us that the rationale of *Broadrick* is sound and should be applied in the present [***1132] context involving the harmful employment of children to make sexually explicit materials for distribution.

The premise that a law should not be invalidated for overbreadth unless it reaches a substantial number of

---

[24] [12B] [13B]

When a federal court is dealing with a federal statute challenged as overbroad, it should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction. *Crowell* v. *Benson*, 285 U.S. 22, 62 (1932). Accord, *e. g., Haynes* v. *United States*, 390 U.S. 85, 92 (1968) (dictum); *Schneider* v. *Smith*, 390 U.S. 17, 27 (1968); *United States* v. *Rumely*, 345 U.S. 41, 45 (1953); *Ashwander* v. *TVA*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring). Furthermore, if the federal statute is not subject to a narrowing construction and is impermissibly overbroad, it nevertheless should not be stricken down on its face; if it is severable, only the unconstitutional portion is to be invalidated. *United States* v. *Thirty-seven Photographs*, 402 U.S. 363 (1971).

[14B]A state court is also free to deal with a state statute in the same way. If the invalid reach of the law is cured, there is no longer reason for proscribing the statute's application to unprotected conduct. Here, of course, we are dealing with a state statute on direct review of a state-court decision that has construed the statute. Such a construction is binding on us.

[25] [15B]

*Parker* v. *Levy*, 417 U.S. 733, 760 (1974) ("This Court has . . . repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied. Thus, even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the 'remainder of the statute . . . covers a whole range of easily identifiable and constitutionally proscribable . . . conduct . . . .' *CSC* v. *Letter Carriers*, 413 U.S. 548, 580-581 (1973)"). See Bogen, First Amendment Ancillary Doctrines, 37 Md. L. Rev. 679, 712-714 (1978); Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844, 860-861 (1970).

impermissible applications is hardly novel. On most occasions involving facial invalidation, the Court has stressed the embracing sweep of the statute over protected expression. [26] [****48] [*772] Indeed, JUSTICE BRENNAN observed in his dissenting opinion in *Broadrick*:

"We have never held that a statute should be held invalid on its face merely because it is possible to conceive [****46] of a single impermissible application, and in that sense a requirement of substantial overbreadth is already implicit in the doctrine." *Id.*, at 630.

The requirement of substantial overbreadth is directly derived from the purpose and nature of the doctrine. While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation. [27] [**3363] This observation appears equally applicable to the publication of books and films as it is to activities, such as picketing or participation in election campaigns, which have previously been categorized as involving conduct plus speech. We see no appreciable difference between the position of a publisher or bookseller in doubt as to the reach of New York's child pornography law and the situation faced by the Oklahoma state employees with respect to that State's restriction on partisan political activity. Indeed, it could reasonably be argued that the bookseller, with an economic incentive to sell materials [***1133] that may fall within [****47] the statute's scope, may be less likely to be deterred than the employee who wishes to engage in political campaign activity. Cf. *Bates* v. *State Bar of Arizona*, 433 U.S. 350, 380-381 (1977) (overbreadth analysis inapplicable to commercial speech).

[16]This requirement of substantial overbreadth may justifiably be applied to statutory challenges which arise in defense [*773] of a criminal prosecution as well as civil enforcement or actions seeking a declaratory judgment. Cf. *Parker* v. *Levy*, 417 U.S. 733, 760 (1974). Indeed, the Court's practice when confronted with ordinary criminal laws that are sought to be applied against protected conduct is not to invalidate the law *in toto*, but rather to reverse the particular [****49] conviction. *Cantwell* v. *Connecticut*, 310 U.S. 296 (1940); *Edwards* v. *South Carolina*, 372 U.S. 229 (1973). We recognize, however, that the penalty to be imposed is relevant in determining whether demonstrable overbreadth is substantial. We simply hold that the fact that a criminal prohibition is involved does not obviate the need for the inquiry or *a priori* warrant a finding of substantial overbreadth.

B

[1C]Applying these principles, we hold that § 263.15 is not substantially overbroad. We consider this the paradigmatic case of a state statute whose legitimate reach dwarfs its arguably impermissible applications. New York, as we have held, may constitutionally prohibit dissemination of material specified in § 263.15. While the reach of the statute is directed at the hard core of child pornography, the Court of Appeals was understandably concerned that some protected expression, ranging from medical textbooks to pictorials in the National Geographic would fall prey to the statute. How often, if ever, it may be necessary to employ

---

[26] In *Gooding* v. *Wilson*, 405 U.S. 518, 519, 527 (1972), the Court's invalidation of a Georgia statute making it a misdemeanor to use "'opprobrious words or abusive language, tending to cause a breach of the peace'" followed from state judicial decisions indicating that "merely to speak words offensive to some who hear them" could constitute a "breach of the peace." Cases invalidating laws requiring members of a "subversive organization" to take a loyalty oath, *Baggett* v. *Bullitt*, 377 U.S. 360 (1964), or register with the government, *Dombrowski* v. *Pfister*, 380 U.S. 479 (1965), can be explained on the basis that the laws involved, unlike § 263.15, defined no central core of constitutionally regulable conduct; the entire scope of the laws was subject to the uncertainties and vagaries of prosecutorial discretion. See also *Bigelow* v. *Virginia*, 421 U.S. 809, 817 (1975) ("the facts of this case well illustrate 'the statute's potential for sweeping and improper applications'") (citation omitted); *NAACP* v. *Button*, 371 U.S. 415, 433 (1963) ("We read the decree of the Virginia Supreme Court of Appeals . . . as proscribing any arrangement by which prospective litigants are advised to seek the assistance of particular attorneys"); *Thornhill* v. *Alabama*, 310 U.S. 88, 97 (1940) (the statute "does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press").

[27] "A substantial overbreadth rule is implicit in the chilling effect rationale. . . . [The] presumption must be that only substantially overbroad laws set up the kind and degree of chill that is judicially cognizable." Moreover, "[without] a substantial overbreadth limitation, review for overbreadth would be draconian indeed. It is difficult to think of a law that is utterly devoid of potential for unconstitutionality in some conceivable application." Note, 83 Harv. L. Rev., *supra* n. 25, at 859, and n. 61.

children to engage [****50] in conduct clearly within the reach of § 263.15 in order to produce educational, medical, or artistic works cannot be known with certainty. Yet we seriously doubt, and it has not been suggested, that these arguably impermissible applications of the statute amount to more than a tiny fraction of the materials within the statute's reach. Nor will we assume that the New York courts will widen the possibly invalid reach of the statute by giving an expansive construction to the proscription on "lewd [exhibitions] of the genitals." Under these circumstances, § 263.15 is "not substantially overbroad and . . . whatever overbreadth may exist [*774] should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Broadrick* v. *Oklahoma*, 413 U.S., at 615-616.

IV

[17] [18A]Because § 263.15 is not substantially overbroad, it is unnecessary to consider its application to material that does not depict sexual conduct of a type that New York may restrict [****51] consistent with the First Amendment. As applied to Paul Ferber and to others who distribute similar material, the statute does not violate the First Amendment as applied to the States [***1134] through the Fourteenth. [28] The judgment [**3364] of the New York Court of Appeals is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*So ordered*.

JUSTICE BLACKMUN concurs in the result.

**Concur by:** O'CONNOR; BRENNAN; STEVENS

## Concur

[****52] JUSTICE O'CONNOR, concurring.

Although I join the Court's opinion, I write separately to stress that the Court does not hold that New York must except "material with serious literary, scientific, or educational value," *ante*, at 766, from its statute. The Court merely holds that, even if the First Amendment shelters such material, New York's current statute is not sufficiently overbroad to support respondent's facial attack. The compelling interests identified in today's opinion, see *ante*, at 756-764, suggest that the Constitution might in fact permit New York to ban knowing distribution of works depicting minors engaged in explicit sexual conduct, regardless of the social value of the depictions. For example, a 12-year-old child photographed while [*775] masturbating surely suffers the same psychological harm whether the community labels the photograph "edifying" or "tasteless." The audience's appreciation of the depiction is simply irrelevant to New York's asserted interest in protecting children from psychological, emotional, and mental harm.

An exception for depictions of serious social value, moreover, would actually increase opportunities for the content-based [****53] censorship disfavored by the First Amendment. As drafted, New York's statute does not attempt to suppress the communication of particular ideas. The statute permits discussion of child sexuality, forbidding only attempts to render the "[portrayals] somewhat more 'realistic' by utilizing or photographing children." *Ante*, at 763. Thus, the statute attempts to protect minors from abuse without attempting to restrict the expression of ideas by those who might use children as live models.

On the other hand, it is quite possible that New York's statute is overbroad because it bans depictions that do not actually threaten the harms identified by the Court. For example, clinical pictures of adolescent sexuality, such as those that might appear in medical textbooks, might not involve the type of sexual exploitation and abuse targeted by New York's statute. Nor might such depictions feed the poisonous "kiddie porn" market that New York and other States have attempted to regulate. Similarly, pictures of children engaged in rites widely approved by their cultures, such as those that might appear in issues of the National Geographic, might not trigger the [***1135] compelling interests [****54] identified by the Court. It is not necessary to address these possibilities further today, however, because this potential overbreadth is not sufficiently substantial to warrant facial invalidation of New York's statute.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in the judgment.

---

[28] [18B]

There is no argument that the films sold by respondent do not fall squarely within the category of activity we have defined as unprotected. Therefore, no independent examination of the material is necessary to assure ourselves that the judgment here "does not constitute a forbidden intrusion on the field of free expression." *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 285 (1964).

I agree with much of what is said in the Court's opinion. As I made clear in the opinion I delivered for the Court in [*776] *Ginsburg* v. *New York*, 390 U.S. 629 (1968), the State has a special interest in protecting the well-being of its youth. *Id.*, at 638-641. See also *Globe Newspaper Co.* v. *Superior Court*, 457 U.S. 596, 607 (1982). This special and compelling interest, and the particular vulnerability of children, afford the State the leeway to regulate pornographic material, the promotion of which is harmful to children, even though the State does not have such leeway when it seeks only to protect consenting adults from exposure to such material. *Ginsburg* v. *New York, supra*, at 637, 638, n. 6, 642-643, n. 10. [**3365] See also *Jacobellis* v. *Ohio*, 378 U.S. 184, 195 (1964) [****55] (opinion of BRENNAN, J.). I also agree with the Court that the "tiny fraction," *ante*, at 773, of material of serious artistic, scientific, or educational value that could conceivably fall within the reach of the statute is insufficient to justify striking the statute on the grounds of overbreadth. See *Broadrick* v. *Oklahoma*, 413 U.S. 601, 630 (1973) (BRENNAN, J., dissenting).

But in my view application of § 263.15 or any similar statute to depictions of children that in themselves do have serious literary, artistic, scientific, or medical value, would violate the First Amendment. As the Court recognizes, the limited classes of speech, the suppression of which does not raise serious First Amendment concerns, have two attributes. They are of exceedingly "slight social value," and the State has a compelling interest in their regulation. See *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 571-572 (1942). The First Amendment value of depictions of children that are in themselves serious contributions to art, literature, or science, is, by definition, simply not *"de minimis*." See *ante*, at 761. At the same time, the State's interest [****56] in suppression of such materials is likely to be far less compelling. For the Court's assumption of harm to the child resulting from the "permanent record" and "circulation" of the child's "participation," *ante*, at 759, lacks much of its force where the depiction is a serious contribution to art or science. The production of materials of serious value is not the "low-profile, [*777] clandestine industry" that according to the Court produces purely pornographic materials. See *ante*, at 760. In short, it is inconceivable how a depiction of a child that is itself a serious contribution to the world of art or literature or science can be deemed "material outside the protection of the First Amendment." See *ante*, at 763.

I, of course, adhere to my view that, in the absence of exposure, or [***1136] particular harm, to juveniles or unconsenting adults, the State lacks power to suppress sexually oriented materials. See, *e. g., Paris Adult Theatre I* v. *Slaton*, 413 U.S. 49, 73 (1973) (BRENNAN, J., dissenting). With this understanding, I concur in the Court's judgment in this case.

JUSTICE STEVENS, concurring in the judgment.

Two propositions [****57] seem perfectly clear to me. First, the specific conduct that gave rise to this criminal prosecution is not protected by the Federal Constitution; second, the state statute that respondent violated prohibits some conduct that is protected by the First Amendment. The critical question, then, is whether this respondent, to whom the statute may be applied without violating the Constitution, may challenge the statute on the ground that it conceivably may be applied unconstitutionally to others in situations not before the Court. I agree with the Court's answer to this question but not with its method of analyzing the issue.

Before addressing that issue, I shall explain why respondent's conviction does not violate the Constitution. The two films that respondent sold contained nothing more than lewd exhibition; there is no claim that the films included any material that had literary, artistic, scientific, or educational value. [1] Respondent was a willing participant in a commercial market that the State of New York has a legitimate interest in suppressing. The character of the State's interest in protecting children from sexual abuse justifies the imposition [*778] of criminal sanctions [****58] against those who profit, directly or indirectly, from the promotion of such films. In this respect my evaluation of this case is different from the opinion [**3366] I have expressed concerning the imposition of criminal sanctions for the promotion of obscenity in other contexts. [2]

---

[1] Respondent's counsel conceded at oral argument that a finding that the films are obscene would have been consistent with the *Miller* definition. Tr. of Oral Arg. 41.

[2] See *Burch* v. *Louisiana*, 441 U.S. 130, 139 (STEVENS, J., concurring); *Pinkus* v. *United States*, 436 U.S. 293, 305 (STEVENS, J., concurring); *Ballew* v. *Georgia*, 435 U.S. 223, 245 (STEVENS, J., concurring); *Smith* v. *United States*, 431 U.S. 291, 311-321 (STEVENS, J., dissenting); *Marks* v. *United States*, 430 U.S. 188, 198 (STEVENS, J., concurring in part and dissenting in part); see also *Schad* v. *Borough of Mount Ephraim*, 452 U.S. 61, 84 (STEVENS, J., concurring in judgment); *FCC* v. *Pacifica Foundation*, 438 U.S. 726, 750 (opinion of STEVENS, J.).

[****59] A holding that respondent may be punished for selling these two films does not require us to conclude that other users of these very films, or that other motion pictures containing similar scenes, are beyond the pale of constitutional protection. Thus, the exhibition of these films before a legislative committee studying a proposed amendment to a state law, or before a group of research scientists studying human behavior, could not, in my opinion, be made a crime. Moreover, it is at least conceivable that a serious work of art, a documentary on behavioral problems, or a medical or psychiatric teaching device, might include a scene from one of these films and, when viewed as a whole in a proper setting, be entitled to constitutional [***1137] protection. The question whether a specific act of communication is protected by the First Amendment always requires some consideration of both its content and its context.

The Court's holding that this respondent may not challenge New York's statute as overbroad follows its discussion of the contours of the category of nonobscene child pornography that New York may legitimately prohibit. Having defined that category in an abstract setting, [****60] [3] the Court makes the [*779] empirical judgment that the arguably impermissible application of the New York statute amounts to only a "tiny fraction of the materials within the statute's reach." *Ante*, at 773. Even assuming that the Court's empirical analysis is sound, [4] I believe a more conservative approach to the issue would adequately vindicate the State's interest in protecting its children and cause less harm to the federal interest in free expression.

[****61] A hypothetical example will illustrate my concern. Assume that the operator of a New York motion picture theater specializing in the exhibition of foreign feature films is offered a full-length movie containing one scene that is plainly lewd if viewed in isolation but that nevertheless is part of a serious work of art. If the child actor resided abroad, New York's interest in protecting its young from sexual exploitation would be far less compelling than in the case before us. The federal interest in free expression would, however, be just as strong as if an adult actor had been used. [**3367] There are at least three different ways to deal with the statute's potential application to that sort of case.

First, at one extreme and as the Court appears to hold, the First Amendment inquiry might be limited to determining [*780] whether the offensive scene, viewed in isolation, is lewd. When the constitutional protection is narrowed in this drastic fashion, the Court is probably safe in concluding that only a tiny fraction of the materials covered by the New York statute is protected. And with respect to my hypothetical exhibitor of foreign films, he need have no uncertainty [****62] about the permissible application of the statute; for the one lewd scene would deprive the entire film of any constitutional protection.

[***1138] Second, at the other extreme and as the New York Court of Appeals correctly perceived, the application of this Court's cases requiring that an obscenity determination be based on the artistic value of a production taken as a whole would afford the exhibitor constitutional protection and result in a holding that the statute is invalid because of its overbreadth. Under that approach, the rationale for invalidating the entire statute is premised on the concern that the exhibitor's understanding about its potential reach could cause him to engage in self-censorship. This Court's approach today substitutes broad, unambiguous, state-imposed censorship for the self-censorship that an overbroad statute might produce.

Third, as an intermediate position, I would refuse to apply overbreadth analysis for reasons unrelated to any prediction concerning the relative number of protected communications that the statute may prohibit. Specifically, I would postpone decision of my

---

[3] "The test for child pornography is separate from the obscenity standard enunciated in *Miller*, but may be compared to it for the purpose of clarity. The *Miller* formulation is adjusted in the following respects: A trier of fact need not find that the material appeals to the prurient interest of the average person; it is not required that sexual conduct portrayed be done so in a patently offensive manner; and the material at issue need not be considered as a whole." *Ante*, at 764.

[4] The Court's analysis is directed entirely at the permissibility of the statute's coverage of nonobscene material. Its empirical evidence, however, is drawn substantially from congressional Committee Reports that ultimately reached the conclusion that a prohibition against *obscene* child pornography -- coupled with sufficiently stiff sanctions -- is an adequate response to this social problem. The Senate Committee on the Judiciary concluded that "virtually all of the materials that are normally considered child pornography are obscene under the current standards," and that "[in] comparison with this blatant pornography, non-obscene materials that depict children are very few and very inconsequential." S. Rep. No. 95-438, p. 13 (1977); see also H. R. Rep. No. 95-696, pp. 7-8 (1977). The coverage of the federal statute is limited to obscene material. See 18 U. S. C. § 2252(a) (1976 ed., Supp. IV).

hypothetical case until it actually arises. Advocates of a liberal use [****63] of overbreadth analysis could object to such postponement on the ground that it creates the risk that the exhibitor's uncertainty may produce self-censorship. But that risk obviously interferes less with the interest in free expression than does an abstract, advance ruling that the film is simply unprotected whenever it contains a lewd scene, no matter how brief.

My reasons for avoiding overbreadth analysis in this case are more qualitative than quantitative. When we follow our [*781] traditional practice of adjudicating difficult and novel constitutional questions only in concrete factual situations, the adjudications tend to be crafted with greater wisdom. Hypothetical rulings are inherently treacherous and prone to lead us into unforeseen errors; they are qualitatively less reliable than the products of case-by-case adjudication.

Moreover, it is probably safe to assume that the category of speech that is covered by the New York statute generally is of a lower quality than most other types of communication. On a number of occasions, I have expressed the view that the First Amendment affords some forms of speech more protection from governmental regulation than other forms [****64] of speech. [5] [****65] Today the Court accepts this view, putting the category of speech described in the New York statute in its rightful place near the bottom of this hierarchy. *Ante*, at 761-763. Although I disagree with the Court's position that such speech is totally without First Amendment protection, I agree that generally [***1139] marginal speech does [**3368] not warrant the extraordinary protection afforded by the overbreadth doctrine. [6]

Because I have no difficulty with the statute's application in this case, I concur in the Court's judgment.

## References

50 Am Jur 2d, Lewdness, Indecency, and Obscenity 16

USCS, Constitution, First Amendment

US L Ed Digest, Constitutional Law 945, 946

L Ed Index to Annos, Indecency

ALR Quick Index, Indecency, Lewdness, and Obscenity

Federal Quick Index, Children and Minors

Annotation References:

Supreme Court's views as to validity of laws restricting or prohibiting sale or distribution to minors of particular types of goods or services otherwise available to adults. [****66] 52 L Ed 2d 892

Supreme Court's development, since Roth v United States, of standards and principles determining concept of obscenity in context of right of free speech and press. 41 L Ed 2d 1257.

End of Document

[5] See, *e. g., Schad* v. *Borough of Mount Ephraim*, 452 U.S., at 80, 83 (STEVENS, J., concurring in judgment); *Consolidated Edison Co.* v. *Public Service Comm'n*, 447 U.S. 530, 544-548 (STEVENS, J., concurring in judgment); *FCC* v. *Pacifica Foundation*, 438 U.S., at 744-748 (opinion of STEVENS, J.); *Carey* v. *Population Services International*, 431 U.S. 678, 716-717 (STEVENS, J., concurring in part and concurring in judgment); *Smith* v. *United States*, 431 U.S., at 317-319 (STEVENS, J., dissenting); *Young* v. *American Mini Theatres, Inc.*, 427 U.S. 50, 66-71 (opinion of STEVENS, J.).

[6] See *FCC* v. *Pacifica Foundation, supra*, at 742-743 (opinion of STEVENS, J.); *Young* v. *American Mini Theatres, Inc., supra*, at 59-61; see also *Metromedia, Inc*. v. *City of San Diego*, 453 U.S. 490, 544-548 (STEVENS, J., dissenting in part); *Schad* v. *Borough of Mount Ephraim, supra*, at 85 (STEVENS, J., concurring in judgment).

# United States v. Gagliardi

506 F.3d 140 (2d Cir. 2007)

Cited in Opening Brief at: 45

Counsel acknowledges that the brief mischaracterized this decision as creating a circuit split. See Response, Part III.A. Highlighted language appears at 506 F.3d at 145 and 147.

Caution
As of: September 14, 2026 7:08 PM Z

# United States v. Gagliardi

United States Court of Appeals for the Second Circuit

September 4, 2007, Argued; October 22, 2007, Decided

Docket No. 06-4541-cr

**Reporter**
506 F.3d 140 *; 2007 U.S. App. LEXIS 24644 **

UNITED STATES OF AMERICA, Appellee, -- v. -- FRANK GAGLIARDI, Defendant-Appellant.

**Prior History:** [**1] Appeal by Defendant Frank Gagliardi from a judgment of conviction of one count of attempt to entice a minor to engage in illegal sexual activity pursuant to 18 U.S.C. § 2422(b), entered in the United States District Court for the Southern District of New York (Sidney H. Stein, Judge). Because we find that § 2422(b) does not require the involvement of an actual minor and that the statute is neither vague nor overbroad, the judgment is AFFIRMED.

United States v. Gagliardi, 2006 U.S. Dist. LEXIS 64576 (S.D.N.Y., Sept. 7, 2006)

United States v. Gagliardi, 2006 U.S. Dist. LEXIS 34123 (S.D.N.Y., May 26, 2006)

**Counsel:** MICHAEL S. POLLOK, New York, N.Y., for Defendant-Appellant.

MARGARET GARNETT, Assistant United States Attorney, of counsel, (Benjamin Gruenstein, Assistant United States Attorney, of counsel, on the brief), for Michael J. Garcia, United States Attorney for the Southern District of New York, New York, N.Y., for Appellee.

**Judges:** Before: WALKER, CALABRESI, and SACK, Circuit Judges.

**Opinion by:** JOHN M. WALKER, JR.

## Opinion

[*143]

JOHN M. WALKER, JR., *Circuit Judge*:

Defendant-Appellant Frank Gagliardi appeals from his conviction on one count of attempting to entice a minor to engage in prohibited sexual activity in violation of 18 U.S.C. § 2422(b). He argues that § 2422(b) requires an actual minor victim and is unconstitutionally vague and overbroad. In the instant case, the targets of [**2] Gagliardi's attempted enticement were not actual minors but adults posing as minors. We now join several other circuits in holding that 18 U.S.C. § 2422(b) does not require that the enticement victim be an actual "individual who has not attained the age of 18 years" and is neither unconstitutionally vague nor overbroad. Because Gagliardi's other arguments challenging his conviction are without merit, we affirm the judgment of conviction.

### BACKGROUND

On July 7, 2005, Gagliardi, then sixty-two years old, entered an Internet chat room called "I Love Older Men" and initiated an instant-message conversation with "Lorie," an adult government informant posing as a thirteen-year-old girl under the screen name "Teen2HoT4u." The informant was a private citizen who had previously assisted the Federal Bureau of Investigation ("FBI") in identifying child predators on the Internet. During this initial conversation, Gagliardi tried to verify that Lorie was in fact thirteen years old and broached the topic of sex.

Gagliardi contacted Lorie again on August 29, 2005 and had the first of many online conversations in which he expressed his desire to have sex with her and used sexually explicit language to [**3] describe the acts he wished to perform with her. Gagliardi even offered to pay Lorie $ 200 to have sex with him, before telling her, "I want to meet you . . . make love to me anytime . . . no strings attached." In the following weeks, Gagliardi repeatedly tried to convince Lorie to meet him in person, asking her to "tell me where is good for you, I come to pick you up," or offering to meet her in a public place.

On September 1, 2005, Lorie indicated that she was "scared" to meet Gagliardi alone and suggested that he

contact her thirteen-year-old friend Julie. "Julie" was in fact FBI Special Agent Austin Berglas, who was working in collaboration with the informant. Gagliardi suggested that the two girls come together to meet him, telling Lorie, "I will dream about you 2 all night." On September 16, 2005, Gagliardi e-mailed Lorie a picture of himself, and the informant sent him a photograph that was taken of her when she was approximately thirteen.

Taking up Lorie's suggestion, Gagliardi e-mailed Julie, introducing himself as a friend of Lorie, asking for her picture, and requesting that she accompany Lorie if they ever set up a meeting. On September 29, 2005, Gagliardi initiated an instant-message [**4] chat with Julie during which he asked if she was willing to meet him and described the sexual activities that they could engage in.

Gagliardi subsequently arranged to meet Lorie and Julie in lower Manhattan on the morning of October 5, 2005. FBI agents placed the pre-arranged meeting place under surveillance and arrested Gagliardi as he waited in his car. After being advised of and agreeing to waive his *Miranda* rights, Gagliardi admitted to the agents that he was at the location to meet two thirteen-year-old girls with whom he [*144] had previously had sexually explicit online conversations; he denied, however, that he intended to have sex with them. During a post-arrest inventory search of Gagliardi's car, the agents found two condoms and a Viagra pill. Gagliardi was charged with attempt to entice, induce, or persuade a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b).

At trial, the government relied on the testimony of the informant and Agent Berglas, together with Gagliardi's electronic communications with "Lorie" and "Julie." Gagliardi moved to dismiss the indictment on the grounds that: (1) the involvement of an actual minor was a prerequisite to a conviction [**5] under 18 U.S.C. § 2422(b); (2) the statute was unconstitutionally vague; and (3) the evidence was insufficient to show that Gagliardi had committed an attempt.

The district court (Sidney H. Stein, *Judge*) denied the motion. *See United States v. Gagliardi*, No. 05 CR 1265(SHS), 2006 U.S. Dist. LEXIS 34123, 2006 WL 1459850 (S.D.N.Y. May 26, 2006). The district court concluded that § 2422(b) did not require an actual minor victim because the statute provided for criminal liability for *attempted* enticement of a minor, and one could demonstrate that Gagliardi had the intent and took a substantial step toward committing the crime, as required for attempt liability, even though it was factually impossible for him to commit the substantive offense. *See* 2006 U.S. Dist. LEXIS 34123, [WL] at *2. It also concluded that the evidence at trial was, in fact, sufficient to demonstrate the elements of intent and substantial step. *See* 2006 U.S. Dist. LEXIS 34123, [WL] at *6. The district court further determined that the statute was not unconstitutionally vague because it was sufficiently definite to provide notice to an ordinary person of what conduct was prohibited. *See* 2006 U.S. Dist. LEXIS 34123, [WL] at *3.

On May 16, 2006, Gagliardi was convicted by a jury and sentenced to the mandatory minimum imprisonment term of [**6] sixty months. The defendant moved to set aside the verdict on the basis of government entrapment and insufficiency of evidence. The district court denied the motion, reasoning that "[e]ven if Gagliardi had adduced enough credible evidence of inducement that no rational trier of fact could have concluded that the government did not induce the crime, a rational juror could nevertheless have rejected Gagliardi's entrapment defense by finding that he was predisposed to commit the crime." *United States v. Gagliardi*, No. 05 CR 1265(SHS), 2006 U.S. Dist. LEXIS 64576, 2006 WL 2597895, at *2 (S.D.N.Y. Sept. 7, 2006). With respect to the sufficiency of the evidence, the court found that based on Gagliardi's numerous sexually explicit communications with Lorie and Julie, his exchange of photographs, and his arrival at the pre-arranged meeting place with condoms and Viagra, a rational juror could have concluded that Gagliardi had the requisite intent and took a substantial step toward commission of the crime. *See* 2006 U.S. Dist. LEXIS 64576, [WL] at *2-3. This appeal followed.

**DISCUSSION**

Gagliardi raises six issues on appeal. He contends that the plain meaning of 18 U.S.C. § 2422(b) requires that the victim of enticement or attempted enticement be an actual [**7] minor and that, because the informant and Agent Berglas were adults posing as minors, his conviction cannot stand; that § 2422(b) is unconstitutionally vague and overbroad; that § 2422(b)'s mandatory minimum sentence violates the separation of powers doctrine or that its imposition in his case resulted from prosecutorial sentencing manipulation; that reversal is required because his conduct could only be construed as *conspiring* to attempt to violate the law, an offense that is "legally impossible" to commit when the [*145] co-conspirators are all government decoys,

Appellant's Br. at 45; that the evidence at trial was insufficient to support a conviction for attempted enticement or to defeat his entrapment defense; and that the district court erred in admitting into evidence e-mails and transcripts of his instant message chats without sufficient authentication.

**I. Involvement of an "Actual Minor"**

Section 2422(b) of Title 18 imposes criminal liability on anyone who "knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts [**8] to do so." 18 U.S.C. § 2422(b). Gagliardi argues that the statute's plain meaning and legislative history unambiguously indicate Congress's intent to criminalize such conduct only when directed toward an actual minor.

To support his argument, Gagliardi points to Congress's rejection of a 1998 amendment to § 2422(b) that would have expanded the statute to reach a defendant who subjectively believed that the target of his enticement was a minor. *Compare* H.R. Rep. No. 105-557, at 2 (1998), *reprinted in* 1998 U.S.C.C.A.N. 678, 678 (proposing an amendment that would extend to one who "knowingly contacts an individual, who has been represented to the person making the contact as not having attained the age of 18 years"), *with* Protection of Children from Sexual Predators Act of 1998, Pub. L. No. 105-314, § 102, 112 Stat. 2974, 2975-76 (amending § 2422(b) without this change). He contends that in refusing to expand the statute in this manner, Congress "made clear that 18 U.S.C. § 2422(b) only criminalizes an attempt involving a minor." Appellant's Br. at 33-34.

Gagliardi also infers from a proposed 2005 amendment that would "allow law enforcement officers to represent themselves as minors on [**9] the Internet to better protect America's children from sexual predators," 151 Cong. Rec. S9833 (daily ed. Sept. 8, 2005), that "Congress does not believe that 18 U.S.C. § 2422(b) applies to undercover law enforcement officials or cooperating witnesses representing themselves as being under the age of 18." Appellant's Br. at 35. He argues that such a proposal would be unnecessary if the statute already applied to government decoys. We disagree.

As an initial matter, we note that Gagliardi's argument has been squarely rejected by the six other circuits to have considered the issue, and for sound reasons. *See, e.g.*, *United States v. Hicks*, 457 F.3d 838, 841 (8th Cir. 2006) ("[A] defendant may be convicted of attempting to violate § 2422(b) even if the attempt is made towards someone the defendant believes is a minor but who is actually not a minor."); *United States v. Tykarsky*, 446 F.3d 458, 466 (3d Cir. 2006) ("Congress did not intend to allow the use of an adult decoy, rather than an actual minor, to be asserted as a defense to § 2422(b)."); *see also United States v. Sims*, 428 F.3d 945, 960 (10th Cir. 2005); *United States v. Meek*, 366 F.3d 705, 717-20 (9th Cir. 2004); *United States v. Root*, 296 F.3d 1222, 1227-29 (11th Cir. 2002); [**10] *United States v. Farner*, 251 F.3d 510, 513 (5th Cir. 2001).

In interpreting a statute, we look first to its text to determine "'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *In re Med Diversified, Inc.*, 461 F.3d 251, 255 (2d Cir. 2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)). Section 2422(b) explicitly proscribes *attempts* to entice a minor, which [*146] suggests that actual success is not required for a conviction and that a defendant may thus be found guilty if he fails to entice an actual minor because the target whom he believes to be underage is in fact an adult. *See Tykarsky*, 446 F.3d at 467 ("The attempt provision is . . . most naturally read to focus on the subjective intent of the defendant, not the actual age of the victim."); *Meek*, 366 F.3d at 718.

In arguing that he could not have completed the intended crime of enticement because extraneous circumstances unknown to him rendered completion impossible, Gagliardi essentially asserts a defense of factual impossibility. We have held, however, that "factual impossibility is not a defense to a charge of attempt in substantive criminal law." *United States v. Weisser*, 417 F.3d 336, 352 (2d Cir. 2005).

Gagliardi's [**11] two arguments from the statute's legislative history are similarly unpersuasive. *Cf. United States v. Craft*, 535 U.S. 274, 287, 122 S. Ct. 1414, 152 L. Ed. 2d 437 (2002) ("[F]ailed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute . . . .'" (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650, 110 S. Ct. 2668, 110 L. Ed. 2d 579 (1990))). His proposed interpretation of that history provides just one possible reading of Congress's intent. As to Gagliardi's first argument, the fact that Congress rejected a supplemental provision to § 2422(b) that would have specifically covered individuals who represented themselves as being minors is not conclusive evidence

that Congress meant to affirmatively *exclude* those individuals. It is equally possible that Congress did not adopt the amendment because it believed that the text of § 2422(b), expressly proscribing the attempt, was sufficient to include victims believed to be minors. *See Pension Benefit Guar. Corp.*, 496 U.S. at 650 ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered [**12] change." (internal quotation marks omitted)).

As to Gagliardi's second argument, the fact that two legislators proposed a bill in 2005 to explicitly expand § 2422(b) is hardly dispositive of the intent of Congress as a whole concerning the statute's scope. Congress could have been aware that several circuits had already interpreted § 2422(b) to include adults posing as minors and found no need to amend the statute. *See Lorillard v. Pons*, 434 U.S. 575, 580, 98 S. Ct. 866, 55 L. Ed. 2d 40 (1978) ("Congress is presumed to be aware of . . . [a] judicial interpretation of a statute . . . ."); *United States v. Gagliardi*, No. 05 CR 1265(SHS), 2006 U.S. Dist. LEXIS 34123, 2006 WL 1459850, at *4 (S.D.N.Y. May 26, 2006) (noting that Congress has failed to move forward on the proposed legislation). Thus, Gagliardi's arguments on this score are unconvincing.

At the time of § 2422(b)'s 1998 amendment, the House Judiciary Committee pointed out that

> law enforcement plays an important role in discovering child sex offenders on the Internet before they are able to victimize an actual child. Those who believe they are victimizing children, even if they come into contact with a law enforcement officer who poses as a child, should be punished just as if a real child [**13] were involved. It is for this reason that several provisions in this Act prohibit certain conduct involving minors and assumed minors.

H.R. Rep. No. 105-557, at 19. The interpretation advanced by Gagliardi would effectively remove the "sting" from the government's sting operations, preventing [*147] undercover officers from obtaining a conviction, or it would require them to use an actual child as a decoy, which they would obviously be reluctant to do. *Cf. Tykarsky*, 446 F.3d at 468 ("It is common knowledge that law enforcement officials rely heavily on decoys and sting operations in enforcing solicitation and child predation crimes such as § 2422(b). We consider it unlikely that Congress intended to prohibit this method of enforcement."). Because such a result would significantly impede legitimate enforcement of the statute, and because the statute's language is clear, we reject Gagliardi's interpretation and join the Third, Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits in holding that the involvement of an actual minor is not a prerequisite to an attempt conviction under § 2422(b).

**II. Vagueness and Overbreadth**

Gagliardi next argues that § 2422(b) is vague and overbroad on its face and [**14] as applied. He contends that the statute is unconstitutionally vague because it does not define the terms "attempt," "persuade," "induce," "entice," or "coerce," and ordinary people could differ in their interpretation of the meaning of these words. He contends that the statute is overbroad because it suppresses protected speech by infringing on the right of an adult "to freely engage in fantasy speech with other adults." Appellant's Br. at 38. We reject both challenges and now join the five other circuits that have already done so. *See, e.g.*, *Tykarsky*, 446 F.3d at 472-73; *United States v. Thomas*, 410 F.3d 1235, 1243-44 (10th Cir. 2005); *Meek*, 366 F.3d at 722; *United States v. Panfil*, 338 F.3d 1299, 1301 (11th Cir. 2003); *United States v. Bailey*, 228 F.3d 637, 639 (6th Cir. 2000).

A penal statute is not void for vagueness if it defines the offense (1) "with sufficient definiteness that ordinary people can understand what conduct is prohibited" and (2) "in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983); *see also Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926). Section 2422(b) satisfies both of these requirements.

The [**15] words "attempt," "persuade," "induce," "entice," or "coerce," though not defined in the statute, are words of common usage that have plain and ordinary meanings. *See Tykarsky*, 446 F.3d at 473; *Panfil*, 338 F.3d at 1301. Although, as Gagliardi argues, there may be some uncertainty as to the precise demarcation between "persuading," which is criminalized, and "asking," which is not, this uncertainty is not cause for constitutional concern because the statute's terms are sufficiently definite that ordinary people using common sense could grasp the nature of the prohibited conduct. *See Tykarsky*, 446 F.3d at 473; *cf. United States v. Cullen*, 499 F.3d 157, 163, 499 F.3d

157, 2007 U.S. App. LEXIS 20071 (2d Cir. 2007) ("Although we recognize in many English words there lurk uncertainties, to meet the fair warning prong an ounce of common sense is worth more than an 800-page dictionary." (citation omitted)).

The statute also establishes the requisite minimal guidelines to prevent arbitrary or discriminatory enforcement, *see Kolender*, 461 U.S. at 358, in that it applies only to those who "knowingly" engage in the prohibited conduct. This scienter requirement narrows the scope of § 2422(b) as well as the ability of prosecutors and law [**16] enforcement officers to act based on their own preferences. *See Panfil*, 338 F.3d at 1301.

We likewise reject Gagliardi's overbreadth argument. "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial [*148] amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002). Gagliardi contends that § 2422(b) impermissibly suppresses fantasy speech with adults who happen to be posing as minors. Yet the statute punishes the *act* of enticing or attempting to entice a minor when it is knowingly done; it does not implicate speech. Moreover, when fantasy speech is directed toward an adult believed to be a minor, it is, in effect, the vehicle through which a pedophile attempts to ensnare a victim, *cf. Meek*, 366 F.3d at 721, and we have held, unremarkably, that "'[s]peech is not protected by the First Amendment when it is the very vehicle of the crime itself,'" *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990) (citation omitted); *see also Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498, 69 S. Ct. 684, 93 L. Ed. 834 (1949) ("It rarely has been suggested that the constitutional freedom for speech and press extends [**17] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute."). By Gagliardi's own admission in his brief, "there is no First Amendment right to persuade minors to engage in illegal sex acts," Appellant's Br. at 38; *see also Tykarsky*, 446 F.3d at 473; there is likewise no First Amendment right to persuade one whom the accused believes to be a minor to engage in criminal sexual conduct.

Because no protected speech would be chilled by § 2422(b), and because the statute's terms are sufficiently unambiguous, we conclude that § 2422(b) is not unconstitutionally vague or overbroad.

### III. Gagliardi's Remaining Challenges

#### A. Separation of Powers and Sentencing Manipulation

Gagliardi contends that § 2422(b) is unconstitutional as applied to him because its application violated the separation of powers doctrine, and that his conviction should therefore be reversed. Specifically, Gagliardi argues that because the offense carries a mandatory minimum sentence, the prosecutor's charging discretion has sentencing implications and thus constitutes executive interference with a judicial function. In addition, he claims that the imposition of the mandatory [**18] minimum sentence was the result of sentencing manipulation, in that the government deliberately selected the age of thirteen for its decoys to maximize the probability of conviction, and asks us to remand for resentencing. Both of these arguments are without merit. First, the executive branch's discretion to charge an offense that carries a mandatory minimum does not result in executive aggrandizement at the expense of the judiciary. *See United States v. Jimenez*, 451 F.3d 97, 102 (2d Cir. 2006) (per curiam) ("[M]andatory minimums have taken on increased significance after *Booker* -- in that they remain binding on the district courts and work to restrain their newly acquired discretion . . . .").

Second, this Court has not yet recognized the doctrine of sentencing manipulation, which occurs "'when the government engages in improper conduct that has the effect of increasing the defendant's sentence.'" *United States v. Gomez*, 103 F.3d 249, 256 (2d Cir. 1997) (quoting *United States v. Okey*, 47 F.3d 238, 240 (7th Cir. 1995)). It has, however, suggested that if a departure based on sentencing manipulation were valid, "it would likely require a showing of 'outrageous' government conduct," *United States v. Bala*, 236 F.3d 87, 93 (2d Cir. 2000). [**19] Even if we were to assume that sentencing manipulation is a valid departure ground, Gagliardi has not made the requisite showing in this case. There is nothing outrageous about [*149] the government's decision to have its decoys present themselves as age thirteen, rather than fourteen or sixteen.

#### B. Conspiracy

Gagliardi next asks us to reverse his conviction because

his conduct could only be properly construed as a conspiracy to attempt to violate § 2422(b), and finding such a conspiracy is legally impossible in this case because the requisite criminal agreement is absent when both co-conspirators are government decoys. *See United States v. Andrades*, 169 F.3d 131, 135 (2d Cir. 1999). He contends that it was improper for the government, knowing that it could not obtain a conviction for conspiracy, to charge him with attempt instead. This argument is frivolous on its face. There is no requirement that the government charge a defendant with a crime that he did not commit instead of or in addition to one that he did commit. *See United States v. Bonnet-Grullon*, 212 F.3d 692, 701 (2d Cir. 2000), *superseded by statute on other grounds*, Prosecutorial Remedies and Other Tools To End the Exploitation [**20] of Children Today (PROTECT) Act of 2003, Pub. L. No. 108-21, 117 Stat. 650,, *as recognized in United States v. Leiva-Deras*, 359 F.3d 183 (2d Cir. 2004) ("It is well established that the decision as to what federal charges to bring against any given suspect is within the province of the Executive Branch of the government.").

Gagliardi further contends that the district court erred in failing to "instruct[] the jury on conspiracy as a lesser included (and legally impossible) offense." Appellant's Br. at 51. Putting aside the fact that there is no evidence in the record that Gagliardi even requested such an instruction at trial, this argument fails because conspiracy to attempt a crime is not a lesser included offense of attempt. We have stated that, "for an uncharged offense to be 'included,' all of its elements must also be elements of the offense charged." *United States v. Giampino*, 680 F.2d 898, 901 (2d Cir. 1982). Gagliardi admits in his own brief that "'[a]n attempt requires but one person for the offense; a conspiracy requires at least two. A conspiracy also requires an agreement; an attempt does not.'" Appellant's Br. at 52 (quoting *United States v. Madonna*, 582 F.2d 704, 705 (2d Cir. 1978) [**21] (per curiam)). Thus, the district court did not err in failing to give the jury a lesser included offense charge.

**C. Sufficiency Challenges**

**1. Entrapment**

The first of Gagliardi's two attacks on the sufficiency of the evidence pertains to the entrapment defense, under which a defendant must first prove government inducement by a preponderance of the evidence. The burden then shifts to the government to show that the defendant was predisposed to commit the crime beyond a reasonable doubt. *See United States v. Brand*, 467 F.3d 179, 189 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 2150, 167 L. Ed. 2d 878 (2007). Gagliardi argues that the evidence was insufficient to prove predisposition because he had no history of engaging in the illegal conduct.

"A defendant challenging the sufficiency of trial evidence 'bears a heavy burden,' and the reviewing court must 'view the evidence presented in the light most favorable to the government'" and draw all reasonable inferences in the government's favor. *United States v. Giovanelli*, 464 F.3d 346, 349 (2d Cir. 2006) (per curiam) (citation omitted), *cert. denied*, 128 S. Ct. 206, 169 L. Ed. 2d 145, 2007 U.S. LEXIS 10632, 76 U.S.L.W. 3162 (2007). The jury's verdict will be affirmed unless "'no rational trier of fact [**22] could have found all of the elements of the crime [*150] beyond a reasonable doubt.'" *Id.* (quoting *United States v. Schwarz*, 283 F.3d 76, 105 (2d Cir. 2002)).

Viewing the evidence in the light most favorable to the government, Gagliardi's sufficiency challenge fails. A rational trier of fact could have found beyond a reasonable doubt that Gagliardi was predisposed to commit the offense. Predisposition can be shown by evidence of a pre-existing design to commit the crime or a ready response to the inducement. *See United States v. Salerno*, 66 F.3d 544, 547 (2d Cir. 1995). Here, the defendant chose to enter a chat room conspicuously labeled "I Love Older Men," contacted Lorie without solicitation after discovering from her online profile that she was thirteen, offered to pay Lorie to have sex with him after just one conversation, vividly described the sexual acts he wished to perform with her, and attempted on numerous occasions to set up a meeting with her. Thus, even if Gagliardi could establish government inducement, and even if he had never before exhibited pedophilic tendencies, there was sufficient evidence for a reasonable juror to conclude that he stood ready and willing to violate § 2422(b). [**23] *See Brand*, 467 F.3d at 189-95 (discussing similar factual circumstances and finding the evidence sufficient to establish predisposition).

**2. Criminal Attempt**

Gagliardi's second attack on the sufficiency of trial evidence pertains to the elements required for an attempt conviction. To establish attempt, the

government must prove that a defendant had the intent to commit the underlying crime and that he took a substantial step toward its completion. *See, e.g.*, *id.* at 202. Gagliardi contends that the government failed to prove both of these elements beyond a reasonable doubt. This argument is meritless.

In *United States v. Brand*, in answering a similar sufficiency challenge, we discussed several facts supporting a finding that the defendant attempted to entice a minor to engage in sexual activity. *See id.* We noted that intent was shown by the fact that the defendant initiated contact with the two victims in a chat room suggestively entitled "I Love Older Men," that he repeatedly made sexual advances toward both girls and asked for their pictures, that he continuously steered the conversation in the direction of sexual contact and described the sexual acts that he would engage in with them, [**24] and that he repeatedly attempted to set up a meeting with one of them. *See id.* at 202-04. Finally, we found that the defendant took a substantial step toward the completion of the crime because he actually went to the designated meeting place with condoms in the glove compartment of his car. *See id.* at 204.

The same facts are present here. Gagliardi initiated contact with Lorie in the same chat room as in *Brand*, repeatedly made sexual advances toward Lorie and Julie, asked them for their pictures, steered the conversation toward sexual activities, described the acts that he would engage in with them, tried to set up a meeting with both of them, and appeared for a meeting with condoms and a Viagra pill in his car. This evidence was easily sufficient for a reasonable juror to have found beyond a reasonable doubt that Gagliardi had the requisite intent to violate § 2422(b). A reasonable juror could also have found that Gagliardi took a substantial step beyond mere preparation when he arrived at the meeting place with two condoms and a Viagra pill in his car. *See also United States v. Munro*, 394 F.3d 865, 870 (10th Cir. 2005). In light of this conclusion, there is no need for us to reach [**25] the government's argument that because the conviction [*151] was for attempt to entice rather than attempt to engage in a prohibited sexual act, the substantial step occurred well before Gagliardi appeared at the designated meeting place, when he repeatedly solicited Lorie and Julie over the Internet.

**D. Authentication of Documents**

Gagliardi's final claim is that the e-mails and transcripts of instant-message chats offered by the government were not properly authenticated. He argues that because the documents were largely cut from his electronic communications and then pasted into word processing files, they were not originals and could have been subject to editing by the government. Gagliardi contends that the communications could even have been completely fabricated. Due to these "highly suspicious" circumstances, Appellant's Br. at 72, Gagliardi submits that the government failed to establish authenticity and the trial court therefore erred in admitting the evidence. We disagree.

We review a district court's evidentiary rulings for abuse of discretion. *Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 266 (2d Cir. 1999). The bar for authentication of evidence is not particularly high. *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001). [**26] "The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Generally, a document is properly authenticated if a reasonable juror could find in favor of authenticity. *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004). The proponent need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (internal quotation marks and citation omitted).

We have stated that the standard for authentication is one of "reasonable likelihood," *id.* (internal quotation marks and citation omitted), and is "minimal," *Tin Yat Chin*, 371 F.3d at 38. The testimony of a witness with knowledge that a matter is what it is claimed to be is sufficient to satisfy this standard. *See* Fed. R. Evid. 901(b)(1). In this case, both the informant and Agent Berglas testified that the exhibits were in fact accurate records of Gagliardi's conversations with Lorie and Julie. Based on their testimony, a reasonable juror could have found that the exhibits did represent [**27] those conversations, notwithstanding that the e-mails and online chats were editable. The district court did not abuse its discretion in admitting the documents into evidence.

**CONCLUSION**

For the foregoing reasons, the judgment of conviction is AFFIRMED.

End of Document

# United States v. Tykarsky

446 F.3d 458 (3d Cir. 2006)

Cited in Opening Brief at: 45

Counsel acknowledges that the brief mischaracterized this decision as creating a circuit split. See Response, Part III.A.

Caution
As of: September 14, 2026 7:08 PM Z

# United States v. Tykarsky

United States Court of Appeals for the Third Circuit

April 3, 2006, Argued ; May 10, 2006, Filed

No. 04-4092

**Reporter**

446 F.3d 458 *; 2006 U.S. App. LEXIS 11622 **

UNITED STATES OF AMERICA v. TODD TYKARSKY a/k/a Toddyty63 a/k/a Golpher12345 TODD TYKARSKY, Appellant

**Prior History:** [**1] On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. No. 03-cr-00400). District Judge: Honorable Harvey Bartle, III.

United States v. Tykarsky, 2004 U.S. Dist. LEXIS 15392 (E.D. Pa., July 20, 2004)

United States v. Tykarsky, 2004 U.S. Dist. LEXIS 2567 (E.D. Pa., Jan. 26, 2004)

**Counsel:** Theodore Simon, Esq. (ARGUED), Philadelphia, Pennsylvania, Counsel for Appellant.

Anne W. Chain, Esq. (ARGUED), Patrick Meehan, Esq., Robert Zauzmer, Esq., Office of United States Attorney, Philadelphia, Pennsylvania, Counsel for Appellee.

**Judges:** Before: RENDELL, SMITH and ALDISERT, Circuit Judges.

**Opinion by:** ALDISERT

## Opinion

[*461] ALDISERT, Circuit Judge.

In this appeal from a conviction and sentence in the United States District Court for the Eastern District of Pennsylvania, we join several sister courts of appeals in holding that the involvement of an actual minor, as distinguished from a government decoy, is not a prerequisite to conviction under 18 U.S.C. § 2422(b) (actual or attempted persuasion of a minor to engage in illicit sexual activity) or 18 U.S.C. § 2423(b) (traveling for the purpose of engaging in illicit sexual activity). We also reject the myriad other attacks Defendant Todd Tykarsky makes on his conviction, which include, without limitation, Commerce Clause and [**2] First, Fifth and Eighth Amendment challenges to the statutes under which he was convicted, a Sixth Amendment Grand Jury Clause challenge to the indictment, violations of his Sixth Amendment Confrontation Clause rights, challenges to the sufficiency of the evidence, *Brady* violations and numerous instructional errors.

Having searched through this proverbial "haystack" of claims, we do, however, agree with Tykarsky's ex post facto challenge to his sentence. Absent a special jury finding that Tykarsky violated § 2422(b) after April 30, 2003, the date on which the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act (PROTECT Act), Pub. L. No. 108-21, 117 Stat. 650 (2003), became effective, the District Court erred in imposing the mandatory minimum sentence prescribed by the Act. Accordingly, we will affirm the conviction and remand for resentencing.

### I. Facts and Procedural History

### A.

Tykarsky is a resident of Trenton, New Jersey. On April 22, 2003, he entered an America Online ("AOL") chat room entitled "Iloveoldermen2," using the screen name "toddty63." In the same chat room was Special Agent Nester, an undercover FBI agent posing as [**3] a 14-year-old girl using the screen name "HeatherJet14." Tykarsky initiated a dialogue over AOL's Instant Messenger with "HeatherJet14," and during the course of these communications he expressed a desire to engage in sexual activity with her.

On at least eight different dates from April 24, 2003 to May 20, 2003, Tykarsky communicated with "HeatherJet14" via either Instant Messenger or email. In these communications, he used the screen names "toddty63" and "golpher12345" and described, in explicit

detail, the sexual acts that he hoped to perform with her.

[*462] On May 8, 2003 and May 9, 2003, Tykarsky sent instant messages to "HeatherJet14" requesting that she provide him with a picture of herself. Special Agent Nester sent him a photograph of herself that was taken when she was approximately 14 or 15 years old. On May 15, 2003, Tykarsky wrote that he was "a little scared" because "HeatherJet14" was so young. He also commented that he could get into trouble and go to jail if they were discovered. The two parties discussed the possibility of meeting on May 20, 2003 at the Holiday Inn on Packer Avenue in Philadelphia. Tykarsky noted that he would wear jeans and a white shirt and drive a [**4] blue Ford Explorer.

On or about May 19, 2003, Tykarsky again communicated by Instant Messenger with "HeatherJet14." They made tentative arrangements, subject to confirmation, to meet on May 21, 2003 at the Holiday Inn. Tykarsky again stated that he would wear jeans to the rendezvous. On May 20, 2003, via Instant Messenger, Tykarsky again described, in explicit detail, the sexual acts in which he planned to engage with the putative minor. The two parties agreed to meet at 9:00 a.m. on May 21, 2003.

On the morning of May 21, 2003, Tykarsky, wearing a white shirt and jeans, drove his car, a blue 2002 Ford Explorer with a New Jersey license plate, to the designated Holiday Inn on Packer Avenue in Philadelphia. He arrived at approximately 9:15 a.m., parked and locked the car, and entered the motel. Once inside, he was arrested and then searched by FBI agents.

After being arrested, Tykarsky was taken to an FBI office where he was advised of his rights. He consented to an interview, which began around 10:00 a.m. Special Agent DeFazio, the case agent, documented the interview, but she did not write down verbatim statements and the interview was not recorded. During the interview, Tykarsky [**5] made various incriminating statements. He said that he had met "HeatherJet14" online, that he believed that she was 14 and that he thought about having sex with her. He claimed that this was the first time that he actually traveled to do something like this, that he thought that it was a mistake and that he should turn around, but that he never did. The interview ended around 11:02 a.m., at which time Tykarsky called his employer and was turned over to the United States Marshal's Office.

Pursuant to both his consent and a search warrant, the FBI conducted a search of Tykarsky's home. His computer was seized and analyzed by the Computer Analysis Response Team ("CART") of the FBI. CART confirmed that the computer had AOL software and "buddy lists" associated with both screen names "toddty63" and "golpher12345," and that one of the buddy lists included the screen name "HeatherJet14." CART also recovered from Tykarsky's hard drive a copy of the photograph that Special Agent Nester had sent to him.

Tykarsky was charged by indictment with interstate travel to engage in illicit sexual conduct with a minor, in violation of 18 U.S.C. § 2423(b) (Count One), [1] [**7] and using [**6] [*463] an interstate facility to attempt to persuade a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b) (Count Two). [2] At trial,

---

[1] Count One of the indictment charged as follows:

On or about May 21, 2003, at Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

TODD TYKARSKY

a/k/a "toddty63,"

a/k/a "golpher12345,"

traveled from New Jersey to Philadelphia, Pennsylvania for the purpose of engaging in, and attempting to engage in, illicit sexual conduct, as defined in Title 18, United States Code, Section 2243(f), that is, a sexual act as defined in Title 18, United States Code, Section 2246(2), with a person under eighteen years of age.

In violation of Title 18, United States Code, Section 2423(b) and (e).

(Tykarsky Br., Ex. H.)

[2] Count Two of the indictment charged as follows:

Between on or about April 22, 2003 and on or about May 20, 2003, at Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

TODD TYKARSKY

a/k/a "toddty63,"

a/k/a "golpher12345,"

used a facility in interstate commerce, that is, a computer modem connected to the Internet to attempt to knowingly persuade, induce, entice and coerce a person under eighteen years of age to engage in sexual activity for which the defendant could be charged with a criminal offense, that is,

the Government relied upon the nine instant messages and emails, Tykarsky's post-arrest statement, the evidence seized from the computer and the testimony of Special Agent Nester ("HeatherJet14") and Special Agent DeFazio. Tykarsky did not testify in his defense. He was convicted on both counts and sentenced to five years in prison pursuant to the post-PROTECT Act version of 18 U.S.C. § 2422(b), which mandates a minimum sentence of five years. Under the pre-PROTECT Act version of 2422(b), there was no minimum sentence, providing only that a violator "shall be fined under this title, imprisoned not more than 15 years, or both." 18 U.S.C. § 2422(b) (2002).

**B.**

Tykarsky filed four motions in the District Court relevant to his appeal. First, before trial, Tykarsky moved to dismiss the indictment. He argued, among other things, that the indictment was legally insufficient [**8] and that Count One of the indictment was duplicitous because it charged both an attempt and a completed offense. He also raised an impossibility defense to both counts on the grounds that no minor was actually involved in the indicted offenses. The District Court rejected his impossibility defense and denied the motion, holding that "[a]n actual victim is not required for a prosecution of attempt under § 2422 or for travel with the requisite intent under § 2423." The Court found Tykarsky's other arguments "unconvincing" and declined to address them.

Second, Tykarsky moved to suppress statements he made to FBI officers after his arrest. The Court denied his motion because it concluded that Tykarsky knowingly and voluntarily waived his *Miranda* rights before speaking to the FBI. *See United States v. Tykarsky*, No. Crim. A. 03-400, 2004 U.S. Dist. LEXIS 2567, at *5-9 (E.D. Pa. Jan. 26, 2004).

Third, after the verdict Tykarsky moved for a judgment of acquittal and a new trial, pursuant to Rules 29, 33 and 34 of the Federal Rules of Criminal Procedure. He challenged the sufficiency of the evidence to support his convictions; [**9] the District Court's restriction of cross-examination at various points during the trial; "arguably misleading, inaccurate and prejudicial testimony" presented by the Government; references that the prosecutor made to the defense counsel's use of Government Exhibit 20 during the prosecution's rebuttal; various jury instructions; the sufficiency of the indictment; the constitutionality of [*464] the statutes under which he was convicted (asserting violations of the Commerce Clause, the Fifth Amendment right to interstate travel and various other provisions of the Bill of Rights); and "other arguable inaccuracies and/or errors" that occurred during the trial.

The District Court denied the motion. *United States v. Tykarsky*, No. Crim. A. 03-400, 2004 U.S. Dist. LEXIS 15392 (E.D. Pa. Jul. 20, 2004). The [**10] Court concluded that the Government had presented sufficient circumstantial evidence from which the jury could infer that Tykarsky traveled across state lines for the purpose of engaging in criminal sexual activity on May 21, 2004. 2004 U.S. Dist. LEXIS 15392 at *4-5. It then reiterated its earlier conclusion that neither § 2422(b) nor § 2423(b) require the involvement of an actual minor. 2004 U.S. Dist. LEXIS 15392 at *6. The Court also found that the Government was not required to prove that the communications between the undercover FBI agent and Tykarsky actually crossed state lines because the use of a computer connected to the Internet constitutes the use of a "'facility or means of interstate commerce,' even though the communications in question may have actually been intrastate in character." 2004 U.S. Dist. LEXIS 15392 at *7 (citations omitted). It declined to address Tykarsky's remaining arguments for post-trial relief, finding them to be "completely without merit." *Id.*

Fourth, after the denial of his post-trial motions but before sentencing, Tykarsky moved for discovery of additional exculpatory evidence. He argued that the Government manipulated the charge and the prosecution to "entrap" him so that he would be subject to the five-year mandatory minimum sentence that became effective on April 30, 2003. He sought evidence from the Government regarding the dates and times that the undercover agent was online to rebut her testimony that she did not see Tykarsky online between April 25 and May 8, 2003. Tykarsky also sought discovery of phone records that he alleges would call into question the Government's [**11] timeline of Tykarsky's post-arrest interview and processing.

In the same motion, Tykarsky asked the Court to "intervene to assure that a just sentence is imposed"

---

statutory rape, in violation of New Jersey Statutes 2C:14-2 and Title 18, Pennsylvania Consolidated Statutes Annotated, Section 3122.1.

In violation of Title 18, United States Code, Section 2422(b).

(Tykarsky Br., Ex. H.)

because the prosecution had declined to file a downward departure motion based on his alleged "cooperation." He explained that although he had not provided the Government with any information or cooperated in any way with respect to the charged offenses, he had "sought to cooperate with the government by providing information as to other matters," even going so far as to hire a private investigator to uncover other illegal activity (in which Tykarsky was not involved) that Tykarsky had later reported to the Government.

The District Court denied Tykarsky's motion for additional discovery as a "fishing expedition." It also found that there was "no basis in the record to support the [sentencing] entrapment defense," and that there was no evidence that the Government had improperly declined to file a downward departure motion on his behalf.

This appeal followed. We have jurisdiction to review Tykarsky's conviction under 28 U.S.C. § 1291 and his sentence under 18 U.S.C. § 3742 [**12] .

**II. "Actual Minor" and §§ 2422(b) & 2423(b)**

Tykarsky's first contention is that the evidence was insufficient to support his conviction on either count because it showed only that he had communicated and traveled to engage in sexual activity with an adult undercover agent. Raising [*465] the defense of legal impossibility, he contends that both § 2422(b) and § 2423(b) require the involvement of an actual minor. The District Court, relying on cases from the Fifth, Ninth and Eleventh Circuit Courts of Appeals, rejected this contention and held that "an actual victim is not required for a prosecution of attempt under § 2422 or for travel with the requisite intent under § 2423." This case presents the first opportunity for us to address whether the attempt provision of § 2422(b) and the travel provision of § 2423(b) require the involvement of an "actual minor." We will discuss each in turn.

**A.**

Section 2422(b) of Title 18 reads:

> Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, knowingly persuades, induces, entices, or coerces any individual who has [**13] not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, *or attempts to do so*, shall be fined under this title, imprisoned not more than 15 years, or both.

18 U.S.C. § 2422(b) (2002) (emphasis added).

As we observed in *United States v. Hsu,* "[t]he law of impossible attempts has received much scholarly attention, but remains a murky area of the law." 155 F.3d 189, 199 (3d Cir. 1998). The common law distinguishes between legal and factual impossibilities, providing that the former is a defense an that the latter is not. Factual impossibility "'is said to occur when extraneous circumstances unknown to the actor or beyond his control prevent consummation of the intended crime.'" *Id.* (quoting *United States v. Berrigan*, 482 F.2d 171, 188 (3d Cir. 1973)). By contrast, "'[l]egal impossibility is said to occur where the intended acts, even if completed, would not amount to a crime.'" *Id.* (quoting *Berrigan*, 482 F.2d at 188). Legal impossibility has been held to apply when a person accepts goods mistakenly believed [**14] to be stolen, *see People v. Jaffe*, 185 N.Y. 497, 78 N.E. 169 (N.Y. 1906), when a hunter shoots a stuffed deer believing it to be alive, *see State v. Guffey*, 262 S.W.2d 152 (Mo. Ct. App. 1953), and when a prisoner attempts to smuggle letters out of prison under the mistaken belief that the warden has not consented, *see Berrigan*, 482 F.2d at 190. [3] A classic example of factual impossibility is when a person fires a gun at a bed intending to kill another person, but the intended victim is not in the bed; the crime cannot be completed because of extraneous factors beyond the shooter's control. *Hsu*, 155 F.3d at 199.

Here, Tykarsky contends that it [**15] was legally impossible for him to persuade a minor to engage in "sexual activity for which any person can be charged with a criminal offense" because "HeatherJet14" was an adult and, as a legal matter, any sexual activity between him and the undercover agent would not be criminal. The Government contends that this is a case of factual impossibility because Tykarsky intended to engage in the conduct proscribed by law but failed only because of circumstances unknown to him. As we have recognized, the difficulty in these types of cases "is that the distinction between factual and legal impossibility is essentially a [*466] matter of semantics, for every case

[3] These cases have been termed by many commentators as examples of "hybrid legal impossibility." *See Hsu*, 155 F.3d at 199 n.16. "Pure" legal impossibility, which is always a defense, occurs when the law does not even "proscribe the goal that the defendant sought to achieve." *Id.*

of legal impossibility can reasonably be characterized as a factual impossibility." *Id*. For example, in the case involving the stuffed deer, had the facts been as the hunter believed, i.e. the deer was alive, the hunter would be guilty of shooting a deer out of season. The elusiveness of this distinction and the belief that the impossibility defense exonerates defendants "in situations where attempt liability most certainly should be imposed," ALI Model Penal Code and Commentaries § 5.01, Comment at 308-309, has led many jurisdictions [**16] to eschew the distinction between legal and factual impossibility and abolish the defense altogether. *See Hsu*, 155 F.3d at 199 (collecting cases and observing that few jurisdictions still recognize impossibility as a defense); *United States v. Farner*, 251 F.3d 510, 512 (5th Cir. 2001) ("The distinction between factual and legal impossibility is elusive at best. Most federal courts have repudiated the distinction or have at least openly questioned its usefulness."); *see also* ALI Model Penal Code and Commentaries § 5.01, Comment at 578 ("The purpose of [the MPC's definition of attempt] is to eliminate legal impossibility as a defense to an attempt charge.").

Two of our sister courts of appeals have held that the absence of an actual minor in a § 2422(b) prosecution is a matter of factual impossibility. *See Farner*, 251 F.3d at 513; *United States v. Sims*, 428 F.3d 945, 959-960 (10th Cir. 2005). We, however, find it unnecessary to resolve this thorny semantical question here. Even assuming that this is a case of legal impossibility, it is well established in this Court that the availability of legal impossibility [**17] as a defense to a crime is a matter of legislative intent. *See Hsu*, 155 F.3d at 200 (examining legislative intent to determine whether Congress meant to permit a defense of impossibility to an "attempt" crime under the Economic Espionage Act); *United States v. Everett*, 700 F.2d 900, 904 (3d Cir. 1983) (reviewing the legislative history of the Drug Control Act and concluding that "Congress intended to eliminate the defense of impossibility when it enacted section 846"). Although when Congress uses a common law term such as "attempt" we generally presume that it intended to adopt the term's widely-accepted common law meaning, including any common law defenses such as impossibility, "the courts will not impose that meaning if there are grounds for inferring an affirmative instruction from Congress to define it otherwise." *Hsu*, 155 F.3d at 200 (citations and internal quotations omitted). Indeed, regardless of whether we frame Tykarsky's challenge as relating to the defense of legal impossibility or to the Government's failure to establish the necessary elements of § 2422(b), our task is the same: to discern legislative intent.

After [**18] examining the text of the statute, its broad purpose and its legislative history, we conclude that Congress did not intend to allow the use of an adult decoy, rather than an actual minor, to be asserted as a defense to § 2422(b). First, the plain language of the statute, which includes an "attempt" provision, indicates that something less than the actual persuasion of a minor is necessary for conviction. *See United States v. Meek*, 366 F.3d 705, 718 (9th Cir. 2004) (observing that the inclusion of the attempt provision "underscores Congress's effort to impose liability regardless of whether the defendant succeeded in the commission of his intended crime"); *United States v. Root*, 296 F.3d 1222, 1227 (11th Cir. 2002) (observing that the attempt provision indicates that "[t]he fact that [the defendant's] crime had not ripened into a completed offense is no obstacle [to a conviction]"). Interpreting § 2422(b) to require the involvement of an actual minor would render the attempt provision largely [*467] meaningless because, as a practical matter, little exists to differentiate those acts constituting "enticement" and those constituting "attempted enticement. [**19] " The attempt provision is therefore most naturally read to focus on the subjective intent of the defendant, not the actual age of the victim. *See Meek*, 366 F.3d at 718 (holding that because the scienter requirement applies to both the act of persuasion and the age of the victim, attempt liability turns on the defendant's subjective belief). We therefore believe that the statute's plain language, though not conclusive, supports our holding.

Second, as in *Hsu* and *Everett*, the underlying purposes of the law provide substantial evidence of a congressional intent that the defense of legal impossibility should not apply. In both *Hsu* and *Everett*, we stressed that the statutes at issue were designed to offer "comprehensive" solutions to the conduct being regulated. *See Hsu*, 155 F.3d at 201; *Everett*, 700 F.2d at 906-907. From this we concluded "that Congress could not have intended to adopt the impossibility defense, 'whose viability at common law was questionable at best,' because doing so would only 'hamper federal efforts to enforce the drug [and corporate espionage] laws.'" *Hsu*, 155 F.3d at 201 (quoting [**20] *Everett*, 700 F.2d at 906-907).

Just as the Drug Control Act embraces a "comprehensive" solution for drug trafficking and the Economic Espionage Act provides a "comprehensive" solution for corporate espionage, the Child Protection and Sexual Predator Punishment Act of 1998 is

described as "a comprehensive response to the horrifying menace of sex crimes against children, particularly assaults facilitated by computers." H.R. Rep. No. 105-557, at 10 (1998), U.S. Code Cong. & Admin. News 678. [4] It seeks to address the challenges of computer crimes "by providing law enforcement with the tools it needs to investigate and bring to justice those individuals who prey on our nation's children." *Id.* The Committee also stated:

> It is the view of the Committee that law enforcement plays an important role in discovering child sex offenders on the Internet before they are able to victimize an actual child. Those who believe they are victimizing children, even if they come into contact with a law enforcement officer who poses as a child, should be punished just as if a real child were involved. It is for this reason that several provisions in this Act prohibit certain [**21] conduct involving minors and assumed minors.

H.R. Rep. No. 105-557, at 19.

Seeking to undermine this evidence of legislative intent, Tykarsky points to two unpublished decisions from the Western District of Missouri that determined [**22] that the legislative history indicates that the involvement of an actual minor is a prerequisite to conviction under § 2422(b). *See United States v. Helder*, 2005 U.S. Dist. LEXIS 38874, No. 05-00125-01-CR-W-DW (W.D. Mo. Aug. 5, 2005) (unpublished), *United States v. Hicks,* 2005 U.S. Dist. LEXIS 36625, No. 05-00042-01-CR-W-DW [*468] (W.D. Mo. Aug. 29, 2005) (unpublished). Both cases rely heavily upon an unadopted amendment to § 2422 that would have added a new subsection (c), making it a crime to "knowingly contact[] an individual, who has been represented to the person making the contact as not having attained the age of 18 years" for the purpose of engaging in sexual activity. *See Helder*, 2005 U.S. Dist. LEXIS 38874 at *2-3, No. 05-00125-01-CR-W-DW (quoting H.R. 3494, § 101, 105th Cong., 2d Sess. (1998). By not adopting this amendment, the District Court for the Western District of Missouri reasoned, Congress specifically considered and rejected liability resulting from law enforcement agents posing as minors. *Id.*

We disagree. Although legislative history is often an undependable guide to legislative intent, "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *See United States v. Craft*, 535 U.S. 274, 287, 122 S. Ct. 1414, 152 L. Ed. 2d 437 (2002) [**23] (internal quotations omitted); *see also Meek*, 366 F.3d at 720 ("Sorting through the dustbin of discarded legislative proposals is a notoriously dubious proposition."). We should be especially wary where, as here, the failed legislative proposal differs in fundamental ways from the enacted legislation. The failed legislative proposal cited by Tykarsky addresses "knowing contact," rather than knowing "persuasion," "inducement," "enticement" and "coercion," and was intended to supplement, not replace, § 2422(b). We therefore do not embrace the District Court for the Western District of Missouri's interpretation of the legislative history and conclude that it is not persuasive here.

Third, we deem significant that the statute here, like those at issue in *Hsu* and *Everett*, "was drafted at a time when 'the doctrine of impossibility had become mired in fine distinctions and had lost whatever acceptance at common law it may have possessed when the statute considered in *Berrigan* was first enacted in 1930.'" *Hsu*, 155 F.3d at 202 (quoting *Everett*, 700 F.2d at 905). [5] The first version of § 2422(b) was added to Title 18 in 1996, [**24] almost three decades after the Model Penal Code reporters first advocated the elimination of the impossibility defense and the National Commission on Reform of the Federal Criminal Laws had concluded that the abolition of legal impossibility was already "the overwhelming modern position." *See id*. (discussing the changing views on the impossibility defense). We therefore doubt that Congress intended to permit legal impossibility to be asserted as a defense to § 2422(b).

Finally, we are mindful "of the potential damage that the [defendant's] position could work on law enforcement under the statute." *Id.*; *see also Everett*, 700 F.2d at 907

---

[4] There is very little legislative history pertaining to the first version of § 2422(b), which was attached to the Telecommunications Act of 1996. Because the Child Protection and Sexual Predator Punishment Act of 1998 rewrote § 2422(b) and made substantial changes to related laws, we find the Congressional findings related to that act to be more relevant here. *See Meek*, 366 F.3d at 719 (discussing the history of the 1998 amendment in relation to § 2422(b)); *see also United States v. MacEwan*, 445 F.3d 237, 2006 U.S. App. LEXIS 8237, 2006 WL 861184 at *9 n.12 (3d Cir. Apr. 5, 2006) ("This Court has held that we are able to examine congressional findings underlying other acts where the findings discuss a matter closely related to the issues underlying the presently analyzed law.").

[5] For the record, the author of this opinion wrote *Berrigan* 33 years ago.

n.16. We mention this not because of our own policy preferences, but because it is relevant to Congress's intent. It is common knowledge that law enforcement officials rely heavily on decoys and sting operations in enforcing solicitation and child predation crimes such as [**25] § 2422(b). We consider it unlikely that Congress intended to prohibit this method of enforcement. Indeed, if we were to adopt Tykarsky's reading of the statute, law enforcement officials would have to use actual minors in conducting sting operations. We do not believe Congress intended such a result.

In light of § 2422(b)'s text, legislative purpose and history, and the unlikeliness that Congress intended the now-disfavored doctrine of legal impossibility to apply, we hold that the lack of an actual minor is not a defense to a charge of attempted persuasion, [*469] inducement, enticement or coercion of a minor in violation of § 2422(b). We therefore join the Courts of Appeals for the Fifth, Ninth, Tenth and Eleventh Circuits in concluding that a conviction under the attempt provision of § 2422(b) does not require the involvement of an actual minor. *Meek*, 366 F.3d at 719; *Farner*, 251 F.3d at 512; *Root*, 296 F.3d at 1227; *Sims*, 428 F.3d at 959-960.

Applying our interpretation of § 2422(b) here, we also conclude that Tykarsky's conduct falls squarely within our definition of criminal attempt. A person is guilty of an attempt [**26] to commit a crime "'if, acting with the kind of culpability otherwise required for commission of the crime, he . . . purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.'" *Hsu*, 155 F.3d at 202-203, 203 n.19 (quoting and adopting Model Penal Code § 5.01(1)(c) (1985)). Thus, an attempt conviction requires evidence that a defendant (1) acted with the requisite intent to violate the statute, and (2) performed an act that, under the circumstances as he believes them to be, constitutes a substantial step in the commission of the crime. *See id.* at 203.

The evidence in this case satisfies both elements. The instant messages and the statements that Tykarsky made to FBI agents upon his arrest establish Tykarsky's subjective intent, and his appearance at the Holiday Inn according to the plan established over the instant messages provides the requisite "measure of objective evidence" corroborating his intent. *See Everett*, 700 F.2d at 908 (holding that "some measure of objective [**27] evidence corroborating" the criminal intent is necessary for an attempt conviction). The instant messages also provide sufficient evidence that he took substantial steps towards "persuading, inducing, enticing or coercing" a minor to engage in sexual activity. Accordingly, we will affirm his conviction under § 2422(b).

**B.**

With respect to § 2423(b), our conclusion is the same, but our analysis is truncated because there is no need to go beyond the text of the statute. *Singh v. Ashcroft*, 383 F.3d 144, 150 (3d Cir. 2004) ("If the statutory meaning is clear, our inquiry is at an end."). Section 2423(b) provides:

> A person who travels in interstate commerce . . . for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

By its unambiguous terms, § 2423(b) criminalizes interstate travel for an illicit purpose. The actual age of the intended victim is not an element of the offense; criminal liability "turns simply on the purpose for which [the defendant] traveled." *Root*, 296 F.3d at 1231. Neither factual nor legal impossibility applies [**28] in these circumstances. *See Sims*, 428 F.3d at 959 ("[W]e see nothing impossible about traveling with a specific purpose, which the jury found beyond a reasonable doubt he did."). As the District Court concluded in denying Tykarsky's post-trial motion, there was ample evidence from which the jury could conclude that Tykarsky traveled from New Jersey to Pennsylvania for the purpose of engaging in illicit sexual activity with a minor. *Tykarsky,* 2004 U.S. Dist. LEXIS 15392 at *5. It "make[s] no difference that an actual minor was not involved." 2004 U.S. Dist. LEXIS 15392 at *6.

[*470] **III. Commerce Clause**

Next, Tykarsky contends that the statutes under which he was convicted exceed Congress's powers under the Commerce Clause. We disagree. The Commerce Clause gives Congress power to regulate three types of activity: (1) "the use of channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "those activities having a substantial relation to interstate commerce, . . . i.e., those activities that substantially affect interstate [**29] commerce."

*See United States v. Lopez*, 514 U.S. 549, 558-559, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995).

Although Tykarsky's Commerce Clause challenge is not fully developed, the thrust of his argument appears to be that the statutes under which he was convicted exceed Congress's power as defined by the Supreme Court's decisions in *Morrison* and *Lopez*. *See generally id.*; *United States v. Morrison*, 529 U.S. 598, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000). Both *Morrison* and *Lopez*, however, involved challenges to statutes enacted pursuant to the third category described in *Lopez* -- Congress's authority to regulate activities that substantially affect interstate commerce. As we made clear in our recent decision in *United States v. MacEwan*, "we need not proceed to an analysis of *Lopez*'s third category when Congress clearly has the power to regulate such an activity under the first two." 2006 U.S. App. LEXIS 8237, 2006 WL 861184 at *5; *see also United States v. Lankford*, 196 F.3d 563, 572 (5th Cir. 1999) (finding that because § 2261(a)(1) is a regulation of the use of channels of interstate commerce, the court "need not address whether domestic violence [**30] 'substantially affects' interstate commerce").

Here, both statutes under which Tykarsky was convicted fall squarely within Congress's power to regulate the first two categories of activities described in *Lopez.* Section 2423(b) criminalizes *interstate travel* with intent to engage in illicit sexual conduct with a minor. As such, it regulates the use of the channels of interstate commerce. *See United States v. Bredimus*, 352 F.3d 200, 205-206 (5th Cir. 2003) (holding that § 2423(b) is a valid exercise of Congress's power to regulate the channels of interstate commerce); *United States v. Han*, 230 F.3d 560, 562-563 (2d Cir. 2000) (same). Section 2422(b) proscribes the use of "any facility or means of interstate . . . commerce" to persuade, induce, entice or coerce any individual under the age of 18 to engage in illicit sexual activity. As we recently stated in *MacEwan*, the "facility of interstate commerce" involved in this case -- the Internet -- is both "an instrumentality and channel of interstate commerce." *See* 2006 U.S. App. LEXIS 8237, 2006 WL 861184 at *6 n.8; *see also United States v. Extreme Assocs., Inc.*, 431 F.3d 150, 161 (3d Cir. 2005) [**31] ("The Internet is a channel of commerce covered by the federal statutes regulating the distribution of obscenity."). Accordingly, both § 2423(b) and § 2422(b) represent constitutional exercises of Congress's Commerce Clause power to regulate the use of the channels and instrumentalities of interstate commerce. [6]

## [**32] [*471] IV. First, Fifth and Eighth Amendment Challenges to 18 U.S.C. § 2423(b)

Tykarsky next argues that he cannot constitutionally be charged under 18 U.S.C. § 2423(b) for doing nothing more than traveling to another state with the intent prohibited by that section. He contends that the statute lacks a "meaningful actus reus" and punishes the mere act of thinking while traveling, in violation of his rights under the First, Fifth and Eighth Amendments. We reject this contention.

As other courts of appeals have observed, it is clear that § 2423(b) does not punish thought alone. At least one act must occur for an individual to be convicted under § 2423(b): crossing a state line. *See Bredimus*, 352 F.3d at 208 ("Consistent with our fellow circuits, therefore, we find that Section 2423(b) does not prohibit mere thought or mere preparation because it requires as an element that the offender actually travel in foreign commerce."); *United States v. Gamache*, 156 F.3d 1, 8 (1st Cir. 1998). That § 2423(b) contains an actus reus component, however, does not alone make it constitutional. The government cannot [**33] punish what it considers to be an immoral thought simply by linking it to otherwise innocuous acts, such as walking down the street or chewing gum. If § 2423(b) proscribed interstate travel with the mere abstract intent to engage in sexual activity with a minor at some undetermined point in the future, this would be a more difficult case.

---

[6] Tykarsky also argues that no reasonable juror could have found the jurisdictional element of either § 2422 or § 2423(b) satisfied. Again, we disagree. Tykarsky lived and worked in New Jersey and his car was registered there. He was arrested at the Holiday Inn in Philadelphia, Pennsylvania on May 21, 2003. There was ample evidence from which the jury could infer that Tykarsky traveled interstate, as required for a conviction under § 2423(b). *See United States v. Abadie*, 879 F.2d 1260, 1266 (5th Cir. 1989) (concluding that there was sufficient evidence of interstate travel to sustain a conviction under the Travel Act, 18 U.S.C. § 1952, where defendant lived in Louisiana and was observed by agents arriving at a gas station in Mississippi). The Government also showed that Tykarsky communicated with the putative minor via the Internet, which is all that is required to satisfy the jurisdictional element of § 2422(b). *See MacEwan*, 2006 U.S. App. LEXIS 8237, 2006 WL 861184 at *6 (stating that proof of transmission over the Internet is sufficient to satisfy the analogous jurisdictional element of § 2252A(a)(2)(B), regardless of whether the transmission crosses state lines).

But it does not. Contrary to Tykarsky's characterization, the relationship between the mens rea and the actus reus required by § 2423(b) is neither incidental nor tangential. Section 2423(b) does not simply prohibit traveling with an immoral thought, or even with an amorphous intent to engage in sexual activity with a minor in another state. The travel must be *for the purpose* of engaging in the unlawful sexual act. *See United States v. Hayward*, 359 F.3d 631, 638 (3d Cir. 2004) (holding that the government must show that the criminal sexual act was a dominant purpose of the trip, not a merely incidental one). By requiring that the interstate travel be "for the purpose of" engaging in illicit sexual activity, Congress has narrowed the scope of the law to exclude mere preparation, thought or fantasy; the statute only applies when [**34] the travel is a necessary step in the commission of a crime. [7]

[**35] [*472] Tykarsky contends that because it is not a crime to travel interstate, criminalizing travel with intent to commit a crime constitutes a "content-based restriction of a person's private thought processes." (Tykarsky Br. at 67.) This argument is misplaced. That the legality of a physical act turns on criminal intent is hardly a novel proposition. If criminal laws could not look to intent and motivation to distinguish lawful conduct from unlawful conduct, virtually every crime with a mens rea requirement would be invalidated on the ground that it constitutes a "thought crime." *See Gamache*, 156 F.3d at 8 ("Proof of intent naturally means proving state of mind, but that does not mean that one is punishing 'mere thought' any more than that the requirement of proving mens rea in most crimes means that one is solely punishing 'mere thought.'"). For example, buying a gun and standing outside someone's home may be perfectly legal, but doing so with the subjective intent of shooting the person who comes out could constitute attempted murder. *See, e.g., United States v. Contreras*, 950 F.2d 232, 237 (5th Cir. 1991). Section § 2423(b) does not punish "thought" [**36] any more than the hundreds of crimes for which criminal liability turns on subjective intent. Accordingly, neither the First nor the Eighth Amendment prohibits the criminalization of the conduct here. [8]

We also reject Tykarsky's contention that § 2423(b) "impermissibly burdens" his fundamental right to travel under the Fifth Amendment. As the Court of Appeals for the Fifth Circuit observed in *Bredimus*, "[w]hile the right to travel is well-established, no federal court has ever held that an individual has a fundamental right to travel for an illicit purpose." 352 F.3d at 210 (citing *Hoke v. United States*, 227 U.S. 308, 320-323, 33 S. Ct. 281, 57 L. Ed. 523 (1913)). Even if we were to accept the proposition that § 2423(b) interferes with Tykarsky's fundamental right to travel, Congress clearly [**37] has a compelling interest in punishing individuals who travel interstate to engage in illicit sexual activities with minors, and § 2423(b) is narrowly tailored to serve that interest. *See United States v. Burton*, 475 F.2d 469, 471 (8th Cir. 1973) ("The citizen's right to travel is subordinate to the Congressional right to regulate interstate commerce when the travel involves the use of an interstate facility for illicit purposes.").

**V. Vagueness and Overbreadth and § 2422(b)**

Tykarsky next argues that § 2422 is vague and overbroad on its face in violation of the First Amendment. Again, we disagree. "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002). A statute is void for vagueness if it "forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322

---

[7] Even if we were able to conceive of some exceptional circumstances in which § 2423(b) could be unconstitutionally applied, this is not such a case. Tykarsky went well beyond mere thought and preparation; he communicated those thoughts to a putative minor, arranged a meeting at a hotel and traveled across state lines for the purpose of engaging in sexual activity with a minor. *See United States v. Han*, 230 F.3d at 563 (refusing to consider the argument that § 2423(b) prohibited mere thought because it was clear that the defendant "engaged in acts beyond mere thinking, evidenced by his telephonic communications in which he developed a plan and articulated a purpose to cross interstate lines to engage in sexual acts with a thirteen-year-old[,]" and then "manifested the prohibited intent by doing so and by going to the arranged meeting spot"); *Gamache,* 156 F.3d at 8 (observing that the constitutionality of punishing "'mere thought' may pose an interesting subject for academic discourse," but "that is not the way this statute is being applied to appellant").

[8] Tykarsky's Eighth Amendment challenge mirrors his First Amendment challenge: he contends that it is "cruel and unusual" to punish someone for his or her thoughts alone. (Tykarsky Br. at 67.)

(1926). [**38] [9]

[**39] [*473] Section 2422(b) is not overbroad. There is no First Amendment right to persuade minors to engage in illegal sex acts. *United States v. Bailey*, 228 F.3d 637, 639 (6th Cir. 2000); *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004) ("Speech attempting to arrange the sexual abuse of children is no more constitutionally protected than speech attempting to arrange any other type of crime."). Section 2422(b) regulates only conduct, not speech. As the Court of Appeals for the Ninth Circuit observed in *United States v. Meek*: "No otherwise legitimate speech [is] jeopardized by § 2422(b) because the statute only criminalizes conduct, i.e., the targeted inducement of minors for illegal sexual activity. . . . [S]peech is merely the vehicle through which a pedophile ensnares the victim." 366 F.3d at 721. Moreover, "the scienter and intent requirements of the statute sufficiently limit criminal culpability to reach only conduct outside the protection of the First Amendment." *United States v. Dhingra*, 371 F.3d 557, 561-562 (9th Cir. 2004) (observing that a family planning provider could not be prosecuted under [**40] § 2422(b) unless it *knew* that it was persuading minors to engage in illicit sexual conduct). Accordingly, § 2422(b) is not overbroad.

Albeit a closer question, we also conclude that § 2422(b) is not unconstitutionally vague. Although § 2422(b) does not define the terms "persuade," "induce," "entice" and "coerce," they "have a plain and ordinary meaning that does not need further technical explanation." *Id.* at 562; *see also Batsell v. United States*, 403 F.2d 395, 399 (8th Cir. 1968) ("The word 'induces' in § 2422 is one of common usage and meaning and requires no explanation or definition."). To be sure, there may be a certain degree of imprecision around the edges of these terms, such as where the line between mere "asking" and "persuading" is drawn. But any ambiguity in § 2422(b) is no greater than that found in many criminal statutes. These terms are sufficiently precise to give a person of ordinary intelligence fair notice as to what is permitted and what is prohibited and to prevent arbitrary and discriminatory enforcement. *See Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) (observing that fair [**41] warning and the prevention of arbitrary enforcement are two of the most important values offended by vague laws). Moreover, the absence of definitions for these terms poses no danger of chilling legitimate speech. The statute's scienter requirement clarifies the law and excludes legitimate activity, including pure speech, from its scope. *Dhingra*, 371 F.3d at 562; *United States v. Panfil*, 338 F.3d 1299, 1301 (11th Cir. 2003) ("[Section 2422(b)'s] scienter requirement discourages 'unscrupulous enforcement' and clarifies § 2422(b)."); *see also United States v. Loy*, 237 F.3d 251 (3d Cir. 2001) ("[I]n some situations, a scienter requirement may mitigate an otherwise vague statute[.]"). We therefore conclude that § 2422(b) is not impermissibly vague.

### VI. Sixth Amendment Grand Jury Clause

Tykarsky next contends that the District Court violated the Grand Jury Clause of the Sixth Amendment [*474] by allowing the jury to convict him of offenses that differed from those charged in the indictment. Count One of the indictment charged Tykarsky with traveling in interstate commerce "for the purpose of engaging in, and attempting to engage [**42] in, illicit sexual conduct." In instructing the jury, however, the Court, consistent with the text of § 2423(b), omitted the "attempting to engage in" language and charged the jury that it had to find only that Tykarsky "traveled in interstate commerce . . . for the purpose of engaging [in illicit sexual activity]." Count Two of the indictment charged Tykarsky with using the Internet "to attempt to knowingly persuade, induce, entice *and* coerce a person under eighteen years of age to engage in sexual activity for which the defendant could be charged with a criminal offense, that is, statutory rape." In instructing the jury, however, the District Court described Count Two as charging him with using a computer "to attempt to knowingly to [sic] persuade, induce, *or* entice a person the defendant believed to be under the age of 16 to engage in statutory rape."

[9] The vagueness doctrine is similar -- but not identical -- to the overbreadth doctrine. *See Kolender v. Lawson*, 461 U.S. 352, 358 n.8, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983) (explaining that "traditionally viewed vagueness and overbreadth as logically related and similar doctrines"). Both doctrines can nullify an ambiguous law that "chills" protected First Amendment activities. But unlike the overbreadth doctrine, the vagueness doctrine was designed to guarantee fair notice and nondiscriminatory application of the laws, thus reflecting its roots in the due process clause. *See Waterman v. Farmer*, 183 F.3d 208, 212 n.4 (3d Cir. 1999). The vagueness doctrine also has more stringent standing rules, requiring that the person raising it show that he himself has been injured by the overly broad language. *See Gibson v. Mayor and Council of City of Wilmington*, 355 F.3d 215, 225 (3d Cir. 2004) ("[I]f the challenged regulation clearly applies to the challenger's conduct, he cannot challenge the regulation for facial vagueness.").

Tykarsky's challenge fails. "His complaint is not that the indictment failed to charge the offense for which he was convicted, but that the indictment charged more than was necessary." *United States v. Miller*, 471 U.S. 130, 140, 105 S. Ct. 1811, 85 L. Ed. 2d 99 (1985). The Supreme Court has observed that a defendant's [**43] right to be tried on the charges set forth in the indictment is not impaired where the indictment alleges more acts than are necessary for conviction. *See, e.g.*, *id.* at 136 ("As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of communicating the same crime."); *Salinger v. United States*, 272 U.S. 542, 548-549, 47 S. Ct. 173, 71 L. Ed. 398 (1926) (holding that there was "not even remotely an infraction of the constitutional provision that 'no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment to the grand jury'" where the district court submitted to the jury only one of several fraudulent schemes charged in the indictment).

Here, the District Court's decision to omit the "coercion" ground in Count Two and to charge the jury in the disjunctive, rather than the conjunctive, amounted only to a *narrowing* of the charged offense. Similarly, its omission of the unnecessary allegation in Count One of the indictment [**44] that Tykarsky "attempt[ed] to engage in . . . illicit sexual activity" also only *narrowed* the charged offense. As in *Miller*, "[t]he variance[s] complained of added nothing new to the grand jury's indictment and constituted no broadening" of the charged offense. 471 U.S. at 145; *see also Turner v. United States*, 396 U.S. 398, 420, 90 S. Ct. 642, 24 L. Ed. 2d 610 (1970) ("[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged."). As a result, Tykarsky can show no "compromise of his right to be tried only on offenses for which the grand jury has returned an indictment," *Miller*, 471 U.S. at 145, and his claim therefore fails. [10]

[**45] [*475] **VII. Sixth Amendment Right to Confrontation**

Tykarsky complains also that the District Court violated his Sixth Amendment Confrontation Clause rights by restricting his cross-examination of the undercover FBI agent, Special Agent Nester, and the FBI's case agent, Special Agent DeFazio. The District Court limited Tykarsky's cross-examination regarding a number of subjects, viz., the location of the undercover computer from which Special Agent Nester communicated with Tykarsky, communications that were not in the record, the agent's opinion as to whether Instant Messenger communications are "fraught with fantasy," the agent's view of Tykarsky's state of mind during the communications and at the time of arrest, the agent's knowledge of the mandatory minimum sentence amendment to § 2422(b), the agent's failure to "develop her own online character," and FBI practices in undercover investigations and post-arrest interrogations, among other topics.

Limitations on cross-examination are reviewed for abuse of discretion. *United States v. Mussare*, 405 F.3d 161, 169 (3d Cir. 2005). Although the Confrontation Clause guarantees the right of a criminal defendant to confront [**46] witnesses for the purpose of cross-examination, a district court retains "'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678-679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)).

---

[10] Tykarsky also argues that the indictment was defective because, although it largely tracked the language of the relevant statutes, it failed to charge "specific intent" and erroneously specified that the victim had to be under the age of 18 rather than 16, the age of majority for statutory rape under New Jersey and Pennsylvania law. We reject this argument. Although the indictment recited the age of 18, it also specified that the sexual activity must be of the type "for which the defendant could be charged with a criminal offense, that is, statutory rape." It therefore required a finding that the victim was under the age of 16. *See Gov't of the Virgin Islands v. Moolenaar*, 39 V.I. 457, 133 F.3d 246, 249 (3d Cir. 1998) ("Failure to allege the statutory elements will not be fatal provided that alternative language is used or that the essential elements are charged in the indictment by necessary implication.") (quoting 24 Moore's Federal Practice § 607.04[2][b][ii] (3d ed. 1997)). For similar reasons, we also conclude that the failure to explicitly recite the element of specific intent is not fatal to the indictment. It states all of the essential elements of the crime by necessary implication and meets all of the requirements of Rule 7(c)(1) of the Federal Rules of Criminal Procedure. *See United States v. Hodge*, 211 F.3d 74, 77 (3d Cir. 2000) (holding that although specific intent is an element of the Virgin Islands robbery statute, the failure to explicitly recite it is not fatal to an indictment).

We agree with the Government that the restrictions of which Tykarsky complains were well within the District Court's discretion. The District Court only restricted cross-examination where it was repetitive of other testimony, confusing or irrelevant. The District Court permitted Tykarsky to cross-examine Special Agents Nester and DeFazio thoroughly. [11] Tykarsky questioned the agents extensively regarding the reliability of determining Instant Messenger identities, the use of fantasy in chat rooms and communications that were purportedly missing from the record. The District Court only sustained objections to this testimony when the questions were misleading or repetitive. The District Court also permitted cross-examination [**47] regarding the use of decoys in [*476] undercover investigations and FBI policy on recording interviews. It only restricted questioning when it became repetitive or when counsel was attempting to testify about FBI practices in other cases. [12] The District Court also permitted cross-examination regarding the plan of arrest at the Holiday Inn, limiting it only when defense counsel asked the agents to speculate as to Tykarsky's intent and state of mind.

[**48] In sustaining other prosecution objections, the District Court acted well within its discretion to restrict irrelevant and confusing testimony. For example, Special Agent Nester's impressions of Tykarsky's state of mind and her knowledge that the PROTECT Act imposed a minimum sentence of five years for violating § 2422(b) are irrelevant. [13] [**49] And because the mere use of the Internet is sufficient to satisfy [*477] the jurisdictional element of § 2422(b), the precise

---

[11] Although whether a trial court unduly restricted cross-examination should be evaluated in terms of quality rather than quantity, we note that the record contains 138 pages of cross-examination of Special Agent Nester and 40 pages of cross-examination of Special Agent DeFazio.

[12] After Special Agent DeFazio testified that "[t]he bureau policy is we do not record interviews" and that the FBI never records interviews, Tykarsky's counsel attempted to ask him about another recent case in the same courthouse where the interview was recorded. The Government objected and the District Court sustained the objection, telling counsel he was not permitted to testify about another case. When counsel attempted to rephrase the question by asking the witness whether she was familiar with that case, the Court cut him off, stating that it was a collateral issue. Although we have doubts about whether this objection should have been sustained -- it was not wholly collateral and questioning could have been limited later on -- we do not believe that the ruling rose to the level of an abuse of discretion. Moreover, even if we were to find error, it was clearly harmless.

In a related argument, Tykarsky contends that the prosecution, by failing to correct Special Agent DeFazio's testimony, knowingly presented false testimony in violation of the rule in *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), and failed to disclose relevant *Brady* material. According to the FBI Agent's Handbook, which defense counsel obtained under the Freedom of Information Act after the close of the evidence, the FBI permits the recording of confessions or interviews, in contradiction of Agent DeFazio's testimony. Even assuming that Agent DeFazio's testimony was false and the prosecution was aware of this, however, Tykarsky's claim nonetheless fails. He has not shown, and cannot show, any prejudice or substantial injustice resulting from this testimony. Tykarsky's argument is that the agent's testimony gave the FBI's failure to record the post-arrest statement an "institutional imprimatur," and that had the jury known that the FBI could have recorded the statement, it would have assumed that it chose not to do so for a reason, and that the reason was to create a fabricated statement or force a confession. This series of assumptions is simply too fantastic to require reversal, especially in light of Tykarsky's failure to present any evidence calling into question either the content of the post-arrest statement or the conditions under which it was made.

[13] This line of questioning relates to Tykarsky's contention that he was eligible for a downward departure based upon "sentencing entrapment" and/or "sentencing factor manipulation." We agree with the District Court that even if we recognized sentencing entrapment as a basis for a downward departure, *see United States v. Raven*, 39 F.3d 428, 438 (3d Cir. 1994) (observing that this Court has not yet recognized sentencing entrapment), the doctrine has no application here. "Sentencing entrapment or 'sentence factor manipulation' occurs when a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment." *United States v. Staufer*, 38 F.3d 1103, 1106 (9th Cir. 1994) (quotation omitted); *see Raven,* 39 F.3d at 438 (defining sentencing entrapment as "'outrageous official conduct [which] overcomes the will of an individual predisposed only to dealing in small quantities for the purpose of increasing the amount of drugs . . . and the resulting sentence of the entrapped defendant.'") (quoting *United States v. Rogers*, 982 F.2d 1241, 1245 (8th Cir. 1993)); *see also United States v. Montoya*, 62 F.3d 1, 3 (1st Cir. 1995) (recognizing sentencing entrapment where "government agents have improperly enlarged the scope or scale of the crime"). Even assuming that the FBI intentionally delayed the sting operation until after April 30, 2003 so that Tykarsky would be subject to the enhanced penalties prescribed by the PROTECT Act, such conduct was not outrageous, *see Raven*, 39 F.3d at 438, and it did not result in the commission of a "greater offense," *see Staufer*, 38 F.3d at 1106. Rather, it only affected the timing of the offense.

location of the computer that Special Agent Nester used to communicate with Tykarsky is also irrelevant. [14] Accordingly, Tykarsky has failed to demonstrate that the District Court exceeded the permissible bounds of discretion in restricting cross-examination.

### VIII. Other Contentions

Tykarsky's other attacks on his conviction merit little discussion. He challenges the District Court's rejection of various proposed jury instructions, including instructions regarding absence of evidence, thoughts, preparation, action, equivocation, intention, attempt, statements, that engaging in criminal sexual activity had to be "the" dominant purpose of the interstate travel, that the travel had to be on May 21, and the impact of the April 30, 2003 amendment to the PROTECT Act. We have reviewed the proposed [**50] instructions and the instructions submitted to the jury and conclude that the latter "fairly and adequately" present the issues in the case without confusing or misleading the jury. *United States v. Simon*, 28 V.I. 398, 995 F.2d 1236, 1243 n.11 (3d Cir. 1993). As we have said before, "[a] defendant is not entitled to a jury instruction of his own choosing." *United States v. Ellis*, 156 F.3d 493, 498 n.7 (3d Cir. 1998).

We reject also Tykarsky's contention that the Government denied him a fair trial by improperly preparing his exhibit book and making an improper rebuttal argument. Government Exhibit 20 was a picture of Special Agent Nester as a minor. The image in the exhibit book provided to Tykarsky contained a photocopy of this image along with handwritten notations at the bottom. Defense counsel used the copy of the picture in the exhibit book to question the integrity of the evidence, arguing that the prosecution had torn off the notations at the bottom. The prosecution responded by pointing out that the actual exhibit provided to the jury did not have any notations and that any notations on the defense copy were irrelevant. We cannot discern [**51] any prejudice resulting from this confusion. Although the prosecution should have provided a true and correct copy of the exhibit, this hardly rises to the level of reversible error.

Tykarsky also argues that his post-arrest statement should have been excluded because of the FBI's failure to electronically record it. *See Stephan v. State*, 711 P.2d 1156 at 1159 (Alaska 1985) (holding that the failure to record an interrogation is a violation of the due process clause of the Alaska Constitution); *State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994) (holding that the failure to record an interrogation is a violation of the due process clause of the Minnesota Constitution). Whatever the merits of the policy arguments in favor of requiring the recording of interrogations may be, it is clear that such recording is not mandated by the United States Constitution. We therefore reject this argument.

[*478] Tykarsky also alleges various *Brady* violations. He refers to potentially exculpatory *Brady* material throughout his brief and contends that the District Court erroneously denied his post-conviction, pre-sentencing motion for discovery of exculpatory evidence. [**52] With respect to many of the documents that Tykarsky alleges were not disclosed -- such as a list of "any and all times that the agent was online or any information that would in any way contradict her trial testimony should be produced or provided to the defense," a missing Internet Messenger conversation regarding a soccer game, Special Agent Nester's Internet profile as it existed on May 21, 2003, interview notes from the post-arrest interview, and the other chat room postings from the time of the initial conversation between Tykarksky and Special Agent Nester to show the "environment" -- there is no proof that they exist, and there is no evidence of any bad faith in failing to preserve them. *See Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). Moreover, even if such documents do exist, it is plain from the record that their nondisclosure, even when considered cumulatively, neither prejudiced Tykarsky nor affected the fairness of the proceedings. *See United States v. Agurs*, 427 U.S. 97, 109-110, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) [**53] ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."). [15]

---

[14] Tykarsky contends that the District Court improperly limited his ability to challenge Special Agent Nester's "bias, credibility and reliability," and that if he knew the location of the computer he might be able to show that Special Agent Nester was not where she said she was. That the answer to a question could possibly later give rise to impeaching evidence, however, does not make the question proper. Absent any reason to doubt that Special Agent Nester was involved in the operation, it is irrelevant precisely where the computer she used was located.

[15] We also conclude that the District Court properly denied

Having concluded that all of Tykarsky's attacks on his conviction are meritless, we now turn to Tykarsky's ex post facto challenge to his five-year sentence.

**IX.** [**54] **Ex Post Facto Application of Mandatory Minimum Sentence**

As we have noted, Tykarsky was convicted of attempting to persuade, coerce, entice or induce an underage person to engage in illegal sexual activity through the Internet, in violation of 18 U.S.C. § 2422(b). Pursuant to Section 103 of the PROTECT Act, 117 Stat. 650, which took effect on April 30, 2003, Congress amended § 2422(b) to require a minimum sentence of five years. The evidence that Tykarsky violated § 2422 consisted of nine email and Instant Messenger conversations. The two initial communications were made prior to April 30, 2003 -- on April 22 and April 24 -- while seven others were made after April 30, 2003. Notwithstanding that the communications straddled the date of the PROTECT Act, the District Court did not provide the jury with a special verdict form. Accordingly, the jury did not make any specific findings as to when the § 2422(b) violation occurred.

At sentencing, Tykarsky objected to the use of the amended version of the statute with its five-year mandatory minimum. He argued that the absence of a special verdict regarding the date of the violation [*479] precluded the Court from imposing [**55] the mandatory minimum. The District Court rejected this argument, concluding that because the only communications arranging the May 21, 2003 meeting at the Holiday Inn were made after April 30, the jury's conviction on Count One -- traveling interstate to engage in illegal sexual activity -- necessarily required a finding that Tykarsky violated § 2422(b) after April 30. It therefore imposed the mandatory minimum of five years. [16]

Tykarsky now challenges his sentence on appeal. Absent a special verdict, he contends, there is no way to know whether the jury may have convicted him under § 2422(b) based solely on his conduct prior to April 30, in which case the imposition of the mandatory minimum would violate the Ex Post Facto Clause. The Government concedes that it would violate the Ex Post Facto Clause to impose the mandatory minimum sentence for crimes solely committed prior to [**56] April 30, 2003, but asserts that this was a "continuing offense." That is, under the Government's theory, all of the communications formed part of a single, continuing plan to meet the putative minor at the Holiday Inn for the purpose of engaging in sexual activity. Like a conspiracy, the Government argues, the continuation of the offense past the date of the enhancing statute would resolve any ex post facto problems. *See United States v. Harris*, 79 F.3d 223, 229 (2d Cir. 1996) ("It is well-settled that when a statute is concerned with a continuing offense, 'the Ex Post Facto clause is not violated by application of a statute to an enterprise that began prior to, but continued after, the effective date of [the statute].'") (citations omitted).

Because we conclude that this argument was not properly raised below, our review is for plain error. [17] To establish plain error, Tykarsky must show that: (1) an

---

Tykarsky's motion for post-conviction discovery. The primary piece of evidence sought by Tykarsky was a record of a telephone call Tykarsky made to his employer after he was arrested. He contends that this record will show that the post-arrest interview took place at a different time than the Government stated at trial. We agree with the District Court that this was not a proper subject of post-conviction discovery. Moreover, we fail to apprehend the significance Tykarsky attaches to this evidence and the inference that either the District Court or we should derive from it.

[16] 18 U.S.C. § 2423(b), the offense charged in Count One, does not carry a mandatory minimum sentence.

[17] The parties disagree on the appropriate standard of review. Before the instructions were given to the jury, defense counsel objected as follows:

[W]e ask, one, that the Court not instruct at all on punishment. And, secondly, in this particular case, I think it's appropriate for the Court, if it's going to do that, that we instruct that this is a mandatory minimum of five years that happened -- that straddled this case, because this case covered from 4/22 to 5/20, and on 4/30 the law changed. And there's facts in this case that I think can suggest that it was important for the jury to know the time of the change in law.

(App. at 779.)

We agree with the Government that this request was insufficient to preserve the issue. Defense counsel appears to be requesting that the jury simply be informed of the potential sentence, which is improper. Although he draws attention to the change in law and makes a vague reference to it being significant to the "facts in this case," he never requests a special verdict form or states that the jury must find that Tykarsky committed that crime after April 30. Although this objection is sufficient to convince us that defense counsel was not "sandbagging," *see United States v. Syme*, 276 F.3d 131, 154 n.9 (3d Cir. 2002) (noting that evidence of sandbagging weighs against finding plain error), it is nonetheless an inadequate objection.

error occurred, (2) the error was plain, (3) the error affected his substantial rights, and (4) the error is one seriously affecting the fairness, integrity or public reputation of judicial proceedings, such that the court should exercise its discretion to correct [**57] the error. *Johnson v. United States*, 520 U.S. 461, 466-467, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997).

[**58] **A.**

We agree with Tykarsky that because the communications spanned two different versions of the statute with different [*480] minimum penalties, the question of whether the violation extended beyond the effective date of the amended version was one that had to be resolved by the jury. [18] The Ex Post Facto Clause proscribes any law that "'changes the punishment, and inflicts a greater punishment, than the law annexed to the crime when committed.'" *Miller v. Florida*, 482 U.S. 423, 429, 107 S. Ct. 2446, 96 L. Ed. 2d 351 (1987) (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L. Ed. 648, 3 Dall. 386 (opinion of Chase, J.)). "Thus, if a defendant completes a crime before an increased penalty takes effect, it would violate his right not to be subject to ex post facto legislation to impose the increased penalty upon him." *United States v. Julian*, 427 F.3d 471, 482 (7th Cir. 2005). This is true even if, as in this case, the law's minimum punishment is not greater than the old law's maximum punishment. *See Miller*, 482 U.S. at 432-433 (citing *Lindsey v. Washington*, 301 U.S. 397, 57 S. Ct. 797, 81 L. Ed. 1182 (1937)). We also conclude that the error [**59] in not requiring a special jury finding was "plain" in that it was an obvious mistake in retrospect. *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) (observing that "plain" error is one which is "clear" or "obvious").

[**60] **B.**

We must next determine whether the error affected Tykarsky's substantial rights. *See Johnson*, 520 U.S. at 466-467. To "affec[t] substantial rights," the error must have been prejudicial. *Olano*, 507 U.S. at 734. Tykarsky has been prejudiced if there is a reasonable possibility that a jury, properly instructed on this point, might have found Tykarsky guilty based exclusively on acts that occurred before the increased penalty took effect. *See Julian*, 427 F.3d at 482 ("If a jury, properly instructed on this point, might have found that the conspiracy had come to an end before the increased penalty took effect or that Julian had withdrawn from the conspiracy before that date, then the error is one that implicates the fairness, integrity, or public reputation of the judicial process."); *United States v. Torres*, 901 F.2d 205, 229 (2d Cir. 1990) (finding plain error where it was possible, though improbable, that the jury would have convicted based on pre-enactment conduct); *see also United States v. Dobson*, 419 F.3d 231, 239-240 (3d Cir. 2005) (finding plain error where there was a "reasonable [**61] likelihood" that the error affected the outcome). If, however, a reasonable jury could have concluded only that the attempted persuasion or [*481] enticement continued past April 30, then the error did not affect Tykarsky's substantial rights.

In *Julian*, the Court of Appeals for the Seventh Circuit ultimately determined that the lack of a specific jury finding regarding the dates of involvement in a conspiracy to travel in foreign commerce for the purpose of engaging in illicit sexual activity did not prejudice the defendant. 427 F.3d at 483. There, the penalty for engaging in a § 2423(b) conspiracy had increased on October 30, 1998. *Id.* at 480. There was no real dispute that the conspiracy to which the defendant belonged was in operation both before and after October 30; the sole question was whether a reasonable jury could have found that the defendant withdrew from the conspiracy prior to October 30. *Id.* at 483. After observing that it is not easy to withdraw from a conspiracy, that it is the

[18] The Government argues that *Harris v. United States*, 536 U.S. 545, 560-568, 122 S. Ct. 2406, 153 L. Ed. 2d 524 (2002), permits judicial fact-finding in these circumstances. We disagree. *Harris* held that Congress may condition mandatory minimums on judicial findings so long as the sentence remains within the range authorized by the jury's verdict. *Id.* at 567. The date that Tykarsky violated § 2422(b) is not a "sentencing factor" as that term is used in *Harris*. Congress has not "'simply taken one factor that has always been considered by sentencing courts to bear on punishment . . . and dictated the precise weight to be given that factor.'" *Id.* at 568 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 89-90, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986)). Indeed, Congress has not authorized any judicial fact-finding. *Cf. id.* at 567 ("The *political system* may channel judicial discretion -- and rely upon judicial expertise -- by requiring defendants to serve minimum terms after judges make certain factual findings.) (emphasis added). The date of the violation determines under which version of § 2422(b) Tykarsky should be sentenced, and the jury must therefore find beyond a reasonable doubt that an element of the crime occurred after the effective date of the PROTECT Act. *See, e.g., United States v. Torres*, 901 F.2d 205, 229 (2d Cir. 1990) (requiring a jury finding where amendment increased mandatory minimum from 10 years to life).

defendant's burden to show that he did so, and that there was no evidence of any affirmative acts of withdrawal, the court concluded that no reasonable [**62] jury could have found that defendant withdrew from the conspiracy prior to October 30, 1998. *Id.*

Reviewing for harmless error, the Court of Appeals for the Second Circuit reached a similar conclusion in *United States v. Harris*, concluding that there was "no possibility" that the jury relied solely on conduct occurring before the enactment of a continuing financial crimes enterprise ("CFCE") statute. 79 F.3d at 229. The court observed that the district court's instruction expressly required the jury to find that Harris engaged in a "series of acts" that necessarily encompassed post-CFCE enactment conduct. *Id.*; *see also United States v. Williams-Davis*, 319 U.S. App. D.C. 267, 90 F.3d 490, 510 (D.C. Cir. 1996) (rejecting defendant's ex post facto claim where "there was no possibility that the jury finding could have rested solely on conduct preceding the critical date").

By contrast, in *United States v. Torres*, the Second Circuit, reviewing for plain error, found an ex post facto violation where the defendants were subjected to life sentences based on conduct that "straddled" the date that the mandatory life sentence provision went into [**63] effect. 901 F.2d at 229. Although the court agreed with the Government that it was highly improbable that the jury did not convict based on post-enactment acts, it nonetheless observed:

> It is clear that (1) it was the government's burden to prove all the elements of section 848(b) beyond a reasonable doubt; (2) the instruction and verdict form allowed a resolution of this issue against the Torres brothers and Flores whether or not they met the requirements of section 848(b)(1) on or after October 27, 1986; (3) the ex post facto rule requires such conduct on or after October 27, 1986, as a constitutional matter, as a basis for a conviction under section 848(b); and (4) as a result of the resolution of this issue adversely to them, these defendants were subjected to the mandatory life sentence imposed by section 848(b), rather than the ten years to life sentence which would otherwise have been applicable under section 848(a).

*Id.* at 229. The court therefore concluded that the mere possibility, however remote under the facts, that the jury convicted based on pre-enactment acts was sufficient to constitute plain error and required a remand for [**64] resentencing. *Id.*

Here, we believe there is a possibility that a reasonable jury could have convicted Tykarsky based solely on the pre-April 30 communications. The District Court's reasoning takes the form of a classic non sequitur insofar as it concludes that the jury *must* have found that Tykarsky violated [*482] § 2422(b) after April 30 because it found that he communicated with the putative minor after that date to arrange the meeting at the Holiday Inn. The District Court's major premise is that § 2422(b) proscribes the attempted persuasion, inducement, enticement or coercion of a minor to engage in sexual activity. The minor premise is that Tykarsky arranged the meeting with the putative minor after April 30. But the District Court's conclusion -- that Tykarsky therefore violated § 2422(b) -- does not follow.

Section 2422(b) does not prohibit all communications with a minor; nor does it prohibit all communications that relate to illegal sexual activity. It only proscribes communications that actually or attempt to knowingly "persuade," "induce," "entice" or "coerce" a minor to engage in illicit sexual activity. That Tykarsky arranged the meeting with the putative minor after [**65] April 30, therefore, does not establish that he violated § 2422(b) after that date.

The problem can be illustrated with a simple hypothetical. Assume that John Doe contacts Jane Minor on April 29 and that they engage in a long Instant Messenger conversation. He promises her various things and asks her to meet up with him for sex. But when he asks her if she is free that night, she says that her parents won't let her leave the house but that she would like to meet the next week. Three days later, on May 1, they engage in another Instant Messenger conversation in which they flirt with one another and schedule a meeting at the local Best Western on May 3. At what point did John Doe violate § 2422(b)? That is, when did the actual or attempted persuasion, inducement, enticement or coercion occur?

A jury could endorse the Government's view here that the communications should be considered together and that they constitute a "continuing offense" in violation of § 2422. It could also conclude that both the April 29 and the May 1 communications independently constituted violations of § 2422(b). But it is also possible for the jury to conclude that only the April 29 communication violated [**66] § 2422(b) and that the subsequent May 1 communication did not entail any enticement or

persuasion. Indeed, if the April 29 conversation accomplished its purposes of persuading Jane Minor to engage in sexual activity, then there would be no need for any further persuasion or enticement.

As in both this hypothetical and *Torres*, here there is at least a possibility that the jury convicted Tykarsky based solely on pre-PROTECT Act conduct. A reasonable jury could have concluded that because "HeatherJet14" already indicated a willingness to engage in sexual activity in the earlier communications, the later communications were either not sufficiently objectively persuasive to constitute a substantial step or were not written with the requisite intent to induce or persuade, *see Dhingra*, 371 F.3d at 562-563 (observing that § 2422(b) requires not only that the communication be objectively persuasive, but that they be made with the intent to persuade). This case is not like *Julian*, where the defendant had the burden of proving withdrawal and did not introduce any evidence. It is also unlike *Harris*, where the district court's instructions required the jury to convict [**67] the defendant based on post-enactment acts. The most that can be said here is that it is improbable, rather than impossible, as a *factual matter*, that the jury convicted Tykarsky exclusively on the basis of pre-April 30 acts. This, however, is insufficient to persuade us that Tykarsky's substantial rights were not affected.

Moreover, we should be especially cautious in making assumptions about how a properly instructed jury would have found [*483] where, as here, the statute under which the defendant was convicted vests broad discretion in the jury. Although we have concluded that § 2422(b) is not unconstitutionally vague, *see supra* Section V, we have also observed that the terms "persuade," "entice," "induce" and "coerce" are somewhat imprecise, requiring the consideration of subtle nuances in a given fact pattern. For example, how much more is needed than simply asking? Can a person be guilty if the minor has already indicated that he or she wants to engage in sexual activity? The absence of statutory guidance indicates that the jury, rather than an appellate court, should decide whether and when the defendant crossed the line from mere conversation to attempted persuasion, [**68] inducement, enticement or coercion.

### C.

We turn now to the fourth element of plain error review: whether the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. In light of the Government's burden of proving all elements beyond a reasonable doubt and the possibility that the jury convicted Tykarsky based solely on pre-PROTECT Act conduct, we conclude that the District Court's failure to require a special verdict tainted the integrity and reputation of the judicial process. The proscription against ex post facto laws is "fundamental to our concept of constitutional liberty." *Marks v. United States*, 430 U.S. 188, 191-192, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977); *see also* The Federalist No. 44, p. 282 (C. Rossiter ed. 1961) ("[E]x post facto laws . . . are contrary to the first principles of the social compact and to every principle of sound legislation."). Tykarsky was sentenced to a mandatory minimum pursuant to a statute -- the amended version of § 2422(b) -- that no jury ever specifically found that he had violated. We therefore conclude that sentencing Tykarsky to the mandatory minimum prescribed by the PROTECT Act constitutes [**69] plain error, and we will vacate his sentence. [19]

* * *

We have considered all other assignments of error and conclude that they do not merit discussion. For the foregoing reasons, we will affirm Tykarsky's convictions for violating 18 U.S.C. §§ 2422(b) & 2423(b), vacate his sentence, and remand to [**70] the District Court for additional proceedings consistent with this opinion.

---

End of Document

[19] Because we will remand for resentencing, we do not reach Tykarsky's contention that the District Court erred in denying a motion to compel the prosecution to file a motion for a downward departure. *See Wade v. United States*, 504 U.S. 181, 185, 112 S. Ct. 1840, 118 L. Ed. 2d 524 (1992) (holding that the prosecution's failure to file a motion for downward departure can be reviewed for an unconstitutional motive). We also do not express any opinion on the question, raised at oral argument, of whether the District Court must sentence Tykarsky under the pre-PROTECT Act version of § 2422(b) or whether it could empanel a new jury to determine the date of the violation.

# Grayned v. City of Rockford

408 U.S. 104 (1972)

Cited in Opening Brief at: 45

See Response, Part III.G. Highlighted language appears at 408 U.S. at 108.

Warning
As of: September 14, 2026 7:08 PM Z

# Grayned v. City of Rockford

Supreme Court of the United States

January 19, 1972, Argued ; June 26, 1972, Decided

No. 70-5106

**Reporter**
408 U.S. 104 *; 92 S. Ct. 2294 **; 33 L. Ed. 2d 222 ***; 1972 U.S. LEXIS 26 ****

GRAYNED v. CITY OF ROCKFORD

**Prior History:** [****1] APPEAL FROM THE SUPREME COURT OF ILLINOIS.

**Disposition:** 46 Ill. 2d 492, 263 N. E. 2d 866, affirmed in part and reversed in part.

## Syllabus

1. Antipicketing ordinance, virtually identical with one invalidated as violative of equal protection in *Police Department of Chicago* v. *Mosley, ante*, p. 92, is likewise invalid. P. 107.

2. Antinoise ordinance prohibiting a person while on grounds adjacent to a building in which a school is in session from willfully making a noise or diversion that disturbs or tends to disturb the peace or good order of the school session is not unconstitutionally vague or overbroad. The ordinance is not vague since, with fair warning, it prohibits only actual or imminent, and willful, interference with normal school activity, and is not a broad invitation to discriminatory enforcement. *Cox* v. *Louisiana*, 379 U.S. 536; *Coates* v. *Cincinnati*, 402 U.S. 611, distinguished. The ordinance is not overbroad as unduly interfering with First Amendment rights since expressive activity is prohibited only if it "materially disrupts classwork." *Tinker* v. *Des Moines School District*, 393 U.S. 503, 513. [****2] Pp. 107-121.

**Counsel:** Sophia H. Hall argued the cause for appellant. With her on the briefs were William R. Ming, Jr., and Aldus S. Mitchell.

William E. Collins argued the cause for appellee. With him on the brief were A. Curtis Washburn and Charles F. Thomas.

**Judges:** Marshall, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, White, Powell, and Rehnquist, JJ., joined. Blackmun, J., filed a statement joining in the judgment and in Part I of the Court's opinion and concurring in the result as to Part II of the opinion, post, p. 121. Douglas, J., filed an opinion dissenting in part and joining in Part I of the Court's opinion, post, p. 121.

**Opinion by:** MARSHALL

## Opinion

[*105] [***225] [**2297] MR. JUSTICE MARSHALL delivered the opinion of the Court.

Appellant Richard Grayned was convicted for his part in a demonstration in front of West Senior High School in Rockford, Illinois. Negro students at the school had first presented their grievances to school administrators. When the principal took no action on crucial complaints, a more public demonstration of protest was planned. On April 25, 1969, approximately 200 people -- students, their family members, and friends -- [****3] gathered next to the school grounds. Appellant, whose brother and twin sisters were attending the school, was part of this group. The demonstrators marched around on a sidewalk about 100 feet from the school building, which was set back from the street. Many carried signs which summarized the grievances: "Black cheerleaders to cheer too"; "Black history with black teachers"; "Equal rights, Negro counselors." Others, without placards, made the "power to the people" sign with their upraised and clenched fists.

[***226] In other respects, the evidence at appellant's trial was sharply contradictory. Government witnesses reported that the demonstrators repeatedly cheered, chanted, baited policemen, and made other noise that was audible in the school; that hundreds of students were distracted from their school activities and lined the classroom windows to watch the demonstration; that

some demonstrators successfully yelled to their friends to leave the school building and join the demonstration; that uncontrolled latenesses after period changes in the school were far greater than usual, with late students admitting that they had been watching the demonstration; and that, in general, [****4] orderly school procedure was disrupted. Defense witnesses claimed that the demonstrators were at all times quiet and orderly; that they did not seek to violate the law, but only to "make [*106] a point"; that the only noise was made by policemen using loudspeakers; that almost no students were noticeable at the schoolhouse windows; and that orderly school procedure was not disrupted.

[1A]After warning the demonstrators, the police arrested 40 of them, including appellant. [1] For participating in the [**2298] demonstration, Grayned was tried and convicted of violating two Rockford ordinances, hereinafter referred to as the "antipicketing" ordinance and the "antinoise" ordinance. A $ 25 fine was imposed for each violation. Since Grayned challenged the constitutionality of each ordinance, he appealed directly to the Supreme Court of Illinois. Ill. Sup. Ct. Rule 302. He claimed that the ordinances were invalid on their face, but did not urge that, as applied to him, the ordinances had punished constitutionally protected activity. The Supreme Court of Illinois held that both ordinances were constitutional on their face. 46 Ill. 2d 492, 263 N. E. 2d 866 (1970). [****5] We noted probable jurisdiction, 404 U. S. 820 (1971). We conclude that the antipicketing ordinance is unconstitutional, but affirm the court below with respect to the antinoise ordinance.

[1B]

[****6] [*107] I

[2] [3A]At the time of appellant's arrest and conviction, Rockford's antipicketing ordinance provided that

"A person commits disorderly conduct when he knowingly:

. . . .

"(i) Pickets or demonstrates on a public way within 150 feet of any primary or secondary school building while the school is in session and one-half hour before the school is in session and one-half hour after the school session has been concluded, provided that this subsection [***227] does not prohibit the peaceful picketing of any school involved in a labor dispute . . . ." Code of Ordinances, c. 28, § 18.1 (i).

This ordinance is identical to the Chicago disorderly conduct ordinance we have today considered in *Police Department of Chicago* v. *Mosley, ante*, p. 92. For the reasons given in *Mosley*, we agree with dissenting Justice Schaefer below, and hold that § 18.1 (i) violates the Equal Protection Clause of the Fourteenth Amendment. Appellant's conviction under this invalid ordinance must be reversed. [2]

[3B]

[****7] II

The antinoise ordinance reads, in pertinent part, as follows:

"No person, while on public or private grounds adjacent to any building in which a school or any [*108] class thereof is in session, shall willfully make or assist in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof. . . ." Code of Ordinances, c. 28, § 19.2 (a).

Appellant claims that, on its face, this ordinance is both vague and overbroad, and therefore unconstitutional. We conclude, however, that the ordinance suffers from neither of these related infirmities.

A. Vagueness

---

[1] Police officers testified that "there was no way of picking out any one in particular" while making arrests. Report of Proceedings in Circuit Court, 17th Judicial Circuit, Winnebago County 66. However, apparently only males were arrested. *Id.*, at 65, 135, 147. Since appellant's sole claim in this appeal is that he was convicted under facially unconstitutional ordinances, there is no occasion for us to evaluate either the propriety of these selective arrests or the sufficiency of evidence that appellant himself actually engaged in conduct within the terms of the ordinances. MR. JUSTICE DOUGLAS, in concluding that appellant's particular behavior was protected by the First Amendment, reaches a question not presented by the parties here or in the court below. See Tr. of Oral Arg. 16-17; Jurisdictional Statement 3; *City of Rockford* v. *Grayned*, 46 Ill. 2d 492, 494, 263 N. E. 2d 866, 867 (1970).

[2] In November 1971, the antipicketing ordinance was amended to delete the labor picketing proviso. As Rockford notes, "This amendment and deletion has, of course, no effect on Appellant's personal situation." Brief 2. Necessarily, we must consider the facial constitutionality of the ordinance in effect when appellant was arrested and convicted.

[4]It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity [**2299] to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. [3] [****9] Second, if arbitrary and discriminatory enforcement is to be prevented, laws [****8] must provide explicit standards for those who apply them. [4] A vague [***228] law impermissibly delegates [*109] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. [5] [****10] Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," [6] it "operates to inhibit the exercise of [those] freedoms." [7] Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." [8]

[5A][6]Although the question is close, we conclude that the antinoise ordinance is not impermissibly vague. The court below rejected appellant's arguments "that proscribed conduct was not sufficiently specified and that police were given too broad a discretion in determining whether conduct was proscribed." 46 Ill. 2d, at 494, 263 N. E. 2d, at 867. Although [****11] it referred to other, similar statutes it had recently construed and upheld, the court [*110] below [**2300] did not elaborate on the meaning of the antinoise ordinance. [9] In this situation, as Mr. Justice Frankfurter put it, we must "extrapolate its allowable meaning." [10] Here, we are "relegated . . . to the words of the ordinance itself," [11] to the interpretations the court below has given to analogous statutes, [12] and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it. [13] [****12] "Extrapolation," of course, is a delicate task, for it is not within our power to construe and narrow state laws. [14]

---

[3] *E. g., Papachristou* v. *City of Jacksonville*, 405 U.S. 156, 162 (1972); *Cramp* v. *Board of Public Instruction*, 368 U.S. 278, 287 (1961); *United States* v. *Harriss*, 347 U.S. 612, 617 (1954); *Jordan* v. *De George*, 341 U.S. 223, 230-232 (1951); *Lanzetta* v. *New Jersey*, 306 U.S. 451, 453 (1939); *Connally* v. *General Construction Co*., 269 U.S. 385, 391 (1926); *United States* v. *Cohen Grocery Co*., 255 U.S. 81, 89 (1921); *International Harvester Co*. v. *Kentucky*, 234 U.S. 216, 223-224 (1914).

[4] *E. g., Papachristou* v. *City of Jacksonville, supra; Coates* v. *Cincinnati*, 402 U.S. 611, 614 (1971); *Gregory* v. *Chicago*, 394 U.S. 111, 120 (1969) (Black, J., concurring); *Interstate Circuit* v. *Dallas*, 390 U.S. 676, 684-685 (1968); *Ashton* v. *Kentucky*, 384 U.S. 195, 200 (1966); *Giaccio* v. *Pennsylvania*, 382 U.S. 399 (1966); *Shuttlesworth* v. *Birmingham*, 382 U.S. 87, 90-91 (1965); *Kunz* v. *New York*, 340 U.S. 290 (1951); *Saia* v. *New York*, 334 U.S. 558, 559-560 (1948); *Thornhill* v. *Alabama*, 310 U.S. 88, 97-98 (1940); *Herndon* v. *Lowry*, 301 U.S. 242, 261-264 (1937).

[5] Where First Amendment interests are affected, a precise statute "evincing a legislative judgment that certain specific conduct be . . . proscribed," *Edwards* v. *South Carolina*, 372 U.S. 229, 236 (1963), assures us that the legislature has focused on the First Amendment interests and determined that other governmental policies compel regulation. See Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup. Ct. Rev. 1, 32; *Garner* v. *Louisiana*, 368 U.S. 157, 200, 202 (1961) (Harlan, J., concurring in judgment).

[6] *Baggett* v. *Bullitt*, 377 U.S. 360, 372 (1964).

[7] *Cramp* v. *Board of Public Instruction*, 368 U.S., at 287.

[8] *Baggett* v. *Bullitt, supra*, at 372, quoting *Speiser* v. *Randall*, 357 U.S. 513, 526 (1958). See *Interstate Circuit* v. *Dallas, supra*, at 684; *Ashton* v. *Kentucky, supra*, at 195, 200-201; *Dombrowski* v. *Pfister*, 380 U.S. 479, 486 (1965); *Smith* v. *California*, 361 U.S. 147, 150-152 (1959); *Winters* v. *New York*, 333 U.S. 507 (1948); *Stromberg* v. *California*, 283 U.S. 359, 369 (1931).

[9] The trial magistrate simply charged the jury in the words of the ordinance. The complaint and verdict form used slightly different language. See n. 24, *infra*.

[10] *Garner* v. *Louisiana*, 368 U.S., at 174 (concurring in judgment).

[11] *Coates* v. *Cincinnati*, 402 U.S., at 614.

[12] *E. g., Gooding* v. *Wilson*, 405 U.S. 518 (1972).

[13] *E. g., Lake Carriers Assn*. v. *MacMullan*, 406 U.S. 498, 506-508 (1972); *Cole* v. *Richardson*, 405 U.S. 676 (1972); *Ehlert* v. *United States*, 402 U.S. 99, 105, 107 (1971); cf. *Poe* v. *Ullman*, 367 U.S. 497 (1961).

[14] *United States* v. *37 Photographs*, 402 U.S. 363, 369 (1971).

[5B]With that warning, we find no unconstitutional vagueness in the antinoise ordinance. Condemned to the use of words, we can never expect [***229] mathematical certainty from our language. [15] [****14] The words of the Rockford ordinance are marked by "flexibility and reasonable breadth, rather than meticulous specificity," *Esteban* v. *Central Missouri State College*, 415 F.2d 1077, 1088 (CA8 1969) (Blackmun, J.), cert. denied, 398 U.S. 965 (1970), but we think it is clear what the ordinance as a whole prohibits. Designed, according to its preamble, "for the protection of Schools," the ordinance forbids deliberately [*111] noisy or diversionary [16] activity that disrupts or is about to disrupt normal school activities. It forbids this willful activity at fixed times -- when school is in session -- and at a sufficiently fixed place -- "adjacent" to the school. [17] Were we left with just the words of the ordinance, we might be troubled by the imprecision of the phrase "tends to disturb." [18] However, [****13] in *Chicago* v. *Meyer*, 44 Ill. 2d 1, 4, 253 N. E. 2d 400, 402 (1969), and *Chicago* v. *Gregory*, 39 Ill. 2d 47, 233 N. E. 2d 422 (1968), reversed on other grounds, 394 U.S. 111 (1969), the Supreme Court of Illinois construed a Chicago ordinance prohibiting, *inter alia*, a "diversion tending to disturb the peace," and held that it permitted conviction only where there was " [**2301] *imminent* threat of violence." (Emphasis supplied.) See *Gregory* v. *Chicago*, 394 U.S. 111, 116-117, 121-122 (1969) (Black, J., concurring). [19] Since *Meyer* was specifically cited in the opinion below, and it in turn drew heavily on *Gregory*, we think it proper to conclude that the Supreme Court of Illinois would interpret the Rockford ordinance to prohibit only actual [*112] or imminent interference with the "peace or good order" of the school. [20]

[****15] Although [***230] the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted. We do not have here a vague, general "breach of the peace" ordinance, but a statute written specifically for the school context, where the prohibited disturbances are easily measured by their impact on the normal activities of the school. Given this "particular context," the ordinance gives "fair notice to those to whom [it] is directed." [21] Although the Rockford ordinance may not be as precise as the statute we upheld in *Cameron* v. *Johnson*, 390 U.S. 611 (1968) -- which prohibited picketing "in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from" any courthouse -- we think that, as in *Cameron*, the ordinance here clearly "delineates its reach in words of common understanding." *Id*., at 616.

[****16] [*113] *Cox* v. *Louisiana*, 379 U.S. 536 (1965),

---

[15] It will always be true that the fertile legal "imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question." *American Communications Assn*. v. *Douds*, 339 U.S. 382, 412 (1950).

[16] "Diversion" is defined by *Webster's Third New International Dictionary* as "the act or an instance of diverting from one course or use to another . . . : the act or an instance of diverting (as the mind or attention) from some activity or concern . . . : a turning aside . . . : something that turns the mind from serious concerns or ordinary matters and relaxes or amuses."

[17] Cf. *Cox* v. *Louisiana*, 379 U.S. 559, 568-569 (1965) ("near" the courthouse not impermissibly vague).

[18] See *Gregory* v. *Chicago*, 394 U.S., at 119-120 (Black, J., concurring); *Gooding* v. *Wilson*, 405 U.S., at 525-527; *Craig* v. *Harney*, 331 U.S. 367, 372 (1947); cf. *Chaplinsky* v. *New Hampshire*, 315 U.S. 568 (1942) (statute punishing "fighting words," that have a "*direct* tendency to cause acts of violence," upheld); *Street* v. *New York*, 394 U.S. 576, 592 (1969).

[19] Cf. *Chicago* v. *Terminiello*, 400 Ill. 23, 79 N. E. 2d 39 (1948), reversed on other grounds, 337 U. S. 1, 6 (1949).

[20] Some intermediate appellate courts in Illinois appear to have interpreted the phrase "tending to" out of the Chicago ordinance entirely, at least in some contexts. *Chicago* v. *Hansen*, 337 Ill. App. 663, 86 N. E. 2d 415 (1949); *Chicago* v. *Holmes*, 339 Ill. App. 146, 88 N. E. 2d 744 (1949); *Chicago* v. *Nesbitt*, 19 Ill. App. 2d 220, 153 N. E. 2d 259 (1958); but cf. *Chicago* v. *Williams*, 45 Ill. App. 2d 327, 195 N. E. 2d 425 (1963).

In its brief, the city of Rockford indicates that its sole concern is with *actual* disruption. "[A] court and jury [are] charged with the duty of determining whether or not . . . a school *has been disrupted* and that the defendant's conduct, [no matter what it was,] caused or contributed to cause the disruption." Brief for Appellee 16 (emphasis supplied). This was the theory on which the city tried appellant's case to the jury, Report, *supra*, n. 1, at 12-13, although the jury was instructed in the words of the ordinance. As already noted, *supra*, n. 1, no challenge is made here to the Rockford ordinance as applied in this case.

[21] *American Communications Assn*. v. *Douds*, 339 U.S., at 412.

and *Coates* v. *Cincinnati*, 402 U.S. 611 (1971), on which appellant particularly relies, presented completely different situations. In *Cox*, a general breach of the peace ordinance had been construed by state courts to mean "to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet." The Court correctly concluded that, as construed, the ordinance permitted persons to be punished for merely expressing unpopular views. [22] In *Coates*, the ordinance punished the sidewalk assembly of three or more persons who "conduct themselves in a manner annoying to [**2302] persons passing by . . ." We held, in part, that the ordinance was impermissibly vague because enforcement depended on the completely subjective standard of "annoyance."

[****17] [5C]In contrast, Rockford's antinoise ordinance does not permit punishment for the expression of an unpopular point of view, and it contains no broad invitation to subjective or discriminatory enforcement. Rockford does not claim the broad power to punish all "noises" and "diversions." [23] The vagueness of these terms, by themselves, is dispelled by the ordinance's requirements that (1) the "noise or diversion" be actually incompatible with normal school activity; (2) there be a demonstrated causality between the disruption that occurs and the "noise or diversion"; and (3) the acts be [*114] "willfully" done. [24] "Undesirables [***231] " or their "annoying" conduct may not be punished. The ordinance does not permit people to "stand on a public sidewalk . . . only at the whim of any police officer." [25] Rather, there must be demonstrated interference with school activities. As always, enforcement requires the exercise of some degree of police judgment, but, as confined, that degree of judgment here is permissible. The Rockford City Council has made the basic policy choices, and has given fair warning as to what is prohibited. "The ordinance defines boundaries sufficiently distinct" [****18] for citizens, policemen, juries, and appellate judges. [26] It is not impermissibly vague.

B. Overbreadth

[7][8]A clear and precise enactment may nevertheless be "overbroad" if in its reach it prohibits constitutionally protected conduct. [27] Although appellant does not claim that, as applied to him, [****19] the antinoise ordinance has punished protected expressive activity, he claims that the ordinance is overbroad on its face. Because overbroad laws, like vague ones, deter privileged activity, our cases firmly establish appellant's standing to raise an overbreadth challenge. [28] The crucial question, then, is [*115] whether the ordinance sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments. Specifically, appellant contends that the Rockford ordinance unduly interferes with First and Fourteenth Amendment rights to picket on a public sidewalk near a school. We disagree.

"

[9]In considering the [****20] right of a municipality to control the use of public streets for the expression of religious [or political] views, we start with the words of Mr. Justice Roberts that 'Wherever the title of streets and parks may rest, they have immemorially been held

---

[22] Cf. *Edwards* v. *South Carolina*, 372 U.S. 229 (1963); *Cantwell* v. *Connecticut*, 310 U.S. 296, 308 (1940). Similarly, in numerous other cases, we have condemned broadly worded licensing ordinances which grant such standardless discretion to public officials that they are free to censor ideas and enforce their own personal preferences. *Shuttlesworth* v. *Birmingham*, 394 U.S. 147 (1969); *Staub* v. *City of Baxley*, 355 U.S. 313 (1958); *Saia* v. *New York*, 334 U.S. 558 (1948); *Schneider* v. *State*, 308 U.S. 147, 163-164 (1939); *Lovell* v. *Griffin*, 303 U.S. 444 (1938); *Hague* v. *CIO*, 307 U.S. 496 (1939).

[23] Cf. *Cox* v. *Louisiana*, 379 U.S. 536, 546-550 (1965); *Edwards* v. *South Carolina*, 372 U.S., at 234-237.

[24] Tracking the complaint, the jury verdict found Grayned guilty of "wilfully causing diversion of good order of public school in session, in that while on school grounds and while school was in session, did wilfully make and assist in the making of a diversion which tended to disturb the peace and good order of the school session and class thereof."

[25] *Shuttlesworth* v. *Birmingham*, 382 U.S., at 90.

[26] *Chicago* v. *Fort*, 46 Ill. 2d 12, 16, 262 N. E. 2d 473, 476 (1970), a case cited in the opinion below.

[27] See *Zwickler* v. *Koota*, 389 U.S. 241, 249-250 (1967), and cases cited.

[28] *E. g., Gooding* v. *Wilson*, 405 U.S. 518 (1972); *Coates* v. *Cincinnati*, 402 U.S., at 616; *Dombrowski* v. *Pfister*, 380 U.S., at 486, and cases cited; *Kunz* v. *New York*, 340 U.S. 290 (1951).

in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing [**2303] public questions.' *Hague* v. *CIO*, 307 U.S. 496, 515 (1939)." *Kunz* v. *New York*, 340 U.S. 290, 293 (1951). See *Shuttlesworth* v. *Birmingham*, 394 U.S. 147, 152 (1969).The right to use a public place for expressive activity may be restricted only for weighty reasons.

[10][11]Clearly, government has no power to restrict such activity because of its message. [29] Our cases make equally clear, however, that reasonable "time, place and manner" regulations may be necessary to further significant governmental interests, [***232] and are permitted. [30] [****22] For example, two parades cannot march on the same street simultaneously, and government may allow only one. *Cox* v. *New Hampshire*, 312 U.S. 569, 576 (1941). [****21] A demonstration or parade on a large street during rush hour [*116] might put an intolerable burden on the essential flow of traffic, and for that reason could be prohibited. *Cox* v. *Louisiana*, 379 U.S., at 554. If overamplified loudspeakers assault the citizenry, government may turn them down. *Kovacs* v. *Cooper*, 336 U.S. 77 (1949); *Saia* v. *New York*, 334 U.S. 558, 562 (1948). Subject to such reasonable regulation, however, peaceful demonstrations in public places are protected by the First Amendment. [31] Of course, where demonstrations turn violent, they lose their protected quality as expression under the First Amendment. [32]

[12][13][14]The nature of a place, "the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." [33] Although a silent vigil may not unduly interfere with a public library, *Brown* v. *Louisiana*, 383 U.S. 131 (1966), making a speech in the reading room almost certainly would. That same speech should be perfectly appropriate in a park. The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; [34] the regulation must be narrowly [*117] tailored [**2304] to further the State's legitimate interest. [35] [****24] Access [***233] to the "streets, sidewalks, parks, and other similar public places . . . for the purpose of exercising [First Amendment [****23] rights] cannot constitutionally be denied broadly . . . ." [36] Free expression "must not, in the guise of regulation, be abridged or denied." [37]

[15A]In light of these general principles, we do not think that Rockford's ordinance is an unconstitutional regulation of activity around a school. Our touchstone is *Tinker* v. *Des Moines School District*, 393 U.S. 503 (1969), in which we considered the question of how to accommodate First Amendment rights with the "special characteristics of the school environment." *Id.*, at 506. *Tinker* held that the Des Moines School District could not punish students for wearing black armbands to

---

[29] *Police Department of Chicago* v. *Mosley, ante*, p. 92.

[30] *Cox* v. *New Hampshire*, 312 U.S. 569, 575-576 (1941); *Kunz* v. *New York*, 340 U.S., at 293-294; *Poulos* v. *New Hampshire*, 345 U.S. 395, 398 (1953); *Cox* v. *Louisiana*, 379 U.S., at 554-555; *Cox* v. *Louisiana*, 379 U.S. 559 (1965); *Adderley* v. *Florida*, 385 U.S. 39, 46-48 (1966); *Food Employees* v. *Logan Valley Plaza*, 391 U.S. 308, 320-321 (1968); *Shuttlesworth* v. *Birmingham*, 394 U.S. 147 (1969).

[31] *Police Department of Chicago* v. *Mosley, ante*, at 95-96, and cases cited.

[32] See generally T. Emerson, The System of Freedom of Expression 328-345 (1970).

[33] Wright, The Constitution on the Campus, 22 Vand. L. Rev. 1027, 1042 (1969). Cf. *Cox* v. *Louisiana*, 379 U.S. 559 (1965); *Adderley* v. *Florida*, 385 U.S. 39 (1966); *Food Employees* v. *Logan Valley Plaza*, 391 U.S. 308 (1968); *Tinker* v. *Des Moines School District*, 393 U.S. 503 (1969).

[34] *E. g., Schneider* v. *State*, 308 U.S. 147 (1939); *Talley* v. *California*, 362 U.S. 60 (1960); *Saia* v. *New York*, 334 U.S., at 562; *Cox* v. *New Hampshire*, 312 U.S., at 574; *Hague* v. *CIO*, 307 U.S., at 516. See generally Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup. Ct. Rev. 1.

[35] *De Jonge* v. *Oregon*, 299 U.S. 353, 364-365 (1937); *Lovell* v. *Griffin*, 303 U.S., at 451; *Schneider* v. *State*, 308 U.S., at 164; *Cantwell* v. *Connecticut*, 310 U.S., at 307; *Cox* v. *Louisiana*, 379 U.S., at 562-564; *Davis* v. *Francois*, 395 F.2d 730 (CA5 1968). Cf. *Shelton* v. *Tucker*, 364 U.S. 479, 488 (1960); *NAACP* v. *Button*, 371 U.S. 415, 438 (1963).

[36] *Food Employees* v. *Logan Valley Plaza*, 391 U.S., at 315.

[37] *Hague* v. *CIO*, 307 U.S., at 516.

school in protest of the Vietnam war. Recognizing that "'wide exposure to . . . robust exchange of ideas'" is an "important part of the educational process" and should be nurtured, *id.*, at 512, we concluded that free expression could not be barred from the school campus. We made clear that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression," *id.*, at 508, [38] [****25] and that particular expressive activity could not be prohibited because of a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," *id.*, at 509. But we nowhere suggested that students, teachers, or anyone else has an absolute constitutional right to use [*118] all parts of a school building or its immediate environs for his unlimited expressive purposes. Expressive activity could certainly be restricted, but only if the forbidden conduct "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.*, at 513. The wearing of armbands was protected in *Tinker* because the students "neither interrupted school activities nor sought to intrude in the school affairs or the lives of others. They caused discussion outside of the classrooms, but no interference with work and no disorder." *Id.*, at 514. Compare *Burnside* v. *Byars*, 363 F.2d 744 (CA5 1966), and *Butts* v. *Dallas Ind. School District*, 436 F.2d 728 (CA5 1971), with *Blackwell* v. *Issaquena County Board of Education*, 363 F.2d 749 (CA5 1966). [****26]

[16]Just as *Tinker* made clear that school property may not be declared off limits for expressive activity by students, we think it clear that the public sidewalk adjacent to school grounds may not be declared off limits for expressive activity by members of the public. But in each case, expressive activity may be prohibited if it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Tinker* v. *Des Moines School District*, 393 U.S., at 513.[39]

[****27] [17]We [***234] would be ignoring reality if we did not recognize that the public schools in a community are important institutions, and are often the focus of [**2305] significant grievances. [40] [****28] Without interfering with normal school activities, [*119] daytime picketing and handbilling on public grounds near a school can effectively publicize those grievances to pedestrians, school visitors, and deliverymen, as well as to teachers, administrators, and students. Some picketing to that end will be quiet and peaceful, and will in no way disturb the normal functioning of the school. For example, it would be highly unusual if the classic expressive gesture of the solitary picket disrupts anything related to the school, at least on a public sidewalk open to pedestrians. [41] On the other hand, schools could hardly tolerate boisterous demonstrators who drown out classroom conversation, make studying impossible, block entrances, or incite children to leave the schoolhouse. [42]

Rockford's antinoise ordinance goes no further than *Tinker* says a municipality may go to prevent interference with its schools. It is narrowly tailored to further Rockford's compelling interest in having an undisrupted school session conducive to the students' learning, and does not unnecessarily interfere with First Amendment rights. Far from having an impermissibly broad prophylactic ordinance, [43] [****29] Rockford punishes only conduct which disrupts or is about to disrupt normal school activities. That decision is made, as it should be, on an individualized basis, given the particular fact situation. Peaceful picketing which does not interfere with the ordinary functioning of the school is permitted. [*120] And the ordinance gives no license

---

[38] Cf. *Hague* v. *CIO, supra*, at 516.

[39] In *Tinker* we recognized that the principle of that case was not limited to expressive activity within the school building itself. *Id.*, at 512 n. 6, 513-514. See *Esteban* v. *Central Missouri State College*, 415 F.2d 1077 (CA8 1969) (Blackmun, J.), cert. denied, 398 U.S. 965 (1970); *Jones* v. *Board of Regents*, 436 F.2d 618 (CA9 1970); *Hammond* v. *South Carolina State College*, 272 F.Supp. 947 (SC 1967), cited in *Tinker*.

[40] Cf. *Thornhill* v. *Alabama*, 310 U.S., at 102. It goes without saying that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider* v. *State*, 308 U.S., at 163.

[41] Cf. *Jones* v. *Board of Regents, supra*.

[42] Cf. *Barker* v. *Hardway*, 283 F.Supp. 228 (SD W. Va.), aff'd, 399 F.2d 638 (CA4 1968), cert. denied, 394 U.S. 905 (1969) (Fortas, J., concurring).

[43] See *Jones* v. *Board of Regents, supra; Hammond* v. *South Carolina State College, supra*.

to punish anyone because of what he is saying. [44]

[18]We recognize that the ordinance prohibits some picketing that is neither violent nor physically obstructive. Noisy demonstrations that disrupt or are incompatible with normal school activities are obviously within the ordinance's reach. Such expressive conduct may be constitutionally protected at other places or other times, cf. *Edwards* v. *South Carolina*, 372 U.S. 229 (1963);*Cox* v. *Louisiana*, 379 U.S. 536 (1965), but next to a school, while classes are in session, it may be prohibited. [45] The [***235] antinoise ordinance imposes no such restriction on expressive activity before or after the school session, while the student/faculty "audience" enters and leaves the school.

[****30]

[**2306] [15B]In *Cox* v. *Louisiana*, 379 U.S. 559 (1965), this Court indicated that, because of the special nature of the place, [46] [****31] persons could be constitutionally prohibited from picketing "in or near" a courthouse "with the intent of interfering with, obstructing, or impeding the administration of justice." Likewise, in *Cameron* v. *Johnson*, 390 U.S. 611 (1968), we upheld a statute prohibiting [*121] picketing "in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any . . . county . . . courthouses." [47] As in those two cases, Rockford's modest restriction on some peaceful picketing represents a considered and specific legislative judgment that some kinds of expressive activity should be restricted at a particular time and place, here in order to protect the schools. [48] Such a reasonable regulation is not inconsistent with the First and Fourteenth Amendments. [49] The antinoise ordinance is not invalid on its face. [50]

The judgment is

*Affirmed in part and reversed in part*.

MR. JUSTICE BLACKMUN joins in the [****32] judgment and in Part I of the opinion of the Court. He concurs in the result as to Part II of the opinion.

**Dissent by:** DOUGLAS (In Part)

## Dissent

[***236] MR. JUSTICE DOUGLAS, dissenting in part.

While I join Part I of the Court's opinion, I would also reverse the appellant's conviction under the antinoise ordinance.

[*122] The municipal ordinance on which this case turns is c. 28, § 19.2 (a) which provides in relevant part:

"That no person, while on public or private grounds adjacent to any building in which a school or any class thereof is in session, shall willfully make or assist in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof."

---

[44] Compare *Scoville* v. *Board of Education*, 425 F.2d 10 (CA7), cert. denied, 400 U.S. 826 (1970); *Dickey* v. *Alabama State Board of Education*, 273 F.Supp. 613 (MD Ala. 1967) (cited in *Tinker*).

[45] Different considerations, of course, apply in different circumstances. For example, restrictions appropriate to a single-building high school during class hours would be inappropriate in many open areas on a college campus, just as an assembly that is permitted outside a dormitory would be inappropriate in the middle of a mathematics class.

[46] Noting the need "to assure that the administration of justice at all stages is free from outside control and influence," we emphasized that "[a] State may protect against the possibility of a conclusion by the public . . . [that a] judge's action was in part a product of intimidation and did not flow only from the fair and orderly working of the judicial process." 379 U.S., at 562, 565.

[47] Quoting *Schneider* v. *State*, 308 U.S., at 161, we noted that "'such activity bears no necessary relationship to the freedom to . . . distribute information or opinion.'" 390 U.S., at 617.

[48] Cf. *Garner* v. *Louisiana*, 368 U.S., at 202-203 (Harlan, J., concurring in judgment).

[49] Cf. *Adderley* v. *Florida*, 385 U.S. 39 (1966). In *Adderley*, the Court held that demonstrators could be barred from jailhouse grounds not ordinarily open to the public, at least where the demonstration obstructed the jail driveway and interfered with the functioning of the jail. In *Tinker* we noted that "a school is not like a hospital or a jail enclosure." 393 U.S., at 512 n. 6.

[50] It is possible, of course, that there will be unconstitutional applications; but that is not a matter which presently concerns us. See *Shuttlesworth* v. *Birmingham*, 382 U.S., at 91, and n. 1, *supra*.

Appellant was one of 200 people picketing a school and carrying signs promoting a black cause -- "Black cheerleaders to cheer too," "Black history with black teachers," "We want our rights," and the like. Appellant, however, did not himself carry a picket sign. There was no evidence that he yelled or made any noise whatsoever. Indeed, the evidence reveals that appellant simply marched quietly and on one occasion raised his arm in the "power to the people" salute.

The pickets [****33] were mostly students; but they included former students, parents of students, and concerned citizens. They had made proposals to the school board on their demands and were turned down. Hence the picketing. The picketing [**2307] was mostly by black students who were counseled and advised by a faculty member of the school. The school contained 1,800 students. Those counseling the students advised they must be quiet, walk hand in hand, no whispering, no talking.

Twenty-five policemen were stationed nearby. There was noise but most of it was produced by the police who used loudspeakers to explain the local ordinance and to announce that arrests might be made. The picketing did not stop, and some 40 demonstrators, including appellant, were arrested.

The picketing lasted 20 to 30 minutes and some students went to the windows of the classrooms to observe it. It is not clear how many there were. The picketing [*123] was, however, orderly or, as one officer testified, "very orderly." There was no violence. And appellant made no noise whatever.

What Mr. Justice Roberts said in *Hague* v. *CIO*, 307 U.S. 496, 515-516, has never been questioned:

"Wherever [****34] the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied."

[***237] We held in *Cox* v. *Louisiana*, 379 U.S. 536, 544-545, that a State could not infringe the right of free speech and free assembly by convicting demonsrators under a "disturbing the peace" ordinance where all that the students in that case did was to protest segregation and discrimination against blacks by peaceably assembling and marching to the courthouse where they sang, prayed, [****35] and listened to a speech, but where there was no violence, no rioting, no boisterous conduct.

The school where the present picketing occurred was the center of a racial conflict. Most of the pickets were indeed students in the school. The dispute doubtless disturbed the school; and the blaring of the loudspeakers of the police was certainly a "noise or diversion" in the [*124] meaning of the ordinance. But there was no evidence that appellant was noisy or boisterous or rowdy. He walked quietly and in an orderly manner. As I read this record, the disruptive force loosed at this school was an issue dealing with race -- an issue that is preeminently one for solution by First Amendment means. [*] That is all that was done here; and the entire picketing, including appellant's part in it, was done in the best First Amendment tradition.

[****36]

## References

16 Am Jur 2d, Constitutional Law 346, 500

US L Ed Digest, Constitutional Law 501; Statutes 14, 17

ALR Digests, Constitutional Law 430; Statutes 26, 44

L Ed Index to Anno (Rev ed), Equal Protection of the

---

[*] The majority asserts that "appellant's sole claim . . . is that he was convicted under facially unconstitutional ordinances" and that there is, therefore, no occasion to consider whether his activities were protected by the First Amendment. *Ante*, at 106 n. 1. Appellant argues, however, that the ordinance is overly broad in that it punishes constitutionally protected activity. A statute may withstand an overbreadth attack "only if, as authoritatively construed . . . , it is not susceptible of application to speech . . . that is protected by the First and Fourteenth Amendments." *Gooding* v. *Wilson*, 405 U.S. 518, 520 (1972). If the ordinance applies to appellant's activities and if appellant's activities are constitutionally protected, then the ordinance is overly broad and, thus, unconstitutional. There is no merit, therefore, to the Court's suggestion that the question whether "appellant's particular behavior was protected by the First Amendment," *ante*, at 106 n. 1, is not presented.

Laws; Freedom of Speech, Press, Religion, and Assembly

ALR Quick Index, Equal Protection of Law; Freedom of Speech and Press; Picketing

Federal Quick Index, Equal Protection of the Laws; Freedom of Speech and Press; Picketing

Annotation References:

Indefiniteness of language as affecting validity of criminal legislation or judicial definition of common-law crime. 96 L Ed 374, 16 L Ed 2d 1231.

The Supreme Court and the right of free speech and press. 93 L Ed 1151 ,2 L Ed 2d 1706, 11 L Ed 2d 1116, 16 L Ed 2d 1053, 21 L Ed 2d 976.

Participation of student in demonstration on or near campus as warranting imposition of criminal liability for breach of peace, disorderly conduct, trespass, unlawful assembly, or similar offense. 32 ALR3d 551.

Nonlabor picketing or boycott. [****37] 93 ALR2d 1284.

Validity of statute or ordinance against picketing. 35 ALR 1200, 108 ALR 1119, 122 ALR 1043, 125 ALR 963, 130 ALR 1303.

---

End of Document

# United States v. Lopez

514 U.S. 549 (1995)

Cited in Opening Brief at: 46

Highlighted language appears at 514 U.S. at 561 n.3.

Warning
As of: September 14, 2026 7:09 PM Z

# United States v. Lopez

Supreme Court of the United States

November 8, 1994, Argued ; April 26, 1995, Decided

No. 93-1260

**Reporter**

514 U.S. 549 *; 115 S. Ct. 1624 **; 131 L. Ed. 2d 626 ***; 1995 U.S. LEXIS 3039 ****; 63 U.S.L.W. 4343; 95 Cal. Daily Op. Service 3074; 8 Fla. L. Weekly Fed. S 752

UNITED STATES, PETITIONER v. ALFONSO LOPEZ, JR.

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.

**Disposition:** 2 F.3d 1342, affirmed.

## Syllabus

After respondent, then a 12th-grade student, carried a concealed handgun into his high school, he was charged with violating the Gun-Free School Zones Act of 1990, which forbids "any individual knowingly to possess a firearm at a place that [he] knows . . . is a school zone," 18 U.S.C. § 922(q)(1)(A). The District Court denied his motion to dismiss the indictment, concluding that § 922(q) is a constitutional exercise of Congress' power to regulate activities in and affecting commerce. In reversing, the Court of Appeals held that, in light of what it characterized as insufficient congressional findings and legislative history, § 922(q) is invalid as beyond Congress' power under the Commerce Clause.

*Held:* The Act exceeds Congress' Commerce Clause authority. First, although this Court has upheld a wide variety [****2] of congressional Acts regulating intrastate economic activity that substantially affected interstate commerce, the possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, have such a substantial effect on interstate commerce. Section 922(q) is a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly those terms are defined. Nor is it an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under the Court's cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which, viewed in the aggregate, substantially affects interstate commerce. Second, § 922(q) contains no jurisdictional element that would ensure, through case-by-case inquiry, that the firearms possession in question has the requisite nexus with interstate commerce. Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement [****3] that his possession of the firearm have any concrete tie to interstate commerce. To uphold the Government's contention that § 922(q) is justified because firearms possession in a local school zone does indeed substantially affect interstate commerce would require this Court to pile inference upon inference in a manner that would bid fair to convert congressional Commerce Clause authority to a general police power of the sort held only by the States. Pp. 552-568.

**Counsel:** Solicitor General Days argued the cause for the United States. With him on the briefs were Assistant Attorney General Harris, Deputy Solicitor General Wallace, Malcolm L. Stewart, and John F. De Pue.

John R. Carter argued the cause for respondent. With him on the brief were Lucien B. Campbell, Henry J. Bemporad, Carter G. Phillips, and Adam D. Hirsh. *

---

* Briefs of amici curiae urging reversal were filed for 16 Members of the United States Senate et al. by Debra A. Valentine, Brady C. Williamson, and Jeffrey J. Kassel; for the State of Ohio et al. by Lee Fisher, Attorney General of Ohio, John P. Ware, Assistant Attorney General, Richard A. Cordray, State Solicitor, Simon B. Karas, G. Oliver Koppell, Attorney General of New York, and Vanessa Ruiz; for the Center to Prevent Handgun Violence et al. by Erwin N. Griswold, Dennis A. Henigan, and Gail A. Robinson; for Children NOW et al. by William F. Abrams; for the Clarendon

Foundation by Ronald D. Maines; for the Coalition to Stop Gun Violence et al. by Brian J. Benner; and for the National School Safety Center et al. by James A. Rapp.

Briefs of amici curiae urging affirmance were filed for the National Conference of State Legislatures et al. by Richard Ruda and Barry Friedman; and for the Pacific Legal Foundation by Ronald A. Zumbrun and Anthony T. Caso.

Briefs of amici curiae were filed for Academics for the Second Amendment et al. by Patrick J. Basial, Don B. Kates, Robert Carter, Henry Mark Holzer, Nicholas J. Johnson, Joseph E. Olson, Daniel Polsby, Charles E. Rice, Wallace Rudolph, Justin Smith, Robert B. Smith, George Strickler, Richard Warner, and Robert Weisberg; and for the Texas Justice Foundation by Clayton Trotter.

**Judges:** REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. KENNEDY, J., filed a concurring opinion, in which O'CONNOR, J., joined, post, p. 568. THOMAS, J., filed a concurring opinion, post, p. 584. STEVENS, J., post, p. 602, and SOUTER, J., post, p. 603, filed dissenting opinions. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, post, p. 615.

**Opinion by:** REHNQUIST

## Opinion

[*551] [**1626] [***632] CHIEF JUSTICE **REHNQUIST** delivered the opinion of the Court.

[1A]In the Gun-Free School Zones Act of 1990, Congress made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922 [****4] (q)(1)(A) (1988 ed., Supp. V). The Act neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce. We hold that the Act exceeds the authority of Congress "to regulate Commerce . . . among the several States . . . ." U.S. Const., Art. I, § 8, cl. 3.

On March 10, 1992, respondent, who was then a 12th-grade student, arrived at Edison High School in San Antonio, Texas, carrying a concealed .38 caliber handgun and five bullets. Acting upon an anonymous tip, school authorities confronted respondent, who admitted that he was carrying the weapon. He was arrested and charged under Texas law with firearm possession on school premises. See Tex. Penal Code Ann. § 46.03(a)(1) (Supp. 1994). The next day, the state charges were dismissed after federal agents charged respondent by complaint with violating the Gun-Free School Zones Act of 1990. 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V). [1]

[****5] A federal grand jury indicted respondent on one count of knowing possession of a firearm at a school zone, in violation of § 922(q). Respondent moved to dismiss his federal indictment on the ground that § 922(q) "is unconstitutional as it is beyond the power of Congress to legislate control over our public schools." The District Court denied the motion, concluding that § 922(q) "is a constitutional exercise of Congress' well-defined power to regulate activities in and affecting [*552] commerce, and the 'business' of elementary, middle and high schools . . . affects interstate commerce." App. to Pet. for Cert. 55a. Respondent waived his right to a jury trial. The District Court conducted a bench trial, found him guilty of violating § 922(q), and sentenced him to six months' imprisonment [***633] and two years' supervised release.

On appeal, respondent challenged his conviction based on his claim that § 922(q) exceeded Congress' power to legislate under the Commerce Clause. The Court of Appeals for the Fifth Circuit agreed and reversed respondent's conviction. It held that, in light of what it characterized as insufficient congressional findings and legislative history, "section 922(q), in the full [****6] reach of its terms, is invalid as beyond the power of Congress under the Commerce Clause." 2 F.3d 1342, 1367-1368 (1993). Because of the importance of the issue, we granted certiorari, 511 U.S. 1029 (1994), and we now affirm.

We start with first principles. The Constitution creates a Federal Government of enumerated powers. See Art. I, § 8. As James Madison wrote, "the powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45, pp. 292-293 (C. Rossiter ed. 1961). This constitutionally mandated division of authority "was adopted by the Framers to ensure protection of our fundamental liberties." *Gregory* v. *Ashcroft*, 501 U.S. 452, 458, 115 L. Ed. 2d 410, 111 S. Ct. 2395 (1991) (internal quotation marks omitted). "Just as the

[1] The term "school zone" is defined as "in, or on the grounds of, a public, parochial or private school" or "within a distance of 1,000 feet from the grounds of a public, parochial or private school." § 921(a)(25).

separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." [****7] *Ibid.*

The Constitution delegates to Congress the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8, [*553] cl. 3. The Court, through Chief Justice Marshall, first defined the nature of Congress' [**1627] commerce power in *Gibbons* v. *Ogden*, 22 U.S. 1, 9 Wheat. 1, 189-190, 6 L. Ed. 23 (1824):

> "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse."

The commerce power "is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Id.*, at 196. The *Gibbons* Court, however, acknowledged that limitations on the commerce power are inherent in the very language of the Commerce Clause.

> "It is not intended to say that these words comprehend that commerce, which is completely internal, [****8] which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States. Such a power would be inconvenient, and is certainly unnecessary.
>
> "Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one. . . . The enumeration presupposes [***634] something not enumerated; and that something, if we regard the language, or the subject of the sentence, must be the exclusively internal commerce of a State." *Id.*, at 194-195.

For nearly a century thereafter, the Court's Commerce Clause decisions dealt but rarely with the extent of Congress' power, and almost entirely with the Commerce Clause as a limit on state legislation that discriminated against interstate commerce. See, *e. g., Veazie* v. *Moor*, 55 U.S. 568, 14 How. 568, 573-575, 14 L. Ed. 545 (1853) (upholding a state-created steamboat monopoly [*554] because it involved regulation of wholly internal commerce); *Kidd* v. *Pearson*, 128 U.S. 1, 17, 20-22, 32 L. Ed. 346, 9 S. Ct. 6 (1888) (upholding a state prohibition on the manufacture of intoxicating liquor because the commerce power "does not comprehend the purely internal domestic [****9] commerce of a State which is carried on between man and man within a State or between different parts of the same State"); see also L. Tribe, American Constitutional Law 306 (2d ed. 1988). Under this line of precedent, the Court held that certain categories of activity such as "production," "manufacturing," and "mining" were within the province of state governments, and thus were beyond the power of Congress under the Commerce Clause. See *Wickard* v. *Filburn*, 317 U.S. 111, 121, 87 L. Ed. 122, 63 S. Ct. 82 (1942) (describing development of Commerce Clause jurisprudence).

In 1887, Congress enacted the Interstate Commerce Act, 24 Stat. 379, and in 1890, Congress enacted the Sherman Antitrust Act, 26 Stat. 209, as amended, 15 U.S.C. § 1 *et seq.* These laws ushered in a new era of federal regulation under the commerce power. When cases involving these laws first reached this Court, we imported from our negative Commerce Clause cases the approach that Congress could not regulate activities such as "production," "manufacturing," and "mining." See, *e. g., United States* v. *E. C. Knight Co.*, 156 U.S. 1, 12, 39 L. Ed. 325, 15 S. Ct. 249 (1895) ("Commerce [****10] succeeds to manufacture, and is not part of it"); *Carter* v. *Carter Coal Co.*, 298 U.S. 238, 304, 80 L. Ed. 1160, 56 S. Ct. 855 (1936) ("Mining brings the subject matter of commerce into existence. Commerce disposes of it"). Simultaneously, however, the Court held that, where the interstate and intrastate aspects of commerce were so mingled together that full regulation of interstate commerce required incidental regulation of intrastate commerce, the Commerce Clause authorized such regulation. See, *e. g., Shreveport Rate Cases*, 234 U.S. 342, 58 L. Ed. 1341, 34 S. Ct. 833 (1914).

In *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 550, 79 L. Ed. 1570, 55 S. Ct. 837 (1935), the Court struck down regulations that [*555] fixed the hours and wages of individuals employed by an intrastate business because the activity being regulated related to interstate commerce only indirectly. In doing so, the Court characterized the distinction between [**1628] direct and indirect effects of intrastate transactions upon interstate commerce as "a fundamental one, essential to the maintenance of our constitutional system." *Id.*, at 548. [****11] Activities

that affected interstate commerce directly were within Congress' power; activities that affected interstate commerce indirectly [***635] were beyond Congress' reach. *Id.*, at 546. The justification for this formal distinction was rooted in the fear that otherwise "there would be virtually no limit to the federal power and for all practical purposes we should have a completely centralized government." *Id.*, at 548.

Two years later, in the watershed case of *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 81 L. Ed. 893, 57 S. Ct. 615 (1937), the Court upheld the National Labor Relations Act against a Commerce Clause challenge, and in the process, departed from the distinction between "direct" and "indirect" effects on interstate commerce. *Id.*, at 36-38 ("The question [of the scope of Congress' power] is necessarily one of degree"). The Court held that intrastate activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions" are within Congress' power to regulate. *Id.*, at 37.

[****12] In *United States* v. *Darby*, 312 U.S. 100, 85 L. Ed. 609, 61 S. Ct. 451 (1941), the Court upheld the Fair Labor Standards Act, stating:

> "The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." *Id.*, at 118.

[*556] See also *United States* v. *Wrightwood Dairy Co.*, 315 U.S. 110, 119, 86 L. Ed. 726, 62 S. Ct. 523 (1942) (the commerce power "extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power").

In *Wickard* v. *Filburn*, the Court upheld the application of amendments to the Agricultural Adjustment Act of 1938 to the production and consumption of homegrown wheat. 317 U.S. at 128-129. The *Wickard* Court explicitly rejected earlier distinctions between direct and indirect effects on interstate commerce, [****13] stating:

> "Even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'" *Id.*, at 125.

The *Wickard* Court emphasized that although Filburn's own contribution to the demand for wheat may have been trivial by itself, that was not "enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Id.*, at 127-128.

*Jones & Laughlin Steel, Darby*, and *Wickard* ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined [***636] authority of Congress under that Clause. In part, this was a recognition of the great changes that had occurred in the way business was carried on in this country. Enterprises that had once been local or at most regional in nature had become national in scope. But the doctrinal change [****14] also reflected a view that earlier Commerce Clause cases artificially had constrained the authority of Congress to regulate interstate commerce.

But even these modern-era precedents which have expanded congressional power under the Commerce Clause [*557] confirm that this power is subject to outer limits. In *Jones & Laughlin Steel*, the Court warned that the scope of the interstate commerce power "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that [**1629] to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." 301 U.S. at 37; see also *Darby, supra*, at 119-120 (Congress may regulate intrastate activity that has a "substantial effect" on interstate commerce); *Wickard, supra*, at 125 (Congress may regulate activity that "exerts a substantial economic effect on interstate commerce"). Since that time, the Court has heeded that warning and undertaken to decide whether a rational basis existed for concluding that a [****15] regulated activity sufficiently affected interstate commerce. See, *e. g., Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 276-280, 69 L. Ed. 2d 1, 101 S. Ct. 2352 (1981); *Perez* v. *United States*, 402 U.S. 146, 155-156, 28 L. Ed. 2d 686, 91 S. Ct. 1357 (1971); *Katzenbach* v. *McClung*, 379 U.S. 294, 299-301, 13 L. Ed. 2d 290, 85 S. Ct. 377 (1964); *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U.S. 241, 252-253, 13 L. Ed. 2d 258, 85 S.

Ct. 348 (1964). [2]

[****16] Similarly, in *Maryland* v. *Wirtz*, 392 U.S. 183, 20 L. Ed. 2d 1020, 88 S. Ct. 2017 (1968), the Court reaffirmed that "the power to regulate commerce, though broad indeed, has limits" that "the Court has ample power" to enforce. *Id.*, at 196, overruled on other grounds, *National League of Cities* v. *Usery*, 426 U.S. 833, 49 L. Ed. 2d 245, 96 S. Ct. 2465 (1976), overruled by *Garcia* v. *San Antonio Metropolitan Transit* [*558] *Authority*, 469 U.S. 528, 83 L. Ed. 2d 1016, 105 S. Ct. 1005 (1985). In response to the dissent's warnings that the Court was powerless to enforce the limitations on Congress' commerce powers because "all activities affecting commerce, even in the minutest degree, *[Wickard]*, may be regulated and controlled by Congress," 392 U.S. at 204 (Douglas, J., dissenting), the *Wirtz* Court replied that the dissent had misread precedent as "neither here nor in *Wickard* has the Court declared that [***637] Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities," *id.*, at 197, n. 27. Rather, "the Court has said only that where [****17] *a general regulatory statute bears a substantial relation to commerce*, the *de minimis* character of individual instances arising under that statute is of no consequence." *Ibid.* (first emphasis added).

[2A]Consistent with this structure, we have identified three broad categories of activity that Congress may regulate under its commerce power. *Perez, supra*, at 150; see also *Hodel, supra*, at 276-277. First, Congress may regulate the use of the channels of interstate commerce. See, *e. g., Darby*, 312 U.S. at 114; *Heart of Atlanta Motel, supra*, at 256 ("'The authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question'" (quoting *Caminetti* v. *United States*, 242 U.S. 470, 491, 61 L. Ed. 442, 37 S. Ct. 192 (1917))). Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only [****18] from intrastate activities. See, *e. g., Shreveport Rate Cases*, 234 U.S. 342, 34 S. Ct. 833, 58 L. Ed. 1341 (1914); *Southern R. Co.* v. *United States*, 222 U.S. 20, 56 L. Ed. 72, 32 S. Ct. 2 (1911) (upholding amendments to Safety Appliance Act as applied to vehicles used in intrastate commerce); *Perez, supra*, at 150 ("For example, the destruction of an aircraft (18 U.S.C. § 32), or . . . thefts from interstate shipments (18 U.S.C. § 659)"). Finally, Congress' commerce authority includes the power to regulate those activities [*559] having a substantial [**1630] relation to interstate commerce, *Jones & Laughlin Steel*, 301 U.S. at 37, *i. e.*, those activities that substantially affect interstate commerce, *Wirtz, supra*, at 196, n. 27.

Within this final category, admittedly, our case law has not been clear whether an activity must "affect" or "substantially affect" interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause. Compare *Preseault* v. *ICC*, 494 U.S. 1, 17, 108 L. Ed. 2d 1, 110 S. Ct. 914 (1990), with *Wirtz, supra*, at 196, [****19] n. 27 (the Court has never declared that "Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities"). We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity "substantially affects" interstate commerce.

[1B]We now turn to consider the power of Congress, in the light of this framework, to enact § 922(q). The first two categories of authority may be quickly disposed of: § 922(q) is not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce; nor can § 922(q) be justified as a regulation by which Congress has sought to protect an instrumentality [***638] of interstate commerce or a thing in interstate commerce. Thus, if § 922(q) is to be sustained, it must be under the third category as a regulation of an activity that substantially affects interstate commerce.

[2B]First, we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate [****20] commerce. Examples include the regulation of intrastate coal mining; *Hodel, supra*, intrastate extortionate credit

---

[2] See also *Hodel*, 452 U.S. at 311 ("Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so") (REHNQUIST, J., concurring in judgment); *Heart of Atlanta Motel*, 379 U.S. at 273 ("Whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court") (Black, J., concurring).

transactions, *Perez, supra*, restaurants utilizing substantial interstate supplies, *McClung, supra*, inns and hotels catering to interstate guests, *Heart of Atlanta Motel, supra*, and production [*560] and consumption of homegrown wheat, *Wickard* v. *Filburn*, 317 U.S. 111, 87 L. Ed. 122, 63 S. Ct. 82 (1942).These examples are by no means exhaustive, but the pattern is clear. Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.

Even *Wickard*, which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not. Roscoe Filburn operated a small farm in Ohio, on which, in the year involved, he raised 23 acres of wheat. It was his practice to sow winter wheat in the fall, and after harvesting it in July to sell a portion of the crop, to feed part of it to poultry and livestock on the farm, to use some in making flour for home consumption, and to keep the [****21] remainder for seeding future crops. The Secretary of Agriculture assessed a penalty against him under the Agricultural Adjustment Act of 1938 because he harvested about 12 acres more wheat than his allotment under the Act permitted. The Act was designed to regulate the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and shortages, and concomitant fluctuation in wheat prices, which had previously obtained. The Court said, in an opinion sustaining the application of the Act to Filburn's activity:

> "One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such wheat overhangs the market and, if induced by rising prices, tends to flow into the market and check price increases. But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. [*561] [****22] Home-grown wheat in this sense competes with wheat in commerce." 317 U.S. at 128.

[1C] [3A]Section 922(q) is a criminal statute that by its terms has nothing to do with [**1631] "commerce" or any sort of economic enterprise, however broadly one might define those terms. [3] Section 922(q) is not an essential [***639] part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

[3B]

[****23] [1D]Second, § 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce. For example, in *United States* v. *Bass*, 404 U.S. 336, 30 L. Ed. 2d 488, 92 S. Ct. 515 (1971), the Court interpreted former 18 U.S.C. § 1202(a), which made it [*562] a crime for a felon to "receive, posses[s], or transport in commerce or affecting commerce . . . any firearm." 404 U.S. at 337. The Court interpreted the possession component of §

---

[3] Under our federal system, the "'States possess primary authority for defining and enforcing the criminal law.'" *Brecht* v. *Abrahamson*, 507 U.S. 619, 635, 123 L. Ed. 2d 353, 113 S. Ct. 1710 (1993) (quoting *Engle* v. *Isaac*, 456 U.S. 107, 128, 71 L. Ed. 2d 783, 102 S. Ct. 1558 (1982)); see also *Screws* v. *United States*, 325 U.S. 91, 109, 89 L. Ed. 1495, 65 S. Ct. 1031 (1945) (plurality opinion) ("Our national government is one of delegated powers alone. Under our federal system the administration of criminal justice rests with the States except as Congress, acting within the scope of those delegated powers, has created offenses against the United States"). When Congress criminalizes conduct already denounced as criminal by the States, it effects a "'change in the sensitive relation between federal and state criminal jurisdiction.'" *United States* v. *Enmons*, 410 U.S. 396, 411-412, 35 L. Ed. 2d 379, 93 S. Ct. 1007 (1973) (quoting *United States* v. *Bass*, 404 U.S. 336, 349, 30 L. Ed. 2d 488, 92 S. Ct. 515 (1971)). The Government acknowledges that § 922(q) "displace[s] state policy choices in . . . that its prohibitions apply even in States that have chosen not to outlaw the conduct in question." Brief for United States 29, n. 18; see also Statement of President George Bush on Signing the Crime Control Act of 1990, 26 Weekly Comp. of Pres. Doc. 1944, 1945 (Nov. 29, 1990) ("Most egregiously, section [922(q)] inappropriately overrides legitimate State firearms laws with a new and unnecessary Federal law. The policies reflected in these provisions could legitimately be adopted by the States, but they should not be imposed upon the States by the Congress").

1202(a) to require an additional nexus to interstate commerce both because the statute was ambiguous and because "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *Id.*, at 349. The *Bass* Court set aside the conviction because although the Government had demonstrated that Bass had possessed a firearm, it had failed "to show the requisite nexus with interstate commerce." *Id.*, at 347. The Court thus interpreted the statute to reserve the constitutional question whether Congress could [****24] regulate, without more, the "mere possession" of firearms. See *id.*, at 339, n. 4; see also *United States* v. *Five Gambling Devices*, 346 U.S. 441, 448, 98 L. Ed. 179, 74 S. Ct. 190 (1953) (plurality opinion) ("The principle is old and deeply imbedded in our jurisprudence that this Court will construe a statute in a manner that requires decision of serious constitutional questions only if the statutory language leaves no reasonable alternative"). Unlike the statute in *Bass*, § 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.

Although as part of our independent evaluation of constitutionality under the Commerce Clause we of course consider legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce, see, *e. g., Preseault* v. [***640] *ICC*, 494 U.S. at 17, the Government concedes that "neither the statute nor its legislative history contain[s] express congressional findings regarding the effects upon interstate commerce of [****25] gun possession in a school zone." Brief for United States 5-6. We agree with the Government that Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce. See *McClung*, 379 U.S. at 304; [*563] see also *Perez*, 402 U.S. at 156 ("Congress need [not] make particularized findings in order to legislate"). But to the [**1632] extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here. [4]

[****26] [4]The Government argues that Congress has accumulated institutional expertise regarding the regulation of firearms through previous enactments. Cf. *Fullilove* v. *Klutznick*, 448 U.S. 448, 503, 65 L. Ed. 2d 902, 100 S. Ct. 2758 (1980) (Powell, J., concurring). We agree, however, with the Fifth Circuit that importation of previous findings to justify § 922(q) is especially inappropriate here because the "prior federal enactments or Congressional findings [do not] speak to the subject matter of section 922(q) or its relationship to interstate commerce. Indeed, section 922(q) plows thoroughly new ground and represents a sharp break with the long-standing pattern of federal firearms legislation." 2 F.3d at 1366.

The Government's essential contention, *in fine*, is that we may determine here that § 922(q) is valid because possession of a firearm in a local school zone does indeed substantially affect interstate commerce. Brief for United States 17. The Government argues that possession of a firearm in a school zone may result in violent crime and that violent crime can be expected to affect the functioning of the national economy in two ways. First, the costs [****27] of violent [*564] crime are substantial, and, through the mechanism of insurance, those costs are spread throughout the population. See *United States* v. *Evans*, 928 F.2d 858, 862 (CA9 1991). Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe. Cf. *Heart of Atlanta Motel*, 379 U.S. at 253. The Government also argues that the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment. A handicapped educational process, in turn, will result in a less productive citizenry. That, in turn, would have an adverse effect on the Nation's economic well-being. As a result, the Government argues that Congress could rationally have [***641] concluded that § 922(q) substantially affects interstate commerce.

We pause to consider the implications of the Government's arguments. The Government admits, under its "costs of crime" reasoning, that Congress

[4] We note that on September 13, 1994, President Clinton signed into law the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, 108 Stat. 1796. Section 320904 of that Act, *id.*, at 2125, amends § 922(q) to include congressional findings regarding the effects of firearm possession in and around schools upon interstate and foreign commerce. The Government does not rely upon these subsequent findings as a substitute for the absence of findings in the first instance. Tr. of Oral Arg. 25 ("We're not relying on them in the strict sense of the word, but we think that at a very minimum they indicate that reasons can be identified for why Congress wanted to regulate this particular activity").

could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce. See [****28] Tr. of Oral Arg. 8-9. Similarly, under the Government's "national productivity" reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.

Although JUSTICE BREYER argues that acceptance of the Government's rationales would not authorize a general federal police power, he is unable to identify any activity that the States may regulate but Congress may not. JUSTICE BREYER posits that there might be some limitations on Congress' [*565] commerce power, such as family law or certain aspects of education. *Post*, at 624. These suggested limitations, when viewed in light of the dissent's expansive analysis, are devoid of substance.

JUSTICE BREYER focuses, for the [****29] most part, on the threat that firearm possession in [**1633] and near schools poses to the educational process and the potential economic consequences flowing from that threat. *Post*, at 619-624. Specifically, the dissent reasons that (1) gun-related violence is a serious problem; (2) that problem, in turn, has an adverse effect on classroom learning; and (3) that adverse effect on classroom learning, in turn, represents a substantial threat to trade and commerce. *Post*, at 623. This analysis would be equally applicable, if not more so, to subjects such as family law and direct regulation of education.

For instance, if Congress can, pursuant to its Commerce Clause power, regulate activities that adversely affect the learning environment, then, *a fortiori*, it also can regulate the educational process directly. Congress could determine that a school's curriculum has a "significant" effect on the extent of classroom learning. As a result, Congress could mandate a federal curriculum for local elementary and secondary schools because what is taught in local schools has a significant "effect on classroom learning," cf. *ibid.*, and that, in turn, has a substantial effect on interstate [****30] commerce.

[5]JUSTICE BREYER rejects our reading of precedent and argues that "Congress . . . could rationally conclude that schools fall on the commercial side of the line." *Post*, at 629. Again, JUSTICE BREYER's rationale lacks any real limits because, depending on the level of generality, any activity can be looked upon as commercial. Under the dissent's rationale, Congress could just as easily look at child rearing as "falling on the commercial [***642] side of the line" because it provides a "valuable service -- namely, to equip [children] with the skills they need to survive in life and, more specifically, in the workplace." *Ibid.* We do not doubt that Congress [*566] has authority under the Commerce Clause to regulate numerous commercial activities that substantially affect interstate commerce and also affect the educational process. That authority, though broad, does not include the authority to regulate each and every aspect of local schools.

[6]Admittedly, a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty. But, so long as Congress' authority is limited to those powers enumerated in the Constitution, and so long as those [****31] enumerated powers are interpreted as having judicially enforceable outer limits, congressional legislation under the Commerce Clause always will engender "legal uncertainty." *Post*, at 630. As Chief Justice Marshall stated in *McCulloch* v. *Maryland*, 17 U.S. 316, 4 Wheat. 316, 4 L. Ed. 579 (1819):

> "The [federal] government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only the powers granted to it . . . is now universally admitted. But the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, as long as our system shall exist." *Id.*, at 405.

See also *Gibbons* v. *Ogden*, 9 Wheat., at 195 ("The enumeration presupposes something not enumerated"). The Constitution mandates this uncertainty by withholding from Congress a plenary police power that would authorize enactment of every type of legislation. See Art. I, § 8. Congress has operated within this framework of legal uncertainty ever since this Court determined that it was the Judiciary's duty "to say what the law is." *Marbury* v. *Madison*, 5 U.S. 137, 1 Cranch 137, 177, 2 L. Ed. 60 (1803) [****32] (Marshall, C. J.).

Any possible benefit from eliminating this "legal uncertainty" would be at the expense of the Constitution's system of enumerated powers.

In *Jones & Laughlin Steel*, 301 U.S. at 37, we held that the question of congressional power under the Commerce Clause "is necessarily one of degree." To the same effect [*567] is the concurring opinion of Justice Cardozo in *Schechter Poultry:*

> "There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours 'is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.'" 295 U.S. at 554 [**1634] (quoting *United States* v. *A. L. A. Schechter Poultry Corp.*, 76 F.2d 617, 624 (CA2 1935) (L. Hand, J., concurring)).

[1E]These are not precise formulations, and in the nature of things they cannot be. But we think they point the way to a correct decision of this case. The possession of a gun in a local school [****33] zone is in no sense an economic activity that might, through repetition elsewhere, substantially [***643] affect any sort of interstate commerce. Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce.

To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. See *supra*, at 556-558. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further. To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, cf. *Gibbons* v. *Ogden, supra*, at 195, and that there never will be a distinction between what is [*568] truly national and what is truly local, [****34] cf. *Jones & Laughlin Steel, supra*, at 30. This we are unwilling to do.

For the foregoing reasons the judgment of the Court of Appeals is

*Affirmed*.

**Concur by:** KENNEDY; THOMAS

# Concur

JUSTICE **KENNEDY**, with whom JUSTICE **O'CONNOR** joins, concurring.

The history of the judicial struggle to interpret the Commerce Clause during the transition from the economic system the Founders knew to the single, national market still emergent in our own era counsels great restraint before the Court determines that the Clause is insufficient to support an exercise of the national power. That history gives me some pause about today's decision, but I join the Court's opinion with these observations on what I conceive to be its necessary though limited holding.

Chief Justice Marshall announced that the national authority reaches "that commerce which concerns more States than one" and that the commerce power "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons* v. *Ogden*, 22 U.S. 1, 9 Wheat. 1, 194, 196, 6 L. Ed. 23 (1824). His statements can be understood now as an early and authoritative recognition that the [****35] Commerce Clause grants Congress extensive power and ample discretion to determine its appropriate exercise. The progression of our Commerce Clause cases from *Gibbons* to the present was not marked, however, by a coherent or consistent course of interpretation; for neither the course of technological advance nor the foundational principles for the jurisprudence itself were self-evident to the courts that sought to resolve contemporary disputes by enduring principles.

Furthermore, for almost a century after the adoption of the Constitution, the Court's Commerce Clause decisions did not concern the authority of Congress to legislate. Rather, [*569] the Court faced the related but quite distinct question of the authority of the States to regulate matters that would be within the commerce power [***644] had Congress chosen to act. The simple fact was that in the early years of the Republic, Congress seldom perceived the necessity to exercise its power in circumstances where its authority would be

called into question. The Court's initial task, therefore, was to elaborate the theories that would permit the States to act where Congress had not done so. Not the least part of the problem was the unresolved [****36] question whether the congressional power was exclusive, a question reserved by Chief Justice Marshall in *Gibbons* v. *Ogden, supra*, at 209-210.

At the midpoint of the 19th century, the Court embraced the principle that the States and the National Government both have authority to regulate certain matters absent the [**1635] congressional determination to displace local law or the necessity for the Court to invalidate local law because of the dormant national power. *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 53 U.S. 299, 12 HOW 299, 318-321, 13 L. Ed. 996 (1852). But the utility of that solution was not at once apparent, see generally F. Frankfurter, The Commerce Clause under Marshall, Taney and Waite (1937) (hereinafter Frankfurter), and difficulties of application persisted, see *Leisy* v. *Hardin*, 135 U.S. 100, 122-125, 34 L. Ed. 128, 10 S. Ct. 681 (1890).

One approach the Court used to inquire into the lawfulness of state authority was to draw content-based or subject-matter distinctions, thus defining by semantic or formalistic categories those activities that were commerce and those that were not. For instance, in deciding that a State could prohibit the in-state [****37] manufacture of liquor intended for out-of-state shipment, it distinguished between manufacture and commerce. "No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufacture and commerce. Manufacture is transformation -- the fashioning of raw materials [*570] into a change of form for use. The functions of commerce are different." *Kidd* v. *Pearson*, 128 U.S. 1, 20, 32 L. Ed. 346, 9 S. Ct. 6 (1888). Though that approach likely would not have survived even if confined to the question of a State's authority to enact legislation, it was not at all propitious when applied to the quite different question of what subjects were within the reach of the national power when Congress chose to exercise it.

This became evident when the Court began to confront federal economic regulation enacted in response to the rapid industrial development in the late 19th century. Thus, it relied upon the manufacture-commerce dichotomy in *United States* v. *E. C. Knight Co.*, 156 U.S. 1, 39 L. Ed. 325, 15 S. Ct. 249 (1895), where a manufacturers' combination controlling some 98% of the Nation's domestic sugar refining capacity was [****38] held to be outside the reach of the Sherman Act. Conspiracies to control manufacture, agriculture, mining, production, wages, or prices, the Court explained, had too "indirect" an effect on interstate commerce. *Id.*, at 16. And in *Adair* v. *United States*, 208 U.S. 161, 52 L. Ed. 436, 28 S. Ct. 277 (1908), the Court rejected the view that the commerce power might extend to activities that, although local in the sense of having originated within a single State, nevertheless had a practical effect on interstate commercial activity. The Court concluded that [***645] there was not a "legal or logical connection . . . between an employe's membership in a labor organization and the carrying on of interstate commerce," *id.*, at 178, and struck down a federal statute forbidding the discharge of an employee because of his membership in a labor organization. See also *The Employers' Liability Cases*, 207 U.S. 463, 497, 52 L. Ed. 297, 28 S. Ct. 141 (1908) (invalidating statute creating negligence action against common carriers for personal injuries of employees sustained in the course of employment, because the statute "regulates the persons [****39] because they engage in interstate commerce and does not alone regulate the business of interstate commerce").

[*571] Even before the Court committed itself to sustaining federal legislation on broad principles of economic practicality, it found it necessary to depart from these decisions. The Court disavowed *E. C. Knight*'s reliance on the manufacturing-commerce distinction in *Standard Oil Co. of N. J.* v. *United States*, 221 U.S. 1, 68-69, 55 L. Ed. 619, 31 S. Ct. 502 (1911), declaring that approach "unsound." The Court likewise rejected the rationale of *Adair* when it decided, in *Texas & New Orleans R. Co.* v. *Railway Clerks*, 281 U.S. 548, 570-571, 50 S. Ct. 427, 74 L. Ed. 1034 (1930), that Congress had the power to regulate matters pertaining to the organization of railroad workers.

In another line of cases, the Court addressed Congress' efforts to impede local activities it considered undesirable by prohibiting the interstate movement of some essential element. In the *Lottery Case*, 188 U.S. 321, 47 L. Ed. 492, 23 S. Ct. 321 (1903), the Court rejected the argument that Congress lacked power to prohibit the interstate movement of lottery tickets because it had power only [****40] to regulate, not to prohibit. See also [**1636] *Hipolite Egg Co.* v. *United States*, 220 U.S. 45, 55 L. Ed. 364, 31 S. Ct. 364 (1911); *Hoke* v. *United States*, 227 U.S. 308, 57 L. Ed. 523, 33 S. Ct. 281 (1913). In *Hammer* v. *Dagenhart*, 247 U.S. 251, 62 L. Ed. 1101, 38 S. Ct. 529 (1918),

however, the Court insisted that the power to regulate commerce "is directly the contrary of the assumed right to forbid commerce from moving," *id.*, at 269-270, and struck down a prohibition on the interstate transportation of goods manufactured in violation of child labor laws.

Even while it was experiencing difficulties in finding satisfactory principles in these cases, the Court was pursuing a more sustainable and practical approach in other lines of decisions, particularly those involving the regulation of railroad rates. In the *Minnesota Rate Cases*, 230 U.S. 352, 57 L. Ed. 1511, 33 S. Ct. 729 (1913), the Court upheld a state rate order, but observed that Congress might be empowered to regulate in this area if "by reason of the interblending of the interstate and intrastate operations of interstate carriers" the regulation of interstate rates could not be maintained [****41] without restrictions on "intrastate [*572] rates which substantially affect the former." *Id.*, at 432-433. And in the *Shreveport Rate Cases*, 234 U.S. 342, 34 S. Ct. 833, 58 L. Ed. 1341 (1914), the Court upheld an Interstate Commerce Commission order fixing railroad rates with the explanation that congressional authority, "extending to these interstate carriers as instruments of interstate commerce, necessarily embraces the [***646] right to control their operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to the security of that traffic, to the efficiency of the interstate service, and to the maintenance of conditions under which interstate commerce may be conducted upon fair terms and without molestation or hindrance." *Id.*, at 351.

Even the most confined interpretation of "commerce" would embrace transportation between the States, so the rate cases posed much less difficulty for the Court than cases involving manufacture or production. Nevertheless, the Court's recognition of the importance of a practical conception of the commerce power was not altogether confined to the rate [****42] cases. In *Swift & Co.* v. *United States*, 196 U.S. 375, 49 L. Ed. 518, 25 S. Ct. 276 (1905), the Court upheld the application of federal antitrust law to a combination of meat dealers that occurred in one State but that restrained trade in cattle "sent for sale from a place in one State, with the expectation that they will end their transit . . . in another." *Id.*, at 398. The Court explained that "commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business." *Ibid.* Chief Justice Taft followed the same approach in upholding federal regulation of stockyards in *Stafford* v. *Wallace*, 258 U.S. 495, 66 L. Ed. 735, 42 S. Ct. 397 (1922). Speaking for the Court, he rejected a "nice and technical inquiry," *id.*, at 519, when the local transactions at issue could not "be separated from the movement to which they contribute," *id.*, at 516.

Reluctance of the Court to adopt that approach in all of its cases caused inconsistencies in doctrine to persist, however. In addressing New Deal legislation the Court [****43] resuscitated [*573] the abandoned abstract distinction between direct and indirect effects on interstate commerce. See *Carter* v. *Carter Coal Co.*, 298 U.S. 238, 309, 80 L. Ed. 1160, 56 S. Ct. 855 (1936) (Act regulating price of coal and wages and hours for miners held to have only "secondary and indirect" effect on interstate commerce); *Railroad Retirement Bd.* v. *Alton R. Co.*, 295 U.S. 330, 368, 79 L. Ed. 1468, 55 S. Ct. 758 (1935) (compulsory retirement and pension plan for railroad carrier employees too "remote from any regulation of commerce as such"); *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 548, 79 L. Ed. 1570, 55 S. Ct. 837 (1935) (wage and hour law provision of National Industrial Recovery Act had "no direct relation to interstate commerce").

The case that seems to mark the Court's definitive commitment to the practical conception of the commerce power is *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 81 L. Ed. 893, 57 S. Ct. 615 (1937), where the Court sustained labor laws that applied to [**1637] manufacturing facilities, making no real attempt to distinguish *Carter, supra*, and *Schechter, supra*. 301 U.S. at 40-41. [****44] The deference given to Congress has since been confirmed. *United States* v. *Darby*, 312 U.S. 100, 116-117, 85 L. Ed. 609, 61 S. Ct. 451 (1941), overruled [***647] *Hammer* v. *Dagenhart, supra*. And in *Wickard* v. *Filburn*, 317 U.S. 111, 87 L. Ed. 122, 63 S. Ct. 82 (1942), the Court disapproved *E. C. Knight* and the entire line of direct-indirect and manufacture-production cases, explaining that "broader interpretations of the Commerce Clause [were] destined to supersede the earlier ones," 317 U.S. at 122, and "whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution," *id.*, at 123, n. 24. Later examples of the exercise of federal power where commercial transactions were the subject of regulation include *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U.S. 241, 13 L. Ed. 2d 258, 85 S. Ct. 348 (1964), *Katzenbach* v. *McClung*, 379 U.S. 294, 13 L. Ed. 2d 290, 85 S. Ct. 377 (1964), and *Perez* v. *United States*,

402 U.S. 146, 28 L. Ed. 2d 686, 91 S. Ct. 1357 (1971). [****45] These and like authorities are within the fair ambit [*574] of the Court's practical conception of commercial regulation and are not called in question by our decision today.

The history of our Commerce Clause decisions contains at least two lessons of relevance to this case. The first, as stated at the outset, is the imprecision of content-based boundaries used without more to define the limits of the Commerce Clause. The second, related to the first but of even greater consequence, is that the Court as an institution and the legal system as a whole have an immense stake in the stability of our Commerce Clause jurisprudence as it has evolved to this point. *Stare decisis* operates with great force in counseling us not to call in question the essential principles now in place respecting the congressional power to regulate transactions of a commercial nature. That fundamental restraint on our power forecloses us from reverting to an understanding of commerce that would serve only an 18th-century economy, dependent then upon production and trading practices that had changed but little over the preceding centuries; it also mandates against returning to the time when congressional authority [****46] to regulate undoubted commercial activities was limited by a judicial determination that those matters had an insufficient connection to an interstate system. Congress can regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy.

In referring to the whole subject of the federal and state balance, we said this just three Terms ago:

> "This framework has been sufficiently flexible over the past two centuries to allow for enormous changes in the nature of government. The Federal Government undertakes activities today that would have been unimaginable to the Framers in two senses: first, because the Framers would not have conceived that any government would conduct such activities; and second, because the Framers would not have believed that the Federal Government, rather than the States, would assume such [*575] responsibilities. Yet the powers conferred upon the Federal Government by the Constitution were phrased in language broad enough to allow for the expansion of the Federal Government's role." *New York* v. *United States*, 505 U.S. 144, 157, [***648] 120 L. Ed. 2d 120, 112 S. Ct. 2408 (1992) (emphasis deleted).

It does [****47] not follow, however, that in every instance the Court lacks the authority and responsibility to review congressional attempts to alter the federal balance. This case requires us to consider our place in the design of the Government and to appreciate the significance of federalism in the whole structure of the Constitution.

Of the various structural elements in the Constitution, separation of powers, checks and balances, judicial review, and federalism, only concerning the last does there seem to be much uncertainty respecting the existence, and the content, of standards that allow the Judiciary to play a significant role [**1638] in maintaining the design contemplated by the Framers. Although the resolution of specific cases has proved difficult, we have derived from the Constitution workable standards to assist in preserving separation of powers and checks and balances. See, *e. g., Prize Cases*, 67 U.S. 635, 2 Black 635, 17 L. Ed. 459 (1863); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 96 L. Ed. 1153, 72 S. Ct. 863 (1952); *United States* v. *Nixon*, 418 U.S. 683, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974); *Buckley* v. *Valeo*, 424 U.S. 1, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976); [****48] *INS* v. *Chadha*, 462 U.S. 919, 77 L. Ed. 2d 317, 103 S. Ct. 2764 (1983); *Bowsher* v. *Synar*, 478 U.S. 714, 92 L. Ed. 2d 583, 106 S. Ct. 3181 (1986); *Plaut* v. *Spendthrift Farm, Inc.*, 514 U.S. 211. These standards are by now well accepted. Judicial review is also established beyond question, *Marbury* v. *Madison*, 5 U.S. 137, 1 Cranch 137, 2 L. Ed. 60 (1803), and though we may differ when applying its principles, see, *e. g., Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U.S. 833, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992), its legitimacy is undoubted. Our role in preserving the federal balance seems more tenuous.

There is irony in this, because of the four structural elements in the Constitution just mentioned, federalism was the unique contribution of the Framers to political science and political theory. See Friendly, Federalism: A Foreword, 86 [*576] Yale L. J. 1019 (1977); G. Wood, The Creation of the American Republic, 1776-1787, pp. 524-532, 564 (1969). Though on the surface the idea may seem counter-intuitive, it was the insight of the Framers that freedom was enhanced by the creation of two governments, not one. "In the compound republic of America, the power [****49] surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different

governments will control each other, at the same time that each will be controlled by itself." The Federalist No. 51, p. 323 (C. Rossiter ed. 1961) (J. Madison). See also *Gregory* v. *Ashcroft*, 501 U.S. 452, 458-459, 115 L. Ed. 2d 410, 111 S. Ct. 2395 (1991) ("Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front. . . . In the tension between federal and state power lies the promise of liberty"); *New York* v. *United States, supra*, at 181 ("The Constitution [***649] divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive [****50] from the diffusion of sovereign power'") (quoting *Coleman* v. *Thompson*, 501 U.S. 722, 759, 115 L. Ed. 2d 640, 111 S. Ct. 2546 (1991) (Blackmun, J., dissenting)).

The theory that two governments accord more liberty than one requires for its realization two distinct and discernable lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States. If, as Madison expected, the Federal and State Governments are to control each other, see The Federalist No. 51, and hold each other in check by competing for the affections of the people, see The Federalist No. 46, those citizens must have some means of knowing which of [*577] the two governments to hold accountable for the failure to perform a given function. "Federalism serves to assign political responsibility, not to obscure it." *FTC* v. *Ticor Title Ins. Co.*, 504 U.S. 621, 636, 119 L. Ed. 2d 410, 112 S. Ct. 2169 (1992). Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political [****51] responsibility would become illusory. Cf. *New York* v. *United States, supra*, at 155-169; *FERC* v. *Mississippi*, 456 U.S. 742, 787, 72 L. Ed. 2d 532, 102 S. Ct. 2126 (1982) (O'CONNOR, J., concurring in judgment in part and dissenting in part). The resultant inability to hold either branch of the government answerable [**1639] to the citizens is more dangerous even than devolving too much authority to the remote central power.

To be sure, one conclusion that could be drawn from The Federalist Papers is that the balance between national and state power is entrusted in its entirety to the political process. Madison's observation that "the people ought not surely to be precluded from giving most of their confidence where they may discover it to be most due," The Federalist No. 46, p. 295 (C. Rossiter ed. 1961), can be interpreted to say that the essence of responsibility for a shift in power from the State to the Federal Government rests upon a political judgment, though he added assurance that "the State governments could have little to apprehend, because it is only within a certain sphere that the federal power can, in the nature of things, be advantageously administered, [****52] " *ibid.* Whatever the judicial role, it is axiomatic that Congress does have substantial discretion and control over the federal balance.

For these reasons, it would be mistaken and mischievous for the political branches to forget that the sworn obligation to preserve and protect the Constitution in maintaining the federal balance is their own in the first and primary instance. In the Webster-Hayne Debates, see The Great Speeches and [*578] Orations of Daniel Webster 227-272 (E. Whipple ed. 1879), and the debates over the Civil Rights Acts, see Hearings on S. 1732 before the Senate Committee on Commerce, 88th Cong., 1st Sess., pts. 1-3 (1963), some Congresses have accepted responsibility to confront the great questions of the proper [***650] federal balance in terms of lasting consequences for the constitutional design. The political branches of the Government must fulfill this grave constitutional obligation if democratic liberty and the federalism that secures it are to endure.

At the same time, the absence of structural mechanisms to require those officials to undertake this principled task, and the momentary political convenience often attendant upon their failure to do so, argue against a complete [****53] renunciation of the judicial role. Although it is the obligation of all officers of the Government to respect the constitutional design, see *Public Citizen* v. *Department of Justice*, 491 U.S. 440, 466, 105 L. Ed. 2d 377, 109 S. Ct. 2558 (1989); *Rostker* v. *Goldberg*, 453 U.S. 57, 64, 69 L. Ed. 2d 478, 101 S. Ct. 2646 (1981), the federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for us to admit inability to intervene when one or the other level of Government has tipped the scales too far.

In the past this Court has participated in maintaining the federal balance through judicial exposition of doctrines such as abstention, see, *e. g., Younger* v. *Harris*, 401

U.S. 37, 27 L. Ed. 2d 669, 91 S. Ct. 746 (1971); *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U.S. 496, 85 L. Ed. 971, 61 S. Ct. 643 (1941); *Burford* v. *Sun Oil Co.*, 319 U.S. 315, 87 L. Ed. 1424, 63 S. Ct. 1098 (1943), the rules for determining the primacy of state law, see, *e. g., Erie R. Co.* v. *Tompkins*, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938), the doctrine of adequate and independent state grounds, see, *e. g., Murdock* v. *Memphis*, 87 U.S. 590, 20 Wall. 590, 22 L. Ed. 429 (1875); [****54] *Michigan* v. *Long*, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983), the whole jurisprudence of pre-emption, see, *e. g., Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 91 L. Ed. 1447, 67 S. Ct. 1146 (1947); *Cipollone* v. *Liggett Group, Inc.*, 505 U.S. 504, 120 L. Ed. 2d 407, 112 S. Ct. 2608 (1992), and many of the rules governing our habeas jurisprudence, see, *e. g., Coleman* v. *Thompson*, 501 U.S. 722, 115 L. Ed. 2d 640, 111 S. Ct. 2546 (1991); *McCleskey* [*579] v. *Zant*, 499 U.S. 467, 113 L. Ed. 2d 517, 111 S. Ct. 1454 (1991); *Teague* v. *Lane*, 489 U.S. 288, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (1989); *Rose* v. *Lundy*, 455 U.S. 509, 71 L. Ed. 2d 379, 102 S. Ct. 1198 (1982); *Wainwright* v. *Sykes*, 433 U.S. 72, 53 L. Ed. 2d 594, 97 S. Ct. 2497 (1977).

Our ability to preserve this principle under the Commerce Clause has presented a much greater challenge. See *supra*, at 568-574. "This clause has throughout the Court's history been the chief source of its adjudications regarding federalism," and "no other body of opinions affords a fairer or more revealing test of judicial qualities." Frankfurter 66-67. But as the branch whose distinctive duty it is to declare "what the law is," *Marbury* v. [**1640] *Madison*, 1 Cranch, at 177, [****55] we are often called upon to resolve questions of constitutional law not susceptible to the mechanical application of bright and clear lines. The substantial element of political judgment in Commerce Clause matters leaves our institutional capacity to intervene more in doubt than when we decide cases, for instance, under the Bill of Rights even though clear and bright lines are often absent in the latter class of disputes. See *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 630, 106 L. Ed. 2d 472, 109 S. Ct. [***651] 3086 (1989) (O'CONNOR, J., concurring in part and concurring in judgment) ("We cannot avoid the obligation to draw lines, often close and difficult lines" in adjudicating constitutional rights). But our cases do not teach that we have no role at all in determining the meaning of the Commerce Clause.

Our position in enforcing the dormant Commerce Clause is instructive. The Court's doctrinal approach in that area has likewise "taken some turns." *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U.S. 175, 115 S. Ct. 1331, 131 L. Ed. 2d 261. Yet in contrast to the prevailing skepticism that surrounds our ability to give meaning to the [****56] explicit text of the Commerce Clause, there is widespread acceptance of our authority to enforce the dormant Commerce Clause, which we have but inferred from the constitutional structure as a limitation on the power of the States. One element of our dormant Commerce Clause jurisprudence has been the principle that the States may not [*580] impose regulations that place an undue burden on interstate commerce, even where those regulations do not discriminate between in-state and out-of-state businesses. See *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U.S. 573, 579, 90 L. Ed. 2d 552, 106 S. Ct. 2080 (1986) (citing *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142, 25 L. Ed. 2d 174, 90 S. Ct. 844 (1970)). Distinguishing between regulations that do place an undue burden on interstate commerce and regulations that do not depends upon delicate judgments. True, if we invalidate a state law, Congress can in effect overturn our judgment, whereas in a case announcing that Congress has transgressed its authority, the decision is more consequential, for it stands unless Congress can revise its law to demonstrate its commercial character. This difference no doubt informs the circumspection [****57] with which we invalidate an Act of Congress, but it does not mitigate our duty to recognize meaningful limits on the commerce power of Congress.

The statute before us upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power, and our intervention is required. As THE CHIEF JUSTICE explains, unlike the earlier cases to come before the Court here neither the actors nor their conduct have a commercial character, and neither the purposes nor the design of the statute have an evident commercial nexus. See *ante*, at 559-561. The statute makes the simple possession of a gun within 1,000 feet of the grounds of the school a criminal offense. In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far. If Congress attempts that extension, then at the least we must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern.

An interference of these dimensions occurs here, for it is well established that education is a traditional concern

of the States. *Milliken* v. *Bradley*, 418 U.S. 717, 741-742, 41 L. Ed. 2d 1069, 94 S. Ct. 3112 (1974); [*581] [****58] *Epperson* v. *Arkansas*, 393 U.S. 97, 104, 21 L. Ed. 2d 228, 89 S. Ct. 266 (1968). The proximity to schools, including of course schools owned and operated by the States or their subdivisions, is [***652] the very premise for making the conduct criminal. In these circumstances, we have a particular duty to ensure that the federal-state balance is not destroyed. Cf. *Rice, supra*, at 230 ("We start with the assumption that the historic police powers of the States" are not displaced by a federal statute "unless that was the clear and manifest purpose of Congress"); *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U.S. 132, 146, 10 L. Ed. 2d 248, 83 S. Ct. 1210 (1963).

[**1641] While it is doubtful that any State, or indeed any reasonable person, would argue that it is wise policy to allow students to carry guns on school premises, considerable disagreement exists about how best to accomplish that goal. In this circumstance, the theory and utility of our federalism are revealed, for the States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear. See *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U.S. 1, 49-50, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973); [****59] *New State Ice Co.* v. *Liebmann*, 285 U.S. 262, 311, 76 L. Ed. 747, 52 S. Ct. 371 (1932) (Brandeis, J., dissenting).

If a State or municipality determines that harsh criminal sanctions are necessary and wise to deter students from carrying guns on school premises, the reserved powers of the States are sufficient to enact those measures. Indeed, over 40 States already have criminal laws outlawing the possession of firearms on or near school grounds. See, *e. g.*, Alaska Stat. Ann. §§ 11.61.195(a)(2)(A), 11.61.220(a)(4)(A) (Supp. 1994); Cal. Penal Code Ann. § 626.9 (West Supp. 1994); Mass. Gen. Laws § 269:10(j) (1992); N. J. Stat. Ann. § 2C:39-5(e) (West Supp. 1994); Va. Code Ann. § 18.2-308.1 (1988); Wis. Stat. § 948.605 (1991-1992).

Other, more practicable means to rid the schools of guns may be thought by the citizens of some States to be preferable for the safety and welfare of the schools those States are [*582] charged with maintaining. See Brief for National Conference of State Legislatures et al. as *Amici Curiae* 26-30 (injection of federal officials into local problems causes friction and diminishes political accountability of state and local governments). These might include [****60] inducements to inform on violators where the information leads to arrests or confiscation of the guns, see Lima, Schools May Launch Weapons Hot Line, Los Angeles Times, Ventura Cty. East ed., Jan. 13, 1995, p. B1, col. 5; Reward for Tips on Guns in Tucson Schools, The Arizona Republic, Jan. 7, 1995, p. B2; programs to encourage the voluntary surrender of guns with some provision for amnesty, see Zaidan, Akron Rallies to Save Youths, The Plain Dealer, Mar. 2, 1995, p. 1B; Swift, Legislators Consider Plan to Get Guns Off Streets, Hartford Courant, Apr. 29, 1992, p. A4; penalties imposed on parents or guardians for failure to supervise the child, see, *e. g.*, Okla. Stat., Tit. 21, § 858 (Supp. 1995) (fining parents who allow students to possess firearm at school); Tenn. Code Ann. § 39-17-1312 (Supp. 1992) (misdemeanor for parents to allow student to possess firearm at school); Straight Shooter: Gov. Casey's Reasonable Plan to Control Assault Weapons, Pittsburgh Post-Gazette, Mar. 14, 1994, p. B2 (proposed bill); Bailey, Anti-Crime Measures Top Legislators' Agenda, Los Angeles Times, Orange Cty. ed., Mar. 7, 1994, p. B1, col. 2 (same); Krupa, New Gun-Control [***653] Plans Could Tighten Local Law, The Boston Globe, [****61] June 20, 1993, p. 29; laws providing for suspension or expulsion of gun-toting students, see, *e. g.*, Ala. Code § 16-1-24.1 (Supp. 1994); Ind. Code § 20-8.1-5-4(b)(1)(D) (1993); Ky. Rev. Stat. Ann. § 158.150(1)(a) (Michie 1992); Wash. Rev. Code § 9.41.280 (1994), or programs for expulsion with assignment to special facilities, see Martin, Legislators Poised to Take Harsher Stand on Guns in Schools, The Seattle Times, Feb. 1, 1995, p. B1 (automatic year-long expulsion for students with guns and intense semester-long reentry program).

[*583] The statute now before us forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise, and it does so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term. The tendency of this statute to displace state regulation in areas of traditional state concern is evident from its territorial operation. There are over 100,000 elementary and secondary schools in the United States. See U.S. Dept. of Education, National Center for Education Statistics, Digest of Education Statistics 73, 104 (NCES 94-115, 1994) (Tables 63, 94). Each [****62] of these now has an invisible federal zone extending 1,000 feet beyond the (often irregular) boundaries of the school property. In some communities no doubt it would be difficult to navigate without infringing on those zones. Yet throughout these areas, school officials would find their own programs for the prohibition [**1642] of guns in danger of displacement

by the federal authority unless the State chooses to enact a parallel rule.

This is not a case where the etiquette of federalism has been violated by a formal command from the National Government directing the State to enact a certain policy, cf. *New York* v. *United States*, 505 U.S. 144, 120 L. Ed. 2d 120, 112 S. Ct. 2408 (1992), or to organize its governmental functions in a certain way, cf. *FERC* v. *Mississippi*, 456 U.S. at 781 (O'CONNOR, J., concurring in judgment in part and dissenting in part). While the intrusion on state sovereignty may not be as severe in this instance as in some of our recent Tenth Amendment cases, the intrusion is nonetheless significant. Absent a stronger connection or identification with commercial concerns that are central to the Commerce Clause, that interference contradicts the federal balance [****63] the Framers designed and that this Court is obliged to enforce.

For these reasons, I join in the opinion and judgment of the Court.

[*584] JUSTICE THOMAS, concurring.

The Court today properly concludes that the Commerce Clause does not grant Congress the authority to prohibit gun possession within 1,000 feet of a school, as it attempted to do in the Gun-Free School Zones Act of 1990, Pub. L. 101-647, 104 Stat. 4844. Although I join the majority, I write separately to observe that our case law has drifted far from the original understanding of the Commerce Clause. In a future case, we ought to temper our Commerce Clause jurisprudence in a manner that both makes sense of our more recent case law and is more faithful to the original understanding of that Clause.

[***654] We have said that Congress may regulate not only "Commerce . . . among the several States," U.S. Const., Art. I, § 8, cl. 3, but also anything that has a "substantial effect" on such commerce. This test, if taken to its logical extreme, would give Congress a "police power" over all aspects of American life. Unfortunately, we have never come to grips with this implication of our substantial effects formula. Although we have supposedly [****64] applied the substantial effects test for the past 60 years, we *always* have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power; our cases are quite clear that there are real limits to federal power. See *New York* v. *United States*, 505 U.S. 144, 155, 120 L. Ed. 2d 120, 112 S. Ct. 2408 (1992) ("No one disputes the proposition that 'the Constitution created a Federal Government of limited powers'") (quoting *Gregory* v. *Ashcroft*, 501 U.S. 452, 457, 115 L. Ed. 2d 410, 111 S. Ct. 2395 (1991); *Maryland* v. *Wirtz*, 392 U.S. 183, 196, 20 L. Ed. 2d 1020, 88 S. Ct. 2017 (1968); *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 81 L. Ed. 893, 57 S. Ct. 615 (1937). Cf. *Chisholm* v. *Georgia*, 2 U.S. 419, 2 Dall. 419, 435, 1 L. Ed. 440 (1793) (Iredell, J.) ("Each State in the Union is sovereign as to all the powers reserved. It must necessarily be so, because the United States have no claim to any authority but such as the States have surrendered to them") (emphasis deleted). Indeed, on this crucial point, the majority and JUSTICE BREYER agree in principle: The Federal [*585] Government has nothing approaching a police power. Compare *ante*, [****65] at 556-558, with *post*, at 624.

While the principal dissent concedes that there are limits to federal power, the sweeping nature of our current test enables the dissent to argue that Congress can regulate gun possession. But it seems to me that the power to regulate "commerce" can by no means encompass authority over mere gun possession, any more than it empowers the Federal Government to regulate marriage, littering, or cruelty to animals, throughout the 50 States. Our Constitution quite properly leaves such matters to the individual States, notwithstanding these activities' effects on interstate commerce. Any interpretation of the Commerce Clause that even suggests that Congress could regulate such matters is in need of reexamination.

In an appropriate case, I believe that we must further reconsider our "substantial effects" test with an eye toward constructing a standard that reflects the text and history of the Commerce Clause without totally rejecting [**1643] our more recent Commerce Clause jurisprudence.

Today, however, I merely support the Court's conclusion with a discussion of the text, structure, and history of the Commerce Clause and an analysis of our early case law. My goal is [****66] simply to show how far we have departed from the original understanding and to demonstrate that the result we reach today is by no means "radical," see *post*, at 602 (STEVENS, J., dissenting). I also want to point out the necessity of refashioning a coherent test that does not tend to "obliterate the distinction between what is national and what is local and create a completely centralized government." *Jones & Laughlin Steel Corp., supra*, at 37.

[***655] I

At the time the original Constitution was ratified, "commerce" consisted of selling, buying, and bartering, as well as transporting for these purposes. See 1 S. Johnson, A Dictionary [*586] of the English Language 361 (4th ed. 1773) (defining commerce as "Intercour[s]e; exchange of one thing for another; interchange of any thing; trade; traffick"); N. Bailey, An Universal Etymological English Dictionary (26th ed. 1789) ("trade or traffic"); T. Sheridan, A Complete Dictionary of the English Language (6th ed. 1796) ("Exchange of one thing for another; trade, traffick"). This understanding finds support in the etymology of the word, which literally means "with merchandise." See 3 Oxford English Dictionary 552 (2d ed. 1989) (com -- "with"; merci -- "merchandise [****67] "). In fact, when Federalists and Anti-Federalists discussed the Commerce Clause during the ratification period, they often used trade (in its selling/bartering sense) and commerce interchangeably. See The Federalist No. 4, p. 22 (J. Jay) (asserting that countries will cultivate our friendship when our "trade" is prudently regulated by Federal Government); [1] *id.*, No. 7, at 39-40 (A. Hamilton) (discussing "competitions of commerce" between States resulting from state "regulations of trade"); *id.*, No. 40, at 262 (J. Madison) (asserting that it was an "acknowledged object of the Convention . . . that the regulation of trade should be submitted to the general government"); Lee, Letters of a Federal Farmer No. 5, in Pamphlets on the Constitution of the United States 319 (P. Ford ed. 1888); Smith, An Address to the People of the State of New-York, in *id.*, at 107.

As one would expect, the term "commerce" was used in contradistinction to productive [****68] activities such as manufacturing and agriculture. Alexander Hamilton, for example, repeatedly treated commerce, agriculture, and manufacturing as three separate endeavors. See, *e. g.*, The Federalist No. 36, at 224 (referring to "agriculture, commerce, manufactures"); *id.*, No. 21, at 133 (distinguishing commerce, arts, and industry); *id.*, No. 12, at 74 (asserting that commerce and agriculture have shared interests). The same distinctions [*587] were made in the state ratification conventions. See, *e. g.*, 2 Debates in the Several State Conventions on the Adoption of the Federal Constitution 57 (J. Elliot ed. 1836) (hereinafter Debates) (T. Dawes at Massachusetts convention); *id.*, at 336 (M. Smith at New York convention).

[1] All references to The Federalist are to the Jacob E. Cooke 1961 edition.

Moreover, interjecting a modern sense of commerce into the Constitution generates significant textual and structural problems. For example, one cannot replace "commerce" with a different type of enterprise, such as manufacturing. When a manufacturer produces a car, assembly cannot take place "with a foreign nation" or "with the Indian Tribes." Parts may come from different States or other nations and hence may have been in the flow of commerce at one time, [****69] but manufacturing takes place at a discrete site. Agriculture and manufacturing involve the production of goods; commerce encompasses traffic in such articles.

The Port Preference Clause also suggests that the term "commerce" denoted sale and/or transport rather than business generally. According [***656] to that Clause, "no Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." U.S. Const., Art. I, § 9, cl. 6. Although it is possible to [**1644] conceive of regulations of manufacturing or farming that prefer one port over another, the more natural reading is that the Clause prohibits Congress from using its commerce power to channel commerce through certain favored ports.

The Constitution not only uses the word "commerce" in a narrower sense than our case law might suggest, it also does not support the proposition that Congress has authority over all activities that "substantially affect" interstate commerce. The Commerce Clause [2] does not state that Congress may [*588] "regulate matters that substantially affect commerce with foreign Nations, and among the several States, and with the Indian Tribes." In contrast, the Constitution itself temporarily [****70] prohibited amendments that would "affect" Congress' lack of authority to prohibit or restrict the slave trade or to enact unproportioned direct taxation. Art. V. Clearly, the Framers could have drafted a Constitution that contained a "substantially affects interstate commerce" Clause had that been their objective.

In addition to its powers under the Commerce Clause,

[2] Even to speak of "the Commerce Clause" perhaps obscures the actual scope of that Clause. As an original matter, Congress did not have authority to regulate all commerce; Congress could only "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. Although the precise line between interstate/foreign commerce and purely intrastate commerce was hard to draw, the Court attempted to adhere to such a line for the first 150 years of our Nation. See *infra*, at 593-599.

Congress has the authority to enact such laws as are "necessary and proper" to carry into execution its power [****71] to regulate commerce among the several States. U.S. Const., Art. I, § 8, cl. 18. But on this Court's understanding of congressional power under these two Clauses, many of Congress' other enumerated powers under Art. I, § 8, are wholly superfluous. After all, if Congress may regulate all matters that substantially affect commerce, there is no need for the Constitution to specify that Congress may enact bankruptcy laws, cl. 4, or coin money and fix the standard of weights and measures, cl. 5, or punish counterfeiters of United States coin and securities, cl. 6. Likewise, Congress would not need the separate authority to establish post offices and post roads, cl. 7, or to grant patents and copyrights, cl. 8, or to "punish Piracies and Felonies committed on the high Seas," cl. 10. It might not even need the power to raise and support an Army and Navy, cls. 12 and 13, for fewer people would engage in commercial shipping if they thought that a foreign power could expropriate their property with ease. Indeed, if Congress could regulate matters that substantially affect interstate commerce, there would have been no need to specify [*589] that Congress can regulate international trade and commerce [****72] with the Indians. As the Framers surely understood, these other branches of trade substantially affect interstate commerce.

Put simply, much if not all of Art. I, § 8 (including portions of the Commerce Clause itself), would be surplusage if Congress had been given authority over matters that substantially affect interstate commerce. An [***657] interpretation of cl. 3 that makes the rest of § 8 superfluous simply cannot be correct. Yet this Court's Commerce Clause jurisprudence has endorsed just such an interpretation: The power we have accorded Congress has swallowed Art. I, § 8. [3]

[****73] Indeed, if a "substantial effects" test can be appended to the Commerce Clause, why not to every other power of the Federal Government? There is no reason for singling out the Commerce Clause for special treatment. Accordingly, Congress could regulate all matters that "substantially affect" the Army and Navy, bankruptcies, tax collection, expenditures, and so on. In that case, the Clauses of § 8 all mutually overlap, something we can assume the Founding Fathers never intended.

[**1645] Our construction of the scope of congressional authority has the additional problem of coming close to turning the Tenth Amendment on its head. Our case law could be read to reserve to the United States all powers not expressly *prohibited* by the Constitution. Taken together, these fundamental textual problems should, at the very least, convince us that the "substantial effects" test should be reexamined.

[*590] II

The exchanges during the ratification campaign reveal the relatively limited reach of the Commerce Clause and of federal power generally. The Founding Fathers confirmed that most areas of life (even many matters that would have substantial effects on commerce) would remain outside the reach of the Federal [****74] Government. Such affairs would continue to be under the exclusive control of the States.

Early Americans understood that commerce, manufacturing, and agriculture, while distinct activities, were intimately related and dependent on each other -- that each "substantially affected" the others. After all, items produced by farmers and manufacturers were the primary articles of commerce at the time. If commerce was more robust as a result of federal superintendence, farmers and manufacturers could benefit. Thus, Oliver Ellsworth of Connecticut attempted to convince farmers of the benefits of regulating commerce. "Your property and riches depend on a ready demand and generous price for the produce you can annually spare," he wrote, and these conditions exist "where trade flourishes and when the merchant can freely export the produce of the country" to nations that will pay the highest price. A Landholder No. 1, Connecticut Courant, Nov. 5, 1787, in 3 Documentary History of the Ratification of the Constitution 399 (M. Jensen ed. 1978) (hereinafter Documentary History). See also The Federalist No. 35, at 219 (A. Hamilton) ("Discerning citizens are well aware that the mechanic and manufacturing [****75] arts furnish the materials of mercantile enterprise and industry. Many of them indeed are immediately connected with the operations of commerce. They know that [***658] the merchant is their natural patron and friend"); *id.*, at 221 ("Will not the merchant . . . be disposed to cultivate . . . the interests of the mechanic

[3] There are other powers granted to Congress outside of Art. I, § 8, that may become wholly superfluous as well due to our distortion of the Commerce Clause. For instance, Congress has plenary power over the District of Columbia and the territories. See U.S. Const., Art. I, § 8, cl. 17, and Art. IV, § 3, cl. 2. The grant of comprehensive legislative power over certain areas of the Nation, when read in conjunction with the rest of the Constitution, further confirms that Congress was not ceded plenary authority over the *whole* Nation.

and manufacturing arts to which his commerce is so nearly allied?"); A Jerseyman: To the Citizens of New Jersey, Trenton Mercury, Nov. 6, 1787, in 3 Documentary History 147 (noting that agriculture will serve as [*591] a "source of commerce"); Marcus, The New Jersey Journal, Nov. 14, 1787, *id.*, at 152 (both the mechanic and the farmer benefit from the prosperity of commerce). William Davie, a delegate to the North Carolina Convention, illustrated the close link best: "Commerce, sir, is the nurse of [agriculture and manufacturing]. The merchant furnishes the planter with such articles as he cannot manufacture himself, and finds him a market for his produce. Agriculture cannot flourish if commerce languishes; they are mutually dependent on each other." 4 Debates 20.

Yet, despite being well aware that agriculture, manufacturing, and other matters substantially affected commerce, [****76] the founding generation did not cede authority over all these activities to Congress. Hamilton, for instance, acknowledged that the Federal Government could not regulate agriculture and like concerns:

> "The administration of private justice between the citizens of the same State, the supervision of agriculture and of other concerns of a similar nature, all those things in short which are proper to be provided for by local legislation, can never be desirable cares of a general jurisdiction." The Federalist No. 17, at 106.

In the unlikely event that the Federal Government would attempt to exercise authority over such matters, its effort "would be as troublesome as it would be nugatory." *Ibid.* [4]

[*592] [****77] [**1646] The comments of Hamilton and others about federal power reflected the well-known truth that the new Government would have only the limited and enumerated powers found in the Constitution. See, *e. g.*, 2 Debates 267-268 (A. Hamilton at New York convention) (noting that there would be just cause for rejecting the Constitution if it would enable the Federal Government to "alter, or abrogate . . . [a State's] civil and criminal institutions [or] penetrate the recesses of domestic life, and control, in all respects, the private conduct of individuals"); The Federalist No. 45, at 313 (J. Madison); 3 Debates 259 (J. Madison) (Virginia convention); R. Sherman & O. Ellsworth, Letter to Governor Huntington, Sept. 26, 1787, in 3 Documentary History 352; J. Wilson, Speech in the State House Yard, Oct. 6, 1787, in 2 *id.*, at 167-168. Agriculture and manufacture, since they were not surrendered to the Federal Government, were state concerns. See The Federalist No. 34, at 212-213 (A. Hamilton) (observing that the " [***659] internal encouragement of agriculture and manufactures" was an object of *state* expenditure). Even before the passage of the Tenth Amendment, it was apparent that Congress would [****78] possess only those powers "herein granted" by the rest of the Constitution. Art. I, § 1.

Where the Constitution was meant to grant federal authority over an activity substantially affecting interstate commerce, the Constitution contains an enumerated power over that particular activity. Indeed, the Framers knew that many of the other enumerated powers in § 8 dealt with matters that substantially affected interstate commerce. Madison, for instance, spoke of the bankruptcy power as being "intimately connected with the regulation of commerce." The Federalist No. 42, at 287. Likewise, Hamilton urged that "if we mean to be a commercial people or even to be secure on our Atlantic side, we must endeavour as soon as possible to have a navy." *Id.*, No. 24, at 157.

In short, the Founding Fathers were well aware of what the principal dissent calls "'economic . . . realities.'" See [*593] *post*, at 625 (BREYER, J.) (quoting *North American Co.* v. *SEC*, 327 U.S. 686, 705, 90 L. Ed. 945, 66 S. Ct. 785 (1946)). Even though the boundary between commerce and other matters may ignore "economic reality" and thus seem arbitrary or artificial to some, we must nevertheless [****79] respect a constitutional line that does not grant Congress power over all that substantially affects interstate commerce.

III

If the principal dissent's understanding of our early case law were correct, there might be some reason to doubt

---

[4] Cf. 3 Debates 40 (E. Pendleton at the Virginia convention) (The proposed Federal Government "does not intermeddle with the local, particular affairs of the states. Can Congress legislate for the state of Virginia? Can [it] make a law altering the form of transferring property, or the rule of descents, in Virginia?"); *id.*, at 553 (J. Marshall at the Virginia convention) (denying that Congress could make "laws affecting the mode of transferring property, or contracts, or claims, between citizens of the same state"); The Federalist No. 33, at 206 (A. Hamilton) (denying that Congress could change laws of descent or could pre-empt a land tax); A Native of Virginia: Observations upon the Proposed Plan of Federal Government, Apr. 2, 1788, in 9 Documentary History 692 (States have sole authority over "rules of property").

this view of the original understanding of the Constitution. According to that dissent, Chief Justice Marshall's opinion in *Gibbons* v. *Ogden*, 22 U.S. 1, 9 Wheat. 1, 6 L. Ed. 23 (1824), established that Congress may control all local activities that "significantly affect interstate commerce," *post*, at 615. And, "with the exception of one wrong turn subsequently corrected," this has been the "traditional" method of interpreting the Commerce Clause. *Post*, at 631 (citing *Gibbons* and *United States* v. *Darby*, 312 U.S. 100, 116-117, 85 L. Ed. 609, 61 S. Ct. 451 (1941)).

In my view, the dissent is wrong about the holding and reasoning of *Gibbons*. Because this error leads the dissent to characterize the first 150 years of this Court's case law as a "wrong turn," I feel compelled to put the last 50 years in proper perspective.

A

In *Gibbons*, the Court examined whether a federal law that licensed ships to engage in the "coasting [****80] trade" pre-empted a New York law granting a 30-year monopoly to Robert Livingston and Robert Fulton to navigate the State's waterways by steamship. In concluding that it did, the Court noted that Congress could regulate "navigation" because "all America . . . has uniformly understood, the [**1647] word 'commerce,' to comprehend navigation. It was so understood, and must have been so understood, when the constitution was framed." 9 Wheat., at 190. The Court also observed [*594] that federal power over commerce "among the several States" meant that Congress could regulate commerce [***660] conducted partly within a State. Because a portion of interstate commerce and foreign commerce would almost always take place within one or more States, federal power over interstate and foreign commerce necessarily would extend into the States. *Id.*, at 194-196.

At the same time, the Court took great pains to make clear that Congress could *not* regulate commerce "which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States." *Id.*, at 194. [****81] Moreover, while suggesting that the Constitution might not permit States to regulate interstate or foreign commerce, the Court observed that "inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State" were but a small part "of that immense mass of legislation . . . not surrendered to a general government." *Id.*, at 203. From an early moment, the Court rejected the notion that Congress can regulate everything that affects interstate commerce. That the internal commerce of the States and the numerous state inspection, quarantine, and health laws had substantial effects on interstate commerce cannot be doubted. Nevertheless, they were not "surrendered to the general government."

Of course, the principal dissent is not the first to misconstrue *Gibbons*. For instance, the Court has stated that *Gibbons* "described the federal commerce power with a breadth never yet exceeded." *Wickard* v. *Filburn*, 317 U.S. 111, 120, 87 L. Ed. 122, 63 S. Ct. 82 (1942). See also *Perez* v. *United States*, 402 U.S. 146, 151, 28 L. Ed. 2d 686, 91 S. Ct. 1357 (1971) (claiming that with *Darby* and [****82] *Wickard*, "the broader view of the Commerce Clause announced by Chief Justice Marshall had been restored"). I believe that this misreading stems from two statements in *Gibbons*.

First, the Court made the uncontroversial claim that federal power does not encompass "*commerce*" that "does [*595] not extend to or affect other States." 9 Wheat., at 194 (emphasis added). From this statement, the principal dissent infers that whenever an activity affects interstate commerce, it necessarily follows that Congress can regulate such activities. Of course, Chief Justice Marshall said no such thing and the inference the dissent makes cannot be drawn.

There is a much better interpretation of the "affect[s]" language: Because the Court had earlier noted that the commerce power did not extend to wholly intrastate commerce, the Court was acknowledging that although the line between intrastate and interstate/foreign commerce would be difficult to draw, federal authority could not be construed to cover purely intrastate commerce. Commerce that did not affect another State could *never* be said to be commerce "among the several States."

But even if one were to adopt the dissent's [****83] reading, the "affect[s]" language, at most, permits Congress to regulate only intrastate *commerce* that substantially affects interstate and foreign commerce. There is no reason to believe that Chief Justice Marshall was asserting that Congress could regulate *all* activities that affect interstate commerce. See *ibid.*

[***661] The second source of confusion stems from the Court's praise for the Constitution's division of power between the States and the Federal Government:

> "The genius and character of the whole government

seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government." *Id.*, at 195.

[*596] In this passage, the Court merely was making the well understood point that the Constitution commits matters of "national" concern to Congress and leaves "local" matters [**1648] to the States. The Court was *not* saying that whatever Congress believes [****84] is a national matter becomes an object of federal control. The matters of national concern are enumerated in the Constitution: war, taxes, patents, and copyrights, uniform rules of naturalization and bankruptcy, types of commerce, and so on. See generally Art. I, § 8. *Gibbons'* emphatic statements that Congress could not regulate many matters that affect commerce confirm that the Court did not read the Commerce Clause as granting Congress control over matters that "affect the States generally." [5] *Gibbons* simply cannot be construed as the principal dissent would have it.

B

I am aware of no cases prior to [****85] the New Deal that characterized the power flowing from the Commerce Clause as sweepingly as does our substantial effects test. My review of the case law indicates that the substantial effects test is but an innovation of the 20th century.

Even before *Gibbons*, Chief Justice Marshall, writing for the Court in *Cohens* v. *Virginia*, 19 U.S. 264, 6 Wheat. 264, 5 L. Ed. 257 (1821), noted that Congress had "no general right to punish murder committed within any of the States," *id.*, at 426, and that it was "clear that congress cannot punish felonies generally," *id.*, at 428. The Court's only qualification was that Congress could enact such laws for places where it enjoyed plenary powers -- for instance, over the District of Columbia. *Id.*, at 426. Thus, whatever effect ordinary murders, or robbery, or gun possession might have on interstate commerce (or on any [*597] other subject of federal concern) was irrelevant to the question of congressional power. [6]

[****86] *United States* v. *Dewitt*, 76 U.S. 41, 9 Wall. 41, 19 L. Ed. 593 (1870), marked the first [***662] time the Court struck down a federal law as exceeding the power conveyed by the Commerce Clause. In a two-page opinion, the Court invalidated a nationwide law prohibiting all sales of naphtha and illuminating oils. In so doing, the Court remarked that the Commerce Clause "has always been understood as limited by its terms; and as a virtual denial of any power to interfere with the internal trade and business of the separate States." *Id.*, at 44. The law in question was "plainly a regulation of police," which could have constitutional application only where Congress had exclusive authority, such as the territories. *Id.*, at 44-45. See also *License Tax Cases*, 72 U.S. 462, 5 Wall. 462, 470-471, 18 L. Ed. 497 (1867) (Congress cannot interfere with the internal commerce and business of a State); *Trade-Mark Cases*, 100 U.S. 82, 25 L. Ed. 550 (1879) (Congress [*598] cannot regulate internal commerce and thus may not establish national trademark registration).

In *United States* v. *E. C. Knight Co.*, 156 U.S. 1, 39 L. Ed. 325, 15 S. Ct. 249 (1895), [****87] this Court held that mere attempts to monopolize the manufacture of

---

[5] None of the other Commerce Clause opinions during Chief Justice Marshall's tenure, which concerned the "dormant" Commerce Clause, even suggested that Congress had authority over all matters substantially affecting commerce. See *Brown* v. *Maryland*, 25 U.S. 419, 12 Wheat. 419, 6 L. Ed. 678 (1827); *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 245 (1829).

[6] It is worth noting that Congress, in the first federal criminal Act, did not establish nationwide prohibitions against murder and the like. See Act of Apr. 30, 1790, ch. 9, 1 Stat. 112. To be sure, Congress outlawed murder, manslaughter, maiming, and larceny, but only when those acts were either committed on United States territory not part of a State or on the high seas. *Ibid.* See U.S. Const., Art. I, § 8, cl. 10 (authorizing Congress to outlaw piracy and felonies on high seas); Art. IV, § 3, cl. 2 (plenary authority over United States territory and property). When Congress did enact nationwide criminal laws, it acted pursuant to direct grants of authority found in the Constitution. Compare Act of Apr. 30, 1790, *supra*, §§ 1 and 14 (prohibitions against treason and the counterfeiting of U.S. securities), with U.S. Const., Art. I, § 8, cl. 6 (counterfeiting); Art. III, § 3, cl. 2 (treason). Notwithstanding any substantial effects that murder, kidnaping, or gun possession might have had on interstate commerce, Congress understood that it could not establish nationwide prohibitions.

Likewise, there were no laws in the early Congresses that regulated manufacturing and agriculture. Nor was there *any* statute that purported to regulate activities with "substantial effects" on interstate commerce.

sugar could not be regulated pursuant to the Commerce Clause. [**1649] Raising echoes of the discussions of the Framers regarding the intimate relationship between commerce and manufacturing, the Court declared that "commerce succeeds to manufacture, and is not a part of it." *Id.*, at 12. The Court also approvingly quoted from *Kidd* v. *Pearson*, 128 U.S. 1, 20, 32 L. Ed. 346, 9 S. Ct. 6 (1888):

> "'No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufacture and commerce . . . . If it be held that the term [commerce] includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested . . . with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining -- in short, every branch of human industry.'" *E. C. Knight, supra*, at 14.

[****88] If federal power extended to these types of production "comparatively little of business operations and affairs would be left for state control." *Id.*, at 16. See also *Newberry* v. *United States*, 256 U.S. 232, 257, 65 L. Ed. 913, 41 S. Ct. 469 (1921) ("It is settled . . . that the power to regulate interstate and foreign commerce does not reach whatever is essential thereto. Without agriculture, manufacturing, mining, etc., commerce could not exist, but this fact does not suffice to subject them to the control of Congress [***663] "). Whether or not manufacturing, agriculture, or other matters substantially affected interstate commerce was irrelevant.

[*599] As recently as 1936, the Court continued to insist that the Commerce Clause did not reach the wholly internal business of the States. See *Carter* v. *Carter Coal Co.*, 298 U.S. 238, 308, 80 L. Ed. 1160, 56 S. Ct. 855 (1936) (Congress may not regulate mine labor because "the relation of employer and employee is a local relation"); see also *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 543-550, 79 L. Ed. 1570, 55 S. Ct. 837 (1935) (holding that Congress may not regulate intrastate sales [****89] of sick chickens or the labor of employees involved in intrastate poultry sales). The Federal Government simply could not reach such subjects regardless of their effects on interstate commerce.

These cases all establish a simple point: From the time of the ratification of the Constitution to the mid-1930's, it was widely understood that the Constitution granted Congress only limited powers, notwithstanding the Commerce Clause. [7] Moreover, there was no question that activities wholly separated from business, such as gun possession, were beyond the reach of the commerce power. If anything, the "wrong turn" was the Court's dramatic departure in the 1930's from a century and a half of precedent.

[****90] IV

Apart from its recent vintage and its corresponding lack of any grounding in the original understanding of the Constitution, the substantial effects test suffers from the further [*600] flaw that it appears to grant Congress a police power over the Nation. When asked at oral argument if there were *any* limits to the Commerce Clause, the Government was at a loss for words. Tr. of Oral Arg. 5. Likewise, the principal dissent insists that there are limits, but it cannot muster even one example. *Post*, at 624. Indeed, the dissent implicitly concedes that its reading has no limits when it criticizes the Court for "threatening legal uncertainty in [**1650] an area of law that . . . seemed reasonably well settled." *Post*, at 630. The one advantage of the dissent's standard is certainty: It is certain that under its analysis everything may be regulated under the guise of the Commerce Clause.

The substantial effects test suffers from this flaw, in part, because of its "aggregation principle." Under so-called "class of activities" statutes, Congress can regulate whole categories of activities that are not themselves either "interstate" or "commerce." In applying the effects test, we ask whether [****91] the class of activities *as a whole* substantially affects interstate commerce, not

---

[7] To be sure, congressional power pursuant to the Commerce Clause was alternatively described less narrowly or more narrowly during this 150-year period. Compare *United States* v. *Coombs*, 12 Pet. 72, 78 (1838) (commerce power "extends to such acts, done on land, which interfere with, obstruct, or prevent the due exercise of the power to regulate [interstate and international] commerce" such as stealing goods from a beached ship), with *United States* v. *E. C. Knight Co.*, 156 U.S. 1, 13, 39 L. Ed. 325, 15 S. Ct. 249 (1895) ("Contracts to buy, sell, or exchange goods to be transported among the several States, the transportation and its instrumentalities . . . may be regulated, but this is because they form part of interstate trade or commerce"). During this period, however, this Court never held that Congress could regulate everything that substantially affects commerce.

whether [***664] any specific activity within the class has such effects when considered in isolation. See *Maryland* v. *Wirtz*, 392 U.S. at 192-193 (if class of activities is "'within the reach of federal power,'" courts may not excise individual applications as trivial) (quoting *Darby*, 312 U.S. at 120-121).

The aggregation principle is clever, but has no stopping point. Suppose all would agree that gun possession within 1,000 feet of a school does not substantially affect commerce, but that possession of weapons generally (knives, brass knuckles, nunchakus, etc.) does. Under our substantial effects doctrine, even though Congress cannot single out gun possession, it can prohibit weapon possession generally. But one *always* can draw the circle broadly enough to cover an activity that, when taken in isolation, would not have substantial effects on commerce. Under our jurisprudence, if Congress passed an omnibus "substantially affects interstate commerce" statute, purporting to regulate every aspect of human existence, the Act apparently [****92] would be constitutional. [*601] Even though particular sections may govern only trivial activities, the statute in the aggregate regulates matters that substantially affect commerce.

V

This extended discussion of the original understanding and our first century and a half of case law does not necessarily require a wholesale abandonment of our more recent opinions. [8] It simply reveals that our substantial effects test is far removed from both the Constitution and from our early case law and that the Court's opinion should not be viewed as "radical" or another "wrong turn" that must be corrected in the future. [9] The analysis also suggests that we ought to temper our Commerce Clause jurisprudence.

[*602] [****93] Unless the dissenting Justices are willing to repudiate our long-held understanding of the limited nature of federal power, I would think that they, too, must be willing to reconsider [***665] the substantial effects test in a future case. If we wish to be true to a Constitution that does not cede a police power to the Federal Government, our Commerce Clause's boundaries simply cannot be "defined" as being "'commensurate with the national needs'" or self-consciously intended [**1651] to let the Federal Government "'defend itself against economic forces that Congress decrees inimical or destructive of the national economy.'" See *post*, at 625 (BREYER, J., dissenting) (quoting *North American Co.* v. *SEC*, 327 U.S. at 705). Such a formulation of federal power is no test at all: It is a blank check.

At an appropriate juncture, I think we must modify our Commerce Clause jurisprudence. Today, it is easy enough to say that the Clause certainly does not empower Congress to ban gun possession within 1,000 feet of a school.

**Dissent by:** STEVENS; SOUTER; BREYER

## Dissent

JUSTICE **STEVENS**, dissenting.

The welfare of our future "Commerce with foreign Nations, and among the several States, [****94] " U.S. Const., Art. I, § 8, cl. 3, is vitally dependent on the character of the education of our children. I therefore agree entirely with JUSTICE BREYER's explanation of

[8] Although I might be willing to return to the original understanding, I recognize that many believe that it is too late in the day to undertake a fundamental reexamination of the past 60 years. Consideration of *stare decisis* and reliance interests may convince us that we cannot wipe the slate clean.

[9] Nor can the majority's opinion fairly be compared to *Lochner* v. *New York*, 198 U.S. 45, 49 L. Ed. 937, 25 S. Ct. 539 (1905). See *post*, at 604-609 (SOUTER, J., dissenting). Unlike *Lochner* and our more recent "substantive due process" cases, to-day's decision enforces only the Constitution and not "judicial policy judgments." See *post*, at 607. Notwithstanding JUSTICE SOUTER's discussion, "'commercial' character" is not only a natural but an inevitable "ground of *Commerce* Clause distinction." See *post*, at 608 (emphasis added). Our invalidation of the Gun-Free School Zones Act therefore falls comfortably within our proper role in reviewing federal legislation to determine if it exceeds congressional authority as defined by the Constitution itself. As John Marshall put it: "If [Congress] were to make a law not warranted by any of the powers enumerated, it would be considered by the judges as an infringement of the Constitution which they are to guard . . . . They would declare it void." 3 Debates 553 (before the Virginia ratifying convention); see also The Federalist No. 44, at 305 (J. Madison) (asserting that if Congress exercises powers "not warranted by [the Constitution's] true meaning" the judiciary will defend the Constitution); *id.*, No. 78, at 526 (A. Hamilton) (asserting that the "courts of justice are to be considered as the bulwarks of a limited constitution against legislative encroachments"). Where, as here, there is a case or controversy, there can be no "misstep," *post*, at 614, in enforcing the Constitution.

why Congress has ample power to prohibit the possession of firearms in or near schools -- just as it may protect the school environment from harms posed by controlled substances such as asbestos or alcohol. I also agree with JUSTICE SOUTER's exposition of the radical character of the Court's holding and its kinship with the discredited, pre-Depression version of substantive due process. Cf. *Dolan* v. *City of Tigard*, 512 U.S. 374, 405-411, 129 L. Ed. 2d 304, 114 S. Ct. 2309 (1994) (STEVENS, J., dissenting). I believe, however, that the Court's extraordinary decision merits this additional comment.

Guns are both articles of commerce and articles that can be used to restrain commerce. Their possession is the consequence, [*603] either directly or indirectly, of commercial activity. In my judgment, Congress' power to regulate commerce in firearms includes the power to prohibit possession of guns at any location because of their potentially harmful use; it necessarily follows that Congress may also prohibit their possession in particular markets. The [****95] market for the possession of handguns by school-age children is, distressingly, substantial. [*] Whether or not the national interest in eliminating that market would have justified federal legislation in 1789, it surely does today.

JUSTICE SOUTER, dissenting.

In reviewing congressional legislation under the Commerce Clause, we defer to what is often a merely implicit congressional judgment that its regulation addresses a subject substantially affecting interstate commerce "if there is any rational basis for such a finding." *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 276, 69 L. Ed. 2d 1, 101 S. Ct. 2352 (1981); *Preseault* [***666] v. *ICC*, 494 U.S. 1, 17, 108 L. Ed. 2d 1, 110 S. Ct. 914 (1990); [****96] see *Maryland* v. *Wirtz*, 392 U.S. 183, 190, 20 L. Ed. 2d 1020, 88 S. Ct. 2017 (1968), quoting *Katzenbach* v. *McClung*, 379 U.S. 294, 303-304, 13 L. Ed. 2d 290, 85 S. Ct. 377 (1964). If that congressional determination is within the realm of reason, "the only remaining question for judicial inquiry is whether 'the means chosen by Congress [are] reasonably adapted to the end permitted by the Constitution.'" *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., supra*, at 276, quoting *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U.S. 241, 262, 13 L. Ed. 2d 258, 85 S. Ct. 348 (1964); see also *Preseault* v. *ICC, supra*, at 17. [1]

[*604] The practice of deferring to rationally based legislative judgments "is a paradigm of judicial restraint." *FCC* v. *Beach Communications, Inc.*, 508 U.S. 307, 314, 124 L. Ed. 2d 211, 113 S. Ct. 2096 (1993). In judicial review under the Commerce Clause, it reflects our respect for the institutional competence of the Congress on a subject expressly assigned to it by the Constitution and our appreciation of the legitimacy that comes [**1652] from Congress's political accountability in dealing with matters open to a wide range of possible choices. [****97] See *id.*, at 313-316; *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., supra*, at 276; *United States* v. *Carolene Products Co.*, 304 U.S. 144, 147, 151-154, 82 L. Ed. 1234, 58 S. Ct. 778 (1938); cf. *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U.S. 483, 488, 99 L. Ed. 563, 75 S. Ct. 461 (1955).

It was not ever thus, however, as even a brief overview of Commerce Clause history during the past century reminds us. The modern respect for the competence and primacy of Congress in matters affecting commerce developed only after one of this Court's most chastening experiences, when it perforce repudiated an earlier and untenably expansive conception of judicial review in derogation of congressional commerce power. A look at history's sequence will serve to show how today's [****98] decision tugs the Court off course, leading it to suggest opportunities for further developments that would be at odds with the rule of restraint to which the Court still wisely states adherence.

I

Notwithstanding the Court's recognition of a broad commerce power in *Gibbons* v. *Ogden*, 22 U.S. 1, 9 Wheat. 1, 196-197, 6 L. Ed. 23 (1824) (Marshall, C. J.), Congress saw few occasions to exercise that power prior to Reconstruction, see generally 2 C. Warren, The Supreme Court in United States History 729-739 (rev. ed. 1935), and it was really the passage of the Interstate Commerce Act of 1887 that opened a new age of congressional reliance on the Commerce Clause for authority to exercise general police powers at the national level, see *id.*, at [*605] 729-730. Although the

[*] Indeed, there is evidence that firearm manufacturers -- aided by a federal grant -- are specifically targeting schoolchildren as consumers by distributing, at schools, hunting-related videos styled "educational materials for grades four through 12," Herbert, Reading, Writing, Reloading, N. Y. Times, Dec. 14, 1994, p. A23, col. 1.

[1] In this case, no question has been raised about means and ends; the only issue is about the effect of school zone guns on commerce.

Court upheld a fair amount of the ensuing legislation as being within the commerce power, see, *e. g., Stafford* v. *Wallace*, 258 U.S. 495, 66 L. Ed. 735, 42 S. Ct. 397 (1922) (upholding an Act regulating trade practices in the meat packing industry); *Shreveport Rate Cases*, 234 U.S. 342, [***667] 34 S. Ct. 833, 58 L. Ed. 1341 (1914) (upholding Interstate Commerce Commission order to equalize interstate and intrastate rail rates); see generally [****99] Warren, *supra*, at 729-739, the period from the turn of the century to 1937 is better noted for a series of cases applying highly formalistic notions of "commerce" to invalidate federal social and economic legislation, see, *e. g., Carter* v. *Carter Coal Co.*, 298 U.S. 238, 303-304, 80 L. Ed. 1160, 56 S. Ct. 855 (1936) (striking Act prohibiting unfair labor practices in coal industry as regulation of "mining" and "production," not "commerce"); *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 545-548, 79 L. Ed. 1570, 55 S. Ct. 837 (1935) (striking congressional regulation of activities affecting interstate commerce only "indirectly"); *Hammer* v. *Dagenhart*, 247 U.S. 251, 62 L. Ed. 1101, 38 S. Ct. 529 (1918) (striking Act prohibiting shipment in interstate commerce of goods manufactured at factories using child labor because the Act regulated "manufacturing," not "commerce"); *Adair* v. *United States*, 208 U.S. 161, 52 L. Ed. 436, 28 S. Ct. 277 (1908) (striking protection of labor union membership as outside "commerce").

These restrictive views of commerce subject to congressional power complemented the Court's activism in limiting the enforceable scope [****100] of state economic regulation. It is most familiar history that during this same period the Court routinely invalidated state social and economic legislation under an expansive conception of Fourteenth Amendment substantive due process. See, *e. g., Louis K. Liggett Co.* v. *Baldridge*, 278 U.S. 105, 73 L. Ed. 204, 49 S. Ct. 57 (1928) (striking state law requiring pharmacy owners to be licensed as pharmacists); *Coppage* v. *Kansas*, 236 U.S. 1, 59 L. Ed. 441, 35 S. Ct. 240 (1915) (striking state law prohibiting employers from requiring their employees to agree not to join labor organizations); *Lochner* v. *New York*, 198 U.S. 45, 49 L. Ed. 937, 25 S. Ct. 539 (1905) (striking state law establishing maximum working hours for bakers). See generally L. Tribe, American Constitutional [*606] Law 568-574 (2d ed. 1988). The fulcrums of judicial review in these cases were the notions of liberty and property characteristic of laissez-faire economics, whereas the Commerce Clause cases turned on what was ostensibly a structural limit of federal power, but under each conception of judicial review the Court's character for the [**1653] first third of the century showed itself in exacting judicial scrutiny [****101] of a legislature's choice of economic ends and of the legislative means selected to reach them.

It was not merely coincidental, then, that sea changes in the Court's conceptions of its authority under the Due Process and Commerce Clauses occurred virtually together, in 1937, with *West Coast Hotel Co.* v. *Parrish*, 300 U.S. 379, 81 L. Ed. 703, 57 S. Ct. 578, and *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 81 L. Ed. 893, 57 S. Ct. 615. See Stern, The Commerce Clause and the National Economy, 1933-1946, 59 Harv. L. Rev. 645, 674-682 (1946). In *West Coast Hotel*, the Court's rejection of a due process challenge to a state law fixing minimum wages for women and children marked the abandonment of its expansive protection of contractual freedom. Two weeks later, *Jones & Laughlin* affirmed congressional commerce power to authorize NLRB injunctions against unfair labor practices. [***668] The Court's finding that the regulated activity had a direct enough effect on commerce has since been seen as beginning the abandonment, for practical purposes, of the formalistic distinction between direct and indirect effects.

In the years following these decisions, [****102] deference to legislative policy judgments on commercial regulation became the powerful theme under both the Due Process and Commerce Clauses, see *United States* v. *Carolene Products Co.*, 304 U.S. at 147-148, 152; *United States* v. *Darby*, 312 U.S. 100, 119-121, 85 L. Ed. 609, 61 S. Ct. 451 (1941); *United States* v. *Wrightwood Dairy Co.*, 315 U.S. 110, 118-119, 86 L. Ed. 726, 62 S. Ct. 523 (1942), and in due course that deference became articulate in the standard of rationality review. In due process litigation, the Court's statement of a rational [*607] basis test came quickly. See *United States* v. *Carolene Products Co., supra*, at 152; see also *Williamson* v. *Lee Optical Co., supra*, at 489-490. The parallel formulation of the Commerce Clause test came later, only because complete elimination of the direct/indirect effects dichotomy and acceptance of the cumulative effects doctrine, *Wickard* v. *Filburn*, 317 U.S. 111, 125, 127-129, 87 L. Ed. 122, 63 S. Ct. 82 (1942); *United States* v. *Wrightwood Dairy Co., supra*, at 124-126, so far [****103] settled the pressing issues of congressional power over commerce as to leave the Court for years without any need to phrase a test explicitly deferring to rational legislative judgments. The moment came, however, with the challenge to congressional Commerce Clause authority to prohibit racial discrimination in places of public accommodation, when the Court simply made explicit

what the earlier cases had implied: "where we find that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end." *Katzenbach* v. *McClung*, 379 U.S. at 303-304, discussing *United States* v. *Darby, supra;* see *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U.S. at 258-259. Thus, under commerce, as under due process, adoption of rational basis review expressed the recognition that the Court had no sustainable basis for subjecting economic regulation as such to judicial policy judgments, and for the past half century the Court has no more turned back [****104] in the direction of formalistic Commerce Clause review (as in deciding whether regulation of commerce was sufficiently direct) than it has inclined toward reasserting the substantive authority of *Lochner* due process (as in the inflated protection of contractual autonomy). See, *e. g., Maryland* v. *Wirtz*, 392 U.S. at 190, 198; *Perez* v. *United States*, 402 U.S. 146, 151-157, 28 L. Ed. 2d 686, 91 S. Ct. 1357 (1971); *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. at 276, 277.

[*608] II

There is today, however, a backward glance at both the old pitfalls, as the Court treats deference under the rationality rule as subject to gradation according to the commercial or noncommercial nature of the immediate subject of the challenged [***669] regulation. [**1654] See *ante*, at 558-561. The distinction between what is patently commercial and what is not looks much like the old distinction between what directly affects commerce and what touches it only indirectly. And the act of calibrating the level of deference by drawing a line between what is patently commercial and what is less purely so will probably resemble the [****105] process of deciding how much interference with contractual freedom was fatal. Thus, it seems fair to ask whether the step taken by the Court today does anything but portend a return to the untenable jurisprudence from which the Court extricated itself almost 60 years ago. The answer is not reassuring. To be sure, the occasion for today's decision reflects the century's end, not its beginning. But if it seems anomalous that the Congress of the United States has taken to regulating school yards, the Act in question is still probably no more remarkable than state regulation of bake shops 90 years ago. In any event, there is no reason to hope that the Court's qualification of rational basis review will be any more successful than the efforts at substantive economic review made by our predecessors as the century began. Taking the Court's opinion on its own terms, JUSTICE BREYER has explained both the hopeless porosity of "commercial" character as a ground of Commerce Clause distinction in America's highly connected economy, and the inconsistency of this categorization with our rational basis precedents from the last 50 years.

Further glosses on rationality review, moreover, may be in the [****106] offing. Although this case turns on commercial character, the Court gestures toward two other considerations that it might sometime entertain in applying rational basis [*609] scrutiny (apart from a statutory obligation to supply independent proof of a jurisdictional element): does the congressional statute deal with subjects of traditional state regulation, and does the statute contain explicit factual findings supporting the otherwise implicit determination that the regulated activity substantially affects interstate commerce? Once again, any appeal these considerations may have depends on ignoring the painful lesson learned in 1937, for neither of the Court's suggestions would square with rational basis scrutiny.

A

The Court observes that the Gun-Free School Zones Act operates in two areas traditionally subject to legislation by the States, education and enforcement of criminal law. The suggestion is either that a connection between commerce and these subjects is remote, or that the commerce power is simply weaker when it touches subjects on which the States have historically been the primary legislators. Neither suggestion is tenable. As for remoteness, it may or may not be wise for [****107] the National Government to deal with education, but JUSTICE BREYER has surely demonstrated that the commercial prospects of an illiterate State or Nation are not rosy, and no argument should be needed to show that hijacking interstate shipments of cigarettes can affect commerce substantially, even though the States have traditionally prosecuted robbery. And as for the notion that the commerce power diminishes the closer it gets to customary state concerns, that idea has been flatly rejected, and not long ago. The commerce power, we [***670] have often observed, is plenary. *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., supra*, at 276; *United States* v. *Darby*, 312 U.S. at 114; see *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 549-550, 83 L. Ed. 2d 1016, 105 S. Ct. 1005 (1985); *Gibbons* v. *Ogden*, 9 Wheat., at 196-197. Justice Harlan put it this way in speaking for

the Court in *Maryland* v. *Wirtz:*

> [*610] "There is no general doctrine implied in the Federal Constitution that the two governments, national and state, are each to exercise its powers so as [****108] not to interfere with the free and full exercise of the powers of the other. . . . It is clear that the Federal Government, when acting within a delegated power, may override countervailing state interests . . . . As long ago as [1925], the Court put to rest the contention that state concerns might constitutionally 'outweigh' the importance of an otherwise valid federal statute regulating commerce." [**1655] 392 U.S. at 195-196 (citations and internal quotation marks omitted).

See also *United States* v. *Darby, supra*, at 114; *Gregory* v. *Ashcroft*, 501 U.S. 452, 460, 115 L. Ed. 2d 410, 111 S. Ct. 2395 (1991); *United States* v. *Carolene Products Co.*, 304 U.S. at 147.

Nor is there any contrary authority in the reasoning of our cases imposing clear statement rules in some instances of legislation that would significantly alter the state-national balance. In the absence of a clear statement of congressional design, for example, we have refused to interpret ambiguous federal statutes to limit fundamental state legislative prerogatives, *Gregory* v. *Ashcroft, supra*, at 460-464, [****109] our understanding being that such prerogatives, through which "a State defines itself as a sovereign," are "powers with which Congress does not readily interfere," 501 U.S. at 460, 461. Likewise, when faced with two plausible interpretations of a federal criminal statute, we generally will take the alternative that does not force us to impute an intention to Congress to use its full commerce power to regulate conduct traditionally and ably regulated by the States. See *United States* v. *Enmons*, 410 U.S. 396, 411-412, 35 L. Ed. 2d 379, 93 S. Ct. 1007 (1973); *United States* v. *Bass*, 404 U.S. 336, 349-350, 30 L. Ed. 2d 488, 92 S. Ct. 515 (1971); *Rewis* v. *United States*, 401 U.S. 808, 812, 28 L. Ed. 2d 493, 91 S. Ct. 1056 (1971).

These clear statement rules, however, are merely rules of statutory interpretation, to be relied upon only when the [*611] terms of a statute allow, *United States* v. *Culbert*, 435 U.S. 371, 379-380, 55 L. Ed. 2d 349, 98 S. Ct. 1112 (1978); see *Gregory* v. *Ashcroft, supra*, at 470; *United States* v. *Bass, supra*, at 346-347, and in cases implicating Congress's historical [****110] reluctance to trench on state legislative prerogatives or to enter into spheres already occupied by the States, *Gregory* v. *Ashcroft, supra*, at 461; *United States* v. *Bass, supra*, at 349; see *Rewis* v. *United States, supra*, at 811-812. They are rules for determining [***671] intent when legislation leaves intent subject to question. But our hesitance to presume that Congress has acted to alter the state-federal status quo (when presented with a plausible alternative) has no relevance whatever to the enquiry whether it has the commerce power to do so or to the standard of judicial review when Congress has definitely meant to exercise that power. Indeed, to allow our hesitance to affect the standard of review would inevitably degenerate into the sort of substantive policy review that the Court found indefensible 60 years ago. The Court does not assert (and could not plausibly maintain) that the commerce power is wholly devoid of congressional authority to speak on any subject of traditional state concern; but if congressional action is not forbidden absolutely when it touches such a [****111] subject, it will stand or fall depending on the Court's view of the strength of the legislation's commercial justification. And here once again history raises its objections that the Court's previous essays in overriding congressional policy choices under the Commerce Clause were ultimately seen to suffer two fatal weaknesses: when dealing with Acts of Congress (as distinct from state legislation subject to review under the theory of dormant commerce power) nothing in the Clause compelled the judicial activism, and nothing about the judiciary as an institution made it a superior source of policy on the subject Congress dealt with. There is no reason to expect the lesson would be different another time.

[*612] B

There remain questions about legislative findings. The Court of Appeals expressed the view, 2 F.3d 1342, 1363-1368 (CA5 1993), that the result in this case might well have been different if Congress had made explicit findings that guns in schools have a substantial effect on interstate commerce, and the Court today does not repudiate that position, see *ante*, at 562-563. Might a court aided by such findings have subjected this legislation to less exacting scrutiny [****112] (or, put another [**1656] way, should a court have deferred to such findings if Congress had made them)? [2] The

---

[2] Unlike the Court, (perhaps), I would see no reason not to consider Congress's findings, insofar as they might be helpful in reviewing the challenge to this statute, even though adopted in later legislation. See the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 320904, 108 Stat. 2125 ("The occurrence of violent crime in school zones

answer to either question must be no, although as a general matter findings are important and to be hoped for in the difficult cases.

[****113] It is only natural to look for help with a hard job, and reviewing a claim that Congress has exceeded the commerce power is much harder in some cases than in others. A challenge to congressional regulation of interstate garbage hauling would be easy to resolve; review of congressional [***672] regulation of gun possession in school yards is more difficult, both because the link to interstate commerce is less obvious and because of our initial ignorance of the relevant facts. In a [*613] case comparable to this one, we may have to dig hard to make a responsible judgment about what Congress could reasonably find, because the case may be close, and because judges tend not to be familiar with the facts that may or may not make it close. But while the ease of review may vary from case to case, it does not follow that the standard of review should vary, much less that explicit findings of fact would even directly address the standard.

The question for the courts, as all agree, is not whether as a predicate to legislation Congress in fact found that a particular activity substantially affects interstate commerce. The legislation implies such a finding, and there is no reason to entertain claims that Congress [****114] acted ultra vires intentionally. Nor is the question whether Congress was correct in so finding. The only question is whether the legislative judgment is within the realm of reason. See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. at 276-277; *Katzenbach* v. *McClung*, 379 U.S. at 303-304; *Railroad Retirement Bd.* v. *Alton R. Co.*, 295 U.S. 330, 391-392, 79 L. Ed. 1468, 55 S. Ct. 758 (1935) (Hughes, C. J., dissenting); cf. *FCC* v. *Beach Communications, Inc.*, 508 U.S. at 315 (in the equal protection context, "those attacking the rationality of the legislative classification have the burden to negate every conceivable basis which might support it[;] . . . it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature") (citations and internal quotation marks omitted); *Ferguson* v. *Skrupa*, 372 U.S. 726, 731-733, 10 L. Ed. 2d 93, 83 S. Ct. 1028 (1963); *Williamson* v. *Lee Optical Co.*, 348 U.S. at 487. Congressional findings do not, however, directly address [****115] the question of reasonableness; they tell us what Congress actually has found, not what it could rationally find. If, indeed, the Court were to make the existence of explicit congressional findings dispositive in some close or difficult cases something other than rationality review would be afoot. The resulting congressional obligation to justify its policy choices on the merits would imply [*614] either a judicial authority to review the justification (and, hence, the wisdom) of those choices, or authority to require Congress to act with some high degree of deliberateness, of which express findings would be evidence. But review for congressional wisdom would just be the old judicial pretension discredited and abandoned in 1937, and review for deliberateness would be as patently unconstitutional as an Act of Congress mandating long opinions from this Court. Such a legislative process requirement would function merely as an excuse for covert review of the merits of legislation under standards never expressed [**1657] and more or less arbitrarily applied. Under such a regime, in any case, the rationality standard of review would be a thing of the past.

On the other hand, to say that courts applying [****116] the rationality standard may not defer to findings is not, of course, to say that findings are [***673] pointless. They may, in fact, have great value in telling courts what to look for, in establishing at least one frame of reference for review, and in citing to factual authority. The research underlying JUSTICE BREYER's dissent was necessarily a major undertaking; help is welcome, and it not incidentally shrinks the risk that judicial research will miss material scattered across the public domain or buried under pounds of legislative record. Congressional findings on a more particular plane than this record illustrates would accordingly have earned judicial thanks. But thanks do not carry the day as long as rational possibility is the touchstone, and I would not allow for the possibility, as the Court's opinion may, *ante*, at 563, that the addition of congressional findings could in principle have affected the fate of the statute here.

III

---

has resulted in a decline in the quality of education in our country; . . . this decline . . . has an adverse impact on interstate commerce and the foreign commerce of the United States; . . . Congress has power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to ensure the integrity and safety of the Nation's schools by enactment of this subsection"). The findings, however, go no further than expressing what is obviously implicit in the substantive legislation, at such a conclusory level of generality as to add virtually nothing to the record. The Solicitor General certainly exercised sound judgment in placing no significant reliance on these particular afterthoughts. Tr. of Oral Arg. 24-25.

Because JUSTICE BREYER's opinion demonstrates beyond any doubt that the Act in question passes the rationality review that the Court continues to espouse, today's decision may be seen as only a misstep, its reasoning and its suggestions [*615] not quite in [****117] gear with the prevailing standard, but hardly an epochal case. I would not argue otherwise, but I would raise a caveat. Not every epochal case has come in epochal trappings. *Jones & Laughlin* did not reject the direct-indirect standard in so many words; it just said the relation of the regulated subject matter to commerce was direct enough. 301 U.S. at 41-43. But we know what happened.

I respectfully dissent.

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

The issue in this case is whether the Commerce Clause authorizes Congress to enact a statute that makes it a crime to possess a gun in, or near, a school. 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V). In my view, the statute falls well within the scope of the commerce power as this Court has understood that power over the last half century.

I

In reaching this conclusion, I apply three basic principles of Commerce Clause interpretation. First, the power to "regulate Commerce . . . among the several States," U.S. Const., Art. I, § 8, cl. 3, encompasses the power to regulate local activities insofar as they significantly [****118] affect interstate commerce. See, *e. g., Gibbons* v. *Ogden*, 22 U.S. 1, 9 Wheat. 1, 194-195, 6 L. Ed. 23 (1824) (Marshall, C. J.); *Wickard* v. *Filburn*, 317 U.S. 111, 125, 87 L. Ed. 122, 63 S. Ct. 82 (1942). As the majority points out, *ante*, at 559, the Court, in describing how much of an effect the Clause requires, sometimes has used the word "substantial" and sometimes has not. Compare, *e. g., Wickard, supra*, at 125 ("substantial economic effect"), with *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 276, 69 L. Ed. 2d 1, 101 S. Ct. 2352 (1981) ("affects interstate commerce"); see also *Maryland* v. *Wirtz*, 392 U.S. 183, 196, n. 27, 20 L. Ed. 2d 1020, 88 S. Ct. 2017 (1968) (cumulative effect must not be "trivial"); *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 81 L. Ed. 893, 57 S. Ct. 615 [***674] (1937) [*616] (speaking of "close and substantial *relation*" between activity and commerce, not of "substantial effect") (emphasis added); *Gibbons, supra*, at 194 (words of Commerce Clause do not "comprehend . . . commerce, which is completely internal . . . and which does not . . . affect other States"). And, as the majority [****119] also recognizes in quoting Justice Cardozo, the question of degree (how *much* effect) requires an estimate of the "size" of the effect that no verbal formulation can capture with precision. See *ante*, at 567. I use the word "significant" because the word "substantial" implies a somewhat narrower power than recent precedent suggests. See, *e. g., Perez* v. *United States*, 402 [**1658] U.S. 146, 154, 28 L. Ed. 2d 686, 91 S. Ct. 1357 (1971); *Daniel* v. *Paul*, 395 U.S. 298, 308, 23 L. Ed. 2d 318, 89 S. Ct. 1697 (1969). But to speak of "substantial effect" rather than "significant effect" would make no difference in this case.

Second, in determining whether a local activity will likely have a significant effect upon interstate commerce, a court must consider, not the effect of an individual act (a single instance of gun possession), but rather the cumulative effect of all similar instances (*i. e.*, the effect of all guns possessed in or near schools). See, *e. g., Wickard, supra*, at 127-128. As this Court put the matter almost 50 years ago:

> "It is enough that the individual activity when multiplied into a general practice . . . contains a threat to the interstate economy that [****120] requires preventative regulation." *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U.S. 219, 236, 92 L. Ed. 1328, 68 S. Ct. 996 (1948) (citations omitted).

Third, the Constitution requires us to judge the connection between a regulated activity and interstate commerce, not directly, but at one remove. Courts must give Congress a degree of leeway in determining the existence of a significant factual connection between the regulated activity and interstate commerce -- both because the Constitution delegates the commerce power directly to Congress and because the [*617] determination requires an empirical judgment of a kind that a legislature is more likely than a court to make with accuracy. The traditional words "rational basis" capture this leeway. See *Hodel, supra*, at 276-277. Thus, the specific question before us, as the Court recognizes, is not whether the "regulated activity sufficiently affected interstate commerce," but, rather, whether Congress could have had "*a rational basis*" for so concluding. *Ante*, at 557 (emphasis added).

I recognize that we must judge this matter independently. "Simply because Congress may

conclude [****121] that a particular activity substantially affects interstate commerce does not necessarily make it so." *Hodel, supra*, at 311 (REHNQUIST, J., concurring in judgment). And, I also recognize that Congress did not write specific "interstate commerce" findings into the law under which Lopez was convicted. Nonetheless, as I have already noted, the matter that we review independently (*i. e.*, whether there is a "rational basis") already has considerable leeway built into it. And, the absence of findings, at most, deprives a statute of the benefit of [***675] some *extra* leeway. This extra deference, in principle, might change the result in a close case, though, in practice, it has not made a critical legal difference. See, *e. g., Katzenbach* v. *McClung*, 379 U.S. 294, 299, 13 L. Ed. 2d 290, 85 S. Ct. 377 (1964) (noting that "no formal findings were made, which of course are not necessary"); *Perez, supra*, at 156-157; cf. *Turner Broadcasting System, Inc.* v. *FCC*, 512 U.S. 622, 666, 129 L. Ed. 2d 497, 114 S. Ct. 2445 (1994) (opinion of KENNEDY, J.) ("Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate [****122] judicial review"); *Fullilove* v. *Klutznick*, 448 U.S. 448, 503, 65 L. Ed. 2d 902, 100 S. Ct. 2758 (1980) (Powell, J., concurring) ("After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate . . ."). It would seem particularly unfortunate to make the validity of [*618] the statute at hand turn on the presence or absence of findings. Because Congress did make findings (though not until after Lopez was prosecuted), doing so would appear to elevate form over substance. See Pub. L. 103-322, §§ 320904 (2)(F), (G), 108 Stat. 2125, 18 U.S.C. §§ 922(q)(1)(F), (G).

In addition, despite the Court of Appeals' suggestion to the contrary, see 2 F.3d 1342, 1365 (CA5 1993), there is no special need here for a clear indication of Congress' rationale. The statute does not interfere with the exercise of state or local authority. Cf., *e. g., Dellmuth* v. *Muth*, 491 U.S. 223, 227-228, 105 L. Ed. 2d 181, 109 S. Ct. 2397 (1989) (requiring clear statement for abrogation of Eleventh Amendment immunity). Moreover, any clear [****123] statement rule would [**1659] apply only to determine Congress' intended result, *not* to clarify the source of its authority or measure the level of consideration that went into its decision, and here there is no doubt as to which activities Congress intended to regulate. See *ibid.; id.*, at 233 (SCALIA, J., concurring) (to subject States to suits for money damages, Congress need only make that intent clear, and need not refer explicitly to the Eleventh Amendment); *EEOC* v. *Wyoming*, 460 U.S. 226, 243, n. 18, 75 L. Ed. 2d 18, 103 S. Ct. 1054 (1983) (Congress need not recite the constitutional provision that authorizes its action).

II

Applying these principles to the case at hand, we must ask whether Congress could have had a *rational basis* for finding a significant (or substantial) connection between gun-related school violence and interstate commerce. Or, to put the question in the language of the *explicit* finding that Congress made when it amended this law in 1994: Could Congress rationally have found that "violent crime in school zones," through its effect on the "quality of education," significantly (or substantially) affects "interstate" or "foreign [****124] commerce"? 18 U.S.C. §§ 922(q)(1)(F), (G). As long as one views the commerce connection, not as a "technical legal conception," but as "a practical one," *Swift & Co.* v. *United States*, 196 U.S. 375, 398, 49 L. Ed. 518, 25 S. Ct. 276 [*619] (1905) (Holmes, J.), the answer to this question must be yes. Numerous reports and studies -- generated both inside and outside government -- [***676] make clear that Congress could reasonably have found the empirical connection that its law, implicitly or explicitly, asserts. (See Appendix, *infra*, at 631, for a sample of the documentation, as well as for complete citations to the sources referenced below.)

For one thing, reports, hearings, and other readily available literature make clear that the problem of guns in and around schools is widespread and extremely serious. These materials report, for example, that four percent of American high school students (and six percent of inner-city high school students) carry a gun to school at least occasionally, Centers for Disease Control 2342; Sheley, McGee, & Wright 679; that 12 percent of urban high school students have had guns fired at them, *ibid.;* that [****125] 20 percent of those students have been threatened with guns, *ibid.;* and that, in any 6-month period, several hundred thousand schoolchildren are victims of violent crimes in or near their schools, U.S. Dept. of Justice 1 (1989); House Select Committee Hearing 15 (1989). And, they report that this widespread violence in schools throughout the Nation significantly interferes with the quality of education in those schools. See, *e. g.*, House Judiciary Committee Hearing 44 (1990) (linking school violence to dropout rate); U.S. Dept. of Health 118-119 (1978) (school-violence victims suffer academically); compare U.S. Dept. of Justice 1 (1991) (gun violence worst in inner-city schools), with National Center 47 (dropout

rates highest in inner cities). Based on reports such as these, Congress obviously could have thought that guns and learning are mutually exclusive. Senate Labor and Human Resources Committee Hearing 39 (1993); U.S. Dept. of Health 118, 123-124 (1978). Congress could therefore have found a substantial educational problem -- teachers unable to teach, students unable to learn -- and concluded that guns near schools contribute substantially to the size and scope of that [****126] problem.

[*620] Having found that guns in schools significantly undermine the quality of education in our Nation's classrooms, Congress could also have found, given the effect of education upon interstate and foreign commerce, that gun-related violence in and around schools is a commercial, as well as a human, problem. Education, although far more than a matter of economics, has long been inextricably intertwined with the Nation's economy. When this Nation began, most workers received their education in the workplace, typically (like Benjamin Franklin) as apprentices. See generally Seybolt; Rorabaugh; U.S. Dept. of Labor (1950). As late as the 1920's, many workers still received general education directly from their employers -- from large corporations, such as General Electric, Ford, and Goodyear, which created schools [**1660] within their firms to help both the worker and the firm. See Bolino 15-25. (Throughout most of the 19th century fewer than one percent of all Americans received secondary education through attending a high school. See *id.*, at 11.) As public school enrollment grew in the early 20th century, see Becker 218 (1993), the need for industry to teach basic educational skills diminished. [****127] But, the direct economic link between basic education and industrial productivity remained. Scholars estimate that nearly a quarter of America's economic [***677] growth in the early years of this century is traceable directly to increased schooling, see Denison 243; that investment in "human capital" (through spending on education) exceeded investment in "physical capital" by a ratio of almost two to one, see Schultz 26 (1961); and that the economic returns to this investment in education exceeded the returns to conventional capital investment, see, *e. g.*, Davis & Morrall 48-49.

In recent years the link between secondary education and business has strengthened, becoming both more direct and more important. Scholars on the subject report that technological changes and innovations in management techniques have altered the nature of the workplace so that more jobs now demand greater educational skills. See, *e. g.*, MIT 32 [*621] (only about one-third of handtool company's 1,000 workers were qualified to work with a new process that requires high-school-level reading and mathematical skills); Cyert & Mowery 68 (gap between wages of high school dropouts and better trained workers increasing); U.S. [****128] Dept. of Labor 41 (1981) (job openings for dropouts declining over time). There is evidence that "service, manufacturing or construction jobs are being displaced by technology that requires a better-educated worker or, more likely, are being exported overseas," Gordon, Ponticell, & Morgan 26; that "workers with truly few skills by the year 2000 will find that only one job out of ten will remain," *ibid.;* and that

> "over the long haul the best way to encourage the growth of high-wage jobs is to upgrade the skills of the work force. . . . Better-trained workers become more productive workers, enabling a company to become more competitive and expand." Henkoff 60.

Increasing global competition also has made primary and secondary education economically more important. The portion of the American economy attributable to international trade nearly tripled between 1950 and 1980, and more than 70 percent of American-made goods now compete with imports. Marshall 205; Marshall & Tucker 33. Yet, lagging worker productivity has contributed to negative trade balances and to real hourly compensation that has fallen below wages in 10 other industrialized nations. See National Center 57; Handbook [****129] of Labor Statistics 561, 576 (1989); Neef & Kask 28, 31. At least some significant part of this serious productivity problem is attributable to students who emerge from classrooms without the reading or mathematical skills necessary to compete with their European or Asian counterparts, see, *e. g.*, MIT 28, and, presumably, to high school dropout rates of 20 to 25 percent (up to 50 percent in inner cities), see, *e. g.*, National Center 47; Chubb & Hanushek 215. Indeed, Congress has said, when writing other statutes, that [*622] "functionally or technologically illiterate" Americans in the work force "erode" our economic "standing in the international marketplace," Pub. L. 100-418, § 6002(a)(3), 102 Stat. 1469, and that "our Nation is . . . paying the price of scientific and technological illiteracy, with our productivity declining, our industrial base ailing, and our global competitiveness dwindling," H. R. Rep. No. 98-6, pt. 1, p. 19 (1983).

Finally, there is evidence that, today more than ever, many firms base their location decisions upon the presence, or absence, of a work [***678] force with a

basic education. See MacCormack, Newman, & Rosenfield 73; Coffee 296. Scholars on the subject report, [****130] for example, that today, "high speed communication and transportation make it possible to produce most products and services anywhere in the world," National Center 38; that "modern machinery and production methods can therefore be combined with low wage workers to drive costs down," *ibid.;* that managers can perform "'back office functions anywhere in the world now,'" and say that if they "'can't get enough skilled [**1661] workers here'" they will "'move the skilled jobs out of the country,'" *id.*, at 41; with the consequence that "rich countries need better education and retraining, to reduce the supply of unskilled workers and to equip them with the skills they require for tomorrow's jobs," Survey of Global Economy 37. In light of this increased importance of education to individual firms, it is no surprise that half of the Nation's manufacturers have become involved with setting standards and shaping curricula for local schools, Maturi 65-68, that 88 percent think this kind of involvement is important, *id.*, at 68, that more than 20 States have recently passed educational reforms to attract new business, Overman 61-62, and that business magazines have begun to rank cities according [****131] to the quality of their schools, see Boyle 24.

The economic links I have just sketched seem fairly obvious. Why then is it not equally obvious, in light of those links, that a widespread, serious, and substantial physical [*623] threat to teaching and learning *also* substantially threatens the commerce to which that teaching and learning is inextricably tied? That is to say, guns in the hands of six percent of inner-city high school students and gun-related violence throughout a city's schools must threaten the trade and commerce that those schools support. The only question, then, is whether the latter threat is (to use the majority's terminology) "substantial." The evidence of (1) the *extent* of the gun-related violence problem, see *supra*, at 619, (2) the *extent* of the resulting negative effect on classroom learning, see *ibid.*, and (3) the *extent* of the consequent negative commercial effects, see *supra*, at 620-622, when taken together, indicate a threat to trade and commerce that is "substantial." At the very least, Congress could rationally have concluded that the links are "substantial."

Specifically, Congress could have found that gun-related violence [****132] near the classroom poses a serious economic threat (1) to consequently inadequately educated workers who must endure low paying jobs, see, *e. g.*, National Center 29, and (2) to communities and businesses that might (in today's "information society") otherwise gain, from a well-educated work force, an important commercial advantage, see, *e. g.*, Becker 10 (1992), of a kind that location near a railhead or harbor provided in the past. Congress might also have found these threats to be no different in kind from other threats that this Court has found within the commerce power, such as the threat that loan sharking poses to the "funds" of "numerous localities," *Perez* v. *United States*, 402 U.S. at 157, and that unfair labor practices pose [***679] to instrumentalities of commerce, see *Consolidated Edison Co.* v. *NLRB*, 305 U.S. 197, 221-222, 83 L. Ed. 126, 59 S. Ct. 206 (1938). As I have pointed out, *supra*, at 618, Congress has written that "the occurrence of violent crime in school zones" has brought about a "decline in the quality of education" that "has an adverse impact on interstate commerce and the foreign commerce of the United States." 18 U.S.C. §§ 922 [****133] (q)(1)(F), (G). The violence-related facts, the educational [*624] facts, and the economic facts, taken together, make this conclusion rational. And, because under our case law, see *supra*, at 615-617; *infra*, at 627-628, the sufficiency of the constitutionally necessary Commerce Clause link between a crime of violence and interstate commerce turns simply upon size or degree, those same facts make the statute constitutional.

To hold this statute constitutional is not to "obliterate" the "distinction between what is national and what is local," *ante*, at 567 (citation omitted; internal quotation marks omitted); nor is it to hold that the Commerce Clause permits the Federal Government to "regulate any activity that it found was related to the economic productivity of individual citizens," to regulate "marriage, divorce, and child custody," or to regulate any and all aspects of education. *Ante*, at 564. First, this statute is aimed at curbing a particularly acute threat to the educational process -- the possession (and use) of life-threatening firearms in, or near, the classroom. The empirical evidence that I have discussed above unmistakably documents the special way [****134] in which guns and education are incompatible. See *supra*, at 619. This Court has previously recognized the singularly disruptive potential [**1662] on interstate commerce that acts of violence may have. See *Perez, supra*, at 156-157. Second, the immediacy of the connection between education and the national economic well-being is documented by scholars and accepted by society at large in a way and to a degree that may not hold true for other social institutions. It must surely be the rare case, then, that a statute strikes at conduct that (when considered in the abstract) seems

so removed from commerce, but which (practically speaking) has so significant an impact upon commerce.

In sum, a holding that the particular statute before us falls within the commerce power would not expand the scope of that Clause. Rather, it simply would apply pre-existing law to changing economic circumstances. See *Heart of Atlanta* [*625] *Motel, Inc.* v. *United States*, 379 U.S. 241, 251, 13 L. Ed. 2d 258, 85 S. Ct. 348 (1964). It would recognize that, in today's economic world, gun-related violence near the classroom makes a significant difference to our economic, as [****135] well as our social, well-being. In accordance with well-accepted precedent, such a holding would permit Congress "to act in terms of economic . . . realities," would interpret the commerce power as "an affirmative power commensurate with the national needs," and would acknowledge that the "commerce clause does not operate so as to render the nation powerless to defend itself [***680] against economic forces that Congress decrees inimical or destructive of the national economy." *North American Co.* v. *SEC*, 327 U.S. 686, 705, 90 L. Ed. 945, 66 S. Ct. 785 (1946) (citing *Swift & Co.* v. *United States*, 196 U.S. at 398 (Holmes, J.)).

III

The majority's holding -- that § 922 falls outside the scope of the Commerce Clause -- creates three serious legal problems. First, the majority's holding runs contrary to modern Supreme Court cases that have upheld congressional actions despite connections to interstate or foreign commerce that are less significant than the effect of school violence. In *Perez* v. *United States, supra*, the Court held that the Commerce Clause authorized a federal statute that makes it a crime to engage in loan [****136] sharking ("extortionate credit transactions") at a local level. The Court said that Congress may judge that such transactions, "though purely *intra*state, . . . affect *inter*state commerce." 402 U.S. at 154 (emphasis added). Presumably, Congress reasoned that threatening or using force, say with a gun on a street corner, to collect a debt occurs sufficiently often so that the activity (by helping organized crime) affects commerce among the States. But, why then cannot Congress also reason that the threat or use of force -- the frequent consequence of possessing a gun -- in or near a school occurs sufficiently often so that such activity (by inhibiting basic education) affects [*626] commerce among the States? The negative impact upon the national economy of an inability to teach basic skills seems no smaller (nor less significant) than that of organized crime.

In *Katzenbach* v. *McClung*, 379 U.S. 294, 13 L. Ed. 2d 290, 85 S. Ct. 377 (1964), this Court upheld, as within the commerce power, a statute prohibiting racial discrimination at local restaurants, in part because that discrimination discouraged travel by African Americans and in part because that discrimination [****137] affected purchases of food and restaurant supplies from other States. See *id.*, at 300; *Heart of Atlanta Motel, supra*, at 274 (Black, J., concurring in *McClung* and in *Heart of Atlanta*). In *Daniel* v. *Paul*, 395 U.S. 298, 23 L. Ed. 2d 318, 89 S. Ct. 1697 (1969), this Court found an effect on commerce caused by an amusement park located several miles down a country road in the middle of Alabama -- because some customers (the Court assumed), some food, 15 paddleboats, and a juke box had come from out of state. See *id.*, at 304-305, 308. In both of these cases, the Court understood that the specific instance of discrimination (at a local place of accommodation) was part of a general practice that, considered as a whole, caused not only the most serious human and social harm, but had nationally significant economic dimensions as well. See *McClung, supra*, at 301; [**1663] *Daniel, supra*, at 307, n. 10. It is difficult to distinguish the case before us, for the same critical elements are present. Businesses are less likely to locate in communities where violence plagues the classroom. [****138] Families will hesitate to move to neighborhoods where students carry guns instead of books. (Congress expressly [***681] found in 1994 that "parents may decline to send their children to school" in certain areas "due to concern about violent crime and gun violence." 18 U.S.C. § 922(q)(1)(E).) And (to look at the matter in the most narrowly commercial manner), interstate publishers therefore will sell fewer books and other firms will sell fewer school supplies where the threat of violence disrupts learning. Most importantly, like the local racial discrimination at issue in *McClung* and *Daniel*, the local instances here, taken [*627] together and considered as a whole, create a problem that causes serious human and social harm, but also has nationally significant economic dimensions.

In *Wickard* v. *Filburn*, 317 U.S. 111, 87 L. Ed. 122, 63 S. Ct. 82 (1942), this Court sustained the application of the Agricultural Adjustment Act of 1938 to wheat that Filburn grew and consumed on his own local farm because, considered in its totality, (1) homegrown wheat may be "induced by rising prices" to "flow into the market and check price increases, [****139] " and (2) even if it never actually enters the market, homegrown wheat nonetheless "supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market" and, in that sense, "competes with wheat

in commerce." *Id.*, at 128. To find both of these effects on commerce significant in amount, the Court had to give Congress the benefit of the doubt. Why would the Court, to find a significant (or "substantial") effect here, have to give Congress any greater leeway? See also *United States* v. *Women's Sportswear Mfrs. Assn.*, 336 U.S. 460, 464, 93 L. Ed. 805, 69 S. Ct. 714 (1949) ("If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze"); *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U.S. at 236 ("It is enough that the individual activity when multiplied into a general practice . . . contains a threat to the interstate economy that requires preventive regulation").

The second legal problem the Court creates comes from its apparent belief that it can reconcile its holding with earlier cases by making [****140] a critical distinction between "commercial" and noncommercial "transaction[s]." *Ante*, at 561. That is to say, the Court believes the Constitution would distinguish between two local activities, each of which has an identical effect upon interstate commerce, if one, but not the other, is "commercial" in nature. As a general matter, this approach fails to heed this Court's earlier warning not to turn "questions of the power of Congress" upon "formula[s]" that would give

> [*628] "controlling force to nomenclature such as 'production' and 'indirect' and foreclose consideration of the actual effects of the activity in question upon interstate commerce." *Wickard, supra*, at 120.

See also *United States* v. *Darby*, 312 U.S. 100, 116-117, 85 L. Ed. 609, 61 S. Ct. 451 (1941) (overturning the Court's distinction between "production" and "commerce" in the child labor case, *Hammer* v. *Dagenhart*, 247 U.S. 251, 271-272, 62 L. Ed. 1101, 38 S. Ct. 529 (1918)); *Swift & Co.* v. *United States*, 196 U.S. at 398 [***682] (Holmes, J.) ("Commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business"). Moreover, [****141] the majority's test is not consistent with what the Court saw as the point of the cases that the majority now characterizes. Although the majority today attempts to categorize *Perez, McClung*, and *Wickard* as involving intrastate "economic activity," *ante*, at 559, the Courts that decided each of those cases did *not* focus upon the economic nature of the activity regulated. Rather, they focused upon whether that activity *affected* interstate or foreign commerce. In fact, the *Wickard* Court expressly held that Filburn's consumption of homegrown wheat, "*though it may not be regarded* [**1664] *as commerce*," could nevertheless be regulated -- "*whatever its nature*" -- so long as "it exerts a substantial economic effect on interstate commerce." *Wickard, supra*, at 125 (emphasis added).

More importantly, if a distinction between commercial and noncommercial activities is to be made, this is not the case in which to make it. The majority clearly cannot intend such a distinction to focus narrowly on an act of gun possession standing by itself, for such a reading could not be reconciled with either the civil rights cases (*McClung* and *Daniel*) or *Perez* -- in [****142] each of those cases the specific transaction (the race-based exclusion, the use of force) was not itself "commercial." And, if the majority instead means to distinguish generally among broad categories of activities, differentiating what is educational from what is commercial, then, as a [*629] practical matter, the line becomes almost impossible to draw. Schools that teach reading, writing, mathematics, and related basic skills serve *both* social and commercial purposes, and one cannot easily separate the one from the other. American industry itself has been, and is again, involved in teaching. See *supra*, at 620, 622. When, and to what extent, does its involvement make education commercial? Does the number of vocational classes that train students directly for jobs make a difference? Does it matter if the school is public or private, nonprofit or profit seeking? Does it matter if a city or State adopts a voucher plan that pays private firms to run a school? Even if one were to ignore these practical questions, why should there be a theoretical distinction between education, when it significantly benefits commerce, and environmental pollution, when it causes economic harm? See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 69 L. Ed. 2d 1, 101 S. Ct. 2352 (1981).

[****143] Regardless, if there is a principled distinction that could work both here and in future cases, Congress (even in the absence of vocational classes, industry involvement, and private management) could rationally conclude that schools fall on the commercial side of the line. In 1990, the year Congress enacted the statute before us, primary and secondary schools spent $ 230 billion -- that is, nearly a quarter of a trillion dollars -- which accounts for a significant portion of our $ 5.5 trillion gross domestic product for that year. See Statistical Abstract 147, 442 (1993). The business of schooling requires expenditure of these funds on student transportation, food and custodial services,

books, and teachers' [***683] salaries. See U.S. Dept. of Education 4, 7 (1993). These expenditures enable schools to provide a valuable service -- namely, to equip students with the skills they need to survive in life and, more specifically, in the workplace. Certainly, Congress has often analyzed school expenditure as if it were a commercial investment, closely analyzing whether schools are efficient, whether they justify the significant resources [*630] they spend, and whether they can be restructured to achieve [****144] greater returns. See, *e. g.*, S. Rep. No. 100-222, p. 2 (1987) (federal school assistance is "a prudent investment"); Senate Appropriations Committee Hearing (1994) (private sector management of public schools); cf. Chubb & Moe 185-229 (school choice); Hanushek 85-122 (performance based incentives for educators); Gibbs (decision in Hartford, Conn., to contract out public school system). Why could Congress, for Commerce Clause purposes, not consider schools as roughly analogous to commercial investments from which the Nation derives the benefit of an educated work force?

The third legal problem created by the Court's holding is that it threatens legal uncertainty in an area of law that, until this case, seemed reasonably well settled. Congress has enacted many statutes (more than 100 sections of the United States Code), including criminal statutes (at least 25 sections), that use the words "affecting commerce" to define their scope, see, *e. g.*, 18 U.S.C. § 844(i) (destruction of buildings used in activity affecting interstate commerce), and other statutes that contain no jurisdictional language at all, see, *e. g.*, 18 U.S.C. § 922 [****145] (*o*)(1) (possession of machineguns). Do these, or similar, statutes regulate noncommercial activities? If so, would that alter the meaning of "affecting commerce" in a jurisdictional element? Cf. *United States* v. *Staszcuk*, 517 F.2d 53, 57-58 (CA7 1975) (en [**1665] banc) (Stevens, J.) (evaluation of Congress' intent "requires more than a consideration of the consequences of the particular transaction"). More importantly, in the absence of a jurisdictional element, are the courts nevertheless to take *Wickard*, 317 U.S. at 127-128, (and later similar cases) as inapplicable, and to judge the effect of a single noncommercial activity on interstate commerce without considering similar instances of the forbidden conduct? However these questions are eventually resolved, the legal uncertainty now created will restrict Congress' ability to enact criminal laws aimed at criminal behavior that, considered problem by problem rather [*631] than instance by instance, seriously threatens the economic, as well as social, well-being of Americans.

IV

In sum, to find this legislation within the scope of the Commerce Clause would permit "Congress . . . [****146] to act in terms of economic . . . realities." *North American Co.* v. *SEC*, 327 U.S. at 705 (citing *Swift & Co.* v. *United States*, 196 U.S. at 398 (Holmes, J.)). It would interpret the Clause as this Court has traditionally interpreted it, with the exception of one wrong turn subsequently corrected. See *Gibbons* v. *Ogden*, 9 Wheat., at 195 (holding that the commerce power extends "to all the external concerns of the nation, and to those internal concerns which affect the States generally [***684] "); *United States* v. *Darby*, 312 U.S. at 116-117 ("The conclusion is inescapable that *Hammer* v. *Dagenhart* [the child labor case] was a departure from the principles which have prevailed in the interpretation of the Commerce Clause both before and since the decision . . . . It should be and now is overruled"). Upholding this legislation would do no more than simply recognize that Congress had a "rational basis" for finding a significant connection between guns in or near schools and (through their effect on education) the interstate and foreign commerce [****147] they threaten. For these reasons, I would reverse the judgment of the Court of Appeals. Respectfully, I dissent.

APPENDIX TO OPINION OF BREYER, J.

*Congressional Materials*

(in reverse chronological order)

Private Sector Management of Public Schools, Hearing before the Subcommittee on Labor, Health and Human Services, and Education and Related Agencies of the Senate Committee on Appropriations, 103d Cong., 2d Sess. (1994) (Senate Appropriations Committee Hearing (1994)).

[*632] Children and Gun Violence, Hearings before the Subcommittee on Juvenile Justice of the Senate Committee on the Judiciary, 103d Cong., 1st Sess. (1993) (Senate Judiciary Committee Hearing (1993)).

Keeping Every Child Safe: Curbing the Epidemic of Violence, Joint Hearing before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources and the House Select Committee on Children, Youth, and Families, 103d Cong., 1st Sess. (1993).

Recess from Violence: Making our Schools Safe, Hearing before the Subcommittee on Education, Arts and Humanities of the Senate Committee on Labor and Human Resources, 103d Cong., 1st Sess. (1993) (Senate Labor and Human Resources Committee Hearing (1993)).

[****148] Preparing for the Economy of the 21st Century, Hearings before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, 102d Cong., 2d Sess. (1992).

Children Carrying Weapons: Why the Recent Increase, Hearing before the Senate Committee on the Judiciary, 102d Cong., 2d Sess. (1992).

Youth Violence Prevention, Hearing before the Senate Committee on Governmental Affairs, 102d Cong., 2d Sess. (1992).

School Dropout Prevention and Basic Skills Improvement Act of 1990, Pub. L. 101-600, § 2(a)(2), 104 Stat. 3042.

Excellence in Mathematics, Science and Engineering Education Act of 1990, 104 [**1666] Stat. 2883, 20 U.S.C. § 5301(a)(5) (1988 ed., Supp. V).

[***685] Oversight Hearing on Education Reform and American Business and the Implementation of the Hawkins-Stafford Amendments of 1988, Hearing before the Subcommittee on Elementary, Secondary, and Vocational Training of the [*633] House Committee on Education and Labor, 101st Cong., 2d Sess. (1990).

U.S. Power in a Changing World, Report Prepared for the Subcommittee on International Economic Policy and Trade of the House Committee on Foreign Affairs, [****149] 101st Cong., 2d Sess., 43-66 (1990).

Gun Free School Zones Act of 1990, Hearing before the Subcommittee on Crime of the House Committee on the Judiciary, 101st Cong., 2d Sess. (1990) (House Judiciary Committee Hearing (1990)).

Restoring American Productivity: The Role of Education and Human Resources, Hearing before the Senate Committee on Labor and Human Resources, 101st Cong., 1st Sess. (1989).

Children and Guns, Hearing before the House Select Committee on Children, Youth, and Families, 101st Cong., 1st Sess. (1989) (House Select Committee Hearing (1989)).

Education and Training for a Competitive America Act of 1988, Pub. L. 100-418, Title VI, 102 Stat. 1469.

S. Rep. No. 100-222 (1987).

Education and Training for American Competitiveness, Hearings before the House Committee on Education and Labor, 100th Cong., 1st Sess. (1987).

Competitiveness and the Quality of the American Work Force, Hearings before the Subcommittee on Education and Health of the Joint Economic Committee, 100th Cong., 1st Sess., pts. 1 and 2 (1987).

Oversight Hearing on Illiteracy, Joint Hearing before the Subcommittee on Elementary, Secondary, and Vocational Education of the House Committee [****150] on Education and Labor and the Subcommittee on Education, Arts and Humanities of the Senate Committee on Labor and Human Resources, 99th Cong., 2d Sess. (1986).

[*634] Oversight on Illiteracy in the United States, Hearings before the Subcommittee on Elementary, Secondary, and Vocational Education of the House Committee on Education and Labor, 99th Cong., 2d Sess. (1986).

Crime and Violence in the Schools, Hearing before the Subcommittee on Juvenile Justice of the Senate Committee on the Judiciary, 98th Cong., 2d Sess. (1984).

H. R. Rep. No. 98-6, pts. 1 and 2 (1983).

S. Rep. No. 98-151 (1983).

Education for Economic Security Act, Hearings before the Subcommittee on Education, Arts and Humanities [***686] of the Senate Committee on Labor and Human Resources, 98th Cong., 1st Sess. (1983).

Pub. L. 93-380, § 825, 88 Stat. 602 (1974).

I. Clarke, Art and Industry: Instruction in Drawing Applied to the Industrial and Fine Arts, S. Exec. Doc. No. 209, 46th Cong., 2d Sess., pt. 2 (1891).

*Other Federal Government Materials*

(in reverse chronological order)

U.S. Dept. of Education, Office of Educational Research and Improvement, First Findings: The Educational Quality of the Workforce Employer [****151] Survey

(Feb. 1995).

Economic Report of the President 108 (Feb. 1994).

U.S. Dept. of Commerce, Statistical Abstract of the United States (1993) (Statistical Abstract (1993)).

U.S. Dept. of Education, Office of Educational Research and Improvement, Public School Education Financing for School Year 1989-90 (June 1993) (U.S. Dept. of Education (1993)).

Economic Report of the President 101 (Feb. 1992).

U.S. Dept. of Labor, Secretary's Commission on Achieving Necessary Skills, Skills and Tasks For Jobs: A SCANS Report for America 2000 (1992).

[*635] U.S. Dept. of Labor, Employment and Training Administration, Beyond the School Doors: The Literacy Needs of Job [**1667] Seekers Served by the U.S. Department of Labor (Sept. 1992).

U.S. Dept. of Justice, Bureau of Justice Statistics, School Crime: A National Crime Victimization Survey Report (Sept. 1991) (U.S. Dept. of Justice (1991)).

U.S. Dept. of Commerce, Bureau of Census, 1990 Census of Population: Education in the United States 474 (Jan. 1994).

U.S. Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention, Weapons in Schools, OJJDP Bulletin 1 (Oct. 1989) (U.S. Dept. of Justice (1989)).

U.S. Dept. of Labor, [****152] Bureau of Labor Statistics, Handbook of Labor Statistics 281, 561, 576 (Aug. 1989) (Handbook of Labor Statistics (1989)).

Bishop, Incentives for Learning: Why American High School Students Compare So Poorly to their Counterparts Overseas, in 1 U.S. Dept. of Labor, Commission on Workforce Quality & Labor Market Efficiency, Investing in People 1 (Sept. 1989).

Rumberger & Levin, Schooling for the Modern Workplace, in 1 U.S. [***687] Dept. of Labor, Commission on Workforce Quality & Labor Market Efficiency, Investing in People 85 (Sept. 1989).

U.S. Dept. of Education and U.S. Department of Labor, The Bottom Line: Basic Skills in the Workplace 12 (1988).

U.S. Dept. of Labor, Employment and Training Administration, Estimating Educational Attainment of Future Employment Demand for States (Oct. 1981) (U.S. Dept. of Labor (1981)).

U.S. Dept. of Health, Education, and Welfare, National Institute of Education, Violent Schools -- Safe Schools: The Safe School Study Report to Congress (1978) (U.S. Dept. of Health (1978)).

[*636] U.S. Dept. of Labor, Bureau of Apprenticeship, Apprenticeship Past and Present (1950) (U.S. Dept. of Labor (1950)).

*Other Readily Available Materials*

(in alphabetical [****153] order)

Akin & Garfinkel, School Expenditures and the Economic Returns to Schooling, 12 J. Human Resources 462 (1977).

American Council on Education, Business-Higher Education Forum, America's Competitive Challenge: A Report to the President of the United States (Apr. 1983).

Applebome, Employers Wary of School System, N. Y. Times, Feb. 20, 1995, p. A1, col. 1.

Are Real Estate Firms Ready to Ride on the Infobahn?: Information Highway of Technology, 36 National Real Estate Investor, Oct. 1994, p. 6.

Aring, What the 'V' Word is Costing America's Economy: Vocational Education, 74 Phi Delta Kappan 396 (1993).

G. Atkinson, The Economics of Education (1983).

Becker, The Adam Smith Address: Education, Labor Force Quality, and the Economy, Business Economics, Jan. 1992, p. 7 (Becker (1992)).

G. Becker, Human Capital (3d ed. 1993) (Becker (1993)).

I. Berg, Education and Jobs: The Great Training Robbery (1970).

Berryman, The Economy, Literacy Requirements, and At-Risk Adults, in Literacy and the Marketplace: Improving the Literacy of Low-Income Single Mothers 22 (June 1989).

Bishop, Is the Test Score Decline Responsible for the Productivity Growth Decline?, 79 Am. Econ. Rev. 178 (Mar. 1989).

[****154] [***688] Bishop, High School Performance and Employee Recruitment, 13 J. Labor Research 41 (1992).

Blackburn, What Can Explain the Increase in Earnings Inequality Among Males?, 29 Industrial Relations 441 (1990).

[*637] Boissiere, Knight, & Sabot, Earnings, Schooling, Ability and Cognitive Skills, 75 Am. Econ. Rev. 1016 (1985).

A. Bolino, A Century of Human Capital by Education and Training (1989) (Bolino).

Boyle, Expansion Management's Education Quotient, Economic Development Rev., Winter 1992, pp. 23-25 (Boyle).

Brandel, Wake Up Get Smart, New England Business, May 1991, p. 46.

[**1668] Callahan & Rivara, Urban High School Youth and Handguns: A School-Based Survey, 267 JAMA 3038 (1992).

Card & Krueger, Does School Quality Matter? Returns to Education and the Characteristics of Public Schools in the United States, 100 J. Pol. Econ. 1 (1992).

A. Carnevale, America and the New Economy: How New Competitive Standards are Radically Changing American Workplaces (1991).

A. Carnevale and J. Porro, Quality Education: School Reform for the New American Economy 31-32 (1994).

Center to Prevent Handgun Violence, Caught in the Cross-fire: A Report [****155] on Gun Violence in our Nation's Schools (Sept. 1990).

Centers For Disease Control, Leads from the Morbidity and Mortality Weekly Report, 266 JAMA 2342 (1991) (Centers for Disease Control).

Chubb & Hanushek, Reforming Educational Reform, in Setting National Priorities 213 (H. Aaron ed. 1990) (Chubb & Hanushek).

J. Chubb & T. Moe, Politics, Markets, and America's Schools (1990) (Chubb & Moe).

Coffee, Survey: Worker Skills, Training More Important in Site Selection, Site Selection, Apr. 1993, p. 296 (Coffee).

E. Cohn, The Economics of Education (rev. ed. 1979).

[*638] Council on Competitiveness, Competitiveness Index 5 (July 1994).

Council on Competitiveness, Elevating the Skills of the American Workforce (May 1993).

Council on Competitiveness, Governing America: A Competitiveness [***689] Policy Agenda for The New Administration 33-39 (1989).

R. Cyert & D. Mowery, Technology and Employment: Innovation and Growth in the U.S. Economy (1987) (Cyert & Mowery).

J. Cynoweth, Enhancing Literacy for Jobs and Productivity: Council of State Policy and Planning Agencies Report (1994).

J. Davis & J. Morrall, Evaluating Educational Investment (1974) (Davis & Morrall).

Denison, [****156] Education and Growth, in Economics and Education 237 (D. Rogers & H. Ruchlin eds. 1971) (Denison).

M. Dertouzos, R. Lester, & R. Solow, MIT Commission on Industrial Productivity, Made In America: Regaining the Productive Edge (1989).

A. DeYoung, Economics and American Education: A Historical and Critical Overview of the Impact of Economic Theories on Schooling in the United States (1989).

Downs, America's Educational Failures Will Hurt Real Estate, National Real Estate Investor, Aug. 1988, p. 34.

Doyle, The Role of Private Sector Management in Public Education, 76 Phi Delta Kappan 128 (1994).

Education and Economic Development (C. Anderson & M. Bowman eds. 1965).

Education Commission of the States, Task Force on Education for Economic Growth, Action for Excellence (June 1983).

Educational Testing Service, Developing the Skills and Knowledge of the Workforce (1993).

[*639] Finding What Really Works in Education, Chief Executive, May 1994, p. 48.

Ganderton & Griffin, Impact of Child Quality on

Earnings: The Productivity-of-Schooling Hypothesis, 11 Contemporary Policy Issues 39 (July 1993).

Garver, "Success Story!": The Evolution of Economic Development in Broward County, [****157] Florida, 11 Economic Development Review 85 (Summer 1993).

Gibbs, Schools for Profit, Time, Oct. 17, 1994, p. 48 (Gibbs).

Gintis, Education, Technology, and the Characteristics of Worker Productivity, 61 Am. Econ. Rev. 266 (1971).

Glazer, A Human Capital Policy for the Cities, Public Interest, Summer 1993, p. 27.

[***690] Glazer, Violence in Schools: Can Anything be Done to Curb the Growing Violence?, The CQ Researcher, Sept. 11, 1992, pp. 785-808.

[**1669] E. Gordon, J. Ponticell, & R. Morgan, Closing the Literacy Gap in American Business 23 (1991) (Gordon, Ponticell, & Morgan).

E. Hanushek, Making Schools Work: Improving Performance and Controlling Costs (1994) (Hanushek).

Henkoff, Where Will the Jobs Come From?, Fortune, Oct. 19, 1992, p. 58 (Henkoff).

Herbert, Reading, Writing, Reloading, N. Y. Times, Dec. 14, 1994, p. A23, col. 1.

Industry's New Schoolhouse, N. Y. Times, Jan. 9, 1994, section 4A, p. 22, col. 3, Education Life Supp.

Introducing the EQ (Education Quotient), Expansion Management, Sept./Oct. 1991, pp. 18-24.

Investment in Education: The Equity-Efficiency Quandary (T. Schultz ed. 1972).

[*640] Itzkoff, America's Unspoken Economic Dilemma: Falling [****158] Intelligence Levels, 18 J. Social, Pol. & Econ. Studies 311 (1993).

Johnson, The Private Sector Should Help U.S. Schools, Financier, Sept. 1991, p. 34.

Johnson & Stafford, Social Returns to Quantity and Quality of Schooling, 8 J. Human Resources 139 (1973).

W. Johnston & A. Packer, Workforce 2000: Work and Workers for the Twenty-first Century (1987).

Jorgenson, The Contribution of Education to U.S. Economic Growth, 1948-73, in Education and Economic Productivity 95 (E. Dean ed. 1984).

Kirkland, Are Service Jobs Good Jobs?, Fortune, June 10, 1985, p. 38.

J. Kozol, Illiterate America 13 (1985).

J. Kozol, Where Stands the Republic? Illiteracy: A Warning and a Challenge to the Nation's Press 9 (1986).

M. Levin & A. Shank, Educational Investment in an Urban Society: Costs, Benefits, and Public Policy (1970).

Link & Ratledge, Social Returns to Quantity and Quality of Education: A Further Statement, 10 J. Human Resources 78 (1975).

Lyne, The Skills Gap: U.S. Work-Force Woes Complicate Business-Location Equation, Site Selection, Aug. 1992, p. 642.

MacCormack, Newman, & Rosenfield, The New Dynamics of Global Manufacturing Site Location, 35 [***691] Sloan Management Review, No. [****159] 4, p. 69 (1994) (MacCormack, Newman, & Rosenfield).

F. Machlup, Education and Economic Growth (1970).

Markey, The Labor Market Problems of Today's High School Dropouts, Monthly Labor Review, June 1988, p. 36.

[*641] Marshall, The Implications of Internationalization for Labor Market Institutions and Industrial Relations Systems, in Rethinking Employment Policy 205 (D. Bawden & F. Skidmore eds. 1989) (Marshall).

R. Marshall & M. Tucker, Thinking for a Living: Work, Skills, and the Future of the American Economy 33 (1992) (Marshall & Tucker).

Maturi, The Workforce Lure: Education/Training Carries More Weight in Siting Decisions, Industry Week, May 16, 1994, pp. 65-68 (Maturi).

M. Maurice, F. Sellier, & J. Silvestre, The Social Foundations of Industrial Power: A Comparison of France and Germany (1986).

Mikulecky, Job Literacy: The Relationship Between School Preparation and Workplace Actuality, 17 Reading Research Quarterly 400 (1982).

Mikulecky & Ehlinger, The Influence of Metacognitive Aspects of Literacy on Job Performance of Electronics Technicians, 18 J. Reading Behavior 41 (1986).

MIT Commission on Industrial Productivity, Education and Training in the United States: [****160] Developing the Human Resources We Need for Technological Advance and Competitiveness, in 2 Working Papers of the MIT Commission on Industrial Productivity (1989) (MIT).

Mitchell, The Impact of International Trade on U.S. Employment, in American Labor in a Changing World Economy 5 (W. Morehouse ed. 1978).

[**1670] Morgan & Sirageldin, A Note on the Quality Dimension in Education, 76 J. Pol. Econ. 1069 (1968).

National Academy of Education, Economic Dimensions of Education (1979).

National Center on Education and the Economy, America's Choice: High Skills or Low Wages! (1990) (National Center).

[*642] National Commission on Excellence in Education, A Nation at Risk 8-9 (Apr. 1983).

National Commission on Jobs and Small Business, Making America Work Again: Jobs, Small Business, and the International Challenge (1987).

[***692] National Governor's Association, Making America Work 35-36, 77-96 (1987).

National Institute of Justice, Research in Brief, J. Toby, Violence in Schools 3 (Dec. 1983).

National School Safety Center, Weapons in Schools (May 1989).

Neef & Kask, Manufacturing Productivity and Labor Costs in 14 Economies, Monthly Labor Review, Dec. 1991, p. 24 (Neef & Kask).

Neff, Recharging [****161] U.S. Competitiveness: Perhaps We Should Use Germany's Education System as a Benchmark, Industry Week, Jan. 20, 1992, p. 21.

O'Connor, Education's Significance as Quality-of-Life Location Factor Parallels Nationwide Reformist Movement, Site Selection Handbook, Aug. 1988, p. 846.

M. O'Donoghue, Economic Dimensions in Education (1971).

Organization for Economic Co-operation and Development, Education and the Economy in a Changing Society (1989).

Overman, Skilled States Lure New Business, HRMagazine, Jan. 1994, pp. 61-62 (Overman).

Packer, Taking Action on the SCANS Report, Educational Leadership, Mar. 1992, p. 27.

R. Perlman, The Economics of Education: Conceptual Problems and Policy Issues (1973).

R. Price, Fighting Violence with 'All the Mushy Stuff,' USA Today, May 9, 1994, p. 9A.

D. Prothrow-Stith & M. Weissman, Deadly Consequences (1991).

[*643] G. Psacharopoulos, Returns to Education: An International Comparison (1973).

M. Rasell & E. Appelbaum, Investment in Learning: An Assessment of the Economic Return (1992).

Ray & Mickelson, Corporate Leaders, Resistant Youth, and School Reform in Sunbelt City: The Political Economy of Education, 37 Social Problems 178 (1990).

R. Reich, [****162] The Work of Nations (1991).

D. Riddle, Service-Led Growth: The Role of the Service Sector in World Development (1986).

W. Rorabaugh, The Craft Apprentice: From Franklin to the Machine Age in America (1986) (Rorabaugh).

[***693] Rumberger & Daymont, The Economic Value of Academic and Vocational Training Acquired in High School, in Youth and the Labor Market 157 (M. Borus ed. 1984).

Ruttenberg, The Limited Promise of Public Health Methodologies to Prevent Youth Violence, 103 Yale L. J. 1885 (1994).

Ryscavage & Henle, Earnings Inequality Accelerates in the 1980's, Monthly Labor Review, Dec. 1990, p. 3.

T. Schultz, Education and Productivity (report prepared for the National Commission on Productivity, 1971).

Schultz, Investment in Human Capital, American Economic Review, Mar. 1961, p. 3, reprinted in 1 Economics of Education 13 (M. Blaug ed. 1968) (Schultz (1961)).

S. Seninger, Labor Force Policies for Regional Economic Development: The Role of Employment and Training Programs (1989).

R. Seybolt, Apprenticeship & Apprenticeship Education in Colonial New England & New York (1917) (Seybolt).

Sheley, McGee, & Wright, Gun-Related Violence in and Around [****163] Inner-City Schools, 146 Am. J. Diseases in Children 677 (1992) (Sheley, McGee, & Wright).

[*644] [**1671] Stone & Boundy, School Violence: The Need for a Meaningful Response, 28 Clearinghouse Review 453 (1994).

Strane, Locating in Rural America Could be a Competitive Advantage, 12 Telemarketing, Oct. 1993, p. 92.

R. Sturm, How Do Education and Training Affect a Country's Economic Performance? A Literature Survey (1993).

A Survey of The Global Economy, The Economist, Oct. 1, 1994, p. 37 (Survey of Global Economy).

Swaim & Podgursky, Do More-Educated Workers Fare Better Following Job Displacement?, Monthly Labor Review, Aug. 1989, p. 43.

Tremblay, The Impact of School and College Expenditures on the Wages of Southern and Non-Southern Workers, 7 J. Labor Research 201 (1986).

J. Vaizey, The Economics of Education (1973).

J. Vaizey, The Political Economy of Human Capital (1973).

Vallens, Global Economy May Dictate More Spending for Training, Modern Plastics, Nov. 1993, p. 19.

Wachtel, The Effect on Earnings of School and College Investment Expenditures, [***694] 58 Review of Economics & Statistics 326, 330 (1976).

Weiner & Siler, Trained to Order, Forbes, June 26, 1989, pp. 73-78.

L. Wheat, [****164] Urban Growth in the Nonmetropolitan South 65 (1976).

Wirth, Education and Work: The Choices We Face, Phi Delta Kappan, Jan. 1993, p. 361.

A. Wirth, Education and Work for the Year 2000 (1992).

L. Wise, Labor Market Policies and Employment Patterns in the United States 50 (1989).

## References

15A Am Jur 2d, Commerce 9, 16, 78-80; 79 Am Jur 2d, Weapons and Firearms 6

USCS, Constitution, Art I, 8, cl 3; 18 USCS 922(q)(1)(A)

L Ed Digest, Commerce 78

L Ed Index, Commerce; Weapons and Firearms

ALR Index, Commerce Clause; Police Power; Weapons and Firearms

Annotation References:

What constitutes receipt of firearm, under 18 USCS 922(h), prohibiting certain persons from receiving any firearm which has been shipped or transported [****165] in interstate or foreign commerce. 74 ALR Fed 486.

Receipt, possession, or transportation of multiple firearms as single or multiple offense under 18 USCS Appx 1202(a)(1), making it federal offense for convicted felon to receive ,possess, or transport any firearm. 62 ALR Fed 829.

Compliance with provision of Gun Control Act of 1968 (18 USCS 922(e)) regulating transportation of firearms on carrier. 60 ALR Fed 305.

Seizure and forfeiture of firearms or ammunition under 18 USCS 924(d). 57 ALR Fed 234.

Validity, construction, and application of 18 USCS 922(a)(6), making it unlawful to knowingly make any false or fictitious oral or written statement in connection with the acquisition or attempted acquisition of any firearm or ammunition. 43 ALR Fed 338.

**End of Document**

# United States v. Morrison

529 U.S. 598 (2000)

Cited in Opening Brief at: 47

See Response, Part III.G. Highlighted language appears at 529 U.S. at 617.

Caution
As of: September 14, 2026 7:09 PM Z

# United States v. Morrison

Supreme Court of the United States

January 11, 2000, Argued ; May 15, 2000, * Decided

Nos. 99-5 and 99-29

* Together with No. 99-29, Brzonkala v. Morrison et al., also on certiorari to the same court.

**Reporter**
529 U.S. 598 *; 120 S. Ct. 1740 **; 146 L. Ed. 2d 658 ***; 2000 U.S. LEXIS 3422 ****; 68 U.S.L.W. 4351; 82 Fair Empl. Prac. Cas. (BNA) 1313; 77 Empl. Prac. Dec. (CCH) P46,376; 2000 Cal. Daily Op. Service 3788; 2000 Daily Journal DAR 5061; 2000 Colo. J. C.A.R. 2583; 13 Fla. L. Weekly Fed. S 287

UNITED STATES v. ANTONIO J. MORRISON, ET AL.; AND CHRISTY BRZONKALA v. ANTONIO J. MORRISON, ET AL.

**Prior History:** [****1] ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT.

**Disposition:** 169 F.3d 820, affirmed.

## Syllabus

Petitioner Brzonkala filed suit, alleging, *inter alia,* that she was raped by respondents while the three were students at the Virginia Polytechnic Institute, and that this attack violated 42 U.S.C. § 13981, which provides a federal civil remedy for the victims of gender-motivated violence. Respondents moved to dismiss on the grounds that the complaint failed to state a claim and that § 13981's civil remedy is unconstitutional. Petitioner United States intervened to defend the section's constitutionality. In dismissing the complaint, the District Court held that it stated a claim against respondents, [****2] but that Congress lacked authority to enact § 13981 under either § 8 of the Commerce Clause or § 5 of the Fourteenth Amendment, which Congress had explicitly identified as the sources of federal authority for § 13981. The en banc Fourth Circuit affirmed.

*Held:* Section 13981 cannot be sustained under the Commerce Clause or § 5 of the Fourteenth Amendment. Pp. 7-28.

(a) The Commerce Clause does not provide Congress with authority to enact § 13981's federal civil remedy. A congressional enactment will be invalidated only upon a plain showing that Congress has exceeded its constitutional bounds. See *United States* v. *Lopez*, 514 U.S. 549, 568, 577-578, 131 L. Ed. 2d 626, 115 S. Ct. 1624. Petitioners assert that § 13981 can be sustained under Congress' commerce power as a regulation of activity that substantially affects interstate commerce. The proper framework for analyzing such a claim is provided by the principles the Court set out in *Lopez*. First, in *Lopez,* the noneconomic, criminal nature of possessing a firearm in a school zone was central to the Court's conclusion that Congress lacks authority to regulate such possession. Similarly, gender-motivated crimes of violence [****3] are not, in any sense, economic activity. Second, like the statute at issue in *Lopez*, § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' regulation of interstate commerce. Although *Lopez* makes clear that such a jurisdictional element would lend support to the argument that § 13981 is sufficiently tied to interstate commerce to come within Congress' authority, Congress elected to cast § 13981's remedy over a wider, and more purely intrastate, body of violent crime. Third, although § 13981, unlike the *Lopez* statute, *is* supported by numerous findings regarding the serious impact of gender-motivated violence on victims and their families, these findings are substantially weakened by the fact that they rely on reasoning that this Court has rejected, namely a but-for causal chain from the initial occurrence of violent crime to every attenuated effect upon interstate commerce. If accepted, this reasoning would allow Congress to regulate any crime whose nationwide, aggregated impact has substantial effects on employment, production, transit, or consumption. Moreover, such reasoning will not limit Congress [****4] to regulating violence, but may be applied equally as well to family law and other areas of state regulation since the aggregate effect of marriage, divorce, and childrearing on the national economy is undoubtedly significant. The Constitution requires a distinction between what is truly national and what is truly local, and there is no better example of the police power, which the Founders undeniably left reposed in the States and denied the central government, than the suppression of violent crime and vindication of its victims. Congress therefore may not regulate noneconomic, violent criminal conduct based solely on the conduct's aggregate effect on interstate commerce. Pp. 7-19.

(b) Section 5 of the Fourteenth Amendment, which permits Congress to enforce by appropriate legislation the constitutional guarantee that no State shall deprive any person of life, liberty, or property, without due process or deny any person equal protection of the laws, *City of Boerne* v. *Flores,* 521 U.S. 507, 517, 138 L. Ed. 2d 624, 117 S. Ct. 2157, also does not give Congress the authority to enact § 13981. Petitioners' assertion that there is pervasive bias in various state

justice systems against victims of [****5] gender-motivated violence is supported by a voluminous congressional record. However, the Fourteenth Amendment places limitations on the manner in which Congress may attack discriminatory conduct. Foremost among them is the principle that the Amendment prohibits only state action, not private conduct. This was the conclusion reached in *United States* v. *Harris,* 106 U.S. 629, 27 L. Ed. 290, 1 S. Ct. 601, and the *Civil Rights Cases,* 109 U.S. 3, 27 L. Ed. 835, 3 S. Ct. 18, which were both decided shortly after the Amendment's adoption. The force of the doctrine of *stare decisis* behind these decisions stems not only from the length of time they have been on the books, but also from the insight attributable to the Members of the Court at that time, who all had intimate knowledge and familiarity with the events surrounding the Amendment's adoption. Neither *United States* v. *Guest,* 383 U.S. 745, 16 L. Ed. 2d 239, 86 S. Ct. 1170, nor *District of Columbia* v. *Carter,* 409 U.S. 418, 34 L. Ed. 2d 613, 93 S. Ct. 602, casts any doubt on the enduring vitality of the *Civil Rights Cases* and *Harris.* Assuming that there has been gender-based disparate treatment by state authorities in this case, it would not be enough to save § 13981's [****6] civil remedy, which is directed not at a State or state actor but at individuals who have committed criminal acts motivated by gender bias. Section 13981 visits no consequence on any Virginia public official involved in investigating or prosecuting Brzonkala's assault, and it is thus unlike any of the § 5 remedies this Court has previously upheld. See *e.g., South Carolina* v. *Katzenbach,* 383 U.S. 301, 15 L. Ed. 2d 769, 86 S. Ct. 803. Section 13981 is also different from previously upheld remedies in that it applies uniformly throughout the Nation, even though Congress' findings indicate that the problem addressed does not exist in all, or even most, States. In contrast, the § 5 remedy in *Katzenbach* was directed only to those States in which Congress found that there had been discrimination. Pp. 19-27.

169 F.3d 820, affirmed.

**Counsel:** Julie Goldscheid argued the cause for petitioner in No. 99-29.

Seth P. Waxman argued the cause for the United States in No. 99-5.

Michael E. Rosman argued the cause for respondents.

**Judges:** REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. THOMAS, J., filed a concurring opinion. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a dissenting opinion, in which STEVENS, J., joined, and in which SOUTER and GINSBURG, [****7] JJ., joined as to Part I-A.

**Opinion by:** REHNQUIST

# Opinion

[*601] [**1745] [***666] *CHIEF JUSTICE **REHNQUIST*** delivered the opinion of the Court.

[1A] In these cases we consider the constitutionality of 42 U.S.C. § 13981, which provides a federal civil remedy for the [*602] victims of gender-motivated violence. The United States Court of Appeals for the Fourth Circuit, sitting en banc, struck down § 13981 because it concluded that Congress lacked constitutional authority to enact the section's civil remedy. Believing that these cases are controlled by our decisions in *United States* v. *Lopez,* 514 U.S. 549, 131 L. Ed. 2d 626, 115 S. Ct. 1624 (1995),*United States* v. *Harris,* 106 U.S. 629, 27 L. Ed. 290, 1 S. Ct. 601 (1883), and the *Civil Rights Cases,* 109 U.S. 3, 27 L. Ed. 835, 3 S. Ct. 18 (1883), we affirm.

I

Petitioner Christy Brzonkala enrolled at Virginia Polytechnic Institute (Virginia Tech) in the fall of 1994. In September of that year, Brzonkala met respondents Antonio Morrison and James Crawford, who [**1746] were both students at Virginia Tech and members of its varsity football team. Brzonkala alleges that, within 30 minutes of meeting Morrison and Crawford, they assaulted and repeatedly raped her. After the attack, Morrison allegedly [****8] told Brzonkala, "You better not have any . . . diseases." Complaint P22. In the months following the rape, Morrison also allegedly announced in the dormitory's dining room that he "liked" to get girls drunk and . . . ." *Id.*, P31. The omitted portions, quoted verbatim in the briefs on file with this Court, consist of boasting, debased remarks about what Morrison would do to women, vulgar remarks that cannot fail to shock and offend.

Brzonkala alleges that this attack caused her to become severely emotionally disturbed and depressed. She sought assistance from a university psychiatrist, who prescribed [*603] antidepressant medication. Shortly

after the rape Brzonkala stopped attending classes and withdrew from the university.

In early 1995, Brzonkala filed a complaint against respondents under Virginia Tech's Sexual Assault Policy. During the school-conducted hearing on her complaint, Morrison admitted having sexual contact with her despite the fact that she had twice told him "no." After the hearing, Virginia Tech's Judicial Committee found insufficient evidence to punish Crawford, but found Morrison guilty of sexual assault and sentenced him to immediate suspension for [****9] two semesters.

Virginia Tech's dean of students upheld the judicial committee's sentence. However, in July 1995, Virginia Tech informed Brzonkala that Morrison intended to initiate a court challenge to his conviction under the Sexual Assault Policy. University officials told her that a second hearing would be necessary to remedy the school's error in prosecuting her complaint [***667] under that policy, which had not been widely circulated to students. The university therefore conducted a second hearing under its Abusive Conduct Policy, which was in force prior to the dissemination of the Sexual Assault Policy. Following this second hearing the Judicial Committee again found Morrison guilty and sentenced him to an identical 2-semester suspension. This time, however, the description of Morrison's offense was, without explanation, changed from "sexual assault" to "using abusive language."

Morrison appealed his second conviction through the university's administrative system. On August 21, 1995, Virginia Tech's senior vice president and provost set aside Morrison's punishment. She concluded that it was "'excessive when compared with other cases where there has been a finding of violation of [****10] the Abusive Conduct Policy,'" 132 F.3d 949, 955 (CA4 1997). Virginia Tech did not inform Brzonkala of this decision. After learning from a [*604] newspaper that Morrison would be returning to Virginia Tech for the fall 1995 semester, she dropped out of the university.

In December 1995, Brzonkala sued Morrison, Crawford, and Virginia Tech in the United States District Court for the Western District of Virginia. Her complaint alleged that Morrison's and Crawford's attack violated § 13981 and that Virginia Tech's handling of her complaint violated Title IX of the Education Amendments of 1972, 86 Stat. 373-375, 20 U.S.C. §§ 1681-1688. Morrison and Crawford moved to dismiss this complaint on the grounds that it failed to state a claim and that § 13981's civil remedy is unconstitutional. The United States, petitioner in No. 99-5, intervened to defend § 13981's constitutionality.

The District Court dismissed Brzonkala's Title IX claims against Virginia Tech for failure to state a claim upon which relief can be granted. See *Brzonkala* v. *Virginia Polytechnic and State Univ.*, 935 F. Supp. 772 (WD Va. 1996). It then held that Brzonkala's [****11] complaint stated a claim against Morrison and Crawford under § 13981, but dismissed the complaint because [**1747] it concluded that Congress lacked authority to enact the section under either the Commerce Clause or § 5 of the Fourteenth Amendment. *Brzonkala* v. *Virginia Polytechnic and State Univ.,* 935 F. Supp. 779 (WD Va. 1996).

A divided panel of the Court of Appeals reversed the District Court, reinstating Brzonkala's § 13981 claim and her Title IX hostile environment claim. [1] *Brzonkala* v. *Virginia Polytechnic and State Univ.*, 132 F.3d 949 (CA4 1997). The full Court of Appeals vacated the panel's opinion and reheard the case en banc. The en banc court then issued an opinion affirming the District Court's conclusion that Brzonkala stated a claim under § 13981 because her complaint alleged a crime of violence and the allegations of Morrison's crude and derogatory statements regarding his [*605] treatment of women sufficiently indicated that his crime was motivated by gender animus. [2] [***668] Nevertheless, the court by a divided vote affirmed the District Court's conclusion that Congress lacked constitutional authority to enact § 13981's civil remedy. *Brzonkala* v. *Virginia Polytechnic and State Univ.*, 169 F.3d 820 (CA4 1999). [****12] Because the Court of Appeals invalidated a federal statute on constitutional grounds, we granted certiorari. 527 U.S. 1068 (1999).

Section 13981 was part of the Violence Against Women Act of 1994, § 40302, 108 Stat. 1941-1942. [****13] It

---

[1] The panel affirmed the dismissal of Brzonkala's Title IX disparate treatment claim. See 132 F.3d at 961-962.

[2] The en banc Court of Appeals affirmed the District Court's conclusion that Brzonkala failed to state a claim alleging disparate treatment under Title IX, but vacated the District Court's dismissal of her hostile environment claim and remanded with instructions for the District Court to hold the claim in abeyance pending this Court's decision in *Davis* v. *Monroe County Bd. of Ed.*, 526 U.S. 629, 143 L. Ed. 2d 839, 119 S. Ct. 1661 (1999). *Brzonkala* v. *Virginia Polytechnic and State Univ.*, 169 F.3d 820, 827, n. 2 (CA4 1999). Our grant of certiorari did not encompass Brzonkala's Title IX claims, and we thus do not consider them in this opinion.

states that "persons within the United States shall have the right to be free from crimes of violence motivated by gender." 42 U.S.C. § 13981(b). To enforce that right, subsection (c) declares:

> "A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate."

Section 13981 defines a "crime" of violence motivated by "gender" as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an [*606] animus based on the victim's gender." § 13981(d)(1). It also provides that the term "crime of violence" includes any

> "(A) . . . act or series of acts that would constitute a felony against the person or that would constitute a felony against property if the conduct presents a serious risk of physical injury to another, and that [****14] would come within the meaning of State or Federal offenses described in section 16 of Title 18, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction and whether or not those acts were committed in the special maritime, territorial, or prison jurisdiction of the United States; and

> "(B) includes an act or series of acts that would constitute a felony described in subparagraph (A) but for the relationship between the person who takes such action and the individual against whom such action is taken." § 13981(d)(2).

[**1748] Further clarifying the broad scope of § 13981's civil remedy, subsection (e)(2) states that "nothing" in this section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action under subsection (c) of this section." And subsection (e)(3) provides a § 13981 litigant with a choice of forums: Federal and state courts "shall have concurrent jurisdiction" over complaints brought under the section.

Although the foregoing language [***669] of § 13981 covers a wide swath of criminal conduct, Congress placed some limitations on the section's federal civil remedy. Subsection (e)(1) states [****15] that "nothing" in this section entitles a person to a cause of action under subsection (c) of this section for random acts of violence unrelated to gender or for acts that cannot be demonstrated, by a preponderance of the evidence, to be motivated by gender." Subsection (e)(4) further states that § 13981 shall not be construed "to confer on the courts of the United States jurisdiction over any State law claim seeking [*607] the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree." [2A]Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution. "The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written." *Marbury* v. *Madison*, 5 U.S. 137, 1 Cranch 137, 176, 2 L. Ed. 60 (1803) (Marshall, C. J.). Congress explicitly identified the sources of federal authority on which it relied in enacting § 13981. It said that a "federal civil rights cause of action" is established "pursuant" to the affirmative power of Congress . . . under section 5 of the Fourteenth Amendment to the Constitution, as well as under section 8 of Article I of [****16] the Constitution." 42 U.S.C. § 13981(a). We address Congress' authority to enact this remedy under each of these constitutional provisions in turn.

II

[2B]Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds. See *United States* v. *Lopez*, 514 U.S. at 568, 577-578 (KENNEDY, J., concurring); *United States* v. *Harris*, 106 U.S. at 635.With this presumption of constitutionality in mind, we turn to the question whether § 13981 falls within Congress' power under Article I, § 8, of the Constitution. Brzonkala and the United States rely upon the third clause of the Article, which gives Congress power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." [3] As we discussed at length in *Lopez*, our interpretation of the Commerce Clause has changed as our Nation has developed. See *Lopez*, 514 U.S. at 552-557; *id.,* at 568-574 (KENNEDY, J., concurring); *id.,* at 584, 593-599 (THOMAS, J., [****17] concurring). We need not repeat that detailed review of [*608] the Commerce Clause's history here; it suffices to say that, in the years since *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 81 L. Ed. 893, 57 S. Ct. 615 (1937), Congress has had considerably greater latitude in regulating conduct and transactions under the

Commerce Clause than our previous case law permitted. See *Lopez*, 514 U.S. at 555-556; *id*., at 573-574 (KENNEDY, J., concurring).

*Lopez* emphasized, however, that even under our modern, expansive interpretation of the Commerce [***670] Clause, Congress' regulatory authority is not without effective bounds. *Id.*, at 557.

> "Even [our] modern-era precedents which have expanded congressional power [**1749] under the Commerce Clause confirm that this power is subject to outer limits. In *Jones & Laughlin Steel*, the Court warned that the scope of the interstate commerce power 'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between [****18] what is national and what is local and create a completely centralized government.'" *Id.*, at 556-557 (quoting *Jones & Laughlin Steel*, *supra*, at 37). [3]

[4] As we observed in *Lopez*, modern Commerce Clause jurisprudence has "identified three broad categories of activity that Congress may regulate [****19] under its commerce power." [*609] 514 U.S. at 558 (citing *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 276-277, 69 L. Ed. 2d 1, 101 S. Ct. 2352 (1981);*Perez* v. *United States*, 402 U.S. 146, 150, 28 L. Ed. 2d 686, 91 S. Ct. 1357 (1971))."First, Congress may regulate the use of the channels of interstate commerce." 514 U.S. at 558 (citing *Heart of Atlanta Motel, Inc*. v. *United States*, 379 U.S. 241, 256, 85 S. Ct. 348, 13 L. Ed. 2d 258 (1964); *United States* v. *Darby*, 312 U.S. 100, 114, 85 L. Ed. 609, 61 S. Ct. 451 (1941)). "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." 514 U.S. at 558 (citing *Shreveport Rate Cases*, 234 U.S. 342 (1914); *Southern R. Co*. v. *United States*, 222 U.S. 20, 32 S. Ct. 2, 56 L. Ed. 72 (1911); *Perez*, *supra*, at 150). "Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, . . . *i.e.*, those activities that substantially affect interstate commerce." 514 U.S. at 558-559 [****20] (citing *Jones & Laughlin Steel*, *supra*, at 37).

Petitioners do not contend that these cases fall within either of the first two of these categories of Commerce Clause regulation. They seek to sustain § 13981 as a regulation of activity that substantially affects interstate commerce. Given § 13981's focus on gender-motivated violence wherever it occurs (rather than violence directed at the instrumentalities of interstate commerce, interstate [***671] markets, or things or persons in interstate commerce), we agree that this is the proper inquiry. [5A][6A] Since *Lopez* most recently canvassed and clarified our case law governing this third category of Commerce Clause regulation, it provides the proper framework for conducting the required analysis of § 13981. In *Lopez*, we held that the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), which made it a federal crime to knowingly possess a firearm in a school zone, exceeded Congress' authority under the Commerce Clause. See 514 U.S. at 551.Several significant considerations contributed to our decision.

[*610] First, we observed that § 922(q) was "a criminal statute that by its terms has nothing [****21] to do with 'commerce' or any sort of economic enterprise, however [**1750] broadly one might define those terms." 514 U.S. at 561. Reviewing our case law, we noted that "we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce." 514 U.S. at 559. Although we cited only a few examples, including *Wickard* v. *Filburn*, 317 U.S. 111, 87 L. Ed. 122, 63 S. Ct. 82 (1942); *Hodel*, *supra; Perez*, *supra; Katzenbach* v. *McClung*, 379 U.S. 294, 13 L. Ed. 2d 290, 85 S. Ct. 377 (1964); and *Heart of Atlanta Motel, supra*, we stated that the pattern of analysis is clear. *Lopez*, 514 U.S. at 559-560. "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." 514 U.S. at 560. [5B] Both petitioners and JUSTICE SOUTER's dissent downplay the role that the economic nature of the regulated activity plays in our Commerce Clause analysis. But a fair reading of

---

[3] JUSTICE SOUTER's dissent takes us to task for allegedly abandoning *Jones & Laughlin Steel* in favor of an inadequate "federalism of some earlier time." *Post,* at 15-17, 29. As the foregoing language from *Jones & Laughlin Steel* makes clear however, this Court has always recognized a limit on the commerce power inherent in "our dual system of government." 301 U.S. at 37. It is the dissent's remarkable theory that the commerce power is without judicially enforceable boundaries that disregards the Court's caution in *Jones & Laughlin Steel* against allowing that power to "effectually obliterate the distinction between what is national and what is local." *Ibid*.

*Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case. See, [****22] *e.g.*, *id.,* at 551 ("The Act [does not] "regulate a commercial activity"), 560 ("Even *Wickard*, which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not"), 561 ("Section 922(q) is not an essential part of a larger regulation of economic activity"), 566 ("Admittedly, a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty. But, so long as Congress' authority is limited to those powers enumerated in the Constitution, and so long as those enumerated powers are interpreted as having judicially enforceable outer limits, congressional legislation under the Commerce Clause always will engender 'legal uncertainty'"), 567 ("The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition [*611] elsewhere, substantially affect any sort of interstate commerce"); see also *id.,* at 573-574 (KENNEDY, J., concurring) (stating that *Lopez* did not alter our "practical conception of commercial regulation" [***672] and that Congress [****23] may "regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy"), 577 ("Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur"), 580 ("Unlike the earlier cases to come before the Court here neither the actors nor their conduct has a commercial character, and neither the purposes nor the design of the statute has an evident commercial nexus. The statute makes the simple possession of a gun within 1,000 feet of the grounds of the school a criminal offense. In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far" (citation omitted)). *Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic [****24] endeavor. See *id.,* at 559-560. [4]

[6B] The second consideration that we found important in analyzing § 922(q) was that [**1751] the statute contained "no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have [*612] an explicit connection with or effect on interstate commerce." *Id.*, at 562.Such a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce. [6C] [7] Third, we noted that neither § 922(q) "'nor [****25] its legislative history contains express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone.'" *Ibid.* (quoting Brief for United States, O.T. 1994, No. 93-1260, pp. 5-6). While "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," 514 U.S. at 562 (citing *McClung*, 379 U.S. at 304;*Perez*, 402 U.S. at 156), the existence of such findings may "enable us to evaluate the legislative judgment that the activity in question substantially affects interstate commerce, even though no such substantial effect [is] visible to the naked eye." 514 U.S. at 563. [6D] Finally, our decision in *Lopez* rested in part on the fact that the link between gun possession and a substantial effect on interstate commerce was attenuated. *Id.*, at 563-567. The United States argued that the [***673] possession of guns may lead to violent crime, and that violent crime "can be expected to affect the functioning of the national economy in two ways. First, the costs of violent crime are substantial, and, through the [****26] mechanism of insurance, those costs are spread throughout the population. Second, violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe." *Id.*, at 563-564 (citation omitted). The Government also argued that the presence of guns at schools poses a threat to the educational process, which in turn threatens to produce a less efficient and productive workforce, which will negatively affect national productivity and thus interstate commerce. *Ibid.*

We rejected these "costs of crime" and "national productivity" arguments because they would permit Congress [*613] to "regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate

[4] JUSTICE SOUTER's dissent does not reconcile its analysis with our holding in *Lopez* because it apparently would cast that decision aside. See *post*, at 10-16. However, the dissent cannot persuasively contradict *Lopez*'s conclusion that, in every case where we have sustained federal regulation under *Wickard*'s aggregation principle, the regulated activity was of an apparent commercial character. See, *e.g.*, *Lopez*, 514 U.S. at 559-560, 580.

commerce." *Id.,* at 564. We noted that, under this but-for reasoning:

> "Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under these theories . . . , it is difficult to perceive any limitation on federal power, even in areas such as criminal law [****27] enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." *Ibid*.

[5C] [8] With these principles underlying our Commerce Clause jurisprudence as reference points, the proper resolution of the present cases is clear. Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity. While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature. See, *e.g.*, *id.*, at 559-560, and the cases cited therein. [6E][9] Like the Gun-Free School Zones Act at issue in *Lopez*, § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce. Although *Lopez* makes clear that such a jurisdictional element would lend support to the argument that § 13981 [**1752] is sufficiently tied to [****28] interstate commerce, Congress elected to cast § 13981's remedy over a wider, and more purely intrastate, body of violent crime. [5]

[*614] [****29] [***674] [6F] [10] In contrast with the lack of congressional findings that we faced in *Lopez*, § 13981 *is* supported by numerous findings regarding the serious impact that gender-motivated violence has on victims and their families. See, *e.g.*, H. R. Conf. Rep. No. 103-711, p. 385 (1994); S. Rep. No. 103- 138, p. 40 (1993); S. Rep. No. 101-545, p. 33 (1990). But the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. As we stated in *Lopez*, "'Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.'" 514 U.S. at 557, n. 2 (quoting *Hodel*, 452 U.S. at 311 (REHNQUIST, J., concurring in judgment)). Rather, "'whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court.'" 514 U.S. at 557, n. 2 (quoting *Heart of Atlanta Motel*, 379 U.S. at 273 (Black, J., concurring)).

[*615] In these cases, Congress' [****30] findings are substantially weakened by the fact that they rely so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers. Congress found that gender-motivated violence affects interstate commerce

> "by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; . . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products." H. R. Conf. Rep. No. 103-711, at 385.

Accord, S. Rep. No. 103-138, at 54. Given these findings and petitioners' arguments, the concern that we

---

[5] Title 42 U.S.C. § 13981 is not the sole provision of the Violence Against Women Act of 1994 to provide a federal remedy for gender-motivated crime. Section 40221(a) of the Act creates a federal criminal remedy to punish "interstate crimes of abuse including crimes committed against spouses or intimate partners during interstate travel and crimes committed by spouses or intimate partners who cross State lines to continue the abuse." S. Rep. No. 103-138, p. 43 (1993). That criminal provision has been codified at 18 U.S.C. § 2261(a)(1), which states:

"A person who travels across a State line or enters or leaves Indian country with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or intimate partner, shall be punished as provided in subsection (b)."

The Courts of Appeals have uniformly upheld this criminal sanction as an appropriate exercise of Congress' Commerce Clause authority, reasoning that the provision properly falls within the first of *Lopez*'s categories as it regulates the use of channels of interstate commerce -- i.e., the use of the interstate transportation routes through which persons and goods move." *United States* v. *Lankford*, 196 F.3d 563, 571-572 (CA5 1999) (collecting cases) (internal quotation marks omitted).

expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded. See *Lopez, supra*, at 564. The reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' [****31] police power) to every attenuated effect upon interstate commerce. If accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the [***675] nationwide, aggregated impact of that crime has substantial [**1753] effects on employment, production, transit, or consumption. Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

[11A] [12A] Petitioners' reasoning, moreover, will not limit Congress to regulating violence but may, as we suggested in *Lopez*, be applied equally as well to family law and other areas of traditional state regulation since the aggregate effect of [*616] marriage, divorce, and childrearing on the national economy is undoubtedly significant. Congress may have recognized this specter when it expressly precluded § 13981 from being used in the family law context. [6] See 42 U.S.C. § 13981(e)(4). Under our written Constitution, however, the limitation of congressional authority is not solely a matter of legislative grace. [7] [****32] See *Lopez*, *supra*, at 575-579 [***676] (KENNEDY, J., concurring); *Marbury*, 1

---

[6] We are not the first to recognize that the but-for causal chain must have its limits in the Commerce Clause area. In *Lopez*, 514 U.S. at 567, we quoted Justice Cardozo's concurring opinion in *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 79 L. Ed. 1570, 55 S. Ct. 837 (1935):

"There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours 'is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.'" *Id.*, at 554 (quoting *United States* v. *A. L. A. Schechter Poultry Corp.*, 76 F.2d 617, 624 (CA2 1935) (L. Hand, J., concurring)).

[7] JUSTICE SOUTER's dissent theory that *Gibbons* v. *Ogden,* 22 U.S. 1, 9 Wheat. 1, 6 L. Ed. 23 (1824), *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 83 L. Ed. 2d 1016, 105 S. Ct. 1005 (1985), and the Seventeenth Amendment provide the answer to these cases, see *post,* at 19-26, is remarkable because it undermines this central principle of our constitutional system. As we have repeatedly noted, the Framers crafted the federal system of government so that the people's rights would be secured by the division of power. See, *e.g.*, *Arizona* v. *Evans,* 514 U.S. 1, 30, 131 L. Ed. 2d 34, 115 S. Ct. 1185 (1995) (GINSBURG, J., dissenting); *Gregory* v. *Ashcroft,* 501 U.S. 452, 458-459, 115 L. Ed. 2d 410, 111 S. Ct. 2395 (1991) (cataloging the benefits of the federal design); *Atascadero State Hospital* v. *Scanlon,* 473 U.S. 234, 242, 87 L. Ed. 2d 171, 105 S. Ct. 3142 (1985) ("The 'constitutionally mandated balance of power' between the States and the Federal Government was adopted by the Framers to ensure the protection of 'our fundamental liberties'") (quoting *Garcia, supra*, at 572 (Powell, J., dissenting)). Departing from their parliamentary past, the Framers adopted a written Constitution that further divided authority at the federal level so that the Constitution's provisions would not be defined solely by the political branches nor the scope of legislative power limited only by public opinion and the legislature's self-restraint. See, *e.g.*, *Marbury* v. *Madison*, 5 U.S. 137, 1 Cranch 137, 176, 2 L. Ed. 60 (1803) (Marshall, C. J.) ("The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written"). It is thus a "'permanent and indispensable feature of our constitutional system'" that "'the federal judiciary is supreme in the exposition of the law of the Constitution.'" *Miller* v. *Johnson,* 515 U.S. 900, 922-923, 132 L. Ed. 2d 762, 115 S. Ct. 2475 (1995) (quoting *Cooper* v. *Aaron,* 358 U.S. 1, 18, 3 L. Ed. 2d 5, 78 S. Ct. 1401 (1958)).

No doubt the political branches have a role in interpreting and applying the Constitution, but ever since *Marbury* this Court has remained the ultimate expositor of the constitutional text. As we emphasized in *United States* v. *Nixon,* 418 U.S. 683, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974), "In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others . . . . Many decisions of this Court, however, have unequivocally reaffirmed the holding of *Marbury* . . . that 'it is emphatically the province and duty of the judicial department to say what the law is.'" *Id.,* at 703 (citation omitted).

Contrary to JUSTICE SOUTER's suggestion, see *post*, at 19-21, and n. 14, *Gibbons* did not exempt the commerce power from this cardinal rule of constitutional law. His assertion that, from *Gibbons* on, public opinion has been the only restraint on the congressional exercise of the commerce power is true only insofar as it contends that political accountability is and has been the only limit on Congress' exercise of the commerce power *within that power's outer bounds*. As the language surrounding that relied upon by JUSTICE SOUTER makes clear, *Gibbons* did not remove from this Court the authority to define that boundary. See *Gibbons, supra,* at 194-195 ("It is not intended to say that these words comprehend that

Cranch at 176-178. [11B][12B]

[*617] [****33] [**1754] [13A][14A] We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is [*618] truly national and what is truly local. *Lopez*, 514 U.S. at 568 (citing *Jones & Laughlin Steel*, 301 U.S. at 30). In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. See, *e.g.*, *Cohens* v. *Virginia*, 19 U.S. 264, 6 Wheat. 264, 426, 428, 5 L. Ed. 257 (1821) (Marshall, C. J.) (stating that Congress "has no general right to punish murder committed within any of the States," and that it is "clear . . . that congress cannot punish felonies generally"). Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims. [8] See, *e.g.*, [****34] *Lopez*, 514 U.S. at 566 ("The Constitution . . . [***677] withholds from Congress a plenary police power"); *id.*, at 584-585 (THOMAS, J., concurring) ("We *always* have rejected readings [*619] of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power"), 596-597, and n. 6 (noting that the first Congresses did not enact nationwide punishments for criminal conduct under the Commerce Clause). [14B]

III

[****35] [1B][13B] Because we conclude that the Commerce Clause does not provide Congress [**1755] with authority to enact § 13981, we address petitioners' alternative argument that the section's civil remedy should be upheld as an exercise of Congress' remedial power under § 5 of the Fourteenth Amendment. As noted above, Congress expressly invoked the Fourteenth Amendment as a source of authority to enact § 13981. [15] The principles governing an analysis of congressional legislation under § 5 are well settled. Section 5 states that Congress may "'enforce,' by 'appropriate legislation' the constitutional guarantee that no State shall deprive any person of 'life, liberty or property, without due process of law,' nor deny any person 'equal protection of the laws.'" *City of Boerne* v. *Flores*, 521 U.S. 507, 517, 138 L. Ed. 2d 624, 117 S. Ct. 2157 (1997). Section 5 is "a positive grant of legislative power," *Katzenbach* v. *Morgan*, 384 U.S. 641, 651, 16 L. Ed. 2d 828, 86 S. Ct. 1717 (1966), that includes authority to "prohibit conduct which is not itself unconstitutional and [to] intrude into 'legislative spheres of autonomy previously reserved to the States.'" *Flores, supra,* at 518 (quoting *Fitzpatrick* v. *Bitzer*, 427 U.S. 445, 455, 49 L. Ed. 2d 614, 96 S. Ct. 2666 (1976)); [****36] see also *Kimel* v. *Florida Bd. of Regents*, 528 U.S. 62, __, 145 L. Ed. 2d 522, 120 S. Ct. 631 (2000) (slip op., at 16). However, as broad as the congressional enforcement power is, it is not unlimited."

---

commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States . . . . Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of a State, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce to which the power was to be extended, would not have been made, had the intention been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State").

[8] JUSTICE SOUTER disputes our assertion that the Constitution reserves the general police power to the States, noting that the Founders failed to adopt several proposals for additional guarantees against federal encroachment on state authority. See *post,* at 19-22, and n. 14. This argument is belied by the entire structure of the Constitution. With its careful enumeration of federal powers and explicit statement that all powers not granted to the Federal Government are reserved, the Constitution cannot realistically be interpreted as granting the Federal Government an unlimited license to regulate. See, *e.g.*, *New York* v. *United States,* 505 U.S. 144, 156-157, 120 L. Ed. 2d 120, 112 S. Ct. 2408 (1992). And, as discussed above, the Constitution's separation of federal power and the creation of the Judicial Branch indicate that disputes regarding the extent of congressional power are largely subject to judicial review. See n. 7, *supra*. Moreover, the principle that "'the Constitution created a Federal Government of limited powers,'" while reserving a generalized police power to the States is deeply ingrained in our constitutional history. *New York, supra,* at 155 (quoting *Gregory* v. *Ashcroft, supra, at* 457; see also *Lopez*, 514 U.S. at 584-599 (THOMAS, J., concurring) (discussing the history of the debates surrounding the adoption of the Commerce Clause and our subsequent interpretation of the Clause); *Maryland* v. *Wirtz*, 392 U.S. 183, 196, 20 L. Ed. 2d 1020, 88 S. Ct. 2017 (1968).

*Oregon* v. *Mitchell*, 400 U.S. 112, 128, 27 L. Ed. 2d 272, 91 S. Ct. 260 (1970); see also *Kimel*, *supra*, at __-__ (slip op., at 16-17). In fact, as we discuss in detail below, several limitations inherent in § 5's text and constitutional context have been recognized since the Fourteenth Amendment was adopted.

Petitioners' § 5 argument is founded on an assertion that there is pervasive bias in various state justice systems against victims of gender-motivated violence. This assertion [*620] is supported by a voluminous congressional record. Specifically, Congress received evidence that many participants in state justice systems are perpetuating an array of erroneous stereotypes and assumptions. Congress concluded that these discriminatory stereotypes often result in insufficient investigation and prosecution of gender-motivated crime, inappropriate focus on the behavior and credibility of the victims of that crime, and unacceptably lenient punishments for those who are actually convicted of gender-motivated violence. See [****37] H. R. Conf. Rep. No. 103-711, at 385-386; S. Rep. No. 103-138, [***678] at 38, 41-55; S. Rep. No. 102-197, at 33-35, 41, 43-47. Petitioners contend that this bias denies victims of gender-motivated violence the equal protection of the laws and that Congress therefore acted appropriately in enacting a private civil remedy against the perpetrators of gender-motivated violence to both remedy the States' bias and deter future instances of discrimination in the state courts. [16] As our cases have established, state-sponsored gender discrimination violates equal protection unless it '"serves "important governmental objectives and . . . the discriminatory means employed" are "substantially related to the achievement of those objectives."' " *United States* v. *Virginia*, 518 U.S. 515, 533, 135 L. Ed. 2d 735, 116 S. Ct. 2264 (1996) (quoting *Mississippi Univ. for Women* v. *Hogan*, 458 U.S. 718, 724, 73 L. Ed. 2d 1090, 102 S. Ct. 3331 (1982), in turn quoting *Wengler* v. *Druggists Mut. Ins. Co.*, 446 U.S. 142, 150, 64 L. Ed. 2d 107, 100 S. Ct. 1540 (1980)).See also *Craig* v. *Boren*, 429 U.S. 190, 198-199, 50 L. Ed. 2d 397, 97 S. Ct. 451 (1976). However, the language and purpose of the Fourteenth Amendment place certain limitations on the manner in which Congress may attack [****38] discriminatory conduct. These limitations are necessary to prevent the Fourteenth Amendment from obliterating the Framers' carefully crafted balance of power between the States and the National Government. See *Flores*, 521 U.S. at 520-524 (reviewing the history of the Fourteenth Amendment's enactment and discussing the contemporary belief [**1756] that the Amendment "does [*621] not concentrate power in the general government for any purpose of police government within the States") (quoting T. Cooley, Constitutional Limitations 294, n. 1 (2d ed. 1871)). Foremost among these limitations is the time-honored principle that the Fourteenth Amendment, by its very terms, prohibits only state action. The principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." *Shelley* v. *Kraemer*, 334 U.S. 1, 13, 92 L. Ed. 1161, 68 S. Ct. 836, and n. 12 (1948).

Shortly after the Fourteenth Amendment was adopted, we decided two cases interpreting the Amendment's provisions, [****39] *United States* v. *Harris*, 106 U.S. 629, 27 L. Ed. 290, 1 S. Ct. 601 (1883), and the *Civil Rights Cases*, 109 U.S. 3, 27 L. Ed. 835, 3 S. Ct. 18 (1883). In *Harris*, the Court considered a challenge to § 2 of the Civil Rights Act of 1871. That section sought to punish "private persons" for "conspiring to deprive any one of the equal protection of the laws enacted by the State." 106 U.S. at 639. We concluded that this law exceeded Congress' § 5 power because the law was "directed exclusively against the action of private persons, without reference to the laws of the State, or their administration by her officers." 106 U.S. at 640. In so doing, we reemphasized our statement from *Virginia* v. *Rives*, 100 U.S. 313, 318, 25 L. Ed. 667 (1880), that '"these provisions of the fourteenth amendment have reference to State action exclusively, and not to any action of private individuals."' [***679] *Harris*, *supra,* at 639 (misquotation in *Harris*).

We reached a similar conclusion in the *Civil Rights Cases*. In those consolidated cases, we held that the public accommodation provisions of the Civil Rights Act of 1875, which applied to purely private conduct, were beyond the scope [****40] of the § 5 enforcement power. 109 U.S. at 11 ("Individual invasion of individual rights is not the subject-matter of the [Fourteenth] Amendment. See also, *e.g.*, *Romer* v. [*622] *Evans*, 517 U.S. 620, 628, 134 L. Ed. 2d 855, 116 S. Ct. 1620 (1996) (It was settled early that the Fourteenth Amendment did not give Congress a general power to prohibit discrimination in public accommodations"); *Lugar* v. *Edmondson Oil Co.,* 457 U.S. 922, 936, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982) ("Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power"); *Blum* v. *Yaretsky,* 457 U.S. 991, 1002, 73 L. Ed. 2d 534, 102 S. Ct. 2777 (1982);

*Moose Lodge No. 107* v. *Irvis,* 407 U.S. 163, 172, 32 L. Ed. 2d 627, 92 S. Ct. 1965 (1972); *Adickes* v. *S. H. Kress & Co.,* 398 U.S. 144, 147 n. 2, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970); *United States* v. *Cruikshank*, 92 U.S. 542, 554, 23 L. Ed. 588 (1876) ("The fourteenth amendment prohibits a state from depriving any person of life, liberty, or property, without due process of law; but this adds nothing to the rights of one citizen as against another. It simply furnishes an additional guaranty against any encroachment by the [****41] States upon the fundamental rights which belong to every citizen as a member of society").

The force of the doctrine of *stare decisis* behind these decisions stems not only from the length of time they have been on the books, but also from the insight attributable to the Members of the Court at that time. Every Member had been appointed by President Lincoln, Grant, Hayes, Garfield, or Arthur -- and each of their judicial appointees obviously had intimate knowledge and familiarity with the events surrounding the adoption of the Fourteenth Amendment.

Petitioners contend that two more recent decisions have in effect overruled this longstanding limitation on Congress' § 5 authority. They rely on *United States* v. [**1757] *Guest*, 383 U.S. 745, 16 L. Ed. 2d 239, 86 S. Ct. 1170 (1966), for the proposition that the rule laid down in the *Civil Rights Cases* is no longer good law. In *Guest*, the Court reversed the construction of an indictment under 18 U.S.C. § 241, saying in the course of its opinion that "we deal here with issues of statutory construction, not with issues of constitutional power." 383 U.S. at 749. Three Members of the Court, in a separate opinion [****42] by Justice Brennan, expressed the view that the *Civil Rights Cases* [*623] were wrongly decided, and that Congress could under § 5 prohibit actions by private individuals. 383 U.S. at 774 (opinion concurring in part and dissenting in part). Three other Members of the Court, who joined the opinion of the Court, joined a separate opinion by Justice Clark which in two or three sentences stated the conclusion that Congress could punish all conspiracies -- with or without state action -- that interfere with Fourteenth Amendment rights." *Id.* at 762 [***680] (concurring opinion). Justice Harlan, in another separate opinion, commented with respect to the statement by these Justices:

> "The action of three of the Justices who joined the Court's opinion in nonetheless cursorily pronouncing themselves on the far-reaching constitutional questions deliberately not reached in Part II seems to me, to say the very least, extraordinary." *Id.*, at 762, n. 1 (opinion concurring in part and dissenting in part).

Though these three Justices saw fit to opine on matters not before the Court in *Guest*, the Court had no occasion to revisit the *Civil Rights* [****43] *Cases* and *Harris*, having determined "the indictment [charging private individuals with conspiring to deprive blacks of equal access to state facilities] in fact contained an express allegation of state involvement." 383 U.S. at 756. The Court concluded that the implicit allegation of "active connivance by agents of the State" eliminated any need to decide "the threshold level that state action must attain in order to create rights under the Equal Protection Clause." *Ibid.* All of this Justice Clark explicitly acknowledged. See *id.*, at 762 (concurring opinion) ("The Court's interpretation of the indictment clearly avoids the question whether Congress, by appropriate legislation, has the power to punish private conspiracies that interfere with Fourteenth Amendment rights, such as the right to utilize public facilities").

[*624] To accept petitioners' argument, moreover, one must add to the three Justices joining Justice Brennan's reasoned explanation for his belief that the *Civil Rights Cases* were wrongly decided, the three Justices joining Justice Clark's opinion who gave no explanation whatever for their similar view. This is simply not the way [****44] that reasoned constitutional adjudication proceeds. We accordingly have no hesitation in saying that it would take more than the naked dicta contained in Justice Clark's opinion, when added to Justice Brennan's opinion, to cast any doubt upon the enduring vitality of the *Civil Rights Cases* and *Harris*.

Petitioners also rely on *District of Columbia* v. *Carter*, 409 U.S. 418, 34 L. Ed. 2d 613, 93 S. Ct. 602 (1973). *Carter* was a case addressing the question whether the District of Columbia was a "State" within the meaning of Rev. Stat. § 1979, 42 U.S.C. § 1983 -- a section which by its terms requires state action before it may be employed. A footnote in that opinion recites the same litany respecting *Guest* that petitioners rely on. This litany is of course entirely dicta, and in any event cannot rise above its source. We believe that the description of the § 5 power contained in the *Civil Rights Cases* is correct:

> "But where a subject has not submitted to the general legislative power of Congress, but is only submitted thereto for the purpose of rendering effective some prohibition against particular state

legislation or state action in reference [****45] to that subject, the power given is limited [**1758] by its object, any legislation by Congress in the matter must necessarily be corrective in its character, adapted to counteract and redress the operation of such prohibited state laws or proceedings [***681] of state officers." 109 U.S. at 18.

Petitioners alternatively argue that, unlike the situation in the *Civil Rights Cases*, here there has been gender-based disparate treatment by state authorities, whereas in those cases there was no indication of such state action. There is [*625] abundant evidence, however, to show that the Congresses that enacted the Civil Rights Acts of 1871 and 1875 had a purpose similar to that of Congress in enacting § 13981: There were state laws on the books bespeaking equality of treatment, but in the administration of these laws there was discrimination against newly freed slaves. The statement of Representative Garfield in the House and that of Senator Sumner in the Senate are representative:

> The chief complaint is not that the laws of the State are unequal, but that even where the laws are just and equal on their face, yet, by a systematic maladministration of them, or a neglect or refusal to [****46] enforce their provisions, a portion of the people are denied equal protection under them." Cong. Globe, 42d Cong., 1st Sess., App. 153 (1871) (statement of Rep. Garfield).

> "The Legislature of South Carolina has passed a law giving precisely the rights contained in your 'supplementary civil rights bill.' But such a law remains a dead letter on her statute-books, because the State courts, comprised largely of those whom the Senator wishes to obtain amnesty for, refuse to enforce it." Cong. Globe, 42d Cong., 2d Sess., 430 (1872) (statement of Sen. Sumner).

See also, *e.g.,* Cong. Globe, 42d Cong., 1st Sess., at 653 (statement of Sen. Osborn); *id.,* at 457 (statement of Rep. Coburn); *id.,* at App. 78 (statement of Rep. Perry); 2 Cong. Rec. 457 (1874) (statement of Rep. Butler); 3 Cong. Rec. 945 (1875) (statement of Rep. Lynch). [17] But even if that distinction were valid, we do not believe it would save § 13981's civil remedy. For the remedy is simply not "corrective in its character, adapted to counteract and redress the operation of such prohibited state laws or proceedings of state officers." *Civil Rights Cases*, 109 U.S. at 18.Or, as we have phrased [****47] it in more recent cases, prophylactic legislation under § 5 must have a "'congruence [*626] and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank*, 527 U.S. 627, 639, 144 L. Ed. 2d 575, 119 S. Ct. 2199 (1999); *Flores*, 521 U.S. at 526. Section 13981 is not aimed at proscribing discrimination by officials which the Fourteenth Amendment might not itself proscribe; it is directed not at any State or state actor, but at individuals who have committed criminal acts motivated by gender bias.

In the present cases, for example, § 13981 visits no consequence whatever on any Virginia public official involved in investigating or prosecuting Brzonkala's assault. The section is, therefore, unlike any of the § 5 remedies that we have previously upheld. For example, in *Katzenbach* v. *Morgan*, 384 U.S. 641, 16 L. Ed. 2d 828, 86 S. Ct. 1717 (1966), Congress prohibited New York from imposing literacy tests as a prerequisite for voting because it found that such a requirement disenfranchised thousands [***682] of Puerto Rican immigrants who had been educated in the Spanish language of their home territory. That [****48] law, which we upheld, was directed at New York officials who administered the State's election law and prohibited them from using a provision of that law. In *South Carolina* v. *Katzenbach*, 383 U.S. 301, 15 L. Ed. 2d 769, 86 S. Ct. 803 (1966), Congress imposed voting rights requirements on States that, Congress found, had a history of discriminating against blacks in voting. [**1759] The remedy was also directed at state officials in those States. Similarly, in *Ex parte Virginia*, 100 U.S. 339, 25 L. Ed. 676 (1880), Congress criminally punished state officials who intentionally discriminated in jury selection; again, the remedy was directed to the culpable state official.

Section 13981 is also different from these previously upheld remedies in that it applies uniformly throughout the Nation. Congress' findings indicate that the problem of discrimination against the victims of gender-motivated crimes does not exist in all States, or even most States. By contrast, the § 5 remedy upheld in *Katzenbach* v. *Morgan*, *supra*, [*627] was directed only to the State where the evil found by Congress existed, and in *South Carolina* v. *Katzenbach*, *supra*, the remedy was directed [****49] only to those States in which Congress found that there had been discrimination. [1C] For these reasons, we conclude that Congress' power under § 5 does not extend to the enactment of § 13981.

IV

[1D] Petitioner Brzonkala's complaint alleges that she was the victim of a brutal assault. But Congress' effort in § 13981 to provide a federal civil remedy can be sustained neither under the Commerce Clause nor under § 5 of the Fourteenth Amendment. If the allegations here are true, no civilized system of justice could fail to provide her a remedy for the conduct of respondent Morrison. But under our federal system that remedy must be provided by the Commonwealth of Virginia, and not by the United States. The judgment of the Court of Appeals is

*Affirmed.*

**Concur by:** THOMAS

## Concur

*JUSTICE* ***THOMAS***, concurring.

The majority opinion correctly applies our decision in *United States* v. *Lopez,* 514 U.S. 549, 131 L. Ed. 2d 626, 115 S. Ct. 1624 (1995), and I join it in full. I write separately only to express my view that the very notion of a "substantial effects" test under the Commerce Clause is inconsistent with the original understanding of Congress' powers and with this Court's early Commerce Clause cases. By [****50] continuing to apply this rootless and malleable standard, however circumscribed, the Court has encouraged the Federal Government to persist in its view that the Commerce Clause has virtually no limits. Until this Court replaces its existing Commerce Clause jurisprudence with a standard more consistent with the original understanding, we will continue to see Congress appropriating state police powers under the guise of regulating commerce.

**Dissent by:** SOUTER; BREYER

## Dissent

[*628] *JUSTICE* ***SOUTER***, with whom JUSTICE **STEVENS**, JUSTICE **GINSBURG**, and JUSTICE **BREYER** join, dissenting.

The Court says both that it leaves Commerce Clause precedent undisturbed and that the Civil Rights [***683] Remedy of the Violence Against Women Act of 1994, 42 U.S.C. § 13981, exceeds Congress's power under that Clause. I find the claims irreconcilable and respectfully dissent. [1]

[****51] I

Our cases, which remain at least nominally undisturbed, stand for the following propositions. Congress has the power to legislate with regard to activity that, in the aggregate, has a substantial effect on interstate commerce. See *Wickard* v. *Filburn,* 317 U.S. 111, 124-128, 87 L. Ed. 122, 63 S. Ct. 82 (1942); *Hodel* v. *Virginia Surface Mining & Reclamation Assn.,* 452 U.S. 264, 277, 69 L. Ed. 2d 1, 101 S. Ct. 2352 (1981). The fact of such a substantial effect is not an issue for the courts in the first instance, *ibid.,* but for the Congress, whose institutional capacity for gathering evidence and taking testimony [**1760] far exceeds ours. By passing legislation, Congress indicates its conclusion, whether explicitly or not, that facts support its exercise of the commerce power. The business of the courts is to review the congressional assessment, not for soundness but simply for the rationality of concluding that a jurisdictional basis exists in fact. See *ibid*. Any explicit findings that Congress chooses to make, though not dispositive of the question of rationality, may advance judicial review by identifying factual authority on which Congress relied. Applying those propositions in these cases can lead [****52] to only one conclusion.

One obvious difference from *United States* v. *Lopez,* 514 U.S. 549, 131 L. Ed. 2d 626, 115 S. Ct. 1624 (1995), is the mountain of data assembled by Congress, [*629] here showing the effects of violence against women on interstate commerce. [2] Passage of the Act in

---

[1] Finding the law a valid exercise of Commerce Clause power, I have no occasion to reach the question whether it might also be sustained as an exercise of Congress's power to enforce the Fourteenth Amendment.

[2] It is true that these data relate to the effects of violence against women generally, while the civil rights remedy limits its scope to "crimes of violence motivated by gender" -- presumably a somewhat narrower subset of acts. See 42 U.S.C. § 13981(b). But the meaning of "motivated by gender" has not been elucidated by lower courts, much less by this one, so the degree to which the findings rely on acts not redressable by the civil rights remedy is unclear. As will appear, however, much of the data seems to indicate behavior with just such motivation. In any event, adopting a cramped reading of the statutory text, and thereby increasing the constitutional difficulties, would directly contradict one of the most basic canons of statutory interpretation. See *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30, 81 L. Ed. 893,

1994 was preceded by four years of hearings, [3] which included testimony [***684] from physicians and law professors; [4] from survivors [*630] of rape and domestic violence; [5] and from representatives of state law enforcement and private business. [6] The record includes reports on gender bias from task forces in 21 States, [7] and we have the benefit of specific factual [**1761] findings [*631] in the eight separate Reports issued by Congress and its committees over the long course leading to enactment. [8] Compare *Hodel*, 452 U.S. at 278-279 (noting "extended hearings," "vast amounts of testimony and documentary evidence," and

57 S. Ct. 615 (1937). Having identified the problem of violence against women, Congress may address what it sees as the most threatening manifestation; "reform may take one step at a time." *Williamson* v. *Lee Optical of Okla., Inc.,* 348 U.S. 483, 489, 99 L. Ed. 563, 75 S. Ct. 461 (1955).

[3] See, *e.g.,* Domestic Violence: Terrorism in the Home, Hearing before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, 101st Cong., 2d Sess. (1990) (S. Hearing 101-897); Women and Violence, Hearing before the Senate Committee on the Judiciary, 101st Cong., 2d Sess. (1990); Violence Against Women: Victims of the System, Hearing on S. 15 before the Senate Committee on the Judiciary, 102d Cong., 1st Sess. (1991) (S. Hearing 102-369); Violence Against Women, Hearing before the Subcommittee on Crime and Criminal Justice of the House Committee on the Judiciary, 102d Cong., 2d Sess. (1992); Hearing on Domestic Violence, Hearing before the Senate Committee on the Judiciary, 103d Cong., 1st Sess. (1993) (S. Hearing 103-596); Violent Crimes Against Women, Hearing before the Senate Committee on the Judiciary, 103d Cong., 1st Sess. (1993) (S. Hearing 103-726); Violence Against Women: Fighting the Fear, Hearing before the Senate Committee on the Judiciary, 103d Cong., 1st Sess. (1993) (S. Hearing 103-878); Crimes of Violence Motivated by Gender, Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 103d Cong., 1st Sess. (1993); Domestic Violence: Not Just a Family Matter, Hearing before the Subcommittee on Crime and Criminal Justice of the House Committee on the Judiciary, 103d Cong., 2d Sess. (1994).

[4] See, *e.g.,* S. Hearing 103-596, at 1-4 (testimony of Northeastern Univ. Law School Professor Clare Dalton); S. Hearing 102-369, at 103-105 (testimony of Univ. of Chicago Professor Cass Sunstein); S. Hearing 103-878, at 7-11 (testimony of American Medical Assn. president-elect Robert McAfee).

[5] See, *e.g., id.,* at 13-17 (testimony of Lisa); *id.* at 40-42 (testimony of Jennifer Tescher).

[6] See, *e.g.,* S. Hearing 102-369, at 24-36, 71-87 (testimony of attorneys general of Iowa and Illinois); *id.,* at 235-245 (testimony of National Federation of Business and Professional Women); S. Hearing No. 103-596, at 15-17 (statement of James Hardeman, Manager, Counseling Dept., Polaroid Corp.).

[7] See Judicial Council of California Advisory Committee on Gender Bias in the Courts, Achieving Equal Justice for Women and Men in the California Courts (July 1996) (edited version of 1990 report); Colorado Supreme Court Task Force on Gender Bias in the Courts, Gender and Justice in the Colorado Courts (1990); Connecticut Task Force on Gender, Justice and the Courts, Report to the Chief Justice (Sept. 1991); Report of the Florida Supreme Court Gender Bias Study Commission (Mar. 1990); Supreme Court of Georgia, Commission on Gender Bias in the Judicial System, Gender and Justice in the Courts (1991), reprinted in 8 Ga. St. U. L. Rev. 539 (1992); Report of the Illinois Task Force on Gender Bias in the Courts (1990); Equality in the Courts Task Force, State of Iowa, Final Report (Feb. 1993); Kentucky Task Force on Gender Fairness in the Courts, Equal Justice for Women and Men (Jan. 1992); Louisiana Task Force on Women in the Courts, Final Report (1992); Maryland Special Joint Comm., Gender Bias in the Courts (May 1989); Massachusetts Supreme Judicial Court, Gender Bias Study of the Court System in Massachusetts (1989); Michigan Supreme Court Task Force on Gender Issues in the Courts, Final Report (Dec. 1989); Minnesota Supreme Court Task Force for Gender Fairness in the Courts, Final Report (1989), reprinted in 15 Wm. Mitchell L. Rev. 825 (1989); Nevada Supreme Court Gender Bias Task Force, Justice For Women (1988); New Jersey Supreme Court Task Force on Women in the Courts, Report of the First Year (June 1984); Report of the New York Task Force on Women in the Courts (Mar. 1986); Final Report of the Rhode Island Supreme Court Committee on Women in the Courts (June 1987); Utah Task Force on Gender and Justice, Report to the Utah Judicial Council (Mar. 1990); Vermont Supreme Court and Vermont Bar Assn., Gender and Justice: Report of the Vermont Task Force on Gender Bias in the Legal System (Jan. 1991); Washington State Task Force on Gender and Justice in the Courts, Final Report (1989); Wisconsin Equal Justice Task Force, Final Report (Jan. 1991).

[8] See S. Rep. No. 101-545 (1990); Majority Staff of Senate Committee on the Judiciary, Violence Against Women: The Increase of Rape in America, 102d Cong., 1st Sess. (Comm. Print 1991); S. Rep. No. 102-197 (1991); Majority Staff of Senate Committee on the Judiciary, Violence Against Women: A Week in the Life of America, 102d Cong., 2d Sess. (Comm. Print 1992); S. Rep. No. 103-138 (1993); Majority Staff of Senate Committee on the Judiciary, The Response to Rape: Detours on the Road to Equal Justice, 103d Cong., 1st Sess. (Comm. Print 1993); H. R. Rep. No. 103-395 (1993); H. R. Conf. Rep. No. 103-711 (1994).

"years of the most thorough legislative consideration"). [****53] [****54] [****55]

[***685] With respect to domestic violence, Congress received evidence for the following findings:

> "Three out of four American women will be victims of violent crimes sometime during their life." H. R. Rep. No. 103-395 p. 25 (1993) (citing U.S. Dept. of Justice, Report to the Nation on Crime and Justice 29 (2d ed. 1988)).
>
> "Violence is the leading cause of injuries to women ages 15 to 44 . . . ." S. Rep. No. 103-138, p. 38 (1993) (citing Surgeon General Antonia Novello, From the Surgeon General, [****56] U.S. Public Health Services, 267 JAMA 3132 (1992)).
>
> "As many as 50 percent of homeless women and children are fleeing domestic violence." S. Rep. No. 101-545, p. 37 (1990) (citing E. Schneider, Legal Reform Efforts for Battered Women: Past, Present, and Future (July 1990)).
>
> "Since 1974, the assault rate against women has outstripped the rate for men by at least twice for some age groups and far more for others." S. Rep. No. 101-545, [*632] at 30 (citing Bureau of Justice Statistics, Criminal Victimization in the United States (1974) (Table 5)).
>
> "Battering 'is the single largest cause of injury to women in the United States.'" S. Rep. No. 101-545, at 37 (quoting Van Hightower & McManus, Limits of State Constitutional Guarantees: Lessons from Efforts to Implement Domestic Violence Policies, 49 Pub. Admin. Rev. 269 (May/June 1989).
>
> "An estimated 4 million American women are battered each year by their [**1762] husbands or partners." H. R. Rep. No. 103-395, at 26 (citing Council on Scientific Affairs, American Medical Assn., Violence Against Women: Relevance for Medical Practitioners, 267 JAMA 3184, 3185 (1992).
>
> "Over 1 million women in the United States seek medical assistance [****57] each year for injuries sustained [from] their husbands or other partners." S. Rep. No. 101-545, at 37 (citing Stark & Flitcraft, Medical Therapy as Repression: The Case of the Battered Woman, Health & Medicine (Summer/Fall 1982).
>
> "Between 2,000 and 4,000 women die every year from [domestic] abuse." S. Rep. No. 101-545, at 36 (citing Schneider, *supra*).
>
> "Arrest rates may be as low as 1 for every 100 domestic assaults." S. Rep. No. 101-545, at 38 (citing Dutton, Profiling of Wife Assaulters: Preliminary Evidence for Trimodal Analysis, 3 Violence and Victims 5-30 (1988)).
>
> "Partial estimates show that violent crime against women costs this country at least 3 billion -- not million, but billion -- dollars a year." S. Rep. No. 101-545, at 33 (citing Schneider, *supra,* at 4).
>
> "Estimates suggest that we spend $ 5 to $ 10 billion a year on health care, criminal justice, and other social costs of domestic violence." S. Rep. No. 103-138, at [*633] 41 (citing Biden, Domestic Violence: A Crime, Not a Quarrel, Trial 56 (June 1993)).

The evidence as to rape was similarly extensive, supporting these conclusions:

> [***686]
>
> "[The incidence of] rape rose four times as fast as the total national [****58] crime rate over the past 10 years." S. Rep. No. 101-545, at 30 (citing Federal Bureau of Investigation Uniform Crime Reports (1988)).
>
> "According to one study, close to half a million girls now in high school will be raped before they graduate." S. Rep. No. 101-545, at 31 (citing R. Warshaw, I Never Called it Rape 117 (1988)).
>
> "[One hundred twenty-five thousand] college women can expect to be raped during this -- or any -- year." S. Rep. No. 101-545, at 43 (citing testimony of Dr. Mary Koss before the Senate Judiciary Committee, Aug. 29, 1990).
>
> "Three-quarters of women never go to the movies alone after dark because of the fear of rape and nearly 50 percent do not use public transit alone after dark for the same reason." S. Rep. No. 102-197, p. 38 (1991) (citing M. Gordon & S. Riger, The Female Fear 15 (1989)).
>
> "[Forty-one] percent of judges surveyed believed that juries give sexual assault victims less credibility than other crime victims." S. Rep. No. 102-197, at 47 (citing Colorado Supreme Court Task Force on Gender Bias in the Courts, Gender Justice in the Colorado Courts 91 (1990)).

> "Less than 1 percent of all [rape] victims have collected damages." S. Rep. No. 102-197, at [****59] 44 (citing report by Jury Verdict Research, Inc.).

> "'An individual who commits rape has only about 4 chances in 100 of being arrested, prosecuted, and found guilty of any offense.'" S. Rep. No. 101-545, at 33, n. 30 [*634] (quoting H. Feild & L. Bienen, Jurors and Rape: A Study in Psychology and Law 95 (1980)).

> "Almost one-quarter of convicted rapists never go to prison and another quarter received sentences in local jails where the average sentence is 11 months." S. Rep. No. 103-138, at 38 (citing Majority Staff Report of Senate Committee on the Judiciary, The Response to Rape: Detours on the Road to Equal Justice, 103d Cong., 1st Sess., 2 (Comm. Print 1993)).

> "Almost 50 percent of rape victims lose their jobs or are forced to quit because of the crime's severity." S. Rep. No. 102-197, at 53 (citing Ellis, Atkeson, & Calhoun, An Assessment of Long-Term Reaction to Rape, 90 J. Abnormal Psych., No. 3, p. 264 (1981).

[**1763] Based on the data thus partially summarized, Congress found that

> "crimes of violence motivated by gender have a substantial adverse effect on interstate commerce, by deterring potential victims from traveling interstate, from engaging in employment in interstate [****60] business, and from transacting with business, and in places involved, in interstate commerce . . . [,] by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products . . . ." H. R. Conf. Rep. No. 103-711, p. 385 (1994).

Congress thereby explicitly stated the predicate for the exercise of its Commerce Clause power. Is its conclusion irrational in view of the data amassed? True, the methodology of [***687] particular studies may be challenged, and some of the figures arrived at may be disputed. But the sufficiency of the evidence before Congress to provide a rational basis for the finding cannot seriously be questioned. Cf. *Turner Broadcasting System, Inc.* v. *FCC,* 520 U.S. 180, 199, 137 L. Ed. 2d 369, 117 S. Ct. 1174 (1997) [*635] ("The Constitution gives to Congress the role of weighing conflicting evidence in the legislative process").

Indeed, the legislative record here is far more voluminous than the record compiled by Congress and found sufficient in two prior cases upholding Title II of the Civil Rights Act of 1964 against Commerce Clause challenges. In *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U.S. 241, 13 L. Ed. 2d 258, 85 S. Ct. 348 (1964), [****61] and *Katzenbach* v. *McClung,* 379 U.S. 294, 13 L. Ed. 2d 290, 85 S. Ct. 377 (1964), the Court referred to evidence showing the consequences of racial discrimination by motels and restaurants on interstate commerce. Congress had relied on compelling anecdotal reports that individual instances of segregation cost thousands to millions of dollars. See Civil Rights -- Public Accommodations, Hearings on S. 1732 before the Senate Committee on Commerce, 88th Cong., 1st Sess., App. V, pp. 1383-1387 (1963). Congress also had evidence that the average black family spent substantially less than the average white family in the same income range on public accommodations, and that discrimination accounted for much of the difference. H. R. Rep. No. 88-914, pt. 2, pp. 9-10, and Table II (1963) (Additional Views on H. R. 7152 of Hon. William M. McCulloch, Hon. John V. Lindsay, Hon. William T. Cahill, Hon. Garner E. Shriver, Hon. Clark MacGregor, Hon. Charles McC. Mathias, Hon. James E. Bromwell).

While Congress did not, to my knowledge, calculate aggregate dollar values for the nationwide effects of racial discrimination in 1964, in 1994 it did rely on evidence of the harms caused by domestic violence and sexual [****62] assault, citing annual costs of $ 3 billion in 1990, see S. Rep. 101-545, and $ 5 to $ 10 billion in 1993, see S. Rep. No. 103-138, at 41. [9] Equally important, though, gender-based violence in the 1990's was shown to operate in a manner similar to racial [*636] discrimination in the 1960's in reducing the mobility of employees and their production and consumption of goods shipped in interstate commerce. Like racial discrimination, gender-based violence bars its most likely targets -- women -- from full participation in the national economy." *Id.,* at 54.

If the analogy to the Civil Rights Act of 1964 is not plain enough, one can always look back a bit further. In *Wickard*, we upheld the application of the Agricultural Adjustment Act to the planting and [****63] consumption

[9] In other cases, we have accepted dramatically smaller figures. See, *e.g., Hodel* v. *Indiana,* 452 U.S. 314, 325, n. 11, 69 L. Ed. 2d 40, 101 S. Ct. 2376 (1981) (stating that corn production with a value of $ 5.16 million "surely is not an insignificant amount of commerce").

of homegrown wheat. The effect on interstate commerce in that case followed from the possibility that wheat [**1764] grown at home for personal consumption could either be drawn into the market by rising prices, or relieve its grower of any need to purchase wheat in the market. See 317 U.S. at 127-129. The Commerce Clause predicate was simply the effect of the production of wheat for home consumption on supply [***688] and demand in interstate commerce. Supply and demand for goods in interstate commerce will also be affected by the deaths of 2,000 to 4,000 women annually at the hands of domestic abusers, see S. Rep. No. 101-545, at 36, and by the reduction in the work force by the 100,000 or more rape victims who lose their jobs each year or are forced to quit, see *id.,* at 56, H. R. Rep. No. 103-395, at 25-26. Violence against women may be found to affect interstate commerce and affect it substantially. [10]

[*637] [****64] II

The Act would have passed muster at any time between *Wickard* in 1942 and *Lopez* in 1995, a period in which the law enjoyed a stable understanding that congressional power under the Commerce Clause, complemented by the authority of the Necessary and Proper Clause, Art. I. § 8 cl. 18, extended to all activity that, when aggregated, has a substantial effect on interstate commerce. As already noted, this understanding was secure even against the turmoil at the passage of the Civil Rights Act of 1964, in the aftermath of which the Court not only reaffirmed the cumulative effects and rational basis features of the substantial effects test, see *Heart of Atlanta, supra,* at 258; *McClung, supra,* at 301-305, but declined to limit the commerce power through a formal distinction between legislation focused on "commerce" and statutes addressing "moral and social wrongs," *Heart of Atlanta, supra,* at 257.

The fact that the Act does not pass muster before the Court today is therefore proof, to a degree that *Lopez* was not, that the Court's nominal adherence to the substantial effects test is merely that. Although a new jurisprudence [****65] has not emerged with any distinctness, it is clear that some congressional conclusions about obviously substantial, cumulative effects on commerce are being assigned lesser values than the once-stable doctrine would assign them. These devaluations are accomplished not by any express repudiation of the substantial effects test or its application through the aggregation of individual conduct, but by supplanting rational basis scrutiny with a new criterion of review.

[*638] Thus the elusive heart of the majority's analysis in these cases is its statement that Congress's findings of fact are "weakened" by the presence of a disfavored "method of reasoning." *Ante,* at 14. This seems to suggest that the "substantial effects" analysis is not a [***689] factual enquiry, for Congress in the first instance with subsequent judicial review looking only to the rationality of the congressional conclusion, but one of a rather different sort, [**1765] dependent upon a uniquely judicial competence.

This new characterization of substantial effects has no support in our cases (the self-fulfilling prophecies of *Lopez* aside), least of all those the majority cites. Perhaps this explains why the majority is not content to [****66] rest on its cited precedent but claims a textual justification for moving toward its new system of congressional deference subject to selective discounts. Thus it purports to rely on the sensible and traditional understanding that the listing in the Constitution of some powers implies the exclusion of others unmentioned. See *Gibbons* v. *Ogden,* 22 U.S. 1, 9 Wheat. 1, 195, 6 L. Ed. 23 (1824); *ante,* at 10; The Federalist No. 45, p. 313 (J. Cooke ed. 1961) (J. Madison). [11] The majority

---

[10] It should go without saying that my view of the limit of the congressional commerce power carries no implication about the wisdom of exercising it to the limit. I and other Members of this Court appearing before Congress have repeatedly argued against the federalization of traditional state crimes and the extension of federal remedies to problems for which the States have historically taken responsibility and may deal with today if they have the will to do so. See Hearings before a Subcommittee of the House Committee on Appropriations, 104th Cong., 1st Sess., pt. 7, pp. 13-14 (1995) (testimony of JUSTICE KENNEDY); Hearings on H. R. 4603 before a Subcommittee of the Senate Committee on Appropriations, 103d Cong., 2d Sess., 100-107 (1994) (testimony of JUSTICES KENNEDY and SOUTER). The Judicial Conference of the United States originally opposed the Act, though after the original bill was amended to include the gender-based animus requirement, the objection was withdrawn for reasons that are not apparent. See Crimes of Violence Motivated by Gender, Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 103d Cong., 1st Sess., 70-71 (1993).

[11] The claim that powers not granted were withheld was the chief Federalist argument against the necessity of a bill of rights. Bills of rights, Hamilton claimed, "have no application to constitutions professedly founded upon the power of the

stresses that Art. I, § 8, enumerates [*639] the powers of Congress, including the commerce power, an enumeration implying the exclusion of powers not enumerated. It follows, for the majority, not only that there must be some limits to "commerce," but that some particular subjects arguably within the commerce power can be identified in advance as excluded, on the basis of characteristics other than their commercial effects. Such exclusions come into sight when the activity regulated is not itself commercial or when the States have traditionally addressed it in the exercise of the general police power, conferred under the state constitutions but never extended to Congress under the Constitution of the Nation, [****67] see *Lopez*, 514 U.S. at 566*. Ante,* at 16.

[****68] The premise that the enumeration of powers implies that other powers are withheld is sound; the conclusion that some particular categories of subject matter are therefore presumptively beyond the reach of the commerce power is, however, a non sequitur. From the fact that Art. I, § 8, cl. 3 grants an authority limited to regulating commerce, it follows only that Congress may claim no authority under that section to address any subject that does not affect commerce. It does not at all follow that an activity affecting commerce nonetheless falls outside the commerce power, depending on the specific character of the activity, or the authority of a State to regulate it [***690] along with Congress. [12] My disagreement [*640] with the majority is not, however, confined to logic, for history has [**1766] shown that categorical exclusions have proven as unworkable in practice as they are unsupportable in theory.

[****69] A

Obviously, it would not be inconsistent with the text of the Commerce Clause itself to declare "noncommercial" primary activity beyond or presumptively beyond the scope of the commerce power. That variant of categorical approach is not, however, the sole textually permissible way of defining the scope of the Commerce Clause, and any such neat limitation would at least be suspect in the light of the final sentence of Article I, § 8, authorizing Congress to make "all Laws . . . necessary and proper" to give effect to its enumerated powers such as commerce. See *United States* v. *Darby,* 312 U.S. 100, 118, 85 L. Ed. 609, 61 S. Ct. 451 (1941) ("The power of Congress . . . extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce"). Accordingly, for significant periods of our history, the Court has defined the commerce power as plenary, unsusceptible to categorical exclusions, and this was the view expressed throughout the latter part of the 20th century in the substantial [****70] effects test. These two conceptions of the commerce power, plenary and categorically limited, are in fact old rivals, and today's revival of their competition summons up familiar history, a brief reprise of which may be helpful in posing what I take to be the key question going to the legitimacy of the majority's decision to breathe new life into the approach of categorical limitation.

[*641] Chief Justice Marshall's seminal opinion in *Gibbons* v. *Ogden, supra,* at 193-194, construed the commerce power from the start with "a breadth never

---

people, and executed by their immediate representatives and servants. Here, in strictness, the people surrender nothing, and as they retain every thing, they have no need of particular reservations." The Federalist No. 84, at 578. James Wilson went further in the Pennsylvania ratifying convention, asserting that an enumeration of rights was positively dangerous because it suggested, conversely, that every right not reserved was surrendered. See 2 J. Elliot, Debates in the Several State Conventions on the Adoption of the Federal Constitution 436-437 (2d ed. 1863) (hereinafter Elliot's Debates). The Federalists did not, of course, prevail on this point; most States voted for the Constitution only after proposing amendments and the First Congress speedily adopted a Bill of Rights. See *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 569, 83 L. Ed. 2d 1016, 105 S. Ct. 1005 (1985) (Powell, J., dissenting). While that document protected a range of specific individual rights against federal infringement, it did not, with the possible exception of the Second Amendment, offer any similarly specific protections to areas of state sovereignty.

[12] To the contrary, we have always recognized that while the federal commerce power may overlap the reserved state police power, in such cases federal authority is supreme. See, *e.g., Lake Shore & Michigan Southern R. Co.* v. *Ohio,* 173 U.S. 285, 297-298, 43 L. Ed. 702, 19 S. Ct. 465 (1899) ("When Congress acts with reference to a matter confided to it by the Constitution, then its statutes displace all conflicting local regulations touching that matter, although such regulations may have been established in pursuance of a power not surrendered by the States to the General Government"); *United States* v. *California,* 297 U.S. 175, 185, 80 L. Ed. 567, 56 S. Ct. 421 (1936) ("We look to the activities in which the states have traditionally engaged as marking the boundary of the restriction upon the federal taxing power. But there is no such limitation upon the plenary power to regulate commerce").

yet exceeded," *Wickard* v. *Filburn,* 317 U.S. at 120. In particular, it is worth noting, the Court in *Wickard* did not regard its holding as exceeding the scope of Chief Justice Marshall's view of interstate commerce; *Wickard* applied an aggregate effects test to ostensibly domestic, noncommercial farming consistently with Chief Justice Marshall's indication that the commerce power may be understood by its exclusion of subjects, among others, "which do not affect other States," *Gibbons,* 9 Wheat. at 195. This plenary view of the power has either prevailed or been acknowledged by this Court at every stage [****71] of our jurisprudence. See, *e.g., id.,* at 197; *Nashville, C. & St. L. R. Co.* v. *Alabama,* [***691] 128 U.S. 96, 99-100, 32 L. Ed. 352, 9 S. Ct. 28 (1888); *Lottery Case,* 188 U.S. 321, 353, 47 L. Ed. 492, 23 S. Ct. 321 (1903); *Minnesota Rate Cases,* 230 U.S. 352, 398, 57 L. Ed. 1511, 33 S. Ct. 729 (1913); *United States* v. *California,* 297 U.S. 175, 185, 80 L. Ed. 567, 56 S. Ct. 421 (1936); *United States* v. *Darby,* 312 U.S. 100, 115, 85 L. Ed. 609, 61 S. Ct. 451 (1941); *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U.S. at 255; *Hodel* v. *Indiana,* 452 U.S. at 324. And it was this understanding, free of categorical qualifications, that prevailed in the period after 1937 through *Lopez,* as summed up by Justice Harlan: "'Of course, the mere fact that Congress has said when particular activity shall be deemed to affect commerce does not preclude further examination by this Court. But where we find that the legislators . . . have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end.'" *Maryland* v. *Wirtz,* 392 U.S. 183, 190, 20 L. Ed. 2d 1020, 88 S. Ct. 2017 (1968) (quoting *Katzenbach* v. *McClung,* 379 U.S. at 303-304). [****72]

Justice Harlan spoke with the benefit of hindsight, for he had seen the result of rejecting the plenary view, and today's attempt to distinguish between primary activities affecting commerce in terms of the relatively commercial or noncommercial character of the primary conduct proscribed [**1767] comes with the pedigree of near-tragedy that I outlined in [*642] *United States* v. *Lopez, supra,* at 603 (dissenting opinion). In the half century following the modern activation of the commerce power with passage of the Interstate Commerce Act in 1887, this Court from time to time created categorical enclaves beyond congressional reach by declaring such activities as "mining," "production," "manufacturing," and union membership to be outside the definition of "commerce" and by limiting application of the effects test to "direct" rather than "indirect" commercial consequences. See, *e.g., United States* v. *E. C. Knight Co.,* 156 U.S. 1, 39 L. Ed. 325, 15 S. Ct. 249 (1895) (narrowly construing the Sherman Antitrust Act in light of the distinction between "commerce" and "manufacture"); *In re Heff,* 197 U.S. 488, 505-506, 49 L. Ed. 848, 25 S. Ct. 506 (1905) (stating that Congress could not regulate the intrastate [****73] sale of liquor); *The Employers' Liability Cases,* 207 U.S. 463, 495-496, 52 L. Ed. 297, 28 S. Ct. 141 (1908) (invalidating law governing tort liability for common carriers operating in interstate commerce because the effects on commerce were indirect); *Adair* v. *United States,* 208 U.S. 161, 52 L. Ed. 436, 28 S. Ct. 277 (1908) (holding that labor union membership fell outside "commerce"); *Hammer* v. *Dagenhart,* 247 U.S. 251, 62 L. Ed. 1101, 38 S. Ct. 529 (1918) (invalidating law prohibiting interstate shipment of goods manufactured with child labor as a regulation of "manufacture"); *A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U.S. 495, 545-548, 79 L. Ed. 1570, 55 S. Ct. 837 (1935) (invalidating regulation of activities that only "indirectly" affected commerce); *Railroad Retirement Bd.* v. *Alton R. Co.,* 295 U.S. 330, 368-369, 79 L. Ed. 1468, 55 S. Ct. 758 (1935) (invalidating pension law for railroad workers on the grounds that conditions of employment were only indirectly linked to commerce); *Carter* v. *Carter Coal Co.,* 298 U.S. 238, 303-304, 80 L. Ed. 1160, 56 S. Ct. 855 (1936) (holding that regulation of unfair labor practices in mining regulated "production," not "commerce").

Since adherence to these formalistically contrived confines [****74] of commerce power in large measure provoked the judicial crisis of 1937, one might reasonably have doubted that Members of this Court would ever again toy with a return to the days before *NLRB* v. *Jones & Laughlin* [***692] *Steel Corp.,* [*643] 301 U.S. 1, 81 L. Ed. 893, 57 S. Ct. 615 (1937), which brought the earlier and nearly disastrous experiment to an end. And yet today's decision can only be seen as a step toward recapturing the prior mistakes. Its revival of a distinction between commercial and noncommercial conduct is at odds with *Wickard*, which repudiated that analysis, and the enquiry into commercial purpose, first intimated by the *Lopez* concurrence, see *Lopez, supra*, at 580 (opinion of KENNEDY, J.), is cousin to the intent-based analysis employed in *Hammer*, *supra*, at 271-272 but rejected for Commerce Clause purposes in *Heart of Atlanta, supra,* at 257 and *Darby, supra,* at 115.

Why is the majority tempted to reject the lesson so painfully learned in 1937? An answer emerges from contrasting *Wickard* with one of the predecessor cases it superseded. It was obvious in *Wickard* that growing wheat for consumption right on the farm was [****75]

not "commerce" in the common vocabulary, [13] but that did not [**1768] matter constitutionally so long as the aggregated activity of domestic wheat growing affected commerce substantially. Just a few years before [*644] *Wickard*, however, it had certainly been no less obvious that "mining" practices could substantially affect commerce, even though *Carter Coal Co., supra,* had held mining regulation beyond the national commerce power. When we try to fathom the difference between the two cases, it is clear that they did not go in different directions because the *Carter Coal* Court could not understand a causal connection that the *Wickard* Court could grasp; the difference, rather, turned on the fact that the Court in *Carter Coal* had a reason for trying to maintain its categorical, formalistic distinction, while that reason had been abandoned by the time *Wickard* was decided. The reason was laissez-faire economics, the point of which was to keep government interference to a minimum. See *Lopez, supra,* at 605-606 (SOUTER, J., dissenting). The Court in *Carter Coal* was still trying to create a laissez-faire world out of the 20th-century economy, and formalistic [****76] commercial distinctions were thought to be useful instruments in achieving that object. The Court in *Wickard* knew it could not do any such thing and in the aftermath of the New Deal had long since stopped attempting the [***693] impossible. Without the animating economic theory, there was no point in contriving formalisms in a war with Chief Justice Marshall's conception of the commerce power.

[****77] If we now ask why the formalistic economic/noneconomic distinction might matter today, after its rejection in *Wickard*, the answer is not that the majority fails to see causal connections in an integrated economic world. The answer is that in the minds of the majority there is a new animating theory that makes categorical formalism seem useful again. Just as the old formalism had value in the service of an economic conception, the new one is useful in serving a conception of federalism. It is the instrument by which assertions of national power are to be limited in favor of preserving a supposedly discernible, proper sphere of state autonomy to legislate or refrain from legislating as the individual [*645] States see fit. The legitimacy of the Court's current emphasis on the noncommercial nature of regulated activity, then, does not turn on any logic serving the text of the Commerce Clause or on the realism of the majority's view of the national economy. The essential issue is rather the strength of the majority's claim to have a constitutional warrant for its current conception of a federal relationship enforceable by this Court through limits on otherwise plenary commerce power. This [****78] conception is the subject of the majority's second categorical discount applied today to the facts bearing on the substantial effects test.

B

The Court finds it relevant that the statute addresses conduct traditionally subject to state prohibition under domestic criminal law, a fact said to have some heightened significance when the violent conduct in question is not itself aimed directly at interstate commerce or its instrumentalities. *Ante,* at 9. Again, history seems to be recycling, for the theory of traditional state concern as grounding a limiting principle has been rejected previously, and more than once. It was disapproved in *Darby,* 312 U.S. at 123-124, and held insufficient standing [**1769] alone to limit the commerce power in *Hodel,* 452 U.S. at 276-277. In the particular context of the Fair Labor Standards Act it was rejected in *Maryland* v. *Wirtz,* 392 U.S. 183, 20 L. Ed. 2d 1020, 88 S. Ct. 2017 (1968), with the recognition that there is no general doctrine implied in the Federal Constitution that the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other." *Id.,* at 195 [****79] (internal quotation marks omitted). The Court held it to be "clear that the Federal Government, when acting within delegated power, may

---

[13] Contrary to the Court's suggestion, *ante,* at 11, n. 4, *Wickard* applied the substantial effects test to domestic agricultural production for domestic consumption, an activity that cannot fairly be described as commercial, despite its commercial consequences in affecting or being affected by the demand for agricultural products in the commercial market. The *Wickard* Court admitted that Filburn's activity "may not be regarded as commerce" but insisted that "it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce . . . ." 317 U.S. at 125. The characterization of home wheat production as "commerce" or not is, however, ultimately beside the point. For if substantial effects on commerce are proper subjects of concern under the Commerce Clause, what difference should it make whether the causes of those effects are themselves commercial? Cf., *e.g., National Organization for Women, Inc.* v. *Scheidler,* 510 U.S. 249, 258, 127 L. Ed. 2d 99, 114 S. Ct. 798 (1994) ("An enterprise surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives"). The Court's answer is that it makes a difference to federalism, and the legitimacy of the Court's new judicially derived federalism is the crux of our disagreement. See *infra*, at 18-19.

override countervailing state interests, whether these be described as 'governmental' or 'proprietary' in character." *Ibid*. While *Wirtz* was later overruled by *National League of Cities* v. *Usery,* 426 U.S. 833, 49 L. Ed. 2d 245, 96 S. Ct. 2465 [*646] (1976), that case was itself repudiated in *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 83 L. Ed. 2d 1016, 105 S. Ct. 1005 (1985), which held that the concept of "traditional governmental function" (as an element of the immunity doctrine under *Hodel*) was incoherent, there being [***694] no explanation that would make sense of the multifarious decisions placing some functions on one side of the line, some on the other. 469 U.S. at 546-547. The effort to carve out inviolable state spheres within the spectrum of activities substantially affecting commerce was, of course, just as irreconcilable with *Gibbons*'s explanation of the national commerce power as being as "absolute as it would be in a single government," 9 Wheat. at 197. [14]

[*647] [****80] The objection to reviving traditional state spheres of action as a consideration in commerce analysis, however, not only rests on the portent of incoherence, but is compounded by a further defect just as fundamental. The defect, in essence, is the majority's rejection of the Founders' considered judgment that politics, not judicial review, should mediate between state and national interests as the strength and legislative jurisdiction of the National Government inevitably increased through the expected growth of the national economy. [15] [**1770] Whereas today's majority takes a leaf from the book of the old judicial economists in saying that the Court should somehow draw the line to keep the federal relationship in a proper balance, Madison, Wilson, and Marshall understood the Constitution very differently.

[****81] Although Madison had emphasized the conception of a National Government of discrete powers (a conception that a number of the ratifying conventions thought was too indeterminate to protect civil liberties), [16] Madison [***695] himself must have sensed the potential scope of some of the powers granted (such as the authority to regulate commerce), for he [*648] took care in The Federalist No. 46 to hedge his argument for limited power by explaining the importance of national politics in protecting the States' interests. The National Government "will partake sufficiently of the spirit [of the States], to be disinclined to invade the rights of the individual States, or the prerogatives of their governments." The Federalist No. 46, at 319. James Wilson likewise noted that "it was a favorite object in the Convention" to secure the sovereignty of the States, and that it had been achieved through the structure of the

---

[14] The Constitution of 1787 did, in fact, forbid some exercises of the commerce power. Article I, § 9, cl. 6, barred Congress from giving preference to the ports of one State over those of another. More strikingly, the Framers protected the slave trade from federal interference, see Art. I, § 9, cl. 1, and confirmed the power of a State to guarantee the chattel status of slaves who fled to another State, see Art. IV, § 2, cl. 3. These reservations demonstrate the plenary nature of the federal power; the exceptions prove the rule. Apart from them, proposals to carve islands of state authority out of the stream of commerce power were entirely unsuccessful. Roger Sherman's proposed definition of federal legislative power as excluding "matters of internal police" met Gouverneur Morris's response that "the internal police . . . ought to be infringed in many cases" and was voted down eight to two. 2 Records of the Federal Convention of 1787, pp. 25-26 (M. Farrand ed. 1911) (hereinafter Farrand). The Convention similarly rejected Sherman's attempt to include in Article V a proviso that "no state shall . . . be affected in its internal police." 5 Elliot's Debates 551-552. Finally, Rufus King suggested an explicit bill of rights for the States, a device that might indeed have set aside the areas the Court now declares off-limits. 1 Farrand 493 ("As the fundamental rights of individuals are secured by express provisions in the State Constitutions; why may not a like security be provided for the Rights of States in the National Constitution"). That proposal, too, came to naught. In short, to suppose that enumerated powers must have limits is sensible; to maintain that there exist judicially identifiable areas of state regulation immune to the plenary congressional commerce power even though falling within the limits defined by the substantial effects test is to deny our constitutional history.

[15] That the national economy and the national legislative power expand in tandem is not a recent discovery. This Court accepted the prospect well over 100 years ago, noting that the commerce powers "are not confined to the instrumentalities of commerce, or the postal service known or in use when the Constitution was adopted, but they keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances." *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.,* 96 U.S. 1, 9, 24 L. Ed. 708 (1878). See also, *e.g., Farmers Loan & Trust Co.* v. *Minnesota,* 280 U.S. 204, 211-212, 74 L. Ed. 371, 50 S. Ct. 98 (1930) ("Primitive conditions have passed; business is now transacted on a national scale").

[16] As mentioned n. 11, *supra,* many state conventions voted in favor of the Constitution only after proposing amendments. See 1 Elliot's Debates 322-323 (Massachusetts), 325 (South Carolina), 325-327 (New Hampshire), 327 (Virginia), 327-331 (New York), 331-332 (North Carolina), 334-337 (Rhode Island).

Federal Government. 2 Elliot's Debates 438-439. [17] The Framers of the Bill of Rights, in turn, may well have sensed that Madison and Wilson were right about politics as the determinant of the federal balance within the broad limits of a power like commerce, for they formulated the Tenth [****82] Amendment without any provision comparable to the specific guarantees proposed for individual liberties. [18] In any case, this Court recognized the political component of federalism in the seminal *Gibbons* opinion. After declaring the plenary character of congressional power within the sphere of activity affecting commerce, the Chief Justice spoke for the Court in explaining that there was only one restraint on its valid exercise:

> [*649] "The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments." *Gibbons, supra,* at 197.

[****83]

Politics as the moderator of the congressional employment of the commerce power was the theme [****84] many years later in *Wickard,* for after the Court acknowledged the breadth of the *Gibbons* formulation it invoked Chief Justice Marshall yet again in adding that "he made emphatic the embracing and penetrating nature of this power by warning that effective restraints on its exercise must proceed from political rather than judicial processes." *Wickard,* [**1771] 317 U.S. at 120 (citation omitted). Hence, "conflicts of economic interest . . . are wisely left under our system to resolution by Congress under its [***696] more flexible and responsible legislative process. Such conflicts rarely lend themselves to judicial determination. And with the wisdom, workability, or fairness, of the plan of regulation we have nothing to do." *Id.,* at 129 (footnote omitted).

As with "conflicts of economic interest," so with supposed conflicts of sovereign political interests implicated by the Commerce Clause: the Constitution remits them to politics. The point can be put no more clearly than the Court put it the last time it repudiated the notion that some state activities categorically defied the commerce power as understood in accordance with generally accepted concepts. After [****85] confirming Madison's and Wilson's views with a recitation of the sources of state influence in the structure of the National Constitution, *Garcia*, 469 U.S. at 550-552, the Court disposed of the possibility of identifying "principled constitutional limitations on the scope of Congress' Commerce Clause powers over the States merely [*650] by relying on *a priori* definitions of state sovereignty," *id.,* at 548. It concluded that

> "the Framers chose to rely on a federal system in which special restraints on federal power over the States inhered principally in the workings of the National Government itself, rather than in discrete limitations on the objects of federal authority. State sovereign interests, then, are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power." *Id.,* at 552.

The *Garcia* Court's rejection of "judicially created limitations" in favor of the intended reliance on national politics was all the more powerful owing to the Court's explicit recognition that in the centuries since the framing the relative powers of [****86] the two sovereign systems have markedly changed. Nationwide economic integration is the norm, the national political power has been augmented by its vast revenues, and the power of the States has been drawn down by the Seventeenth Amendment, eliminating selection of senators by state legislature in favor of direct election.

The *Garcia* majority recognized that economic growth and the burgeoning of federal revenue have not amended the Constitution, which contains no circuit breaker to preclude the political consequences of these

---

[17] Statements to similar effect pervade the ratification debates. See, *e.g.,* 2 *id.,* at 166-170 (Massachusetts, remarks of Samuel Stillman); *id.,* at 251-253 (New York, remarks of Alexander Hamilton); 4 *id.,* at 95-98 (North Carolina, remarks of James Iredell).

[18] The majority's special solicitude for "areas of traditional state regulation," *ante,* at 15, is thus founded not on the text of the Constitution but on what has been termed the "*spirit* of the Tenth Amendment," *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U.S. at 585 (O'CONNOR, J., dissenting) (emphasis in original). Susceptibility to what Justice Holmes more bluntly called "some invisible radiation from the general terms of the Tenth Amendment," *Missouri* v. *Holland,* 252 U.S. 416, 434, 64 L. Ed. 641, 40 S. Ct. 382 (1920), has increased in recent years, in disregard of his admonition that "we must consider what this country has become in deciding what that Amendment has reserved." *Ibid.*

developments. Nor is there any justification for attempts to nullify the natural political impact of the particular amendment that was adopted. The significance for state political power of ending state legislative selection of senators was no secret in 1913, and the amendment was approved despite public comment on that very issue. Representative Franklin Bartlett, after quoting Madison's Federalist No. 62, as well as remarks by George Mason and John Dickinson during the Constitutional Convention, concluded, "It follows, therefore, that the [*651] framers of the Constitution, were they present in this House to-day, would inevitably regard this resolution as a most [****87] direct blow at the doctrine of State's rights and at the integrity of the State sovereignties; for if you once deprive a State as a collective organism [***697] of all share in the General Government, you annihilate its federative importance." 26 Cong. Rec. 7774 (1894). Massachusetts Senator George Hoar likewise defended indirect election of the Senate as "a great security for the rights of the States." S. Doc. No. 232, 59th Cong., 1st Sess., 21 (1906). And Elihu Root warned that if the selection of senators should be taken from state legislatures, "the tide that now sets toward the Federal Government will swell in volume and power." 46 Cong. Rec. 2243 (1911). "The time will come," he continued, "when the Government of the United States will be driven to the exercise of more arbitrary and unconsidered [**1772] power, will be driven to greater concentration, will be driven to extend its functions into the internal affairs of the States." *Ibid*. These warnings did not kill the proposal; the Amendment was ratified, and today it is only the ratification, not the predictions, which this Court can legitimately heed. [19]

[*652] [****88] Amendments that alter the balance of power between the National and State Governments, like the Fourteenth, or that change the way the States are represented within the Federal Government, like the Seventeenth, are not rips in the fabric of the Framers' Constitution, inviting judicial repairs. The Seventeenth Amendment may indeed have lessened the enthusiasm of the Senate to represent the States as discrete sovereignties, but the Amendment did not convert the judiciary into an alternate shield against the commerce power.

C

The Court's choice to invoke considerations of traditional state regulation in these cases is especially odd in light of a distinction recognized in the now-repudiated opinion for the Court in *Usery*. In explaining that there was no inconsistency between declaring the States immune to the commerce power exercised in the Fair Labor Standards Act, but subject to it under the Economic Stabilization Act of 1970, as decided in *Fry* [***698] v. *United States,* 421 U.S. 542, 44 L. Ed. 2d 363, 95 S. Ct. 1792 (1975), the Court spoke of the latter statute as dealing with a serious threat affecting all the political components of the federal [*653] system, "which only collective action by the National [****89] Government might forestall." *Usery*, 426 U.S. at 853. Today's majority, however, finds no significance whatever in the state support for the Act based upon the States' acknowledged failure to deal adequately with gender-based violence in state courts, and the belief of their own law enforcement agencies that national action is essential. [20]

---

[19] The majority tries to deflect the objection that it blocks an intended political process by explaining that the Framers intended politics to set the federal balance only within the sphere of permissible commerce legislation, whereas we are looking to politics to define that sphere (in derogation even of *Marbury* v. *Madison,* 5 U.S. 137, 1 Cranch 137, 2 L. Ed. 60 (1803)), *ante,* at 16-17. But we all accept the view that politics is the arbiter of state interests only within the realm of legitimate congressional action under the commerce power. Neither Madison nor Wilson nor Marshall, nor the *Jones & Laughlin*, *Darby, Wickard,* or *Garcia* Courts, suggested that politics defines the commerce power. Nor do we, even though we recognize that the conditions of the contemporary world result in a vastly greater sphere of influence for politics than the Framers would have envisioned. Politics has legitimate authority, for all of us on both sides of the disagreement, only within the legitimate compass of the commerce power. The majority claims merely to be engaging in the judicial task of patrolling the outer boundaries of that congressional authority. See *ante,* at 16, n. 7. That assertion cannot be reconciled with our statements of the substantial effects test, which have not drawn the categorical distinctions the majority favors. See, *e.g., Wickard,* 317 U.S. at 125; *Darby*, 312 U.S. at 118-119. The majority's attempt to circumscribe the commerce power by defining it in terms of categorical exceptions can only be seen as a revival of similar efforts that led to near tragedy for the Court and incoherence for the law. If history's lessons are accepted as guides for Commerce Clause interpretation today, as we do accept them, then the subject matter of the Act falls within the commerce power and the choice to legislate nationally on that subject, or to except it from national legislation because the States have traditionally dealt with it, should be a political choice and only a political choice.

[20] See n. 7, *supra*. The point here is not that I take the position that the States are incapable of dealing adequately with domestic violence if their political leaders have the will to do so; it is simply that the Congress had evidence from which it

The National Association of Attorneys General supported the Act unanimously, see Violence Against Women: Victims of the System, Hearing on S. 15 before the Senate Committee on the Judiciary, 102d Cong., 1st Sess., 37-38 (1991), and Attorneys [**1773] General from 38 States urged Congress to enact the Civil Rights [****90] Remedy, representing that "the current system for dealing with violence against women is inadequate," see Crimes of Violence Motivated by Gender, Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 103d Cong., 1st Sess., 34-36 (1993). It was against this record of failure at the state level that the Act was passed to provide the choice of a federal forum in place of the state-court systems found inadequate to stop gender-biased violence. See Women and Violence, Hearing before the Senate Committee on the Judiciary, 101st Cong., 2d Sess., 2 (1990) (statement of Sen. Biden) (noting importance of federal forum). [21] The Act accordingly offers a federal civil rights remedy aimed exactly [*654] at violence against women, as an alternative to the generic state tort causes of action found to be poor tools of action by the state task forces. See S. Rep. No. 101-545, at 45 (noting difficulty of fitting gender-motivated crimes into common-law categories). As the 1993 Senate Report put it, "The Violence Against Women Act is intended to respond both to the underlying attitude that this violence is somehow less serious than other crime and to the [****91] resulting failure of our criminal justice system to address such violence. Its goals are both symbolic and practical . . . ." S. Rep. No. 103-138, at 38.

The collective opinion of state officials that the Act was needed continues virtually unchanged, and when the Civil Rights Remedy was challenged in court, the States came to its defense. Thirty-six of them and the Commonwealth of Puerto Rico have filed an *amicus* brief in support of petitioners in these cases, and only one State has taken respondents' side. It [****92] is, then, not the least irony of these cases that the States will be forced to enjoy the new federalism [***699] whether they want it or not. For with the Court's decision today, Antonio Morrison, like *Carter Coal*'s James Carter before him, has "won the states' rights plea against the states themselves." R. Jackson, The Struggle for Judicial Supremacy 160 (1941).

III

All of this convinces me that today's ebb of the commerce power rests on error, and at the same time leads me to doubt that the majority's view will prove to be enduring law. There is yet one more reason for doubt. Although we sense the presence of *Carter Coal, Schechter,* and *Usery* once again, the majority embraces them only at arm's-length. Where such decisions once stood for rules, today's opinion points to considerations by which substantial effects are discounted. Cases standing for the sufficiency of substantial effects are not overruled; cases overruled since 1937 are not quite revived. The Court's thinking betokens less clearly [*655] a return to the conceptual straitjackets of *Schechter* and *Carter Coal* and *Usery* than to something like the unsteady state of obscenity law between *Redrup* v. *New York,* 386 U.S. 767, 18 L. Ed. 2d 515, 87 S. Ct. 1414 (1967) [****93] *(per curiam),* and *Miller* v. *California,* 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607 (1973), a period in which the failure to provide a workable definition left this Court to review each case ad hoc. See *id.,* at 22, n. 3; *Interstate Circuit, Inc.* v. *Dallas,* 390 U.S. 676, 706-708, 20 L. Ed. 2d 225, 88 S. Ct. 1298 (1968) (Harlan, J., dissenting). As our predecessors learned then, the practice of such ad hoc review cannot preserve the distinction between the judicial and the legislative, and this Court, in any event, lacks the institutional [**1774] capacity to maintain such a regime for very long. This one will end when the majority realizes that the conception of the commerce power for which it entertains hopes would inevitably fail the test expressed in Justice Holmes's statement that "the first call of a theory of law is that it should fit the facts." O. Holmes, The Common Law 167 (Howe ed. 1963). The facts that cannot be ignored today are the facts of integrated national commerce and a political relationship between States and Nation much affected by their respective treasuries and constitutional modifications adopted by the people. The federalism of some earlier time is no more adequate to account [****94] for those facts today than the theory of laissez-faire was able to govern the national economy 70 years ago.

*JUSTICE BREYER*, with whom JUSTICE STEVENS

---

could find a national statute necessary, so that its passage obviously survives Commerce Clause scrutiny.

[21] The majority's concerns about accountability strike me as entirely misplaced. Individuals, such as the defendants in this action, haled into federal court and sued under the United States Code, are quite aware of which of our dual sovereignties is attempting to regulate their behavior. Had Congress chosen, in the exercise of its powers under § 5 of the Fourteenth Amendment, to proceed instead by regulating the States, rather than private individuals, this accountability would be far less plain.

joins, and with whom JUSTICE SOUTER and JUSTICE GINSBURG join as to Part I-A, dissenting.

No one denies the importance of the Constitution's federalist principles. Its state/federal division of authority protects liberty -- both by restricting the burdens that government can impose from a distance and by facilitating citizen participation in government that is closer to home. The question is how the judiciary can best implement that [*656] original federalist understanding where the Commerce Clause is at issue.

I

The majority holds that the federal commerce power does not extend to such "noneconomic" activities as "noneconomic, violent criminal conduct" that significantly affects interstate commerce only if we "aggregate" [***700] the interstate "effects" of individual instances. *Ante*, at 17-18. JUSTICE SOUTER explains why history, precedent, and legal logic militate against the majority's approach. I agree and join his opinion. I add that the majority's holding illustrates the difficulty of finding a workable judicial Commerce Clause touchstone [****95] -- a set of comprehensible interpretive rules that courts might use to impose some meaningful limit, but not too great a limit, upon the scope of the legislative authority that the Commerce Clause delegates to Congress.

A

Consider the problems. The "economic/noneconomic" distinction is not easy to apply. Does the local street corner mugger engage in "economic" activity or "noneconomic" activity when he mugs for money? See *Perez* v. *United States,* 402 U.S. 146, 28 L. Ed. 2d 686, 91 S. Ct. 1357 (1971) (aggregating local "loan sharking" instances); *United States* v. *Lopez,* 514 U.S. 549, 559, 131 L. Ed. 2d 626, 115 S. Ct. 1624 (1995) (loan sharking is economic because it consists of "intrastate extortionate credit transactions"); *ante*, at 9. Would evidence that desire for economic domination underlies many brutal crimes against women save the present statute? See United States General Accounting Office, Health, Education, and Human Services Division, Domestic Violence: Prevalence and Implications for Employment Among Welfare Recipients 7-8 (Nov. 1998); Brief for Equal Rights Advocates, *et al.* as *Amicus Curiae* 10-12.

The line becomes yet harder to draw given the need for exceptions. The Court itself would [****96] permit Congress to aggregate, hence regulate, "noneconomic" activity taking place [*657] at economic establishments. See *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U.S. 241, 13 L. Ed. 2d 258, 85 S. Ct. 348 (1964) (upholding civil rights laws forbidding discrimination at local motels); *Katzenbach* v. *McClung,* 379 U.S. 294, 13 L. Ed. 2d 290, 85 S. Ct. 377 (1964) (same for restaurants); *Lopez, supra,* at 559 (recognizing congressional power to aggregate, hence forbid, noneconomically motivated discrimination at public accommodations); *ante*, at 9-10 (same). And it would permit Congress to regulate where that regulation [**1775] is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez, supra,* at 561; cf. Controlled Substances Act, 21 U.S.C. § 801 *et seq.* (regulating drugs produced for home consumption). Given the former exception, can Congress simply rewrite the present law and limit its application to restaurants, hotels, perhaps universities, and other places of public accommodation? Given the latter exception, can Congress save the present law [****97] by including it, or much of it, in a broader "Safe Transport" or "Workplace Safety" act?

More important, why should we give critical constitutional importance to the economic, or noneconomic, nature of an interstate-commerce-affecting *cause*? If chemical emanations through indirect environmental change cause identical, severe commercial harm [***701] outside a State, why should it matter whether local factories or home fireplaces release them? The Constitution itself refers only to Congress' power to "regulate Commerce . . . among the several States," and to make laws "necessary and proper" to implement that power. Art. I, § 8, cls. 3, 18. The language says nothing about either the local nature, or the economic nature, of an interstate-commerce-affecting cause.

This Court has long held that only the interstate commercial effects, not the local nature of the cause, are constitutionally relevant. See *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U.S. 1, 38-39, 81 L. Ed. 893, 57 S. Ct. 615 (1937) (focusing upon interstate effects); *Wickard* v. *Filburn,* 317 U.S. 111, 125, 87 L. Ed. 122, 63 S. Ct. 82 (1942) (aggregating [*658] interstate effects of wheat grown for home consumption); *Heart of Atlanta Motel, supra,* at 258 [****98] ("'If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze'" (quoting *United States* v. *Women's Sportswear Mfrs. Assn.,* 336 U.S. 460, 464, 93 L. Ed. 805, 69 S. Ct. 714 (1949))). Nothing in the Constitution's language, or that of earlier

cases prior to *Lopez*, explains why the Court should ignore one highly relevant characteristic of an interstate-commerce-affecting cause (how "local" it is), while placing critical constitutional weight upon a different, less obviously relevant, feature (how "economic" it is).

Most important, the Court's complex rules seem unlikely to help secure the very object that they seek, namely, the protection of "areas of traditional state regulation" from federal intrusion. *Ante*, at 15. The Court's rules, even if broadly interpreted, are underinclusive. The local pickpocket is no less a traditional subject of state regulation than is the local gender-motivated assault. Regardless, the Court reaffirms, as it should, Congress' well-established and frequently exercised power to enact laws that satisfy a commerce-related jurisdictional prerequisite -- for example, that some item relevant to the federally [****99] regulated activity has at some time crossed a state line. *Ante*, at 8-9, 11, 13, and n. 5; *Lopez, supra,* at 558; *Heart of Atlanta Motel, supra,* at 256 ("'The authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question'" (quoting *Caminetti* v. *United States,* 242 U.S. 470, 491, 61 L. Ed. 442, 37 S. Ct. 192 (1917))); see also *United States* v. *Bass,* 404 U.S. 336, 347-350, 30 L. Ed. 2d 488, 92 S. Ct. 515 (1971) (saving ambiguous felon-in-possession statute by requiring gun to have crossed state line); *Scarborough* v. *United States,* 431 U.S. 563, 575, 52 L. Ed. 2d 582, 97 S. Ct. 1963 (1977) (interpreting same statute to require only that gun passed "in interstate commerce" "at some time," without questioning constitutionality); cf., *e.g.*, 18 U.S.C. § 2261(a)(1) (making it a federal crime for a person to cross state lines to commit [*659] a crime of violence against a spouse or intimate partner); § 1951(a) (federal crime to commit [**1776] robbery, extortion, physical violence or threat thereof, where "article or commodity in commerce" is affected, obstructed or delayed); [****100] § 2315 (making unlawful [***702] the knowing receipt or possession of certain stolen items that have "crossed a State . . . boundary"); § 922(g)(1) (prohibiting felons from shipping, transporting, receiving, or possessing firearms "in interstate . . . commerce").

And in a world where most everyday products or their component parts cross interstate boundaries, Congress will frequently find it possible to redraft a statute using language that ties the regulation to the interstate movement of some relevant object, thereby regulating local criminal activity or, for that matter, family affairs. See, *e.g.*, Child Support Recovery Act of 1992, 18 U.S.C. § 228. Although this possibility does not give the Federal Government the power to regulate everything, it means that any substantive limitation will apply randomly in terms of the interests the majority seeks to protect. How much would be gained, for example, were Congress to reenact the present law in the form of "An Act Forbidding Violence Against Women Perpetrated at Public Accommodations or by Those Who Have Moved in, or through the Use of Items that Have Moved in, Interstate Commerce"? Complex Commerce Clause rules [****101] creating fine distinctions that achieve only random results do little to further the important federalist interests that called them into being. That is why modern (pre-*Lopez*) case law rejected them. See *Wickard, supra,* at 120; *United States* v. *Darby,* 312 U.S. 100, 116-117, 85 L. Ed. 609, 61 S. Ct. 451 (1941); *Jones & Laughlin Steel Corp., supra,* at 37.

The majority, aware of these difficulties, is nonetheless concerned with what it sees as an important contrary consideration. To determine the lawfulness of statutes simply by asking whether Congress could reasonably have found that *aggregated* local instances significantly affect interstate commerce will allow Congress to regulate almost anything. [*660] Virtually all local activity, when instances are aggregated, can have "substantial effects on employment, production, transit, or consumption." Hence Congress could "regulate any crime," and perhaps "marriage, divorce, and childrearing" as well, obliterating the "Constitution's distinction between national and local authority." *Ante*, at 15; *Lopez*, 514 U.S. at 558; cf. *A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U.S. 495, 548, 79 L. Ed. 1570, 55 S. Ct. 837 (1935) [****102] (need for distinction between "direct" and "indirect" effects lest there "be virtually no limit to the federal power"); *Hammer* v. *Dagenhart,* 247 U.S. 251, 276, 62 L. Ed. 1101, 38 S. Ct. 529 (1918) (similar observation).

This consideration, however, while serious, does not reflect a jurisprudential defect, so much as it reflects a practical reality. We live in a Nation knit together by two centuries of scientific, technological, commercial, and environmental change. Those changes, taken together, mean that virtually every kind of activity, no matter how local, genuinely can affect commerce, or its conditions, outside the State -- at least when considered in the aggregate. *Heart of Atlanta Motel,* 379 U.S. at 251. And that fact makes it close to impossible for courts to develop meaningful subject-matter categories that would exclude some kinds of local activities from [***703] ordinary Commerce Clause "aggregation" rules without, at the same time, depriving Congress of

the power to regulate activities that have a genuine and important effect upon interstate commerce.

Since judges cannot change the world, the "defect" means that, within the bounds of the rational, Congress, not the courts, [****103] must remain primarily responsible for striking the appropriate state/federal balance. *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 552, 83 L. Ed. 2d 1016, 105 S. Ct. 1005 (1985); *ante*, at 19-24 (SOUTER, J., dissenting); [**1777] *Kimel* v. *Florida Bd. of Regents*, 528 U.S. __, 145 L. Ed. 2d 522, 120 S. Ct. 631, (2000) (slip op., at 2) (STEVENS, J., dissenting) (Framers designed important structural safeguards to ensure that, when Congress legislates, "the normal operation of the legislative process itself would adequately defend [*661] state interests from undue infringement"); see also Kramer, Putting the Politics Back into the Political Safeguards of Federalism, 100 Colum. L. Rev. 215 (2000) (focusing on role of political process and political parties in protecting state interests). Congress is institutionally motivated to do so. Its Members represent state and local district interests. They consider the views of state and local officials when they legislate, and they have even developed formal procedures to ensure that such consideration takes place. See, *e.g.,* Unfunded Mandates Reform Act of 1995, Pub. L. 104-4, 109 Stat. 48 (codified in scattered sections of 2 U.S.C.). Moreover, Congress often can [****104] better reflect state concerns for autonomy in the details of sophisticated statutory schemes than can the judiciary, which cannot easily gather the relevant facts and which must apply more general legal rules and categories. See, *e.g.*, 42 U.S.C. § 7543(b) (Clean Air Act); 33 U.S.C. § 1251 *et seq.* (Clean Water Act); see also *New York* v. *United States,* 505 U.S. 144, 167-168, 120 L. Ed. 2d 120, 112 S. Ct. 2408 (1992) (collecting other examples of "cooperative federalism"). Not surprisingly, the bulk of American law is still state law, and overwhelmingly so.

B

I would also note that Congress, when it enacted the statute, followed procedures that help to protect the federalism values at stake. It provided adequate notice to the States of its intent to legislate in an "area of traditional state regulation." *Ante*, at 15. And in response, attorneys general in the overwhelming majority of States (38) supported congressional legislation, telling Congress that "our experience as Attorneys General strengthens our belief that the problem of violence against women is a national one, requiring federal attention, federal leadership, and federal funds." [****105] *Id.,* at 34-36; see also Violence Against Women: Victims of [*662] the System, Hearing on S. 15 before the Senate Committee on the Judiciary, 102d Cong., 1st Sess., 37-38 (1991) (unanimous resolution of the National Association of Attorneys General); but cf. Crimes of Violence Motivated by Gender, Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 103d Cong., 1st Sess., 77-84 (1993) (Conference of Chief Justices opposing legislation).

Moreover, as JUSTICE SOUTER has [***704] pointed out, Congress compiled a "mountain of data" explicitly documenting the interstate commercial effects of gender-motivated crimes of violence. *Ante*, at 2-8, 27-28 (dissenting opinion). After considering alternatives, it focused the federal law upon documented deficiencies in state legal systems. And it tailored the law to prevent its use in certain areas of traditional state concern, such as divorce, alimony, or child custody. 42 U.S.C. § 13981(e)(4). Consequently, the law before us seems to represent an instance, not of state/federal conflict, but of state/federal efforts to cooperate in order to help solve a mutually acknowledged [****106] national problem. Cf. §§ 300w-10, 3796gg, 3796hh, 10409, 13931 (providing federal moneys to encourage state and local initiatives to combat gender-motivated violence).

I call attention to the legislative process leading up to enactment of this statute because, as the majority recognizes, *ante*, at 14, it far surpasses that which led to the enactment of the statute we considered in *Lopez*. And even were I to accept *Lopez* as an accurate statement of the law, which I do not, that distinction provides a possible basis for upholding the law here. This Court on occasion has pointed to the importance of procedural limitations in [**1778] keeping the power of Congress in check. See *Garcia,* 469 U.S. at 554 ("Any substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a 'sacred province of state autonomy'" (quoting *EEOC* v. *Wyoming,* 460 U.S. 226, 236, 75 L. Ed. 2d 18, 103 S. Ct. 1054 (1983))); see [*663] also *Gregory* v. *Ashcroft,* 501 U.S. 452, 460-461, 115 L. Ed. 2d 410, 111 S. Ct. 2395 (1991) (insisting upon [****107] a "plain statement" of congressional intent when Congress legislates "in areas traditionally regulated by the States"); cf. *Hampton* v. *Mow Sun Wong,* 426 U.S. 88, 103-105, 114-117, 48 L. Ed. 2d 495, 96 S. Ct. 1895

(1976); *Fullilove* v. *Klutznick,* 448 U.S. 448, 548-554, 65 L. Ed. 2d 902, 100 S. Ct. 2758 (1980) (STEVENS, J., dissenting).

Commentators also have suggested that the thoroughness of legislative procedures -- *e.g.,* whether Congress took a "hard look" -- might sometimes make a determinative difference in a Commerce Clause case, say when Congress legislates in an area of traditional state regulation. See, *e.g.,* Jackson, Federalism and the Uses and Limits of Law: *Printz* and Principle?, 111 Harv. L. Rev. 2180, 2231-2245 (1998); Gardbaum, Rethinking Constitutional Federalism, 74 Texas L. Rev. 795, 812-828, 830-832 (1996); Lessig, Translating Federalism: *United States* v. *Lopez*, 1995 S. Ct. Rev. 125, 194-214 (1995); see also Treaty Establishing the European Community Art. 5; Bermann, Taking Subsidiarity Seriously: Federalism in the European Community and the United States, 94 Colum. L. Rev. 331, 378-403 (1994) (arguing for similar limitation [****108] in respect to somewhat analogous principle of subsidiarity for European Community); Gardbaum, *supra,* at 833-837 (applying subsidiarity principles to American federalism). Of course, any judicial insistence that Congress follow [***705] particular procedures might itself intrude upon congressional prerogatives and embody difficult definitional problems. But the intrusion, problems, and consequences all would seem less serious than those embodied in the majority's approach. See *supra*, at 2-7.

I continue to agree with JUSTICE SOUTER that the Court's traditional "rational basis" approach is sufficient. *Ante*, at 1-2 (dissenting opinion); see also *Lopez*, 514 U.S. at 603-615 (SOUTER, J., dissenting); *id.,* at 615-631 (BREYER, J., dissenting). But I recognize that the law in this area is unstable and that time and experience may demonstrate both the unworkability of the majority's rules and the superiority [*664] of Congress' own procedural approach -- in which case the law may evolve towards a rule that, in certain difficult Commerce Clause cases, takes account of the thoroughness with which Congress has considered the federalism issue.

For these reasons, as [****109] well as those set forth by JUSTICE SOUTER, this statute falls well within Congress's Commerce Clause authority, and I dissent from the Court's contrary conclusion.

II

Given my conclusion on the Commerce Clause question, I need not consider Congress' authority under § 5 of the Fourteenth Amendment. Nonetheless, I doubt the Court's reasoning rejecting that source of authority. The Court points out that in *United States* v. *Harris,* 106 U.S. 629, 27 L. Ed. 290, 1 S. Ct. 601 (1883), and the *Civil Rights Cases,* 109 U.S. 3, 27 L. Ed. 835, 3 S. Ct. 18 (1883), the Court held that § 5 does not authorize Congress to use the Fourteenth Amendment as a source of power to remedy the conduct of *private persons*. *Ante*, at 21-23. That is certainly so. The Federal Government's argument, however, is that Congress used § 5 to remedy the actions of *state actors*, namely, those States which, through discriminatory design or the discriminatory conduct of their officials, failed to provide [**1779] adequate (or any) state remedies for women injured by gender-motivated violence -- a failure that the States, and Congress, documented in depth. See *ante*, at 3-4, n. 7, 27-28 (SOUTER, J., dissenting) (collecting sources).

[****110] Neither *Harris* nor the *Civil Rights Cases* considered this kind of claim. The Court in *Harris* specifically said that it treated the federal laws in question as "directed *exclusively* against the action of private persons, without reference to the laws of the State, or their administration by her officers." 106 U.S. at 640 (emphasis added); see also *Civil Rights Cases*, 109 U.S. at 14 (observing that the statute did "not profess to be corrective of any constitutional wrong committed by the States" and that it established "rules for the conduct [*665] of individuals in society towards each other, . . . without referring in any manner to any supposed action of the State or its authorities").

The Court responds directly to the relevant "state actor" claim by finding that the present law lacks "'congruence and proportionality'" to the state discrimination that it purports to remedy. *Ante*, at 26; [***706] see *City of Boerne* v. *Flores,* 521 U.S. 507, 526, 138 L. Ed. 2d 624, 117 S. Ct. 2157 (1997). That is because the law, unlike federal laws prohibiting literacy tests for voting, imposing voting rights requirements, or punishing state officials who intentionally discriminated [****111] in jury selection, *Katzenbach* v. *Morgan,* 384 U.S. 641, 16 L. Ed. 2d 828, 86 S. Ct. 1717 (1966); *South Carolina* v. *Katzenbach,* 383 U.S. 301, 15 L. Ed. 2d 769, 86 S. Ct. 803 (1966); *Ex parte Virginia,* 100 U.S. 339, 25 L. Ed. 676 (1880), is not "directed . . . at any State or state actor." *Ante*, at 26.

But why can Congress not provide a remedy against private actors? Those private actors, of course, did not themselves violate the Constitution. But this Court has held that Congress at least sometimes can enact remedial "legislation . . . [that] prohibits conduct which is

not itself unconstitutional." *Flores*, 521 U.S. at 518; see also *Katzenbach* v. *Morgan, supra,* at 651; *South Carolina* v. *Katzenbach, supra,* at 308. The statutory remedy does not in any sense purport to "determine what constitutes a constitutional violation." *Flores, supra,* at 519. It intrudes little upon either States or private parties. It may lead state actors to improve their own remedial systems, primarily through example. It restricts private actors only by imposing liability for private conduct that is, in the main, already forbidden by state law. Why [****112] is the remedy "disproportionate"? And given the relation between remedy and violation -- the creation of a federal remedy to substitute for constitutionally inadequate state remedies -- where is the lack of "congruence"?

The majority adds that Congress found that the problem of inadequacy of state remedies "does not exist in all States, [*666] or even most States." *Ante*, at 27. But Congress had before it the task force reports of at least 21 States documenting constitutional violations. And it made its own findings about pervasive gender-based stereotypes hampering many state legal systems, sometimes unconstitutionally so. See, *e.g.,* S. Rep. No. 103-138, pp. 38, 41-42, 44-47 (1993); S. Rep. No. 102-197, pp. 39, 44-49 (1991); H. R. Conf. Rep. No. 103-711, p. 385 (1994). The record nowhere reveals a congressional finding that the problem "does not exist" elsewhere. Why can Congress not take the evidence before it as evidence of a national problem? This Court has not previously held that Congress must document the existence of a problem in every State prior to proposing a national solution. And the deference this Court gives to Congress' chosen remedy under § 5, *Flores, supra,* at 536, [****113] suggests that any such requirement would be inappropriate.

Despite my doubts about the majority's § 5 reasoning, I need not, and do not, [**1780] answer the § 5 question, which I would leave for more thorough analysis if necessary on another occasion. Rather, in my view, the Commerce Clause provides an adequate basis for the statute before us. And I would uphold its constitutionality as the "necessary and proper" exercise of legislative power granted to Congress by that Clause.

## References

15A Am Jur 2d, Commerce 9, 16, 78-80; 16B Am Jur 2d, Constitutional Law 826, 827, 829, 835

USCS, Constitution, Art I, 8, cl 3; USCS, Constitution, Amendment 14; 42 USCS 13981

L Ed Digest, Commerce 86; Constitutional Law 7

L Ed Index, Sex Discrimination

Annotation References:

Supreme Court's view as to applicability, to conduct of private person or entity, of equal protection and due process clauses of the Fourteenth Amendment. 42 L Ed 2d 922.

[****114] Sex discrimination-- Supreme Court cases. 27 L Ed 2d 935.

---

End of Document

# Crane v. Kentucky

476 U.S. 683 (1986)

Cited in Opening Brief at: 48

Highlighted language appears at 476 U.S. at 690.

Caution
As of: September 14, 2026 7:10 PM Z

# Crane v. Ky.

Supreme Court of the United States

April 23, 1986, Argued ; June 9, 1986, Decided

No. 85-5238

**Reporter**
476 U.S. 683 *; 106 S. Ct. 2142 **; 90 L. Ed. 2d 636 ***; 1986 U.S. LEXIS 89 ****; 54 U.S.L.W. 4598

CRANE v. KENTUCKY

**Prior History:** [****1] CERTIORARI TO THE SUPREME COURT OF KENTUCKY.

**Disposition:** 690 S. W. 2d 753, reversed and remanded.

## Syllabus

Prior to his trial for murder in a Kentucky court, petitioner moved to suppress his confession. Following a hearing, the trial court determined that the confession was voluntary and denied the motion. At trial, petitioner, who was 16 years old at the time of his arrest, sought to introduce testimony describing the length of the interrogation and the manner in which it was conducted. In attempting to introduce such testimony, petitioner hoped to show that the confession, which was the principal component of the State's case, was unworthy of belief. The trial court ruled that the testimony pertained solely to the issue of voluntariness and was therefore inadmissible. The jury returned a verdict of guilty. The Kentucky Supreme Court affirmed, rejecting petitioner's claim that the exclusion of the testimony violated his rights under the Sixth and Fourteenth Amendments.

*Held*: The exclusion of the testimony about the circumstances of his confession deprived petitioner of his fundamental constitutional right -- whether under the Due Process Clause of the Fourteenth Amendment [****2] or under the Compulsory Process or Confrontation Clauses of the Sixth Amendment -- to a fair opportunity to present a defense. Evidence about the manner in which a confession was secured, in addition to bearing on its voluntariness, often bears on its credibility, a matter that is exclusively for the jury to assess. The physical and psychological environment that yielded a confession is not only relevant to the legal question of voluntariness but can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence, especially in a case such as this where there apparently was no physical evidence to link petitioner to the crime. Respondent's argument that any error was harmless since the excluded evidence came in through other witnesses should be directed in the first instance to the state court. Pp. 687-692.

**Counsel:** Frank W. Heft, Jr., argued the cause for petitioner. With him on the briefs were J. David Niehaus and Daniel T. Goyette.

John S. Gillig, Assistant Attorney General of Kentucky, argued the cause for respondent. With him on the brief were David L. Armstrong, Attorney General, and Virgil W. Webb III, Assistant Attorney General.

**Judges:** O'CONNOR, [****3] J., delivered the opinion for a unanimous Court.

**Opinion by:** O'CONNOR

## Opinion

[*684] [***641] [**2143] JUSTICE O'CONNOR delivered the opinion of the Court.

[1A]Prior to his trial for murder, petitioner moved to suppress his confession. The trial judge conducted a hearing, determined that the confession was voluntary, and denied the motion. At trial, petitioner sought to introduce testimony about the physical and psychological environment in which the confession was obtained. His objective in so doing was to suggest that the statement was unworthy of belief. The trial court ruled that the testimony pertained solely to the issue of voluntariness and was therefore inadmissible. The question presented is whether this ruling deprived petitioner of his rights under the Sixth and Fourteenth Amendments to the Federal Constitution.

I

On August 7, 1981, a clerk at the Keg Liquor Store in Louisville, Kentucky, was shot to death, apparently during the course of a robbery. A complete absence of identifying physical evidence hampered the initial investigation of the crime. A week later, however, the police arrested petitioner, then 16 years old, for his suspected participation in an unrelated service station [****4] holdup. According to police testimony at the suppression hearing, "just out of the clear blue sky," petitioner began to confess to a host of local crimes, including shooting a police officer, robbing a hardware store, and robbing several individuals at a bowling alley. App. 4. Their curiosity understandably aroused, the police transferred petitioner to a juvenile detention center to continue the interrogation. After initially denying any involvement in the Keg Liquors shooting, petitioner eventually confessed to that crime as well.

Subsequent to his indictment for murder, petitioner moved to suppress the confession on the grounds that it had been impermissibly coerced in violation of the Fifth and Fourteenth [*685] Amendments to the Federal Constitution. At the ensuing hearing, he testified that he had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and been denied permission to telephone his mother, and that he had been badgered [**2144] into making a false confession. Several police officers offered a different version of the relevant [****5] events. Concluding that there had been "no sweating or coercion of the defendant" and "no overreaching" by the police, the court denied the motion. *Id*., at 21.

The case proceeded to trial. In his opening statement, the prosecutor stressed that the Commonwealth's case rested almost entirely on petitioner's confession and on the statement of his uncle, who had told the police that he was also present during the holdup and murder. Tr. 10-14. In response, defense counsel outlined what would prove to be the principal avenue of defense advanced at trial -- that, for a number of reasons, the story petitioner had told the police should not be believed. The confession was rife with inconsistencies, counsel argued. For example, petitioner had told the police that the crime was committed during daylight hours and that he [***642] had stolen a sum of money from the cash register. In fact, counsel told the jury, the evidence would show that the crime occurred at 10:40 p. m. and that no money at all was missing from the store. Beyond these inconsistencies, counsel suggested, "[the] very circumstances surrounding the giving of the [confession] are enough to cast doubt on its credibility." [****6] *Id*., at 16. In particular, she continued, evidence bearing on the length of the interrogation and the manner in which it was conducted would show that the statement was unworthy of belief.

In response to defense counsel's opening statement, and before any evidence was presented to the jury, the prosecutor moved *in limine* to prevent the defense from introducing any testimony bearing on the circumstances under which the [*686] confession was obtained. Such testimony bore only on the "voluntariness" of the confession, the prosecutor urged, a "legal matter" that had already been resolved by the court in its earlier ruling. App. 27. Defense counsel responded that she had no intention of relitigating the issue of voluntariness, but was seeking only to demonstrate that the circumstances of the confession "[cast] doubt on its validity and its credibility." *Ibid*. Rejecting this reasoning, the court granted the prosecutor's motion. Although the precise contours of the ruling are somewhat ambiguous, the court expressly held that the defense could inquire into the inconsistencies contained in the confession, but would not be permitted to "develop in front of the jury" any [****7] evidence about the duration of the interrogation or the individuals who were in attendance. *Id*., at 28.

After registering a continuing objection, petitioner invoked a Kentucky procedure under which he was permitted to develop a record of the evidence he would have put before the jury were it not for the court's evidentiary ruling. That evidence included testimony from two police officers about the size and other physical characteristics of the interrogation room, the length of the interview, and various other details about the taking of the confession. *Id*., at 45-53.

The jury returned a verdict of guilty, and petitioner was sentenced to 40 years in prison. The sole issue in the ensuing appeal to the Kentucky Supreme Court was whether the exclusion of testimony about the circumstances of the confession violated petitioner's rights under the Sixth and Fourteenth Amendments to the Federal Constitution. Over one dissent, the court rejected the claim and affirmed the conviction and sentence. 690 S. W. 2d 753 (1985). The excluded testimony "related solely to voluntariness," the court reasoned. *Id*., at 754. Although evidence bearing on [****8] the credibility of the confession would have been admissible, under established Kentucky procedure

a trial court's pretrial voluntariness determination is conclusive and may not be [*687] relitigated at trial. Because the proposed testimony about the circumstances of petitioner's confession pertained only to the voluntariness question, the court held, there was no error in keeping that testimony from the jury.

[**2145] [1B]Because the reasoning of the Kentucky Supreme Court is directly at odds with language in several of this Court's opinions, see, *e. g., Lego* v. *Twomey*, 404 U.S. 477, 485-486 (1972), and [***643] because it conflicts with the decisions of every other state court to have confronted the issue, see, *e. g., Beaver* v. *State*, 455 So. 2d 253, 256 (Ala. Crim. App. 1984); *Palmes* v. *State*, 397 So. 2d 648, 653 (Fla. 1981), we granted the petition for certiorari. 474 U.S. 1019 (1985). We now reverse and remand.

II

[1C] The holding below rests on the apparent assumption that evidence bearing on the voluntariness of a confession and evidence bearing on its credibility fall in conceptually distinct [****9] and mutually exclusive categories. Once a confession has been found voluntary, the Supreme Court of Kentucky believed, the evidence that supported that finding may not be presented to the jury for any other purpose. This analysis finds no support in our cases, is premised on a misconception about the role of confessions in a criminal trial, and, under the circumstances of this case, contributed to an evidentiary ruling that deprived petitioner of his fundamental constitutional right to a fair opportunity to present a defense. *California* v. *Trombetta*, 467 U.S. 479, 485 (1984).

[2]It is by now well established that "certain interrogation techniques, either in isolation, or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller* v. *Fenton*, 474 U.S. 104, 109 (1985). To assure that the fruits of such techniques are never used to secure a conviction, due process also requires "that a jury [not] hear a confession unless and until the trial judge [or some [*688] other independent decisionmaker] [****10] has determined that it was freely and voluntarily given." *Sims* v. *Georgia*, 385 U.S. 538, 543-544 (1967). See generally *Jackson* v. *Denno*, 378 U.S. 368 (1964).

[3]In laying down these rules the Court has never questioned that "evidence surrounding the making of a confession bears on its credibility" as well as its voluntariness. *Id.*, at 386, n. 13. As the Court noted in *Jackson*, because "questions of credibility, whether of a witness or of a confession, are for the jury," the requirement that the court make a pretrial *voluntariness* determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial. *Ibid*. To the same effect was *Lego* v. *Twomey, supra*, where the Court stated,

"Nothing in *Jackson* [v. *Denno*] questioned the province or capacity of juries to assess the truthfulness of confessions. Nothing in that opinion took from the jury any evidence relating to the accuracy or weight of confessions admitted into evidence. A defendant has been as free since *Jackson* as he was before to familiarize [****11] a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness." *Id.*, at 485-486.

Thus, as *Lego* and *Jackson* make clear, to the extent the Court has [***644] addressed the question at all, it has expressly assumed that evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess.

[4]The decisions in both *Jackson* and *Lego*, while not framed in the language of constitutional command, reflect the common-sense understanding that the circumstances surrounding the taking of a confession can be highly relevant to two separate inquiries, one legal and one factual. The manner in which a statement was extracted [**2146] is, of course, relevant to the purely legal question of its voluntariness, a question most, but not all, States assign to the trial judge alone to resolve. [*689] See *Jackson* v. *Denno, supra*, at 378. But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's [****12] guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be "insufficiently corroborated or otherwise . . . unworthy of belief." *Lego* v. *Twomey, supra*, at 485-486. Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one

question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt? Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.

[1D] [5]This simple insight is reflected in a federal statute, 18 U. S. C. § 3501(a), the Federal Rules of Evidence, Fed. Rule Evid. 104(e), and the statutory and decisional law of virtually every State in the Nation. See, *e. g.*, Mont. Code Ann. [****13] § 46-13-301(5) (1983); *Palmes* v. *State, supra*, at 653. We recognize, of course, that under our federal system even a consensus as broad as this one is not inevitably congruent with the dictates of the Constitution. We acknowledge also our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts. In any given criminal case the trial judge is called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence. As we reaffirmed earlier this Term, the Constitution leaves to the judges who must make these decisions "wide latitude" to exclude evidence that is "repetitive . . . , only marginally relevant" or poses an undue risk of [*690] "harassment, prejudice, [or] confusion of the issues." *Delaware* v. *Van Arsdall*, 475 U.S. 673, 679 (1986). Moreover, we have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability -- even if the defendant would prefer to see that evidence admitted. *Chambers* v. *Mississippi*, 410 U.S. 284, 302 (1973). [****14] Nonetheless, [***645] without "[signaling] any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures," we have little trouble concluding on the facts of this case that the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial. *Id.*, at 302-303.

[6] [7]Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers* v. *Mississippi, supra*, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, *Washington* v. *Texas*, 388 U.S. 14, 23 (1967); *Davis* v. *Alaska*, 415 U.S. 308 (1974), the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *California* v. *Trombetta*, 467 U.S., at 485; cf. *Strickland* v. *Washington*, 466 U.S. 668, 684-685 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment"). We break no new ground in observing that an essential [****15] component of procedural fairness is an opportunity [**2147] to be heard. *In re Oliver*, 333 U.S. 257, 273 (1948); *Grannis* v. *Ordean*, 234 U.S. 385, 394 (1914). That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and "survive the crucible [*691] of meaningful adversarial testing." *United States* v. *Cronic*, 466 U.S. 648, 656 (1984). See also *Washington* v. *Texas, supra*, at 22-23.

[1E]Under these principles, the Kentucky courts erred in foreclosing petitioner's efforts to introduce testimony about the environment in which the police secured his confession. As both *Lego* and *Jackson* make clear, evidence about the manner in which a confession was obtained is often highly relevant to its reliability and credibility. Such evidence was especially relevant [****16] in the rather peculiar circumstances of this case. Petitioner's entire defense was that there was no physical evidence to link him to the crime and that, for a variety of reasons, his earlier admission of guilt was not to be believed. To support that defense, he sought to paint a picture of a young, uneducated boy who was kept against his will in a small, windowless room for a protracted period of time until he confessed to every unsolved crime in the county, including the one for which he now stands convicted. We do not, of course, pass on the strength or merits of that defense. We do, however, think it plain that introducing evidence of the physical circumstances that yielded the confession was all but indispensable to any chance of its succeeding. Especially since neither the Supreme Court of Kentucky in its opinion, nor respondent in its [***646] argument to this Court, has advanced any rational justification for the wholesale exclusion of this body of potentially exculpatory evidence, the decision below must be reversed.

[8]Respondent contends that any error was harmless since the very evidence excluded by the trial court's ruling ultimately came in through other witnesses. [****17] Petitioner concedes, and we agree, that the

erroneous ruling of the trial court is subject to harmless error analysis. Tr. of Oral Arg. 7; cf. *Delaware* v. *Van Arsdall, supra*. We believe, however, that respondent's harmless error argument should be directed in the first instance to the state court.

[*692] Accordingly, the judgment of the Supreme Court of Kentucky is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*So ordered*.

## References

21A Am Jur 2d, Criminal Law 640, 646, 647; 29 Am Jur 2d, Evidence 587; 75 Am Jur 2d, Trial 126

22 Am Jur Proof of Facts 2d 539, Involuntary Confession: Psychological Coercion

USCS, Constitution, Amendments 6, 14

US L Ed Digest, Constitutional Law 839.5; Criminal Law 46, 50; Trial 15, 19; Witnesses 4

Index to Annotations, Confessions and Admissions; Constitutional Law; Criminal Law; Exclusion and Suppression of Evidence

Annotation References:

Federal constitutional right to confront witnesses. 23 L Ed 2d 853.

Propriety and prejudicial effect of presence of jury during court's inquiry [****18] into voluntariness of accused's confession. 19 L Ed 2d 1313.

Construction of provision of Rule 43(c) of the Federal Rules of Civil Procedure ,and similar state provisions, providing for entry into record of evidence excluded by trial court. 9 ALR3d 508.

Voluntariness and admissibility of minor's confession. 87 ALR2d 624.

End of Document

# Rodriguez v. United States

575 U.S. 348 (2015)

Cited in Opening Brief at: 51

Highlighted language appears at 575 U.S. at 354.

Caution
As of: September 14, 2026 7:10 PM Z

# Rodriguez v. United States

Supreme Court of the United States

January 21, 2015, Argued; April 21, 2015, Decided

No. 13-9972

**Reporter**
575 U.S. 348 *; 135 S. Ct. 1609 **; 191 L. Ed. 2d 492 ***; 2015 U.S. LEXIS 2807 ****; 83 U.S.L.W. 4241; 2015 LX 32617; 25 Fla. L. Weekly Fed. S 191

DENNYS RODRIGUEZ, Petitioner v. UNITED STATES

**Notice:** The LEXIS pagination of this document is subject to change pending release of the final published version.

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

United States v. Rodriguez, 741 F.3d 905, 2014 U.S. App. LEXIS 1897 (8th Cir. Neb., 2014)

**Disposition:** Vacated and remanded.

## Syllabus

[*348] [**1610] Officer Struble, a K-9 officer, stopped petitioner Rodriguez for driving on a highway shoulder, a violation of Nebraska law. After Struble attended to everything relating to the stop, including, *inter alia,* checking the driver's licenses of Rodriguez and his passenger and issuing a warning for the traffic offense, he asked Rodriguez for permission to walk his dog around the vehicle. When Rodriguez refused, Struble detained him until a second officer arrived. Struble then retrieved his dog, who alerted to the presence of drugs in the vehicle. The ensuing search revealed methamphetamine. Seven or eight minutes elapsed from the time Struble issued the written warning until the dog alerted.

Rodriguez was indicted on federal drug charges. He moved to suppress the evidence seized from the vehicle on the ground, among others, that Struble had prolonged the traffic stop without reasonable suspicion in order to conduct the dog sniff. The Magistrate Judge recommended denial of the motion. He found no reasonable suspicion supporting detention [**1611] once Struble issued the written warning. Under Eighth [****2] Circuit precedent, however, he concluded that prolonging the stop by “seven to eight minutes” for [***495] the dog sniff was only a *de minimis* intrusion on Rodriguez's Fourth Amendment rights and was for that reason permissible. The District Court then denied the motion to suppress. Rodriguez entered a conditional guilty plea and was sentenced to five years in prison. The Eighth Circuit affirmed. Noting that the seven or eight minute delay was an acceptable “*de minimis* intrusion on Rodriguez's personal liberty,” the court declined to reach the question whether Struble had reasonable suspicion to continue Rodriguez's detention after issuing the written warning.

*Held:*

1. Absent reasonable suspicion, police extension of a traffic stop in order to conduct a dog sniff violates the Constitution's shield against unreasonable seizures.

A routine traffic stop is more like a brief stop under *Terry* v. *Ohio*, 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889, than an arrest, see, *e.g., Arizona* v. *Johnson*, 555 U. S. 323, 330, 129 S. Ct. 781, 172 L. Ed. 2d 694. Its tolerable duration is determined by the seizure's “mission,” which is to address the traffic violation that warranted the stop, *Illinois* v. *Caballes*, 543 U. S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842, and attend to related safety concerns. [*349] Authority for the seizure ends when tasks tied to the traffic infraction are--or reasonably should have been--completed. The Fourth Amendment may tolerate [****3] certain unrelated investigations that do not lengthen the roadside detention, *Johnson*, 555 U. S., at 327-328, 129 S. Ct. 781, 172 L. Ed. 2d 694 (questioning); *Caballes*, 543 U. S., at 406, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842 (dog sniff), but a traffic stop “become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission” of issuing a warning ticket, *id.,* at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842.

Beyond determining whether to issue a traffic ticket, an officer's mission during a traffic stop typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. See *Delaware* v. *Prouse*, 440 U. S. 648, 658-659, 99 S. Ct. 1391, 59 L. Ed. 2d 660. Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission.

In concluding that the *de minimis* intrusion here could be offset by the Government's interest in stopping the flow of illegal drugs, the Eighth Circuit relied on *Pennsylvania* v. *Mimms*, 434 U. S. 106, 98 S. Ct. 330, 54 L. Ed. 2d 331. The Court reasoned in *Mimms* that the government's "legitimate and weighty" interest in officer safety outweighed the "*de minimis*" additional intrusion of requiring a driver, lawfully stopped, [****4] to exit a vehicle, *id.,* at 110-111, 98 S. Ct. 330, 54 L. Ed. 2d 331. The officer-safety interest recognized in *Mimms*, however, stemmed from the danger to the officer associated with the traffic stop itself. On-scene investigation into other crimes, in contrast, detours from the officer's traffic-control mission and therefore gains no support from *Mimms*.

The Government's argument that an officer who completes all traffic- [***496] related tasks expeditiously should earn extra time to pursue an unrelated criminal investigation is unpersuasive, for a traffic stop "prolonged beyond" the time in fact needed for the officer to complete his traffic-based inquiries is "unlawful," [**1612] *Caballes*, 543 U. S., at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842. The critical question is not whether the dog sniff occurs before or after the officer issues a ticket, but whether conducting the sniff adds time to the stop. Pp. 354-357, 191 L. Ed. 2d, at 496-498.

2. The determination adopted by the District Court that detention for the dog sniff was not independently supported by individualized suspicion was not reviewed by the Eighth Circuit. That question therefore remains open for consideration on remand. Pp. 357-358, 191 L. Ed. 2d, at 498.

741 F. 3d 905, vacated and remanded.

**Counsel:** Shannon P. O'Connor argued the cause for petitioner

Ginger D. Anders argued the cause for respondent

**Judges:** Ginsburg, J., delivered the opinion of the Court, in which Roberts, C. J., and Scalia, Breyer, Sotomayor, and Kagan, JJ., joined. [****5] Kennedy, J., filed a dissenting opinion, *post*, p.358. Thomas, J., filed a dissenting opinion, in which Alito, J., joined, and in which Kennedy, J., joined as to all but Part III, *post*, p.358. Alito, J., filed a dissenting opinion, *post*, p.370.

**Opinion by:** Ginsburg

# Opinion

[*350] Justice **Ginsburg** delivered the opinion of the Court.

In *Illinois* v. *Caballes*, 543 U. S. 405, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005), this Court held that a dog sniff conducted during a lawful traffic stop does not violate the Fourth Amendment's proscription of unreasonable seizures. This case presents the question whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop. We hold that [1] a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete [*351] th[e] mission" of issuing a ticket for the violation. *Id*., at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842. The Court so recognized in *Caballes*, and we adhere to the line drawn in that decision.

I

Just after midnight on March 27, 2012, police officer Morgan Struble observed a Mercury Mountaineer veer slowly onto the shoulder of Nebraska State Highway 275 for one or two seconds and then jerk back onto the road. Nebraska [****6] law prohibits driving on highway shoulders, see Neb. Rev. Stat. §60-6,142 (2010), and on that basis, Struble pulled the Mountaineer over at 12:06 a.m. Struble is a K-9 officer with the Valley Police Department in Nebraska, and his dog Floyd was in his patrol car that night. Two men were in the Mountaineer: the driver, Dennys Rodriguez, and a front-seat passenger, Scott Pollman.

[**1613] Struble approached the Mountaineer on the passenger's side. After Rodriguez identified himself,

Struble asked him why he had driven onto the shoulder. Rodriguez replied that he had swerved to avoid a pothole. Struble then gathered Rodriguez's license, registration, and proof of insurance, [***497] and asked Rodriguez to accompany him to the patrol car. Rodriguez asked if he was required to do so, and Struble answered that he was not. Rodriguez decided to wait in his own vehicle.

After running a records check on Rodriguez, Struble returned to the Mountaineer. Struble asked passenger Pollman for his driver's license and began to question him about where the two men were coming from and where they were going. Pollman replied that they had traveled to Omaha, Nebraska, to look at a Ford Mustang that was for sale and that they were returning to Norfolk, [****7] Nebraska. Struble returned again to his patrol car, where he completed a records check on Pollman, and called for a second officer. Struble then began writing a warning ticket for Rodriguez for driving on the shoulder of the road.

[*352] Struble returned to Rodriguez's vehicle a third time to issue the written warning. By 12:27 or 12:28 a.m., Struble had finished explaining the warning to Rodriguez, and had given back to Rodriguez and Pollman the documents obtained from them. As Struble later testified, at that point, Rodriguez and Pollman "had all their documents back and a copy of the written warning. I got all the reason[s] for the stop out of the way[,] . . . took care of all the business." App. 70.

Nevertheless, Struble did not consider Rodriguez "free to leave." *Id.,* at 69-70. Although justification for the traffic stop was "out of the way," *id.,* at 70, Struble asked for permission to walk his dog around Rodriguez's vehicle. Rodriguez said no. Struble then instructed Rodriguez to turn off the ignition, exit the vehicle, and stand in front of the patrol car to wait for the second officer. Rodriguez complied. At 12:33 a.m., a deputy sheriff arrived. Struble retrieved his dog and led him twice around the Mountaineer. [****8] The dog alerted to the presence of drugs halfway through Struble's second pass. All told, seven or eight minutes had elapsed from the time Struble issued the written warning until the dog indicated the presence of drugs. A search of the vehicle revealed a large bag of methamphetamine.

Rodriguez was indicted in the United States District Court for the District of Nebraska on one count of possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U. S. C. §§841(a)(1) and (b)(1). He moved to suppress the evidence seized from his car on the ground, among others, that Struble had prolonged the traffic stop without reasonable suspicion in order to conduct the dog sniff.

After receiving evidence, a Magistrate Judge recommended that the motion be denied. The Magistrate Judge found no probable cause to search the vehicle independent of the dog alert. App. 100 (apart from "information given by the dog," "Officer Struble had [no]thing other than a rather [*353] large hunch"). He further found that no reasonable suspicion supported the detention once Struble issued the written warning. He concluded, however, that under Eighth Circuit precedent, extension of the stop by "seven to eight minutes" for the dog [****9] sniff was only a *de minimis* intrusion on Rodriguez's Fourth Amendment rights and was therefore permissible.

The District Court adopted the Magistrate Judge's factual findings and legal conclusions and denied Rodriguez's motion to suppress. The [***498] court noted that, in the Eighth Circuit, "dog sniffs that occur within a short time following the completion of [**1614] a traffic stop are not constitutionally prohibited if they constitute only de minimis intrusions." *Id.*, at 114 (quoting *United States* v. *Alexander*, 448 F. 3d 1014, 1016 (CA8 2006)). The court thus agreed with the Magistrate Judge that the "7 to 10 minutes" added to the stop by the dog sniff "was not of constitutional significance." App. 114. Impelled by that decision, Rodriguez entered a conditional guilty plea and was sentenced to five years in prison.

The Eighth Circuit affirmed. The "seven- or eight-minute delay" in this case, the opinion noted, resembled delays that the court had previously ranked as permissible. 741 F. 3d 905, 907 (2014). The Court of Appeals thus ruled that the delay here constituted an acceptable "*de minimis* intrusion on Rodriguez's personal liberty." *Id.,* at 908. Given that ruling, the court declined to reach the question whether Struble had reasonable suspicion to continue Rodriguez's detention after issuing the written [****10] warning.

We granted certiorari to resolve a division among lower courts on the question whether police routinely may extend an otherwise-completed traffic stop, absent reason-able suspicion, in order to conduct a dog sniff. 573 U. S. 991, 135 S. Ct. 43, 189 L. Ed. 2d 896 (2014). Compare, *e.g., United States* v. *Morgan*, 270 F. 3d 625, 632 (CA8 2001) (postcompletion delay of "well under

ten minutes" permissible), with, *e.g., State* v. *Baker*, 2010 UT 18, ¶13, 229 P. 3d 650, 658 (2010) ("[W]ithout additional reasonable [*354] suspicion, the officer must allow the seized person to depart once the purpose of the stop has concluded.").

II

[2] A seizure for a traffic violation justifies a police investigation of that violation. "[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called '*Terry* stop' . . . than to a formal arrest." *Knowles* v. *Iowa*, 525 U. S. 113, 117, 119 S. Ct. 484, 142 L. Ed. 2d 492 (1998) (quoting *Berkemer* v. *McCarty*, 468 U. S. 420, 439, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984), in turn citing *Terry* v. *Ohio*, 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). See also *Arizona* v. *Johnson*, 555 U. S. 323, 330, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009). Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, *Caballes*, 543 U. S., at 407 125 S. Ct. 834, 160 L. Ed. 2d 842, and attend to related safety concerns, *infra*, at 356-357, 191 L. Ed. 2d, at 499-500. See also *United States* v. *Sharpe*, 470 U. S. 675, 685, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985); *Florida* v. *Royer*, 460 U. S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." *[****11] Ibid.* See also *Caballes*, 543 U. S., at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. See *Sharpe*, 470 U. S., at 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").

[***499] Our decisions in *Caballes* and *Johnson* heed these constraints. In both cases, we concluded that[3] the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention. *Johnson*, 555 U. S., at 327-328, 129 S. Ct. 781, 172 L. Ed. 2d 694 (questioning); *Caballes*, 543 U. S., at 406, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842 (dog sniff). In *Caballes*, however, we cautioned that a traffic stop "can become un [**1615] lawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a [*355] warning ticket. 543 U. S., at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842. And we repeated that admonition in *Johnson*: The seizure remains lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop." 555 U. S., at 333, 129 S. Ct. 781, 172 L. Ed. 2d 694. See also *Muehler* v. *Mena*, 544 U. S. 93, 101, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005) (because unrelated inquiries did not "exten[d] the time [petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was required"). An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But contrary to Justice Alito's suggestion, *post,* at 372, n. 2, 191 L. Ed. 2d, at 510, he may not do so in a way that prolongs [****12] the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual. But see *post*, at 370, 191 L. Ed. 2d, at 508-509 (Alito, J., dissenting) (premising opinion on the dissent's own finding of "reasonable suspicion," although the District Court reached the opposite conclusion, and the Court of Appeals declined to consider the issue).

[4] Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." *Caballes*, 543 U. S., at 408, 125 S. Ct. 834, 160 L. Ed. 2d 842. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. See *Delaware* v. *Prouse*, 440 U. S. 648, 658-660, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979). See also 4 W. LaFave, Search and Seizure §9.3(c), pp. 507-517 (5th ed. 2012). These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. See *Prouse,* 440 U. S., at 658-659, 99 S. Ct. 1391, 59 L. Ed. 2d 660; LaFave, Search and Seizure §9.3(c), at 516 (A "warrant check makes it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.").

[5] A dog sniff, by contrast, is a measure aimed at "detect[ing] evidence of ordinary criminal wrongdoing." *Indianapolis* v. *Edmond*, 531 U. S. 32, 40-41, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000). See also *Florida* v. *Jardines*, 569 U. S. 1, 9-10, 569 U.S. 1, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013). Candidly, [****13] the Government [*356] acknowledged at oral argument that a dog sniff, unlike the routine measures just mentioned, is not an ordinary incident of a traffic stop. See Tr. of Oral Arg. 33. [6] Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission.

In advancing its *de minimis* rule, the Eighth Circuit relied heavily on our decision in *Pennsylvania* v. *Mimms*, 434 U. S. 106, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (*per curiam*). [***500] See *United States* v. *$404,905.00 in U. S. Currency*, 182 F. 3d 643, 649 (CA8 1999). In *Mimms*, we reasoned that the government's "legitimate and weighty" interest in officer safety outweighs the "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle. 434 U. S., at 110-111, 98 S. Ct. 330, 54 L. Ed. 2d 331. See also *Maryland* v. *Wilson*, 519 U. S. 408, 413-415, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997) (passengers may be required to exit vehicle stopped for traffic violation). The Eighth Circuit, echoed in JUSTICE THOMAS's dissent, believed that the imposition here similarly could be offset by the Government's "strong interest in interdicting the flow of illegal drugs along the nation's highways." *$404,905.00 in U. S. Currency*, 182 F. 3d, at 649; see *post,* at 366, 191 L. Ed. 2d, at 506.

[**1616] Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself. Traffic stops are "especially fraught with danger to police officers," [****14] *Johnson*, 555 U. S., at 330, 129 S. Ct. 781, 172 L. Ed. 2d 694 (internal quotation marks omitted), so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely. Cf. *United States* v. *Holt*, 264 F. 3d 1215, 1221-1222 (CA10 2001) (en banc) (recognizing officer safety justification for criminal record and outstanding warrant checks), abrogated on other grounds as recognized in *United States* v. *Stewart*, 473 F. 3d 1265, 1269 (CA10 2007). On-scene investigation into other crimes, however, detours from that mission. See *supra,* at 355, 191 L. Ed. 2d, at 499-500. So too do safety precautions taken in order to facilitate such detours. But cf. *post,* at 371-372, 191 L. Ed. 2d, at 509-510 (Alito, J., dissenting). [*357] Thus, even assuming that the imposition here was no more intrusive than the exit order in *Mimms*, the dog sniff could not be justified on the same basis. Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular.

The Government argues that an officer may "incremental[ly]" prolong a stop to conduct a dog sniff so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances. Brief for United States 36-39. The Government's argument, in [****15] effect, is that by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation. See also *post,* at 360-362, 191 L. Ed. 2d, at 502-504 (Thomas, J., dissenting) (embracing the Government's argument). [7] The reasonableness of a seizure, however, depends on what the police in fact do. See *Knowles*, 525 U. S., at 115-117, 119 S. Ct. 484, 142 L. Ed. 2d 492. In this regard, the Government acknowledges that "an officer always has to be reasonably diligent." Tr. of Oral Arg. 49. How could diligence be gauged other than by noting what the officer actually did and how he did it? [8] If an officer can complete traffic-based inquiries expeditiously, then that is the amount of "time reasonably required to complete [the stop's] mission." *Caballes*, 543 U. S., at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842. As we said in *Caballes* and reiterate today, a traffic stop "prolonged beyond" that point is "unlawful." [***501] *Ibid.* The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, as Justice Alito supposes, *post,* at 370-372, 191 L. Ed. 2d, at 509, but whether conducting the sniff "prolongs"—*i.e.,* adds time to—"the stop," *supra,* at 355, 191 L. Ed. 2d, at 499.

III

The Magistrate Judge found that detention for the dog sniff in this case was not independently supported by individualized suspicion, see App. 100, and the [****16] District Court [*358] adopted the Magistrate Judge's findings, see *id.*, at 112-113, . The Court of Appeals, however, did not review that determination. But see *post,* at 359, 367-369, 191 L. Ed. 2d, at 501, 507-508 (Thomas, J., dissenting) (resolving the issue, nevermind that the Court of Appeals left it unaddressed); *post,* at 370, 191 L. Ed. 2d, at 508-509 (Alito, J., dissenting) (upbraiding the Court for addressing the sole issue decided by the Court of Appeals and characterizing the Court's answer as "unnecessary" because the Court, instead, should have decided an issue the Court of Appeals did not decide). The question whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction [**1617] investigation, therefore, remains open for Eighth Circuit consideration on remand.

* * *

For the reasons stated, the judgment of the United States Court of Appeals for the Eighth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

**Dissent by:** Kennedy; Thomas; Alito

## Dissent

Justice **Kennedy**, dissenting.

My join in Justice Thomas' dissenting opinion does not extend to Part III. Although the issue discussed in that Part was argued here, the Court of Appeals has not addressed that aspect of the [****17] case in any detail. In my view the better course would be to allow that court to do so in the first instance.

Justice Thomas, with whom Justice Alito joins, and with whom Justice Kennedy joins as to all but Part III, dissenting.

Ten years ago, we explained that "conducting a dog sniff [does] not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner." *Illinois* v. *Caballes*, 543 U. S. 405, 408, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). The [*359] only question here is whether an officer executed a stop in a reasonable manner when he waited to conduct a dog sniff until after he had given the driver a written warning and a backup unit had arrived, bringing the overall duration of the stop to 29 minutes. Because the stop was reasonably executed, no Fourth Amendment violation occurred. The Court's holding to the contrary cannot be reconciled with our decision in *Caballes* or a number of common police practices. It was also unnecessary, as the officer possessed reasonable suspicion to continue to hold the driver to conduct the dog sniff. I respectfully dissent.

I

The Fourth Amendment protects "[t]he right of the people to be secure [***502] in their persons, houses, papers, and effects, against unreasonable searches and seizures." U. S. Const., Amdt. 4. As the text indicates, and as we [****18] have repeatedly confirmed, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City* v. *Stuart*, 547 U. S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). We have defined reasonableness "in objective terms by examining the totality of the circumstances," *Ohio* v. *Robinette*, 519 U. S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996), and by considering "the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the framing," *Atwater* v. *Lago Vista*, 532 U. S. 318, 326, 121 S. Ct. 1536, 149 L. Ed. 2d 549 (2001) (internal quotation marks omitted). When traditional protections have not provided a definitive answer, our precedents have "analyzed a search or seizure in light of traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Virginia* v. *Moore*, 553 U. S. 164, 171, 128 S. Ct. 1598, 170 L. Ed. 2d 559 (2008) (internal quotation marks omitted).

Although a traffic stop "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]," such a seizure [*360] is constitutionally "reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren* v. *United States*, 517 U. S. 806, 809-810, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). But "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests [**1618] protected by the Constitution." *Caballes*, *supra,* at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842.

Because Rodriguez does [****19] not dispute that Officer Struble had probable cause to stop him, the only question is whether the stop was otherwise executed in a reasonable manner. See Brief for Appellant in No. 13-1176 (CA8), p. 4, n. 2. I easily conclude that it was. Approximately 29 minutes passed from the time Officer Struble stopped Rodriguez until his narcotics-detection dog alerted to the presence of drugs. That amount of time is hardly out of the ordinary for a traffic stop by a single officer of a vehicle containing multiple occupants even when no dog sniff is involved. See, *e.g., United States* v. *Ellis*, 497 F. 3d 606 (CA6 2007) (22 minutes); *United States* v. *Barragan*, 379 F. 3d 524 (CA8 2004) (approximately 30 minutes). During that time, Officer Struble conducted the ordinary activities of a traffic stop—he approached the vehicle, questioned Rodriguez about the observed violation, asked Pollman about their travel plans, ran serial warrant checks on Rodriguez and Pollman, and issued a written warning to Rodriguez. And when he decided to conduct a dog sniff, he took the precaution of calling for backup out of concern for his safety. See 741 F. 3d 905, 907 (CA8 2014); see also *Pennsylvania* v. *Mimms*, 434 U. S. 106, 110, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (*per curiam*) (officer safety is a "legitimate and weighty" concern relevant to reasonableness).

As *Caballes* makes clear, the fact that Officer Struble

waited [****20] until after he gave Rodriguez the warning to conduct the dog sniff does not alter this analysis. Because "the use of a well-trained narcotics-detection dog . . . generally does not implicate legitimate [***503] privacy interests," 543 U. S., at 409, 125 S. Ct. 834, 160 L. Ed. 2d 842, "conducting a dog sniff would not change the character of a [*361] traffic stop that is lawful at its inception and otherwise executed in a reasonable manner," *id.,* at 408, 125 S. Ct. 834, 160 L. Ed. 2d 842. The stop here was "lawful at its inception and otherwise executed in a reasonable manner." *Ibid*. As in *Caballes*, "conducting a dog sniff [did] not change the character of [the] traffic stop," *ibid.*, and thus no Fourth Amendment violation occurred.

II

Rather than adhere to the reasonableness requirement that we have repeatedly characterized as the "touchstone of the Fourth Amendment," *Brigham City*, *supra*, at 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650, the majority constructed a test of its own that is inconsistent with our precedents.

A

The majority's rule requires a traffic stop to "en[d] when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Ante*, at 354, 191 L. Ed. 2d, at 498. "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission" and he may hold the individual no longer. *Ante*, at 357, 191 L. Ed. 2d, at 500 (internal [****21] quotation marks and alterations omitted). The majority's rule thus imposes a one-way ratchet for constitutional protection linked to the characteristics of the individual officer conducting the stop: If a driver is stopped by a particularly efficient officer, then he will be entitled to be released from the traffic stop after a shorter period of time than a driver stopped by a less efficient officer. Similarly, if a driver is stopped by an officer with access to technology that can shorten a records check, then he will be entitled to be released from the stop after a shorter period of time than an individual stopped by an officer without access to such technology.

I "cannot accept that the search and seizure protections of the Fourth Amendment [**1619] are so variable and can be made to turn upon such trivialities." *Whren*, 517 U. S., at 815, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (citations omitted). We have repeatedly explained that the reasonableness [*362] inquiry must not hinge on the characteristics of the individual officer conducting the seizure. We have held, for example, that an officer's state of mind "does not invalidate [an] action taken as long as the circumstances, viewed objectively, justify that action." *Id.*, at 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (internal quotation marks omitted). We have spurned theories [****22] that would make the Fourth Amendment "change with local law enforcement practices." *Moore*, 553 U.S., at 172, 128 S. Ct. 1598, 170 L. Ed. 2d 559. And we have rejected a rule that would require the offense establishing probable cause to be "closely related to" the offense identified by the arresting officer, as such a rule would make "the constitutionality of an arrest . . . vary from place to place and from time to time, depending on whether the arresting officer states the reason for the detention and, if so, whether he correctly identifies a general class of offense for which probable cause exists." *Devenpeck* v. *Alford*, 543 U. S. 146, 154, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004) (internal quotation marks and citation omitted). In *Devenpeck*, a unanimous [***504] Court explained: "An arrest made by a knowledgeable, veteran officer would be valid, whereas an arrest made by a rookie *in precisely the same circumstances* would not. We see no reason to ascribe to the Fourth Amendment such arbitrarily variable protection." *Ibid.*

The majority's logic would produce similarly arbitrary results. Under its reasoning, a traffic stop made by a rookie could be executed in a reasonable manner, whereas the same traffic stop made by a knowledgeable, veteran officer *in precisely the same circumstances* might not, if in fact his knowledge and experience made him capable [****23] of completing the stop faster. We have long rejected interpretations of the Fourth Amendment that would produce such haphazard results, and I see no reason to depart from our consistent practice today.

B

As if that were not enough, the majority also limits the duration of the stop to the time it takes the officer to complete [*363] a narrow category of "traffic-based inquiries." *Ante,* at 357, 191 L. Ed. 2d, at 500. According to the majority, these inquiries include those that "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Ante,* at 355, 191 L. Ed. 2d, at 499. Inquiries directed to "detecting evidence of ordinary criminal wrongdoing" are not traffic-related inquiries and thus cannot count toward the overall duration of the stop. *Ibid*. (internal quotation marks and alteration omitted).

The combination of that definition of traffic-related inquiries with the majority's officer-specific durational limit produces a result demonstrably at odds with our decision in *Caballes*. *Caballes* expressly anticipated that a traffic stop could be *reasonably* prolonged for officers to engage in a dog sniff. We explained that no Fourth Amendment violation had occurred in *Caballes*, where the "duration of the stop [****24] . . . was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop," but suggested a different result might attend a case "involving a dog sniff that occurred during an *unreasonably* prolonged traffic stop." 543 U. S., at 407-408, 125 S. Ct. 834, 160 L. Ed. 2d 842 (emphasis added). The dividing line was whether the overall duration of the stop exceeded "the time reasonably required to complete th[e] mission," *id.,* at 407, 125 S. Ct. 834, 160 L. Ed. 2d 842, not, as the majority suggests, whether the duration of the stop "in fact" exceeded the time necessary [**1620] to complete the traffic-related inquiries, *ante,* at 357, 191 L. Ed. 2d, at 500.

The majority's approach draws an artificial line between dog sniffs and other common police practices. The lower courts have routinely confirmed that warrant checks are a constitutionally permissible part of a traffic stop, see, *e.g., United States* v. *Simmons*, 172 F. 3d 775, 778 (CA11 1999); *United States* v. *Mendez*, 118 F. 3d 1426, 1429 (CA10 1997); *United States* v. *Shabazz*, 993 F. 2d 431, 437 (CA5 1993), and the majority confirms that it finds no fault in these measures, *ante,* at 355, 191 L. Ed. 2d, at 499. Yet its reasoning suggests the opposite. Such warrant checks look more like they are directed to "detecting [*364] evidence of ordinary criminal wrongdoing" than to "ensuring that vehicles on the road are operated safely and responsibly." *Ibid,* (internal quotation [***505] marks and alteration omitted). Perhaps one could argue that the existence [****25] of an outstanding warrant might make a driver less likely to operate his vehicle safely and responsibly on the road, but the same could be said about a driver in possession of contraband. A driver confronted by the police in either case might try to flee or become violent toward the officer. But under the majority's analysis, a dog sniff, which is directed at uncovering that problem, is not treated as a traffic-based inquiry. Warrant checks, arguably, should fare no better. The majority suggests that a warrant check is an ordinary inquiry incident to a traffic stop because it can be used "'to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.'" *Ibid,* (quoting 4 W. LaFave, Search and Seizure §9.3(c), p. 516 (5th ed. 2012)). But as the very treatise on which the majority relies notes, such checks are a "manifest[ation of] the 'war on drugs' motivation so often underlying [routine traffic] stops," and thus are very much like the dog sniff in this case. *Id.*, at 507-508.

Investigative questioning rests on the same basis as the dog sniff. "Asking questions is an essential part of police investigations." *Hiibel* v. *Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U. S. 177, 185, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004). And the lower courts have routinely [****26] upheld such questioning during routine traffic stops. See, *e.g., United States* v. *Rivera*, 570 F. 3d 1009, 1013 (CA8 2009); *United States* v. *Childs*, 277 F. 3d 947, 953-954 (CA7 2002). The majority's reasoning appears to allow officers to engage in *some* questioning aimed at detecting evidence of ordinary criminal wrongdoing. *Ante,* at 354, 191 L. Ed. 2d, at 498. But it is hard to see how such inquiries fall within the "seizure's 'mission' [of] address[ing] the traffic violation that warranted the stop," or "attend[ing] to related safety concerns." *Ibid.* Its reasoning appears to come down to the principle that dogs are different.

[*365] C

On a more fundamental level, the majority's inquiry elides the distinction between traffic stops based on probable cause and those based on reasonable suspicion. Probable cause is *the* "traditional justification" for the seizure of a person. *Whren*, 517 U. S., at 817, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (emphasis deleted); see also *Dunaway* v. *New York*, 442 U. S. 200, 207-208, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979). This Court created an exception to that rule in *Terry* v. *Ohio*, 392 U. S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), permitting "police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause," *Michigan* v. *Summers*, 452 U. S. 692, 698, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). Reasonable suspicion is the justification for such seizures. [**1621] *Prado Navarette* v. [**1621] *California*, 572 U. S. 393, 397, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014).

Traffic stops can be initiated based on probable cause or reasonable suspicion. Although the Court has commented that a routine traffic stop is "more analogous to a so-called '*Terry [****27]* stop' than to a formal arrest," it has rejected the notion "that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop." *Berkemer* v. *McCarty*, 468 U. S. 420, 439,

104 S. Ct. 3138, 82 L. Ed. 2d 317, and n. 29 (1984) (citation omitted).

[***506] Although all traffic stops must be executed reasonably, our precedents make clear that traffic stops justified by reasonable suspicion are subject to additional limitations that those justified by probable cause are not. A traffic stop based on reasonable suspicion, like all *Terry* stops, must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel,* 542 U. S., at 185, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (internal quotation marks omitted). It also "cannot continue for an excessive period of time or resemble a traditional arrest." *Id.,* at 185-186, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (citation omitted). By contrast, a stop based on probable cause affords an officer considerably more leeway. In such seizures, an officer may engage in a warrantless arrest of the driver, *Atwater*, 532 U. S., at 354, 121 S. Ct. 1536, 149 L. Ed. 2d 549, a warrantless search incident to arrest of the driver, *Riley* v. *California*, 573 U. S. 373, 382, [*366] 134 S. Ct. 2473, 189 L. Ed. 2d 430, 441 (2014), and a warrantless search incident to arrest of the vehicle if it is reasonable to believe evidence relevant to the crime of arrest might be found there, *Arizona* v. *Gant*, 556 U. S. 332, 335, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009).

The majority casually tosses this [****28] distinction aside. It asserts that the traffic stop in this case, which was undisputedly initiated on the basis of probable cause, can last no longer than is in fact necessary to effectuate the mission of the stop. *Ante,* at 357, 191 L. Ed. 2d, at 500. And, it assumes that the mission of the stop was merely to write a traffic ticket, rather than to consider making a custodial arrest. *Ante,* at 354, 191 L. Ed. 2d, at 498. In support of that durational requirement, it relies primarily on cases involving *Terry* stops. See *ante,* at 354-356, 191 L. Ed. 2d, at 498-500 (citing *Arizona* v. *Johnson*, 555 U. S. 323, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009) (analyzing "stop and frisk" of *passenger* in a vehicle temporarily seized for a traffic violation); *United States* v. *Sharpe*, 470 U. S. 675, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (analyzing seizure of individuals based on suspicion of marijuana trafficking); *Florida* v. *Royer*, 460 U. S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (plurality opinion) (analyzing seizure of man walking through airport on suspicion of narcotics activity)).

The *only* case involving a traffic stop based on probable cause that the majority cites for its rule is *Caballes*. But, that decision provides no support for today's restructuring of our Fourth Amendment jurisprudence. In *Caballes*, the Court made clear that, in the context of a traffic stop supported by probable cause, "a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed [****29] in a reasonable manner." 543 U. S., at 408, 125 S. Ct. 834, 160 L. Ed. 2d 842. To be sure, *the dissent* in *Caballes* would have "appl[ied] *Terry*'s reasonable-relation test . . . to determine whether the canine sniff impermissibly expanded the scope of the initially valid seizure of Caballes." *Id.,* at 420, 125 S. Ct. 834, 160 L. Ed. 2d 842 (opinion of Ginsburg, J.). But even it conceded that the *Caballes* majority had "implicitly [rejected] the application of *Terry* to a traffic stop converted, by calling [**1622] in a dog, to a drug search." *Id.,* at 421, 125 S. Ct. 834, 160 L. Ed. 2d 842.

[*367] By strictly limiting the tasks that define the durational scope of the traffic [***507] stop, the majority accomplishes today what the *Caballes* dissent could not: strictly limiting the scope of an officer's activities during a traffic stop justified by probable cause. In doing so, it renders the difference between probable cause and reasonable suspicion virtually meaningless in this context. That shift is supported neither by the Fourth Amendment nor by our precedents interpreting it. And, it results in a constitutional framework that lacks predictability. Had Officer Struble arrested, handcuffed, and taken Rodriguez to the police station for his traffic violation, he would have complied with the Fourth Amendment. See *Atwater, supra,* at 354-355, 121 S. Ct. 1536, 149 L. Ed. 2d 549. But because he made Rodriguez wait for seven or eight extra [****30] minutes, he evidently committed a constitutional violation. Such a view of the Fourth Amendment makes little sense.

III

Today's revision of our Fourth Amendment jurisprudence was also entirely unnecessary. Rodriguez suffered no Fourth Amendment violation here for an entirely independent reason: Officer Struble had reasonable suspicion to continue to hold him for investigative purposes. Our precedents make clear that the Fourth Amendment permits an officer to conduct an investigative traffic stop when that officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Prado Navarette,* 572 U. S., at 396, 134 S. Ct. 1683, 188 L. Ed. 2d 680, 686, 691, 692) (internal quotation marks omitted). Reasonable suspicion is determined by looking at "the whole picture," *Id.*., at 397, 188 L. Ed. 2d, at 686, taking into account "the factual and practical considerations of everyday life on which reasonable and

prudent men, not legal technicians, act," *Ornelas* v. *United States*, 517 U. S. 690, 695, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996) (internal quotation marks omitted).

Officer Struble testified that he first became suspicious that Rodriguez was engaged in criminal activity for a number [*368] of reasons. When he approached the vehicle, he smelled an "overwhelming odor of air freshener coming from the vehicle," which is, in his experience, "a common attempt to conceal an odor that [people] don't [****31] want . . . to be smelled by the police." App. 20-21. He also observed, upon approaching the front window on the passenger side of the vehicle, that Rodriguez's passenger, Scott Pollman, appeared nervous. Pollman pulled his hat down low, puffed nervously on a cigarette, and refused to make eye contact with him. The officer thought he was "more nervous than your typical passenger" who "do[esn't] have anything to worry about because [t]hey didn't commit a [traffic] violation." *Id.*, at 34.

Officer Struble's interactions with the vehicle's occupants only increased his suspicions. When he asked Rodriguez why he had driven onto the shoulder, Rodriguez claimed that he swerved to avoid a pothole. But that story could not be squared with Officer Struble's observation of the vehicle slowly driving off the road before being jerked back onto it. And when Officer Struble asked Pollman where they were coming from and where they were going, Pollman told him they were traveling from Omaha, Nebraska, back to Norfolk, Nebraska, after looking at a vehicle they were considering purchasing. Pollman told the officer that he had neither seen pictures of the vehicle nor confirmed title before the trip. As Officer Struble [****32] [***508] explained, it "seemed suspicious" to him "to drive . . . approximately two hours . . . late at night to see a vehicle [**1623] sight unseen to possibly buy it," *id.,* at 26, and to go from Norfolk to Omaha to look at it because "[u]sually people leave Omaha to go get vehicles, not the other way around" due to higher Omaha taxes, *id.,* at 65.

These facts, taken together, easily meet our standard for reasonable suspicion. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Illinois* v. *Wardlow*, 528 U. S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000), and both vehicle occupants were engaged in such conduct. The officer also recognized [*369] heavy use of air freshener, which, in his experience, indicated the presence of contraband in the vehicle. "[C]ommonsense judgments and inferences about human behavior" further support the officer's conclusion that Pollman's story about their trip was likely a cover story for illegal activity. *Id.,* at 125, 120 S. Ct. 673, 145 L. Ed. 2d 570. Taking into account all the relevant facts, Officer Struble possessed reasonable suspicion of criminal activity to conduct the dog sniff.

Rodriguez contends that reasonable suspicion cannot exist because each of the actions giving rise to the officer's suspicions could be entirely innocent, but our cases easily dispose of that argument. Acts that, by themselves, [****33] might be innocent can, when taken together, give rise to reasonable suspicion. *United States* v. *Arvizu*, 534 U. S. 266, 274-275, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). *Terry* is a classic example, as it involved two individuals repeatedly walking back and forth, looking into a store window, and conferring with one another as well as with a third man. 392 U. S., at 6, 88 S. Ct. 1868, 20 L. Ed. 2d 889. The Court reasoned that this "series of acts, each of them perhaps innocent in itself, . . . together warranted further investigation," *id.,* at 22, 88 S. Ct. 1868, 20 L. Ed. 2d 889, and it has reiterated that analysis in a number of cases, see, *e.g., Arvizu*, *supra,* at 277, 122 S. Ct. 744, 151 L. Ed. 2d 740; *United States* v. *Sokolow*, 490 U. S. 1, 9-10, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). This one is no different.

* * *

I would conclude that the police did not violate the Fourth Amendment here. Officer Struble possessed probable cause to stop Rodriguez for driving on the shoulder, and he executed the subsequent stop in a reasonable manner. Our decision in *Caballes* requires no more. The majority's holding to the contrary is irreconcilable with *Caballes* and a number of other routine police practices, distorts the distinction between traffic stops justified by probable cause and those justified by reasonable suspicion, and abandons reasonableness as the touchstone of the Fourth Amendment. I respectfully dissent.

[*370] Justice Alito, dissenting.

This is an unnecessary, [1] impractical, and arbitrary decision. It addresses a purely [****34] hypothetical question: whether the traffic stop in this case *would be* unreasonable if the police officer, prior to leading a drug-sniffing dog around the exterior of petitioner's car, did not already have reasonable suspicion that the car contained drugs. In fact, however, the police officer *did*

---

[1] See Brief in Opposition 11-14.

*have* reasonable suspicion, [***509] and, as a result, the officer was justified in detaining the occupants for the short period of time (seven or eight minutes) that is at issue.

The relevant facts are not in dispute. Officer Struble, who made the stop, was the only witness at the suppression hearing, and his testimony about what happened was not challenged. Defense counsel argued that the facts recounted by Officer Struble were insufficient to establish [**1624] reasonable suspicion, but defense counsel did not dispute those facts or attack the officer's credibility. Similarly, the Magistrate Judge who conducted the hearing did not question the officer's credibility. And as Justice Thomas's opinion shows, the facts recounted by Officer Struble "easily meet our standard for reasonable suspicion." *Ante*, at 368, 191 L. Ed. 2d, at 508 (dissenting opinion); see also, *e.g.*, *United States* v. *Carpenter*, 462 F. 3d 981, 986-987 (CA8 2006) (finding reasonable suspicion for [****35] a dog sniff based on implausible travel plans and nervous conduct); *United States* v. *Ludwig*, 641 F. 3d 1243, 1248-1250 (CA10 2011) (finding reasonable suspicion for a dog sniff where, among other things, the officer smelled "strong masking odors," the defendant's "account of his travel was suspect," and the defendant "was exceptionally nervous throughout his encounter").

Not only does the Court reach out to decide a question not really presented by the facts in this case, but the Court's answer to that question is arbitrary. The Court refuses to address the real Fourth Amendment question: whether the [*371] stop was unreasonably prolonged. Instead, the Court latches onto the fact that Officer Struble delivered the warning prior to the dog sniff and proclaims that the authority to detain based on a traffic stop ends when a citation or warning is handed over to the driver. The Court thus holds that the Fourth Amendment was violated, not because of the length of the stop, but simply because of the sequence in which Officer Struble chose to perform his tasks.

This holding is not only arbitrary; it is perverse since Officer Struble chose that sequence for the purpose of protecting his own safety and possibly the safety of others. See App. 71-72. Without prolonging the stop, Officer Struble [****36] could have conducted the dog sniff while one of the tasks that the Court regards as properly part of the traffic stop was still in progress, but that sequence would have entailed unnecessary risk. At approximately 12:19 a.m., after collecting Pollman's driver's license, Officer Struble did two things. He called in the information needed to do a records check on Pollman (a step that the Court recognizes was properly part of the traffic stop), and he requested that another officer report to the scene. Officer Struble had decided to perform a dog sniff but did not want to do that without another officer present. When occupants of a vehicle who know that their vehicle contains a large amount of illegal drugs see that a drug-sniffing dog has alerted for the presence of drugs, they will almost certainly realize that the police will then proceed to search the vehicle, discover the drugs, and make arrests. Thus, it is reasonable for an officer to believe that an alert will increase the risk that the occupants of the vehicle will attempt to flee or perhaps even attack the officer. See, *e.g., United States* v. *Dawdy*, 46 F. 3d 1427, 1429 (CA8 1995) (recounting scuffle between officer and defendant after drugs were discovered).

[***510] In this case, Officer [****37] Struble was concerned that he was outnumbered at the scene, and he therefore called for backup and waited for the arrival of another officer before conducting the sniff. As a result, the sniff was not completed until [*372] seven or eight minutes after he delivered the warning. But Officer Struble could have proceeded with the dog sniff while he was waiting for the results of the records check on Pollman and before the arrival of the second officer. The drug-sniffing dog was present in Officer Struble's car. If he had chosen that riskier sequence of events, the dog sniff would have been completed before the point in time when, according to the Court's analysis, the authority to detain for the traffic stop ended. Thus, an action that would have been lawful had the [**1625] officer made the *unreasonable* decision to risk his life became unlawful when the officer made the *reasonable* decision to wait a few minutes for backup. Officer Struble's error—apparently—was following prudent procedures motivated by legitimate safety concerns. The Court's holding therefore makes no practical sense. And nothing in the Fourth Amendment, which speaks of *reasonableness*, compels this arbitrary line.

The rule that the Court adopts will [****38] do little good going forward. [2] It is unlikely to have any appreciable

---

[2] It is important to note that the Court's decision does not affect procedures routinely carried out during traffic stops, including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Ante,* at 355, 191 L. Ed. 2d, at 495. And the Court reaffirms that police "may conduct certain unrelated checks during an otherwise lawful traffic stop." *Ibid.* Thus, it remains true that police may ask questions aimed at uncovering other criminal conduct and may

effect on the length of future traffic stops. Most officers will learn the prescribed sequence of events even if they cannot fathom the reason for that requirement. (I would love to be the proverbial fly on the wall when police instructors teach this rule to officers who make traffic stops.)

For these reasons and those set out in Justice Thomas's opinion, I respectfully dissent.

## References

U.S.C.S., Constitution, Amendment 4

27 Moore's Federal Practice §§641.102, 641.103 (Matthew Bender 3d ed.)

L Ed Digest, Search and Seizure § 10.1

L Ed Index, Automobiles and Highway Traffic

Validity, under Federal [****39] Constitution, of warrantless search of motor vehicle--Supreme Court cases. 142 L. Ed. 2d 993.

Law enforcement officer's authority, under Federal Constitution's Fourth Amendment to stop and briefly detain, and to protect limited protective search of or “frisk,” for investigative purposes, person suspected of criminal activity--Supreme Court cases. 104 L. Ed. 2d 1046.

End of Document

order occupants out of their car during a valid stop. See *Arizona* v. *Johnson*, 555 U. S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009); *Maryland* v. *Wilson*, 519 U. S. 408, 414-415, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997); *Pennsylvania* v. *Mimms*, 434 U. S. 106, 111, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (*per curiam*).

# United States v. Whitley

34 F.4th 522 (6th Cir. 2022)

Cited in Opening Brief at: 51

Highlighted language appears at 34 F.4th at 529–30.

Caution
As of: September 14, 2026 8:09 PM Z

# United States v. Whitley

United States Court of Appeals for the Sixth Circuit

April 27, 2022, Argued; May 18, 2022, Decided; May 18, 2022, Filed

File Name: 22a0106p.06

No. 20-1955

**Reporter**
34 F.4th 522 *; 2022 U.S. App. LEXIS 13398 **; 2022 FED App. 0106P (6th Cir.) ***; 2022 WL 1561329

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. DANTE DEVON WHITLEY, Defendant-Appellant.

**Prior History:** [**1] Appeal from the United States District Court for the Western District of Michigan at Grand Rapids. No. 1:19-cr-00296-1—Paul Lewis Maloney, District Judge.

United States v. Whitley, 2020 U.S. Dist. LEXIS 118544 (W.D. Mich., June 19, 2020)

**Counsel:** ARGUED: Matthew N. Ball, GIBSON DUNN & CRUTCHER, LLP, Denver, Colorado, for Appellant.

Jennifer Lee McManus, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

ON BRIEF: Matthew N. Ball, GIBSON DUNN & CRUTCHER, LLP, Denver, Colorado, for Appellant.

Kristin M. Pinkston, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

**Judges:** Before: SUTTON, Chief Judge; MOORE and GILMAN, Circuit Judges.

**Opinion by:** RONALD LEE GILMAN

## Opinion

[*526] [***1] RONALD LEE GILMAN, Circuit Judge. Dante Devon Whitley was the subject of a traffic stop for failing to come to a standstill before exiting a private drive onto a public street. [***2] Prior to pulling Whitley over, law-enforcement officers had been surveilling Whitley for suspected drug trafficking. During the stop, the officers noticed a digital scale sitting on Whitley's lap. They asked Whitley to exit the vehicle so that they could further investigate the scale. Whitley initially refused, but he eventually complied after his mother arrived. At that point, a drug-detection dog was brought on the [**2] scene and alerted to the presence of narcotics in Whitley's vehicle. The officers then conducted a warrantless search. In the vehicle, they found a Glock 19mm handgun with an extended magazine, ammunition, over $7,600 in cash, a digital scale, and a pound and a half of marijuana.

Whitley moved to suppress this evidence, as well as several post-*Miranda* statements that he made, as fruits of an unlawful stop and search. The district court denied the motion. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

### I. BACKGROUND

#### A. Factual background

On September 25, 2019, Detective Jeffrey Woollam set up surveillance of a residence located at 5828 Ridgebrook Avenue in Kentwood, Michigan after receiving a tip from a confidential informant about activity concerning the sale of heroin from that location. Detective Woollam saw Whitley leave the surveilled residence and walk to a red car. According to Detective Woollam, Whitley was "looking at a large bundle or sum of cash in his hand as if he was counting it as he walked out to the vehicle."

Whitley then embarked on a trip that included multiple stops. He drove away from the residence, and Detective Woollam followed in an [**3] unmarked car. Detective Woollam saw Whitley pull into a driveway of a house down the street and meet with another man for 20 to 25 seconds. After the brief meeting, Whitley traveled to a nearby Family Dollar. Detective Woollam's partner in the Special Investigations Unit, Detective Scott Drumm, met Detective Woollam at the Family Dollar to assist with the

surveillance. Whitley exited the Family Dollar without any purchases, took a black bag out of the passenger side of the vehicle, and placed it in the trunk. As Whitley drove out of the parking lot and pulled onto the street, he failed to stop in accordance with the state traffic laws.

[***3] Whitley proceeded to a Mother Hubbard Liquor Store. Detectives Drumm and Woollam followed. Whitley walked into the store briefly and left without any packages. When Whitley exited the private drive of the Mother Hubbard, he again failed to stop.

Detective Woollam then called Officer Turmell, a patrol officer in the area. He communicated to Officer Turmell that there was probable cause for a traffic stop based on Whitley's traffic violations, and that he suspected Whitley of being engaged in a narcotics-related offense. Detective Woollam also requested [**4] the presence of a drug-detection dog because of the suspected drug trafficking.

Officer Turmell pulled Whitley over at 7:44 p.m. Detective Woollam was driving behind Officer Turmell when the stop occurred. As Officer Turmell made contact with Whitley, Detective Woollam parked and stood behind Officer Turmell's patrol [*527] vehicle so that Whitley would not see his plainclothes presence.

Officer Turmell explained to Whitley that he had stopped Whitley because Whitley had failed to make a complete stop when exiting two private drives. He asked Whitley to produce his identification, automobile registration, and proof of insurance. While waiting for the documents, Officer Turmell asked whether Whitley had anything illegal in the vehicle. Whitley stated that he did not. After Whitley handed the requested documents to Officer Turmell, the officer noticed a scale in Whitley's lap and asked why it was there. Whitley stated that he smokes weed, did not have any, and was on his way to get some.

Officer Turmell told Whitley that he would be right back. He proceeded to tell Detective Woollam that Whitley had a scale "right there" on his lap. This prompted Detective Woollam to say that they should pull [**5] Whitley out of the vehicle. Officer Turmell returned to the vehicle and asked Whitley to step out for him. Whitley responded by saying "what?" Officer Turmell replied that they wanted to "investigate the scale real quick." He further explained that Whitley was not presently under arrest, but that they needed "to have a conversation." When Whitley did not exit the vehicle, Detective Woollam approached the passenger side window and told Whitley that he was now under arrest.

[***4] Whitley continued to refuse to get out of the vehicle. He stated that he needed to call his lawyer and that he had not done anything illegal. When Whitley stated that he would call his lawyer, Detective Woollam asked if he needed to make this call because he had "something." Officer Turmell then noted that Whitley had marijuana "shake" (residue) in the vehicle. Whitley pointed out that marijuana is legal in Michigan. Officer Turmell responded that Whitley was "also hindering [his] investigation by not coming out" of the vehicle and that Whitley "would be under arrest for that too."

As the officers were ordering Whitley to exit the vehicle, Detective Woollam explained to Whitley that they "stopped [him] for a valid [**6] reason and then [they] saw drug paraphernalia in [his] lap," so he was "not free to leave." When Whitley continued to refuse to get out, Detective Woollam repeated that he was being told to exit the vehicle because he had "digital scales in [his] lap," which constitutes "possession of drug paraphernalia." Detective Woollam also proclaimed that Whitley could not be smoking weed and driving his vehicle, to which Whitley asked: "When was I smoking?" Whitley insisted that he had not been smoking in his vehicle.

Over the next seven minutes, Whitley continued to refuse to get out of the vehicle, explaining that he wanted to wait until his mother got there. Whitley finally exited the vehicle when his mother arrived, which was about twenty minutes after he was initially pulled over. He was arrested for "hindering" and "opposing" the officers' investigation.

After Whitley was taken into custody, the canine unit was deployed. The "K-9 narcotics sniff" revealed a "large[,] sealed baggy that had marijuana residue in it," which prompted the officers to conduct a search. In the car, the officers uncovered a handgun with an extended magazine underneath the driver's seat and a handgun magazine, digital [**7] scale, and $6,784 in cash in the center console. They also found an additional $912 in cash on Whitley's person and 692.5 grams (approximately a pound and a half) of marijuana in a black bag in the trunk of the vehicle.

Whitley told the police that he knew the gun was under the seat and that, if tested, his fingerprints would be on the gun and [*528] the ammunition. He also stated that he takes "donations" in exchange for marijuana.

[***5] **B. Procedural background**

Following the September 25, 2019 search of his vehicle, Whitley was indicted on the following three counts: (1) being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 921(a), 924(a)(2) (Count 1); (2) possessing with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D) (Count 2); and (3) possessing a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 3). The charges were largely based on the evidence that was discovered during the search of Whitley's vehicle, evidence that Whitley unsuccessfully moved to suppress as the fruits of an unlawful search.

After the district court denied the motion to suppress, Whitley entered into a conditional plea agreement with the government, pleading guilty to Counts 2 and [**8] 3 of the indictment. Whitley reserved his right, "on appeal from the [district court's] judgment, to seek review of the adverse determination of the Defendant's Motion to Suppress Evidence." The court entered judgment against Whitley on Counts 2 and 3 of the indictment and sentenced him to 60 months' imprisonment followed by four years of supervised release. Whitley timely appealed the court's judgment, challenging the court's denial of his motion to suppress.

## II. ANALYSIS

### A. Standard of review

When reviewing a district court's decision concerning a motion to suppress, we review findings of fact under the clear-error standard and review conclusions of law de novo. *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020). We must give "due weight to the factual inferences and credibility determinations" of the district court. *United States v. Moon*, 513 F.3d 527, 536 (6th Cir. 2008). "[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (alteration in original) (quoting *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019)), *cert. denied*, 141 S. Ct. 1395, 209 L. Ed. 2d 133 (2021).

[***6] **B. The officers abandoned the traffic stop, but had reasonable suspicion to continue detaining Whitley such that the stop did not violate the Fourth Amendment**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . and effects against [**9] unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1986). Whether that seizure is reasonable, however, does not depend on "the actual motivations of the individual officers involved." *Id.* at 813. Rather, the reasonableness of the stop is contingent only upon whether "the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810.

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407, [*529] 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984)). A lawful traffic stop must therefore be limited in scope and duration. *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). If an officer exceeds the scope or duration of the traffic stop, he must have "reasonable suspicion" to continue the stop on unrelated grounds. *Id.* at 354-55.

Based on this caselaw, our analysis will proceed in two parts. We first inquire whether the officers' entire engagement with Whitley should be deemed a traffic stop. Because we conclude that the officers abandoned the traffic stop and converted the stop into a drug investigation, [**10] we next analyze whether there was reasonable suspicion to engage in that new course of investigation.

#### *1. The officers abandoned the traffic stop*

"[T]he Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention" of traffic stops. *Id.* at 354 (citing *Arizona v. Johnson*, 555 U.S. 323, 327-28, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009); *Caballes*, 543 U.S. at 406). Such unrelated investigations include questioning and dog sniffs. *Id.* But "a traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Id.*

[***7] at 354-55 (alteration in original) (quoting *Caballes*, 543 U.S. at 407). In addition to determining whether to issue a ticket, an officer's "mission" during a traffic stop "includes 'ordinary inquiries incident to [the traffic] stop,'" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (alteration in original) (quoting *Caballes*, 543 U.S. at 408). In contrast, "measure[s] aimed at 'detect[ing] evidence of ordinary criminal wrongdoing[]'" lack "the same close connection to roadway safety as the ordinary inquiries" and therefore are "not fairly characterized as part of the officer's traffic mission." *Id.* at 355-56 (second alteration in [**11] original) (citation omitted).

Three aspects of the Supreme Court's decision in *Rodriguez* guide our analysis of whether Officer Turmell and Detective Woollam had reasonable suspicion of illegal activity necessary to prolong the traffic stop. First, *Rodriguez* expressly rejected the view that a "de minimis" intrusion or delay is permissible. *Id.* at 353, 356-57. Thus, post-*Rodriguez*, our prior caselaw permitting de minimis extensions of traffic stops is no longer good law. *See e.g.*, *United States v. Everett*, 601 F.3d 484, 491-93 (6th Cir. 2010) (permitting de minimis extensions); *United States v. Cochrane*, 702 F.3d 334, 340-41 (6th Cir. 2012) (same). Second, the Court rejected the government's argument that the relevant measure is whether "the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." *Rodriguez*, 575 U.S. at 357. Instead, the Court made clear that "[t]he reasonableness of a seizure . . . depends on what the police in fact do." *Id.* Finally, the Court explained that "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff prolongs—i.e., adds time to—the [*530] stop." *Id.* (internal quotation marks omitted).

We now turn [**12] to examining whether the officers' stop of Whitley remained within the proper duration and scope of a traffic stop. Whitley has conceded that the initial traffic stop by the officers was permissible, so we need not evaluate whether the officers had probable cause to initially stop Whitley. We will focus only on the questions and statements that the officers made after Whitley was pulled over.

[***8] Officer Turmell's initial questioning of Whitley was within the scope of the traffic stop because Officer Turmell informed Whitley that he had not come to a complete stop when leaving a private drive. Officer Turmell then requested Whitley's driver's license, automobile registration, and proof of insurance. Each of these questions is an ordinary inquiry incident to a traffic stop. The further questions of whether Whitley had anything illegal in the vehicle and where he was coming from are permissible only because Officer Turmell asked these questions during the time that Whitley was retrieving his license and registration. Thus, the questions "d[id] not measurably extend the duration of the stop." *Rodriguez*, 575 U.S. at 355 (quoting *Johnson*, 555 U.S. at 333).

Within a few seconds of receiving the requested documents, Officer Turmell noticed a [**13] scale in Whitley's lap and asked what the scale was for and if Whitley was going to buy weed. These questions were also unrelated to the traffic stop. But these two short questions came immediately after Officer Turmell noticed the scale while he still had Whitley's documents in his hands and was during the time "when tasks tied to the traffic infraction [were]—or reasonably should have been" ongoing. *See id.* at 354.

After Officer Turmell walked back to his cruiser and conferred with Detective Woollam, Whitley's detention objectively exceeded the relevant scope of the traffic stop because it was now entirely focused on Whitley's scale. The officers did not examine Whitley's documents, did not run his name through a database, and totally abandoned their investigation of the traffic violation. At that point, the traffic stop had morphed into a drug investigation, prompting Detective Woollam to say that they should pull Whitley out of his vehicle.

Officer Turmell then explained to Whitley that the officers wanted to "investigate the scale real quick." This explicit identification of the officers' purpose did not occur "during the supposedly dead time while [Officer Turmell] or another officer [was] [**14] completing a task related to the traffic violation"—a time during which an "officer may ask unrelated questions to his heart's content." *See United States v. Howard*, 815 F. App'x 69, 75 (6th Cir. 2020) (quoting *Everett*, 601 F.3d at 492). Rather, this interaction concerning the scale happened when both the officers were outside of the police cruiser and had left the materials relevant to the traffic stop behind.

[***9] Although in other contexts officers may require an individual to exit a vehicle as a safety precaution,

*see, e.g.*, *United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010), such "safety measures taken to facilitate a different investigation . . . are not tasks incident to the initial stop." *Lott*, 954 F.3d at 924. Even if asking Whitley to exit the vehicle is properly considered a safety measure, it is still a detour that requires independent reasonable suspicion because the request facilitated the investigation into the scale and did not pertain to the original traffic stop.

The district court determined that the officers had not abandoned the traffic stop because, "[d]uring the traffic stop, Officer [*531] Turmell was permitted to ask Whitley questions about the digital scale he observed on Whitley's lap." Although the court correctly concluded that Officer Turmell could ask Whitley about the scale within the confines of the traffic stop, [**15] the officers' subsequent actions constituted an abandonment of that investigation.

The district court, in rendering its decision, compared this case to *United States v. Lash*, 665 F. App'x 428 (6th Cir. 2016). *Lash* involved a traffic stop of a rental car that the driver had borrowed from his girlfriend. The officers performed a routine traffic stop in which they ran Lash's driver's license through a database, determined that it was valid, and noted that he did not have any outstanding warrants. As the officers were about to return Lash's license and let him go, however, one officer noticed a plastic bag sticking out from Lash's trousers. The officer testified that he then asked to see the car rental agreement "because he 'kind of wanted to investigate a little further, and that gave [him] time and opportunity to do so.'" *Id.* at 429-30 (alteration in original).

Had the officer in *Lash* not seen the bag, he said that "he 'likely' would not have issued Lash a traffic citation." *Id.* at 430. He then saw what appeared to be the butt of a gun inside of the bag and asked Lash to exit the vehicle. Lash refused and began to speed away, striking two officers in his flight before losing control of the vehicle. When officers subsequently searched the vehicle, they found a [**16] gun in the plastic bag. Asking to see a rental agreement is a "routine incidental request[]" normally permitted during a traffic stop. *Id.* at 431 (citing *United States v. Bell*, 555 F.3d 535, 542 (6th Cir. 2009)). This court concluded that because the initial officer asked to see Lash's rental agreement before the officer had written a ticket, issued a verbal [***10] warning, or even returned Lash's license, the traffic stop had not ended, and the officer's question about the rental agreement was within the scope of the initial traffic stop. *Id.*

In applying *Lash* to this case, the district court concluded that "[t]here are no facts in the record that indicate that the traffic stop ended" at the point when Officer Turmell asked Whitley about the scale or when the officers returned to Whitley's vehicle to ask him to exit because "Officer Turmell had not yet checked the status of Whitley's driver's license, written a ticket, issued a warning, or returned Whitley's driver's license." Because "the stop remained a routine traffic stop when the officers returned to Whitley's window," the court reasoned that the officers were permitted to ask Whitley to exit. The prolonged nature of the stop from that point on, according to the court, was attributable to "Whitley's own [**17] actions in refusing to exit the vehicle."

We disagree with the district court's analysis for two reasons. First, the rule that the court distilled from *Lash* is unworkable. The relevant inquiry is *not* whether the officers' detour from the traffic stop took place after the traffic stop was over. If there were a bright-line rule that a traffic stop does not end until an officer decides whether to issue a ticket and returns the driver's license, then an officer could withhold the ticket and the license indefinitely for the sake of pursuing another investigation. *See Rodriguez*, 575 U.S. at 357 ("The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . ."). Instead of asking *when* a detour took place, we look at "what the police in fact d[id]" and whether it related to the purpose of the traffic stop. *Id.* Thus, if the stopped party can show "*either* that the [police activity] was not 'tied to the traffic infraction' *or* that the traffic stop [*532] 'reasonably should have been' already completed," *Hernandez v. Boles*, 949 F.3d 251, 257 (6th Cir. 2020) (emphases added) (quoting *Rodriguez*, 575 U.S. at 354) then the traffic stop has been prolonged and independent reasonable suspicion is required.

Second, unlike in *Lash*, the officers in the present case explicitly [**18] stated that their purpose in continuing the stop was to "investigate the scale." This meant that the stop now became concerned with the scale and Whitley's possible drug-related activity. The officer in *Lash*, in contrast, never asked Lash questions that objectively exceeded the scope of the traffic stop. Even the officer's request that immediately preceded Lash's decision to flee—to review the rental agreement—was directly related to the traffic violation. We therefore conclude that this [***11] case is unlike *Lash*, and that the officers here had abandoned the traffic stop to investigate Whitley's drug-related activities, an

investigation that required a source of reasonable suspicion unrelated to the traffic stop.

***2. The officers had reasonable suspicion to continue the stop***

Because the officers abandoned their traffic-related investigation, an independent reasonable suspicion of unlawful activity beyond the traffic violation was required to lawfully continue the stop. *See Rodriguez*, 575 U.S. at 357-58 (remanding so that the district court could determine whether a dog sniff that came after an abandoned traffic stop was "independently supported by individualized suspicion"). We must therefore assess whether the officers had some [**19] "minimal level of objective justification" to continue detaining Whitley. *See United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016) (citing *Navarette v. California*, 572 U.S. 393, 396-97, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014), and quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)).

To satisfy the reasonable-suspicion standard, an officer must put forth "more than an inchoate and unparticularized suspicion or 'hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). Reasonable suspicion, however, requires "considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* "Reviewing courts must look to the totality of the circumstances of each case to see whether the detaining officer has a particularized or objective basis for suspecting legal wrongdoing." *United States v. Belakhdhar*, 924 F.3d 925, 927 (6th Cir. 2019) (internal quotation marks omitted) (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002)).

The district court's "findings of historical fact" are reviewed under the clear-error standard. *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996). And a reviewing court must "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers," *id.*, as well as "considerable deference to the district court's credibility determinations," *United States v. Hudson*, 405 F.3d 425, 431 (6th Cir. 2005) (citing *United States v. Johnson*, 344 F.3d 562, 567 (6th Cir. 2003)).

[***12] Here, we conclude that the district court's findings of fact are supported by the record. We thus accept them as true for the purposes of resolving this appeal. The facts relevant to whether the officers had reasonable suspicion are as follows: [**20]

[*533] • Detective Woollam received information from a confidential informant about the sale of heroin at 5828 Ridgebrook Avenue in Kentwood, Michigan.

• Detective Woollam observed Whitley leave the home with a "wad of cash" that Whitley appeared to be counting.

• Whitley drove to a house down the street—5986 Ridgebrook—where he had an interaction, lasting less than 30 seconds, with another male.

• Detective Scott Drumm observed Whitley exit the Family Dollar without any purchases, take a black bag out of the passenger side of the vehicle, and place it in the trunk of the vehicle.

• Whitley then drove to the Mother Hubbard Liquor Store in Grand Rapids, entered the liquor store empty handed, and came out empty handed.

• During the traffic stop, which was initiated for failing to come to a standstill while exiting a private drive, Officer Turmell noticed a digital scale sitting in plain view on Whitley's lap.

• One of the officers observed marijuana "shake" on the dashboard of Whitley's vehicle.

The court must also give due weight to the district court's inferences and credibility determinations. Based on the testimony offered during the motion-to-suppress hearing, the court found credible "Detective [**21] Woollam's testimony about the 'wad of cash'" as well as "Detective Woollam's testimony about observing an interaction at 5986 Ridgebrook." But the court attributed limited value to Detective Woollam's testimony that the interaction amounted to a drug transaction. The court did infer, however, that the observed interaction "may be indicative of some relationship involving drugs." Finally, the court attributed minimal weight to Detective Woollam's testimony about the confidential informant because "there was no testimony or evidence presented to indicate that the informant had been previously reliable or that the tipster's information had been corroborated."

The relevant inquiry, however, is whether the totality of the circumstances presented above supports a conclusion that the officers had reasonable suspicion to believe that Whitley was engaged in illegal activity. In

considering the totality of the circumstances, "[p]ertinent [***13] circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008) (citations omitted).

This court, on previous occasions, [**22] has concluded that circumstances comparable to those in the present case gave rise to reasonable suspicion. For example, officers were deemed to have reasonable suspicion to believe that a car had "some connection to narcotic activity" where a "roll of cash" was found in plain view in the car's front seat and other suspicious activity had also been observed: the suspect was traveling to Miami for only two days, he used a name variation that eliminated the suspect's surname, and he failed to provide "documentation of any kind relating to" a legitimate business purpose of the trip. *United States v. Winfrey*, 915 F.2d 212, 213, 216-17 (6th Cir. 1990) ("While each factor by itself may be insufficient to establish reasonable suspicion that a crime was committed, articulable suspicion is based on an evaluation of *all* the surrounding circumstances as viewed by those trained in the law enforcement field." (emphasis in original) (citations omitted)).

[*534] This court also concluded that making "a series of brief stops" while driving and "manipulat[ing] objects on the floor of the car" after each stop was indicative of drug-trafficking activity. *United States v. Jones*, 75 F. App'x 334, 338-39 (6th Cir. 2003). Finally, possessing a scale is an additional datapoint weighing in favor of reasonable suspicion if other conduct suggestive [**23] of drug activity is observed. *See United States v. Frazier*, 249 F. App'x 396, 402 (6th Cir. 2007) (citing several decisions in which this court treated scales "as tools of the drug trade").

The officers in the present case observed Whitley entering and leaving a suspected drug house, counting a wad of cash, making a series of short stops, and moving a black bag from the passenger seat of his vehicle to the trunk. They also observed a digital scale sitting on Whitley's lap as well as what was believed to be marijuana residue on Whitley's dashboard. We conclude that these facts are comparable to those considered relevant to the reasonable-suspicion analysis in *Winfrey* and *Jones*.

[***14] Whitley raises several counterarguments. He first argues that because the possession of marijuana or a marijuana accessory is lawful under the Michigan Regulation and Taxation of Marihuana Act (MRTMA), the presence of a scale on his lap, as well as his statements made during the stop that he smoked marijuana and was on his way to purchase marijuana, cannot give rise to reasonable suspicion. To support his argument, Whitley analogizes his case to *Northrup v. City of Toledo Police Department*, 785 F.3d 1128 (6th Cir. 2015), in which this court held that an officer lacked reasonable suspicion to stop a man observed walking down the street in Ohio with a firearm [**24] because "Ohio law permits the open carry of firearms." *Id.* at 1131. But as Whitley concedes, *Northrup* "recognized that reasonable suspicion would have existed if the officer observed specific indicia of unlawful use," such as "carrying . . . an assault rifle or some other illicit firearm" that is not covered by Ohio's open-carry law. *Id.* at 1132. The scope of marijuana-related activity deemed lawful by the MRTMA is thus a relevant consideration.

Under the MRTMA, the possession, use, or transportation of up to 2.5 ounces of marijuana is considered a legal "permissive act." Mich. Comp. Laws § 333.27955(1)(a). But the MRTMA does not go so far as to legalize the distribution or trafficking of marijuana for remuneration. § 333.27955(1)(d) (stating that "transferring *without* remuneration up to 2.5 ounces of marihuana" is a permissive act (emphasis added)). This court's decision in *Northrup* stands for the proposition that, when an activity is deemed lawful by a state, that activity cannot give rise to reasonable suspicion standing alone.

The MRTMA goes further and provides that possessing or transporting no more than 2.5 ounces of marijuana "[is] not grounds for search or inspection." *Id.* § 333.27955(1). We read the statute to mean what it says: under Michigan law, possessing a permissible amount [**25] of marijuana is not grounds for a search. Officer Turmell and Detective Woollam would thus have been unable to rely solely on the marijuana shake on Whitley's dashboard to justify the search in this case. We can, however, consider the scale, subject to the caveats that we explained in *Northup*. Although possessing a permissible quantity of marijuana cannot be grounds for a search, the MRTMA lacks a similar provision regarding marijuana accessories. *Compare* Mich. Comp. Laws §333.27955(1) (the possession of 2.5 ounces or less of marijuana is "not grounds for search or inspection") *with id.* § 333.27955(2) (lacking similar language).

[*535] [***15] Whitley attempts to erode the officers'

basis for reasonable suspicion by addressing each factual circumstance in isolation. He contends that the conduct and interactions observed by the officers--such as exiting a Family Dollar without any packages, placing a black bag in his trunk, entering and exiting a liquor store empty handed, or driving with a scale in his lap--were consistent with innocent behavior. Although "individual datapoints" might "portray entirely innocent conduct[,] . . . our cases teach that the overall scatterplot may give rise to reasonable suspicion." *United States v. Belakhdhar*, 924 F.3d 925, 928 (6th Cir. 2019) (citing *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001)). And that is the [**26] case here, where the totality of the circumstances establishes a factual basis upon which an officer could reasonably suspect that Whitley was engaged in unlawful drug activity.

Whitley's reliance on *United States v. Baro*, 15 F.3d 563 (6th Cir. 1994), and *United States v. Cervantes*, 19 F.3d 1151 (7th Cir. 1994), for the proposition that a wad of cash alone is not suspicious, does not advance his argument. The question before this court in *Baro* was whether the carrying of a large amount of cash through an airport established *probable cause* for the government to seize the currency, which poses a higher burden on the government than the reasonable-suspicion standard. 15 F.3d at 568. And the Seventh Circuit's decision in *Cervantes* actually cuts against Whitley's argument. The court in that case held that, "although a wad of cash is not in itself a suspicious object, a wad of cash in the hands of a person who the police have good reason to believe just received it in exchange for a delivery of illegal drugs *is* suspicious and indeed enough so to give the police probable cause to believe it evidence of criminal activity." 19 F.3d at 1153 (emphasis in original).

To be clear, the wad of cash that Detective Woollam observed Whitley counting would not give rise to reasonable suspicion of drug activity standing on its own. But the cumulative [**27] effect of all the facts detailed above establishes that the officers had good reason to suspect that Whitley was engaged in the distribution or trafficking of either marijuana or heroin.

Whitley's final argument--raised for the first time in his reply brief--that the government forfeited its right to argue that the officers had reasonable suspicion to believe that Whitley was distributing drugs other than marijuana is also unavailing. We can affirm the denial of a motion to suppress on any grounds supported by the record. *United States v. Trice*, 966 F.3d [***16] 506, 512 (6th Cir. 2020) ("[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." (alteration in original) (quoting *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019))), *cert. denied*, 141 S. Ct. 1395, 209 L. Ed. 2d 133 (2021). Here, the record supports the conclusion that the officers had reasonable suspicion that Whitley was engaged in drug trafficking, so they had an independent basis to continue the traffic stop regardless of the specific drug in question.

### C. The officers had probable cause to search Whitley's vehicle

We next address whether the officers had probable cause to conduct a warrantless search of Whitley's vehicle. Once Whitley exited his vehicle, a drug-detection dog circled the vehicle and [**28] gave a positive alert for the presence of narcotics. The question then is whether the officers had probable cause to search Whitley's vehicle based on the drug-detection dog's positive alert. "The automobile exception permits officers to search a vehicle [*536] without a warrant if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019) (quoting *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)). A dog's positive alert to narcotics can serve as probable cause to search "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting." *Florida v. Harris*, 568 U.S. 237, 246-47, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013).

The record in the present case establishes that the drug-detection dog was certified, so the dog's positive alert was sufficient to establish probable cause. This permitted the officers to conduct a warrantless search of Whitley's vehicle. Accordingly, the evidence discovered during the search of the vehicle--ammunition, a Glock 19mm handgun with an extended magazine, over $7,600 in cash, a digital scale, and a pound and a half of marijuana, as well as Whitley's post-*Miranda* statements--were the fruits of a lawful search.

## III. CONCLUSION

For all of the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

End of Document

# United States v. Brown

No. 23-3657, 2024 WL 4240558 (6th Cir. Sept. 19, 2024)

Cited in Opening Brief at: 51

The brief cited this case as 66 F.4th 581 (6th Cir. 2023); that reporter citation does not exist. See Response, Part III.A.

Neutral
As of: September 14, 2026 7:35 PM Z

# United States v. Brown

United States Court of Appeals for the Sixth Circuit

September 19, 2024, Filed

File Name: 24a0392n.06

No. 23-3657

**Reporter**
2024 U.S. App. LEXIS 23970 *; 2024 FED App. 0392N (6th Cir.); 2024 WL 4240558

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. DAMARCUS BROWN, Defendant-Appellant.

**Notice:** CONSULT 6TH CIR. R. 32.1 FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Prior History:** [*1] ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.

United States v. Brown, 2022 U.S. Dist. LEXIS 94212 (N.D. Ohio, May 25, 2022)

**Counsel:** For UNITED STATES OF AMERICA, Plaintiff - Appellee: Colleen Egan, Office of the U.S. Attorney, Cleveland, OH.

For DAMARCUS BROWN, Defendant - Appellant: Susan J. Moran, Law Office, Cleveland, OH.

DAMARCUS BROWN, Defendant - Appellant, Pro se, Milan, MI.

**Judges:** Before: WHITE, STRANCH, and DAVIS, Circuit Judges.

**Opinion by:** HELENE N. WHITE

## Opinion

HELENE N. WHITE, Circuit Judge. Defendant-Appellant Damarcus Brown appeals the denial of his motion to suppress evidence that Akron police obtained during a traffic stop. Because police did not impermissibly extend the traffic stop and had probable cause to arrest Brown because he was driving without a valid license, we AFFIRM.

### I. Facts

At around 1:00 a.m. on May 5, 2021, Officers Guilmette and Mook initiated a traffic stop of the vehicle Brown was driving because the license plate did not match the vehicle's make and model. In Ohio, vehicle owners may use their old license plates on their new vehicle for up to thirty days, a fact the officers knew. Because his mother, Diann Pou, had purchased the vehicle on April 15, Brown's mismatching license plate was not in violation of Ohio law. [*2]

Officer Guilmette explained the reason for the stop and asked for the vehicle's paperwork. Brown responded that he had the paperwork and that the car was his mother's. Brown flipped through papers from his glovebox to find the document showing that the vehicle was recently purchased. Brown also tried to call his mother so that she could confirm his assertions, but Guilmette told him to hang up the phone. As Brown sifted through his paperwork, Guilmette asked him if he had a driver's license. Brown said he did not, and Guilmette told Brown to exit the vehicle so that he could be placed under arrest. Before stepping out, Brown took off the satchel he was wearing and gave it to his passenger.

Once Brown was out of the vehicle, Guilmette searched him incident to his arrest and found two baggies in Brown's pockets—one with marijuana and another with white powder. Mook retrieved the satchel Brown had handed to his passenger, intending to search it. Guilmette asked whether there was anything in the car or satchel that he should know about, and Brown responded that there was a handgun in the satchel. Mook searched the satchel and found the firearm and additional drugs. After a few more minutes, [*3] Mook said "the VIN's all right," suggesting that the paperwork Brown produced had checked out. R. 37, PID 250-251.

Brown was indicted on four charges: (1) Felon in possession of a firearm, 18 U.S.C. § 922(g)(1); (2)

possession of a firearm by a person with a domestic-violence conviction, 18 U.S.C. § 922(g)(9); (3) possession with intent to distribute a controlled substance, 21 U.S.C. § 841(a)(1); and (4) possession of a firearm in furtherance of a drug-trafficking offense, 18 U.S.C. § 924(c)(1)(A)(i). The indictment also contained a forfeiture provision. A superseding indictment added a charge of possession with intent to distribute methamphetamine. 21 U.S.C. § 841(a)(1).

Brown moved to suppress the evidence, arguing that the traffic stop was unlawfully extended, that there was no basis for his arrest, and that the accompanying searches violated the Fourth Amendment.[1] The district court held a suppression hearing and denied Brown's motion. The court reasoned in part that the arrest was constitutional because police were entitled to ask Brown for his license and registration and because driving without a license or with a suspended license is "an arrestable offense." *Id.* at 275. The court further concluded that the search of Brown's pockets was a "lawful search incident to arrest" and that the search of the satchel [*4] was justified because officers could search for contraband or weapons. *Id.*

Pursuant to a written plea agreement that preserved Brown's right to appeal the denial of his motion to suppress, the district court sentenced Brown to sixty-one months of imprisonment. After the court's order denying his motion to suppress, Brown filed a motion to supplement the record with his driving record, which the court denied on the basis that it was an attempt to "introduce evidence retroactively."

## II. Analysis

### A. Standard of Review

When reviewing a district court's order denying a motion to suppress, we review findings of fact for clear error and questions of law de novo. *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000). A factual finding is clearly erroneous when, "although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). Where there is video evidence, we must view the facts "in the light depicted by the videotape." *See Scott v. Harris*, 550 U.S. 372, 381, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). Whether a seizure is reasonable is a question of law. *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008).

### B. Scope of Detention

Brown concedes that the officers had a reasonable basis to initiate the traffic stop because the license plate on the vehicle he was driving [*5] did not match the make and model of the car. Brown contends, however, that the traffic stop became unlawful when the police continued to detain him despite his producing paperwork showing that the vehicle complied with Ohio's vehicle-licensing laws.

#### 1. Constitutional Limits

A traffic stop is a seizure within the meaning of the Fourth Amendment, "even if the purpose of the stop is limited and the resulting detention is quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979). Before initiating a traffic stop, police must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417-418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)). An officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). To determine whether an officer's suspicion is reasonable, we consider the "totality of the circumstances," *Navarette*, 572 U.S. at 397 (quoting *Cortez*, 449 U.S. at 417), including "both the content of information possessed by police and its degree of reliability," *id.* (quoting *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)). Good faith alone on the part of police is insufficient to justify an intrusion. *See Terry*, 392 U.S. at 22. Instead, we use an "objective" standard: "[W]ould the facts available to the officer at the moment of the seizure or search [*6] 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21-22 (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S. Ct. 280, 69 L. Ed. 543, T.D. 3686 (1925)). "Anything less would invite intrusions upon constitutionally guaranteed

[1] Brown also challenged the admission of his un-Mirandized statements during the traffic stop, but he does not repeat the challenge here.

rights based on nothing more substantial than inarticulate hunches." *Id.* at 22.

Even when a traffic stop is legal at its inception, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). "'Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed;' whichever comes first." *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) (quoting *Rodriguez v. United States*, 575 U.S. 348, 349, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015)). A traffic stop "becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission" of the stop. *Rodriguez*, 575 U.S. at 350 (brackets omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005)). In assessing whether the length of a seizure is unreasonable, we consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). Because there is no "de minimis" exception to this rule, even incremental extensions beyond the time reasonably necessary to complete a traffic stop are unlawful. *Rodriguez*, 575 U.S. at 356-57.

The Constitution also places limits on the scope of a detention, not just its duration. During [*7] a traffic stop, officers must use "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. Thus, a detention can become unlawful where the "scope of the detention [is not] carefully tailored to its underlying justification." *Id.* "Even minor police actions aimed at 'detecting evidence of ordinary criminal wrongdoing' or any purpose beyond addressing the traffic infraction are not tasks incident to the stop." *United States v. Lott*, 954 F.3d 919, 924 (6th Cir. 2020) (quoting *Rodriguez*, 575 U.S. at 355).

Brown relies heavily on *State v. Chatton*, 11 Ohio St. 3d 59, 11 Ohio B. 250, 463 N.E.2d 1237 (Ohio 1984) (per curiam), a case he contends has facts very similar to those we consider today. In that case, an officer initiated a traffic stop because Chatton's vehicle appeared to have no license plate. *Id.* at 1237. As the officer approached Chatton's vehicle, he noticed that there was a temporary license plate lying right below the rear window, a fact that dispelled any reasonable suspicion justifying the stop. *Id.* Still, the officer continued to the driver-side window and asked Chatton for his driver's license, which he produced. *Id.* After running a computer check, the officer learned that Chatton's license was suspended. *Id.* The officer arrested Chatton and searched his vehicle, discovering a handgun. [*8] *Id.* at 1238. Chatton was indicted for carrying a concealed weapon. *Id.*

The *Chatton* court explained that the initial stop was legal because the officer had "specific and articulable facts" to justify his reasonable suspicion—the absence of a license plate on the vehicle. *Id.* at 1239 (*quoting Terry*, 392 U.S. at 21-22). However, the basis justifying Chatton's detention was extinguished once the officer saw the temporary plate. *Id.* at 1240. At that point, the officer could no longer maintain a reasonable suspicion that Chatton was violating the law. *Id.* Consequently, any further detention of Chatton was unreasonable because the officer lacked any basis to detain him. *Id.*; *see also Prouse*, 440 U.S. at 661 (holding that asking a driver to produce their driver's license is unlawful "[w]hen there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations—or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered").

**2. Brown's Detention**

*Chatton*'s analysis is helpful in examining the circumstances of Brown's traffic stop. Like in *Chatton*, the "purpose" or "mission" of the stop here was to investigate whether Brown's vehicle was operating in violation of the state's [*9] vehicle-licensing laws. *Id.* at 170, 196. Thus, the officers had a duty to use the "least intrusive means reasonably available to verify or dispel" the theory that Brown's vehicle was improperly licensed. *Royer*, 460 U.S. at 500. This case might be analogous to *Chatton* had Brown produced the exculpatory paperwork immediately after he was pulled over and nevertheless had his detention extended. But that is not what occurred. Footage from the traffic stop shows Brown fumbling around for over a minute to find the correct paperwork, at which point Guilmette asked Brown whether he had a driver's license. Leading up to this point, Guilmette had acted diligently—he had not done anything to extend the traffic stop longer than necessary to effectuate its purpose. Brown would have taken equally long to find his documents whether Guilmette had asked the question or not. This case is thus different from *Chatton*, where the officer extended the stop beyond the time necessary to dispel reasonable suspicion. Here, Guilmette's question did not

unlawfully extend the duration of the traffic stop in any way.

Nor did Guilmette's inquiry impermissibly expand the scope of the stop. When officers have reasonable suspicion of a traffic violation, they may carry [*10] out "ordinary inquiries incident to the traffic stop." *Rodriguez*, 575 U.S. at 355 (brackets omitted) (quoting *Caballes*, 543 U.S. at 408). This may include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* We applied this principle in *Lott*, holding that an officer did not unconstitutionally expand the scope of a traffic stop when he spent a few minutes running a warrant check on a driver who was pulled over for a left-lane infraction. 954 F.3d at 924-25. These cases make clear that Guilmette could ask for Brown's driver's license during the traffic stop because, at the time of the request, he had reasonable suspicion that Brown had committed a traffic offense.

**C. Legality of Arrest**

Police must have probable cause before making a warrantless arrest. *See Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964). In determining whether probable cause existed, we examine whether, at the moment of arrest, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Id.*

Guilmette testified that he intended to arrest Brown [*11] for violating Akron's prohibition against driving with a suspended license. Under the Akron municipal code, it is a first-degree misdemeanor—and thus an arrestable offense—for a person whose driver's license "has been suspended" to "operate any motor vehicle . . . during the period of the suspension." Akron, Ohio, Mun. Code §§ 71.01(A)(1), (F)(1); *see id.* § 10.99(D)(1).

The government argues that there was probable cause to believe that Brown was operating a vehicle on a suspended license. However, the only supporting evidence police had at the time was Brown's statement that he did not have a driver's license. Guilmette did not ask to see Brown's ID—which would have made clear whether Brown had obtained a license in the first place—and did not look up Brown's name in the LEADS system, which would have shown whether Brown had a suspension. At the suppression hearing, Guilmette confirmed that he had not investigated whether Brown was under any license suspension. Because Guilmette had almost no evidence at the time suggesting that Brown's license was suspended, Brown argues that there was no probable cause to believe he had violated Section 71.07 at the time of his arrest.

Brown argues that a different provision of the Akron municipal code applied to him—the [*12] prohibition against operating a vehicle without a driver's license in Section 71.01. Brown contends that, unlike Section 71.07, a violation of Section 71.01 is a minor misdemeanor, for which police cannot make an arrest. But Brown overstates Section 71.01.[2]

That section states only that the minor-misdemeanor penalty applies to an individual who "operat[es] a motor vehicle when his driver's . . . license has been expired for no more than six months." *Id.* at 71.01(C). Relevant here, the penalty for driving without ever obtaining a license—Brown's circumstances here—is unstated. However, Section 71.99, a catchall provision, states that "[w]hoever violates any provision of this chapter for which another penalty is not provided shall be guilty of a misdemeanor of the first degree." Accordingly, as the district court concluded, a reasonable officer would have had probable cause to arrest Brown for driving without a license.[3]

---

[2] We acknowledge that the prosecution did not dispute Brown's reading of Section 71.01 in its brief. And Guilmette gave contradictory testimony at the suppression hearing regarding the consequences of driving without a license. At the suppression hearing, Guilmette testified that driving without having acquired a license was not an arrestable offense, and that if Brown did not have a license suspension, he "was not properly being arrested." R. 37, PID 206; *id.* at PID 205 ("I believe if . . . you've never had [a license] issued to you, I don't believe that's an M1 arrestable offense, but driving under a suspended license is."). But Guilmette also testified that he routinely arrested anyone driving without a valid license, that "[d]riving without a license" is a "per se arrestable offense under the Akron City Code," and that "[i]t doesn't matter why you don't have a license." *Id.* at 204-06.

[3] Once officers had probable cause to arrest Brown, they were permitted to conduct the search incident to arrest that produced narcotics in his pockets. *See Chimel v. California*, 395 U.S. 752, 762-63, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969). And once Brown informed them that he had a weapon in the car—a statement Brown has not argued on appeal was elicited in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)—they had probable cause

**III. Conclusion**

For the foregoing reasons, we AFFIRM the district court's order denying Brown's motion to suppress.

End of Document

to search his satchel. [*13] *See Arizona v. Gant*, 556 U.S. 332, 347, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) (citing *United States v. Ross*, 456 U.S. 798, 820-821, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982)).

# United States v. Weaver

99 F.3d 1372 (6th Cir. 1996)

Cited in Opening Brief at: 52

Highlighted language appears at 99 F.3d at 1378.

Caution
As of: September 14, 2026 7:16 PM Z

# United States v. Weaver

United States Court of Appeals for the Sixth Circuit

November 8, 1996, Decided ; November 8, 1996, Filed

No. 94-6575

**Reporter**
99 F.3d 1372 *; 1996 U.S. App. LEXIS 29129 **; 1996 FED App. 0354P (6th Cir.) ***

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. GARY LYNN WEAVER, Defendant-Appellant.

**Subsequent History:** [**1] Rehearing Denied April 7, 1998, Reported at: 1998 U.S. App. LEXIS 9543.

**Prior History:** ON APPEAL from the United States District Court for the Middle District of Tennessee. 94-00033. John T. Nixon, Chief District Judge.

**Disposition:** REVERSED.

**Counsel:** For UNITED STATES OF AMERICA, Plaintiff - Appellee: William Cohen, Asst. U.S. Attorney, ARGUED, BRIEFED, Office of the U.S. Attorney, Nashville, TN.

For GARY WEAVER, Defendant - Appellant: Bob Lynch, Jr., ARGUED, BRIEFED, Nashville, TN.

**Judges:** Before: JONES, BATCHELDER, and MOORE, Circuit Judges.

**Opinion by:** NATHANIEL R. JONES

## Opinion

[*1374] NATHANIEL R. JONES, Circuit Judge. Defendant-appellant Gary Lynn Weaver appeals his conviction for the unlawful possession of firearms and ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). For the reasons that follow, we reverse.

[***2] I.

On February 23, 1994, a federal grand jury returned a two-count indictment against Gary L. Weaver in the District Court for the Middle District of Tennessee for the unlawful possession of firearms and ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), respectively. On April 18, 1994, Weaver filed a motion to suppress the introduction and use of firearms and ammunition seized from his residence during the execution of a search warrant. On August 23, 1994, the district court denied the motion. Trial to a jury occurred on August 30 and 31, 1994. The jury convicted Weaver on both counts. On November 16, 1994, the judge sentenced him to 18 months imprisonment, 3 years supervised release, fines, [**2] and costs. This timely appeal followed.

The principal issues on appeal are (1) whether the affidavit presented for issuance of the search warrant contained sufficient particularized facts from which the issuing magistrate could find a substantial basis for probable cause; and, (2) if the affidavit was defective, whether the law enforcement officers acted in good faith reliance on the warrant when executing the search.

II.

A.

In 1986 Weaver pled guilty to the felony charge of illegally engaging in the interstate distribution of explosives without a license. As a condition of his probation, Weaver could not thereafter own or possess firearms or ammunition. After his conviction, Weaver disposed of all but two of the nine rifles he owned. In early May 1993, these two rifles, along with some live ammunition, bullet molds, and other items used in home-loading ammunition, were returned to the Weaver home at 3031 Hartford Drive in Murfreesboro, Tennessee, by a friend who could not afford to purchase them. As Weaver was not present at the time of return, his wife, aware of the probation conditions, [***3] instructed the friend to place all the returned items in a detached "outbuilding" [**3] located behind the residence, with the intent to dispose of the items herself without informing Weaver. She did not, however, dispose of the items and they remained in the outbuilding.

Later that month, on May 23, 1993, Detective Mickey McCullough of the Vice Division of the Murfreesboro Police Department received a tip from a known and previously reliable confidential informant, Philip Dinovo, regarding a possible marijuana sales operation occurring on or near Hartford Drive in [*1375] Murfreesboro. Dinovo informed McCullough that he learned of the operation from a third person he knew only as "Charlie." Charlie was not an informant and was unaware of Dinovo's connection to the police. Dinovo said he would attempt to purchase some marijuana with Charlie at the Hartford Drive location. McCullough provided Dinovo with $ 100 for the purchase and instructed the informant to contact him with the drugs or to return the money. The police did not conduct surveillance of the drug transaction or believe that surveillance was necessary.

At midday on May 25, 1993, Dinovo and McCullough met again. The informant informed McCullough that, on the previous day, he and Charlie went "to the home of Mr. Gary [**4] Weaver on Hartford Drive" and jointly purchased one-half ounce of marijuana. J.A. at 136-37. The informant also told the detective that Charlie believed Weaver was growing marijuana at the house, although Dinovo personally observed no indications of a marijuana growing operation. McCullough then drove Dinovo to Hartford Drive, at which time the informant identified the Weaver house as the location of the marijuana purchase. By calling the Murfreesboro Electric Department, McCullough verified that Weaver held the utilities account for the property identified. Although aware of Weaver's prior conviction, McCullough had no prior knowledge connecting Weaver with illegal drugs or drug distribution. The detective took no additional steps to corroborate the informant's story.

[***4] Based on this information, McCullough immediately prepared a preprinted form affidavit to obtain a search warrant for the Weaver premises, with the intent "to make a case for the felonious possession of marijuana to keep the identity of the informant anonymous." J.A. at 131. [1] McCullough's preprinted affidavit was composed of boilerplate text with a few open spaces for additional information:

> Personally [**5] appeared before *James W. Buckner*, Judge of the Court of *Gen. Session* for Rutherford County, Tennessee the undersigned *Mickey McCullough*, a lawful officer of said County and State, who makes affidavit that there is probable cause to believe, and that affiant does believe, that *Gary Weaver* is now unlawfully keeping a quantity of *marijuana* for the purpose or with the intention of unlawful possession, sale or transportation thereof, and upon his, her or their person, or in his, her, or their possession, custody or control upon premises used, occupied, possessed or controlled by him, her, or them, and which premises are located and described as follows: *A two story brick dwelling house having a city designated street address of 3031 Hartford Drive. Having a two car attached garage and a detached brick building behind the main house having a concrete driveway and a mailbox erected adjacent to said driveway with the numbers 3031 attached to it. Having a city designated street address of 3031 Hartford Drive, M'boro, Ruth. Co. TN.*
>
> Affiant further makes affidavit that on the *25* day of *May*, 19*93*, affiant received information from a reputable and reliable [**6] person, whose name and identity have been disclosed to the Judge to whom this application is made, that Affiant verily believes, and accordingly represents to the Court, that the said informer is truthful, reliable and credible, and that the [***5] information so given is accurate and reliable, because: (1) the said informer appears to have intelligence and unimpaired physical senses; (2) the said informer appears to affiant to have sufficient personal knowledge or familiarity or experience with the contraband substance herein mentioned to be able to identify the same by sight, smell and other senses, insofar as such identification can usually be made by the human physical senses unaided by laboratory analysis; (3) there has been a previous occasion, or occasions, on which the same informer has given information of violation of law of the state, which information thereafter was found to have been accurate and reliable; (4) that within the last 72 hours said informant was upon the above described premises and while thereon personally [*1376] observed (*Gary Weaver*) having personal possession and control over a quantity of (*marijuana*) being held expressly for the purpose of unlawful [**7] distribution. Affiant knows of no reasons why said informer would falsify or fabricate any of the information given. Consequently, affiant believes that all or some portion of the said (*marijuana*) still remains upon the above described premises.

[1] McCullough testified that he never planned to charge Weaver on the misdemeanor marijuana sale to Dinovo. J.A. at 120.

J.A. at 39 (emphasis denotes handwritten information). At some point after 2:00 p.m. that afternoon McCullough presented the affidavit to the judge and may have orally supplemented the affidavit with additional information. The judge issued the warrant at that time.

At 8:25 p.m. that same evening, McCullough led a team of six officers in executing the warrant. Upon searching the residence and outbuilding, the authorities found a quarter-ounce of marijuana but uncovered no other evidence of possession, distribution, or growth of marijuana on the property. The search team also discovered the rifles, ammunition, and other ammunition-related [**8] items left in the outbuilding and arrested Weaver for having these articles in his possession. The authorities [***6] did not charge Weaver with any marijuana-related offenses. [2]

Prior to trial, Weaver moved to suppress the evidence taken from his property due to lack of probable cause for the search. The district court denied his motion, finding without discussion that the averments of the affidavit were not false and the search warrant was not defective. J.A. at 72. Weaver contends that the district court erred in denying his motion because McCullough's boilerplate affidavit lacked sufficient particularized facts of criminal activity to justify a search of his residence. Moreover, the appellant argues that McCullough's search could not have been in good faith because [**9] the detective was executing a search warrant based on his own insufficient affidavit. Therefore, without either probable cause or a good faith exception to the exclusionary rule, Weaver asserts the evidence seized under the defective warrant should be suppressed.

The government responds that the affidavit included ample factual information to show probable cause, regardless of whether some of the facts were included in preprinted language. Moreover, even if the affidavit and warrant were defective, the government argues the authorities acted in good faith reliance on the judge's neutral and detached determination of probable cause. Therefore, the government contends that the evidence discovered in the search should be admitted.

B.

When reviewing decisions on motions to suppress, this court will uphold the factual findings of the district court unless clearly erroneous, while legal conclusions are reviewed *de novo*. *United States v. Leake*, 998 F.2d 1359, 1362 [***7] (6th Cir. 1993). When the district court itself is a reviewing court, as in this case, this court owes the district court's conclusions no particular deference. *Id.* at 1362-63 (citations omitted).

In [**10] *Illinois v. Gates*, the Supreme Court established that a warrant must be upheld as long as the "magistrate had a 'substantial basis for . . . concluding' that a search would uncover evidence of wrongdoing . . . ." 462 U.S. 213, 236, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *United States v. Pelham*, 801 F.2d 875, 877-78 (6th Cir. 1986), *cert. denied*, 479 U.S. 1092, 94 L. Ed. 2d 160, 107 S. Ct. 1305 (1987). This court pays great deference to the determinations of probable cause made by a state magistrate, whose findings "should not be set aside unless arbitrarily exercised." *Pelham*, 801 F.2d at 877 (citing *United States v. Swihart*, 554 F.2d 264, 270 (6th Cir. 1977)). Yet, "the court must . . . insist that the magistrate perform his 'neutral and detached' function and not serve merely as a rubber stamp for police." *Aguilar v. Texas*, 378 U.S. 108, 111, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964). As such, "deference to the [issuing] magistrate . . . is not boundless." *United States v. Leon*, 468 U.S. 897, 914, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984).

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, . . . ." U.S. CONST. amend. IV. The protections of personal privacy and property embodied in the amendment require that probable cause [**11] "be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14, 92 L. Ed. 436, 68 S. Ct. 367 (1947). For the magistrate to be able to properly perform this official function, the affidavit presented must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant. *Whiteley v. Warden*, 401 U.S. 560, 564, 28 L. Ed. 2d 306, 91 S. Ct. 1031 (1971); *Nathanson v. United States*, 290 U.S. 41, 47, 78 L. Ed. 159, 54 S. Ct. 11 (1933). These supporting facts need not be based on the direct knowledge and observations of the affiant, but may also come from hearsay information supplied by an informant. *Jones v. United States,* 362 U.S. 257, 269-70, 4 L. Ed. 2d 697, 80 S. Ct. 725 [***8] (1960). From whatever source, the information presented must be sufficient to allow the

[2] Weaver purchased the discovered marijuana a few days before the execution of the search warrant, apparently for personal use. McCullough testified that he declined to charge Weaver on this misdemeanor possession violation. J.A. at 131.

official to independently determine probable cause; "his action cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239.

In a case involving an anonymous tip, the *Gates* Court established a "totality of the circumstances" test for determining probable cause:

> The task of the issuing [**12] magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

462 U.S. at 238. Although rejecting the previous two-pronged "veracity" and "basis of knowledge" test fashioned in the cases of *Aguilar v. Texas, supra,* and *Spinelli v. United States*, 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969), the Court stressed that these factors remain highly relevant in the new analysis. *Gates*, 462 U.S. at 230; *Pelham*, 801 F.2d at 877. Moreover, the *Gates* Court maintained that the formerly independent factors should be considered together, emphasizing that a deficiency in one area could be counterbalanced by a "strong showing" in the other:

> If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activity in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a [**13] finding of probable cause based on his tip.

462 U.S. at 233.

The present affidavit is based almost entirely on hearsay information supplied by a previously reliable confidential informant. This court applies the *Gates* "totality of the circumstances" analysis to cases involving known, reliable [***9] informants. *E.g., United States v. Smith*, 783 F.2d 648, 650-51 (6th Cir. 1986). In so doing, we recognize that two factors are critical to determining whether an affidavit based on a confidential informant's tip provides a "substantial basis" for finding probable cause: (1) an "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's tip] to greater weight than might otherwise be the case"; and, (2) corroboration of the tip through the officer's independent investigative work is significant. *United States v. Sonagere*, 30 F.3d 51, 53 (6th Cir.) (citing *Gates*, 462 U.S. at 234, 244), *cert. denied*, 130 L. Ed. 2d 434, 115 S. Ct. 531 (1994).

Weaver argues that the affidavit presented was a "bare bones" composition of boilerplate language, with few particularized facts linking this suspect [**14] and his residence to illegal drugs or any other criminal activities. The government responds that preprinted boilerplate language can support probable cause as long as there are sufficient particularized [*1378] facts presented. An affidavit that states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, is a "bare bones" affidavit. *See Aguilar*, 378 U.S. at 114. In determining whether an affidavit is "bare bones," the reviewing court is concerned exclusively with the statements contained within the affidavit itself. *Whiteley*, 401 U.S. at 564-65; *United States v. Hatcher*, 473 F.2d 321, 323 (6th Cir. 1973). [3] As we are aware that "affidavits are 'normally drafted by nonlawyers in the midst and haste of a criminal investigation,'" we remain cautious not to interpret the language of affidavits in a "hypertechnical" manner. [***10] *Pelham*, 801 F.2d at 878 (citing *United States v. Ventresca*, 380 U.S. 102, 108-09, 13 L. Ed. 2d 684, 85 S. Ct. 741 (1965)). Nevertheless, it is imperative that affidavits accurately reflect the facts of the particular situation at hand. *United States v. Richardson*, 274 U.S. App. D.C. 58, 861 F.2d 291, [**15] 294-95 (D.C. Cir. 1988), *cert. denied*, 489 U.S. 1058, 103 L. Ed. 2d 593, 109 S. Ct. 1325 (1989). The use of generalized boilerplate recitations designed to meet all law enforcement needs for illustrating certain types of criminal conduct engenders the risk that insufficient "particularized facts" about the case or the suspect will be presented for a magistrate to determine probable cause. *See In re Young*, 716 F.2d 493, 500 (8th Cir. 1983) (holding unacceptable an FBI affidavit of "broad, boilerplate statement describing in a general way" applications, reports, and records commonly kept in bail bond operation); *see also United States v. Barham*, 595 F.2d 231, 246 (5th Cir. 1979), *cert. denied*, 450 U.S. 1002, 68 L. Ed. 2d 205, 101 S. Ct. 1711 (1981) (characterizing sufficient affidavit as "honest and straightforward recitation (unadorned by the boilerplate so frequently and woodenly inserted to satisfy Fourth

---

[3] The government's attempt to bolster McCullough's initial affidavit through a second, more-detailed affidavit and testimony at the suppression hearing are without merit. Due to the brevity of the district court's order, there is no way for this court to determine the extent to which the district court relied on the additional information in its deliberations.

Amendment standards in the most artificial fashion)"); *contra United States v. Romo*, 914 F.2d 889, 898 (7th Cir. 1990) ("As long as there is sufficient information to provide probable cause for the search, the fact that the affidavit is partially pre-printed is irrelevant."), *cert. denied*, 498 U.S. 1122, 112 L. Ed. 2d 1183, 111 S. Ct. 1078 (1991).

[**16] Reading this affidavit in a "practical, common-sense" manner, the only claim of possible wrongdoing is the averment that, within three days prior to the affidavit date, the informant was on the suspect premises and, while there, he saw some quantity of marijuana "expressly for the purpose of unlawful distribution." J.A. at 39. McCullough presents no underlying factual circumstances to support the informant's knowledge regarding distribution, nor the detective's own "belief" that these quantities of marijuana were present "for the purpose or with the intention of unlawful possession, sale or transportation," or even that marijuana would be on the premises when the warrant was executed. *Id*. The government asks us to recognize that McCullough did not include additional drug-related information in the affidavit, [***11] including the circumstances of the drug transaction between Weaver and Dinovo, because to do so would have tipped Weaver off to the identify of the informant and possibly jeopardize the informant's safety. A limited privilege exists to withhold information which could identify an informant. *United States v. Jenkins*, 4 F.3d 1338, 1340 (6th Cir. 1993), *cert.* [**17] *denied*, 114 S. Ct. 1547, 128 L. Ed. 2d 197 (1994). Nevertheless, particularized facts regarding alleged wrongdoing that did not identify Dinovo could have been discovered and included in the affidavit without necessarily jeopardizing the identity of the informant. [4] From this affidavit, all other information that the government cites as particularized facts, that is, the suspect's name, address, and description of the residence, could arguably be obtained by any [*1379] person passing the Weaver house. As presented, the combined boilerplate language and minimal handwritten information provide few, if any, particularized facts of an incriminating nature and little more than conclusory statements of affiant's belief that probable cause existed regarding criminal activity.

[**18] Nevertheless, we bear in mind that "probable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts . . . [in which] 'informants' tips, like all other clues and evidence . . . may vary greatly in their value and reliability.'" *Gates*, 462 U.S. at 232 (citing *Adams v. Williams*, 407 U.S. 143, 147, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972)). Moreover, the circumstances of each case are unique. *See Leon*, 468 U.S. at 918 (suppression of evidence obtained pursuant to warrant must be addressed on case-by-case basis). Consequently, it is possible that weak factual information may be bolstered if the authorities undertook probative efforts to corroborate an informant's claims [***12] through independent investigations. *Gates*, 462 U.S. at 242. [5] [***13]

---

[4] For instance, a description of the marijuana and how it was maintained, identifying aspects of the location in the residence where the marijuana or distribution paraphernalia was seen or kept, a description of Weaver, information on the distribution operation, etc. could have been elicited from the informant, either at the time of this transaction or over the course of a surveillance.

[5] Panels of this court have differed on the need for corroboration in situations regarding tips from known, reliable informants. For instance, in *United States v. Smith*, this court considered the following affidavit prepared from the tip of a known, confidential informant who had provided reliable information in the past:

On the 20th day of August, 1984, at approximately 5:00 p.m., the affiant received information from a reliable informant that Eric Helton was producing marijuana at his residence. Acting on the information received, affiant conducted the following independent investigation: On August 21, 1984 at 11:30 a.m. Detective William Stweart [sic] observed a marijuana plant growing beside the residence of Eric Helton.

783 F.2d at 649. The panel found that the affidavit "though sketchy" appeared to satisfy the *Gates* test, stating twice, however, that the informant's tip alone would not have been sufficient, even though the informant was known and had provided reliable information in the past. *Id.* at 650, 651. The crucial information the court relied upon in upholding the affidavit was the corroboration of the growing plant. *Id.* at 651; *Leake*, 998 F.2d at 1365.

Subsequently, in *United States v. Finch*, this court addressed a defense challenge to the following search warrant affidavit as "conclusory":

Affiant has talked with a reliable informant of Memphis, Shelby County, Tennessee who has given the affiant other information in the past which has been found to be true and correct, and which has resulted in several narcotic arrests and drug seizures. This reliable informant stated that within the past five (5) days of January 19, 1991, this reliable informant has been inside the above described residence and has seen the above described person storing and selling Cocaine inside this residence.

998 F.2d 349, 352 (6th Cir. 1993). In upholding the

Regarding the reliability of this informant, the affidavit states that McCullough was relying on an informant who could identify marijuana and who on "occasion, or occasions, . . . [had] given information of violation of law of the state, which information thereafter was found to have been accurate and reliable." J.A. at 39. There is no indication in this affidavit that this informant provided reliable information [**19] in the past leading to drug-related arrests or prosecutions. More important, however, is that McCullough possessed only Dinovo's tip linking Weaver to possible drug activities, yet undertook no substantive independent investigative actions to corroborate his informant's claims, such as surveillance of the Weaver residence for undue traffic or a second controlled purchase made with officers viewing. The discovery of the utilities account holder, by itself, is insignificant. *See United States v. Gibson*, 928 F.2d 250, 252-53 (8th Cir. 1991) (insufficient showing of probable cause when officer only corroborated "innocent details" of utility records for account name, revenue agency for physical description, and car titles, and "there was neither surveillance nor observation of unusual civilian or vehicular traffic at the address, nor were there very short visits characteristic of drug trafficking.")

[**20] Thus, even assuming the reliability of Dinovo as an informant, our review of this affidavit reveals a paucity of particularized facts indicating that a search of the Weaver residence "would uncover evidence of wrongdoing." *Gates*, 462 U.S. at 236. In sum, we hold that, when viewed in the totality of the circumstances, this "bare [*1380] bones" affidavit failed to provide sufficient factual information for a finding of probable cause. Therefore, our inquiry turns to whether exclusion of the items seized during the search is appropriate.

C.

The government contends that even if the warrant was issued without a showing of probable cause, McCullough relied on the warrant's validity in good faith, thus raising [***14] an exception to the exclusionary rule, as announced in *United States v. Leon, supra*. In *Leon*, the Supreme Court held that the exclusionary rule "should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." 468 U.S. at 905. The Court noted, however, four specific situations where the good faith reliance exception was inappropriate: first, if the issuing magistrate [**21] "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," *id.* at 914; second, if "the issuing magistrate wholly abandoned his judicial role," *id.*; third, if the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *id.* at 915 (citations omitted), or in other words, where "the warrant application was supported by [nothing] more than a 'bare bones' affidavit," *id.*; and, fourth, if the "warrant may be so facially deficient--i.e., failing to particularize the place to be searched or the things to be seized . . . ," *id.* at 923 (citations omitted).

Regarding the third situation, Weaver asks this court to apply the Fifth Circuit's reasoning in *United States v. Barrington*, 806 F.2d 529 (5th Cir. 1989). Drawing from the Supreme Court's note in *Leon* that "nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a 'bare bones' affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search," [**22] 468 U.S. at 923 n.24, the Fifth Circuit extrapolated that an officer who submitted an insufficient "bare bones" affidavit to the magistrate, and then executed the resulting warrant himself, could not have acted in objective good faith reliance on the warrant. 806 F.2d at 532. The government avers that *Barrington* is distinguishable, as McCullough presented significantly [***15] more information in his affidavit than the officer in that case. [6]

Although the Fifth Circuit's reasoning appears to be a logical extension of *Leon*, the threshold question is one of reasonableness: whether the "reliance on the validity of the warrant was objectively reasonable, that is, 'whether a reasonably well-trained officer would have known that the search was illegal [**23] despite the magistrate's authorization.'" *Leake*, 998 F.2d at 1366 (quoting *Leon*, 468 U.S. at 922 n.23). Viewed objectively, McCullough possessed some information from a previously reliable informant regarding possible criminal activities but 1) possessed no prior personal knowledge of any unlawful activity by this suspect, or at the suspect residence, other than an old conviction on

affidavit, the *Finch* court did not address whether corroboration was necessary, finding that the authorities had provided "a statement of the affiants' reasons for their belief as to the existence of probable cause." *Id.*

[6] The *Barrington* affidavit "stated only that Captain Solomon 'received information from a confidential informant' who is 'known to Captain Phil Solomon and has provided information in the past that has led to arrest and convictions.'" 806 F.2d at 531.

completely unrelated circumstances; 2) possessed no present personal knowledge of any connection between this suspect and marijuana possession or distribution; 3) had not personally seen any marijuana at the suspect residence nor conducted any visual reconnaissance of the property to determine whether marijuana was likely to be present on the property; and 4) possessed only third-party hearsay information about a possible marijuana grow operation on the property. With little firsthand information and no personal observations, McCullough should have realized that he needed to do more independent investigative work to show a fair probability that this suspect was either possessing, distributing, or growing marijuana. *Cf*. *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996) (holding [**24] preprinted boilerplate affidavit reciting [*1381] generalizations about evidence in drug dealer's residence, without more information, insufficient to render officers' reliance objectively reasonable). Had the detective made some meaningful "effort to corroborate the informant's report at [***16] issue, 'an entirely different case' would have been presented." *Gates*, 462 U.S. at 242 (citing *Aguilar*, 378 U.S. at 109 n.1). We believe a reasonably prudent officer would have sought greater corroboration to show probable cause and therefore do not apply the *Leon* good faith exception on the facts of this case. [7] Accordingly, the items seized at the Weaver residence should be suppressed.

[**25] III.

"The security of one's privacy against arbitrary intrusion by the police--which is at the core of the Fourth Amendment--is basic to a free society." *Wolf v. Colorado*, 338 U.S. 25, 27, 93 L. Ed. 1782, 69 S. Ct. 1359 (1949). The Fourth Amendment does not require an officer to reinvent the wheel with each search warrant application. Nevertheless, because of the threat of generalization when particular facts are necessary, we remain concerned about boilerplate language in affidavits or search warrants. *See United States v. Brown*, 49 F.3d 1162, 1175 (6th Cir. 1995) (Batchelder, J., dissenting) (preprinted boilerplate language is insufficient for "suitable words of reference" required for incorporation of affidavit in search warrant). It takes but a few minutes more for law enforcement authorities to obtain and include sufficient particularized facts so that magistrates may perform their detached function fully informed. *United States v. Schauble*, 647 F.2d 113, 116 (10th Cir. 1981). Such time was not taken in this case.

For the foregoing reasons, the district court's denial of the motion to suppress is REVERSED.

---

End of Document

[7] Because this kind of pre-printed affidavit form had been in use for a substantial period of time in Murfreesboro and apparently had the blessing of the local prosecutor and General Sessions Judge, we think it is important to stress that in the situation at hand, Officer McCullough should have recognized that he did not even possess sufficient factual information to constitute probable cause.

# Horton v. California

496 U.S. 128 (1990)

Cited in Opening Brief at: 53

Highlighted language appears at 496 U.S. at 136.

Caution
As of: September 14, 2026 7:18 PM Z

# Horton v. California

Supreme Court of the United States

February 21, 1990, Argued ; June 4, 1990, Decided

No. 88-7164

**Reporter**
496 U.S. 128 *; 110 S. Ct. 2301 **; 110 L. Ed. 2d 112 ***; 1990 U.S. LEXIS 2937 ****; 58 U.S.L.W. 4694

TERRY BRICE HORTON, PETITIONER v. CALIFORNIA

**Prior History:** [****1] On Writ of Certiorari to the Court of Appeal of California Sixth Appellate District.

**Disposition:** Affirmed.

## Syllabus

A California policeman determined that there was probable cause to search petitioner Horton's home for the proceeds of a robbery and the robbers' weapons. His search warrant affidavit referred to police reports that described both the weapons and the proceeds, but the warrant issued by the Magistrate only authorized a search for the proceeds. upon executing the warrant, the officer did not find the stolen property but did find the weapons in plain view and seized them. The trial court refused to suppress the seized evidence, and Horton was convicted of armed robbery. The California Court of Appeal affirmed. Since the officer had testified that while he was searching Horton's home for the stolen property he was also interested in finding other evidence connecting Horton to the robbery, the seized evidence was not discovered "inadvertently." However, in rejecting Horton's argument that Coolidge v. New Hampshire, 403 U.S. 443, therefore required suppression of that evidence, the Court of Appeal relied on a State Supreme Court decision holding that Coolidge's discussion of the inadvertence [****2] limitation on the "plain view" doctrine was not binding because it was contained in a four-Justice plurality opinion.

Held: The Fourth Amendment does not prohibit the warrantless seizure of evidence in plain view even though the discovery of the evidence was not inadvertent. Although inadvertence is a characteristic of most legitimate plain view seizures, it is not a necessary condition. Pp. 4-13.

(a) Coolidge is a binding precedent. However, the second of the Coolidge plurality's two limitations on the plain view doctrine -- that the discovery of evidence in plain view must be inadvertent, id., at 469 -- was not essential to the Court's rejection of the State's plain view argument in that case. Rather, the first limitation -- that plain view alone is never enough to justify a warrantless seizure, id., at 468 -- adequately supports the Court's holding that gunpowder found in vacuum sweepings from one of the automobiles seized in plain view on the defendant's driveway in the course of his arrest could not be introduced against him because the warrantless seizures violated the Fourth Amendment. In order for a warrantless seizure of an object in plain view to be valid, two conditions [****3] must be satisfied in addition to the essential predicate that the officer did not violate the Fourth Amendment in arriving at the place from which the object could be plainly viewed. First, the object's incriminating character must be "immediately apparent," id., at 466. Although the cars in Coolidge were obviously in plain view, their probative value remained uncertain until after their interiors were swept and examined microscopically. Second, the officer must have a lawful right of access to the object itself. Justice Harlan, who concurred in the Coolidge judgment but did not join the plurality's plain view discussion, may well have rested his vote on the fact that the cars' seizure was accomplished by means of a warrantless trespass on the defendant's property. Pp. 4-8.

(b) There are two flaws in the Coolidge plurality's conclusion that the inadvertence requirement was necessary to avoid a violation of the Fourth Amendment's mandate that a valid warrant "'particularly describe . . . [the] . . . things to be seized,'" id., at 469-471. First, evenhanded law enforcement is best achieved by applying objective standards of conduct, rather than standards that depend upon the officer's [****4] subjective state of mind. The fact that an officer is interested in an item and fully expects to find it

should not invalidate its seizure if the search is confined in area and duration by a warrant's terms or by a valid exception to the warrant requirement. Second, the suggestion that the inadvertence requirement is necessary to prevent the police from conducting general searches, or from converting specific warrants into general warrants, is not persuasive because that interest is already served by the requirements that an unparticularized warrant not be issued and that a warrantless search be circumscribed by the exigencies which justify is initiation. Here, the search's scope was not enlarged by the warrant's omission of reference to the weapons; indeed, no search for the weapons could have taken place if the named items had been found or surrendered at the outset. The prohibition against general searches and warrants is based on privacy concerns, which are not implicated when an officer with a lawful right of access to an item in plain view seizes it without a warrant. Pp. 8-13.

**Judges:** Stevens, J., delivered the opinion of the Court, in which Rehnquist, C. J., and White, Blackmun, O'Connor, [****5] Scalia, and Kennedy, JJ. joined. Brennan, J., filed a dissenting opinion, in which Marshall, J., joined.

**Opinion by:** STEVENS

## Opinion

[*130] [***118] [**2304] [1A]In this case we revisit an issue that was considered, but not conclusively resolved, in Coolidge v. New Hampshire, 403 U.S. 443 (1971): Whether the warrantless seizure of evidence of crime in plain view is prohibited by the Fourth Amendment if the discovery of the evidence was not inadvertent. We conclude that even though inadvertence is a [***119] characteristic of most legitimate "plain view" seizures, it is not a necessary condition.

I

Petitioner was convicted of the armed robbery of Erwin Wallaker, the treasurer of the San Jose Coin Club. When Wallaker returned to his home after the Club's annual show, he entered his garage and was accosted by two masked men, one armed with a machine gun and the other with an electrical shocking device, sometimes referred to as a "stun gun." The two men shocked Wallaker, bound and handcuffed him, and robbed him of jewelry and cash. During the encounter sufficient conversation took place to enable Wallaker subsequently to identify petitioner's distinctive voice. His identification was partially corroborated by a witness who saw the robbers leaving [****6] the scene, and by evidence that petitioner had attended the coin shows.

Sergeant LaRault, an experienced police officer, investigated the crime and determined that there was probable cause to search petitioner's home for the proceeds of the robbery [*131] and for the weapons used by the robbers. His affidavit for a search warrant referred to police reports that described the weapons as well as the proceeds, but the warrant issued by the Magistrate only authorized a search for the proceeds, including three specifically described rings.

Pursuant to the warrant, LaRault searched petitioner's residence, but he did not find the stolen properly. During the course of the search, however, he discovered the weapons [**2305] in plain view and seized them. Specifically, he seized an Uzi machine gun, a .38 caliber revolver, two stun guns, a handcuff key, a San Jose Coin Club advertising brochure, and a few items of clothing identified by the victim. [1] LaRault testified that while he was searching for the rings, he also was interested in finding other evidence connecting petitioner to the robbery. Thus, the seized evidence was not discovered "inadvertently."

[****7] The trial court refused to suppress the evidence found in petitioner's home and, after a jury trial, petitioner was found guilty and sentenced to prison. The California Court of Appeal affirmed. App. 43. It rejected petitioner's argument that our decision in Coolidge required suppression of the seized evidence that had not been listed in the warrant because its discovery was not inadvertent. App. 52-53. The court relief on the California Supreme Court's decision in North v. Superior Court, 8 Cal. 3d 301, 502 P.2d 1305 (1972). In that case the court noted that the discussion of the inadvertence limitation on the "plain view" doctrine in Justice Stewart's opinion in Coolidge had been joined by only three other Members of this Court and therefore was not binding on it. [2] The California [***120] Supreme Court

---

[1] Although the officer viewed other handguns and rifles, he did not seize them because there was no probable cause to believe they were associated with criminal activity. App. 30; see Arizona v. Hicks, 480 U.S. 321, 327 (1987).

[2] "In Coolidge, the police arrested a murder suspect in his house and thereupon seized his automobile and searched it later at the police station, finding physical evidence that the victim had been inside the vehicle. The record disclosed that

denied petitioner's request for review. App. 78.

[****8] [*132] Because the California courts' interpretation of the "plain view" doctrine conflicts with the view of other courts, [3] and because the unresolved issue is important, we granted certiorari, 493 U.S. (1989).

[****9] [*133] II

The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, [**2306] shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." [2][3A][4A]The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures. A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property. United States v. Jacobsen, 466 U.S. 109, 113 (1984). The "plain view" doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable, [4] but this [***121] characterization overlooks the important difference between searches and seizures. [5] If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. Arizona v. Hicks, [*134] 480 U.S. 321, 325(1987); Illinois v. Andreas, 463 U.S. 765, 771 (1983). A seizure of the article, however, would obviously [****10] invade the owner's possessory interest. Maryland v. Macon, 472 U.S. 463, 469 (1985); Jacobsen, 466 U.S., at 113. If "plain view" justifies an exception from an otherwise applicable warrant requirement, therefore, it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches.

[3B]

[4B]

---

the police had known for some time of the probable role of the car in the crime, and there were no 'exigent circumstances' to justify a warrantless search. Accordingly, the plurality opinion of Justice Stewart concluded that the seizure could not be justified on the theory that the vehicle was itself the 'instrumentality' of the crime and was discovered 'in plain view' of the officers. Justice Stewart was of the opinion that the 'plain view' doctrine is applicable only to the inadvertent discovery of incriminating evidence.

"If the plurality opinion in Coolidge were entitled to binding effect as precedent, we would have difficulty distinguishing its holding from the instant case, for the discovery of petitioner's car was no more 'inadvertent' than in Coolidge. However, that portion of Justice Stewart's plurality opinion which proposed the adoption of new restrictions to the 'plain view' rule was signed by only four members of the court (Stewart, J., Douglas, J., Brennan, J., and Marshall, J.). Although concurring in the judgment, Justice Harlan declined to join in that portion of the opinion, and the four remaining justices expressly disagreed with Justice Stewart on this point." North v. Superior Court, 8 Cal. 3d 301, 307-308, 502 P.2d 1305, 1308 (1972) (citations omitted).

[3] See, e. g., Wolfenbarger v. Williams, 826 F.2d 930 (CA10 1987); United States v. $ 10,000 in United States Currency, 780 F.2d 213 (CA2 1986); United States v. Roberts, 644 F.2d 683 (CA8), cert. denied, 449 U.S. 821 (1980); United States v. Antill, 615 F.2d 648 (CA5 1980); Terry v. State, 271 Ark. 715, 610 S.W.2d 272 (App. 1981); State v. Johnson, 17 Wash. App. 153, 561 P.2d 701 (1977); Commonwealth v. Cefalo, 381 Mass. 319, 409 N.E.2d 719 (1980); State v. Sanders, 431 So. 2d 1034 (Fla. App. 1983); State v. Galloway, 232 Kan. 87, 652 P.2d 673 (1982); Clark v. State, 498 N.E.2d 918 (Ind. 1986); State v. Eiseman, 461 A.2d 369, 380 (R. I. 1983); State v. McColgan, 631 S.W.2d 151 (Tenn. Crim. App. 1981); Tucker v. State, 620 P.2d 1314 (Okla. Crim. App. 1980); State v. Dingle, 279 S.C. 278, 306 S.E.2d 223 (1983). See also the cases cited in the appendices to JUSTICE BRENNAN'S dissenting opinion, post, at 9-12. At least two other state courts have agreed with the California Supreme Court. See State v. Pontier, 95 Idaho 707, 712, 518 P.2d 969, 974 (974); State v. Romero, 660 P.2d 715 (Utah 1983).

[4] "We reaffirm the basic rule of Fourth Amendment jurisprudence stated by Justice Stewart for a unanimous Court in Mincey v. Arizona, 437 U.S. 385, 390 [1978]:

"'The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (footnotes omitted).'" United States v. Ross, 456 U.S. 798, 824-825 (1982).

[5] "It is important to distinguish 'plaint view,' as used in Coolidge to justify seizure of an object, from an officer's mere observation of an item left in plain view. Whereas the latter generally involves no Fourth Amendment search, see infra, at 740; Katz v. United States, 389 U.S. 347 (1967), the former generally does implicate the Amendment's limitations upon seizures of personal property." Texas v. Brown, 460 U.S. 730, 738, n. 4 (1983) (opinion of REHNQUIST, J.).

[****11] The criteria that generally guide "plain view" seizures were set forth in Coolidge v. New Hampshire, 403 U.S. 443 (1971). The Court held that the seizure of two automobiles parked in plain view on the defendant's driveway in the course of arresting the defendant violated the Fourth Amendment. Accordingly, particles of gun powder that had been subsequently found in vacuum sweepings from one of the cars could not be introduced in evidence against the defendant. The State endeavored to justify the seizure of the automobiles, and their subsequent search at the police station, on four different grounds, including the "plain view" doctrine. [6] The scope of that doctrine as it had developed in earlier cases was fairly summarized in these three paragraphs from Justice Stewart's opinion:

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, any evidence seized by the police will be in plain view, at least at the moment of seizure. The problem [**2307] with the 'plain view' doctrine [****12] has been to identify the circumstances in which plain view [*135] has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

"An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across [***122] some other article of incriminating character. Cf. Go-Bart Importing Co. v. United States, 282 U.S. 344, 358; United States v. Lefkowitz, 285 U.S. 452, 465; Steele v. United States, 267 U.S. 498; Stanley v. Georgia, 394 U.S. 557, [****13] 571 (STEWART, J., concurring in result). Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. Thus the police may inadvertently come across evidence while in 'hot pursuit' of a fleeing suspect. Warden v. Hayden, supra [387 U.S. 294 (1967)]; cf. Hester v. United States, 265 U.S. 57. And an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant. Chimel v. California, 395 U.S., at 762-763. Finally, the 'plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object. Harris v. United States, 390 U.S. 234; Frazier v. Cupp, 394 U.S. 731; Ker v. California, 374 U.S., at 43. Cf. Lewis v. United States, 385 U.S. 206.

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence [****14] incriminating the accused. The doctrine serves to supplement the prior justification -- whether it be a warrant for another object, [*136] hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused -- and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." Id., at 465-466 (footnote omitted).Justice Stewart then described the two limitations on the doctrine that he found implicit in its rationale: First, "that plain view alone is never enough to justify the warrantless seizure of evidence, id., at 468; and second, "that the discovery of evidence in plain view must be inadvertent." Id., at 469. [1B]Justice Stewart's analysis of the "plain view" doctrine did not command a majority and a plurality of the Court has since made clear that the discussion is "not a binding precedent." Texas v. Brown, 460 U.S., at 737 [****15] (opinion of REHNQUIST, J.). Justice Harlan, who concurred in the Court's judgment and in its response to the dissenting opinions, 403 U.S., at 473-484, 490-493, [***123] did not join the plurality's discussion of the "plain view" doctrine. See id., at 464-473. The decision nonetheless is a [**2308] binding precedent. Before discussing the second limitation, which is implicated in this case, it is therefore necessary to explain why the first adequately supports the Court's judgment. [1C][5][6A]It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only

[6] The State primarily contended that the seizures were authorized by a warrant issued by the Attorney General, but the Court held the warrant invalid because it had not been issued by "a neutral and detached magistrate." 403 U.S., at 449-453. In addition, the State relied on three exceptions from the warrant requirement: (1) search incident to arrest; (2) the automobile exception; and (3) the "plain view" doctrine. Id., at 453-473.

must the item be in plain view, its incriminating character must also be "immediately apparent." Id., at 466; see also Arizona v. [*137] Hicks, 480 U.S., at 326-327.Thus, in Coolidge, the cars were obviously in plain view, but their probative value remained uncertain until after the interiors were swept and examined microscopically. Second, not only must the officer be lawfully located [****16] in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself. [7] [****17] As the Solicitor General has suggested, Justice Harlan's vote in Coolidge may have rested on the fact that the seizure of the cars was accomplished by means of a warrantless trespass on the defendant's property. [8] In all events, we are satisfied that the absence of inadvertence was not essential to the court's rejection of the State's "plain view" argument in Coolidge.

[6B]

III

[1D]Justice Stewart concluded that the inadvertence requirement was necessary to avoid a violation of the express constitutional requirement that a valid warrant must particularly describe the things to be seized. He explained:

"The rationale of the exception to the warrant requirement, as just stated, is that a plain-view seizure will not turn an initially valid (and therefore limited) search into [*138] a 'general' one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the location of the evidence [***124] and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as 'per se unreasonable' in the absence of 'exigent circumstances.'

"If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location [****18] and intend to seize it, then there is a violation of the express constitutional requirement of 'Warrants . . . particularly describing . . [the] things to be seized.'" 403 U.S., at 469-471.

We find two flaws in this reasoning. First, evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that [**2309] depend upon the subjective state of mind of the officer. The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement. If the officer has knowledge approaching certainty that the item will be found, we see no reason why he or she would deliberately omit a particular description of the item to be seized from the application for a search warrant. [9] Specification of the additional item could only permit the officer [*139] to expand the scope of the search. On the other hand, if he or she has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to [****19] see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first. The hypothetical case put by JUSTICE WHITE in his dissenting opinion in Coolidge is instructive:

"Let us suppose officers secure a warrant to search a house for a rifle. While staying well within the range of a rifle search, they discover two photographs of the

---

[7] "This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure. Taylor v. United States, 286 U.S. 1 [1932]; Johnson v. United States, 333 U.S. 10 [1948]; McDonald v. United States, 335 U.S. 451 [1932]; Jones v. United States, 357 U.S. 493, 497-498 [1958]; Chapman v. United States, 365 U.S. 610 [1961]; Trupiano v. United States, 334 U.S. 699 [1948]." Coolidge, 403 U.S., at 468.

We have since applied the same rule to the arrest of a person in his home. See Minnesota v. Olson, U.S. (1990); Payton v. New York, 445 U.S. 573 (1980).

[8] See Brief for the United States as Amicus Curiae 7, n. 4.

[9] "If the police have probable cause to search for a photograph as well as a rifle and they proceed to seek a warrant, they could have no possible motive for deliberately including the rifle but omitting the photograph. Quite the contrary is true. Only oversight or careless mistake would explain the omission in the warrant application if the police were convinced they had probable cause to search for the photograph." Coolidge, 403 U.S., at 517 (WHITE, J., dissenting).

murder victim, both in plain sight in the bedroom. Assume also that the discovery of the one photograph was inadvertent but finding the other was anticipated. The Court would permit the seizure of only one of the photographs. But in terms of the 'minor' peril to Fourth Amendment values there is surely no difference between these two photographs: the interference with possession is the same in each case and the officers' appraisal of the photograph they expected to see is no less reliable than their judgment about the other. And in both situations the actual inconvenience and danger to evidence remain identical if the officers must depart and secure a warrant." Id., at 516.

[****20] [1E][7A][8][9][10]Second, the suggestion [***125] that the inadvertence requirement is necessary to prevent the police from conducting general searches, or from converting specific warrants into general warrants, is not persuasive because that interest is already served by the requirements that no warrant issue unless it "particularly describes the place to be searched and the persons or things to be seized," see Maryland v. Garrison, 480 U.S. 79, 84 (1987);Steele v. United States No. 1, 267 U.S. 498, 503 (1925),[10] and that a warrantless search be circumscribed [*140] by the exigencies which justify its initiation. See, e.g., Maryland v. Buie, 494 U.S. 325 (1990) (slip op. at 8-9); Mincey v. Arizona, 437 U.S. 385, 393 (1978).Scrupulous adherence to these requirements serves the interests in limiting the area and duration of the search that the inadvertence requirement inadequately protects. Once those commands have been satisfied and the officer has a lawful right of access, however, no additional [**2310] Fourth Amendment interest is furthered by requiring that the discovery of evidence be inadvertent. If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the [****21] relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more. Thus, in the case of a search incident to a lawful arrest, "if the police stray outside the scope of an authorized Chimel search they are already in violation of the Fourth Amendment, and evidence so seized will be excluded; adding a second reason for excluding evidence hardly seems worth the candle." Coolidge, 403 U.S., at 517. Similarly, the object of a warrantless search of an automobile also defines its scope:

"The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found. Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe [*141] that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase. Probable cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does not justify a search [****22] of the entire cab." United States v. Ross, 456 U.S. 798, 824 (1982). [7B]

[11]In this case, the scope of the search was not enlarged in the slightest by the omission of any reference to the weapons in the warrant. [***126] Indeed, if the three rings and other items named in the warrant had been found at the outset -- or petitioner had them in his possession and had responded to the warrant by [****23] producing them immediately -- no search for weapons could have taken place. Again, JUSTICE WHITE's dissenting opinion in Coolidge is instructive:"Police with a warrant for a rifle may search only places where rifles might be and must terminate the search once the rifle is found; the inadvertence rule will in no way reduce the number of places into which they may lawfully look." 403 U.S., at 517. [1F]As we have already suggested, by hypothesis the seizure of an object in plain view does not involve an intrusion on privacy. [11] If the interest in privacy has been invaded, the violation must have occurred before the object came

---

[10] "The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized.' The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." Maryland v. Garrison, 480 U.S. 79, 84 (1987).

[11] Even if the item is a container, its seizure does not compromise the interest in preserving the privacy of its contents because it may only be opened pursuant to either a search warrant, see Smith v. Ohio, 494 U.S. (1980); United States v. Place, 462 U.S. 696, 701 (1983); Arkansas v. Sanders, 442 U.S. 753 (1979); United States v. Chadwick, 433 U.S. 1 (1977); United States v. Van Leeuwen, 397 U.S. 249 (1970); Ex parte Jackson, 96 U.S. 727, 733 (1878), or one of the well-delineated exceptions to the warrant requirement. See Colorado v. Bertine, 479 U.S. 367 (1987); United State v. Ross, 456 U.S. 798 (1982).

into plain view and there is no need for an inadvertence limitation on seizures to condemn it. The prohibition against general searches and general warrants serves primarily as a protection against unjustified intrusions on privacy. But reliance [*142] on privacy concerns that support that prohibition is misplaced when the inquiry concerns the scope of an exception that merely authorizes an officer with a lawful right of access to an item to seize it without a warrant.

[****24] In this case the items seized from petitioner's home were discovered during a lawful search authorized by a valid warrant. When they were discovered, it was immediately apparent to the officer that they constituted incriminating evidence. He had probable cause, not only to obtain a warrant to search for the stolen property, but also to believe that the weapons and handguns had [**2311] been used in the crime he was investigating. The search was authorized by the warrant, the seizure was authorized by the "plain view" doctrine. The judgment is affirmed.

It is so ordered.

**Dissent by:** BRENNAN

## Dissent

JUSTICE **BRENNAN**, with whom JUSTICE **MARSHALL** joins, dissenting.

I remain convinced that Justice Stewart correctly articulated the plain view doctrine in Coolidge v. New Hampshire, 403 U.S. 443 (1971). The Fourth Amendment permits law enforcement officers to seize items for which they do not have a warrant when those items are found in plain view and (1) the officers are lawfully in a position to observe the items, (2) the discovery of the items is "inadvertent," and (3) it is immediately [***127] apparent to the officers that the items are evidence of a crime, contraband, or otherwise subject to seizure. In eschewing the inadvertent [****25] discovery requirement, the majority ignores the Fourth Amendment's express command that warrants particularly describe not only the places to be searched, but also the things to be seized. I respectfully dissent from this rewriting of the Fourth Amendment.

I

The Fourth Amendment states:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable [*143] searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Amendment protects two distinct interests. The prohibition against unreasonable searches and the requirement that a warrant "particularly describe the place to be searched" protect an interest in privacy. The prohibition against unreasonable seizures and the requirement that a warrant "particularly describe . . . the . . . things to be seized" protect a possessory interest in property. [1] See *ante,* at 4; *Texas v. Brown,* 460 U.S. 730, 747 (1983) (STEVENS, J., concurring in judgment). The Fourth Amendment, by its terms, declares the privacy and possessory [****26] interests to be equally important. As this Court recently stated, "Although the interest protected by the Fourth Amendment injunction against unreasonable searches is quite different from that protected by its injunction against unreasonable seizures, neither the one nor the other is of inferior worth or necessarily requires only lesser protection." *Arizona v. Hicks,* 480 U.S. 321, 328 (1987) (citation omitted).

[****27] The Amendment protects these equally important interests in precisely the same manner: by requiring a neutral and detached magistrate to evaluate, before the search or seizure, the government's showing of probable cause and its particular description of the place to be searched and the items to be seized. Accordingly, just as a warrantless [*144] search is *per se* unreasonable absent exigent circumstances, so too a seizure of personal property is *"per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place,* 462 U.S. 696, 701 (1983) (footnote omitted) (citing *Marron v.*

[1] As the majority recognizes, the requirement that warrants particularly describe the things to be seized also protects privacy interests by preventing general searches. *Ante,* at 10-12. The scope of a search is limited to those places in which there is probable cause to believe an item particularly described in the warrant might be found. A police officer cannot search for a lawnmower in a bedroom, or for an undocumented alien in a suitcase. *Ante,* at 11-12 (citing *United States v. Ross,* 456 U.S. 798, 824 (1982)). Similarly, once all of the items particularly described in a warrant have been found, the search must cease an no further invasion of privacy is permitted. *Ante,* at 12.

*United* [**2312] [***128] *States,* 275 U.S. 192, 196 (1927)). "Prior review by a neutral and detached magistrate is the time-tested means of effectuating Fourth Amendment rights." *United States v. United States District Court,* 407 U.S. 297, 318 (1972). A decision to invade a possessory interest in property is too important to be left to the discretion of zealous officers "engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* [****28] 333 U.S. 10, 14 (1948). "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron, supra,* at 196.

The plain view doctrine is an exception to the general rule that a seizure of personal property must be authorized by a warrant. As Justice Stewart explained in Coolidge, 403 U.S., at 470, we accept a warrantless seizure when an officer is lawfully in a location and inadvertently sees evidence of a crime because of "the inconvenience of procuring a warrant" to seize this newly discovered piece of evidence. But "where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it," the argument that procuring a warrant would be "inconvenient" loses much, if not all, of its force. Ibid. Barring an exigency, there is no reason why the police officers could not have obtained a warrant to seize this evidence before entering the premises. The rationale behind the inadvertent discovery requirement [****29] is simply that we will not excuse officers [*145] from the general requirement of a warrant to seize if the officers know the location of evidence, have probable cause to seize it, intend to seize it, and yet do not bother to obtain a warrant particularly describing that evidence. To do so would violate "the express constitutional requirement of 'Warrants . . . particularly describing . . . [the] things to be seized,'" and would "fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure." Id., at 471.

Although joined by only three other Members of the Court, Justice Stewart's discussion of the inadvertent discovery requirement has become widely accepted. See Texas v. Brown, supra, at 746 (Powell, J., concurring in judgment) ("Whatever my view might have been when Coolidge was decided, I see no reason at this late date to imply criticism of its articulation of this exception. It has been accepted generally for over a decade"). Forty-six States and the District of Columbia [2] and twelve [***129] United States Court of Appeals [3] now require plain view seizures to be inadvertent. There has been no outcry from law enforcement officials that the inadvertent discovery [****30] requirement unduly burdens their efforts. Given that the requirement is inescapably rooted in the plain language of the Fourth Amendment, I cannot fathom the Court's enthusiasm for discarding this element of the plain view doctrine.

The Court posits two "flaws" in Justice Stewart's reasoning that it believes demonstrate the inappropriateness of the inadvertent discovery requirement. But these flaws are illusory. First, the majority explains that it can see no reason [*146] why an office who [****31] "has knowledge approaching certainty" that an item will be found in a particular [**2313] location "would deliberately omit a particular description of the item to be seized from the application for a search warrant." Ante, at 9. But to the individual whose possessory interest has been invaded, it matters not why the police officer decided to omit a particular item from his application for a search warrant. When an officer with probable cause to seize an item fails to mention that item in his application for a search warrant -- for whatever reason -- and then seizes the item anyway, his conduct is per se unreasonable. Suppression of the evidence so seized will encourage officers to be more precise and complete in future warrant applications.

Furthermore, there are a number of instances in which a law enforcement officer might deliberately choose to omit certain items from a warrant application even though he has probable cause to seize them knows they are on the premises, and intends to seize them when they are discovered in plain view. For example, the warrant application process can often be time-consuming, especially when the police attempt to seize a large number of items. An officer interested [****32] in conducting a search as soon as possible might decide to save time by listing only one or two hard-to-find items,

---

[2] See Appendix A, infra, at 9-11. Only three States -- California, Idaho, and Utah -- have rejected the inadvertent discovery requirement. See People v. Bittaker, 48 Cal. 3d 1046, 1076, 774 P.2d 659, 673-674 (1989), cert. pending, No. 89-6223; State v. Pontier, 95 Idaho 707, 712, 518 P.2d 969, 974 (1974); State v. Kelly, 718 P.2d 385, 389, n. 1 (Utah 1986). The status of the inadvertent discovery requirement in Delaware is unclear. See, e.g., Wicks v. State, 552 A.2d 462, 465 (Del. Super. 1988).

[3] See Appendix B, infra, at 12.

such as the stolen rings in this case, confident that he will find in plain view all of the other evidence he is looking for before he discovers the listed items. Because rings could be located almost anywhere inside or outside a house, it is unlikely that a warrant to search for and seize the rings would restrict the scope of the search. An officer might rationally find the risk of immediately discovering the items listed in the warrant -- thereby forcing him to conclude the search immediately -- outweighed by the time saved in the application process.

The majority also contends that, once an officer is lawfully in a house and the scope of the his search is adequately circumscribed by a warrant, "no additional Fourth Amendment [*147] interest is furthered by requiring that the discovery of evidence be inadvertent." Ante, at 11. Put another way, "'the inadvertence rule will in no way reduce the number of places into which [law enforcement officers] may lawfully look.'" Ante, at 12 (quoting Coolidge, 403 U.S., at 517 (WHITE, J., concurring in part and dissenting in part)). The [****33] majority [***130] is correct, but it has asked the wrong question. It is true that the inadvertent discovery requirement furthers no privacy interests. The requirement in no way reduces the scope of a search or the number of places into which officers may look. But it does protect possessory interests. Cf. Illinois v. Andreas, 463 U.S. 765, 771 (1983) ("The plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy") (emphasis added). The inadvertent discovery requirement is essential if we are to take seriously the Fourth Amendment's protection of possessory interests as well as privacy interests. See supra, at . The Court today eliminates a rule designed to further possessory interests on the ground that it fails to further privacy interests. I cannot countenance such constitutional legerdemain.

II

Fortunately, this decision should have only a limited impact, for the Court is not confronted today with what lower courts have described as a "pretextual" search. See, e. g., State v. Lair, 95 Wash. [****34] 2d 706, 717-718, 630 P.2d 427, 434 (1981) (en banc) (holding pretextual searches invalid). For example, if an officer enters a house pursuant to a warrant to search for evidence of one crime when he is really interested only in seizing evidence relating to another crime, for which he does not have a warrant, his search is "pretextual" and the fruits of that search should be suppressed. See, e. g., State v. Kelsey, 592 S.W.2d 509 (Mo. App. 1979) (evidence suppressed because officers, who had ample opportunity [**2314] to obtain [*148] warrant relating to murder investigation, entered the premises instead pursuant to a warrant relating to a drug investigation. and searched only the hiding place of the murder weapon, rather than conducting a "top to bottom" search for drugs). Similarly, an officer might use an exception to the generally applicable warrant requirement, such as "hot pursuit," as a pretext to enter a home to seize items he knows he will find in plain view. Such conduct would be a deliberate attempt to circumvent the constitutional requirement of a warrant "particularly describing the place to be searched, and the persons or things to be seized," and cannot be condoned.

The discovery [****35] of evidence in pretextual searches is not "inadvertent" and should be suppressed for that reason. But even state courts that have rejected the inadvertent discovery requirement have held that the Fourth Amendment prohibits pretextual searches. See State v. Bussard, 114 Idaho 781, 788, n.2, 760 P.2d 1197, 1204, n.2 (1988); State v. Kelly, 718 P.2d 385, 389, n. 1 (Utah 1986). The Court's opinion today does not address pretextual searches, but I have no doubt that such searches violate the Fourth Amendment. [4]

[****36] [***131] III

The Fourth Amendment demands that an individual's possessory interest in property be protected from unreasonable governmental seizures, not just by requiring a showing of probable cause, but also by requiring a neutral and detached [*149] magistrate to authorize the seizure in advance. The Court today ignores the explicit language of the Fourth Amendment, which protects possessory interests in the same manner as it protects privacy interests, in order to eliminate a generally accepted element of the plain view doctrine that has caused no apparent difficulties for law

[4] The Court also does not dispute the unconstitutionality of a search that goes "so far astray of a search for the items mentioned in the warrant that it [becomes] a general exploratory search for any evidence of wrongdoing that might be found." United States v. Tranquillo, 330 F. Supp. 871, 876 (MD Fla. 1971). Indeed, the Court reiterates that "converting specific warrants" is unconstitutional and emphasizes the need for scrupulous adherence to the requirements that warrants particularly describe the place to be searched and the things to be seized and that a warrantless search "be circumscribed by the exigencies which justify its initiation." Ante, at 10-11.

enforcement officers. I am confident, however, that when confronted with more egregious police conduct than that found in this case, ante, at 2, such as pretextual searches, the Court's interpretation of the Constitution will be less parsimonious than it is today. I respectfully dissent.

APPENDIX ASTATES THAT HAVE ADOPTED THE INADVERTENT DISCOVERY REQUIREMENTAL: Taylor v. State, 399 So. 2d 881, 892 (Ala. 1981)AK: Deal v. State, 626 P.2d 1073, 1079 (Alaska 1980)AZ: State v. Ault, 150 Ariz. 459, 464, 724 P.2d 545, 550 (1986)AR: Johnson v. State, 291 Ark. 260, 263, 724 S.W.2d 160, 162 (1987)CO: People [****37] v. Cummings, 706 P.2d 766, 771 (Colo. 1985)CT: State v. Hamilton, 214 Conn. 692, , 573 A.2d 1197, (1990)DC: Gant v. United States, 518 A.2d 103, 107 (DC App. 1986)FL: Hurt v. State, 388 So. 2d 281, 282-283 (Fla. App. 1980), review denied, 399 So. 2d 1146 (Fla. 1981) [*150] GA: Mooney v. State, 243 Ga. 373, 383-384, 254 S.E.2d 337, 346, cert. denied, 444 U.S. 886 (1979)HI: State v. Barnett, 68 Haw. 32, 35, 703 P.2d 680, 683 (1985)IL: People v. Madison, 121 Ill. 2d 195, 208, 520 N.E.2d 374, 380-381, cert. denied, 488 U.S. 907 (1988)IN: Clark v. State, 498 N.E.2d 918, 921 (Ind. 1986) [**2315] IA: State v. Emerson, 375 N.W.2d 256, 259 (Iowa 1985)KS: State v. Doile, 244 Kan. 493, 497, 769 P.2d 666, 669 (1989)KY: Patrick v. Commonwealth, 535 S.W.2d 88, 89 (Ky. 1976)LA: State v. Stott, 395 So. 2d 714, 716 (La. 1981)ME: State v. Cloutier, 544 A.2d 1277, 1281, n. 4 (Me. 1988)MD: Wiggins v. State, 315 Md. 232, 251-252, 554 A.2d 356, 365 (1989)MA: Commonwealth v. Cefalo, 381 Mass. 319, 330-331, 409 N.E.2d 719, 727 (1980) [***132] MI: People v. Dugan, 102 Mich. App. 497, 503-505, 302 N.W.2d 209, 211-212 (1980), cert. denied, 455 U.S. 927 (1982)MN: State [****38] v. Buschkopf, 373 N.W.2d 756, 768 (Minn. 1985)MS: Smith v. State, 419 So. 2d 563, 571 (Miss. 1982), cert. denied, 460 U.S. 1047 (1983)MO: State v. Clark, 592 S.W.2d 709, 713 (Mo. 1979), cert. denied, 449 U.S. 847 (1980) [*151] MT: State v. Hembd, 235 Mont. 361, 368-369, 767 P.2d 864, 869 (1989)NE: State v. Hansen, 221 Neb. 103, 108-109, 375 N.W.2d 605, 609 (1985)NV: Johnson v. State, 97 Nev. 621, 624, 637 P.2d 1209, 1211 (1981)NH: State v. Cote, 126 N.H. 514, 525, 526, 493 A.2d 1170, 1177-1178 (1985)NJ: State v. Bruzzese, 94 N.J. 210, 237-238, 463 A.2d 320, 334-335 (1983), cert. denied, 465 U.S. 1030 (1984)NM: State v. Luna, 93 N.M. 773, 779, 606 P.2d 183, 188 (1980)NY: People v. Jackson, 41 N.Y.2d 146, 150-151, 359 N.E.2d 677, 681 (1976)NC: State v. White, 322 N.C. 770, 773, 370 S.E.2d 390, 392, cert. denied, 488 U.S. 958 (1988)ND: State v. Riedinger, 374 N. W. 2d 866, 874 (N. D. 1985)OH: State v. Benner, 40 Ohio St. 3d 301, 308, 533 N.E.2d 701, 709-710 (1988), cert. denied, 494 U.S. (1990)OK: Farmer v. State, 759 P.2d 1031, 1033 (Okla. Cr. App. 1988)OR: State v. Handran, 97 Ore. App. 546, 550-551, 777 P.2d 981, 983, review [****39] denied, 308 Or. 405, 781 P.2d 855 (1989)PA: Commonwealth v. Davidson, 389 Pa. Super. 166, , 566 A.2d 897, 901 (1989) [*152] RI: State v. Robalewski, 418 A.2d 817, 824 (R. I. 1980)SC: State v. Culbreath, 300 S.C. 232, , 387 S.E.2d 255, 257 (1990)SD: State v. Albright, 418 N.W.2d 292, 295 (S. D. 1988)TN: State v. Byerley, 635 S.W.2d 511, 513 (Tenn. 1982)TX: Stoker v. State, S.W.2d , (Tex. Crim. App., Sept. 20, 1989) (en banc)VT: State v. Dorn, 145 Vt. 606, 620-621, 496 A.2d 451, 459-460 (1985)VA: Holloman v. Commonwealth, 221 Va. 947, 949, 275 S.E.2d 620, 621-622 (1981)WA: State v. Bell, 108 Wash. 2d 193, 196, 737 P.2d 254, 257 (1987)WV: State v. Moore, 165 W. Va. 837, 852-853, 272 S.E.2d 804, 813-814 (1980)WI: State v. Washington, 134 Wis. 2d 108, 119-121, 396 N.W.2d 156, 161 (1986)WY: Jessee v. State, 640 P.2d 56, 63 (Wyo. 1982)

[***133] APPENDIX B

UNITED STATES COURTS OF Appeals THAT HAVE ADOPTED THE INADVERTENT DISCOVERY REQUIREMENTCA1: United States v. Caggiano, 899 F.2d 99, (CA1 1990) [**2316] CA2: United States v. Barrios-Moriera, 872 F.2d 12, 16 (CA2), cert. denied, 493 U.S. (1989) [*153] CA3: United States v. Meyer, 827 F.2d [****40] 943, 945 (CA3 1987)CA4: Tarantino v. Baker, 825 F.2d 772, 777, n. 3 (CA4 1987)CA5: Crowder v. Sinyard, 884 F.2d 804, 826, n. 30 (CA5 1989), cert. pending, No. 89-1326CA6: United States v. Poulos, 895 F.2d 1113, 1121 (CA6 1990)CA7: United States v. Perry, 815 F.2d 1100, 1105 (CA7 1987)CA8: United States v. Peterson, 867 F.2d 1110, 1113 (CA8 1989)CA9: United States v. Holzman, 871 F.2d 1496, 1512 (CA9 1989)CA10: Wolfenbarger v. Williams, 826 F.2d 930, 935 (CA10 1987)CA11: United States v. Bent-Santana, 774 F.2d 1545, 1551 (CA11 1985)CADC: In re Search Warrant Dated July 4, 1977, for Premises at 2125 S Street, Northwest, Washington, D. C., 215 U.S. App. D.C. 74, 102, 667 F.2d 117, 145 (1981), cert. denied, 456 U.S. 926 (1982)

## References

Applicability of "plain view" doctrine and its relation to Fourth Amendment prohibition against unreasonable searches and seizures

68 Am Jur 2d, Searches and Seizures 23, 88, 113

8 Federal Procedure, L Ed, Criminal Procedure 22:137, 22:158

7 Federal Procedural Forms, L Ed, Criminal Procedure 20:589, 20:595

22 Am Jur Pl & Pr Forms (Rev), Searches and [****41] Seizures, Forms 43, 44, 65

5 Am Jur Trials 331, Excluding Illegally Obtained Evidence

USCS, Constitution, Amendment 4

US L Ed Digest, Search and Seizure 9, 25

Index to Annotations, Exclusion and Suppression of Evidence; Fourth Amendment; Plain View Doctrine; Search and Seizure

Annotation References:

Validity of seizure under Fourth Amendment "plain view" doctrine. 75 L Ed 2d 1018 .

Admissibility of evidence obtained by illegal search and seizure. 93 L Ed 1797, 96 L Ed 145, 98 L Ed 581, 100 L Ed 239, 6 L Ed 2d 1544.

Seizure of books, documents, or other papers under search warrant not describing such items. 54 ALR4th 391.

Officer's ruse to gain entry as affecting admissibility of plain-view evidence. 47 ALR4th 425.

Binding effect upon state courts of opinion of United States Supreme Court supported by less than a majority of all its members. 65 ALR3d 504.

---

End of Document