# EXHIBIT B

United States v. Kuhl, No. 25-2065 (6th Cir.)

LexisNexis printouts of the authorities cited in the tendered Supplemental Brief, in order of first appearance. Highlighting identifies the language supporting each cited proposition. Page references are to the proposed Amended Supplemental Brief (Exhibit D).

# Groh v. Ramirez

540 U.S. 551 (2004)

Cited in Supplemental Brief at: iv, 3, 4, 5, 6 (passim)

Caution
As of: September 17, 2026 9:35 PM Z

# Groh v. Ramirez

Supreme Court of the United States

November 4, 2003, Argued ; February 24, 2004, Decided

No. 02-811

**Reporter**

540 U.S. 551 *; 124 S. Ct. 1284 **; 157 L. Ed. 2d 1068 ***; 2004 U.S. LEXIS 1624 ****; 72 U.S.L.W. 4160; 17 Fla. L. Weekly Fed. S 146

JEFF GROH, Petitioner v. JOSEPH R. RAMIREZ et al.

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

Ramirez v. Butte-Silver Bow County, 298 F.3d 1022, 2002 U.S. App. LEXIS 14908 (9th Cir. Mont., 2002)

**Disposition:** Affirmed.

## Syllabus

Petitioner, a Bureau of Alcohol, Tobacco and Firearms agent, prepared and signed an application for a warrant to search respondents' Montana ranch, which stated that the search was for specified weapons, explosives, and records. The application was supported by petitioner's detailed affidavit setting forth his basis for believing that such items were on the ranch and was accompanied by a warrant form that he completed. The Magistrate Judge (Magistrate) signed the warrant form even though it did not identify any of the items that petitioner intended to seize. The portion calling for a description of the "person or property" described [****2] respondents' house, not the alleged weapons; the warrant did not incorporate by reference the application's itemized list. Petitioner led federal and local law enforcement officers to the ranch the next day but found no illegal weapons or explosives. Petitioner left a copy of the warrant, but not the application, with respondents. Respondents sued petitioner and others under *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 29 L. Ed. 2d 619, 91 S. Ct. 1999, and 42 USC § 1983 [42 USCS § 1983], claiming, *inter alia,* a Fourth Amendment violation. The District Court granted the defendants summary judgment, finding no Fourth Amendment violation, and finding that even if such a violation occurred, the defendants were entitled to qualified immunity. The Ninth Circuit affirmed except as to the Fourth Amendment claim against petitioner, holding that the warrant was invalid because it did not describe with particularity the place to be searched and the items to be seized. The court also concluded that *United States* v. *Leon,* 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405, precluded qualified immunity for petitioner because he was the leader of a search who did not read the warrant and satisfy himself [****3] that he understood its scope and limitations and that it was not obviously defective.

[***1075] *Held:*

1. The search was clearly "unreasonable" under the Fourth Amendment. .

(a) The warrant was plainly invalid. It did not meet the Fourth Amendment's unambiguous requirement that a warrant "particularly describ[e] . . . the persons or things to be seized." The fact that the application adequately described those things does not save the warrant; *Fourth Amendment* interests are not necessarily vindicated when another document says something about the objects of the search, but that document's contents are neither known to the person whose home is being searched nor available for her inspection. It is not necessary to decide whether the Amendment permits a warrant to cross-reference other documents, because such incorporation did not occur here.

(b) Petitioner's argument that the search was nonetheless reasonable is rejected. Because the warrant did not describe the items *at all,* it was so obviously deficient that the search must be regarded as warrantless, and thus presumptively unreasonable. This presumptive rule applies to searches [****4] whose only defect is a lack of particularity in the warrant. Petitioner errs in arguing that such searches should be exempt from the presumption if they otherwise satisfy the particularity requirement's goals. Unless items in

the affidavit are set forth in the warrant, there is no written assurance that the Magistrate actually found probable cause for a search as broad as the affiant requested. The restraint petitioner showed in conducting the instant search was imposed by the agent himself, not a judicial officer. Moreover, the particularity requirement's purpose is not limited to preventing general searches; it also assures the individual whose property is searched and seized of the executing officer's legal authority, his need to search, and the limits of his power to do so. This case presents no occasion to reach petitioner's argument that the particularity requirements' goals were served when he orally described the items to respondents, because respondents dispute his account.

2. Petitioner is not entitled to qualified immunity despite the constitutional violation because "it would be clear to a reasonable officer that his conduct was unlawful in the situation [****5] he confronted," *Saucier* v. *Katz,* 533 U.S. 194, 202, 150 L. Ed. 2d 272, 121 S. Ct. 2151. Given that the particularity requirement is stated in the Constitution's text, no reasonable officer could believe that a warrant that did not comply with that requirement was valid. Moreover, because petitioner prepared the warrant, he may not argue that he reasonably relied on the Magistrate's assurance that it contained an adequate description and was valid. Nor could a reasonable officer claim to be unaware of the basic rule that, absent consent or exigency, a warrantless search of a home is presumptively unconstitutional. "[A] warrant may be so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Leon,* 468 U.S., at 923, 82 L. Ed. 2d 677, 104 S. Ct. 3405 . This is such a case.

298 F.3d 1022, affirmed.

**Counsel: Richard A. Cordray** argued the cause for petitioner.

**Austin C. Schlick** argued the cause for the United States, as amicus curiae, by special leave of court.

**Vince Kozakiewicz** argued the cause for respondents.

**Judges:** Stevens, J., delivered the opinion of the Court, in which O'Connor, Souter, Ginsburg, and Breyer, JJ., joined. Kennedy, J., filed a dissenting opinion, in which Rehnquist, [***1076] C. J., joined. Thomas, J., filed a dissenting opinion, in which Scalia, J., joined, and in which Rehnquist, C. J., joined as to Part III.

**Opinion by:** STEVENS

# Opinion

[**1287] [*553] Justice **Stevens** delivered [****6] the opinion of the Court.

[1A] [2A] Petitioner conducted a search of respondents' home pursuant to a warrant that failed to describe the "persons or things to be seized." U.S. Const., Amdt. 4. The questions presented are (1) whether the search violated the Fourth Amendment, and (2) if so, whether petitioner nevertheless is entitled to qualified immunity, given that a Magistrate Judge (Magistrate), relying on an affidavit that particularly described the items in question, found probable cause to conduct the search.

[*554] I

Respondents, Joseph Ramirez and members of his family, live on a large ranch in Butte-Silver Bow County, Montana. Petitioner, Jeff Groh, has been a Special Agent for the Bureau of Alcohol, Tobacco and [**1288] Firearms (ATF) since 1989. In February 1997, a concerned citizen informed petitioner that on a number of visits to respondents' ranch the visitor had seen a large stock of weaponry, including an automatic rifle, grenades, a grenade launcher, and a rocket launcher. [1] Based on that information, petitioner prepared and signed an application for a warrant to search the ranch. The application stated that the search was for "any automatic firearms or parts to automatic weapons, destructive [****7] devices to include but not limited to grenades, grenade launchers, rocket launchers, and any and all receipts pertaining to the purchase or manufacture of automatic weapons or explosive devices or launchers." App. to Pet. for Cert. 28a. Petitioner supported the application with a detailed affidavit, which he also prepared and executed, that set forth the basis for his belief that the listed items were concealed on the ranch. Petitioner then presented these documents to a Magistrate, along with a warrant form that petitioner also had completed. The Magistrate signed the warrant form.

[1] Possession of these items, if unregistered, would violate 18 U.S.C. § 922(o)(1) [18 USCS § 922(*o*)(1)] and 26 USC § 5861 [26 USCS § 5861].

Although the application particularly described the place to be searched and the contraband petitioner expected to find, the warrant itself was less specific; it failed to identify any of the items that petitioner intended to seize. In the portion of the form that called for a [****8] description of the "person or property" to be seized, petitioner typed a description of respondents' two-story blue house rather than the alleged stockpile of firearms. [2] The warrant did not incorporate by [*555] reference the itemized list contained in the application. It did, however, recite that the Magistrate was satisfied the affidavit established probable cause to believe that contraband was concealed on the premises, and that sufficient [***1077] grounds existed for the warrant's issuance. [3]

The day after the Magistrate issued the warrant, petitioner led a team of law enforcement officers, including both federal agents and members [****9] of the local sheriff's department, in the search of respondents' premises. Although respondent Joseph Ramirez was not home, his wife and children were. Petitioner states that he orally described the objects of the search to Mrs. Ramirez in person and to Mr. Ramirez by telephone. According to Mrs. Ramirez, however, petitioner explained only that he was searching for "'an explosive device in a box.'" *Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022, 1026 (CA9 2002). At any rate, the officers' search uncovered no illegal weapons or explosives. When the officers left, petitioner gave Mrs. Ramirez a copy of the search warrant, but not a copy of the application, which had been sealed. The following day, in response to a request from respondents' attorney, petitioner faxed the attorney a copy of the page of the application that listed the items to be seized. No charges were filed against the Ramirezes.

Respondents sued petitioner and the other officers under *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 29 L. Ed. 2d 619, 91 S. Ct. 1999 (1971), and Rev Stat § 1979, 42 USC § 1983 [42 USCS § 1983], raising eight claims, including violation of [**1289] the Fourth Amendment. [****10] App. 17-27. The District Court entered summary judgment for all defendants. The court found no Fourth Amendment violation, because it considered the case comparable to one in which the warrant contained an inaccurate address, and in such a case, the court reasoned, the warrant is sufficiently [*556] detailed if the executing officers can locate the correct house. App. to Pet. for Cert. 20a-22a. The court added that even if a constitutional violation occurred, the defendants were entitled to qualified immunity because the failure of the warrant to describe the objects of the search amounted to a mere "typographical error." *Id.*, at 22a-24a.

The Court of Appeals affirmed the judgment with respect to all defendants and all claims, with the exception of respondents' Fourth Amendment claim against petitioner. 298 F.3d at 1029-1030. On that claim, the court held that the warrant was invalid because it did not "describe with particularity the place to be searched and the items to be seized," and that oral statements by petitioner during or after the search could not cure the omission. *Id.*, at 1025-1026. The court observed that the warrant's facial defect "increased [****11] the likelihood and degree of confrontation between the Ramirezes and the police" and deprived respondents of the means "to challenge officers who might have exceeded the limits imposed by the magistrate." *Id.*, at 1027. The court also expressed concern that "permitting officers to expand the scope of the warrant by oral statements would broaden the area of dispute between the parties in subsequent litigation." *Ibid.* The court nevertheless concluded that all of the officers except petitioner were protected by qualified immunity. With respect to petitioner, the court read our opinion in *United States* v. *Leon,* 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984), as precluding qualified immunity for the leader of [***1078] a search who fails to "read the warrant and satisfy [himself] that [he] understand[s] its scope and limitations, and that it is not defective in some obvious way." 298 F.3d at 1027. The court added that "[t]he leaders of the search team must also make sure that a copy of the warrant is available to give to the person whose property is being searched at the commencement of the search, and that such copy has no missing pages or other obvious defects." *Ibid.* *[****12]* (footnote omitted). We granted certiorari. 537 U.S. 1231, 155 L. Ed. 2d 195, 123 S. Ct. 1354 (2003).

[*557] II

[1B] The warrant was plainly invalid. The Fourth Amendment states unambiguously that "no Warrants

[2] The warrant stated: "[T]here is now concealed [on the specified premises] a certain person or property, namely [a] single dwelling residence two story in height which is blue in color and has two additions attached to the east. The front entrance to the residence faces in a southerly direction." App. to Pet. for Cert. 26a.

[3] The affidavit was sealed. Its sufficiency is not disputed.

shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and *the persons or things to be seized.*" (Emphasis added.) The warrant in this case complied with the first three of these requirements: It was based on probable cause and supported by a sworn affidavit, and it described particularly the place of the search. On the fourth requirement, however, the warrant failed altogether. Indeed, petitioner concedes that "the warrant . . . was deficient in particularity because it provided no description of the type of evidence sought." Brief for Petitioner 10.

[1C] [3] The fact that the *application* adequately described the "things to be seized" does not save the *warrant* from its facial invalidity. The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents. See *Massachusetts* v. *Sheppard,* 468 U.S. 981, 988, n. 5, 82 L. Ed. 2d 737, 104 S. Ct. 3424 (1984) ("[A] warrant that fails to conform to the particularity [****13] requirement of the Fourth Amendment is unconstitutional"); [**1290] see also *United States* v. *Stefonek*, 179 F.3d 1030, 1033 (CA7 1999) ("The Fourth Amendment requires that the *warrant* particularly describe the things to be seized, not the papers presented to the judicial officer . . . asked to issue the warrant"). And for good reason: "The presence of a search warrant serves a high function," *McDonald* v. *United States,* 335 U.S. 451, 455, 93 L. Ed. 153, 69 S. Ct. 191 (1948), and that high function is not necessarily vindicated when some other document, somewhere, says something about the objects of the search, but the contents of that document are neither known to the person whose home is being searched nor available for her inspection. We do not say that the Fourth Amendment prohibits a warrant from cross-referencing other documents. Indeed, most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant [*558] uses appropriate words of incorporation, and if the supporting document accompanies the warrant. See, *e.g., United States* v. *McGrew*, 122 F.3d 847, 849-850 (CA9 1997); *United States* v. *Williamson*, 1 F.3d 1134, 1136, n. 1 (CA10 1993); [****14] *United States* v. *Blakeney*, 942 F.2d 1001, 1025-1026 (CA6 1991); *United States* v. *Maxwell*, 287 U.S. App. D.C. 234, 920 F.2d 1028, 1031 (CADC 1990); *United States* v. *Curry*, 911 F.2d 72, 76-77 (CA8 1990); *United States* v. *Roche*, 614 F.2d 6, 8 (CA1 1980). But in this case the warrant did not incorporate other documents by reference, nor did either the affidavit or the application (which had been placed under seal) accompany the [***1079] warrant. Hence, we need not further explore the matter of incorporation.

[1D] Petitioner argues that even though the warrant was invalid, the search nevertheless was "reasonable" within the meaning of the Fourth Amendment. He notes that a Magistrate authorized the search on the basis of adequate evidence of probable cause, that petitioner orally described to respondents the items to be seized, and that the search did not exceed the limits intended by the Magistrate and described by petitioner. Thus, petitioner maintains, his search of respondents' ranch was functionally equivalent to a search authorized by a valid warrant.

We disagree. This warrant did not simply omit a few items from a list of many to be [****15] seized, or misdescribe a few of several items. Nor did it make what fairly could be characterized as a mere technical mistake or typographical error. Rather, in the space set aside for a description of the items to be seized, the warrant stated that the items consisted of a "single dwelling residence . . . blue in color." In other words, the warrant did not describe the items to be seized *at all.* In this respect the warrant was so obviously deficient that we must regard the search as "warrantless" within the meaning of our case law. See *Leon,* 468 U.S., at 923, 82 L. Ed. 2d 677, 104 S. Ct. 3405 ; cf. *Maryland* v. *Garrison,* 480 U.S. 79, 85, 94 L. Ed. 2d 72, 107 S. Ct. 1013 (1987); *Steele* v. *United States,* 267 U.S. 498, 503-504, 69 L. Ed. 757, 45 S. Ct. 414 (1925). "We are not [*559] dealing with formalities." *McDonald,* 335 U.S., at 455, 93 L. Ed. 153, 69 S. Ct. 191. Because "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion'" stands "'[a]t the very core' of the Fourth Amendment," *Kyllo* v. *United States,* 533 U.S. 27, 31, 150 L. Ed. 2d 94, 121 S. Ct. 2038 (2001) (quoting *Silverman* v. *United States,* 365 U.S. 505, 511, 5 L. Ed. 2d 734, 81 S. Ct. 679 (1961)), our cases have firmly established the "'basic principle [****16] of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable," *Payton* v. *New York,* 445 U.S. 573, 586, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980) (footnote omitted). [**1291] Thus, "absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." *Id.*, 445 U.S. at 587-588, 63 L. Ed. 2d 639, 1010 S. Ct. 1371 (footnote omitted). See *Kyllo*, 533 U.S., at 29, 150 L. Ed. 2d 94, 121 S. Ct. 2038; *Illinois* v. *Rodriguez,* 497 U.S. 177, 181, 111 L. Ed. 2d 148, 110

S. Ct. 2793 (1990); *Chimel* v. *California,* 395 U.S. 752, 761-763, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969); *McDonald,* 335 U.S., at 454, 93 L. Ed. 153, 69 S. Ct. 191; *Johnson* v. *United States,* 333 U.S. 10, 92 L. Ed. 436, 68 S. Ct. 367 (1948).

We have clearly stated that the presumptive rule against warrantless searches applies with equal force to searches whose only defect is a lack of particularity in the warrant. In *Sheppard*, for instance, the petitioner argued that even though the warrant was invalid for lack of particularity, "the search was constitutional because it was reasonable within the meaning of the Fourth Amendment." 468 U.S., at 988, n. 5, 82 L. Ed. 2d 737, 104 S. Ct. 3424. [****17] In squarely rejecting that position, we explained: [***1080]

> "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional. *Stanford* v. *Texas*, 379 U.S. 476 [13 L. Ed. 2d 431, 85 S. Ct. 506] (1965); *United States* v. *Cardwell*, 680 F.2d 75, 77-78 (CA9 1982); *United States* v. *Crozier*, 674 F.2d 1293, 1299 (CA9 1982); *United States* v. *Klein*, 565 F.2d 183, 185 (CA1 1977); *United States* v. *Gardner*, 537 F.2d 861, 862 (CA6 1976); *United States* v. *Marti*, 421 F.2d 1263, [*560] 1268-1269 (CA2 1970). That rule is in keeping with the well-established principle that 'except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.' *Camara* v. *Municipal Court*, 387 U.S. 523, 528-529 [18 L. Ed. 2d 930, 87 S. Ct. 1727] (1967). See *Steagald* v. *United States*, 451 U.S. 204, 211-212 [68 L. Ed. 2d 38, 101 S. Ct. 1642] (1981); *Jones* v. *United States*, 357 U.S. 493, 499 [2 L. Ed. 2d 1514, 78 S. Ct. 1253, 1958-2 C.B. 1005] (1958)." *Ibid.*

Petitioner asks us to hold [****18] that a search conducted pursuant to a warrant lacking particularity should be exempt from the presumption of unreasonableness if the goals served by the particularity requirement are otherwise satisfied. He maintains that the search in this case satisfied those goals--which he says are "to prevent general searches, to prevent the seizure of one thing under a warrant describing another, and to prevent warrants from being issued on vague or dubious information," Brief for Petitioner 16--because the scope of the search did not exceed the limits set forth in the application. But unless the particular items described in the affidavit are also set forth in the warrant itself (or at least incorporated by reference, and the affidavit present at the search), there can be no written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit. See *McDonald*, 335 U.S., at 455, 93 L. Ed. 153, 69 S. Ct. 191 ("Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done . . . so that an objective mind might weigh the need to invade [the citizen's] privacy in order to enforce [****19] the law"). In this case, for example, it is at least theoretically possible that the Magistrate was satisfied that the search for weapons and explosives was justified by the showing in the affidavit, but not convinced that any evidentiary basis existed [**1292] for rummaging through respondents' files and papers for receipts pertaining to the purchase or manufacture of such items. Cf. *Stanford* v. *Texas,* 379 U.S. 476, 485-486, 13 L. Ed. 2d 431, 85 S. Ct. 506 (1965). Or, conceivably, the Magistrate might [*561] have believed that some of the weapons mentioned in the affidavit could have been lawfully possessed and therefore should not be seized. See 26 USC § 5861 [26 USCS § 5861] (requiring registration, but not banning possession of, certain firearms). The mere fact that the Magistrate issued a warrant does not necessarily establish that he agreed that the scope of the search should be as broad as the affiant's request. Even though petitioner acted with restraint in conducting the search, "the inescapable fact is that this restraint was imposed by the agents [***1081] themselves, not by a judicial officer." *Katz* v. *United States,* 389 U.S. 347, 356, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). [4]

---

[4] For this reason petitioner's argument that any constitutional error was committed by the Magistrate, not petitioner, is misplaced. In *Massachusetts* v. *Sheppard,* 468 U.S. 981, 82 L. Ed. 2d 737, 104 S. Ct. 3424 (1984), we suggested that "the judge, not the police officers," may have committed "[a]n error of constitutional dimension," *id*., 468 U.S. at 990, 82 L. Ed. 2d 737, 104 S. Ct. 3424, because the judge had assured the officers requesting the warrant that he would take the steps necessary to conform the warrant to constitutional requirements, *id*., 468 U.S. at 986, 82 L. Ed. 2d. 737, 104 S. Ct. 3424. Thus, "it was not unreasonable for the police in [that] case to rely on the judge's assurances that the warrant authorized the search they had requested." *Id*., 468 U.S. at 990, n. 6, 82 L. Ed. 2d 737, 104 S. Ct. 3424 . In this case, by contrast, petitioner did not alert the Magistrate to the defect in the warrant that petitioner had drafted, and we therefore cannot know whether the Magistrate was aware of the scope of the search he was authorizing. Nor would it have been

[****20] We have long held, moreover, that the purpose of the particularity requirement is not limited to the prevention of general searches. See *Garrison*, 480 U.S., at 84, 94 L. Ed. 2d 72, 107 S. Ct. 1013. A particular warrant also "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *United States* v. *Chadwick,* 433 U.S. 1, 9, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (1977) (citing *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U.S. 523, 532, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967)), abrogated on other grounds, *California* v. *Acevedo,* 500 U.S. 565, 114 L. Ed. 2d 619, 111 S. Ct. 1982 (1991). See also *Illinois* v. *Gates,* 462 U.S. 213, 236, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983) ("[P]ossession [*562] of a warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct"). [5]

[****21] [4] [**1293] Petitioner argues that even if the goals of the particularity requirement are broader than he acknowledges, those goals nevertheless were served because he orally described to respondents the items for which he was searching. Thus, he submits, respondents had all of the notice that a proper warrant would have accorded. But this case presents no occasion even to reach this argument, since respondents, as noted above, dispute petitioner's account. According to Mrs. Ramirez, petitioner stated only that he was looking for an "'explosive [*563] device in a box.'" 298 F.3d at 1026. Because this dispute is before us on petitioner's motion for summary judgment, App. to Pet. for Cert. 13a, "[t]he evidence of the [***1082] nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor," *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (citation omitted). The posture of the case therefore obliges us to credit Mrs. Ramirez's account, and we find that petitioner's description of "'an explosive device in a box'" was little better than no guidance at all. See *Stefonek*, 179 F.3d at 1032-1033 (holding that a search warrant for [****22] "'evidence of crime'" was "[s]o open-ended" in its description that it could "only be described as a general warrant").

[1E] It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted. [6] Because petitioner did not have in his possession a warrant particularly describing the things he intended to seize, proceeding with the search was clearly "unreasonable" under the Fourth Amendment. The Court of Appeals correctly held that the search was unconstitutional.

[****23] III

[2B] [5] Having concluded that a constitutional violation occurred, we turn to the question whether petitioner is entitled to qualified immunity despite that violation. See *Wilson* v. *Layne,* 526 U.S. 603, 609, 143 L. Ed. 2d 818, 119 S. Ct. 1692 (1999). The answer depends on whether the right that was transgressed was "'clearly established'"--that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier* v. *Katz,* 533 U.S. 194, 202, 150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001).

[2C] Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply

---

reasonable for petitioner to rely on a warrant that was so patently defective, even if the Magistrate was aware of the deficiency. See *United States* v. *Leon,* 468 U.S. 897, 915, 922, n. 23, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984).

[5] It is true, as petitioner points out, that neither the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search. Rule 41(f)(3) provides that "[t]he officer executing the warrant must: (A) give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken; or (B) leave a copy of the warrant and receipt at the place where the officer took the property." Quite obviously, in some circumstances--a surreptitious search by means of a wiretap, for example, or the search of empty or abandoned premises--it will be impracticable or imprudent for the officers to show the warrant in advance. See *Katz* v. *United States,* 389 U.S. 347, 355, n. 16, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967); *Ker* v. *California*, 374 U.S. 23, 37-41, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963). Whether it would be unreasonable to refuse a request to furnish the warrant at the outset of the search when, as in this case, an occupant of the premises is present and poses no threat to the officers' safe and effective performance of their mission, is a question that this case does not present.

[6] The Court of Appeals' decision is consistent with this principle. Petitioner mischaracterizes the court's decision when he contends that it imposed a novel proofreading requirement on officers executing warrants. The court held that officers leading a search team must "mak[e] sure that they have a proper warrant that in fact authorizes the search and seizure they are about to conduct." 298 F.3d 1022, 1027 (CA9 2002). That is not a duty to proofread; it is, rather, a duty to ensure that the warrant conforms to constitutional requirements.

with that requirement was valid. See *Harlow* v. *Fitzgerald,* 457 U.S. 800, 818-819, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982) ("If the law was clearly established, the immunity [*564] defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct"). Moreover, because petitioner himself prepared the invalid warrant, he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore [****24] valid. Cf. *Sheppard*, 468 U.S., at 989-990, 82 L. Ed. 2d 737, 104 S. Ct. 3424. In fact, the guidelines of petitioner's own department placed him on notice that he might be liable for executing [**1294] a manifestly invalid warrant. An ATF directive in force at the time of this search warned: "Special agents are liable if they exceed their authority while executing a search warrant and must be sure that a search warrant is sufficient on its face even when issued by a magistrate." Searches and Examinations, ATF Order O 3220.1(7)(d) (Feb. 13, 1997). See also *id.,* at 3220.1(23)(b) ("If any error or deficiency is discovered and there is [***1083] a reasonable probability that it will invalidate the warrant, such warrant shall not be executed. The search shall be postponed until a satisfactory warrant has been obtained"). [7] And even a cursory reading of the warrant in this case--perhaps just a simple glance--would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal.

[****25] [2D] [6] No reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional. See *Payton*, 445 U.S., at 586-588, 63 L. Ed. 2d 639, 100 S. Ct. 1371. Indeed, as we noted nearly 20 years ago in *Sheppard:* "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." [*565] 468 U.S., at 988, n. 5, 82 L. Ed. 2d 737, 104 S. Ct. 3424. [8] Because not a word in any of our cases would suggest to a reasonable officer that this case fits within any exception to that fundamental tenet, petitioner is asking us, in effect, to craft a new exception. Absent any support for such an exception in our cases, he cannot reasonably have relied on an expectation that we would do so.

[****26] [2E] [7] Petitioner contends that the search in this case was the product, at worst, of a lack of due care, and that our case law requires more than negligent behavior before depriving an official of qualified immunity. See *Malley* v. *Briggs,* 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986). But as we observed in the companion case to *Sheppard*, "a warrant may be so facially deficient--*i.e.*, in failing to particularize the place to be searched or the things to be seized--that the executing officers cannot reasonably presume it to be valid." *Leon,* 468 U.S., at 923, 82 L. Ed. 2d 677, 104 S. Ct. 3405 . This is such a case. [9]

[****27] [**1295] [***1084] [*566] Accordingly, the judgment of the Court of Appeals is affirmed.

It is so ordered.

---

[7] We do not suggest that an official is deprived of qualified immunity whenever he violates an internal guideline. We refer to the ATF Order only to underscore that petitioner should have known that he should not execute a patently defective warrant.

[8] Although both *Sheppard* and *Leon* involved the application of the "good faith" exception to the Fourth Amendment's general exclusionary rule, we have explained that "the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer." *Malley* v. *Briggs,* 475 U.S. 335, 344, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986) (citation omitted).

[9] [2F] Justice Kennedy argues in dissent that we have not allowed "'ample room for mistaken judgments,'" post, at ____, 157 L. Ed. 2d, at 1087 (quoting *Malley*, 475 U.S., at 343, 89 L. Ed. 2d 271, 106 S. Ct. 1092), because "difficult and important tasks demand the officer's full attention in the heat of an ongoing and often dangerous criminal investigation," *post*, at ____, 157 L. Ed. 2d, at 1085. In this case, however, petitioner does not contend that any sort of exigency existed when he drafted the affidavit, the warrant application, and the warrant, or when he conducted the search. This is not the situation, therefore, in which we have recognized that "officers in the dangerous and difficult process of making arrests and executing search warrants" require "some latitude." *Maryland* v. *Garrison,* 480 U.S. 79, 87, 94 L. Ed. 2d 72, 107 S. Ct. 1013 (1987).

Nor are we according "the correctness of paper forms" a higher status than "substantive rights." *Post*, at ____, 157 L. Ed. 2d, at 1087. As we have explained, the Fourth Amendment's particularity requirement assures the subject of the search that a magistrate has duly authorized the officer to conduct a search of limited scope. This substantive right is not protected when the officer fails to take the time to glance at the authorizing document and detect a glaring defect that Justice Kennedy agrees is of constitutional magnitude, *post*, at ____, 157 L. Ed. 2d, at 1084.

**Dissent by:** KENNEDY, THOMAS

## Dissent

Justice **Kennedy,** with whom The **Chief Justice** joins, dissenting.

I agree with the Court that the Fourth Amendment was violated in this case. The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The warrant issued in this case did not particularly describe the things to be seized, and so did not comply with the Fourth Amendment. I disagree with the Court on whether the officer who obtained the warrant and led the search team is entitled to qualified immunity for his role in the search. In my view, the officer should receive qualified immunity.

An officer conducting a search is entitled to qualified immunity if "a reasonable officer could have believed" that the search was lawful "in light of clearly established law and the information the searching officers possessed." *Anderson* v. *Creighton,* 483 U.S. 635, 641, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987). As the Court notes, this is the same objective reasonableness standard applied under [****28] the "good faith" exception to the exclusionary rule. See *ante*, at ____, n 8, 157 L. Ed. 2d, at 1083 (citing *Malley* v. *Briggs,* 475 U.S. 335, 344, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986)). The central question is whether someone in the officer's position could reasonably but mistakenly conclude that his conduct complied with the Fourth Amendment. *Creighton, supra,* 483 U.S. at 641, 97 L. Ed. 2d 523, 107 S. Ct. 3034 . See also *Saucier* v. *Katz,* 533 U.S. 194, 206, 150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001); *Hunter* v. *Bryant,* 502 U.S. 224, 227, 116 L. Ed. 2d 589, 112 S. Ct. 534 (1991) *(per curiam).*

An officer might reach such a mistaken conclusion for several reasons. He may be unaware of existing law and how it should be applied. See, *e.g., Saucier*, *supra*. Alternatively, [*567] he may misunderstand important facts about the search and assess the legality of his conduct based on that misunderstanding. See, *e.g., Arizona* v. *Evans,* 514 U.S. 1, 131 L. Ed. 2d 34, 115 S. Ct. 1185 (1995). Finally, an officer may misunderstand elements of both the facts and the law. See, *e.g., Creighton*, *supra*. Our qualified immunity doctrine applies regardless of whether the officer's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Butz* v. *Economou,* 438 U.S. 478, 507, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978) [****29] (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law").

The present case involves a straightforward mistake of fact. Although the Court does not acknowledge it directly, it is obvious from the record below that the officer simply made a clerical error when he filled out the proposed warrant and offered it to the Magistrate Judge. The officer used the proper description of the property to be seized when he completed the affidavit. He also used [***1085] the proper description in the accompanying application. When he typed up the description a third time for the proposed warrant, however, the officer accidentally entered a description of the place to be searched in the part of the warrant form that called for a description of the property to be seized. No one noticed the error before the search was executed. Although the record is not entirely [**1296] clear on this point, the mistake apparently remained undiscovered until the day after the search when respondents' attorney reviewed the warrant for defects. The officer, being unaware of his mistake, did not rely on it in any way. It is uncontested that the officer trained the search team and [****30] executed the warrant based on his mistaken belief that the warrant contained the proper description of the items to be seized.

The question is whether the officer's mistaken belief that the warrant contained the proper language was a reasonable belief. In my view, it was. A law enforcement officer charged with leading a team to execute a search warrant for [*568] illegal weapons must fulfill a number of serious responsibilities. The officer must establish probable cause to believe the crime has been committed and that evidence is likely to be found at the place to be searched; must articulate specific items that can be seized, and a specific place to be searched; must obtain the warrant from a magistrate judge; and must instruct a search team to execute the warrant within the time allowed by the warrant. The officer must also oversee the execution of the warrant in a way that protects officer safety, directs a thorough and professional search for the evidence, and avoids unnecessary destruction of property. These difficult and important tasks demand the officer's full attention in the heat of an ongoing and often dangerous criminal investigation.

An officer who complies fully with all of [****31] these duties can be excused for not being aware that he had

made a clerical error in the course of filling out the proposed warrant. See *Maryland* v. *Garrison,* 480 U.S. 79, 87, 94 L. Ed. 2d 72, 107 S. Ct. 1013 (1987) (recognizing "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants"). An officer who drafts an affidavit, types up an application and proposed warrant, and then obtains a judge's approval naturally assumes that he has filled out the warrant form correctly. Even if the officer checks over the warrant, he may very well miss a mistake. We all tend toward myopia when looking for our own errors. Every lawyer and every judge can recite examples of documents that they wrote, checked, and doublechecked, but that still contained glaring errors. Law enforcement officers are no different. It would be better if the officer recognizes the error, of course. It would be better still if he does not make the mistake in the first place. In the context of an otherwise proper search, however, an officer's failure to recognize his clerical error on a warrant form can be a reasonable mistake.

[****32] [*569] The Court reaches a different result by construing the officer's error as a mistake of law rather than a mistake of fact. According to the Court, the officer should not receive qualified immunity because "no reasonable [***1086] officer could believe that a warrant that plainly did not comply with [the particularity] requirement was valid." *Ante*, at ____, 157 L. Ed. 2d, at 1082. The majority is surely right that a reasonable officer must know that a defective warrant is invalid. This much is obvious, if not tautological. It is also irrelevant, for the essential question here is whether a reasonable officer in petitioner's position would necessarily know that the warrant had a clerical error in the first place. The issue in this case is whether an officer can reasonably fail to recognize a clerical error, not whether an officer who recognizes a clerical error can reasonably conclude that a defective warrant is legally valid.

The Court gives little attention to this important and difficult question. It receives [**1297] only two sentences at the very end of the Court's opinion. In the first sentence, the Court quotes dictum from *United States* v. *Leon,* 468 U.S. 897, 923, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984), to the effect that "'a [****33] warrant may be so facially deficient--*i.e.,* in failing to particularize the place to be searched or the things to be seized--that the executing officers cannot reasonably presume it to be valid.'" *Ante*, at ____ - ____, 157 L. Ed. 2d, at 1083. In the second sentence, the Court informs us without explanation that "[t]his is such a case." *Ante,* at ____, 157 L. Ed. 2d, at 1083. This reasoning is not convincing.

To understand the passage from *Leon* that the Court relies upon, it helps to recognize that most challenges to defective search warrants arise when officers rely on the defect and conduct a search that should not have occurred. The target of the improper search then brings a civil action challenging the improper search, or, if charges have been filed, moves to suppress the fruits of the search. The inquiry in both instances is whether the officers' reliance on the defect was reasonable. See, *e.g., Garrison, supra*, (apartment wrongly searched because the searching officers did not realize that [*570] there were two apartments on the third floor and obtained a warrant to search the entire floor); *Arizona* v. *Evans,* 514 U.S. 1, 131 L. Ed. 2d 34, 115 S. Ct. 1185 (1995) (person wrongly arrested and searched because a court [****34] employee's clerical error led officer to believe a warrant existed for person's arrest); *McLeary v. Navarro*, 504 U.S. 966, 19 L. Ed. 2d 243, 112 S. Ct. 2324 (1992) (White, J., dissenting from denial of certiorari) (house wrongly searched because informant told officers the suspect lived in the second house on the right, but the suspect lived in the third house on the right).

The language the Court quotes from *Leon* comes from a discussion of when "an officer [who] has obtained a [defective] warrant and abided by its terms" has acted reasonably. 468 U.S., at 922, 82 L. Ed. 2d 677, 104 S. Ct. 3405. The discussion notes that there are some cases in which "no reasonably well trained officer should rely on the warrant." *Id.*, 468 U.S. at 923, 82 L. Ed. 2d 677, 104 S. Ct. 3405. The passage also includes several examples, among them the one that the Court relies on in this case: "depending on the circumstances of the particular case, a warrant may be so facially deficient--*i.e.*, in failing to particularize the place to be searched or the things to be seized--that the executing officers cannot reasonably presume it to be valid." *Ibid.*

The Court interprets this language [***1087] to mean that a clerical mistake can be so obvious that an officer [****35] who fails to recognize the mistake should not receive qualified immunity. Read in context, however, the quoted language is addressed to a quite different issue. The most natural interpretation of the language is that a clerical mistake can be so obvious that the officer cannot reasonably rely on the mistake in the course of executing the warrant. In other words, a defect can be so clear that an officer cannot reasonably

"abid[e] by its terms" and execute the warrant as written. *Id.,* 468 U.S. at 922, 82 L. Ed. 2d 677, 104 S. Ct. 3405.

We confront no such issue here, of course. No one suggests that the officer reasonably could have relied on the defective language in the warrant. This is a case about an officer being unaware of a clerical error, not a case about an officer relying on one. The respondents do not make the [*571] usual claim that they were injured by a defect that led to an improper search. Rather, they make an unusual claim that they were injured simply because the warrant form did not contain the correct description of the property to be seized, even though no property was seized. The language from *Leon* is not on point.

[**1298] Our Court has stressed that "the purpose of encouraging recourse to the warrant [****36] procedure" can be served best by rejecting overly technical standards when courts review warrants. *Illinois* v. *Gates,* 462 U.S. 213, 237, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983). We have also stressed that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley,* 475 U.S., at 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092. The Court's opinion is inconsistent with these principles. Its analysis requires our Nation's police officers to concentrate more on the correctness of paper forms than substantive rights. The Court's new "duty to ensure that the warrant conforms to constitutional requirements" sounds laudable, *ante*, at ____, n 6, 157 L. Ed. 2d, at 1082, but would be more at home in a regime of strict liability than within the "ample room for mistaken judgments" that our qualified immunity jurisprudence traditionally provides, *Malley, supra,* 475 U.S. at 343, 89 L. Ed. 2d 271, 106 S. Ct. 1092.

For these reasons, I dissent.

Justice **Thomas,** with whom Justice **Scalia** joins, and with whom The **Chief Justice** joins as to Part III, dissenting.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and [****37] seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The precise relationship between the Amendment's Warrant Clause and Unreasonableness Clause is unclear. But neither Clause explicitly requires a warrant. [*572] While "it is of course textually possible to consider [a warrant requirement] implicit within the requirement of reasonableness," *California* v. *Acevedo,* 500 U.S. 565, 582, 114 L. Ed. 2d 619, 111 S. Ct. 1982 (1991) (Scalia, J., concurring in judgment), the text of the Fourth Amendment certainly does not mandate this result. Nor does the Amendment's history, which is clear as to the Amendment's [***1088] principal target (general warrants), but not as clear with respect to when warrants were required, if ever. Indeed, because of the very different nature and scope of federal authority and ability to conduct searches and arrests at the founding, it is possible that neither the history of the Fourth Amendment nor the common law provides much guidance.

As a result, the Court has vacillated between imposing a categorical warrant requirement and applying [****38] a general reasonableness standard. Compare *Thompson* v. *Louisiana,* 469 U.S. 17, 20, 83 L. Ed. 2d 246, 105 S. Ct. 409 (1984) *(per curiam)*, with *United States* v. *Rabinowitz,* 339 U.S. 56, 65, 94 L. Ed. 653, 70 S. Ct. 430 (1950). The Court has most frequently held that warrantless searches are presumptively unreasonable, see, *e.g., Katz* v. *United States,* 389 U.S. 347, 357, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967); *Payton* v. *New York,* 445 U.S. 573, 583, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980), but has also found a plethora of exceptions to presumptive unreasonableness, see, *e.g., Chimel* v. *California,* 395 U.S. 752, 762-763, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969) (searches incident to arrest); *United States* v. *Ross,* 456 U.S. 798, 800, 72 L. Ed. 2d 572, 102 S. Ct. 2157 (1982) (automobile searches); *United States* v. *Biswell,* 406 U.S. 311, 315-317, 32 L. Ed. 2d 87, 92 S. Ct. 1593 (1972) (searches of "pervasively regulated" businesses); *Camara* v. *Municipal Court of City and County of San Francisco,* 387 U.S. 523, 534-539, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967) (administrative searches); *Warden, Md. Penitentiary* v. *Hayden,* 387 U.S. 294, 298, 18 L. Ed. 2d 782, 87 S. Ct. 1642 (1967) ( [**1299] exigent circumstances); *California* v. *Carney,* 471 U.S. 386, 390-394, 85 L. Ed. 2d 406, 105 S. Ct. 2066 (1985) (mobile home searches); [****39] *Illinois* v. *Lafayette,* 462 U.S. 640, 648, 77 L. Ed. 2d 65, 103 S. Ct. 2605 (1983) (inventory searches); *Almeida-Sanchez* v. *United States,* 413 U.S. 266, 272, 37 L. Ed. 2d 596, 93 S. Ct. 2535 (1973) (border searches). That is, our cases stand for [*573] the illuminating proposition that warrantless searches are *per se* unreasonable, except, of course, when they are not.

Today the Court holds that the warrant in this case was

"so obviously deficient" that the ensuing search must be regarded as a warrantless search and thus presumptively unreasonable. *Ante*, at ____ - ____, 157 L. Ed. 2d, at 1079. However, the text of the Fourth Amendment, its history, and the sheer number of exceptions to the Court's categorical warrant requirement seriously undermine the bases upon which the Court today rests its holding. Instead of adding to this confusing jurisprudence, as the Court has done, I would turn to first principles in order to determine the relationship between the Warrant Clause and the Unreasonableness Clause. But even within the Court's current framework, a search conducted pursuant to a defective warrant is constitutionally different from a "warrantless search." Consequently, despite the defective warrant, I would still ask whether this search [****40] was unreasonable and would conclude that it was not. Furthermore, even if the Court were correct that this search violated the Constitution (and in particular, respondents' Fourth Amendment rights), given the confused state of our Fourth Amendment jurisprudence and the reasonableness of petitioner's actions, I cannot agree with the [***1089] Court's conclusion that petitioner is not entitled to qualified immunity. For these reasons, I respectfully dissent.

I

"[A]ny Fourth Amendment case may present two separate questions: whether the search was conducted pursuant to a warrant issued in accordance with the second Clause, and, if not, whether it was nevertheless 'reasonable' within the meaning of the first." *United States* v. *Leon,* 468 U.S. 897, 961, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984) (Stevens, J., dissenting). By categorizing the search here to be a "warrantless" one, the Court declines to perform a reasonableness inquiry and ignores the fact that this search is quite different from searches that the Court has considered to be "warrantless" in the past. Our cases [*574] involving "warrantless" searches do not generally involve situations in which an officer has obtained a warrant that is later determined to [****41] be facially defective, but rather involve situations in which the officers neither sought nor obtained a warrant. See, *e.g., Anderson* v. *Creighton,* 483 U.S. 635, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987) (officer entitled to qualified immunity despite conducting a warrantless search of respondents' home in the mistaken belief that a robbery suspect was hiding there); *Payton* v. *New York, supra,* (striking down a New York statute authorizing the warrantless entry into a private residence to make a routine felony arrest). By simply treating this case as if no warrant had even been sought or issued, the Court glosses over what should be the key inquiry: whether it is always appropriate to treat a search made pursuant to a warrant that fails to describe particularly the things to be seized as presumptively unreasonable.

The Court bases its holding that a defect in the particularity of the warrant by itself renders a search "warrantless" on a citation of a single footnote in *Massachusetts* v. *Sheppard,* 468 U.S. 981, 82 L. Ed. 2d 737, 104 S. Ct. 3424 (1984). In [*575] *Sheppard*, the Court, after noting that "the sole issue . . . in th[e] case is [**1300] whether the officers reasonably believed that the search [****42] they conducted was authorized by a valid warrant," *id*., 468 U.S. at 988, 82 L. Ed. 2d 737, 104 S. Ct. 3424, rejected the petitioner's argument that despite the invalid warrant, the otherwise reasonable search was constitutional, *id.*, 468 U.S. at 988, n. 5, 82 L. Ed. 2d 737, 104 S. Ct. 3424. The Court recognized that under its case law a reasonableness inquiry would be appropriate if one of the exceptions to the warrant requirement applied. But the Court declined to consider whether such an exception applied and whether the search actually violated the Fourth Amendment because that question presented merely a "fact-bound issue of little importance." *Ibid.* Because the Court in *Sheppard* did not conduct any sort of inquiry into whether a Fourth Amendment violation actually occurred, it is clear that the Court assumed a violation for the purposes of its analysis. Rather than rely on dicta buried in a footnote in *Sheppard*, the Court should actually analyze the arguably dispositive issue in this case.

The Court also rejects the argument that the details of the warrant application and affidavit save the warrant, because "'[t]he presence of a search warrant serves a high function.'" *Ante*, at ____, 157 L. Ed. 2d, at [***1090] 1078 (quoting *McDonald* v. *United States,* 335 U.S. 451, 455, 93 L. Ed. 153, 69 S. Ct. 191 (1948)). [****43] But it is not only the physical existence of the warrant and its typewritten contents that serve this high function. The Warrant Clause's principal protection lies in the fact that the "'Fourth Amendment has interposed a magistrate between the citizen and the police . . . . so that an objective mind might weigh the need to invade [the searchee's] privacy in order to enforce the law.'" *Ibid.* The Court has further explained,

> "The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and

detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be [****44] decided by a judicial officer, not by a policeman or government enforcement agent." *Johnson* v. *United States,* 333 U.S. 10, 13-14, 92 L. Ed. 436, 68 S. Ct. 367 (1948) (footnotes omitted).

But the actual contents of the warrant are simply manifestations of this protection. Hence, in contrast to the case of a truly warrantless search, a warrant (due to a mistake) does not specify on its face the particular items to be seized [*576] but the warrant application passed on by the magistrate judge contains such details, a searchee still has the benefit of a determination by a neutral magistrate that there is probable cause to search a particular place and to seize particular items. In such a circumstance, the principal justification for applying a rule of presumptive unreasonableness falls away.

In the instant case, the items to be seized were clearly specified in the warrant application and set forth in the affidavit, both of which were given to the Judge (Magistrate). The Magistrate reviewed all of the documents and signed the warrant application and made no adjustment or correction to this application. It is clear that respondents here received the protection of the Warrant Clause, as described in [****45] *Johnson* and *McDonald.* Under these circumstances, [**1301] I would not hold that any ensuing search constitutes a presumptively unreasonable warrantless search. Instead, I would determine whether, despite the invalid warrant, the resulting search was reasonable and hence constitutional.

II

Because the search was not unreasonable, I would conclude that it was constitutional. Prior to execution of the warrant, petitioner briefed the search team and provided a copy of the search warrant application, the supporting affidavit, and the warrant for the officers to review. Petitioner orally reviewed the terms of the warrant with the officers, including the specific items for which the officers were authorized to search. Petitioner and his search team then conducted [***1091] the search entirely within the scope of the warrant application and warrant; that is, within the scope of what the Magistrate had authorized. Finding no illegal weapons or explosives, the search team seized nothing. *Ramirez* v. *Butte-Silver Bow County,* 298 F.3d 1022, 1025 (CA9 2002). When petitioner left, he gave respondents a copy of the search warrant. Upon request the next day, petitioner faxed respondent a [****46] copy of the more detailed [*577] warrant application. Indeed, putting aside the technical defect in the warrant, it is hard to imagine how the actual search could have been carried out any more reasonably.

The Court argues that this eminently reasonable search is nonetheless unreasonable because "there can be no written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit" "unless the particular items described in the affidavit are also set forth in the warrant itself." *Ante*, at ____, 157 L. Ed. 2d, at 1080. The Court argues that it was at least possible that the Magistrate intended to authorize a much more limited search than the one petitioner requested. *Ibid.* As a theoretical matter, this may be true. But the more reasonable inference is that the Magistrate intended to authorize everything in the warrant application, as he signed the application and did not make any written adjustments to the application or the warrant itself.

The Court also attempts to bolster its focus on the faulty warrant by arguing that the purpose of the particularity requirement is not only to prevent general searches, but also to assure the searchee of the [****47] lawful authority for the search. *Ante*, at ____, 157 L. Ed. 2d, at 1081. But as the Court recognizes, neither the Fourth Amendment nor Federal Rule of Criminal Procedure 41 requires an officer to serve the warrant on the searchee before the search. *Ante*, at ____, n 5, 157 L. Ed. 2d, at 1081. Thus, a search should not be considered *per se* unreasonable for failing to apprise the searchee of the lawful authority prior to the search, especially where, as here, the officer promptly provides the requisite information when the defect in the papers is detected. Additionally, unless the Court adopts the Court of Appeals' view that the Constitution protects a searchee's ability to "be on the lookout and to challenge officers," while the officers are actually carrying out the search, 298 F.3d at 1027, petitioner's provision of the requisite information the following day is sufficient to satisfy this interest.

III

[*578] Even assuming a constitutional violation, I would find that petitioner is entitled to qualified immunity. The qualified immunity inquiry rests on "the 'objective legal reasonableness' of the action, *Harlow [v Fitzgerald,* 457 U.S. 800, 819, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)], assessed in light of the legal rules [****48] that were 'clearly [**1302] established' at the time it was taken." *Anderson* v. *Creighton,* 483 U.S., at 639, 97 L. Ed. 2d 523, 107 S. Ct. 3034. The outcome of this inquiry "depends substantially upon the level of generality at which the relevant 'legal rule' is . . . identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause . . . violates a clearly established right." [***1092] *Ibid.* To apply the standard at such a high level of generality would allow plaintiffs "to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Ibid.* The Court in *Anderson* criticized the Court of Appeals for considering the qualified immunity question only in terms of the petitioner's "right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances." *Id*., 483 U.S. at 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034. The Court of Appeals should have instead considered "the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's [****49] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." *Id.*, 483 U.S. at 641, 97 L. Ed. 2d 523, 107 S. Ct. 3034 .

The Court errs not only by defining the question at too high a level of generality but also by assessing the question without regard to the relevant circumstances. Even if it were true that no reasonable officer could believe that a search of a home pursuant to a warrant that fails the particularity requirement is lawful absent exigent circumstances--a proposition apparently established by dicta buried in a footnote in *Sheppard*--petitioner did not know when he carried [*579] out the search that the search warrant was invalid--let alone legally nonexistent. Petitioner's entitlement to qualified immunity, then, turns on whether his belief that the search warrant was valid was objectively reasonable. Petitioner's belief surely was reasonable.

The Court has stated that "depending on the circumstances of the particular case, a warrant may be so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *United States* v. *Leon,* 468 U.S., at 923, 82 L. Ed. 2d 677, 104 S. Ct. 3405. This language makes clear that [****50] this exception to *Leon*'s good-faith exception does not apply in every circumstance. And the Court does not explain why it should apply here. As an initial matter, the Court does not even argue that the fact that petitioner made a mistake in preparing the warrant was objectively unreasonable, nor could it. Given the sheer number of warrants prepared and executed by officers each year, combined with the fact that these same officers also prepare detailed and sometimes somewhat comprehensive documents supporting the warrant applications, it is inevitable that officers acting reasonably and entirely in good faith will occasionally make such errors.

The only remaining question is whether petitioner's failure to notice the defect was objectively unreasonable. The Court today points to no cases directing an officer to proofread a warrant after it has been passed on by a neutral magistrate, where the officer is already fully aware of the scope of the intended search and the magistrate gives no reason to believe that he has authorized anything other than the requested search. Nor does the Court point to any case suggesting that where the same officer both prepares and executes the invalid [****51] warrant, he can never rely on the magistrate's assurance that the warrant is proper. Indeed, in *Massachusetts* v. *Sheppard,* 468 U.S. 981, 82 L. Ed. 2d 737, 104 S. Ct. 3424 (1984), the Court suggested that although an officer who [***1093] is [**1303] not involved in the warrant application process would normally read the issued warrant to determine the object of the search, an executing [*580] officer who is also the affiant might not need to do so. *Id.*, 468 U.S. at 989, n. 6, 82 L. Ed. 2d 737, 104 S. Ct. 3424.

Although the Court contends that it does not impose a proofreading requirement upon officers executing warrants, *ante*, at ____, n 6, 157 L. Ed. 2d, at 1082, I see no other way to read its decision, particularly where, as here, petitioner could have done nothing more to ensure the reasonableness of his actions than to proofread the warrant. After receiving several allegations that respondents possessed illegal firearms and explosives, petitioner prepared an application for a warrant to search respondents' ranch, along with a supporting affidavit detailing the history of allegations against respondents, petitioner's investigation into these allegations, and petitioner's verification of the sources of

the allegations. Petitioner properly filled out the warrant application, [****52] which described both the place to be searched and the things to be seized, and obtained the Magistrate's signature on both the warrant application and the warrant itself. Prior to execution of the warrant, petitioner briefed the search team to ensure that each officer understood the limits of the search. Petitioner and his search team then executed the warrant within those limits. And when the error in the search warrant was discovered, petitioner promptly faxed the missing information to respondents. In my view, petitioner's actions were objectively reasonable, and thus he should be entitled to qualified immunity.

For the foregoing reasons, I respectfully dissent.

## References

63C Am Jur 2d, Public Officers and Employees §§ 314, 319, 344; 68 Am Jur 2d, Searches and Seizures §§ 10-12, 222, 223, 313, 320

USCS, Constitution, Amendment 4

[****53] L Ed Digest, Search and Seizure §§ 25, 28; United States § 107

L Ed Index, Search and Seizure

**Annotation References**

Supreme Court's views as to admissibility in criminal case, under United States v Leon and its progeny, of evidence obtained in alleged violation of Federal Constitution's Fourth Amendment by law enforcement officers relying on quashed or defective warrant. 131 L Ed 2d 1021.

Supreme Court's views as to application or applicability of doctrine of qualified immunity in action under 42 USCS § 1983, or in Bivens action, seeking damages for alleged civil rights violations. 116 L Ed 2d 965.

Sufficiency, under Federal Constitution's Fourth Amendment, of description in search warrant of place to be searched or of person or thing to be seized--Supreme Court cases. 94 L Ed 2d 813.

Defense of good faith in action for damages against law enforcement official under 42 U.S.C.A. § 1983 [42 USCS § 1983], providing for liability of person who, under color of law, subjects another [****54] to deprivation of rights. 61 ALR Fed 7.

Sufficiency of description of business records under Fourth Amendment requirement of particularity in federal warrant authorizing search and seizure. 53 ALR Fed 679.

Seizure of books, documents, or other papers under search warrant not describing such items. 54 ALR4th 391.

---

End of Document

# United States v. Carpenter

360 F.3d 591 (6th Cir. 2004) (en banc)

Cited in Supplemental Brief at: iv

Caution
As of: September 17, 2026 9:39 PM Z

# United States v. Carpenter

United States Court of Appeals for the Sixth Circuit

June 11, 2003, Argued and Submitted ; March 9, 2004, Decided ; March 9, 2004, Filed

Nos. 01-5368/01-5370/01-5446

**Reporter**

360 F.3d 591 *; 2004 U.S. App. LEXIS 4435 **; 2004 FED App. 0072P (6th Cir.) ***

UNITED STATES OF AMERICA, Plaintiff-Appellee/Cross-Appellant, v. LONNIE D. CARPENTER (01-5368) and SHEILA J. CARPENTER (01-5370), Defendants-Appellants/Cross-Appellees.

**Subsequent History:** US Supreme Court certiorari denied by Carpenter v. United States, 2004 U.S. LEXIS 6305 (U.S., Oct. 4, 2004)

US Supreme Court certiorari denied by Carpenter v. United States, 2004 U.S. LEXIS 6306 (U.S., Oct. 4, 2004)

**Prior History:** [**1] Appeal from the United States District Court for the Eastern District of Tennessee at Greeneville. No. 99-00045. Thomas G. Hull, District Judge. Argued and.

United States v. Carpenter, 317 F.3d 618, 2003 U.S. App. LEXIS 588 (6th Cir.) (6th Cir. Tenn., 2003)

**Disposition:** Prior panel decision reinstated and adopted in part, district court judgment remanded for further proceedings.

**Counsel:** ARGUED: Nikki C. Pierce, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, Greeneville, Tennessee, for Appellants.

Michael E. Winck, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

ON BRIEF: Nikki C. Pierce, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, Greeneville, Tennessee, for Appellants.

Michael E. Winck, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

Lonnie D. Carpenter, Rogersville, Tennessee, Pro se.

**Judges:** Before: BOGGS, Chief Judge; MARTIN, SILER, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, and COOK, Circuit Judges. SILER, J., delivered the opinion of the court, in which BOGGS, C. J., BATCHELDER, GIBBONS, ROGERS, SUTTON, and COOK, JJ., joined. GILMAN, J., delivered a separate concurring opinion. MOORE, J., delivered a separate dissenting opinion, in which MARTIN, DAUGHTREY, COLE, and CLAY, JJ., joined, with MARTIN, J., also delivering a separate dissenting opinion.

**Opinion by:** SILER

## Opinion

[*593] [***2] SILER, Circuit Judge. Defendants [**2] Lonnie D. and Sheila J. Carpenter were convicted of manufacturing marijuana. One of the issues that they raised on appeal was a claim that the district court erred in failing to suppress the evidence of their illegal activity. The government cross-appealed the district court's ruling that limited the amount of the Carpenters' land subject to forfeiture. A divided panel of this court affirmed in part, vacated in part, and remanded the case for further [***3] proceedings. *United States v. Carpenter*, 317 F.3d 618 (6th Cir. 2003).

Rehearing en banc was subsequently granted in order to consider a question regarding the application of *United States v. Leon*, 468 U.S. 897, 922, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984), that is, whether a search conducted pursuant to an invalid warrant may be saved under the "good-faith exception" on the basis that the officers had other information that was not presented to the issuing magistrate, but that would have established probable cause. We need not reach that question because we conclude that the police officers' reliance on the deficient warrant was reasonable because the information that *was* presented to the issuing judge [**3] was sufficient to support a good-faith belief in the warrant's validity. We therefore REINSTATE the judgment of the panel in this case, and adopt the panel opinion except for its discussion of the *Leon* good-faith

exception, and REMAND the case to the district court for further proceedings.

I. BACKGROUND

A. Factual background

In June 1999, Police Lieutenant Robert Crumley was conducting helicopter surveillance over Hawkins County, Tennessee. He spotted patches of marijuana growing in fields approximately 900 feet away from a residence belonging to the Carpenters. In addition, he observed beaten paths leading from the back door of the residence to the marijuana patches and saw two men, who turned out to be Lonnie Carpenter and his son, walking from the patches toward the residence. Crumley relayed this information to a team of police officers on the ground.

Captain Ronnie Lawson, a member of the ground team, sought a warrant to search the residence. A state judge, satisfied that Lawson's affidavit established probable cause, [***4] issued the requested search warrant. The affidavit, which the warrant incorporated, described the location of the Carpenter residence and then [**4] set forth the following reasons (in exactly the syntax shown) why Lawson believed that evidence of criminal conduct would be found in the residence:

> On June 23, 1999 at approx 12:30 pm, Helicopter Pilot Lt Bob Crumley was conducting an aerial search of Hawkins Co when he was flying over the above described property he saw numerous Marijuana Plants growing. Near the residence.
>
> Upon information I received from Lt Crumley, there is a road connecting the above described residence to the Marijuana Plants. Having personal knowledge that Lt. Crumley is certified in the identification of Marijuana I feel there is probable cause to search the said residence and property and seize any illegal contraband found.

Armed with this warrant, police officers searched the Carpenters' residence. They seized marijuana, marijuana seeds, and other items associated with marijuana manufacturing.

[*594] B. Procedural background

In July 1999, the Carpenters were indicted for manufacturing marijuana and with employing a minor to assist them, in violation of 21 U.S.C. §§ 841 and 861, respectively. The indictment also sought the forfeiture of the Carpenters' real property, [**5] a 100-acre farm, on the basis that it had been "used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of" marijuana manufacturing. 21 U.S.C. § 853(a)(2).

The district court subsequently denied the Carpenters' motions to suppress the evidence seized during the search of their residence. The Carpenters were eventually acquitted on the charge that they employed a minor to manufacture [***5] marijuana, but were found guilty of manufacturing marijuana. The jury also concluded that the Carpenters' property had been used to commit the crime, thereby triggering a forfeiture of the property.

II. ANALYSIS

A. The motions to suppress

*1. Standard of review*

In reviewing the denial of a motion to suppress, we defer to the district court's factual findings unless they are clearly erroneous. Legal conclusions, however, are reviewed *de novo*. *United States v. Bartholomew*, 310 F.3d 912, 919 (6th Cir. 2002), *cert. denied*, 537 U.S. 1177, 154 L. Ed. 2d 923, 123 S. Ct. 1005 (2003).

*2. Whether the affidavit provided a substantial basis for the determination of probable cause*

The Fourth Amendment provides that "no Warrants [**6] shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. In determining whether an affidavit establishes probable cause,

> the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983) (internal quotation marks and alterations omitted).

[***6] To justify a search, the circumstances must indicate why evidence of illegal activity will be found "in a particular place." There must, in other words, be a "nexus between the place to be searched and the evidence sought." *United States v. Van Shutters*, 163

F.3d 331, 336-37 (6th Cir. 1998). Lawson's affidavit did not provide a substantial basis for the issuing judge's conclusion that probable cause existed to search the Carpenters' [**7] residence, because it failed to set forth sufficient facts that incriminating evidence would be found *there*, rather than in some other place.

The facts that marijuana was growing "near" the residence and that a road ran nearby fall short of establishing the required nexus between the Carpenters' residence and evidence of marijuana manufacturing. If Lawson's affidavit had stated that beaten paths led from the marijuana patches to the door of the residence, and that two men had been spotted walking from the marijuana patches to the residence, the affidavit would likely have been sufficient to establish probable cause. *See United States v. Robins*, 978 F.2d 881, 892 (5th Cir. 1992) (holding that where a police detective has ascertained that a particular person, Robins, was a marijuana dealer, "there was undoubtedly an adequate nexus, [*595] between Robins' residence and Detective Soule's allegations to the Magistrate Judge about Robins' marijuana operation, to support the search warrant for the marijuana and related records [that] Detective Soule's experience and common sense told him would likely be at Robins' residence"); *United States v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990) [**8] (holding that a police officer's "observation of marijuana growing in Malin's [fenced] yard reasonably yielded the conclusion that marijuana or other evidence of marijuana possession would be found in Malin's house").

These additional facts, however, were not included in the affidavit. The facts in the affidavit that did connect the marijuana patches and the residence were too vague, generalized, and insubstantial to establish probable cause. [***7] We therefore conclude that the state judge lacked a substantial basis to determine that probable cause existed to search the Carpenters' residence. The government, indeed, concedes this point. Because the search of the Carpenters' residence violated the Fourth Amendment, we are left with the question of whether the evidence seized should be suppressed.

*3. The good-faith exception to the exclusionary rule*

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347, 94 L. Ed. 2d 364, 107 S. Ct. 1160 (1987). Courts should not, however, suppress [**9] "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984). But this good-faith exception to the exclusionary rule does not apply in circumstances where "the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 923. Thus, an officer would not "manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (quotation omitted).

*a. Whether the officers had a reasonable basis to believe that the information actually submitted supported the issuance of the search warrant*

Pursuant to *Leon*, we must now decide whether the officers in the instant case had a reasonable basis to believe that the information that *was submitted* supported the issuance of the search warrant. In considering this question, we agree with the following analysis by the Fourth Circuit:

> If a lack of a substantial basis also prevented application of the *Leon* objective good faith [**10] exception, the exception [***8] would be devoid of substance. In fact, *Leon* states that . . . a finding of objective good faith [is inappropriate] when an officer's affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." This is a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause in the first place.

*United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002) (citation omitted).

The affidavit in the case before us failed to provide a substantial basis for probable cause because it did not provide the required nexus between the residence and the illegal activity. However, the affidavit was not completely devoid of any nexus between the residence and the marijuana [*596] that the police observed. Rather, it noted both that the marijuana was growing "near" the residence and that "there is a road connecting" the residence and the marijuana plants.

We previously found *Leon* applicable in cases where we determined that the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched [**11] to support an officer's good-faith belief in the warrant's validity, even if the information provided was not enough to establish probable cause. *See* *United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998) (upholding a search where the affidavit underlying the warrant described the residence, the items sought, and the defendant's counterfeiting scheme, but connected the place to the illegal activity only by stating that the residence "was available" to the defendant); *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994) (upholding a search of safe deposit boxes at a bank where the affidavit underlying the warrant connected the boxes and the defendant's trafficking in illegal drugs only by stating that the officer's training and experience led him to believe that evidence would be located there). [***9]

A useful contrast is provided by *United States v. Hove*, 848 F.2d 137 (9th Cir. 1988). In *Hove,* the police officer had obtained a warrant to search a particular residence after submitting to the issuing magistrate an affidavit that failed to provide *any* nexus between the residence and illegal activity. *Id.* at 139-40 [**12] ("The final warrant application, while it set forth facts suggesting that Kimberly Hove had sent threatening letters, never linked Kimberly Hove or any suspected criminal activity in any way with the 2727 DeAnza residence."). The Ninth Circuit held that no reasonable officer could have believed that the warrant was valid, given the failure of the affidavit to articulate any nexus between the illegal activity and the place to be searched.

In the present case, however, the affidavit was not totally lacking in facts connecting the residence to the marijuana patches. These facts, as we explained above, were too vague to provide a substantial basis for the determination of probable cause. But these facts (unlike *Hove*) were not so vague as to be conclusory or meaningless. *See* *United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993) ("This is not a case in which the affidavit contained mere conclusory assertions or a single piece of evidence which the law of the stationhouse shop would recognize as clearly insufficient."). We therefore conclude that reasonable officers could have believed that the affidavit as submitted, even without the additional relevant information [**13] known to the officers, was sufficient to support the issuance of the warrant.

At oral argument, the Carpenters contended that Lawson's omission from his affidavit of the additional information known to the police (concerning the beaten paths and the two men walking from the marijuana patches to the residence) militated against the conclusion that they executed the warrant in good-faith reliance on its reasonableness. We disagree. Extrapolating from *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), this court has recognized that "material omissions [from an affidavit] are not immune from inquiry under [***10] *Franks*." *United States v. Atkin*, 107 F.3d 1213, 1216-17 (6th Cir. 1997) (discussing *Franks*'s holding that a defendant is entitled to an evidentiary hearing on the veracity of the affidavit if (1) he or she can make a preliminary showing that portions of the affidavit are deliberately or recklessly false, and (2) after setting aside the false information, the remaining parts of the affidavit would not support a finding of probable cause). But to be constitutionally problematic, the material must have [*597] been deliberately or recklessly [**14] omitted and must have *undermined* the showing of probable cause. *See id.* ("If the defendant does succeed in making a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists."). The Carpenters have made no showing that Lawson omitted facts from his affidavit deliberately or recklessly. Moreover, the omitted facts would have *bolstered* the affidavit's showing of probable cause, not undermined it.

The fact that a police officer had such additional knowledge certainly raises the inference that the officer should have recognized that a stronger showing of probable cause could have been made to the issuing magistrate. But such recognition says nothing about the reasonableness of the belief that the information that was presented was sufficient.

To the extent that the Carpenters are continuing to argue that the factual assertions that were in the affidavit were both false and recklessly included (a traditional *Franks* challenge), the district court [**15] found after a hearing that the affidavit was reasonably accurate and that no evidence supported the proposition that any inaccuracy was deliberately or recklessly included. These findings were not clearly erroneous.

[***11] *b.Whether the fact that the officers had other information that was not presented to the issuing magistrate, but that would have established probable cause, is relevant to the good-faith analysis*

Since we have concluded that the police officers' reliance on the deficient warrant was reasonable based on the information that actually was submitted to the issuing judge, we leave for another day the question of whether the search could have been saved under the "good-faith exception" on the basis that the officers had other information that was not presented to the issuing magistrate, but that would have established probable cause. *See, e.g., United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001).

B. Other issues

Rule 35 of the Rules of the Sixth Circuit provides that "the effect of the granting of a rehearing en banc shall be to vacate the previous opinion and judgment of this Court." All of the issues raised by the Carpenters [**16] on appeal are thus before us. In our opinion, however, the reasoning of the prior panel was correct on all issues other than its analysis of the motions to suppress. We therefore reinstate and reaffirm the judgment in *United States v. Carpenter*, 317 F.3d 618 (6th Cir. 2003), and adopt its opinion except for its discussion of the *Leon* good-faith exception. *See Donahey v. Bogle*, 129 F.3d 838, 844 (6th Cir. 1997) (en banc) (reinstating the prior panel opinion on all issues not otherwise discussed by the en banc court), *vacated on other grounds*, 524 U.S. 924, 141 L. Ed. 2d 692, 118 S. Ct. 2317 (1998).

III. CONCLUSION

For all of the reasons set forth above, we REINSTATE the judgment of the panel in this case, albeit with different reasoning, and REMAND the case to the district court for further proceedings.

**Concur by:** RONALD LEE GILMAN

## Concur

[***12] RONALD LEE GILMAN, Circuit Judge, concurring. I concur in the conclusion reached by the majority opinion and in most of its [*598] reasoning. But I respectfully disagree with its decision to defer to another day the issue of whether a court should consider the additional information known to the officers but not communicated to [**17] the magistrate in deciding if the *Leon* good-faith exception has been satisfied. The government persuaded the district court that the consideration of such additional information was appropriate. In addition, the issue has been fully briefed and argued on appeal and is discussed in the dissenting opinion. Deciding the issue is therefore appropriate in order to provide guidance to the district courts within our circuit and to future panels of this court. *See Webster v. Reproductive Health Servs.*, 492 U.S. 490, 532-35, 106 L. Ed. 2d 410, 109 S. Ct. 3040 (1989) (Scalia, J., concurring in part and concurring in the judgment) (discussing numerous cases where the Supreme Court has departed from the general principle of deciding cases on the narrowest possible constitutional grounds).

As part of its argument, the government contends that the good-faith exception to the exclusionary rule should apply in this case because the police officers knew additional facts that were not included in Captain Lawson's affidavit, but that, when added to the information contained in the affidavit, would have established probable cause. Specifically, the police (1) knew that beaten paths led from the back [**18] door of the residence to the marijuana patches, and (2) had seen two men walking from the patches to the residence. I am of the opinion that any consideration of this additional information would be contrary to controlling Supreme Court precedent.

[***13] The Fourth Amendment prohibits police officers, absent certain exceptions not applicable here, from conducting searches of a residence without a properly issued warrant. *Agnello v. United States*, 269 U.S. 20, 33, 70 L. Ed. 145, 46 S. Ct. 4 (1925) ("Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant."). An officer's correct belief in the existence of probable cause does not obviate the warrant requirement. *Id.* ("And such searches are held unlawful notwithstanding facts unquestionably showing probable cause.").

According to the Supreme Court in *Leon*, evidence obtained through a search pursuant to a deficient warrant must be suppressed, unless the police officer acted "in objectively reasonable reliance on a subsequently invalidated search warrant." 468 U.S. at 922. Information tending to show the [**19] existence of probable cause that was not disclosed to the issuing magistrate cannot logically have any bearing on the reasonableness of the presenting officer's belief *that the warrant was properly issued*, as opposed to the officer's reasonable belief that probable cause existed for the search. The straightforward reason for this conclusion is that no magistrate can base his or her determination of the existence of probable cause upon information never received.

*Leon* and *Agnello* make clear that the relevant question is whether the officer reasonably believed that the warrant was properly issued, *not* whether probable cause existed in fact. *See* *United States v. Hove*, 848 F.2d 137, 140 (9th Cir. 1988) ("The *Leon* test for good faith reliance is clearly an objective one and it is based solely on facts presented to the magistrate. An obviously deficient affidavit cannot be cured by an officer's later testimony on his subjective intentions or knowledge.") (citation omitted); *United States v. Bynum*, 293 F.3d 192, 212 (4th Cir. 2002) (Michael, J., dissenting) ("*Leon* requires that the officer be able to entertain a reasonable belief [**20] that the magistrate had a substantial [*599] basis for finding probable [***14] cause. . . . What the officer knew but did not tell the magistrate is irrelevant.").

The government argues that *Leon* itself described situations in which a reviewing court would need to look to facts beyond the affidavit in order to ascertain whether the officers could have reasonably relied on a deficient warrant. I do not quarrel with this argument. But nothing in *Leon* suggests the illogical position that information supporting probable cause that is known to the officers but not to the issuing magistrate could make the officers' reliance on the deficient warrant reasonable. Instead, *Leon* describes several specific situations where the relevant extra-affidavit facts are ones other than pertinent, truthful information known to the officers but not communicated to the magistrate. 468 U.S. at 923. Suppression is appropriate, for example, "in cases where the issuing magistrate wholly abandoned his judicial role," because the Fourth Amendment requires a magistrate to be neutral and detached and to make his or her own determination of probable cause. *Id.* "No reasonably well trained [**21] officer should rely on the warrant" where the officer knows that it was not validly issued. *Id.* Similarly, the *Leon* Court instructed:

> Our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances--including whether the warrant application had previously been rejected by a different magistrate--may be considered.

*Id.* at 922 n.23.

This passage from *Leon* points out the need to consider the circumstances where extra-affidavit information might be relevant to an officer's good-faith reliance on the warrant's validity. For example, if an officer takes an affidavit to nine [***15] magistrates, all of whom decide that it does not establish probable cause, and the officer subsequently relies on a later-invalidated warrant issued by a tenth magistrate presented with the same affidavit, the fact that nine magistrates had decided against issuing a warrant raises an inference that the officer's reliance on the warrant was not objectively reasonable. [**22] A contrasting situation is found in the case before us, where the officer knew of facts that would have established probable cause, but omitted those facts from his affidavit and then relied on the warrant issued by a judge who did not know those additional facts. Knowing additional facts that would establish probable cause, but that were not presented to the issuing magistrate, does not establish that the officer reasonably believed that the warrant was properly issued. In the first situation, extra-affidavit facts are relevant to the pertinent question of whether the officer reasonably believed that the warrant was valid. But the extra-affidavit facts in the second situation have no bearing on the question.

The government also cites the Eleventh Circuit's decision in *United States v. Martin*, 297 F.3d 1308 (11th Cir.), *cert. denied*, 537 U.S. 1076, 123 S. Ct. 667, 154 L. Ed. 2d 574 (2002), in support of its proposed rule. In *Martin*, the Eleventh Circuit concluded that although the affidavit did not establish probable cause, it "contained sufficient indicia of probable cause to enable a reasonable officer to execute the warrant thinking it valid. [**23] " *Id.* at 1315. Because no other exception to *Leon* applied (e.g., the magistrate had not abandoned his judicial role), this conclusion should have ended the Eleventh Circuit's inquiry.

The *Martin* court then proceeded, however, to redundantly "make an inquiry as [*600] to whether [the police officer] reasonably relied upon the search warrant." *Id.* at 1318. In answering this question, the Eleventh Circuit decided that it was permitted to consider additional facts supporting probable cause that the police officer had known but had not disclosed to the issuing magistrate. The court concluded: "Under the totality of the circumstances, taking into account the facts [***16] known to [the police officer] at the time he applied for the search warrant, we find that [the police officer] reasonably believed that probable cause existed to execute a search warrant." *Id.* at 1320. I find this portion of the opinion in *Martin* perplexing, because the relevant question under *Leon* is whether the officer reasonably believed that the warrant was valid, not

whether probable cause existed. Perhaps this part of *Martin* can be chalked up [**24] to dicta. But even if this characterization is incorrect, this court is of course not bound by the holdings of our sister circuits. *Nixon v. Kent County*, 76 F.3d 1381, 1388 (6th Cir. 1996) (en banc).

The government also recites the comment in *Martin* that "the exclusionary rule is meant to guard against police officers who purposely leave critical facts out of search warrant affidavits because these facts would not support a finding of probable cause." 297 F.3d at 1320. I agree with this statement, but find it underinclusive. The Supreme Court stated in *Leon* that "the exclusionary rule . . . operates as a judicially created remedy *designed to safeguard Fourth Amendment rights generally* through its deterrent effect." 468 U.S. at 906 (internal quotation marks omitted) (emphasis added). Although an officer's intentional omission of unsupportive facts from a search warrant application may well violate the Fourth Amendment, it is by no means the only way to violate the Amendment. *See, e.g., id.* at 922-24 (listing multiple examples of Fourth Amendment violations). The *Martin* court's statement of the exclusionary [**25] rule's purpose is therefore underinclusive and does not justify the government's position.

One other conceivable source of authority for the consideration of the undisclosed information, which this court relied upon in the unpublished decision of *United States v. Leaster*, 35 Fed. Appx. 402, 2002 WL 1147343, at *8 (6th Cir. 2002), is *Anderson v. Creighton*, 483 U.S. 635, 641, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987). Although the Supreme Court did indeed state in *Anderson* that "whether it was objectively legally reasonable [***17] to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials," *id.* at 641, this statement was made in the context of deciding whether qualified immunity protected an officer conducting a warrantless search that was undertaken because of exigent circumstances. Given that no warrant is required for a search undertaken with both probable cause and exigent circumstances, I believe that *Anderson* provides no support for the rule proposed by the government. *Leaster* failed to make this key distinction [**26] and is thus unpersuasive.

The Eighth Circuit also relied on *Anderson* to justify its adoption of the rule proposed by the government. *See United States v. Martin*, 833 F.2d 752, 756 (8th Cir. 1987). It did so without acknowledging the significance of the "exigent circumstances" exception to the warrant requirement, an exception not present in the case before us. Subsequent Eighth Circuit cases have simply followed *Martin* without any further analysis. *See, e.g., United States v. Johnson*, 78 F.3d 1258, 1263 (8th Cir. 1996); *United States v. Simpkins*, 914 F.2d 1054, 1057 (8th Cir. [*601] 1990). I therefore find the Eighth Circuit cases equally unpersuasive.

No compelling authority, in sum, stands for the proposition that a search conducted pursuant to an invalid warrant can be saved under *Leon*'s good-faith exception on the basis that the officers had other information that was not presented to the issuing magistrate, but that would have established probable cause. This proposition is contrary to *Leon* and, in my opinion, the court should so declare in the case before us.

**Dissent by:** KAREN NELSON MOOREBoyce F. Martin

## Dissent

[***18] [**27] KAREN NELSON MOORE, Circuit Judge, dissenting. I respectfully dissent because the officers' reliance upon the warrant was not reasonable given the exiguous information presented to the issuing judge, and thus the *Leon* good-faith exception does not apply to this case. *See United States v. Leon*, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405 (1984).

Consequently, I believe that we must reach the issue, buried in the sand by the majority, of whether an officer can reasonably rely on a warrant when the officer possesses information that could establish probable cause but does not communicate that information to the magistrate. I wholeheartedly agree with Judge Gilman's opinion on the proper role (or lack thereof) of withheld information in the calculus of *Leon*, and I do not elaborate on its reasoning at great length. Judge Gilman is certainly correct that Captain Lawson's affidavit was insufficient to permit the issuing magistrate to determine that probable cause existed. Judge Gilman also properly concludes that information known to the officers, but not relayed to the issuing magistrate, cannot preserve the fruits of an invalid warrant under the *Leon* good-faith exception. [**28] The original panel should be reversed on this point, and I endorse Judge Gilman's rejection of the decisions of the Eighth and Eleventh Circuits. *See United States v. Johnson*, 78 F.3d 1258 (8th Cir. 1996); *United States v. Martin*, 297 F.3d 1308 (11th Cir.), *cert.*

*denied*, 537 U.S. 1076, 123 S. Ct. 667, 154 L. Ed. 2d 574 (2002). Knowledge withheld, either by accident or through purposeful omission or misrepresentation, cannot resuscitate otherwise suppressible evidence, because an officer who neglects to inform fully the issuing magistrate and who then executes the defective warrant does not manifest an "objectively reasonable" good-faith belief that the warrant was valid. *Leon*, 468 U.S. at 922. Far from [***19] demonstrating reasonable belief, the omitted information serves chiefly to highlight an officer's understanding of the warrant's deficiency because that officer is in a unique position to understand that the issuing magistrate lacked all the necessary data. Permitting information not presented to the issuing magistrate to serve as the lynchpin for invoking *Leon* perverts the meaning of the warrant requirement [**29] because it allows law enforcement officials to bypass the judiciary; evidence produced by inadequate search warrants, which are starved of information and seemingly doomed by insufficient probable cause, should not receive a reprieve solely because of information obscured from the issuing magistrate's consideration.

I part ways with Judge Gilman, as well as the majority, because of their conclusion that the officers here had an objectively reasonable good-faith belief in the warrant's legitimacy based upon the scant information actually given to the issuing magistrate. I would rule that these officers were "relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923 (quotation omitted). [*602] The majority holds that even though the affidavit did not provide enough of a nexus between the Carpenters' residence and the illegal activity to sustain probable cause, "the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched to support an officer's good-faith belief in the warrant's validity . . . ." Maj. Op. at 8. In the majority's [**30] view, the affidavit attesting to (1) the presence of marijuana "near" the residence and (2) "a road connecting" the residence to the area where the plants were growing did not suffice to give the officers probable cause to search, but supported the officers' objectively reasonable belief that the warrant was valid. *Id*. Because I believe that the two facts presented in the affidavit at best draw a tenuous and shadowy connection between the Carpenter residence and the marijuana plants that is not sufficient to meet the *Leon* standards, I cannot agree that a [***20] reasonable officer could have believed that the warrant was valid.

The threshold issue is how to determine whether an officer has an objectively reasonable good-faith belief in the defective warrant's validity. The *Leon* Court wrote that "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." 468 U.S. at 922 n.23. "The objective standard . . . requires officers to have a reasonable knowledge of what the law prohibits." *Id.* at 919 n.20. [**31] Some minimal connection between the property or person to be searched and the alleged wrongdoing is a necessary, but not sufficient, precondition for the satisfaction of this objective standard. The mere existence of some nexus will not preserve evidence from the exclusionary rule when a reasonable officer, well trained in the practice of searches and presumed to understand the basic principles of the law in this area, submits an affidavit describing a connection that so plainly fails to establish probable cause that the reasonable officer should not have applied for the warrant initially.

The presence of marijuana "near" the Carpenter residence and the sighting of a road "connecting" the marijuana and the residence implied some relationship between the two, but this link was so minimal and so plainly failed to show probable cause to search that the officers could not have believed that the warrant authorizing the search was valid. Several courts have held that *Leon* does not apply when an affidavit offers an extremely limited factual basis for probable cause or an extremely minimal nexus, because such an affidavit is "so lacking in indicia of probable cause as to render official [**32] belief in its existence entirely unreasonable." *Id.* at 923 (quotation omitted). For example, the Eighth Circuit ruled that no reasonable officer could have believed that probable cause existed when the only evidence connecting the defendant's home to the cultivation of drugs was the presence of [***21] marijuana on a farm close to the defendant, which was owned by his relatives. *United States v. Herron*, 215 F.3d 812, 815 (8th Cir. 2000). The court held that *Leon* did not apply, because there was neither evidence of marijuana growing at the defendant's residence nor proof of any participation by the defendant in the cultivation of the marijuana discovered at the other farm. *Id.* at 814. The "officers involved should have been fully aware of the deficiencies of their affidavits" because the affidavits, which make only a few passing references to the defendant, "simply do not say very much about [the defendant] or his residence." *Id.* & n.2; *see also* *United States v. Hove*, 848 F.2d 137, 140 (9th Cir. 1988) (rejecting argument that [*603] *Leon*

applied when affidavit did not link the searched residence to the defendant [**33] or explain why incriminating evidence may have been found there).

The cases upon which the majority relies are distinguishable from the facts here, because in each, the underlying affidavit contained considerably more detail or precision than Lawson's affidavit, and therefore made it possible for officers executing the warrant to form a reasonable belief that probable cause existed. In *United States v. Van Shutters*, 163 F.3d 331 (6th Cir. 1998), we upheld a search under *Leon* because the affidavit stated that the affiant had personal knowledge of the defendant's illegal activities, and because the affidavit described the location of the residence to be searched "with such particularity that a common sense inference is that the affiant visited the premises himself and presumably . . . observed [the defendant] in the premises." *Id.* at 337. In contrast to the majority's reading of *Van Shutters*, I do not believe that we applied the *Leon* exception based only upon an extremely minimal connection to the illegal activity, namely the defendant's access to the residence; we explained in *Van Shutters* that the affidavit presented a detailed connection [**34] such that "only a police officer with extraordinary legal training would have detected any deficiencies in [the] document." *Id.* Generally, when an affidavit provides [***22] detailed facts and eschews vague descriptions of the location or person to be searched, it is much more likely that a law enforcement official could form an objectively reasonable belief that a warrant was valid. *See United States v. Watkins*, 179 F.3d 489, 493, 499 (6th Cir. 1999) (applying *Leon* when a six-page affidavit detailed several instances of the defendant's drug-related activity both at and away from a different residence that the police did not search, even though the affidavit did not mention a second house that was the object of the search); *United States v. Williams*, 3 F.3d 69, 70-71, 74 (3d Cir. 1993) (applying *Leon* because affidavit of housekeeper detailed specifics of illegal drug activity in motel room, such as "coded" knocks, overheard conversations, and observations of paraphernalia made while cleaning); *cf. United States v. Helton*, 314 F.3d 812, 816, 824 (6th Cir. 2003) (rejecting application of *Leon* exception even though [**35] a twenty-seven-page affidavit supported the warrant, because the affidavit relied too heavily on an anonymous tipster's recollections).

Additionally, the proximity of illegal marijuana cultivation to the property that is searched is a significant factor in assessing the objective reasonableness of an officer's belief that probable cause existed. In *United States v. Malin*, 908 F.2d 163 (7th Cir. 1990), the Seventh Circuit found that probable cause existed to search a residence, but questioned in the alternative whether *Leon* would apply. The court answered affirmatively because the officer's affidavit described his observation of marijuana growing directly next to a house in a fenced-in yard, even though the officer did not observe any individual near the marijuana. *Id.* at 165-67. *See also United States v. Huggins*, 299 F.3d 1039, 1041, 1045 (9th Cir. 2002) (concluding that an objectively reasonable officer could rely on an affidavit when it presented information that the defendant's home consumed electricity in a manner consistent with marijuana cultivation).

[***23] The facts here are much closer to *Herron* than they are [**36] to *Van Shutters* or *Malin*. Lawson's affidavit provided only the barest modicum of information to the issuing magistrate. Its brevity and vacuousness sharply distinguishes it from the detailed affidavit presented in *Van Shutters*. It did not connect the Carpenter residence to the marijuana observed; that [*604] the marijuana was seen "near" to the residence does not necessarily imply a connection between the two, particularly when Lawson knew that the plants were in fact approximately 900 feet from the Carpenter residence. Unlike *Malin*, when the marijuana grew in a fenced-in yard directly adjacent to the house, the marijuana "near" the Carpenters' trailer was far enough away that no officer could draw a firm connection between the two, or between the marijuana and any other residence in the neighborhood for that matter. If the marijuana had been growing next to the trailer or in the patch of corn behind the trailer, the officers' belief in the warrant's validity might have been more reasonable. Furthermore, the road "connecting" the residence to the marijuana plants was in reality a dirt path leading from the Carpenters' trailer to a separate tractor path that may have served [**37] as the connection between the city road and a homestead behind the Carpenters' trailer that had burned down several years before. The good-faith exception cannot apply here because Lawson's affidavit was based on two extremely inconclusive connections between the marijuana and the house, and therefore Lawson could not have reasonably believed that probable cause existed.

Because there was no probable cause to justify the search and because I do not believe that a law enforcement officer could form the objectively reasonable belief that the warrant was valid when so little linked the Carpenter residence to the marijuana plants growing "near" the residence, I would reverse the

district court and exclude the evidence gathered from the illegal search.

[***24] BOYCE F. MARTIN, JR., Circuit Judge, dissenting. I join Judge Moore's very persuasive dissent and add only the following. Given the sophisticated technologies that the police now have at their disposal, as well as the wide discretion that they currently enjoy, it is especially important that we are careful not to expand their powers beyond what is authorized by the Constitution. In this case, the Constitution has been set aside [**38] in the name of expediency. Regrettably, we have descended further down that slippery slope of post-hoc rationalization, where everything that the police do becomes acceptable when viewed in retrospect.

For the reasons set forth by Judge Moore and for these reasons, I respectfully dissent.

---

End of Document

# Richardson v. United States

526 U.S. 813 (1999)

Cited in Supplemental Brief at: v, 9

Caution
As of: September 17, 2026 9:37 PM Z

# Richardson v. United States

Supreme Court of the United States

February 22, 1999, Argued ; June 1, 1999, Decided

No. 97-8629

**Reporter**
526 U.S. 813 *; 119 S. Ct. 1707 **; 143 L. Ed. 2d 985 ***; 1999 U.S. LEXIS 3640 ****; 67 U.S.L.W. 4381; 99 Cal. Daily Op. Service 4070; 99 Daily Journal DAR 5177; 1999 Colo. J. C.A.R. 3011; 12 Fla. L. Weekly Fed. S 295

EDDIE RICHARDSON, PETITIONER v. UNITED STATES

**Subsequent History:** Post-conviction relief denied at, Dismissed by United States v. Westmoreland, 1999 U.S. Dist. LEXIS 12441 (N.D. Ill., Aug. 10, 1999)

On remand at, Remanded by United States v. Richardson, 195 F.3d 316, 1999 U.S. App. LEXIS 26560 (7th Cir. Ill., Oct. 22, 1999)

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

United States v. Richardson, 130 F.3d 765, 1997 U.S. App. LEXIS 32081 (7th Cir. Ill., Nov. 14, 1997)

**Disposition:** 130 F.3d 765, vacated and remanded.

## Syllabus

At petitioner Richardson's trial for violating 21 U.S.C. § 848 -- which forbids any "person" from "engaging in a continuing criminal enterprise," § 848(a), and defines "continuing criminal enterprise" (CCE) as involving a violation of the drug statutes where "such violation is part of a continuing series of violations," § 848(c) -- the judge rejected Richardson's proposal to instruct the jury that it must unanimously agree on which three acts constituted the series of violations. Instead, the judge instructed the jurors that they must unanimously agree that the defendant committed at least three federal narcotics offenses, but did not have [****2] to agree as to the particular offenses. The jury convicted Richardson, and the Seventh Circuit upheld the trial judge's instruction.

*Held:* A jury in a § 848 case must unanimously agree not only that the defendant committed some "continuing series of violations," but also about which specific "violations" make up that "continuing series." Pp. 3-11.

(a) A jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element of the offense. However, it need not always decide unanimously which of several possible means the defendant used to commit an element. If § 848(c)'s phrase "series of violations" refers to one element, a "series," in respect to which individual "violations" are but the means, then the jury need only agree that the defendant committed at least three underlying crimes, and need not agree about which three. Conversely, if the statute creates several elements, the several "violations," then the jury must agree unanimously about which three crimes the defendant committed. Pp. 3-4.

(b) Considerations of language, tradition, and potential unfairness support a reading of "violations" as elements rather [****3] than means. The Government has not found any legal source reading any instance of the words "violation" or "violations" as means. To hold that each "violation" here amounts to a separate element is consistent with a tradition of requiring juror unanimity where the issue is whether a defendant has engaged in conduct that violates the law. To hold the contrary is not. The CCE statute's breadth aggravates the dangers of unfairness that treating each violation as a means would risk. The statute's word "violations" covers many different kinds of behavior of varying degrees of seriousness. The two chapters of the Federal Criminal Code setting forth drug crimes contain approximately 90 numbered sections, many of which proscribe various acts that may be alleged as "violations" for purposes of § 848's series requirement. This consideration increases the likelihood that treating violations simply as alternative means, by permitting a jury to avoid discussion of the specific factual details of each violation, will cover up wide disagreement among the jurors about just what the defendant did, or did not, do.

Moreover, the Government may seek to prove that a defendant has been involved in numerous [****4] underlying violations, significantly aggravating the risk that jurors will fail to focus on specific factual detail unless required to do so. Finally, this Court has indicated that the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition. *Schad* v. *Arizona,* 501 U.S. 624, 632-633. Pp. 3-6, 115 L. Ed. 2d 555, 111 S. Ct. 2491.

(c) The Government's arguments for interpreting "violations" as means -- that the words "continuing series" focus on the drug business, not on the particular violations that constitute the business; that an analogy can be found in state courts' interpretations of statutes permitting conviction upon proof of a continuous course of conduct without jury agreement on a specific underlying crime; that a jury-unanimity requirement will make the statute's crime too difficult to prove; and that other portions of the statute do not require jury unanimity -- are not sufficiently powerful to overcome the foregoing considerations. Pp. 7-11.

(d) The questions [****5] whether to engage in harmless-error analysis, and if so, whether the error was harmless in this case, are left to the Seventh Circuit on remand. P. 11.

130 F.3d 765, vacated and remanded.

**Counsel:** William A. Barnett, Jr. argued the cause for petitioner.

Irving L. Gornstein argued the cause for respondent.

**Judges:** BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, SCALIA, SOUTER, and THOMAS, JJ., joined. KENNEDY, J., filed a dissenting opinion, in which O'CONNOR and GINSBURG, JJ., joined.

**Opinion by:** BREYER

## Opinion

[*815] [***991] [**1709] JUSTICE **BREYER** delivered the opinion of the Court.

[1A] A federal criminal statute forbids any "person" from "engaging in a continuing criminal enterprise." 84 Stat. 1264, 21 U.S.C. § 848(a). It defines "continuing criminal enterprise" (CCE) as involving a "violation" of the drug statutes where "such violation is a part of a continuing series of violations." § 848(c). We must decide whether a jury has to agree unanimously about which specific violations make up the "continuing series of violations." We hold that the jury must do so. That [****6] is to say, a jury in a federal criminal case brought under § 848 must unanimously agree not only that the defendant committed some "continuing series of violations" but also that the defendant committed each of the individual "violations" necessary to make up that "continuing series."

I

The CCE statute imposes a mandatory minimum prison term of at least 20 years upon a person who engages in a "continuing criminal enterprise." § 848(a). It says:

"[A] person is engaged in a continuing criminal enterprise if --

"(1) he violates any provision of [the federal drug laws, *i.e.,*] this subchapter or subchapter II of this chapter the punishment for which is a felony, and

"(2) such violation is a part of a continuing series of violations of [the federal drug laws, *i.e.,*] this subchapter or subchapter II of this chapter --

"(A) which are undertaken by such person in concert with five or more other persons with respect to whom [*816] such person occupies a position of organizer [or supervisor or manager] and

"(B) from which such person obtains substantial income or resources." § 848(c).

In 1994 the Federal Government charged the petitioner, Eddie Richardson, with [****7] violating this statute. The Government presented evidence designed to show that in 1970 Richardson had organized a Chicago street gang called the Undertaker Vice Lords, that the gang had distributed heroin, crack cocaine, and powder cocaine over a period of years stretching from 1984 to 1991, and that Richardson, known as "King of all the Undertakers," had run the gang, managed the sales, and obtained substantial income from those unlawful activities. The jury convicted Richardson.

The question before us arises out of the trial court's instruction about the statute's "series of violations" requirement. The judge rejected Richardson's proposal to instruct the jury that it must "unanimously agree on

which three acts constituted [the] series of violations." App. 21. Instead, the judge instructed the jurors that they "must unanimously agree that the defendant committed at least three federal narcotics offenses," while adding, "you do not . . . have to agree as to the particular three or more federal narcotics offenses committed by the defendant." *Id.* at 37. On appeal, the Seventh Circuit upheld the trial judge's instruction. [****8] 130 F.3d 765, 779 (1998). Recognizing a split in the Circuits on the matter, [***992] we granted certiorari. Compare *United States* v. *Edmonds*, 80 F.3d 810, 822 (CA3 1996) (en banc) (jury must unanimously agree on which "violations" constitute the series), with *United States* v. *Hall*, 93 F.3d 126, 129 (CA4 1996) (unanimity with respect to particular "violations" is not required), and *United States* v. *Anderson*, 309 U.S. App. D.C. 54, 39 F.3d 331, 350-351 (CADC 1994) (same). We now conclude that unanimity in respect to each individual violation is necessary.

[*817] [**1710] II

Federal crimes are made up of factual elements, which are ordinarily listed in the statute that defines the crime. A (hypothetical) robbery statute, for example, that makes it a crime (1) to take (2) from a person (3) through force or the threat of force (4) property (5) belonging to a bank would have defined the crime of robbery in terms of the five elements just mentioned. Cf. 18 U.S.C. § 2113(a). Calling a particular kind of fact an "element" carries certain legal consequences. [****9] *Almendarez-Torres* v. *United States*, 523 U.S. 224, 239, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998). The consequence that matters for this case is that a jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element. *Johnson* v. *Louisiana*, 406 U.S. 356, 369-371, 32 L. Ed. 2d 152, 92 S. Ct. 1620 (1972) (Powell, J., concurring); *Andres* v. *United States*, 333 U.S. 740, 748, 92 L. Ed. 1055, 68 S. Ct. 880 (1948); Fed. Rule Crim. Proc. 31(a).

The question before us arises because a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime. *Schad* v. *Arizona*, 501 U.S. 624, 631-632, 115 L. Ed. 2d 555, 111 S. Ct. 2491 (1991) (plurality opinion); *Andersen* v. *United States*, 170 U.S. 481, 499-501, 42 L. Ed. 1116, 18 S. Ct. 689 (1898). Where, for example, an element of robbery is force or the threat of force, some jurors might conclude [****10] that the defendant used a knife to create the threat; others might conclude he used a gun. But that disagreement -- a disagreement about means -- would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely that the defendant had threatened force. See *McKoy* v. *North Carolina*, 494 U.S. 433, 449, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990) (Blackmun, J., concurring).

In this case, we must decide whether the statute's phrase "series of violations" refers to one element, namely a "series," in respect to which the "violations" constitute the underlying brute facts or means, or whether those words [*818] create several elements, namely the several "violations," in respect to *each* of which the jury must agree unanimously and separately. Our decision will make a difference where, as here, the Government introduces evidence that the defendant has committed more underlying drug crimes than legally necessary to make up a "series." (We assume, but do not decide, that the necessary number is three, the number used in this case.) If the statute creates a single element, a "series," in respect to which [****11] individual violations are but the means, then the jury need only agree that the defendant [***993] committed at least three of all the underlying crimes the Government has tried to prove. The jury need not agree about which three. On the other hand, if the statute makes each "violation" a separate element, then the jury must agree unanimously about which three crimes the defendant committed.

A

[1B][2][3A]When interpreting a statute, we look first to the language. *United States* v. *Wells*, 519 U.S. 482, 490, 137 L. Ed. 2d 107, 117 S. Ct. 921 (1997). In this case, that language may seem to permit either interpretation, that of the Government or of the petitioner, for the statute does not explicitly tell us whether the individual violation is an element or a means. But the language is not totally neutral. The words "violates" and "violations" are words that have a legal ring. A "violation" is not simply an act or conduct; it is an act or conduct that is contrary to law. Black's Law Dictionary 1570 (6th ed. 1990). That circumstance is significant because the criminal law ordinarily entrusts a jury with determining [****12] whether alleged conduct "violates" the law, see *infra,* at 7-8, and, as noted above, a federal criminal jury must act unanimously when doing so. Indeed, even though the words "violates" and "violations" appear more than 1,000 times in the United

States Code, the Government has not pointed us to, nor have we found, any legal source reading any instance of either word as the Government would have us read them in this case. To hold that [*819] each "violation" here amounts to a separate element is consistent [**1711] with a tradition of requiring juror unanimity where the issue is whether a defendant has engaged in conduct that violates the law. To hold the contrary is not.

[1C][3B]The CCE statute's breadth also argues against treating each individual violation as a means, for that breadth aggravates the dangers of unfairness that doing so would risk. Cf. *Schad* v. *Arizona*, *supra*, at 645 (plurality opinion). The statute's word "violations" covers many different kinds of behavior of varying degrees of seriousness. The two chapters of the Federal Criminal Code setting forth drug crimes contain approximately 90 [****13] numbered sections, many of which proscribe various acts that may be alleged as "violations" for purposes of the series requirement in the statute. Compare, *e.g.*, 21 U.S.C. §§ 842(a)(4) and (c) (1994 ed. and Supp. III) (providing civil penalties for removing drug labels) and 21 U.S.C. § 844(a) (Supp. III) (simple possession of a controlled substance) with 21 U.S.C. § 858 (endangering human life while manufacturing a controlled substance in violation of the drug laws) and § 841(b)(1)(A) (possession with intent to distribute large quantities of drugs). At the same time, the Government in a CCE case may well seek to prove that a defendant, charged as a drug kingpin, has been involved in numerous underlying violations. The first of these considerations increases the likelihood that treating violations simply as alternative means, by permitting a jury to avoid discussion of the specific factual details of each violation, will cover-up wide disagreement among the jurors about just what the defendant did, or did [***994] not, do. The second consideration significantly aggravates the risk (present at least to a small [****14] degree whenever multiple means are at issue) that jurors, unless required to focus upon specific factual detail, will fail to do so, simply concluding from testimony, say, of bad reputation, that where there is smoke there must be fire.

[*820] Finally, this Court has indicated that the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition. *Schad* v. *Arizona,* 501 U.S. at 632-633 (plurality opinion); 501 U.S. at 651 (SCALIA, J., concurring) ("We would not permit . . . an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday . . . "). We have no reason to believe that Congress intended to come close to, or to test, those constitutional limits when it wrote this statute. See *Garrett* v. *United States*, 471 U.S. 773, 783-784, 85 L. Ed. 2d 764, 105 S. Ct. 2407 (1985) (citing H. R. Rep. No. 91-1444, pt. 1, pp. 83-84 (1970)) (in making CCE a separate crime, rather than a sentencing provision, Congress sought increased procedural [****15] protections for defendants); cf. *Gomez* v. *United States*, 490 U.S. 858, 864, 104 L. Ed. 2d 923, 109 S. Ct. 2237 (1989) ("It is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question"); *Ashwander* v. *TVA*, 297 U.S. 288, 346-348, 80 L. Ed. 688, 56 S. Ct. 466 (1936) (Brandeis, J., concurring).

B

[1D] [4A]The Government's arguments for an interpretation of "violations" as means are not sufficiently powerful to overcome the considerations just mentioned, those of language, tradition, and potential unfairness. The Government, emphasizing the words "*continuing series*," says that the statute, in seeking to punish drug kingpins, focuses upon the drug business, not upon the particular violations that constitute the business. Brief for United States 18-19. The argument, however, begs the question. Linguistically speaking, the statute punishes those kingpins who are involved in a "continuing series of *violations*" of the drug laws. And Congress might well have intended a jury to focus [****16] upon individual violations in order to assure guilt of the serious [*821] crime the statute creates. Emphasizing the first two words in the passage does not eliminate the last.

Nor can the Government successfully appeal to a history or tradition of treating individual criminal "violations" as simply means toward the commission of a greater [**1712] crime. The Government virtually concedes the absence of any such tradition when it says that the statute "departed significantly from common-law models and prior drug laws, creating a new crime keyed to the concept of a 'continuing criminal enterprise.'" *Id.* at 18. The closest analogies it cites consist of state statutes making criminal such crimes as sexual abuse of a minor. State courts interpreting such statutes have sometimes permitted jury disagreement about a "specific" underlying criminal "incident" insisting only upon proof of a "continuous course of conduct" in

violation of the law. *E.g.*, *People* v. [***995] *Gear*, 19 Cal. App. 4th 86, 89-94, 23 Cal. Rptr. 2d 261, 263-267 (1993) (continuous sexual abuse of a child); [****17] *People* v. *Reynolds*, 294 Ill. App. 3d 58, 69-71, 689 N.E.2d 335, 343-344, 228 Ill. Dec. 463 (1997) (criminal sexual assault of a minor and aggravated sexual abuse of a minor); *State* v. *Spigarolo*, 210 Conn. 359, 391-392, 556 A.2d 112, 129 (1989) (committing an act likely to impair the health or morals of a child); *Soper* v. *State*, 731 P.2d 587, 591 (Alaska App. 1987) (sexual assault in the first degree). With one exception, see Cal. Penal Code Ann. § 288.5(a) (West Supp. 1998), the statutes do not define the statutory crime in terms that require the commission of other predicate crimes by the defendant. The state practice may well respond to special difficulties of proving individual underlying criminal acts, *People* v. *Gear*, 19 Cal. App. 4th at 90-92, 23 Cal. Rpt. 2d at 263-265, which difficulties are absent here. See *infra*, at 9-10. The cases are not federal but state, where this Court has not held that the Constitution imposes a jury unanimity requirement. [****18] *Johnson* v. *Louisiana*, 406 U.S. at 366 (Powell, J., concurring). And their special subject matter indicates that they represent an exception; they do not represent a general [*822] tradition or a rule. *People* v. *Gear*, 19 Cal. App. 4th at 89-92, 23 Cal. Rptr. 2d at 263-265.

[4B]In fact, federal criminal law's treatment of recidivism offers a competing analogy no more distant than the analogy the Government offers. See *Garrett* v. *United States, supra,* at 782 (the statute originated in a "recidivist provision . . . that provided for enhanced sentences"). If one looks to recidivism, one finds that commission of a prior crime will lead to an enhanced punishment only when a relevant factfinder, judge, or jury has found that the defendant committed that specific individual prior crime. Where sentencing is at issue, the judge, enhancing a sentence in light of recidivism, must find a prior individual conviction, United States Sentencing Commission, Guidelines Manual §§ 4A1.1, 4B1.1 (Nov. 1998) which means that an earlier fact-finder (*e.g.*, [****19] a unanimous federal jury in the case of a federal crime) found that the defendant committed the specific earlier crime, §§ 4A1.2(a)(1), 4B1.2(c). Where a substantive statute is at issue, for example, a statute forbidding a felon's possession of a firearm, 18 U.S.C. § 922(g) (1994 ed. and Supp. III), the relevant precondition, namely that the gun possessor be a felon, means at a minimum that an earlier factfinder (*e.g.*, a unanimous federal jury in the case of a federal crime) found that the defendant in fact committed that earlier individual crime. The Government's interpretation is inconsistent with this practice, for it, in effect, imposes punishment on a defendant for the underlying crimes without any factfinder having found that the defendant committed those crimes. If there are federal statutes reflecting a different practice or tradition, the Government has not called them to our attention, which suggests that any such statute would represent a lesser known exception to ordinary practice. Cf. *Schad* v. *Arizona*, 501 U.S. at 633 (plurality opinion) ("It is an assumption of our system of criminal justice . . . that no person may be [****20] punished criminally save upon proof of some illegal conduct").

[*823] [***996] Neither are we convinced by the Government's two remaining significant arguments. First, the Government says that a jury-unanimity requirement will make the statute's crime too difficult to prove -- to the point where it is unreasonable to assume Congress intended such a requirement. But we do not understand why a unanimity requirement would produce that level of difficulty. After all, the Government routinely obtains the testimony of underlings -- street-level [**1713] dealers who could point to specific incidents -- as well as the testimony of agents who make controlled buys or otherwise observe drug transactions. Such witnesses should not have inordinate difficulty pointing to specific transactions. Or, if they do have difficulty, would that difficulty in proving individual specific transactions not tend to cast doubt upon the existence of the requisite "series"?

[5] [6]The dissent, but not the Government, argues that the prosecution will now have to prove that the defendant derived substantial income or resources from, and that 5 persons were involved [****21] with, the specific underlying crimes the jury unanimously agrees were committed. See *post*, at 7. To the extent the dissent suggests that those other statutory requirements must be satisfied with respect to *each* underlying crime, it is clearly wrong. Those requirements must be met with respect to the *series*, which, at a minimum, permits the jury to look at all of the agreed-upon violations in combination. Even if the jury were limited to the agreed-upon violations, we still fail to see why prosecutions would prove unduly difficult. The dissent writes as if it follows from its reading that conviction under the CCE statute depends on specific proof of specific sales to specific street level users. See *post*, at 9. That is not true. A specific transaction is not an element of possession with intent to distribute under 21 U.S.C. § 841. It would be enough to present testimony, like that of Michael Sargent partially recounted by the dissent, showing that the defendant supplied a runner in his

organization with large quantities of drugs on or about [*824] particular dates as alleged in an indictment. And one need only examine Sargent's testimony to [****22] dispel any fears about fading memories. He testified that he received from Richardson large quantities of heroin three times a week; he was able to specify the location where Richardson gave him the drugs; he was able to recall precisely how the heroin was packaged when Richardson gave it to him. Tr. 1399-1401. Though he was not pressed to be specific, he even testified that he started receiving drugs from Richardson sometime in the beginning of 1989. Tr. 1382. Given the record in this case, we find it hard to believe the Government will have as hard a time producing evidence sufficient to support a CCE conviction as the dissent suggests.

[4C]Second, the Government points to a different portion of the statute, which requires a defendant to have supervised "five or more other persons." 21 U.S.C. § 848(c)(2)(A). The Government says that no one claims that the jury must unanimously agree about the identity of those five other persons. It adds that the jury may also disagree about the brute facts that make up other statutory elements such as the "substantial income" [***997] that the defendant must derive from the enterprise, § 848(c)(2)(B), [****23] or the defendant's role in the criminal organization, § 848(c)(2)(A). Assuming, without deciding, that there is no unanimity requirement in respect to these other provisions, we nonetheless find them significantly different from the provision before us. They differ in respect to language, breadth, tradition, and the other factors we have discussed.

[1E] [7]These considerations, taken together, lead us to conclude that the statute requires jury unanimity in respect to each individual "violation." We leave to the Court of Appeals the question of whether to engage in harmless error analysis, and if so, whether the error was harmless in this case.

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

**Dissent by:** KENNEDY

## Dissent

[*825] JUSTICE **KENNEDY**, with whom JUSTICE **O'CONNOR** and JUSTICE **GINSBURG** join, dissenting.

The evidence in this case established that petitioner was the head of a sophisticated, well-entrenched, successful drug distribution enterprise. It had sales of hundreds of kilograms of heroin and cocaine over a period of years in Chicago. [****24] The jury found that petitioner was engaged in a "continuing criminal enterprise" (CCE).

Title 21 U.S.C., subchapter I, § 848(c) defines a person as engaged in a CCE if --

"(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

[**1714] "(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter --

"(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

"(B) from which such person obtains substantial income or resources." 84 Stat. 1266.

We are concerned with subparagraph (2), which by its terms requires the Government to establish the following elements if it is to prove a CCE: (1) that the violation is part of a continuing series of violations of the drug laws; (2) that the continuing series is undertaken by the accused in concert with five or more other persons; (3) that the accused occupied a position of organizer, supervisor, or manager, with respect to those other persons; and (4) that [****25] the accused obtained substantial income or resources from the continuing series of violations.

The Court today reasons that the first enumerated element in the subparagraph is not an element at all; instead, it is shorthand for some number of other elements corresponding to the individual violations in the series. The jury [*826] must therefore be unanimous not as to whether there was a continuing series of violations [***998] but rather as to each of the individual violations making up some subset of the continuing series. The Court does not decide how many elements this portion of the statute contains, although it assumes without deciding that three will do. *Ante*, at 4.

The Court gives no satisfactory explanation for confining its holding to the continuing series phrase, while assuming nonunanimity as to the specifics of the other elements in the same subparagraph. Nor does the Court attempt to explain how a jury is supposed to make sense of the other elements -- like deriving substantial income from the series -- now that the series has in effect been replaced with a few discrete violations.

The consequences of the Court's decision go well beyond the jury instruction [****26] the Court discusses. The Court's decision of necessity alters the manner in which the Government must frame its indictment and design its trial strategy. The elements of the offenses charged must be set forth in the indictment, see *Hamling* v. *United States,* 418 U.S. 87, 117, 41 L. Ed. 2d 590, 94 S. Ct. 2887 (1974), so henceforth when the Government indicts it must choose three or more specific violations and allege those, despite its ability to show that the CCE involves hundreds or thousands of sales. This is a substantial departure from what Congress intended. I submit my respectful dissent.

I

The Government procured a two-count indictment against petitioner. The CCE charge is in Count II and the Government, in my view, charged precisely what Congress said it should. Count II was as follows:

"1. From in or about 1984, to and including October 1991, at Chicago and elsewhere in the Northern District of Illinois, Eastern Division,

[*827] EDDIE RICHARDSON,

also known as 'Hi Neef' and 'Chief,' and

CARMEN TATE

also known as 'Red' and 'Redman,'

defendants herein, did engage in a continuing criminal enterprise by committing a continuing series of felony [****27] violations of Section 841(a)(1) of Title 21, United States Code, which continuing series of violations was undertaken by defendants in concert with at least five other persons with respect to whom defendants occupied a position as organizer, a supervisory position, and some other position of management, and from which continuing series of violations defendants obtained substantial income and resources.

"2. The continuing series of violations undertaken by defendants EDDIE RICHARDSON and CARMEN TATE included:

"a. From in or about 1984 through and including October 1991, at Chicago, in the Northern District of Illinois, Eastern Division, defendants EDDIE RICHARDSON and CARMEN TATE knowingly and intentionally repeatedly distributed and caused to be distributed cocaine and cocaine [**1715] base and possessed cocaine and cocaine base with intent to distribute, in violation of Title 21, United States Code, Section 841(a)(1).

[***999] "b. From in or about 1984 through and including October 1991, at Chicago, in the Northern District of Illinois, Eastern Division, defendants EDDIE RICHARDSON and CARMEN TATE knowingly and intentionally repeatedly distributed [****28] and caused to be distributed heroin and possessed heroin with intent to distribute, in violation of Title 21, United States Code, Section 841(a)(1).

"In violation of Title 21, United States Code, Section 848." App. 11-12.

[*828] By holding that the Government must in addition allege three or more discrete violations, thus pinning a case involving thousands of transactions on just three of them, the Court misunderstands the whole design and purpose of the statute.

We begin on common ground, for, as the Court acknowledges, it is settled that jurors need not agree on all of the means the accused used to commit an offense. *Schad* v. *Arizona,* 501 U.S. 624, 115 L. Ed. 2d 555, 111 S. Ct. 2491 (1991), confirmed this principle. In my view, Congress intended the "continuing series of violations" to be one of the defining characteristics of a continuing criminal enterprise, and therefore to be a single element of the offense, subject to fulfillment in various ways. The important point is not just that the violations occurred but that they relate to the enterprise and demonstrate its ongoing nature, hence the requirement [****29] of a "continuing" series. Evidence that the accused supervised a ring that engaged in thousands of illegal transactions is more probative of the continuing nature of the enterprise than evidence tending to show three particular violations.

Nowhere in the text of the statute or its legislative history does Congress show an interest in the particular predicate violations constituting the continuing series. Rather, the CCE offense is aimed at what Congress perceived to be a peculiar evil: the drug kingpin. The

Court's observation that there is a tradition requiring juror unanimity where the issue is whether a defendant has engaged in conduct that violates the law, *ante*, at 5, simply restates the question presented. The Court has made clear in an earlier case that Congress did not "intend to substitute the CCE offense for the underlying predicate offenses in the case of a big-time drug dealer," but rather intended "to permit prosecution for CCE in addition to prosecution for the predicate offenses." *Garrett* v. *United States*, 471 U.S. 773, 785, 786, 85 L. Ed. 2d 764, 105 S. Ct. 2407 (1985). The CCE statute provides a specific remedy to combat criminal organizations, [****30] in large part because of the perceived inadequacies [*829] of prior law. 471 U.S. at 782-784. By treating the CCE offense like a simple recidivism statute, the Court's opinion does not conform to the statutory purpose.

The continuing series element reflects Congress' intent to punish those who organize or direct ongoing narcotics-related activity. As the Court said in *Garrett*: "A common-sense reading of this definition [of 'engaged in a continuing criminal enterprise'] reveals a carefully crafted prohibition aimed at a special problem. This language is designed to reach the 'top brass' in the drug rings, not the lieutenants and foot [***1000] soldiers." *Id*. at 781. As part of that statutory design, the continuing series element of the offense aims to punish those whose persistence and organization establish a successful, ongoing criminal operation. The continuing series element, as a consequence, is directed at identifying drug enterprises of the requisite size and dangerousness, not at punishing drug offenders for discrete drug violations.

The remaining elements of the CCE definition likewise target drug kingpins. With respect to the requirement [****31] of action in concert with five or more other persons, every Court of Appeals to have considered the issue has concluded that the element aims the statute at enterprises of a certain size, so the identity of the individual supervisees is irrelevant. See, *e.g.*, *United States* v. *Harris*, 294 U.S. App. D.C. 300, 959 F.2d 246, 255 (CADC 1992) *(per curiam)* (panel including Ruth Bader Ginsburg and Clarence Thomas, JJ.); *United States* v. *Garcia*, 988 F.2d 965, 969 (CA9 1993); *United States* v. [**1716] *Moorman*, 944 F.2d 801, 803 (CA11 1991); *United States* v. *English*, 925 F.2d 154, 159 (CA6 1991); *United States* v. *Linn*, 889 F.2d 1369, 1374 (CA5 1989); *United States* v. *Jackson*, 879 F.2d 85, 88 (CA3 1989); *United States* v. *Tarvers*, 833 F.2d 1068, 1074-1075 (CA1 1987); *United States* v. *Markowski*, 772 F.2d 358, 364 (CA7 1985). As for the remaining elements, it is undisputed that the jury need not agree unanimously on whether the defendant was a supervisor as opposed to an organizer or other manager, because the leadership [****32] [*830] role is what matters. It should be equally apparent that the jury need not agree unanimously on which income or resources the defendant received from the CCE, because what matters is that there be substantial income from the continuing series, without regard to the form in which it arrives.

The Court assumes that other elements of the statute can be fulfilled without juror unanimity as to the means of fulfillment, and offers nothing more than the conclusory assertion that these other elements "differ in respect to language, breadth, [and] tradition" from the continuing series element. *Ante*, at 10. Not only does the Court fail to provide any analysis that might explain how the elements differ, it also ignores the point that they are the same in the one respect that counts for the statute's purposes, namely, that they are all ways of ensuring that the accused directs schemes of sufficient size, duration, and effectiveness to warrant special punishment, without regard to the particulars of the schemes.

It is easy enough to understand that a drug distribution organization should have five or more other persons to come within the condemnation of the statute. It is likewise [****33] easy to understand that the organization should generate substantial income for its leaders as a requirement for conviction. Once the continuing series has been replaced with three individual violations, however, the remaining elements become difficult for the jury to apply. The Court's unnecessary atomization of the continuing series element disrupts Congress' careful concentration on the ongoing enterprise and replaces it with a concentration on perhaps three violations picked out of the continuing series.

The Court seems to proceed on the assumption that any three small [***1001] transactions involving a few grams will establish the requisite series. That is not so. In my view, the necessary consequence of the Court's ruling is that the three specific crimes must themselves be the ones, in the words [*831] of the statute, "from which [the accused] obtains substantial income or resources." 21 U.S.C. § 848(c)(2)(B). Just any three will not do. This significant new burden will make prosecutions under the CCE statute remarkably more difficult. Three small transactions will probably not generate substantial income, and it is unlikely that each

transaction [****34] will involve five or more other persons. Or there might be different views among the jurors as to which transactions netted substantial income and as to which were undertaken in concert with five or more others. It is disruptive of the statutory purpose to require the Government at the outset to isolate just three or more violations and then relate all the other parts of the CCE definition to just these offenses. Yet that is what the Court appears to require. As a consequence, the statute might not even reach businesses (like petitioner's) which depend for their success upon a high volume of relatively small sales, unless there is jury unanimity on 20 or 30 discrete transactions. It is all but inconceivable that Congress intended, in effect, to exempt such businesses from coverage by this unwarranted emphasis on individual transactions. It is the enterprise as a whole that must be examined, and the continuing series of violations relates to the entire scope of the operations.

In addition, the individual violations making up a continuing series may not always be easy to prove with particularity. The Court assures us that "witnesses should not have inordinate difficulty pointing to [****35] specific transactions." *Ante*, at 10. It then asks the rhetorical question: "Or, if they do have difficulty, would that difficulty in proving individual specific transactions not tend to cast doubt upon the existence of the requisite 'series'?" *Ibid.* Quite apart from the point already mentioned that the continuing series [**1717] must relate to the elements of action in concert and receipt of substantial income, the answer to that question is "no." The evidence in this case so demonstrates.

[*832] Petitioner was the founder and leader of a gang called the Undertaker Vice Lords. The evidence indicated that petitioner operated what might be called a chain drugstore in Chicago, selling various kinds of drugs, including white and brown heroin, powder cocaine, and rock or crack cocaine, at various established locations or "spots." Several gang members pleaded guilty, cooperated with the Government, and testified at petitioner's trial. The following are but a few examples of the testimony offered against petitioner. Johnnie Chew, who ran a brown heroin distribution spot for the gang in 1987 and 1988, estimated that the gang sold a "frame" -- 25 packs, each containing 25 [****36] bags worth $ 25 apiece -- every three to four days. Michael Sargent testified that, while he was in charge of a white heroin distribution spot, Richardson supplied him with $ 40,000 to $ 60,000 worth of heroin three times a week. Joseph Westmoreland estimated the Undertakers were collecting about $ 20,000 to $ 30,000 per day selling white heroin from 1988 to 1990. Andre Cal [***1002] admitted cooking a quarter kilo of powder cocaine into crack cocaine two to three times a week for 10 months in the early 1990's. Several other gang members admitted to earning $ 50,000 to $ 60,000 each selling drugs for the gang on a regular basis. To suggest that Congress intended, in the face of devastating testimony like this, to allow petitioner to escape a CCE conviction because the witnesses did not describe any specific, individual transaction out of thousands (many of which are more than a decade old) is to misunderstand the nature of the crime Congress sought to prohibit.

State course-of-conduct crimes provide an analog to the federal CCE statute. A crime may be said to involve a continuing course of conduct because it is committed over a period of time, like kidnaping, harboring a fugitive, [****37] or failing to provide support for a minor. In such cases, the jury need not agree unanimously on individual acts that occur during the ongoing crime. See generally, *e.g.*, B. Witkin & [*833] N. Epstein, California Criminal Law § 2942, p. 245 (2d ed., Supp. 1997) ("A unanimity instruction is not required when the crime charged involves a continuous course of conduct . . . such as failure to provide, child abuse, contributing to the delinquency of a minor, and driving under the influence"). States have also chosen to define as continuous some crimes that involve repeated conduct where the details of specific instances may be difficult to prove, as in cases of child molestation or promoting prostitution. See, *e.g.*, *People* v. *Adames*, 54 Cal. App. 4th 198, 62 Cal. Rptr. 2d 631 (1997) (continuous sexual abuse of a child); *People* v. *Reynolds*, 294 Ill. App. 3d 58, 689 N.E.2d 335, 228 Ill. Dec. 463 (1997) (criminal sexual assault and aggravated sexual abuse of a minor); *State* v. *Molitor*, 210 Wis. 2d 415, 565 N.W.2d 248 (App. 1997) (repeated sexual intercourse with underage partner); [****38] *State* v. *Doogan*, 82 Wash. App. 185, 917 P.2d 155 (1996) (advancing prostitution and profiting from prostitution). The CCE offense has some attributes of both of these categories: To the extent the CCE offense aims to punish acting as leader of a drug enterprise, it targets an ongoing violation. To the extent it relies on there being a series of violations, it may be susceptible to difficulties of proof which make it reasonable to base a conviction upon the existence of the series rather than the individual violations. As in this very case, the transactions may have been so numerous or taken place so long ago that they cannot be recalled individually.

Having failed to confront the acknowledged purpose of the statute, the Court invokes the principle of constitutional doubt. Just last Term we warned that overuse of the doctrine risks aggravating the friction between the branches of Government "by creating (through the power of precedent) statutes foreign to those Congress intended, simply through fear of a constitutional difficulty that, upon analysis, will evaporate." [****39] *Almendarez-Torres* v. *United States,* 523 U.S. 224, 238, 140 L. Ed. 2d 350, 118 S. Ct. 1219 (1998). As discussed in Part II, *infra*, the CCE statute in my view passes constitutional muster. Yet the [*834] Court today interprets the statute in a way foreign to Congress' intent without discussing any possible [**1718] constitutional infirmity other than to say that it has "no reason to believe that Congress intended to come close to, or to test," the limits on the definition of crimes [***1003] imposed by the Due Process Clause when it wrote the CCE statute. *Ante*, at 6.

There is no indication that Congress had any concerns about the statute's constitutionality. The Court seems to imply the contrary by citing *Garrett* for the proposition that Congress "sought increased procedural protections for defendants" in making CCE a separate crime, *ante*, at 6 (paraphrasing *Garrett*, 471 U.S. at 783-784). Taken in context, the passage from *Garrett* supports neither the Court's reading of the statute nor its invocation of constitutional doubt. *Garrett* held the Double Jeopardy Clause did not bar prosecution for the CCE offense after [****40] a prior conviction for one of the underlying predicate offenses. The passage in question discussed the debate in Congress over whether to impose enhanced punishments for drug kingpins by means of a separate offense or by means of a sentencing factor. The House Report cited by the Court noted that an amendment by Representative Dingell "made engagement in a continuing criminal enterprise a new and distinct offense with all its elements triable in court." H. R. Rep. No. 91-1444, pt. 1, p. 84 (1970). That is of course true, but it begs the question presented in this case, namely, whether the existence of a series is itself an element, or whether the individual offenses in that series are elements. To say that the jury must agree unanimously on the elements provides no guidance in determining what those elements are. The competing provision from Representative Poff, moreover, which would have treated engaging in a CCE as a sentencing factor, was also adopted, with the result that "both approaches are contained in the statute." *Garrett, supra,* at 784 (citing 21 U.S.C. §§ 848, 849, 850). There is thus no reason to think Congress thought it necessary [****41] for the jury to agree on which [*835] particular predicate offenses made up the continuing series before an enhanced punishment may be imposed.

II

In my view, there is no due process problem with interpreting the continuing series requirement as a single element of the crime. The plurality opinion in *Schad* spoke of "the impracticability of trying to derive any single test for the level of definitional and verdict specificity permitted by the Constitution." 501 U.S. at 637. Rather, our inquiry is guided by "due process with its demands for fundamental fairness and for the rationality that is an essential component of that fairness." *Ibid.* (citation omitted). Our analysis of fundamental fairness and rationality, by necessity, is contextual, taking into account both the purposes of the legislature and the practicalities of the criminal justice system. In the CCE context, the continuing series element advances the goals of the statute in a way that is neither unfair nor irrational: It is a direct and overt prohibition upon drug lords whose very persistence and success makes them a particular evil.

[****42] The CCE statute does not in any way implicate the suggestion in *Schad* that an irrational single crime consisting of, for instance, either robbery or failure to file a tax return would offend due process. See 501 U.S. at 633, 650. [***1004] Although the continuing series may consist of different drug crimes, the mere proof of a series does not suffice to convict. The Government must also prove action in concert with five or more persons, a leadership role for the defendant with respect to those persons, and substantial income or resources derived from the continuing series. The presence of these additional elements distinguishes the CCE statute from a simple recidivism statute, notwithstanding the Court's attempt to draw an analogy between the two. See *ante*, at 8-9.

[*836] The Court cites *Garrett* for the proposition that the CCE statute originated in a "recidivist provision . . . that provided for enhanced sentences." *Ante*, at 9. In fact, the point the Court was making in *Garrett* was that Congress rejected the simple recidivist provision in favor of the current definition of a CCE, which, as the Court in [**1719] *Garrett* took pains to [****43] point out, "is not drafted in the way that a recidivist provision would be drafted" but instead uses "starkly contrasting language." 471 U.S. at 781-782 (comparing the CCE definition of § 848 with the recidivist provision incorporated into § 849).

One could concede, *arguendo,* that if Congress were to pass a habitual-offender statute the sole element of which was the existence of a series of crimes without a requirement of jury unanimity on any underlying offense, then the statute would raise serious questions as to fairness and rationality because the jury's discretion would be so unconstrained. The statute before us is not of that type, for the various elements work together to channel the jury's attention toward a certain kind of ongoing enterprise. We should not strike down this reasonable law out of fear that we will not be able to deal in an appropriate manner with an unreasonable law if one should confront us. The CCE statute does not represent an end run around the Constitution's jury unanimity requirement, for Congress had a sound basis for defining the elements as it did: to punish those who act as drug kingpins. There are many ways to be a drug kingpin, [****44] just as there are many ways to commit murder or kidnaping.

With regard to the fundamental fairness of the alternative means of satisfying the continuing series element, the plurality opinion in *Schad* indicated that the Court should look to see whether the alleged predicate offenses making up the series in each particular case are morally equivalent. The alternative means of fulfilling an element "must reasonably reflect notions of equivalent blameworthiness or culpability, [*837] whereas a difference in their perceived degrees of culpability would be a reason to conclude that they identified different offenses altogether." 501 U.S. at 643. The proper question is not whether the blameworthiness is comparable "in all possible instances"; rather, the question is whether one means of fulfillment "may ever be treated as the equivalent" of another, and in particular whether the alternative means presented in a given case may be so treated. 501 U.S. at 643, 644. The continuity itself is what Congress sought to prohibit with the series element, so it makes no difference if the violations [***1005] in the series involve comparable amounts of drugs.

[****45] In the absence of any reason to think Congress' definition of the CCE offense was irrational, or unfair under fundamental principles, or an illicit attempt to avoid the constitutional requirement of jury unanimity, there is no constitutional barrier to requiring jury unanimity on the existence of a continuing series of violations without requiring unanimity as to the underlying predicate offenses.

* * *

Petitioner is just the sort of person at whom the CCE statute is aimed. Where witnesses have testified they sold drugs on a regular basis as part of an enterprise led by the defendant, it is appropriate for the jury to conclude that a continuing series of violations of the drug laws has taken place. Neither Congress' intent nor the Due Process Clause requires the result the Court reaches today, which rewards those drug kingpins whose operations are so vast that the individual violations cannot be recalled or charged with specificity. I would affirm the judgment of the Court of Appeals.

## References

25 Am Jur 2d, Drugs and Controlled Substances 161 [****46] ; 75B Am Jur 2d, Trial 1753

21 USCS 848 et seq.

L Ed Digest, Drugs, Narcotics, and Poisons 6; Jury 34

L Ed Index, Drugs and Narcotics; Unanimity

Annotation References:

Requirement of jury unanimity as to mode of committing crime under statute setting forth the various modes by which offense may be committed. 75 ALR4th 91.

End of Document

# United States v. Carroll

26 F.3d 1380 (6th Cir. 1994)

Cited in Supplemental Brief at: v, 12

Q Questioned
As of: September 17, 2026 9:38 PM Z

# United States v. Carroll

United States Court of Appeals for the Sixth Circuit

October 13, 1993, Submitted ; June 22, 1994, Decided ; June 22, 1994, Filed

No. 93-5030

**Reporter**
26 F.3d 1380 *; 1994 U.S. App. LEXIS 15393 **; 1994 FED App. 0220P (6th Cir.) ***

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. RICHARD CARROLL, Defendant-Appellant.

**Subsequent History:** [**1] Rehearing En Banc Denied August 26, 1994, Reported at: 1994 U.S. App. LEXIS 23934.

**Prior History:** ON APPEAL from the United States District Court for the Western District of Tennessee. District No. 92-10004. James D. Todd, District Judge.

**Disposition:** REVERSED and REMANDED

**Counsel:** For UNITED STATES OF AMERICA, Plaintiff - Appellee: Daniel A. Clancy, U.S. Attorney, Office of the U.S. Attorney, Memphis, TN. Leigh Grinalds, Asst. U.S. Attorney, BRIEFED, Office of the U.S. Attorney, Jackson, TN.

For RICHARD CARROLL, Defendant - Appellant: Hugh Harvey, BRIEFED, Hardee & Martin, Jackson, TN.

**Judges:** Before: MARTIN and JONES, Circuit Judges; and WEBER, District Judge. *

**Opinion by:** NATHANIEL R. JONES

## Opinion

[***1] [*1381] NATHANIEL R. JONES, Circuit Judge. Appellant Richard Carroll appeals his conviction for possession and distribution of cocaine, alleging that:

[***2]

> (1) the court erred by failing to instruct the jury to disregard improper remarks by the prosecutor;
>
> (2) the court erred by not bringing the matter to trial within the required time limit;
>
> (3) the court erred by determining that Carroll's sentencing range was within criminal history two; and
>
> (4) the court erred by not producing witness interview notes for Appellant's inspection.

The second, third, and fourth allegations are entirely meritless. However, the issue raised in the first allegation merits an extended discussion. We have developed at least three different approaches to this issue, at least one of which is inconsistent with the other two. For this reason, we offer an in-depth analysis [**2] so as to clarify our doctrine on [*1382] prosecutorial misconduct in closing argument. It turns out that, by failing to admonish the jury to disregard the prosecutor's improper remarks at closing argument, the trial court committed reversible error. Therefore, we reverse Carroll's conviction and remand for a new trial.

I. Facts

Appellant was indicted for possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and for conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846. The trial was continued three times, first upon a motion by Appellant, and the next two times upon motion by the government due to the unavailability of a material government witness, Robin Patrick, for medical reasons. For purposes of measuring the time until trial, the court did not count the period in which the continuances were pending. Before the jury was impaneled, Appellant moved for a dismissal under the Speedy Trial Act, 18 U.S.C. § 3161; this motion was denied.

[***3] At trial, Robin Patrick testified that she had a plea agreement with the government [**3] according to which she would receive a lesser sentence in exchange

* The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

for her truthful testimony. She further testified that Appellant had provided cocaine to her before Appellant met her husband, and that she set up deals between Appellant and her husband to enable her husband to purchase more cocaine from Appellant.

Her husband, Richard David Patrick, Jr., testified that he, too, had an agreement with the government according to which he would receive a lesser sentence in return for his truthful testimony. He further testified that his wife set up a cocaine deal between Appellant and himself. Other witnesses identified the cocaine that Appellant sold to the Patricks.

At closing argument, the prosecutor stressed that the Patricks' plea agreements provided that any lies or half-truths on the part of the witnesses would void the agreements, and he declared that if Richard Patrick lied, he would lose the benefit of their plea agreement. [1] Appellant objected, and the court sustained, ruling that the prosecutor could comment on what the agreement says, but could not tell what the government would or would not do if the witness did not tell the truth. Moments later, the prosecutor made a [**4] very similar point with regard to Robin [***4] Patrick. [2] [**5] There was no objection at that time. During his rebuttal, the prosecutor reiterated these points. [3] Again, [***5] Appellant [*1383] objected, but this time the court overruled the objection, saying that the agreement is in evidence and that the statement to which Appellant objected was "a proper comment on the evidence." R. 35-2 at 281.

The jury found Appellant guilty on both [**6] counts. At the disposition proceedings, based upon a prior Florida conspiracy to import marijuana conviction, the court found that Appellant's sentencing range fell within criminal history category two. This appeal followed.

*II. Discussion*

**A. Improper Remarks by Prosecutor**

The first issue on appeal involves a challenge to the district court's denial of Appellant's motion for a mistrial. "We review the denial of a motion for mistrial for an abuse of discretion." *United States v. Chambers,* 944 F.2d 1253, 1263 (6th Cir. 1991), *cert. denied,* 117 L. Ed. 2d 455, 112 S. Ct. 1217 (1992); *United States v. Atisha,*

---

[1] In relevant part, the prosecutor argued as follows:

Any half-truths, withholding of information, falsehoods or perjury on the part of Mr. Patrick will automatically void this agreement. Mr. Patrick does not want to stay in jail any longer than he has to. . . . And if the government finds that Mr. Patrick has lied, that's exactly what's going to happen.

> R. 35-2 at 276 (Trial Transcript, Vol. II, October 14, 1992).

[2] In relevant part, the prosecutor argued as follows:

Robin Patrick has already pled guilty. She has not been sentenced. She's facing ten to fifteen years in the penitentiary. If she comes in here and she tells the truth, cooperates fully, the government may, meaning me, make a 5K1 motion, which allows the judge to sentence her . . . below the ten to fifteen years. . . . If she comes in here and lies, that agreement is void. If she comes in here and gets on this witness stand and the judge believes she lied, she's jeopardizing herself further. . . .

> *Id.* at 278. Concluding this line of reasoning, the prosecutor stated:

I submit to you that Robin and Ritchie Patrick are credible witnesses. I submit to you that no person would jeopardize themselves with this agreement to do anything but tell the truth.

> *Id.* at 279. Interestingly, Appellant did not cite to page 279 in his brief, nor did he include page 279 in the joint appendix.

[3] During the prosecutor's rebuttal to defense counsel Mr. Harvey's closing argument, the prosecutor argued as follows:

Mr. Harvey tells you that [the Patricks'] testimony is conditioned on their testimony against Mr. Carroll and getting Mr. Carroll. . . . Did you hear anybody testify to that? Did you hear any evidence that came from the witness stand that says this [plea agreement] is to get Mr. Carroll? What their deal is, ladies and gentlemen, is to tell the truth anytime that they're put in front of a law enforcement officer, in front of a judge, in front of a jury.

He says that Mrs. Robin Patrick wants a deal. . . . She doesn't want to spend any more time than she's going to have to, just like Richie [Patrick] doesn't want to spend any more time than he has to. Well, what is the one thing that will keep them from doing any more time than necessary?

[Defense counsel objects at this point, and the objection is overruled.]

The truth. That's what this [plea agreement] represents, for both Richie and Robin.

> *Id.* at 280-81.

804 F.2d 920, 926 (6th Cir. 1986), *cert. denied,* 479 U.S. 1067, 93 L. Ed. 2d 1003, 107 S. Ct. 955 (1987). [4] An abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made. *In re Bendectin,* 857 F.2d 290, 307 (6th Cir. 1988), *cert. denied,* 488 U.S. 1006 (1989); *Schrand v. Federal Pacific Electric Co.,* 851 F.2d 152, 156-57 (6th 1988). [**7] The first issue also involves improper comments made by the prosecutor [***6] without objection from Appellant. These we review only for plain error. *United States v. Young,* 470 U.S. 1, 16, 84 L. Ed. 2d 1, 105 S. Ct. 1038 (1985); *United States v. Morrow,* 977 F.2d 222, 229 (6th Cir. 1992) (en banc), *cert. denied,* 125 L. Ed. 2d 668, 113 S. Ct. 2969 (1993). "The plain error doctrine mandates reversal 'only in exceptional circumstances' and only where the error is so plain that 'the trial judge and prosecutor were derelict in countenancing it.'" *United States v. Slone,* 833 F.2d 595, 598 (6th Cir. 1987) (quoting *United States v. Mendez-Ortiz,* 810 F.2d 76, 78 (6th Cir. 1986), *cert. denied,* 480 U.S. 922 (1987); *United States v. Hook,* 781 F.2d 1166, 1172 (6th Cir.), *cert. denied,* 479 U.S. 882, 93 L. Ed. 2d 246, 107 S. Ct. 269 (1986); *United States v. Frady,* 456 U.S. 152, 163, 71 L. Ed. 2d 816, 102 S. Ct. 1584 (1982)). [**8]

Appellant contends that during the prosecutor's closing remarks, "he improperly vouched for the credibility of the Government's witnesses, put the prestige of the Government behind them, and commented on evidence not before the jury." Appellant's Br. at 6. We find that the record supports this allegation.

Appellant further contends that the court erred by not granting a mistrial on the basis of the prosecutor's improper remarks. Because we have developed mutually inconsistent approaches for determining whether this sort of prosecutorial misconduct warrants a mistrial, to properly resolve the issue, we must first explore these various approaches.

**1. The Standard for Determining When a Prosecutor's [**9] Improper Comments Constitute Reversible Error**

Since 1976, the Sixth Circuit has applied at least three different tests for determining whether improper remarks by a prosecutor during closing arguments warrant a new [***7] trial. To make matters even more confusing, all three tests have been applied within the past two years. [5]

[**10] [*1384] The first of these tests was introduced in *United States v. Leon,* 534 F.2d 667, 678-683 (6th Cir. 1976). The court began its analysis with an "oft-repeated" quote from the United States Supreme Court that stresses the importance of the issue:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or [***8] innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so.

---

[4] *But cf. United States v. Clark,* 982 F.2d 965, 968 (6th Cir. 1993) ("Whether the government's closing argument amounted to prosecutorial misconduct and whether the argument rendered the trial 'fundamentally unfair' are mixed questions of law and fact," subject to *de novo* review).

[5] More confusing still, in some cases we did not apply any of the three tests. Instead, we applied one of two standards that, without further elucidation, are not detailed enough to rise to the level of being "tests." *See, e.g., United States v. Ashworth,* 836 F.2d 260, 267 (6th Cir. 1988) ("Improprieties in counsel's argument to the jury do not require a new trial unless they are so gross as probably to prejudice the defendant and any resulting prejudice is not neutralized by the court's instructions.") (quoting *United States v. Flake,* 746 F.2d 535, 542 (9th Cir. 1984), *cert. denied,* 469 U.S. 1225, 84 L. Ed. 2d 360, 105 S. Ct. 1220 (1985)); *United States v. Moreno,* 899 F.2d 465, 468 (6th Cir. 1990), *cert. denied,* 117 L. Ed. 2d 643, 112 S. Ct. 1504 (1992) ("In order for [prosecutorial misconduct] to warrant reversal, the comments must have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'") (quoting *Darden v. Wainwright,* 477 U.S. 168, 181, 91 L. Ed. 2d 144, 106 S. Ct. 2464 (1986)). Both of these standards have also been applied more than once within the last few years. *See, e.g., United States v. Farley,* 2 F.3d 645, 656 (6th Cir.) (applying *Ashworth* standard), *cert. denied,* 126 L. Ed. 2d 607, 114 S. Ct. 649 (1993); *United States v. Sivils,* 960 F.2d 587, 592 (6th Cir.) (applying *Moreno* standard), *cert. denied,* 1992 U.S. LEXIS 4997, 113 S. Ct. 130 (1992); *United States v. Sturman,* 951 F.2d 1466, 1477 (6th Cir. 1991) (applying *Moreno* standard), *cert. denied,* 119 L. Ed. 2d 586, 112 S. Ct. 2964 (1992); *United States v. Solivan,* 937 F.2d 1146, 1156-57 (6th Cir. 1991) (applying *Ashworth* standard). Both of these standards are vague enough as to be fully consistent with either of the three tests described herein.

> But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 679 (quoting *Berger v. United States,* 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935)). [**11] The court proceeded to establish a two-step approach; first, it determines whether the prosecutor's remarks were improper, and second it determines whether the error was harmless. As to the second step, the court held that a reviewing court will consider the following four factors:

> the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they were isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proofs introduced to establish the guilt of the accused.

*Id.* Another factor that is relevant is whether the trial court gave the jury a "cautionary instruction designed to overcome or to dissipate any prejudice that may have been caused." *Id.* Presumably, this factor is encompassed within the first factor, the tendency of the remark to mislead the jury or to prejudice the accused. The *Leon* court applied this "test" to the prosecutor's remarks, and concluded that the prosecutor deliberately injected inadmissible, prejudicial remarks into his closing argument, that the remarks may have affected the jury, that the trial court failed [**12] to give an appropriate cautionary instruction, and that the evidence against the defendant was not overwhelming. Therefore, the court remanded for a new trial.

The second test was introduced in *United States v. Bess,* 593 F.2d 749, 753-57 (6th Cir. 1979). *Bess* was a close case in which credibility was the key issue. *Id.* at 753. [***9] The prosecutor declared in his closing argument that "if the United States did not believe the defendant was guilty . . . the case . . . would never have been presented to you in the first place." He continued, "I believe beyond a reasonable doubt that the defendant" was guilty. *Id.* The court once again included in its analysis the passage from *Berger* quoted above. It found the prosecutor's remarks "astonishing," "egregious," and "doubly inexcusable" insofar as they were made by a prosecutor whose obligation is to be impartial and whose interest should be in justice rather than winning. *Id.* at 753-54 (citing *Berger,* 295 U.S. at 88). The statements violated "the established rule that the personal [**13] opinion of counsel has no place at trial." *Id.* at 754. The court reviewed some of the reasons for this [*1385] rule: that statements of personal belief on the part of a prosecutor may have a "devastating impact" on a jury; that these statements may infringe upon the jury's role as factfinder and determiner of guilt or innocence; that they amount to inadmissible and highly prejudicial evidence that is not presented under oath and is not subject to cross-examination; and that permitting such statements would improperly favor better-known or unscrupulous lawyers, and would disfavor counsel who omitted such positive assertions. *Id.* at 755.

Like the *Leon* court, the *Bess* court held that a two-step approach was required; allowing a prosecutor's personal beliefs to taint a closing argument is ordinarily "error," but it is not *per se* reversible error. *Id.* at 756-57. The court held that, more commonly, once a prosecutor's remarks are found to be improper, "the complained-of conduct will not rise to *reversible* error, notably if it is not flagrant, where proof of guilt is over-whelming, where counsel does not object and/or where the trial judge steps in and admonishes the [**14] jury." [6] *Id.* at 757. The court stressed that, more often [***10] than not, prosecutorial misconduct will not be reversible under this test, and that it was intended to have only "minimal

---

[6] As written, this standard is ambiguous due to the *Bess* court's use of the expression "and/or". It is clear that, when the prosecutor's expression of belief is not flagrant, there are three factors to apply: (1) whether proof of guilt is overwhelming; (2) whether defense counsel objects; and (3) whether the trial judge steps in and admonishes the jury. The court did not make it clear, however, whether a new trial is called for if any one of these factors does not apply, or whether a new trial is only called for if all three factors do not apply. The latter alternative is the better interpretation. Where the error is not flagrant, reversal is inappropriate if *either* proof of defendant's guilt is overwhelming, *or* defense counsel failed to object to the error, *or* if the trial court cured the error with an admonishment to the jury.

The *Bess* court was unclear as to what standard to apply when the complained-of conduct is flagrant. Our precedents make it clear that prosecutorial misconduct may be so exceptionally flagrant that it constitutes plain error, and is grounds for reversal even if the defendant did not object to it. *Young,* 470 U.S. at 16; *Morrow,* 977 F.2d at 229; *Slone,* 833 F.2d at 598. *Bess* left open the possibility that flagrant prosecutorial misconduct, even if it does not rise to the level of plain error, may sometimes be reversible regardless of the interplay of the three factors discussed above.

effect on appellate review." *Id.* Nevertheless, the court expressed that it intended to create a "precise rule" so as to "maximize opportunity for curative steps at the trial level." *Id.; see also id.* n.10 ("We reiterate that under many circumstances, this type of prosecutorial error will not be prejudicial. We write to draw the line as clearly as possible to encourage proper argument and alert both opposing counsel and trial judges so that corrective measures can be taken on the spot."). Applying this standard to the remarks at issue in *Bess,* the court found that the prosecutor's comments were improper, the defendant promptly objected, the trial judge did not give a curative admonishment, and the case was otherwise close; consequently, the court remanded for a new trial. *Id.*

[**15] *Bess* and *Leon* can and should be construed in a way that makes them mutually consistent. Both require a two step approach; first we determine whether a prosecutor's remarks were improper, and then we determine whether the impropriety amounts to reversible error. Regarding the second step, the *Leon* test involves four factors: [***11]

> (1) whether the remarks tended to mislead the jury or to prejudice the accused;
>
> (2) whether they were isolated or extensive;
>
> (3) whether they were deliberately or accidentally placed before the jury; and
>
> (4) the strength of the evidence against the accused.

The first factor includes consideration of whether the trial judge gave an appropriate cautionary instruction to the jury. 534 F.2d at 679. *Leon* does not explain how these factors are to be balanced against one another. The second step of the *Bess* test involves three factors, some of which overlap with the *Leon* factors:

> A reviewing court considering improper prosecutorial remarks that are not flagrant is to remand for a new trial if:
>
> (1) proof of defendant's guilt is not overwhelming, *and*
>
> (2) defense counsel [**16] objected, *and*
>
> [*1386] (3) the trial court failed to cure the error with an admonishment to the jury.

593 F.2d at 757; *see supra* note 6. *Bess* does not define "flagrant," nor does it instruct what standard one is to apply to flagrantly improper prosecutorial remarks. *See supra* note 6. If we regard the first three *Leon* factors as elucidating the concept of "flagrancy," then the *Bess* test is simply a logical extension of *Leon* that instructs how the four *Leon* factors are to be weighed in situations in which the error is not flagrant.

We introduced a third "test" in *United States v. Thomas,* 728 F.2d 313, 319-20 (6th Cir. 1984). In *Thomas,* we considered several instances of prosecutorial misconduct, at least some of which appeared to be expressions of the [***12] prosecutor's personal beliefs about the defendant. [7] *Thomas,* too, began its analysis with the *Berger* quote. Although we cited to *Bess* briefly, we did not use the *Bess* test for determining whether the improprieties warranted a new trial. Rather, we adopted a standard from the Fifth Circuit: "To warrant a new trial, however, [**17] prosecutorial misconduct 'must be so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *Id.* at 320 (quoting *United States v. Lichenstein,* 610 F.2d 1272, 1281 (5th Cir.), *cert. denied sub nom., Bella v. United States,* 447 U.S. 907, 64 L. Ed. 2d 856, 100 S. Ct. 2991 (1980); *United States v. Blevins,* 555 F.2d 1236, 1240 (5th Cir. 1977), *cert. denied,* 434 U.S. 1016, 54 L. Ed. 2d 761, 98 S. Ct. 733 (1978)). We concluded that "in light of the relatively strong evidence of guilt, and the trial court's curative instructions to the jury, we reject the contention that the prosecutor's misconduct in this case necessitated a new trial." *Id.* We now recognize that the standard we introduced in *Thomas* -- that reversal is warranted only when the misconduct at issue is so pronounced and persistent that it permeates the entire trial -- amounts to an unfortunate retreat from our *Leon* and *Bess*

---

[7] There were six acts of alleged misconduct: (1) that a defendant was escorted by marshalls in the jury's presence; (2) that, while questioning a defendant, the prosecutor waved a piece of paper not in evidence, suggesting that the paper intimated that the prosecutor had proof of a fact not in evidence; (3) that the prosecutor questioned a defendant about whether he had threatened his lawyer, who was not available to testify; (4) that, in summation, the prosecutor remarked that a defendant had been trying to stare down the government's witnesses -- "It's a nice old trick, trying to stare them down, trying to threaten them"; (5) that, in summation, the prosecution hinted that a defendant had underworld connections; and (6) that, in summation, the prosecutor referred to the President of the Teamster's Union as defendant's "friend." We did not discuss these six acts individually, but our discussion assumed that at least some of these acts were improper. *Thomas,* 728 F.2d at 319-20.

standards. Where prosecutorial misconduct is so persistent [**18] and permeating that it fails the *Thomas* test, it will, of course, be reversible under *Leon* and *Bess* as well, but an isolated remark could be reversible error under *Leon* and *Bess,* yet [***13] not be sufficiently "persistent" and "permeating" to warrant reversal under *Thomas.* For instance, a non-persistent expression of a prosecutor's personal belief would still constitute reversible error under *Bess* where the proof of guilt is not overwhelming, the defense counsel objected to the comments, and the trial judge failed to give a curative admonishment to the jury. 593 F.2d at 757; *see supra* note 6. Furthermore, the *Thomas* standard elevates the importance of just one of the *Leon* factors -- that of whether the remarks were isolated -- over the other three. This is a shortcoming. *See, e.g., United States v. Solivan,* 937 F.2d 1146, 1150 (6th Cir. 1991) ("There are instances where a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated.").

[**19] All three of these approaches are still in frequent use. [8] In most (but not all) of these [*1387] cases, the end result would probably have been the same regardless of which test was used. Nevertheless, we find it necessary to clarify our doctrine regarding when prosecutorial misconduct in a closing argument constitutes reversible error for three reasons. First, the use of three different standards is [***14] confusing both for lower courts and for litigants. Second, even if everyone usually reaches the same net result, the process of reaching this result is more difficult when our doctrine is so murky. Third, and most important, situations sometimes arise, though perhaps only infrequently, in which the choice of doctrine determines the result. One very important example of this is found in the case of *Solivan,* in which isolated remarks by the prosecutor were so prejudicial that a new trial was necessary. 937 F.2d at 1157. Had the panel applied the *Thomas* test, it could not have reached this result. The court made this manifestly clear when it held:

[**20]

> There are instances where a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated. *See Pierce v. United States,* 86 F.2d 949 (6th Cir. 1936). We realize that such instances may be rare, but we believe this case exemplifies a single misstep so destructive to defendant's right to a fair trial that it constitutes reversible error.

937 F.2d at 1150. It turns out that the instant case presents a second example.

Just last year, the *en banc* court expressly applied the *Bess* test when we considered the issue of prosecutorial misconduct in a closing argument in *United States v. Morrow,* 977 F.2d 222, 229 (6th Cir. 1992). In light of this fact, and for the reasons stated in *Bess,* not only will we apply the *Bess* approach in the present case, but we also believe that *Bess* ought to be used in all subsequent cases involving non-flagrant improper prosecutorial remarks. We will also use the factors introduced in *Leon* to elucidate the concept of "flagrancy" when applying the *Bess* test.

**2. The Prosecutor's Remarks in the Present Case** [**21]

**Were Improper**

Under the *Bess* approach, our first task is to determine whether the prosecutor's remarks in the present case were improper. In *United States v. Krebs,* 788 F.2d 1166, 1176 [***15] (6th Cir. 1986), *cert. denied,* 479 U.S. 930, 93 L. Ed. 2d 353, 107 S. Ct. 400 (1986), the prosecutor made the following statements in her closing argument: "I want to suggest to you that in this trial testimony [the witness] was telling the truth . . . . Basically, she had no reason to lie." Even though we recognized that "I suggest" or "I submit" is not

---

[8] *See, e.g., United States v. Payne,* 2 F.3d 706, 711-12 (6th Cir. 1993) (per curiam) (applying *Leon* and *Thomas* tests, but citing *Bess* with approval); *United States v. Dandy,* 998 F.2d 1344, 1351-53 (6th Cir. 1993) (applying *Thomas* test, but considering *Leon* factors, and citing *Bess* with approval); *United States v. Jackson,* 990 F.2d 251, 255 (6th Cir. 1993) (applying *Thomas* test); *United States v. Roberts,* 986 F.2d 1026, 1031-32 (6th Cir.), *cert. denied,* 126 L. Ed. 2d 222, 114 S. Ct. 271 (1993) (applying both *Bess* and *Thomas* tests); *United States v. August,* 984 F.2d 705, 714-15 (6th Cir. 1992), *cert. denied,* 126 L. Ed. 2d 119, 114 S. Ct. 158 (1993) (applying *Leon* test); *United States v. Morrow,* 977 F.2d 222, 229 (6th Cir. 1992) (en banc) (applying *Bess* test), *cert. denied,* 125 L. Ed. 2d 668, 113 S. Ct. 2969 (1993); *United States v. Warner,* 971 F.2d 1189, 1205 (6th Cir. 1992) (applying *Thomas* test); *United States v. Driscoll,* 970 F.2d 1472, 1484-85 (6th Cir. 1992), *cert. denied,* 122 L. Ed. 2d 362, 113 S. Ct. 1056 (1993) (applying *Leon* test); *United States v. Chambers,* 944 F.2d 1253, 1272 (6th Cir. 1991), *cert. denied,* 117 L. Ed. 2d 455, 112 S. Ct. 1217 (1992) (applying *Leon* test); *United States v. Solivan,* 937 F.2d 1146, 1156-57 (6th Cir. 1991) (applying *Ashworth* standard, but citing *Bess* with approval).

-

equivalent to "I believe", we found that "the effect of the two statements taken together can be reasonably construed to be based on personal belief." *Id.* at 1176-77 (citing *Bess*). We not only found that this constituted misconduct calling for the trial court to take corrective measures, but we also characterized the prosecutor's conduct as "inexcusable." *Id.* at 1177. [9]

[**22] Similarly, in *United States v. Dandy,* 998 F.2d 1344, 1353 (6th Cir. 1993) (citing *Bess*), we held: "It was improper for the prosecutor to state [in his closing argument] that [a witness] is honest. Such a statement conveys a conviction of personal belief regarding the witness's veracity." The error might have been reversible had the trial court not immediately instructed the jury that all assertions are to be made from the evidence. *See also United States v. Hart,* 640 F.2d 856, 858-59 (6th Cir.) (holding that various expressions of personal belief by the prosecutor in closing argument were improper, warranting [*1388] admonishment by the trial court), *cert. denied,* 451 U.S. 992, 68 L. Ed. 2d 853, 101 S. Ct. 2334 (1981).

The Ninth Circuit's treatment of similar remarks by prosecutors is instructive. In *United States v. Shaw,* 829 F.2d 714, 717 (9th Cir. 1987), *cert. denied,* 485 U.S. 1022, 99 L. Ed. 2d 892, 108 S. Ct. 1577 (1988), where the prosecutor, in his opening statement, [**23] said of his witness, "*as long as he is truthful we will present his truthful cooperation* to the local prosecutor," the court held: [***16]

> The statement does not explicitly refer to any extra-record facts. . . . Yet the emphasized words necessarily imply that the prosecutor has some method of determining whether the witness's testimony is truthful, so that it will know whether to present the witness's "truthful cooperation" to the local authorities. "The unspoken message is that the prosecutor knows what the truth is and is assuring its revelation." . . . In our view, the statement constitutes improper vouching.

*Id.* (quoting *United States v. Roberts,* 618 F.2d 530, 536 (9th Cir. 1980)); *see also United States v. Necoechea,* 986 F.2d 1273, 1278-79 (9th Cir. 1993).

In *Roberts,* 618 F.2d at 536, the Ninth Circuit adopted a powerful argument advanced by Judge Friendly in *United States v. Arroyo-Angulo,* 580 F.2d 1137, 1149-50 (2d Cir.) (Friendly, J., concurring), *cert. denied,* 439 U.S. 913 (1978). At issue was a closing argument [**24] remarkably like the one at issue in the present case. *See id.* at 1149. Judge Friendly pointed out that the prosecutor's statements suggested that plea agreements imply truthfulness on the part of the government witness:

> Such remarks are prosecutorial overkill. They inevitably give jurors the impression that the prosecutor is carefully monitoring the testimony of the cooperating witness to make sure that the latter is not stretching the facts -- something the prosecutor usually is quite unable to do. . . . If proper objection had been made to the summation, the judge should have sustained it; if matters had gone too far to make a striking of the remarks an effective cure, the judge should have instructed that the promise in the cooperation agreement adds little to the truth-telling obligation imposed by the oath; that the prosecutor often has no way of knowing whether the witness is telling the truth or not; that the books are not filled with perjury indictments of Government witnesses who have [***17] gone beyond the facts; and that an acquittal would not mean that as a matter of course the Government would seek such an indictment or even fail [**25] to make its promised recommendation of leniency. If prosecutors know that such instructions will be given, they will hardly be tempted to the excesses committed here.

*Id.* at 1150 (Friendly, J., concurring), *quoted in Roberts,* 618 F.2d at 536.

Along similar lines, in *United States v. Smith,* 962 F.2d 923, 933-34 (9th Cir. 1992), the court explained:

> By assuring the jury that Brown [the government's witness] could not just "get up here and say whatever he wanted to say" because he would prosecute him for perjury if he did so, the prosecutor was in fact commenting on Brown's actual testimony. Those remarks made it clear that no such prosecution of Brown was intended. The conclusion that followed inexorably from the remarks was that in the prosecutor's opinion, Brown's testimony was true.

. . .

[9] Ultimately, the *Krebs* court found that, in light of the substantial evidence of guilt and the trial court's efforts "to take corrective measures to eliminate the resulting prejudice," the misconduct did not justify reversal. 788 F.2d at 1177.

> Finally, [the prosecutor] stated: "If I did anything wrong in this trial I wouldn't be here. The court wouldn't allow that to happen."

. . .

> The prosecutor's statement that the court wouldn't allow him to do anything wrong was also clearly improper. That statement, in effect, attributed [**26] to the court some independent knowledge regarding the government's decision to prosecute Smith and its subsequent conduct of the trial. Moreover, it suggested to the jury that the court also was satisfied as to the truth of Brown's testimony. Just as the prosecutor may not take advantage of his special role as representative of the sovereign to imply that the government's investigatory apparatus is satisfied of the defendant's guilt, even more so may he not [***18] abuse his position and his obligation to see [*1389] justice done by imputing such satisfaction to the court.

In the present case, the prosecutor blatantly implied that the Patrick's plea agreements ensured that the witnesses were truthful; the prosecutor did not give the jury any inkling that the government has no independent means of discerning truthfulness. Further, the prosecutor placed the prestige of the government, and even of the court, behind the credibility of the Patricks, by stating that, if the government or the judge did not believe that the witnesses were being truthful, the witnesses would be in jeopardy. This implied to the jury that the government and the court were satisfied that the witnesses were truthful. This [**27] constitutes improper vouching.

Some of the prosecutor's remarks in the closing argument of the present case are no different from the remarks at issue in *Krebs.* Immediately after declaring that the Patricks had no reason to lie, the prosecutor stated, "I submit to you that Robin and Richie Patrick are credible witnesses." R. 35-2 at 276-79 (quoted *supra* notes 1-2). As per *Krebs,* this was inexcusable. *See* 788 F.2d at 1177. However, Appellant did not object to this particular statement.

Appellant did object at two other points during the prosecutor's closing argument. The Government admits that one of the prosecutor's other remarks "inadvertently" stated a fact not in evidence. [10] The trial court sustained an objection to this one remark. However, a later remark to which Appellant objected was equivalent to the earlier objectionable remark, yet the trial court overruled the later [***19] objection. [11] In both of these remarks, the prosecutor implied that the Government would somehow be able to divine whether the Patricks were lying and would punish them accordingly. Therefore, the trial court erred by failing to sustain Appellant's second objection [**28] to the argument, and by failing to give a prompt and appropriate curative instruction to the jury. [12]

[**29] We cannot overstate the extent to which we disapprove of this sort of improper vouching by prosecutors. As per *Berger,* by engaging in such conduct, prosecutors thereby violate their obligation to strive to do justice rather than merely to win. Therefore, we suggest that trial judges within the circuit respond to improper vouching with a prompt, curative instruction similar to that recommended by Judge Friendly in *Arroyo-Angulo,* 580 F.2d at 1149-50 (Friendly, J., concurring) (quoted *supra*). As Judge Friendly so convincingly argued, "if prosecutors know that such instructions will be given, they will hardly be tempted to the excesses committed here." *Id.* [***20]

Now that we have determined that the prosecutor's remarks were improper, the next step under Leon and *Bess* is to determine whether the court abused its discretion by denying Appellant's motion for mistrial. If the error was harmless, there was no abuse of discretion.

### 3. The Impropriety Constitutes Reversible Error

---

[10] The prosecutor stated that if the government finds that Mr. Patrick has lied, he will have to stay in jail longer. R. 35-2 at 276; *see supra* note 1.

[11] The prosecutor stated, "What is the one thing that will keep [the Patricks] from doing any more [jail] time than necessary? The truth." R. 35-2 at 281; *see supra* note 3.

[12] The court did instruct the jury later that "the lawyers' statements and arguments are not evidence," and that the jurors are to make their decision "based only on the evidence." R. 35-2 at 287. Such instructions have sometimes been deemed to cure improprieties in closing argument. However, in *Solivan,* 937 F.2d at 1149, 1156, when the trial court declared a recess after a prosecutor's improper closing remarks, and admonished the jury only after the recess, we held that

> the instructions given by the district court were insufficient and came too late to mitigate the negative and highly prejudicial impact of the remarks on the jurors minds, especially since the remarks were among the final arguments presented to the jurors prior to their deliberations.

Applying the *Leon* factors to determine whether the impropriety was flagrant, it is clear that remarks of the sort that are at issue in the present case have a tendency [**30] to mislead the jury and to prejudice the accused. On the other hand, however, these improper remarks were isolated, and there is [*1390] no indication that they were deliberate. On balance, we conclude that the impropriety was not flagrant. It follows that the *Bess* test applies, and that the Appellant is entitled to a new trial only if proof of his guilt was not overwhelming, he objected to the improper remarks, and the court failed to cure the error with an admonishment to the jury. *See Bess,* 593 F.2d at 757; *see supra* note 6.

All three of these factors apply to the present case. First, the only evidence against Appellant was the testimony of the Patricks; there was no physical evidence linking Appellant to cocaine distribution or to the conspiracy. Thus, it is possible that the prosecutor's improper bolstering of the Patricks' testimony made the difference between conviction and acquittal. Second, although one of the prosecutor's worst remarks was not objected to, *see supra* note 2, Appellant did object to other improper remarks. Third, the court failed to give a prompt and adequate curative instruction to the jury. We hold that this failure was [**31] an abuse of the trial court's discretion. Appellant is entitled to a new trial untainted by improper prosecutorial vouching.

**B. Time Limit for Bringing Matter to Trial**

Appellant argues that the district court violated his right to a speedy trial by not holding the trial within the time required by the Speedy Trial Act, 18 U.S.C. § 3161. The [***21] trial court did not count the time in which three continuances were pending. One of these continuances was requested by Appellant, but two were requested by the government because a material witness, Robin Patrick, was unavailable for medical reasons.

"We review the facts supporting a Speedy Trial Act ruling using the clearly erroneous standard, and the legal conclusions de novo." *United States v. Ortega-Mena,* 949 F.2d 156, 158 (5th Cir. 1991); *see also United States v. Tanner,* 941 F.2d 574, 579 (7th Cir. 1991) ("On appeal we review the district court's interpretation of the [Speedy Trial] Act *de novo,* and its findings of fact concerning the Act for clear error."), *cert. denied,* 117 L. Ed. 2d 432, 112 S. Ct. 1190 (1992). [**32] A finding of fact will only be clearly erroneous when, although there may be some evidence to support the finding, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer,* 470 U.S. 564, 573, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985). Appellant agrees that § 3161(h)(3) excludes from consideration a delay caused by the unavailability of an essential witness, and does not challenge the sufficiency of the medical reasons for Ms. Patrick's unavailability. He contends instead that the government failed to show in its motions for continuances that Ms. Patrick's testimony was essential. Consequently, Appellant concludes, the district court had no basis for concluding that Ms. Patrick was an essential witness.

The record shows that, at the time it ruled on Appellant's motion to dismiss pursuant to the Speedy Trial Act, the court knew that Ms. Patrick was a co-defendant and an alleged co-conspirator, and that she was fully cooperating and had given the government a full statement prior to the indictment. The court held that "there can [**33] be . . . no more important witness than a codefendant, an alleged co-conspirator; and it seems to me the government is entitled to have that witness present at the trial." On the basis of what the court knew, this conclusion was amply justified, and it turned out that Ms. Patrick's actual testimony was as [***22] essential as the court predicted it would be. There was no clear error here.

**C. Sentencing Range Within Criminal History Two**

The court placed Appellant in criminal history category two for sentencing purposes, in light of a prior Florida conviction for importing over a thousand kilograms of marijuana. The court expressly found that the Florida crime and the present crime were two separate offenses. The district court also mentioned that a Florida plea agreement expressly limits the prosecution to the offenses involving the smuggling of marijuana, which serves to indicate the separateness [*1391] of the two offenses. *See* Disposition Proceedings Transcript at 8-9.

Appellant argues that the court's finding was erroneous; the Florida conspiracy was so related to the present case -- both involving a common scheme to distribute drugs during the same two year period -- that they should [**34] be treated as one crime, meriting only one sentence. The government responds that the one charge involved smuggling marijuana into Florida, and the other involves distributing cocaine in Tennessee; despite the time frame, these are two separate offenses.

With respect to applying the sentencing guidelines, a court of appeals "shall accept the findings of fact of the district court unless they are clearly erroneous." 18 U.S.C. § 3742(d); *United States v. Garner,* 940 F.2d 172, 174 (6th Cir. 1991) ("We review a district court's factual findings which underlie the application of a guideline provision for clear error."). Appellant has neither asserted any facts, nor cited to any law, in support of his contention that the two offenses involved a common scheme. That the two crimes were perpetrated during the same two year period hardly constitutes proof that they stemmed from one common scheme. We find no basis for reversing the court below on this issue.

[***23] **D. Production of Witness Interview Notes**

During the trial, Appellant asked for the notes taken by Tennessee Bureau of Investigation agent David Jolley, claiming that [**35] it was Jencks material. The court reviewed the material, found that it was not a "substantially verbatim transcript of the interview," and concluded that the notes were not Jencks material. At Appellant's request, the court ordered that the notes be sealed and sent to the court of appeals.

The court's conclusion of law -- that if the notes are not a substantially verbatim transcript, they are not Jencks material -- was certainly correct. *United States v. Williams,* 962 F.2d 1218, 1224 (6th Cir. 1992). The government's notes from an interview must be produced only if they "were read back to and verified by the witness *and* if the report summarized the notes without material variation." *Id.* "The reasoning behind the rule is that it would be grossly unfair to allow the defense to use a statement to impeach a witness which could not fairly be said to be the witness' own rather than a product of the investigator's selections, interpretations, and interpolations." *Id.*

"The district court's ruling on factual determinations relating to production of documents is reviewed under a clearly erroneous standard." Id. We have reviewed the interview notes. Arguably, [**36] they could be considered a "*substantially* verbatim transcript" of the interview, though it is clear that the writer was not attempting to make a *literal* verbatim transcript. Arguably, the district court erred when it found that the material was not a "substantially verbatim transcript of the interview." Nevertheless, there is no indication that they were verified or adopted by the witness interviewed. Therefore, regardless of whether these notes are substantially verbatim or not, they are not Jencks Act material. Therefore, we affirm the district court's holding that the Jencks Act does not require their production.

[***24] *III. Conclusion*

Although the prosecutor's remarks were not flagrant, the remarks were improper. In view of the quality of the evidence presented at trial, the improper remarks may have affected the outcome of the trial and thus were not harmless. In light of the prosecutor's improper vouching for the honesty and credibility of his witnesses to which the defendant objected, and the trial court's lack of a prompt and adequate admonishment to the jury so as to cure the harm caused by the prosecutor's improper vouching for the honesty and credibility of his witnesses, [**37] Richard Carroll's conviction is REVERSED, and the matter is REMANDED for a new trial in accordance with this opinion.

---

End of Document

# Riley v. California

573 U.S. 373 (2014)

Cited in Supplemental Brief at: 5

Caution
As of: September 17, 2026 9:36 PM Z

# Riley v. California

Supreme Court of the United States

April 29, 2014, Argued [*]; June 25, 2014, Decided

13-132, 13-212

[*] Together with No. 13-212, *United States* v. *Wurie,* on certiorari to the United States Court of Appeals for the First Circuit.

**Reporter**
573 U.S. 373 *; 134 S. Ct. 2473 **; 189 L. Ed. 2d 430 ***; 2014 U.S. LEXIS 4497 ****; 82 U.S.L.W. 4558; 42 Media L. Rep. 1925; 24 Fla. L. Weekly Fed. S 921; 60 Comm. Reg. (P & F) 1175; 2014 WL 2864483

DAVID LEON RILEY, Petitioner (No. 13-132) v. CALIFORNIA, UNITED STATES, Petitioner (No. 13-212) v. BRIMA WURIE

**Notice:** The LEXIS pagination of this document is subject to change pending release of the final published version.

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION ONE

People v. Riley, 2013 Cal. LEXIS 3714 (Cal., May 1, 2013)

United States v. Wurie, 728 F.3d 1, 2013 U.S. App. LEXIS 9937 (1st Cir. Mass., May 17, 2013)

**Disposition:** No. 13-132, reversed and remanded; No. 13-212, 728 F. 3d 1, affirmed.

## Syllabus

[**2477] [*373] In No. 13-132, petitioner Riley was stopped for a traffic violation, which eventually led to his arrest on weapons charges. An officer searching Riley incident to the arrest seized a cell phone from Riley's pants pocket. The officer accessed information on the phone and noticed the repeated use of a term associated with a street gang. At the police station two hours later, a detective specializing in gangs further examined the phone's digital contents. Based in part on photographs and videos that the detective found, [***434] the State charged Riley in connection with a shooting that had occurred a few weeks earlier and sought an enhanced sentence based on Riley's gang membership. Riley moved to suppress all evidence that the police had obtained from his cell phone. The trial court denied the motion, and Riley was convicted. The California Court of Appeal affirmed.

In No. 13-212, respondent Wurie was arrested after police observed him participate in an apparent drug sale. At the police station, the officers seized a cell phone [****2] from Wurie's person and noticed that the phone was receiving multiple calls from a source identified as “my house” on its external screen. The officers opened the phone, accessed its call log, determined the number associated with the “my house” label, and traced that number to what they suspected was Wurie's apartment. They secured a search warrant and found drugs, a firearm and ammunition, and cash in the ensuing search. Wurie was then charged with drug and firearm offenses. He moved to suppress the evidence obtained from the search of the apartment. The District Court denied the motion, and Wurie was convicted. The First Circuit reversed the denial of the motion to suppress and vacated the relevant convictions.

*Held:* The police generally may not, without a warrant, search digital information on a cell phone seized from an individual who has been arrested. Pp. 381-403, 134 S. Ct. 2473, 189 L. Ed. 2d, at 439-453.

(a) A warrantless search is reasonable only if it falls within a specific exception to the Fourth Amendments warrant requirement. See *Kentucky* v. *King*, 563 U. S. 452, 459-460, 131 S. Ct. 1849, 179 L. Ed. 2d 865. The well-established exception at [*374] issue here applies when a warrantless search is conducted incident to a lawful arrest.

Three related precedents govern [****3] the extent to which officers may search property found on or near an arrestee. *Chimel* v. *California*, 395 U. S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685, requires that a search incident to arrest be limited to the area within the arrestee's immediate control, where it is justified by the interests in officer safety and in preventing evidence destruction. In *United States* v. *Robinson*, 414 U. S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427, the Court applied the *Chimel* analysis to a search of a cigarette pack found on the arrestee's person. It held that the risks identified in *Chimel* are present in all custodial arrests, 414 U. S., at 235, 94 S. Ct. 467, 38 L. Ed. 2d 427, even when there is no specific concern about the loss of evidence or the threat to officers in a particular case, *id.*, at 236, 94 S. Ct. 467, 38 L. Ed. 2d 427. The trilogy concludes with *Arizona* v. *Gant*, 556 U. S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485, which permits searches of a car where the arrestee is unsecured and within reaching distance of the passenger compartment, or where it is reasonable to believe that evidence of the crime of [**2478] arrest might be found in the vehicle, *id.*, at 343, 129 S. Ct. 1710, 173 L. Ed. 2d 485. Pp. 381-385, 134 S. Ct. 2473, 189 L. Ed. 2d, at 439-441.

(b) The Court declines to extend *Robinson*'s categorical

rule to searches of data stored on cell phones. Absent more precise guidance from the founding era, the Court generally determines whether to [****4] exempt a given type of search from the warrant requirement "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on [***435] the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming* v. *Houghton*, 526 U. S. 295, 300, 119 S. Ct. 1297, 143 L. Ed. 2d 408. That balance of interests supported the search incident to arrest exception in *Robinson*. But a search of digital information on a cell phone does not further the government interests identified in *Chimel*, and implicates substantially greater individual privacy interests than a brief physical search. Pp. 385-398, 134 S. Ct. 2473, 189 L. Ed. 2d, at 441-449.

(1) The digital data stored on cell phones does not present either *Chimel* risk. Pp. 386-391, 134 S. Ct. 2473, 189 L. Ed. 2d, at 442-445.

(i) Digital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee's escape. Officers may examine the phone's physical aspects to ensure that it will not be used as a weapon, but the data on the phone can endanger no one. To the extent that a search of cell phone data might warn officers of an impending danger, *e.g.*, that the arrestee's confederates are headed to the scene, such a concern is better addressed through consideration [****5] of case-specific exceptions to the warrant requirement, such as exigent circumstances. See, *e.g., Warden, Md. Penitentiary* v. *Hayden*, 387 U. S. 294, 298-299, 87 S. Ct. 1642, 18 L. Ed. 2d 782. Pp. 387-388, 134 S. Ct. 2473, 189 L. Ed. 2d, at 442-443.

(ii) The United States and California raise concerns about the destruction of evidence, arguing that, even if the cell phone is physically [*375] secure, information on the cell phone remains vulnerable to remote wiping and data encryption. As an initial matter, those broad concerns are distinct from *Chimel*'s focus on a defendant who responds to arrest by trying to conceal or destroy evidence within his reach. The briefing also gives little indication that either problem is prevalent or that the opportunity to perform a search incident to arrest would be an effective solution. And, at least as to remote wiping, law enforcement currently has some technologies of its own for combating the loss of evidence. Finally, law enforcement's remaining concerns in a particular case might be addressed by responding in a targeted manner to urgent threats of remote wiping, see *Missouri* v. *McNeely*, 569 U. S. 141, 153, 133 S. Ct. 1552, 185 L. Ed. 2d 696, or by taking action to disable a phone's locking mechanism in order to secure the scene, see *Illinois* v. *McArthur*, 531 U. S. 326, 331-333, 121 S. Ct. 946, 148 L. Ed. 2d 838. [****6] Pp. 388-391, 134 S. Ct. 2473, 189 L. Ed. 2d, at 443-445.

(2) A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but more substantial privacy interests are at stake when digital data is involved. Pp. 391-398, 134 S. Ct. 2473, 189 L. Ed. 2d, at 445-449.

(i) Cell phones differ in both a quantitative and a qualitative sense from other objects that might be carried on an arrestee's person. Notably, modern cell phones have an immense storage capacity. Before cell phones, a search of a person was limited by physical realities and generally constituted only a narrow intrusion on privacy. But cell phones can store millions of pages of text, thousands of pictures, or hundreds of videos. This has several interrelated privacy consequences. [***436] First, a [**2479] cell phone collects in one place many distinct types of information that reveal much more in combination than any isolated record. Second, the phone's capacity allows even just one type of information to convey far more than previously possible. Third, data on the phone can date back for years. In addition, an element of pervasiveness characterizes cell phones but not physical records. A decade ago officers [****7] might have occasionally stumbled across a highly personal item such as a diary, but today many of the more than 90% of American adults who own cell phones keep on their person a digital record of nearly every aspect of their lives. Pp. 393-397, 134 S. Ct. 2473, 189 L. Ed. 2d, at 446-448.

(ii) The scope of the privacy interests at stake is further complicated by the fact that the data viewed on many modern cell phones may in fact be stored on a remote server. Thus, a search may extend well beyond papers and effects in the physical proximity of an arrestee, a concern that the United States recognizes but cannot definitively foreclose. Pp. 397-398, 134 S. Ct. 2473, 189 L. Ed. 2d, at 448-449.

(c) Fallback options offered by the United States and California are flawed and contravene this Court's general preference to provide clear [*376] guidance to law enforcement through categorical rules. See

*Michigan* v. *Summers*, 452 U. S. 692, 705, n. 19, 101 S. Ct. 2587, 69 L. Ed. 2d 340. One possible rule is to import the *Gant* standard from the vehicle context and allow a warrantless search of an arrestee's cell phone whenever it is reasonable to believe that the phone contains evidence of the crime of arrest. That proposal is not appropriate in this context, and would prove no practical limit at all when it comes to cell phone searches. [****8] Another possible rule is to restrict the scope of a cell phone search to information relevant to the crime, the arrestee's identity, or officer safety. That proposal would again impose few meaningful constraints on officers. Finally, California suggests an analogue rule, under which officers could search cell phone data if they could have obtained the same information from a pre-digital counterpart. That proposal would allow law enforcement to search a broad range of items contained on a phone even though people would be unlikely to carry such a variety of information in physical form, and would launch courts on a difficult line-drawing expedition to determine which digital files are comparable to physical records. Pp. 398-401, 134 S. Ct. 2473, 189 L. Ed. 2d, at 449-451.

(d) It is true that this decision will have some impact on the ability of law enforcement to combat crime. But the Court's holding is not that the information on a cell phone is immune from search; it is that a warrant is generally required before a search. The warrant requirement is an important component of the Court's Fourth Amendment jurisprudence, and warrants may be obtained with increasing efficiency. In addition, although the search incident to arrest exception [****9] does not apply to cell phones, the continued availability of the exigent circumstances exception may give law enforcement a justification for a warrantless search in particular cases. Pp. 401-402, 134 S. Ct. 2473, 189 L. Ed. 2d, at 451-452.

No. 13-132, reversed and remanded; No. 13-212, 728 F. 3d 1, affirmed.

**Counsel: Michael R. Dreeben** argued the cause for petitioner.

**Judith H. Mizner** argued the cause for respondent.

**Judges:** Roberts, C. J., delivered the opinion of the Court, in which Scalia, Kennedy, Thomas, Ginsburg, Breyer, Sotomayor, and Kagan, JJ., joined. Alito, J., filed an opinion concurring in part and concurring in the judgment, *post* p. 404.

**Opinion by:** Roberts

## Opinion

[**2480] [***437] [*378] Chief Justice **Roberts** delivered the opinion of the Court.

These two cases raise a common question: whether the police may, without a warrant, search digital information on a cell phone seized from an individual who has been arrested.

I

A

In the first case, petitioner David Riley was stopped by a police officer for driving with expired registration tags. In the course of the stop, the officer also learned that Riley's license had been suspended. The officer impounded Riley's car, pursuant to department policy, and another officer conducted an inventory search of the car. Riley was arrested for possession of concealed and loaded firearms when that search turned up two handguns under the car's hood. See Cal. Penal Code Ann. §§12025(a)(1), [****10] 12031(a)(1) (West 2009).

An officer searched Riley incident to the arrest and found items associated with the "Bloods" street gang. He also [*379] seized a cell phone from Riley's pants pocket. According to Riley's uncontradicted assertion, the phone was a "smart phone," a cell phone with a broad range of other functions based on advanced computing capability, large storage capacity, and Internet connectivity. The officer accessed information on the phone and noticed that some words (presumably in text messages or a contacts list) were preceded by the letters "CK"—a label that, he believed, stood for "Crip Killers," a slang term for members of the Bloods gang.

At the police station about two hours after the arrest, a detective specializing in gangs further examined the contents of the phone. The detective testified that he "went through" Riley's phone "looking for evidence, because . . . gang members will [**2481] often video themselves with guns or take pictures of themselves with the guns." App. in No. 13-132, p. 20. Although there was "a lot of stuff" on the phone, particular files that "caught [the detective's] eye" included videos of young men sparring while someone yelled encouragement using the [****11] moniker "Blood." *Id.*, at 11-13. The police also found photographs of Riley standing in front

of a car they suspected had been involved in a shooting a few weeks earlier.

Riley was ultimately charged, in connection with that earlier shooting, with firing at an occupied vehicle, assault with a semiautomatic firearm, and attempted murder. The State alleged that Riley had committed those crimes for the benefit of a criminal street gang, an aggravating factor that carries an enhanced sentence. Compare Cal. Penal Code Ann. §246 (2008) with §186.22(b)(4)(B) (2014). Prior to trial, Riley moved to suppress all evidence that the police had obtained from his cell phone. He contended that the searches of his phone violated the Fourth Amendment, because they had been performed without a warrant and were not otherwise justified by exigent circumstances. [***438] The trial court rejected that argument. App. in No. 13-132, at 24, 26. At Riley's trial, police officers testified about the photographs and videos [*380] found on the phone, and some of the photographs were admitted into evidence. Riley was convicted on all three counts and received an enhanced sentence of 15 years to life in prison.

The California Court [****12] of Appeal affirmed. No. D059840 (Feb. 8, 2013), App. to Pet. for Cert. in No. 13-132, pp. 1a-23a. The court relied on the California Supreme Court's decision in *People* v. *Diaz*, 51 Cal. 4th 84, 119 Cal. Rptr. 3d 105, 244 P. 3d 501 (2011), which held that the Fourth Amendment permits a warrantless search of cell phone data incident to an arrest, so long as the cell phone was immediately associated with the arrestee's person. See *id.*, at 93, 244 P. 3d, at 505-506.

The California Supreme Court denied Riley's petition for review, App. to Pet. for Cert. in No. 13-132, at 24a, and we granted certiorari, 571 U. S. 1161, 134 S. Ct. 999, 187 L. Ed. 2d 847 (2014).

B

In the second case, a police officer performing routine surveillance observed respondent Brima Wurie make an apparent drug sale from a car. Officers subsequently arrested Wurie and took him to the police station. At the station, the officers seized two cell phones from Wurie's person. The one at issue here was a "flip phone," a kind of phone that is flipped open for use and that generally has a smaller range of features than a smart phone. Five to ten minutes after arriving at the station, the officers noticed that the phone was repeatedly receiving calls from a source identified [****13] as "my house" on the phone's external screen. A few minutes later, they opened the phone and saw a photograph of a woman and a baby set as the phone's wallpaper. They pressed one button on the phone to access its call log, then another button to determine the phone number associated with the "my house" label. They next used an online phone directory to trace that phone number to an apartment building.

When the officers went to the building, they saw Wurie's name on a mailbox and observed through a window a woman [*381] who resembled the woman in the photograph on Wurie's phone. They secured the apartment while obtaining a search warrant and, upon later executing the warrant, found and seized 215 grams of crack cocaine, marijuana, drug paraphernalia, a firearm and ammunition, and cash.

[**2482] Wurie was charged with distributing crack cocaine, possessing crack cocaine with intent to distribute, and being a felon in possession of a firearm and ammunition. See 18 U. S. C. §922(g); 21 U. S. C. §841(a). He moved to suppress the evidence obtained from the search of the apartment, arguing that it was the fruit of an unconstitutional search of his cell phone. The District Court denied the motion. 612 F. Supp. 2d 104 (Mass. 2009). [****14] Wurie was convicted on all three counts and sentenced to 262 months in prison.

A divided panel of the First Circuit reversed the denial of Wurie's motion to suppress and vacated Wurie's convictions for possession with intent to distribute and possession of a firearm as a felon. 728 F. 3d 1 (2013). The court held that cell phones are distinct from [***439] other physical possessions that may be searched incident to arrest without a warrant, because of the amount of personal data cell phones contain and the negligible threat they pose to law enforcement interests. See *id.*, at 8-11.

We granted certiorari. 571 U. S. 1161, 134 S. Ct. 999, 187 L. Ed. 2d 847 (2014).

II

The Fourth Amendment provides:

> [1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

As the text makes clear, [2] "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham*

*City* v. *[*382] Stuart*, 547 U. S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). Our cases have determined that "[w]here a search is undertaken by law [****15] enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." *Vernonia School Dist. 47J v. Acton*, 515 U. S. 646, 653, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995). Such a warrant ensures that the inferences to support a search are "drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States*, 333 U. S. 10, 14, 68 S. Ct. 367, 92 L. Ed. 436 (1948). In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement. See *Kentucky* v. *King*, 563 U. S. 452, 459-460, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011.

The two cases before us concern the reasonableness of a warrantless search incident to a lawful arrest. In 1914, this [3] Court first acknowledged in dictum "the right on the part of the Government, always recognized under English and American law, to search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime." *Weeks* v. *United States*, 232 U. S. 383, 392, 34 S. Ct. 341, 58 L. Ed. 652, T.D. 1964. Since that time, it has been well accepted that such a search constitutes an exception to the warrant requirement. Indeed, the [****16] label "exception" is something of a misnomer in this context, as warrantless searches incident to arrest occur with far greater frequency than searches conducted pursuant to a warrant. See 3 W. LaFave, Search and Seizure §5.2(b), p. 132, and n. 15 (5th ed. 2012).

Although the existence of the exception for such searches has been recognized for a century, its scope has been debated for nearly as long. See [**2483] *Arizona* v. *Gant*, 556 U. S. 332, 350, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) (noting the exception's "checkered history"). That debate has focused on the extent to which officers may search property found on or near the arrestee. Three related precedents set forth the rules governing such searches.

The first, *Chimel* v. *California*, 395 U. S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), laid the groundwork for most of the existing search incident to [*383] arrest doctrine. Police officers in that case arrested Chimel inside his home and proceeded to search his entire [***440] three-bedroom house, including the attic and garage. In particular rooms, they also looked through the contents of drawers. *Id.*, at 753-754, 89 S. Ct. 2034, 23 L. Ed. 2d 685.

The Court crafted the following rule for assessing the reasonableness of a search incident to arrest:

> [4] "When an arrest is made, it is reasonable for the arresting [****17] officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. . . . There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.*, at 762-763, 89 S. Ct. 2034, 23 L. Ed. 2d 685.

The extensive warrantless search of Chimel's home did not fit within this exception, because it was not needed to protect officer safety or to preserve evidence. *Id.*, at 763, 768, 89 S. Ct. 2034, 23 L. Ed. 2d 685.

Four years later, in *United States* v. *Robinson*, 414 U. S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), the Court applied the *Chimel* analysis in the context of a search of the arrestee's person. A police officer had arrested Robinson for driving with a revoked license. The officer conducted a patdown search and felt an object that he could not identify in Robinson's [****18] coat pocket. He removed the object, which turned out to be a crumpled cigarette package, and opened it. Inside were 14 capsules of heroin. 414 U.S., at 220, 223, 94 S. Ct. 467, 38 L. Ed. 2d 427.

The Court of Appeals concluded that the search was unreasonable because Robinson was unlikely to have evidence [*384] of the crime of arrest on his person, and because it believed that extracting the cigarette package and opening it could not be justified as part of a protective search for weapons. This Court reversed, rejecting the notion that "case-by-case adjudication" was required to determine "whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest." *Id.*, at 235, 94 S. Ct. 467, 38 L. Ed. 2d 427. As the Court explained, [5] "[t]he authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a

court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." *Ibid.* Instead, a "custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a [****19] search incident to the arrest requires no additional justification." *Ibid.*

The Court thus concluded that the search of Robinson was reasonable even though there was no concern about the loss of evidence, and the arresting officer had no specific concern that Robinson might be armed. *Id.*, at 236, 94 S. Ct. 467, 38 L. Ed. 2d 427. [**2484] In doing so, the Court did not draw a line between a search of Robinson's person and a further examination of the cigarette pack found during [***441] that search. It merely noted that, "[h]aving in the course of a lawful search come upon the crumpled package of cigarettes, [the officer] was entitled to inspect it." *Ibid.* A few years later, the Court clarified that this exception was limited to "personal property . . . immediately associated with the person of the arrestee." *United States* v. *Chadwick*, 433 U. S. 1, 15, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977) (200-pound, locked footlocker could not be searched incident to arrest), abrogated on other grounds by *California* v. *Acevedo*, 500 U. S. 565, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991).

The search incident to arrest trilogy concludes with *Gant*, which analyzed searches of an arrestee's vehicle. *Gant*, like *Robinson*, recognized that the *Chimel* concerns for officer safety and evidence preservation underlie the search incident [*385] [****20] to arrest exception. See 556 U. S., at 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485. As a result, the Court concluded that [6] *Chimel* could authorize police to search a vehicle "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." 556 U. S., at 343, 129 S. Ct. 1710, 173 L. Ed. 2d 485. *Gant* added, however, an independent exception for a warrantless search of a vehicle's passenger compartment "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Ibid.* (quoting *Thornton* v. *United States*, 541 U. S. 615, 632, 124 S. Ct. 2127, 158 L. Ed. 2d 905 (2004) (Scalia, J., concurring in judgment)). That exception stems not from *Chimel*, the Court explained, but from "circumstances unique to the vehicle context." 556 U. S., at 343, 129 S. Ct. 1710, 173 L. Ed. 2d 485.

III

These cases require us to decide how the search incident to arrest doctrine applies to modern cell phones, which are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy. A smart phone of the sort taken from Riley was unheard of ten years ago; a significant majority of American adults now own such phones. See A. Smith, Pew Research Center, Smartphone Ownership—2013 [****21] Update (June 5, 2013). Even less sophisticated phones like Wurie's, which have already faded in popularity since Wurie was arrested in 2007, have been around for less than 15 years. Both phones are based on technology nearly inconceivable just a few decades ago, when *Chimel* and *Robinson* were decided.

Absent more precise guidance from the founding era, [7] we generally determine whether to exempt a given type of search from the warrant requirement "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming* v. *Houghton*, 526 U. S. 295, 300, 119 S. Ct. 1297, 143 L. Ed. 2d 408 (1999). [*386] Such a balancing of interests supported the search incident to arrest exception in *Robinson*, and a mechanical application of *Robinson* might well support the warrantless searches at issue here.

But while *Robinson*'s categorical rule strikes the appropriate balance in the context of physical objects, neither of its rationales has much force with respect to digital content on cell phones. On the government interest [***442] side, *Robinson* concluded that the two risks identified in *Chimel*—harm to officers and destruction [****22] of evidence—are present in all custodial [**2485] arrests. There are no comparable risks when the search is of digital data. In addition, *Robinson* regarded any privacy interests retained by an individual after arrest as significantly diminished by the fact of the arrest itself. Cell phones, however, place vast quantities of personal information literally in the hands of individuals. A search of the information on a cell phone bears little resemblance to the type of brief physical search considered in *Robinson*.

We therefore decline to extend *Robinson* to searches of data on cell phones, and hold instead that [8] officers must generally secure a warrant before conducting such a search.

A

We first consider each *Chimel* concern in turn. In doing

so, we do not overlook *Robinson*'s admonition that [9] searches of a person incident to arrest, "while based upon the need to disarm and to discover evidence," are reasonable regardless of "the probability in a particular arrest situation that weapons or evidence would in fact be found." 414 U. S., at 235, 94 S. Ct. 467, 38 L. Ed. 2d 427. Rather than requiring the "case-by-case adjudication" that *Robinson* rejected, *ibid.*, we ask instead whether application of the search incident to arrest doctrine to [****23] this particular category of effects would "untether the rule from the justifications underlying the *Chimel* exception," *Gant*, *supra*, at 343, 129 S. Ct. 1710, 173 L. Ed. 2d 485. See also *Knowles* v. *Iowa*, 525 U. S. 113, 119, 119 S. Ct. 484, 142 L. Ed. 2d 492 (1998) (declining to extend *Robinson* to the issuance of citations, "a [*387] situation where the concern for officer safety is not present to the same extent and the concern for destruction or loss of evidence is not present at all").

1

Digital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee's escape. Law enforcement officers remain free to examine the physical aspects of a phone to ensure that it will not be used as a weapon—say, to determine whether there is a razor blade hidden between the phone and its case. Once an officer has secured a phone and eliminated any potential physical threats, however, data on the phone can endanger no one.

Perhaps the same might have been said of the cigarette pack seized from Robinson's pocket. Once an officer gained control of the pack, it was unlikely that Robinson could have accessed the pack's contents. But unknown physical objects may always pose risks, no matter how slight, during the tense atmosphere [****24] of a custodial arrest. The officer in *Robinson* testified that he could not identify the objects in the cigarette pack but knew they were not cigarettes. See 414 U. S., at 223, 236, n. 7, 94 S. Ct. 467, 38 L. Ed. 2d 427. Given that, a further search was a reasonable protective measure. No such unknowns exist with respect to digital data. As the First Circuit explained, the officers who searched Wurie's cell phone "knew exactly what they would find therein: data. They also knew that the data could not harm them." 728 F. 3d, at 10.

The United States and California both suggest that a search of cell [***443] phone data might help ensure officer safety in more indirect ways, for example by alerting officers that confederates of the arrestee are headed to the scene. There is undoubtedly a strong government interest in warning officers about such possibilities, but neither the United States nor California offers evidence to suggest that their concerns are based on actual experience. The [**2486] proposed consideration [*388] would also represent a broadening of *Chimel*'s concern that an *arrestee himself* might grab a weapon and use it against an officer "to resist arrest or effect his escape." 395 U. S., at 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685. And any such threats from outside the [****25] arrest scene do not "lurk[ ] in all custodial arrests." *Chadwick*, 433 U. S., at 14-15, 97 S. Ct. 2476, 53 L. Ed. 2d 538. Accordingly, the interest in protecting officer safety does not justify dispensing with the warrant requirement across the board. To the extent dangers to arresting officers may be implicated in a particular way in a particular case, they are better addressed through consideration of case-specific exceptions to the warrant requirement, such as the one for exigent circumstances. See, *e.g., Warden, Md. Penitentiary* v. *Hayden*, 387 U. S. 294, 298-299, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others.").

2

The United States and California focus primarily on the second *Chimel* rationale: preventing the destruction of evidence.

Both Riley and Wurie concede that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant. See Brief for Petitioner in No. 13-132, p. 20; Brief for Respondent in No. 13-212, p. 41. That is a sensible concession. See *Illinois* v. *McArthur*, 531 U. S. 326, 331-333, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001); *Chadwick*, *supra*, at 13, 97 S. Ct. 2476, 53 L. Ed. 2d 538, and n. 8. [****26] And once law enforcement officers have secured a cell phone, there is no longer any risk that the arrestee himself will be able to delete incriminating data from the phone.

The United States and California argue that information on a cell phone may nevertheless be vulnerable to two types of evidence destruction unique to digital data—remote wiping and data encryption. Remote wiping occurs when a phone, connected to a wireless network, receives a signal [*389] that erases stored data. This can happen when a third party sends a remote signal or when a phone is preprogrammed to delete data upon entering or leaving certain geographic areas (so-called

"geofencing"). See Dept. of Commerce, National Institute of Standards and Technology, R. Ayers, S. Brothers, & W. Jansen, Guidelines on Mobile Device Forensics (Draft) 29, 31 (SP 800-101 Rev. 1, Sept. 2013) (hereinafter Ayers). Encryption is a security feature that some modern cell phones use in addition to password protection. When such phones lock, data becomes protected by sophisticated encryption that renders a phone all but "unbreakable" unless police know the password. Brief for United States as *Amicus Curiae* in No. 13-132, p. 11.

As an initial [****27] matter, these broader concerns about the loss of evidence are distinct from *Chimel*'s focus on a defendant who responds to arrest by [***444] trying to conceal or destroy evidence within his reach. See 395 U. S., at 763-764, 89 S. Ct. 2034, 23 L. Ed. 2d 685. With respect to remote wiping, the Government's primary concern turns on the actions of third parties who are not present at the scene of arrest. And data encryption is even further afield. There, the Government focuses on the ordinary operation of a phone's security features, apart from *any* active attempt by a defendant or his associates to conceal or destroy evidence upon arrest.

We have also been given little reason to believe that either problem is prevalent. The briefing reveals only a couple of anecdotal examples of remote wiping triggered by an arrest. See Brief for Association of State Criminal Investigative Agencies et al. [**2487] as *Amici Curiae* in No. 13-132, pp. 9-10; see also Tr. of Oral Arg. in No. 13-132, p. 48. Similarly, the opportunities for officers to search a password-protected phone before data becomes encrypted are quite limited. Law enforcement officers are very unlikely to come upon such a phone in an unlocked state because most phones lock at the touch of [****28] a button or, as a default, after some very short period of inactivity. See, *e.g.*, iPhone User Guide for iOS 7.1 [*390] Software 10 (2014) (default lock after about one minute). This may explain why the encryption argument was not made until the merits stage in this Court, and has never been considered by the Courts of Appeals.

Moreover, in situations in which an arrest might trigger a remote-wipe attempt or an officer discovers an unlocked phone, it is not clear that the ability to conduct a warrantless search would make much of a difference. The need to effect the arrest, secure the scene, and tend to other pressing matters means that law enforcement officers may well not be able to turn their attention to a cell phone right away. See Tr. of Oral Arg. in No. 13-132, at 50; see also Brief for United States as *Amicus Curiae* in No. 13-132, at 19. Cell phone data would be vulnerable to remote wiping from the time an individual anticipates arrest to the time any eventual search of the phone is completed, which might be at the station house hours later. Likewise, an officer who seizes a phone in an unlocked state might not be able to begin his search in the short time remaining before the phone [****29] locks and data becomes encrypted.

In any event, as to remote wiping, law enforcement is not without specific means to address the threat. Remote wiping can be fully prevented by disconnecting a phone from the network. There are at least two simple ways to do this: First, law enforcement officers can turn the phone off or remove its battery. Second, if they are concerned about encryption or other potential problems, they can leave a phone powered on and place it in an enclosure that isolates the phone from radio waves. See Ayers 30-31. Such devices are commonly called "Faraday bags," after the English scientist Michael Faraday. They are essentially sandwich bags made of aluminum foil: cheap, lightweight, and easy to use. See Brief for Criminal Law Professors as *Amici Curiae* 9. They may not be a complete answer to the problem, see Ayers 32, but at least for now they provide a reasonable response. In fact, a number of law enforcement agencies [*391] around the country already encourage the use of Faraday bags. See, *e.g.*, Dept. of Justice, National Institute of Justice, Electronic Crime Scene Investigation: A Guide for First [***445] Responders 14, 32 (2d ed. Apr. 2008); Brief for Criminal Law Professors [****30] as *Amici Curiae* 4-6.

To the extent that law enforcement still has specific concerns about the potential loss of evidence in a particular case, there remain more targeted ways to address those concerns. If "the police are truly confronted with a 'now or never' situation"—for example, circumstances suggesting that a defendant's phone will be the target of an imminent remote-wipe attempt—they may be able to rely on exigent circumstances to search the phone immediately. *Missouri* v. *McNeely*, 569 U. S. 141, 153, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013) (quoting *Roaden* v. *Kentucky*, 413 U. S. 496, 505, 93 S. Ct. 2796, 37 L. Ed. 2d 757 (1973); some internal quotation marks omitted). Or, if officers happen to seize a phone in an unlocked state, they may be able to disable a phone's automatic-lock feature in order to prevent the phone from locking and encrypting data. See App. to Reply Brief in No. 13-132, p. 3a (diagramming the few necessary steps). Such a preventive measure could [**2488] be analyzed under

the principles set forth in our decision in *McArthur*, 531 U. S. 326, 121 S. Ct. 946, 148 L. Ed. 2d 838, which approved officers' reasonable steps to secure a scene to preserve evidence while they awaited a warrant. See *id.*, at 331-333, 121 S. Ct. 946, 148 L. Ed. 2d 838.

B

The search incident to arrest exception rests [****31] not only on the heightened government interests at stake in a volatile arrest situation, but also on an arrestee's reduced privacy interests upon being taken into police custody. *Robinson* focused primarily on the first of those rationales. But it also quoted with approval then-Judge Cardozo's account of the historical basis for the search incident to arrest exception: "Search of the person becomes lawful when grounds for arrest and accusation have been discovered, and the law is in the act of subjecting the body of the accused to its physical [*392] dominion." 414 U. S., at 232, 94 S. Ct. 467, 38 L. Ed. 2d 427 (quoting *People* v. *Chiagles*, 237 N. Y. 193, 197, 142 N. E. 583, 584 (1923)); see also 414 U. S., at 237, 94 S. Ct. 467, 38 L. Ed. 2d 427 (Powell, J., concurring) ("an individual lawfully subjected to a custodial arrest retains no significant Fourth Amendment interest in the privacy of his person"). Put simply, a patdown of Robinson's clothing and an inspection of the cigarette pack found in his pocket constituted only minor additional intrusions compared to the substantial government authority exercised in taking Robinson into custody. See *Chadwick*, 433 U. S., at 16, n. 10, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (searches of a person are justified in part by "reduced expectations of privacy [****32] caused by the arrest").

The fact that an arrestee has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely. [10] Not every search "is acceptable solely because a person is in custody." *Maryland* v. *King*, 569 U. S. 435, 463, 133 S. Ct. 1958, 1979, 186 L. Ed. 2d 1, 30 (2013). To the contrary, when "privacy-related concerns are weighty enough" a "search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." *Ibid.* One such example, of course, is *Chimel*. *Chimel* refused to "characteriz[e] the invasion of privacy that results from a top-to-bottom search of a man's house as 'minor.'" 395 U. S., at 766-767, n. 12, 89 S. Ct. 2034, 23 L. Ed. 2d 685. [***446] Because a search of the arrestee's entire house was a substantial invasion beyond the arrest itself, the Court concluded that a warrant was required.

*Robinson* is the only decision from this Court applying *Chimel* to a search of the contents of an item found on an arrestee's person. In an earlier case, this Court had approved a search of a zipper bag carried by an arrestee, but the Court analyzed only the validity of the arrest itself. See *Draper* v. *United States*, 358 U. S. 307, 310-311, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959). Lower courts applying *Robinson* and [****33] *Chimel*, however, have approved searches of a variety of personal items carried by an arrestee. See, *e.g., United States* v. *Carrion*, 809 F. 2d 1120, 1123, 1128 (CA5 1987) (billfold and address book); [*393] *United States* v. *Watson*, 669 F. 2d 1374, 1383-1384 (CA11 1982) (wallet); *United States* v. *Lee*, 501 F. 2d 890, 892, 163 U.S. App. D.C. 330 (CADC 1974) (purse).

The United States asserts that a search of all data stored on a cell phone is "materially indistinguishable" from searches of these sorts of physical items. Brief for United States in No. 13-212, p. 26. That is like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together. Modern cell phones, as a category, implicate privacy concerns far beyond those [**2489] implicated by the search of a cigarette pack, a wallet, or a purse. A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but any extension of that reasoning to digital data has to rest on its own bottom.

1

Cell phones differ in both a quantitative and [****34] a qualitative sense from other objects that might be kept on an arrestee's person. The term "cell phone" is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as telephones. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.

One of the most notable distinguishing features of modern cell phones is their immense storage capacity. Before cell phones, a search of a person was limited by physical realities and tended as a general matter to constitute only a narrow intrusion on privacy. See Kerr, Foreword: Accounting for Technological Change, 36 Harv. J. L. & Pub. Pol'y 403, 404-405 (2013). Most people cannot lug around every piece of mail they have received for the past several months, every picture they have taken, or every book or article they have [*394] read—nor would they have any reason to attempt to do

so. And if they did, they would have to drag behind them a trunk of the sort held to require a search warrant in *Chadwick*, *supra*, rather than a container the size of the cigarette package in *Robinson*.

But the [****35] possible intrusion on privacy is not physically limited in the same way when it comes to cell phones. The current top-selling smart phone has a standard capacity of 16 gigabytes (and is available with up to 64 gigabytes). Sixteen gigabytes translates to millions of pages of text, [***447] thousands of pictures, or hundreds of videos. See Kerr, *supra*, at 404; Brief for Center for Democracy & Technology et al. as *Amici Curiae* 7-8. Cell phones couple that capacity with the ability to store many different types of information: Even the most basic phones that sell for less than $20 might hold photographs, picture messages, text messages, Internet browsing history, a calendar, a thousand-entry phone book, and so on. See *id.*, at 30; *United States* v. *Flores-Lopez*, 670 F. 3d 803, 806 (CA7 2012). We expect that the gulf between physical practicability and digital capacity will only continue to widen in the future.

The storage capacity of cell phones has several interrelated consequences for privacy. First, a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record. Second, [****36] a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet. Third, the data on a phone can date back to the purchase of the phone, or even earlier. A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the [*395] past several months, as would routinely be kept on a phone. [1]

[**2490] Finally, there is an element of pervasiveness that characterizes cell phones but not physical records. Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day. Now it is the person who is not carrying a cell phone, [****37] with all that it contains, who is the exception. According to one poll, nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower. See Harris Interactive, 2013 Mobile Consumer Habits Study (June 2013). A decade ago police officers searching an arrestee might have occasionally stumbled across a highly personal item such as a diary. See, *e.g., United States* v. *Frankenberry*, 387 F. 2d 337 (CA2 1967) (*per curiam*). But those discoveries were likely to be few and far between. Today, by contrast, it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate. See *Ontario* v. *Quon*, 560 U. S. 746, 760, 130 S. Ct. 2619, 177 L. Ed. 2d 216 (2010). Allowing the police to scrutinize such records on a routine basis is quite different from allowing them to search a personal item or two in the occasional case.

Although the data stored on a cell phone is distinguished from physical records by quantity alone, certain types of data are also qualitatively different. An Internet search [****38] and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private [***448] interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits [*396] to WebMD. Data on a cell phone can also reveal where a person has been. Historic location information is a stand-ard feature on many smart phones and can reconstruct someone's specific movements down to the minute, not only around town but also within a particular building. See *United States* v. *Jones*, 565 U. S. 400, 415 , 132 S. Ct. 945, 955, 181 L. Ed. 2d 911, 925 (2012) (Sotomayor, J., concurring) ("GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.").

Mobile application software on a cell phone, or "apps," offer a range of tools for managing detailed information about all aspects of a person's life. There are apps for Democratic Party news and Republican Party news; apps for alcohol, drug, and gambling addictions; apps for sharing prayer requests; apps for tracking pregnancy symptoms; apps for planning your budget; apps for every conceivable hobby [****39] or pastime; apps for

[1] Because the United States and California agree that these cases involve *searches* incident to arrest, these cases do not implicate the question whether the collection or inspection of aggregated digital information amounts to a search under other circumstances.

improving your romantic life. There are popular apps for buying or selling just about anything, and the records of such transactions may be accessible on the phone indefinitely. There are over a million apps available in each of the two major app stores; the phrase "there's an app for that" is now part of the popular lexicon. The average smart phone user has installed 33 apps, which together can form a revealing montage of the user's life. See Brief for Electronic Privacy Information Center et al. as *Amici Curiae* in No. 13-132, p. 9.

In 1926, Learned Hand observed (in an opinion later quoted in *Chimel*) that it is "a totally different thing to search a man's [**2491] pockets and use against him what they contain, from ransacking his house for everything which may incriminate him." *United States* v. *Kirschenblatt*, 16 F. 2d 202, 203 (CA2). If his pockets contain a cell phone, however, that is no longer true. Indeed, a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the [*397] home; it also contains a broad array of private information never [****40] found in a home in any form—unless the phone is.

2

To further complicate the scope of the privacy interests at stake, the data a user views on many modern cell phones may not in fact be stored on the device itself. Treating a cell phone as a container whose contents may be searched incident to an arrest is a bit strained as an initial matter. See *New York* v. *Belton*, 453 U. S. 454, 460, n. 4, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981) (describing a "container" as "any object capable of holding another object"). But the analogy crumbles entirely when a cell phone is used to access data located elsewhere, at the tap of a screen. That is what cell phones, with increasing frequency, are designed to do by taking advantage of "cloud computing." Cloud computing is the capacity of Internet-connected devices to display data stored on remote servers rather than on the device itself. Cell phone users often may not know whether particular information is stored on the device or in the cloud, and it generally makes little difference. See Brief for Electronic Privacy Information [***449] Center in No. 13-132, at 12-14, 20. Moreover, the same type of data may be stored locally on the device for one user and in the cloud for another.

The United States [****41] concedes that the search incident to arrest exception may not be stretched to cover a search of files accessed remotely—that is, a search of files stored in the cloud. See Brief for United States in No. 13-212, at 43-44. Such a search would be like finding a key in a suspect's pocket and arguing that it allowed law enforcement to unlock and search a house. But officers searching a phone's data would not typically know whether the information they are viewing was stored locally at the time of the arrest or has been pulled from the cloud.

Although the Government recognizes the problem, its proposed solutions are unclear. It suggests that officers could disconnect a phone from the network before searching the [*398] device—the very solution whose feasibility it contested with respect to the threat of remote wiping. Compare Tr. of Oral Arg. in No. 13-132, at 50-51, with Tr. of Oral Arg. in No. 13-212, pp. 13-14. Alternatively, the Government proposes that law enforcement agencies "develop protocols to address" concerns raised by cloud computing. Reply Brief in No. 13-212, pp. 14-15. Probably a good idea, but the Founders did not fight a revolution to gain the right to government agency protocols. [****42] The possibility that a search might extend well beyond papers and effects in the physical proximity of an arrestee is yet another reason that the privacy interests here dwarf those in *Robinson*.

C

Apart from their arguments for a direct extension of *Robinson*, the United States and California offer various fallback options for permitting warrantless cell phone searches under certain circumstances. Each of the proposals is flawed and contravenes our general preference to provide clear guidance to law enforcement through categorical rules. "[I]f police are to have workable rules, the balancing of the competing interests . . . 'must in large part be [**2492] done on a categorical basis—not in an ad hoc, case-by-case fashion by individual police officers.'" *Michigan* v. *Summers*, 452 U. S. 692, 705, n. 19, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981) (quoting *Dunaway* v. *New York*, 442 U. S. 200, 219-220, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979) (White, J., concurring)).

The United States first proposes that the *Gant* standard be imported from the vehicle context, allowing a warrantless search of an arrestee's cell phone whenever it is reasonable to believe that the phone contains evidence of the crime of arrest. But *Gant* relied on "circumstances unique to the vehicle context" [****43] to endorse a search solely for the purpose of gathering evidence. 556 U. S., at 343, 129 S. Ct. 1710, 173 L. Ed. 2d 485. Justice Scalia's *Thornton* opinion, on

which *Gant* was based, explained that those unique circumstances are "a reduced expectation of privacy" and "heightened law enforcement needs" when it comes to motor vehicles. 541 U. S., at 631, 124 S. Ct. 2127, 158 L. Ed. 2d 905; see also *Wyoming* [*399] v. *Houghton*, 526 U. S., at 303-304, 119 S. Ct. 1297, 143 L. Ed. 2d 408. For reasons that we have explained, cell phone searches bear neither of those characteristics.

At any rate, a *Gant* standard would prove no practical limit at all when it comes to cell phone searches. In the vehicle context, *Gant* generally protects against searches for evidence of [***450] past crimes. See 3 W. LaFave, Search and Seizure §7.1(d), at 709, and n. 191. In the cell phone context, however, it is reasonable to expect that incriminating information will be found on a phone regardless of when the crime occurred. Similarly, in the vehicle context *Gant* restricts broad searches resulting from minor crimes such as traffic violations. See LaFave, §7.1(d), at 713, and n. 204. That would not necessarily be true for cell phones. It would be a particularly inexperienced or unimaginative law enforcement officer who could not come up [****44] with several reasons to suppose evidence of just about any crime could be found on a cell phone. Even an individual pulled over for something as basic as speeding might well have locational data dispositive of guilt on his phone. An individual pulled over for reckless driving might have evidence on the phone that shows whether he was texting while driving. The sources of potential pertinent information are virtually unlimited, so applying the *Gant* standard to cell phones would in effect give "police officers unbridled discretion to rummage at will among a person's private effects." 556 U. S., at 345, 129 S. Ct. 1710, 173 L. Ed. 2d 485.

The United States also proposes a rule that would restrict the scope of a cell phone search to those areas of the phone where an officer reasonably believes that information relevant to the crime, the arrestee's identity, or officer safety will be discovered. See Brief for United States in No. 13-212, at 51-53. This approach would again impose few meaningful constraints on officers. The proposed categories would sweep in a great deal of information, and officers would not always be able to discern in advance what information would be found where.

[*400] We also reject the United States' final suggestion [****45] that officers should always be able to search a phone's call log, as they did in Wurie's case. The Government relies on *Smith* v. *Maryland*, 442 U. S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979), which held that no warrant was required to use a pen register at telephone company premises to identify numbers dialed by a particular caller. The Court in that case, however, concluded that the use of a pen register was not a "search" at all under the Fourth Amendment. See *id.*, at 745-746, 99 S. Ct. 2577, 61 L. Ed. 2d 220. There is no dispute here that the officers engaged in a search of Wurie's cell [**2493] phone. Moreover, call logs typically contain more than just phone numbers; they include any identifying information that an individual might add, such as the label "my house" in Wurie's case.

Finally, at oral argument California suggested a different limiting principle, under which officers could search cell phone data if they could have obtained the same information from a pre-digital counterpart. See Tr. of Oral Arg. in No. 13-132, at 38-43; see also *Flores-Lopez*, 670 F. 3d, at 807 ("If police are entitled to open a pocket diary to copy the owner's address, they should be entitled to turn on a cell phone to learn its number."). But the fact that a search in the [****46] pre-digital era could have turned up a photograph or two in a wallet does not justify a search of thousands of photos in a digital gallery. The fact that someone could have tucked a paper bank statement in a pocket does not justify a search of every bank statement from the last five years. And to make matters worse, such an analogue test would allow law enforcement [***451] to search a range of items contained on a phone, even though people would be unlikely to carry such a variety of information in physical form. In Riley's case, for example, it is implausible that he would have strolled around with video tapes, photo albums, and an address book all crammed into his pockets. But because each of those items has a pre-digital analogue, police under California's proposal would be able to search a phone for all of those items—a significant diminution of privacy.

[*401] In addition, an analogue test would launch courts on a difficult line-drawing expedition to determine which digital files are comparable to physical records. Is an e-mail equivalent to a letter? Is a voicemail equivalent to a phone message slip? It is not clear how officers could make these kinds of decisions before conducting a search, [****47] or how courts would apply the proposed rule after the fact. An analogue test would "keep defendants and judges guessing for years to come." *Sykes* v. *United States*, 564 U. S. 1, 34, 131 S. Ct. 2267, 2287, 180 L. Ed. 2d 60, 86 (2011) (Scalia, J., dissenting) (discussing the Court's analogue test under the Armed Career Criminal Act).

IV

We cannot deny that our decision today will have an impact on the ability of law enforcement to combat crime. Cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals. Privacy comes at a cost.

[11] Our holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search, even when a cell phone is seized incident to arrest. Our cases have historically recognized that the warrant requirement is "an important working part of our machinery of government," not merely "an inconvenience to be somehow 'weighed' against the claims of police efficiency." *Coolidge* v. *New Hampshire*, 403 U. S. 443, 481, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). Recent technological advances similar to those discussed here [****48] have, in addition, made the process of obtaining a warrant itself more efficient. See *McNeely*, 569 U. S., at 154-155, 133 S. Ct. 1552; 1573, 185 L. Ed. 2d 696, 720 ); *id.*, at 173 (Roberts, C. J., concurring in part and dissenting in part) (133 S. Ct. 1552; 1573, 185 L. Ed. 2d 696, 720) (describing jurisdiction where "police officers can e-mail warrant requests to judges' iPads [and] judges have signed such warrants and e-mailed them back to officers in less than 15 minutes").

[**2494] Moreover, even though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions [*402] may still justify a warrantless search of a particular phone. "One well-recognized exception applies when ' "the exigencies of the situation" make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" *Kentucky* v. *King*, 563 U. S., at 460, 131 S. Ct. 1849, 1856, 179 L. Ed. 2d 865, 874 ) (quoting *Mincey* v. *Arizona*, 437 U. S. 385, 394, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)). Such exigencies could include the need to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury. 563 U. S., at [***452] 460, 131 S. Ct. 1849, 179 L. Ed. 2d 865. In *Chadwick*, for example, the Court [****49] held that the exception for searches incident to arrest did not justify a search of the trunk at issue, but noted that "if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage." 433 U. S., at 15, n. 9, 97 S. Ct. 2476, 53 L. Ed. 2d 538.

In light of the availability of the exigent circumstances exception, there is no reason to believe that law enforcement officers will not be able to address some of the more extreme hypotheticals that have been suggested: a suspect texting an accomplice who, it is feared, is preparing to detonate a bomb, or a child abductor who may have information about the child's location on his cell phone. The defendants here recognize—indeed, they stress—that such fact-specific threats may justify a warrantless search of cell phone data. See Reply Brief in No. 13-132, pp. 8-9; Brief for Respondent in No. 13-212, at 30, 41. The critical point is that, unlike the search incident to arrest exception, the exigent circumstances exception requires a court to examine whether an emergency justified a warrantless search in each particular case. See *McNeely*, *supra*, at 149-150, 133 S. Ct. 1552, 185 L. Ed. 2d 696. [****50] [2]

***

[*403] Our cases have recognized that the Fourth Amendment was the founding generation's response to the reviled "general warrants" and "writs of assistance" of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity. Opposition to such searches was in fact one of the driving forces behind the Revolution itself. In 1761, the patriot James Otis delivered a speech in Boston denouncing the use of writs of assistance. A young John Adams was there, and he would later write that "[e]very man of a crowded audience appeared to me to go away, as I did, ready to take arms against writs of assistance." 10 Works of [****51] John Adams 247-248 (C. Adams ed. 1856). According to Adams, Otis's speech was "the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born." *Id.*, at 248 (quoted in *Boyd* v. *United States*, 116 U. S. 616, 625, 6 S. Ct. 524, 29 L. Ed. 746 (1886)).

Modern cell phones are not just another technological

---

[2] In Wurie's case, for example, the dissenting First Circuit Judge argued that exigent circumstances could have justified a search of Wurie's phone. See 728 F. 3d 1, 17 (2013) (opinion of Howard, J.) (discussing the repeated unanswered calls from "my house," the suspected location of a drug stash). But the majority concluded that the Government had not made an exigent circumstances argument. See *id.*, at 1. The Government acknowledges the same in this Court. See Brief for United States in No. 13-212, p. 28, n. 8.

convenience. With all they contain and all they may reveal, they hold [**2495] for many Americans "the privacies of life," *id.*, at 630, 6 S. Ct. 524, 29 L. Ed. 746. The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. [12] Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant.

[***453] We reverse the judgment of the California Court of Appeal in No. 13-132 and remand the case for further proceedings not inconsistent with this opinion. We affirm the judgment of the First Circuit in No. 13-212.

*It is so ordered.*

**Concur by:** Alito

## Concur

[*404] Justice **Alito**, concurring in part and concurring in the judgment.

I agree with the Court that law enforcement officers, in conducting a lawful search incident to [****52] arrest, must generally obtain a warrant before searching information stored or accessible on a cell phone. I write separately to address two points.

I

A

First, I am not convinced at this time that the ancient rule on searches incident to arrest is based exclusively (or even primarily) on the need to protect the safety of arresting officers and the need to prevent the destruction of evidence. Cf. *ante*, at 386, 189 L. Ed. 2d, at 442. This rule antedates the adoption of the Fourth Amendment by at least a century. See T. Clancy, The Fourth Amendment: Its History and Interpretation 340 (2008); T. Taylor, Two Studies in Constitutional Interpretation 28 (1969); Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 764 (1994). In *Weeks* v. *United States*, 232 U. S. 383, 392, 34 S. Ct. 341, 58 L. Ed. 652, T.D. 1964 (1914), we held that the Fourth Amendment did not disturb this rule. See also Taylor, *supra*, at 45; Stuntz, The Substantive Origins of Criminal Procedure, 105 Yale L. J. 393, 401 (1995) ("The power to search incident to arrest—a search of the arrested suspect's person . . .—was well established in the mid-eighteenth century, and nothing in . . . the Fourth Amendment changed that"). And neither in *Weeks* nor in any of the authorities discussing [****53] the old common-law rule have I found any suggestion that it was based exclusively or primarily on the need to protect arresting officers or to prevent the destruction of evidence.

On the contrary, when pre-*Weeks* authorities discussed the basis for the rule, what was mentioned was the need to obtain probative evidence. For example, an 1839 case stated that "it is clear, and beyond doubt, that . . . constables . . . are entitled, upon a lawful arrest by them of one charged [*405] with treason or felony, to take and detain property found in his possession which will form material evidence in his prosecution for that crime." See *Dillon* v. *O'Brien*, 16 Cox Crim. Cas. 245, 249-251 (1887) (citing *Regina* v. *Frost*, 9 Car. & P. 129, 173 Eng. Rep. 771 (1839)). The court noted that the origins of that rule "deriv[e] from the interest which the State has in a person guilty (or reasonably believed to be guilty) of a crime being brought to justice, and in a prosecution, once commenced, being determined in due course of law." 16 Cox Crim. Cas., at 249-250. See also *Holker* v. *Hennessey*, 141 Mo. 527, 537-540, 42 S. W. 1090, 1093 (1897).

Two 19th-century treatises that this Court has previously cited in connection [****54] with the origin of the search-incident-to-arrest rule, see *Weeks*, *supra*, at 392, 34 S. Ct. 341, 58 L. Ed. 652, T.D. 1964, suggest the same rationale. See F. Wharton, Criminal Pleading and Practice §60, p. 45 (8th ed. 1880) ("Those [**2496] arresting a defendant are [***454] bound to take from his person any articles which may be of use as proof in the trial of the offense with which the defendant is charged"); J. Bishop, Criminal Procedure §§210-212, p. 127 (2d ed. 1872) (if an arresting officer finds "about the prisoner's person, or otherwise in his possession, either goods or moneys which there is reason to believe are connected with the supposed crime as its fruits, or as the instruments with which it was committed, or as directly furnishing evidence relating to the transaction, he may take the same, and hold them to be disposed of as the court may direct").

What ultimately convinces me that the rule is not closely linked to the need for officer safety and evidence preservation is that these rationales fail to explain the rule's well-recognized scope. It has long been accepted that written items found on the person of an arrestee

may be examined and used at trial. * But once these items are taken away [*406] from an arrestee (something that obviously [****55] must be done before the items are read), there is no risk that the arrestee will destroy them. Nor is there any risk that leaving these items unread will endanger the arresting officers.

The idea that officer safety and the preservation of evidence are the sole reasons for allowing a warrantless search incident to arrest appears to derive from the Court's reasoning in *Chimel* v. *California*, 395 U. S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), a case that involved the lawfulness of a search of the scene of an arrest, not the person of an arrestee. As I have explained, *Chimel*'s reasoning is questionable, see *Arizona* v. *Gant*, 556 U. S. 332, 361-363, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) (dissenting opinion), and I think it is a mistake to allow that reasoning to affect cases like these that concern the search of the person of arrestees.

B

Despite [****57] my view on the point discussed above, I agree that we should not mechanically apply the rule used in the predigital [*407] era to the search of a cell phone. Many cell phones now in use are capable of storing and accessing a quantity of information, some highly personal, that no person would ever have had on his person in hard-copy [***455] form. This calls for a new balancing [**2497] of law enforcement and privacy interests.

The Court strikes this balance in favor of privacy interests with respect to all cell phones and all information found in them, and this approach leads to anomalies. For example, the Court's broad holding favors information in digital form over information in hard-copy form. Suppose that two suspects are arrested. Suspect number one has in his pocket a monthly bill for his land-line phone, and the bill lists an incriminating call to a long-distance number. He also has in his wallet a few snapshots, and one of these is incriminating. Suspect number two has in his pocket a cell phone, the call log of which shows a call to the same incriminating number. In addition, a number of photos are stored in the memory of the cell phone, and one of these is incriminating. Under established law, [****58] the police may seize and examine the phone bill and the snapshots in the wallet without obtaining a warrant, but under the Court's holding today, the information stored in the cell phone is out.

While the Court's approach leads to anomalies, I do not see a workable alternative. Law enforcement officers need clear rules regarding searches incident to arrest, and it would take many cases and many years for the courts to develop more nuanced rules. And during that time, the nature of the electronic devices that ordinary Americans carry on their persons would continue to change.

II

This brings me to my second point. While I agree with the holding of the Court, I would reconsider the question presented here if either Congress or state legislatures, after assessing the legitimate needs of law enforcement and the [*408] privacy interests of cell phone owners, enact legislation that draws reasonable distinctions based on categories of information or perhaps other variables.

The regulation of electronic surveillance provides an instructive example. After this Court held that electronic surveillance constitutes a search even when no property interest is invaded, see *Katz* v. *United States*, 389 U. S.

---

* Cf. *Hill* v. *California*, 401 U. S. 797, 799-802, 91 S. Ct. 1106, 28 L. Ed. 2d 484, and n. 1 (1971) (diary); *Marron* v. *United States*, 275 U. S. 192, 193, 198-199, 48 S. Ct. 74, 72 L. Ed. 231, Treas. Dec. 42528 (1927) (ledger and bills); *Gouled* v. *United States*, 255 U. S. 298, 309, 41 S. Ct. 261, 65 L. Ed. 647 (1921), overruled on other grounds, *Warden, Md. Penitentiary* v. *Hayden*, 387 U. S. 294, 300-301, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967) (papers); see *United States* v. *Rodriguez*, 995 F. 2d 776, 778 (CA7 1993) (address book); *United States* v. *Armendariz-Mata*, 949 F. 2d 151, 153 (CA5 1991) (notebook); *United States* v. *Molinaro*, 877 F. 2d 1341 (CA7 1989) (wallet); *United States* v. *Richardson*, 764 F. 2d 1514, 1527 (CA11 1985) (wallet and papers); *United States* v. *Watson*, 669 F. 2d 1374, 1383-1384 (CA11 1982) (documents found in a wallet); *United States* v. *Castro*, 596 F. 2d 674, 677 (CA5), cert. denied, 444 U. S. 963, 100 S. Ct. 448, 62 L. Ed. 2d 375, 1979 U.S. LEXIS 3815 (1979) (paper found in a pocket); *United States* v. *Jeffers*, 520 F. 2d 1256, 1267-1268 (CA7 1975) (three notebooks and meeting minutes); *Bozel* v. *Hudspeth*, 126 F. 2d 585, 587 (CA10 1942) (papers, circulars, advertising matter, "memoranda [****56] containing various names and addresses"); *United States* v. *Park Avenue Pharmacy*, 56 F. 2d 753, 755 (CA2 1932) ("numerous prescriptions blanks" and a check book). See also 3 W. LaFave, Search and Seizure §5.2(c), p. 144 (5th ed. 2012) ("Lower courts, in applying *Robinson*, have deemed evidentiary searches of an arrested person to be virtually unlimited"); W. Cuddihy, Fourth Amendment: Origins and Original Meaning 847-848 (1990) (in the pre-Constitution colonial era, "[a]nyone arrested could expect that not only his surface clothing but his body, luggage, and saddlebags would be searched").

347, 353-359, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), [****59] Congress responded by enacting Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 211. See also 18 U. S. C. §2510 *et seq*. Since that time, electronic surveillance has been governed primarily, not by decisions of this Court, but by the statute, which authorizes, but imposes detailed restrictions on, electronic surveillance. See *ibid.*

Modern cell phones are of great value for both lawful and unlawful purposes. They can be used in committing many serious crimes, and they present new and difficult law enforcement problems. See Brief for United States in No. 13-212, pp. 2-3. At the same time, because of the role that these devices have come to play in contemporary life, searching their contents implicates very sensitive privacy interests that this Court is poorly positioned to understand and evaluate. Many forms of modern technology are making it easier and easier for both government and private entities to amass a wealth of information about the lives of ordinary Americans, and at the same time, many ordinary Americans are choosing to make public much information that was seldom [***456] revealed to outsiders just a few decades ago.

In light of these developments, it would [****60] be very unfortunate if privacy protection in the 21st century were left primarily to the federal courts using the blunt instrument of the Fourth Amendment. Legislatures, elected by the people, are in a better position than we are to assess and respond to the changes that have already occurred [**2498] and those that almost certainly will take place in the future.

## References

U.S.C.S., Constitution, Amendment 4

2 Search and Seizure §§22.02-22.08 (Matthew Bender)

L Ed Digest, Search and Seizure § 12

L Ed Index, Arrest; Search and Seizure

Validity, under Federal Constitution, of warrantless search of motor vehicle--Supreme Court cases. 142 L. Ed. 2d 993.

Constitutionality of searching premises without warrant as incident to valid arrest--Supreme Court cases. 108 L. Ed. 2d 987.

Supreme Court's views as to the federal legal aspects of the right of privacy. 43 L. Ed. 2d 871.

Admissibility of evidence obtained by illegal search and seizure--Supreme Court cases. 93 L. Ed. 1797, 96 L. Ed. 145, 98 L. Ed. 581, 100 L. Ed. 239, 6 L. Ed. 2d 1544.

End of Document

# United States v. Leon

468 U.S. 897 (1984)

Cited in Supplemental Brief at: 6

Caution
As of: September 17, 2026 9:36 PM Z

# United States v. Leon

Supreme Court of the United States

January 17, 1984, Argued ; July 5, 1984, Decided

No. 82-1771

**Reporter**
468 U.S. 897 *; 104 S. Ct. 3405 **; 82 L. Ed. 2d 677 ***; 1984 U.S. LEXIS 153 ****; 52 U.S.L.W. 5155

UNITED STATES v. LEON ET AL.

**Subsequent History:** [****1] Petition for Rehearing Denied September 18, 1984

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** 701 F.2d 187, reversed.

## Syllabus

Acting on the basis of information from a confidential informant, officers of the Burbank, Cal., Police Department initiated a drug-trafficking investigation involving surveillance of respondents' activities. Based on an affidavit summarizing the police officers' observations, Officer Rombach prepared an application for a warrant to search three residences and respondents' automobiles for an extensive list of items. The application was reviewed by several Deputy District Attorneys, and a facially valid search warrant was issued by a state-court judge. Ensuing searches produced large quantities of drugs and other evidence. Respondents were indicted for federal drug offenses, and filed motions to suppress the evidence seized pursuant to the warrant. After an evidentiary hearing, the District Court granted [****2] the motions in part, concluding that the affidavit was insufficient to establish probable cause. Although recognizing that Officer Rombach had acted in good faith, the court rejected the Government's suggestion that the Fourth Amendment exclusionary rule should not apply where evidence is seized in reasonable, good-faith reliance on a search warrant. The Court of Appeals affirmed, also refusing the Government's invitation to recognize a good-faith exception to the rule. The Government's petition for certiorari presented only the question whether a good-faith exception to the exclusionary rule should be recognized.

*Held*:

1. The Fourth Amendment exclusionary rule should not be applied so as to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid. Pp. 905-925.

(a) An examination of the Fourth Amendment's origin and purposes makes clear that the use of fruits of a past unlawful search or seizure works no new Fourth Amendment wrong. The question whether the exclusionary sanction is appropriately imposed in a particular case [****3] as a judicially created remedy to safeguard Fourth Amendment rights through its deterrent effect, must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence. Indiscriminate application of the exclusionary rule -- impeding the criminal justice system's truth-finding function and allowing some guilty defendants to go free -- may well generate disrespect for the law and the administration of justice. Pp. 906-908.

(b) Application of the exclusionary rule should continue where a Fourth Amendment violation has been substantial and deliberate, but the balancing approach that has evolved in determining whether the rule should be applied in a variety of contexts -- including criminal trials -- suggests that the rule should be modified to permit the introduction of evidence obtained by officers reasonably relying on a warrant issued by a detached and neutral magistrate. Pp. 908-913.

(c) The deference accorded to a magistrate's finding of probable cause for the issuance of a warrant does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based, [****4] and the courts must also insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubber stamp for the

police. Moreover, reviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause. However, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Admitting evidence obtained pursuant to a warrant while at the same time declaring that the warrant was somehow defective will not reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests. Pp. 913-917.

(d) Even assuming that the exclusionary rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity. In the ordinary case, an officer cannot be expected to question the [****5] magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law, and penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations. Pp. 918-921.

(e) A police officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable. Suppression remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth, or if the issuing magistrate wholly abandoned his detached and neutral judicial role. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient [****6] -- *i. e.*, in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid. Pp. 922-925.

2. In view of the modification of the exclusionary rule, the Court of Appeals' judgment cannot stand in this case. Only respondent Leon contended that no reasonably well trained police officer could have believed that there existed probable cause to search his house. However, the record establishes that the police officers' reliance on the state-court judge's determination of probable cause was objectively reasonable. Pp. 925-926.

**Counsel:** Solicitor General Lee argued the cause for the United States. With him on the briefs were Assistant Attorney General Trott, Deputy Solicitor General Frey, Kathryn A. Oberly, and Robert J. Erickson.

Barry Tarlow argued the cause for respondent Leon. With him on the brief were Norman Kaplan and Thomas V. Johnston. Roger L. Cossack argued the cause for respondents Stewart et al. With him on the brief was Jay L. Lichtman. *

---

* Briefs of amici curiae urging reversal were filed for the State of California by John K. Van De Kamp, Attorney General, William D. Stein, Chief Assistant Attorney General, and Clifford K. Thompson, Jr., Deputy Attorney General; for the State of Kansas et al. by Wilkes C. Robinson, Dan M. Peterson, Robert T. Stephan, Attorney General of Kansas, John D. Ashcroft, Attorney General of Missouri, Mark V. Meierhenry, Attorney General of South Dakota, and Bronson C. La Follette, Attorney General of Wisconsin; for the Criminal Justice Legal Foundation by Christopher N. Heard; for the National District Attorneys Association, Inc., by Newman A. Flanagan, Austin J. McGuigan, John M. Massameno, Edwin L. Miller, Jr., Jack E. Yelverton, and James P. Manak; and for Seven Former Members of the Attorney General's Task Force on Violent Crime et al. by David L. Crump, Frank G. Carrington, Griffin B. Bell, Wayne W. Schmidt, James P. Manak, Fred E. Inbau, Rufus L. Edmisten, Attorney General of North Carolina, and David S. Crump, Deputy Attorney General.

Briefs of amici curiae urging affirmance were filed for the Bar Association of San Francisco et al. by James J. Brosnahan; for the Arkansas Trial Lawyers Association et al. by John Wesley Hall, Jr.; for the Association of Trial Lawyers of America by Sidney Bernstein; and for the Texas Criminal Defense Lawyers Association et al. by Gerald H. Goldstein and Marvin Miller.

Briefs of amici curiae were filed for the Committee on Criminal Law of the Association of the Bar of the City of New York by Peter L. Zimroth and Barbara D. Underwood; for the Illinois State Bar Association by Michael J. Costello, Albert Hofeld, William J. Martin, and Joshua Sachs; for the Minnesota State Bar Association by Ronald L. Seeger, Steven H. Goldberg, and Bruce H. Hanley; for the National Association of Criminal Defense Lawyers et al. by Marshall W. Krause, Steffan B. Imhoff, and Charles Scott Spear; for the National Association for the Advancement of Colored People et al. by Steven P. Lockman, John M. Campbell, and Thomas I. Atkins; for the

[****7]

**Judges:** WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a concurring opinion, post, p. 927. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, post, p. 928. STEVENS, J., filed a dissenting opinion, post, p. 960.

**Opinion by:** WHITE

# Opinion

[*900] [***684] [**3409] JUSTICE **WHITE** delivered the opinion of the Court.

[1A]This case presents the question whether the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. To resolve this question, we must consider once again the tension between the sometimes competing goals of, on the one hand, deterring official misconduct and removing inducements to unreasonable invasions of privacy and, on the other, establishing procedures under which criminal defendants are "acquitted [*901] or convicted [****8] on the basis of all the evidence which exposes the truth." *Alderman* v. *United States*, 394 U.S. 165, 175 (1969).

I

In August 1981, a confidential informant of unproven reliability informed an officer of the Burbank Police Department that two persons known to him as "Armando" and "Patsy" were selling large quantities of cocaine and methaqualone from their residence at 620 Price Drive in Burbank, Cal. The informant also indicated that he had witnessed a sale of methaqualone by "Patsy" at the residence approximately five months earlier and had observed at that time a shoebox containing a large amount of cash that belonged to "Patsy." He further declared that "Armando" and "Patsy" generally kept only small quantities of drugs at their residence and stored the remainder at another location in Burbank.

On the basis of this information, the Burbank police initiated an extensive investigation focusing first on the Price Drive residence and later on two other residences as well. Cars parked at the Price Drive residence were determined to belong to respondents Armando Sanchez, who had previously been arrested for possession of marihuana, and Patsy Stewart, who had [****9] no criminal record. During the course of the investigation, officers observed an automobile belonging to respondent Ricardo Del Castillo, who had previously been arrested for possession of 50 pounds of marihuana, arrive at the Price Drive residence. The driver of that car entered the house, exited shortly thereafter carrying a small paper sack, and drove away. A check of Del Castillo's probation records led the officers to respondent Alberto Leon, whose telephone number Del Castillo had listed as his employer's. Leon had been arrested in 1980 on drug charges, and a companion had informed the police at that time that Leon was heavily involved in the importation of drugs into this country. Before the current investigation began, the Burbank officers had [*902] learned that an informant had told a Glendale police officer that Leon stored a large quantity of methaqualone at his residence in Glendale. During the course of this investigation, the Burbank officers learned that Leon was living at 716 South Sunset Canyon in Burbank.

Subsequently, the officers observed [***685] several persons, at least one of whom had prior drug involvement, arriving at the Price Drive residence [****10] and leaving with small packages; observed a variety of other material activity at the two residences as well as at a condominium at 7902 Via Magdalena; and witnessed a variety of relevant activity involving respondents' automobiles. The officers also observed respondents Sanchez and Stewart board separate flights for Miami. The pair later returned to Los Angeles together, consented to a search of their luggage that revealed only a small amount of marihuana, and left the airport. Based on these and other observations summarized in the affidavit, App. 34, Officer Cyril Rombach of the Burbank Police Department, an experienced and well-trained narcotics investigator, prepared an application for a warrant to search 620 Price Drive, 716 South Sunset Canyon, 7902 Via Magdalena, and automobiles registered [**3410] to each of the respondents for an extensive list of items believed to be related to respondents' drug-

National Legal Aid and Defender Association by Kenneth M. Mogill; and for Dan Johnston, County Attorney, Polk County, Iowa, by Mr. Johnston, pro se.

trafficking activities. Officer Rombach's extensive application was reviewed by several Deputy District Attorneys.

A facially valid search warrant was issued in September 1981 by a State Superior Court Judge. The ensuing searches produced large quantities of drugs at the [****11] Via Magdalena and Sunset Canyon addresses and a small quantity at the Price Drive residence. Other evidence was discovered at each of the residences and in Stewart's and Del Castillo's automobiles. Respondents were indicted by a grand jury in the District Court for the Central District of California and charged with conspiracy to possess and distribute cocaine and a variety of substantive counts.

[*903] The respondents then filed motions to suppress the evidence seized pursuant to the warrant. [1] The District Court held an evidentiary hearing and, while recognizing that the case was a close one, see *id*., at 131, granted the motions to suppress in part. It concluded that the affidavit was insufficient to establish probable cause, [2] [****13] but did not suppress all of the evidence as to all of the respondents because none of the respondents had standing to challenge all [***686] of the searches. [3] In [*904] response to a request from the Government, the court made clear that Officer Rombach had acted in good faith, but it rejected the Government's suggestion that the Fourth Amendment exclusionary rule should not apply where evidence is seized in reasonable, good-faith [****12] reliance on a search warrant. [4]

[****14] The District Court denied the Government's motion for reconsideration, *id*., at 147, and a divided panel of the Court of Appeals for the Ninth Circuit affirmed, judgt. order reported at 701 F.2d 187 (1983). The Court of Appeals first concluded that Officer Rombach's affidavit could not establish probable cause to search the Price Drive residence. To the extent that the affidavit set forth facts demonstrating the basis of the informant's knowledge of criminal activity, the information included was fatally stale. The affidavit, moreover, failed to establish the informant's credibility. [**3411] Accordingly, the Court of Appeals concluded that the information provided by the informant was inadequate under both prongs of the two-part test established in *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969). [5]

---

[1] Respondent Leon moved to suppress the evidence found on his person at the time of his arrest and the evidence seized from his residence at 716 South Sunset Canyon. Respondent Stewart's motion covered the fruits of searches of her residence at 620 Price Drive and the condominium at 7902 Via Magdalena and statements she made during the search of her residence. Respondent Sanchez sought to suppress the evidence discovered during the search of his residence at 620 Price Drive and statements he made shortly thereafter. He also joined Stewart's motion to suppress evidence seized from the condominium. Respondent Del Castillo apparently sought to suppress all of the evidence seized in the searches. App. 78-80. The respondents also moved to suppress evidence seized in the searches of their automobiles.

[2] "I just cannot find this warrant sufficient for a showing of probable cause.

. . . .

"There is no question of the reliability and credibility of the informant as not being established.

"Some details given tended to corroborate, maybe, the reliability of [the informant's] information about the previous transaction, but if it is not a stale transaction, it comes awfully close to it; and all the other material I think is as consistent with innocence as it is with guilt.

. . . .

"So I just do not think this affidavit can withstand the test. I find, then, that there is no probable cause in this case for the issuance of the search warrant. . . ." *Id*., at 127.

[3] The District Court concluded that Sanchez and Stewart had standing to challenge the search of 620 Price Drive; that Leon had standing to contest the legality of the search of 716 South Sunset Canyon; that none of the respondents had established a legitimate expectation of privacy in the condominium at 7902 Via Magdalena; and that Stewart and Del Castillo each had standing to challenge the searches of their automobiles. The Government indicated that it did not intend to introduce evidence seized from the other respondents' vehicles. *Id*., at 127-129. Finally, the court suppressed statements given by Sanchez and Stewart. *Id*., at 129-130.

[4] "On the issue of good faith, obviously that is not the law of the Circuit, and I am not going to apply that law.

"I will say certainly in my view, there is not any question about good faith. [Officer Rombach] went to a Superior Court judge and got a warrant; obviously laid a meticulous trail. Had surveilled for a long period of time, and I believe his testimony -- and I think he said he consulted with three Deputy District Attorneys before proceeding himself, and I certainly have no doubt about the fact that that is true." *Id*., at 140.

[5] In *Illinois* v. *Gates*, 462 U.S. 213 (1983), decided last Term, the Court abandoned the two-pronged *Aguilar-Spinelli* test for determining whether an informant's tip suffices to establish probable cause for the issuance of a warrant and substituted

The officers' independent investigation neither cured the staleness nor corroborated the details of the informant's declarations. The Court of Appeals then considered whether the affidavit formed a proper basis for the [*905] search of the Sunset Canyon residence. In [****15] its view, the affidavit included no facts indicating the basis for the informants' statements concerning respondent Leon's criminal activities and was devoid of information establishing the informants' reliability. Because these deficiencies had not been cured by the police investigation, the District Court properly suppressed the fruits of the search. The Court of Appeals refused the Government's invitation to recognize a good-faith exception to the Fourth Amendment exclusionary rule. App. to Pet. for Cert. 4a.

[2]The Government's petition for certiorari expressly declined to seek review of the lower courts' [****16] determinations that the search warrant was unsupported by probable cause and presented only the question "[whether] the Fourth Amendment exclusionary rule should be modified [***687] so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." We granted certiorari to consider the propriety of such a modification. 463 U.S. 1206 (1983). Although it undoubtedly is within our power to consider the question whether probable cause existed under the "totality of the circumstances" test announced last Term in *Illinois* v. *Gates*, 462 U.S. 213 (1983), that question has not been briefed or argued; and it is also within our authority, which we choose to exercise, to take the case as it comes to us, accepting the Court of Appeals' conclusion that probable cause was lacking under the prevailing legal standards. See this Court's Rule 21.1(a).

We have concluded that, in the Fourth Amendment context, the exclusionary rule can be modified somewhat without jeopardizing its ability to perform its intended functions. Accordingly, we reverse the judgment of the Court of Appeals.

[****17] II

[3]Language in opinions of this Court and of individual Justices has sometimes implied that the exclusionary rule is a necessary corollary of the Fourth Amendment, *Mapp* v. [*906] *Ohio*, 367 U.S. 643, 651, 655-657 (1961);*Olmstead* v. *United States*, 277 U.S. 438, 462-463 (1928), or that the rule is required by the conjunction of the Fourth and Fifth Amendments. *Mapp* v. *Ohio, supra*, at 661-662 (Black, J., concurring); *Agnello* v. *United States*, 269 U.S. 20, 33-34 (1925). These implications need not detain us long. The Fifth Amendment theory has not withstood critical analysis or the test of time, see *Andresen* v. *Maryland*, 427 U.S. 463 (1976), and the Fourth Amendment "has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons." *Stone* v. *Powell*, 428 U.S. 465, 486 (1976).

A

[4] [****18] The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure "[works] no new Fourth Amendment wrong." *United States* v. *Calandra*, 414 U.S. 338, 354 (1974). The wrong condemned by the Amendment is "fully accomplished" by the unlawful search or seizure itself, *ibid*., and [**3412] the exclusionary rule is neither intended nor able to "cure the invasion of the defendant's rights which he has already suffered." *Stone* v. *Powell, supra*, at 540 (WHITE, J., dissenting). The rule thus operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States* v. *Calandra, supra*, [***688] at 348.

Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is "an issue [****19] separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *Illinois* v. *Gates, supra*, at 223. Only the former question is currently before us, and it must [*907] be resolved by weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective.

The substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights have long been a source of concern. "Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of

in its place a "totality of the circumstances" approach.

governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." *United States* v. *Payner*, 447 U.S. 727, 734 (1980). An objectionable collateral consequence of this interference with the criminal justice system's truth-finding function is that some guilty defendants may go free or receive reduced sentences as a result of favorable plea bargains. [****20] [6] Particularly [*908] when law enforcement [***689] officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system. *Stone* v. *Powell*, 428 U.S., at 490. Indiscriminate application of the exclusionary rule, therefore, may well "[generate] disrespect for the law and administration of justice." *Id*., at 491. Accordingly, "[as] with [**3413] any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States* v. *Calandra, supra*, at 348; see *Stone* v. *Powell, supra*, at 486-487; *United States* v. *Janis*, 428 U.S. 433, 447 (1976).

[****21] B

Close attention to those remedial objectives has characterized our recent decisions concerning the scope of the Fourth Amendment exclusionary rule. The Court has, to be sure, not seriously questioned, "in the absence of a more efficacious sanction, the continued application of the rule to suppress evidence [*909] from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate. . . ." *Franks* v. *Delaware*, 438 U.S. 154, 171 (1978); *Stone* v. *Powell, supra*, at 492. Nevertheless, the balancing approach that has evolved in various contexts -- including criminal trials -- "forcefully [suggests] that the exclusionary rule be more generally modified to permit the introduction of evidence obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." *Illinois* v. *Gates*, 462 U.S., at 255 (WHITE, J., concurring in judgment).

In *Stone* v. *Powell, supra*, the Court emphasized the costs of the exclusionary rule, expressed its [****22] view that limiting the circumstances under which Fourth Amendment claims could be raised in federal habeas corpus proceedings would not reduce the rule's deterrent effect, *id*., at 489-495, and held that a state prisoner who has been afforded a full and fair opportunity to litigate a Fourth Amendment claim may not obtain federal habeas relief on the ground that unlawfully obtained evidence had been introduced at his trial. Cf. *Rose* v. *Mitchell*, 443 U.S. 545, 560-563 (1979). Proposed extensions of the exclusionary rule to proceedings other than the criminal trial itself have been evaluated and rejected under the same analytic approach. In *United States* v. *Calandra*, for example,

---

[6] Researchers have only recently begun to study extensively the effects of the exclusionary rule on the disposition of felony arrests. One study suggests that the rule results in the nonprosecution or nonconviction of between 0.6% and 2.35% of individuals arrested for felonies. Davies, A Hard Look at What We Know (and Still Need to Learn) About the "Costs" of the Exclusionary Rule: The NIJ Study and Other Studies of "Lost" Arrests, 1983 A. B. F. Res. J. 611, 621. The estimates are higher for particular crimes the prosecution of which depends heavily on physical evidence. Thus, the cumulative loss due to nonprosecution or nonconviction of individuals arrested on felony drug charges is probably in the range of 2.8% to 7.1%. *Id*., at 680. Davies' analysis of California data suggests that screening by police and prosecutors results in the release because of illegal searches or seizures of as many as 1.4% of all felony arrestees, *id*., at 650, that 0.9% of felony arrestees are released, because of illegal searches or seizures, at the preliminary hearing or after trial, *id*., at 653, and that roughly 0.05% of all felony arrestees benefit from reversals on appeal because of illegal searches. *Id*., at 654. See also K. Brosi, A Cross-City Comparison of Felony Case Processing 16, 18-19 (1979); U.S. General Accounting Office, Report of the Comptroller General of the United States, Impact of the Exclusionary Rule on Federal Criminal Prosecutions 10-11, 14 (1979); F. Feeney, F. Dill, & A. Weir, Arrests Without Convictions: How Often They Occur and Why 203-206 (National Institute of Justice 1983); National Institute of Justice, The Effects of the Exclusionary Rule: A Study in California 1-2 (1982); Nardulli, The Societal Cost of the Exclusionary Rule: An Empirical Assessment, 1983 A. B. F. Res. J. 585, 600. The exclusionary rule also has been found to affect the plea-bargaining process. S. Schlesinger, Exclusionary Injustice: The Problem of Illegally Obtained Evidence 63 (1977). But see Davies, *supra*, at 668-669; Nardulli, *supra*, at 604-606.

Many of these researchers have concluded that the impact of the exclusionary rule is insubstantial, but the small percentages with which they deal mask a large absolute number of felons who are released because the cases against them were based in part on illegal searches or seizures. "[Any] rule of evidence that denies the jury access to clearly probative and reliable evidence must bear a heavy burden of justification, and must be carefully limited to the circumstances in which it will pay its way by deterring official unlawlessness." *Illinois* v. *Gates*, 462 U.S., at 257-258 (WHITE, J., concurring in judgment). Because we find that the rule can have no substantial deterrent effect in the sorts of situations under consideration in this case, see *infra*, at 916-921, we conclude that it cannot pay its way in those situations.

we declined to allow grand jury witnesses to refuse to answer questions based on evidence obtained from an unlawful search or seizure since "[any] incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best." 414 U.S., at 348. [***690] Similarly, in *United States* v. *Janis, supra*, we permitted the use in federal civil proceedings of evidence illegally seized by [****23] state officials since the likelihood of deterring police misconduct through such an extension of the exclusionary rule was insufficient to outweigh its substantial social costs. In so doing, we declared that, "[if] . . . the exclusionary rule does not result in appreciable deterrence, then, clearly, its use in the instant situation is unwarranted." *Id*., at 454.

[*910] [5]As cases considering the use of unlawfully obtained evidence in criminal trials themselves make clear, it does not follow from the emphasis on the exclusionary rule's deterrent value that "anything which deters illegal searches is thereby commanded by the Fourth Amendment." *Alderman* v. *United States*, 394 U.S., at 174. In determining whether persons aggrieved solely by the introduction of damaging evidence unlawfully obtained from their co-conspirators or codefendants could seek suppression, for example, we found that the additional benefits of such an extension of the exclusionary rule would not outweigh its costs. *Id*., at 174-175. Standing to invoke the rule has thus been [****24] limited to cases in which the prosecution seeks to use the fruits of an illegal search or seizure against the victim of police misconduct. *Rakas* v. *Illinois*, 439 U.S. 128 (1978); *Brown* v. *United States*, 411 U.S. 223 (1973); *Wong Sun* v. *United States*, 371 U.S. 471, 491-492 (1963). Cf. *United States* v. *Payner*, 447 U.S. 727 (1980).

[6][7]Even defendants with standing to challenge the introduction in their criminal [**3414] trials of unlawfully obtained evidence cannot prevent every conceivable use of such evidence. Evidence obtained in violation of the Fourth Amendment and inadmissible in the prosecution's case in chief may be used to impeach a defendant's direct testimony. *Walder* v. *United States*, 347 U.S. 62 (1954). See also *Oregon* v. *Hass*, 420 U.S. 714 (1975); *Harris* v. *New York*, 401 U.S. 222 (1971). [****25] A similar assessment of the "incremental furthering" of the ends of the exclusionary rule led us to conclude in *United States* v. *Havens*, 446 U.S. 620, 627 (1980), that evidence inadmissible in the prosecution's case in chief or otherwise as substantive evidence of guilt may be used to impeach statements made by a defendant in response to "proper cross-examination reasonably suggested by the defendant's direct examination." *Id*., at 627-628.

[8]When considering the use of evidence obtained in violation of the Fourth Amendment in the prosecution's case in chief, moreover, we have declined to adopt a *per se* or "but for" rule [*911] that would render inadmissible any evidence that came to light through a chain of causation that began with an illegal arrest. *Brown* v. *Illinois*, 422 U.S. 590 (1975); *Wong Sun* v. *United States, supra*, at 487-488. We also have held that a witness' testimony may be admitted even when his identity was [****26] discovered in [***691] an unconstitutional search. *United States* v. *Ceccolini*, 435 U.S. 268 (1978). The perception underlying these decisions -- that the connection between police misconduct and evidence of crime may be sufficiently attenuated to permit the use of that evidence at trial -- is a product of considerations relating to the exclusionary rule and the constitutional principles it is designed to protect. *Dunaway* v. *New York*, 442 U.S. 200, 217-218 (1979); *United States* v. *Ceccolini, supra*, at 279. [7] In short, the "dissipation of the taint" concept that the Court has applied in deciding whether exclusion is appropriate in a particular case "attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Brown* v. *Illinois, supra*, at 609 (POWELL, J., concurring in part). Not surprisingly in view of this purpose, an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus. *Dunaway* v. *New York, supra*, at 218; [****27] *Brown* v. *Illinois, supra*, at 603-604.

The same attention to the purposes underlying the exclusionary rule also has characterized decisions not involving the scope of the rule itself. We have not

---

[7] "*Brown*'s focus on 'the causal connection between the illegality and the confession' reflected the two policies behind the use of the exclusionary rule to effectuate the Fourth Amendment. Where there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts." *Dunaway* v. *New York*, 442 U.S., at 217-218 (citation omitted).

required suppression of the fruits of a search incident to an arrest made in good-faith reliance on a substantive criminal statute that subsequently [*912] is declared unconstitutional. *Michigan* v. *DeFillippo*, 443 U.S. 31 (1979). [****28] [8] [****29] Similarly, although the Court has been unwilling to conclude that new Fourth Amendment principles are always to have only prospective effect, *United States* v. [**3415] *Johnson*, 457 U.S. 537, 560 (1982), [9] no [***692] Fourth Amendment decision marking a "clear break with the past" has been applied retroactively. See *United States* v. *Peltier*, 422 U.S. 531 (1975); *Desist* v. *United States*, 394 U.S. 244 (1969); *Linkletter* v. *Walker*, 381 U.S. 618 (1965). [10] The propriety [*913] of retroactive application of a newly announced Fourth Amendment principle, moreover, has been assessed largely in terms of the contribution retroactivity might make to the deterrence of police misconduct. *United States* v. *Johnson, supra*, at 560-561; *United States* v. *Peltier, supra*, at 536-539, 542.

[****30] As yet, we have not recognized any form of good-faith exception to the Fourth Amendment exclusionary rule. [11] But the balancing approach that has evolved during the years of experience with the rule provides strong support for the modification currently urged upon us. As we discuss below, our evaluation of the costs and benefits of suppressing reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate leads to the conclusion that such evidence should be admissible in the prosecution's case in chief.

[****31] III

A

Because a search warrant "provides the detached scrutiny of a neutral magistrate, [**3416] which is a more reliable safeguard [*914] against improper [***693] searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime,'" *United States* v. *Chadwick*, 433 U.S. 1, 9 (1977) (quoting *Johnson* v.

---

[8] We have held, however, that the exclusionary rule requires suppression of evidence obtained in searches carried out pursuant to statutes, not yet declared unconstitutional, purporting to authorize searches and seizures without probable cause or search warrants. See, *e. g., Ybarra* v. *Illinois*, 444 U.S. 85 (1979); *Torres* v. *Puerto Rico*, 442 U.S. 465 (1979); *Almeida-Sanchez* v. *United States*, 413 U.S. 266 (1973); *Sibron* v. *New York*, 392 U.S. 40 (1968); *Berger* v. *New York*, 388 U.S. 41 (1967). "Those decisions involved statutes which, by their own terms, authorized searches under circumstances which did not satisfy the traditional warrant and probable-cause requirements of the Fourth Amendment." *Michigan* v. *DeFillippo*, 443 U.S. at 39. The substantive Fourth Amendment principles announced in those cases are fully consistent with our holding here.

[9] The Court held in *United States* v. *Johnson*, that a construction of the Fourth Amendment that did not constitute a "clear break with the past" is to be applied to all convictions not yet final when the decision was handed down. The limited holding, see 457 U.S., at 562, turned in part on the Court's judgment that "[failure] to accord *any* retroactive effect to Fourth Amendment rulings would 'encourage police or other courts to disregard the plain purport of our decisions and to adopt a let's-wait-until-it's-decided approach.'" *Id.*, at 561 (emphasis in original) (quoting *Desist* v. *United States*, 394 U.S. 244, 277 (1969) (Fortas, J., dissenting)). Contrary to respondents' assertions, nothing in *Johnson* precludes adoption of a good-faith exception tailored to situations in which the police have reasonably relied on a warrant issued by a detached and neutral magistrate but later found to be defective.

[10] Our retroactivity decisions have, for the most part, turned on our assessments of "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Stovall* v. *Denno*, 388 U.S. 293, 297 (1967). As we observed earlier this Term:

"In considering the reliance factor, this Court's cases have looked primarily to whether law enforcement authorities and state courts have justifiably relied on a prior rule of law said to be different from that announced by the decision whose retroactivity is at issue. Unjustified 'reliance' is no bar to retroactivity. This inquiry is often phrased in terms of whether the new decision was foreshadowed by earlier cases or was a 'clear break with the past.'" *Solem* v. *Stumes*, 465 U.S. 638, 645-646 (1984).

[11] Members of the Court have, however, urged reconsideration of the scope of the exclusionary rule. See, *e. g., Stone* v. *Powell*, 428 U.S. 465, 496 (1976) (BURGER, C. J., concurring); *id.*, at 536 (WHITE, J., dissenting); *Illinois* v. *Gates*, 462 U.S., at 254-267 (WHITE, J., concurring in judgment); *Brown* v. *Illinois*, 422 U.S. 590, 609-612 (1975) (POWELL, J., concurring in part); *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 261-271 (1973) (POWELL, J., concurring); *California* v. *Minjares*, 443 U.S. 916 (1979) (REHNQUIST, J., dissenting from denial of stay). One Court of Appeals, no doubt influenced by these individual urgings, has adopted a form of good-faith exception to the exclusionary rule. *United States* v. *Williams*, 622 F.2d 830 (CA5 1980) (en banc), cert. denied, 449 U.S. 1127 (1981).

*United States*, 333 U.S. 10, 14 (1948)), we have expressed a strong preference for warrants and declared that "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *United States* v. *Ventresca*, 380 U.S. 102, 106 (1965). See *Aguilar* v. *Texas*, 378 U.S., at 111. Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according "great deference" to a magistrate's determination. *Spinelli* v. *United States*, 393 U.S., at 419. [****32] See *Illinois* v. *Gates*, 462 U.S., at 236; *United States* v. *Ventresca, supra*, at 108-109.

[9][10]Deference to the magistrate, however, is not boundless. It is clear, first, that the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based. *Franks* v. *Delaware*, 438 U.S. 154 (1978). [12] Second, the courts must also insist that the magistrate purport to "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." *Aguilar* v. *Texas, supra*, at 111. See *Illinois* v. *Gates, supra*, at 239. A magistrate failing to "manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application" and who acts instead as "an adjunct law enforcement officer" cannot provide valid authorization for an otherwise unconstitutional search. *Lo-Ji Sales,* [****33] *Inc*. v. *New York*, 442 U.S. 319, 326-327 (1979).

[*915] [11][12]Third, reviewing courts will not defer to a warrant based on an affidavit that does not "provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois* v. *Gates*, 462 U.S., at 239. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Ibid*. See *Aguilar* v. *Texas, supra*, at 114-115;*Giordenello* v. *United States*, 357 U.S. 480 (1958); [****34] *Nathanson* v. *United States*, 290 U.S. 41 (1933).[13] [***694] Even if the warrant application was supported by more than a "bare bones" affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the [**3417] warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances, *Illinois* v. *Gates, supra*, at 238-239, or because the form of the warrant was improper in some respect.

[****35] Only in the first of these three situations, however, has the Court set forth a rationale for suppressing evidence obtained pursuant to a search warrant; in the other areas, it has simply excluded such evidence without considering whether [*916] Fourth Amendment interests will be advanced. To the extent that proponents of exclusion rely on its behavioral effects on judges and magistrates in these areas, their reliance is misplaced. First, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion. [14]

---

[12] Indeed, "it would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." 438 U.S., at 165.

[13] See also *Beck* v. *Ohio*, 379 U.S. 89 (1964), in which the Court concluded that "the record . . . does not contain a single objective fact to support a belief by the officers that the petitioner was engaged in criminal activity at the time they arrested him." *Id*., at 95. Although the Court was willing to assume that the arresting officers acted in good faith, it concluded:

"'[Good] faith on the part of the arresting officers is not enough.' *Henry* v. *United States*, 361 U.S. 98, 102. If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Id*., at 97.

We adhere to this view and emphasize that nothing in this opinion is intended to suggest a lowering of the probable-cause standard. On the contrary, we deal here only with the remedy to be applied to a concededly unconstitutional search.

[14] Although there are assertions that some magistrates become rubber stamps for the police and others may be unable effectively to screen police conduct, see, *e. g*., 2 W. LaFave, Search and Seizure § 4.1 (1978); Kamisar, Does (Did) (Should) The Exclusionary Rule Rest on a "Principled Basis" Rather than an "Empirical Proposition"?, 16 Creighton L. Rev. 565, 569-571 (1983); Schroeder, Deterring Fourth Amendment Violations: Alternatives to the Exclusionary Rule,

[****36] Third, and most important, we discern no basis, and are offered none, for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate. [15] [****38] Many of the factors [*917] that indicate [***695] that the exclusionary rule cannot provide an effective "special" or "general" deterrent for individual offending law enforcement officers [16] apply as well to judges or magistrates. And, to the extent that the rule is thought to operate as a "systemic" deterrent on a wider audience, [17] it clearly can have no such effect on individuals empowered to issue search warrants. Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions. The threat of exclusion thus cannot be expected significantly to deter them. Imposition of the exclusionary sanction is not necessary meaningfully to inform judicial officers of their errors, and we cannot conclude that admitting evidence obtained [**3418] pursuant to a warrant while at the same time declaring that the warrant was somehow defective will in any way [****37] reduce judicial officers' professional incentives to comply with the Fourth Amendment, encourage them to repeat their mistakes, or lead to the granting of all colorable warrant requests. [18]

[****39] [*918] B

[13]If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, therefore, it must alter the behavior of individual law enforcement officers or the policies of their departments. One could argue that applying the exclusionary rule in cases where the police failed to demonstrate probable cause in the warrant application deters future inadequate presentations or "magistrate shopping" and thus promotes the ends of the Fourth Amendment. Suppressing evidence obtained pursuant to a technically defective warrant supported by probable cause also might encourage officers to scrutinize more closley the form of the warrant and to point out suspected judicial errors. We find such arguments speculative and conclude that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule. [19]

---

69 Geo. L. J. 1361, 1412 (1981), we are not convinced that this is a problem of major proportions. See L. Tiffany, D. McIntyre, & D. Rotenberg, Detection of Crime 119 (1967); Israel, Criminal Procedure, the Burger Court, and the Legacy of the Warren Court, 75 Mich. L. Rev. 1319, 1414, n. 396 (1977); P. Johnson, New Approaches to Enforcing the Fourth Amendment 8-10 (Working Paper, Sept. 1978), quoted in Y. Kamisar, W. LaFave, & J. Israel, Modern Criminal Procedure 229-230 (5th ed. 1980); R. Van Duizend, L. Sutton, & C. Carter, The Search Warrant Process, ch. 7 (Review Draft, National Center for State Courts, 1983).

[15] As the Supreme Judicial Court of Massachusetts recognized in *Commonwealth* v. *Sheppard*, 387 Mass. 488, 506, 441 N. E. 2d 725, 735 (1982):

"The exclusionary rule may not be well tailored to deterring judicial misconduct. If applied to judicial misconduct, the rule would be just as costly as it is when it is applied to police misconduct, but it may be ill-fitted to the job-created motivations of judges. . . . [Ideally] a judge is impartial as to whether a particular piece of evidence is admitted or a particular defendant convicted. Hence, in the abstract, suppression of a particular piece of evidence may not be as effective a disincentive to a neutral judge as it would be to the police. It may be that a ruling by an appellate court that a search warrant was unconstitutional would be sufficient to deter similar conduct in the future by magistrates."

But see *United States* v. *Karathanos*, 531 F.2d 26, 33-34 (CA2), cert. denied, 428 U.S. 910 (1976).

[16] See, *e. g., Stone* v. *Powell*, 428 U.S., at 498 (BURGER, C. J., concurring); Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 709-710 (1970).

[17] See, *e. g., Dunaway* v. *New York*, 442 U.S. 220, 221 (1979) (STEVENS, J., concurring); Mertens & Wasserstrom, The Good Faith Exception to the Exclusionary Rule: Deregulating the Police and Derailing the Law, 70 Geo. L. J. 365, 399-401 (1981).

[18] Limiting the application of the exclusionary sanction may well increase the care with which magistrates scrutinize warrant applications. We doubt that magistrates are more desirous of avoiding the exclusion of evidence obtained pursuant to warrants they have issued than of avoiding invasions of privacy.

Federal magistrates, moreover, are subject to the direct supervision of district courts. They may be removed for "incompetency, misconduct, neglect of duty, or physical or mental disability." 28 U. S. C. § 631(i). If a magistrate serves merely as a "rubber stamp" for the police or is unable to exercise mature judgment, closer supervision or removal provides a more effective remedy than the exclusionary rule.

[19] Our discussion of the deterrent effect of excluding evidence obtained in reasonable reliance on a subsequently invalidated warrant assumes, of course, that the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant. Cf. *Massachusetts* v. *Sheppard, post*, at 989,

[****40] [14]We [***696] have frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment. "No empirical researcher, proponent or opponent of the rule, has yet been able to establish with any assurance whether the rule has a deterrent effect. . . ." *United States* v. *Janis*, 428 U.S., at 452, n. 22. But even assuming that the rule effectively [*919] deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.

As we observed in *Michigan* v. *Tucker*, 417 U.S. 433, 447 (1974), and reiterated in *United States* v. *Peltier*, 422 U.S., at 539:

"The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has [****41] deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."

The *Peltier* Court continued, *id*., at 542:

[**3419] "If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."

See also *Illinois* v. *Gates*, 462 U.S., at 260-261 (WHITE, J., concurring in judgment); *United States* v. *Janis, supra*, at 459; *Brown* v. *Illinois*, 422 U.S., at 610-611 (POWELL, J., concurring in part). [20] In short, where the officer's [***697] [****42] conduct is objectively reasonable,

[*920] "excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." *Stone* v. *Powell*, 428 U.S., at 539-540 (WHITE, J., dissenting).

[****43] This is particularly true, we believe, when an

---

n. 6 ("[It] was not unreasonable for the police in this case to rely on the judge's assurances that the warrant authorized the search they had requested").

[20] We emphasize that the standard of reasonableness we adopt is an objective one. Many objections to a good-faith exception assume that the exception will turn on the subjective good faith of individual officers. "Grounding the modification in objective reasonableness, however, retains the value of the exclusionary rule as an incentive for the law enforcement profession as a whole to conduct themselves in accord with the Fourth Amendment." *Illinois* v. *Gates*, 462 U.S., at 261, n. 15 (WHITE, J., concurring in judgment); see *Dunaway* v. *New York*, 442 U.S., at 221 (STEVENS, J., concurring). The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits. *United States* v. *Peltier*, 422 U.S. 531, 542 (1975). As Professor Jerold Israel has observed:

"The key to the [exclusionary] rule's effectiveness as a deterrent lies, I believe, in the impetus it has provided to police training programs that make officers aware of the limits imposed by the fourth amendment and emphasize the need to operate within those limits. [An objective good-faith exception] is not likely to result in the elimination of such programs, which are now viewed as an important aspect of police professionalism. Neither is it likely to alter the tenor of those programs; the possibility that illegally obtained evidence may be admitted in borderline cases is unlikely to encourage police instructors to pay less attention to fourth amendment limitations. Finally, [it] should not encourage officers to pay less attention to what they are taught, as the requirement that the officer act in 'good faith' is inconsistent with closing one's mind to the possibility of illegality." Israel, *supra* n. 14, at 1412-1413 (footnotes omitted).

officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope. [21] [****44] In most [*921] such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. "[Once] the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." *Id.*, at 498 (BURGER, C. J., concurring). Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations. [22]

[****45] [*922] [**3420] C

[***698] [15A]We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion. We do not suggest, however, that exclusion is always inappropriate in cases where an officer has obtained a warrant and abided by its terms. "[Searches] pursuant to a warrant will rarely require any deep inquiry into reasonableness," *Illinois* v. *Gates*, 462 U.S., at 267 (WHITE, J., concurring in judgment), for "a warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search." *United States* v. *Ross*, 456 U.S. 798, 823, n. 32 (1982). Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, cf. *Harlow* v. *Fitzgerald*, 457 U.S. 800, 815-819 (1982), [****46] [23] [****47] and it is

---

[21] According to the Attorney General's Task Force on Violent Crime, Final Report (1981), the situation in which an officer relies on a duly authorized warrant

"is a particularly compelling example of good faith. A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions. Accordingly, we believe that there should be a rule which states that evidence obtained pursuant to and within the scope of a warrant is prima facie the result of good faith on the part of the officer seizing the evidence." *Id.*, at 55.

[22] To the extent that JUSTICE STEVENS' conclusions concerning the integrity of the courts, *post*, at 976-978, rest on a foundation other than his judgment, which we reject, concerning the effects of our decision on the deterrence of police illegality, we find his argument unpersuasive. "Judicial integrity clearly does not mean that the courts must never admit evidence obtained in violation of the Fourth Amendment." *United States* v. *Janis*, 428 U.S. 433, 458, n. 35 (1976). "While courts, of course, must ever be concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for the exclusion of highly probative evidence." *Stone* v. *Powell*, 428 U.S., at 485. Our cases establish that the question whether the use of illegally obtained evidence in judicial proceedings represents judicial participation in a Fourth Amendment violation and offends the integrity of the courts

"is essentially the same as the inquiry into whether exclusion would serve a deterrent purpose. . . . The analysis showing that exclusion in this case has no demonstrated deterrent effect and is unlikely to have any significant such effect shows, by the same reasoning, that the admission of the evidence is unlikely to encourage violations of the Fourth Amendment." *United States* v. *Janis, supra*, at 459, n. 35.

Absent unusual circumstances, when a Fourth Amendment violation has occurred because the police have reasonably relied on a warrant issued by a detached and neutral magistrate but ultimately found to be defective, "the integrity of the courts is not implicated." *Illinois* v. *Gates, supra*, at 259, n. 14 (WHITE, J., concurring in judgment). See *Stone* v. *Powell*, 428 U.S., at 485, n. 23; *id.*, at 540 (WHITE, J., dissenting); *United States* v. *Peltier*, 422 U.S. 531, 536-539 (1975).

[23] [15B]

In *Harlow*, we eliminated the subjective component of the qualified immunity public officials enjoy in suits seeking damages for alleged deprivations of constitutional rights. The situations are not perfectly analogous, but we also eschew inquiries into the subjective beliefs of law enforcement officers who seize evidence pursuant to a subsequently invalidated warrant. Although we have suggested that, "[on] occasion, the motive with which the officer conducts an illegal search may have some relevance in determining the propriety of applying the exclusionary rule," *Scott* v. *United States*, 436 U.S. 128, 139, n. 13 (1978), we believe that "sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources." *Massachusetts* v. *Painten*, 389 U.S. 560, 565 (1968) (WHITE, J., dissenting). Accordingly, our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the

clear that in some circumstances [*923] the officer [24] will have no reasonable grounds for believing that the warrant was properly issued.

[**3421] [16]Suppression therefore remains an appropriate remedy if the magistrate [***699] or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. [****48] *Franks* v. *Delaware*, 438 U.S. 154 (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc*. v. *New York*, 442 U.S. 319 (1979); in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown* v. *Illinois*, 422 U.S., at 610-611 (POWELL, J., concurring in part); see *Illinois* v. *Gates, supra*, at 263-264 (WHITE, J., concurring in judgment). Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient -- *i. e.*, in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid. Cf. *Massachusetts* v. *Sheppard, post*, at 988-991.

In so limiting the suppression remedy, we leave untouched the probable-cause standard and [****49] the various requirements for a valid warrant. Other objections to the modification of [*924] the Fourth Amendment exclusionary rule we consider to be insubstantial. The good-faith exception for searches conducted pursuant to warrants is not intended to signal our unwillingness strictly to enforce the requirements of the Fourth Amendment, and we do not believe that it will have this effect. As we have already suggested, the good-faith exception, turning as it does on objective reasonableness, should not be difficult to apply in practice. When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time.

[17]Nor are we persuaded that application of a good-faith exception to searches conducted pursuant to warrants will preclude review of the constitutionality of the search or seizure, deny needed guidance from the courts, or freeze Fourth Amendment law in its present state. [25] There is no need for courts to adopt the inflexible practice of always deciding whether the officers' conduct manifested [****50] objective good faith before turning to the question whether the Fourth Amendment has been violated. Defendants seeking suppression of the fruits of allegedly unconstitutional searches or seizures undoubtedly raise live controversies which Art. III empowers federal courts to adjudicate. As cases addressing questions of good-faith immunity under 42 U. S. C. § 1983, compare *O'Connor* v. *Donaldson*, 422 U.S. 563 (1975), with *Procunier* v. *Navarette*, 434 U.S. 555, 566, n. 14 [***700] (1978), and cases involving the harmless-error doctrine, compare *Milton* v. *Wainwright*, 407 U.S. 371, 372 (1972), with *Coleman* v. *Alabama*, 399 U.S. 1 (1970), make clear, courts have considerable [*925] discretion in conforming their decisionmaking processes to the exigencies of particular cases.

[****51] [18]If the resolution of a particular Fourth Amendment question is necessary to guide future action by law enforcement officers and magistrates, nothing will prevent reviewing courts from deciding that question [**3422] before turning to the good-faith issue. [26]

---

circumstances -- including whether the warrant application had previously been rejected by a different magistrate -- may be considered.

[24] References to "officer" throughout this opinion should not be read too narrowly. It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination. Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a "bare bones" affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search. See *Whiteley* v. *Warden*, 401 U.S. 560, 568 (1971).

[25] The argument that defendants will lose their incentive to litigate meritorious Fourth Amendment claims as a result of the good-faith exception we adopt today is unpersuasive. Although the exception might discourage presentation of insubstantial suppression motions, the magnitude of the benefit conferred on defendants by a successful motion makes it unlikely that litigation of colorable claims will be substantially diminished.

[26] It has been suggested, in fact, that "the recognition of a 'penumbral zone,' within which an inadvertent mistake would

Indeed, it frequently will be difficult to determine whether the officers acted reasonably without resolving the Fourth Amendment issue. Even if the Fourth Amendment question is not one of broad import, reviewing courts could decide in particular cases that magistrates under their supervision need to be informed of their errors and so evaluate the officers' good faith only after finding a violation. In other circumstances, those courts could reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith. We have no reason to believe that our Fourth Amendment jurisprudence would suffer by allowing reviewing courts to exercise an informed discretion in making this choice.

[****52] IV

When the principles we have enunciated today are applied to the facts of this case, it is apparent that the judgment of the Court of Appeals cannot stand. The Court of Appeals applied the prevailing legal standards to Officer Rombach's warrant application and concluded that the application could not support the magistrate's probable-cause determination. In so doing, the court clearly informed the magistrate that he [*926] had erred in issuing the challenged warrant. This aspect of the court's judgment is not under attack in this proceeding.

Having determined that the warrant should not have issued, the Court of Appeals understandably declined to adopt a modification of the Fourth Amendment exclusionary rule that this Court had not previously sanctioned. Although the modification finds strong support in our previous cases, the Court of Appeals' commendable self-restraint is not to be criticized. We have now reexamined the purposes of the exclusionary rule and the propriety of its application in cases where officers have relied on a subsequently invalidated search warrant. Our conclusion is that the rule's purposes will only rarely be served by applying it in such circumstances.

[****53] [1B] [19] [20]In the absence of an [***701] allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause. Only respondent Leon has contended that no reasonably well trained police officer could have believed that there existed probable cause to search his house; significantly, the other respondents advance no comparable argument. Officer Rombach's application for a warrant clearly was supported by much more than a "bare bones" affidavit. The affidavit related the results of an extensive investigation and, as the opinions of the divided panel of the Court of Appeals make clear, provided evidence sufficient to create disagreement among thoughtful and competent [****54] judges as to the existence of probable cause. Under these circumstances, the officers' reliance on the magistrate's determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion is inappropriate.

Accordingly, the judgment of the Court of Appeals is

*Reversed*.

**Concur by:** BLACKMUN (In Part)

## Concur

[*927] JUSTICE BLACKMUN, concurring.

The Court today holds that evidence obtained in violation of the Fourth Amendment by officers acting in objectively reasonable reliance on a search warrant issued by a neutral and detached magistrate need not be excluded, as a matter of federal law, [**3423] from the case in chief of federal and state criminal prosecutions. In so doing, the Court writes another chapter in the volume of Fourth Amendment law opened by *Weeks* v. *United States*, 232 U.S. 383 (1914). I join the Court's opinion in this case and the one in *Massachusetts* v. *Sheppard, post*, p. 981, because I believe that the rule announced today advances the legitimate interests of the criminal justice system without sacrificing the individual rights protected by the Fourth Amendment. I write separately, [****55] however, to underscore what I regard as the unavoidably provisional nature of today's decisions.

As the Court's opinion in this case makes clear, the Court has narrowed the scope of the exclusionary rule

---

not call for exclusion, . . . will make it less tempting for judges to bend fourth amendment standards to avoid releasing a possibly dangerous criminal because of a minor and unintentional miscalculation by the police." Schroeder, *supra* n. 14, at 1420-1421 (footnote omitted); see Ashdown, Good Faith, the Exclusionary Remedy, and Rule-Oriented Adjudication in the Criminal Process, 24 Wm. & Mary L. Rev. 335, 383-384 (1983).

because of an empirical judgment that the rule has little appreciable effect in cases where officers act in objectively reasonable reliance on search warrants. See *ante*, at 918-921. Because I share the view that the exclusionary rule is not a constitutionally compelled corollary of the Fourth Amendment itself, see *ante*, at 905-906, I see no way to avoid making an empirical judgment of this sort, and I am satisfied that the Court has made the correct one on the information before it. Like all courts, we face institutional limitations on our ability to gather information about "legislative facts," and the exclusionary rule itself has exacerbated the shortage of hard data concerning the behavior of police officers in the absence of such a rule. See *United States* v. *Janis*, 428 U.S. 433, 448-453 (1976). Nonetheless, we cannot escape the responsibility to [***702] decide the question before us, however imperfect our information may be, and I am prepared [****56] to join the Court on the information now at hand.

[*928] What must be stressed, however, is that any empirical judgment about the effect of the exclusionary rule in a particular class of cases necessarily is a provisional one. By their very nature, the assumptions on which we proceed today cannot be cast in stone. To the contrary, they now will be tested in the real world of state and federal law enforcement, and this Court will attend to the results. If it should emerge from experience that, contrary to our expectations, the good-faith exception to the exclusionary rule results in a material change in police compliance with the Fourth Amendment, we shall have to reconsider what we have undertaken here. The logic of a decision that rests on untested predictions about police conduct demands no less.

If a single principle may be drawn from this Court's exclusionary rule decisions, from *Weeks* through *Mapp* v. *Ohio*, 367 U.S. 643 (1961), to the decisions handed down today, it is that the scope of the exclusionary rule is subject to change in light of changing judicial understanding about the effects of the rule outside the confines of the courtroom. [****57] It is incumbent on the Nation's law enforcement officers, who must continue to observe the Fourth Amendment in the wake of today's decisions, to recognize the double-edged nature of that principle.

**Dissent by:** BRENNAN; STEVENS

## Dissent

JUSTICE BRENNAN, with whom JUSTICE **MARSHALL** joins, dissenting. *

Ten years ago in *United States* v. *Calandra*, 414 U.S. 338 (1974), I expressed the fear that the Court's decision "may signal that a majority of my colleagues have positioned themselves to reopen the door [to evidence secured by official lawlessness] still further and abandon altogether the exclusionary rule in search-and-seizure cases." *Id.*, at 365 (dissenting opinion). Since then, in case after case, I have witnessed the Court's gradual but determined strangulation [*929] of the rule. [1] It now appears that the Court's victory over the Fourth Amendment is complete. That today's [****58] decisions represent the *piece de resistance* of the Court's past efforts cannot be doubted, for today the Court sanctions the use in the prosecution's case in chief of illegally obtained evidence against the individual whose rights have been violated -- a result that had previously been thought to be foreclosed.

The Court seeks to justify this result on the ground that the "costs" of adhering to the exclusionary rule in cases like those before us exceed the "benefits." But the language of [***703] deterrence and [****59] of cost/benefit analysis, if used indiscriminately, can have a narcotic effect. It creates an illusion of technical precision and ineluctability. It suggests that not only constitutional principle but also empirical data support the majority's result. When the Court's analysis is examined carefully, however, it is clear that we have not been treated to an honest assessment of the merits of the exclusionary rule, but have instead been drawn into a curious world where the "costs" of excluding illegally obtained evidence loom to exaggerated heights and where the "benefits" of such exclusion are made to disappear with a mere wave of the hand.

The majority ignores the fundamental constitutional

---

* [This opinion applies also to No. 82-963, *Massachusetts* v. *Sheppard*, *post*, p. 981.]

[1] See, *e. g., United States* v. *Peltier*, 422 U.S. 531, 544 (1975) (BRENNAN, J., dissenting); *United States* v. *Janis*, 428 U.S. 433, 460 (1976) (BRENNAN, J., dissenting); *Stone* v. *Powell*, 428 U.S. 465, 502 (1976) (BRENNAN, J., dissenting); *Michigan* v. *DeFillippo*, 443 U.S. 31, 41 (1979) (BRENNAN, J., dissenting); *United States* v. *Havens*, 446 U.S. 620, 629 (1980) (BRENNAN, J., dissenting).

importance of what is at stake here. While the machinery of law enforcement and indeed the nature of crime itself have changed dramatically since the Fourth Amendment became part of the Nation's fundamental law in 1791, what the Framers understood then remains true today -- that the task of combating crime and convicting the guilty will in every era seem of such critical and pressing concern that we may be lured by the temptations of expediency into forsaking our [*930] commitment to protecting [****60] individual liberty and privacy. It was for that very reason that the Framers of the Bill of Rights insisted that law enforcement efforts be permanently and unambiguously restricted in order to preserve personal freedoms. In the constitutional scheme they ordained, the sometimes unpopular task of ensuring that the government's enforcement efforts remain within the strict boundaries fixed by the Fourth Amendment was entrusted to the courts. As James Madison predicted in his address to the First Congress on June 8, 1789:

"If [these rights] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." 1 Annals of Cong. 439.

If those independent tribunals lose their resolve, however, as the Court has done today, and give way to the seductive call of expediency, the vital guarantees of the Fourth Amendment are reduced to nothing more than a "form [****61] of words." *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 392 (1920).

A proper understanding of the broad purposes sought to be served by the Fourth Amendment demonstrates that the principles embodied in the exclusionary rule rest upon a far firmer constitutional foundation than the shifting sands of the Court's deterrence rationale. But even if I were to accept the Court's chosen method of analyzing the question posed by these cases, I would still conclude that the Court's decision cannot be justified.

I

The Court holds that physical evidence seized by police officers reasonably relying upon a warrant issued by a detached [*931] and neutral magistrate [***704] is admissible in the prosecution's case in chief, even though a reviewing court has subsequently determined either that the warrant was defective, No. 82-963, or that those officers failed to demonstrate when applying for the warrant that there was probable cause to conduct the search, No. 82-1771. I have no doubt that these decisions will prove in time to have been a grave mistake. But, as troubling and important as today's new doctrine may be for the administration of criminal [****62] justice in this country, the mode of analysis used to generate that doctrine also requires critical examination, for it may prove in the long run to pose the greater threat to our civil liberties.

A

At bottom, the Court's decision turns on the proposition that the exclusionary rule is merely a "'judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right.'" *Ante*, at 906, quoting *United States* v. *Calandra*, 414 U.S., at 348. The germ of that idea is found in *Wolf* v. *Colorado*, 338 U.S. 25 (1949), and although I had thought that such a narrow conception of the rule had been forever put to rest by our decision in *Mapp* v. *Ohio*, 367 U.S. 643 (1961), it has been revived by the present Court and reaches full flower with today's decision. The essence of this view, as expressed initially in the *Calandra* opinion and as reiterated today, is that the sole "purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the privacy of one's person, house, papers, or effects. The wrong condemned is the [****63] unjustified governmental invasion of these areas of an individual's life. That wrong . . . is *fully accomplished* by the original search without probable cause." 414 U.S., at 354 (emphasis added); see also *ante*, at 906. This reading of the Amendment implies that its proscriptions are directed solely at those government agents who may actually invade an individual's constitutionally [*932] protected privacy. The courts are not subject to any direct constitutional duty to exclude illegally obtained evidence, because the question of the admissibility of such evidence is not addressed by the Amendment. This view of the scope of the Amendment relegates the judiciary to the periphery. Because the only constitutionally cognizable injury has already been "fully accomplished" by the police by the time a case comes before the courts, the Constitution is not itself violated if the judge decides to admit the tainted evidence. Indeed, the most the judge *can* do is wring his hands and hope that perhaps by

excluding such evidence he can deter future transgressions by the police.

Such a reading appears plausible, because, as critics of the exclusionary rule never [****64] tire of repeating, [2] the Fourth Amendment makes no express provision for the exclusion of [***705] evidence secured in violation of its commands. A short answer to this claim, of course, is that many of the Constitution's most vital imperatives are stated in general terms and the task of giving meaning to these precepts is therefore left to subsequent judicial decisionmaking in the context of concrete cases. The nature of our Constitution, as Chief Justice Marshall long ago explained, "requires that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves." *McCulloch* v. *Maryland*, 4 Wheat. 316, 407 (1819).

A more direct answer may be supplied by recognizing that the Amendment, like other provisions of the Bill [****65] of Rights, restrains the power of the government as a whole; it does not specify only a particular agency and exempt all others. The judiciary is responsible, no less than the executive, for ensuring that constitutional rights are respected.

[*933] When that fact is kept in mind, the role of the courts and their possible involvement in the concerns of the Fourth Amendment comes into sharper focus. Because seizures are executed principally to secure evidence, and because such evidence generally has utility in our legal system only in the context of a trial supervised by a judge, it is apparent that the admission of illegally obtained evidence implicates the same constitutional concerns as the initial seizure of that evidence. Indeed, by admitting unlawfully seized evidence, the judiciary becomes a part of what is in fact a single governmental action prohibited by the terms of the Amendment. [3] [****67] Once that connection between the evidence-gathering role of the police and the evidence-admitting function of the courts is acknowledged, the plausibility of the Court's interpretation becomes more suspect. Certainly nothing in the language or history of the Fourth Amendment suggests [****66] that a recognition of this evidentiary link between the police and the courts was meant to be foreclosed. [4] [****68] [***706] It is difficult to give any meaning [*934] at all to the limitations imposed by the Amendment if they are read to proscribe only certain conduct by the police but to allow other agents of the same government to take advantage of evidence secured by the police in violation of its requirements. [5]

---

[2] See, *e. g.*, Wilkey, The Exclusionary Rule: Why Suppress Valid Evidence?, 62 Judicature 215 (1978); S. Schlesinger, Exclusionary Injustice (1977).

[3] In deciding to enforce the exclusionary rule as a matter of state law, the California Supreme Court clearly recognized this point:

"When, as in the present case, the very purpose of an illegal search and seizure is to get evidence to introduce at a trial, the success of the lawless venture depends entirely on the court's lending its aid by allowing the evidence to be introduced. It is no answer to say that a distinction should be drawn between the government acting as law enforcer and the gatherer of evidence and the government acting as judge." *People* v. *Cahan*, 44 Cal. 2d 434, 445, 282 P. 2d 905, 912 (1955).

For a thoughtful examination of this point, see Schrock & Welsh, Up from Calandra: The Exclusionary Rule as a Constitutional Requirement, 59 Minn. L. Rev. 251, 289-307 (1974).

[4] Examination of the early state declarations of rights which formed the models for the Fourth Amendment reveals that they were aimed as much at explicitly limiting the manner in which government could gather evidence as at protecting individual privacy. For example, the Massachusetts Constitution of 1780 provided:

"Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil Officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued, but in cases, and with the formalities prescribed by the laws." Art. XIV of the Declaration of Rights of 1780.

See generally T. Taylor, Two Studies in Constitutional Interpretation 41-43 (1969); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 51-105 (1970); J. Lanynski, Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation 30-48 (1966); Stewart, The Road to *Mapp* v. *Ohio* and Beyond: The Origins, Development, and Future of the Exclusionary Rule in Search-and-Seizure Cases, 83 Colum. L. Rev. 1365, 1369 (1983).

[5] In *Silverthorne Lumber Co*. v. *United States*, 251 U.S. 385 (1920), the Court expressly recognized this point in rejecting

The Amendment therefore must be read to condemn not only the initial unconstitutional invasion of privacy -- which is done, after all, for the purpose of securing evidence -- but also the subsequent use of any evidence so obtained.

[****69] [*935] The Court evades this principle by drawing an artificial line between the constitutional rights and responsibilities that are engaged by actions of the police and those that are engaged when a defendant appears before the courts. According to the Court, the substantive protections of the Fourth Amendment are wholly exhausted at the moment when police unlawfully invade an individual's privacy and thus no substantive force remains to those protections at the time of trial when the government seeks to use evidence obtained by the police.

I submit that such a crabbed reading of the Fourth Amendment casts aside the teaching of those Justices who first formulated the exclusionary rule, and rests ultimately on an impoverished understanding of judicial responsibility in our constitutional scheme. For my part, "[the] right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" comprises a personal right to exclude all evidence secured by means of unreasonable searches and seizures. The right to be free from the initial invasion of privacy and the right of exclusion are coordinate components of the central embracing [****70] right to be free from unreasonable searches and seizures.

Such a conception of the rights secured by the Fourth Amendment was unquestionably the original basis of what has come to be called the exclusionary rule when it was first formulated in *Weeks* v. *United States*, 232 U.S. 383 [***707] (1914). There the Court considered whether evidence seized in violation of the Fourth Amendment by a United States Marshal could be admitted at trial after the defendant had moved that the evidence be returned. Significantly, although the Court considered the Marshal's initial invasion of the defendant's home to be unlawful, it went on to consider a question that "involves the right of the court in a criminal prosecution to retain for the purposes of evidence the letters and correspondence of the accused, seized in his house in his absence without his authority, by a United States Marshal holding no [*936] warrant for . . . the search of his premises." *Id*., at 393. In answering that question, Justice Day, speaking for a unanimous Court, expressly recognized that the commands of the Fourth Amendment were addressed to both the courts and the Executive [****71] Branch:

"The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and *the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws*. The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures . . . should find no sanction in the judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights." *Id*., at 391-392.

The heart of the *Weeks* opinion, and for me the beginning of wisdom about the Fourth Amendment's proper meaning, is found in the following passage:

"If letters and private documents can . . . be seized [****72] and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and [federal] officials to bring the guilty to punishment, praiseworthy as they are, are not to be

---

the Government's contention that it should be permitted to make use of knowledge obtained in violation of the Fourth Amendment:

"The Government now while in form repudiating and condemning the illegal seizure, seeks to maintain its right to avail itself of the knowledge obtained by that means which otherwise it would not have had.

"The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them. . . . In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. *The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all."* *Id*., at 391-392 (citations omitted) (emphasis added).

aided by the sacrifice of those great [*937] principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land. The United States Marshal could only have invaded the house of the accused when armed with a warrant issued as required by the Constitution. . . . Instead, he acted without sanction of law, doubtless prompted by the desire to bring further proof to the aid of the Government, and under color of his office undertook to make a seizure of private papers in direct violation of the constitutional prohibition against such action. . . . To sanction such proceedings would be to affirm by [***708] judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution, [****73] intended for the protection of the people against such unauthorized action." *Id*., at 393-394.

What this passage succinctly captures is the essential recognition, ignored by the present Court, that seizures are generally executed for the purpose of bringing "proof to the aid of the Government," *id*., at 393, that the utility of such evidence in a criminal prosecution arises ultimately in the context of the courts, and that the courts therefore cannot be absolved of responsibility for the means by which evidence is obtained. As the Court in *Weeks* clearly recognized, the obligations cast upon government by the Fourth Amendment are not confined merely to the police. In the words of Justice Holmes: "If the search and seizure are unlawful as invading personal rights secured by the Constitution those rights would be infringed yet further if the evidence were allowed to be used." *Dodge* v. *United States*, 272 U.S. 530, 532 (1926). As the Court further explained in *Olmstead* v. *United States*, 277 U.S. 438 (1928):

"The striking outcome of the *Weeks* case and those which followed it was the sweeping declaration [****74] that the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction if obtained by government officers through a [*938] violation of the Amendment. Theretofore many had supposed under the ordinary common law rules, if the tendered evidence was pertinent, the method of obtaining it was unimportant. . . . But in the *Weeks* case, and those which followed, this Court decided with great emphasis, and established as the law for the federal courts, that the protection of the Fourth Amendment would be much impaired unless it was held that not only was the official violator of the rights under the Amendment subject to an action at the suit of the injured defendant, but also that the evidence thereby obtained could not be received." *Id*., at 462-463.

That conception of the rule, in my view, is more faithful to the meaning and purpose of the Fourth Amendment and to the judiciary's role as the guardian of the people's constitutional liberties. In contrast to the present Court's restrictive reading, the Court in *Weeks* recognized that, if the Amendment is to have any meaning, police and the courts cannot [****75] be regarded as constitutional strangers to each other; because the evidence-gathering role of the police is directly linked to the evidence-admitting function of the courts, an individual's Fourth Amendment rights may be undermined as completely by one as by the other.

B

From the foregoing, it is clear why the question whether the exclusion of evidence would deter future police misconduct was never considered a relevant concern in the early cases [***709] from *Weeks* to *Olmstead*. [6] In those formative decisions, the Court plainly understood that the exclusion of illegally obtained evidence was compelled not by judicially fashioned [*939] remedial purposes, but rather by a direct constitutional command. A new phase in the history of the rule, however, opened with the Court's decision in *Wolf* v. *Colorado*, 338 U.S. 25 (1949). Although that decision held that the security of one's person and privacy protected by the Fourth Amendment was "implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause" of the Fourteenth Amendment, *id*., at 27-28, quoting *Palko* v. *Connecticut*, 302 U.S. 319, 325 (1937), [****76] the Court went on, in what can only be regarded as a *tour de force* of constitutional obfuscation, to say that the "ways of enforcing such a basic right raise questions of a different order," 338 U.S., at 28. Notwithstanding the force of the *Weeks* doctrine that the Fourth Amendment required exclusion, a state court was free to admit illegally seized evidence, according to the Court in *Wolf*, so long as the State had devised some other "effective" means of vindicating a defendant's Fourth Amendment rights. 338 U.S., at 31.

Twelve years later, in *Mapp* v. *Ohio*, 367 U.S. 643 (1961), however, the [****77] Court restored the original understanding of the *Weeks* case by overruling the

[6] See generally Kamisar, Does (Did) (Should) The Exclusionary Rule Rest on a "Principled Basis" Rather than an "Empirical Proposition"?, 16 Creighton L. Rev. 565, 598-599 (1983); Mertens & Wasserstrom, The Good Faith Exception to the Exclusionary Rule: Deregulating the Police and Derailing the Law, 70 Geo. L. J. 365, 379-380 (1981).

holding of *Wolf* and repudiating its rationale. Although in the course of reaching this conclusion the Court in *Mapp* responded at certain points to the question, first raised in *Wolf*, of whether the exclusionary rule was an "effective" remedy compared to alternative means of enforcing the right, see 367 U.S., at 651-653, it nevertheless expressly held that "all evidence obtained by searches and seizures in violation of the Constitution is, *by that same authority*, inadmissible in a state court." *Id*., at 655 (emphasis added). In the Court's view, the exclusionary rule was not one among a range of options to be selected at the discretion of judges; it was "an essential part of both the Fourth and Fourteenth Amendments." *Id*., at 657. Rejection of the *Wolf* approach was constitutionally required, the Court explained, because "the admission of the new constitutional right by *Wolf* could not consistently tolerate denial of [*940] its most important constitutional privilege, namely, the exclusion of the evidence which an accused had [****78] been forced to give by reason of the unlawful seizure. To hold otherwise is to grant the right but in reality to withhold its privilege and enjoyment." 367 U.S., at 656. [***710] Indeed, no other explanation suffices to account for the Court's holding in *Mapp*, since the only possible predicate for the Court's conclusion that the States were bound by the Fourteenth Amendment to honor the *Weeks* doctrine is that the exclusionary rule was "part and parcel of the Fourth Amendment's limitation upon [governmental] encroachment of individual privacy." 367 U.S., at 651. [7]

[****79] Despite this clear pronouncement, however, the Court since *Calandra* has gradually pressed the deterrence rationale for the rule back to center stage. See, *e. g., United States* v. *Peltier*, 422 U.S. 531 (1975); *United States* v. *Janis*, 428 U.S. 433 (1976); *Stone* v. *Powell*, 428 U.S. 465 (1976). The various arguments advanced by the Court in this campaign have only strengthened my conviction that the deterrence theory is both misguided and unworkable. First, [*941] the Court has frequently bewailed the "cost" of excluding reliable evidence. In large part, this criticism rests upon a refusal to acknowledge the function of the Fourth Amendment itself. If nothing else, the Amendment plainly operates to disable the government from gathering information and securing evidence in certain ways. In practical terms, of course, this restriction of official power means that some incriminating evidence inevitably will go undetected if the government obeys these constitutional restraints. It is the loss of that evidence that is the "price" our society pays for enjoying the freedom and privacy safeguarded by the Fourth [****80] Amendment. Thus, some criminals will go free *not*, in Justice (then Judge) Cardozo's misleading epigram, "because the constable has blundered," *People* v. *Defore*, 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926), but rather because official compliance with Fourth Amendment requirements makes it more difficult to catch criminals. Understood in this way, the Amendment directly contemplates that some reliable and incriminating evidence will be lost to the government; therefore, it is [***711] not the exclusionary rule, but the Amendment itself that has imposed this cost. [8]

---

[7] Indeed, the Court in *Mapp* expressly noted that the "factual considerations" raised in *Wolf* concerning the effectiveness of alternative remedies "are not basically relevant to a decision that the exclusionary rule is an essential ingredient of the Fourth Amendment." 367 U.S., at 651. It is true that in *Linkletter* v. *Walker*, 381 U.S. 618 (1965), in holding that *Mapp* was not to be applied retroactively, the Court described the exclusionary rule as the "only effective deterrent to lawless police action," 381 U.S., at 636, thereby suggesting that the rule rested on a deterrence rationale. But, as I have explained on another occasion, "[the] emphasis upon deterrence in *Linkletter* must be understood in the light of the crucial fact that the States had justifiably relied from 1949 to 1961 upon *Wolf* . . . , and consequently, that application of *Mapp* would have required the wholesale release of innumerable convicted prisoners, few of whom could have been successfully retried. In that circumstance, *Linkletter* held not only that retrospective application of *Mapp* would not further the goal of deterrence but also that it would not further 'the administration of justice and the integrity of the judicial process.' 381 U.S., at 637." *United States* v. *Calandra*, 414 U.S. 338, 359-360 (1974) (dissenting opinion).

[8] Justice Stewart has explained this point in detail in a recent article:

"Much of the criticism leveled at the exclusionary rule is misdirected; it is more properly directed at the Fourth Amendment itself. It is true that, as many observers have charged, the effect of the rule is to deprive the courts of extremely relevant, often direct evidence of the guilt of the defendant. But these same critics fail to acknowledge that, in many instances, the same extremely relevant evidence would not have been obtained had the police officer complied with the commands of the fourth amendment in the first place. . . .

". . . The exclusionary rule places no limitations on the actions of the police. The fourth amendment does. The inevitable result of the Constitution's prohibition against unreasonable searches and seizures and its requirement that no warrant shall issue but upon probable cause is that police officers who obey its strictures will catch fewer criminals. . . . [That] is the price the framers anticipated and were willing to pay to ensure

[****81] [*942] In addition, the Court's decisions over the past decade have made plain that the entire enterprise of attempting to assess the benefits and costs of the exclusionary rule in various contexts is a virtually impossible task for the judiciary to perform honestly or accurately. Although the Court's language in those cases suggests that some specific empirical basis may support its analyses, the reality is that the Court's opinions represent inherently unstable compounds of intuition, hunches, and occasional pieces of partial and often inconclusive data. In *Calandra*, for example, the Court, in considering whether the exclusionary rule should apply in grand jury proceedings, had before it no concrete evidence whatever concerning the impact that application of the rule in such proceedings would have either in terms of the long-term costs or the expected benefits. To the extent empirical data are available regarding the general costs and benefits of the exclusionary rule, such data have shown, on the one hand, as the Court acknowledges today, that the costs are not as substantial as critics have asserted in the past, see *ante*, at 907-908, n. 6, and, on the other hand, [****82] that while the exclusionary rule may well have certain deterrent effects, it is extremely difficult to determine with any degree of precision whether the incidence of unlawful conduct by police is now lower than it was prior to *Mapp*. See *United States* v. *Janis*, 428 U.S., at 449-453, and n. 22; *Stone* v. *Powell*, 428 U.S., at 492, n. 32. [9] [****83] The [*943] Court has sought to turn this uncertainty to its advantage by casting the burden of proof upon proponents of the rule, see, *e. g., United States* v. *Janis, supra*, [***712] at 453-454. "Obviously," however, "the assignment of the burden of proof on an issue where evidence does not exist and cannot be obtained is outcome determinative. [The] assignment of the burden is merely a way of announcing a predetermined conclusion." [10]

By remaining within its redoubt of empiricism and by basing the rule solely on the deterrence rationale, the Court has robbed the rule of legitimacy. A doctrine that is explained as if it were an empirical proposition but for which there is only limited empirical support is both inherently unstable and an easy mark for critics. The extent of this Court's fidelity to Fourth Amendment requirements, however, should not turn on such statistical uncertainties. I share the view, expressed by Justice [****84] Stewart for the Court in *Faretta* v. *California*, 422 U.S. 806 (1975), that "[personal[liberties are not rooted in the law of averages." *Id*., at 834. Rather than seeking to give effect to the liberties secured by the Fourth Amendment through guesswork about deterrence, the Court should restore to its proper place the principle framed 70 years ago in *Weeks* that an individual whose privacy has been invaded in violation of the Fourth Amendment has a right grounded in that Amendment to prevent the government from subsequently making use of any evidence so obtained.

[*944] II

Application of that principle clearly requires affirmance in the two cases decided today. In the first, *United States* v. *Leon*, No. 82-1771, it is conceded by the Government and accepted by the Court that the affidavit filed by the police officers in support of their application for a search warrant failed to provide a sufficient basis on which a neutral and detached magistrate could conclude that there was probable cause to issue the warrant. Specifically, it is conceded that the officers' application for a warrant was based in part on information supplied [****85] by a confidential informant of unproven reliability that was over five months old by the time it was relayed to the police. Although the police conducted an independent investigation on the basis of

---

the sanctity of the person, the home, and property against unrestrained governmental power." Stewart, 83 Colum. L. Rev., at 1392-1393.

See also Dellinger, Of Rights and Remedies: The Constitution as a Sword, 85 Harv. L. Rev. 1532, 1563 (1972) ("Under the exclusionary rule a court attempts to maintain the status quo that would have prevailed if the constitutional requirement had been obeyed").

[9] See generally on this point, Davies, A Hard Look at What We Know (and Still Need to Learn) About the "Costs" of the Exclusionary Rule: The NIJ Study and Other Studies of "Lost" Arrests, 1983 A. B. F. Res. J. 611, 627-629; Canon, Ideology and Reality in the Debate over the Exclusionary Rule: A Conservative Argument for its Retention, 23 S. Tex. L. J. 559, 561-563 (1982); Critique, On the Limitations of Empirical Evaluations of the Exclusionary Rule: A Critique of the Spiotto Research and United States v. Calandra, 69 Nw. U. L. Rev. 740 (1974).

[10] Dworkin, Fact Style Adjudication and the Fourth Amendment: The Limits of Lawyering, 48 Ind. L. J. 329, 332-333 (1973). See also White, Forgotten Points in the "Exclusionary Rule" Debate, 81 Mich. L. Rev. 1273, 1281-1282 (1983) (balancing of deterrent benefits and costs is an "inquiry [that] can never be performed in an adequate way and the reality is thus that the decision must rest not upon those grounds, but upon prior dispositions or unarticulated intuitions that are never justified"); Canon, *supra*, at 564; Kamisar, 16 Creighton L. Rev., at 646.

this tip, both the District Court and the Court of Appeals concluded that the additional information gathered by the officers failed to corroborate the details of the informant's tip and was "as consistent with innocence as . . . with guilt." App. to Pet. for Cert. 10a. The warrant, therefore, should never have issued. Stripped of the authority of the warrant, the conduct of these officers was plainly unconstitutional -- it amounted to nothing less than a naked invasion of the privacy of respondents' homes without the requisite justification demanded by the Fourth Amendment. In order to restore the Government to the position it would have occupied had this [***713] unconstitutional search not occurred, therefore, it was necessary that the evidence be suppressed. As we said in *Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971), the Warrant Clause is not "an inconvenience to be somehow 'weighed' against the claims of police efficiency. It is, or should be, an important [****86] working part of our machinery of government, operating as a matter of course to check the 'well-intentioned but mistakenly overzealous executive officers' who are part of any system of law enforcement." *Id*., at 481 (footnote omitted).

A close examination of the facts of this case reveals that this is neither an extraordinary nor indeed a very costly step. [*945] The warrant had authorized a search for cocaine, methaqualone tablets, and miscellaneous narcotics paraphernalia at several locations: a condominium at 7902 Via Magdalena in Los Angeles; a residence at 620 Price Drive in Burbank; a residence at 716 South Sunset Canyon in Burbank; and four automobiles owned respectively by respondents Leon, Sanchez, Stewart, and Del Castillo. App. 31-33. Pursuant to this warrant, the officers seized approximately four pounds of cocaine and over 1,000 methaqualone tablets from the Via Magdalena condominium, nearly one pound of cocaine from the Sunset Canyon residence, about an ounce of cocaine from the Price Drive residence, and certain paraphernalia from Del Castillo's and Stewart's automobiles. On the basis of this and other evidence, the four respondents were charged [****87] with violating 21 U. S. C. § 846 for conspiring to possess and distribute cocaine, and § 841(a)(1) for possessing methaqualone and cocaine with intent to distribute. The indictment specifically alleged that respondents had maintained the Via Magdalena condominium as a storage area for controlled substances which they distributed to prospective purchasers. App. 27-28.

At the suppression hearing, the District Court determined that none of the respondents had a sufficient expectation of privacy to contest the search of the Via Magdalena condominium, that respondents Stewart and Sanchez could challenge the search of their home at Price Drive, that respondent Leon was entitled to challenge the search of his home at Sunset Canyon, and that respondents Del Castillo and Stewart could contest the search of their cars. Given its finding that probable cause to issue the warrant was lacking, the District Court ruled that the evidence from the Price Drive residence could not be used against respondents Stewart and Sanchez, that evidence from the Sunset Canyon residence could not be used against Leon, and that evidence obtained from both Del Castillo's and Stewart's [****88] automobiles could not be used against them. App. to Pet. for Cert. 10a-13a.

[*946] The tenor of the Court's opinion suggests that this order somehow imposed a grave and presumably unjustifiable cost on society. Such a suggestion, however, is a gross exaggeration. Since the indictment focused upon a conspiracy among all respondents to use the Via Magdalena condominium as a storage area for controlled substances, and since the bulk of the evidence seized was from that condominium and was [***714] plainly admissible under the District Court's order, the Government would clearly still be able to present a strong case to the jury following the court's suppression order. I emphasize these details not to suggest how the Government's case would fare before the jury but rather to clarify a point that is lost in the Court's rhetorical excesses over the costs of the exclusionary rule -- namely, that the suppression of evidence will certainly tend to weaken the Government's position but it will rarely force the Government to abandon a prosecution. Cf. *infra*, at 950-951, and n. 11. In my view, a doctrine that preserves intact the constitutional rights of the accused, and, at [****89] the same time, is sufficiently limited to permit society's legitimate and pressing interest in criminal law enforcement to be served should not be so recklessly discarded. It is a doctrine that gives life to the "very heart of the Fourth Amendment directive: that . . . a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises." *United States* v. *United States District Court*, 407 U.S. 297, 316 (1972).

In the second case before the Court, *Massachusetts* v. *Sheppard*, No. 82-963, the State concedes and the Court accepts that the warrant issued to search respondent's home completely failed to state with

particularity the things to be seized. Indeed, the warrant expressly and particularly described things such as "controlled [substances]" and "other paraphernalia used in, for, or in connection with the unlawful possession or use of any controlled substance" that the police had no reason whatsoever to believe were to be found in [*947] respondent's home. App. 17a. [****90] Given the Fourth Amendment's requirement that "no Warrants shall issue, but upon probable cause . . . and particularly describing the . . . things to be seized," this warrant should never have been issued. The police who entered respondent's home, therefore, were without constitutional authority to do so.

Although the Court's opinion tends to overlook this fact, the requirement of particularity is not a mere "technicality," it is an express constitutional command. *Ybarra* v. *Illinois*, 444 U.S. 85, 92 (1979); *Lo-Ji Sales, Inc*. v. *New York*, 442 U.S. 319 (1979); *Stanford* v. *Texas*, 379 U.S. 476 (1965); *Marron* v. *United States*, 275 U.S. 192, 196 (1927). The purpose of that requirement is to prevent precisely the kind of governmental conduct that the faulty warrant at issue here created a grave risk of permitting -- namely, a search that was not narrowly and particularly limited to the things that a neutral and detached magistrate had reason to believe might be found at respondent's home. Although it is true, as JUSTICE STEVENS observes, see *post*, at 964, that the affidavit submitted by the police [****91] set forth with particularity those items that they sought authority to search for, it is nevertheless clear that the warrant itself -- the document which actually gave the officers legal authority to invade respondent's privacy -- made no mention [***715] of these items. And, although it is true that the particular officers who applied for the warrant also happened to execute it and did so in accordance with the limits proposed in their affidavit, this happenstance should have no bearing on the central question whether these officers secured that prior judicial authority to conduct their search required by the Fourth Amendment. As we made clear in *United States* v. *United States District Court, supra*, at 317 (footnote omitted), "[the] Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised." See also *Katz* v. *United States*, 389 U.S. 347, 356-357 (1967) ("this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime [*948] and voluntarily confined their activities to the least intrusive means [****92] consistent with that end"). Had the warrant actually been enforced by officers other than those who prepared the affidavit, the same result might not have occured; indeed, the wholly erroneous nature of the warrant might have led such officers to feel at liberty to roam throughout respondent's home in search of drugs. Cf. *Whiteley* v. *Warden*, 401 U.S. 560 (1971). I therefore fail to see how a search pursuant to such a fundamentally defective warrant can be characterized as "reasonable."

What the Framers of the Bill of Rights sought to accomplish through the express requirements of the Fourth Amendment was to define precisely the conditions under which government agents could search private property so that citizens would not have to depend solely upon the discretion and restraint of those agents for the protection of their privacy. Although the self-restraint and care exhibited by the officers in this case is commendable, that alone can never be a sufficient protection for constitutional liberties. I am convinced that it is not too much to ask that an attentive magistrate take those minimum steps necessary to ensure that every warrant he issues describes with [****93] particularity the things that his independent review of the warrant application convinces him are likely to be found in the premises. And I am equally convinced that it is not too much to ask that well-trained and experienced police officers take a moment to check that the warrant they have been issued at least describes those things for which they have sought leave to search. These convictions spring not from my own view of sound criminal law enforcement policy, but are instead compelled by the language of the Fourth Amendment and the history that led to its adoption.

III

Even if I were to accept the Court's general approach to the exclusionary rule, I could not agree with today's result. [*949] There is no question that in the hands of the present Court the deterrence rationale has proved to be a powerful tool for confining the scope of the rule. In *Calandra*, for example, the Court concluded that the "speculative and undoubtedly minimal advance in the deterrence of police misconduct," was insufficient to outweigh the "expense of substantially impeding the role of the grand jury." 414 U.S., at 351-352. [***716] In *Stone* v. *Powell*, the Court found [****94] that "the additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs." 428 U.S., at 493. In *United States* v. *Janis*, 428 U.S. 433 (1976), the Court concluded that "exclusion from federal civil proceedings of evidence unlawfully seized by a state criminal enforcement officer has not been shown

to have a sufficient likelihood of deterring the conduct of the state police so that it outweighs the societal costs imposed by the exclusion." *Id*., at 454. And in an opinion handed down today, the Court finds that the "balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings held by the [Immigration and Naturalization Service]." *INS* v. *Lopez-Mendoza, post*, at 1050.

Thus, in this bit of judicial stagecraft, while the sets sometimes change, the actors always have the same lines. Given this well-rehearsed pattern, one might have predicted with some assurance how the present case would unfold. First there is the ritual incantation of the "substantial social costs" exacted by the [****95] exclusionary rule, followed by the virtually foreordained conclusion that, given the marginal benefits, application of the rule in the circumstances of these cases is not warranted. Upon analysis, however, such a result cannot be justified even on the Court's own terms.

At the outset, the Court suggests that society has been asked to pay a high price -- in terms either of setting guilty persons free or of impeding the proper functioning of trials -- as a result of excluding relevant physical evidence in cases [*950] where the police, in conducting searches and seizing evidence, have made only an "objectively reasonable" mistake concerning the constitutionality of their actions. See *ante*, at 907-908. But what evidence is there to support such a claim?

Significantly, the Court points to none, and, indeed, as the Court acknowledges, see *ante*, at 907-908, n. 6, recent studies have demonstrated that the "costs" of the exclusionary rule -- calculated in terms of dropped prosecutions and lost convictions -- are quite low. Contrary to the claims of the rule's critics that exclusion leads to "the release of countless guilty criminals," *Bivens* v. *Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 416 (1971) [****96] (BURGER, C. J., dissenting), these studies have demonstrated that federal and state prosecutors very rarely drop cases because of potential search and seizure problems. For example, a 1979 study prepared at the request of Congress by the General Accounting Office reported that only 0.4% of all cases actually declined for prosecution by federal prosecutors were declined primarily because of illegal search problems. Report of the Comptroller General of the United States, Impact of the Exclusionary Rule on Federal Criminal Prosecutions 14 (1979). If the GAO data are restated as a percentage of *all* arrests, the study shows that only 0.2% of all felony arrests are declined for prosecution because [***717] of potential exclusionary rule problems. See Davies, A Hard Look at What We Know (and Still Need to Learn) About the "Costs" of the Exclusionary Rule: The NIJ Study and Other Studies of "Lost" Arrests, 1983 A. B. F. Res. J. 611, 635. [11] Of course, these data describe [*951] only the costs attributable to the exclusion of evidence in all cases; the costs due to the exclusion of evidence in the narrower category of cases where police have made objectively [****97] reasonable mistakes must necessarily be even smaller. The Court, however, ignores this distinction and mistakenly weighs the aggregated costs of exclusion in *all* cases, irrespective of the circumstances that led to exclusion, see *ante*, at

---

[11] In a series of recent studies, researchers have attempted to quantify the actual costs of the rule. A recent National Institute of Justice study based on data for the 4-year period 1976-1979 gathered by the California Bureau of Criminal Statistics showed that 4.8% of all cases that were declined for prosecution by California prosecutors were rejected because of illegally seized evidence. National Institute of Justice, Criminal Justice Research Report -- The Effects of the Exclusionary Rule: A Study in California 1 (1982). However, if these data are calculated as a percentage of all arrests, they show that only 0.8% of all arrests were rejected for prosecution because of illegally seized evidence. See Davies, 1983 A. B. F. Res. J., at 619.

In another measure of the rule's impact -- the number of prosecutions that are dismissed or result in acquittals in cases where evidence has been excluded -- the available data again show that the Court's past assessment of the rule's costs has generally been exaggerated. For example, a study based on data from nine midsized counties in Illinois, Michigan, and Pennsylvania reveals that motions to suppress physical evidence were filed in approximately 5% of the 7,500 cases studied, but that such motions were successful in only 0.7% of all these cases. Nardulli, The Societal Cost of the Exclusionary Rule: An Empirical Assessment, 1983 A. B. F. Res. J. 585, 596. The study also shows that only 0.6% of all cases resulted in acquittals because evidence had been excluded. *Id*., at 600. In the GAO study, suppression motions were filed in 10.5% of all federal criminal cases surveyed, but of the motions filed, approximately 80-90% were denied. GAO Report, at 8, 10. Evidence was actually excluded in only 1.3% of the cases studied, and only 0.7% of all cases resulted in acquittals or dismissals after evidence was excluded. *Id*., at 9-11. See Davies, *supra*, at 660. And in another study based on data from cases during 1978 and 1979 in San Diego and Jacksonville, it was shown that only 1% of all cases resulting in nonconviction were caused by illegal searches. F. Feeney, F. Dill, & A. Weir, Arrests Without Conviction: How Often They Occur and Why (National Institute of Justice 1983). See generally Davies, *supra*, at 663.

907, against the potential benefits associated with only those cases in which evidence is excluded because police reasonably but mistakenly believe that their conduct does not violate the Fourth Amendment, see *ante*, at 915-921. When such faulty scales are used, it is little wonder that the balance tips in favor of restricting the application of the rule.

[****98] [*952] What then supports the Court's insistence that this evidence be admitted? Apparently, the Court's only answer is that even though the costs of exclusion are not very substantial, the potential deterrent effect in these circumstances is so marginal that exclusion cannot be justified. The key to the Court's conclusion in this respect is its belief that the prospective deterrent effect of the exclusionary rule operates only in those situations in which police officers, when deciding whether to go forward with some particular search, have reason to know that their planned conduct will violate the requirements of the Fourth Amendment. See *ante*, at 919-921. If these officers in fact understand (or reasonably [***718] should understand because the law is well settled) that their proposed conduct will offend the Fourth Amendment and that, consequently, any evidence they seize will be suppressed in court, they will refrain from conducting the planned search. In those circumstances, the incentive system created by the exclusionary rule will have the hoped-for deterrent effect. But in situations where police officers reasonably (but mistakenly) believe that their planned [****99] conduct satisfies Fourth Amendment requirements -- presumably either (a) because they are acting on the basis of an apparently valid warrant, or (b) because their conduct is only later determined to be invalid as a result of a subsequent change in the law or the resolution of an unsettled question of law -- then such officers will have no reason to refrain from conducting the search and the exclusionary rule will have no effect.

At first blush, there is some logic to this position. Undoubtedly, in the situation hypothesized by the Court, the existence of the exclusionary rule cannot be expected to have any deterrent effect on the particular officers at the moment they are deciding whether to go forward with the search. Indeed, the subsequent exclusion of any evidence seized under such circumstances appears somehow "unfair" to the particular officers involved. As the Court suggests, these officers have acted in what they thought was an appropriate [*953] and constitutionally authorized manner, but then the fruit of their efforts is nullified by the application of the exclusionary rule. *Ante*, at 920-921.

The flaw in the Court's argument, however, is that its logic captures [****100] only one comparatively minor element of the generally acknowledged deterrent purposes of the exclusionary rule. To be sure, the rule operates to some extent to deter future misconduct by individual officers who have had evidence suppressed in their own cases. But what the Court overlooks is that the deterrence rationale for the rule is not designed to be, nor should it be thought of as, a form of "punishment" of individual police officers for their failures to obey the restraints imposed by the Fourth Amendment. See *United States* v. *Peltier*, 422 U.S., at 556-557 (BRENNAN, J., dissenting). Instead, the chief deterrent function of the rule is its tendency to promote institutional compliance with Fourth Amendment requirements on the part of law enforcement agencies generally. [12] [****102] Thus, [***719] as the Court has previously [*954] recognized, "over the long term, [the] demonstration [provided by the exclusionary rule] that our society attaches serious consequences to violation of constitutional rights is thought to encourage those who formulate law enforcement policies, and the officers who implement them, to incorporate Fourth Amendment ideals into their [****101] value system." *Stone* v. *Powell*, 428 U.S., at 492. It is only through such an institutionwide mechanism that information concerning Fourth Amendment standards can be effectively

[12] As Justice Stewart has observed:

"[The] exclusionary rule is not designed to serve a specific deterrence function; that is, it is not designed to punish the particular police officer for violating a person's fourth amendment rights. Instead, the rule is designed to produce a 'systematic deterrence': the exclusionary rule is intended to create an incentive for law enforcement officials to establish procedures by which police officers are trained to comply with the fourth amendment because the purpose of the criminal justice system -- bringing criminals to justice -- can be achieved only when evidence of guilt may be used against defendants." Stewart, 83 Colum. L. Rev., at 1400.

See also Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 709-710 (1970) ("The exclusionary rule is not aimed at special deterrence since it does not impose any direct punishment on a law enforcement official who has broken the rule. . . . The exclusionary rule is aimed at affecting the wider audience of all law enforcement officials and society at large. It is meant to discourage violations by individuals who have never experienced any sanction for them"); Mertens & Wasserstrom, 70 Geo. L. J., at 399-401; Kamisar, 16 Creighton L. Rev., at 597, n. 204.

communicated to rank-and-file officers. [13]

[****103] [*955] If the overall educational effect of the exclusionary rule is considered, application of the rule to even those situations in which individual police officers have acted on the basis of a reasonable but mistaken belief that their conduct was authorized can still be expected to have a considerable long-term deterrent effect. If evidence is consistently excluded in these circumstances, police departments will surely be prompted to instruct their officers to devote greater care and attention to providing sufficient information to establish probable cause when applying for a warrant, and to review with some attention the form of the warrant that they have been issued, rather than automatically assuming that whatever document the magistrate has signed will necessarily [***720] comport with Fourth Amendment requirements.

After today's decisions, however, that institutional incentive will be lost. Indeed, the Court's "reasonable mistake" exception to the exclusionary rule will tend to put a premium on police ignorance of the law. Armed with the assurance provided by today's decisions that evidence will always be admissible whenever an officer has "reasonably" relied upon [****104] a warrant, police departments will be encouraged to train officers that if a warrant has simply been signed, it is reasonable, without more, to rely on it. Since in close cases there will no longer be any incentive to error on the side of constitutional behavior, police would have every reason to adopt a "let's-wait-until-it's-decided" approach in situations in which there is a question about a warrant's validity or the basis for its issuance. Cf. *United States* v. *Johnson*, 457 U.S. 537, 561 (1982). [14]

[****105] [*956] Although the Court brushes these concerns aside, a host of grave consequences can be expected to result from its decision to carve this new exception out of the exclusionary rule. A chief consequence of today's decisions will be to convey a clear and unambiguous message to magistrates that their decisions to issue warrants are now insulated from subsequent judicial review. Creation of this new exception for good-faith reliance upon a warrant implicitly tells magistrates that they need not take much care in reviewing warrant applications, since their mistakes will from now on have virtually no consequence: If their decision to issue a warrant was

---

[13] Although specific empirical data on the systemic deterrent effect of the rule are not conclusive, the testimony of those actually involved in law enforcement suggests that, at the very least, the *Mapp* decision had the effect of increasing police awareness of Fourth Amendment requirements and of prompting prosecutors and police commanders to work towards educating rank-and-file officers. For example, as former New York Police Commissioner Murphy explained the impact of the *Mapp* decision: "I can think of no decision in recent times in the field of law enforcement which had such a dramatic and traumatic effect. . . . I was immediately caught up in the entire program of reevaluating our procedures, which had followed the *Defore* rule, and modifying, amending, and creating new policies and new instructions for the implementation of *Mapp*. . . . Retraining sessions had to be held from the very top administrators down to each of the thousands of foot patrolmen." Murphy, Judicial Review of Police Methods in Law Enforcement: The Problem of Compliance by Police Departments, 44 Texas L. Rev. 939, 941 (1966).

Further testimony about the impact of the *Mapp* decision can be found in the statement of Deputy Commissioner Reisman: "The *Mapp* case was a shock to us. We had to reorganize our thinking, frankly. Before this, nobody bothered to take out search warrants. Although the U.S. Constitution requires warrants in most cases, the U.S. Supreme Court had ruled that evidence obtained without a warrant -- illegally, if you will -- was admissible in state courts. So the feeling was, why bother? Well, once that rule was changed we knew we had better start teaching our men about it." N. Y. Times, Apr. 28, 1965, p. 50, col. 1. A former United States Attorney and now Attorney General of Maryland, Stephen Sachs, has described the impact of the rule on police practices in similar terms: "I have watched the rule deter, routinely, throughout my years as a prosecutor. . . . [Police-prosecutor] consultation is customary in all our cases when Fourth Amendment concerns arise. . . . In at least three Maryland jurisdictions, for example, prosecutors are on twenty-four hour call to field search and seizure questions presented by police officers." Sachs, The Exclusionary Rule: A Prosecutor's Defense, 1 Crim. Justice Ethics 28, 30 (Summer/Fall 1982). See also LaFave, The Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith," 43 U. Pitt. L. Rev. 307, 319 (1982); Mertens & Wasserstrom, *supra*, at 394-401.

[14] The authors of a recent study of the warrant process in seven cities concluded that application of a good-faith exception where an officer relies upon a warrant "would further encourage police officers to seek out the less inquisitive magistrates and to rely on boilerplate formulae, thereby lessening the value of search warrants overall. Consequently, the benefits of adoption of a broad good faith exception in terms of a few additional prosecutions appears to be outweighed by the harm to the quality of the entire search warrant process and the criminal justice system in general." R. Van Duizend, L. Sutton, & C. Carter, The Search Warrant Process: Preconceptions, Perceptions, and Practices 8-12 (Review Draft, National Center for State Courts, 1983). See also Stewart, 83 Colum. L. Rev., at 1403.

correct, the evidence will be admitted; if their decision was incorrect but the police relied in good faith on the warrant, the evidence will also be admitted. Inevitably, the care and attention devoted to such an inconsequential chore will dwindle. Although the Court is correct to note that magistrates do not share the same stake in the outcome of a criminal case as the police, they nevertheless need to appreciate that their role is of some moment in order to continue performing the important task of carefully reviewing warrant [****106] applications. Today's decisions effectively remove that incentive. [15]

[****107] [*957] Moreover, [***721] the good-faith exception will encourage police to provide only the bare minimum of information in future warrant applications. The police will now know that if they can secure a warrant, so long as the circumstances of its issuance are not "entirely unreasonable," *ante*, at 923, all police conduct pursuant to that warrant will be protected from further judicial review. [16] The clear incentive that operated in the past to establish probable cause adequately because reviewing courts would examine the magistrate's judgment carefully, see, *e. g., Franks* v. *Delaware*, 438 U.S. 154, 169-170 (1978); *Jones* v. *United States*, 362 U.S. 257, 271-272 (1960); *Giordenello* v. *United States*, 357 U.S. 480, 483 (1958), has now been so completely vitiated that the police need only show that it was not "entirely unreasonable" under the circumstances [*958] of a particular case for them to believe that the warrant they were issued was valid. See *ante*, at 923. The long-run effect unquestionably will be to undermine the integrity of the warrant process.

[****108] Finally, even if one were to believe, as the Court apparently does, that police are hobbled by inflexible and hypertechnical warrant procedures, today's decisions cannot be justified. This is because, given the relaxed standard for assessing probable cause established just last Term in *Illinois* v. *Gates*, 462 U.S. 213 (1983), the Court's newly fashioned good-faith exception, when applied in the warrant context, will rarely, if ever, offer any greater flexibility for police than the *Gates* standard already supplies. In *Gates*, the Court held that "[the] task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*., at 238. The task of a reviewing court is confined to determining whether "the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." *Ibid*. Given such a relaxed standard, it is virtually inconceivable that a reviewing court, when faced with a defendant's motion to suppress, [****109] could first find that a warrant was invalid under the new *Gates* standard, but then, at the [***722] same time, find that a police officer's reliance on such an invalid warrant was nevertheless "objectively reasonable" under the test announced today. [17] Because the two standards overlap so completely, it is unlikely that a warrant could be found invalid under *Gates* and yet the police reliance upon it could be seen

---

[15] Just last Term in *Illinois* v. *Gates*, 462 U.S. 213 (1983), the Court noted:

"Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." *Id*., at 239.

After today's decisions, there will be little reason for reviewing courts to conduct such a conscientious review; rather, these courts will be more likely to focus simply on the question of police good faith. Despite the Court's confident prediction that such review will continue to be conducted, see *ante*, at 924-925, it is difficult to believe that busy courts faced with heavy dockets will take the time to render essentially advisory opinions concerning the constitutionality of the magistrate's decision before considering the officer's good faith.

[16] As the Court of Appeals for the Second Circuit has observed in this regard:

"If a magistrate's issuance of a warrant were to be, as the government would have it, an all but conclusive determination of the validity of the search and of the admissibility of the evidence seized thereby, police officers might have a substantial incentive to submit their warrant applications to the least demanding magistrates, since once the warrant was issued, it would be exceedingly difficult later to exclude any evidence seized in the resulting search even if the warrant was issued without probable cause. . . . For practical purposes, therefore, the standard of probable cause might be diluted to that required by the least demanding official authorized to issue warrants, even if this fell well below what the Fourth Amendment required." *United States* v. *Karathanos*, 531 F.2d 26, 34 (1976).

[17] See Kamisar, *Gates*, "Probable Cause," "Good Faith," and Beyond, 69 Iowa L. Rev. 551, 588-589 (1984); Wasserstrom, The Incredible Shrinking Fourth Amendment, 21 Am. Crim. L. Rev. 257 (1984); LaFave, 43 U. Pitt. L. Rev., at 307.

as objectively reasonable; otherwise, we would have to entertain the mind-boggling [*959] concept of objectively reasonable reliance upon an objectively unreasonable warrant.

This paradox, as JUSTICE STEVENS suggests, see *post*, at 961-962, perhaps explains the Court's unwillingness to remand No. 82-1771 for [****110] reconsideration in light of *Gates*, for it is quite likely that on remand the Court of Appeals would find no violation of the Fourth Amendment, thereby demonstrating that the supposed need for the good-faith exception in this context is more apparent than real. Therefore, although the Court's decisions are clearly limited to the situation in which police officers reasonably rely upon an apparently valid warrant in conducting a search, I am not at all confident that the exception unleashed today will remain so confined. Indeed, the full impact of the Court's regrettable decisions will not be felt until the Court attempts to extend this rule to situations in which the police have conducted a warrantless search solely on the basis of their own judgment about the existence of probable cause and exigent circumstances. When that question is finally posed, I for one will not be surprised if my colleagues decide once again that we simply cannot afford to protect Fourth Amendment rights.

IV

When the public, as it quite properly has done in the past as well as in the present, demands that those in government increase their efforts to combat crime, it is all too easy for those government [****111] officials to seek expedient solutions. In contrast to such costly and difficult measures as building more prisons, improving law enforcement methods, or hiring more prosecutors and judges to relieve the overburdened court systems in the country's metropolitan areas, the relaxation of Fourth Amendment standards seems a tempting, costless means of meeting the public's demand for better law enforcement. In the long run, however, we as a society pay a heavy price for such expediency, because as Justice Jackson observed, the rights guaranteed in the Fourth Amendment [*960] "are not mere second-class rights but belong in the catalog of indispensable freedoms." *Brinegar* v. *United States*, 338 U.S. 160, 180 (1949) (dissenting opinion). Once lost, such rights are difficult to recover. There is hope, however, that in time this or some later Court will restore these precious freedoms to their rightful place as a primary protection for our citizens against overreaching officialdom.

I dissent.

JUSTICE STEVENS, concurring in the judgment in No. [***723] 82-963, *post*, p. 981, and dissenting in No. 82-1771.

It is appropriate to begin with the plain language of [****112] the Fourth Amendment:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Court assumes that the searches in these cases violated the Fourth Amendment, yet refuses to apply the exclusionary rule because the Court concludes that it was "reasonable" for the police to conduct them. In my opinion an official search and seizure cannot be both "unreasonable" and "reasonable" at the same time. The doctrinal vice in the Court's holding is its failure to consider the separate purposes of the two prohibitory Clauses in the Fourth Amendment.

The first Clause prohibits unreasonable searches and seizures and the second prohibits the issuance of warrants that are not supported by probable cause or that do not particularly describe the place to be searched and the persons or things to be seized. We have, of course, repeatedly held that warrantless searches are presumptively unreasonable, [1] [*961] and [****113] that there are only a few carefully delineated exceptions to that basic presumption. [2] But when such an exception has been recognized, analytically we have necessarily concluded that the warrantless activity was not "unreasonable" within the meaning of the first Clause. Thus, any Fourth Amendment case may present two separate questions: whether the search was conducted pursuant to a warrant issued in accordance with the second Clause, and, if not, whether it was nevertheless "reasonable" within the meaning of the first. On these questions, the constitutional text requires that we speak with one voice. We cannot intelligibly assume, *arguendo*, that a search

---

[1] See, *e. g., Payton* v. *New York*, 445 U.S. 573, 586 (1980); *Chimel* v. *California*, 395 U.S. 752, 762-763 (1969).

[2] See, *e. g., Coolidge* v. *New Hampshire*, 403 U.S. 443, 474-475 (1971); *Vale* v. *Louisiana*, 399 U.S. 30 (1970).

was constitutionally unreasonable but that the seized evidence is admissible because the same search was reasonable.

[****114] I

In No. 82-963, the Supreme Judicial Court of Massachusetts determined that a warrant which purported to authorize a search of respondent's home had been issued in violation of the Warrant Clause. In its haste to make new law, this Court does not tarry to consider this holding. Yet, as I will demonstrate, this holding is clearly wrong; I would reverse the judgment on that ground alone.

In No. 82-1771, there is also a substantial question whether the warrant complied with the Fourth Amendment. There was a strong dissent [***724] on the probable-cause issue when *Leon* was before the Court of Appeals, and that dissent has been given added force by this Court's intervening decision in *Illinois* v. *Gates*, 462 U.S. 213 (1983), which constituted a significant development in the law. It is probable, though admittedly not certain, that the Court of Appeals would now conclude that the warrant in *Leon* satisfied the Fourth Amendment if it were given the opportunity to reconsider the issue in the light of *Gates*. Adherence to our normal [*962] practice following the announcement of a new rule would therefore postpone, and probably obviate, the need [****115] for the promulgation of the broad new rule the Court announces today. [3]

It is, of course, disturbing that the Court chooses one case in which there was no violation of the Fourth Amendment, and another in which there is grave doubt on the question, in order to promulgate a "good faith" exception to the Fourth Amendment's exclusionary rule. The Court's explanation for its failure to decide the merits of the Fourth Amendment question in No. 82-963 is that it "is a factbound issue of little importance," *Massachusetts* v. *Sheppard, post*, at 988, n. 5. In No. 82-1771, the Court acknowledges that the case could be remanded to the Court of Appeals for reconsideration in light of *Gates*, yet does not bother to explain why [****116] it fails to do so except to note that it is "within our power" to decide the broader question in the case. *United States* v. *Leon, ante*, at 905. The Court seems determined to decide these cases on the broadest possible grounds; such determination is utterly at odds with the Court's traditional practice as well as any principled notion of judicial restraint. Decisions made in this manner are unlikely to withstand the test of time.

Judges, more than most, should understand the value of adherence to settled procedures. By adopting a set of fair procedures, and then adhering to them, courts of law ensure that justice is administered with an even hand. "These are subtle matters, for they concern the ingredients of what constitutes justice. Therefore, justice must satisfy the appearance of justice." *Offutt* v. *United States*, 348 U.S. 11, 14 (1954). Of course, this Court has a duty to face questions of constitutional law when necessary to the disposition of an actual case or controversy. *Marbury* v. *Madison*, 1 Cranch [*963] 137, 177 (1803). But when the Court goes beyond what is necessary to decide the case before it, it can only [****117] encourage the perception that it is pursuing its own notions of wise social policy, rather than adhering to its judicial role. I do not believe the Court should reach out to decide what is undoubtedly a profound question concerning the administration of criminal justice before assuring itself that this question is actually and of necessity presented by the concrete facts before the Court. Although it may appear that the [***725] Court's broad holding will serve the public interest in enforcing obedience to the rule of law, for my part, I remain firmly convinced that "the preservation of order in our communities will be best ensured by adherence to established and respected procedures." *Groppi* v. *Leslie*, 436 F.2d 331, 336 (CA7 1971) (en banc) (STEVENS, J., dissenting), rev'd, 404 U.S. 496 (1972).

II

In No. 82-963, there is no contention that the police officers did not receive appropriate judicial authorization for their search of respondent's residence. A neutral and detached judicial officer had correctly determined that there was probable cause to conduct a search. Nevertheless, the Supreme Judicial Court suppressed the fruits of the [****118] search because the warrant did not particularly describe the place to be searched and the things to be seized.

The particularity requirement of the Fourth Amendment has a manifest purpose -- to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to

[3] In his petition for certiorari in *Leon*, the Solicitor General did not seek plenary review, but only that the petition "be disposed of as appropriate in light of the Court's decision in *Illinois* v. *Gates*," Pet. for Cert. in *United States* v. *Leon*, No. 82-1771, p. 10.

search, the requirement ensures that the search is carefully tailored to its justification, and does not resemble the wide-ranging general searches that the Framers intended to prohibit. [4] In this [*964] case the warrant did not come close to authorizing a general search. [5]

[****119] The affidavit supporting the application for the warrant correctly identified the things to be seized, and on its face the affidavit indicated that it had been presented to the judge who had issued the warrant. [6] Both the police officers and the judge were fully aware of the contents of the affidavit, and therefore knew precisely what the officers were authorized to search for. Since the affidavit was available for after-the-fact review, the Massachusetts courts could readily ascertain the limits of the officers' authority under the warrant. In short, the judge who issued the warrant, the police officers who executed it, and the reviewing courts all were able easily to ascertain the precise scope of the authorization provided by the warrant.

All that our cases require is that a warrant contain a description sufficient [***726] to enable the officers who execute it to ascertain with reasonable effort where they are to search and [****120] what they are to seize. [7] The test is whether the executing officers' discretion has been limited in a way that forbids a general search. [8] Here there was no question that the [*965] executing officers' discretion had been limited -- they, as well as the reviewing courts, knew the precise limits of their authorization. There was simply no "occasion or opportunity for officers to rummage at large," *Zurcher* v. *Stanford Daily*, 436 U.S. 547, 566 (1978). [9]

The only Fourth Amendment interest that is arguably implicated by the "defect" in the warrant is the citizen's interest in being able to [****121] ascertain the limits of the officers' authorization by examining the warrant. [10] [****122] Respondent, however, was not home at the time the warrant was executed, and therefore had no occasion to see the warrant. The two persons who were present when the warrant was executed, respondent's mother and sister, did not read the warrant or ask to have it read. "[The] general rule [is] that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman* v. *United States*, 394 U.S. 165, 174 (1969). Thus, respondent, who has standing to assert only his own Fourth Amendment interests, [11] cannot complain that his interest in ascertaining the limits of the officers' authority under the search warrant was infringed. [12] In short, our [*966] precedents construing

---

[4] See *Andresen* v. *Maryland*, 427 U.S. 463, 480 (1976); *Stanley* v. *Georgia*, 394 U.S. 557, 569-572 (1969) (Stewart, J., concurring in result); *Stanford* v. *Texas*, 379 U.S. 476, 481-482, 485 (1965); *Go-Bart Importing Co*. v. *United States*, 282 U.S. 344, 357 (1931); *Marron* v. *United States*, 275 U.S. 192, 195-196 (1927).

[5] Indeed, the "defect" in the warrant was that it authorized -- albeit mistakenly -- a search for quite particular "things to be seized," controlled substances, rather than the evidence described in the affidavit supporting the warrant application. This "defect" posed no risk of a general search. On its face, the warrant correctly identified the place to be searched. Thus, the threshold invasion of privacy -- entry into respondent's home -- was properly and specifically authorized. Moreover, the four corners of the warrant plainly indicate that it was not intended to authorize a search for controlled substances. On the cover of the warrant the caption "Controlled Substances" had been crossed out, and an "addendum" to the warrant authorized a search for and seizure of a rifle and ammunition, indicating that the warrant was not limited to controlled substances.

[6] The issuing judge attested to the affiant's signature on the affidavit.

[7] See *Steele* v. *United States*, 267 U.S. 498, 503 (1925).

[8] See *Lo-Ji Sales, Inc*. v. *New York*, 442 U.S. 319, 325 (1979); *Andresen* v. *Maryland*, 427 U.S., at 480-482; *Marcus* v. *Search Warrant*, 367 U.S. 717, 732-733 (1961).

[9] See also *Coolidge* v. *New Hampshire*, 403 U.S., at 467.

[10] See *Illinois* v. *Gates*, 462 U.S. 213, 236 (1983); *United States* v. *Chadwick*, 433 U.S. 1, 9 (1977); *Camara* v. *Municipal Court*, 387 U.S. 523, 532 (1967).

[11] See, *e. g., Rawlings* v. *Kentucky*, 448 U.S. 98, 104-106 (1980); *Rakas* v. *Illinois*, 439 U.S. 128 (1978).

[12] Even if respondent had standing to assert his right to be able to ascertain the officers' authority from the four corners of the warrant, it is doubtful that he could succeed. On its face the warrant authorized a search of respondent's residence, "42 Deckard Street." Had respondent read the warrant he would have had no reason to question the officers' right to enter the premises. Moreover, the face of the warrant indicated that the caption "Controlled Substances" had been stricken, and at the bottom of the warrant an addendum authorized the search for and seizure of a rifle and ammunition. The supporting affidavit, which the police had with them when they executed the warrant, and which was attested by the same judge who had issued the warrant, described in detail the items which the police were authorized to search for and to seize.

the particularity requirement of the Warrant Clause unambiguously demonstrate that this warrant did not violate the Fourth Amendment.

III

Even if it be assumed that there was a technical violation of the particularity requirement in [****123] No. 82-963, it by no means follows that the "warrantless" search in that case was "unreasonable" within the [***727] meaning of the Fourth Amendment. For this search posed none of the dangers to which the Fourth Amendment is addressed. It was justified by a neutral magistrate's determination of probable cause and created no risk of a general search. It was eminently "reasonable."

In No. 82-1771, however, the Government now admits -- at least for the tactical purpose of achieving what it regards as a greater benefit -- that the substance, as well as the letter, of the Fourth Amendment was violated. The Court therefore assumes that the warrant in that case was not supported by probable cause, but refuses to suppress the evidence obtained thereby because it considers the police conduct to satisfy a "newfangled" nonconstitutional standard of reasonableness. [13] Yet if the Court's assumption is correct -- if there was no probable cause -- it must follow that it was "unreasonable" [*967] for the authorities to make unheralded entries into and searches of private dwellings and automobiles. The Court's conclusion that such searches undertaken without probable cause can nevertheless [****124] be "reasonable" is totally without support in our Fourth Amendment jurisprudence.

[****125] Just last Term, the Court explained what probable cause to issue a warrant means:

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois* v. *Gates*, 462 U.S., at 238.

Moreover, in evaluating the existence [***728] of probable cause, reviewing courts must give substantial deference to the magistrate's determination. [14] [****127] In doubtful cases the warrant [*968] should be sustained. [15] The judgment as to whether there is probable cause must be made in a practical and nontechnical manner. [16] The probable-cause standard

---

[13] I borrow the adjective from Justice Clark, who so characterized the warrants authorized by the Court in *Camara* v. *Municipal Court*, 387 U.S. 523 (1967), but not authorized by the Constitution itself. In an opinion joined by Justice Harlan and Justice Stewart, he wrote:

"Today the Court renders this municipal experience, which dates back to Colonial days, for naught by overruling *Frank* v. *Maryland* [359 U.S. 360 (1959)] and by striking down hundreds of city ordinances throughout the country and jeopardizing thereby the health, welfare, and safety of literally millions of people.

"But this is not all. It prostitutes the command of the Fourth Amendment that 'no Warrants shall issue, but upon probable cause' and sets up in the health and safety codes area inspection a newfangled 'warrant' system that is entirely foreign to Fourth Amendment standards. It is regrettable that the Court wipes out such a long and widely accepted practice and creates in its place such enormous confusion in all of our towns and metropolitan cities in one fell swoop." *See* v. *City of Seattle*, 387 U.S. 541, 547 (1967) (dissenting in both *Camara* and *See*).

The kind of doctrinal difficulties in the two lines of cases engendered by the Court's creation of a newfangled warrant, compare *Marshall* v. *Barlow's, Inc*., 436 U.S. 307 (1978), with *Donovan* v. *Dewey*, 452 U.S. 594 (1981), can be expected to grow out of the Court's creation of a new double standard of reasonableness today. Ironically, as I have previously suggested, the failure to consider both Clauses of the Amendment infects both lines of decision. See *Michigan* v. *Clifford*, 464 U.S. 287, 301-303 (1984) (STEVENS, J., concurring in judgment); *Dewey*, 452 U.S., at 606-608 (STEVENS, J., concurring); *Michigan* v. *Tyler*, 436 U.S. 499, 513 (1978) (STEVENS, J., concurring in part and concurring in judgment); *Barlow's*, 436 U.S., at 325-339 (STEVENS, J., dissenting).

[14] See *Massachusetts* v. *Upton*, 466 U.S. 727, 732-733 (1984) (*per curiam*); *Illinois* v. *Gates*, 462 U.S., at 236; *United States* v. *Harris*, 403 U.S. 573, 577-583 (1971) (plurality opinion); *Spinelli* v. *United States*, 393 U.S. 410, 419 (1969); *Aguilar* v. *Texas*, 378 U.S. 108, 111 (1964); *Jones* v. *United States*, 362 U.S. 257, 271 (1960).

[15] See *Illinois* v. *Gates*, 462 U.S., at 237, n. 10; *United States* v. *Ventresca*, 380 U.S. 102, 109 (1965).

[16] See *Massachusetts* v. *Upton*, 466 U.S., at 732 (*per curiam*);

therefore gives law enforcement officers ample room to engage in any reasonable law enforcement activity. What is more, the standard has been familiar to the law enforcement profession for centuries. [17] In an opinion written in 1949, and endorsed by the Court last Term in *Gates*, we explained:

"These long-prevailing [****126] standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." *Brinegar* v. *United States*, 338 U.S. 160, 176.

Thus, if the majority's assumption is correct, that even after paying heavy deference to the magistrate's finding and resolving all doubt in its favor, there is no probable cause here, then by definition -- as a matter of constitutional law -- [*969] the officers' conduct was unreasonable. [18] [****128] The Court's own hypothesis is that there was no fair likelihood that the officers would find evidence of a crime, and hence there was no reasonable law enforcement justification for their conduct. [19]

The [***729] majority's contrary conclusion rests on the notion that it must be reasonable for a police officer to rely on a magistrate's finding. Until today that has plainly not been the law; it has been well settled that even when a magistrate issues a warrant there is no guarantee that the ensuing search and seizure is constitutionally reasonable. Law enforcement officers have long been on notice that despite the magistrate's decision a warrant will be invalidated if the officers did not provide sufficient facts to enable the magistrate to evaluate the existence of probable cause responsibly and independently. [20] [****130] Reviewing courts have always [****129] inquired into whether the magistrate acted properly in issuing the warrant -- not merely whether the officers acted properly in executing it. See *Jones* v. *United States*, 362 U.S. 257, 271-272 (1960). [21] Indeed, just last Term, in *Gates*, after noting [*970] that "'the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for [concluding]' that probable cause existed,'" 462 U.S., at 238-239 (quoting *Jones*, 362 U.S., at 271), the Court added:

"Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur,

*Illinois* v. *Gates*, 462 U.S., at 231; *United States* v. *Ventresca*, 380 U.S., at 108.

[17] See, *e. g.*, 2 M. Hale, Pleas of the Crown 150 (1st Am. ed. 1847).

[18] "[If] nothing said under oath in the warrant application demonstrates the need for an unannounced search by force, the probable-cause requirement is not satisfied. In the absence of some other showing of reasonableness, the ensuing search violates the Fourth Amendment." *Zurcher* v. *Stanford Daily*, 436 U.S. 547, 583 (1978) (STEVENS, J., dissenting).

[19] As the majority recognizes, *United States* v. *Leon, ante*, at 915, n. 13, an officer's good faith cannot make otherwise "unreasonable" conduct reasonable. See *Terry* v. *Ohio*, 392 U.S. 1, 22 (1968); *Beck* v. *Ohio*, 379 U.S. 89, 97 (1964); *Henry* v. *United States*, 361 U.S. 98, 102 (1959). The majority's failure to appreciate the significance of that recognition is inexplicable.

[20] See *Franks* v. *Delaware*, 438 U.S. 154, 165, 169-170 (1978); *Whiteley* v. *Warden*, 401 U.S. 560, 564 (1971); *Spinelli* v. *United States*, 393 U.S., at 415-416; *United States* v. *Ventresca*, 380 U.S., at 108-109; *Aguilar* v. *Texas*, 378 U.S., at 113-115; *Nathanson* v. *United States*, 290 U.S. 41 (1933); *Byars* v. *United States*, 273 U.S. 28 (1927).

[21] In making this point in *Franks* v. *Delaware*, 438 U.S. 154 (1978), JUSTICE BLACKMUN wrote for the Court: "We see no principled basis for distinguishing between the question of the sufficiency of an affidavit, which is also subject to a post-search examination, and the question of its integrity." *Id.*, at 171. Yet today the Court justifies its holding in part by distinguishing veracity claims, *United States* v. *Leon, ante*, at 922-923, thereby distinguishing what we previously held could not be distinguished on a principled basis. Just why it should be less reasonable for an innocent officer to rely on a warrant obtained by another officer's fraud than for him to rely on a warrant that is not supported by probable cause is entirely unclear to me.

courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." 462 U.S. at 239. [22]

[****131] Thus, under our cases it has never been "reasonable" for the police to rely on the mere fact that a warrant has issued; the police have always known that if they fail to supply the [***730] magistrate with sufficient information, the warrant will be held invalid and its fruits excluded. [23]

The notion that a police officer's reliance on a magistrate's warrant is automatically appropriate is one the Framers of [*971] the Fourth Amendment would have vehemently rejected. The precise problem that the Amendment was intended to address was *the unreasonable issuance* [****132] *of warrants* . As we have often observed, the Amendment was actually motivated by the practice of issuing general warrants -- warrants which did not satisfy the particularity and probable-cause requirements. [24] [****133] The resentments which led to the Amendment were directed at the issuance of *warrants* unjustified by particularized evidence of wrongdoing. [25] Those who sought to amend the Constitution to include a Bill of Rights repeatedly voiced the view that the evil which had to be addressed was the issuance of warrants on insufficient evidence. [26] As Professor Taylor has written:

[*972] "[Our] constitutional fathers were not concerned about warrantless searches, but about overreaching warrants. It is perhaps too much to say that they feared the warrant more than the search, but it is plain enough that the warrant was the prime object of their concern. Far from looking at the warrant as a protection against unreasonable searches, they saw it as an authority for unreasonable and oppressive searches. . . ." T. Taylor, [***731] Two Studies in Constitutional Interpretation 41 (1969).

In short, the Framers of the Fourth Amendment were deeply suspicious [****134] of warrants; in their minds the paradigm of an abusive search was the execution of a warrant not based on probable cause. The fact that colonial officers had magisterial authorization for their conduct when they engaged in general searches surely did not make their conduct "reasonable." The Court's view that it is consistent with our Constitution to adopt a rule that it is presumptively reasonable to rely on a defective warrant is the product of constitutional amnesia. [27]

---

[22] Judicial review of magisterial determinations is all the more necessary since the magistrate acts without benefit of adversarial presentation; his determination partakes of the unreliability inherent in any *ex parte* proceeding. See *Franks* v. *Delaware*, 438 U.S., at 169.

[23] The majority seems to be captivated by a vision of courts invalidating perfectly reasonable police conduct because of "technical" violations of the Fourth Amendment. In my view there is no such thing as a "technical" violation of the Fourth Amendment. No search or seizure can be unconstitutional unless it is "unreasonable." By definition a Fourth Amendment violation cannot be reasonable. My analysis of No. 82-963 illustrates this point.

[24] See, *e. g., Steagald* v. *United States*, 451 U.S. 204, 220 (1981); *Payton* v. *New York*, 445 U.S., at 583-584; *Lo-Ji Sales, Inc*. v. *New York*, 442 U.S., at 325; *Marshall* v. *Barlow's, Inc*., 436 U.S., at 327-328 (STEVENS, J., dissenting); *United States* v. *Chadwick*, 433 U.S., at 7-8; *Chimel* v. *California*, 395 U.S., at 760-762; *Stanford* v. *Texas*, 379 U.S., at 480-485; *Marcus* v. *Search Warrant*, 367 U.S., at 727-729; *Henry* v. *United States*, 361 U.S., at 100-101; *Frank* v. *Maryland*, 359 U.S. 360, 363-365 (1959); *United States* v. *Rabinowitz*, 339 U.S. 56, 69-70 (1950) (Frankfurter, J., dissenting); *Marron* v. *United States*, 275 U.S., at 195-196; *Weeks* v. *United States*, 232 U.S. 383, 390-391 (1914); *Boyd* v. *United States*, 116 U.S. 616, 624-630 (1886).

[25] See J. Landynski, Search and Seizure and the Supreme Court 19-47 (1966); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 53-98 (1937); R. Rutland, The Birth of the Bill of Rights 11 (rev. ed. 1983); Marke, The Writs of Assistance Case and the Fourth Amendment, in Essays in Legal History in Honor of Felix Frankfurter 351 (M. Forkosch ed. 1966).

[26] See 1 The Bill of Rights: A Documentary History 473, 488-489, 508 (B. Schwartz ed. 1971); 2 *id*., at 658, 665, 730, 733-734, 805-806, 815, 841-842, 913, 968. In fact, the original version of the Fourth Amendment contained only one clause providing that the right to be protected against unreasonable searches and seizures "shall not be violated by warrants issuing. . . ." The change to its present form broadened the coverage of the Amendment but did not qualify the unequivocal prohibition against the issuance of warrants without probable cause. See 2 *id*., at 1112; N. Lasson, *supra* n. 25, at 101-103.

[27] "It makes all the difference in the world whether one recognizes the central fact about the Fourth Amendment, namely, that it was a safeguard against recurrence of abuses so deeply felt by the Colonies as to be one of the potent causes of the Revolution, or one thinks of it as merely a requirement for a piece of paper." *United States* v. *Rabinowitz*, 339 U.S., at 69 (Frankfurter, J., dissenting).

IV

In *Brinegar*, Justice Jackson, after observing that "[indications] are not wanting that Fourth Amendment freedoms [****135] are tacitly marked as secondary rights, to be relegated to a deferred position," 338 U.S., at 180 (dissenting opinion), continued:

"These, I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and [*973] seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.

. . . .

"Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing [****136] incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are, many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear.

"Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty. . . . So a search against Brinegar's car must be regarded as a search of the car of Everyman." *Id.*, at 180-181.

Justice Jackson's reference to his [***732] experience at Nuremberg should remind us of the importance of considering the consequences of today's decision for "Everyman."

The exclusionary rule is designed to prevent violations of the Fourth Amendment. [28] [****138] "Its purpose is to deter -- to compel [*974] respect for the constitutional guaranty in the only effectively available way, by removing the incentive to disregard it." *Elkins* v. *United States*, 364 U.S. 206, 217 (1960). [29] If the police cannot use evidence [****137] obtained through warrants issued on less than probable cause, they have less incentive to seek those warrants, and magistrates have less incentive to issue them.

Today's decisions do grave damage to that deterrent function. Under the majority's new rule, even when the police know their warrant application is probably insufficient, they retain an incentive to submit it to a magistrate, on the chance that he may take the bait. No longer must they hesitate and seek additional evidence

---

[28] For at least two reasons, the exclusionary rule is a better remedy than a civil action against an offending officer. Unlike the fear of personal liability, it should not create excessive deterrence; moreover, it avoids the obvious unfairness of subjecting the dedicated officer to the risk of monetary liability for a misstep while endeavoring to enforce the law. Society, rather than the individual officer, should accept the responsibility for inadequate training or supervision of officers engaged in hazardous police work. What THE CHIEF JUSTICE wrote, some two decades ago, remains true today:

"It is the proud claim of a democratic society that the people are masters and all officials of the state are servants of the people. That being so, the ancient rule of *respondeat superior* furnishes us with a simple, direct and reasonable basis for refusing to admit evidence secured in violation of constitutional or statutory provisions. Since the policeman is society's servant, his acts in the execution of his duty are attributable to the master or employer. Society as a whole is thus responsible and society is 'penalized' by refusing it the benefit of evidence secured by the illegal action. This satisfies me more than the other explanations because it seems to me that society -- in a country like ours -- *is* involved in and *is* responsible for what is done in its name and by its agents. Unlike the Germans of the 1930's and early '40's, we cannot say 'it is all The Leader's doing. I am not responsible.' In a representative democracy we are responsible, whether we like it or not. And so each of us is involved and each is in this sense responsible when a police officer breaks rules of law established for our common protection." Burger, Who Will Watch the Watchman?, 14 Am. U. L. Rev. 1, 14 (1964) (emphasis in original) (footnote omitted).

[29] See *Stone* v. *Powell*, 428 U.S. 465, 484 (1976); *United States* v. *Janis*, 428 U.S. 433, 443, n. 12 (1976); *United States* v. *Calandra*, 414 U.S. 338, 347-348 (1974); *Terry* v. *Ohio*, 392 U.S., at 29; *Tehan* v. *United States ex rel. Shott*, 382 U.S. 406, 413 (1966); *Mapp* v. *Ohio*, 367 U.S. 643, 656 (1961).

in doubtful cases. Thus, what we [*975] said two Terms ago about a rule that would prevent exclusion except in cases in which the authorities violate well-settled law applies fully to the rule the Court adopts today:

"If, as the Government argues, all rulings resolving unsettled Fourth Amendment questions should be nonretroactive, then, [****139] in close cases law enforcement officials would have little incentive to err on the side of constitutional behavior. Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the [***733] area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question. Failure to accord *any* retroactive effect to Fourth Amendment rulings would 'encourage police or other courts to disregard the plain purport of our decisions and to adopt a let's-wait-until-it's-decided approach.'" *United States* v. *Johnson*, 457 U.S. 537, 561 (1982) (emphasis in original) (footnote omitted) (quoting *Desist* v. *United States*, 394 U.S. 244, 277 (1969) (Fortas, J., dissenting)). [30]

[****140] The Court is of course correct that the exclusionary rule cannot deter when the authorities have no reason to know that their conduct is unconstitutional. But when probable cause is lacking, then by definition a reasonable person under the circumstances would not believe there is a fair likelihood that a search will produce evidence of a crime. Under such circumstances well-trained professionals must know that they are violating the Constitution. The Court's approach -- [*976] which, in effect, encourages the police to seek a warrant even if they know the existence of probable cause is doubtful -- can only lead to an increased number of constitutional violations.

Thus, the Court's creation of a double standard of reasonableness inevitably must erode the deterrence rationale that still supports the exclusionary rule. But we should not ignore the way it tarnishes the role of the judiciary in enforcing the Constitution. For the original rationale for the exclusionary rule retains its force as well as its relevance:

"The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures . . . should find no sanction in the [****141] judgments of the courts which are charged at all times with the support of the Constitution and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights." *Weeks* v. *United States*, 232 U.S. 383, 392 (1914). [31] [****143]

[***734] Thus, "Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional [*977] rights of citizens by permitting unhindered governmental use of the fruits of such invasions. . . ." *Terry* v. *Ohio*, 392 U.S. 1, 13 (1968). [32] As the Court correctly notes, [33] we have refused to apply the exclusionary rule to collateral contexts in which its marginal efficacy is questionable;

[30] See also LaFave, The Fourth Amendment in an Imperfect World: On Drawing "Bright Lines" and "Good Faith," 43 U. Pitt. L. Rev. 307, 358 (1982); Stewart, The Road to *Mapp* v. *Ohio* and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases, 83 Colum. L. Rev. 1365, 1401-1403 (1983); Wasserstrom, The Incredible Shrinking Fourth Amendment, 21 Am. Crim. L. Rev. 257, 395-397 (1984).

[31] The Court continued:

"The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land. The United States Marshal could only have invaded the house of the accused when armed with a warrant issued as required by the Constitution, upon sworn information and describing with reasonable particularity the things for which the search was to be made. Instead, he acted without sanction of law, doubtless prompted by the desire to bring further proof to the aid of the Government, and under color of his office undertook to make a seizure of private papers in direct violation of the constitutional prohibition against such action. Under such circumstances, without sworn information and particular description, not even an order of court would have justified such procedure. . . . To sanction such proceedings would be to affirm by judicial decision a manifest neglect if not an open defiance of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action." 232 U.S., at 393-394.

[32] See *United States* v. *Peltier*, 422 U.S. 531, 536 (1975); *Lee* v. *Florida*, 392 U.S. 378, 385-386 (1968); *Berger* v. *New York*, 388 U.S. 41, 50 (1967); *Mapp* v. *Ohio*, 367 U.S., at 647-650; *Byars* v. *United States*, 273 U.S., at 33-34.

[33] *United States* v. *Leon, ante*, at 908-913.

until today, however, every time the police have violated the applicable commands of the Fourth Amendment a court has been prepared to vindicate that Amendment by preventing the use of evidence so obtained in the prosecution's case in chief against those whose rights have been violated. [34] Today, for the first time, this Court holds that although the Constitution has been violated, no court should do anything about it at any time and in any proceeding. [****142] [35] [****144] In my judgment, [*978] the Constitution requires more. Courts simply cannot escape their responsibility for redressing constitutional violations if they admit evidence obtained through unreasonable searches and seizures, since the entire point of police conduct that violates the Fourth Amendment is to obtain evidence for use at trial. If such evidence is admitted, then the courts become not merely the final and necessary link in an unconstitutional chain of events, but its actual motivating force. "If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed." *Olmstead* v. *United States*, 277 U.S. 438, 470 [***735] (1928) (Holmes, J., dissenting). Nor should we so easily concede the existence of a constitutional violation for which there is no remedy. [36] To do so is to convert a Bill of *Rights* into an unenforced honor code that the police may follow in their discretion. The Constitution requires more; it requires a *remedy*. [37] If the Court's new rule is to be followed, the Bill of Rights should be renamed.

[****145] [*979] It is of course true that the exclusionary rule exerts a high price -- the loss of probative evidence of guilt. But that price is one courts have often been required to pay to serve important social goals. [38] [****146] That price is also one the Fourth Amendment requires us to pay, assuming as we must that the Framers intended that its strictures "shall not be violated." For in all such cases, as Justice Stewart has observed, "the same extremely relevant evidence would not have been obtained had the police officer complied with the commands of the fourth amendment in the first place." [39]

---

[34] Indeed, we have concluded that judicial integrity is not compromised by the refusal to apply the exclusionary rule to collateral contexts precisely because the defendant is able to vindicate his rights in the primary context -- his trial and direct appeal therefrom. See *Stone* v. *Powell*, 428 U.S., at 485-486.

[35] As the majority recognizes, *United States* v. *Leon, ante*, at 922-923, and n. 23, in all cases in which its "good faith" exception to the exclusionary rule would operate, there will also be immunity from civil damages. See also *United States* v. *Ross*, 456 U.S. 798, 823, n. 32 (1982); *Stadium Films, Inc*. v. *Baillargeon*, 542 F.2d 577, 578 (CA1 1976); *Madison* v. *Manter*, 441 F.2d 537 (CA1 1971). See generally *Pierson* v. *Ray*, 386 U.S. 547 (1967). The Court amazingly suggests that in some cases in which suppression would not be appropriate courts should nevertheless adjudicate the merits of Fourth Amendment claims to provide guidance to police and magistrates but not a remedy. *United States* v. *Leon, ante*, at 925. Not only is the propriety of deciding constitutional questions in the absence of the strict necessity to do so open to serious question, see *Bowen* v. *United States*, 422 U.S. 916, 920 (1975), but such a proceeding, in which a court would declare that the Constitution had been violated but that it was unwilling to do anything about it, seems almost a mockery: "[The] assurance against unreasonable federal searches and seizures would be 'a form of words,' valueless and undeserving of mention in a perpetual charter of inestimable human liberties." *Mapp* v. *Ohio*, 367 U.S., at 655. See also *Segura* v. *United States, ante*, at 838-840 (STEVENS, J., dissenting).

[36] "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury* v. *Madison*, 1 Cranch 137, 163 (1803). See generally Schrock & Welsh, Up From Calandra: The Exclusionary Rule as a Constitutional Requirement, 59 Minn. L. Rev. 251, 350-372 (1974).

[37] See Stewart, 83 Colum. L. Rev., at 1383-1384 (footnotes omitted) ("In my opinion, however, the framers did not intend the Bill of Rights to be no more than unenforceable guiding principles -- no more than a code of ethics under an honor system. The proscriptions and guarantees in the amendments were intended to create legal rights and duties"). See also Ervin, The Exclusionary Rule: An Essential Ingredient of the Fourth Amendment, 1983 S. Ct. Rev. 283. In fact, if the Constitution of the United States does not compel use of the exclusionary rule, *Mapp* v. *Ohio*, 367 U.S. 643 (1961), which the majority does not purport to question, could not have been decided as it was. See *id*., at 655 ("We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court").

[38] The exclusion of probative evidence in order to serve some other policy is by no means unique to the Fourth Amendment. In his famous treatise on evidence, Dean Wigmore devoted an entire volume to such exclusionary rules, which are common in the law of evidence. See 8 J. Wigmore, Evidence (J. McNaughton rev. 1961) (discussing, *inter alia*, marital privilege, attorney-client privilege, communications among jurors, state secrets privilege, physician-patient privilege, priest-penitent privilege).

[39] Stewart, 83 Colum. L. Rev., at 1392 (footnote omitted). See

"[The] forefathers thought this was not too great a price to pay for that decent privacy of home, papers and effects which is indispensable to individual dignity and self-respect. They may have overvalued privacy, but I am not disposed to set their command at naught." *Harris* v. *United States*, 331 U.S. 145, 198 (1947) (Jackson, J., dissenting). [40]

We could, of course, facilitate the process of administering justice to [***736] those who violate the criminal laws by ignoring the commands of the Fourth Amendment -- indeed, by ignoring [*980] the entire Bill of Rights -- but it is the very purpose of a Bill of Rights to identify values that may not be sacrificed to expediency. In a just society those [****147] who govern, as well as those who are governed, must obey the law.

While I concur in the Court's judgment in No. 82-963, I would vacate the judgment in No. 82-1771 and remand the case to the Court of Appeals for reconsideration in the light of *Gates*. Accordingly, I respectfully dissent from the disposition in No. 82-1771.

## References

Admissibility in criminal case of evidence obtained by law enforcement officer allegedly relying reasonably and in good faith on defective warrant

29 Am Jur 2d, Evidence 416

12 Federal Procedure, L Ed, Evidence 33:389

7 Federal Procedural Forms, L Ed, Criminal Procedure 20:585 et seq.

22 Am Jur Pl & Pr Forms (Rev), Searches and Seizures Form 41 et seq.

5 Am Jur Trials 331, Excluding Illegally Obtained Evidence

USCS, Constitution, Fourth Amendment

US L Ed Digest, Evidence 681, 681.5

L Ed Index to Annos, Search and Seizure

ALR Quick Index, Exclusion or Suppression of Evidence

Federal Quick Index, Exclusion of Evidence; Suppression of Evidence

Annotation References:

Admissibility in criminal case of evidence obtained by [****148] law enforcement officer allegedly relying reasonably and in good faith on defective warrant. 82 L Ed 2d 1054.

Admissibility of evidence obtained by illegal search and seizure. 6 L Ed 2d 1544; 50 ALR2d 531.

Federal Constitution as affecting admissibility of evidence obtained by illegal search and seizure. 84 ALR2d 959.

---

End of Document

---

also Traynor, Mapp v. Ohio at Large in the Fifty States, 1962 Duke L. J. 319, 322 ("Ah, but surely the guilty should not go free? However grave the question, it seemed improperly directed at the exclusionary rule. The hard answer is in the United States Constitution as well as in state constitutions. They make it clear that the guilty would go free if the evidence necessary to convict could only have been obtained illegally, just as they would go free if such evidence were lacking because the police had observed the constitutional restraints upon them").

[40] See also *United States* v. *Di Re*, 332 U.S. 581, 595 (1948).

# Massachusetts v. Sheppard

468 U.S. 981 (1984)

Cited in Supplemental Brief at: 6

Caution
As of: September 17, 2026 9:36 PM Z

# Mass. v. Sheppard

Supreme Court of the United States

January 17, 1984, Argued ; July 5, 1984, Decided

No. 82-963

**Reporter**
468 U.S. 981 *; 104 S. Ct. 3424 **; 82 L. Ed. 2d 737 ***; 1984 U.S. LEXIS 154 ****; 52 U.S.L.W. 5177

MASSACHUSETTS v. SHEPPARD

**Prior History:** [****1] CERTIORARI TO THE SUPREME JUDICIAL COURT OF MASSACHUSETTS.

**Disposition:** 387 Mass. 488, 441 N. E. 2d 725, reversed and remanded.

## Syllabus

On the basis of evidence gathered in the investigation of a homicide in the Roxbury section of Boston, a police detective drafted an affidavit to support an application for an arrest warrant and a search warrant authorizing the search of respondent's residence. The affidavit stated that the police wished to search for certain described items, including clothing of the victim and a blunt instrument that might have been used on the victim. The affidavit was reviewed and approved by the District Attorney. Because it was Sunday, the local court was closed, and the police had a difficult time finding a warrant application form. The detective finally found a warrant form previously used in another district to search for controlled substances. After making some changes in the form, the detective presented it and the affidavit to a judge at his residence, informing him that the warrant form might need to be further changed. Concluding that the affidavit established probable cause to search respondent's residence and telling the detective that [****2] the necessary changes in the warrant form would be made, the judge made some changes, but did not change the substantive portion, which continued to authorize a search for controlled substances, nor did he alter the form so as to incorporate the affidavit. The judge then signed the warrant and returned it and the affidavit to the detective, informing him that the warrant was sufficient authority in form and content to carry out the requested search. The ensuing search of respondent's residence by the detective and other police officers was limited to the items listed in the affidavit, and several incriminating pieces of evidence were discovered. Thereafter, respondent was charged with first-degree murder. At a pretrial suppression hearing, the trial judge ruled that notwithstanding the warrant was defective under the Fourth Amendment in that it did not particularly describe the items to be seized, the incriminating evidence could be admitted because the police had acted in good faith in executing what they reasonably thought was a valid warrant. At the subsequent trial, respondent was convicted. The Massachusetts Supreme Judicial Court held that the evidence should have been [****3] suppressed.

*Held*: Federal law does not require the exclusion of the disputed evidence. Pp. 987-991.

(a) The exclusionary rule should not be applied when the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid. *United States* v. *Leon, ante*, p. 897. Pp. 987-988.

(b) Here, there was an objectively reasonable basis for the officers' mistaken belief that the warrant authorized the search they conducted. The officers took every step that could reasonably be expected of them. At the point where the judge returned the affidavit and warrant to the detective, a reasonable police officer would have concluded, as the detective did, that the warrant authorized a search for the materials outlined in the affidavit. Pp. 988-989.

(c) A police officer is not required to disbelieve a judge who has just advised him that the warrant he possesses authorizes him to conduct the search he has requested. Pp. 989-990.

(d) An error of constitutional dimensions may have been committed with respect to the issuance of the warrant in this case, but it was the judge, not the [****4] police officer, who made the critical mistake. Suppressing

evidence because the judge failed to make all the necessary clerical corrections despite his assurance that such changes would be made will not serve the deterrent function that the exclusionary rule was designed to achieve. Pp. 990-991.

**Counsel:** Barbara A. H. Smith, Assistant Attorney General of Massachusetts, argued the cause for petitioner. With her on the briefs were Francis X. Bellotti, Attorney General, Newman Flanagan, and Michael J. Traft.

John Reinstein argued the case for respondent. With him on the brief was Nancy Gertner. *

[****5]

**Judges:** WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, ante, p. 960. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, ante, p. 928.

**Opinion by:** WHITE

## Opinion

[*983] [***741] [**3425] JUSTICE WHITE delivered the opinion of the Court.

This case involves the application of the rules articulated today in *United States* v. *Leon, ante*, p. 897, to a situation in [*984] which police officers seize items pursuant to a warrant subsequently invalidated because of a technical error on the part of the issuing judge.

I

The badly burned body of Sandra Boulware was discovered in a vacant lot in the Roxbury section of Boston at approximately 5 a. m., Saturday, May 5, 1979. An autopsy revealed that Boulware had died of multiple compound skull fractures caused by blows to the head. After a brief investigation, the police decided to question one of the victim's boyfriends, Osborne Sheppard. Sheppard told the police that he had last seen the victim on Tuesday night and that he had been at a local gaming house (where card games were played) from 9 [****6] p. m. Friday [**3426] until 5 a. m. Saturday. He identified several people who would be willing to substantiate the latter claim.

---

* Briefs of amici curiae urging reversal were filed for the United States by Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Frey, Kathryn A. Oberly, and Robert J. Erickson; for the State of Arkansas et al. by John Steven Clark, Attorney General of Arkansas, Wilkes C. Robinson, and Dan M. Peterson; for Laws at Work et al. by Robert F. Kane, George Deukmejian, Governor of California, John Jay Douglass, G. Joseph Bertain, Jr., Lloyd Dunn, Donald E. Santarelli, Robert L. Toms, and Harold S. Voegelin; for the National District Attorneys Association, Inc., by Newman A. Flanagan, Austin J. McGuigan, John M. Massameno, Edwin L. Miller, Jr., Jack E. Yelverton, and James P. Manak; and for Seven Former Members of the Attorney General's Task Force on Violent Crime et al. by David L. Crump, Frank G. Carrington, Griffin B. Bell, Wayne W. Schmidt, James P. Manak, Fred E. Inbau, Rufus L. Edmisten, Attorney General of North Carolina, and David S. Crump, Deputy Attorney General.

James J. Brosnahan filed a brief for the Bar Association of San Francisco et al. as amici curiae urging affirmance.

Briefs of amici curiae were filed for the State of Florida et al. by Jim Smith, Attorney General of Florida, and Lawrence A. Kaden and Raymond L. Marky, Assistant Attorneys General, and by the Attorneys General for their respective States as follows: Robert K. Corbin of Arizona, John K. Van de Kamp of California, Duane Woodard of Colorado, Austin J. McGuigan of Connecticut, Charles M. Oberly III of Delaware, Michael J. Bowers of Georgia, Tany S. Hong of Hawaii, Jim Jones of Idaho, Linley E. Pearson of Indiana, Robert T. Stephan of Kansas, William J. Guste, Jr., of Louisiana, Frank J. Kelley of Michigan, Hubert H. Humphrey III of Minnesota, Bill Allain of Mississippi, Michael T. Greely of Montana, Brian McKay of Nevada, Gregory H. Smith of New Hampshire, Irwin I. Kimmelman of New Jersey, Rufus L. Edmisten of North Carolina, Robert O. Wefald of North Dakota, Anthony J. Celebrezze, Jr., of Ohio, Michael C. Turpen of Oklahoma, LeRoy S. Zimmerman of Pennsylvania, Dennis J. Roberts II of Rhode Island, T. Travis Medlock of South Carolina, David L. Wilkinson of Utah, John J. Easton, Jr., of Vermont, Gerald L. Baliles of Virginia, Ken Eikenberry of Washington, Chauncey H. Browning, Jr., of West Virginia, Bronson C. La Follette of Wisconsin, and A. G. McClintock of Wyoming; for the Appellate Committee of the California District Attorneys Association by Robert H. Philibosian, Harry B. Sondheim, and Roderick W. Leonard; for the Illinois State Bar Association by Michael J. Costello, Albert Hofeld, William J. Martin, and Joshua Sachs; for the Committee on Criminal Law of the Association of the Bar of the City of New York by Peter L. Zimroth and Barbara D. Underwood; for the National Association of Criminal Defense Lawyers et al. by Marshall W. Krause, Steffan B. Imhoff, and Charles Scott Spear; for the National Legal Aid and Defender Association by Kenneth M. Mogill; and for Dan Johnston, County Attorney, Polk County, Iowa, by Mr. Johnston, pro se.

By interviewing the people Sheppard had said were at the gaming house on Friday night, the police learned that although Sheppard was at the gaming house that night, he had borrowed an automobile at about 3 o'clock Saturday morning in order to give two men a ride home. Even though the trip normally took only 15 minutes, Sheppard did not return with the car until nearly 5 a. m.

On Sunday morning, police officers visited the owner of the car Sheppard had borrowed. He consented to an inspection of the vehicle. Bloodstains and pieces of hair were found on the rear bumper and within the trunk compartment. In addition, the officers noticed strands of wire in the trunk similar to wire strands found on and near the body of the victim. The owner of the car told the officers that when he last used the car on Friday night, shortly before Sheppard borrowed it, he had placed articles in the trunk and had not noticed any stains on the bumper or in the trunk.

On the basis of the evidence gathered thus far in the investigation, Detective Peter O'Malley drafted [****7] an affidavit designed to support an application for an arrest warrant and a search warrant authorizing a search of Sheppard's residence. [*985] The affidavit set forth the results of the investigation and stated that the police wished to search for

"[a] fifth bottle of amaretto liquor, 2 nickel bags of marijuana, a woman's jacket that has been described as black-grey (charcoal) possessions of Sandra D. Boulware, similar type wire and rope that match those on the body of Sandra D. Boulware, or in the above [Thunderbird]. Blunt instrument that might have been used on the victim. Men's or women's clothing that may have blood, gasoline, burns on them. Items that may have fingerprints of the victim." [1]

[***742] Detective O'Malley showed the affidavit to the District Attorney, the District Attorney's first assistant, and a sergeant, who all concluded that it set forth probable cause for the search and the arrest. 387 Mass. 488, 492, 441 N. E. 2d 725, 727 (1982).

[****8] Because it was Sunday, the local court was closed, and the police had a difficult time finding a warrant application form. Detective O'Malley finally found a warrant form previously in use in the Dorchester District. The form was entitled "Search Warrant -- Controlled Substance G. L. c. 276 §§ 1 through 3A." Realizing that some changes had to be made before the form could be used to authorize the search requested in the affidavit, Detective O'Malley deleted the subtitle "controlled substance" with a typewriter. He also substituted "Roxbury" for the printed "Dorchester" and typed Sheppard's name and address into blank spaces provided for that information. However, the reference to "controlled substance" was not deleted in the portion of the form that constituted the warrant application and that, when signed, would constitute the warrant itself.

[*986] Detective O'Malley then took the affidavit and the warrant form to the residence of a judge who had consented to consider the warrant application. The judge examined the affidavit and stated that he would authorize the search as requested. Detective O'Malley offered the warrant form and stated that he knew the form as presented [****9] dealt with controlled substances. He showed the judge where he had crossed out the subtitles. After unsuccessfully searching for a more suitable form, the judge informed O'Malley that he would make the necessary changes so as to provide a proper search warrant. The judge then took the form, made some changes on it, and dated and signed the warrant. However, he did not change the substantive portion of the warrant, which continued to authorize [**3427] a search for controlled substances; [2] [****10] nor did he alter the form so as to incorporate the affidavit. The judge returned the affidavit and the warrant to O'Malley, informing him that the warrant was sufficient authority in form and content to carry out the search as requested. [3] O'Malley took the two

[1] The liquor and marihuana were included in the request because Sheppard had told the officers that when he was last with the victim, the two had purchased two bags of marihuana and a fifth of amaretto before going to his residence.

[2] The warrant directed the officers to "search for any controlled substance, article, implement or other paraphernalia used in, for, or in connection with the unlawful possession or use of any controlled substance, and to seize and securely keep the same until final action. . . ."

[3] Sheppard contends that there is no evidence in the record that the judge spoke to O'Malley after he made the changes. Brief for Respondent 11, n. 4. However, the trial judge expressly found that the judge "informed Detective O'Malley that the warrant as delivered over was sufficient authority in form and content to carry out the search as requested," App. 27a, and a plurality of the Supreme Judicial Court noted that finding without any apparent disapproval. 387 Mass. 488, 497, 441 N. E. 2d 725, 730 (1982). Since it would have been reasonable for O'Malley to infer that the warrant was valid

documents and, accompanied by other officers, proceeded to Sheppard's residence. [*987] The scope of the ensuing search was limited to the items listed in the affidavit, and several incriminating pieces of evidence [***743] were discovered. [4] Sheppard was then charged with first-degree murder.

[****11] At a pretrial suppression hearing, the trial judge concluded that the warrant failed to conform to the commands of the Fourth Amendment because it did not particularly describe the items to be seized. The judge ruled, however, that the evidence could be admitted notwithstanding the defect in the warrant because the police had acted in good faith in executing what they reasonably thought was a valid warrant. App. 35a. At the subsequent trial, Sheppard was convicted.

On appeal, Sheppard argued that the evidence obtained pursuant to the defective warrant should have been suppressed. The Supreme Judicial Court of Massachusetts agreed. A plurality of the justices concluded that although "the police conducted the search in a good faith belief, reasonably held, that the search was lawful and authorized by the warrant issued by the judge," 387 Mass., at 503, 441 N. E. 2d, at 733, the evidence had to be excluded because this Court had not recognized a good-faith exception to the exclusionary rule. Two justices combined in a separate concurrence to stress their rejection of the good-faith exception, and one justice dissented, contending that since exclusion [****12] of the evidence in this case would not serve to deter any police misconduct, the evidence should be admitted. We granted certiorari and set the case for argument in conjunction with *United States* v. *Leon, ante*, p. 897. 463 U.S. 1205 (1983).

II

[1] [2A] [3A] [4]Having already decided that the exclusionary rule should not be applied when the officer conducting the search acted in [*988] objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid, *ante*, at 922-923, the sole issue before us in this case is whether the officers reasonably believed that the search they conducted was authorized by a valid warrant. [5] There is no [**3428] dispute [***744] that the officers believed that the warrant authorized the search that they conducted. Thus, the only question is whether there was an objectively reasonable basis for the officers' mistaken belief. Both the trial court, App. 35a, and a majority of the Supreme Judicial Court, 387 Mass., at 503, 441 N. E. 2d, at 733; *id*., at 524-525, 441 N. E. 2d, at 745 (Lynch, J., dissenting), concluded [****13] that there was. We agree.

[****14] [*989] The officers in this case took every step that could reasonably be expected of them. Detective O'Malley prepared an affidavit which was reviewed and approved by the District Attorney. He presented that affidavit to a neutral judge. The judge

---

when the judge made some changes after assuring him that the form would be corrected, an express assurance that the warrant was adequate would add little to the reasonableness of O'Malley's belief that the necessary changes had been made. Therefore, nothing would be served by combing the record to determine whether there is sufficient evidence to support the trial court's finding that the judge spoke to O'Malley after signing the warrant.

[4] The police found a pair of bloodstained boots, bloodstains on the concrete floor, a woman's earring with bloodstains on it, a bloodstained envelope, a pair of men's jockey shorts and women's leotards with blood on them, three types of wire, and a woman's hairpiece, subsequently identified as the victim's.

[5] Both the trial court, App. 32a, and a majority of the Supreme Judicial Court, 387 Mass., at 500-501, 441 N. E. 2d, at 731-732; *id*., at 510, 441 N. E. 2d, at 737 (Liacos, J., joined by Abrams, J., concurring), concluded that the warrant was constitutionally defective because the description in the warrant was completely inaccurate and the warrant did not incorporate the description contained in the affidavit. Petitioner does not dispute this conclusion.

[2B] [3B]

Petitioner does argue, however, that even though the warrant was invalid, the search was constitutional because it was reasonable within the meaning of the Fourth Amendment. Brief for Petitioner 28-32. The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional. *Stanford* v. *Texas*, 379 U.S. 476 (1965); *United States* v. *Cardwell*, 680 F.2d 75, 77-78 (CA9 1982); *United States* v. *Crozier*, 674 F.2d 1293, 1299 (CA9 1982); *United States* v. *Klein*, 565 F.2d 183, 185 (CA1 1977); *United States* v. *Gardner*, 537 F.2d 861, 862 (CA6 1976); *United States* v. *Marti*, 421 F.2d 1263, 1268-1269 (CA2 1970). That rule is in keeping with the well-established principle that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara* v. *Municipal Court*, 387 U.S. 523, 528-529 (1967). See *Steagald* v. *United States*, 451 U.S. 204, 211-212 (1981); *Jones* v. *United States*, 357 U.S. 493, 499 (1958). Whether the present case fits into one of those carefully defined classes is a fact-bound issue of little importance since similar situations are unlikely to arise with any regularity.

concluded that the affidavit established probable cause to search Sheppard's residence, App. 26a, and informed O'Malley that he would authorize the search as requested. O'Malley then produced the warrant form and informed the judge that it might need to be changed. He was told by the judge that the necessary changes would be made. He then observed the judge make some changes and received the warrant and the affidavit. At this point, a reasonable police officer would have concluded, as O'Malley did, that the warrant authorized a search for the materials outlined in the affidavit.

[5]Sheppard contends that since O'Malley knew the warrant form was defective, he should have examined it to make sure that the necessary changes had been made. However, that argument is based on the premise that O'Malley had a duty to disregard the judge's assurances that the requested search would be authorized and the necessary changes would be made. [****15] Whatever an officer may be required to do when he executes a warrant without knowing beforehand what items are to be seized, [6]we refuse to rule that an officer is required [*990] to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested. In Massachusetts, as in most jurisdictions, the determinations of a judge acting within his jurisdiction, even if erroneous, are valid and binding until they are set aside under some recognized procedure. *Streeter* v. *City of Worcester*, 336 Mass. 469, 472, 146 N. E. 2d 514, 517 (1957);*Moll* v. *Township of Wakefield*, 274 Mass. 505, 507, 175 N. E. 81, 82 (1931).If an officer is required to accept at face value the judge's conclusion that a warrant form is invalid, [**3429] there is little reason why he should be expected to disregard assurances [***745] that everything is all right, especially when he has alerted the judge to the potential problems.

[****16] In sum, the police conduct in this case clearly was objectively reasonable and largely error-free. An error of constitutional dimensions may have been committed with respect to the issuance of the warrant, but it was the judge, not the police officers, who made the critical mistake. "[The] exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges." *Illinois* v. *Gates*, 462 U.S. 213, 263 (1983) (WHITE, J., concurring in judgment). [7] Suppressing evidence because the [*991] judge failed to make all the necessary clerical corrections despite his assurances that such changes would be made will not serve the deterrent function that the exclusionary rule was designed to achieve. Accordingly, federal law does not require the exclusion of the disputed evidence in this case. The judgment of the Supreme Judicial Court is therefore reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

[****17] *It is so ordered*.

**Concur by:** STEVENS

# Concur

[For opinion of JUSTICE STEVENS concurring in the judgment, see *ante*, p. 960.]

**Dissent by:** BRENNAN

---

[6] Normally, when an officer who has not been involved in the application stage receives a warrant, he will read it in order to determine the object of the search. In this case, Detective O'Malley, the officer who directed the search, knew what items were listed in the affidavit presented to the judge, and he had good reason to believe that the warrant authorized the seizure of those items. Whether an officer who is less familiar with the warrant application or who has unalleviated concerns about the proper scope of the search would be justified in failing to notice a defect like the one in the warrant in this case is an issue we need not decide. We hold only that it was not unreasonable for the police in this case to rely on the judge's assurances that the warrant authorized the search they had requested.

[7] This is not an instance in which "it is plainly evident that a magistrate or judge had no business issuing a warrant." *Illinois* v. *Gates*, 462 U.S., at 264 (WHITE, J., concurring in judgment). The judge's error was not in concluding that a warrant should issue but in failing to make the necessary changes on the form. Indeed, Sheppard admits that if the judge had crossed out the reference to controlled substances, written "see attached affidavit" on the form, and attached the affidavit to the warrant, the warrant would have been valid. Tr. of Oral Arg. 27, 50. See *United States* v. *Johnson*, 690 F.2d 60, 64-65 (CA3 1982), cert. denied, 459 U.S. 1214 (1983); *In re Property Belonging to Talk of the Town Bookstore, Inc.*, 644 F.2d 1317, 1318-1319 (CA9 1981); *United States* v. *Johnson*, 541 F.2d 1311, 1315-1316 (CA8 1976); *United States* v. *Womack*, 166 U. S. App. D. C. 35, 49, 509 F.2d 368, 382 (1974); *Commonwealth* v. *Todisco*, 363 Mass. 445, 450, 294 N. E. 2d 860, 864 (1973).

## Dissent

[For dissenting opinion of JUSTICE BRENNAN, see *ante*, p. 928.]

## References

29 Am Jur 2d, Evidence 416

12 Federal Procedure, L Ed, Evidence 33:389

7 Federal Procedural Forms, L Ed, Criminal Procedure 20:585 et seq.

22 Am Jur Pl & Pr Forms (Rev), Searches and Seizures Form 41 et seq.

5 Am Jur Trials 331, Excluding Illegally Obtained Evidence

USCS, Constitution, Fourth Amendment

US L Ed Digest, Evidence 681, 681.5

L Ed Index to Annos, Search and Seizure

ALR Quick Index, Exclusion or Suppression of Evidence

Federal Quick Index, Exclusion of Evidence; Suppression of Evidence

Annotation References:

Admissibility of evidence obtained by illegal search and seizure. 6 L Ed 2d 1544; 50 ALR3d 531.

Federal Constitution as affecting admissibility [****18] of evidence obtained by illegal search and seizure. 84 ALR2d 959.

---

End of Document

# Wong Sun v. United States

371 U.S. 471 (1963)

Cited in Supplemental Brief at: 6

Caution
As of: September 17, 2026 9:37 PM Z

# Wong Sun v. United States

Supreme Court of the United States

March 29 and April 2, 1962, Argued ; January 14, 1963, Decided

No. 36

**Reporter**
371 U.S. 471 *; 83 S. Ct. 407 **; 9 L. Ed. 2d 441 ***; 1963 U.S. LEXIS 2431 ****

WONG SUN ET AL. v. UNITED STATES

**Subsequent History:** [****1] Restored to calendar for reargument June 4, 1962. Reargued October 8, 1962.

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** 288 F.2d 366, reversed and cause remanded.

## Syllabus

In a trial in a Federal District Court without a jury, petitioners were convicted of fraudulent and knowing transportation and concealment of illegally imported heroin, in violation of 21 U. S. C. § 174. Although the Court of Appeals held that the arrests of both petitioners without warrants were illegal, because not based on "probable cause" within the meaning of the Fourth Amendment nor "reasonable grounds" within the meaning of the Narcotics Control Act of 1956, it affirmed their convictions, notwithstanding the admission in evidence over their timely objections of (1) statements made orally by petitioner Toy in his bedroom at the time of his arrest; (2) heroin surrendered to the agents by a third party as a result of those statements; and (3) unsigned statements made by each petitioner several days after his arrest, and after [****2] being lawfully arraigned and released on his own recognizance. The Court of Appeals held that these items were not the fruits of the illegal arrests, and, therefore, were properly admitted in evidence. *Held*:

1. On the record in this case, there was neither reasonable grounds nor probable cause for Toy's arrest, since the information upon which it was based was too vague and came from too untested a source to accept it as probable cause for the issuance of an arrest warrant; and this defect was not cured by the fact that Toy fled when a supposed customer at his door early in the morning revealed that he was a narcotics agent. Pp. 479-484.

2. On the record in this case, the statements made by Toy in his bedroom at the time of his unlawful arrest were the fruits of the agents' unlawful action, and they should have been excluded from evidence. Pp. 484-487.

3. The narcotics taken from a third party as a result of statements made by Toy at the time of his arrest were likewise fruits of the unlawful arrest, and they should not have been admitted as evidence against Toy. Pp. 487-488.

4. After exclusion of the foregoing items of improperly admitted evidence, the only proofs remaining [****3] to sustain Toy's conviction are his and his codefendant's unsigned statements; any admissions of guilt in Toy's statement require corroboration; no reference to Toy in his codefendant's statement constitutes admissible evidence corroborating any admission by Toy; and Toy's conviction must be set aside for lack of competent evidence to support it. Pp. 488-491.

5. In view of the fact that, after his unlawful arrest, petitioner Wong Sun had been lawfully arraigned and released on his own recognizance and had returned voluntarily several days later when he made his unsigned statement, the connection between his unlawful arrest and the making of that statement was so attenuated that the unsigned statement was not the fruit of the unlawful arrest and, therefore, it was properly admitted in evidence. P. 491.

6. The seizure of the narcotics admitted in evidence invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial. Pp. 491-492.

7. Any references to Wong Sun in his codefendant's statement were incompetent to corroborate Wong Sun's

admissions, and Wong Sun is entitled to a new trial, because it is not clear from the record whether [****4] or not the trial court relied upon his codefendant's statement as a source of corroboration of Wong Sun's confession. Pp. 492-493.

**Counsel:** Edward Bennett Williams, acting under appointment by the Court, 368 U.S. 973, reargued the cause and filed a supplemental brief for petitioners. Sol A. Abrams also filed a brief for petitioners.

J. William Doolittle reargued the cause for the United States. On the brief were Solicitor General Cox, Assistant Attorney General Miller, Beatrice Rosenberg and J. F. Bishop.

**Judges:** Warren, Black, Douglas, Clark, Harlan, Brennan, Stewart, White, Goldberg

**Opinion by:** BRENNAN

## Opinion

[*472] [***446] [**409] MR. JUSTICE BRENNAN delivered the opinion of the Court.

The petitioners were tried without a jury in the District Court for the Northern District of California under a two-count indictment for violation of the Federal Narcotics [*473] Laws, 21 U. S. C. § 174. [1] They were acquitted under the first count which charged a conspiracy, but convicted under the second [**410] count which charged the substantive offense of fraudulent and knowing transportation and concealment [****5] of illegally imported heroin. The Court of Appeals for the Ninth Circuit, one judge dissenting, affirmed the convictions. 288 F.2d 366. We granted certiorari. 368 U.S. 817. We heard [***447] argument in the 1961 Term and reargument this Term. 370 U.S. 908.

[****6] About 2 a. m. on the morning of June 4, 1959, federal narcotics agents in San Francisco, after having had one Hom Way under surveillance for six weeks, arrested him and found heroin in his possession. Hom Way, who had not before been an informant, stated after his arrest that he had bought an ounce of heroin the night before from one known to him only as "Blackie Toy," proprietor of a laundry on Leavenworth Street.

About 6 a. m. that morning six or seven federal agents went to a laundry at 1733 Leavenworth Street. The sign [*474] above the door of this establishment said "Oye's Laundry." It was operated by the petitioner James Wah Toy. There is, however, nothing in the record which identifies James Wah Toy and "Blackie Toy" as the same person. The other federal officers remained nearby out of sight while Agent Alton Wong, who was of Chinese ancestry, rang the bell. When petitioner Toy appeared and opened the door, Agent Wong told him that he was calling for laundry and dry cleaning. Toy replied that he didn't open until 8 o'clock and told the agent to come back at that time. Toy started to close the door. Agent Wong thereupon took his badge from his pocket and said, [****7] "I am a federal narcotics agent." Toy immediately "slammed the door and started running" down the hallway through the laundry to his living quarters at the back where his wife and child were sleeping in a bedroom. Agent Wong and the other federal officers broke open the door and followed Toy down the hallway to the living quarters and into the bedroom. Toy reached into a nightstand drawer. Agent Wong thereupon drew his pistol, pulled Toy's hand out of the drawer, placed him under arrest and handcuffed him. There was nothing in the drawer and a search of the premises uncovered no narcotics.

One of the agents said to Toy ". . . [Hom Way] says he got narcotics from you." Toy responded, "No, I haven't been selling any narcotics at all. However, I do know somebody who has." When asked who that was, Toy said, "I only know him as Johnny. I don't know his last name." However, Toy described a house on Eleventh Avenue where he said Johnny lived; he also described a

[1] 21 U. S. C. § 174:

"Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $ 20,000. For a second or subsequent offense (as determined under section 7237 (c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $ 20,000.

"Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

bedroom in the house where he said "Johnny kept about a piece" [2] of heroin, and where he and Johnny had smoked some of the drug the night before. The agents [*475] left immediately for Eleventh Avenue and located the [****8] house. They entered and found one Johnny Yee in the bedroom. After a discussion with the agents, Yee took from a bureau drawer several tubes containing in all just less than one ounce of heroin, and surrendered them. Within the hour Yee and Toy were taken to the Office of the Bureau [**411] of Narcotics. Yee there stated that the heroin had been brought to him some four days earlier by petitioner Toy and another Chinese known to him only as "Sea Dog."

Toy was questioned as to the identity of "Sea Dog" and said that "Sea Dog" was Wong Sun. Some agents, including Agent Alton Wong, took Toy to Wong Sun's neighborhood where Toy pointed out a multifamily dwelling where he said Wong [***448] Sun lived. Agent Wong rang a downstairs door bell and a buzzer sounded, opening the door. The officer identified himself as a narcotics agent to a woman on the landing and asked "for Mr. Wong." The woman was the wife of petitioner Wong Sun. She said that Wong Sun was "in the [****9] back room sleeping." Alton Wong and some six other officers climbed the stairs and entered the apartment. One of the officers went into the back room and brought petitioner Wong Sun from the bedroom in handcuffs. A thorough search of the apartment followed, but no narcotics were discovered.

Petitioner Toy and Johnny Yee were arraigned before a United States Commissioner on June 4 on a complaint charging a violation of 21 U. S. C. § 174. Later that day, each was released on his own recognizance. Petitioner Wong Sun was arraigned on a similar complaint filed the next day and was also released on his own recognizance. [3] [*476] Within a few days, both petitioners and Yee were interrogated at the office of the Narcotics Bureau by Agent William Wong, also of Chinese ancestry. [4] The agent advised each of the three of his right to withhold information which might be used against him, and stated to each that he was entitled to the advice of counsel, though it does not appear that any attorney was present during the questioning of any of the three. The officer also explained to each that no promises or offers of immunity or leniency were being or could be [****10] made.

[****11] The agent interrogated each of the three separately. After each had been interrogated the agent prepared a statement in English from rough notes. The agent read petitioner Toy's statement to him in English and interpreted certain portions of it for him in Chinese. Toy also read the statement in English aloud to the agent, said there were corrections to be made, and made the corrections in his own hand. Toy would not sign the statement, however; in the agent's words "he wanted to know first if the other persons involved in the case had signed theirs." Wong Sun had considerable difficulty understanding the [*477] statement in English and the agent restated its substance in Chinese. Wong Sun refused to sign the statement although he admitted the accuracy of its contents. [5]

Hom Way did not testify at petitioners' trial. The Government offered Johnny Yee as its principal witness but excused him after he [***449] invoked [****12] the privilege [**412] against self-incrimination and flatly repudiated the statement he had given to Agent William Wong. That statement was not offered in evidence nor was any testimony elicited from him identifying either petitioner as the source of the heroin in his possession, or otherwise tending to support the charges against the petitioners.

The statute expressly provides that proof of the accused's possession of the drug will support a conviction under the statute unless the accused satisfactorily explains the possession. The

[2] A "piece" is approximately one ounce.

[3] The Record of the arraignment proceedings recites that arrest warrants were issued, on the arraignment dates, for the arrest of both petitioners and Yee. It was conceded in the trial court, however, that no arrest warrants were outstanding at the time of the actual arrests on June 4.

The Record also states that bond was initially fixed for each of the petitioners and for Yee in the amount of $ 5,000, on the recommendation of the United States Attorney. Later on the respective arraignment days, again on motion of the United States Attorney, it was ordered that each of the three be released on his own recognizance.

[4] Because neither statement was ever signed, the blanks in which the dates were to have been inserted were never filled in. The heading of Toy's statement suggests that it was made on June 5, although Agent William Wong at the trial suggested he had only talked informally with Toy on that date, the formal statement not being made until June 9. The agent also testified that Wong Sun's statement was made June 9, although a rubber-stamp date beneath the agent's own signature at the foot of the statement reads, "June 15, 1959."

[5] The full texts of both statements are set forth in an Appendix to this opinion.

Government's evidence tending to prove the petitioners' possession (the petitioners offered no exculpatory testimony) consisted of four items which the trial court admitted over timely objections that they were inadmissible as "fruits" of unlawful arrests or of attendant searches: (1) the statements made orally by petitioner Toy in his bedroom at the time of his arrest; (2) the heroin surrendered to the agents by Johnny Yee; (3) petitioner Toy's pretrial unsigned statement; and (4) petitioner Wong Sun's similar statement. The dispute below and here has [****13] centered around the correctness of the rulings of the trial judge allowing these items in evidence.

The Court of Appeals held that the arrests of both petitioners were illegal because not based on "'probable cause' within the meaning of the Fourth Amendment" nor "reasonable grounds" within the meaning of the Narcotic [*478] Control Act of 1956. [6] The court said as to Toy's arrest, "There is no showing in this case that the agent knew Hom Way to be reliable," and, furthermore, found "nothing in the circumstances occurring at Toy's premises that would provide sufficient justification for his arrest without a warrant." 288 F.2d, at 369, 370. As to Wong Sun's arrest, the Court said "there is no showing that Johnnie Yee was a reliable informer." The Court of Appeals nevertheless held that the four items of proof were not the "fruits" of the illegal arrests and that they were therefore properly admitted in evidence.

[1]

[****14] The Court of Appeals rejected two additional contentions of the petitioners. The first was that there was insufficient evidence to corroborate the petitioners' unsigned admissions of possession of narcotics. The court held that the narcotics in evidence surrendered by Johnny Yee, together with Toy's statements in his bedroom at the time of arrest corroborated petitioners' admissions. The second contention [***450] was that the confessions were [*479] inadmissible because they were not signed. The Court of Appeals held on this point that the petitioners were not prejudiced, since the agent might properly have testified to the substance of the conversations which produced the statements.

We believe that significant differences between the cases of the two petitioners require separate discussion of each. We shall first consider the case of petitioner Toy.

[**413] I.

[2A][3][4]The Court of Appeals found there was neither reasonable grounds nor [****15] probable cause for Toy's arrest. Giving due weight to that finding, we think it is amply justified by the facts clearly shown on this record. It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion, see *Henry* v. *United States*, 361 U.S. 98, 101, though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause -- evidence which would "warrant a man of reasonable caution in the belief" that a felony has been committed, *Carroll* v. *United States*, 267 U.S. 132, 162 -- must be measured by the facts of the particular case. The history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would "leave law-abiding citizens at the mercy of the officers' whim or caprice." [7] *Brinegar* v. *United States*, 338 U.S. 160, 176.

[****16] [5] [2B]Whether or not the requirements of

---

[6] 26 U. S. C. § 7607:

"The Commissioner, Deputy Commissioner, Assistant to the Commissioner, and agents, of the Bureau of Narcotics of the Department of the Treasury, and officers of the customs (as defined in section 401 (1) of the Tariff Act of 1930, as amended; 19 U. S. C., sec. 1401 (1)), may --

"(1) carry firearms, execute and serve search warrants and arrest warrants, and serve subpenas and summonses issued under the authority of the United States, and

"(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs (as defined in section 4731) or marihuana (as defined in section 4761) where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

The terms "probable cause" for purposes of the Fourth Amendment and "reasonable grounds" as used in the statute, mean substantially the same. *Draper* v. *United States*, 358 U.S. 307, 310, n. 3; *United States* v. *Walker*, 246 F.2d 519, 526.

[7] See *Giordenello* v. *United States*, 357 U.S. 480, 485-487; *Johnson* v. *United States*, 333 U.S. 10, 16-17. See generally Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 673, 695-701 (1924).

reliability and particularity of the information on which an officer may act are more stringent where an arrest warrant is absent, they surely cannot be less stringent than where an arrest warrant is obtained. Otherwise, a principal incentive now [*480] existing for the procurement of arrest warrants would be destroyed. [8] The threshold question in this case, therefore, is whether the officers could, on the information which impelled [***451] them to act, have procured a warrant for the arrest of Toy. We think that no warrant would have issued on evidence then available.

[****17] [6]The narcotics agents had no basis in experience for confidence in the reliability of Hom Way's information; he had never before given information. And yet they acted upon his imprecise suggestion that a person described only as "Blackie Toy," the proprietor of a laundry somewhere on Leavenworth Street, had sold one ounce of heroin. We have held that identification of the suspect by a reliable informant may constitute probable cause for arrest where the information given is sufficiently accurate to lead the officers directly to the suspect. *Draper* v. *United States*, 358 U.S. 307. That rule does not, however, fit this case. For aught that the record discloses, Hom Way's accusation merely invited the officers to roam the length of Leavenworth Street (some 30 blocks) in search of one "Blackie Toy's" laundry -- and whether by chance or other [*481] means (the record does not say) they came upon petitioner Toy's laundry, which bore not his name over the door, [**414] but the unrevealing label "Oye's." Not the slightest intimation appears on the record, or was made on oral argument, [****18] to suggest that the agents had information giving them reason to equate "Blackie" Toy and James Wah Toy -- *e. g.*, that they had the criminal record of a Toy, or that they had consulted some other kind of official record or list, or had some information of some kind which had narrowed the scope of their search to this particular Toy.

[2C][7][8] It is conceded that the officers made no attempt to obtain a warrant for Toy's arrest. The simple fact is that on the sparse information at the officers' command, no arrest warrant could have issued consistently with Rules 3 and 4 of the Federal Rules of Criminal Procedure. *Giordenello* v. *United States*, 357 U.S. 480, 486. [9] The arrest warrant procedure serves to insure that the deliberate, impartial judgment of a judicial officer will be interposed [*482] between the citizen and the police, to assess [****19] the weight and credibility of the information which the complaining officer adduces as probable cause. Cf. *Jones* v. *United States*, 362 U.S. 257, 270. To hold that an officer may act in his own, unchecked discretion upon [***452] information too vague and from too untested a source to permit a judicial officer to accept it as probable cause for an arrest warrant, would subvert this fundamental policy.

[****20] [9A]

The Government contends, however, that any defects in the information which somehow took the officers to petitioner Toy's laundry were remedied by events which

[8] Our discussion implies no view whether a search warrant should be obtained where a search is conducted incident to a valid arrest, cf. *United States* v. *Rabinowitz*, 339 U.S. 56, for nothing in this case turns on the presence or absence of a search warrant. Since the officers had obtained an arrest warrant in *Rabinowitz*, the question before us here was not there presented. As to the question before us, see *Wrightson* v. *United States*, 222 F.2d 556, 559-560:

"But, if officers can arrest without a warrant and never be required to disclose the facts upon which they based their belief of probable cause -- if, in other words, they have an untouchable power to arrest without a warrant, -- why would they ever bother to get a warrant? And the same obvious conclusion follows if the courts, when an arrest is attacked as illegal, will assume, without facts, that an arrest without a warrant was for probable cause. To strike down all factual requirements in respect to probable cause for arrests without a warrant, while maintaining them for the issuance of a warrant, would be to blast one of the support columns of justice by law."

[9] We noted in *Giordenello* that Rules 3 and 4 of the Federal Rules of Criminal Procedure provide that an arrest warrant shall issue only upon a sworn complaint setting forth "the essential facts constituting the offense charged," and showing "that there is probable cause to believe that an offense has been committed and that the defendant has committed it . . . ." The Fourth Amendment, from which the requirements of the Rules derive, provides that ". . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* . . . the persons or things to be seized." (Emphasis added.) The requirement applies both to arrest and search warrants. A description of a suspect merely as "Blackie Toy," operator of a laundry somewhere on Leavenworth Street, hardly is information "particularly describing . . . the person . . . to be seized." Such information is no better than the wholesale or "dragnet" search warrant, which we have condemned. See, *e. g.*, *Marron* v. *United States*, 275 U.S. 192, 196; see generally Kaplan, Search and Seizure: A No-Man's Land in the Criminal Law, 49 Calif. L. Rev. 474, 480-482 (1961).

occurred after they arrived. Specifically, it is urged that Toy's flight down the hall when the supposed customer at the door revealed that he was a narcotics agent adequately corroborates the suspicion generated by Hom Way's accusation. Our holding in *Miller* v. *United States*, 357 U.S. 301, is relevant here, and exposes the fallacy of this contention. We noted in that case that the lawfulness of an officer's entry to arrest without a warrant "must be tested by criteria identical with those embodied in 18 U. S. C. § 3109, which deals with entry to execute a search warrant." 357 U.S., at 306. That statute requires that an officer must state his authority and his purpose at the threshold, and be refused admittance, before he may break open the door. We held that when an officer insufficiently or unclearly identifies his office or his mission, the occupant's flight from the door must [****21] be regarded as ambiguous conduct. We expressly reserved the question "whether the unqualified requirements of the rule admit of an exception justifying noncompliance in exigent circumstances." 357 U.S., at 309. In the instant case, Toy's flight from the door afforded no surer an inference of guilty knowledge than did the suspect's conduct in the *Miller* case. Agent Wong did [**415] eventually disclose that he was a narcotics officer. However, he affirmatively misrepresented his mission at the [*483] outset, by stating that he had come for laundry and dry cleaning. And before Toy fled, the officer never adequately dispelled the misimpression engendered by his own ruse. Cf. *Gouled* v. *United States*, 255 U.S. 298; *Gatewood* v. *United States*, 209 F.2d 789.

Moreover, he made no effort at that time, nor indeed at any time thereafter, to ascertain whether the man at the door was the "Blackie Toy" named by Hom Way. Therefore, this is not the case we hypothesized in *Miller* where "without an express announcement of purpose, the facts known to officers would justify them in being virtually certain" that the person [****22] at the door knows their purpose. 357 U.S., at 310. Toy's refusal to admit the officers and his flight down the hallway thus signified a guilty knowledge no more clearly than it did a natural desire to repel an apparently unauthorized intrusion. [10] Here, as in *Miller*, [*484] the Government [***453] claims no extraordinary circumstances -- such as the imminent destruction of vital evidence, or the need to rescue a victim in peril -- see 357 U.S., at 309 -- which excused the officer's failure truthfully to state his mission before he broke in.

[****23] [10] [11] [2D] [9B] A contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked. Cf. *Henry* v. *United States*, 361 U.S. 98, 104. That result would have the same essential vice as a proposition we have consistently rejected -- that a search unlawful at its inception may be validated by what it turns up. *Byars* v. *United States*, 273 U.S. 28; *United States* v. *Di Re*, 332 U.S. 581, 595. Thus we conclude that the Court of Appeals' finding that the officers' uninvited entry into Toy's living quarters was unlawful and that the bedroom arrest which followed was likewise unlawful, was fully justified on the evidence. It remains to be seen what consequences flow from this conclusion.

II.

It is conceded [****24] that Toy's declarations in his bedroom are to be excluded [**416] if they are held to be "fruits" of the agents' unlawful action.

[12]In order to make effective the fundamental constitutional guarantees of sanctity of the home and

---

[10] Although the question presented here is only whether the petitioner's flight justified an inference of guilt sufficient to generate probable cause for his arrest, and not whether his flight would serve to corroborate proof of his guilt at trial, the two questions are inescapably related. Thus it is relevant to the present case that we have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime. In *Alberty* v. *United States*, 162 U.S. 499, 511, this Court said:

". . . it is not universally true that a man, who is conscious that he has done a wrong, 'will pursue a certain course not in harmony with the conduct of a man who is conscious of having done an act which is innocent, right and proper;' since it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.'"

See also *Hickory* v. *United States*, 160 U.S. 408; *Allen* v. *United States*, 164 U.S. 492; *Starr* v. *United States*, 164 U.S. 627; and for the views of two Courts of Appeals see *Vick* v. *United States*, 216 F.2d 228, 233 (C. A. 5th Cir.) ("One motive is about as likely as another. Appellant may be guilty, but his conviction cannot rest upon mere conjecture and suspicion"); cf. *Cooper* v. *United States*, 218 F.2d 39, 41 (C. A. D. C. Cir.) ("After all, innocent people caught in a web of circumstances frequently become terror-stricken"). But cf. *United States* v. *Heitner*, 149 F.2d 105 (C. A. 2d Cir.).

inviolability of the person, *Boyd* v. *United States*, 116 U.S. 616, this Court held nearly half a century ago that evidence seized during an unlawful search could not constitute proof against the victim of the search. *Weeks* v. *United States*, 232 U.S. 383. The exclusionary prohibition extends as well to the indirect as the direct products of such invasions. *Silverthorne Lumber Co*. v. *United States*, 251 U.S. 385. [*485] Mr. Justice Holmes, speaking for the Court in that case, in holding that the Government might not make use of information obtained during an unlawful search to subpoena from the victims the very documents illegally viewed, expressed succinctly the policy of the broad exclusionary rule:

[13] [****25] "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts [***454] thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." 251 U.S., at 392.

[14][15]The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. It follows from our holding in *Silverman* v. *United States*, 365 U.S. 505, that the Fourth Amendment may protect against the overhearing of verbal statements [****26] as well as against the more traditional seizure of "papers and effects." Similarly, testimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies. *McGinnis* v. *United States*, 227 F.2d 598. Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the "fruit" of official illegality than the more common tangible fruits of the unwarranted intrusion. [11] See [*486] *Nueslein* v. *District of Columbia*, 115 F.2d 690. Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence. Either in terms of deterring lawless conduct by federal officers, *Rea* v. *United States*, 350 U.S. 214, or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained, *Elkins* v. *United States*, 364 U.S. 206, the danger in relaxing the exclusionary rules in the case of verbal [****27] evidence would seem too great to warrant introducing such a distinction.

[16] The Government argues that Toy's statements to the officers in his bedroom, although closely consequent upon the invasion which we hold unlawful, were nevertheless admissible because they resulted from "an intervening independent act of a free will." This contention, however, takes insufficient account of the circumstances. Six or seven officers had broken the door and followed on Toy's heels into the bedroom where his wife and child were sleeping. He had been almost immediately handcuffed and arrested. Under such circumstances it is unreasonable to infer that Toy's response was sufficiently an act of free [**417] [****28] will to purge the primary taint of the unlawful invasion. [12]

[****29]

[*487] [17] The [***455] Government also contends that Toy's declarations should be admissible because they were ostensibly exculpatory rather than incriminating. There are two answers to this argument. First, the statements soon turned out to be incriminating,

---

[11] See Kamisar, Illegal Searches or Seizures and Contemporaneous Incriminating Statements: A Dialogue on a Neglected Area of Criminal Procedure, 1961 U. of Ill. Law Forum 78, 84-96. But compare Maguire, Evidence of Guilt (1959), 187-190.

[12] See Lord Devlin's comment: "It is probable that even today, when there is much less ignorance about these matters than formerly, there is still a general belief that you must answer all questions put to you by a policeman, or at least that it will be the worse for you if you do not." Devlin, The Criminal Prosecution in England (1958), 32. Even in the absence of such oppressive circumstances, and where an exclusionary rule rests principally on nonconstitutional grounds, we have sometimes refused to differentiate between voluntary and involuntary declarations. See Hogan and Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Geo. L. J. 1, 26-27 (1958). For illustrative situations where a voluntary act of the accused has been held insufficient to cure the otherwise unlawful acquisition of evidence, see *Bynum* v. *United States*, 262 F.2d 465 (holding inadmissible fingerprints made by defendant after unlawful arrest); *United States* v. *Watson*, 189 F.Supp. 776 (excluding narcotics voluntarily surrendered by accused in the course of an unauthorized search). The Ninth Circuit Court of Appeals from which the instant case comes has recognized in an analogous context, that "all declarations and statements under the compulsion of the things so seized, are affected by the vice of primary illegality. . . ." *Takahashi* v. *United States*, 143 F.2d 118, 122.

for they led directly to the evidence which implicated Toy. Second, when circumstances are shown such as those which induced these declarations, it is immaterial whether the declarations be termed "exculpatory." [13] Thus we find no substantial reason to omit Toy's declarations from the protection of the exclusionary rule.

III.

[18] [****30] We now consider whether the exclusion of Toy's declarations requires also the exclusion of the narcotics taken from Yee, to which those declarations led the police. The prosecutor candidly told the trial court that "we wouldn't have found those drugs except that Mr. Toy helped us to." Hence this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence "from an independent source," *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 392; nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." *Nardone* v. *United States*, 308 U.S. 338, 341.We need not hold that all evidence [*488] is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently [****31] distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959). We think it clear that the narcotics were "come at by the exploitation of that illegality" and hence that they may not be used against Toy.

IV.

It remains only to consider Toy's unsigned statement. We need not decide whether, in light of the fact that Toy was free on his own recognizance when he made the statement, that statement was a fruit of the illegal arrest. Cf. *United States* v. *Bayer*, 331 U.S. 532. Since [**418] we have concluded that his declarations in the bedroom and the narcotics surrendered by Yee should not have been admitted in evidence against him, the only proofs remaining to sustain his conviction are his and Wong [***456] Sun's unsigned statements. Without scrutinizing the contents of Toy's ambiguous recitals, we conclude that no reference to Toy in Wong Sun's statement constitutes admissible evidence corroborating any admission by Toy. We arrive at this conclusion upon two clear lines of decisions which converge to require it. One line of our decisions establishes that criminal confessions and admissions of guilt require extrinsic corroboration; [****32] the other line of precedents holds that an out-of-court declaration made after arrest may not be used at trial against one of the declarant's partners in crime.

[19]It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or [*489] confession of the accused. [14] We observed in *Smith* v. *United States*, 348 U.S. 147, 153, that the requirement of corroboration is rooted in "a long history of judicial experience with confessions and in the realization that sound law enforcement requires police investigations which extend beyond the words of the accused." In *Opper* v. *United States*, 348 U.S. 84, 89-90, we elaborated the reasons for the requirement:

"In our country the doubt persists that the zeal of the agencies of prosecution to protect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the aberration or weakness of [****33] the accused under the strain of suspicion may tinge or warp the facts of the confession. Admissions, retold at a trial, are much like hearsay, that is, statements not made at the pending trial. They had neither the compulsion of the oath nor the test of cross-examination."

[22][23][24][25] [****34] It is true that in *Smith* v. *United States, supra*, we held that although "corroboration is necessary for all elements of the offense established by admissions alone," extrinsic proof was sufficient which "merely fortifies the truth of the confession, without independently establishing the crime charged . . . ." 348

---

[13] Moreover, we held in *Opper* v. *United States*, 348 U.S. 84, 92, that even where exculpatory statements are voluntary and thus clearly admissible, they require at least the degree of corroboration required of incriminating statements.

[14] For the history and development of the corroboration requirement, see 7 Wigmore, Evidence (3d ed. 1940), §§ 2070-2071; Note, Proof of the Corpus Delicti Aliunde the Defendant's Confession, 103 U. of Pa. L. Rev. 638-649 (1955). For the present scope and application of the rule, see 2 Underhill, Criminal Evidence (5th ed. 1956), §§ 402-403. For a comprehensive collection of cases, see Annot., 45 A. L. R. 2d 1316 (1956).

U.S., at 156.[15] [****37] [*490] However, Wong Sun's unsigned confession does not furnish competent corroborative evidence. [***457] The second governing principle, likewise well settled in our decisions, is that an out-of-court declaration made after arrest may not be used at trial against one of the declarant's partners in crime. While such a statement is "admissible against the others [**419] where it is in furtherance of the criminal undertaking . . . all such responsibility is at an end when the conspiracy ends." *Fiswick* v. *United States*, 329 U.S. 211, 217. We have consistently refused to broaden that very narrow exception to the traditional hearsay rule which admits statements of a codefendant made in furtherance [****35] of a conspiracy or joint undertaking.[16] See *Krulewitch* v. *United States*, 336 U.S. 440, 443-445. And where postconspiracy declarations have been admitted, we have carefully ascertained that limiting instructions kept the jury from considering the contents with respect to the guilt of anyone but the declarant. *Lutwak* v. *United States*, 344 U.S. 604, 618-619; *Delli Paoli* v. *United States*, 352 U.S. 232, 236-237. We have never ruled squarely on the question presented here, whether a codefendant's statement might serve to corroborate even where it will not suffice to convict.[17] We see [*491] no warrant for a different result so long as the rule which regulates the use of out-of-court statements is one of admissibility, rather than simply of weight, of the evidence. The import of our previous holdings is that a co-conspirator's hearsay statements may be admitted against the accused for no purpose whatever, unless made during and in furtherance of the conspiracy. Thus as to Toy the only possible source of corroboration [****36] is removed and his conviction must be set aside for lack of competent evidence to support it.

[20] [21]

V.

[26] [27] [28] We turn now to the case of the other petitioner, Wong Sun. We have no occasion to disagree with the finding of the Court of Appeals that his arrest, also, was without probable cause or reasonable grounds. At all events no evidentiary consequences turn upon that question. For Wong Sun's unsigned [****38] confession was not the fruit of that arrest, and was therefore properly admitted at trial. On the evidence that Wong Sun had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, we hold that the connection between the arrest and the statement had "become so attenuated as to dissipate the taint." *Nardone* v. *United States*, 308 U.S. 338, 341. The fact that the statement was unsigned, whatever bearing this may have upon its weight [***458] and credibility, does not render it inadmissible; Wong Sun understood and adopted its substance, though he could not comprehend the English words. The petitioner has never suggested any impropriety in the interrogation itself which would require the exclusion of this statement.

[29]We must then consider the admissibility of the narcotics surrendered by Yee. Our holding, *supra*, that this [*492] ounce of heroin was inadmissible against Toy does not compel a like result with respect to Wong Sun. The exclusion of the narcotics as to Toy was required solely [****39] by their tainted relationship to information unlawfully obtained from Toy, and not by any official impropriety connected with their surrender by Yee. The seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial. Cf. *Goldstein* v. *United States*, 316 U.S. 114.[18]

---

[15] Where the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable. A notable example is the principle that an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim. See 7 Wigmore, Evidence (3d ed. 1940), § 2072, n. 5. There need in such a case be no link, outside the confession, between the injury and the accused who admits having inflicted it. But where the crime involves no tangible *corpus delicti*, we have said that "the corroborative evidence must implicate the accused in order to show that a crime has been committed." 348 U.S., at 154. Finally, we have said that one uncorroborated admission by the accused does not, standing alone, corroborate an unverified confession. *United States* v. *Calderon*, 348 U.S. 160, 165.

[16] See Developments in the Law -- Criminal Conspiracy, 72 Harv. L. Rev. 922, 989-990 (1959).

[17] Cf. Williams, The Proof of Guilt (1958), 135: "Even where . . . the evidence of an accomplice becomes admissible against his fellows, it remains suspect evidence, because of the tainted source from which it comes. The accomplice may no longer have anything to fear or hope from the way in which he gives his evidence; yet he may mistakenly entertain such a fear or hope, or he may wish by his evidence against others to gratify some spite against them."

[18] This case is not like *Jones* v. *United States*, 362 U.S. 257,

[30] [31] However, [****40] [**420] for the reasons that Wong Sun's statement was incompetent to corroborate Toy's admissions contained in Toy's own statement, any references to Wong Sun in Toy's statement were incompetent to corroborate Wong Sun's admissions. Thus, the only competent source of corroboration for Wong Sun's statement was the heroin itself. We cannot be certain, however, on this state of the record, that the trial judge may not also have considered the contents of Toy's statement as a source of corroboration. Petitioners raised as one ground of objection to the introduction of the statements the claim that each statement, "even if it were a purported admission or confession or declaration against interest of a defendant . . . would not be binding upon the other defendant." The trial judge, in allowing the statements in, apparently overruled all of petitioners' objections, including this one. Thus we presume that he considered all portions of both statements as bearing upon the guilt of both petitioners.

We intimate no view one way or the other as to whether the trial judge might have found in the narcotics alone sufficient evidence to corroborate Wong Sun's admissions [*493] that he [****41] delivered heroin to Yee and smoked heroin at Yee's house around the date in question. But because he might, as the factfinder, have found insufficient corroboration from the narcotics alone, we cannot be sure that the scales were not tipped in favor of conviction by reliance upon the inadmissible Toy statement. This is particularly important because of the nature of the offense involved here.

[32] Surely, under the narcotics statute, the discovery of heroin raises a presumption that someone -- generally the possessor -- violated the law. As to him, once possession alone is proved, the other elements of the offense -- transportation and concealment with knowledge of the illegal [***459] importation of the drug -- need not be separately demonstrated, much less corroborated. 21 U. S. C. § 174. Thus particular care ought to be taken in this area, when the crucial element of the accused's possession is proved solely by his own admissions, that the requisite corroboration be found among [****42] the evidence which is properly before the trier of facts. We therefore hold that petitioner Wong Sun is also entitled to a new trial.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered*.

[For concurring opinion of MR. JUSTICE DOUGLAS, see *post*, p. 497.]

[For dissenting opinion of MR. JUSTICE CLARK, see *post*, p. 498.]

APPENDIX TO OPINION OF THE COURT.

Statement of JAMES WAH TOY taken on June 5, 1959, concerning his knowledge of WONG SUN's narcotic trafficking

I have known WONG SUN for about 3 months. I know him as SEA DOG which is what everyone calls him. [*494] I first met him in Marysville, California, during a Chinese holiday. I drove him back to San Francisco on that occasion. Sometimes he asks me to drive him home and to different places in San Francisco.

Sometime during April or May of this year, he asked me to drive him out to JOHNNY YEE's house, at 11th and Balboa Streets. He asked me to call JOHNNY and tell him we were coming. When [**421] we got there we went into the house and WONG SUN took a paper package out of his pocket [****43] and put it on the table. Then both WONG SUN and JOHNNY YEE opened the package. I don't know how much heroin was in it, but I know it was more than 10 spoons. I asked them if I could have some for myself and they said yes. I took a little bit and went across the room and smoked it in a cigarette.

WONG SUN and JOHNNY YEE talked for about 10 or 15 minutes, but they were talking in low tones so that I could not hear what they were saying. I didn't see any money change hands, because I wasn't paying too much attention. WONG SUN and I then left the house and drove. I drove WONG SUN to his home and he gave me $ 15.00. He said the money was for driving him out there.

I have driven WONG SUN out to JOHNNY YEE's house about 5 times altogether. Each time WONG SUN gave me $ 10 or $ 15 for doing it and also, Johnny gave me a little heroin -- enough to put in 3 or 4 cigarettes. The last time I drove WONG SUN out to YEE's house was

where the person challenging the seizure of evidence was lawfully on the premises at the time of the search. Nor is it like *Chapman* v. *United States*, 365 U.S. 610, where we held that a landlord could not lawfully consent to a search of his tenant's premises. See generally Edwards, Standing to Suppress Unreasonably Seized Evidence, 47 N. W. U. L. Rev. 471 (1952).

last Tuesday, May 26, 1959. On Wednesday night June 3, 1959, at about 10:00 p. m., I called JOHNNY YEE and told him that "I'm coming out pretty soon -- I don't have anything." He said okay, so I drove out there. When I got there I went in the house and Johnny [****44] gave me a paper of heroin. The bindle had about enough for 5 or 6 cigarettes. I didn't give him any money and he didn't ask for any. He gives it to me just out of friendship. He has given me heroin like this quite a few times. I don't remember how many times. I have known HOM WEI [*495] about 2 or 3 years but I have never dealt in narcotics with him. I have known ED FONG about 1 year and I have never dealt in narcotics with him, either. I have heard people that I know in the Hop Sing Tong Club talk about HOM WEI dealing in narcotics but [***460] nothing about ED FONG. I do not know JOHN MOW LIM or BILL FONG. The only connection I have now is JOHNNY YEE.

I have carefully read the foregoing statement, which was made of my own free will, without promise of reward or immunity and not under duress. I have been given ample opportunity to make corrections have initialed or signed each page as evidence thereof and hereby state that this statement is true to the best of my knowledge and belief.

JAMES WAH TOY

. . . .

JAMES WAH TOY did not wish to sign this statement at this time. He stated he may change his mind at a later date. However, [****45] I read this statement to him and in addition he read it also and stated that the contents thereof were true to the best of his knowledge. Corrections made were by JAMES WAH TOY without his initials.

/s/ WILLIAM WONG

William Wong, Narcotic Agent

STATEMENT OF WONG SUN

I met JAMES TOY approximately the middle of March, this year, at Marysville, California, during a Chinese celebration. We returned to San Francisco together and we discussed the possible sale of heroin. I told JAMES that I could get a piece of heroin for $ 450 from a person known as BILL.

Shortly after returning to San Francisco, JAMES told me he wanted me to get a piece. I asked him who it was [*496] for and he told me it was for JOHNNY. He gave me $ 450 and I obtained a piece of heroin from BILL. I did this on approximately 8 occasions, however, at least one of these times the heroin was not for JOHNNY -- for another friend of JAMES TOY. JOHNNY would pay JAMES $ 600 for each piece.

On several occasions after I had obtained the piece for JAMES I would drive with him to JOHNNY's house, 606 11th Avenue, and we would go upstairs to the bedroom. There, all three of us would smoke some of the heroin and JAMES [****46] would give the piece to JOHNNY. I also went with JAMES on approximately [**422] 3 other occasions when he did not take any heroin and then we smoked at JOHNNY's and we would also get some for our own use.

About 4 days before I was arrested (arrested on June 4, 1959) JAMES called me at home about 7 o'clock in the evening and told me to come by. I went to the laundry and JAMES told me to get a piece. I called BILL and arranged to meet him. JAMES gave me $ 450 which I gave to BILL when I met him. BILL called me about one hour later at the laundry and I met him. He gave me one piece, which I gave to JAMES, and JAMES immediately thereafter called JOHNNY. We drove to 606 -- 11th Ave. at approximately midnight and JAMES gave the piece to JOHNNY. It was contained in a rubber contraceptive in a small brown paper bag.

Again on June 3rd, the night before I was arrested, I met JAMES at the laundry, prior to 11 o'clock in the evening, and JAMES telephoned JOHNNY at EV -- 6-9336. Then we went out to JOHNNY's and smoked heroin and also had one paper for our own use later. We were there approximately 1/2 hour and then left.

The laundry mentioned is OYE's [***461] LAUNDRY, 1733 [****47] Leavenworth Street, which is run by JAMES TOY. I do not know JOHNNY's last name and know him only [*497] through JAMES TOY. As well as the few times at JOHNNY's home, I have seen JOHNNY on a number of occasions at the laundry.

I have carefully read the foregoing statement, consisting of 2 pages which was made of my own free will, without promise of reward or immunity and not under duress. I have been given ample opportunity to make corrections, have initialed or signed each page as evidence thereof and hereby state that this statement is true to the best of my knowledge and belief.

WONG SUN

. . . .

WONG SUN, being unable to read English, did not sign this statement. However, I read this statement to him and he stated that the contents thereof were true to the best of his knowledge.

/s/ WILLIAM WONG

William Wong, Narcotic Agent

**Concur by:** DOUGLAS

## Concur

MR. JUSTICE DOUGLAS, concurring.

While I join the Court's opinion I do so because nothing the Court holds is inconsistent with my belief that there having been time to get a warrant, probable cause alone could not have justified the arrest of petitioner Toy without a warrant.

I adhere to the [****48] views I expressed in *Jones* v. *United States*, 362 U.S. 257, 273. What I said in the *Jones* case had been earlier stated by Mr. Justice Jackson, writing for the Court in *Johnson* v. *United States*, 333 U.S. 10 (another narcotics case):

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection [*498] consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." Pp. 13-14. And see *Chapman* v. *United States*, 365 U.S. 610, 615-616.

The Court finds it unnecessary to reach that constitutional question. I mention [**423] it only [****49] to reiterate that the *Johnson* case represents the law and is in no way eroded by what we fail to decide today.

**Dissent by:** CLARK

## Dissent

MR. JUSTICE CLARK, with whom MR. JUSTICE HARLAN, MR. JUSTICE **STEWART** and MR. JUSTICE **WHITE** join, dissenting.

The Court has made a Chinese puzzle out of this simple case involving four participants: Hom Way, Blackie Toy, Johnny Yee and "Sea Dog" Sun. In setting aside the convictions of Toy and Sun it has dashed to pieces the heretofore recognized standards of probable cause necessary to secure an arrest warrant or to make an arrest without [***462] one. Instead of dealing with probable cause as involving "probabilities," "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *Brinegar* v. *United States*, 338 U.S. 160, 175 (1949), the Court sets up rigid, mechanical standards, applying the 20-20 vision of hindsight in an area where the ambiguity and immediacy inherent in unexpected arrest are present. While probable cause must be based on more than mere suspicion, *Henry* v. *United States*, 361 U.S. 98, 104 (1959), it does [*499] [****50] not require proof sufficient to establish guilt. *Draper* v. *United States*, 358 U.S. 307, 312 (1959). The sole requirement heretofore has been that the knowledge in the hands of the officers at the time of arrest must support a "man of reasonable caution in the belief" that the subject had committed narcotic offenses. *Carroll* v. *United States*, 267 U.S. 132, 162 (1925). That decision is faced initially not in the courtroom but at the scene of arrest where the totality of the circumstances facing the officer is weighed against his split-second decision to make the arrest. This is an everyday occurrence facing law enforcement officers, and the unrealistic, enlarged standards announced here place an unnecessarily heavy hand upon them. I therefore dissent.

I.

The first character in this affair is Hom Way, who was arrested in possession of narcotics and told the officers early that morning that he had purchased an ounce of heroin on the previous night from Blackie Toy, who operated a laundry on Leavenworth Street. Narcotics agents, armed with this information from a person they had known for six weeks and who was under arrest for possession of [****51] narcotics, immediately sought out Blackie Toy, the second character. The laundry was located without difficulty (as far as the record shows) from the information furnished by Hom Way. The Court gratuitously reads into the record its supposition that Hom Way "merely invited the officers to roam the length of Leavenworth Street (some 30 blocks) in search of one 'Blackie Toy's' laundry . . . ." On the contrary, the identification of "Blackie" and the directions to his

laundry were sufficiently accurate for the officers -- two of whom were of Chinese ancestry -- to find Blackie at his laundry within an hour. I cannot say in the face of this record that this was a "roaming" performance [*500] up and down Leavenworth Street. To me it was efficient police work by officers familiar with San Francisco and the habits and practices of its Chinese-American inhabitants. Indeed, the information was much more explicit than that approved by this Court in *Draper* v. *United States, supra*.

There are other indicia of reliability, however. Here the informer, believed by the officers to be reliable, [*] was under arrest when he implicated himself in the [**424] purchase [****52] of an ounce of heroin the previous night. Since he was in possession [***463] of narcotics and his information related to a narcotics sale in which he was the buyer, the officers had good reason to rely on Hom Way's knowledge. See *Rodgers* v. *United States*, 267 F.2d 79 (C. A. 9th Cir. 1959), and *Thomas* v. *United States*, 281 F.2d 132 (C. A. 8th Cir.), cert. denied, 364 U.S. 904 (1960). As to his credibility, he was confronted with prosecution for possession of narcotics and well knew that any discrepancies in his story might go hard with him. Furthermore, the statement was a declaration against interest which stripped Hom Way of any explanation for his possession of narcotics and made certain the presumption of 21 U. S. C. § 174. I do not see what stronger and more reliable information one could have to establish probable cause for the arrest without warrant of Blackie Toy.

[****53] But even assuming there was no probable cause at this point, the Government produced additional evidence to support the lawfulness of Blackie's arrest. In broad daylight, about 6:30 on the same morning that Hom Way was arrested, one of the officers of Chinese ancestry, Agent Alton Wong, knocked on Blackie Toy's laundry door. When Wong told him that he wanted laundry, Blackie [*501] opened the door and advised him to return at 8 a. m. Wong testified that he then "pulled out [his] badge" and announced that he was a narcotics agent. Blackie slammed the door in Wong's face and ran down the hall of the laundry. Wong broke through the door after him -- calling again that he was "a narcotics Treasury agent." Only when Blackie reached the family bedroom was Wong able to arrest him, as he reached into a nightstand drawer, apparently looking for narcotics. Agent Wong immediately confronted him with Hom Way's accusation that Blackie Toy had sold him narcotics. Blackie denied selling narcotics, but he did not deny knowing Hom Way and later admitted knowing him. There is no basis in *Miller* v. *United States*, 357 U.S. 301 (1958), for the Court's conclusion that Blackie's [****54] flight "signified . . . a natural desire [by Toy] to repel an apparently unauthorized intrusion. . . ." As I see it this is incredible in the light of the record. Nor is there any support in the record that "before Toy fled, the officer never adequately dispelled the misimpression engendered by his own ruse." On the contrary the officer's showing of his badge and announcement that he was a narcotics agent immediately put Blackie in flight behind the slamming door. To conclude otherwise takes all prizes as a *non sequitur*. As he pursued, Wong continued to identify himself as a narcotics agent. I ask, how could he more clearly announce himself and his purpose?

This Court has often held unexplained flight -- as here -- from an officer to be strong evidence of guilt. *E. g., Husty* v. *United States*, 282 U.S. 694 (1931); *Brinegar* v. *United States, supra*, at p. 166, n. 7; see *Henry* v. *United States, supra*, where the Court was careful to distinguish its facts from those of "fleeing men or men acting furtively." 361 U.S., at 103. Moreover, as the Government has always emphasized, this is particularly true [****55] in narcotics cases where delay may have serious consequences, *i. e.*, the hiding [*502] or destruction [***464] of the drugs. This Court noted without disapproval in *Miller* v. *United States, supra*, the state decisions holding that "justification for noncompliance [with the rule] exists in exigent circumstances, as, for example, when the officers may in good faith believe . . . that the person to be arrested is fleeing or attempting to destroy evidence. *People* v. *Maddox*, 46 Cal. 2d 301, 294 P. 2d 6." 357 U.S., at 309. And the Court continued, "It may be that, without an express announcement of purpose, the facts known to officers would justify them in being virtually certain [**425] that the petitioner already knows their purpose so that an announcement would be a useless gesture. Cf. *People* v. *Martin*, 45 Cal. 2d 755, 290 P. 2d 855; Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 798, 802 (1924)." *Id.*, at 310.

The Court places entire reliance on the decision in *Miller*. I submit that it is inapposite. That case involved interpretation of the law of the [****56] District of Columbia. *Id.*, at 306. The arrest was at night, and the door was broken in just as the defendant began to close

---

[*] One of the officers testified at the trial that he had known Hom Way for six weeks. In response to the question whether Hom Way was a reliable informer, the officer replied, "I believe so, yes, sir."

it. Thus there was no flight but only what the officers believed to be an attempt to bar their entrance. The only identification given by the officers occurred before the defendant opened the door, when "in a low voice" through the closed door they answered the defendant's query as to who was there by saying, "Police." *Id*., at 303. The facts in *Miller* differ significantly from this case both in the clarity of identification by the officers and in the character and extent of the defendant's conduct. For that reason, the conclusions that Blackie's flight is evidence to support probable cause and that the officers gave sufficient notice to permit lawful entry are supported rather than weakened by the Court's decision in *Miller*.

The information from Hom Way and Blackie Toy's unexplained flight cannot be viewed "in two separate, logic-tight compartments. . . . Together they composed [*503] a picture meaningful to a trained, experienced observer." *Christensen* v. *United States*, 104 U. S. App. D. C. 35, 36, 259 F.2d 192, 193 (1958). [****57] I submit that the officers as reasonable men properly concluded that the petitioner was the "Blackie Toy" who Hom Way informed them had committed a felony and that his immediate arrest -- as he ran through his hall -- was lawful and was imperative in order to prevent his escape. In view of this there is no "poisonous tree" whose fruits we must evaluate, and Blackie's declaration at the time of the arrest and the narcotics found in Yee's possession are admissible in evidence. The trial court found that evidence sufficiently corroborative of Toy's confession, and the Court of Appeals affirmed. For the same reasons discussed, *infra*, as to Wong Sun, I see no occasion to overturn these consistent findings of two courts.

II.

As to "Sea Dog," Wong Sun, there is no disagreement that his confession and the narcotics found in Yee's possession were admissible in evidence against him. The question remains as to whether there was sufficient independent evidence to corroborate the confession. Such evidence "does not have to prove the offense beyond a reasonable doubt, [***465] or even by a preponderance . . . ." *Smith* v. *United States*, 348 U.S. 147, 156 (1954). [****58] The requirement is satisfied "if the corroboration merely fortifies the truth of the confession, without independently establishing the crime charged . . . ." *Ibid*.; see also *Opper* v. *United States*, 348 U.S. 84 (1954). Wong Sun's confession stated in part that about four days before his arrest he and Toy delivered an ounce of heroin to Yee and that on the night before his arrest -- the night of June 3, 1959 -- he and Toy smoked some heroin at Yee's house. On June 4, 1959, the officers found at Yee's residence quantities of heroin totaling "just less than one ounce." In light [*504] of this evidence, I am unable to say that the trial court and the Court of Appeals erred in holding that Wong Sun's confession was sufficiently corroborated.

The Court does not reach a contrary conclusion as to corroboration, but it grants Wong Sun a new trial on the ground that the trial court "may" also "have considered the contents of Toy's statement as a source of corroboration" of it. This point was not raised as a question here nor was it discussed in the briefs. Despite this the Court goes to some lengths to develop a chain of inferences [**426] in finding prejudicial [****59] error. This might be plausible where the case was tried to a jury, as were all the cases cited by the Court. Indeed, I find no case where such presumption of error was applied, as here, to a trial before a judge. The Court admits that the heroin found in Johnny Yee's possession might itself be sufficient corroboration, but it reverses on the excuse that the judge "may" have considered Toy's confession as well. I see no reason for this assumption where a federal judge is the trier of the fact, and I would therefore affirm the judgment as to both petitioners.

## References

Annotation References:

1. What constitutes "probable cause" or "reasonable grounds" justifying arrest of narcotics suspect without warrant. 3 L ed 2d 1736.

2. Admissibility of evidence obtained by illegal search. 24 ALR 1408; 32 ALR 408; 41 ALR 1145; 52 ALR 477; 88 ALR 348; 134 ALR 819; 150 ALR 566. See also 93 L ed 1797; 96 L ed 145; 98 L ed 581; 100 L ed 239; 6 L ed 2d 1544 (dealing with United States Supreme Court cases in point). [****60] As to modern (prior to Mapp v Ohio) status of rule, see 50 ALR2d 531. As to status of rule after Mapp v Ohio, see 84 ALR2d 959.

3. Sufficiency of corroborative evidence in connection with extrajudicial confessions or admissions in federal criminal prosecutions. 99 L ed 110.

4. Corroboration of extrajudicial confession or admission. 127 ALR 1130, 45 ALR2d 1316.

5. Admissibility as against conspirator of extrajudicial declarations of coconspirator. 1 L ed 2d 278.

6. Interest in property as requisite of accused's standing to raise question of constitutionality of search and

seizure. 96 L ed 66, 4 L ed 2d 1999.

7. Nature of interest, or connection with, premises searched as affecting standing to attack legality of search. 78 ALR2d 246.

8. Admissibility in evidence of unsigned confession. 23 ALR2d 919.

---

End of Document

# United States v. Esch

832 F.2d 531 (10th Cir. 1987)

Cited in Supplemental Brief at: 7

Caution
As of: September 17, 2026 9:37 PM Z

# United States v. Esch

United States Court of Appeals for the Tenth Circuit

October 29, 1987, Filed

Nos. 86-2070, 86-2090

**Reporter**
832 F.2d 531 *; 1987 U.S. App. LEXIS 14308 **

United States of America, Plaintiff-Appellee, v. William Esch, Defendant-Appellant; United States of America, Plaintiff-Appellee, v. Linda Esch, Defendant-Appellant

**Prior History:** [**1] Appeal from the United States District Court for the District of Colorado, D.C. Nos. 86-CR-80-2 and 86-CR-80-3.

**Disposition:** Affirmed.

**Counsel:** Thomas M. O'Rourke, Assistant United States Attorney, Colorado (Robert N. Miller, United States Attorney, with him on the brief), for Plaintiff-Appellee.

Richard N. Stuckey, for Defendant-Appellant William Esch.

Cheryl E. Peake, for Defendant-Appellant Linda Esch.

**Judges:** Seymour, Seth and Baldock, Circuit Judges.

**Opinion by:** BALDOCK

## Opinion

[*533] BALDOCK, Circuit Judge.

A jury found defendants-appellants William Esch and Linda Esch guilty of sixteen counts of sexual exploitation of children, in violation of 18 U.S.C. § 2251(a). The court sentenced both defendants to concurrent ten-year terms of imprisonment on eight of the counts, to be followed by concurrent five-year terms of probation on the remaining counts. On appeal, the defendants contend that: 1) the trial court erred in excluding expert testimony; 2) the trial court improperly admitted irrelevant and unduly prejudicial evidence; 3) 18 U.S.C. § 2251(a) is unconstitutional because it lacks a *mens rea* requirement; 4) the trial [**2] court improperly admitted co-conspirator statements; 5) the trial court erred in denying a motion for severance; 6) the government agents' conduct of the undercover operation was so outrageous as to violate due process; 7) the government agents "manufactured" federal jurisdiction; 8) no federal jurisdiction existed as to the fourteen counts involving photographs which were not mailed; 9) the evidence of the defendants' knowledge that those photographs would be mailed was insufficient to transform the transaction into a crime against the United States; and 10) the indictment was multiplicitous. We affirm.

In the spring of 1985, the United States Postal Inspection Service commenced an undercover operation which targeted suspected pedophiles. [1] Postal Inspector Patrick J. Carr, a prohibited mail specialist, established a post office box in Loveland, [*534] Colorado for a fictitious organization known as "Love Land." A membership application was sent to Thomas Blackledge, who was jointly tried with the defendants. Blackledge was a suspected pedophile whose pseudonym, Kalium Ghatt, had been discovered during an investigation in Cleveland, Ohio.

[**3] Blackledge returned the membership application in August of 1985. His answers to the enclosed questionnaire were interpreted by Carr to indicate an interest in pedophilia. Once Blackledge became a member of "Love Land," he received newsletters and responded to classified advertisements. Carr, who assumed the identity of one of the advertisers, corresponded with him over a four-month period. In two letters sent in October of 1985, Blackledge wrote about his sexual experiences with a husband and wife, later identified as defendants, and their two children. He indicated that they would be interested in producing

---

[1] Pedophilia is defined as a "paraphilia in which children are the preferred sexual object." Webster's Third New International Dictionary 1665 (1981). Paraphilia is defined as "a preference for or addiction to unusual sexual practices." *Id.* at 1638.

photographs or films because they needed money.

On December 7, 1985, Carr and Blackledge met at a motel in Evans, Colorado. During the course of the conversation, which Carr recorded, they discussed taking photographs as well as making a movie or a videotape. At that time, Blackledge mentioned a family with children ages two and three. Carr in turn expressed an interest in buying photographs and suggested that Blackledge purchase a camera to take the pictures.

Blackledge also corresponded with Postal Inspector William B. Reeves, Jr. of Walnut Creek, California. At Carr's [**4] request, Reeves, also a prohibited mail specialist, assumed the identity of an advertiser in the "Love Land" newsletter. In one of his letters to Reeves, Blackledge mentioned a couple who were interested in making some photographs and videos. Reeves responded by suggesting that they swap photographs or videotapes. In February of 1986, Reeves received in the mail from Blackledge two sexually explicit photographs depicting Blackledge, the defendants and their two children.

On March 11, 1986, Blackledge and Carr met again. Blackledge showed Carr a number of sexually explicit photographs depicting himself, the defendants and their children. Carr then purchased fourteen of the photographs. Those photographs, along with the two photographs mailed by Blackledge to California, were the basis of the sixteen counts upon which the defendants were convicted.

On March 14, 1985, Carr arrested Blackledge and seized an address book which contained the names of the defendants. Five days later, postal inspectors searched the defendants' home in Loveland, Colorado. They seized a lamp, a bedspread and a clock radio, all of which corresponded to those shown in the photographs which Blackledge had delivered [**5] to Carr and had mailed to Reeves. The postal inspectors also seized a Polaroid camera and a number of so-called "swingers" magazines.

I.

Defendant Linda Esch first contends that the trial court erred in excluding the testimony of her expert witness, a clinical psychologist. She argues that the testimony was admissible to show motive as well as to show her particular psychological characteristics.

Prior to trial, the government filed a motion in limine to prevent any testimony concerning defendant's mental state. The trial court granted the motion, stating that unless there was an issue of competency or insanity, it would not permit expert testimony on a factual issue within the competence of the jury. Rec. vol. VI at 199. At a hearing on defendant's offer of proof, the psychologist testified that the defendant had a "dependent personality," and further testified that defendant's values regarding sexuality and nudity were derived from her "rigid" childhood experiences. Citing Fed. R. Evid. 704(b), [2] the court refused to allow [*535] the psychologist to testify before the jury, again stating that the issue of intent was a matter of fact for the jury. The court also cited [**6] Fed. R. Evid. 702 [3] in concluding that, because there had been no indication of neurosis or mental defect, the expert testimony was unnecessary. Rec. vol. XI at 946-47.

The determination of whether expert testimony should be admitted rests within the sound discretion of [**7] the trial court. *United States v. Barton*, 731 F.2d 669, 672 (10th Cir. 1984). The court's ruling will not be disturbed absent a clear abuse of that discretion. *Id.*

It is not entirely clear whether the testimony was proffered to address defendant's contention that she was duped by Blackledge, or to elucidate her "motive" for producing the photographs, or both. In any event, we agree with the trial court that the testimony essentially addressed the issue of intent. An expert may not substitute her judgment as to the defendant's state of mind by testifying that because of the defendant's personality, she would not have acted in a particular manner. *United States v. Pino*, 606 F.2d 908, 918 (10th Cir. 1979). Absent the suggestion of the presence of a mental disease or defect, a trial court may properly exclude psychiatric testimony which merely offers an opinion about the defendant's capacity to form the

---

[2] Fed. R. Evid. 704(b) provides:

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

[3] Fed. R. Evid. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

mental state required to commit the offense charged. *United States v. McBride*, 786 F.2d 45, 50 (2d Cir. 1986).

Even assuming that the psychologist would not have focused solely on defendant's capacity to form the requisite intent, [**8] more generalized testimony regarding her personality characteristics was excludable because it addressed a subject matter within the knowledge and experience of the jury and therefore did not meet the helpfulness criterion of Fed. R. Evid. 702. *See United States v. Affleck*, 776 F.2d 1451, 1458 (10th Cir. 1985); *United States v. Kepreos*, 759 F.2d 961, 964-65 (1st Cir.), *cert. denied*, 474 U.S. 901, 88 L. Ed. 2d 227, 106 S. Ct. 227 (1985). Defendant testified about her upbringing and her attitudes toward sexuality and nudity. She further testified that she did not believe she was producing sexually explicit pictures and that she had been duped by Blackledge. The jury was capable of making an intelligent evaluation of that testimony without the assistance of an expert. The trial court was within its discretion in excluding the psychologist's testimony.

II.

Defendant Linda Esch claims the trial court improperly admitted certain evidence which had been seized from her home. The seized items included "swingers" magazines as well as advertisements and photographs mailed to such magazines by the defendants. Defendant argues that because [**9] the evidence pertained solely to adult sexual practices, it was not relevant to the charge of sexual exploitation of children and should have been excluded due to its prejudicial nature.

The determination of whether evidence is relevant lies within the sound discretion of the trial court, and the court's determination will not be disturbed absent a clear showing of an abuse of that discretion. *United States v. Neal,* 718 F.2d 1505, 1509-10 (10th Cir. 1983), *cert. denied*, 469 U.S. 818, 83 L. Ed. 2d 34, 105 S. Ct. 87 (1984). A trial court also has broad discretion to determine whether otherwise relevant evidence should be excluded if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Id.* at 1510; *see* Fed. R. Evid. 403.

Evidence of other acts is not admissible solely to prove a defendant's criminal disposition. *United States v. Naranjo*, 710 F.2d 1465, 1467 [*536] (10th Cir. 1983). Such evidence, however, may be admissible under Fed. R. Evid. 404(b) [4] to show knowledge, motive or intent on the part of the actor. *United States v. Cummings*, 798 F.2d 413, 417 (10th Cir. 1986). [**10]

The magazines, advertisements and photographs were relevant, as they tended to show that defendant had previously sent sexually explicit materials through the mail and that she knew or had reason to know that the photographs at issue would be mailed. The exhibits also tended to rebut her contention that she had been duped by Blackledge. *See United States v. Garot*, 801 F.2d 1241, 1247 (10th Cir. 1986) (evidence of other mailings of child pornography relevant to show knowledge, *scienter* and absence of mistake). In specifically articulating the purposes for which the evidence was admitted, *United States v. Morales-Quinones*, 812 F.2d 604, 612 (10th Cir. 1987), [**11] the trial court stated that the evidence rebutted the defense that the defendants did not engage in photographing sexual behavior prior to meeting Blackledge, that it showed knowledge of the mailing of such materials and that it indicated "past practices and customs." Rec. vol. VII at 243; rec. vol. IX at 549, 614. A limiting instruction was given to the effect that possession of the materials was not unlawful. The court did not abuse its discretion in admitting the controverted evidence.

III.

With regard to the two counts involving the photographs mailed to the postal inspector in California, defendant Linda Esch asserts that 18 U.S.C. § 2251(a) is unconstitutional because it is a strict liability statute lacking a requirement of proof of criminal intent.

As amended by the Child Protection Act of 1984, 18 U.S.C. § 2251(a) provides:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, any sexually explicit conduct *for the purpose of producing any visual depiction of such conduct*, shall be punished as provided under subsection [**12] (c), if such person knows or has

---

[4] Fed. R. Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

> reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed. (emphasis added).

The statute proscribes the employment or use of a minor to engage in sexually explicit conduct "for the purpose of producing" a visual depiction of such conduct. "In a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent." *United States v. Bailey*, 444 U.S. 394, 405, 62 L. Ed. 2d 575, 100 S. Ct. 624 (1980). Thus the statute, by requiring proof of purposeful conduct, clearly contains a scienter requirement. [5] The fact that the statute does not specifically require intent regarding the mailing element does not render the statute unconstitutional. *See United States v. Yermian*, 468 U.S. 63, 68, 82 L. Ed. 2d 53, 104 S. Ct. 2936 (1984) (jurisdictional language need not contain same culpability requirement as other elements of offense).

[**13] IV.

Defendant Linda Esch contends that the trial court erroneously ruled that a conspiracy existed and, as a result, improperly admitted Blackledge's hearsay statements [*537] against her. Specifically, she argues that there was a total lack of independent evidence indicating that she conspired to mail sexually explicit photographs.

Hearsay statements of a co-conspirator are properly admitted pursuant to Fed. R. Evid. 801(d)(2)(E) [6] if the trial court makes a factual determination that the government has established, by a preponderance of the evidence, that: 1) a conspiracy existed; 2) the declarant and the defendant were members of the conspiracy; and 3) the hearsay statements were made in the course and in furtherance of the conspiracy. *United States v. Hernandez*, 829 F.2d 988, slip op. at 12-13 (10th Cir. 1987). The court may consider the hearsay statements sought to be admitted, along with evidence independent of the statements, in determining whether a conspiracy existed. *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 2782, 97 L. Ed. 2d 144 (1987); *United States v. Hernandez*, 829 F.2d at 993.

[**14] Prior to the trial court's ruling on the existence of a conspiracy, numerous hearsay statements contained in the letters sent to the postal inspectors and in the tape recordings of the meetings with Carr were admitted solely against Blackledge. On the fourth day of trial, the court conducted a hearing to determine whether that evidence also could be admitted against defendants. In determining that a conspiracy, or what it termed a "joint venture," did exist, the court relied on the following evidence: the photographs, which depicted Blackledge, the defendants and the defendants' children; Blackledge's address book containing the defendants' names; the defendants' shared interest in "swingers" magazines and in the mailing of sexually explicit photographs; the advertisements placed in the "swingers" magazines, which indicated an apparent interest by William Esch in young girls; the longstanding nature of the defendants' relationship with Blackledge; and telephone records indicating communication between the defendants and Blackledge at pertinent times. Rec. vol. X at 755-60.

The independent evidence upon which the court relied, particularly the photographs, supports its determination. [**15] Contrary to defendant's contention, that evidence supported a reasonable inference that the photographs were produced with the knowledge that they would be mailed. The court's finding that a "joint venture" existed is further buttressed by the hearsay statements themselves, which could have been considered along with the independent evidence. *United States v. Bourjaily*, 107 S. Ct. at 2782; *United States v. Hernandez*, 829 F.2d at 993. There was no error in the admission of the co-conspirator hearsay statements.

V.

---

[5] Similar attacks on the constitutionality of the statute, on the basis that it imposes strict liability, have been rejected. *See United States v. Fenton*, 654 F. Supp. 379, 380 (E.D. Pa. 1987); *United States v. Reedy*, 632 F. Supp. 1415, 1422 (W.D. Okla. 1986).

[6] Fed. R. Evid. 801 provides in pertinent part:

(d) **Statements which are not hearsay. A** statement is not hearsay if --

. . . .

(2) **Admission by party-opponent**. The statement is offered against a party and is

. . . .

(E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Defendant Linda Esch claims that the trial court erred in denying her motion for severance. She argues that her defenses were clearly antagonistic to Blackledge's and that she should not have been tried with her husband.

The decision whether to grant a severance is within the sound discretion of the trial court, and its decision will not be reversed in the absence of a strong showing of prejudice. *United States v. Heath*, 580 F.2d 1011, 1022 (10th Cir. 1978), *cert. denied*, 439 U.S. 1075, 99 S. Ct. 850, 59 L. Ed. 2d 42 (1979). The court must weigh any potential prejudice against the important considerations [**16] of economy and expedition in judicial administration. *United States v. Petersen*, 611 F.2d 1313, 1331 (10th Cir. 1979), *cert. denied*, 447 U.S. 905, 64 L. Ed. 2d 854, 100 S. Ct. 2985, 100 S. Ct. 2986 (1980).

Joinder of the defendants was proper. Under Fed. R. Crim. P. 8(b), [7] defendants [*538] may be charged in the same indictment if they are alleged to have participated in the same series of acts or transactions. Eighteen of the nineteen counts in the original indictment named all three defendants, with each count alleging the use of the children to produce a specific photograph. The remaining count charged Blackledge with mailing the photographs mentioned in counts II and III. According to the indictment, the offenses occurred on or about February 12, 1986 or March 11, 1986. Where the evidence overlaps, the offenses are similar and the operable events occurred within a relatively short span of time, joinder of defendants and offenses is proper. *United States v. Riebold*, 557 F.2d 697, 707 (10th Cir.), *cert. denied*, 434 U.S. 860, 54 L. Ed. 2d 133, 98 S. Ct. 186 (1977).

[**17] In attempting to demonstrate prejudice, defendant first argues that her defenses were antagonistic to Blackledge's. Severance is not required where co-defendants rely on different defenses unless the defenses are so antagonistic that they are mutually exclusive. *United States v. Burrell*, 720 F.2d 1488, 1492 (10th Cir. 1983). The conflict between co-defendant defenses must be so intense that there is a danger the jury will unjustifiably infer from the conflict alone that both defendants are guilty. *United States v. Swingler*, 758 F.2d 477, 495 (10th Cir. 1985). Blackledge's defenses were entrapment and outrageous government conduct, a claim requiring a legal ruling by the trial court, while defendant essentially asserted that she had been duped and that she lacked the requisite intent. Those defenses were not so antagonistic as to compel severance. *See United States v. Burrell*, 720 F.2d at 1492-93.

Second, defendant claims that the marital privilege was violated by the joint trial with her husband. We fail to discern from the record in what regard the marital privilege was implicated. Defendant's generalized equal protection argument, [**18] in support of which she cites no authority, is unavailing. The trial court did not abuse its discretion in denying defendant's motion for severance.

VI.

Both defendants claim that the postal inspectors' conduct in carrying out the undercover operation was so outrageous that their convictions should be reversed on due process grounds. They argue that the operation directly harmed their children, since there was no evidence to indicate the existence of any photographs prior to the government agents urging Blackledge to take such photographs. They also argue that the operation potentially harmed other unknown children, due to the encouraging of pedophilia through the forwarding of mail generated by the "Love Land" newsletter.

"The outrageous governmental conduct defense is manifestly reserved for only 'the most intolerable government conduct.'" *United States v. Warren*, 747 F.2d 1339, 1341-42 (10th Cir. 1984) (citing *United States v. Jannotti*, 673 F.2d 578, 608 (3d Cir. 1982)). A defendant may not invoke the due process clause unless the acts of the government agents, "no matter how outrageous, had a role in inducing the defendant to become involved [**19] in the crime." *United States v. Gamble*, 737 F.2d 853, 858 (10th Cir. 1984).

We hold that the undercover operation did not constitute intolerable governmental conduct. The postal inspectors had knowledge, gleaned from a previous investigation, that Blackledge was a suspected pedophile. The agents did not introduce Blackledge to the defendants and did not provide any of the instrumentalities of the crime. Nor did the agents induce the defendants to engage in any activity that they were not otherwise disposed to

---

[7] Fed. R. Crim. P. 8(b) provides:

**Joinder of Defendants**. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

undertake. While it is true that Carr encouraged Blackledge to take photographs, and that other mail was forwarded during the [*539] course of the "Love Land" operation, the postal inspectors' conduct was not outrageous in light of the clandestine nature of the activity that they were investigating. To the contrary, we agree with the trial court's observation that it was reasonable for the postal inspectors to assume that the only way they could ferret out suspected pedophiles "was to encourage the photograph[ing] and mailing of what was otherwise being done or what they thought was being done." Rec. vol. XII at 1138-39.

In *United States v. Thoma*, 726 F.2d 1191 [**20] (7th Cir.), *cert. denied*, 467 U.S. 1228, 81 L. Ed. 2d 878, 104 S. Ct. 2683 (1984), a panel of the Seventh Circuit addressed a claim of outrageous government conduct involving a similar undercover operation set up to investigate prohibited mailings of child pornography. The defendant responded to a survey sent by the government agents, and eventually mailed videotapes of children engaged in sexually explicit conduct. The court concluded that the sting operation "was nothing more than an undercover operation of an inherently clandestine activity and *did not constitute Government misconduct, much less violate defendant's right to due process." Id.* at 1199 (emphasis added).

By way of dicta, the court stated that because the defendant did not photograph any minors engaged in sexual activity, but only videotaped photographs from several publications, "we decline to speculate about the possibility of indirect harm to minors in other investigations." *Id.* The defendants cite that language in arguing that in this case the harm to children envisioned in *Thoma* was present and warranted the dismissal of the indictment. Their argument is unpersuasive, [**21] for the evidence indicates that the defendants were predisposed to engage in sexual activity with their children and were willing to photograph such activity. The contention that other unknown minors were harmed is speculative at best. Defendants' allegations of harm to minors resulting from the undercover operation do not substantiate their otherwise meritless claim of outrageous government conduct.

VII.

Defendant Linda Esch contends that the government agents "manufactured" federal jurisdiction. Relying on *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), she argues that the agents provided the interstate elements which confer federal jurisdiction.

In *Archer*, the Second Circuit reversed several Travel Act convictions, holding that Congress did not intend to grant federal jurisdiction over cases "where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present." *United States v. Archer*, 486 F.2d at 682. This circuit has expressly limited the applicability of *Archer* to cases of virtual entrapment. *United States v. O'Connor*, 635 F.2d 814, 817 (10th Cir. 1980); [**22] *United States v. Hall*, 536 F.2d 313, 327 (10th Cir.), *cert. denied*, 429 U.S. 919, 97 S. Ct. 313, 50 L. Ed. 2d 285 (1976).

This is not a case of virtual entrapment. Although the creation of the undercover operation by the postal inspectors undeniably provided a conduit for interstate activity, the government agents did not provoke any activity that the defendants were not predisposed to undertake. As indicated, Blackledge consistently expressed a willingness to correspond through interstate mailings and to send sexually explicit photographs through the mail. Further, the defendants' production of the sexually explicit photographs, with the knowledge that the photographs would be mailed, constituted activity which represented an integral, rather than an incidental or unforeseen, aspect of the criminal transaction. *United States v. O'Connor*, 635 F.2d at 818.

Defendant also contends that Carr enlisted the help of Inspector Reeves in California for the purpose of supplying the interstate element of the crimes. As Carr testified, he requested Reeves' assistance because Reeves was a prohibited mail specialist familiar with pedophiles. [**23] Reeves testified that pedophiles often do not correspond with persons in close proximity for [*540] fear of being identified. The agents, by working in concert during the course of the investigation, did not thereby act "to ensure that an interstate element would be present." *United States v. Archer*, 486 F.2d at 682.

VIII.

Defendant William Esch contends that the knowledge element in 18 U.S.C. § 2251(a) is insufficient to create federal jurisdiction because an actual mailing is not required for a conviction. While conceding that a mailing clearly provides a satisfactory federal nexus, he argues that allowing a "state of mind" to provide the jurisdictional element of the crime significantly alters federal-state relationships.

Congress has the inherent power to prohibit criminal activity under the Commerce Clause even though the

effect of such activity on interstate commerce may be *de minimis. See Perez v. United States*, 402 U.S. 146, 150-51, 28 L. Ed. 2d 686, 91 S. Ct. 1357 (1971); *United States v. Schwanke*, 598 F.2d 575, 578 (10th Cir. 1979). Given Congress' inherent power to prohibit actions [**24] that interfere with federal interests, [8] we construe defendant's argument to be that without an actual mailing, the government cannot establish the jurisdictional element of 18 U.S.C. § 2251(a) by merely showing that he knew or had reason to know that the photographs would be mailed. We cannot agree.

The statute provides in part that any person who uses a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct [**25] "shall be punished . . . if such person knows or has reason to know that such visual depiction will be . . . mailed." 18 U.S.C. § 2251(a). The knowledge element does not relate to mere "subjective knowledge," as characterized by defendant, but rather addresses intentional conduct. "'Knowledge' corresponds loosely with the concept of general intent." *United States v. Bailey*, 444 U.S. at 405. Accordingly, the government must prove the existence of such intentional conduct and not merely the existence of "subjective knowledge."

Federal courts have refused to base federal jurisdiction upon "unforeseen interstate activity." *United States v. O'Connor*, 635 F.2d at 818. Here, there was sufficient evidence adduced to prove that a mailing was foreseeable. In that regard, the statute under which the defendants were convicted is analogous to the mail fraud statute, which has been interpreted to mean that a defendant causes a mailing when it is reasonably foreseeable that his activities will result in the use of the mail. *United States v. Roylance*, 690 F.2d 164, 167 (10th Cir. 1982). "All that is necessary to establish [**26] a mailing under 18 U.S.C. § 1341 is a showing that the defendant acted 'with knowledge that the use of the mails [would] follow in the ordinary course of business, or where such use [could] reasonably be foreseen, even though not actually intended . . . .'" *Bank of America Nat'l Trust & Savings Ass'n v. Touche Ross & Co.*, 782 F.2d 966, 971 (11th Cir. 1986) (quoting *Pereira v. United States*, 347 U.S. 1, 8-9, 98 L. Ed. 435, 74 S. Ct. 358 (1954)).

Finally, we cannot agree with defendant's contention that the statute upsets federal-state relationships by exerting federal jurisdiction over an area traditionally left to the states. Defendant cites this court's statement in *O'Connor* that "in grounding federal criminal jurisdiction on an interstate nexus we must avoid 'alter[ing] sensitive federal-state relationships' through usurpation of state control over local matters." *United States v. O'Connor*, 635 F.2d at 818 (citing *Rewis v. United States*, 401 U.S. 808, 812, 28 L. Ed. 2d 493, 91 S. Ct. 1056 (1971)). Congress [*541] was aware of that potentiality in passing the Protection [**27] of Children Against Sexual Exploitation Act of 1977. The legislative history of the Act indicates that while Congress recognized that a "delicate balance" must be maintained between federal and state law enforcement efforts, it deemed that "the use of children in the production of pornographic materials is a matter that cannot be adequately controlled by state and local authorities." S. Rep. No. 95-438, 95th Cong., 2d Sess., *reprinted in* 1978 U.S. Code Cong. & Admin. News 40, 48.

IX.

In a related argument, defendant William Esch contends that the evidence of his knowledge that the fourteen photographs sold by Blackledge would be mailed was insufficient to transform the transaction into a crime against the United States. He relies on *Archer* in asserting that such a "casual" interstate contact cannot create a federal offense and that the "speculative" nature of the inference that he knew or had reason to know that the photographs would be mailed was not sufficient to create a federal crime.

As discussed above, the knowledge element of the statute clearly provides a federal jurisdictional basis. Despite defendant's argument that the evidence showed only one fact, that Blackledge [**28] insisted that the photographs he sold to Carr not be mailed, there was sufficient evidence adduced at trial to prove that a mailing of those photographs was foreseeable. For instance, two of the photographs produced by the defendants were actually mailed, supporting a reasonable inference that defendant knew or had reason to know that the fourteen photographs sold by Blackledge to the postal inspector also would be mailed. Additional evidence indicated that defendant had previously used the mail to send sexually explicit photographs, albeit depicting adult sexual activity.

---

[8] A jurisdictional requirement "is sufficient to confer jurisdiction on the federal courts for what otherwise are state crimes precisely because it implicates factors that are an appropriate subject for federal concern." *United States v. Feola*, 420 U.S. 671, 676 n. 9, 43 L. Ed. 2d 541, 95 S. Ct. 1255 (1975). "Congress has the inherent power to establish criminal penalties for actions that interfere with any federal interest." 1 R. Rotunda, J. Nowak & J. Young, Treatise on Constitutional Law § 4.10 (1986).

Viewed in the light most favorable to the government, *United States v. Alonso*, 790 F.2d 1489, 1492 (10th Cir. 1986), there is sufficient evidence to support the convictions.

X.

The final issue to be addressed is defendant Linda Esch's contention that the indictment was multiplicitous. She argues that the photographs depicted the same two children and were produced in the same photographing session and therefore constitute only one crime.

"Multiplicity is the charging of a single offense in more than one count." *United States v. De La Torre*, 634 F.2d 792, 794 (5th Cir. 1981). [**29] This is not an instance where the same act or transaction constitutes a violation of two distinct statutory provisions. *See Blockburger v. United States*, 284 U.S. 299, 304, 76 L. Ed. 306, 52 S. Ct. 180 (1932). Rather, it is a case where each successive act has been charged as a separate crime under the same statute. The pertinent inquiry becomes defining the correct unit of prosecution. *Bell v. United States*, 349 U.S. 81, 99 L. Ed. 905, 75 S. Ct. 620 (1955).

18 U.S.C. § 2251(a) proscribes the use of a minor to engage in "any sexually explicit conduct for the purpose of producing *any visual depiction* of such conduct." (emphasis added). As we construe the statute, each use of a minor to create a visual depiction constitutes a separate and distinct violation, and thus represents the correct unit of prosecution.

The inquiry as to what constitutes the correct unit of prosecution focuses in part on the identification of the key element of the federal offense. In *United States v. Villano*, 529 F.2d 1046 (10th Cir.), *cert. denied*, 426 U.S. 953, 49 L. Ed. 2d 1193, 96 S. Ct. 3180 (1976), the [**30] defendants, who were charged with three counts of using the telephone to promote gambling, claimed that, because their activities were continuous, the government had acted arbitrarily in charging separate offenses. This court concluded that the charging of separate offenses was warranted because while the continuing "'unlawful activity'" was part of the required elements, "the key element for the federal offense is the act of travel or use of interstate facilities." *Id.* at 1061.

[*542] Here, we conclude that the key element of the offense is the use a minor to engage in sexually explicit conduct for the purpose of creating a visual depiction of such conduct. [9] [**32] That conclusion is supported by the legislative history of the statute, which indicates that Congress intended to protect children from the abuse inherent in the production of pornographic materials. S. Rep. No. 95-438, *reprinted in* 1978 U.S. Code Cong. & Admin. News at 53. [10] The fact that multiple photographs may have been sequentially produced during a single photographing session is irrelevant. Each photograph depended upon a separate and distinct use of the children. *See Blockburger v. United States*, 284 U.S. at 302-03; [**31] *United States v. Williams*, 685 F.2d 319, 321 (9th Cir. 1982).

---

[9] In other cases the courts have focused on the key element of the offense in determining the correct unit of prosecution. In *Ebeling v. Morgan*, 237 U.S. 625, 59 L. Ed. 1151, 35 S. Ct. 710 (1915), the defendant, who cut open a number of mail bags, was charged with a separate count for each mail bag. The Supreme Court concluded that "although the transaction of cutting the mail bags was in a sense continuous, the complete statutory offense was committed every time a mail bag was cut . . . ." *Id.* at 629.

In *United States v. Marzano*, 537 F.2d 257 (7th Cir. 1976), *cert. denied*, 429 U.S. 1038, 50 L. Ed. 2d 749, 97 S. Ct. 734 (1977), the defendant broke into a security company vault and took money belonging to six different banks. The Seventh Circuit rejected the defendant's claim that it was improper to charge him with separate violations of 18 U.S.C. § 2113(b), finding the fact that all the money was taken from the same vault irrelevant because "Congress was concerned with protecting bank money." *Id.* at 273.

In *Barringer v. United States*, 130 U.S. App. D.C. 186, 399 F.2d 557 (D.C. Cir. 1968), *cert. denied*, 393 U.S. 1057, 21 L. Ed. 2d 698, 89 S. Ct. 697 (1969) (per curiam), the defendant robbed two individuals in a grocery store and was convicted on two separate counts. The District of Columbia Court of Appeals rejected the defendant's claim that the rule of lenity necessitated the invalidation of the consecutive sentences imposed, because there was "no doubt that the robbery statute was designed to safeguard individual citizens from being robbed." *Id.* at 558.

[10] As explained in the Senate report,

Current Federal laws dealing with pornography focus almost exclusively on the sale, distribution and importation of obscene materials, and, do not directly address the abuse of children inherent in their participation in the production of such materials. . . the Committee intends to fill the existing gap in Federal law by declaring that the use of children in the production of such materials is a form of child abuse. S. Rep. No. 95-438, *reprinted in* 1978 U.S. Code Cong. & Admin. News at 53.

Defendant's reliance on *United States v. Meyer*, 602 F. Supp. 1480 (S.D. Cal. 1985), is unavailing. In *Meyer*, the defendant was charged under 18 U.S.C. §§ 2252(a)(1) and 545 in connection with entering the United States with a binder containing pornographic pictures of young males. Each count of the indictment related to the transportation of one photograph contained in the binder. The court agreed with the defendant's contention that the indictment was multiplicitous, deeming it dispositive "that the pictures [**33] were transported and imported simultaneously." *Id.* at 1482. The court noted, however, that "this case is distinguishable from those cases in which the criminal acts listed in each count were not simultaneous." *Id.* (citations omitted).

The criminal acts in the instant case were not simultaneous. Again, our conclusion that the correct unit of prosecution is each use of the children to create a visual depiction is supported by the legislative history, which indicates an unequivocal intent to protect children from the abuse inherent in the production of sexually explicit materials. As explained by the Supreme Court, materials depicting sexual activity by juveniles "are a permanent record of the children's participation." *New York v. Ferber*, 458 U.S. 747, 759, 73 L. Ed. 2d 1113, 102 S. Ct. 3348 (1982). The indictment properly charged separate counts for each of the photographs produced.

AFFIRMED.

---

End of Document

# Stirone v. United States

361 U.S. 212 (1960)

Cited in Supplemental Brief at: 9

Q Questioned
As of: September 17, 2026 9:37 PM Z

# Stirone v. United States

Supreme Court of the United States

November 9-10, 1959, Argued ; January 11, 1960, Decided

No. 35

**Reporter**
361 U.S. 212 *; 80 S. Ct. 270 **; 4 L. Ed. 2d 252 ***; 1960 U.S. LEXIS 1969 ****; 38 Lab. Cas. (CCH) P66,087; 45 L.R.R.M. 2367

STIRONE v. UNITED STATES

**Prior History:** [****1] CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT.

**Disposition:** 262 F.2d 571, reversed.

## Syllabus

Petitioner was indicted and convicted in a Federal District Court for interfering with interstate commerce by extortion, in violation of the Hobbs Act, 18 U. S. C. § 1951. The only interstate commerce mentioned in the indictment was the importation into Pennsylvania of sand to be used in building a steel plant there; but the trial judge permitted the introduction of evidence to show interference also with the exportation from Pennsylvania of steel to be manufactured in the new plant, and he instructed the jury that it could base a conviction upon interference with either the importation of sand or the exportation of steel. *Held*: The conviction is reversed. Pp. 213-219.

(a) Since the indictment did not charge interference with the exportation of steel from the State, it was prejudicial error to submit to the jury the question whether the extortion interfered with the exportation of steel. Pp. 215-219.

(b) The variance between [****2] pleading and proof here involved was not insignificant and may not be dismissed as harmless error, because it deprived petitioner of his substantial right to be tried for a felony only on charges presented in an indictment returned by a grand jury. Pp. 217-218.

(c) Since the jury might have based the conviction on a finding of interference with the exportation of steel, the conviction must be reversed. P. 219.

**Counsel:** Michael von Moschzisker argued the cause for petitioner. With him on the brief was Vincent M. Casey.

Wayne G. Barnett argued the cause for the United States. On the brief were Solicitor General Rankin, Assistant Attorney General Wilkey, Ralph S. Spritzer, Beatrice Rosenberg and Theodore George Gilinsky.

**Judges:** Warren, Black, Frankfurter, Douglas, Clark, Harlan, Brennan, Whittaker, Stewart

**Opinion by:** BLACK

## Opinion

[*213] [***254] [**271] MR. JUSTICE BLACK delivered the opinion of the Court.

Petitioner Nicholas Stirone was indicted and convicted in a federal court for unlawfully interfering with interstate commerce in violation of the Hobbs Act. [1] The crucial

---

[1] 62 Stat. 793, 18 U. S. C. § 1951.

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $ 10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section --

. . . .

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official

question here is whether he was convicted of an offense not charged in the indictment.

[****3] So far as relevant to this question the indictment charged the following:

From 1951 until 1953, a man by the name of William G. Rider had a contract to supply ready-mixed concrete from his plant in Pennsylvania to be used for the erection of a steel-processing plant at Allenport, Pennsylvania. For the purpose of performing this contract Rider

"caused supplies and materials [sand] to move in interstate commerce [***255] between various points in the United States and the site of his plant for the manufacture or mixing of ready mixed concrete, and more particularly, from outside the State of Pennsylvania into the State of Pennsylvania."

The indictment went on to charge that Stirone, using his influential union position,

"did . . . unlawfully obstruct, delay [and] affect interstate commerce between the several states of [*214] the United States and the movement of the aforesaid materials and supplies in such commerce, by extortion . . . of $ 31,274.13 . . . induced by fear and by the wrongful use of threats of labor disputes and threats of the loss of, and obstruction and prevention of, performance of his contract to supply ready mixed concrete. [****4] "

The district judge, over petitioner's objection as to its materiality and relevancy, permitted the Government to offer evidence of an effect on interstate commerce not only in sand brought into Pennsylvania from other States but also in steel shipments from the steel plant in Pennsylvania into Michigan and Kentucky. Again over petitioner's [**272] objection the trial judge charged the jury that so far as the interstate commerce aspect of the case was concerned, Stirone's guilt could be rested either on a finding that (1) sand used to make the concrete "had been shipped from another state into Pennsylvania" or (2) "Mr. Rider's concrete was used for constructing a mill which would manufacture articles of steel to be shipped in interstate commerce . . ." from Pennsylvania into other States. On motion of petitioner for arrest of judgment, acquittal or new trial, the District Court held that "A sufficient foundation for introduction of both kinds of proof was laid in the indictment." 168 F.Supp. 490, 495. The Court of Appeals affirmed, all the judges agreeing that interference with the sand movements into Pennsylvania was barred by the Hobbs Act. 262 F.2d 571. [****5] Judge Hastie and Chief Judge Biggs disagreed with the court's holding that Stirone could be tried and convicted for interference with the possible future shipments of steel from Pennsylvania to Michigan and Kentucky. 262 F.2d, at 578, 580. They were of opinion that no interference with interstate steel shipments was charged in the indictment and that in any event it is an unreasonable extension of the Act to make a federal offense out of [*215] extortion from a man merely because he is supplying concrete to build a mill which after construction will produce steel, a part of which may, if processed, move in interstate commerce.

[1] [2] [3]We agree with the Court of Appeals that Rider's dependence on shipments of sand from outside Pennsylvania to carry on his ready-mixed concrete business entitled him to the Hobbs Act's protection against interruption or stoppage of his commerce in sand by extortion of the kind that the jury found the petitioner [****6] had committed here. That Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference "in any way or degree." 18 U. S. C. § 1951 (a). Had Rider's business been hindered or destroyed, interstate movements of sand to him [***256] would have slackened or stopped. The trial jury was entitled to find that commerce was saved from such a blockage by Rider's compliance with Stirone's coercive and illegal demands. It was to free commerce from such destructive burdens that the Hobbs Act was passed. *United States* v. *Green*, 350 U.S. 415, 420.

[4]Whether prospective steel shipments from the new steel mills would be enough, alone, to bring this transaction under the Act is a more difficult question. We need not decide this, however, since we agree with the dissenting judges in the Court of Appeals that it was error to submit that question to the jury and that the error cannot be dismissed as merely [****7] an insignificant variance between allegation and proof and thus harmless error as in *Berger* v. *United States*, 295 U.S. 78. The crime charged here is a felony and the Fifth Amendment requires that prosecution be begun by indictment.

Ever since *Ex parte Bain*, 121 U.S. 1, was decided in 1887 it has

right."

[5] been the rule that after an indictment has been [*216] returned its charges may not be broadened through amendment except by the grand jury itself. In that case, the court ordered that some specific and relevant allegations the grand jury had charged be stricken from the indictment so that Bain might be convicted without proof of those particular allegations. [2] In holding that this could [**273] not be done, Mr. Justice Miller, speaking for the Court, said:

"If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention [****8] had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the Constitution says 'no person shall be held to answer,' may be frittered away until its value is almost destroyed." 121 U.S. 1, 10.

The Court went on to hold in *Bain*:

"that after the indictment [****9] was changed it was no longer the indictment of the grand jury who presented it. Any other doctrine would place the rights of the citizen, which were intended to be protected [*217] by the constitutional provision, at the mercy or control of the court or prosecuting attorney . . . ." 121 U.S. 1, 13.

[6][7][8][9]The *Bain* case, which has never been disapproved, stands for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him. See also *United States* v. *Norris*, 281 U.S. 619, 622. Cf. *Clyatt* v. *United States*, 197 U.S. 207, 219, 220. Yet the court did permit that [***257] in this case. The indictment here cannot fairly be read as charging interference with movements [****10] of steel from Pennsylvania to other States nor does the Court of Appeals appear to have so read it. The grand jury which found this indictment was satisfied to charge that Stirone's conduct interfered with interstate importation of sand. But neither this nor any other court can know that the grand jury would have been willing to charge that Stirone's conduct would interfere with interstate exportation of steel from a mill later to be built with Rider's concrete. And it cannot be said with certainty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned. Although the trial court did not permit a formal amendment of the indictment, the effect of what it did was the same. And the addition charging interference with steel exports here is neither trivial, useless, nor innocuous. Compare *Ford* v. *United States*, 273 U.S. 593, 602; *Goto* v. *Lane*, 265 U.S. 393, 402. While there was a variance in the sense of a variation between pleading and proof, that variation here destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned [****11] by a grand jury. Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error. Compare *Berger* v. [*218] *United States*, 295 U.S. 78. The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge. [3] Thus the [**274] basic protection the grand jury was designed to afford is defeated by a device or method which subjects the defendant to prosecution for interference with interstate commerce which the grand jury did not charge.

---

[2] Bain was indicted for making a false statement "with intent to deceive *the Comptroller of the Currency and* the agent appointed to examine the affairs of said association . . . ." After sustaining demurrers of Bain to the indictment, the trial court went on to say that "thereupon, on motion of the United States, by counsel, the court orders that the indictment be amended by striking out the words '*the Comptroller of the Currency and*' therein contained." By this amendment it was intended to permit conviction of Bain without proof that he had deceived the Comptroller as the grand jury had charged.

[3] "Yet the institution [the grand jury] was adopted in this country, and is continued from considerations similar to those which give to it its chief value in England, and is designed as a means, not only of bringing to trial persons accused of public offences upon just grounds, but also as a means of protecting the citizen against unfounded accusation, whether it comes from government, or be prompted by partisan passion or private enmity. No person shall be required, according to the fundamental law of the country, except in the cases mentioned, to answer for any of the higher crimes unless this body, consisting of not less than sixteen nor more than twenty-three good and lawful men, selected from the body of the district, shall declare, upon careful deliberation, under the solemnity of an oath, that there is good reason for his accusation and trial." *Ex parte Bain*, 121 U.S. 1, 11. See also *Costello* v. *United States*, 350 U.S. 359, 362, 363, n. 6.

[****12] [10] [11] [12] [13]Here, as the trial court charged the jury, there are two essential elements of a Hobbs Act crime: interference with commerce, and extortion. Both elements have to be charged. Neither is surplusage and neither can be treated as surplusage. The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference. It follows that when only one particular kind of commerce is charged to have been burdened a conviction must rest on [***258] that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened. The right [*219] to have the grand jury make the charge on its [****13] own judgment is a substantial right which cannot be taken away with or without court amendment. Here, as in the *Bain* case, we cannot know whether the grand jury would have included in its indictment a charge that commerce in steel from a nonexistent steel mill had been interfered with. Yet because of the court's admission of evidence and under its charge this might have been the basis upon which the trial jury convicted petitioner. If so, he was convicted on a charge the grand jury never made against him. This was fatal error. Cf. *Cole* v. *Arkansas*, 333 U.S. 196; *De Jonge* v. *Oregon*, 299 U.S. 353.

*Reversed*.

## References

Validity, construction, and application of the Hobbs Act (18 USC 1951) against racketeering in interstate or foreign commerce

Annotation References:

Validity, construction, and application of the Hobbs Act (18 USC 1951) against racketeering in interstate or foreign commerce, 100 L ed 501, 4 L ed 2d 1843. For a discussion of cases decided under the Federal Anti-racketeering Act of June 18, 1934, see [****14] 138 ALR 811.

End of Document

# Berger v. United States

295 U.S. 78 (1935)

Cited in Supplemental Brief at: 11

Q Questioned
As of: September 17, 2026 9:39 PM Z

# Berger v. United States

Supreme Court of the United States

March 7, 1935 ; April 15, 1935

No. 544

**Reporter**

295 U.S. 78 *; 55 S. Ct. 629 **; 79 L. Ed. 1314 ***; 1935 U.S. LEXIS 308 ****

BERGER *v.* UNITED STATES

**Prior History:** [****1] CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT

United States v. Berger, 73 F.2d 278, 1934 U.S. App. LEXIS 2668 (2d Cir. N.Y., 1934)

## Syllabus

1. Where an indictment charges a conspiracy of several persons and the conspiracy proved involves only some of them, the variance is not fatal. P. 81.

2. Where the proof shows two conspiracies, each fitting the single charge in the indictment, and each participated in by some but not all of the convicted defendants, one of them who was connected by the evidence with one only of the conspiracies revealed by it has no ground to complain of the variance if it did not affect his substantial rights. Jud. Code, § 269. P. 82.

3. The objects of the rule that allegations and proof must correspond are (1) to inform the accused, so that he may not be taken by surprise, and (2) to protect him against another prosecution for the same offense. P. 82.

4. The purpose of Jud. Code, § 269, as amended, was to end the too rigid application of the rule that, error being shown, prejudice must be presumed, and to establish the more reasonable rule that if, upon an examination of the entire record, substantial prejudice does not appear, the error must be regarded as harmless. P. 82.

5. Misconduct of a United States Attorney [****2] in his cross-examination of witnesses and address to the jury, in a criminal case, may be so gross and persistent as to call for stern rebuke and repression -- even for the granting of a mistrial -- by the trial judge; and, when not so counteracted, it may require the reversal of a conviction, particularly when weakness of the case accentuates the probability of prejudice to the accused. P. 84.

6. It is as much the duty of the United States Attorney to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. P. 88.

73 F. (2d) 278, reversed.

CERTIORARI, 293 U.S. 552, to review the affirmance of a conviction and sentence for conspiracy.

**Counsel:** *Mr. Nathan D. Perlman,* with whom *Mr. Sydney Rosenthal* was on the brief, submitted for petitioner.

*Mr. Justin Miller,* with whom *Solicitor General Biggs* and *Messrs. H. Brian Holland, W. Marvin Smith,* and *Harry S. Ridgely* were on the brief, for the United States.

**Judges:** Hughes, Van Devanter, McReynolds, Brandeis, Sutherland, Butler, Stone, roberts, Cardozo

**Opinion by:** SUTHERLAND

## Opinion

[*79] [**630] [***1317] MR. JUSTICE **SUTHERLAND** delivered the opinion of the Court.

Petitioner [****3] was indicted in a federal district court charged with having conspired with seven other persons named in the indictment to utter counterfeit notes purporting [*80] to be issued by designated federal reserve banks, with knowledge that they had been counterfeited. The indictment contained eight additional counts alleging substantive offenses. Among the

persons named in the indictment were Katz, Rice and Jones. Rice and Jones were convicted by the jury upon two of the substantive counts and the conspiracy count. Petitioner was convicted upon the conspiracy count only. Katz pleaded guilty to the conspiracy count, and testified for the government upon an arrangement that a *nolle prosequi* as to the substantive counts would be entered. It is not necessary now to refer to the evidence further than to say that it tended to establish not a single conspiracy as charged but two conspiracies -- one between Rice and Katz and another between Berger, Jones and Katz. The only connecting link between the two was that Katz was in both conspiracies and the same counterfeit money had to do with both. There was no evidence that Berger was a party to the conspiracy between Rice and Katz. [****4] During the trial, the United States attorney who prosecuted the case for the government was guilty of misconduct, both in connection with his cross-examination of witnesses and in his argument to the jury, the particulars of which we consider at a later point in this opinion. At the conclusion of the evidence, Berger moved to dismiss the indictment as to the conspiracy count, on the ground that the evidence was insufficient to support the charge. That motion was denied. Petitioner, Rice, Katz and Jones were sentenced to terms of imprisonment.

The court of appeals, affirming the judgment, 73 F. (2d) 278, held that there was a variance between the allegations of the conspiracy count and the proof, but that it was not prejudicial; and that the conduct of the prosecuting attorney, although to be condemned, was not sufficiently grave to affect the fairness of the trial. We brought the case here on certiorari because of a conflict [*81] with other circuit courts of appeals in respect of the effect of the alleged variance.

[1][2]1. It is settled by the great weight of authority that although an indictment charges a conspiracy involving several persons and the proof establishes the [****5] conspiracy against some of them only, the variance is not material. But several circuit courts of appeals have held that if the indictment charges a single conspiracy, and the effect of the proof is to split the conspiracy into two, the variance is fatal. Thus it is said in *Telman* v. *United States,* 67 F. (2d) 716, 718: "Where one large conspiracy is charged, proof of different and disconnected smaller ones will not sustain a conviction." In support of that statement the various decisions upon which petitioner here relies are cited. This view, however, ignores the question of materiality, and should be so qualified as to make the result of the variance depend upon whether it has substantially injured the defendant.

[3]In the present case, the objection is not that the allegations of the indictment do not describe the conspiracy of which petitioner was convicted, but, in effect, it is that the proof includes more. If the proof had been confined to that conspiracy, the variance, as we have seen, would not have been fatal. Does it become so because, in addition to proof of the conspiracy with which [***1318] petitioner was connected, proof of a conspiracy with which he was not connected [****6] was also furnished and made the basis of a verdict against others?

Section 269 of the Judicial Code, as amended (28 U.S.C. § 391) provides:

"On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

[*82] [4]The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to "affect the substantial rights" of the accused. The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense. *Bennett* v. *United States,* 227 U.S. 333, 338; *Harrison* v. *United States,* 200 Fed. 662, 673; *United States* v. *Wills,* 36 F. (2d) 855, 856-857. [****7] Cf. *Hagner* [**631] v. *United States,* 285 U.S. 427, 431-433.

Evidently Congress intended by the amendment to § 269 to put an end to the too rigid application, sometimes made, of the rule that error being shown, prejudice must be presumed; and to establish the more reasonable rule that if, upon an examination of the entire record, substantial prejudice does not appear, the error must be regarded as harmless. See *Haywood* v. *United States,* 268 Fed. 795, 798; *Rich* v. *United States,* 271 Fed. 566, 569-570.

The count in question here charges a conspiracy to utter false notes of one federal reserve bank each calling for

$ 20, and those of another each calling for $ 100. The object of the utterance thus concerted is not stated; but the proof as to the conspiracies is that the one between Katz and Rice was with the purpose of uttering the false notes to buy rings from persons advertising them for sale, and the object of the other between Katz, Jones and Berger was to pass the notes to tradesmen. Suppose the indictment had charged these two conspiracies in separate counts in identical terms, except that, in addition, it had specifically set forth the contemplated object [****8] [*83] of passing the notes, naming Berger, Katz, Rice and Jones as the conspirators in each count. Suppose further that the proof had established both counts, connecting Berger with one but failing to connect him with the other, and thereupon he had been convicted of the former and acquitted of the latter. Plainly enough, his substantial rights would not have been affected. The situation supposed and that under consideration differ greatly in form; but do they differ in real substance? The proof here in respect of the conspiracy with which Berger was not connected may, as to him, be regarded as incompetent; but we are unable to find anything in the facts -- which are fairly stated by the court below -- or in the record from which it reasonably can be said that the proof operated to prejudice his case, or that it came as a surprise; and certainly the fact that the proof disclosed two conspiracies instead of one, each within the words of the indictment, cannot prejudice his defense of former acquittal of the one or former conviction of the other, if he should again be prosecuted.

[5]In *Washington & Georgetown R. Co.* v. *Hickey,* 166 U.S. 521, 531, this court said that "no [****9] variance ought ever to be regarded as material where the allegation and proof substantially correspond, or where the variance was not of a character which could have misled [***1319] the defendant at the trial." This was said in a civil case, it is true, but it applies equally to a criminal case if there be added the further requisite that the variance be not such as to deprive the accused of his right to be protected against another prosecution for the same offense. See *Meyers* v. *United States,* 3 F. (2d) 379, 380; *Mansolilli* v. *United States,* 2 F. (2d) 42, 43.

We do not mean to say that a variance such as that here dealt with might not be material in a different case. We simply hold, following the view of the court below, [*84] that applying § 269 of the Judicial Code, as amended, to the circumstances of this case the variance was not prejudicial and hence not fatal.

[6][7]2. That the United States prosecuting attorney overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense is clearly shown by the record. He was guilty of misstating the facts in his cross-examination of witnesses; [****10] of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and in general, of conducting himself in a thoroughly indecorous and improper manner. We reproduce in the margin * a [***1320] few excerpts [*85] [**632] from

* [The defendant (petitioner) was on the stand; cross-examination by the United States attorney]:

". . . The man who didn't have his pants on and was running around the apartment, he wasn't there?

"A. No, Mr. Singer. Mr. Godby told me about this, he told me, as long as you ask me about it, if you want it, I will tell you, he told me 'If you give this man's name out, I will give you the works.'

"Q. Give me the works?

"A. No, Mr. Godby told me that.

"Q. You are going to give me the works?

"A. Mr. Singer, you are a gentleman, I have got nothing against you. You are doing your duty.

"Mr. Wegman: You are not going to give Mr. Singer the works. Apparently Mr. Singer misunderstood you. Who made that statement?

"The Witness: Mr. Godby says that.

"Q. Wait a minute. Are you going to give me the works?

"A. Mr. Singer, you are absolutely a gentleman, in my opinion, you are doing your duty here.

"Q. Thank you very much. But I am only asking you are you going to give me the works?

"A. I do not give anybody such things, I never said it.

"Q. All right. Then do not make the statement.

"Mr. Wegman: The witness said that Mr. Godby said that.

"The Court: The jury heard what was said. It is not for you or me to interpret the testimony.

"Q. I asked you whether the man who was running around this apartment . . . , was he there in the Secret Service office

on the morning that you were arrested?

"A. I didn't see him.

"Q. I wasn't in that apartment, was I?

"A. No, Mr. Singer.

"Q. I didn't pull the gun on you and stick you up against the wall?

"A. No.

"Q. I wasn't up in this apartment at any time, as far as you know, was I?

"A. As far as I know, you weren't.

"Q. You might have an idea that I may have been there?

"A. No, I should say not.

"Q. I just want to get that part of it straight.

. . . . .

"Q. Was I in that apartment that night?

"A. No, but Mr. Godby --

"Q. Was Mr. Godby in that apartment?

"A. No, but he has been there.

. . . . .

"Q. Do you include as those who may have been there the Court and all the jurymen and your own counsel?

"A. Mr. Singer, you ask me a question. May I answer it?

"Mr. Wegman: I object to the question.

"The Witness: Are you serious about that?

"The Court: I am not going to stop him because the question incmdes the Court. I will let him answer it.

"Mr. Singer: I would like to have an answer to it.

"The Witness: Mr. Singer, you asked me the question before --

"The Court: You answer this question.

(Question repeated by the reporter.)

"A. I should say not; that is ridiculous.

. . . . .

"Q. Now Mr. Berger, do you remember yesterday when the court recessed for a few minutes and you saw me out in the hall; do you remember that?

"A. I do, Mr. Singer.

"Q. You talked to me out in the hall?

"A. I talked to you?

"Q. Yes.

"A. No.

"Q. You say you didn't say to me out in the hall yesterday, 'You wait until I take the stand and I will take care of you'? You didn't say that yesterday?

"A. No; I didn't, Mr. Singer; you are lying.

"Q. I am lying, you are right. You didn't say that at all?

"A. No.

"Q. You didn't speak to me out in the hall?

"A. I never did speak to you outside since this case started, except the day I was in your office, when you questioned me.

"Q. I said yesterday.

"A. No, Mr. Singer.

"Q. Do you mean that seriously?

"A. I said no.

"Q. That never happened?

"A. No, Mr. Singer, it did not.

"Q. You did not say that to me?

"A. I did not.

"Q. Of course, I have just made that up?

"A. What do you want me to answer you?

"Q. I want you to tell me I am lying, is that so? . . .

[No effort was later made to prove that any such statement had ever been made.]

. . . . .

"Q. Did she say she was going to meet me for anything except business purposes?

"A. No.

"Q. If she was to meet me?

"A. Just told me that you gave her your home telephone number and told her to call you up after nine o'clock in the evening if she found out anything about the case that you could help me with, that is what she told me.

"Q. Even if that is so, what is wrong about that, that you have been squawking about all morning."

the record illustrating some of the various points of the foregoing summary. It is impossible, however, without reading the testimony at some length, and thereby obtaining a knowledge of the setting in which the objectionable matter occurred, to appreciate fully the extent of the misconduct. The trial judge, it is true, sustained objections to some of the questions, insinuations and misstatements, and instructed the jury to disregard them. But the situation was one which

called for stern rebuke and repressive measures and, perhaps, if these were not successful, for the granting of a mistrial. It is [****11] impossible to [**633] say that the evil influence upon the jury of these acts of misconduct was removed by such mild judicial action as was taken.

[****12] [8]The prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury. A reading of the entire argument is necessary to an appreciation of these objectionable features. The following is an illustration: A witness by the name of Goldie Goldstein [*86] had been called by the prosecution to identify the petitioner. She apparently had difficulty in doing so. The prosecuting attorney, in the course of his argument, said (italics added):

"Mrs. Goldie Goldstein takes the stand. She says she knows Jones, *and you can bet your bottom dollar she knew Berger.* She stood right where I am now and looked at him and was afraid to go over there, and when I [***1321] waved my arm everybody started to holler, 'Don't point at him.' [*87] You know the rules of law. Well, it is the most complicated game in the world. I was examining *a woman that I knew knew Berger and could identify him,* she was standing right here looking at him, and I couldn't say, 'Isn't that the man?' Now, imagine that! But that is the rules of the game, and I have to play within those rules."

[*88] The jury was thus invited to [****13] conclude that the witness Goldstein knew Berger well but pretended otherwise; and that this was within the personal knowledge of the prosecuting attorney.

Again, at another point in his argument, after suggesting that defendants' counsel had the advantage of being able to charge the district attorney with being unfair "of trying to twist a witness," he said:

"But, oh, they can twist the questions, . . . *they can sit up in their offices and devise ways to pass counterfeit money*; 'but don't let the Government touch me, that is unfair; please leave my client alone.'"

[9]The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike [****14] foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. The court below said that the case against Berger was not strong; and from a careful examination of the record we agree. Indeed, the case against Berger, who was convicted only of conspiracy and not of any substantive offense as were [*89] the other defendants, we think may properly be characterized as weak -- depending, as it did, upon the testimony of Katz, an accomplice with a long criminal record.

In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence. If the case against Berger had been strong, or, as some courts have said, the evidence of [****15] his guilt "overwhelming," a different conclusion might be reached. Compare *Fitter* v. *United States,* 258 Fed. 567, 573; *Johnson* v. *United States,* 215 Fed. 679, 685; *People* v. *Malkin,* 250 N.Y. 185, 201-202; 164 N.E. 900; *Iowa* v. *Roscum,* 119 Iowa 330, 333; 93 N.W. 295. Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential. A new trial must be awarded. Compare *N.Y. Central R. Co.* v. *Johnson,* 279 U.S. 310, 316-318.

The views we have expressed find support in many decisions, among which the following are good examples: *People* v. *Malkin, supra; People* v. *Esposito,* 224 N.Y. 370, 375-377; 121 N.E. 344; *Johnson* v. *United States, supra; Cook* v. *Commonwealth,* 86 Ky. 663, 665-667; 7 S.W. 155; *Gale* v. *People,* 26 Mich. 157; *People* [***1322] v. *Wells,* 100 Cal. 459; 34 Pac. 1078. The case last cited is especially apposite.

*Judgment reversed.*

[****16]

---

End of Document

# United States v. Solivan

937 F.2d 1146 (6th Cir. 1991)

Cited in Supplemental Brief at: 11, 12

The Supplemental Brief quoted language that does not appear in this opinion. The court's actual language, at 937 F.2d at 1152, is highlighted, together with the passage at 1157 cited for the absence of a curative instruction. See Response, Part III.E.

Caution
As of: September 17, 2026 9:38 PM Z

# United States v. Solivan

United States Court of Appeals for the Sixth Circuit

January 24, 1991, Argued ; July 5, 1991, Decided ; July 5, 1991, Filed

No. 90-5500

**Reporter**
937 F.2d 1146 *; 1991 U.S. App. LEXIS 13935 **

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. ROSALBA SOLIVAN, Defendant-Appellant

**Subsequent History:** Rehearing Denied August 6, 1991, Reported at: 1991 U.S. App. LEXIS 18722.

**Prior History:** [**1] On Appeal from the United States District Court for the Eastern District of Kentucky.

**Disposition:** Reversed and Remanded.

**Counsel:** Louis DeFalaise, U.S. Attorney, Office of the U.S. Attorney, Lexington, Kentucky, Frederick A. Stine, V, Asst. U.S. Attorney, Office of the U.S. Attorney, Covington, Kentucky.

Robert Alan Rosenblatt, Miami, Florida.

**Judges:** Keith and Milburn, Circuit Judges, and Contie, Senior Circuit Judge.

**Opinion by:** KEITH

## Opinion

[*1147] KEITH, Circuit Judge.

Defendant-appellant, Rosalba Solivan ("defendant") appeals from her March 28, 1990, judgment and sentence resulting from the sale of cocaine. For the following reasons, we REVERSE.

I.

A.

Terry and Lorraine Brown (collectively "the Browns") became Drug Enforcement Administration ("DEA") informants in July 1988, subsequent to Terry Brown's arrest for the purchase of one kilogram of cocaine from Pepe (defendant's former boyfriend) and defendant on March 8, 1988.

On February 13, 1989, while in custody, the Browns began making a series of DEA controlled, tape recorded, telephone calls to defendant. The first call concerned the delivery of three to five kilograms of cocaine to northern Kentucky and the price of the cocaine. During a subsequent telephone conversation, defendant informed the Browns [**2] that the price would be $ 19,500 per kilogram of cocaine. The series of recorded telephone conversations, which took place over the following weeks, detailed defendant's involvement in the narcotics [*1148] industry, the problems she encountered locating cocaine, and how she planned to fill the Browns' order for four kilograms of cocaine.

On March 19, 1989, defendant flew to Cincinnati from Miami to complete the transaction. The Browns met her at the airport and transported her to the Holiday Inn in Covington, Kentucky, where they rented a room. Shortly thereafter, Francisco Gomez ("Gomez") arrived at the hotel. Gomez had driven the cocaine from the New York City area to Covington. Terry Brown, Gomez and defendant went outside to Gomez' vehicle, retrieved the four kilograms of cocaine, brought it back to the hotel room, and examined it. DEA agents then entered the hotel room and arrested Gomez and defendant.

B.

On April 12, 1989, defendant and Gomez were indicted on seven counts, including conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846; attempt to distribute cocaine, in violation of 21 U.S.C. § 846; interstate travel to facilitate narcotics activity, in violation of 18 [**3] U.S.C. § 1952; and use of a telephone to facilitate narcotics activity, in violation of 21 U.S.C. § 843(b). Gomez pled guilty to all charges on September 11, 1989. Defendant pled not guilty. Her trial commenced September 12, 1989, and included September 19, 1989.

At trial, during closing argument, the Assistant United

States Attorney ("Assistant U.S. Attorney" or the "prosecutor") made the following remarks:

> [Assistant U.S. Attorney]: *What you're listening to is a wholesale distributor of narcotics, cocaine discuss her business affairs* and complain about her busy schedule, the lack of good product and the trouble she's having getting this stuff up here now. And I'd submit to you, folks, that *she's been caught now. And I'm asking you to tell her and all of the other drug dealers like her*--(defense counsel's objection and Court's response omitted)--*that we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky* and . . .
>
> The Court: Don't continue the comment until I rule on it.
>
> [Defense counsel]: Objection.
>
> [Assistant U.S. Attorney]: Oh, okay. I'm sorry.
>
> The Court: Ready to break off?
>
> [Assistant U.S. Attorney]: Just [**4] that, ladies and gentlemen. . . .

Transcript at 767-68 (emphasis added). The court did not immediately admonish the jury, but instead declared a recess. Out of the presence of the jury, the court allowed defense counsel to state his objection to the prosecutor's comment on closing. Defense counsel at that time also moved for a mistrial based on the prosecutor's highly prejudicial comments. The court sustained the objection but denied the motion for a mistrial. [1] The court stated [*1149] that it would

---

[1] The trial transcript reveals that the following dialogue took place out of the presence of the jury immediately after the Assistant U.S. Attorney concluded his closing argument:

The Court: All right. You have a -- state your motion and your objection.

[Defense Counsel]: Your Honor, comes now the defendant Rosalba Solivan and based on counsel's comment in closing argument with respect to her other activities and the drug business of which there's no significant --

The Court: Can't hear you.

[Defense Counsel]: -- of which there's no significant or substantial evidence, as well as his last comment, and that to send a message to the other drug dealers in Northern Kentucky that's clearly an appeal to the community interest of this jury. It is extremely prejudicial to make that type of

---

comment that you have to lock her up and send a message. It's kind of like giving a punitive damage argument in a straight negligence case, this send-a-message type argument.

It's extremely prejudicial given the nature of the publicity about Columbia, the nature of the political situation, the -- the repeated references in the newspapers, in the media to the drug problem, the President's speech on drugs. A gallup poll has shown that [for] the majority of Americans, this [sic] [is] their number one concern right now, all these things in this climate in this time, that type of comment is overkill. It's prejudicial, and we respectfully move for a mistrial.

The Court: All right. Sustain the motion for a mistrial. I think it's probably going a little too far. I think it's overwhelming -- the motion has two parts. I think there's a lot of evidence of -- that -- in there which counsel can put on the characterization she was in the drug business, as he has spelled out. But I don't think you can -- should be asking the jury to send anybody messages. It's the duty of the jury to convict if there's proof beyond a reasonable doubt and to acquit if there isn't proof beyond a reasonable doubt, and the jury will be so admonished.

However, in the light of all the evidence I think it can be cured by an admonition. I don't think a little rhetoric if cured by an admonition of the Court is going to taint the whole trial, during which counsel has been afforded -- counsel for the defense has been afforded great liberality. As you know, we were inclined not to give the entrapment instruction at all. You got that.

[Defense Counsel]: I would have --

The Court: I think you've had a very fair trial and we will cure this with an admonition. He didn't get very far with it before you interrupted him.

* * *

The Court: It's the part about sending the message that I find objectionable.

[Defense Counsel]: The part about sending the message is amplified --

The Court: It's not their duty to send messages. It's their duty to acquit -- or convict if there's evidence beyond a reasonable doubt and acquit if there isn't evidence beyond a reasonable doubt. I'm going to tell them that when they get back.

[Defense Counsel]: Well, without waiving our motion, we would ask for the instruction. I don't think it's going to cure it.

The Court: I think it will cure it.

[Defense Counsel]: It's going to be etched in granite on these jurors' minds.

admonish the jury when court resumed, which it did, stating:

> At the conclusion . . . certain remarks were made in the closing argument of the prosecutor to which the Court has sustained an objection and will admonish you not to consider them. Do not consider any urgings by the prosecutor to send messages to anybody. We're not here to send messages to anybody. We're here to try this defendant's case.
>
> It's our duty to try -- try this defendant's case based on the evidence in this case and the law in this case and not with concern about anybody else. The Court reiterates its instructions that if the evidence establishes beyond a reasonable doubt that the defendant is guilty of the offense [**5] as charged or any of them its your duty to convict. If the United States fails to meet that burden, it's your duty to acquit. Don't worry about anybody else or send anybody any messages. We're concerned with this one case to try [defendant] on the evidence in it.

Transcript at 768.

[**6] The jury returned a verdict of guilty on all counts. On March 28, 1990, defendant was sentenced to 151-months imprisonment. Defendant filed a timely notice of appeal on March 28, 1990.

II.

A.

On appeal, defendant argues that, during closing argument, the prosecutor made improper and prejudicial statements which deprived her of a fair trial. Defendant contends that the prosecutor's argument constitutes reversible error because the resulting prejudice was not cured by the district court's subsequent admonition to the jury. The prosecutor's remarks, defendant argues, were prejudicial because they improperly appealed to the community conscience and interest of the jurors in ridding society of drug dealers. The prosecutor counters that its comments, if improper, were cured by the district court's admonition.

B.

We review the district court's denial of defendant's motion for a mistrial for abuse of discretion. *See Illinois v. Somerville*, 410 U.S. 458, 462-64, 93 S. Ct. 1066, [*1150] 35 L. Ed. 2d 425 (1973); *United States v. Cordell*, 924 F.2d 614, 617 (6th Cir. 1991) (citing *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990), *cert. denied*, 498 U.S. 1091, 111 S. Ct. 974, 112 L. Ed. 2d 1060 (1991)). [**7]

In the case before us, the question of whether the district court abused its discretion in turn depends on whether the conduct of the prosecutor constitutes reversible error. *Cf. United States v. Alloway*, 397 F.2d 105, 113 (6th Cir. 1968) (no abuse of discretion shown in denying motion for a mistrial where prosecutor's argument was not found to warrant reversal). In making this determination, we consider whether there was misconduct. If there was misconduct, we must determine whether the misconduct was harmless. *See United States v. Bess*, 593 F.2d 749, 756-57 (6th Cir. 1979) (determining first that the conduct complained of, the prosecutor's statement of personal belief of the defendant's guilt, constituted error and then determining that such conduct constituted reversible error).

Thus, this Court must determine whether defendant's right to a fair trial was prejudiced by improper prosecutorial conduct. There are instances where a "single misstep" on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated. *See Pierce v. United States*, 86 F.2d 949 (6th Cir. 1936). We realize [**8] that such instances may be rare, but we believe this case exemplifies a single misstep so destructive to defendant's right to a fair trial that it constitutes reversible error.

C.

1.

This Circuit has many times expressed itself fully on the issue of misconduct of government counsel in the prosecution of criminal cases. Our decisions in this area

---

The Court: Going to be what?

[Defense Counsel]: Etched in granite. It's going to be like trying to unring a bell. It's been told to them. He's gotten his message across. He's gone to the community interests, the other drug problems and other drug dealers. I think it's just a grievous error, Judge. The only way it can be rectified is to declare a mistrial.

The Court: Well, you made your motion. I'll overrule the motion. I'll correct it. I think it can be corrected with an admonition. And to my observation of the jury you had a very fair trial, I think. We've been more liberal with you than with most people as far as the time we've allowed you to take and everything. I think it can be cured with an admonition. I'll do it when we get back. About ten more minutes.

Transcript at 768-71.

have recognized the standard of conduct imposed upon the prosecution of federal crimes as enunciated in *Berger v. United States*, 295 U.S. 78, 79 L. Ed. 1314, 55 S. Ct. 629 (1935). *See, e.g., Bess*, 593 F.2d at 756-57. In *Berger*, the Supreme Court considered an instance of prosecutorial misconduct involving both improper cross examination of witnesses and improper argument to the jury in a prosecution for conspiracy to utter counterfeit notes. *Berger*, 295 U.S. at 79-80. The Supreme Court found that the prosecutor's conduct rose to the level of prejudicial misconduct because his argument to the jury was undignified and intemperate. The argument was found to have contained improper insinuations and assertions calculated to mislead the jury. *Id.* at 85. Because the jury will normally place great [**9] confidence in the faithful execution of the obligations of a prosecuting attorney, improper insinuations or suggestions are apt to carry more weight against a defendant than such statements by witnesses. The Supreme Court stated the following in asserting that the conduct of government prosecutors must meet a high standard:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 88-89.

Thus, it is the duty of the prosecutor to advance the [**10] government's cause with force and persuasiveness. However, this duty encompasses concerns beyond mere advocacy. The prosecutor has a concomitant duty not to derogate from a fair and impartial criminal proceeding. Stated in slightly different terms, the government's conduct [*1151] in prosecuting the defendant may determine whether or not a defendant is accorded his or her constitutional right to a fair trial. *Cf. Viereck v. United States*, 318 U.S. 236, 247-48, 87 L. Ed. 734, 63 S. Ct. 561 (1943) (finding that the prosecutor's conduct prejudiced the defendant's right to a fair trial and was "offensive to the dignity and good order with which all proceedings in court should be conducted" and quoting language in *Berger*, 295 U.S. at 88, which stressed that the role of the prosecutor in a criminal case is to see that justice is done); *Bess*, 593 F.2d at 755 (stating that prosecutors carry a special aura of legitimacy).

In sum, the principles set forth in *Berger* forbid the government's injection of improper or prejudicial material that deprives an accused of his or her right to a fair trial. For instance, the government prosecutor may not express to the jury his [**11] or her personal knowledge of the guilt of the accused, *Bess*, 593 F.2d at 754, or bring to the jury's attention purported facts that are not in evidence and are prejudicial, *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976) (citing *Berger*, 295 U.S. at 88).

2.

Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible. *See Henderson v. United States*, 218 F.2d 14, 19-20 (6th Cir.), *cert. denied*, 349 U.S. 920, 75 S. Ct. 660, 99 L. Ed. 1253 (1955). [2] Our determination of whether

---

[2] Our holding in *Henderson* and the result reached in *Alloway* reflect a general rule followed by other circuits as well. In *United States v. Shirley*, 435 F.2d 1076 (7th Cir. 1970), the Seventh Circuit stated that the prosecutor's closing remarks concerning the increasing number of cars being stolen did not overstep the bounds of fairness and propriety and could not have worked a substantial injury to the defendant in denying him a fair trial because, even though the statements were not particularly relevant and had no bearing on the guilt or innocence of the defendant, the remarks did not contain an emotional appeal to the jurors' self-interest designed to arouse their prejudice against the defendant. *Id.* at 1079.

The Eighth Circuit has also stated, in a case where the prosecutor told the jurors that they were the public's last shield and the district court instructed the jury to disregard the remark, that unless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible. *United States v. Lewis*, 547 F.2d 1030, 1036 (8th Cir.), *cert. denied*, 429 U.S. 1111, 97 S. Ct. 1149, 51 L. Ed. 2d 566 (1976). Similarly, the Eleventh Circuit, in *United States v. Kopituk*, 690 F.2d 1289, 1342-43 (11th Cir. 1982), *cert. denied*, 463 U.S. 1209, 77 L. Ed. 2d 1391, 103 S. Ct.

comments are calculated to incite prejudice and passion in the jury is informed by the Supreme Court opinion in *Viereck*.

[**12] Eight years after the *Berger* decision, in *Viereck*, the Supreme Court considered the propriety of a prosecutor's closing argument which appealed to the national or patriotic community interest of the jurors during World War II. The petitioner had been convicted for willfully omitting a material fact in a registration form filed by him with the Secretary of State. The Secretary of State required the registration of certain agents of foreign principals. The Secretary of State also required disclosure of the terms and conditions of the agents' contracts with foreign principals. *Viereck*, 318 U.S. at 237-38.

At a time when the United States was participating in World War II, the Supreme Court found that statements by the prosecutor regarding jurors' patriotism constituted an appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could have only been to arouse passion and prejudice. While the Supreme Court reversed on the grounds of a different error, the Court explicitly stated that it thought the prosecutor's conduct prejudiced the petitioner's right to a fair trial and that, independent of the error for which the conviction was [**13] reversed, the conduct might well have placed the judgment [*1152] of conviction in jeopardy. The remarks found prejudicial were as follows:

> In closing, let me remind you, ladies and gentlemen, that this is war. This is war, harsh, cruel, murderous war. There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps.
>
> This is war. It is a fight to the death. The American people are relying upon you ladies and gentlemen for their protection against this sort of crime, just as much as they are relying upon the protection of the men who man the guns in Bataan Peninsula, and everywhere else. They are relying upon you ladies and gentlemen for their protection. We are at war. You have a duty to perform here.
>
> As a representative of your Government I am calling upon every one of you to do your duty.

*Id.* at 247 n.3.

The remarks in the instant case are analogous to the comments adjudged inflammatory and prejudicial in *Viereck*. The fairness or unfairness of comments appealing to the [**14] national or local community interests of jurors in a given instance will depend in great part on the nature of the community interest appealed to, and its relationship to, and the nature of, the wider social-political context to which it refers. The correlation between the community interest comments and the wider social-political context to a large extent controls the determination of whether an appeal is deemed impermissible because it is calculated to inflame passion and prejudice. The Supreme Court in *Viereck* framed the inquiry to incorporate both the purpose and effect of the comments. In that case, in the light of contemporaneous events, which had great impact on the emotions and perceptions of jurors, the remarks "could only have . . . arouse[d] passion and prejudice." *See id.* at 247.

In *United States v. Barker*, 553 F.2d 1013, 1024-25 (6th Cir. 1977), in reviewing a conviction for bank robbery, we considered remarks which were found to have been deliberately made. These remarks were: "If you can't take this evidence and find these defendants guilty on this evidence that [sic] we might as well open all the banks and say, 'Come on and [**15] get the money, boys, because we'll never be able to convict them.'" *Id.* at 1025. We determined that it was beyond the bounds of propriety for a prosecutor to suggest that unless the defendant was convicted it would be impossible to maintain "law and order" in the jurors' community. *Id.* [3]

---

3542 (1983), stated that appeals to the jury to act as the conscience of the community, unless designed to inflame the jury, are not per se impermissible. However, the remarks complained of in *Kopituk* were found by the court to have approached the line demarcating impermissible comment calculated to incite the jury against the accused, but not to have crossed the line into the realm of impropriety and prejudice by directly suggesting that the jurors had personal stakes in the outcome of the case.

[3] Similar reasoning was applied in *Brown v. United States*, 125 U.S. App. D.C. 220, 370 F.2d 242 (D.C. Cir. 1966), a case involving a criminal prosecution of an African-American youth for assault based on a confrontation between the defendant and two police officers. The court found the prosecutor's community appeal improper. During closing argument, the prosecutor warned the jury that to acquit the defendant would leave the police powerless to protect themselves and citizens

[**16] The D.C. Circuit has applied this principle prohibiting appeals which are inflammatory in the contemporary climate to pleas against the drug problem in the ongoing drug war. *United States v. Hawkins*, 193 U.S. App. D.C. 366, 595 F.2d 751 (D.C. Cir. 1978), *cert. denied*, 441 U.S. 910, 99 S. Ct. 2005, 60 L. Ed. 2d 380 (1979). The D.C. Circuit stated that prosecutors are not "at liberty to substitute emotion for evidence by equating, directly or by innuendo, a verdict of guilty to a blow against the drug problem." *Id.* at 754.

In *United States v. Barlin*, 686 F.2d 81 (2d Cir. 1982), the Second Circuit found improper statements very similar to the ones alleged prejudicial in the instant case. In *Barlin*, the court found the prosecutor to [*1153] have improperly appealed to the jury's passion and emotion in characterizing its job as "the one occasion on which you have a duty to do something about the drug traffic in our community." *Id.* at 93. We agree with the Second Circuit's condemnation of this genre of comments designed to divert rather than focus the jury upon the evidence. *See id.*

We agree with the following statement by the court in *United States v. Monaghan*, 239 U.S. App. D.C. 275, 741 F.2d 1434 (D.C. Cir. 1984), [**17] *cert. denied*, 470 U.S. 1085, 85 L. Ed. 2d 146, 105 S. Ct. 1847 (1985), condemning appeals to the community interest to end a societal evil:

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.

*Id.* at 1441.

In the instant case, we examine closely the substance of the prosecutor's statements to determine whether they were calculated to inflame. Our determination will depend on whether the statements appeal to community interests in light of current events and the nature of the specific case. In the case before us, the effect of the prosecutor's comments was to suggest to the jury that, because of defendant's participation in the drug trade in northern Kentucky, the drug problem [**18] facing the jurors' community would continue if they did not convict her. It is error for a prosecutor to direct the jurors' desires to end a social problem toward convicting a particular defendant.

Even though this nation is in the midst of an ongoing crisis, popularly termed the "War on Drugs," this crisis does not create an excuse to impinge on the constitutional right to a fair trial. We repeat what we stated in *United States v. Radka*, 904 F.2d 357 (6th Cir. 1990):

> Presently, our nation is plagued with the destructive effects of the illegal importation and distribution of drugs. At this critical time, our Constitution remains a lodestar for the protections that shall endure the most pernicious affronts to our society. . . . The drug crisis does not license the aggrandizement of governmental power in lieu of civil liberties. Despite the devastation wrought by drug trafficking in communities nationwide, we cannot suspend the precious rights guaranteed by the Constitution in an effort to fight the "War on Drugs."

*Id.* at 361 (reversing a denial of a defendant's motion to suppress evidence obtained in a warrantless search of defendant's home [**19] because there were no exigent circumstances). Here, defendant's constitutional right to a fair trial was violated because the appeal to the community conscience in the context of the War on Drugs prejudicially impacted on her. The fear surrounding the War on Drugs undoubtedly influenced the jury by diverting its attention away from its task to weigh the evidence and submit a reasoned decision finding defendant guilty or innocent of the crimes with which she was charged. The substance of the statements made by the prosecutor in this case were designed, both in purpose and effect, to arouse passion and prejudice and to inflame the jurors' emotions regarding the War on Drugs by urging them to send a

against assault short of resort to martial law. In condemning these remarks, and in reversing the defendant's conviction, the D.C. Circuit found that such an argument was an appeal wholly irrelevant to any facts or issues in the case. *Id.* at 246 (relying on *Viereck*, 318 U.S. at 247, and *Berger*, 295 U.S. at 88). Further, the court stated that the prosecutor's argument raised the spectre of martial law and therefore constituted an especially flagrant and reprehensible appeal to passion and prejudice in the context of current events (i.e., the social unrest of the late 1960s).

message and strike a blow to the drug problem.

This nation faces a variety of social problems with which all citizens are daily confronted. The drug problem is one of the most compelling and devastating problems faced by this nation today. This Court is acutely aware of the nature and extent of the drug problem. However, government prosecutors are not at liberty to urge jurors to convict defendants as blows to the drug problem faced by society or specifically, within their communities, or [**20] to send messages to all drug dealers. Such appeals are extremely prejudicial and harmful [*1154] to the constitutional right to a fair trial. It should be clear from the foregoing discussion that, while not causing error per se unless the statements are deemed to be calculated to incite prejudice, prosecutors should exercise extreme caution when making any statement referring to the community interests of jurors.

The government relies on *United States v. Alloway*, 397 F.2d 105 (6th Cir. 1968), to provide an example of a similar instance of comments directed to the community conscience of jurors. In *Alloway* we reviewed a conviction for armed robbery of a Federal Savings & Loan Association. The defendant asserted that improper argument by the prosecutor should have resulted in a mistrial. We held that the following statements by the prosecutor did not exceed the permissible bounds of advocacy and that therefore the district court did not abuse its discretion in denying defendant's motion for a mistrial:

> You, the jurors, are called upon in this case to be the world conscience of the community. And I'm calling on this jury to speak out for the community and let the John [**21] Alloways know that this type of conduct will not be tolerated, that we're not going to tolerate [armed robbery]. . . .

397 F.2d at 113. The district court in *Alloway* subsequently instructed the jury to base its verdict solely on the evidence and to consider the prosecutor's argument only as it corresponded with the evidence. *Id.*

The comments by the prosecutor in *Alloway* and the comments complained of in the instant case are only vaguely similar. The remarks in this case appear to us to have been deliberately injected into the proceedings to incite the jury against defendant. Given the nature of this case, involving a cocaine transaction, and the wider social context which the prosecutor sought to bring to bear on the proceedings, the national drug problem, the purpose and effect of the comments could have only been to arouse passion and prejudice. *See Viereck*, 318 U.S. at 247. We determined that the statements made in *Alloway* were not deliberately injected into the proceedings to inflame the jury. *See* 397 F.2d at 113. Indeed, examined in the light of the nature of the case and the wider social context in which the case [**22] was prosecuted, it is clear that the government's statements in *Alloway* were devoid of the sort of inflammatory content inherent in the prosecutor's statements in this case precisely because there was no comparable specific wider context of national attention and concern present in *Alloway* pertaining to armed robbery. The comments in *Alloway* did not attempt to compare or to associate the defendant with a feared and highly publicized group, such as drug dealers, as did the prosecutor in this case. The prosecutor in *Alloway* did not go beyond a mere allusion to the general need to convict guilty people, as did the prosecutor in this case, and bring to bear upon the jury's deliberations the attendant social consequences of defendant's criminal conduct or urge the jury to convict an individual defendant in an effort to ameliorate society's woes.

Here, the prosecutor honed in on the illegal drug trade, which is the specific focus of much national attention, concern and fear. Thus, in *Alloway*, we were not presented with a context similar to the context of the case before us now. This case involves a woman charged with possession of cocaine with intent to distribute cocaine, [**23] among other charges. The wider social, political reality into which the prosecutor impermissibly sought to insert the case is the highly publicized, national and international drug trade. The prosecutor brought to bear upon the jury's decision whether to convict defendant the pervasive fear of drugs and the attendant dangers of drugs and drug addiction. The almost daily attention given by the media and politicians to the drug trade and gang violence, for example, have heightened the nation's awareness of, and hardened its attitudes towards, the drug problem. Thus, the prosecutor's appeal to the jury to convict a defendant as a blow to the drug problem or to send messages to drug dealers cannot be other than highly prejudicial given the specific context of the case in the current social-political environment.

[*1155] In *Alloway*, we were presented with remarks by the prosecutor which alluded only to the general criminality of the defendant's conduct in robbing a bank and the general community need to convict guilty people. The comments at issue in *Alloway* constituted a

general plea which did not even specifically refer to the crime of armed robbery. Moreover, armed robbery was not and [**24] is not the specific focus of national attention as is the drug problem. In the instant case, we find that *Alloway* is inapposite because, in this case, the prosecutor went beyond the scope of the prosecutor's statements in *Alloway*, which constituted a mere innocuous reference to the community or societal need to convict guilty people. The prosecutor in the instant case went beyond stating the obvious, and went so far as to urge the jury to send a message to the community, to defendant and "all of the drug dealers like her" by convicting defendant. The prosecutor suggested to the jury that convicting defendant would help keep its community in northern Kentucky free of the drug trade by sending the message that "we don't want that stuff in Northern Kentucky and that anybody who brings that stuff . . ." presumably would be convicted just like defendant in this case. We determine that the prosecutor improperly injected the spectre of an influx of cocaine dealers into the jurors' community in an attempt to appeal to the jurors' emotions, passions and prejudices against the drug problem. *See generally United States v. Love*, 534 F.2d 87, 89 (6th Cir. 1976) (finding [**25] reversible misconduct where prosecutor intentionally and for no legitimate purpose injected into the trial the spectre of organized crime and the Mafia).

Thus, we conclude that the complained of remarks by the prosecutor in this case constitute error. The remarks were isolated to one portion of the trial, closing argument. However, this fact does not ameliorate their prejudicial impact; the remarks were misleading, inflammatory and prejudiced defendant's right to a fair trial.

D.

1.

Having determined that the prosecutor's remarks were prejudicial to defendant's right to a fair trial and thus constituted error, we now turn to examine whether such error was harmless.

Our review of a claim of prosecutorial misconduct on appeal is guided by the standards set forth in *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), to determine whether constitutional error is harmless error or whether reversible error has resulted from improper evidence or improper argument to the jury. In *Chapman*, the Supreme Court held that errors at trial, even federal constitutional errors, do not require automatic reversal of a conviction if the error can be classified as harmless. It is incumbent [**26] upon the government to demonstrate that such constitutional error, resulting from the admission of highly prejudicial evidence or comment, is harmless beyond a reasonable doubt. *Id.* at 24. If there is a reasonable possibility that the evidence or comment complained of might have contributed to the conviction, then such error cannot be harmless beyond a reasonable doubt. *See id.* at 23-24 (relying on *Fahy v. Connecticut*, 375 U.S. 85, 11 L. Ed. 2d 171, 84 S. Ct. 229 (1963)); *Coury v. Livesay*, 868 F.2d 842, 845-46 (6th Cir. 1989) (applying the *Chapman* harmless error analysis to determine whether the error affected the result).

The result of a harmless error analysis depends on the circumstances of the particular case. *Phelps v. Duckworth*, 772 F.2d 1410, 1413 (7th Cir.) (en banc), *cert. denied*, 474 U.S. 1011, 88 L. Ed. 2d 471, 106 S. Ct. 541 (1985); *United States v. Shue*, 766 F.2d 1122, 1132 (7th Cir. 1985). Determining whether an error is reversible necessitates examination of the entire record. *See United States v. Hasting*, 461 U.S. 499, 509, 76 L. Ed. 2d 96, 103 S. Ct. 1974 (1983). *Hasting* reiterated the Supreme Court's [**27] recognition that "given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an [*1156] error free, perfect trial, and that the Constitution does not guarantee such a trial." *Id.* at 508-09.

2.

The government urges us to find that the prosecutor's comments were fair comment based upon the evidence and were cured by an admonition from the trial judge.

Prosecutorial missteps have been held harmless in light of the relative strength of the evidence or because instructions given by the trial court sufficiently diluted or eradicated any resulting prejudice. *See United States v. Hawkins*, 193 U.S. App. D.C. 366, 595 F.2d 751, 754-55 (D.C. Cir. 1978), *cert. denied*, 441 U.S. 910, 99 S. Ct. 2005, 60 L. Ed. 2d 380 (1979). Regardless of the strength of the case against defendant, the instructions given by the district court were insufficient and came too late to mitigate the negative and highly prejudicial impact of the remarks on the jurors' minds, especially since the remarks were among the final arguments presented to the jurors prior to their deliberations.

When isolated remarks are [**28] made in the course of a long trial and the jury is given an appropriate cautionary instruction designed to overcome any

prejudice that may have been caused, the error may be harmless. We examine the curative effect, if any, of the cautionary instruction to the jury in the light of the degree and effect of the prejudice. However, an error may be so prejudicial that no cautionary instruction, however swiftly and forcibly given, can safely eradicate its effect. *See Pierce v. United States*, 86 F.2d 949, 952-53 (6th Cir. 1936).

In *Pierce*, we articulated the method for testing prejudice where a cautionary instruction has been given to a jury because of improper argument by a prosecutor:

> The inquiry . . . must always be as to whether in view of the whole record the impression conveyed to the minds of jurors by irrelevant and prejudicial matter is such that the court may fairly say that it has not been successfully eradicated by the rulings of the trial judge, his admonition to counsel, and his instruction to the jurors to disregard it.

*Id.* at 952. Similarly, in *Ippolito v. United States*, 108 F.2d 668, 670-71 (6th Cir. 1940), [**29] we stated that "appeals to the passion and prejudice of a jury," while constituting error, do not require reversal unless such error affects the substantial rights of parties. *Id.* at 670. We recognized, as we do here, that a single instance of error may be so destructive of a defendant's right to a fair trial that reversal must follow. *Id.* at 671.

In *United States v. Ashworth*, 836 F.2d 260, 267 (6th Cir. 1988), we adopted the Ninth Circuit's analysis in *United States v. Flake*, 746 F.2d 535 (9th Cir. 1984), *cert. denied*, 469 U.S. 1225, 84 L. Ed. 2d 360, 105 S. Ct. 1220 (1985). The *Flake* court framed the question of whether a new trial is warranted as whether improprieties in counsel's argument to the jury were so gross as to probably prejudice the defendant and whether any resulting prejudice was not neutralized by the trial judge's instruction or admonition to the jury. *Id.* at 542. The court in *Flake* found that improprieties in the prosecutor's argument to the jury were improper but not gross, and in any case were followed swiftly by the court's admonition and the prosecutor's apology and personal [**30] request that the jury heed the court's instructions. *Ashworth* involved an appeal from the defendants' convictions for conspiracy and arson. The *Ashworth* court applied the *Flake* approach to determine whether prejudice resulted from improper prosecutorial comment on a fact not in evidence and whether such comment was cured by an admonition from the court. In argument to the jury, the prosecutor referred to prior statements by two co-defendants to the effect that they denied talking to each other on the night of the fire. On appeal, we concluded that the prosecutor's comment was not so gross as to probably prejudice the defendants and that any slight prejudice resulting from the improper argument was neutralized by the court's cautionary instruction to the jury that the attorneys' arguments were not evidence. *Ashworth*, 836 F.2d at 267.

[*1157] In this case, we find the comments made by the prosecutor during closing argument to have been so gross as to probably prejudice defendant. We also find that the trial court's admonition to the jury did not neutralize the prejudice resulting from such comments. Therefore, we cannot conclude that there is no reasonable possibility [**31] that the comments did not contribute to defendant's conviction.

Both the timing and the firmness of the trial court's admonition are relevant in evaluating whether an admonition has been sufficient to mitigate prejudicial error. In *Bess* we found the timing of the trial judge's admonition relevant. In finding improper remarks by the prosecutor to constitute reversible error, we noted that the objectionable remarks were promptly objected to, but that the trial judge failed to give an immediate curative admonition. 593 F.2d at 757. In *Bess* we stressed that corrective measures should be taken immediately in instances of prosecutorial misconduct so as to ameliorate any resulting prejudice. *Id.* at 757 n.10. While the trial judge in this case did admonish the jury, the admonition given to the jury took place after a twenty-minute recess which occurred immediately following the prosecutor's improper statements. As the defense counsel stated, these comments were allowed to become "etched in granite" in the jurors' minds. The admonition given by the district court in this case was given too late to eradicate the prejudice from the jurors' minds. Moreover, the [**32] misconduct which took place in the instant case "called for stern rebuke and repressive measures." *Berger v. United States*, 295 U.S. 78, 85, 79 L. Ed. 1314, 55 S. Ct. 629 (1935). In cases where an admonition has been found to mitigate or remove the taint of prejudicial prosecutorial misconduct, the admonition has been swiftly given and firm. *See Phelps v. Duckworth*, 772 F.2d 1410, 1413-14 (7th Cir.) (en banc), *cert. denied*, 474 U.S. 1011, 88 L. Ed. 2d 471, 106 S. Ct. 541 (1985). In *Phelps*, the jury was admonished twice to correct the prejudicial statements. *Id.* Moreover, in *Phelps*, the jury was admonished immediately. The admonition in this case was neither

swiftly given nor did it sufficiently convey to the jury a sense of judicial disapproval of the remarks to dispel the harmful content and impact of the prosecutor's egregious statements. Even were the district court to have immediately and appropriately admonished the jury to disregard the remarks, we doubt seriously that any cautionary instruction could have safely eradicated the highly prejudicial effect of the prosecutor's statements in this case. The statements were deliberately injected into the proceedings to inflame [**33] the jurors' emotions and fears associated with the current drug epidemic that is reported daily in our newspapers and which threatens the very fabric of our society. *Cf. United States v. Love*, 534 F.2d 87, 89 (6th Cir. 1976) (finding the trial judge's effort to neutralize prejudicial government comments ineffective and reversing the defendant's conviction where prosecutor intentionally injected into the trial the spectre of organized crime and the Mafia). The statements were so inflammatory in the context of the ongoing drug war that no charge could have sufficiently cured the prejudice.

In the instant case, we cannot say that the government has demonstrated, beyond a reasonable doubt, that the prejudicial comments did not contribute to the defendant's conviction. As we have stated previously, "due process does not require perfect trials but it mandates fair ones." *Love*, 534 F.2d at 89.

III.

Because we find that the egregious prosecutorial misconduct which occurred in this case did not constitute harmless error, we conclude that the district court abused its discretion in denying defendant's motion for a mistrial. Accordingly, the judgment and [**34] sentence against defendant are REVERSED and this case is REMANDED for a new trial consistent with this opinion.

---

End of Document

# United States v. Young

470 U.S. 1 (1985)

Cited in Supplemental Brief at: 13

The Supplemental Brief overstated this decision's holding. The language the Proposed Amended Supplemental Brief now quotes appears at 470 U.S. at 13 and is highlighted. See Response, Part III.E.

Caution
As of: September 17, 2026 9:38 PM Z

# United States v. Young

Supreme Court of the United States

October 2, 1984, Argued ; February 20, 1985, Decided

No. 83-469

**Reporter**
470 U.S. 1 *; 105 S. Ct. 1038 **; 84 L. Ed. 2d 1 ***; 1985 U.S. LEXIS 49 ****; 53 U.S.L.W. 4159

UNITED STATES v. YOUNG

**Prior History:** [****1] CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT.

**Disposition:** 736 F.2d 565, reversed.

## Syllabus

Respondent was charged with various federal offenses involving a scheme to defraud a refinery by submitting false certifications that oil purchased by the refinery from respondent's company was crude oil when in fact it was less valuable fuel oil. At the trial in District Court, defense counsel in his closing argument impugned the prosecutor's integrity and charged that the prosecutor did not believe in the Government's case. No objection to defense counsel's summation was made at the time, but in rebuttal arguments the prosecutor stated his opinion that respondent was guilty and urged the jury to "do its job"; defense counsel made no objection. Respondent was convicted on several counts, and on appeal alleged that he was unfairly prejudiced by the prosecutor's response to defense counsel's argument. The Court of Appeals reversed and remanded for a new trial, holding that under case law of that Circuit, such remarks constituted misconduct and were plain error, and that appellate review was not precluded by defense counsel's failure to object at trial.

*Held*: The [****2] prosecutor's remarks during the rebuttal argument, although error, did not constitute "plain error" that a reviewing court could properly act on under Federal Rule of Criminal Procedure 52(b), absent a timely objection by defense counsel; on the record, the challenged argument did not undermine the fairness of the trial. Pp. 6-20.

(a) The kind of advocacy on both sides as shown by the record has no place in the administration of justice and should neither be permitted nor rewarded; the appropriate solution is for the trial judge to deal promptly with any breach by either counsel. Pp. 6-11.

(b) The issue is not the prosecutor's license to make otherwise improper arguments, but whether his "invited response" taken in context unfairly prejudiced the defendant. *Lawn* v. *United States*, 355 U.S. 339, 2 L. Ed. 2d 321, 78 S. Ct. 311. In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's conduct. The impact of the evaluation has been that if the prosecutor's remarks were "invited" and did no more than respond substantially in order to "right the scale," such comments would not [****3] warrant reversing a conviction. Pp. 11-14.

(c) The plain-error exception of Rule 52(b) to the contemporaneous-objection requirement is to be used only in those circumstances in which a miscarriage of justice would otherwise result. Especially when addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claimed error against the entire record. When reviewed under these principles, the prosecutor's remarks in this case did not rise to the level of plain error. Viewed in context, the remarks, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice. Pp. 14-20.

**Counsel:** Michael W. McConnell argued the cause pro hac vice for the United States. With him on the briefs were Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Frey, and Louis M. Fischer.

Burck Bailey argued the cause and filed a brief for respondent.

**Judges:** BURGER, C. J., delivered the opinion of the

Court, in which WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL and [****4] BLACKMUN, JJ., joined, post, p. 20. STEVENS, J., filed a dissenting opinion, post, p. 35.

**Opinion by:** BURGER

## Opinion

[*2] [***4] [**1039] CHIEF JUSTICE **BURGER** delivered the opinion of the Court.

We granted certiorari to review the reversal of respondent's conviction because [**1040] of prosecutorial comments responding to defense counsel's closing argument impugning the prosecution's integrity and belief in the Government's case.

[*3] I

Respondent Billy G. Young, as vice president and general manager of the Compton Petroleum Corporation in Abilene, Texas, contracted in 1976 and 1977 to deliver monthly supplies of "sweet" crude oil to the Apco Oil Corporation refinery in Cyril, Oklahoma. Some 205,000 barrels of oil were delivered under the contract between January and September 1977, but more than half of the oil delivered to Apco, approximately 117,250 barrels, consisted of fuel oil, [***5] an already refined product less valuable than crude oil. Compton's invoices accompanying those deliveries falsely certified that all of the oil was crude. Apco relied on those false certifications and reported to the Federal Energy Administration, in compliance with Government regulations, 10 CFR [****5] §§ 211.66, 211.67, and 212.131 (1976), the amount of crude oil it thought it was refining each month. The Federal Energy Administration in turn relied on Apco's reports to determine the national averages of tier categories of refined oil for purposes of equalizing the cost of crude oil under its entitlement program.

Respondent's scheme to deceive Apco by selling it cheaper fuel oil masquerading as "sweet" crude oil was relatively simple. Respondent arranged with an oil brokerage firm, owned by a longtime friend, to procure fuel oil from another source and sell it to Compton under the false certification that it was crude oil. Compton would then pay the brokerage firm 10 cents per barrel commission as a fee for the "recertification." Once in Compton's storage tanks, respondent had the fuel oil disguised as crude oil before delivering it to Apco by blending condensate, a high gravity liquid taken from the wellheads of natural gas wells, with the fuel oil. [1] In September 1977, after an Apco technician performed a distillation [*4] test on one of Compton's deliveries, Apco discovered that it had not been receiving crude oil as required by the contract, but rather a mixture of fuel [****6] oil and condensate. This discovery prompted the Federal Bureau of Investigation to launch an investigation which resulted in this prosecution.

On December 1, 1980, respondent and Compton were charged with 11 counts of mail fraud in violation of 18 U. S. C. § 1341, three counts of willfully and knowingly making false statements to a Government agency in violation of 18 U. S. C. § 1001, one count of interstate transportation of stolen property in violation of 18 U. S. C. § 2314, and with aiding and abetting in the commission of all 15 counts in violation of 18 U. S. C. § 2. A jury trial was held in the District Court for the Western District of Oklahoma. [2] In his own [****7] defense, respondent testified that he had knowingly purchased fuel oil and delivered it to Apco, but he claimed that he thought such fuel oil could legitimately be certified as crude oil. He also believed that if condensate were blended with fuel oil, the result would be the equivalent of crude oil. Because Apco had not complained about the deliveries before September 1977, respondent thought that Apco was satisfied with the quality of oil he was supplying.

At the close of the case, the prosecutor summarized the evidence against respondent. Defense counsel began his own summation by arguing [***6] that the case against respondent "has been presented unfairly by the prosecution," and that "[from] the beginning" to "this very moment the [prosecution's] statements have been made to poison your minds unfairly." Tr. 542. He [**1041] intimated that the prosecution deliberately withheld exculpatory evidence, and [****8] proceeded to charge the prosecution with "reprehensible" conduct in purportedly attempting to cast a false light on

[1] Apco wanted a high gravity crude oil for gasoline production. A high gravity crude oil yields greater quantities of gasoline and diesel fuels after refining than does a lower gravity crude oil, which yields more fuel oil and asphalt. Fuel oil, on the other hand, has a low gravity and was neither what Apco needed nor what it thought it was buying.

[2] Prior to trial, the District Court accepted Compton's plea of *nolo contendere* and imposed a fine.

respondent's activities. Defense counsel also pointed directly at the prosecutor's table and stated: "I submit to you that there's not a person in this [*5] courtroom including those sitting at this table who think that Billy Young intended to defraud Apco." *Id.*, at 543-544. Finally, defense counsel stated that respondent had been "the only one in this whole affair that has acted with honor and with integrity" and that "[these] complex [Department of Energy] regulations should not have any place in an effort to put someone away." *Id.*, at 547.

The prosecutor did not object to defense counsel's summation, but in rebuttal argument he responded to defense counsel's claim that the Government did not believe in its own case:

"I think [defense counsel] said that not anyone sitting at this table thinks that Mr. Young intended to defraud Apco. Well, I was sitting there and I think he was. I think he got 85 cents a barrel for every one of those 117,250.91 barrels he hauled and every bit of the money they made on that he got one percent of. So, I think he did. [****9] If we are allowed to give our personal impressions *since it was asked of me*." *Id.*, at 549. (Emphasis added.)

Continuing with a review of portions of the evidence against respondent, the prosecutor responded to defense counsel's statement that Apco was not defrauded:

"I don't know what you call that, I call it fraud.

"You can look at the evidence and you can remember the testimony, you remember what [the witnesses] said and what [respondent] admitted they said. I think it's a fraud." *Id.*, at 550.

Finally, the prosecutor addressed defense counsel's claim that respondent had acted with honor and integrity. The prosecutor briefly recapped some of respondent's conduct and stated:

"I don't know whether you call it honor and integrity, I don't call it that, [defense counsel] does. If you feel you should acquit him for that it's your pleasure. I don't [*6] think you're doing your job as jurors in finding facts as opposed to the law that this Judge is going to instruct you, you think that's honor and integrity then stand up here in Oklahoma courtroom and say that's honor and integrity; I don't believe it." *Id.*, at 552.

In turn, defense counsel did not [****10] object to the prosecutor's statements. Nor did he request any curative instructions and none were given.

The jury returned a verdict of guilty as to each of the mail fraud and false statement counts. Respondent was acquitted of interstate transportation of stolen property. Respondent was sentenced to two years' imprisonment on each count, to be served concurrently, and was fined $ 39,000.

On appeal, respondent alleged [***7] that he was unfairly prejudiced by the prosecutor's remarks made during closing rebuttal argument. In a *per curiam* opinion, the Court of Appeals, one judge dissenting without opinion, reversed the conviction and remanded for retrial. 736 F.2d 565 (CA10 1983). The Court of Appeals held that the prosecutor's statements constituted misconduct and were sufficiently egregious to constitute plain error. In short, respondent's failure to object at trial was held not to preclude appellate review. Rejecting the Government's contention that the statements were invited by the defense counsel's own closing argument, the Court of Appeals stated that "the rule is clear in this Circuit that improper conduct on the part of opposing counsel should [****11] be met with an objection to the court, not a similarly improper response." *Id.*, at 570.

We granted certiorari, 465 U.S. 1021 (1984). We now reverse.

[**1042] II

[1A]The principal issue to be resolved is not whether the prosecutor's response to defense counsel's misconduct was appropriate, but whether it was "plain error" that a reviewing court could act on absent a timely objection. Our task is to [*7] decide whether the standard laid down in *United States* v. *Atkinson*, 297 U.S. 157, 160, 80 L. Ed. 555, 56 S. Ct. 391 (1936), and codified in Federal Rule of Criminal Procedure 52(b), was correctly applied by the Court of Appeals.

Nearly a half century ago this Court counselled prosecutors "to refrain from improper methods calculated to produce a wrongful conviction. . . ." *Berger* v. *United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935). The Court made clear, however, that the adversary system permits the prosecutor to "prosecute with earnestness and vigor." *Ibid*. In other words, "while he may strike hard blows, he is not at liberty to strike foul ones." *Ibid*.

The line separating acceptable from improper advocacy is not easily drawn; [****12] there is often a gray zone.

Prosecutors sometimes breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence. Accordingly, the legal profession, through its Codes of Professional Responsibility, [3] [****13] and the federal courts, [4] have tried to police [*8] prosecutorial misconduct. In complementing these efforts, the American Bar Association's Standing Committee on [***8] Standards for Criminal Justice has promulgated useful guidelines, one of which states that

"[it] is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." ABA Standards for Criminal Justice 3-5.8(b) (2d ed. 1980). [5]

[****14] It is clear that counsel on both sides of the table share a duty to confine arguments to the jury within proper bounds. Just as the conduct of prosecutors is circumscribed, "[the] interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders." [**1043] *Sacher* v. *United States*, 343 U.S. 1, 8, 96 L. Ed. 717, 72 S. Ct. 451 (1952). Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation [*9] of his case. See, *e. g.*, ABA Model Code of Professional Responsibility DR 7-106(C)(3) and (4) (1980), quoted in n. 3, *supra*; ABA Model Rules of Professional Conduct, Rule 3.4(e) (1984). Defense counsel, like his adversary, must not be permitted to make unfounded and inflammatory attacks on the opposing advocate. [6]

[****15] The kind of advocacy shown by this record has no place in the administration of justice and should neither be permitted nor rewarded; a trial judge should deal promptly with any breach by either counsel. These considerations plainly guided the ABA Standing Committee on Standards for Criminal Justice in laying down rules of trial conduct for counsel that quite properly hold all advocates to essentially the same standards. [7] Indeed, the accompanying [***9]

---

[3] See, *e. g.*, ABA Model Code of Professional Responsibility DR 7-106(C) (1980), which provides in pertinent part:

"In appearing in his professional capacity before a tribunal, a lawyer shall not:

. . . . .

"(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.

"(4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to matters stated herein."

See also ABA Model Rules of Professional Conduct, Rule 3.4(e) (1984).

[4] See, *e. g., United States* v. *DiPasquale*, 740 F.2d 1282, 1296 (CA3 1984); *United States* v. *Maccini*, 721 F.2d 840, 846 (CA1 1983); *United States* v. *Harrison*, 716 F.2d 1050, 1051 (CA4 1983); *United States* v. *Bagaric*, 706 F.2d 42, 58-61 (CA2 1983); *United States* v. *West*, 680 F.2d 652, 655-656 (CA9 1982); *United States* v. *Garza*, 608 F.2d 659, 665-666 (CA5 1979).

[5] The remaining text of ABA Standards for Criminal Justice 3-5.8 (2d ed. 1980) provides:

"(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

. . . . .

"(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

"(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

"(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds."

The accompanying commentary succinctly explains one of the critical policies underlying these proscriptions:

"Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." *Id.*, at 3.89.

[6] Of course, when defense counsel employs tactics which would be reversible error if used by a prosecutor, the result may be an unreviewable acquittal. The prosecutor's conduct and utterances, however, are always reviewable on appeal, for he is "both an administrator of justice and an advocate." ABA Standard for Criminal Justice 3-1.1(b) (2d ed. 1980); cf. *Berger* v. *United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935).

[7] ABA Standard for Criminal Justice 4-7.8 provides:

"(a) In closing argument to the jury the lawyer may argue all reasonable inferences from the evidence in the record. It is

commentary points out that "[it] should be accepted that both prosecutor and defense counsel are subject to the same general limitations in [*10] the scope of their argument," ABA Standards for Criminal Justice 4-7.8, p. 4x97, and provides the following guideline:

"The prohibition of personal attacks on the prosecutor is but a part of the larger duty of counsel to avoid acrimony in relations with opposing counsel during trial and confine argument to record evidence. It is firmly established that the lawyer should abstain from any allusion to the personal peculiarities and idiosyncrasies of opposing counsel. A personal attack by the prosecutor on defense counsel is improper, and the duty to abstain from such attacks is obviously [****16] reciprocal." *Id*., at 4x99 (footnotes omitted).

[****17] These standards reflect a consensus of the profession that the courts must not lose sight of the reality that "[a] criminal trial does not unfold like a play with actors following a script." *Geders* v. *United States*, 425 U.S. 80, 86, 47 L. Ed. 2d 592, 96 S. Ct. 1330 (1976). It should come as no surprise that "in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused." *Dunlop* v. *United States*, 165 U.S. 486, 498, 41 L. Ed. 799, 17 S. Ct. 375 (1897). [8]

We emphasize that the trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding; "the judge is not a mere moderator, [****18] [**1044] but is the governor of the trial for the purpose of assuring its proper conduct." *Quercia* v. *United States*, 289 U.S. 466, 469, 77 L. Ed. 1321, 53 S. Ct. 698 (1933). The judge "must meet situations as they arise and [be able] to cope with . . . the contingencies inherent in the adversary process." *Geders* v. *United States, supra*, at 86. Of course, "hard blows" cannot be avoided in criminal trials; both the prosecutor and defense counsel must be kept within appropriate [*11] bounds. See *Herring* v. *New York*, 422 U.S. 853, 862, 45 L. Ed. 2d 593, 95 S. Ct. 2550 (1975).

III

[2A]The situation brought before the Court of Appeals was but one example of an all too common occurrence in criminal trials -- the defense counsel argues improperly, provoking the prosecutor to respond in kind, and the trial judge takes no corrective action. Clearly two improper arguments -- two apparent wrongs -- do not make for a right result. Nevertheless, a criminal conviction is not to be lightly overturned [***10] on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's [****19] conduct affected the fairness of the trial. To help resolve this problem, courts have invoked what is sometimes called the "invited response" or "invited reply" rule, which the Court treated in *Lawn* v. *United States*, 355 U.S. 339, 2 L. Ed. 2d 321, 78 S. Ct. 311 (1958).

The petitioners in *Lawn* sought to have the Court overturn their criminal convictions for income tax evasion on a number of grounds, one of which was that the prosecutor's closing argument deprived them of a fair trial. In his closing argument at trial, defense counsel in *Lawn* had attacked the Government for "persecuting" the defendants. He told the jury that the prosecution was instituted in bad faith at the behest of federal revenue agents and asserted that the Government's key witnesses were perjurers. The prosecutor in response vouched for the credibility of the challenged witnesses, telling the jury that the Government thought those witnesses testified truthfully. In concluding that the prosecutor's remarks, when viewed within the context of the entire trial, did not deprive petitioners of a fair trial, the Court pointed out that defense counsel's "comments clearly invited the reply." *Id*., at 359-360, n. 15.

---

unprofessional conduct for a lawyer intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

"(b) It is unprofessional conduct for a lawyer to express a personal belief or opinion in his client's innocence or personal belief or opinion in the truth or falsity of any testimony or evidence, or to attribute the crime to another person unless such an inference is warranted by the evidence.

"(c) A lawyer should not make arguments calculated to inflame the passions or prejudices of the jury.

"(d) A lawyer should refrain from argument which would divert the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions of the consequences of the jury's verdict.

"(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds."

[8] Learned Hand observed: "It is impossible to expect that a criminal trial shall be conducted without some showing of feeling; the stakes are high, and the participants are inevitably charged with emotion." *United States* v. *Wexler*, 79 F.2d 526, 529-530 (CA2 1935), cert. denied, 297 U.S. 703, 80 L. Ed. 991, 56 S. Ct. 384 (1936).

[****20] [2B]This Court's holding in *Lawn* was no more than an application of settled law. Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. [*12] Instead, as *Lawn* teaches, the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant. See *United States* v. *Socony-Vacuum Oil Co*., 310 U.S. 150, 242, 84 L. Ed. 1129, 60 S. Ct. 811 (1940); *Crumpton* v. *United States*, 138 U.S. 361, 364, 34 L. Ed. 958, 11 S. Ct. 355 (1891). Indeed most Courts of Appeals, applying these holdings, have refused to reverse convictions where prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray. [9]

[****21] In retrospect, perhaps the idea of "invited response" has evolved in a way not [**1045] contemplated. *Lawn* and the earlier cases cited above should not be read as suggesting judicial approval or -- encouragement -- of response-in-kind that inevitably exacerbates the tensions inherent in the adversary process. As *Lawn* itself indicates, the issue is not the prosecutor's license to make otherwise improper arguments, but whether [***11] the prosecutor's "invited response," taken in context, unfairly prejudiced the defendant.

[2C][3A]In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no [*13] more than respond substantially in order to "right the scale," such comments would not warrant reversing a conviction. [10]

[3B]

[****22] Courts have not intended by any means to encourage the practice of zealous counsel's going "out of bounds" in the manner of defense counsel here, or to encourage prosecutors to respond to the "invitation." Reviewing courts ought not to be put in the position of weighing which of two inappropriate arguments was the lesser. "Invited responses" can be effectively discouraged by prompt action from the bench in the form of corrective instructions to the jury and, when necessary, an admonition to the errant advocate.

Plainly, the better remedy in this case, at least with the accurate vision of hindsight, would have been for the District Judge to deal with the improper argument of the defense counsel promptly and thus blunt the need for the prosecutor to respond. Arguably defense counsel's misconduct could have warranted the judge to interrupt the argument and admonish him, see *Viereck* v. *United States*, 318 U.S. 236, 248, 87 L. Ed. 734, 63 S. Ct. 561 (1943), thereby rendering the prosecutor's response unnecessary. Similarly, the prosecutor at the close of defense summation should have objected to the defense counsel's improper statements with a request that the court give a timely warning [****23] and curative instruction to the jury. Defense counsel, even though obviously vulnerable, could well have done likewise if he thought that the prosecutor's remarks were harmful to his client. Here neither counsel made a timely objection to preserve the issue for review. See *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 644, 40 L. Ed. 2d 431, 94 S. Ct. 1868 (1974). However, interruptions of arguments, either by an opposing counsel or the presiding judge, are matters to be approached cautiously. At the very least, a bench conference might have been convened [*14] out of the hearing of the jury once defense counsel closed, and an appropriate instruction given.

IV

[1B]Here the Court of Appeals was not unaware of our

---

[9] See, *e. g., United States* v. *DiPasquale*, 740 F.2d at 1296; *United States* v. *Maccini*, 721 F.2d at 846; *United States* v. *Harrison*, 716 F.2d at 1052; *United States* v. *Trujillo*, 714 F.2d 102, 105 (CA11 1983); *United States* v. *West*, 670 F.2d 675, 688-689 (CA7 1982); *United States* v. *Tham*, 665 F.2d 855, 862 (CA9 1981); *United States* v. *Schwartz*, 655 F.2d 140, 142 (CA8 1981) *(per curiam); United States* v. *Praetorius*, 622 F.2d 1054, 1060-1061 (CA2 1979); *United States* v. *Kim*, 193 U.S. App. D.C. 370, 381-383, 595 F.2d 755, 767-768 (1979).

[10] Assuming the prosecutor's remarks exceeded permissible bounds and defense counsel raised a timely objection, a reviewing court could reverse an otherwise proper conviction only after concluding that the error was not harmless. See *United States* v. *Hasting*, 461 U.S. 499, 76 L. Ed. 2d 96, 103 S. Ct. 1974 (1983).

holdings and those of other Circuits, but seemingly did not undertake to weigh the prosecutor's comments in context. The court acknowledged defense counsel's obvious misconduct, but it does not appear that this was given appropriate weight in evaluating the situation.

We share the Court of Appeals' desire to minimize "invited responses"; and we agree that the prosecutor's response constituted error. In [***12] addition to departing from the Tenth Circuit's "rule" prohibiting such remarks, [****24] [11] the prosecutor's comments [**1046] crossed the line of permissible conduct established by the ethical rules of the legal profession, as did defense counsel's argument, see *supra*, at 6-10, and went beyond what was necessary to "right the scale" in the wake of defense counsel's misconduct. Indeed the prosecutor's first error was in failing to ask the District Judge to deal with defense counsel's misconduct.

[****25] [1C]As we suggested earlier, the dispositive issue under the holdings of this Court is not whether the prosecutor's remarks amounted to error, but whether they rose to the level of "plain error" when he responded to defense counsel. In this setting and on this record the prosecutor's response -- although error -- was not "plain error" warranting the court to overlook the absence of any objection by the defense.

[*15] [4A]The plain-error doctrine of Federal Rule of Criminal Procedure 52(b) [12] [****27] tempers the blow of a rigid application of the contemporaneous-objection requirement. The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," *United States* v. *Frady*, 456 U.S. 152, 163, 71 L. Ed. 2d 816, 102 S. Ct. 1584 (1982), those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings," *United States* v. *Atkinson*, 297 U.S. at 160. In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States* v. *Frady*, 456 U.S. at 163, n. 14. Any unwarranted [****26] extension of this exacting definition of plain error would skew the Rule's "careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around [***13] against our insistence that obvious injustice be promptly redressed." *Id.*, at 163 (footnote [*16] omitted). Reviewing courts are not to use the plain-error doctrine to consider trial court errors not meriting appellate review absent timely objection [13] -- a practice which we have criticized as "extravagant protection." *Henderson* v. *Kibbe*, 431 U.S. 145, 154, n. 12, 52 L. Ed. 2d 203, 97 S. Ct. 1730 (1977); *Namet* v. *United States*,

---

[11] Until this decision, the Tenth Circuit's "rule" appeared largely as dicta in earlier opinions. See, *e. g., United States* v. *Rios*, 611 F.2d 1335, 1343 (CA10 1979); *United States* v. *Latimer*, 511 F.2d 498, 503 (CA10 1975); *United States* v. *Martinez*, 487 F.2d 973, 977 (CA10 1973); *United States* v. *Coppola*, 479 F.2d 1153, 1163 (CA10 1973). But see *United States* v. *Ludwig*, 508 F.2d 140, 143 (CA10 1974) (court recites rule in context of rejecting Government's argument that the prosecutor's concededly improper remarks were harmless error in light of defense counsel's conduct).

[12] Federal Rule of Criminal Procedure 52(b) provides:

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

The Advisory Committee's Notes indicate that the Rule restated existing law as set forth by this Court in *Wiborg* v. *United States*, 163 U.S. 632, 41 L. Ed. 289, 16 S. Ct. 1127 (1896):

"[Although] this question was not properly raised, yet if a plain error was committed in a manner so absolutely vital to defendants, we feel ourselves at liberty to correct it." *Id.*, at 658. See Advisory Committee's Notes on Fed. Rule Crim. Proc. 52(b), 18 U. S. C. App., p. 657.

A review of the drafting that led to the Rule shows that the Committee sought to enable the courts of appeals to review prejudicial errors "so that any miscarriage of justice may be thwarted." Advisory Committee on Rules of Criminal Procedure to the Supreme Court of the United States, Federal Rules of Criminal Procedure, Preliminary Draft 263 (1943).

The Committee's use of the disjunctive in the phrasing of the Rule is misleading, for as one commentator has noted, this "may simply be a means of distinguishing for definitional purposes between 'errors' (*e. g.*, exclusion of evidence) and 'defects' (*e. g.*, defective pleading)," and in either case the Rule applies only to errors affecting substantial rights. 8B J. Moore, Moore's Federal Practice para. 52.02[2], p. 52-4, and n. 7 (2d ed. 1984).

[13] In *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 84 L. Ed. 1129, 60 S. Ct. 811 (1940), for example, the Court held that "counsel for the defendant cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that [the prosecutor's] comments to the jury were improper and prejudicial." *Id.*, at 238-239.

373 U.S. 179, 190, 10 L. Ed. 2d 278, 83 S. Ct. 1151 (1963).

[4B]Especially when addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record. We have been reminded:

[**1047] "In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution." *Johnson* v. *United States*, 318 U.S. 189, 202, 87 L. Ed. 704, 63 S. Ct. 549 (1943) (Frankfurter, J., concurring).

It is simply not possible for an appellate court to assess the [****28] seriousness of the claimed error by any other means. As the Court stated in *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. at 240, "each case necessarily turns on its own facts."

[1D][4C]When reviewed with these principles in mind, the prosecutor's remarks cannot be said to rise to the level of plain error. Viewed in context, the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice. See *United States* v. *Frady, supra*, at 163; *United States* v. *Atkinson, supra*, at 160. [14]

[4D]

[****29] [*17] The [***14] prosecutor responded with his "personal [impression]," Tr. 549, that respondent intended to commit a fraud to answer defense counsel's accusation that no member of the prosecution team believed that respondent intended to defraud Apco. Indeed, the prosecutor made a point to preface his statement by summarizing defense counsel's acerbic charge and candidly told the jury that he was giving his "personal impressions" because defense counsel had asked for them.

Notwithstanding the defense counsel's breach of ethical standards, the prosecutor's statement of his belief that the evidence showed Apco had been defrauded should not have been made; it was an improper expression of personal opinion and was not necessary to answer defense counsel's improper assertion that no one on the prosecution team believed respondent intended to defraud Apco. Nevertheless, we conclude that any potential harm from this remark was mitigated by the jury's understanding that the prosecutor was countering defense counsel's repeated attacks on the [*18] prosecution's integrity and defense counsel's argument that the evidence established no such crime.

Finally, the prosecutor's comments [****30] that respondent had not acted with "honor and integrity," and his calling attention to the jury's responsibility to follow the court's instructions were in response to defense counsel's rhetoric that respondent alone was the sole honorable actor in "this whole affair," *id.*, at 547, and that the jury should not find respondent guilty simply because he could not understand applicable, but complex, federal regulations. The prosecutor was also in error to try to exhort the jury to "do its job"; that kind of pressure, [**1048] whether by the prosecutor or defense counsel, has no place in the administration of criminal justice, see, *e. g.*, ABA Standards for Criminal Justice 3-5.8(c) and 4-7.8(c). Given the context of the prosecutor's remarks and defense counsel's broadside

---

[14] The Court of Appeals held that the prosecutor's improper remarks constituted "plain error" solely because the prosecutor ignored that court's rule prohibiting such responses. A *per se* approach to plain-error review is flawed. An error, of course, must be more than obvious or readily apparent in order to trigger appellate review under Federal Rule of Criminal Procedure 52(b). Following decisions such as *United States* v. *Frady, United States* v. *Socony-Vacuum Oil Co., supra*, and *United States* v. *Atkinson*, federal courts have consistently interpreted the plain-error doctrine as requiring an appellate court to find that the claimed error not only seriously affected "substantial rights," but that it had an unfair prejudicial impact on the jury's deliberations. Only then would the court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice. To do otherwise could well lead to having appellate courts indulge in the pointless exercise of reviewing "harmless plain errors" -- a practice that is contrary to the draftsmen's intention behind Rule 52(b), see n. 12, *supra*, and one that courts have studiously avoided and commentators have properly criticized, see, *e. g.*, 8B J. Moore, *supra*, § 52.02[2], at 52-3 to 52-4; 3A C. Wright, Federal Practice and Procedure § 856, p. 344 (2d ed. 1982). It should be noted that the Tenth Circuit seems to have retreated from its position that improper prosecutorial remarks are *per se* "plain error." *Mason* v. *United States*, 719 F.2d 1485, 1489-1490 (1983).

attack, however, we conclude that the jury was not influenced to stray from its responsibility to be fair and unbiased. [15]

[****31] The concerns underlying our reactions against improper prosecutorial arguments to the jury are implicated here, but not to the extent that we conclude that the jury's deliberations were compromised. The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its [*19] own view of the evidence. See *Berger* v. *United States*, 295 U.S. at 88-89.

[***15] The prosecutor's statement of his belief that respondent intended to commit a fraud contained no suggestion that he was relying on information outside the evidence presented at trial. He supported his comment by referring to respondent's own testimony that Compton received 85 cents a barrel for its deliveries [****32] to Apco and that respondent personally received a bonus of one percent of Compton's net profits, see Tr. 501-503; he then summarized portions of the evidence adduced at trial before suggesting to the jury that the record established the fraud charged. Although it was improper for the prosecutor to express his personal opinion about respondent's guilt, see *Berger* v. *United States, supra*, at 88; ABA Standard for Criminal Justice 3-5.8(b), when viewed in context, the prosecutor's remarks cannot be read as implying that the prosecutor had access to evidence outside the record. The jury surely understood the comment for what it was -- a defense of his decision and his integrity -- in bringing criminal charges on the basis of the very evidence the jury had heard during the trial.

Finally, the overwhelming evidence of respondent's intent to defraud Apco and submit false oil certifications to the Government eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations or exploited the Government's prestige in the eyes of the jury. Not a single witness supported respondent's asserted defense that fuel oil mixed with condensate [****33] could be certified and sold as crude oil, and several witnesses flatly rejected such a proposition, see Tr. 352-353, 393-395. Indeed, respondent's crude oil trader testified that he had never heard of a firm legally blending fuel oil with condensate and stating that the mixture was crude oil. See *id*., at 359. It was undisputed that respondent failed to advise Apco of what he was actually supplying and that the oil supplied did not meet the contract requirements. See *id*., at 358-359.

[*20] Moreover, the evidence established beyond any doubt whatever that respondent deliberately concealed his scheme to defraud Apco. Apart from enlisting the aid of an oil brokerage firm to "recertify" the fuel oil as crude oil, respondent on three separate occasions, when questioned by two Apco officials and by FBI agents, falsely denied that he was supplying fuel oil instead of crude oil, see *id*., at 293-294, 357-358, 379, 496, 516. Under these circumstances, the substantial and virtually uncontradicted evidence of respondent's willful violation provides an additional indication that the prosecutor's remarks, when reviewed in context, cannot be said to undermine [**1049] the [****34] fairness of the trial and contribute to a miscarriage of justice.

V

[1E]On this record, we hold that the argument of the prosecutor, although error, did not constitute plain error warranting the Court of Appeals to overlook the failure of the defense counsel to preserve the point by timely objection; nor are we persuaded that the challenged argument seriously affected the fairness of the trial. Accordingly, the judgment of the Court of Appeals, ordering a new trial based on the prosecutor's argument, is reversed.

*It is so ordered*.

**Dissent by:** BRENNAN (In Part); STEVENS

## Dissent

[***16] JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE **BLACKMUN** join, concurring in part and dissenting in part.

[15] The jury acquitted respondent of the most serious charge he faced, interstate transportation of stolen property. This reinforces our conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and fairly.

In his rebuttal argument to the jury, the prosecutor from the Criminal Fraud Section of the United States Department of Justice in Washington, D. C., (1) repeatedly stated his personal opinion that the respondent Billy G. Young was guilty of fraud, (2) used his prosecutorial "experience in these matters" in discussing the consequences of Young's conduct, [*21] and (3) admonished the jurors that, if they voted to acquit, they would not be "doing your job as jurors." App. 8-11. The Government would justify [****35] the prosecutor's remarks as "invited" by the defense counsel's own improper arguments. In reversing Young's conviction, the Court of Appeals for the Tenth Circuit rejected this justification and emphasized that "'[we] can give no comfort to the proposition that unprofessional conduct upon the part of defense counsel opens the door to similar conduct by government counsel.'" 736 F.2d 565, 570 (1983), quoting *United States* v. *Ludwig*, 508 F.2d 140, 143 (CA10 1974). Accordingly, the Court of Appeals held that "improper conduct on the part of opposing counsel should be met with an objection to the court, not a similarly improper response." 736 F.2d at 570.

This surely is a sensible conclusion and falls well within the authority of the courts of appeals to define reasonable rules of courtroom conduct. Because Young's counsel did not object to the prosecutor's misconduct, however, a reversal was proper only if the misconduct constituted plain error under Federal Rule of Criminal Procedure 52(b) -- that is, if it either (1) had a prejudicial impact on the verdict when viewed in the context of the trial as a whole, or (2) "seriously [****36] [affected] the . . . integrity or public reputation of [the] judicial proceedings." *United States* v. *Atkinson*, 297 U.S. 157, 160, 80 L. Ed. 555, 56 S. Ct. 391 (1936); see also *United States* v. *Frady*, 456 U.S. 152, 163, n. 11, 71 L. Ed. 2d 816, 102 S. Ct. 1584 (1982); *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 239, 84 L. Ed. 1129, 60 S. Ct. 811 (1940). The Court of Appeals noted the contours of this inquiry, and its opinion could perhaps be read as implicitly concluding that the prosecutor's misconduct substantially prejudiced the outcome of the trial or seriously affected the integrity of the proceedings. The court did not address the application of the plain-error standard to the facts of this case, however, but instead cryptically concluded that the challenged remarks "speak for themselves" and constituted "plain error." 736 F.2d at 570. Accordingly, I would [*22] remand the case to the Court of Appeals for a proper plain-error inquiry. [1]

[****37] [**1050] This analysis leads me to concur [***17] in much of the Court's opinion. Specifically, I agree fully with the Court's conclusion that federal prosecutors do not have a "right" of reply to defense improprieties, but must instead object to the trial judge and request curative action. Moreover, I join with the Court in concluding that federal courts may set reasonable rules of rhetorical conduct and that prosecutorial violations of such rules constitute error. And I concur that the judgment below cannot stand. However, I must respectfully but completely disagree with two other aspects of the Court's resolution of this case. First, the Court appears to adopt an "invited error" analysis, under which it only grudgingly acknowledges that the prosecutor acted improperly in this case. This approach leads the Court to minimize the gravity of the prosecutor's gross misconduct. Second, instead of remanding this case to the Court of Appeals, the Court reaches out to conduct the plain-error inquiry on its own. Even if the Court's conclusion is correct -- and I have substantial [*23] misgivings about the thoroughness of the Court's analysis -- I believe this unexplained departure [****38] from our usual practice misconceives the Court's institutional role and constitutes poor judicial administration.

I

This Court only infrequently gives plenary consideration to cases involving standards of prosecutorial conduct.

---

[1] The Tenth Circuit's statement that the prosecutor's remarks were "sufficiently egregious as to constitute plain error" could be read as concluding that the evidence of Young's guilt was not overwhelming. 736 F.2d at 570. Similarly, the Tenth Circuit's pointed discussion about the frequency with which "[the] issue has come before this Court . . . in recent years" could be construed as suggesting that the Government's recurrent violations have seriously threatened the integrity of courtroom proceedings in that Circuit. *Ibid*. Although these are possible readings of the opinion below, the societal costs of reversing a conviction and requiring a retrial justify the requirement that an appellate court discuss the basis of its reasoning that prosecutorial misconduct is sufficiently egregious as to constitute plain error. Cf. *United States* v. *Hasting*, 461 U.S. 499, 528, 76 L. Ed. 2d 96, 103 S. Ct. 1974 (1983) (BRENNAN, J., concurring in part and dissenting in part) (courts should exercise supervisory powers to reverse convictions "only after careful consideration, and balancing, of all the relevant interests"). This Court's primary function is to ensure that such considered evaluation has been conducted by the court below. See *infra*, at 30-31, 33-35.

When we do, it is important that we attempt to set forth with clarity the standards by which federal prosecutors must guide their trial conduct.

A

The Court granted the Government's petition for a writ of certiorari to resolve, *inter alia*, the question "[whether] a prosecutor may rebut [improper] closing defense argument . . . by responsive argument that would be inappropriate in the absence of such provocation." Pet. for Cert. (I). The Government contends that we should recognize "a prosecutor's right to respond" to improper defense arguments and that, in light of this "right," we should hold that such responses "are not improper" even if standing alone they would be impermissible. Brief for United States 15-16.

Today the Court rejects this asserted "right" of reply, emphasizing instead that prosecutors have no "license to make otherwise improper arguments" in response to defense rhetoric, *ante*, at 12, and holding that the prosecutor's responses [****39] in this case "constituted error," *ante*, at 14. See also *ante*, at 12 (rejecting "judicial approval -- or encouragement -- of response-in-kind"), 14, 16-20. As the Court observes, "[clearly] two improper arguments -- two [***18] apparent wrongs -- do not make for a right result." *Ante*, at 11. Instead, the Court instructs, the proper recourse is an objection to the trial judge and "prompt action from the bench in the form of corrective instructions to the jury, and when [*24] necessary, an admonition to the errant advocate." *Ante*, at 13. [2]

[****40] The Court today also reaffirms the authority of lower courts to define and enforce [**1051] reasonable rules of prosecutorial conduct. [3] As the Court notes, the prosecutor in this case departed from Tenth Circuit precedents requiring prosecutors to object to defense misconduct rather than respond in kind; this action in and of itself "constituted error." *Ante*, at 14.

[****41] [*25] B

I fully agree with these conclusions. The Court goes on to suggest, however, that courts should apply an "invited error" analysis in determining the consequences of prosecutorial violations of these standards. Under this analysis, courts not only should determine the possible effect of the misconduct "on the jury's ability to judge the evidence fairly," but also should consider (1) "[defense] counsel's conduct," and (2) whether the prosecutor "responded reasonably" under the circumstances. *Ante*, at 12. The conclusion is that prosecutorial misconduct, if "invited" by defense misconduct, will be excused if it "did no more than respond substantially in order to 'right the scale.'" *Ante*, at 12-13. See also *ante*, at 14.

I believe the Court's "invited error" analysis is critically flawed: it overlooks the ethical responsibilities of federal prosecutors and threatens to undercut the prohibition of prosecutorial misconduct in the first [***19] place. In addition, the Court's analysis is misapplied to the facts of this case.

To begin with, while the Court correctly observes that

---

[2] In its 39-page brief, the Government devotes just one footnote in its effort to demonstrate the unreasonableness of requiring prosecutors to object to defense misconduct rather than according them a "right" of reply. See Brief for United States 23, n. 18: "We do not believe that the alternative proposed by the court of appeals (Pet. App. 11a) -- objecting to an improper defense argument and requesting an instruction to the jury to disregard that argument -- is sufficient to dispel the unfairness engendered by an argument like respondent's here. Such an instruction would not answer the factual assertion of prosecutorial hypocrisy that was made here." As the Court notes today, however, an objection followed by admonition or instruction is typically presumed to be sufficient to dispel prejudice. *Ante*, at 13. This presumption surely applies to the United States Government as well as to the accused.

[3] We have long recognized that the courts of appeals may prescribe rules of conduct and procedure to be followed by district courts within their respective jurisdictions. In *Cupp* v. *Naughten*, 414 U.S. 141, 146, 38 L. Ed. 2d 368, 94 S. Ct. 396 (1973), for example, the Court observed that within the federal system an "appellate court will, of course, require the trial court to conform to constitutional mandates, but it may likewise require it to follow procedures deemed desirable from the viewpoint of sound judicial practice although in nowise commanded by statute or by the Constitution." And in *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 648, n. 23, 40 L. Ed. 2d 431, 94 S. Ct. 1868 (1974), the Court emphasized that "appellate courts, by proper exercise of their supervisory authority," should "discourage" prosecutorial misconduct. See also *Bartone* v. *United States*, 375 U.S. 52, 54, 11 L. Ed. 2d 11, 84 S. Ct. 21 (1963) *(per curiam)* (courts of appeals have "broad powers of supervision" over federal proceedings); *Mesarosh* v. *United States*, 352 U.S. 1, 14, 1 L. Ed. 2d 1, 77 S. Ct. 1 (1956); *McNabb* v. *United States*, 318 U.S. 332, 340, 87 L. Ed. 819, 63 S. Ct. 608 (1943) ("Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence").

both sides are subject to ethical rules of rhetorical conduct, it fails completely [****42] to acknowledge that we have long emphasized that a representative of the United States Government is held to a *higher* standard of behavior:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . .

". . . Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger* v. *United States*, 295 U.S. 78, 88, 79 L. Ed. 1314, 55 S. Ct. 629 (1935).

[*26] Accord, *Viereck* v. *United States*, 318 U.S. 236, 248, 87 L. Ed. 734, 63 S. Ct. 561 (1943). Cf. ABA Model Rules of Professional Conduct, Rule 3.8 comment (1984) ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate"); ABA Model Code of Professional Responsibility EC 7-13 (1980) (prosecutor owes a "special duty"); ABA Standard for Criminal Justice 3-5.8, p. 3x88 (2d ed. 1980). I believe the Court trivializes [****43] these high standards by suggesting that a violation may be overlooked merely because the prosecutor decided *sua sponte* that he had to "right the scale." [4]

[**1052] Moreover, the Court's suggestion that lower courts should evaluate prosecutorial misconduct to determine whether it was "[reasonable]" [****44] and "necessary to 'right the scale,'" *ante*, at 12, 14, is palpably inconsistent with the Court's conclusion that such misconduct "[constitutes] error." *Ante*, at 14; see also *ante*, at 11, 14, 16-20. As the Court observes, prosecutorial rhetoric of the sort in this case has "no place in the administration of justice and should neither be permitted nor rewarded." *Ante*, at 9. Such errors in appropriate cases might be determined to be harmless, but it is a contradiction in terms to suggest they might be "[reasonable]" or "necessary to 'right the scale.'" *Ante*, at 12, 14.

There was certainly nothing "[reasonable]" in this case about the prosecutor's responses to the concededly improper defense arguments. The defense counsel's most serious assertion was that the prosecutor did [***20] not believe Young had [*27] intended to defraud Apco. [5] The prosecutor's initial statement that he personally believed that Young had indeed intended to defraud Apco, while itself error, see *ante*, at 16-18, might be characterized as falling within the bounds of restrained reply. [6] But the prosecutor was not content to leave matters there. First, he repeatedly emphasized his [****45] personal opinion that Young was guilty of fraud. [7] [****46] Second, he made predictions about the continuing effects of Young's conduct based on his prosecutorial "experience in these matters." [8] Third, he

[4] Excusing a federal prosecutor's courtroom misconduct merely on the ground that the prosecutor was responding to his adversary suggests, it seems to me, that a trial is something like a schoolyard brawl between two children. Such an excuse smacks of the "sporting theory of justice," a theory long recognized as "only a survival of the days when a lawsuit was a fight between two clans." Pound, The Causes of Popular Dissatisfaction with the Administration of Justice, 29 A. B. A. Rep. 395, 404-406 (1906). If unethical arguments by the prosecutor in response to defense remarks constitute error, as the Court concedes, it is unclear why the error should be excused because the prosecutor wanted to "right the scale."

[5] "The indictment says that Billy Young is charged with intending to devise a scheme to defraud Apco and to obtain money and property by false and fraudulent pretenses. And I submit to you that there's not a person in this courtroom including those sitting at this table who think that Billy Young intended to defraud Apco." App. 5. The defense counsel also argued that the Government had tried the case "unfairly," and that Young was "the only one in this whole affair that has acted with honor and with integrity." *Id.*, at 4-7.

[6] "I think he said that not anyone sitting at this table thinks that Mr. Young intended to defraud Apco. Well, I was sitting there and I think he was." *Id.*, at 8.

[7] "I think he got 85 cents a barrel for every one of those 117,250.91 barrels he hauled and every bit of the money they made on that he got one percent of. So, I think he did. If we are allowed to give our personal impressions since it was asked of me. . . . I don't know what you call that, I call it fraud. You can look at the evidence and you can remember the testimony, you remember what they said and what he admitted they said. I think it's a fraud. . . . That's the whole point of the prosecution, it was a fraud." *Id.*, at 8-9.

[8] "He said -- Mr. Bailey said Apco didn't lose, says doesn't think anyone will come back. Well, what he thinks they won't come back but my experience in these matters is when the government does something like this they're going to come back. All that money that Apco got for this stripper and new oil, Al Green at the Apco trust he's going to get some kind of invoices. That's what I think." *Id.*, at 10.

warned the jurors that they would not be "doing your job as jurors" if they failed to convict Young. [9]

[*28] These arguments, which separately and cumulatively so clearly violated the disciplinary rules of our profession, [10] [****48] deserve [**1053] stern and unqualified judicial condemnation. Yet the Court reserves the force of its ire for criticism of [****47] the *defense* counsel's behavior: the Court castigates the defense counsel's "attacks," "opening salvo," "going 'out of bounds,'" "misconduct," "obviously vulnerable [***21] " position, "obvious misconduct," "[accusations]," "[acerbic charges]," "breach of ethical standards," "improper [assertions]," "repeated attacks," and "broadside [attacks]." *Ante*, at 12, 13, 14, 17, 18. In comparison, the Court appears only reluctantly to concede that "we agree that the prosecutor's response constituted error" because his remarks were "inappropriate," "should not have been made," and were "not necessary." *Ante*, at 14, 16, 17. This disparity of tone illustrates one of the major abuses of the "invited error" doctrine, an abuse often noted by the commentators. [11] Rather than apply the doctrine as a [*29] limited corrective, courts frequently employ it as a rule of unclean hands that altogether prevents a defendant from successfully challenging prosecutorial improprieties. Such use of the doctrine results, as it has today, in minimizing the gravity of virtually unchecked prosecutorial appeals going far beyond a "fair" response to the defense counsel's arguments. [12]

In further support of its analysis, the Court contends that while the underlying "concerns" of the legal and ethical strictures against improper prosecutorial arguments "are implicated here," they are not implicated in a serious way. *Ante*, at 18. The Court maintains, for example, that the prosecutor's arguments "contained no suggestion that he was relying on information outside the evidence [****49] presented at trial." *Ante*, at 19. I doubt very much, however, that the prosecutor ever testified or presented evidence about "my experience in these matters." App. 10. Moreover, the proscription against prosecutorial assertions of personal belief is obviously not concerned solely with references to nonrecord evidence. As the Court itself recognizes, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Ante*, at 18. Thus "improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger* v. *United States*, 295 U.S. at 88. [13] The [*30] Court today acknowledges these risks, but then decrees that the prosecutor's assertions in this case cannot be construed as having "exploited the Government's prestige in the eyes of the jury." *Ante*, at 19. This cavalier [***22] assertion is wholly at odds with a

[9] "I don't know whether you call it honor and integrity, I don't call it that, Mr. Bailey does. If you feel you should acquit him for that it's your pleasure. I don't think you're doing your job as jurors in finding facts as opposed to the law that this Judge is going to instruct you, you think that's honor and integrity then stand up here in Oklahoma courtroom and say that's honor and integrity; I don't believe it." *Id*., at 10-11.

[10] See, *e. g*., ABA Model Code of Professional Responsibility DR 7-106(C) (1980), stating in relevant part:

"In appearing in his professional capacity before a tribunal, a lawyer shall not:

. . . . .

"(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.

"(4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to matters stated herein."

See also ABA Model Rules of Professional Conduct, Rule 3.4(e) (1984) (incorporating standards set forth above); ABA Standards for Criminal Justice 3-5.8(b) (2d ed. 1980) ("It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant").

[11] See, *e. g*., J. Stein, Closing Argument -- The Art and the Law § 88 (1982); Alschuler, Courtroom Misconduct by Prosecutors and Trial Judges, 50 Texas L. Rev. 629, 657-658 (1972); Crump, The Function and Limits of Prosecution Jury Argument, 28 Sw. L. Rev. 505, 531-533 (1974).

[12] Under this sort of application of the invited-response rule, "[the] prosecutor may deduce . . . that he would do well to watch carefully for certain mistakes that the defense counsel may make, and, instead of objecting if that course is open to him, attempt to take advantage of that mistake. . . ." Comment, Limitations Upon the Prosecutor's Summation to the Jury, 42 J. Crim. L., C. & P. S. 73, 81 (1951).

[13] See also *United States* v. *Bess*, 593 F.2d 749, 755 (CA6 1979) ("Implicit in [a prosecutor's] assertion of personal belief that a defendant is guilty, is an implied statement that the prosecutor, by virtue of his experience, knowledge and intellect, has concluded that the jury must convict. The devastating impact of such 'testimony' should be apparent").

longstanding presumption to the contrary, see *Berger* v. *United States, supra*, and the Court [****50] should at least provide [**1054] a more reasoned basis for this striking departure.

Similarly, the prosecutor's admonition that the jurors would not be "doing your job as jurors" if they voted to acquit was neither invited nor excusable, as the Court concedes. *Ante*, at 18. Many courts historically have viewed such warnings about not "doing your job" as among the most egregious forms of prosecutorial misconduct. See, *e. g*., Annot., 85 A. L. R. 2d 1132 (1962 and Supp. 1979). How possibly, then, can the Court characterize remarks such as these as a "defense" by the prosecutor "of his decision and his integrity in [****51] bringing criminal charges"? *Ante*, at 19.

II

Although Young's counsel did not object to the prosecutor's arguments, those arguments nevertheless constitute plain error that require reversal of Young's conviction if they may be said either (1) to have created an unacceptable danger of prejudicial influence on the jury's verdict, or (2) to have "seriously [affected] the . . . integrity or public reputation of [the] judicial proceedings." *United States* v. *Atkinson*, 297 U.S. at 160. The Tenth Circuit did not address the application of these standards to the facts of this case, see n. 1, *supra*, reversing instead simply on its conclusory finding that the prosecutor committed "plain error."

When we detect legal error in a lower court's application of the plain-error or harmless-error rules, as here, the proper [*31] course is to set forth the appropriate standards and then remand for further proceedings. We have followed this procedure in countless cases. [14] But the Court today reaches out without explanation and inappropriately decides the issue itself. Its analysis is flawed in several respects, and these flaws demonstrate the wisdom of leaving [****52] such inquiries in the first instance to the lower courts.

First, the Court's conclusion [****53] that the prosecutor's arguments could not have prejudiced Young rests in large part on its "invited error" analysis. The gravamen of its reasoning apparently is that, since the defense misconduct supposedly canceled out much of the prosecutor's excesses, the prosecutor's remarks were tied to the record evidence, and the jurors "surely understood" the prosecutor's rhetoric "for what it was," the prosecutor's unethical behavior could not likely have had [***23] a prejudicial impact on the jurors' deliberations. *Ante*, at 19. I have already demonstrated the fallacy of these underlying premises.

Second, the plain-error inquiry necessarily requires a careful review of the entire record to determine the question of possible prejudice. The Court in two brief paragraphs summarizes its review of the record and proclaims that the evidence of Young's guilt was "overwhelming" and supported the conviction "beyond any doubt whatever." *Ante*, at 19, 20. The Court invokes a curious analysis in support of this pronouncement: the fact that the jury acquitted Young on [*32] "the most serious charge he faced . . . reinforces our conclusion that the prosecutor's remarks did not undermine [****54] the jury's ability to view the evidence independently and fairly." *Ante*, at 18, n. 15. If the evidence against Young was [**1055] so "overwhelming," it is difficult to perceive why the jury would have returned a partial acquittal. The jury's decision can just as naturally be interpreted to suggest that the evidence was close and the verdict a compromise, thus supporting a belief that the prosecutor's assertion of personal knowledge and his exhortation to "do your job" did in fact have a prejudicial impact. Moreover, the Court minimizes the fact that mail fraud and the making of false statements are specific-intent crimes and that good faith therefore stands as a complete defense. See, *e. g., United States* v. *Martin-Trigona*, 684 F.2d 485, 492 (CA7 1982) (mail fraud); *United States* v. *Lange*, 528 F.2d 1280, 1287-1288 (CA5 1976) (false statements). The question of Young's specific intent to defraud necessarily turned on witness credibility, and in this context the prosecutor's misconduct may well have had a prejudicial impact on

[14] See, *e. g., Kentucky* v. *Whorton*, 441 U.S. 786, 789-790, 60 L. Ed. 2d 640, 99 S. Ct. 2088 (1979) *(per curiam); Moore* v. *Illinois*, 434 U.S. 220, 232, 54 L. Ed. 2d 424, 98 S. Ct. 458 (1977); *Moore* v. *United States*, 429 U.S. 20, 23, 50 L. Ed. 2d 25, 97 S. Ct. 29 (1976) *(per curiam); Coleman* v. *Alabama*, 399 U.S. 1, 11, 26 L. Ed. 2d 387, 90 S. Ct. 1999 (1970); *Foster* v. *California*, 394 U.S. 440, 444, 22 L. Ed. 2d 402, 89 S. Ct. 1127 (1969); *Gilbert* v. *California*, 388 U.S. 263, 274, 18 L. Ed. 2d 1178, 87 S. Ct. 1951 (1967); *United States* v. *Wade*, 388 U.S. 218, 242, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967); *Ferguson* v. *United States*, 375 U.S. 962, 11 L. Ed. 2d 413, 84 S. Ct. 479 (1964) (order). See also *Connecticut* v. *Johnson*, 460 U.S. 73, 102, 74 L. Ed. 2d 823, 103 S. Ct. 969 (1983) (POWELL, J., dissenting) (question of an error's possible prejudice is "[normally] . . . a question more appropriately left to the courts below," in part because "[there] may be facts and circumstances not apparent from the record before us").

the jurors' deliberations. Although the Court is surely correct in emphasizing the impropriety of [****55] the crude oil condensate blending scheme that Young participated in, there was significant evidence that, if believed, might well have suggested Young's innocent though ignorant motives. [15]

[****56] [*33] Third, the Court altogether fails to consider whether the prosecutor's gross misconduct and flouting of the professional canons "seriously [affected] [***24] the . . . integrity or public reputation of [the] judicial proceedings." *United States* v. *Atkinson*, 297 U.S. at 160; see also *United States* v. *Frady*, 456 U.S. at 162, n. 11; *Brasfield* v. *United States*, 272 U.S. 448, 450, 71 L. Ed. 345, 47 S. Ct. 135 (1926). From the citations in the Tenth Circuit's opinion, see 736 F.2d at 570, it would appear that prosecutorial improprieties of the sort committed in this case may present a recurring problem. This Court is in no position at this time to pass judgment on the gravity of the problem and the panel's apparent concern that the prosecutor's misconduct in this case compromised the integrity and public reputation of the Circuit's administration of justice. Clearly a remand to address the question is necessary. [16]

[****57] These deficiencies in the Court's plain-error analysis reinforce the conviction that it [**1056] was poor judicial administration [*34] for the Court to embark on its inquiry in the first place. Our traditional practice has been to leave fact-bound questions of possible prejudicial error to the lower courts on remand. See *supra*, at 30-31, and n. 14. Two important considerations undergird this practice. First, the function of this Court is not primarily to correct factual errors in lower court decisions, but instead to resolve important questions of federal law and to exercise supervisory power over lower federal courts. Our institutional role properly is focused on ensuring clarity and uniformity of legal doctrine, and not on the case-specific process of reviewing the application of law to the particularized facts of individual disputes -- one of the functions performed quite capably by the federal courts of appeals. This allocation of responsibilities can result in subtle but vitally important differences in institutional outlook, differences that should not be shortcut simply because a majority decides the evidence of a particular defendant's guilt is "overwhelming" [****58] and "established beyond any doubt whatever." *Ante*, at 19, 20.

Second, if the Court is to be evenhanded in its willingness to review lower courts' plain-error and harmless-error determinations, we will be required to undertake such analyses with ever-increasing frequency. Yet this Court simply is not institutionally capable of conducting the sort of detailed record analyses required in properly administering the plain-error and harmless-error doctrines.

---

[15] Young's defense was that he believed that the blending of crude oil condensate with Number 4 fuel oil, an "unfinished" oil under Government regulations, would yield a blend that could still properly be certified as "crude" under then-extant regulations. Young maintained that Kenneth Ross, then an officer at Prime Resources Corporation, had convinced him that such certification was permissible. Tr. 78, 514. Ross denied that he had so persuaded Young, and the dispute turned on the jurors' credibility determinations. There was substantial testimony from Government witnesses that the blending of crude oil condensate with other oil was a common industry practice, albeit not the blending of condensate with fuel oil. *Id*., at 55, 59, 69, 361, 392. There was also testimony that the highest-quality crude condensate, when mixed with Number 4 fuel oil, yielded a blend superior to some lower-quality crudes. *Id*., at 55-56, 384, 427. Moreover, Apco received this blend for seven months, tested it, and reported no untoward results; it was only when another company attempted to pass off unadulterated low-quality fuel oil that Apco became concerned. *Id*., at 364-366, 412. Young, who had an eighth-grade education, maintained that he had thought Government regulations permitted his manner of certification; Government witnesses agreed that it was difficult to "make a lick of sense" out of the complex standards. *Id*., at 367. Finally, Government witnesses themselves testified that they did not believe that Young had intended to defraud Apco, that many others had been aware of the scheme, and that others had taken advantage of Young. *Id*., at 57-58, 78-80.

[16] The Court suggests that plain error may be found *only* where the error "had an unfair prejudicial impact on the jury's deliberations." *Ante*, at 17, n. 14. Plain error also may be grounded, however, on those errors that "seriously affect the . . . integrity or public reputation of [the] judicial proceedings." *United States* v. *Atkinson*, 297 U.S. 157, 160, 80 L. Ed. 555, 56 S. Ct. 391 (1936). I believe that certain extreme circumstances, such as egregious misbehavior or a pattern and practice of intentional prosecutorial misconduct that has not been deterred through other remedies, may well so seriously undermine the integrity of judicial proceedings as to support reversal under the plain-error doctrine. Cf. *United States* v. *Hasting*, 461 U.S. at 527 (BRENNAN, J., concurring in part and dissenting in part) (supervisory powers).

"This Court is far too busy to be spending countless hours reviewing trial transcripts in an effort to determine the likelihood that an error may have affected a jury's deliberations. . . . As a practical matter, it is impossible for any [***25] Member of this Court to make the kind of conscientious and detailed examination of the record that should precede a determination that there can be no reasonable doubt that the jury's deliberations as to [the] defendant were not affected by the alleged error. And it is an insult to the Court of Appeals to imply, as the [*35] Court does today, that it cannot be trusted with a task that would normally be conducted on remand." *United States* v. *Hasting*, 461 U.S. 499, 516-517, 76 L. Ed. 2d 96, 103 S. Ct. 1974 (1983) [****59] (STEVENS, J., concurring in judgment).

Surely the Court's time could have been better spent than on familiarizing ourselves in this case with the details of crude-oil refining and blending processes; the relative gravities and qualities of sweet crude, crude-oil condensate, and Number 4 fuel oil; long-rescinded Government regulations; various oil-industry testing procedures; and the complex of companies and individuals with whom Billy G. Young interacted -- matters that are all important to a fair evaluation of Young's defense, but that necessarily are limited to the facts of this isolated case.

JUSTICE STEVENS, dissenting.

In *Namet* v. *United States*, 373 U.S. 179, 10 L. Ed. 2d 278, 83 S. Ct. 1151 (1963), the Court recognized that even in the absence of an objection, trial error may require reversal of a criminal conviction on either of two theories: (1) that it reflected prosecutorial misconduct, or (2) that it was obviously prejudicial to the accused. *Id.*, at 186-187. In that case, after determining that the challenged error did not satisfy either standard, *id.*, at 188-189, the Court concluded that it saw "no reason to require such extravagant protection [****60] against errors which were not obviously prejudicial and which the petitioner himself appeared to disregard." *Id.*, at 190. [1] [**1057] It therefore affirmed the judgment of the Court of Appeals in that case.

[*36] In this case the Court has unanimously concluded that the prosecutor's response to defense counsel's closing argument constituted error. [2] It has thus decided against the Government the principal question that its petition for a writ of certiorari presented. [3] The Court [****61] has also unanimously concluded that "the prosecutor's comments crossed the lines of permissible conduct established by the ethical rules of the legal profession." *Ante*, [***26] at 14; see also *ante*, at 25-26 (BRENNAN, J., joined by MARSHALL and BLACKMUN, JJ., concurring in part and dissenting in part). Thus, at least one of the elements that was absent in *Namet* is present here.

With respect to the second element -- prejudice -- there is disagreement and, I submit, some confusion within the Court. The majority opinion carefully avoids denying that the prosecutorial [****62] misconduct was prejudicial to the accused. Instead, it concludes that the error did not "unfairly" prejudice the jury, *ante*, at 19, partly because the error was invited by defense counsel's misconduct and partly because the Court is convinced that respondent is guilty. [4] [****63] JUSTICE BRENNAN, on the other hand, correctly explains why this Court should permit the Court of Appeals to decide whether [*37] the error was "plain" or "harmless." He therefore would send the case back to that court to

[1] The Court appended the following footnote:

"Finding, as we do, that this case involves neither misconduct by the prosecution nor inferences of material importance, we need not pass upon the holding in *United States* v. *Maloney*, [262 F.2d 535 (CA2 1959)], that a failure to give proper curative instructions when such elements are present constitutes plain error." 373 U.S. at 190, n. 10.

See also *Henderson* v. *Kibbe*, 431 U.S. 145, 154, n. 12, 52 L. Ed. 2d 203, 97 S. Ct. 1730 (1977).

[2] *Ante*, at 14, 16-20; *ante*, at 26-30 (BRENNAN, J., joined by MARSHALL and BLACKMUN, JJ., concurring in part and dissenting in part).

[3] The principal question asked:

"Whether a prosecutor may rebut closing defense argument impugning the integrity of the prosecution and asserting that the prosecutors themselves do not believe in the defendant's guilty by responsive argument that would be inappropriate in the absence of such provocation."

[4] *Ante*, at 17-19. I do not, of course, suggest that it is improper for the Court to evaluate the probable impact of the error on the outcome of the case. It is important to remember, however, that the question is not whether the judge is persuaded that the defendant is guilty, but "rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting." *Kotteakos* v. *United States*, 328 U.S. 750, 764, 90 L. Ed. 1557, 66 S. Ct. 1239 (1946).

perform that task. [5]

In my opinion, it is perfectly clear that the Court of Appeals has already made that determination. I do not understand how anyone could dispute the proposition that the prosecutor's comments were obviously prejudicial. Instead, the question is whether the degree of prejudice, buttressed by the legitimate interest in deterring prosecutorial misconduct, is sufficient to warrant reversal. On that question, the factor of judgment necessarily plays a critical role. [6] I am persuaded that a due respect for the work of our circuit judges, combined with a fair reading of their opinion in this case, warrants the conclusion that they have already done exactly what JUSTICE BRENNAN would have them do again.

[****64] The Court of Appeals' opinion took note of defense counsel's failure to make an objection to the improper argument, but nevertheless accepted the contention on appeal that "the prosecutor's conduct substantially prejudiced the Appellant at trial. [**1058] " App. to Pet. for Cert. 9a. After reviewing relevant portions of the transcript that "speak for themselves," *id*., at 10a, and considering other Tenth Circuit cases dealing with "prejudicial statements made by the prosecution during [*38] argument to the [***27] jury," *ibid*., the Court of Appeals expressly concluded that "the above quoted remarks were sufficiently egregious as to constitute plain error." *Ibid*. I have no doubt that the judges of the Court of Appeals for the Tenth Circuit are familiar with the difference between "harmless error" and "plain error." [7] Rather than asking those judges to supplement the opinion they have already written, I would simply affirm their judgment.

[****65]

## References

Supreme Court's views as to what constitute harmless errors or plain errors, under Rule 52 of Federal Rules of Criminal Procedure

5 Am Jur 2d, Appeal and Error 624-627, 722, 896; 32 Am Jur 2d, Federal Practice and Procedure 361; 75 AmJur 2d, Trial 233, 261, 307

9 Federal Procedure, L Ed, Criminal Procedure 22:831, 22:832, 22:1278-22:1282

7 Federal Procedural Forms, L Ed, Criminal Procedure 20:1037

11 Am Jur Pl & Pr Forms (Rev), Federal Criminal Procedure, Form 214

6 Am Jur Trials 873, Prosecution Summations 26

USCS Federal Rules of Criminal Procedure, Rule 52(b)

US L Ed Digest, Appeal 1104, 1109, 1622; Trial 32

L Ed Index to Annos, Appeal and Error; Criminal Law; Federal Rules of Criminal Procedure

ALR Quick Index, Appeal and Error; Argument of Counsel; Rules of Criminal Procedure

Federal Quick Index, Appeal and Error; Argument of Counsel; Plain Error

---

[5] *Ante*, at 30-35 (BRENNAN, J., joined by MARSHALL and BLACKMUN, JJ., concurring in part and dissenting in part).

[6] The Court has commented on the difficulty of applying the harmless-error standard:

"This, in part, because it is general; but in part also because the discrimination it requires is one of judgment transcending confinement by formula or precise rule. *United States* v. *Socony-Vacuum Oil Co*., 310 U.S. 150, 240, 84 L. Ed. 1129, 60 S. Ct. 811. That faculty cannot ever be wholly imprisoned in words, much less upon such a criterion as what are only technical, what substantial rights; and what really affects the latter hurtfully. Judgment, the play of impression and conviction along with intelligence, varies with judges and also with circumstance. What may be technical for one is substantial for another; what minor and unimportant in one setting crucial in another." *Kotteakos* v. *United States*, 328 U.S. at 761.

[7] Rule 52 of the Federal Rules of Criminal Procedure, which is entitled "Harmless Error and Plain Error," reads as follows:

"(a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

"(b) Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the Court."

The note of the Advisory Committee to Rule 52(b) reads as follows:

"This rule is a restatement of existing law, *Wiborg* v. *United States*, 163 U.S. 632, 658, 41 L. Ed. 289, 16 S. Ct. 1127 . . .; *Hemphill* v. *United States*, 112 F.2d 505, C. C. A. 9th, reversed 312 U.S. 657, 85 L. Ed. 1106, 61 S. Ct. 729, . . . conformed to 120 F.2d 115, certiorari denied 314 U.S. 627. . . . Rule 27 of the Rules of the Supreme Court, 28 U. S. C. foll. § 354, provides that errors not specified will be disregarded, 'save as the court, at its option, may notice a plain error not assigned or specified.' Similar provisions are found in the rules of several circuit courts of appeals." 18 U. S. C. App., p. 657.

Annotation References:

Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L Ed 2d 886.

Propriety and prejudicial effect of prosecutor's argument to jury indicating his belief or knowledge as to guilt of accused. 41 ALR Fed 10; 88 ALR 3d 449.

---

End of Document

# Darden v. Wainwright

477 U.S. 168 (1986)

Cited in Supplemental Brief at: 13

Caution
As of: September 17, 2026 9:40 PM Z

# Darden v. Wainwright

Supreme Court of the United States

Argued January 13, 1986 ; June 23, 1986

No. 85-5319

**Reporter**
477 U.S. 168 *; 106 S. Ct. 2464 **; 91 L. Ed. 2d 144 ***; 1986 U.S. LEXIS 113 ****; 54 U.S.L.W. 4734

DARDEN *v.* WAINWRIGHT, SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

## Syllabus

[****1] After a jury trial in a Florida court, petitioner was found guilty of murder, robbery, and assault with intent to kill. Pursuant to Florida's capital sentencing statute, the same jury heard further testimony and argument, and made a nonbinding recommendation that the death penalty be imposed. The trial judge followed that recommendation, and the Florida Supreme Court affirmed the conviction and the sentence, rejecting petitioner's contention that the prosecution's closing argument during the guilt phase of the trial rendered the trial fundamentally unfair and deprived the sentencing determination of the reliability required by the Eighth Amendment. The court also rejected petitioner's contention that the trial court erred in excluding a member of the venire for cause on the basis of his affirmative response to the judge's question during *voir dire* "Do you have any moral or religious, conscientious moral or religious principles in opposition to the death penalty so strong that you would be unable without violating your own principles to vote to recommend a death penalty regardless of the facts?" In subsequent federal habeas corpus proceedings, petitioner raised the same claims, [****2] as well as the additional claim that he had been denied effective assistance of counsel at the sentencing phase of his trial. The District Court denied relief, and the Court of Appeals ultimately affirmed the District Court's judgment in all of its aspects.

*Held:*

1. The record of the jury *voir dire,*viewed in its entirety, shows that the trial court's decision to exclude the juror involved here was proper. *Wainwright* v. *Witt,* 469 U.S. 412, held that the proper test is whether a juror's views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. Petitioner's argument on this issue rested solely on the wording of the question (quoted above) that the trial court asked the juror before excluding him. However, a proper determination of the issue requires examination of the context surrounding the juror's exclusion. The record shows that prior to individual questioning the trial court told the entire venire that they would be questioned on this point, and that the juror in question was present while the court repeatedly stated the correct standard when questioning other [****3] individual members of the panel. Pp. 175-178.

2. The record also supports the rejection of petitioner's contention as to the prosecution's closing argument. The prosecution's argument included improper remarks that indicated that petitioner was on weekend furlough from an earlier prison sentence when the crime involved here occurred; implied that the death penalty would be the only guarantee against a future similar act; referred to petitioner as an "animal"; and reflected an emotional reaction to the case. However, the relevant question is whether the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. Viewed under this standard, the prosecution's comments did not deprive petitioner of a fair trial. The comments did not manipulate or misstate the evidence, or implicate other specific rights of the accused, and much of their objectionable content was responsive to the opening summation of the defense (available under a state procedural rule). Moreover, defense counsel were able to use their final rebuttal argument to turn much of the prosecution's argument to turn much of the prosecution's closing argument against it. [****4] Pp. 178-183.

3. With respect to the claim of ineffective assistance of

counsel at the sentencing phase of the trial, petitioner failed to satisfy the first part of the two-part test set forth in *Strickland* v. *Washington,* 466 U.S. 668, that his trial counsels' performance fell below an objective standard of reasonableness. There is no merit to petitioner's contention that trial counsel devoted only the time between the close of the guilt phase of trial and the start of the penalty phase -- approximately one-half hour -- to prepare the case in mitigation. The record indicates that a great deal of time and effort went into the defense of this case; a significant portion of that time was devoted to preparation for sentencing. Moreover, a defendant must overcome the presumption that, under the circumstances, the challenged action of counsel might be considered sound trial strategy. Petitioner did not overcome that presumption here. The record shows several reasons why counsel reasonably could have chosen to rely on a simple plea for mercy from petitioner himself, rather than to attempt to introduce mitigating evidence. Pp. 184-187.

767 F. 2d 752, affirmed and remanded.

[****5] POWELL, J., delivered the opinion of the Court, in which BURGER, C.J., and WHITE, REHNQUIST, and O'CONNOR, JJ., joined. BURGER, C.J., filed a concurring opinion, *post,* p, 187. BRENNAN, J., filed a dissenting opinion, *post,* p. 188. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post,* p. 188.

**Counsel:** *Robert Augustus Harper, Jr.,* argued the cause and filed briefs for petitioner.

*Richard W. Prospect,* Assistant Attorney General of Florida, argued the cause for respondent. With him on the brief was *Jim Smith,* Attorney General.

**Judges:** Burger, Brennan, White, Marshall, Blackmun, Powell, Rehnquist, Stevens, O'Connor

**Opinion by:** POWELL

# Opinion

[*170] [***150] [**2466] JUSTICE POWELL delivered the opinion of the Court.

[1A] [2A] [3A] [4A]This case presents three questions concerning the validity of petitioner's criminal conviction and death sentence: (i) whether the exclusion for cause of a member of the venire violated the principles announced in *Wainwright* v. *Witt,* 469 U.S. 412 (1985); (ii) whether the prosecution's closing argument during the guilt phase of a bifurcated trial rendered the trial fundamentally [****6] unfair and deprived the sentencing determination of the reliability required by the Eighth Amendment; and (iii) whether petitioner was denied effective assistance of counsel at the sentencing phase of his trial.

I

Petitioner was tried and found guilty of murder, robbery, and assault with intent to kill in the Circuit Court for Citrus County, Florida, in January 1974. Pursuant to Florida's capital sentencing statute, the same jury that convicted petitioner heard further testimony and [***151] argument in order to make a nonbinding recommendation as to whether a death sentence should be imposed. The jury recommended a death sentence, and the trial judge followed that recommendation. On direct appeal, the Florida Supreme Court affirmed the conviction and the sentence. Petitioner made several of the same arguments in that appeal that he makes here. With respect to the prosecutorial misconduct claim, the court disapproved of the closing argument, but reasoned that the law required a new trial "only in those cases in which it is reasonably evident that the remarks might have influenced the jury to reach a more severe verdict of guilt . . . or in which the comment is unfair." *Darden* v. [****7] *State,* 329 So. 2d 287, 289 (1976). It concluded that the comments had not rendered [*171] petitioner's trial unfair. Petitioner's challenge to the juror exclusion was rejected without comment. Petitioner did not at that time raise his claim of ineffective assistance of counsel. This Court granted certiorari, 429 U.S. 917 (1976), limited the grant to the claim of prosecutorial misconduct, 429 U.S. 1036 (1977), heard oral argument, and dismissed the writ as improvidently granted, 430 U.S. 704 (1977).

Petitioner then sought federal habeas corpus relief, raising the same claims he raises here. The District Court denied the petition. *Darden* v. *Wainwright,* 513 F. Supp. 947 [**2467] (MD Fla. 1981). A divided panel of the Court of Appeals for the Eleventh Circuit affirmed. *Darden* v. *Wainwright,* 699 F. 2d 1031 (1983). The Court of Appeals granted rehearing en banc, and affirmed the District Court by an equally divided court. 708 F. 2d 646 (1983). Following a second rehearing en banc the Court of Appeals reversed on the claim of improper excusal of a member of the venire. 725 F. 2d 1526 (1984). This Court granted the State's petition for

certiorari on that claim, [****8] vacated the Court of Appeals' judgment, and remanded for reconsideration in light of *Wainwright* v. *Witt.* 469 U.S. 1202 (1985). On remand, the en banc court denied relief, 767 F. 2d 752 (1985). Petitioner filed an application for a stay of his execution that this Court treated as a petition for certiorari and granted, at the same time staying his execution. 473 U.S. 928 (1985). We now affirm.

II

Because of the nature of petitioner's claims, the facts of this case will be stated in more detail than is normally necessary in this Court. On September 8, 1973, at about 5:30 p.m., a black adult male entered Carl's Furniture Store near Lakeland, Florida. The only other person in the store was the proprietor, Mrs. Turman, who lived with her husband in a house behind the store. Mr. Turman, who worked nights at a juvenile home, had awakened at about 5 p.m., had a cup of coffee at the store with his wife, and returned home to let [*172] their dogs out for a run. Mrs. Turman showed the man around the store. He stated that he was interested in purchasing about $ 600 worth of furniture for a rental unit, and asked to see several different items. He left the store briefly, [****9] stating that his wife would be back to look at some of the items.

The same man returned just a few minutes later asking to see some [***152] stoves, and inquiring about the price. When Mrs. Turman turned toward the adding machine, he grabbed her and pressed a gun to her back, saying "Do as I say and you won't get hurt." He took her to the rear of the store and told her to open the cash register. He took the money, then ordered her to the part of the store where some box springs and mattresses were stacked against the wall. At that time Mr. Turman appeared at the back door. Mrs. Turman screamed while the man reached across her right shoulder and shot Mr. Turman between the eyes. Mr. Turman fell backwards, with one foot partially in the building. Ordering Mrs. Turman not to move, the man tried to pull Mr. Turman into the building and close the door, but could not do so because one of Mr. Turman's feet was caught in the door. The man left Mr. Turman faceup in the rain, and told Mrs. Turman to get down on the floor approximately five feet from where her husband lay dying. While she begged to go to her husband, he told her to remove her false teeth. He unzipped his pants, unbuckled his [****10] belt, and demanded that Mrs. Turman perform oral sex on him. She began to cry "Lord, have mercy." He told her to get up and go towards the front of the store.

Meanwhile, a neighbor family, the Arnolds, became aware that something had happened to Mr. Turman. The mother sent her 16-year-old son Phillip, a part-time employee at the furniture store, to help. When Phillip reached the back door he saw Mr. Turman lying partially in the building. When Phillip opened the door to take Turman's body inside, Mrs. Turman shouted "Phillip, no, go back." Phillip did not know [*173] what she meant and asked the man to help get Turman inside. He replied, "Sure, buddy, I will help you." As Phillip looked up, the man was pointing a gun in his face. He pulled the trigger and the gun misfired; he pulled the trigger again and shot Phillip in the mouth. Phillip started to run away, and was shot in the neck. While he was still running, he was shot a third time in the side. Despite these wounds, Phillip managed to stumble to the home of a neighbor, Mrs. Edith Hill. She had her husband call an ambulance while she tried to stop Phillip's bleeding. While she was helping Phillip, she saw a late [****11] model green Chevrolet leave the store and head towards Tampa on State Highway 92. Phillip survived the incident; Mr. Turman, who never regained consciousness, died later that night.

[**2468] Minutes after the murder petitioner was driving towards Tampa on Highway 92, just a few miles away from the furniture store. He was out on furlough from a Florida prison, and was driving a car borrowed from his girl friend in Tampa. He was driving fast on a wet road. Petitioner testified that as he came up on a line of cars in his lane, he was unable to slow down. He attempted to pass, but was forced off the road to avoid a head-on collision with an oncoming car. Petitioner crashed into a telephone pole. The driver of the oncoming car, John Stone, stopped his car and went to petitioner to see if he could help. Stone testified that as he approached the car, petitioner was zipping up his pants and buckling his belt. Police at the crash site later identified petitioner's car as a 1969 Chevrolet Impala of greenish golden brown color. Petitioner paid a bystander to [***153] give him a ride to Tampa. Petitioner later returned with a wrecker, only to find that the car had been towed away by the police.

By [****12] the time the police arrived at the scene of the accident, petitioner had left. The fact that the car matched the description of the car leaving the scene of the murder, and that the accident had occurred within three and one-half miles of the furniture store and within minutes of the murder, led police [*174] to suspect that the car was driven by the murderer. They searched the area. An officer found a pistol -- a revolver -- about 40 feet from the crash site. The arrangement of shells

within the chambers exactly matched the pattern that should have been found in the murder weapon: one shot, one misfire, followed by three shots, with a live shell remaining in the next chamber to be fired. A specialist for the Federal Bureau of Investigation examined the pistol and testified that it was a Smith & Wesson .38 special revolver. It had been manufactured as a standard .38; it later was sent to England to be rebored, making it a much rarer type of gun than the standard .38. An examination of the bullet that killed Mr. Turman revealed that it came from a .38 Smith & Wesson special.

On the day following the murder petitioner was arrested at his girl friend's house in Tampa. A few [****13] days later Mrs. Turman identified him at a preliminary hearing as her husband's murderer. Phillip Arnold selected petitioner's picture out of a spread of six photographs as the man who had shot him. [1] By that time, a Public Defender had been appointed to represent petitioner.

---

[1] There are some minor discrepancies in the eyewitness identification. Mrs. Turman first described her assailant immediately after the murder while her husband was being taken to the emergency room. She told the investigating officer that the attacker was a heavy-set man. Tr. 237. When asked if he was "neat in his appearance, clean-looking, clean-shaven," she responded "[a]s far as I can remember, yes, sir." *Ibid.* She also stated to the officer that she thought that the attacker was about her height, 5' 6" tall, and that he was wearing a pullover shirt with a stripe around the neck. *Id.,* at 227. The first time she saw petitioner after the attack was when she identified him at the preliminary hearing. She had not read any newspaper accounts of the crime, nor had she seen any picture of petitioner. When she was asked if petitioner was the man who had committed the crimes, she said yes. She also repeatedly identified him at trial.

Phillip Arnold first identified petitioner in a photo lineup while in the hospital. He could not speak at the time, and in response to the written question whether petitioner had a mustache, Phillip wrote back "I don't think so." *Id.,* at 476. Phillip also testified at trial that the attacker was a heavy-set man wearing a dull, light color knit shirt with a ring around the neck. *Id.,* at 443. He testified that the man was almost his height, about 6' 2" tall.

A motorist who stopped at the scene of the accident testified that petitioner was wearing a white or off-grey button-down shirt and that he had a slight mustache. *Id.,* at 313, 318-320. In fact, the witness stated that he "didn't know it was that [the mustache] or the raindrops on him or not. I couldn't really tell that much to it, it was real thin, that's all." *Id.,* at 318-319. Petitioner is about 5' 10" tall, and at the time of trial testified that he weighed about 175 pounds.

[****14] [*175] As petitioner's arguments all relate to incidents in the course of his trial, they will be taken up, together with the relevant facts, in chronological order.

III

[1B]Petitioner contends that one member of the venire, Mr. Murphy, was excluded improperly under the test enunciated in *Wainwright* v. [***154] *Witt,* 496 U.S. 412 (1985).That case [**2469] modified this Court's opinion in *Witherspoon* v. *Illinois,* 391 U.S. 510 (1968). *Witherspoon* had held that potential jurors may be excused for cause when their opposition to the death penalty is such that they automatically would vote against a sentence of death or would be impaired in the task of determining defendant's guilt. *Witt* held that the proper test is whether the juror's views on capital punishment would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U.S., at 424, quoting *Adams* v. *Texas,* 448 U.S. 38, 45 (1980). *Witt* also made clear that the trial judge's determination that a potential juror is impermissibly biased is a factual finding entitled to a presumption of correctness under 28 U.S.C. § 2254.

Petitioner's argument [****15] on this issue relies solely on the wording of a question the trial court asked Murphy before excluding him. The court asked: "Do you have any moral or religious, conscientious moral or religious principles in opposition [*176] to the death penalty so strong that you would be unable without violating your own principles to vote to recommend a death penalty regardless of the facts?" App. 9. Petitioner argues that this question does not correctly state the relevant legal standard. As *Witt* makes clear, however, our inquiry does not end with a mechanical recitation of a single question and answer. 469 U.S., at 424-426. We therefore examine the context surrounding Murphy's exclusion to determine whether the trial court's decision that Murphy's beliefs would "substantially impair the performance of his duties as a juror" was fairly supported by the record.

During *voir dire,* but prior to individual questioning on this point, the trial court spoke to the entire venire, including Murphy, saying: S

"Now I am going to ask each of you individually the same question so listen to me carefully, I want to know if any of you have such strong religious, moral or conscientious principles [****16] in opposition to the death penalty that you would be unwilling to vote to return an advisory sentence recommending the death

sentence even though the facts presented to you should be such as under the law would require that recommendation? Do you understand my question?"I

The court then proceeded to question the members of the venire individually, but did so while the entire venire was present in the courtroom. Thus, throughout the individual questioning, all the veniremen could hear the questions and answers. In fact, the prosecution frequently incorporated prior questioning of other veniremen by reference, each time with the assurance from the individual being questioned that he or she had heard and understood the previous questions. See Tr. 89-90, 112, 141-142; see also *id.,* at 150.

[*177] The court repeatedly stated the correct standard when questioning individual members of the venire. [2] [***155] Murphy was present and heard the court ask the proper *Witherspoon* question over and over again. [3] After many instances of such [*178] [**2470] questioning, Murphy was seated in the jury box. The court first asked Murphy his occupation, and learned that he was retired, but had [****17] spent the eight years before retirement working in the administration office of St. Pios Seminary. As previously noted, the court then asked: "Do you have any moral or religious, conscientious moral or religious principles in opposition to the death penalty so strong that you would be unable without violating your own principles to vote to recommend a death penalty regardless of the facts?" After Murphy responded "Yes, I have" he was excused.

[****18]

[****19] The precise wording of the question asked of Murphy, and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty. But *Witt* recognized that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." 469 U.S., at 424. The trial court, "aided as it undoubtedly was by its assessment of [the potential juror's] demeanor," *id.,* at 434, was under the obligation to determine whether Murphy's views would "'prevent or substantially impair the performance of his duties as a juror,'" *id.,* at 424. In making this determination, the trial court could take account of the fact that Murphy was present throughout an entire series of questions that made the purpose and meaning of the *Witt* inquiry absolutely clear. No specific objection was made to the excusal of Murphy by defense counsel. Nor did the court perceive, as it had previously, any need to question further. Viewing [***156] the record of *voir dire* in its entirety, we agree with the reasoning of the Court of Appeals that the trial court's decision to exclude this juror was proper. [****20] 767 F. 2d, at 754.

IV

Petitioner next contends that the prosecution's closing argument at the guilt-innocence stage of the trial rendered his conviction fundamentally unfair and

---

[2] Prior to *voir dire* defense counsel objected to any questioning by the prosecution regarding a potential juror's feelings about the death penalty. The judge denied the motion, stating:

"It is my ruling if a prospective juror states on his voir dire examination tht because of his moral, religious or conscientious principles and belief he would be unwilling to recommend a death penalty, even though the facts and circumstances meet the requirements of law, then he in effect has said he would be unwilling to follow the law . . . ." App. 6.

Although the judge correctly stated the general standard for dismissal, he assured defense counsel that they were free to make an objection to any particular *Witherspoon* question that was otherwise objectionable or that had "gone too far." *Id.,* at 7.

[3] For example, the court asked Mrs. Macy: "[D]o you hold such conscientious moral or religious principles in opposition to the death penalty that you would be unwilling under any circumstances to recommend the death sentence?" Tr. 44. To Mr. Varney, who responded affirmatively to the above question, the court asked further: "[I]n the event that the evidence should be such that under the law that should be the legal recommendation you would be unwilling to return such a recommendation because of your conscientious beliefs?" *Ibid.* When three new veniremen replaced others who had been excused, the court asked: "Do either of the three of you hold such strong religious, moral or conscientious principles in opposition to the imposition of the death penalty that you would be unwilling to vote to recommend the death penalty regardless of what the evidence was?" *Id.,* at 88. At a similar point later on, the court explained to replacements from the venire that "I have asked the others and I will ask each of the four of you whether you have such strong religious, conscientious or moral principles against the imposition of the death penalty that you would be unwilling to vote to return a recommended sentence of the death penalty regardless of what the evidence or the facts might be?" *Id.,* at 109. When one of the four expressed reservations, the court once again followed up with further questioning, demonstrating its practice of assuring itself, if there was any doubt, of the potential juror's true position. See also *id.,* at 107. During the *voir dire* examination prior to Murphy, four potential jurors were excused on *Witherspoon*grounds.

deprived the sentencing [*179] determination of the reliability that the Eighth Amendment requires.

It is helpful as an initial matter to place these remarks in context. Closing argument came at the end of several days of trial. Because of a state procedural rule [4] petitioner's counsel had the opportunity to present the initial summation as well as a rebuttal to the prosecutors' closing arguments. The prosecutors' comments must be evaluated in light of the defense argument that preceded it, which blamed the Polk County Sheriff's Office for a lack of evidence, [5] alluded to the death penalty, [6] characterized the perpetrator of the crimes as an "animal," [7] and contained counsel's [**2471] personal opinion of the strength of the State's evidence. [8]

[****21]

[****22]

[2B] [3B] [5] [6]The prosecutors then made their closing argument. That argument deserves the condemnation it has received from every court to review it, although no court has held that the argument rendered the trial unfair. Several comments attempted to place some of the blame for the crime on the [*180] Division of Corrections, because Darden was on weekend furlough from a prison sentence when the crime occurred. [9] Some comments implied that the death penalty would be the only guarantee against a future similar act. [10] Others incorporated the defense's [***157] use of the word "animal." [11] Prosecutor McDaniel made several offensive comments reflecting an emotional reaction to the case. [12] These comments undoubtedly were improper. But as both the District [****23] Court and the [*181] original panel of the Court of Appeals (whose opinion on this issue still stands) recognized, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden* v. *Wainwright,* 699 F. 2d, at 1036. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial

[4] Rule 3.250 of the Florida Rules of Criminal Procedure (1973) provided that "a defendant offering no testimony in his own behalf, except his own, shall be entitled to the concluding argument before the jury."

[5] "The Judge is going to tell you to consider the evidence or the lack of evidence. We have a lack of evidence, almost criminally negligent on the part of the Polk County Sheriff's Office in this case. You could go on and on about it." Tr. 728.

[6] "They took a coincidence and magnified that into a capital case. And they are asking you to kill a man on coincidence." *Id.,* at 730.

[7] "The first witness that you saw was Mrs. Turman, who was a pathetic figure; who worked and struggled all of her life to build what little she had, the little furniture store; and a woman who was robbed, sexually assaulted, and then had her husband slaughtered before her eyes, by what would have to be a vicious animal." *Id.,* at 717. "And this murderer ran after him, aimed again, and this poor kid with half his brains blown away. . . . It's the work of an animal, there's no doubt about it." *Id.,* at 731-732.

[8] "So they come on up here and ask Citrus County people to kill the man. You will be instructed on lesser included offenses. . . . The question is, do they have enough evidence to kill that man, enough evidence? And I honestly do not think they do." *Id.,* at 736-737.

[9] "As far as I am concerned, there should be another Defendant in this courtroom, one more, and that is the division of corrections, the prisons. . . . Can we expect him to stay in a prison when they go there? Can't we expect them to stay locked up once they go there? Do we know that they're going to be out on the public with guns, drinking?" App. 15-16. "Yes, there is another Defendant, but I regret that I know of no charges to place upon him, except the public condemnation of them, condemn them." *Id.,* at 16.

[10] "I will ask you to advise the Court to give him death. That's the only way that I know that he is not going to get out on the public. It's the only way I know. It's the only way I can be sure of it. It's the only way that anybody can be sure of it now, because the people that turned him loose --." *Id.,* at 17-18.

[11] "As far as I am concerned, and as Mr. Maloney said as he identified this man, this person as an animal, this animal was on the public for one reason." *Id.,* at 15.

[12] "He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash." *Id.,* at 16. "I wish [Mr. Turman] had had a shotgun in his hand when he walked in the back door and blown his [Darden's] face off. I wish that I could see him sitting here with no face, blown away by a shotgun." *Id.,* at 20. "I wish someone had walked in the back door and blown his head off at that point." *Ibid.* "He fired in the boy's back, number five, saving one. Didn't get a chance to use it. I wish he had used it on himself." *Id.,* at 28. "I wish he had been killed in the accident, but he wasn't. Again, we are unlucky that time." *Id.,* at 29. "[D]on't forget what he has done according to those witnesses, to make every attempt to change his appearance from September the 8th, 1973. The hair, the goatee, even the moustache and the weight. The only thing he hasn't done that I know of is cut his throat." *Id.,* at 31. After this, the last in a series of such comments, defense counsel objected for the first time.

of due process." *Donnelly* v. *DeChristoforo,* 416 U.S. 637 (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.,* at 642.

[****24]

[****25] [2C][3C]Under this standard of review, we agree with the reasoning of every court to consider these comments that they did not deprive petitioner of a fair trial. [13] The [**2472] prosecutors' argument [*182] did not manipulate [***158] or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent. See *Darden* v. *Wainwright,* 513 F. Supp., at 958. Much of the objectionable content was invited by or was responsive to the opening summation of the defense. As we explained in *United States* v. *Young,* 470 U.S. 1 (1985), the idea of "invited response" is used not to excuse improper comments, but to determine their effect on the trial as a whole. *Id.,* at 13. The trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. The weight of the evidence against petitioner was heavy; the "overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges," 329 So. 2d, at 291, reduced the likelihood that the jury's decision was influenced by argument. Finally, defense counsel [****26] made the tactical decision not to present any witness other than petitioner. This decision not only permitted them to give their summation prior to the prosecution's closing argument, but also gave them the opportunity to make a final rebuttal argument. Defense counsel were able to use the opportunity for rebuttal very effectively, turning much of the prosecutors' closing argument against them by placing many of the prosecutors' comments and actions in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner. [14] [*183] For these reasons, we agree with the District Court below that "Darden's trial was not perfect -- few are -- but neither was it fundamentally unfair." 513 F. Supp., at 958. [15]

---

[13] JUSTICE BLACKMUN's dissenting opinion argues that because of prosecutorial misconduct petitioner did not receive a fair trial. The dissent states that the Court is "willing to tolerate not only imperfection but a level of fairness and reliability so low it should make conscientious prosecutors cringe." *Post,* at 189. We agree that the argument was, and deserved to be, condemned. *Supra,* at 179. Conscientious prosecutors will recognize, however, that *every court* that criticized the argument went on to hold that the *fairness* of petitioner's trial was not affected by the prosecutors' argument.

On direct appeal in 1976, the Florida Supreme Court so held after a careful review of the "totality of the record." *Darden* v. *State,* 329 So. 2d 287, 290-291. On the first federal habeas petition, the District Court considered the prosecution's closing argument at length and denied the petition. It concluded after a "thorough review of the record" that it was "convinced that no relief is warranted." *Darden* v. *Wainwright,*513 F. Supp. 947, 958 (MD Fla. 1981). "Darden's trial was not perfect -- few are -- but neither was it fundamentally unfair." *Ibid.* The original panel of the Court of Appeals affirmed the District Court's holding with respect to the prosecutors' argument. It stated that it had "considered the prosecutors' remarks and evaluated them in light of Darden's entire trial," and that it "agree[d] with the district court's conclusion that the prosecutors' comments did not deny Darden a fundamentally fair trial." 699 F. 2d 1031, 1036-1037 (1983). When the Court of Appeals reheard the case en banc for the second time it expressly agreed with the panel decision on the prosecutorial misconduct issue. 725 F. 2d 1526, 1532 (1984).

The Court of Appeals, however, reversed the District Court on the *Witherspoon* issue. This Court granted the State's petition for certiorari only on that issue, and vacated and remanded the case for reconsideration in light of *Wainwright* v. *Witt,* 469 U.S. 412 (1985). The Court of Appeals denied all relief, 767 F. 2d 752 (1985). During this protracted litigation not one court has agreed with petitioner's claim with respect to improper prosecutorial argument.

[14] "Mr. McDaniel made an impassioned plea . . . how many times did he repeat [it]? I wish you had been shot, I wish they had blown his face away. My God, I get the impression he would like to be the man that stands there and pulls the switch on him." Tr. 791; see also *id.,* at 794.

One of Darden's counsel testified at the habeas corpus hearing that he made the tactical decision not to object to the improper comments. Based on his long experience with prosecutor McDaniel, he knew McDaniel would "get much more vehement in his remarks if you allowed him to go on." By not immediately objecting, he hoped to encourage the prosecution to commit reversible error. Supp. App. 46-47.

[15] JUSTICE BLACKMUN's dissenting opinion mistakenly argues that the Court today finds, in essence, that any error was harmless, and then criticizes the Court for not applying the harmless-error standard. *Post,* at 196-197. We do not decide the claim of prosecutorial misconduct on the ground that it was harmless error. In our view of the case, that issue is not presented. Rather, we agree with the holding of every

[****27]

[2D] [3D]

[****28] [*184] [**2473] V

[***159] [4B][7]Petitioner contends that he was denied effective assistance of counsel at the sentencing phase of trial. That claim must be evaluated against the two-part test announced in *Strickland* v. *Washington,* 466 U.S. 668 (1984). First, petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.,* at 688. Second, petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* at 694. Petitioner argues that his trial counsel did not delve sufficiently into his background, and as a result were unprepared to present mitigating evidence at the sentencing hearing.

As an initial matter, petitioner contends that trial counsel devoted only the time between the close of the guilt phase of trial and the start of the penalty phase -- approximately one-half hour -- to preparing the case in mitigation. That argument is without merit. Defense counsel engaged in extensive preparation prior to trial, in a manner that included preparation for sentencing. Mr. Jack Johnson, head of the Public Defender's office at the time, [****29] stated to the habeas court that "we had expended hundreds of hours on [petitioner's] behalf trying to represent him," Tr. of Habeas Corpus Proceedings 219, and that his office "worked very hard on the case." *Id.,* at 237. Mr. Goodwill, an experienced criminal trial lawyer, testified that he "spent more time on this case [*185] than I spent on . . . any capital case I have been involved in, probably more time than any case I've ever been involved in." Supp. App. 30. That included time investigating petitioner's alibi, and driving petitioner around the scene of events to establish each point of his story. Counsel obtained a psychiatric report on petitioner, with an eye toward using it in mitigation during sentencing. Counsel also learned in pretrial preparation that Mrs. Turman was opposed to the death penalty, and considered the possibility of putting her on the stand at the sentencing phase. The record clearly indicates that a great deal of time and effort went into the defense of this case; a significant portion of that time was [***160] devoted to preparation for sentencing.

Petitioner also claims that his trial counsel interpreted Fla. Stat. § 921.141(6) (1985), a statutory [****30] list of mitigating factors, as an exclusive list. He contends that their failure to introduce any evidence in mitigation was the result of this interpretation of the statute, and that he was thereby deprived of effective assistance of counsel. We express no view about the reasonableness of that interpretation of Florida law, because in this case the trial court specifically informed petitioner and his counsel just prior to the sentencing phase of trial that they could "go into any other factors that might really be pertinent to full consideration of your case and the analysis of you and your family situation, your causes, or anything else that might be pertinent to what is the appropriate sentence." Tr. 887. At that point,

---

court that has addressed the issue, that the prosecutorial argument, in the context of the facts and circumstances of this case, did not render petitioner's trial unfair -- *i.e.,* that it was not constitutional error. Petitioner also maintains that the comments violated the requirement of reliability in the sentencing process articulated in *Caldwell* v. *Mississippi,* 472 U.S. 320 (1985). The principles of *Caldwell* are not applicable to this case. *Caldwell* involved comments by a prosecutor during the sentencing phase of trial to the effect that the jury's decision as to life or death was not final, that it would automatically be reviewed by the State Supreme Court, and that the jury should not be made to feel that the entire burden of the defendant's life was on them. This Court held that such comments "presen[t] an intolerable danger that the jury will in fact choose to minimize the importance of its role," a view that would be fundamentally incompatible with the Eighth Amendment requirement that the jury make an individualized decision that death is the appropriate punishment in a specific case. *Id.,* at 333.

There are several factual reasons for distinguishing *Caldwell* from the present case. The comments in *Caldwell* were made at the sentencing phase of trial and were approved by the trial judge. In this case, the comments were made at the guilt-innocence stage of trial, greatly reducing the chance that they had any effect at all on sentencing. The trial judge did not approve of the comments, and several times instructed the jurors that the arguments were not evidence and that their decision was to be based only on the evidence. But petitioner's reliance on *Caldwell* is even more fundamentally mistaken than these factual differences indicate. *Caldwell* is relevant only to certain types of comment -- those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision. In this case, none of the comments could have had the effect of misleading the jury into thinking that it had a reduced role in the sentencing process. If anything, the prosecutors' comments would have had the tendency to *increase* the jury's perception of its role. We therefore find petitioner's Eighth Amendment argument unconvincing.

even if counsel previously believed the list to be exclusive, they knew they were free to [**2474] offer nonstatutory mitigating evidence, and chose not to do so.

[4C][8]As we recognized in *Strickland:*"Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and [****31] to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689.In particular, "a court [*186] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Ibid., quoting *Michel* v. *Louisiana,* 350 U.S. 91, 101 (1955). In this case, there are several reasons why counsel reasonably could have chosen to rely on a simple plea for mercy from petitioner himself. Any attempt to portray petitioner as a nonviolent man would have opened the door for the State to rebut with evidence of petitioner's prior convictions. This evidence had not previously been admitted in evidence, and trial counsel reasonably could have viewed it as particularly damaging. The head of the Public Defenders Office testified at the habeas corpus hearing that petitioner "had been in and out of jails and prisons for most of his adult life . . . ." Tr. of Habeas Corpus Proceedings 209. Petitioner had, for example, previously been convicted of assault with intent to commit rape. [****32] *Darden* v. *State,* 218 So. 2d 485 (Fla. App. 1969). In addition, if defense counsel had attempted to offer testimony that petitioner was incapable of committing the crimes at issue here, the State could have responded with a psychiatric report that indicated that petitioner "very well could have committed the crime; that he was, as I recall his [the psychiatrist's] term, sociopathic type personality; that he would act entirely on impulse with no premeditation from the standpoint of planning. But that when a situation arose, the decision would be made simultaneously to commit the act." Supp. App. 76 (testimony of Mr. Goodwill). For that reason, after consultation with petitioner, defense counsel rejected use of the psychiatric testimony. Tr. 886. Similarly, if defense counsel had attempted to put on evidence that petitioner [***161] was a family man, they would have been faced with his admission at trial that, although still married, he was spending the weekend furlough with a girlfriend. In sum, petitioner has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered [*187] sound trial strategy.'" 466 U.S., at 689, quoting *Michel* [****33] v. *Louisiana, supra,* at 101. Petitioner has failed to satisfy the first part of the *Strickland* test, that his trial counsels' performance fell below an objective standard of reasonableness. We agree with both the District Court and the Court of Appeals that petitioner was not deprived of the effective assistance of counsel. 699 F. 2d, at 1037.

VI

The judgment of the Court of Appeals is affirmed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

**Concur by:** BURGER

# Concur

CHIEF JUSTICE BURGER, concurring.

I concur fully in the opinion for the Court and write separately only to address the suggestion in JUSTICE BLACKMUN's dissent that the Court rejects Darden's *Witherspoon* claim because of its "impatience with the progress of Darden's constitutional challenges to his conviction." *Post,* at 204. In support of this contention, reference is made to my dissent from the grant of certiorari in this case. The dissent states that I voted to deny the petition because Darden's claims have been reviewed by 95 judges in the 12 years since his conviction. This is simply incorrect. To set the record straight, I quote my dissent in full: S

"In the 12 [****34] years since petitioner was convicted of murder and sentenced to death, the issues now raised in the petition for certiorari have been considered [**2475] by this Court four times, see *Darden* v. *Florida,* 430 U.S. 704 (1977) (dismissing certiorari as improvidently granted); *Darden* v. *Wainwright,* 467 U.S. 1230 (1984) (denying certiorari); *Wainwright* v. *Darden,* 469 U.S. 1202 (1985) (vacating and remanding 725 F. 2d 1526 (CA11 1984)); *Darden* v. *Wainwright,* [473 U.S. 927] (order dated September 3, 1985, denying application for stay), and have been passed upon no fewer than 95 times by federal and [*188] state court judges. Upon review of the petition and the history of this case, I conclude that no issues are presented that merit plenary review by this Court. Because we abuse our discretion when we accept meritless petitions

presenting claims that we rejected only hours ago, I dissent." 473 U.S. 929 (1985).I

As my dissent makes clear, I voted to deny the petition in this extraordinary case because the meritless claims raised did not require plenary review. Full briefing and oral argument have not changed my views.

The dissent's suggestion that this Court [****35] is motivated by impatience with Darden's constitutional claims is refuted by the record; the 13 years of judicial proceedings in this [***162] case manifest substantial care and patience. Our rejection of Darden's claims in this the fourth time he has sought review in this Court is once again based on a thoughtful application of the law to the facts of the case. At some point there must be finality.

**Dissent by:** BRENNAN; BLACKMUN

## Dissent

JUSTICE BRENNAN, dissenting.

I join my Brother BLACKMUN's dissent. Moreover, adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia,* 428 U.S. 153, 227 (1976) (BRENNAN, J., dissenting), I would vacate the death sentence imposed in this case.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

Although the Constitution guarantees a criminal defendant only "a fair trial [and] not a perfect one," *Lutwak* v. *United States,* 344 U.S. 604, 619 (1953); *Bruton* v. *United States,* 391 U.S. 123, 135 (1968), this Court has stressed repeatedly in the decade since *Gregg* v. *Georgia,* 428 U.S. 153 (1976), [****36] that the Eighth Amendment requires a heightened degree of reliability in any case where a State seeks to take the defendant's [*189] life. [1] Today's opinion, however, reveals a Court willing to tolerate not only imperfection but a level of fairness and reliability so low it should make conscientious prosecutors cringe.

I

A

The Court's discussion of Darden's claim of prosecutorial misconduct is noteworthy for its omissions. Despite the fact that earlier this Term the Court relied heavily on standards governing the professional responsibility of defense counsel in ruling that an attorney's actions [****37] did not deprive his client of any constitutional right, see *Nix* v. *Whiteside,* 475 U.S. 157, 166-171 (1986), today it entirely ignores standards governing the professional responsibility of prosecutors in reaching the conclusion that the summations of Darden's prosecutors did not deprive him of a fair trial. See *ante,* at 178-183.

The prosecutors' remarks in this case reflect behavior as to which "virtually all [**2476] the sources speak with one voice," *Nix* v. *Whiteside, supra,* at 166, that is, a voice of strong condemnation. [2] The following brief

---

[1] See, *e.g., Caldwell* v. *Mississippi,* 472 U.S. 320, 328-329 (1985); *California* v. *Ramos,* 463 U.S. 992, 998-999 (1983); *Beck* v. *Alabama,* 447 U.S. 625, 637-638 (1980); *Lockett* v. *Ohio,* 438 U.S. 586, 604 (1978) (plurality opinion); *Gardner* v. *Florida,* 430 U.S. 349, 358-359 (1977) (plurality opinion); *Woodson* v. *North Carolina,* 428 U.S. 280, 305 (1976) (plurality opinion).

[2] Every judge who has addressed the prosecutors' behavior has condemned it. See *Darden* v. *State,* 329 So. 2d 287, 290 (Fla. 1976) ("[T]he prosecutor's remarks under ordinary circumstances would constitute a violation of the Code of Professional Responsibility"); *id.,* at 291-295 (dissenting opinion); *Darden* v. *Wainwright,* 513 F. Supp. 947, 955 (MD Fla. 1981) ("Anyone attempting a text-book illustration of a violation of the Code of Professional Responsibility . . . could not possibly improve upon [prosecutor White's final statement]"); *Darden* v. *Wainwright,* 699 F. 2d 1031, 1035-1036 (CA11 1983); *id.,* at 1040-1043 (dissenting opinion). Even the State's Attorney concedes that prosecutor McDaniel's summation was an "unnecessary tirade," Supp. App. 46, that "[n]o one has ever even weakly suggested that McDaniel's closing remarks were anything but improper," Supplemental Answer in *Darden* v. *Wainwright,* Case No. 79 -- 566-Civ. T.H. (MD Fla.) (June 1, 1979), p. 12, and that much of the summation consisted of "inflammatory irrelevancies," Answer to Pet. for Habeas Corpus in *Darden* v. *Wainwright,* Case No. 79 -- 566-Civ. T.H. (MD Fla.) (May 22, 1979), p. 11.

It is true that the Florida Supreme Court, the Federal District Court, and the Court of Appeals each ultimately concluded that Darden had not been deprived of a fair trial. But the grounds on which each rested its conclusion are troubling indeed. The Florida Supreme Court's "careful review of the 'totality of the record,'" as this Court now would describe it, *ante,* at 181, n. 13, consists of three paragraphs. The first of

these discusses evidence that petitioner "was a career criminal," who stayed with a woman other than his wife while on furlough, and used her car to visit various bars and a pool hall contrary to the conditions of his furlough. The second paragraph notes, among other things, that petitioner "admitted speeding in a rainstorm and creating great danger to other motorists" on the night of the murder. And the last describes the heinousness of the events that occurred at the Turmans' store, but says absolutely nothing about the evidence tying petitioner to those events. 329 So. 2d, at 290. (The court earlier had noted that Mrs. Turman and Phillip Arnold had identified petitioner as the perpetrator. *Id.,* at 288.)

The crux of the Florida Supreme Court's analysis, however, is that it was not "possible to use language which is fair comment about these crimes without shocking the feelings of any normal person[.] The language used by the prosecutor would have possibly been reversible error if it had been used regarding a less heinous set of crimes. The law permits fair comment. This comment was fair." *Id.,* at 290. Since the prosecutors had "reasonably describ[ed] what happened and what should be done to the guilty party," their comments were not erroneous. *Id.,* at 291.

The standard apparently applied by Florida is wholly unacceptable. A defendant's right to a fair trial cannot depend on the nature of the crime of which he is accused. And "what should be done to the guilty party" cannot be relevant to the determination of guilt.

The District Court's conclusion suffers from a similar error. In addition to advancing many of the arguments adopted by the Court today -- none of which is persuasive, see *infra,* at 194-200 -- the District Court found no prejudice because the offensive statements were not "keyed to arouse prejudice against the accused on any basis other than the horror of the crimes themselves." 513 F. Supp., at 956, n. 12. But at the guilt phase of this bifurcated trial, horror about the crimes was irrelevant. The sole issue was whether Darden committed them. The Court of Appeals merely quoted and approved the analysis of the District Court. See 699 F. 2d, at 1036-1037.

In its catalog of the number of judges who have found petitioner's trial to have been fair, the Court fails to include the Magistrate before whom petitioner's federal habeas proceedings were actually conducted, and who recommended that the District Court grant petitioner habeas relief on the basis of his claim of prosecutorial misconduct. Magistrate Paul Game, Jr., correctly recognized that this case essentially turned on the relative credibility of three witnesses, Mrs. Turman, Phillip Arnold, and Willie Darden, and that the prosecutors' concerted attack on Darden's humanity could well have affected the jury's assessment of his credibility. See App. 214. He also recognized that the remarks occurred "[i]n the context of the emotionally charged trial of Darden, a black man, accused of robbery, the brutal murder of a white man, the repeated shooting of a defenseless white teenager and vile sexual advances on a white woman." *Id.,* at 215. Notably, the Court today ignores the context in which the trial took place, including the fact that petitioner's motion for a change of venue was granted, and contents itself instead with hypothesizing reasons why the prosecutors' shameful conduct should not deprive them of a hanging verdict.

comparison [***163] of established standards [*190] of prosecutorial conduct with the prosecutors' behavior in this case merely illustrates, but hardly exhausts, the scope of the misconduct involved:

[*191] 1. "A lawyer shall not . . . state a personal opinion as to . . . the credibility of a witness . . . or the guilt or innocence of an accused." Model Rules of Professional Conduct, Rule [***164] 3.4(e) (1984); see also Code of Professional Responsibility, DR 7-106(C)(4) (1980); ABA Standards for Criminal Justice 3-5.8(b)(2d ed. 1980). Yet one [**2477] prosecutor, White, stated: "I am convinced, as convinced as I know I am standing before you [****38] today, that Willie Jasper Darden is a murderer, that he murdered Mr. Turman, that he robbed Mrs. Turman and that he shot to kill Phillip Arnold. I will be convinced of that the rest of my life." App. 15. And the other prosecutor, McDaniel, stated, with respect to Darden's testimony: "Well, let me tell you something: If I am ever over in that chair over there, facing life or death, life imprisonment or death, I guarantee you I will lie until my teeth fall out." *Id.,* at 18.

2. "The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the [*192] evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict." ABA Standards for Criminal Justice 3-5.8(d) (2d ed. 1980); cf. Model Rules of Professional Conduct, Rule 3.4(e); Code of Professional Responsibility, DR 7-106(C)(7); ABA Standards for Criminal Justice 3-6.1(c) (2d ed. 1980). Yet McDaniel's argument was filled with references to Darden's status as a prisoner on furlough who "shouldn't be out of his cell unless he has a leash on him." App. 16; see also, *e.g.,* [****39] *id.,* at 17, 18, 23, 24, 26. Again and again, he sought to put on trial an absent "defendant," the State Department of Corrections that had furloughed Darden. See, *e.g., id.,* at 15, 17, 23, 32. He also implied that defense counsel would use improper tricks to deflect the jury from the real issue. See *id.,* at 15, 26. Darden's status as a furloughed prisoner, the release policies of the Department of Corrections, and his counsel's anticipated tactics obviously had no legal relevance to the question the jury

was being asked to decide: whether he had committed the robbery and murder at the Turmans' furniture store. Indeed, the State argued before this Court that McDaniel's remarks were harmless precisely *because* he "failed to discuss the issues, the weight of the evidence, or the credibility of the witnesses." Brief for Respondent 26.

3. "The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury." ABA Standards for Criminal Justice 3-5.8(c) (2d ed. 1980); see *Berger* v. *United States,* 295 U.S. 78, 88 (1935). Yet McDaniel repeatedly expressed a wish "that I could see [Darden] sitting here with no face, blown [****40] away by a shotgun," App. 20; see also, *e.g., id.,* at 28, 29, 31. Indeed, I do not think McDaniel's summation, taken as a whole, can accurately be described as anything but a relentless and single-minded attempt to inflame the jury.

[****41] [*193] B

The Court, see *ante,* at 181, relies on the standard established in *Donnelly* v. *DeChristoforo,* 416 U.S. 637, 643 (1974), for deciding when a prosecutor's comments at a state trial render that trial fundamentally unfair. It omits, however, any discussion of the facts, so different from those in this case, that led [***165] the Court to conclude in *DeChristoforo* that that defendant had not been deprived of a fair trial.

*DeChristoforo* concerned "two remarks made by the prosecutor during the course of his rather lengthy closing argument to the jury." *Id.,* at 640. One remark was "but one moment of an extended trial." *Id.,* at 645. And even the more objectionable remark was so "ambiguous," *ibid.,* that it provided no basis for inferring either that the prosecutor "intend[ed] [it] to have its most damaging meaning or that a jury, sitting through lengthy exhortation, [would] draw that meaning from the plethora of less damaging interpretations," *id.,* at 647. Finally, the trial judge in *DeChristoforo* expressly instructed the jury to disregard the improper statements. *Id.,* at 645. This Court's holding thus rested on its conclusion that the [****42] prosecutor's comments [**2478] were neither so extensive nor so improper as to violate the Constitution.

Far from involving "ambiguous" statements that "might or might not" affect the jury, *id.,* at 647, the remarks at issue here were "focused, unambiguous, and strong." *Caldwell* v. *Mississippi,* 472 U.S. 320, 340 (1985). It is impossible to read the transcript of McDaniel's summation without seeing it as a calculated and sustained attempt to inflame the jury. Almost every page contains at least one offensive or improper statement; some pages contain little else. The misconduct here was not "slight or confined to a single instance, but . . . was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Berger* v. *United States,* 295 U.S., at 89.

[*194] C

The Court presents what is, for me, an entirely unpersuasive one-page laundry list of reasons for ignoring this blatant misconduct. First, the Court says that the summations "did not manipulate or misstate the evidence [or] . . . implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Ante,* at 182. [****43] With all respect, that observation is quite beside the point. The "solemn purpose of endeavoring to ascertain the truth . . . is the *sine qua non* of a fair trial," Estes v. Texas, 381 U.S. 532, 540 (1965), and the summations cut to the very heart of the Due Process Clause by diverting the jury's attention "from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding." *Stone* v. *Powell,* 428 U.S. 465, 490 (1976).

Second, the Court says that "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense." *Ante,* at 182, citing *United States* v. *Young,* 470 U.S. 1 (1985). The Court identifies four portions of the defense summation that it thinks somehow "invited" McDaniel's sustained barrage. The State, however, did not object to any of these statements, and, to my mind, none of them is so objectionable [***166] that it would have justified a tactical decision to interrupt the defense summation and perhaps irritate the jury. Cf. *id.,* at 13-14.

The Court begins by stating that defense counsel "blamed" the Sheriff's Office for a lack of evidence. *Ante,* at 179. The Court [****44] does not identify which, if any, of McDaniel's remarks represented a response to this statement. I cannot believe that the Court is suggesting, for example, that defense counsel's one mention of the "almost crimina[l] negligen[ce] on the part of the Polk County Sheriff's Office," Tr. 728, justified McDaniel's express and repeated wish that he could try the Department of Corrections for murder. See, *e.g.,* App. 15, 17, 23, 32.

[*195] Next, the Court notes that defense counsel "alluded" to the death penalty. *Ante,* at 179. While this

allusion might have justified McDaniel's statement that "you are merely to determine his innocence or guilt, nothing else," App. 17, it could hardly justify, for example, McDaniel's expressions of his personal wish that Darden be "blown away by a shotgun," *id.,* at 20; see also *id.,* at 28, 29, 31.

Moreover, the Court says, defense counsel twice referred to the perpetrator as an "animal." *Ante,* at 179; see Tr. 717, 732. It is entirely unclear to me why this characterization called for any response from the prosecutor at all. Taken in context, defense counsel's statements did nothing more than tell the jury that, although everyone [****45] agreed that a heinous crime had been committed, the issue on which it should focus was whether *Darden* had committed it.

Finally, the Court finds that Darden brought upon himself McDaniel's tirade because defense counsel gave his "personal opinion of the strength of the State's evidence." *Ante,* at 179. Again, the Court [**2479] gives no explanation of how the statement it quotes -- a single, mild expression of defense counsel's overall assessment of the evidence -- justified the "response" that followed, which consisted, to the extent it represented a comment on the evidence at all, of accusations of perjury, see App. 18-19, and personal disparagements of opposing counsel, see *id.,* at 15, 26. In sum, McDaniel went so far beyond "respond[ing] substantially in order to 'right the scale,'" *Young,* 470 U.S., at 13, that the reasoning in *Young* provides no basis at all for the Court's holding today.

The third reason the Court gives for discounting the effects of the improper summations is the supposed curative effect of the trial judge's instructions: the judge had instructed the jury that it was to decide the case on the evidence and that the arguments of counsel were not [****46] evidence. *Ante,* at 182. But the trial court overruled Darden's objection to McDaniel's repeated expressions of his wish that Darden had been killed, App. 31, thus perhaps leaving the jury with the [*196] impression that McDaniel's comments were somehow relevant to the question before them. The trial judge's instruction that the attorneys were "trained in the law," and thus that their "analysis of the issues" could be "extremely helpful," Tr. 714, might also have suggested to the jury that the substance of McDaniel's [***167] tirade was pertinent to their deliberations.

Fourth, the Court suggests that because Darden enjoyed the tactical advantage of having the last summation, he was able to "tur[n] much of the prosecutors' closing argument against them." *Ante,* at 182. But the issue before the jury was whether Darden was guilty, not whether McDaniel's summation was proper. And the question before this Court is not whether we agree with defense counsel's criticism of the summation but whether the jury was affected by it. Since Darden was ultimately convicted, it is hard to see what basis the Court has for its naked assertion that "[d]efense counsel were able to use the opportunity [****47] for rebuttal very effectively." *Ante,* at 182; cf. *Young,* 470 U.S., at 18, n. 15 (the defendant's acquittal of the most serious charge "reinforces our conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and fairly").

Fifth, the Court finds, in essence, that any error was harmless: "The weight of the evidence against petitioner was heavy; the 'overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges,' 329 So. 2d, at 291, reduced the likelihood that the jury's decision was influenced by argument." *Ante,* at 182. The Court rejects the "no effect" test set out in *Caldwell* v. *Mississippi,* 472 U.S. 320 (1985), see *ante,* at 183, n. 14, but it does not identify the standard it does use to decide the harmlessness of the error. [3]

[****48] [*197] Every harmless-error standard that this Court has employed, however, shares two salient features. First, once serious error has been identified, the burden shifts to the beneficiary of the error to show that the conviction was not tainted. Second, although different formulations of the [**2480] harmless-error

---

[3] The Court finds *Caldwell* inapposite because the offending comment in *Caldwell* occurred at the sentencing stage of the defendant's trial and misled the jury as to its role in the sentencing process. *Ante,* at 183, n. 14. But Caldwell's Eighth Amendment underpinnings clearly extend to guilt determinations in capital cases as well as to sentencing. *Beck* v. *Alabama,* 447 U.S., at 637-638. And under the circumstances of this case, where the sentencing hearing followed immediately upon the jury's return of a guilty verdict and the State's summation consisted of less than a full page of transcript, see Tr. 894, I think the State must have assumed that its attacks on the Department of Corrections and repeatedly expressed wish that Darden die would affect the jury's sentencing decision as well as its determination of guilt. Indeed, the District Court found that the summations during the guilt phase were "in effect [the State's] principal argument in support of the death penalty." 513 F. Supp., at 953, and n. 10. Moreover, I do not see why misleading a jury as to the relevant issues in a capital trial is somehow less pernicious than misleading a jury as to its role.

standard differ in the level of confidence in the outcome required to overcome that burden, the question before a reviewing court is never whether the evidence would have been sufficient to justify conviction, absent an error, but, rather, whether the error undermines its confidence in the outcome of the proceeding to an unacceptable degree. See, *e.g., United States* v. *Young,* 470 U.S., at 20; *Chapman* v. *California,* 386 U.S. 18, 24 (1967); *Kotteakos* v. *United States,* 328 U.S. 750, 765 (1946). [***168]

Regardless of which test is used, I simply do not believe the evidence in this case was so overwhelming that this Court can conclude, on the basis of the written record before it, that the jury's verdict was not the product of the prosecutors' misconduct. The three most damaging pieces of evidence -- the identifications of Darden by Phillip Arnold and Helen [****49] Turman and the ballistics evidence -- are all sufficiently problematic that they leave me unconvinced that a jury not exposed to McDaniel's egregious summation would necessarily have convicted Darden.

[*198] Arnold first identified Darden in a photo array shown to him in the hospital. The trial court suppressed that out-of-court identification following a long argument concerning the reliability and constitutionality of the procedures by which it was obtained. See Tr. 487-488. [4]

Mrs. Turman's [****50] initial identification was made under even more suggestive circumstances. She testified at trial that she was taken to a preliminary hearing at which Darden appeared in order "[t]o identify him." *Id.,* at 215. Instead of being asked to view Darden in a lineup, Mrs. Turman was brought into the courtroom, where Darden apparently was the only black man present. See *id.,* at 220-221. Over defense counsel's objection, after the prosecutor asked her whether "this man sitting here" was "the man that shot your husband," *ibid.,* she identified Darden. [5] Cf. *Moore* v. *Illinois,* 434 U.S. 220, 229-230 (1977).

[****51] [*199] The use of showups has long been condemned by this Court, precisely because they can result in unreliable identifications. See, *e.g., Stovall* v. *Denno,* 388 U.S. 293, 302 (1967). Similarly, the Court has condemned the use of photo arrays in which the suspect's photograph "is in some way emphasized." *Simmons* v. *United States,* 390 U.S. 377, 383 (1968) [***169] . While the question [**2481] whether the various in- and out-of-court identifications ought to have been suppressed is not now before the Court, [6] my

---

[4] Of the six photographs in the array, Arnold immediately rejected four because "[t]hey just didn't fit the description" he had earlier given the police. Tr. 457. Darden's photograph was one of no more than two that identified the subject by name, and under the name on Darden's photograph was the notation "Sheriff's Department, Bartow, Florida" and the date "9/9/73." *Id.,* at 476-477. Arnold was aware at the time of the identification on September 11 that a suspect recently had been arrested. *Id.,* at 459.

[5] Mrs. Turman's identification took place after the following colloquy between the court, the prosecutor (Mr. Mars), and the defense attorney (Mr. Hill):

"THE COURT: Ask her to identify.

"MR. MARS: Yes, sir.

"Q: Can you see this man sitting here?

"MR. HILL: Your Honor, I am going to object to that type of identification.

"THE COURT: I am not. Sit down.

"MR. HILL: Judge --

"THE COURT: Not under these circumstances, Mr. Hill.

"MR. HILL: Judge, even as a defense attorney, that shows no respect in court, much less for the Court, and I --

"THE COURT: I appreciate --

"MR. HILL: And the objection, I want on the record.

"THE COURT: I appreciate that. It's on the record. This woman has had a traumatic experience and she --

"MR. HILL: Judge, I appreciate that. I still have an obligation to my client.

"THE COURT: I appreciate that. Now if you want to be held in contempt, you pardon me. Alright, go ahead.

"Q: Is this the man that shot your husband?

"A: Yes, sir."

See Pet. for Habeas Corpus in *Darden* v. *Wainwright,* Case No. 79 -- 566-Civ. T.H. (MD Fla.) (May 21, 1979), pp. 18-19; Tr. 218-219.

[6] Challenges to the admissibility of the various identifications were presented in Darden's petition to this Court for direct review of his conviction and sentence. See Brief for Petitioner in *Darden* v. *Florida,* O.T. 1976, No. 76-5382, pp. 2-3 (second and third questions presented raising issues concerning the witnesses' identifications). Although that petition for certiorari was granted, 429 U.S. 917 (1976), the Court later limited its grant to the issue of the prosecutor's closing argument, 429 U.S. 1036 (1977), and ultimately dismissed the writ as improvidently granted, 430 U.S. 704 (1977).

confidence in their reliability is nonetheless undermined by the suggestiveness of the procedures by which they were obtained, particularly in light of Mrs. Turman's earlier difficulties in describing the criminal.

[****52] Finally, the ballistics evidence is hardly overwhelming. The purported murder weapon was tied conclusively neither to the crime nor to Darden. Special Agent Cunningham of the Federal Bureau of Investigation's Firearms Identification Unit testified that the bullets recovered at the scene of the crime "could have been fired" from the gun, but he was unwilling to say that they in fact had come from that weapon. [*200] Tr. 347, 357. He also testified, contrary to the Court's assertion, that rebored Smith & Wessons were fairly common. See *id.,* at 350-351, 357-358. Deputy Sheriff Weatherford testified that the gun was discovered in a roadside ditch adjacent to where Darden had wrecked his car on the evening of the crime. But the gun was discovered the next day, *id.,* at 503, and the ditch was also next to a bar's parking lot. *Id.,* at 531.

Darden testified at trial on his own behalf and denied any involvement in the robbery and murder. See *id.,* at 571-660. His account of his actions on the day of the crime was contradicted only by Mrs. Turman's and Arnold's identifications. Indeed, a number of the State's witnesses corroborated parts of Darden's account. The [****53] trial judge who had seen and heard Darden testify found that he "emotionally and with what appeared on its face to be sincerity, proclaimed his innocence." App. 34. In setting sentence, he viewed the fact that Darden "repeatedly professed his complete innocence of the charges" as a mitigating factor. *Id.,* at 35.

Thus, at bottom, this case rests on the jury's determination of the credibility of three witnesses -- Helen Turman and Phillip Arnold, on the one side, and Willie Darden, on the other. I cannot conclude that McDaniel's sustained assault on Darden's very humanity did not affect the jury's ability to judge the credibility question on the real evidence before it. Because I believe that he did not have a trial that was fair, I would reverse Darden's conviction; I would not allow him to go to his death until he has been convicted at a fair trial.

II

Even if Darden had been convicted fairly, however, I believe his death sentence should be vacated because of the improper exclusion for cause of a member of the venire who was qualified to serve under this Court's decisions in *Witherspoon* v. *Illinois,* 391 U.S. 510 (1968), and [***170] *Wainwright* v. *Witt,* 469 U.S. 412 [****54] (1985). In *Davis* v. *Georgia,* 429 U.S. 122 (1976), [*201] the Court held that the improper exclusion of one juror renders a death sentence constitutionally infirm *per se.* In Darden's case, the potential prejudice is palpable. Even though it was stripped of members expressing reservations about the death penalty, this jury could not agree unanimously that a death sentence was appropriate. See Tr. 908; 699 F. 2d, at 1041 (dissenting opinion).

*Witherspoon* concerned an Illinois statute that excused for cause "'any juror who shall, on being examined, state that he has [**2482] conscientious scruples against capital punishment, or that he is opposed to the same.'" 391 U.S., at 512, quoting Ill. Rev. Stat., ch. 38, § 743 (1959). The Court held that the Constitution barred the execution of a defendant sentenced to death by a jury from which such persons had been excluded for cause. That holding rested in large part on the Court's recognition that even some jurors who oppose the death penalty can set aside their personal beliefs and follow the court's instructions to consider whether death is an appropriate penalty. See 391 U.S., at 514-515, n. 7, 515-516, n. 9, 519, 520. [****55] As recently as last Term, we held once again that trial courts must distinguish between "prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial." *Witt,* 469 U.S., at 421; see also *id.,* at 422, n. 4; *Adams* v. *Texas,* 448 U.S. 38, 44-45 (1980); *Boulden* v. *Holman,* 394 U.S. 478, 483-484 (1969).

The Court's discussion of Darden's claim rests on a premise that the claim depends entirely on the wording of a single question asked by the trial judge prior to the exclusion of venire member Murphy. See *ante,* at 176. That premise is mistaken. The trial court's error lay in its misunderstanding of the proper standard for exclusion under *Witherspoon.* This misunderstanding influenced both the question the court [*202] asked Murphy and its evaluation of his answer. On this record, I cannot say with any assurance that Murphy was properly excluded.

Prior to the *voir dire* of individual venire members, the trial judge announced his intention to excuse, not only [****56] any potential juror whose religious or moral principles made him unable to impose the death penalty, but also any potential juror who, if he did follow

the court's instructions, "would be going against his principles" (emphasis deleted). App. 6. [7] This standard is essentially indistinguishable [***171] from the standard employed by Illinois and expressly disapproved by this Court in *Witherspoon.* If a juror who has reservations about the wisdom or morality of the death penalty nonetheless follows the court's instructions, he has *not* been "'prevent[ed] or substantially impair[ed in] the performance of his duties as [*203] a juror in accordance with his instructions and his oath,'" *Witt,* 469 U.S., at 424, quoting *Adams,* 448 U.S., at 45. To permit only those individuals who have no reservations about exercising "the truly [**2483] awesome responsibility of decreeing death for a fellow human," *McGautha* v. *California,* 402 U.S. 183, 208 (1971), to serve on capital juries would surely mark a return to the empaneling of juries "uncommonly willing to condemn a man to die," *Witherspoon,* 391 U.S., at 521.

[****57] This case is thus entirely unlike *Witt.* *Witt's* statement that determinations of juror bias cannot be reduced to a catechism, 469 U.S., at 424, and its reliance on the peculiar ability of trial judges to observe the demeanor and credibility of potential jurors, *id.,* at 428, make sense when there is "every indication that the judge . . . applied the correct standard." *Id.,* at 431. But the record before us today provides no such indication. It is impossible to determine whether the judge's finding of bias reflected a belief that Murphy would be unable to follow the court's instructions or a belief that Murphy would have to set aside his personal beliefs to do so. In fact, Murphy never gave any indication that he could not follow the court's instructions. The burden of proving Murphy's bias rested on the State. *Id.,* at 423-424. The Court's present heavy reliance on "the context surrounding Murphy's exclusion," *ante,* at 176, simply cannot support its conclusion because the trial court's improper interpretation of *Witherspoon* infected that context.

The Court's statement that "the trial court could take account of the fact that Murphy was present throughout [****58] an entire series of questions that made the purpose and meaning of the *Witt* inquiry absolutely clear," *ante,* at 178, suffers from a similar defect. [8] [***172] I find implausible the Court's assumption [*204] that Murphy followed closely the day-long questioning of other jurors. But if that assumption were correct, then the Court should also assume that Murphy anticipated being asked whether his beliefs would prevent or substantially impair performance of his duties as a juror, as other jurors expressing similar sentiments had been asked. That three other jurors, under somewhat more extensive questioning, explicitly stated that *they* did not think *they* could vote for the death penalty, see Tr. 44 (juror Varney); *id.,* at 107 (juror Carn); *id.,* at 109-110 (juror Maher), says nothing about whether *Murphy* shared

---

[7] In denying Darden's pretrial motion to limit *voir dire* concerning jurors' attitudes towards the death penalty, the trial court stated:

"It is my ruling if a prospective juror states on his voir dire examination that because of his moral, religious or conscientious principles and belief he would be unwilling to recommend a death penalty, even though the facts and circumstances meet the requirements of law, then he in effect has said he would be unwilling to follow the law the court shall charge upon it and disregard and be unwilling to follow it or if he did follow it, it would be going against his principles, and therefore, I would rule that would be disqualification. If that exists, I intend to disqualify for cause." App. 6 (emphasis deleted).

The Court's statement that "the judge correctly stated the general standard for dismissal," *ante,* at 177, n. 2, comes immediately on the heels of a truncated quotation of the trial judge's ruling which omits the critical phrase, "if he did follow it, it would be going against his principles, and therefore, I would rule that would be disqualification."

The court gave petitioner a continuing objection to its proposed *voir dire* questioning. App. 7. Even if this continuing objection were not enough standing alone to preserve petitioner's claim -- and the Court does not so hold -- the statement that "[n]o specific objection was made to the excusal of Murphy by defense counsel," *ante,* at 178, is flatly contradicted by the trial transcript. Immediately following Murphy's excusal, the court directed the stenographer to "note the defendant's object to him being excused for cause." Tr. 165.

[8] Even to refer to the "*Witt* inquiry" reflects inattention to chronology. This case was tried about a dozen years before *Witt* sought to dispel the "general confusion surrounding the application of *Witherspoon*" under which courts across the country had labored for 15 years. 469 U.S., at 418. How the purpose and meaning of *Witt* could be clear to a layman like Murphy when they were unclear to the judge trying this case and to federal and state appellate courts is nowhere explained. Moreover, from Murphy's perspective, the purpose of the inquiry was to obtain from him truthful answers regarding his background and beliefs. His oath as a juror required him to reveal his strong feelings about the death penalty, even if he believed that he could follow the judge's instructions notwithstanding those feelings.

their inability to put aside personal beliefs and obey his oath as a juror. *Witt* may be right that "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear,'" 469 U.S., at 424-425; here, however, the judge did not even ask the one question that might have given him real insight into [****59] Murphy's ability to serve. The wrong answer is what no question at all begets. Cf. A. Bickel, The Least Dangerous Branch 103 (1962).

A close reading of the lengthy *voir dire* transcript [****60] leads me to conclude that the trial court's behavior is more easily explained by Murphy's appearance in the jury box at the end of a long day of questioning and the desire to finish jury selection expeditiously than by any definite impression on the part of the trial judge that Murphy was unqualified. But neither the trial court's eagerness to get the trial started, nor this Court's impatience with the progress of Darden's constitutional challenges to his [**2484] conviction and death sentence, see, *e.g.,* 473 U.S. 928, 929 (1985) (BURGER, C.J., dissenting [*205] from the grant of certiorari because 12 years had elapsed since Darden's conviction and sentence and no fewer than "95" judges had reviewed the case), [9] renders Murphy's [***173] exclusion justifiable or harmless.

[****61] III

Twice during the past year -- in *United States* v. *Young,* 470 U.S. 1 (1985), and again today -- this Court has been faced with clearly improper prosecutorial misconduct during summations. Each time, the Court has condemned the behavior but affirmed the conviction. Forty years ago, Judge Jerome N. Frank, in dissent, discussed the Second Circuit's similar approach in language we would do well to remember today: S

"This court has several times used vigorous language in denouncing government counsel for such conduct as [*206] that of the [prosecutor] here. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable. It means actual condonation of counsel's alleged offense, coupled with verbal disapprobation. If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it. For otherwise it will be as if we declared in effect, 'Government attorneys, without fear of reversal, may say just about what they please in addressing juries, for our rules on the subject are pretend-rules. If prosecutors win verdicts as a result of "disapproved" remarks, we will not deprive [****62] them of their victories; we will merely go through the form of expressing displeasure. The deprecatory words we use in our opinions on such occasions are purely ceremonial.' Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of this court -- recalling the bitter tear shed by the Walrus as he ate the oysters -- breeds a deplorably cynical attitude towards the judiciary" (footnote omitted). *United States* v. *Antonelli Fireworks Co.,* 155 F. 2d 631, 661, cert. denied, 329 U.S. 742 (1946).I

I believe this Court must do more than wring its hands when a State uses improper legal standards to select juries in capital cases and permits prosecutors to pervert the adversary process. I therefore dissent.

## References

21A Am Jur 2d, Criminal Law 748, 751, 752 [****63] ; 47 Am Jur 2d, Jury 289; 75 Am Jur 2d, Trial 233, 261

9 Federal Procedure, L Ed, Criminal Procedure 22:393-22:398, 22:405.5

5 Am Jur Proof of Facts 2d 267, Ineffective Assistance

---

[9] A public dissent from a grant of certiorari is extremely rare. Indeed, I know of no other recent case in which a Justice has dissented on the ground that the claims raised by the petitioner -- which at least four Justices must have found worthy of full consideration -- were meritless. See also *Ohio ex rel. Eaton* v.*Price,* 360 U.S. 246, 247, n. 1 (1959) (memorandum of BRENNAN, J.) (finding only one instance of such a dissent -- the extraordinary case of *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U.S. 937 (1952), where certiorari was granted prior to the Court of Appeals' judgment). The concurrence filed by THE CHIEF JUSTICE today, see *ante,* p. 187, to justify his dissent from the grant of certiorari in this case shows why. As JUSTICE BRENNAN persuasively explained in *Price,* a public dissent from a grant of certiorari poses dangers both to the actual workings of the adjudicatory process and to public respect for that process. 360 U.S., at 247-248. By reprinting his dissent in its entirety and emphasizing once again the number of times this Court has been asked to review Darden's claims, THE CHIEF JUSTICE suggests that he irrevocably had committed himself to rejecting those claims before he had received the benefit of the full briefing, oral argument, access to the record, and discussion of the issues by other Members of the Court that followed our grant of certiorari. To me, the fact that this Court has granted certiorari three times is hardly a reason for concluding Darden's claims are meritless, or that the undoubted interest in finality should outweigh our duty to ensure that Darden receives due process.

of Counsel

6 Am Jur Trials 873, Prosecution Summations; 30 Am Jur Trials 561, Jury Selection and Voir Dire in Criminal Cases

USCS, Constitution, 5th, 6th, and 8th Amendments

US L Ed Digest, Constitutional Law 839.5; Criminal Law 46.4, 46.6, 82, 83; Jury 38

Index to Annotations, Arguments of Counsel; Attorney or Assistance of Attorney; Capital Offenses and Punishment; Criminal Law; Due Process; Fair and Impartial Trial; Jury and Jury Trial

Annotation References:

Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed. 51 L Ed 2d 886.

Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L Ed 2d 886.

Propriety and prejudicial effect of prosecutor's [****64] argument to jury indicating his belief or knowledge as to guilt of accused. 41 ALR Fed 10; 88 ALR3d 449.

Modern status of rules and standards in state courts as to adequacy of defense counsel's representation of criminal client. 2 ALR4th 27.

Religious belief, affiliation, or prejudice of prospective juror as proper subject of inquiry or ground for challenge on voir dire. 95 ALR3d 172.

Beliefs regarding capital punishment as disqualifying juror in capital case--post-Witherspoon cases. 39 ALR3d 550.

---

End of Document